*HEARING DATE: FEBRUARY 8, 2011*

Sigmund S. Wissner-Gross
May Orenstein
Marek P. Krzyzowski
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel for Edward S. Weisfelner, as Litigation
Trustee of the LB Litigation Trust*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 09-10023 (REG) |
| LYONDELL CHEMICAL COMPANY, *et al.*, | |
| | Chapter 11 |
| Debtors. | |
| | |
| EDWARD S. WEISFELNER, AS | (Jointly Administered) |
| LITIGATION TRUSTEE OF THE | |
| LB LITIGATION TRUST, | |
| | |
| Plaintiff, | Adv. Pro. No. 09-1375 (REG) |
| | |
| v. | |
| | |
| LEONARD BLAVATNIK, *et al.*, | |
| | |
| Defendants. | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTIONS TO DISMISS COUNTS VI, VII, XIV AND XVIII.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

ALLEGATIONS OF THE AMENDED COMPLAINT ..................................... 3

I.  The Access Defendants ................................................................................ 3

II.  The GP ........................................................................................................... 6

STANDARD ........................................................................................................... 8

I.  Standard on a Motion to Dismiss ............................................................. 8

II.  Determinations Regarding Foreign Law ................................................ 8

III.  Nature Of Luxembourg Law ...................................................................... 9

ARGUMENT ....................................................................................................... 10

I.  Count VI States a Claim Under Luxembourg Law................................ 10

   A.  Count VI States a Claim Against the GP Managers ........................... 11

      1.  The Duties of the GP and the GP Managers ................................... 12

      2.  The GP Managers Are Liable Directly to LBI................................. 13

II.  Count VII States A Claim Under Luxembourg Law. ............................. 14

   A.  Tort Claims Under Luxembourg Law................................................... 15

   B.  Count VII is a Tort Claim Properly Pled in the Alternative to the Contract Claim. ....................................................................................................... 16

III.  Count XIV States A Claim Under Luxembourg Law.............................. 18

IV.  Count XVIII States A Claim..................................................................... 20

   A.  Count XVIII States a Direct Tort Claim Under Luxembourg Law Against These Defendants. ...................................................................................... 20

      1.  Fault ....................................................................................................... 21

      2.  Damage ................................................................................................. 22

      3.  Causal Link ........................................................................................... 22

B.  Count XVIII States a Claim Under New York or Delaware Law For Aiding and Abetting Against These Defendants. .................................................................. 22

V.  Currier's Arguments Regarding Substitution And Proper Service Are Without Merit. ........................................................................................................................ 25

A.  Currier Has Consented to Substitution.................................................................. 27

B.  Even if a Formal Motion for Substitution is Required, Dismissal Is Not the Proper Remedy. ....................................................................................................... 28

VI.  The Trustee Alternatively Should Be Permitted To Replead. ................................... 30

CONCLUSION................................................................................................................ 31

# TABLE OF AUTHORITIES

## CASES

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988)................................................................. 14, 24

*Anderson v. Republic Motor Inns, Inc.,*
    444 F.2d 87 (3d Cir. 1971)....................................................................... 27

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) ............................................................................... 8

*In re Churchill Mortgage Inv. Corp.,*
    256 B.R. 664 (Bankr. E.D.N.Y. 1992)....................................................... 8

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................. 8

*Foman v. Davis,*
    371 U.S. 178 (1962)................................................................................ 30

*Fraternity Fund v. Beacon Hill Asset Management,*
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)...................................................... 23

*Friedl v. City of New York,*
    210 F.3d 79 (2d Cir. 2000)........................................................................ 8

*Gotham Partners, LP v. Hallwood Relaty Partners, LP,*
    817 A.2d 160 (Del. 2002) .................................................................. 23, 24

*In re M. Fabrikant & Sons, Inc.,*
    394 B.R. 721 (Bankr. S.D.N.Y. 2008)...................................................... 31

*Kaubisch v. Weber,*
    408 F.3d 540 (8th Cir. 2005) .................................................................. 27

Meadows v. Hartford Life Ins. Co.,
    492 F.2d 634, 639 (5th Cir. 2007) .......................................................... 24

*N.F.L. Ins. v. B&B Holdings,*
    1993 WL 255101 (S.D.N.Y. July 1, 1993) ................................................ 9

*Nauman v. Rensselaer Polytechnic Institute,*
    No. 07-0740, 2010 WL 1257876 (N.D.N.Y. Mar. 26, 2010) ...................... 29

*Okolie v. Paikoff*,
   589 F. Supp. 2d 204 (E.D.N.Y. 2008) ....................................................................... 29

*Papasan v. Allain*,
   478 U.S. 265 (1986)...................................................................................................... 8

*Russell v. City of Milwaukee*,
   338 F.3d 662 (7th Cir. 2003) ...................................................................................... 29

*Saylor v. Bastedo*,
   623 F.2d 230 (2d Cir. 1980)........................................................................................ 28

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974)...................................................................................................... 8

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)........................................................................ 30

*Smith v. Thebaud*,
   258 F.R.D. 207 (E.D.N.Y. 2009) ............................................................................... 28

*Staggers v. Otto Gerdau Co.*,
   359 F.2d 292 (2d Cir. 1966)........................................................................................ 28

*Unicorn Tales, Inc. v. Banjeree*,
   138 F.3d 467 (2d Cir. 1998)........................................................................................ 29

## RULES

Fed. R. Civ. P. 6(b) ............................................................................................. 28, 29

Fed. R. Civ. P. 8(a)(2).............................................................................................. 8

Fed. R. Civ. P. 15(a)(2)............................................................................................ 30

Fed. R. Civ. P. 25(a) ................................................................................ 27, 28, 29, 30

Fed. R. Civ. P. 44.1............................................................................................... 8, 9

Fed. R. Bankr. P. 7008(a) ........................................................................................ 8

Fed. R. Bankr. P. 7015............................................................................................. 30

Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust (the "Trustee"), submits this Memorandum in Opposition (the "Opposition") to the motions of Defendants Leonard Blavatnik, Alan Bigman, Diane Currier, Philip Kassin, Lynn Coleman, Lincoln Benet, Peter Thorén, BI S.à r.l., Alex Blavatnik, Nell Limited, Access Industries Holdings LLC, Access Industries, Inc. and AI International (together, "Defendants") to Dismiss Counts VI, VII,  XIV and XVIII of the Amended Complaint.[1]

## PRELIMINARY STATEMENT

Basell AF S.C.A. ("Basell"), a Luxembourg company, acquired Lyondell Chemical Company in December 2007.  Within weeks, as a direct result of the acquisition, combined company LyondellBasell Industries AF S.C.A. ("LBI") descended into a liquidity crisis from which it never emerged.  The Amended Complaint asserts four claims under Luxembourg law against those who committed Basell to the Merger despite knowing the likely result, as well as those who lined up the financing that drove the Company into bankruptcy while hedging their bets by extracting over $1 billion from the liquidity-depleted Company along the way.  As set forth in the Amended Complaint, all of these defendants, whether nominally at Basell or Access, operated under the direction, and for the benefit, of Leonard Blavatnik, the individual who initiated the process and drove it to its doomed conclusion.

Defendants recently filed six motions to dismiss the Luxembourg claims ("Motions").  With the partial exception of one claim, however, in no case does any defendant dispute that the misconduct alleged is actionable under Luxembourg law.  Instead, every defendant advances various technical arguments as to why they in particular should be shielded from liability.  Each argument is without merit.

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the amended complaint filed by the Trustee on July 23, 2010 (the "Amended Complaint"). The "Company" refers to the legal entity that pre-Merger was named Basell AF S.C.A. and post-Merger was named LyondellBasell Industries AF S.C.A.

Management authority for pre-merger Basell was vested in the Luxembourg entity Basell AF GP S.à r.l. (the "GP"), but the managers of the GP argue that they are not liable under Count VI (mismanagement) because they are protected by corporate form, despite having ignored corporate form. Blavatnik and the other Basell defendants argue that Count VII (tort) must be dismissed because it is based on the same conduct as the claim for contractual relief, Count VI, ignoring that Luxembourg law allows contract and tort claims to be pled in the alternative. The individuals that approved € 315 million of improper distributions, further depleting LBI's estate, argue that Count XIV (improper distributions) must be dismissed because an action for the return of dividends can only be brought against a shareholder, ignoring that Count XIV is not such an action, but rather an action for damages against those responsible for the distributions. Finally, the defendants that secured the heavily-leveraged financing and extracted over $1 billion from the Company for the benefit of Blavatnik argue that because there is no action denominated "aiding and abetting" under Luxembourg law, Court XVIII (tort) must be dismissed, even though the count states a cause of action for direct tort liability against them.

All of these technical arguments fail. Moreover, even where defendants' arguments do not mischaracterize the Trustee's claims or omit from their analyses significant aspects of Luxembourg doctrine, they disregard the fundamental nature of Luxembourg corporate law. By comparison to the United States, reported caselaw is relatively sparse, the opinion of a scholar will at times carry more weight than a court decision, statutory law is broad and vague and decisions of courts are therefore necessarily highly fact-specific. Given a law of this nature, it is not surprising that the courts of Luxembourg do not employ a "motion to dismiss" stage. Liability simply cannot be determined without an examination of the facts.

Here, for the reasons set forth herein, the allegations pled support claims under Luxembourg law and the factual determinations necessary to resolve the claims must occur upon summary judgment or at trial. The Motions, which are without merit, are premature and should be denied.

## ALLEGATIONS OF THE AMENDED COMPLAINT

This action arises from the December 2007 acquisition of Lyondell Chemical Company ("Lyondell") by Basell AF S.C.A. ("Basell"), a Luxembourg entity, thereafter renamed LyondellBasell Industries AF S.C.A. ("LBI") (the "Merger"). Am. Compl. ¶ 1. The Merger was funded entirely with debt. *Id.* Within 18 months, as a direct result of the massive debt imposed upon LBI to finance the Merger, Lyondell's parent company and related entities filed for bankruptcy. *Id.* ¶ 2. Within months, LBI itself was added voluntarily. *Id.* The critical roles of (i) Access and certain of its affiliates, which secured and structured the Merger financing and related agreements and (ii) Basell AF GP S.à r.l. (the "GP"), which managed Basell during this period, insofar as relevant to the Motions, are set forth herein.[2]

## I.    The Access Defendants

Defendants Access, Access Industries, Inc., AI International, AI Chemical and Nell Limited undertook four roles without which the Merger could not have occurred.

First, Access secured the financing arrangements that enabled the Merger to proceed but ultimately dragged the Company into insolvency. Access lined up the lead bankers. Am. Compl. ¶ 185. Access directed the development of financing arrangements that relied entirely upon leverage, refusing to put any of its own capital into the deal. *Id.* ¶¶ 1, 213, 216, 312-314. Indeed, Merrill was sufficiently concerned about the amount of leverage Access planned to use

---

[2] This Memorandum also incorporates by reference the statements of facts in the Trustee's Opposition to the Motion of Nell Limited and Blavatnik to Dismiss Count II and its Opposition to the Motion of Lyondell Officers and Directors to Dismiss Count IV.

to finance the deal that it proposed an alternate arrangement under which Access would put $1-2 billion of its own equity into the deal; Access rejected the proposal as "wholly unacceptable." *Id.* ¶ 176. Access persisted with its insistence on this leverage-only structure despite its full knowledge before the Merger that LBI's combined leverage would be dangerously excessive, *id.* ¶¶ 177, 312, both in view of the Lyondell liquidity issues, *id.* ¶¶ 244, 289, and the forthcoming industry downturn. *Id.* ¶¶ 179, 234.

Second, Access manipulated Basell earnings projections in order to secure financing for the Merger. Access provided to Merrill multiple "adjusted" Basell earnings forecasts that ignored the forecast industry downturn and failed to reflect the sharp decrease in earnings that Basell would foreseeably experience. *Id.* ¶¶ 178-79. For example, one week before the Merger was agreed to, the projected Basell EBITDA for 2007 was increased from the $1,375 million figure in the existing projections to $1,675 million, and then a few days later abruptly increased to $1,905 million, 38.5% above the existing projections. *Id.* ¶ 178. 2008 projections were boosted by 25.7% and later years also boosted significantly. *Id.* As Access knew or should have known, Merrill did not subject these "updated" Basell earnings forecasts to independent analysis. *Id.* ¶ 179. These forecasts were then incorporated into the financial case for approval of the Merger. *Id.* ¶¶ 180, 196, 278. Access also recklessly accepted Lyondell earnings projections having performed due diligence that was at best perfunctory and in material respects nonexistent, and used the projections to inflate the purported valuation of Lyondell. *Id.* ¶¶ 190-193, 198-199. Then, after approval of the Merger Agreement, Access received from Lyondell financial results that fell below earnings projections by over 20%. *Id.* ¶¶ 221, 222. The revelation that Lyondell's earnings projections had been entirely misleading forced the issue of the Merger's viability into clear relief, and certain Access members suggested that Basell contact its attorneys

4

and consider its "options". *Id.* ¶¶ 223. Instead, under Blavatnik's direction, Access chose to forge ahead with the plan to finance the acquisition 100% from debt. *Id.* ¶ 225, 226. To avoid the fees and penalties that the banks were entitled to extract upon a failed syndication, *id.* ¶225, Access chose to "goose" the financials in order to help with the syndication effort, *id.* ¶¶ 225-229, developing projections that were unsupported by any reasoned analysis and inconsistent with industry forecasts, if not outright fraudulent. *Id.* ¶¶ 232-237. In addition, despite the massive leverage already imposed on LBI by the Merger, Access decided to roll Basell's pre-Merger irrevocable offer to purchase Berre L'Etang Refinery (the "Berre Refinery") from Royal Dutch Shell plc into the Merger financing, adding nearly $1 billion in additional liabilities. *Id.* ¶¶ 211, 212.

Third, Access and certain affiliates, acting as instrumentalities of Blavatnik and for his personal profit, and without regard for the capital needs of LBI, extracted $1.2 billion from the combined entities through the series of transactions characterized in the Amended Complaint as the "Toe-Hold" transactions. As set forth in further detail in the Trustee's Opposition to the Motion of Blavatnik and Nell Limited to Dismiss Count II, Blavatnik prior to the Merger had acquired, through his Delaware entity AI Chemical, a beneficial interest in nearly 10% of Lyondell's stock. *Id.* ¶¶ 3, 125-133. Upon the Merger, Blavatnik netted a personal profit in excess of $333 million upon receipt of the $1.2 billion of Merger Consideration payable in respect of the Toe Hold Position, thereby further diminishing LBI's estate. *Id.* ¶¶ 265-271.

Fourth, Access affiliate Nell Limited extracted further funding from the Company in the form of unreasonable transaction fees. Specifically, Nell Limited was awarded a $100 million "transaction fee," Am. Compl. ¶ 272, plus a $25 million "management fee." *Id.* ¶ 3.

In addition, Blavatnik-controlled Access affiliate BI S.à r.l., which held 99.99% of the shares of Basell *Id.* ¶33, approved €315 million of distributions in 2007, further worsening LBI's financial condition.  *Id.* ¶¶ 417-428.

Throughout all of the relevant events, Blavatnik operated Nell Limited, Access, Access Industries, Inc., BI S.à r.l. and AI Chemical as his alter egos.  *Id.* ¶ 34.

## II.    The GP

It is clear that Basell's decision to proceed with the Merger was a grave error.  But this is not merely a matter of hindsight.  Basell's management authority was vested in the GP, a Luxembourg entity, Am. Compl. ¶ 365, and throughout the entire period in which the Merger was considered, approved and prepared for closing, the GP Managers, including Bigman, Floor and Kassin, were fully involved in the planning and execution of the Merger strategy and, well before closing, aware of the likely result.

The GP Managers, acting at the direction of Blavatnik, pursued the Merger despite realizing early on that it was not in the best interest of Basell.  On July 11, 2010, Bigman, Kassin and Blavatnik received an email from Access CEO Lincoln Benet in which Benet reviewed the merger "Base Case" that was based upon inflated Basell and Lyondell earnings projections. Benet concluded that under those projections the equity owners would be "essentially working for the banks" and only if Lyondell materially outperformed the projections would the transaction make any sense.  *Id.* ¶ 181.  The next day, Kassin acknowledged that the transaction was not in Basell's interest, writing in an email that "My job is to sign this up . . . I will make it happen if I have to kill myself . . . I am trying to separate my two roles – one deal weasel who will get this signed up in record time . . . vs. Board member with fiduciary role for the shareholder . . . this one will be tough."  *Id.* ¶ 188.  Kassin later testified under oath that he found the $48 per share price "ludicrous" and could not vote in favor of the Merger consistent with his

fiduciary responsibility to Basell; he claimed that he voted against it as a member of a supervisory board of a Dutch Basell entity. *Id.* ¶ 205.[3]  Similarly, days before the Merger, GP Manager Bigman wrote to Blavatnik that a "flex financing" proposal made by Merrill was "another indication that we're on the edge here." *Id.* ¶ 177.

The Merger was approved on July 16, 2007. *Id.* ¶ 206.  Following approval of the Merger, the GP Managers continued to receive reports of the financial results relevant to the Merger.  On September 11, 2007, upon receiving Lyondell's emerging third quarter operating results and projected fourth quarter results, in which Lyondell missed the projections underlying the Merger by over 20%, Kassin and Bigman reacted with alarm. *Id.* ¶¶ 221-222.  Having studied the financials, Bigman wrote on September 24, 2007 that "Lyondell's shortfall is the number one problem we face—by a big margin." *Id.* ¶ 224.  However, under Blavatnik's direction, the GP Managers decided that the best course was to obscure these financial problems in order to facilitate the merger's closing.  Upon receipt of the increasingly-dire financials, *id.* ¶ 225, Kassin set out to "goose" the projections to achieve the financials that would allow financing of the merger to go forward. *Id.* ¶ 226.  As the Merger closing approached, the GP Managers were fully aware of the financial situation. *Id.* ¶ 250.  Nevertheless, the Merger closed on December 20, 2007. *Id.* ¶ 258.

---

[3] Basell was a party to the Merger Agreement and the Amended Complaint assumes that Kassin's approved of the Merger was in the capacity of a member of the Supervisory Board of Basell.  Am. Compl. ¶ 205.  Further analysis of documents produced in discovery indicates that  such approval may have been in his capacity as member of the supervisory board of the Dutch entity Basell Holdings BV.

## STANDARD

### I. Standard on a Motion to Dismiss

A complaint need only set forth "a short plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (as made applicable by Fed. R. Bankr. P. 7008(a)). Detailed factual allegations are unnecessary, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A complaint that states a plausible claim for relief will survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1950. Whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* In so doing, the court should also ascertain from counsel the factual claims it is and is not trying to make, so as to determine what is intended and not intended to be at issue. *See In re Churchill Mortgage Inv. Corp.*, 256 B.R. 664, 673 (Bankr. E.D.N.Y. 1992). Although a court is not bound to accept legal conclusions as true, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), the existence of legal conclusions in a complaint is not grounds for dismissal. *See Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000) (allegation that work release was revoked in retaliation was not conclusory where the complaint set forth a clear causal chain supporting the allegation).

### II. Determinations Regarding Foreign Law

Federal Rule of Civil Procedure 44.1 provides:

> "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Civil

> Procedure.  The court's determination must be treated as a ruling
> on a question of law."

Fed. R. Civ. P. 44.1.  Resolution of a pure question of foreign law can be appropriate at the

motion to dismiss stage.  *See N.F.L. Ins. v. B&B Holdings*, 1993 WL 255101 (S.D.N.Y. July 1,

1993).  Parties may submit, as here, the opinions of experts on the foreign law in question, which

the court may consider in reaching its determination.  *See N.F.L. Ins. v. B&B Holdings*, 1993 WL

255101 at *2.  However, as set forth below, because of the nature of the law of the particular

foreign jurisdiction applicable here, although the Court can rule regarding the legal principles

that apply, dismissal of the claims here at issue based upon such rulings is not possible at the

pleading stage.

## III.   Nature Of Luxembourg Law

Luxembourg law does not employ the procedural equivalent of a motion to dismiss stage:

> "[I]n the Luxembourg courts there is no equivalent to the 'motion
> to dismiss' stage found in U.S. courts.  Instead, a Luxembourg
> court will rule only after examining the facts."

Declaration of Professor Jacques Delvaux, dated November 22, 2010 ("Delvaux Decl.") ¶ 32.

Thus, "[l]iability generally cannot be ruled out without a full review by a court of all relevant

facts."   *Id.*

Moreover, by comparison to the United States, the courts of Luxembourg issue relatively

few decisions on issues of corporate law.  *Id.* ¶ 32.  The fact that there is no Luxembourg court

decision finding liability under a similar set of circumstances is therefore not instructive as to

whether under Luxembourg law liability might in fact lie in a particular case that is yet to be

adjudicated:

> "It is important to understand, in considering all of the Amended
> Complaint's counts under Luxembourg law, that the fact that no
> Luxembourg court decision supports liability in a particular case is
> not dispositive of the question.   Rather, because case law is
> limited, it is necessary to review statutes and other authorities

9

including legal scholarship to determine whether liability may be
possible."

*Id.* Moreover, because Luxembourg employs a civil law system, reported decisions interpreting
Luxembourg law are not binding. *See* Arendt Decl. at ¶ 50 ("While published court decisions
do have a certain authority . . they are not binding in respect of any future court decisions at
whatever level"). Furthermore, as defendants' foreign law expert concedes, the opinion of a
learned scholar may at times carry more weight than a court decision. *See id.* ¶¶ 49-50 ("it is
likely that a well reasoned position taken by a reputed scholar would prevail over the occasional
position adopted by a lower court").

Here, as set forth below, the Amended Complaint states plausible claims under
Luxembourg law. Applying Luxembourg law principles, these claims cannot be dismissed
without an evidentiary examination of the relevant facts. Liability here can only appropriately be
determined upon summary judgment or at trial, not now.

## ARGUMENT

## THE MOTIONS TO DISMISS SHOULD BE DENIED

**I. Count VI States a Claim Under Luxembourg Law.**

Count VI alleges that Blavatnik and GP Managers Bigman, Kassin and Floor violated
duties imposed upon them under Luxembourg law in connection with their management and
supervision responsibilities, by their conduct in ratifying and facilitating the Merger (and related
transactions).[4] Am. Compl. ¶¶ 363-373. These were the individuals responsible for committing
Basell to a transaction that they knew was not in its best interests, and who, upon becoming

---

[4] Count VI was also asserted against Baker, Shand, Duc, in their capacity as pre-Merger Supervisory Board
members. Upon evaluating the arguments solely regarding personal jurisdiction made by Baker, Shand and Duc, the
Trustee has elected to negotiate a stipulation with Baker, Shand and Duc dismissing those claims without prejudice,
tolling applicable the limitations period applicable thereto and providing for other relief. Counsel for Baker, Shand
and Duc has indicated that if such stipulation is not finalized today, the Trustee's time to oppose the motions to
dismiss of Baker, Shand and Duc is extended through November 30, 2010.

10

aware that the Lyondell earnings projections upon which the Merger was based were a sham, proceeded under Blavatnik's direction to "goose" the numbers and close the Merger with the heavy-leverage financing that drove the Company into bankruptcy.[5]  Am. Compl. ¶¶ 177, 181, 188, 205, 222-226, 250, 363-373.

There is no controversy that Count VI states a claim against Blavatnik and Kassin, both of whom did not move to dismiss the count.  For the reasons set forth herein, Count VI also states a claim under Luxembourg law against GP Managers Bigman and Floor.

### A.  Count VI States a Claim Against the GP Managers

Bigman and Currier (the executor of Floor's estate)[6] do not dispute that the misconduct alleged constitutes mismanagement under Luxembourg law.  They argue instead that they cannot be held directly liable to LBI, only to the GP.[7]  As set forth herein, this argument is without merit.

---

[5] Count VI also asserts a claim against Coleman in connection with his service on the Supervisory Board of Basell. Coleman argues that because he joined the Supervisory Board in March 2008, he cannot be liable in connection with his membership thereupon.  This argument is without merit.  As set forth in the Affidavit of Professor Delvaux, members of the Supervisory Board were required to exercise a broad power of supervision over the Company.  *See* Decl. ¶¶ 24-33.  The Amended Complaint alleges that after Coleman joined the Supervisory Board, the Company consummated the acquisition of the Berre Refinery, at a cost of an additional $600 million of funding taken out of the Merger Consideration, Am. Compl. ¶ 211-212; this was the acquisition that LBI's advisors at Goldman Sachs termed "morally wrong."  *Id.* ¶ 293.  Coleman may have an argument concerning causation and the limits of his ability to correct decisions already made in connection with the Merger, but that is an argument for summary judgment or trial, after a complete evidentiary record has been developed.

[6] Currier also argues that she must be released of all liability for these claims because (i) she has run out the time for her formal substitution for the late Richard Floor under Rule 25 and (ii) she was not properly served.  As set forth in Part V below, her argument is without merit.

[7] Bigman also argues that Count VI does not state a claim against him because it alleges only mismanagement of "LBI", which came into existence on December 20, 2007, but fails to allege that Bigman engaged in misconduct after December 20, 2007.  *See* Bigman Mot. at p. 3.  However, as the very first paragraph of the Amended Complaint makes clear, the Luxembourg entity now called LyondellBasell Industries AF SCA (i.e., LBI) was before the Merger called Basell AF SCA (i.e. Basell).  Am. Compl. ¶ 1.  The fact that Count VI refers to this entity by its current name rather than by two names is not a basis for dismissal.  The other defendants do not appear to share Bigman's confusion.

1.   The Duties of the GP and the GP Managers

Since its acquisition by Blavatnik, the Company has been a *société en commandite par actions* (an "SCA").   Under Luxembourg law, an SCA is a "partnership by shares" and is managed by a general partner who is also an unlimited shareholder.  Delvaux Decl. ¶ 12.  Under Luxembourg doctrine, the general partner has the same powers of management and owes to the SCA the same contractual duties under its mandate that a director owes to an *sociétés anonymes* (an "SA") under Article 59 § 1 of the Luxembourg law on commercial companies (the "Law").  *Id.* ¶ 12, 13.  In this case, the contractual mandate is confirmed by article 11 of Basell's Articles as of 13 October 2005, which provides:

> "*the manager is vested with the broadest powers to perform all acts necessary or useful for accomplishing the company's object. All powers not expressly reserved by law or by these Articles to the general meeting of shareholders or to the board of auditors fall within the powers of the manager.*"

*Id.* ¶ 12.  Imposed upon the general partner are the contractual duties:

> "(i) to act in the best interest of the company, (ii) to perform and respect the corporate object of the company and the provisions of the articles of association, (iii) to act competently, diligently and in good faith, (iv) to ensure that the interests of the company take precedence over their own personal interest and (v) of individual investigation and information.  Each action done or approved by a director must be in the best corporate interest of the company."

*Id.* ¶¶ 4, 11-13.  Here the general partner of the Company was the GP, a Luxembourg private limited liability company, *société à responsabilité limitée* (an "S.à r.l.").  Under Luxembourg law, the managers of an S.à r.l. owe to the S.à r.l. the same duties that a general partner owes to the SCA.  *Id.* ¶¶ 5, 12-13.  Therefore, the GP Managers owed to the GP the five duties enumerated above, and the GP in turn owed those same duties to the Company.

12

2.    The GP Managers Are Liable Directly to LBI

Where an S.à r.l., as general partner of an SCA, engages in mismanagement, the SCA

may bring a claim against the S.à r.l.  Delvaux Decl. ¶ 15.  Defendants argue that this is the end

of the analysis and that the Company, as an SCA, may only recover for mismanagement against

the GP.   *See* Bigman Mot. at 3; Currier Mot. at 9-12.   As defendants' expert puts it, "the

Luxembourg Company Law does not allow the Trustee to disregard the business form of the

general partner, Basell GP, by suing Mr. Floor or Mr. Bigman for actions they allegedly took in

their alleged capacity as a manager of the S.C.A."  Prum Decl.  ¶ 82.

There is more to the analysis, however, than defendants' expert suggests.  Where a legal

entity serves as general partner of an SCA, that entity "must appoint a natural person as

permanent representative to accept civil liability."  Delvaux Decl. ¶ 16-17.  Such representative

"shall be subject to the same conditions and shall incur the same civil responsibility with respect

to the management duties of the S.à r.l. and of the SCA through the S.à r.l. as if it fulfilled such

duty in its own name and for its own account."  *Id. at 16.*

It appears from public documents that the GP failed to appoint such a permanent

representative, a responsibility that lies with its managers.  *Id.* ¶¶ 17-18.  While the fact of this

failure and the circumstances surrounding it cannot be resolved on the pleadings, the import of

Luxembourg's requirement that a personal representative be appointed is that if such

appointment were not made, the GP Managers would become personally liable to the Company

in place of such personal representative.  Specifically, if a permanent representative was not

appointed, the GP Managers may be found liable under article 59 §2 of the Law directly to the

Company:[8]

> "[B]ecause of the failure to appoint a permanent representative, the
> managers of the S.à r.l. acting as GP may under 59 §2 of the Law
> be held jointly and severally liable directly to the GP or towards
> third parties (the Company being a third party) for any damages
> resulting from the violation of the Law or the articles of the GP. . .
> .
>
> [B]ecause of the failure to appoint a permanent representative,
> each of the managers of the GP may be considered as permanent
> representative and may be held personally liable for the
> mismanagement by the GP in the scope of its management duties
> of the SCA in accordance with articles 51bis and 59 §1 of the
> Law."

Delvaux Decl. ¶ 20-21.   The GP Managers' joint and several liability may be "for the full

amount of damages for harm to the GP or to third parties (including the Company) caused by the

managers of the GP's violation of the Law."   *Id.* at 20.   Defendants' conclusion that direct

liability of the GP Managers to the Company is impossible therefore ignores relevant provisions

of Luxembourg law; when those provisions are considered, defendants' argument for dismissal

on the pleadings fails.

Count VI therefore states a claim against Bigman and Currier under Luxembourg law.

## II.    Count VII States A Claim Under Luxembourg Law.

Count VII alleges that Blavatnik, Benet, Coleman and GP Managers Bigman, Kassin and

Floor, through all of their misconduct related to the Merger and related transactions, harmed LBI

and are liable to it in tort under Luxembourg law.[9]   Am. Compl. ¶¶ 374-378.   Defendants argue

---

[8] That Count VI enumerates article 59 §1 of the Law but not 59 §2 is not a grounds for dismissal.  *See Albert v. Carovano*, 851 F.2d 561, 571 n.2 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters.").

[9] Count VII was also asserted against Baker, Shand, Duc, in their capacity as pre-Merger Supervisory Board members.  *See* n.4, *supra*.  The Trustee's response to Coleman's argument regarding joining the Supervisory Board after the Merger closed is addressed in footnote 5, *supra*, and the same response applies regarding the role of Benet

that the count should be dismissed because it improperly mixes tort and contract causes of action and fails to allege "extra-contractual" harm, such that it is merely duplicative of Count VI.[10]  *See* Access Mot. to Dismiss Counts VII, XIV and XVIII at 7-8.   This argument is without merit.

### A.  Tort Claims Under Luxembourg Law

Under article 1382 and 1383 of the Luxembourg Civil Code, liability in tort may be found as against any person where a plaintiff can establish "fault, the damage and a causal link between the fault and the damage."  Delvaux Decl. ¶ 38-39.  Under these provisions, a manager or director of a *sociétés anonymes* (an "SA"), SCA or S.à r.l. may be held liable towards third parties for harm resulting from for any acts undertaken on behalf of the corporate entity.  *Id.* ¶ 37.  In addition,

> "[a]n action under article 1382 or 1383 of the Luxembourg Civil Code may also be enforced by the company itself against the manager for harm to the company, but only where the acts or omissions of a manager do not constitute a purely contractual fault, i.e. do not constitute a mismanagement fault or a violation of the company's articles of association or of the Law."

*Id.*  ¶¶ 38; *see also id.* 37, 40.  Therefore, direct tort liability to the Company is possible where defendants engage in "extra-contractual" acts, i.e., acts that do not constitute a mismanagement fault or a violation of the company's articles of association or of the Law.

---

and others who joined the Supervisory Board upon the Merger's closing.  Aside from Coleman, those others are also liable in connection with conduct outside of their Supervisory Board activities – Kassin and Floor as GP Managers, for example, and Benet in connection with his misconduct as Access CEO.

[10] Two Count VII defendants also repeat arguments made in favor of dismissal of Count VI.  Bigman and Currier argue that there can be no direct liability of the GP Managers to LBI; Currier argues that the claims must be dismissed under Rule 25 and for failure to properly serve her.  Both of these arguments are addressed by Part II of this Opposition, regarding Count VI of the Amended Complaint.

**B.  Count VII is a Tort Claim Properly Pled in the Alternative to the Contract Claim.**

Defendants argue that Count VII is based upon the same alleged misconduct that gives rise to the claim based upon contractual duties (Count VI) and therefore must be dismissed because under Luxembourg law tort liability may not be imposed for actions that violate contractually-imposed duties.[11]  As the Access defendants frame the issue, the Trustee "has not pleaded any fault separate from the alleged breach of the duty of case" or "any injury separate from the one supposedly stemming from that alleged breach of the duty of care."  *See* Access Mot. to Dismiss Counts VII, XIV and XVIII at 7.

Defendants' argument ignores a concept familiar to litigators both in America and in Luxembourg:  pleading in the alternative.  While it is correct that a Luxembourg court will not, in rendering a final judgment, impose contractual and tort liability upon a defendant for the same act, a determination of which form of liability is appropriate for which act would generally not be possible at a motion to dismiss stage (if Luxembourg employed such a stage), for the simple reason that a defendant that owes contractual duties may nevertheless be liable in tort for acts committed outside the scope of his contractual relationship.  *Id.* ¶¶ 40-42.  Thus, in the courts of Luxembourg, a plaintiff may assert both a contractual mismanagement claim and in the alternative, a claim for tort liability, both arising out of the same conduct:

> "Even though there exists under Luxembourg law a principle in civil liability not to mix contractual liability and extra-contractual liability, it remains possible for third parties, for wrongful acts that

---

[11] Defendants' further argument that Count VII is both a tort and contract claim is belied by the heading of the count—"Tort Claim Under Luxembourg Law."  Am. Compl.  ¶¶ 374-378.  Moreover, the argument that the mixing of contract and tort requires dismissal relies upon paragraph 44 of the affidavit of Mr. Arendt, but a review of that paragraph indicates that he is simply restating defendants' primary argument, that a plaintiff may not plead a tort claim based upon facts that give rise to a contract claim:

"[I]t is my opinion that Luxembourg courts would dismiss Count VII due to the mixing of contract and tort claims. At a minimum, Luxembourg courts would dismiss any claims of tort liability against those who were subject to contractual responsibilities and against whom a contractual action might lie."  Arendt Decl. ¶ 44.

> cause harm to them, to invoke, first the contractual liability and in
> the alternative, extra-contractual liability. The movant may plead
> the contract and tort causes in the alternative, enumerating in its
> complaint the different causes of actions and their legal basis. The
> extra-contractual liability is residual."

*Id.* at 41. The court will not accept the characterization of contractual relationships in the pleadings but rather will "review the facts and exercise its independent judgment as to the existence and scope of a contractual relationship." *Id.* ¶ 43. The court may conclude that liability lies for contractual mismanagement only, or for tort only, or that certain acts give rise to contractual liability and others lie outside the scope of the contractual mandate and give rise to tort liability. *Id.* ¶ 42.

Here, the Court has of course not yet determined whether defendants are liable on a contract theory under Count VI. Indeed, Defendants have presented arguments with respect to Count VI regarding the purportedly limited scope of the contractual duties they owed to Basell and other entities. *See* Part II, *supra.* The scope of Defendants' contractual duties the particular contractual arrangements to which they were subject, as well as the specifics of the misconduct alleged, are factual issues that preclude dismissal of these tort claims on a motion to dismiss. After the scope of the contractual duties has been determined and the specifics of the conduct proven, the Court will be able reach a determination as to which acts fall within the scope of contractual duties and which fall outside, i.e. constitute extra-contractual acts.

At that time, the Court could conclude that certain conduct supports liability in contract under Count VI and not liability under Count VII, but that other conduct constitutes extra-contractual action that supports tort liability. For example, the Court might find that a decision by a manager of the GP to vote in favor of the Merger supports liability under Count VI rather than Count VII, but that the Blavatnik's successful campaign to use the Basell and Access entities under his control to drive the Merger through at any cost, or the extraction by him and

entities under his control of $1.2 billion from LBI's estate through the Toe-Hold Payments, or the decision of defendants to willfully ignore the true financial conditions surrounding the Merger, Delvaux Decl. ¶ 45, constitute extra-contractual acts giving rise to tort liability. The determination as to which among the multitude of alleged bad acts are "extra-contractual" is not proper at this stage. Counts VI and VII are properly pled in the alternative under Luxembourg law and Defendants' motion to dismiss Count VII should therefore be denied.

### III.   Count XIV States A Claim Under Luxembourg Law.

Count XIV alleges that Blavatnik, GP Managers Bigman, Kassin and Floor, BI S.à r.l., Alex Blavatnik, Thorén and Baker participated in effecting €315 million of distributions during the year 2007 in a manner that violated the provision of Luxembourg law governing distributions, thereby causing harm actionable under Luxembourg law.[12]  Am. Compl. ¶¶ 417-428.

Blavatnik and Kassin do not move to dismiss the count.  No defendant disputes that the distributions failed to comply with the relevant provisions of Luxembourg law.  Defendants Alex Blavatnik, Peter Thorén and Currier argue that Count XIV must be dismissed because the managers of BI S.à r.l. cannot be held liable directly to LBI for recovery of the distributions under Luxembourg law (and, for the purposes of analogy, U.S. law).[13]  Bigman and Currier further argue that recovery, in any case, would only be permissible against a shareholder of Basell, which Bigman and Floor were not.[14]

However, Count XIV is not, as defendants assume for the purposes of their analyses, a claim for the return by shareholders of an improper distribution.  Rather, it seeks damages from

---

[12] Regarding the claims against Baker, Shand and Duc, *see* footnote 4, *supra*.

[13] BI S.à r.l. argues that this Court cannot exercise personal jurisdiction over it.  As set forth in the Trustee's Opposition to BI S.à r.l. Motion to Dismiss Counts XIV and XIX, this argument is without merit.

[14] Currier repeats her arguments regarding Rule 25 and proper service, addressed in Part V below.

all persons whose wrongful participation in the approval and making of the distributions resulted in harm to the Company. Those damages are sought articles 59 § 2, 60bis-16 of the law, as well as articles 1382 and 1383 of the Luxembourg Civil Code, the latter of which broadly provide for liability for tortious conduct. Under articles 1382 and 1383, the particular corporate position held by a defendant that caused the harm is not determinative of liability:

> "I understand that defendants argue that the Company may not recover directly from BI S.à r.l's managers. However, my understanding is that the Company does not seek a simple reimbursement of the amounts distributed but rather damages under articles 59 §2 and 60bis-16 of the Law and articles 1382 and 1383 of the Luxembourg Civil Code, from persons who have wrongfully participated in the decision to approve the distributions in breach of Luxembourg law. I am therefore of the opinion that the allegations supported in the Complaint, if true, provide basis for a claim under Luxembourg law."

Delvaux Decl. ¶ 57. Indeed, defendants' expert concedes as to tort liability that the question is instead whether a defendant "had a personal involvement, and had committed a relevant wrongdoing, capable of triggering their liability in tort." Arendt. Decl. ¶ 46. The Amended Complaint alleges involvement by these defendants in the decision to approve these distributions. *See* Am. Compl. ¶¶ 417-428. During 2007, Basell distributed an aggregate of €315 million to its shareholders BI S.à r.l. and the GP. *Id.* 418. Each distribution was proposed by the GP and approved by managers of BI S.à r.l. and of the GP. *Id.* 419. These distributions, which were initiated by Blavatnik, did not comply with Luxembourg law and, as was foreseeable by Blavatnik, the GP Managers, S.à r.l. and its managers, they further weakened the already liquidity-starved Company and contributed to its demise. *Id.* 423, 424, 425, 426. These allegations adequately state a claim under Luxembourg law, and any further particulars of these defendants' actions with regard to the distributions must be developed in discovery and addressed at summary judgment or trial.

19

Count XIV therefore states a claim under Luxembourg law.

## IV.   Count XVIII States A Claim.

Count XVIII asserts a tort claim against defendants Nell Limited, Access, Access Industries, Inc., AI International and AI Chemical arising out of their conduct in financing and facilitating the Merger (and related transactions).  Am. Compl.  ¶¶ 447-452.  As set forth below, these are the defendants that secured the financing that crushed the Company.  To secure that financing, they manipulated financial projections.  To hedge their risk, the extracted over $1 billion from the Company.

AI Chemical does not move to dismiss the count.  Defendants Nell Limited, Access, Access Industries, Inc. and AI International argue that the count should be dismissed because (i) there is no claim for aiding and abetting under Luxembourg law, (ii) the count does not adequately allege a direct tort violation under Luxembourg law, (iii) even under state law the count does not adequately plead aiding and abetting liability and (iv) the count fails to give adequate notice to allow a response.  Defendants' arguments are without merit. Count XVIII states a direct tort claim against these defendants under Luxembourg law.  If the Court were to conclude that the conduct engaged in by defendants in connection with the Merger and its related transactions was subject to New York, Delaware or Texas law, rather than that of Luxembourg, Count XVIII would state a cause of action under that law against these defendants for aiding and abetting breach of fiduciary duty.

### A.  Count XVIII States a Direct Tort Claim Under Luxembourg Law Against These Defendants.

Defendants argue that there can be no liability under this count because (i) there is no tort cause of action for "aiding and abetting" under Luxembourg law and (ii) the count does not state a claim for direct tort liability.  *See* Access Defendants' Motion to Dismiss Counts VII, XIV and

XVIII at 13.  This argument is without merit, because while Luxembourg law does not include claims denominated as "aiding and abetting," the allegations upon which this count is based describe conduct for which the defendants may be held liable for primary tort liability under the general statutes governing tort actions under Luxembourg law.  The relevant Luxembourg statutes, article 1382 and 1383 of the Luxembourg Civil Code, are identified in the caption to Court XVIII.  Under such provisions, liability in tort may be found as against any person based on fault, damage and a causal link between the fault and the damage.  Delvaux Decl. ¶ 59.  Each element is amply pled here.

   1. Fault

Defendants Nell Limited, Access, Access Industries, Inc., AI International and AI Chemical committed multiple and serious faults by their participation in the structuring, financing and approval of the Merger and related transactions.  In particular, these defendants:

(i) secured and structured financing arrangements for the Merger that relied upon excessive leverage, which allowed the Merger to go forward but left the Company with a massive debt burden that led to insolvency, and allowed Basell to proceed to closing  despite knowing even before the Merger that that the Company was inadequately capitalized to survive a downturn in the industries in which it operated, Am. Compl. ¶¶ 1, 185, 244, 289, 317;

(ii) recklessly and knowingly participated in the successive upward "adjustment" of the Basell earnings projections upon with the Merger was based, and then, after learning that Lyondell's earnings projections were a sham, set out to "goose" the combined company's financials in order to secure the Merger financing, *id.* ¶¶ 178-180, 190-93, 196, 198-99, 221-222, 225-229, 232-237, 278;

(iii) facilitated the removal of over $1 billion in capital from the already liquidity-depleted Company through the series of transactions characterized in the Amended Complaint as

the "Toe-Hold" transactions, which were structured for the benefit of Blavatnik and designed to hide from the public the nature of the transfers and to shield the transfers from tax liability; *id.* ¶¶ 3, 125-133, 265-271 and

(iv) extracted further funding from the Company in the form of $125 million in purported "advisory" and "management" fees paid to Nell Limited. *Id.* ¶¶ 3, 263, 272.

All of these actions could be found to constitute a fault under applicable Luxembourg law. Delvaux Decl. ¶¶ 60-62.

### 2. Damage

The damage element is satisfied by the consequences to the Company which included a severe liquidity crises which, unresolved, resulted in bankruptcy. Delvaux Decl. ¶ 63.

### 3. Causal Link

The causal link element is satisfied by the factual allegations that the Merger led directly to the bankruptcy and would not have occurred without (i) financing arrangements secured by these defendants and (ii) defendants' knowing participation in development of inflated financial projections on which basis the Merger financing was approved. Delvaux Decl. ¶ 64. The further depletion of LBI's estate in the form of the Toe-Hold payments and transaction fees contributed to the Company's condition.

Count XVIII therefore states a direct tort cause of action against these defendants under Luxembourg law.

### B. Count XVIII States a Claim Under New York or Delaware Law For Aiding and Abetting Against These Defendants.

If the Court were to conclude that defendants' conduct was governed by the law of New York, Delaware or Texas, rather than Luxembourg, law, Count XVIII would state a claim against these defendants.

22

Under New York law, to establish aiding and abetting of a breach of duty, plaintiff must prove (i) the existence of the breach, (ii) defendant knowingly induced or participated in the breach and (iii) that plaintiff suffered damages as a result of the breach. *See Fraternity Fund v. Beacon Hill Asset Management,* 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007). Here, a primary breach of fiduciary duties owed to LBI is alleged, including in Count VI. There can be no question of defendants' knowing inducement or participation in the breach, because the Access planned the Merger hand-in-glove with Basell and understood that it was not in Basell's interest, Am. Compl. ¶¶ 98-143, 169-257, with Access executive Kassin even writing that he was unsure how to reconcile his work on behalf of Access to sign up the Merger with his fiduciary responsibilities to Basell. *Id.* ¶ 188 ("I am trying to separate my two roles — one deal weasel who will get this signed up in record time . . . vs. Board member with fiduciary roles for the shareholder . . . this one will be tough"). Finally, there is no question regarding damage—LBI is in bankruptcy as a result of the breaches alleged. *Id.* ¶¶ 363-373.[15] This is a textbook aiding and abetting claim.

The result under Delaware law would be the same. In Delaware, to establish liability for aiding and abetting a breach of fiduciary duty, a plaintiff must prove (i) the existence of a fiduciary relationship, (ii) a breach by the fiduciary, (iii) knowing participation in the breach by a non-fiduciary and (iv) damages resulting from the concerted action of the fiduciary and non-fiduciary. *Gotham Partners, LP v. Hallwood Relaty Partners, LP*, 817 A.2d 160, 172 (Del. 2002). The first two elements are alleged in Count VI. "Knowing participation" is satisfied by

---

[15] Defendants also reference the standard for aiding and abetting fraud under New York law, including the requirement that plaintiff establish that defendant "provided substantial assistance to advance the commission of the breach." *See* Access Defendants' Motion to Dismiss Counts VII, XIV and XVIII at 15. While alleging "substantial assistance" establishes the "knowing participation" element referenced above, whether the requirement is characterized as "knowing participation" or "substantial assistance," *see Fraternity Fund,* 479 F. Supp. 2d at 360, there is no question that it is satisfied by the allegations here: as set forth in Part IV-A above, Access performed four critical roles without which the Merger would not have occurred.

the months of joint work performed by Access and Basell in manipulating financials, approving the Merger, securing financing and closing the Merger.  Am. Compl. ¶¶ 98-143, 169-257.  As set forth in Part IV-A above, damages resulting from the concerted action are present here, where the Company was driven into bankruptcy as a direct result of the coordinated efforts of Access with those who breached their fiduciary duties to LBI.

The result under Texas law would be the same.  In Texas, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."  *Meadows v. Hartford Life Ins. Co.*, 492 F.2d 634, 639 (5th Cir. 2007).  "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship."  *Id.*  Again, fiduciary relationships are alleged here, including in Count VI, these defendants knew of those relationships (with Kassin himself writing of his struggle with regard to his fiduciary duties to Basell) and awareness of participation is established by the performance, in close coordination with those who breached duties, of the four critical roles without which the Merger would not have occurred, set forth in Part IV-A above.[16]

Therefore Count XVIII would state a claim under New York, Delaware or Texas law.

---

[16] Defendants also argue that Count XVIII (i) fails to cite the specific state law upon which it seeks relief, (ii) fails to explain how the particular Luxembourg statutes give rise to liability and (iii) fails to articulate specific factual allegations, and therefore is too vague to give notice and must be replead with greater specificity.  First, a complaint need not specify the particular statutes and law it relies upon.  *See Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters.").  Moreover, Count XVIII incorporates the entirety of the Amended Complaint's factual allegations, which amply set forth and detail these defendants' extensive participation in the "structuring, financing and approval" of the Merger as referred to under Count XVIII.  Although the Trustee believes this vagueness argument is without merit, if the Court concludes otherwise the Trustee does not oppose the relief of being directed to replead Count XVIII.

**V.  Currier's Arguments Regarding Substitution And Proper Service Are Without Merit.**

Currier argues that the claims asserted in the Amended Complaint against the Estate of Richard Floor must be dismissed with prejudice because Currier was not properly substituted for the late Richard Floor under Rule 25.[17]  Currier is not entitled to this relief and her motion should be denied.

The procedural history relevant to Currier's substitution argument is set forth in the Trustee's November 16, 2010 Motion for Amendment of the Caption or Substitution.  That history is summarized briefly herein.

The original Complaint in this action, filed on July 22, 2009 by the Official Committee of Unsecured Creditors (the "Committee"), asserted a mismanagement claim and a tort claim against Richard Floor, a manager of the GP and member of the Supervisory Board of LBI.  Floor was represented in the action by Goodwin Procter LLP, which actively defended him against the claims asserted.

Following the settlement of claims against the Financing Party Defendants, the Trustee of the newly-created LB Litigation Trust on July 23, 2010 filed an amended complaint asserting claims against various non-settling defendants.  Among those claims were the mismanagement and tort claims, asserted now against the executor of Floor's estate.  Floor had died prior to the filing of the amended complaint, but because the Middlesex County probate court docket (and staff) indicated that the executor's appointment had not yet been made official, the Trustee identified her in the caption as the "Legal Representative of the Estate of Richard Floor (deceased)."

---

[17] Currier also argues that the claims against her should be dismissed because she was not properly served with a summons and Amended Complaint. This argument is now moot because the Trustee served a Summons and Amended Complaint upon her on October 7, 2010.

Before filing the amended complaint, the Trustee had provided multiple drafts thereof to Goodwin Procter, now counsel to Currier, each naming the "Legal Representative of the Estate of Richard Floor (deceased)" and also referencing Currier by her name, pending the official appointment. Although Currier presumably knew at this point that, notwithstanding the public docket, her appointment had become official, her counsel did not inform the Trustee.

Indeed, counsel for Currier raised no issue whatsoever with the Trustee relating to the manner in which she was named in the draft amended complaint at any point before filing. Moreover, when the Court on July 14, 2010 held a status conference concerning the draft amended complaint and solicited from defense counsel issues regarding the draft so that the Trustee could "put [its] best pleading foot forward," counsel for Currier participated but identified no concerns regarding Currier. Currier through counsel also negotiated the July 21, 2010 case management order, which included her as a defendant, and consented to its terms, including the filing of the Amended Complaint, all without raising any issue regarding the manner in which she was named.

September 24, 2010, Currier filed her motion to dismiss, arguing *inter alia* that notwithstanding her months of participation in this Action, her consent to the current case management order and the filing of the Amended Complaint (identifying the "Estate of Richard Floor" as a defendant) she has never been properly before the Court, because she was not formally substituted under Rule 25. According to her, by remaining silent for months about the fact of her official appointment as executor (which was not publicly docketed until over three months after it occurred), she has run out the clock under Rule 25 and the Rule now requires that the Court release her from all liability for claims in the Amended Complaint by granting her a dismissal with prejudice.

26

Rule 25 does not require this result.  Currier's motion should be denied because (i) by her actions she has consented to substitution and (ii) even if her actions do not constitute consent, the proper remedy is not dismissal but formal substitution.

### A.  Currier Has Consented to Substitution.

Rule 25(a) provides for the substitution of a new party when the original party is deceased.  Fed. R. Civ. P. 25(a).   Here, Currier's consent to (i) the filing of an Amended Complaint that named the "Legal Representative of the Estate of Richard Floor (deceased)" as a defendant and referenced Currier by name as the presumed estate representative, following her counsel's review of several drafts of that complaint and participation in a status conference thereupon and (ii) the July 21, 2010 case management order naming "Estate of Richard Floor" as a defendant, should be deemed to constitute Currier's consent to her substitution for Floor, obviating the need for any further motion, as well as waiver of any objection based on untimeliness.  *See Anderson v. Republic Motor Inns, Inc.*, 444 F.2d 87, 88 (3d Cir. 1971) (holding that a stated intention to substitute a deceased party in a pre-trial memorandum was "sufficient to constitute the motion contemplated by F.R.Civ.P. 25(a)(1)").

Currier relies upon an Eighth Circuit case, *Kaubisch v. Weber*, 408 F.3d 540 (8th Cir. 2005), for the proposition that the filing of an amended complaint identifying the legal representative of a deceased party cannot satisfy the requirements of Rule 25.  *Kaubisch*, however, does not support that proposition.  In *Kaubisch*, the plaintiff proposed to defendants that they stipulate to an untimely amendment of the complaint, but every defendant refused to consent.  Under such circumstances, the court held that the plaintiffs' argument, which was in essence that the substitution had occurred with consent or that objections had been waived, was "unsupported by the record." *Id.* at 542.   Here, by contrast, after declining at the status conference to indicate any problem with the amended complaint, Currier consented to its filing

and consented to multiple case management orders that included her as a defendant. Currier's actions constitute consent to substitution. Likewise, every other party to these proceedings had notice of the circumstances by virtue of receipt of the draft Amended Complaint and no party objected.

### B. Even if a Formal Motion for Substitution is Required, Dismissal Is Not the Proper Remedy.

Even if the Court finds that Currier's substitution as the proper party upon the death of Floor was not be achieved through her consent to the filing of an amended complaint identifying the fiduciary of his estate as the proper party, the Trustee respectfully submits that the proper remedy is not dismissal of the claims but the granting of the Trustee's November 16, 2010 Motion to Amend the Caption or for Substitution.

Rule 25 "was not intended to act as a bar to otherwise meritorious actions." *Smith v. Thebaud*, 258 F.R.D. 207, 210 (E.D.N.Y. 2009); *see also Staggers v. Otto Gerdau Co.,* 359 F.2d 292, 296 (2d Cir. 1966) (same). Rather, the purpose behind the rule is to provide an estate with finality, so that assets may be distributed and to allow the estate to be wound up. *Saylor v. Bastedo*, 623 F.2d 230, 237 (2d Cir. 1980). Moreover, "[n]otwithstanding the mandatory language in Rule 25(a), the district court has considerable discretion in addressing the timing of substitution in the event of the death of a party." *Thebaud*, 258 F.R.D. at 208-09. A party may make a motion for substitution after the 90 days provided for in Rule 25(a) has expired, where it can demonstrate "excusable neglect," pursuant to Fed. R. Civ. P. 6(b)(2). *See Id.* at 209 (granting motion for substitution after 90-day period had expired based on excusable neglect). Excusable neglect is intended to be "elastic" in its application and exists when a party can demonstrate both "good faith and a reasonable basis for noncompliance." *Id.* Extensions of time

28

for seeking the substitution of a party are liberally granted where excusable neglect is demonstrated and the opposing party does not suffer prejudice. *Id.*[18]

Under these standards, it is substitution rather than dismissal that is warranted here.

First, Currier has been on notice of the claims against her for several months and would suffer no prejudice by remaining a defendant. Her counsel served as counsel for Floor and was aware that the claims against him had not been settled and that a trustee was to be appointed to pursue the non-settling claims. After the Trustee was appointed, Currier, through counsel, continued to participate actively in the litigation, consenting to case management orders and participating through counsel in the July 14, 2010 status conference.

Second, Currier and her counsel chose to remain silent for months regarding the fact of her appointment in order to preserve her right to file this wasteful motion. In particular, Currier and her counsel chose not to inform the Trustee or the Court at any point while Rule 25's 90-day clock was running that she had been formally appointed executor in April, a fact that was not made public on the probate court docket until several weeks after the 90 days had run. Then, during the subsequent period when draft complaints noting that the appointment had not been confirmed were provided to Currier's counsel, and the Court held a status conference and inquired regarding pleading deficiencies, Currier raised no issue.

Third, under the circumstances, the Trustee's omitting to file a formal motion for substitution was, at worst, excusable neglect. The Trustee, appointed after the 90-day period had

---

[18] The cases cited by Currier are not to the contrary. In *Unicorn Tales, Inc. v. Banjeree,* 138 F.3d 467 (2d Cir. 1998), the court rejected plaintiff's arguments in support of an extension and affirmed the lower court's dismissal under Rule 25. *Id.* at 470. In so ruling, the court explicitly noted that a motion may be brought under Rule 6(b) to extend the time to substitute but that the plaintiff had failed to do so and had accordingly had waived its rights. In *Russell v. City of Milwaukee,* 338 F.3d 662 (7th Cir. 2003), plaintiff ignored a stipulated-to deadline for filing a motion for substitution and the court found that he had not demonstrated excusable neglect. In *Nauman v. Rensselaer Polytechnic Institute,* No. 07-0740, 2010 WL 1257876 (N.D.N.Y. Mar. 26, 2010) and *Okolie v. Paikoff,* 589 F. Supp. 2d 204 (E.D.N.Y. 2008), no party argued that extension of the time to move for substitution was proper and there was therefore no analysis whatsoever of whether excusable neglect had been established.

begun to run, made repeated and diligent good-faith efforts to confirm the identity of the Executor. In particular, his counsel made numerous inquiries of the probate court, and was either told that the Executor's appointment was not official or received no response at all. As the probate court later informed Trustee's counsel, the Executor's appointment was not made public on the docket until July 23, 2010, several weeks after Rule 25's 90-day clock had expired. The Executor, of course, knew her appointment had been made official in April, but remained silent.

The prejudice to the Trustee in releasing timely, meritorious claims against a defendant following this sequence of events would be considerable. Currier is simply not correct when she argues that she has managed to run out the clock under Rule 25 and is now free of all liability. To credit her argument and grant her motion would indeed be to use Rule 25(a) "as a bar to otherwise meritorious claims," precisely what the caselaw does not allow. Her motion to dismiss should be denied.

## VI.   The Trustee Alternatively Should Be Permitted To Replead.

If this Court determines that the Amended Complaint's pleading of any of the claims under Luxembourg law is insufficient, the Trustee requests leave to re-plead to cure such deficiencies. Rule 15(a) of the Federal Rules of Civil Procedure, applicable to adversary proceedings pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that "when justice so requires," leave to amend should be "freely granted." *See* Fed. R. Civ. P. 15(a)(2). Under Rule 15(a), leave to amend a complaint should not be denied absent undue delay, bad faith, undue prejudice to the non-movant, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Defendants cannot establish any of these grounds for denial. The fact that discovery preceded the complaint "does not conclusively demonstrate undue delay and prejudice." *See SEC v. Espuelas*, 579 F. Supp. 2d 461, 488 (S.D.N.Y. 2008) (permitting SEC leave to amend, even though SEC had reviewed thousands of documents and deposed all of the defendants in its

pre-suit investigation).    Any deficiency exists are oversights in a complex matter involving multiple layers of foreign entities, and the Trustee should be permitted leave to amend and cure the deficiency.  *See Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 746-47 (Bankr. S.D.N.Y. 2008) (permitting leave to amend to correct two pleading deficiencies: (i) particularization of transfers that were contended to have been made with fraudulent intent; and (ii) pleading of facts necessary to support inference of transferees' actual or constructive knowledge of fraudulent scheme).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny the Motions.  Alternatively, the Trustee should be granted leave to replead.

Dated:  November 23, 2010
      New York, New York

                            EDWARD S. WEISFELNER, AS LITIGATION
                            TRUSTEE OF THE LB LITIGATION TRUST

                          By:  _/s/ Sigmund S. Wissner-Gross___
                                Sigmund S. Wissner-Gross
                                May Orenstein
                                Marek P. Krzyzowski
                                BROWN RUDNICK LLP
                                Seven Times Square
                                New York, NY 10036
                                (212) 209-4800

                                Steven D. Pohl
                                BROWN RUDNICK LLP
                                One Financial Center
                                Boston, MA 02111
                                (617) 856-8200

                                *Counsel for Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust*

31