UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| LYONDELL CHEMICAL COMPANY, et al., | ) | No. 09-10023 (REG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE | ) | |
| OF THE LB LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary Proceeding |
| LEONARD BLAVATNIK, et al., | ) | No. 09-1375 (REG) |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECISION AND ORDER ON DEFENDANT
BI S.À.R.L.'S MOTION TO DISMISS
COUNTS 14 AND 19 OF THE COMPLAINT

APPEARANCES:

BROWN RUDNICK, LLP
*Counsel for Edward S. Weisfelner, Litigation Trustee of the LB Litigation Trust*
Seven Times Square
New York, New York 10036
By:    Sigmund S. Wissner-Gross, Esq.
       May Orenstein, Esq.
One Financial Center
Boston, Massachusetts 02111
By:    Steven D. Pohl, Esq. (argued)

QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
*Attorneys for Defendants Access Industries, Inc.; Access Industries Holdings LLC; AI*
*International, S.à.r.l.; Nell Limited; BI S.à.r.l; Len Blavatnik; Lincoln Benet; Philip Kassin;*
*Peter Thorén; and Alex Blavatnik*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Richard I. Werder, Jr., Esq.
       Susheel Kirpalani, Esq.
       Benjamin Finestone, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity controlled by

Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company ("**Lyondell**"), a

Delaware corporation headquartered in Houston—forming a new company after a merger (the

"**Merger**"), LyondellBasell Industries AF S.C.A. (as used by the parties, "**LBI**," or here, the

"**Resulting Company**"),[1] Lyondell's parent—by means of a leveraged buyout ("**LBO**").  The

LBO was 100% financed by debt, which, as is typical in LBOs, was secured not by the acquiring

company's assets, but rather by the assets of the company to be acquired.  Lyondell took on

approximately $21 billion of secured indebtedness in the LBO, of which $12.5 billion was paid

out to Lyondell stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped

Lyondell filed a petition for chapter 11 relief in this Court.[2]  Lyondell's unsecured creditors then

found themselves behind that $21 billion in secured debt, with Lyondell's assets effectively

having been depleted by payments of $12.5 billion in loan proceeds to stockholders.  Lyondell's

assets were allegedly also depleted by payments incident to the LBO and the Merger—of

approximately $575 million in transaction fees and expenses, and another $337 million in

payments to Lyondell officers and employees in change of control payments and other

management benefits.

---

[1]     Acronyms make understanding difficult for readers who have not been living with a case.  The Court tries to minimize their use. For readability, except where acronyms appear in quotations or have acquired obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the entity's role in the transaction.

[2]     Lyondell then filed along with 78 affiliates. About three months later, the Resulting Company and another Lyondell affiliate joined them as Debtors in this Court.

1

Those events led to the filing of what are now five adversary proceedings—three against shareholder recipients of that $12.5 billion, one dealing with unrelated issues,[3] and one other—this action, which was originally the first of the five—against Blavatnik and companies he controlled; Lyondell's officers and directors; and certain others.

In his Amended Complaint (the "**Complaint**") in this adversary proceeding (brought, like the others, under the umbrella of the jointly administered chapter 11 cases of Lyondell, the Resulting Company and their affiliates (the "**Debtors**")), Edward S. Weisfelner (the "**Trustee**"), the trustee of the LB Litigation Trust (one of two trusts formed to prosecute the Debtors' claims), asserts a total of 21 claims against the defendants in this action. The 21 claims variously charge breaches of fiduciary duty; the aiding and abetting of those alleged breaches; intentional and constructive fraudulent conveyances, unlawful dividends, and a host of additional bases for recovery under state law, the Bankruptcy Code, and the laws of Luxembourg, under which several of the Basell entities were organized.[4] The Complaint also seeks to equitably subordinate defendants' claims that might otherwise be allowed.

The Trustee's Complaint, in turn, engendered a large number of motions to dismiss. This is one of several opinions ruling on those motions[5]—here relating to Counts 14 and 19.[6]

Those counts relate to a shareholder distribution of €100 million Basell made on December 7, 2007, about two weeks before the closing of the Merger (the "**December**

---

[3]    *See Weisfelner v. NAG Investments, LLC*, Adv. Proc. 11-1844.

[4]    A table listing all of the claims and the particular defendants against whom they were asserted appears in Appendix A. The Complaint numbers each claim using a Roman number. To make them easier to read, the Court has referred to the claims using Arabic ones.

[5]    This Court issued other opinions on Fed. R. Civ. P. 12(b)(6) motions in the related adversary proceedings against selling shareholders. *See Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014); *Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 541 B.R. 172 (Bankr. S.D.N.Y. 2015).

[6]    To avoid a decision of unwieldy length, the Court's rulings on the other motions appear in separate decisions.

**Distribution**"), that allegedly "drained Basell of the capital that it would soon desperately need to continue in operation and meet its obligations."[7]  In Count 14, the Trustee seeks to hold various defendants, including BI S.à.r.l., the parent of Basell before the Merger, liable for extra-contractual tort under Articles 1382 and 1383 of the Luxembourg Civil Code for approving the December Distribution.  In Count 19, the Trustee seeks to avoid and recover the December Distribution as a fraudulent transfer under sections 548 and 550 of the Bankruptcy Code.[8]

Defendant BI S.à.r.l. moves, pursuant to Fed. R. Civ. P. 12(b)(2), to dismiss Counts 14 and 19 for lack of personal jurisdiction, and, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Count 19 for failure to state a claim, on grounds that the avoidance powers of section 548 of the Bankruptcy Code do not apply to the December Distribution because it was an extraterritorial transaction.

For the reasons set forth below, the Court:

(1) Grants the motion to dismiss Counts 14 and 19 for lack of personal jurisdiction, but grants leave to the Trustee to amend the Complaint to remedy its jurisdictional deficiencies (without granting further jurisdictional discovery); and

(2) Denies the motion to dismiss Count 19 for failure to state a claim upon which relief can be granted.

The bases for the Court's determination follow.

---

[7]     Cmplt. ¶ 423.

[8]     In the original complaint, the Trustee sought to claw back two shareholder distributions made by Basell—the December Distribution and another made on July 16, 2007.  However, pursuant to the Stipulation of Dismissal of Certain Allegations from Count 14 and 19 of the Amended Complaint, dated March 18, 2011 [Dkt. No. 524] (the "**Stipulation**"), "[a]ll claims asserted in Count [19] with respect to the July distribution" were dismissed.  The Stipulation also dismissed all claims in Count 14 other than those based on Articles 1382 and 1383 of the Luxembourg Civil Code with respect to the December Distribution.  *Id.* ¶¶ 1 & 2.

Facts

The Complaint is quite detailed, at over 140 pages, but most of those details are unnecessary for purposes of the motions being decided here.  Useful background may be found in the Court's prior opinions in the actions brought by the Trustee against selling shareholders, familiarity with which is assumed.  To minimize the length of this decision, the Court summarizes background facts essential for context and ease of reference, but otherwise only focuses on facts relevant to Counts 14 and 19.

As previously noted, the gist of the Trustee's claims is that the Merger—and more importantly, the highly leveraged financing of the Merger—left the newly formed Resulting Company, Lyondell and many of their affiliates insolvent, inadequately capitalized, and grossly overleveraged.  Prior to the Merger, Basell AF GP S.à.r.l. ("**Basell GP**") was the general partner of Basell, and BI S.à.r.l. was the immediate corporate parent of Basell GP.  BI S.à.r.l. held 99.99% of the capital stock of Basell (with Basell GP holding the rest).[9]  BI S.à.r.l. is an entity organized under the laws of Luxembourg, and was at all relevant times directly and wholly owned by Nell Limited.[10]  Nell Limited is a Gibraltar entity owned by Access Industries Holdings LLC ("**Access Industries**") and NAG Investments, LLC, both Delaware entities and both owned and controlled by Leonard Blavatnik ("**Blavatnik**"),[11] Chairman and President of Access Industries.[12]

---

[9]    Exhibits provided by the Defendants at oral argument were consistent with these allegations and showed that pre-Merger, Basell was wholly owned by BI S.à.r.l. and Basell GP, with BI S.à.r.l. owning 403,225 shares and Basell GP owning 1 share.  The exhibits also showed that BI S.à.r.l. was the corporate parent of Basell GP, and that Nell Limited was the corporate parent of BI S.à.r.l.

[10]    Cmplt. ¶ 33.

[11]    Cmplt. ¶ 33.  Both Leonard Blavatnik and Alex Blavatnik are defendants in this action.  All references to "Blavatnik" alone refer to Leonard Blavatnik.  Alex Blavatnik is referred to as "Alex Blavatnik."

[12]    Blavatnik had a 97.3% ownership interest in NAG Investments LLC, which in turn had at least a 96.5% interest in Nell Limited.  *See* Cmplt. ¶ 32.

On December 7, 2007, two weeks before the closing of the Merger, Basell made the December Distribution to its shareholders, BI S.à.r.l. and Basell GP. According to the Complaint, the distribution was "initiated by Blavatnik after he had begun to implement his plan of acquiring Lyondell,"[13] proposed by Basell's general partner (Basell GP), and approved by Basell's shareholders (BI S.à.r.l. and Basell GP), each acting through their managers.[14]

According to the Complaint, at all relevant times, the managers of BI S.à.r.l. were:

(i) Alex Blavatnik, who was also a vice president of Access Industries Holdings;

(ii) Peter Thoren ("**Thoren**"), who was also an executive vice president as Access Industries Holdings and manager of AI Chemical;

(iii) Alan Bigman ("**Bigman**") who was also a representative of Basell GP pre-Merger and Resulting Company General Partner post-Merger, and a board member of Lyondell as of March 28, 2008; and

(iv) Simon Baker ("**Baker**") who was also a representative of Basell GP pre-Merger and Resulting Company General Partner post-merger.

In addition, the Complaint asserts that management of Basell GP included Bigman, Richard Floor and Philip Kassin, both of whom were also members of the board of the Resulting Company.

<u>Discussion</u>

The standards for deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6) are well known. "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

---

[13]    Cmplt. ¶ 423.

[14]    Cmplt. ¶¶ 418, 419, 422.

accepted as true, to state a claim to relief that is plausible on its face."[15]  But legal conclusions couched as factual allegations are not entitled to the assumption of the truth.[16]  "A claim has facial plausibility," the Supreme Court has explained:

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.[17]

Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[18]

A trial court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."[19]  A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[20]  Where the plaintiff has relied "on the terms and effect of a document in drafting the complaint," the court may consider the document on a dismissal motion.[21]  Defendants may raise affirmative defenses on a motion to dismiss, but only "if the defense appears on the face of the complaint."[22]

---

[15]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*").

[16]  *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions").

[17]  *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

[18]  *Id.* at 679.

[19]  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[20]  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

[21]  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[22]  *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (citations omitted).

<u>I.</u>

<u>This Court's Jurisdiction over BI S.à.r.l. (Counts 14 and 19)</u>

Upon motion, the Court is required to dismiss an action against any defendant over whom it lacks personal jurisdiction.[23] "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant."[24] Where, as here, the court does not conduct a full-blown evidentiary hearing on the issue of personal jurisdiction, "the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant."[25] "After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."[26] "In deciding whether the plaintiff has met this burden, the pleadings and affidavits must be

---

[23]     *See* Fed. R. Civ. P. 12(b)(2), made applicable in this adversary proceeding by Fed. R. Bankr. P. 7012(b).

[24]     *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("***Metropolitan Life***") (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)).  *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam).

[25]     *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) ("***DiStefano***").  *See also Southern New England Telephone Co. v. Global NAPS Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) ("***Southern New England Telephone***").  BI S.à.r.l. argues that after discovery, the plaintiff must establish jurisdiction by a preponderance of the evidence.  *See* Defs.' Count 14 and 19 Reply Br. at 3.  To the contrary, the Second Circuit has made clear that even where there has been "extensive discovery," where no evidentiary hearing has been held, the plaintiff need only make a *prima facie* showing.  *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) ("In the instant case, the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held. Accordingly, 'plaintiff[s'] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant.'" citing *Metropolitan Life*, 84 F.3d at 567 (alterations and omissions by Second Circuit)).  *See also Ginsberg v. Gov't Prop. Trust, Inc.*, No. 07 Civ. 365, 2007 WL 2981683, at *4 n.1 (S.D.N.Y. Oct. 10, 2007) (when "an evidentiary hearing has not been held, the plaintiff need only make a prima facie showing of jurisdiction…").

[26]     *Forties B LLC v. America West Satellite, Inc.*, 725 F.Supp.2d 428, 432, n. 7 (S.D.N.Y. 2010) ("***Forties B***") (citing *Ball v. Metallurgie Hoboken-Overpelt, S.a.*, 902 F.2d 194, 197 (2d Cir. 1990)).  *See also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 399 F.Supp.2d 325, 330 (S.D.N.Y. 2005) ("A plaintiff can make this showing through [its] own affidavits and supporting materials, containing [a] [good faith] averment of facts that, if credited . . ., would suffice to establish jurisdiction over the defendant." (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir.2001) ("***Whitaker***")) (brackets and omission in original)).

viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor."[27]

"However, conclusory allegations are not enough to establish personal jurisdiction."[28]

### A. This Court's Authority to Exercise Jurisdiction over BI S.à.r.l.

A federal court applies a two-step test when analyzing personal jurisdiction over a

defendant. The first is whether a statute or rule provides a basis for exercising jurisdiction. The

second question—and the issue that the parties dispute here—is whether exercising jurisdiction

over BI S.à.r.l. comports with due process.

### 1. Statutory Basis for Personal Jurisdiction

There is clearly a legal basis for this Court to exercise jurisdiction over BI S.à.r.l. under

the Federal Rules of Civil Procedure, together with the Federal Rules of Bankruptcy Procedure.

Fed. R. Bankr. P. 7004(f), which applies in adversary proceedings, provides:

> If the exercise of jurisdiction is consistent with the Constitution
> and laws of the United States, serving a summons or filing a
> waiver of service in accordance with this rule or the subdivisions
> of Rule 4 F. R. Civ. P. made applicable by these rules is effective
> to establish personal jurisdiction over the person of any defendant
> with respect to a case under the Code or a civil proceeding arising
> under the Code, or arising in or related to a case under the Code.[29]

---

[27] *DirecTV Latin America, LLC v. Park 610, LLC*, 691 F.Supp.2d 405, 417 (S.D.N.Y. 2010) ("*DirecTV Latin America*") (citing *DiStefano*, 286 F.2d at 84; *Whitaker*, 261 F.3d at 208). *See also Forties B*, 725 F.Supp.2d at 432, n. 7 ("because no evidentiary hearing was held on the motion, all pleadings and affidavits must be construed in the light most favorable to [the plaintiff] and all doubts must be resolved in the ... plaintiff's favor." (internal citations omitted)). Neither party here submitted affidavits in connection with the motion to dismiss. Therefore, the Court will rely only on the allegations in the Complaint, taken to be true.

[28] *DirecTV Latin America*, 691 F.Supp.2d at 417 (citing *Gmurzynska v. Hutton*, 257 F.Supp.2d 621, 625 (S.D.N.Y.2003) (citation and internal quotation marks omitted), *aff'd*, 355 F.3d 206 (2d Cir. 2004). *See also Jazini v. Nissan Motor Co., Ltd*, 148 F.3d 181, 185 (2d Cir. 1998) ("*Jazini*"); *Alki Partners, L.P. v. Vatas Holding GMBH*, 769 F.Supp.2d 478, 487 (S.D.N.Y. 2011) ("*Alki Partners*") ("Conclusory allegations lacking factual specificity . . . do not satisfy plaintiff's burden" of showing a *prima facie* case for exercising personal jurisdiction.).

[29] Fed. R. Bankr. P. 7004(f).

Fed. R. Civ. P. 4(k), made applicable pursuant to Fed. R. Bankr. P. 7004(a), allows for

worldwide service of process.[30]  There is no dispute that service was proper under applicable

federal law,[31] and so the Court has a statutory basis for the exercise of jurisdiction over BI S.à.r.l.

The question the Court next addresses is whether such exercise is consistent with due process.[32]

### 2.  *Personal Jurisdiction and Due Process*

When an action is in federal court on the basis of 28 U.S.C. § 1334 jurisdiction, the

sovereign exercising its power over a defendant is the United States, and not any particular

state.[33]  Therefore, to determine whether a bankruptcy court's exercise of personal jurisdiction is

constitutionally proper, only the requirements of the Fifth Amendment to the U.S. Constitution

must be satisfied.  That analysis has two components: (1) whether the defendant has sufficient

minimum contacts with the United States as a whole;[34] and (2) whether the exercise of

---

[30]    BI S.à.r.l. was amenable to service of process because the Bankruptcy Rules provide for worldwide service of process.  *See In re Teknek LLC*, 354 B.R. 191, 192 (Bankr. N.D. Ill. 2006) ("***Teknek***") (describing 7004(f) as a "worldwide service of process" provision (citing *In re Federalpha Steel LLC*, 341 B.R. 872, 887 (Bankr. N.D. Ill.2006)).  *Cf. U.S. ex rel. Vallejo v. Investronica, Inc.*, 2 F.Supp.2d 330, 334 (W.D.N.Y. 1998) ("In the instant case, the [False Claims Act] provides for worldwide service of process. 31 U.S.C. § 3732(a).  Therefore, the first requirement is easily met.  S.a., a Spanish corporation, is amenable to service of process under the [False Claims Act].").

[31]    The Court need not look to any state jurisdictional statute as a statutory basis for personal jurisdiction.  *See In re Bozel S.a.*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) (Gonzalez, J.) ("Because valid service of process . . . is sufficient to establish personal jurisdiction, state long-arm statutes are inapplicable . . . Since Marengère does not contend that service of process was improper, he is subject to personal jurisdiction in this Court so long as the Due Process requirements are satisfied."); *In re Enron Corp.*, 316 B.R. 434, 444 (Bankr. S.D.N.Y. 2004) (Gonzalez, J.) ("***Enron***"); *In re Paques, Inc.*, 277 B.R. 615, 632 (Bankr. E.D. Pa. 2000) (explaining that Fed. R. Bankr. P. 7004(f), enacted in 1996, was intended to establish a federal long-arm statute, which made it unnecessary to look to a state's long-arm statute).

[32]    When the basis for personal jurisdiction is based on a federal statute providing for jurisdiction to the extent permitted by due process, a court need only consider whether exercising personal jurisdiction over the defendant on the basis of an alter ego theory would comport with due process.  *Cf. Alki Partners*, 769 F.Supp.2d at 487-88 ("Plaintiffs' federal claims are based on the Exchange Act, which provides for worldwide service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.  Defendants do not argue that there was a defect in service, so Defendants are subject to the jurisdiction of this Court unless an exercise of jurisdiction would violate Defendants' rights under the Due Process Clause." (internal citations omitted)).

[33]    *In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997).

[34]    *Teknek*, 354 B.R. at 192 (minimum-contacts evaluated "with respect to the United States as a whole (i.e., with respect to the sovereign of which the court is an extension)."); *Enron*, 316 B.R. at 444.  *See also In re*

jurisdiction is "reasonable" such that it would not offend "traditional notions of fair play and substantial justice."[35]

The Trustee argues that BI S.à.r.l. has had sufficient contacts with the United States for purposes of personal jurisdiction because it is an "alter ego" of Blavatnik and Nell Limited, and therefore Blavatnik and Nell Limited's contacts with the United States can be imputed to BI S.à.r.l.[36]  BI S.à.r.l., however, contends that the Trustee has failed to adequately allege that BI S.à.r.l. is the alter ego of either Nell Limited or Blavatnik such that this Court may exercise personal jurisdiction over BI S.à.r.l. consistent with due process.

The Court agrees with BI S.à.r.l.

---

*Bernard L. Madoff Investment Securities LLC*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010) ("Where, as here, a foreign defendant has not consented to jurisdiction by filing a proof of claim in the bankruptcy case, the plaintiff must show that 'the foreign defendant has the requisite minimum contacts with the United States at large' to satisfy Fifth Amendment due process."); *In re Cyphermint, Inc.*, 445 B.R. 11, 17-18 (Bankr. D. Mass. 2011) ("When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. . . . Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded.  In such circumstances, the Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with the particular forum state" (citing *United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992)); *North v. Winterthur Assurances (In re North)*, 279 B.R. 845, 852-53 (Bankr. D.Ariz. 2002) ("[T]he Bankruptcy Rules effectively provide for worldwide service of process, limited only by the due process clause of the Fifth Amendment . . . which requires only that the defendant have the requisite minimum contacts with the United States, rather than with the forum state." (internal quotations omitted), *reversed and remanded on other grounds*, 2003 Bankr. LEXIS 829 (9th Cir. B.A.P. 2003)).  *See also U.S. ex rel. Vallejo v. Investronica, Inc.*, 2 F.Supp.2d 330, 334 (W.D.N.Y. 1998) ("When a federal statute permits worldwide service of process, the relevant due process inquiry is whether defendant has "minimum contacts" with the United States as a whole (citing *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 976 F.Supp. 207, 210 (S.D.N.Y. 1997)).

[35]  *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 108-16, 107 S.Ct. 1026 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-78, 105 S.Ct. 2174 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154 (1945).

[36]  BI S.à.r.l. contends that the Trustee has not alleged facts showing that BI S.à.r.l., on its own, had any contacts with the United States sufficient to justify personal jurisdiction over it.  The Trustee did not argue otherwise, and instead relies exclusively on an alter ego theory of jurisdiction.  Therefore, the Court need not consider whether it could exercise personal jurisdiction over BI S.à.r.l. even if it concluded that BI S.à.r.l. was not the alter ego of Blavatnik or Nell Limited.  BI S.à.r.l. has not argued that Blavatnik or Nell Limited lack the requisite minimal contacts with the United States for this Court to exercise personal jurisdiction over them.

B. *Choice of Law for "Alter Ego" Analysis*

The parties disagree whether New York or federal law governs the Court's "alter ego" jurisdictional analysis. When a plaintiff asserts an alter ego theory of *liability*, the governing law is chosen using applicable choice of law rules.[37] Here, however, the Trustee relies on an alter ego theory of *jurisdiction*. Caselaw on whether a choice-of-law analysis is required in this context is unsettled, with some courts finding that for a jurisdictional analysis, courts should instead apply either the law governing the interpretation of the applicable jurisdictional statute (here, federal law) or federal due process jurisprudence, or both.[38]

---

[37] *See, e.g., Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013) (performing choice of law analysis to determine governing law of alter ego liability claim).

[38] Some federal courts have engaged in a choice of law analysis to decide which law to apply to an alter ego theory of *jurisdiction*, usually finding that the law of the corporation's state of incorporation governs. *See, e.g., Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382 (N.D. Tex. 2008) (finding that law of Quebec, defendant's state of incorporation, provided relevant law for jurisdictional veil-piercing analysis); *Amoco Chem. Co. v. Tex Tin Corp.*, 925 F.Supp. 1192, 1201 (S.D. Tex.1996) (addressing alter ego theory of *jurisdiction* and stating that courts look to law of state of incorporation to determine whether corporate veil should be pierced); *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F.Supp. 740, 773 (E.D. Wis. 1994) (applying law of California, defendant's state of incorporation, for jurisdictional veil-piercing analysis).

Other courts have disagreed, distinguishing the analysis for "alter ego" *liability* and for "alter ego" *jurisdiction*, and finding that because "alter ego" jurisdiction is either a construction of the statute providing jurisdiction or is part of due process (or both), for a *jurisdictional* veil piercing analysis, courts should apply either the law governing the interpretation of the jurisdictional statute or federal due process jurisprudence, or both. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993) (applying state law when basis for personal jurisdiction was state law and not engaging in a choice of law analysis); *Rual Trade Ltd. v. Viva Trade LLC*, 549 F.Supp.2d 1067 (E.D. Wis. 2008) (applying Wisconsin law and federal due process jurisprudence to alter ego theory of *jurisdiction* but engaging in choice of law analysis to determine which law to apply to plaintiff's alter ego theory of *liability*); *Poulson Roser A/S v. Jackson & Perkins Wholesale, Inc.*, 2010 WL 3419460 (N.D. Ill. 2010) ("[A]lthough the law of the state of incorporation applies when a party seeks to substantively pierce a corporation's veil, Illinois law governs the analysis where a party uses veil piercing to establish personal jurisdiction."). *See also Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) (acknowledging issue but declining to decide whether "the choice of law for alter ego analysis for personal jurisdiction purposes is different than for liability"); *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F.Supp.2d 456, 459, n.2 (S.D.N.Y. 2007) ("**International Equity**") (same).

11

Here, neither party contends that the Court needs to undertake a choice-of-law analysis

and therefore the Court does not determine whether such an analysis is required.[39]  The Trustee

argues that *New York law* is applicable, not based on choice-of-law rules, but because he

believed (erroneously, as the Court has now concluded) that New York jurisdictional statutes

could be the basis for this Court's exercise of personal jurisdiction over BI S.à.r.l.  Because, as

explained above, *federal law*, not New York law, provides the basis for this Court's exercise of

personal jurisdiction, the Court would apply federal law to its alter ego analysis.[40]

However, the Court need not determine whether New York or federal law is appropriate

here because both federal and New York law recognize that "as long as a parent and a subsidiary

are separate and distinct corporate entities, the presence of one in a forum state may not be

attributed to the other",[41] and both federal law and New York law lead to the same conclusion—

---

[39]    *See International Equity*, 475 F. Supp. 2d at 459; *Miramax Film Corp. v. Abraham*, 2003 WL 22832384
(S.D.N.Y. Nov. 25, 2003) ("implied consent . . . is sufficient to establish choice of law" (citing *Krumme v.
Westpoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

[40]    Although not controlling here, cases applying New York law are not wholly irrelevant.  New York
jurisdictional statutes do not assert jurisdiction to the maximum extent allowed by due process.  Therefore,
courts asserting jurisdiction on the basis of a New York jurisdictional statute (e.g., federal courts sitting in
diversity in New York), must first consider whether exercising alter ego jurisdiction would be consistent
with New York law before determining whether exercising "alter ego" jurisdiction would comport with due
process.  Where courts applying New York law have found it permissible to exercise jurisdiction over a
defendant on the basis of an "alter ego" theory, those courts necessarily also determined that exercising
"alter ego" jurisdiction was consistent with due process.  *See, e.g.*, *Ugalde v. Dyncorp, Inc.*, 2000 WL
217502 (S.D.N.Y. 2000) (finding, based on "alter ego" theory, that plaintiff made a *prima facie* showing
that defendants were subject to general jurisdiction under section 301 of the CPLR and then explaining,
"N.Y. CPLR § 301 'doing business' jurisdiction satisfies the minimum contacts requirements of due
process" (citing *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017, 1022 (2d Cir. 1978) ("The
constitutional standard of due process may be met by fewer contacts, however, than those required under
the more restrictive statutory test of 'doing business,' N.Y. CPLR § 301 ....")).  And because federal courts
apply the same due process test under both the Fifth and Fourteenth Amendments, such cases are still
relevant here.  Cases in which courts declined to exercise jurisdiction, if done so on the basis of New York
law, however, are arguably less relevant.

[41]    *Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000) (citing *Cannon
Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925));
*see also Marantis v. Dolphin Aviation, Inc.*, 453 F. Supp. 803, 807 (S.D.N.Y. 1978) (citing *Fergus Motors
v. Standard-Triumph Motor Co.*,130 F. Supp. 780, 782 (S.D.N.Y. 1955), decided under federal law, for
proposition that under New York law "(s)o long as separate identity of the subsidiary is real and formally
preserved," the subsidiary's presence in a local jurisdiction is insufficient to subject the foreign parent
corporation to the local judicial jurisdiction).

that the Trustee has failed to allege sufficient facts to establish that BI S.à.r.l. and either Nell

Limited or Blavatnik were not separate and distinct entities.[42]

### 1. Alter Ego Jurisdiction Under Federal Law

"Under the federal law governing the exercise of in personam jurisdiction, if a

corporation is the alter ego of an individual defendant, or one corporation the alter ego of

another, the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts'

accordingly."[43]  "It is [] well established that the exercise of personal jurisdiction over an alter

ego corporation does not offend due process."[44]

"Federal common law allows piercing of the corporate veil where (1) a corporation uses

its alter-ego status to perpetrate a fraud *or* (2) where it so dominates and disregards its alter-ego's

corporate form that the alter-ego was actually carrying on the controlling corporation's business

instead of its own."[45]  With respect to the second prong, a plaintiff demonstrates that an entity is

the alter ego of another entity for jurisdictional purposes when one entity "exerts greater than

---

[42]     *Blake v. Comm'r*, 697 F.2d 473, 477 n. 4 (2d Cir. 1982) (declining to decide whether to apply federal
common law or state law where the result would be the same under either analysis).

[43]     *ADO Finance, AG v. McDonnell Douglas Corp.*, 931 F.Supp. 711, 715 (C.D. Cal. 1996).  *See also
Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) ("***Transfield ER Cape***")
("we have previously observed that, in general, 'alter egos are treated as one entity' for jurisdictional
purposes" (citations omitted)); *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 & n. 18 (5th
Cir. 2002) ("[F]ederal courts have consistently acknowledged that it is compatible with due process for a
court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be
subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor
of a corporation that would be subject to personal jurisdiction in that court." (colleting cases)).

[44]     *Southern New England Telephone*, 624 F.3d at 138 (citing *Transfield ER Cape*, 571 F.3d at 224).  *See also
Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 ("[N]or does jurisdiction over a parent
corporation automatically establish jurisdiction over a wholly owned subsidiary.").

[45]     *Status Int'l S.a. v. M & D Maritime Ltd*., 994 F.Supp. 182, 186 (S.D.N.Y. 1998) (emphasis in original).  *But
see Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011) (stating that courts will impute
contacts of subsidiary to exercise personal jurisdiction over upon showing "(1) that there is such unity of
interest and ownership that the separate personalities of the two entities no longer exist *and* (2) that failure
to disregard their separate identities would result in fraud or injustice" (citing *Doe v. Unocal Corp*., 248
F.3d 915, 926 (9th Cir. 2001) (per curiam) (emphasis added) ("***Unocal***").  While a number of Ninth Circuit
decisions state that the "alter ego" test, even for jurisdictional purposes, requires a showing of fraud or
injustice, all of those cases rely on *Unocal* for that proposition, and *Unocal* was a liability case, not a
personal jurisdiction case.  In addition, because there is Second Circuit law on point, the Court need not
look to the Ninth Circuit for authority on this issue.

normal control" over the other or one entity is merely an empty shell.[46]  A plaintiff need not

show that the allegedly "sham" corporate structure laid out in a complaint was used for an evil

purpose, but must demonstrate that "it would be unfair under the circumstances not to disregard

the corporate form."[47]

While traditionally alter ego jurisdiction is used to obtain personal jurisdiction over a

foreign parent that exercises control over affiliated entities within the forum, the reverse is also

possible, and a parent's contacts with a forum can be imputed to a subsidiary to obtain personal

jurisdiction over that subsidiary.[48]  Federal courts have also found that an individual

shareholder's contacts can be imputed to an alter ego corporation.[49]

---

[46] *In re Lernout &Hauspie Securities Litigation*, 337 F.Supp.2d 298, 312 (D.Mass. 2004) (citing *In re Lupron Marketing and Sales Practices Litig.*, 245 F.Supp.2d 280 (D.Mass. 2003)).  *See also In re Chocolate Confectionary Antitrust Litigation*, 674 F.Supp.2d 580, 599 (M.D. Pa. 2009) ("**Chocolate Confectionary II**").

[47] *Southern New England Telephone*, 624 F.3d at 138 ("[T]he rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." (internal citations omitted)).  *See also Flynn v. Greg Anthony Construction Co., Inc.*, 95 Fed.Appx. 726, 734 (6th Cir. 2003).

[48] *See Chocolate Confectionary II*, 674 F.Supp.2d at 599 n.25 ("[O]ur sister courts have consistently exercised alter ego jurisdiction over 'either the parent or the subsidiary based upon the other's connections to the forum.'  This broader formulation reflects the common-sense principle that the court should not defer to corporate boundaries that the defendant itself has disregarded. . . .  Courts commonly exercise alter ego jurisdiction over a foreign parent based upon its control of an in-forum subsidiary, but reversal of the entities' geographic placement does not restrict the application of alter ego principles"); *In re Chocolate Confectionary Antitrust Litigation*, 602 F.Supp. 538, 569-70 (M.D. Pa. 2009) ("**Chocolate Confectionary I**") ("A plaintiff may invoke alter ego jurisdiction against 'nonresident corporations upon a finding that either the 'dominant' or 'subservient' corporation does business' within the forum."); *Taurus IP v. DaimlerChrysler Corp.*, 519 F.Supp.2d 905, 919 (W.D. Wis. 2007).

[49] *See SEC v. Montle*, 65 Fed.Appx. 749, 752 (2d Cir. 2003) ("**Montle**") ("If personal jurisdiction exists over an individual, personal jurisdiction exists also over his or her corporate alter ego."); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir. 1974) (affirming district court decision that it could exercise jurisdiction over defendant corporation by piercing the corporate veil and treating corporation as the equivalent of its dominant shareholder where the virtual identity of the two was uncontroverted and the shareholder transferred assets to the defendant corporation as part of fraudulent scheme) *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Hunt v. Global Incentive & Meeting Management*, No. 09-4921, 2010 WL 3740808, at *8 (D.N.J. 2010) ("**Hunt**"); *Seghers v. El Bizri*, 513 F.Supp.2d 694, 703 (N.D. Tex. 2007).

2.  *Alter Ego Theory Under New York Law*

The same is true under New York law.  A New York (or domestic) subsidiary can confer

jurisdiction over a foreign parent where the subsidiary is so dominated by the parent that it is the

"alter ego"[50] of the parent.[51]  New York courts will also pierce the corporate veil in reverse and

"exercise personal jurisdiction over a subsidiary based on its jurisdiction over the parent

company . . . when the subsidiary is an 'alter ego' or 'mere department' of the parent

company."[52]  Similarly, "where personal jurisdiction over an individual or corporation is proper,

such jurisdiction may be extended in order to obtain jurisdiction over a foreign corporation . . . if

the latter is deemed the alter ego of the former."[53]

Under New York law, "[e]stablishing the exercise of personal jurisdiction over an alleged

alter ego requires application of a less stringent standard than that necessary to pierce the

corporate veil for purposes of liability."[54]  "[W]hen veil piercing is only being used to assert

---

[50]    The exercise of personal jurisdiction over a foreign affiliate on the basis of alter ego theory under New
York jurisdictional law is known as the "mere department" theory of jurisdiction and courts use that phrase
in addition to "alter ego" in their decisions on the issue.  For convenience and clarity, the Court uses only
the phrase "alter ego" in this opinion, other than when quoting from such other decisions or the Complaint.

[51]    *See Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996).

[52]    *Fagan v. Republic of Austria*, No. 08 Civ. 6715, 2011 WL 1197677, at *17 (S.D.N.Y. Mar. 25, 2011)
(citing *Drucker Cornell v. Assicurazioni Generali S.p.a. Consolidated*, No. 97 Civ. 2262, 2000 WL
284222, at *3 (S.D.N.Y. March 16, 2000) ("Although this case is the converse of the ordinary one—the
entity allegedly doing business in New York . . . is the parent firm, and the foreign entity over which
jurisdiction is sought . . . is its subsidiary—both the mere department and the agency grounds for attribution
may be applied.")).  *See also International Equity*, 475 F.Supp.2d at 458 (citing cases from New York and
Second Circuit); *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 51 (S.D.N.Y. 1999) ("*ESI*").

[53]    *Miramax Film Corp. v. Abraham*, No. 01 Civ. 5202, 2003 WL 22832384, at *6-7 (S.D.N.Y. Nov. 25,
2003).  *See also Mayatextil v. Liztex U.S.A., Inc.*, No. 92 Civ. 4528, 1995 WL 131774, *4-5 (S.D.N.Y. Mar.
23, 1995) ("***Mayatextil***"); *M.Prusman, Ltd., v. Ariel Maritime Group, Inc.*, 719 F.Supp. 214, 221 (S.D.N.Y.
1989).

[54]    *GEM Advisors, Inc. v. Corporaction Sidenor, S.a.*, 667 F.Supp.2d 308, 319 (S.D.N.Y. 2009) ("***Gem
Advisors***") (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981) ("***Marine
Midland***")).  *See also International Equity*, 475 F.Supp.2d at 456; 1 C. Keating & G. O'Gradney,
FLETCHER CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS § 43.70 (2007) ("[P]iercing the
corporate veil for the purpose of acquiring jurisdiction over a subsidiary corporation does not require the
same strict standards as are necessary to hold a parent corporation liable in damages for acts of its
subsidiary.").

jurisdiction, the question is whether the allegedly controlled entity was a shell for the allegedly

controlling party; it is not necessary to show also that the shell was used to commit a fraud,

which is normally required to pierce the corporate veil for liability."[55]

### C.  Analysis of BI S.à.r.l. as Alter Ego of Nell Limited or Blavatnik

Having laid out the requirements for alter ego jurisdiction, the Court evaluates whether

the Trustee has provided sufficient allegations in the Complaint for this Court to find that BI

S.à.r.l. was the alter ego of either Nell Limited or Blavatnik for purposes of personal jurisdiction.

### 1.  Whether BI S.à.r.l is an Alter Ego of Nell Limited

The Court turns first to the Trustee's contention that BI S.à.r.l. is an "alter ego" of Nell

Limited.

To determine whether the subsidiary is an "alter ego" of the parent corporation, courts

from this circuit have considered: (1) "common ownership"; (2) "financial dependency of the

subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes

in the selection and assignment of the subsidiary's executive personnel and fails to observe

corporate formalities"; and (4) "the degree of control over the marketing and operational policies

exercised by the parent."[56]  "The first factor, common ownership, is essential to the assertion of

jurisdiction over a foreign related corporation, while the three other factors are important."[57]

Therefore, common ownership is a necessary, but not sufficient, factor to establish alter ego

---

[55]     *Gem Advisors*, 667 F.Supp.2d at 319 (citing *Marine Midland*, 664 F.2d at 904).

[56]     *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984)
        ("**Beech**") (applying New York law). *Accord Jazini*, 148 F.3d at 184-85 (applying *Beech* factors).

[57]     *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, No. 03 Civ. 1681, 2004 WL
        2199547, at *9 (S.D.N.Y. Sept. 29, 2004) ("**Northrop Grumman**") (citing *Beech*, 751 F.2d at 120-22).

status.[58]  "The overall weighing of the various factors thus necessitates a balancing process, and

not every factor need weigh entirely in the plaintiff's favor."[59]

With respect to the threshold factor, common ownership, the Complaint adequately

alleges that at all relevant times, BI S.à.r.l. was directly and wholly owned by Nell Limited,[60] and

BI S.à.r.l. did not offer evidence to the contrary.  Therefore, the first factor has been satisfied.

But the Complaint is deficient with respect to the second factor, BI S.à.r.l.'s financial

dependency on Nell Limited.  The Complaint contains no allegations as to whether BI S.à.r.l.

was undercapitalized, whether it had any operations or was merely a holding company, or

whether and how money flowed between BI S.à.r.l. and Nell Limited.

The Complaint is likewise deficient with respect to the third factor, which looks at *both*

the degree to which the parent corporation chooses the subsidiary's personnel *and* whether the

entities failed to observe corporate formalities.  The Trustee alleges that there was significant

overlap between the managers of BI S.à.r.l. and the officers and directors of other indirect or

direct parents of BI S.à.r.l.  Of the four managers of BI S.à.r.l., one, Thoren, was also an officer

of Access Industries Management LLC, the entity that managed the two shareholders of Nell

Limited (Access Industries and NAG), and a second, Alex Blavatnik, was a vice president of

Access Industries, which, together with NAG, owned Nell Limited.[61]  But the Complaint lacks

any allegations with respect to the maintenance of (or failure to maintain) corporate formalities.

There are no allegations that BI S.à.r.l.'s corporate form was disregarded.

---

[58]  *Hvide Marine Int'l v. Employers Ins. of Wausau*, 724 F.Supp. 180, 186 (S.D.N.Y. 1989) (citing cases).

[59]  *Northrop Grumman*, 2004 WL 2199547, at *9 (S.D.N.Y. Sept. 29, 2004) (citing *Beech*, 751 F.2d at 120-22).

[60]  Cmplt. ¶ 33.

[61]  Cmplt. ¶ 23-34.

In addition, the Complaint lacks allegations sufficient to satisfy the fourth factor—"the degree of control over the marketing and operational policies exercised by the parent."  Courts have found this factor satisfied where a complaint and supporting affidavits alleged, among other things, that the affiliates were merely holding companies formed to finance, own, operate and manage the parent corporation's business in foreign country; that policies for affiliates were made at meetings of the parent's executives; and that agreements involving affiliates required the participation and consent of parent.[62]  The same may in fact be true with respect to BI S.à.r.l.; however, no such allegations are in the Complaint.  The Complaint fails to allege even that BI S.à.r.l. served as a mere holding company for Nell Limited.

In sum, the Complaint alleges only that BI S.à.r.l. was wholly-owned by Nell Limited, and that there was significant overlap of management and personnel.  However, courts have recognized that "[t]he existence of common directors and officer is a normal business practice of a multi-national corporation,"[63] and that a showing of mere corporate ownership or common management will not be sufficient to justify veil piercing.[64]

The majority of cases on which the Trustee relies do not suggest otherwise.[65]  And the Trustee has not identified, and the Court cannot find, a single case in which analogous

---

[62]    *See, ESI*, 61 F.Supp.2d at 55-57.  *See also Chocolate Confectionary II,* 674 F.Supp.2d at 614 (not applying *Beech* factors but finding that plaintiffs established *prima facie* case that Cadbury USA acted as alter ego of Cadbury plc and Cadbury Holdings where complaint alleged and evidence supported that Cadbury plc and Cadbury Holdings managed subsidiaries according to business lines rather than corporate boundaries, determined global operational strategy, apportioned profits and losses between subsidiaries, controlled daily functions of Cadbury USA through overlapping officers, and required Cadbury USA to obtain approval before it could implement new project).

[63]    *Mayatextil*, 1995 WL 131774, at *6.

[64]    *See De Castro v. Sanifill, Inc.*, 198 F.3d 282, 283 (1st Cir. 1999); *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

[65]    *See Network Enterprises, Inc. v. APBA Offshore Productions, Inc.,* 2002 WL 31050846 (S.D.N.Y. 2002), in which the district court found that personal jurisdiction under an alter ego was proper based on allegations that the officer had same address and phone number as corporate entity, used letterhead for his different entities interchangeably, and kept corporate entity undercapitalized); *M. Prusman, Ltd. v. Ariel Maritime Group, Inc.*, 719 F. Supp. 214, 221 (S.D.N.Y. 1989) (finding ample evidence that defendant directed and

allegations, *without more*, have been found to make a *prima facie* showing of alter ego

jurisdiction.  Rather, courts in this circuit have found a *prima facie* showing of alter ego

jurisdiction only where the plaintiff alleged (and in some instances provided evidence), *in

addition* to common ownership and overlapping officers and directors, that the subsidiary was

kept undercapitalized, that there was a failure to respect corporate formalities or permit

autonomous decision-making, or both.[66]

The conclusory allegation in the Complaint that "upon information and belief, [BI

S.à.r.l.] was operated as a mere department of both Nell Limited and Nell Limited's

shareholders"[67] is insufficient to make a *prima facie* showing of jurisdiction.[68]

For these reasons, the Court finds that the Trustee has not made a *prima facie* showing

that BI S.à.r.l. is subject to personal jurisdiction in this court as the "alter ego" of Nell Limited.

---

controlled corporation and disregarded corporate form); *Passalacqua Builders, Inc. v. Resnick Developers South, Inc.* 933 F.2d 131, 139 (2d Cir. 1991) (reviewing the record and finding, among other things, that defendants had not maintained corporate form, separate corporate records or accounts, intermingling of corporate funds).

[66]    *Se* supra n. 65; *see also, e.g.*, *King County, Wash. v. IKB Deutsche Industriebank AG*, 712 F.Supp.2d 104 (S.D.N.Y. 2010) (complaint alleged common ownership, overlap of officers, that the parent and subsidiary issued joint financial statements, that overlapping employees were all paid by the parent, and that subsidiary could not make lending decisions without approval from the parent); *ESI*, 61 F.Supp.2d at 51- 57 (complaint alleged facts satisfying all four factors); *Obabueki v. Int'l Bus. Mach. Corp*., No. 99 Civ. 11262, 2001 WL 921172, at *5 n.10 (S.D.N.Y. Aug. 14, 2001) (complaint alleged common ownership, near total overlap of officers, and deficient corporate formalities of subsidiary); *Derthick v. Bassett-Walker Inc*., No. 90 Civ. 5427, 1992 WL 249951 (S.D.N.Y. Sept. 23, 1992) (complaint alleged and evidence demonstrated common ownership, overlapping of officers, that the entities issued consolidated financial statements and had a consolidated marketing plan, the subsidiary didn't hold board meetings, and the subsidiary was described as a "division" of the parent in annual reports and corporate minutes); *Knapp v. Consolidated Rail Corp*., No. 89-CV-1034S, 1992 WL 170891, at *4 (W.D.N.Y. Jul. 7, 1992) (complaint alleged common ownership, overlap of officers, that parent provided subsidiary with an interest-free loan, that general counsel for subsidiaries acted to represent parent, and that parent held subsidiaries out to be divisions).

[67]    Cmplt. ¶ 33.

[68]    *See* n.60 *supra*; *DirecTV Latin America*, 691 F.Supp.2d at 417; *Jazini*, 148 F.3d at 185; *Alki Partners*, 769 F.Supp.2d at 487.

### 2.  Whether BI S.à.r.l. is the Alter Ego of Blavatnik

The Trustee also asserts that this Court has personal jurisdiction over BI S.à.r.l. because BI S.à.r.l. is the alter ego of Blavatnik.  For alter ego analyses involving an individual shareholder, courts have considered, either explicitly or implicitly: (1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation.[69]

Here, there are no allegations in the Complaint that BI S.à.r.l. failed to maintain its corporate form or formalities; that BI S.à.r.l. was kept undercapitalized; that Blavatnik used BI S.à.r.l. to intermingle personal and corporate finances; or that BI S.à.r.l. was merely a holding company for Blavatnik and lacked business discretion.[70]  While it is alleged that the distribution from Basell to BI S.à.r.l. was "initiated by Blavatnik," it is not alleged that BI S.à.r.l. ever failed to exercise its business discretion in connection with the December Distribution, the Merger or otherwise.

---

[69]    *Packer v. TDI Systems, Inc.*, 959 F.Supp. 192, 202 (S.D.N.Y. 1997) (citing *Kinetic Instruments, Inc. v. Lares*, 802 F.Supp. 976, 985 (S.D.N.Y.1992)).  *See also Montle*, 65 Fed.Appx. at 749 (concluding that district court did not err in finding that it had personal jurisdiction over foreign corporation as individual defendant's alter ego where defendant set up corporation to acquire a yacht and limit his liability in case of an accident, corporation had no other assets and did "nothing," and yacht was used only for recreational purposes); *Mayatextil*, 1995 WL 131774, at *4-6 (applying *Beech* factors and finding *prima facie* case of alter ego jurisdiction over defendant corporations where it was alleged and demonstrated by affidavits that owner of corporate defendants commingled personal and corporate funds, that no records were kept for some of the corporate defendants, and that owner controlled operational policies for all corporate defendants); *Hunt*, 2010 WL 3740808, at *8 (applying similar factors and finding *prima facie* showing of alter ego jurisdiction where plaintiffs alleged and pointed to evidence in the record supporting allegations that president and majority shareholder commingled corporate and personal funds).

[70]    The Trustee argues in his brief that all of the Blavatnik-owned entities "were used by Blavatnik to extract capital from the entities to be combined in the Merger even before it was consummated" and that BI S.à.r.l. was merely a pass thru entity.  *See* Trustee's Counts 14 and 19 Opp. Br. at 7.  However, no such allegations are contained in the Complaint.

The only non-conclusory relevant allegations[71] in the Complaint are (1) that BI S.à.r.l. held 99.99% of the capital stock of Basell; (2) that BI S.à.r.l. was directly and wholly owned by Nell Limited, which was in turn indirectly owned by Blavatnik; (3) that the managers of BI S.à.r.l. were Bigman, Alex Blavatnik, Thoren, and Baker; and (4) that BI S.à.r.l. approved the payment of the distributions from Basell, and then received the distributions from Basell.  As explained above, such allegations are insufficient to plead that BI S.à.r.l. is the alter ego of Blavatnik for jurisdictional purposes.

The Trustee does point to allegations in the Complaint that Blavatnik exercised significant control over entities under the Access umbrella *other than* BI S.à.r.l., and over the officers and directors of those entities.  But these allegations are insufficient for a *prima facie* showing, as they allege no specific facts with respect to BI S.à.r.l.  The Trustee also points to allegations in the Complaint that Blavatnik formed AI Chemical Investments LLC ("**AI Chemical**," another Access entity) solely for the purpose of using it as a pass-thru entity to minimize tax liability on payments he would receive in connection with his ownership of approximately 10% of Lyondell's stock pre-Merger, and that AI Chemical was dissolved shortly after he received those payments.  Such allegations might establish that *AI Chemical* was merely an alter ego of Blavatnik, but are irrelevant with respect to *BI S.à.r.l.*  And lastly, the Trustee points to allegations in the Complaint demonstrating that Bigman, a manager of BI S.à.r.l., "acted under the control and direction of Blavatnik," "participated in every step of the merger

---

[71]    The Complaint contains conclusory allegations with respect to Blavatnik and BI S.à.r.l.  *See, e.g.*, Cmplt. ¶ 34 ("At all relevant times, Blavatnik operated Nell Limited, Access Industries, Access Industries Inc., BI S.à.r.l., and AI Chemical as his alter egos."); Cmplt. ¶ 398.  Conclusory allegations are insufficient to establish personal jurisdiction.  *See* n.59, 96 *supra* (citing *DirecTV Latin America*, 691 F.Supp.2d at 417; *Jazini*, 148 F.3d at 185; *Alki Partners*, 769 F.Supp.2d at 487).

discussions," and was essentially Blavatnik's right-hand man.[72]  But the Complaint does not allege that Blavatnik ever used his influence over Bigman to exercise control over BI S.à.r.l.

For these reasons, the Court concludes that the Trustee has not alleged sufficient facts to demonstrate that BI S.à.r.l. is the alter ego of Blavatnik for jurisdictional purposes.[73]

### D. Conclusions on Personal Jurisdiction

Because the Court finds that the Complaint fails to allege facts sufficient to establish that BI S.à.r.l. is the alter ego of Nell Limited or Blavatnik, the contacts of Nell Limited and Blavatnik with the United States cannot be imputed to BI S.à.r.l. Therefore, the Trustee has failed to make a *prima facie* case for this Court's exercise of personal jurisdiction over BI S.à.r.l consistent with due process.  BI S.à.r.l.'s motion to dismiss Counts 14 and 19 for lack of personal jurisdiction is therefore granted.

## II.

### Extraterritorial Reach of Section 548 (Count 19)

In Count 19 of the Complaint, the Trustee seeks recovery from BI S.à.r.l. of the December Distribution as a fraudulent transfer under section 548 of the Bankruptcy Code.  In its motion to dismiss, BI S.à.r.l. argues that Count 19 must be dismissed under Rule 12(b)(6) because the December Distribution was an extraterritorial transfer, and the Court's avoidance powers under section 548 cannot be applied extraterritorially.

---

[72]    Trustee's Counts 14 and 19 Opp. Br. at 9; 3/10/11 Hr'g Tr. at 273.

[73]    Some of the cases upon which the Trustee relied were alter ego *liability* cases, not alter ego *jurisdiction* cases.  *See, e.g. Farley v. Davis*, No. 91 Civ. 5530, 1992 WL 110753 (S.D.N.Y. May 8, 1992) (finding that plaintiff stated a claim against corporations' principal where it was alleged that principal purchased corporation through a leveraged buyout, stripped corporation of its assets and operating cash, and used corporation as a mere conduit for its several business enterprises).  Even if these cases are applicable here, the allegations found to state a claim for alter ego liability in those cases are distinguishable from the allegations here.

It is well-settled that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States."[74]  However, it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."[75]  The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord."[76]

Courts perform a two-step inquiry when determining whether to apply the presumption against extraterritorial reach of a statute in a specific factual setting.[77]  First, a court must determine if the presumption applies at all—by "identifying the conduct proscribed or regulated by the particular legislation in question," and considering whether that conduct "occurred outside of the borders of the U.S."[78]  "Second, if the presumption is implicated, an inquiry into Congressional intent must be undertaken to determine if Congress intended to extend the coverage of the relevant statute to such extraterritorial conduct."[79]

Based on the allegations in the Complaint, the Court concludes that the December Distribution was an extraterritorial transfer, but that Congress' intent was to extend the scope of section 548 to cover extraterritorial conduct.  Therefore, the presumption against extraterritoriality has been rebutted and does not preclude the relief sought in Claim 19 under section 548.  Thus, BI S.à.r.l.'s motion to dismiss Count 19 on this ground is denied.

---

[74]     *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 11 S. Ct. 1227 (1991) ("***Aramco***").

[75]     *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 248, 130 S. Ct. 2869, 2887 (2010) ("***Morrison***") (citing *Aramco*, 499 U.S. at 247) (quotation omitted).

[76]     *Aramco*, 499 U.S. at 248, 111 S.Ct. at 1230 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963)).

[77]     *See Societe General plc v. Maxwell Commc'n Corp. plc (In re Maxwell Commc'n Corp. plc)*, 186 B.R. 807, 816 (S.D.N.Y. 1995) ("***Maxwell II***"), *aff'd on other grounds,* 93 F.3d 1036 (2d Cir. 1996).

[78]     *Id.*

[79]     *Id.*

A. *Was the Transaction Extraterritorial?*

BI S.à.r.l. argues that the December Distribution was extraterritorial because it was made by a foreign entity (Basell, a Luxembourg company) to a foreign entity (BI S.à.r.l., its Luxembourg parent).  However, in determining whether a transaction is domestic or extraterritorial, courts employ a less simplistic and formalistic approach and consider a number of factors.[80]  In a case in this district, Judge Scheindlin noted that if courts concluded that a transfer (in that case, under section 547) was extraterritorial based solely on the fact that the debtor paid, and the creditor received, the funds outside of the United States:

> such a limited conception of "transfer" for purposes of an extraterritoriality analysis would have potentially dangerous implications for the future application of § 547: a creditor—be it foreign or domestic—who wished to characterize a transfer as extraterritorial could simply arrange to have the transfer made overseas, a result made all too easy in the age of the multinational company and information superhighway.[81]

Thus courts rely on a "flexible" approach,[82] and "have applied a 'center of gravity' test, under which they 'look at the facts of a case to determine whether they have a center of gravity outside the United States.'"[83]  Such an analysis may include consideration of "all component events of the transfer[],"[84] such as "whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic."[85]

---

[80]    *See, e.g., id.*; *French v. Liebmann (In re French),* 440 F.3d 145 (4th Cir. 2006) ("***French***"), cert. denied 549 U.S. 815, 127 S.Ct. 72 (2006); *In re Florsheim Group Inc.*, 336 B.R. 126, 130 (Bankr. N.D. Ill. 2005) ("***Florsheim***").

[81]    *Maxwell II*, 186 B.R. at 816.

[82]    *French*, 440 F.3d at 149.

[83]    *Florsheim*, 336 B.R. at 130 (citing *Maxwell Communication Corp. plc v. Barclays Bank (In re Maxwell Commc'n Corp. plc)*, 170 B.R. 800, 809 (Bankr.S.D.N.Y.1994) ("***Maxwell I***"), *aff'd Maxwell II*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir. 1996)).

[84]    *Maxwell II*, 186 B.R. at 816.

[85]    *French*, 440 F.3d at 150 (internal citations omitted).

Although the December Distribution was made from one Luxembourg entity to another,[86]

the Trustee points to certain "component events" of the transfer that have connections to the

United States.  First, the Trustee argues that at least some of the decisions to make the December

Distribution were made in the United States.[87]  According to the Complaint, the December

Distribution was initiated by and occurred at the direction of Blavatnik,[88] who operated out of

New York.[89]  Second, the Trustee argues that the Merger had substantial connections to the

United States and, as a part of the Merger, so does the December Distribution.  Third, the Trustee

suggests that the payment of the December Distribution had substantial effects in the United

States by rendering Basell—and 13 days later the Resulting Company—undercapitalized.[90]

---

[86]     Although there is no evidence that the funds were transferred from a Luxembourg bank to another Luxembourg bank, the Trustee has not alleged in the Complaint that the funds ever passed through the United States.

[87]     *See French*, 440 F.3d at 150 (noting as relevant that although the act of recording deed to transfer the property took place abroad, "the transferees themselves may well have been located in the United States both when they decided to record the deed and when they arranged for the Bahamian lawyer's services").

[88]     Cmplt. ¶ 423.

[89]     *Id.* ¶ 86.  The Complaint acknowledges that the December Distribution was approved by Basell's shareholders, BI S.à.r.l. and Basell GP, all of which were acting through their managers, but it is not clear from the Amended Complaint where these managers were located when they made the relevant decisions.

[90]     The Basell shareholder distributions were paid after Basell had entered into the merger agreement with Lyondell, a United States company, and just 13 days before the Merger was set to close.  Moreover, it is alleged that in November 2007, S&P and Moody's downgraded the debt of both Lyondell and Basell, the lead arrangers were struggling to syndicate their loans, Access knew that Lyondell's actual EBITDA had been short of management projections for the first three quarters of 2007, and it was apparent that the Resulting Company would suffer a critical liquidity problem following the Merger.  All of these facts were allegedly known to Blavatnik and the managers of BI S.à.r.l. and Basell GP when they initiated and approved the December Distribution.

BI S.à.r.l. argues that the Trustee must demonstrate that the Basell dividends were "intended to have substantial effects in the United States."  *See* Def.'s Count 14 and 19 Reply Br. at 17 (citing *Maxwell II*, 186 B.R. at 821 n.9).  However, in that section of *Maxwell II* cited by BI S.à.r.l., Judge Scheindlin was not addressing whether the transfer at issue was domestic or extraterritorial.  Rather, she was addressing a purported exception to the presumption against extraterritoriality, which provides that even where the conduct at issue *is foreign*, the presumption against extraterritorial reach of a federal statute still does not apply where "the failure to extend the scope of the statute to a foreign setting will result in adverse effects in the United States."  *Maxwell II*, 186 B.R. at 821.  Here, by contrast, the Trustee points to the domestic effects of the Basell dividends to demonstrate that the transfers were not foreign in the first place.  *See French*, 440 F.3d at 150 (noting that in determining whether a transfer is foreign or domestic, courts should look to "whether the participants, acts, targets, and *effects* involved in the transaction at issue are primarily foreign or primarily domestic" (emphasis added)).  The Trustee did not rely on the purported "effects"

25

Nevertheless, the minimal contacts to the United States that the Trustee points to in the

Complaint[91] are insufficient to overcome the substantially foreign nature of the December

Distribution.[92]   As stated in the Supreme Court's decision in *Morrison v. National Australian*

*Bank Ltd.*, the court must target its inquiry on "the 'focus' of congressional concern," or, in other

words, the "transactions that the statute seeks to 'regulate.'"[93]   Section 548 focuses on the

"nature of the transaction in which property is transferred."[94]   A court in this district has stated

that a "mere connection to the U.S....is insufficient on its own to make every application of the

Bankruptcy Code domestic."[95]   "[E]ven where the claims touch and concern the territory of the

United States, they must do so with sufficient force to displace the presumption against

extraterritorial application."[96]   Here, the connection to the United States is not sufficiently strong

---

exception to the presumption against extraterritoriality discussed in *Maxwell II*, and the Court notes that that exception was, at the very least, called into question by the Supreme Court's decision in *Morrison*.  *See Morrison*, 130 S. Ct. at 2887.

[91]   Additional facts were raised at oral argument, which if true, and if alleged in the Complaint, could indicate further connections to the United States.  For example, in response to questioning from the Court, counsel to BI S.à.r.l. informed the Court that "it's fair to assume that [the managers of BI S.à.r.l. and Basell GP] were not in Luxembourg; that they were probably in New York at the time" they approved the shareholder distributions.  *See* 3/10/11 Hrg. Tr. at 268:11-14.  In addition, counsel to the Trustee alleged that the distribution that was meant to be paid to BI S.à.r.l. was in fact transferred to a U.S.-domiciled affiliate. 3/10/11 Hrg. Tr. at 273:21-274:22.  This second allegation—that the transfer itself was not made between two foreign entities—would be of particular importance in the extraterritoriality analysis.  But the Trustee has not alleged these facts in the Complaint, and therefore the Court cannot consider them.  *See Palatkevich v. Choupak*, 2014 WL 1509236, at *10 (S.D.N.Y. Jan. 24, 2014) (McMahon, J.) (citing *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).  And the Court expresses no view on whether a transfer involving a domestic transferor or transferee would be extraterritorial.

[92]   S*ee, e.g., Sherwood Investments Overseas Ltd., Inc. v. The Royal Bank of Scotland N.V. (In re Sherwood Investments Overseas Ltd., Inc.)*, 2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ("**Sherwood Investments**") (finding transfer from Swiss bank account to English bank account to be extraterritorial even though transfer was initiated from the U.S.).

[93]   *Morrison*, 561 U.S. 247, 266, 130 S.Ct. 2869, 2884 (2010).

[94]   *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 227 (S.D.N.Y. July 28, 2014) (Rakoff, J.) ("**Madoff**").

[95]   *Id.*

[96]   *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659, 1669, 185 L.Ed.2d 671 (2013).

for the transfer to be considered anything but extraterritorial.[97]  As Justice Scalia stated in

*Morrison*: "[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with

the territory of the United States. But the presumption against extraterritorial application would

be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is

involved in the case."[98]

B. *Did Congress Intend Section 548 to Apply to Extraterritorial Transfers?*

Having found that the December Distribution was extraterritorial, the Court now must

consider whether the presumption against a statute's extraterritoriality precludes the Trustee's

use of section 548 to avoid the transfer.

As the Supreme Court made clear in *Morrison*, "'unless there is the affirmative intention

of the Congress clearly expressed' to give a statute extraterritorial effect," courts "must presume

it is primarily concerned with domestic conditions."[99]  "When a statute gives no clear indication

of an extraterritorial application, it has none."[100]  Thus, to determine whether a federal statute can

be applied extraterritorially, and whether Congress so intended, the court must look to the

language of the statute.

Section 548 of the Bankruptcy Code provides that a trustee may avoid any fraudulent

transfer "of an interest of the debtor in property" that was made within 2 years of the filing of the

bankruptcy petition.  The text of section 548 does not contain any express language or indication

---

[97]     *Maxwell I*, 186 B.R. at 817; *see Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538–39 (9th Cir.1994)
(holding that merely because a letter containing a request that the plaintiff close its bank account at another
bank was sent from a United States territory did not preclude application of the presumption against
extraterritorial application of the Bank Holding Company Act, 12 U.S.C. §§ 1971–1978); *Sherwood
Investments*, supra n. 93.

[98]     *Morrison*, 561 U.S. at 266.

[99]     *Morrison*, 561 U.S. at 255 (quoting *Aramco*, 499 U.S. at 248).

[100]    *Id.*

that Congress intended the statute to apply extraterritorially.[101]  However, the presumption

against Congressional intent to extend the reach of a statute extraterritorially is not a "clear

statement rule," and courts may look to "context,"[102] including surrounding provisions of the

Bankruptcy Code, to determine whether Congress nevertheless intended that statute to apply

extraterritorially.[103]

Pursuant to 28 U.S.C. § 1334 and section 541 of the Bankruptcy Code, a bankruptcy

court has *in rem* jurisdiction over all of a debtor's property, whether foreign or domestic.[104]

Section 541, which defines "property of the estate," provides, in relevant part:

> (a) . . . Such estate is comprised of all the following property,
> *wherever located* and by whomever held:
>
> (1) . . . [A]ll legal or equitable interests of the debtor in
> property as of the commencement of the case.
> . . .
> (3) Any interest in property that the trustee recovers under
> section 329(b), 363(n), 543, 550, 553, or 723 of this
> title.[105]

And section 550 authorizes a trustee to recover transferred property for the benefit of the estate

to the extent that a transfer is avoided, *inter alia*, as fraudulent under either section 544 or section

548.[106]

---

[101] *Barclay v. Swiss Fin. Corp. Ltd. (In re Bankr. Estate of Midland Euro Exch. Inc.)*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006) ("***Midland Euro***") (Mund, J.); *see also Maxwell I*, 170 B.R. at 812 (reaching a similar conclusion with respect to section 547); *Maxwell II*, 186 B.R. at 819 (same).

[102] *Morrison*, 130 S.Ct. at 2883.

[103] *Madoff*, 513 B.R. at 228.

[104] *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998).

[105] 11 U.S.C. § 541 (emphasis added).  As explained in *French*, "[[t]he phrase 'wherever located'] first appeared in the Bankruptcy Code in 1952; Congress explained that the amendment 'make[s] clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States.' H.R.Rep. No. 82-2320, at 15 (1952), reprinted in 1952 U.S.C.C.a.N.1960, 1976. Thus, 'property of the estate' includes both foreign and domestic property."  440 F.3d at 151.

[106] *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992) ("***Colonial Realty***").

The Fourth Circuit, in addressing the same issue presented here, concluded that section 548 of the Code, read in conjunction with section 541, demonstrates congressional intent to apply section 548 extraterritorially.[107]  In *French*, the Fourth Circuit, speaking through Judge Motz, explicitly stated that section 548 could be applied extraterritorially regardless of when property subject to a fraudulent avoidance action becomes property of the estate: "we hold that § 548 applies to the transfer in this case even assuming that § 541's definition of "property of the estate" does not by itself extend to the Bahamian property . . . ."[108]  The *French* court explained that section 548 applies extraterritorially *not* because it provides for recovery of property that is already property of the estate, but rather, because section 548 provides for the recovery of property that *would have been* property of the estate—*i.e.* property *worldwide* in which the debtor *would have had* an interest—but for the fraudulent transfer.[109]

But the Fourth Circuit's views in *French* are not uniformly shared.[110]  In *Midland Euro*, a decision from the Central District of California Bankruptcy Court, the court acknowledged that section 541(a) provides that property of the estate includes property "wherever located," but ultimately concluded that section 541 did not support a reading of section 548 to apply extraterritorially.  The court reasoned that because property held by third-party transferees would become "property of the estate" only when the transfer has been avoided—a proposition for which the *Midland Euro* court cited the Second Circuit's decision in *Colonial Realty* for

---

[107]    *See French*, 440 F.3d 145.

[108]    *French*, 440 F.3d at 152 n.2.  *See also In re French*, 320 B.R. 78, 85 (D. Md. 2004) (explaining that even though bankruptcy judge based decision that section 548 applies extraterritorially, at least in part, on erroneous finding that the fraudulently transferred property *was* property of the estate, the fact that "the real property was *not* property of the estate, however, does not alter this Court's conclusion as to the non-applicability of the presumption.  Confronting the presumption head on, this Court finds that 'all available evidence' demonstrates that Congress did intend for the key provisions of the Bankruptcy Code to be applied extraterritorially for the reasons stated above" (emphasis added)).

[109]    *French*, 440 F.3d at 151-52.

[110]    *See Midland Euro*, 347 B.R. at 717-20; *Madoff*, 513 B.R. at 228-229.

support—section 541 did not indicate Congress' intent for section 548 to apply extraterritorially.[111]

In *Colonial Realty*, the Second Circuit did indeed conclude that fraudulently conveyed property does not become property of the estate until it has been recovered.[112] But that is just a matter of timing.  It is not at all the same thing as finding a lack of Congressional intent to allow property to be recovered on an extraterritorial basis.  The *Colonial Realty* court noted that, pursuant to section 541(a)(1), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," and pursuant to section 541(a)(3), property of the estate also includes "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, including section 550—which comes *after* the commencement of the case.  The Circuit explained:

> If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions… [T]he inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.[113]

Relying on that holding in *Colonial Realty,* the *Midland Euro* court criticized the Fourth Circuit's conclusion in *French* that Congress intended section 548 to apply extraterritorially:

---

[111]    *Midland Euro*, 347 B.R. at 717-18.  Courts from this district reached a similar conclusion with respect to section 547.  *See Maxwell I*, 170 B.R. at 811-12 (citing *Colonial Realty* and rejecting argument that that section 541 indicates that Congress intended section 547 to govern foreign transfers), *aff'd, Maxwell II*, 186 B.R. at 820, *aff'd on other grounds*, 93 F.3d 1036 (2nd Cir. 1996).  In *Maxwell*, Bankruptcy Judge Brozman concluded that Congress did not intend for section 547 to be applied extraterritorially.  As an alternative holding, she concluded that the avoidance actions before her should be dismissed under principles of international comity.  Judge Scheindlin of district court affirmed on both grounds.  But the Second Circuit did not reach the question as to whether the Code's preference provisions could be applied extraterritorially, affirming instead only on grounds of comity.

[112]    *Id.*

[113]    *Id.* at 131 (citations omitted).

> [*French*'s] reasoning apparently presumes that the debtor retains a
> "legal or equitable" interest in the property transferred pre-petition,
> or to paraphrase, that "property of the estate" includes property
> transferred but not yet recovered.  It ignores the language in
> § 541(a)(1) and (a)(3) that the debtor must have an interest in the
> property "as of the commencement of the case" and that property
> of the estate includes "any interest in property that the trustee
> recovers under section . . . 550 . . . of this title."[114]

But this Court cannot agree with *Midland Euro*'s criticism of *French,* and rather finds the

Fourth Circuit's decision in *French* to be persuasive.[115]  First, but importantly, the *Colonial*

*Realty* court recognized that sections 541(a)(1) and (a)(3) were speaking as of different times.

Section 541(a)(1) speaks of property of the estate "as of the commencement of the case";

whereas sections 541(a)(3) speaks of property that enters the estate at a later time, when it is

recovered under section 550.  That plainly correct observation by the Second Circuit falls far

short of holding that property not in the estate as of the commencement of the case cannot be

brought into the estate because it is in a foreign locale.  Second, it is hard to believe that

Congress intended for the Code to apply extraterritorially with respect to property of the estate,

but not to apply extraterritorially with respect to what would have been property of the estate but

for a fraudulent transfer.

Therefore, this Court believes that the conclusion reached by the Fourth Circuit in *French*

is the superior one, in part for the reasons stated by the *French* court, but more importantly for

the reasons stated by Professor Jay Westbrook in an article which addresses the *French* and

*Midland Euro* decisions.[116]  Discussing the *French* court's examination of the statutory language

---

[114]     *Midland Euro*, 347 B.R. at 717-18.

[115]     To the extent that the Court's decision here is inconsistent with *Maxwell I*, *Maxwell II*, and *Madoff*, the
Court respectfully disagrees with those decisions as well.

[116]     Jay Lawrence Westbrook, *Avoidance of Pre-Bankruptcy Transactions in Multinational Bankruptcy Cases*,
42 TEX. INT'L L.J. 899.

of section 541(a)(1) of the Bankruptcy Code together with section 1334 of the Judicial Code,

Professor Westbrook explained:

> The [*French*] court reasonably concluded that the combination of these two provisions demonstrated Congress' intent to include the debtor's worldwide property in the estate, and therefore, that they likely intended to include foreign property transferred before bankruptcy within the reach of the bankruptcy avoidance power. That conclusion was buttressed by a similar analysis by the Fifth Circuit Court of Appeals, albeit in a different context [in *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*].[117]

Professor Westbrook further noted that:

> [o]ddly enough, neither the Fourth nor the Fifth Circuits cited or discussed section 541(a) of the Bankruptcy Code which explicitly includes in the property of the estate all property that the trustee in bankruptcy recovers under the avoiding powers. That provision strongly suggests that Congress intended the reach of those powers to be co-extensive with the broad, global embrace of its definition of estate property, although the bankruptcy court in Midland disagreed.[118]

This Court agrees with Professor Westbrook that section 541(a)(3) of the Bankruptcy

Code supports a finding that Congress intended section 548 to extend extraterritorially.  Section

541(a)(3) provides that any interest in property that the trustee recovers under section 550

becomes property of the estate.  Section 550 authorizes a trustee to recover transferred property

to the extent that the transfer is avoided under either section 544 or section 548.  It would be

inconsistent (such that Congress could not have intended) that property located anywhere in the

world could be property of the estate once recovered under section 550, but that a trustee could

not avoid the fraudulent transfer and recover that property if the center of gravity of the

fraudulent transfer were outside of the United States.  It is necessary to rule as the *French* court

---

[117]    *Id.* (citing *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1417 (5th Cir. 1997), which held that for purposes of section 547(b) analysis, a debtor retains at least an equitable interest in property that was fraudulently transferred out of the debtor's estate).

[118]    *Id.* at 908 (noting that the Fourth Circuit in *French* failed to address section 541(a)(3)).

did in order to protect the *in rem* jurisdiction of the bankruptcy courts over assets that Congress has declared become property of the estate when recovered under section 541(a)(3).

For these reasons, even after *Colonial Realty* (which addresses a wholly different issue), the Court finds that section 541 evidences an intent by Congress that section 548 can be employed extraterritorially to claw back the December Distribution. Therefore, BI S.à.r.l.'s motion to dismiss Count 19 for failure to state a claim is denied.

## III.

### Jurisdictional Discovery and Leave to Amend

In his opposition brief, the Trustee asserts that if the Court finds that the Complaint does not make out a *prima facie* case for the Court to exercise personal jurisdiction over BI S.à.r.l., the Trustee should be entitled to jurisdictional discovery.

"[I]t is within the trial court's discretion to determine whether a plaintiff is entitled to conduct jurisdictional discovery."[119] However, "if the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional discovery is generally not granted."[120] The Complaint and briefs on this motion were filed before discovery was completed. Between briefing and oral argument on this motion, the parties undertook additional discovery, and discovery has since been completed. Because the Trustee has had significant discovery in this case, the Court believes that additional jurisdictional discovery would be inappropriate.

The Trustee also requests that the dismissal of Counts 14 and 19 for lack of personal jurisdiction be without prejudice and for leave to amend the Complaint. Leave to amend a

---

[119] *RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 402 (S.D.N.Y. 2009) ("**RSM Production**") (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

[120] *RSM Production*, 643 F.Supp.2d at 402 (citing *Jazini*, 148 F.3d at 186).

complaint "shall be freely given when justice so requires."[121]  Leave to amend should be granted in the absence of "evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility."[122]

The Court does not believe that the Defendant would be prejudiced by the Trustee's amendment of the Complaint, or that such an amendment would be futile.  Counsel for the Trustee represented to the Court at oral argument that it obtained additional information through discovery conducted after the Complaint was filed and after briefing was completed on this motion.   Thus, although the facts alleged here are insufficient for the exercise of personal jurisdiction over BI S.à.r.l., it is possible that with this new information, the Trustee may be able to plead legally sufficient, non-conclusory allegations establishing a *prima facie* case of personal jurisdiction over BI S.à.r.l.  Therefore, the dismissal of Counts 14 and 19 for lack of personal jurisdiction is without prejudice, and the Trustee is granted leave to amend.

Conclusion

For the reasons stated above, BI S.à.r.l.'s motion to dismiss Counts 14 and 19 of the Amended Complaint for lack of personal jurisdiction is granted; BI S.à.r.l.'s motion to dismiss Count 19 for failure to state a claim is denied; the Trustee's request to conduct further jurisdictional discovery is denied; but the Trustee is granted leave to amend his Complaint again to cure the deficiencies as to personal jurisdiction.

SO ORDERED.

Dated: New York, New York                        **_s/Robert E. Gerber_**
        January 4, 2016                          United States Bankruptcy Judge

---

[121]    Fed. R. Civ. P. 15(a).

[122]    *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 283 (2d Cir. 2000).

# APPENDIX A

Weisfelner v. Blavatnik, Adv. No. 09-01375

## APPENDIX A*

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 1 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 2 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 3 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers[1] |
| 4 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers |
| 5 | Breach of fiduciary duty | Lyondell Pre-Merger Directors |
| 6 | Mismanagement and breach of duty under Luxembourg law | Leonard Blavatnik[2] |
| 7 | Tort under Luxembourg law | Blavatnik;[3] the GP Managers; the Nominees; and the Successors[4] |

---

[*] Except as to Count 6, (*see* n.2, *infra*), counts and claims listed below are based on the amended complaint dated July 23, 2010 [Dkt. 381] (the "**Complaint**"). This table does not reflect subsequent dismissals of claims or defendants by stipulation of the parties or by order of the Court.

[1] Pre-Merger, in addition to chairman and CEO Dan Smith, Lyondell had ten outside directors on its Board of Directors: Carol Anderson, Susan Carter, Stephen Chazen, Travis Engen, Paul Halata, Daniel Huff, David Lesar, David Meachin, Daniel Murphy, and William Spivey (collectively, the "**Lyondell Pre-Merger Directors**"). The relevant Lyondell officers identified in the Complaint as named defendants are: James Bayer, T. Kevin DeNicola, Bart de Jong, Edward Dineen, Kerry Galvin, Morris Gelb, John Hollinshead, and W. Norman Philips (collectively, the "**Lyondell Pre-Merger Officers**").

[2] This Count 6 is based upon the second amended complaint dated September 29, 2011 [Dkt. 598].

[3] Although the Complaint did not specify whether Count 7 is asserted against Leonard Blavatnik or Alex Blavatnik, who is also a named defendant in this action, the Court understands this claim to be asserted against Leonard Blavatnik.

[4] The "**GP Managers**" are identified in the Complaint as including: Alan Bigman, Richard Floor and Philip Kassin. The "**Nominees**" are defined in the Complaint as including: Simon Baker, Dawn Shand, and Bertrand Duc. The "**Successors**" are defined in the Complaint as including: Philip Kassin, Lincoln Benet, Lynn Coleman, and Richard Floor.

Richard Floor is deceased and Diane Currier has been appointed as the executor for the estate of Richard Floor.

Weisfelner v. Blavatnik, Adv. No. 09-01375

## APPENDIX A*

| Count | Claim | Defendant Parties |
|---|---|---|
| 8 | Breach of fiduciary duty | Subsidiary Directors[5] |
| 9 | Avoidance preference under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 10 | Equitable subordination under the Bankruptcy Code | AI International, S.à.r.l. |
| 11 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell Limited; Deutsche Bank Securities Inc.; and Perella Weinberg Partners LP |
| 12 | Breach of contract | Access Industries Holdings LLC; and AI International, S.à.r.l. |
| 13 | Illegal dividends or redemption | Lyondell Pre-Merger Directors |
| 14 | Unlawful distribution and extra-contractual tort under Luxembourg law | Leonard Blavatnik; the GP Managers; BI S.à.r.l.; Alan Bigman; Alex Blavatnik; Peter Thorén; Simon Baker; and the Nominees |
| 15 | Declaratory judgment for characterization of purported loan advances under the Access Revolver as capital contributions | Access Industries Holdings LLC; and the Lyondell Post-Merger Directors[6] |
| 16 | Illegal dividends | Lyondell Post-Merger Directors |
| 17 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 18 | Aiding and abetting breach of fiduciary duty under applicable state law and Luxembourg law | Nell Limited; Access Industries Holdings, LLC; Access Industries, Inc.; AI International, S.à.r.l.; AI Chemical Investments LLC |

---

[5] The "**Subsidiary Directors**" are identified in the Complaint as including: Kevin Cadenhead, Charles Hall, Rick Fontenot, and John Fisher Gray.

[6] The "**Lyondell Post-Merger Director**" are identified in the Complaint as including: Alan Bigman, Edward Dineen, and Morris Gelb.

Weisfelner v. Blavatnik, Adv. No. 09-01375

**APPENDIX A***

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 19 | Constructive fraudulent transfer under the Bankruptcy Code | BI S.à.r.l. |
| 20 | Breach of fiduciary duty | Dan Smith; T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |
| 21 | Aiding and abetting breach of fiduciary duty | T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |