UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LYONDELL CHEMICAL COMPANY, *et al.*,<br><br>        Debtors.<br><br>EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE<br>OF THE LB LITIGATION TRUST,<br><br>        Plaintiff,<br><br>      v.<br><br>LEONARD BLAVATNIK, *et al.*,<br><br>        Defendants. | Chapter 11 Cases<br><br>No. 09-10023 (REG)<br><br>(Jointly Administered)<br><br><br><br><br><br><br><br>Adversary Proceeding<br>No. 09-01375 (REG) |

DECISION AND ORDER ON DEFENDANTS'
MOTIONS TO DISMISS COUNTS 12, 15, AND 16

APPEARANCES:

BROWN RUDNICK, LLP
*Counsel for Plaintiff Edward S. Weisfelner, as Litigation Trustee*
 *of the LB Litigation Trust*
Seven Times Square
New York, New York 10036
By: Sigmund S. Wissner-Gross, Esq.
   May Orenstein, Esq.
One Financial Center
Boston, Massachusetts 02111
By: Steven D. Pohl, Esq. (argued)

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
*Attorneys for Defendant Alan S. Bigman*
75 East 55th Street
New York, New York 10022
By: Bill Novomisle, Esq.
   Douglas Koff, Esq.

DLA PIPER, LLP
*Attorneys for Defendant Alan S. Bigman*
500 Eighth Street NW
Washington, D.C. 20004
By:    James D. Wareham, Esq.

QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
*Attorneys for Defendants Access Industries, Inc.; Access Industries Holdings LLC;*
  *AI International, S.à.r.l.; Nell Limited; BI S.à.r.l; Len Blavatnik;*
  *Lincoln Benet; Philip Kassin; Peter Thorén; and Alex Blavatnik*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Richard I. Werder, Jr., Esq. (argued)
        Susheel Kirpalani, Esq.
        Benjamin Finestone, Esq.

COVINGTON & BURLING, LLP
*Attorneys for Defendant Edward J. Dineen*
620 Eighth Avenue
New York, New York 10018
By:    Dianne Coffino, Esq. (argued)
        Andrew Ruffino, Esq.
        Andrea Gildea, Esq.

PORTER & HEDGES, L.L.P.
*Attorneys to Defendant Morris Gelb*
1000 Main, 36th Floor
Houston, TX  77002
By;    John F. Higgins, Esq.
        Eric. D. Wade, Esq.
        Thomas A. Woolley, III Esq.

DENTONS US LLP
*Attorneys to Defendant Morris Gelb*
1221 Avenue of the Americas
New York, New York 10020
By:    Peter D. Wolfson
        Arthur H. Ruegger

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity controlled by

Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company ("**Lyondell**"), a

Delaware corporation headquartered in Houston—forming a new company after a merger (the

"**Merger**"), LyondellBasell Industries AF S.C.A. (as used by the parties, "**LBI**," or here, the

"**Resulting Company**"),[1] Lyondell's parent—by means of a leveraged buyout ("**LBO**").  The

LBO was 100% financed by debt, which, as is typical in LBOs, was secured not by the acquiring

company's assets, but rather by the assets of the company to be acquired.  Lyondell took on

approximately $21 billion of secured indebtedness in the LBO, of which $12.5 billion was paid

out to Lyondell stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped

Lyondell filed a petition for chapter 11 relief in this Court.[2]  Lyondell's unsecured creditors then

found themselves behind that $21 billion in secured debt, with Lyondell's assets effectively

having been depleted by payments of $12.5 billion in loan proceeds to stockholders.  Lyondell's

assets were allegedly also depleted by payments incident to the LBO and the Merger—of

approximately $575 million in transaction fees and expenses, and another $337 million in

payments to Lyondell officers and employees in change of control payments and other

management benefits.

---

[1]    Acronyms make understanding difficult for readers who have not been living with a case.  The Court tries
       to minimize their use. For readability, except where acronyms appear in quotations or have acquired
       obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the
       entity's role in the transaction.

[2]    Lyondell then filed along with 78 affiliates. About three months later, the Resulting Company and another
       Lyondell affiliate joined them as Debtors in this Court.

Those events led to the filing of what are now five adversary proceedings—three against shareholder recipients of that $12.5 billion, one dealing with unrelated issues,[3] and one other—this action, which was originally the first of the five—against Blavatnik and companies he controlled; Lyondell's officers and directors; and certain others.

In his Amended Complaint (the "**Complaint**") in this adversary proceeding (brought, like the others, under the umbrella of the jointly administered chapter 11 cases of Lyondell, the Resulting Company and their affiliates (the "**Debtors**")), Edward S. Weisfelner (the "**Trustee**"), the trustee of the LB Litigation Trust (one of two trusts formed to prosecute the Debtors' claims), asserts a total of 21 claims against the defendants in this action. The 21 claims variously charge breaches of fiduciary duty; the aiding and abetting of those alleged breaches; intentional and constructive fraudulent conveyances, unlawful dividends, and a host of additional bases for recovery under state law, the Bankruptcy Code, and the laws of Luxembourg, under which several of the Basell entities were organized.[4] The Complaint also seeks to equitably subordinate defendants' claims that might otherwise be allowed.

The Trustee's Complaint, in turn, engendered a large number of motions to dismiss. This is one of several opinions ruling on those motions[5]—here relating to Counts 12, 15, and 16.[6]

Those counts relate to a $750 million revolving credit facility (the "**Revolver**")—one of several debt facilities into which the Debtors ultimately entered—under which the Resulting

---

[3]   *See Weisfelner v. NAG Investments, LLC*, Adv. Proc. 11-01844.

[4]   A table listing all of the claims and the particular defendants against whom they were asserted appears in Appendix A. The Complaint numbers each claim using a Roman number. To make them easier to read, the Court has referred to the claims using Arabic ones.

[5]   This Court issued other opinions on 12(b)(6) motions in the related adversary proceedings against selling shareholders. *See Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348 (Bankr.S.D.N.Y.2014); *Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 541 B.R. 172 (Bankr. S.D.N.Y. 2015).

[6]   To avoid a decision of unwieldy length, the Court's rulings on the other motions appear in separate decisions.

Company, Lyondell and Basell Finance Company, B.V. ("**Basell Finance**") were the borrowers

(collectively, the "**Borrowers**"), and Access Industries Holdings LL ("**Access Holdings**") and its

assignee AI International, S.á.r.l. ("**AI International**") were the lenders (collectively, the

"**Lenders**").  The Revolver was put into place following the Merger in an attempt to supply

Lyondell with much-needed liquidity.  Count 12 charges the Lenders with breach of the Resolver

agreement by reason of their failure to fund upon a draw request in December 2008, shortly

before the Debtors' chapter 11 filing.  Counts 15 seeks to recharacterize the Revolver as equity,

and, assuming the Revolver debt is recharacterized as equity, to impose liability against the post-

Merger Board of Directors of Lyondell (the "**Post-Merger Directors**") for unlawful dividends

based on the repayment of the Revolver debt.

The Lenders assume potential liability under Count 12 for 12(b)(6) purposes, but seek to

dismiss Count 12 under provisions of the Revolver documentation exempting them from liability

for "any special, punitive, indirect or consequential damages related to this Agreement."  And

the Lyondell Post-Merger Directors (who might be civilly liable for illegal dividends for

Lyondell's repayments to the Lenders if the Revolver is recharacterized as equity) move to

dismiss the Trustee's recharacterization claim in Count 15, and then the illegal dividend claims

in Count 16 that might exist if the recharacterization claims were upheld.

For the reasons set forth below, the Court:

(1) Denies the motion to dismiss Count 12 to the extent Count 12 seeks

restitutionary damages, but grants the motion to the extent Count 12 seeks damages of

other types;

(2) Grants the motion to dismiss Count 15, seeking recharacterization; and

(3) Grants the motion to dismiss Count 16, charging illegal dividends.

-3-

The bases for the Court's determination follow.

Facts

The Complaint is quite detailed, at over 140 pages, but most of those details are unnecessary for purposes of the motions being decided here. Useful background may be found in the Court's prior opinions in the actions brought by the Trustee against selling shareholders, familiarity with which is assumed. To minimize the length of this already very long decision, the Court summarizes background facts essential for context and ease of reference, but otherwise focuses only on facts relevant to Counts 12, 15, and 16.

As previously noted, the gist of the Trustee's claims is that the Merger—and more importantly, the highly leveraged financing of the Merger—left the newly formed Resulting Company, Lyondell and many of their affiliates insolvent, inadequately capitalized, and grossly overleveraged. To finance the Merger, Lyondell and Lyondell affiliates incurred obligations of approximately $20.7 billion, entering into several borrowing facilities (collectively, the "**Merger Loans**"), secured by one type of collateral or another:

(i) a senior credit facility (consisting of term and revolving loans) in the aggregate amount of approximately $12.4 billion;

(ii) second lien bridge loans in the total amount of $8 billion; and

(iii) a $1 billion inventory-based revolving credit facility (the "**ABL Inventory Facility**");[7] and

---

[7]    "ABL" is an acronym not uncommonly used to refer to "asset based lending"—*i.e.* lending secured by assets of one or more particular types, with lending advances made under a formula pegged to the value of the underlying collateral. The Court understands that to be the meaning of ABL as it was used here.

(iv) a $1.15 billion receivables securitization credit facility (the "**ABL Receivables Facility**," and together with the ABL Inventory Facility, the "**ABL Facilities**").

But by the time the Merger closed in December 2007, the Debtors were already experiencing a liquidity crisis. And within weeks after the Merger, the Resulting Company's management was forced to seek a $600 million "upsize" in its borrowing capacity under the ABL Facilities.

While waiting for additional funds to become available through the upsizing of the ABL Facilities, the Borrowers entered into the agreement with Access Holdings, as lender, dated March 27, 2008 (the "**Revolver Agreement**"), underlying the Revolver. It provided for a $750 million *unsecured* revolving line of credit. Among many other provisions, the Revolver Agreement included one of particular relevance here. Its Section 9.05, captioned "Indemnification by the Borrowers," stated, in relevant part:

> Whether or not the transactions contemplated hereby are consummated, the Borrowers shall . . . indemnify and hold harmless the Lender and its Affiliates, and the directors, officers, partners, employees . . . from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may at any time be imposed, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with [the Revolver]. . . . [*No Indemnitee*] *shall have any liability for any special, punitive, indirect or consequential damages related to this Agreement* . . . *or arising out of its activities in connection herewith or therewith.*[8]  (emphasis added)

Even as the parties were putting the Revolver into place, "the intention was to use [it] only as a last resort" and to delay a draw until the ABL Facilities' lead agents and arrangers

---

[8]       Revolver Agreement (Exh. A to Decl. of Dianne Coffino) [Dkt. No. 402-2], § 9.05.

could syndicate the Merger Loans.[9]  But Lyondell's liquidity problems only worsened over the next seven months.  On October 15, 2008, Lyondell drew down $300 million of the Revolver. But almost immediately thereafter, this draw-down was repaid in increments of $100 million on October 16th, 17th, and 20th.

Lyondell's liquidity continued to suffer into December 2008, and Lyondell began negotiating forbearance agreements with its secured lenders.  On December 12, 2008, Lyondell advised Access Holdings that Lyondell would need to draw $400 to $450 million under the Revolver at the end of the year, but that Lyondell would be unable to repay the borrowings for several months.  Five days later (so that draws under the Revolver could be funded with offshore funds), Access Holdings assigned the Revolver to AI International, a Luxembourg entity.  But by then, the Resulting Company's management and Blavatnik were already in discussions with restructuring advisors and preparing for a Chapter 11 filing.  On December 30, 2008, "even though Lyondell managers knew that AI International would reject the request," Lyondell requested a draw on the Revolver for the entire $750 million.[10]  AI International did indeed reject the request. Lyondell and most of the other Debtors filed chapter 11 petitions on January 6, 2009, one week later.

<u>Discussion</u>

The standards for deciding a motion to dismiss under Rule 12(b)(6) are well known.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[11]  But legal conclusions couched as factual

---

[9]    Cmplt. ¶ 294.

[10]    *Id.* ¶ 311.

[11]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("***Iqbal***") (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("***Twombly***").

allegations are not entitled to the assumption of the truth.[12]  "A claim has facial plausibility," the

Supreme Court has explained:

> when the plaintiff pleads factual content that allows the
> court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged.  The plausibility standard
> is not akin to a probability requirement, but it asks for more
> than a sheer possibility that a defendant has acted
> unlawfully.  Where a complaint pleads facts that are merely
> consistent with a defendant's liability, it stops short of the
> line between possibility and plausibility of entitlement to
> relief.[13]

Determining whether a complaint states a plausible claim for relief is a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.[14]

A trial court's function on a motion to dismiss is "not to weigh the evidence that might be

presented at trial but merely to determine whether the complaint itself is legally sufficient."[15]  A

complaint is "deemed to include any written instrument attached to it as an exhibit or any

statements or documents incorporated in it by reference."[16]  Where the plaintiff has relied "on the

terms and effect of a document in drafting the complaint," the court may consider the document

on a dismissal motion.[17]  Defendants may raise affirmative defenses on a motion to dismiss, but

only "if the defense appears on the face of the complaint."[18]

---

[12]    *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in the
complaint is inapplicable to legal conclusions").

[13]    *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

[14]    *Id.* at 679.

[15]    *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[16]    *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("***Cortec Industries***").

[17]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[18]    *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158
(2d Cir. 2003) ("***Color Tile***") (citations omitted).

## I.

### Count 12 (Breach of Duty to Fund Under the Revolver)

The Complaint alleges that Access Holdings and AI International breached the Revolver Agreement by rejecting the December 30, 2008 draw request, and that the Resulting Company suffered damages as a result of that breach. For the purpose of their motion to dismiss, the Lenders assume liability—that AI International breached the Revolver Agreement when it failed to fund the $750 million. But they assert that the limitation on damages provision in the Revolver Agreement bars the Trustee from collecting damages for any such breach, and that Count 12 therefore must be dismissed.

In response, the Trustee contends that the Revolver Agreement's limitation on damages is unenforceable under New York law.[19] The Trustee additionally asserts that even if the limitation on damages provision is enforceable, the Trustee is still entitled to recover restitution. The Court disagrees with the Trustee's first contention, but agrees with the second.

#### A. *Enforceability of the Limitation on Damages Provision*

As noted above when it was quoted in full, the Revolver Agreement's Section 9.05 provides, among other things, that no Lender:[20]

> shall have any liability for any special, punitive, indirect or consequential damages related to this Agreement . . . or arising out of its activities in connection herewith or therewith.

If that language is enforceable, any claims for "special, punitive, indirect or consequential damages" are proscribed.

---

[19]    Section 9.15 of the Revolver Agreement provides that New York law governs. *See also* Hr'g Tr., dated Mar. 10, 2011 [Dkt. No. 520], at 133.

[20]    The Revolver Agreement made reference to an "Indemnitee." By a series of definitional cross-references unnecessary to address at length here, each of the Lenders was an "Indemnitee."

Limitation on damages clauses, such as Section 9.05 of the Revolver Agreement, are

generally enforceable under New York Law.  "A limitation on liability provision in a contract

represents the parties' agreement on the allocation of the risk of economic loss in the event that

the contemplated transaction is not fully executed, which the courts should honor."[21]  But New

York courts have recognized two exceptions to the general enforceability of exculpatory clauses.

The first—sometimes referred to as the "**Disparity in Bargaining Power Exception**"—voids

limits on liability when there is a disparity in bargaining power.  When applicable, it renders a

limitation on damages clause wholly unenforceable, regardless of the nature of the breach at

issue.  The second—sometimes referred to as the "***Kalisch-Jarcho* Exception**," by reason of the

New York Court of Appeals decision recognizing it[22]—renders the clause unenforceable only

with respect to the specific breach at issue, when the breaching party's conduct "smacks of

intentional wrongdoing."[23]

### 1.  Disparity in Bargaining Power Exception

Under the first exception, a limitation on liability or damages clause will not be enforced

in New York if the provision was "the result of unconscionable conduct or unequal bargaining

power between the parties."[24]  Likewise, courts in other states recognize a similar exception to

---

[21]     *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436, 643 N.E.2d 504, 507, 618 N.Y.S.2d 882, 885 (1994) ("***Metropolitan Life***").

[22]     *See Kalisch-Jarcho, Inc. v. City of New York,* 58 N.Y.2d 377, 448 N.E.2d 413, 461 N.Y.S.2d 746 (1983) *("**Kalisch-Jarcho**").*

[23]     *Id.* at 384.

[24]     *CAMOFI Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (Chin, J.) (citing *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) (Hellerstein, J.) ("***DynCorp***")); *see also Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.*, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005) (Hellerstein, J.) ("[P]arties, especially those of equal bargaining power, should be able to rely upon the general New York rule that enforces contracts for the release of claims of liability.").

the enforceability of exculpatory clauses, and their decisions serve as persuasive authority.[25]

These cases, taken as a whole, tell us that courts will invalidate an exculpatory clause if, but only

if, the court finds unconscionability or a disparity in bargaining power.  The plaintiff bears the

burden of demonstrating that such provision in unenforceable.[26]  Thus, "[c]ourts will not

interfere with contracts containing exculpatory clauses, unless there is a defect in the negotiation

process such that a disparity in bargaining power denied one party a meaningful choice" or there

is "such a disparity of bargaining power that the agreement does not represent a free choice on

the part of the plaintiff, such as a monopoly."[27]

The Trustee notes what he contends are deficiencies in the drafting of the Revolver

Agreement, and contends that it was not negotiated between sophisticated parties at arm's length.

In particular, he asserts that Access Holdings, as the lender and the controlling shareholder of the

Resulting Company, was on both sides of the transaction.  Additionally, the Trustee argues that

the exculpatory clause wasn't "negotiated" at all.  Rather, he contends, Section 9.05 (and

possibly the entire Revolver Agreement) was copied from the ABL Facilities' credit agreement.

---

[25]  *See, e.g., SI Commc'ns, Inc. v. Nielsen Media Research*, 181 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (Batts, J.) ("**SI Communications**") (applying Illinois law); *Mistry Prabhudas Manji Eng. Pvt. Ltd v. Raytheon Eng'rs & Constructors, Inc.*, 213 F. Supp. 2d 20, 25 (D. Mass. 2002) (Saris, J.) ("**Mistry Prabhudas**") (evaluating enforceability of liquidated damages clause under Pennsylvania law); *Stelluti v. Casapenn Enterprises, LLC*, 203 N.J. 286, 300-301, 1 A.3d 678, 687-688 (2010) ("**Stelluti**") (enforcing exculpatory clause in contract under New Jersey law); *Orion Refining Corp. v. UOP*, 259 S.W.3d 749 (Tex. App. 2007) ("**Orion Refining**") (applying Illinois law).

[26]  *See Mistry Prabhudas*, 213 F. Supp. 2d at 27 ("The burden of proof lies with the party who alleges unconscionability."); *Orion Refining*, 259 S.W.3d at 763 ("As the party seeking to avoid an exculpatory clause or limitation, Orion has the burden to establish unenforceability.").

[27]  *SI Communications*, 181 F. Supp. 2d at 412 (citing *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 227 Ill. App. 3d 414, 592 N.E.2d 8, 11-12 (1st App. Div. 1991)); *see also Stelluti*, 1 A.3d 678 (enforcing exculpation clause in a case involving an unsophisticated consumer plaintiff who was presented with a contract on "take-it-or-leave-it" basis because (1) the contract related to widely-available services such that the plaintiff could have gone elsewhere, (2) the plaintiff could have sought legal advice before signing the contract, and (3) no time limitation was placed on her ability to do so) (some quotation marks omitted).

But assuming the factual predicates for these arguments to be true, the Court nevertheless cannot find the requisite disparity in bargaining power here.

First, the factual allegations do not support the contention that the Revolver parties were not sophisticated parties.  Instead, the Complaint shows that each of Lyondell, Basell Finance, the Resulting Company and Access Holdings were large commercial corporations with experienced directors and officers.[28]

Second, the fact that Access Holdings (as the controlling shareholder of the Resulting Company, Lyondell, and Basell Finance) was on both sides of the transaction, without quite a bit more, is insufficient to show that the Revolver Agreement was not negotiated at arm's length or that there was a disparity in bargaining power such that the Borrowers were denied a meaningful choice in entering the Revolver Agreement.  As the Lenders quite fairly argue,[29] it is implausible to allege that if Blavatnik truly controlled both sides at that time, he would have caused the Borrowers to make a draw demand on the Revolver, and then caused the Lenders to refuse to honor it; the only plausible interpretation is that either Blavatnik did not then control the Borrowers when they made that demand, or chose not to exercise any control he had.  There are no allegations suggesting that the situation was any different when the Revolver was put into place.[30]  And the Revolver Agreement itself states:

> In connection with all aspect of each transaction contemplated hereby . . . , each Loan Party acknowledges and agrees that: (i) (A) the services regarding this Agreement provided the Lender are arm's-length commercial transactions between the Company and the Borrowers and their respective Affiliates, on the one hand,

---

[28]    *See* Cmplt. ¶¶ 23-33, 54-66, 79-81, 86-88.

[29]    *See* Lenders' Count 12 Reply Br., dated Dec. 23, 2010 [Dkt. No. 470], at 2.

[30]    As the Lenders also note in their Count 12 Reply Br. (at p. 5), the Complaint lacks any allegations that Blavatnik had any role in the negotiation of the Revolver.

and the Lender on the other hand, (B) each Loan Party has
consulted its own legal, accounting, regulatory, and tax
advisors to the extent it has deemed appropriate and (C)
each Loan Party is capable of evaluating, and understands
and accepts, the terms, risks and conditions of the
transactions contemplated hereby and by the other Loan
Documents . . .[31]

Third, assuming as true that Section 9.05 was taken from one of the ABL Credit

Facilities' contractual documents, such fact *cuts against* the Trustee's position.  The lenders and

obligors who had negotiated the ABL Facilities plainly were sophisticated commercial parties,

with at least comparable bargaining power, dealing at arm's length.  If it came from the ABL

Facilities, the limitation on damages clause later appearing in Section 9.05, when originally

drafted, *was* negotiated at arm's length by sophisticated parties.  At the very least, it shows that

an exculpatory clause like the one in the Revolver Agreement was commercially reasonable,

appearing in other credit agreements between arm's length sophisticated parties.

For these reasons, the Court concludes that the Complaint fails to adequately allege that

the limitation of damages provision was the result of unconscionability or a disparity in

bargaining power.  The Court cannot, and will not, find Section 9.05 to be unenforceable for that

reason.

### 2.  *The Kalisch-Jarcho Exception*

But even if a limitation on damages provision is the result of arm's length negotiation

between the parties, and there is no disparity in bargaining power, a provision may still be

unenforceable with respect to a specific breach at issue.  As noted above, there is an exception to

the general enforceability of limitation on damages provisions in contracts if the breaching

---

[31]      Revolver Agreement § 9.22.

party's misconduct "smacks of intentional wrongdoing."[32]  In *Kalisch-Jarcho,* the New York

Court of Appeals explained that such misconduct "can be explicit, as when it is fraudulent,

malicious or prompted by the sinister intention of one acting in bad faith.  Or when, as in gross

negligence, it betokens a reckless indifference to the rights of others, it may be implicit."[33]

In *Delphi*, a similar case involving a failure to fund claim, Judge Drain of this Court

applied the *Kalisch-Jarcho* exception to the enforceability of the exculpatory clauses at issue,

and refused to dismiss the plaintiff's action for damages.[34]  There, the debtor Delphi Corporation

sued its would-be investors for terminating the debtor's exit-financing agreement hours before

the closing.  Delphi asserted that the pullout derailed its reorganization and prevented its

emergence from bankruptcy, and sought, among other remedies, specific performance or

---

[32]    *Kalisch-Jarcho,* 58 N.Y.3d at 384.  *See also Global Crossing Telecomm. Inc. v. CCT Commc'ns, Inc. (In re CCT Commc'ns)*, 464 B.R. 97, 106-108 (Bankr. S.D.N.Y. Jul. 22, 2011) (Bernstein, CJ.) ("**CCT Communications**"); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554, 593 N.E.2d 1365, 583 N.Y.S.2d 957(1992) ("**Sommer**")).  This exception applies equally to contract clauses exonerating a party from all liability as well as clauses limiting damages.  *See Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 315 (S.D.N.Y. 2007) (Scheindlin, J.) ("**Trump**") (citing *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 823, 611 N.E.2d 282, 283 (1993).

[33]    *Kalisch-Jarcho,* 58 N.Y.2d at 384-85.  *See also Metropolitan Life*, 84 N.Y.2d at 438 ("limiting [a] defendant's liability for consequential damages to injuries to plaintiff caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy").

The Trustee contends that because the caselaw requires an "intentional wrongdoing" showing to avoid enforceability of exculpation clauses negotiated by sophisticated commercial parties at arm's length— citing *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010) (Chin, J.) ("**Baidu**") ("The gross negligence exception applies even to contracts between sophisticated commercial parties, although a 'more exacting standard of gross negligence' must be satisfied.")—in instances where a contract was not negotiated by sophisticated parties at arm's length, only a lesser showing of "willful or gross negligence" or "recklessly indifference conduct" is required to avoid enforcement of a damages limitation clause.

The Court disagrees.  *Baidu* cited to *Sommer* for support, but the *Sommer* Court neither stated nor suggested that there were two different standards of gross negligence—the word "sophisticated" does not appear anywhere in that decision.  Instead, *Sommer*, like *Kalisch-Jarcho*, makes clear that in all cases, to avoid enforcement of an exculpatory clause, the plaintiff must show that in breaching the agreement, there was *intentional wrongdoing*, which can be "gross negligence that betokens a reckless indifference to the rights of others."

[34]    *Delphi Corp. v. Appaloosa Mgm't L.P. (In re Delphi Corp.)*, 2008 WL 3486615, *5 (Bankr. S.D.N.Y.) (Drain, J.) ("**Delphi**").

monetary damages.  Delphi not only alleged that the investors breached the financing agreement, but also that defendant, Appaloosa:

> either was aware of or even secretly encouraged efforts to denigrate the value of Delphi and its securities, including... short selling of Delphi's stock, so as to surreptitiously increase the likelihood that Delphi would not obtain the third party financing that . . . was required to consummate Delphi's Chapter 11 plan.[35]

Delphi further alleged that "Appaloosa . . . had its counsel assert a specious claim that Delphi not only had breached [the agreement] but also was liable for an $82.5 million Alternate Transaction Fee."[36]  Judge Drain characterized Appaloosa's alleged attempt to sabotage Delphi's efforts to obtain alternate financing as "truly jaw-dropping," and noted that "[s]uch secret efforts might, in fact, even rise to the level of a bankruptcy crime."[37]  Given such alleged conduct, Judge Drain determined that under the *Kalisch–Jarcho* doctrine, the contractual caps on Appaloosa's liability would not necessarily apply, and denied Appaloosa's motion to dismiss.[38]

Courts have also refused to enforce exculpatory clauses where the defendant breached the contract in furtherance of an extortionate ulterior motive.  In *Solow*, a New York state court judge refused to enforce an exculpatory clause and denied the defendant's motion for summary judgment based on a finding that, in breaching the contract, the defendant had acted with malice and bad faith.[39]  In that case, the landlord Solow refused to consent to non-structural modifications to the space leased by the tenant, in breach of the lease agreement.  Solow not only

---

[35]    *Id.* at *6.

[36]    *Id.*

[37]    *Id.* at *7.

[38]    *Id.*  But Judge Drain also decided that the other two defendant-lenders *could* enforce limitation on damages provisions because although these defendants likewise breached, "the complaint [did not] allege[] sufficient jaw-dropping wrongdoing or reckless disregard in respect of those two entities . . . to justify . . . lifting the damage cap . . . under *Kalisch-Jarcho* and *Solow Bldg*."  *Id.* at *21.

[39]    *Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.,* 47 A.D.3d 239, 249; 847 N.Y.S.2d 49, 56 (App. Div. 1st Dep't 2007) ("***Solow***").

breached the contract, but also demanded a fee equal to 3% of the cost of the renovation, or

$6 million.  When the tenant did not pay this fee, Solow instructed his attorneys to serve five

default notices on the tenant.[40]

The *Solow* Court held that the tenant could collect consequential damages for Solow's

unreasonable refusal to consent to 14 alteration proposals despite an exculpatory clause in the

lease that ostensibly shielded Solow from such damages.  It did so because the tenant

demonstrated that Solow withheld approval "for purely ulterior motives, to force [the tenant] to

agree, among other things, to unwarranted demands in the millions of dollars for payments not

called for under the lease. . . . [The tenant] contended that defendant's objective in 'extracting

unwarranted payments' amounts to extortion."[41]

New York courts have also clarified that to invalidate an exculpatory clause, it is

insufficient for the plaintiff to allege or show that the defendant acted with malice or reckless

indifference *in the general course of conduct* between the parties.  Rather, the defendant must

have acted with malice or reckless indifference *in breaching the contract specifically*.

For example, in *Metropolitan Life*, the defendant agreed to license and customize a

computer software program for the plaintiff over the course of several years, and then demanded

an upward increase in the contractually fixed price ceiling when it became unprofitable for the

defendant to continue its performance at the contract price.[42]  When the plaintiff refused the

defendant's demand, the defendant then discontinued its performance in breach of the

agreement.[43]  Despite the defendant's *intentional breach*, the New York Court of Appeals

---

[40]        *Id.*

[41]        *Id.* at 50.

[42]        *Metropolitan Life*, 84 N.Y.2d at 435.

[43]        *Id.*

concluded that the contractual limitation on consequential damages was enforceable.  That was so because the plaintiff was unable to demonstrate that the defendant's conduct *in breaching the contract* was malicious or motivated by anything other than economic self-interest:

> [W]e conclude that plaintiff's proof was insufficient as a matter of law to establish that defendant willfully intended to inflict harm on plaintiff through its abandonment of the contract.  Apart from evidence of alleged misconduct by defendant during the course of its performance of the contract, totally irrelevant to the subsequent withdrawal from the project, the proof, as plaintiff has indeed stressed, was that defendant's repudiation of the Agreement was motivated exclusively by its own economic self-interest in divesting itself of a highly unprofitable business undertaking in order to promote the sale of its computer software division to a competitor company.  Consequential damages resulting from that kind of contract nonperformance constitute a risk which plaintiff assumed under . . . the parties' Agreement.[44]

Applying these principles here, the Court determines that the Complaint fails to sufficiently allege malice or reckless indifference by AI Chemical in refusing to honor Lyondell's drawdown request.  Here, there are no allegations of misconduct on the part of the Lenders anywhere near like those alleged on the part of Appaloosa—and thus *Delphi*, while plainly properly decided, has no material relevance here.  Nor are there any allegations that the Lenders declined to fund as a means of extortion, as in *Solow*.  At most the Complaint plausibly alleges that the Lenders were unwilling to fund by reason of self-interest when they realized that making unsecured loans to Lyondell and the Resulting Company at that point in time would be throwing their money down the drain.  Depending on the nature of their documentation's Material Adverse Change protection, that might or might not excuse them from a finding of breach.  But those allegations would fall far short of alleging the requisite malice.

---

[44]    *Id.* at 439.

The Trustee points to several allegations of misconduct by Blavatnik and (by virtue of being his alter egos) Access Holdings and AI International, as lenders under the Revolver: (i) refusal to put equity into the Resulting Company and approving the overleveraged Merger financing; (ii) facilitating the syndication of the Merger Loans by providing the Revolver; (iii) committing the Resulting Company to borrow an additional $600 million from third party lenders to purchase the Berre L'Etang refinery (even though the Resulting Company desperately needed equity and liquidity); and (iv) mandating that the Borrowers draw on the credit line only as a last resort, and that they repay any such draws immediately.[45]  But these allegations involve conduct unrelated to AI International's alleged breach of the Revolver Agreement—refusing to honor the $750 million draw request—and are insufficient to provide a basis for invalidating the limitation on damages clause.[46]

There is, however, one allegation of misconduct relating specifically to the breach of the Revolver—that the Lenders denied Lyondell's request to draw on $750 million in funds because Blavatnik knew that if Access Holdings (or another Blavatnik controlled entity) could lend to Lyondell as a *post-petition* DIP financing lender—by waiting until Lyondell filed for bankruptcy—Access Holdings would have a better chance to be repaid than it would lending under the Revolver.[47]  But assuming such allegation to be true, it does not indicate intentional malice or gross negligence by Blavatnik or the Lenders towards the Borrowers.

---

[45]     The Complaint did not specifically allege that Blavatnik mandated the "unstated term" that advances under the Revolver be repaid immediately. Instead, this allegation was raised in the Plaintiff's Memorandum of Law.  *See* Cmplt. ¶¶ 294, 302; Trustee Count 12 Opp. Br., dated Nov. 24, 2010 [Dkt. No. 457], at 1.

[46]     *See Metropolitan Life*, 84 N.Y.2d at 439 (concluding that defendant's alleged misconduct during course of its performance of the contract was "totally irrelevant" to the specific breach at issue and enforcing limitation on damages clause).

[47]     *See* Cmplt. ¶ 308.

-17-

Rather, it suggests that (like a possible decision on the part of the Lenders here to decline to make an unsecured loan to a probably insolvent borrower already loaded up with secured debt) the refusal to fund the draw was an economically-motivated business decision. Indeed, other allegations in the Complaint show that Blavatnik and the Lenders had considered whether to fund to the Borrowers, but were concerned with mitigating their losses. These include, for example, allegations that (i) the Revolver had been assigned by Access Holdings to AI International, a Luxembourg corporation, "so that draws under the Revolver can be funded with offshore funds," in contemplation of the draw requests that Lyondell said it would need at year end 2008; (ii) Access Holdings reacted with distress when Lyondell indicated that the potential year-end drawdowns would not be repaid for several months (which, given the timing, might mean *after* Lyondell filed for bankruptcy); and (iii) Blavatnik was effectively advised by Lazard not to throw good money after bad.[48]

While a claim of economic self-interest would not absolve a party if its conduct *were* intentionally malicious or reckless (as one can see from *Solow*, for example), the allegations of misconduct here do not rise to that level.[49]

Thus the Court concludes that the Trustee's allegations fall short of those necessary to justify invalidating the limitation on damages clause. Accordingly, the Trustee may not recover

---

[48]    *See* Cmplt. ¶¶ 305-307.  According to the Complaint, a Managing Director at Lazard, Ltd., who was seeking to be retained for LBI's restructuring, allegedly told Blavatnik that not only would an additional $1 billion infusion ($250 million more than the Revolver limit) be insufficient to save the equity in Lyondell, but Blavatnik would not get that money back.

[49]    *See Net2Globe Int'l, Inc. v. Time Warner Telecomm. of New York*, 273 F. Supp. 2d 436, 451 (S.D.N.Y 2003) (Marrero, J.) (finding that defendant's alleged misconduct "amounted to an effort to mitigate costs and consequentially diminish the amount of the charges passed on to [the plaintiff]," and that "this economically motivated decision cannot, as a matter of law, rise to the level of malice or intentional wrongdoing necessary to invalidate the contracts' limitation on liability provision.").

any "special, punitive, indirect or consequential" damages[50] arising from any Lender's breach of the Revolver Agreement.

### B. Restitutionary Damages

The Trustee further argues, however, that even if the exculpatory clause is enforceable, he still is entitled to restitution for approximately $12 million in fees that Lyondell paid to Access Holdings under the Revolver. The Lenders contend that restitutionary damages are "special damages," and likewise disallowed by the limitation on damages clause. In this respect, the Court agrees with the Trustee.

Section 9.05 protects the Lenders from any "special, punitive, indirect or consequential damages related to this Agreement."[51] The term "special damages" is synonymous with "consequential damages," and both refer to damages that do not flow directly from the breach of the contract, but are still caused by the breach.[52] Restitution, on the other hand, "aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, *without attempting to compensate her for consequential harms*."[53]

---

[50]     Revolver Agreement § 9.05.

[51]     *Id.*

[52]     *See generally, CCT Communications*, 464 B.R. at 117; *Amer. List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 43, 550 N.Y.S.2d 590, 593, 549 N.E.2d 1161, 1164 (1989); *Kenford Co. Inc. v. County of Erie*, 73 N.Y.2d 312, 537 N.E.2d 176, 540 N.Y.S.2d 1 (1989). *See also* Restatement (Second) of Contracts § 351 cmt. b. (1981) ("The damages recoverable for loss that results other than in the ordinary course of events are sometimes called 'special' or 'consequential' damages.").

[53]     *360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)*, 404 B.R. 335, 341 (S.D.N.Y. 2009) (Holwell, J.) (citations omitted). *See also* Restatement, Restitution, § 150, cmt. a. (1937) ("In an action in restitution in which the benefit received was money, the measure of recovery for this benefit is the amount of money received"); Restatement (Second) of Contracts § 371 cmt. a. (1981) ("a party who is liable in restitution for a sum of money must pay an amount equal to the benefit that has been conferred upon him"); Black's Law Dictionary (10th ed. 2014) (defining "restitution damages" as damages awarded to a plaintiff when the defendant has been unjustly enriched at the plaintiff's expense).

-19-

In *Three S Delaware*,[54] the Fourth Circuit, faced with a contract with a very similar

limitation on damages, addressed a similar issue.  There the contract provided that "[i]n no event,

shall either party be liable for any indirect, incidental or consequential damages, including, but

not limited to, lost income or lost revenue."[55]  The loser of an arbitration, found by the arbitrator

to owe the winner over $6 million, sought to have the arbitrator's award set aside, asserting that

damages were barred by the limitation of damages provision.  The Fourth Circuit disagreed,

explaining:

> [T]he Agreement does not . . . prohibit an award of
> restitution, the type of damages the arbitrator awarded for
> [the defendant's] unjust enrichment claim.  Because an
> award based on unjust enrichment does not contradict the
> clear language of the Agreement, [the plaintiff] cannot
> meet its burden of showing that the Award is not drawn
> from the essence of the Agreement, and the Award cannot
> be vacated on this ground.[56]

It is clear, then, that restitution is distinct in character from special or consequential

damages, and the Trustee here has alleged that the Borrowers paid fees (pursuant to both the

Revolver Agreement and "the terms of a separate side letter") in the total approximate amount of

$12 million.[57]  Such fees were incurred separate and apart from any consequential damages

resulting from the breach, and although the consequential damages cannot be recovered, the fees

can.[58]  At least at the 12(b)(6) stage, the Trustee has plausibly alleged that fees the Borrowers

---

[54]    *See Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.,* 492 F.3d 520 (4th Cir. 2007).

[55]    492 F.3d 520, 528 (4th Cir. 2007).

[56]    *Id.* at 528-529.  *See also CCT Communications*, 464 B.R. at 118 (explaining that defendant conceded that
        clause providing, "[i]n no circumstances shall either we or you be liable for indirect, consequential,
        reliance, or special loss or damages or for lost revenues, lost savings, lost business opportunity or lost
        profits of any kind," did not prevent plaintiff from recovering restitution).

[57]    *See* Trustee Count 12 Opp. Br. at 17; 3/10/11 Hr'g Tr. at 141-143.

[58]    The views in this decision conform to those in the recent decision by Judge Chapman of this Court in the
        *Lehman* bankruptcy case.  *See In re Lehman Bros. Holdings, Inc.*, 2015 Bankr. LEXIS 4369, *29, 2015
        WL ---- (Bankr. S.D.N.Y. Dec. 29, 2015).  There, the claimant Spanish Broadcasting asserted a claim for

-20-

paid for financing they could not draw upon unjustly enriched the Lenders, and that the Trustee

is entitled to restitution for them.  Thus the Court agrees with the Trustee that the limitation on

damages clause, even though the Court has found it to be enforceable, does not preclude

recovery of restitution.

Accordingly, dismissal of Count 12 is denied to the extent the Trustee seeks damages for

restitution.  It otherwise is granted.

<u>II.</u>

<u>Count 15 (Recharacterization of the Revolver)</u>

In Count 15, the Trustee seeks to recharacterize, as an equity contribution, the

$300 million drawn down under the Revolver on October 15, 2008,[59] arguing that the

circumstances surrounding the Revolver indicated that the parties intended it to be a capital

infusion. [60]

It has long been established that "bankruptcy courts, as courts of equity, have broad

authority to modify creditor-debtor relationships."[61]  The purpose of this equitable power is so

"that fraud will not prevail, that substance will not give way to form, [and] that technical

---

damages (including fees paid to Lehman as administrative agent) stemming from Lehman's failure to fund under a credit agreement that contained a provision waiving "special, exemplary, punitive or consequential damages."  Judge Chapman found the damages waiver enforceable, and disallowed that component of the claim.  But although not the subject of the dispute, the fee damages (though only the fee damages) component of the claim was ultimately allowed as that was not a consequential damage subject to the waiver clause.

[59]    This is the same $300 million that was repaid, in increments of $100 million each, on October 16, 17 and 20.  *See* discussion under Facts section, *supra*.

[60]    The issue before the Court here is whether the complaint states a claim for recharacterization of debt as equity.  The Complaint contains a separate claim against AI International for equitable subordination, Count 10, which the defendants have not here moved to dismiss.  Recharacterization and equitable subordination address distinct concerns.  *See In re SubMicron Systems Corp.*, 432 F.3d 448, 454 (3d Cir. 2006) ("***SubMicron***") ("Equitable subordination is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants.  In contrast, the focus of the recharacterization inquiry is whether 'a debt actually exists.'" (internal citations omitted)).

[61]    *United States v. Energy Res. Co.,* 495 U.S. 545, 549 (1990) (citations omitted).

considerations will not prevent substantial justice from being done."[62]  Bankruptcy courts have

utilized this power to, among other things, recharacterize debt as equity,[63] and there can be little

doubt that bankruptcy courts have the power to recharacterize debt as equity when such is

warranted by the facts.  But the Lyondell Post-Merger Directors, while not disputing that,

counter that the pleadings do not support recharacterization under an analysis of the *Autostyle*

factors,[64] and thus move, under Rule 12(b)(6), to dismiss Count 15.

### A.  The AutoStyle Factors

The leading case on recharacterization doctrine in bankruptcy is *SubMicron*,[65] where the

Third Circuit, speaking through Judge Ambro, addressed not only the factors to be considered,

but their conceptual underpinnings and *how* they should be considered.[66]  The *SubMicron* court

started with the history.  It explained that in *Roth Steel Tube Co. v. Comm'r,*[67] the Sixth Circuit

laid out eleven factors to determine whether an investment was debt or equity in the context of

assessing income tax liability.[68]  Then, the *SubMicron* Court explained, *AutoStyle* extended the

use of those factors to the recharacterization context.[69]

---

[62]     *Pepper v. Litton*, 308 U.S. 295, 305 (1939).

[63]     *See In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749 (6th Cir. 2001) ("*AutoStyle*") ("we join those courts that have concluded that a bankruptcy court has the power to recharacterize a claim from debt to equity"); *Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 231 (4th Cir. 2006) ("*Dornier Aviation*") ("In our view, recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the application of the priority scheme laid out in § 726."); *Adelphia Commc'ns Corp. v. Bank of America, N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 n.209 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("*Adelphia-Bank of America*") (rejecting contention that bankruptcy courts lack authority to recharacterize debt as equity, noting that *Dornier Aviation* had rejected that exact contention).

[64]     *See Autostyle*, 269 F.3d at 749-750.

[65]     *See* n.60 *supra*.

[66]     *See SubMicron*, 432 F.3d at 455-56 & n.8.

[67]     800 F.2d 625 (6th Cir.1986) ("*Roth Steel*").

[68]     *See id.* at 630.

[69]     *See Autostyle,* 269 F.3d at 749-50.

Those factors are now widely used.[70]  They are:

> (1) the names given to the instruments, if any, evidencing the indebtedness;
>
> (2) the presence or absence of a fixed maturity date and schedule of payments;
>
> (3) the presence or absence of a fixed rate of interest and interest payments;
>
> (4) the source of repayments;
>
> (5) the adequacy or inadequacy of capitalization;
>
> (6) the identity of interest between the creditor and the stockholder;
>
> (7) the security, if any, for the advances;
>
> (8) the corporation's ability to obtain financing from outside lending institutions;
>
> (9) the extent to which the advances were subordinated to the claims of outside creditors;
>
> (10) the extent to which the advances were used to acquire capital assets; and
>
> (11) the presence or absence of a sinking fund to provide repayments.[71]

While "[o]ther cases include other factors, or state the factors somewhat differently, [] they do not differ in material respects."[72]

No one factor is dispositive of either the intent of the parties or whether a loan should be recharacterized as equity.[73]  And a court can find recharacterization to be appropriate even if less than all of the factors weigh in favor of a capital contribution.[74]

---

[70]  *See, e.g., Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 157–60 (Bankr. S.D.N.Y. 2009) (Glenn, J.) ("*S & B Holdings*") (applying *AutoStyle* factors); *Adelphia-Bank of America*, 365 B.R. at 74 (same); *Dornier Aviation*, 453 F.3d at 233–34 (same); *In re Broadstripe, LLC*, 444 B.R. 51, 95–101 (Bankr. D. Del. 2010) (Sontchi, J.) ("*Broadstripe*") (same).

[71]  *AutoStyle*, 269 F.3d at 749–50.  These factors are derived from tax law.  *See Roth Steel*, 800 F.2d at 630) (determining whether advances to a corporation were loans or capital contributions using the 11 listed factors for the purpose of establishing rights to a tax deduction); *Adelphia-Bank of America*, 365 B.R. at 74.

[72]  *Adelphia-Bank of America*, 365 B.R. at 74.  *See also Dornier Aviation*, 453 F.3d at 234, n.6; *SubMicron*, 432 F.3d at 455–56 & n.8.

[73]  *AutoStyle*, 269 F.3d at 750 ("No one factor is controlling or decisive."); *S & B Holdings*, 420 B.R. at 157 (same); *Sender v. Bronze Group, Ltd. (In re Hedged-Investments Assocs.)*, 380 F.3d 1292, 1298–99 (10th

On a motion to dismiss, a complaint "would have to plead facts to trigger the applicability of the *AutoStyle* factors or their equivalent, or a meaningful subset of them" to avoid dismissal.[75]  Upon consideration of the facts as pleaded here, and though some of the factors cut in the opposite direction, the Court determines, on balance, that the Trustee has failed to do so.

1.    *Names given to the instruments*
       *evidencing the indebtedness*

As to the first factor, "[t]he issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness."[76]  When an advance occurs without any instruments of indebtedness, such an action points to an equity contribution.[77]

But here, of course the advance the Trustee seeks to recharacterize as equity was indeed documented with instruments of indebtedness, and was fully documented as a loan.  The advance came from the Revolver, pursuant to the Revolver Agreement.[78]  The parties themselves referred

---

Cir. 2004) ("None of these factors is dispositive and their significance may vary depending upon circumstances."); *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (Walsh, J.) ("**Radnor Holdings**") (stating "the intent of the parties at the time of the transaction, [is] determined not by a applying any specific factor").

[74]    *See Dornier Aviation*, 453 F.3d at 234 (affirming the lower court's determination that "[w]hile some aspects of the transaction were consistent with a loan, the transaction on the whole was more consistent with a capital contribution" and therefore should be treated as such.); *In re Cold Harbor Assocs. L.P.*, 204 B.R. 904, 916–19 (Bankr. E.D. Va. 1997) (Shelley, J.) ("**Cold Harbor**") (concluding the advances should be treated as equity where 5 factors weighed in favor of equity and 4 factors weighed in favor of a loan).

[75]    *Adelphia-Bank of America*, 365 B.R. at 75, n.216.

[76]    *S & B Holdings*, 420 B.R. at 158 (quoting *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984)).

[77]    *Broadstripe*, 444 B.R. at 95 ("The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans.") (quoting *AutoStyle*, 269 F.3d at 750).

[78]    *See* Cmplt. ¶ 302.

-24-

to the Revolver as a "credit facility," or "credit line."[79]  And though the Court is disinclined to regard that as any kind of characterization that should be dispositive here, the Court notes the accuracy of that statement in light of the underlying documentation.

The Revolver was established pursuant to a "Revolving Credit Agreement,"[80] which was publicly filed with the SEC.[81]  And the documentation was allegedly modeled, in part, on the documentation of the ABL Facilities[82]—an unquestionably arm's length transaction that could not seriously be argued to be anything other than for loans.  All of these facts tend to indicate that the $300 million advance and the Revolver was a loan.  This factor weighs, very heavily, against recharacterization.

> 2.    *Presence of fixed maturity date*
>        *and repayment schedule*

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans . . . [and] the absence of a set schedule of repayment of principal weighs in favor of equity, but is not dispositive."[83]

The Revolver Agreement has a clear maturity date, once again weighing in favor of a finding that the advance was a loan.[84]  On the other hand, the Revolver Agreement does not have a schedule of payments, and permits drawdowns and repayments without reference to a fixed

---

[79]    *See id.* at ¶ 8, 291, 294.  *See also* 3/10/11 Hr'g Tr. at 138-41 (counsel for the Trustee noting that Access Holdings should have provided equity, not debt, to address Lyondell's liquidity issue; discussing the terms of the Revolver Agreement).

[80]    *See* Revolver Agreement.

[81]    *See id.*

[82]    *See* 3/10/11 Hr'g Tr. at 144-45.

[83]    *AutoStyle*, 269 F.3d at 750.

[84]    *See* Revolver Agreement §2.06 ("Each Borrower shall repay the Lender on the Maturity Date the aggregate principal amount."); Revolver Agreement § 1.01 (defining "Maturity Date" as "the date which is eighteen months after the Closing Date").

schedule.[85]  But that is like all of the revolvers in this Court's experience,[86] and this Court has

never seen a revolver that was anything other than a loan.  Thus the lack of a schedule of

payments is irrelevant in this case, and hardly weighs in favor of recharacterization.

Ultimately, this factor does not strongly tilt in either direction.  But to the extent it goes

either way, it tips mildly in opposition to recharacterization of the loan as equity.

> 3.    *The presence of a fixed rate of*
> *interest and interest payments*

"The absence of a fixed rate of interest and interest payments is a strong indication that

the advances were capital contributions rather than loans."[87]  But here the facts are just the

opposite.  Section 2.07 of the Revolver Agreement provides for the accrual of interest at a fixed

interest rate, and the repayment of interest at fixed dates.[88]

These terms weigh strongly in favor of a finding indicate that the $300 million advance

was made as a loan.  Conversely, they weigh heavily against a finding of recharacterization.

> 4.    *The source of repayments*

"If the expectation of repayment depends solely on the success of the borrower's

business, the transaction has the appearance of a capital contribution."[89]  Even when repayment

---

[85]    *See id.* § 2.04 (Repayments); § 2.06 (Repayment of Loans on the Maturity Date).

[86]    In deciding motions to dismiss, trial courts may, and indeed must, analyze the allegations for plausibility in light of their experience.  *See* n.14 *supra,* and *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

[87]    *AutoStyle*, 269 F.3d at 750.

[88]    *See* Revolver Agreement § 1.01 (defining "Applicable Rate," "Base Rate" and "Eurocurrency Rate"); *see also* Revolver Agreement § 2.07 (providing for the accrual and payment of interest).

[89]    *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 631).

is not solely dependent on the success of borrower's business, this factor may still be "slightly in favor of equity."[90]

In *Roth Steel*, the tax court, later affirmed by the Sixth Circuit, determined that repayment was entirely dependent on the prospective financial success of the corporation because all existing assets of the corporation were subject to security interests and thus were not available as a source of repayment.[91]  And in a more recent case from the Eastern District of Oklahoma Bankruptcy Court, Judge Michael explained:

> The Court believes this factor must be considered in conjunction with a borrower's overall capital structure. The question is whether the lender has any reasonable expectation of payment if the business fails.  It is one thing to loan money on an unsecured basis to a debtor with a significant net worth or positive equity.  Even if a default occurs, there is a reasonable expectation of repayment out of something other than earnings.  On the other hand, if the capital structure of the entity is such that future profits are the only hope of repayment, and a lender knows or should know that, the transaction sounds in equity.[92]

Those holdings suggest that when other creditors have lent on a secured basis and have a first claim on a company's assets, and the company is so overleveraged that there is little likelihood that those other creditors will be oversecured (thus generating a surplus for allocation to others), repayment of more junior debt is dependent on success of the business because "future profits are the only hope of repayment."[93]

---

[90]     *Id.*; *see also S & B Holdings*, 420 B.R. at 159 (finding source of repayments factor weighed in favor of recharacterization because the committee "adequately pled that the source of repayments was expected to be [the borrower's] earnings").

[91]     *Roth Steel Tube Co. v. Comm'r*, T.C.Memo. 1985–58 (U.S. Tax Ct. 1985) *aff'd* 800 F.2d 625 (6th Cir. 1986).

[92]     *Miller v. Dow (In re Lexington Oil and Gas Ltd.)*, 423 B.R. 353, 366 (Bankr. E.D. Okla. 2010) (Michael, J.) ("***Lexington Oil***").

[93]     *Id.*

The Trustee alleges that at the time the Revolver Agreement was entered into, the

Resulting Company and each of its subsidiaries were overleveraged and insolvent due to the

$20.7 billion of secured debt incurred in connection with the Merger.[94]   The Trustee also alleges

in great detail the liquidity problems that the Borrowers suffered during 2008.   And the Trustee

further alleges that the Lenders knew of the liquidity issues; knew that the Borrowers' assets

were already pledged as security under the Merger Loans; and nevertheless agreed to provide an

unsecured credit facility.[95]   Given the Resulting Company's overleveraged capital structure, its

lack of equity and liquidity, the Trustee has plausibly alleged that the parties could not have

expected repayment of unsecured claims, including any money advanced pursuant to the

Revolver, except by means of future profits—and could not expect repayment in the event of

bankruptcy.[96]

Nevertheless, the Post-Merger Directors argue that the "Complaint avers that Lyondell

paid the October 15 borrowing within days from its working capital, notwithstanding alleged

liquidity pressures."[97]   That is true.   And it strongly supports their argument that the Revolver

was a bona fide lending facility, as a manifestation of the parties' intent.   But strictly speaking, it

is not relevant to this factor.   The fact remains, as relevant to this factor, that the loan was made

to an entity on an unsecured basis to entities who were already mortgaged to the hilt, and whose

ability to pay the loan back, with such limited liquidity, rested on their ability to either exhaust

that liquidity or go cash positive going forward.

---

[94]    Cmplt. ¶ 259.

[95]    *Id.* ¶¶ 293–295; 431.

[96]    *See Adelphia-Bank of America*, 365 B.R. at 74 ("[T]he paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.").

[97]    Post-Merger Directors' Counts 15 & 16 Reply Br., dated Dec. 23, 2010 [Dkt. No. 472], at 15 (citing Cmplt. ¶ 302).

The Post-Merger Directors' position is stronger when they assert a different point—that there are no allegations that the Borrowers' *duty to repay* was dependent on Lyondell's future performance.  They also are right when they note that all borrowings were due on the maturity date and that the Lenders had a right of enforcement on default—though given the Borrowers' financial situation at the time, and the unsecured nature of the underlying debt, that right of enforcement would likely be of only modest value.

On balance, the Court finds that this factor weighs in favor of recharacterization, at an intermediate level.

### 5.    Adequacy or inadequacy of capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[98]  While courts have cautioned against placing too much emphasis on this factor,[99] it has been amply pleaded here.  The Trustee alleges in extensive detail that following the Merger, the Resulting Company and its subsidiaries were overleveraged, had grossly insufficient liquidity, and were severely undercapitalized at all times after December 2007.[100]

These factual allegations, taken as true, support weighing this factor in favor of recharacterization.  But they overlap materially with those considered under the preceding factor—and indeed are the same reasons why the Court found as it did with respect to Factor 4.  The Court considers these to weigh in favor of recharacterization.  But because of the admonition in *S&B Holdings*, and the fact that the Court based its conclusions as to Factor #4 on these same allegations, the Court here gives them only modest weight.

---

[98]    *AutoStyle*, 269 F.3d at 751.

[99]    *See S & B Holdings*, 420 B.R. at 159 ("Courts should not put too much emphasis on this factor, in any event, because all companies in bankruptcy are in some sense undercapitalized.").

[100]    *See* Cmplt. ¶¶ 273-277, 289, 293, 302, 431.

6.    *Identity of interest between the*
      *creditor and the stockholder*

"If stockholders make advances in proportion to their respective stock ownership, an

equity contribution is indicated,"[101] while "a sharply disproportionate ratio between a

stockholder's percentage interest in stock and debt is indicative of bona fide debt."[102]  But here

this factor is largely inapplicable, because it applies most obviously when several stockholders

extend the funds, and one can measure the proportion of the contribution of each against the

stock ownership of each.

Here, by contrast, the funds came from a single source.[103]  But while the Trustee has also

alleged that Access Holdings was the *controlling* shareholder of Lyondell, it is not clear from the

Complaint whether Access Holdings was the *sole* shareholder of Lyondell.  And the Post-Merger

Directors are correct in their point that *Autostyle*, *Cold Harbor* and *Broadstripe* spoke in terms of

precise proportionality.[104]

For these reasons, this factor tips either very slightly in favor of recharacterization or is a

wash.

7.    *Security, if any, for the advances*

The *Autostyle* court stated that "[t]he absence of a security for an advance is a strong

indication that the advances were capital contributions rather than loans."[105]  But when the

*Autostyle* court stated that, it may have spoken more broadly than it intended, and if it really

---

[101]    *AutoStyle*, 269 F.3d at 751.

[102]    *Id.*

[103]    *See* Cmplt. ¶ 23, 302, 305.

[104]    *See* Post-Merger Directors' Reply Br. at 20 (citing *Autostyle*, 269 F.3d at 751 ("Where there is an exact
         correlation between the ownership interests of the equity holders and their proportionate share of the
         alleged loan … this evidence standing alone is almost … overwhelming"), *Cold Harbor* (same), and
         *Broadstripe* (same)).

[105]    *AutoStyle*, 269 F.3d at 752.

meant that, its reasoning was questionable.  What the *Autostyle* court could have said (and in this

Court's view, *should* have said) was that when loans are made on an unsecured basis, they are

much easier to recharacterize than secured loans, and deserve higher scrutiny; the additional

formality associated with secured loans, and the need to perfect their security interests, tends to

make secured loans particularly difficult to recharacterize.  But bona fide loans have been made

on an unsecured basis for decades, if not centuries (e.g., when insurance companies made private

placement loans on an unsecured basis), and the fact that they were made without security cannot

be regarded as a "strong indication" that loans documented as such were really "capital

contributions rather than loans."

As previously discussed, the Trustee has alleged that "the Debtors gave Access

[Holdings] no security for such advances,"[106] and the Post-Merger Directors do not argue

otherwise.  Here the fact that unsecured loans were made to borrowers already mortgaged to the

hilt is an indication tending to support recharacterization, but not because the loans were made

on an unsecured basis; it supports recharacterization, to the extent it does, only because of

Factors 4 and 5 above, and 8 below.

8.      *Corporation's ability to obtain outside financing*

"The fact that no reasonable creditor would have acted in the same manner is strong

evidence that the advances were capital contributions rather than loans."[107]  This factor looks at

"whether a reasonable outside creditor would have made a loan to the debtor on similar

terms."[108]

---

[106]      Cmplt. ¶ 431.

[107]      *S & B Holdings*, 420 B.R. at 158 (citing *AutoStyle*, 269 F.3d at 752).

[108]      *See In re AutoStyle Plastics*, 238 B.R. 346, 350 (W.D. Mich. 1999) (Stevenson, J.) (citing *Cold Harbor,
204 B.R. at 918*) (emphasis added).  *See also Roth Steel*, 800 F.2d at 631; *S & B Holdings*, 420 B.R. at 158

-31-

The Post-Merger Directors point out that in March 2008, the time the parties entered into the Revolver Agreement, Lyondell was in the process of exercising its option to borrow an additional $600 million under the accordion feature in its ABL Facilities.[109]  Because this alternative credit was available, the defendants argue, this factor weighs against recharacterization.  In response, the Trustee argues that the terms of the ABL Facilities and the terms of the Revolver were dramatically different.[110]  Lending under the ABL Facilities would be *secured*, and ABL debt would be guaranteed on an unsecured basis by each U.S. subsidiary.[111]  The Trustee also alleges that in order to obtain the $600 million upsize in the ABL Facilities, the Resulting Company "agreed to a 'LIBOR floor' on the term loan facility with an estimated incremental cost of $309 million."[112]

By comparison, the Trustee points out, the Revolver was an unsecured revolving credit facility.[113]  And despite the much greater risk to a Lender under the Revolver (because it was unsecured and behind nearly $22 million in secured debt), the interest rate margin of the Revolver was only slightly higher than the margin on the secured ABL Facilities, and did not include a LIBOR floor.[114]

The Court is only modestly persuaded by each party's argument here.  As the Third Circuit, speaking through Judge Ambro, observed in *SubMicron*:

---

(explaining that this factor looks at whether "a reasonable creditor would have acted in the same manner" (citation omitted)).

[109]    *See* Cmplt. ¶ 291.

[110]    *Id.* ¶¶ 262, 291, 431.

[111]    *Id.* ¶ 262.

[112]    *Id.* ¶ 291.

[113]    *Id.* ¶ 431.

[114]    *See* Trustee Counts 15 and 16 Opp. Br., dated Nov. 24, 2010 [Dkt. No. 456], at 20.

> when existing lenders make loans to a distressed company,
> they are trying to protect their existing loans and traditional
> factors that lenders consider (such as capitalization,
> solvency, collateral, ability to pay cash interest and debt
> capacity ratios) do not apply as they would when lending to
> a financially healthy company.[115]

That analysis is compelling—and grounded in both law and experience. It will usually, if not

always, be applicable when lenders make additional protective loans. And when the asserted

loan is made by an equity holder, as contrasted to a previous lender, the factors identified by

Judge Ambro would often, if not always, apply as well. Like the investors in *SubMicron*, the

Lenders here, as insiders and parents of the Borrowers, were looking to protect their existing

investment in Lyondell. For these exact reasons, the terms of the Revolver would be far more

favorable than what Lyondell could obtain under the ABL upsize. Thus, any differences

between the below-market terms of the Revolver and the highly costly upsizing of the ABL

Facilities would not necessarily be significant in showing that the Revolver was intended to be

equity.[116]

The Trustee also contends that the Debtors could not obtain funding from any outside

lender on any terms.[117] And the Trustee makes reference to the difficulty of the lead arrangers in

syndicating the ABL Facilities.[118] But other than that (and it is not exactly the same thing), there

is little support in the Complaint for such allegations.[119]

---

[115]    *SubMicron*, 432 F.3d at 457 (internal quotation marks and citations omitted).

[116]    *See also Broadstripe*, 444 B.R. at 100 (noting that ability to obtain outside funding factor, "while weighing in favor of recharacterization as equity, should be afforded little to no weight," where there were no alternative loans comparable to the insiders' investment that was the subject of the recharacterization).

[117]    *See* Cmplt. ¶ 431 ("credit was unavailable from outside parties at the time Access advanced the funds; [and] no non-insider third party would have advanced the funds to the Debtors at the time such funds were advanced because of the Debtors' inability to repay such obligations.").

[118]    *See id.* ¶¶ 9, 249, 294.

[119]    *Compare Broadstripe*, 444 B.R. at 99-100 (referencing evidentiary record regarding company's efforts to obtain outside financing, and noting testimony conceding that "Other companies were not willing to put as

Under these circumstances, the Court concludes that this factor is either neutral or weighs only modestly in favor of recharacterization.

9.      *Extent to which advances were subordinated to claims of outside creditors*

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."[120]  Yet in *S & B Holdings*, the court evaluated an advance that ranked junior to one short-term loan but was senior to the claims of other creditors,[121] and concluded that even though the advance was partially subordinated, that factor did not weigh in favor of recharacterization.[122]

Here, the Revolver was clearly an unsecured loan, and unlike the loans in *S & B Holdings*, any advances would not be senior to any other creditor claims.  On the other hand, advances under the Revolver would rank *pari passu* with, and would not be subordinated to, the claims of all other unsecured creditors.  As such, this factor is neutral.  It certainly does not weigh in favor of recharacterization.

10.     *Extent to which the advances were used to acquire capital assets*

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[123]  Here, the allegations in the

---

much debt on the company;" and emails with general counsel that the insiders' notes were "[the] only financing option" and "the only game in town.")  Here, there are no allegations of this type—for example, that that the Resulting Company had even sought or tried to negotiate alternative funding with other lending institutions around the time of the Revolver, but failed in its efforts.  *See also* 3/10/11 Hr'g Tr. at 284 ("They say that no one would make a loan. But that's not a fact, that's a speculation.").

[120]    *AutoStyle*, 269 F.3d at 752.

[121]    *S & B Holdings*, 420 B.R. at 160.

[122]    *Id.*  ("The Finco Loan was junior to the Abelco Loan, but was senior to the claims of other creditors. This weighs in favor of a finding of indebtedness. The Committee cannot plead facts showing that this factor weighs in favor of recharacterization.").

[123]    *AutoStyle*, 269 F.3d at 752.

Complaint describe the Revolver funds as being needed to maintain liquidity for Lyondell.[124]

They would be used for daily operating needs.  Thus this factor does not support

recharacterization, and to the extent it tilts either way, it tilts, albeit mildly, against

recharacterization.

     *11.*     *The presence or absence of a sinking fund to provide repayment*

A sinking fund is "[a] fund consisting of regular deposits that are accumulated with

interest to pay off a long-term corporate or public debt."[125]  The *Autostyle* court took as true a

statement in *Roth Steel* that "[t]he failure to establish a sinking fund for repayment is evidence

that the advances were capital contributions rather than loans"[126]—though the *Autostyle* court

recognized that where the loans were secured with liens, they obviated the need for a sinking

fund, and thus concluded that "this factor only slightly weighs toward equity, if at all.[127]

But even so, this Court queries, with the benefit of its experience,[128] whether the *Autostyle*

court was too charitable, and that the *Roth Steel* statement it effectively quoted was overly broad

(or downright erroneous), and assumed the existence of a business practice no longer in common

usage.  Of course the presence of a sinking fund would strongly support a finding of debt.  But

the converse is not necessarily true.  Each court appears to have assumed that sinking funds

would be the norm in bona fide loans—but that assumption is at best debatable.  To the contrary,

the Court wonders, based on its experience, whether sinking funds in modern corporate

financings are in any way the norm (or in this day even common), and this Court would need

---

[124]     *See* Cmplt. ¶ 291.

[125]     Black's Law Dictionary (10th ed. 2014).

[126]     *AutoStyle*, 269 F.3d at 753, effectively quoting *Roth Steel*, 800 F.2d at 631.

[127]     *Id.*

[128]     *See* n.86 *supra*.

evidence proving up the assumption as to this point before it would ever draw an inference that

the absence of a sinking fund on corporate debt is in any way meaningful.

Both sides agree, as does this Court, that the presence or absence of a sinking fund is

irrelevant here.[129]

### 12.    Other Indicia of Intent

The purpose of the 11 point analysis just completed is, or should be, to discern the intent

of the parties.  As the Third Circuit explained in *SubMicron*:

> In defining the recharacterization inquiry, courts have
> adopted a variety of multi-factor tests borrowed from non-
> bankruptcy caselaw.  While these tests undoubtedly include
> pertinent factors, they devolve to an overarching inquiry:
> the characterization as debt or equity is a court's attempt to
> discern whether the parties called an instrument one thing
> when in fact they intended it as something else.  That intent
> may be inferred from what the parties say in their contracts,
> from what they do through their actions, and from the
> economic reality of the surrounding circumstances.
> Answers lie in facts that confer context case-by-case.[130]

Similarly, as Judge Walsh explained in *Radnor Holdings*,[131]

> the overarching inquiry in a recharacterization case is the
> intent of the parties at the time of the transaction,
> determined not by a applying any specific factor, but
> through a *common sense* evaluation of the facts and
> circumstances surrounding a transaction.[132]

Thus the Court can, and should, look to any indicia of intent beyond what the *Roth Steel*

and *Autostyle* factors themselves suggest, and to the entirety of the facts and circumstances

---

[129]    *See* Trustee Counts 15 and 16 Opp. Br. at 24; Post-Merger Directors' Counts 15 and 16 Reply Br. at 18–19.
The relevance of this factor in determining whether a purported debt should be recharacterized has been
questioned in similar situations.  *See, e.g., AutoStyle*, 269 F.3d at 753; *S & B Holdings*, 420 B.R. at 160
(stating "[t]his factor is irrelevant" because a loan secured by a lien obviates the need of a sinking fund).

[130]    432 F.3d at 455-56.

[131]    353 B.R. at 838.

[132]    *Id.* (emphasis in original).

-36-

surrounding the transaction, when such are helpful in gauging intent. That means, for example, that the Court should also consider, as the *SubMicron* court suggested, "what the parties say in their contracts" and "what they do through their actions."[133] Here, for example, the Trustee's allegations include the fact that the Access advance was paid back[134]—a fact inconsistent with the contention that it was a contribution of equity.

### B. Conclusions As To Recharacterization

As appears from the discussion above, only four[135] of the eleven *AutoStyle* factors support recharacterizing the Revolver as an equity contribution, and then only one[136] of those factors does so in more than a minimal way. A very large number of the factors[137] do not tip dramatically one way or the other—though the lesser number that do[138] tip strongly in favor of recognizing the loan documentation for what it said it was. But "no mechanistic scorecard suffices,"[139] and ultimately, recharacterization is a "highly fact-dependent inquiry."[140] As the Sixth Circuit stated in *Dornier Aviation*:

> We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans. However, when other factors indicate that the transaction is

---

[133]    *SubMicron*, 432 F.3d at 456, *accord Radnor Holdings*, 353 B.R. at 839 (quoting *SubMicron*).

[134]    *See* Cmplt. ¶ 302 ("on October 16, 17, and 20, [Lyondell] repaid the $300 million in three payments of $100 million.").

[135]    *See* Factors 4, 5, 6 and 8.

[136]    *See* Factor 4.

[137]    *See* Factors 2, 7, 9, 10, 11, found by the Court to be irrelevant or to result in no material tip.

[138]    *See* Factors 1, 3 and the loan payback recognized as a separate indicator of intent (each of which weighs against recharacterization) and Factor 4 (which weighs in favor), in each case to the extent noted above.

[139]    *SubMicron*, 432 F.3d at 456.

[140]    *Id.*

> not a loan at all, recharacterization is appropriate to ensure
> the consistent application of the Bankruptcy Code.[141]

Looking at the factual allegations in their totality (and, importantly, the manifestation of the parties' intent)—the Court concludes that the Revolver is exactly what the parties said it was—a debt facility under which funds could be (and were) borrowed, and could be (and were) repaid. Consistent with *SubMicron* and *Radnor Holdings,* the Court focuses heavily on indicia of the parties' intent—that:

- They prepared documentation;

- The documentation said it was a loan;

- They referred to it as such to the SEC;

- The Borrowers had to pay interest; and

- The Borrowers paid the advanced amounts back.

It is plainly true that the loan was unsecured and behind a mountain of secured debt, but the discussion in *SubMicron* explains why loans are nevertheless made as a protective matter.

Then, since as *SubMicron* and *Radnor Holdings* make clear, the ultimate exercise is to ascertain the intent of the parties, the Court focuses on allegations in the Complaint indicative of that intent. And those allegations support the view that Blavatnik never wanted to make any equity contribution to the Resulting Company or Lyondell. For example, the Complaint alleges that in March 2008 (around the time the Revolver was entered into), Goldman Sachs[142] pressed Access Holdings to "put in $400-$1,000 million of equity in Basell," but Access Holdings and Basell rejected that request.[143] The Complaint also alleges that when Merrill Lynch suggested an

---

[141]    *Id.*

[142]    Goldman Sachs Credit Partners L.P. ("**Goldman Sachs**") and Merrill Lynch Capital Corporation ("**Merrill Lynch**") were two of the original joint lead arrangers for the Merger Loans.

[143]    Cmplt. ¶ 293.

equity contribution provision as part of the Merger financing commitment, Merrill Lynch was informed by a senior Vice President at Access Holdings that such structure was "wholly unacceptable."[144]

Finally, the allegations here stand in contrast those in cases in which courts have recharacterized loans as capital contributions or denied motions to dismiss recharacterization claims.  For instance, in *Dornier Aviation*, in which the Fourth Circuit affirmed the bankruptcy court's grant of summary judgment and decision to recharacterize, not only was the purported lender the sole owner of the debtor, but also the purported loan lacked a fixed maturity date, the debtor was not required to repay the purported loan until it became profitable, and the purported lender assumed the debtor's losses.[145]

Similarly, the court in *Musicland* sustained a claim for recharacterization where the plaintiff alleged that "[d]uring the two-and-one-half years that [the lender] contributed cash to Musicland, it had never imposed any repayment terms" and that even though [the investor] began "loaning" money to Musicland in 2001, the purported loan agreement was not executed until 2003.[146]

Again, in *Lexington Oil*, the court determined that most of the factors weighed in favor of recharacterization, and emphasized that: the purported lenders "advanced money before the promissory note was signed and before he had even seen it"; could not remember when the promissory notes were actually signed; did not execute the related loan agreement until over a

---

[144]    *Id.* ¶ 176.

[145]    *Id.*

[146]    *See Musicland*, 398 B.R. at 775.

year after the date on the promissory notes; and "when the notes were rewritten in 2006, they contained no provision for payment of the interest accrued during that interim period."[147]

And in a case from the District of Massachusetts,[148] although the purported loan was properly documented as a loan with maturity dates and interest rates, the bankruptcy court recharacterized the loan as equity because it was established at trial that the purported secured lender never made any effort to collect the promissory note or foreclose on his collateral because he realized that doing so would put the company out of business, and that the lender rejected a cash offer upon the erroneous belief that the "value would be significantly higher later."[149]

As these decisions demonstrate, in most cases where courts have recharacterized a loan as equity, the purported loan documentation did not comport with the formalities typical of debt instruments, the lender did not take any action to enforce his rights as a lender, or both.

But here, the Trustee has not alleged that the Revolver Agreement was written after the funds were advanced or otherwise failed to comport with formalities typical of a commercial loan. In addition, Access Holdings did not decline to exercise its rights as a lender. In fact, it is alleged that that Access used its position as an insider *to force the Resulting Company to pay back* the October 15 draw in five days at a time when the Resulting Company was undercapitalized and insolvent. Such allegations might support claims for equitable subordination or for a preference, but are insufficient for recharacterization.

For these reasons, the Court finds that the Trustee has failed to state a claim for recharacterization. The defendants' motion to dismiss Count 15 is granted.

---

[147]    *Lexington Oil*, 423 B.R. at 370.

[148]    *See Aquino v. Black (In re AtlanticRancher, Inc.),* 279 B.R. 411 (Bankr. D. Mass. 2002) (Feeney, J.).

[149]    *Id.* at 437.

## II.

### Count 16 (Illegal Dividends)

In Count 16, the Trustee asserts that if the $300 million advance made on October 15,

2008 is recharacterized as an equity contribution, then the repayments of those funds, on October

16, 17, and 20, were actually dividend payments to Access Holdings.  But by reason of the

Court's conclusions as to Count 15, declining to recharacterize the Revolver debt as equity, the

underpinning of Count 16 has fallen away.  The payments on those three days—on account of

debt the Court has declined to recharacterize—no longer can be argued to be dividends.

Count 16 too must be dismissed.

### Conclusion

For the reasons stated above, the motions to dismiss of Access Holdings,

AI International, and the Lyondell Post-Merger Directors are denied in part and granted in part:

- Count 12 (Breach of Contract):  dismissal is denied to the extent the Trustee seeks restitutionary damages; dismissal is granted to the extent the Trustee seeks damages of other types.

- Count 15 (Recharacterization):  dismissal is granted.

- Count 16 (Illegal Dividends):  dismissal is granted.

As to each Count, the Court sees no material possibility that deficiencies it has noted

could be cured by an amended pleading.  Thus, to the extent the Court has dismissed these

Counts, they are dismissed without leave to replead.

SO ORDERED.

Dated: New York, New York
      January 4, 2016

*s/Robert E. Gerber*
United States Bankruptcy Judge

-41-

# APPENDIX A

Weisfelner v. Blavatnik, Adv. No. 09-01375

# APPENDIX A*

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 1 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 2 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 3 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers[1] |
| 4 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers |
| 5 | Breach of fiduciary duty | Lyondell Pre-Merger Directors |
| 6 | Mismanagement and breach of duty under Luxembourg law | Leonard Blavatnik[2] |
| 7 | Tort under Luxembourg law | Blavatnik;[3] the GP Managers; the Nominees; and the Successors[4] |

---

[*] Except as to Count 6, (*see* n.2, *infra*), counts and claims listed below are based on the amended complaint dated July 23, 2010 [Dkt. 381] (the "**Complaint**"). This table does not reflect subsequent dismissals of claims or defendants by stipulation of the parties or by order of the Court.

[1] Pre-Merger, in addition to chairman and CEO Dan Smith, Lyondell had ten outside directors on its Board of Directors: Carol Anderson, Susan Carter, Stephen Chazen, Travis Engen, Paul Halata, Daniel Huff, David Lesar, David Meachin, Daniel Murphy, and William Spivey (collectively, the "**Lyondell Pre-Merger Directors**"). The relevant Lyondell officers identified in the Complaint as named defendants are: James Bayer, T. Kevin DeNicola, Bart de Jong, Edward Dineen, Kerry Galvin, Morris Gelb, John Hollinshead, and W. Norman Philips (collectively, the "**Lyondell Pre-Merger Officers**").

[2] This Count 6 is based upon the second amended complaint dated September 29, 2011 [Dkt. 598].

[3] Although the Complaint did not specify whether Count 7 is asserted against Leonard Blavatnik or Alex Blavatnik, who is also a named defendant in this action, the Court understands this claim to be asserted against Leonard Blavatnik.

[4] The "**GP Managers**" are identified in the Complaint as including: Alan Bigman, Richard Floor and Philip Kassin. The "**Nominees**" are defined in the Complaint as including: Simon Baker, Dawn Shand, and Bertrand Duc. The "**Successors**" are defined in the Complaint as including: Philip Kassin, Lincoln Benet, Lynn Coleman, and Richard Floor.

Richard Floor is deceased and Diane Currier has been appointed as the executor for the estate of Richard Floor.

Weisfelner v. Blavatnik, Adv. No. 09-01375

**APPENDIX A***

| Count | Claim | Defendant Parties |
|---|---|---|
| 8 | Breach of fiduciary duty | Subsidiary Directors[5] |
| 9 | Avoidance preference under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 10 | Equitable subordination under the Bankruptcy Code | AI International, S.à.r.l. |
| 11 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell Limited; Deutsche Bank Securities Inc.; and Perella Weinberg Partners LP |
| 12 | Breach of contract | Access Industries Holdings LLC; and AI International, S.à.r.l. |
| 13 | Illegal dividends or redemption | Lyondell Pre-Merger Directors |
| 14 | Unlawful distribution and extra-contractual tort under Luxembourg law | Leonard Blavatnik; the GP Managers; BI S.à.r.l.; Alan Bigman; Alex Blavatnik; Peter Thorén; Simon Baker; and the Nominees |
| 15 | Declaratory judgment for characterization of purported loan advances under the Access Revolver as capital contributions | Access Industries Holdings LLC; and the Lyondell Post-Merger Directors[6] |
| 16 | Illegal dividends | Lyondell Post-Merger Directors |
| 17 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 18 | Aiding and abetting breach of fiduciary duty under applicable state law and Luxembourg law | Nell Limited; Access Industries Holdings, LLC; Access Industries, Inc.; AI International, S.à.r.l.; AI Chemical Investments LLC |

---

[5]    The "**Subsidiary Directors**" are identified in the Complaint as including: Kevin Cadenhead, Charles Hall, Rick Fontenot, and John Fisher Gray.

[6]    The "**Lyondell Post-Merger Director**" are identified in the Complaint as including: Alan Bigman, Edward Dineen, and Morris Gelb.

Weisfelner v. Blavatnik, Adv. No. 09-01375

**APPENDIX A***

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 19 | Constructive fraudulent transfer under the Bankruptcy Code | BI S.à.r.l. |
| 20 | Breach of fiduciary duty | Dan Smith; T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |
| 21 | Aiding and abetting breach of fiduciary duty | T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |