UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | ) | |
| In re: | ) | Chapter 11 Case |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | No. 09-10023 (REG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | ) | |
| | ) | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE | ) | |
| OF THE LB LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | |
| | ) | No. 09-1375 (REG) |
| LEONARD BLAVATNIK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | ) | |

DECISION AND ORDER ON DEFENDANTS' MOTIONS
TO DISMISS COUNTS 2, 6, 7, 14, AND 18

APPEARANCES:

BROWN RUDNICK, LLP
*Attorneys for Plaintiff Edward S. Weisfelner, Litigation Trustee of the LB Litigation Trust*
Seven Times Square
New York, New York 10036
By:    Sigmund S. Wissner-Gross, Esq. (argued)
       May Orenstein, Esq. (argued)
One Financial Center
Boston, Massachusetts 02111
By:    Steven D. Pohl, Esq.

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
*Attorneys for Defendant Alan S. Bigman*
75 East 55th Street
New York, New York 10022
By:    William A. Novomisle, Esq. (argued)
       Douglas Koff, Esq.

PORTER & HEDGES, LLP
*Attorneys for Defendant Alan S. Bigman*
Reliant Energy Plaza
1000 Main Street, 36th Floor
Houston, Texas 77002
By: John Higgins, Esq. (argued)
   Eric D. Wade, Esq.

DLA PIPER, LLP
*Attorneys for Defendant Alan S. Bigman*
500 Eighth Street NW
Washington, D.C. 20004
By: James D. Wareham, Esq.

QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
*Attorneys for Defendants Access Industries, Inc.; Access Industries Holdings LLC;*
*AI International, S.à.r.l.; Nell Limited; BI S.à.r.l; Len Blavatnik; Lincoln Benet;*
*Philip Kassin; Peter Thorén; and Alex Blavatnik*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By: Richard I. Werder, Jr., Esq. (argued)
   Susheel Kirpalani, Esq.
   Benjamin I. Finestone, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity controlled by Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company ("**Lyondell**"), a Delaware corporation headquartered in Houston—forming a new company after a merger (the "**Merger**"), LyondellBasell Industries AF S.C.A. (as used by the parties, "**LBI**," or here, the "**Resulting Company**"),[1] Lyondell's parent—by means of a leveraged buyout ("**LBO**").  The LBO was 100% financed by debt, which, as is typical in LBOs, was secured not by the acquiring company's assets, but rather by the assets of the company to be acquired.  Lyondell took on approximately $21 billion of secured indebtedness in the LBO, of which $12.5 billion was paid out to Lyondell stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped Lyondell filed a petition for chapter 11 relief in this Court.[2]  Lyondell's unsecured creditors then found themselves behind that $21 billion in secured debt, with Lyondell's assets effectively having been depleted by payments of $12.5 billion in loan proceeds to stockholders.  Lyondell's assets were allegedly also depleted by payments incident to the LBO and the Merger—of approximately $575 million in transaction fees and expenses, and another $337 million in payments to Lyondell officers and employees in change of control payments and other management benefits.

---

[1]  Acronyms make understanding difficult for readers who have not been living with a case.  The Court tries to minimize their use. For readability, except where acronyms appear in quotations or have acquired obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the entity's role in the transaction.

[2]  Lyondell then filed along with 78 affiliates. About three months later, the Resulting Company and another Lyondell affiliate joined them as Debtors in this Court.

Those events led to the filing of what are now five adversary proceedings—three against shareholder recipients of that $12.5 billion, one dealing with unrelated issues,[3] and one other—this action, which was originally the first of the five—against Blavatnik and companies he controlled; Lyondell's officers and directors; and certain others.[4]

In his Amended Complaint (the "**Complaint**"[5]) in this adversary proceeding (brought, like the others, under the umbrella of the jointly administered chapter 11 cases of Lyondell, the Resulting Company and their affiliates (the "**Debtors**")), Edward S. Weisfelner (the "**Trustee**"), the trustee of the LB Litigation Trust (one of two trusts formed to prosecute the Debtors' claims), asserts a total of 21 claims against the defendants in this action. The 21 claims variously charge breaches of fiduciary duty; the aiding and abetting of those alleged breaches; intentional and constructive fraudulent conveyances, unlawful dividends, and a host of additional bases for recovery under state law, the Bankruptcy Code, and the laws of Luxembourg, under which several of the Basell entities were organized.[6] The Complaint also seeks to equitably subordinate defendants' claims that might otherwise be allowed.

The Trustee's Complaint, in turn, engendered a large number of motions to dismiss. This is one of several opinions ruling on those motions[7]—here relating to Counts 2, 6, 7, 14 and 18:

---

3    *See Weisfelner v. NAG Investments, LLC*, Adv. Proc. 11-01844.

4    This Court issued other opinions on 12(b)(6) motions in the related adversary proceedings against selling shareholders (the "**Shareholder Actions**"). *See Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348 (Bankr.S.D.N.Y. 2014) (the "**First Shareholder Decision**"; *Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 541 B.R. 172 (Bankr. S.D.N.Y. 2015) (the "**Second Shareholder Decision**," and collectively, the "**Shareholder Fraudulent Transfer Decisions**").

5    *See* Amended Complaint, dated July 23, 2010 [Dkt. 381]. The Trustee subsequently filed a second amended complaint on September 29, 2011 [Dkt. 598] (the "**Revised Complaint**"), which principally amended allegations related to Count 6, as authorized by this Court. *See also* n.13 and n.143, *infra*.

6    A table listing all of the claims and the particular defendants against whom they were asserted appears in Appendix A. The Complaint numbers each claim using a Roman number. To make them easier to read, the Court has referred to the claims using Arabic ones.

7    To avoid a decision of unwieldy length, the Court's rulings on the other motions appear in separate decisions.

2

- Count 2 seeks the avoidance and recovery from Nell Limited ("**Nell**"), AI Chemical Investments LLC ("**AI Chemical**") and Blavatnik of certain "Toe-Hold" payments made by Basell Funding S.à.r.l. ("**Basell Funding**") and LyondellBasell Finance Company ("**LB Finance**")[8] as intentional fraudulent conveyances under applicable state law and sections 544, 548(a)(1)(A) and 550 of the Bankruptcy Code;

- Count 6 is a claim for mismanagement and breach of duty under Luxembourg law against Blavatnik;[9]

- Count 7 is a tort claim under Luxembourg law against Blavatnik, Alan Bigman ("**Bigman**"[10]), Philip Kassin ("**Kassin**"), Lincoln Benet ("**Benet**") and the legal representative of the estate of Richard Floor ("**Floor**"[11]);

- Count 14 is a claim for unlawful distribution and extra-contractual tort under Luxembourg law against Blavatnik, Bigman, Kassin, Floor, BI S.á.r.l., Alex Blavatnik[12] and Peter Thoren ("**Thoren**"); and

- Count 18 is a claim for aiding and abetting breach of fiduciary duty under Luxembourg law and applicable state law against Nell, Access Industries

---

[8]    LB Finance, a Delaware entity formed post-Merger (pre-Merger it was known as Basell Finance), is the parent company of the Resulting Company and a subsidiary of Basell Funding, a Luxembourg entity.

[9]    *See* Rev. Cmplt. ¶¶ 357-402.

[10]    Bigman is a representative of Basell AF GP S.à.r.l., ("**GP**"), a manager of BI S.à.r.l., and a board member of Lyondell as of March 28, 2008.

      GP was the general partner to Basell pre-Merger; post-Merger, it also changed its name to LyondellBasell AF GP S.à.r.l. and remained the general partner to the post-Merger Resulting Company.

[11]    There are related motions to dismiss the counts against Richard Floor, as well as a motion by the Trustee to amend the caption of the Complaint to substitute Diane Currier as defendant, which are the subject of a separate decision. For readability, the Court simply refers to "Floor" rather than "Diane Currier, as the legal representative of the estate of Richard Floor."

[12]    Both Leonard Blavatnik and Alex Blavatnik are defendants in this action. References to "Blavatnik" alone are to Leonard Blavatnik; Alex Blavatnik is referenced as "Alex Blavatnik."

Holdings LLC ("**Access Holdings**"), Access Industries, Inc. ("**Access**

**Industries**"), AI International S.á.r.l. ("**AI International**") and AI Chemical.

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on

which relief can be granted as to Counts 2, 7, 14 and 18, as well as for *forum non conveniens* as

to Counts 6, 7, 14 and 18 (which are based in large part on Luxembourg law).[13]  Alternatively,

select defendants also move for a more definite re-statement of Count 18 pursuant to Fed. R. Civ.

P. 12(e).[14]

For the reasons set forth below, the Court:

(1)     Grants the motions to dismiss Count 2 for intentional fraudulent conveyance

under applicable state law and the Bankruptcy Code;

(2)     Grants the motions to dismiss Count 7, but with leave for the Trustee to replead;

(3)     Denies the motions to dismiss Counts 14, with leave to renew such motions

following the submission of supplemental analysis by experts on Luxembourg

law;

(4)     Grants the defendants' motion for a more definite statement under Rule 12(e), and

grants the motions to dismiss Count 18 to the extent any claims for aiding and

abetting breach of fiduciary duty rest under (i) Luxembourg law, and (ii) Texas

law against Nell, Access Industries and AI International; and

(5)     Denies the motion to dismiss Counts 6, 7, 14, and 18 under the doctrine of *forum*

*non conveniens*.

---

[13]   Defendants initially also sought to dismiss Count 6.  However, because Count 6 has been amended since these
motions to dismiss were originally filed (*see* n.5, *supra* and n.143, *infra*), the parties agree that the motions to
dismiss Count 6 based on failure to state a claim are now moot.

[14]   Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(e) are made applicable to this adversary proceeding pursuant to
Fed. R. Bankr. P. 7012(b) and 7012(e), respectively.

<u>Facts</u>[15]

A.    *The Access/Basell Parties*

As alleged in the Complaint,[16] Blavatnik, a self-described strategic investor known for his role in Soviet privatization auctions of the 1990s, is the founder and Chairman of Access Holdings, a Delaware limited liability company.  Over the years, Blavatnik accumulated a portfolio of investments in oil, coal, aluminum, petrochemicals, plastics, telecommunications, media, and real estate, including, in May 2005, a stake in Basell, an international chemicals company based in the Netherlands.[17]

Blavatnik sought to avoid tax liabilities by arranging whenever possible to have payments to him made on his behalf to Nell, which is organized under the laws of Gibraltar, and an indirect subsidiary of Access Holdings and AI International (a Luxembourg entity).  Nell, in turn, owned BI S.à.r.l., another Luxembourg entity that allegedly operated as a "mere department" of both Nell and Nell's shareholders."[18]  Following Basell's acquisition (and until the Lyondell Merger), BI S.à.r.l. held 99.99% of Basell's stock.[19]

B.    *The Merger*

1.    *Early Negotiations*

Before the Merger, Lyondell was a publicly traded chemicals company based in the United States led by CEO Dan Smith, who was also a director on Lyondell's Board, along with

---

[15]    As with the other decisions in this action, the Court limits its discussion of the facts to only those relevant to the claims analyzed here.  Additional factual and procedural background is set forth in the Shareholder Fraudulent Transfer Decisions, familiarity with which is assumed.

[16]    All matters stated here are as alleged in the Complaint.  Even where allegations drift into characterization, the Court typically refers to them as alleged, without repeatedly preceding them with words like "as alleged in the Complaint."  Needless to say, its doing so says nothing about whether they ultimately will be proven.

[17]    *See* Cmplt. ¶¶ 86-88, 91.

[18]    *See id.* ¶¶ 32-33, 92.

[19]    *See id.* ¶¶ 33, 91.

10 outside directors.[20]  In April 2006, Blavatnik and Kassin, head of M&A and Financing for

Access Holdings, held talks with representatives of Lyondell, including Smith, regarding a

potential acquisition, at a price of $24 to $27 per share, which was about 10% above the range at

which Lyondell's stock was then trading.  Smith told Kassin that any offer would have to start

with at least a 20% premium above Lyondell's most recent closing share price.[21]  When Access

Holdings made its formal offer to purchase Lyondell for $26.50 to $28.50 on August 10, 2006,

the offer was rejected by Lyondell's Board.[22]

Notwithstanding the rejection, Blavatnik continued to be interested in a possible

acquisition of Lyondell.  When Lyondell's shares rose past $30 per share in February 2007

(following Lyondell's acquisition of CITGO's joint venture interest in a Houston refinery that

Lyondell and CITGO had jointly owned), Blavatnik had Merrill, Lynch, Pierce, Fenner & Smith

Incorporated ("**Merrill Lynch**"), which had been retained back in 2006 to advise Access

Holdings on a potential acquisition of Lyondell, revise its models based on an acquisition price

of $35 to $38 per Lyondell share.[23]

2.    *The Toe-Hold Position and "Refreshed" Projections*

In early 2007, Merrill Lynch suggested that Access Holdings should proceed with

acquiring Lyondell by first establishing a so-called "toe-hold" position in Lyondell of up to

14.9%.  Blavatnik then formed AI Chemical, a Delaware entity wholly-owned by Blavatnik, for

the purpose of acquiring this toe-hold position.[24]

---

[20]    *See id.* ¶¶ 43-53.

[21]    *See id.* ¶¶ 103-05.

[22]    *See id.* ¶¶ 109-10.

[23]    *See id.* ¶¶ 112-19.

[24]    *See id.* ¶ 127.

On May 4, 2007, AI Chemical entered into a forward contract with Merrill Lynch (the "**Forward Contract**") to purchase 20,990,070 shares of Lyondell stock at $32.11 per share, which was described in AI Chemical's Williams Act Schedule 13D filing on May 20, 2007. Lyondell also received a letter from AI Chemical and Blavatnik stating that Blavatnik, through AI Chemical, might acquire over 50% of the outstanding stock of Lyondell.[25]

In response to Blavatnik's acquisition of the "toe-hold" position, Smith determined that he needed to update Lyondell's earnings projections to induce Blavatnik to agree to a premium buy-out price. Smith then tasked Robert Salvin, Manager of Portfolio Planning at Lyondell, with preparing "refreshed" projections that were based on fabricated numbers to increase Lyondell's EBITDA projections in order to support the $48 per share price that Smith wanted Blavatnik to pay.[26]

### 3. Subsequent Negotiations and the Merger Agreement

Merger negotiations continued into the summer of 2007, and on July 9, 2007, Blavatnik told Smith that Basell would pay $48 per share if Lyondell would sign a definitive agreement by July 16, 2007 and agree to a $400 million breakup fee. Blavatnik also indicated that the Merger would have fully committed financing.[27] Smith presented Blavatnik's new offer, as well as the "refreshed" projections allegedly prepared at Smith's direction to support the $48 Merger price, for consideration and approval by Lyondell's Board at a meeting on July 10, 2007.[28]

Around the same time, in anticipation of Lyondell's Board accepting the $48 per share price, Access Holdings, and the lead banks (which included a different Merrill Lynch entity) that

---

[25]   *See id.* ¶ 127-28.

[26]   *See id.* ¶ 147.  Robert Salvin is described as Lyondell's Manager of Portfolio Planning in the Trustee's complaints in the Shareholder Actions.

[27]   *See id.* ¶¶ 170-72.

[28]   *See id.* ¶ 172.

had agreed to finance the Merger, commenced their due diligence review of various business,

financial and legal materials provided by Lyondell—including the allegedly fabricated

"refreshed" earnings projections.[29]  Financing and due diligence preparations also included

reviewing EBITDA forecasts for Basell, which had likewise been "refreshed" to project a 10%

increase of $650 million for the period 2007 through 2011.[30]

On Monday, July 16, 2007, Access Holdings and Basell made a formal written proposal

to acquire Lyondell for $48 per share.[31]  As negotiated, the proposal indicated that financing for

the Merger had been fully committed by the underwriting banks.[32]  The proposal was

unanimously approved by Lyondell's Board.[33]  On or about the same day, the supervisory board

of Basell (the equivalent of a board of directors) likewise voted to approve the proposed

acquisition.  Basell board member Kassin, and possibly Basell's CEO Volker Trautz, did not

support acquiring Lyondell at $48 per share, and voted against the proposed Merger.[34]

     4.     *Deteriorating Conditions and Additional Toe-Hold Acquisition*

Lyondell's actual earnings for the second quarter of 2007 were below its projections, and

by August, Lyondell's stock was trading below the $48 per share Merger price.  Blavatnik and

his Access team decided to purchase additional shares of Lyondell to increase Blavatnik's profit

---

[29]  *See id.* ¶¶ 185, 187, 190.

[30]  *See id.* ¶ 196.

[31]  *See id.* ¶ 200. The $48 per share price represented a 45% premium to the closing stock price of $33.07 on May 10, 2007.  *Id.*

[32]  The banks provided a commitment letter, pursuant to which the three co-lead banks committed to fund up to $14 billion of first lien secured credit facilities, including a $13 billion term loan, and up to $7 billion of second lien loans pursuant to a bridge facility.  Basell, at its option and in lieu of the bridge facility, could issue up to $7 billion in principal amount of second lien notes and/or senior unsecured notes (at the option of the banks) in a private debt offering.  *See* Cmplt. ¶¶ 203, 207, 212.

[33]  *See id.* ¶ 201.

[34]  *See id.* ¶ 205.

from the Merger.[35]  On August 21, 2007, using cash that had been posted to Merrill Lynch as

collateral, AI Chemical purchased an additional 3,971,900 shares of Lyondell on the open market

at an average price of $44.21.  Combined with its earlier toe-hold acquisition, Blavatnik's

beneficial ownership constituted roughly 9.85% of Lyondell's then total outstanding stock.[36]

Lyondell's third quarter performance likewise fell short of its projections, by

approximately 16%.[37]  Lyondell's poor performance caused concerns over the banks' ability to

syndicate the Merger loans, which would have led to increases in interest rates on certain

tranches, commitment fees on undrawn portions of certain facilities, and re-tranched debt on

terms more favorable to the banks.  Thus, Access and Basell worked with Lyondell to develop

"reverse engineered" projections for both Lyondell and the new consolidated company for the

underwriting lenders, showing forecasts for a huge earnings spike in 2008 (which was allegedly

inconsistent with the industry outlook and Merrill Lynch's own prior analysis), based on alleged

"synergies" of combining Lyondell and Basell.[38]

However, in light of Lyondell's continued deteriorating performance, efforts to syndicate

the Merger loans in October 2007 failed.  As a result, the lead arrangers to the Merger loans

modified the terms of the financing to limit lender exposure and reduce the borrowing base

(which was tied to Lyondell's inventory and receivables).[39]

---

[35]  *See id.* ¶ 209.

[36]  *See id.* ¶¶ 208-09.

[37]  Despite knowing by no later than mid-August that Lyondell would widely miss its third quarter projections, Smith did not disclose this information to anyone at Access Holdings until September 11th.  On that date, Smith sent an email to Blavatnik with emerging results of the third quarter, informing Blavatnik that Lyondell was likely to miss its fourth quarter EBITDA projections by approximately $200 million, or approximately 22%. Cmplt. ¶ 221.

[38]  *See id.* ¶¶ 225-28, 232-37.

[39]  *See id.* ¶¶ 242-44.

5.    *The Basell Dividend, Merger Closing and Toe-Hold Payments*

Just before the closing of the Merger, on December 7, 2007, Basell issued its third shareholder distribution of 2007, for €100 million, bringing the total amount of shareholder distributions in 2007 to €315 million, or approximately $430 million (the "**December Distribution**").[40]

The Merger closed on December 20, 2007.[41]  An indirect subsidiary of Basell was merged into Lyondell, and all of Lyondell's outstanding common stock was converted into the right to receive $48 in cash.  Basell changed its name and became (through the intermediate holding company, Basell Funding), the corporate parent of Lyondell.[42]

Upon the closing of the Merger, Blavatnik's toe-hold shares converted into the right to receive approximately $1.2 billion of Merger consideration, netting a profit in excess of $333 million.[43]  To avoid the bad optics of removing $333 million of equity while syndication of the Merger debt was suffering, and capital gains tax liability, the payment of this $333 million profit was structured in multiple steps, using different Blavatnik controlled entities, as follows:

(i)    Blavatnik transferred his entire interest in AI Chemical (which consisted solely of the toe-hold Lyondell shares) to Nell as a capital contribution.  When Nell accepted the membership units of AI Chemical, it also assumed AI Chemical's liability under the Forward Contract with Merrill Lynch.

---

[40]    *See id.* ¶ 249.  During 2007, Basell made three dividend distributions to its shareholders, BI S.à.r.l. and the GP (collectively, the "**2007 Basell Distributions**"): (i) €315 million (€140 million) on or about May 29, 2007, (ii) €75 million on or about July 16, 2007, and (iii) €100 million on or about December 7, 2007.  *See id.* ¶ 418.

[41]    The Merger had been previously approved by Lyondell's shareholders at a meeting on November 20, 2007.  *See* Cmplt. ¶ 246.

[42]    *See* Cmplt. ¶ 258.

[43]    Before the Merger agreement was executed, the lead arrangers of the Merger loans had asked if Blavatnik would contribute his gain on the toe-hold shares as equity, but Blavatnik refused.

10

(ii)    Using funds from the Merger loans, Basell Funding purchased Nell's interest in AI Chemical for $523,822,505, pursuant to a stock purchase agreement ("**Toe-Hold Payment I**").  Basell Funding took the interest in AI Chemical subject to the terms of the Forward Contract.

(iii)   Blavatnik arranged for another affiliated company, LB Finance, again using funds obtained through the Merger financing, to loan funds to AI Chemical.  AI Chemical drew down the funds (in the amount of $674,328,055) under this loan and instructed LB Finance to pay the funds directly to Merrill Lynch ("**Toe-Hold Payment II**," and together with Toe-Hold Payment I, the "**Toe-Hold Payments**").[44]

<u>Discussion</u>

<u>I.</u>

<u>Pleading Requirements</u>

A.    *Standards for Application of Rule 12(b)(6)*

The standards for deciding a motion to dismiss under Rule 12(b)(6) are well known.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[45]  But legal conclusions couched as factual allegations are not entitled to the assumption of the truth.[46]  "A claim has facial plausibility," the Supreme Court has explained:

> when the plaintiff pleads factual content that allows the
> court to draw the reasonable inference that the defendant is

---

[44]   *See* Cmplt. ¶¶ 266-72.

[45]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("***Iqbal***") (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("***Twombly***").

[46]   *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions").

> liable for the misconduct alleged. The plausibility standard
> is not akin to a probability requirement, but it asks for more
> than a sheer possibility that a defendant has acted
> unlawfully. Where a complaint pleads facts that are merely
> consistent with a defendant's liability, it stops short of the
> line between possibility and plausibility of entitlement to
> relief.[47]

Determining whether a complaint states a plausible claim for relief is a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.[48]

A trial court's function on a motion to dismiss is "not to weigh the evidence that might be

presented at trial but merely to determine whether the complaint itself is legally sufficient."[49] A

complaint is "deemed to include any written instrument attached to it as an exhibit or any

statements or documents incorporated in it by reference."[50] Where the plaintiff has relied "on the

terms and effect of a document in drafting the complaint," the court may consider the document

on a dismissal motion.[51] Defendants may raise affirmative defenses on a motion to dismiss, but

only "if the defense appears on the face of the complaint."[52]

B.     Heightened Requirement Under Rule 9(b)

Further, when a claim is premised on fraud—and the claim for intentional fraudulent

transfers in Count 2 is in this category[53]—Fed. R. Civ. P. Rule 9(b), which imposes a heightened

pleading requirement, applies. The more stringent standard of Rule 9(b) is essentially twofold.

---

[47]   *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

[48]   *Id.* at 679.

[49]   *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[50]   *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("**Cortec Industries**").

[51]   *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[52]   *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) ("**Color Tile**") (citations omitted).

[53]   *See Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) ("It is well-settled that the Rule 9(b) pleading requirements apply to claims of intentional fraudulent transfer.") (citation omitted).

It requires a plaintiff to (i) plead "with *particularity*, the circumstances constituting fraud or mistake," and to (ii) establish the defendant's mental state.[54] While intent may be alleged generally, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations."[55]

Thus, to support a fraud claim, a complaint must "allege facts that give rise to a 'strong inference' of fraudulent intent."[56] The Supreme Court has interpreted "strong inference" as requiring an inference to be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."[57] In determining whether the pleadings give rise to a strong inference of scienter, courts "must take into account plausible opposing inferences."[58]

## C.    Definite Statement Under Rule 12(e)

Fed. R. Civ. P. 12(e), made applicable to adversary proceedings by Bankruptcy Rule 7012, provides that a party may seek "a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." The purpose of the rule is to "strike at unintelligibility rather

---

[54]    *See* Fed. R. Civ. Proc. 9(b) (emphasis added); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

[55]    *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

[56]    *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ("*Acito*")).

[57]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("*Tellabs*"). While *Tellabs* was a securities fraud case under the Private Securities Litigation Reform Act of 1995 Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (the "**PSLRA**"), the "strong inference" standard (originally established by the Second Circuit, and incorporated into the PSLRA by Congress) has been extended to apply to other (non-securities) fraud claims as well. *See e.g., Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 774 n.7 (Bankr. S.D.N.Y. 2008) (Bernstein, S.J.) ("*Musicland*"); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 17 (Bankr. E.D.N.Y. 2007) (Stong, J.) (requiring plaintiffs to allege facts that give rise to a strong inference of fraudulent intent involving claims for fraudulent transfer).

[58]    *Tellabs*, 551 U.S. at 323.

than want of detail."[59]  Generally, "Rule 12(e) motions are disfavored because they can be used

as a tool for delay," but where "there actually is a substantial threshold question that may be

dispositive, such as a critical date, a more definite statement may be warranted."[60]

## II.

### Motion to Dismiss Count 2 (Nell and Blavatnik)

Count 2 of the Complaint seeks to recover, as intentional fraudulent transfers under

sections 544, 548(a)(1)(A), and 550(a) of the Bankruptcy Code and applicable state law, the Toe-

Hold Payments that benefitted Blavatnik, Nell, and AI Chemical.

This is the Court's fourth decision addressing the Trustee's claims of intentional

fraudulent conveyance—joining two in the previously issued Shareholder Fraudulent Transfers

Decisions, and one in the Court's concurrent decision dismissing Count 4 in this action.

Although the sums that the Trustee seeks to recover in this Count 2 (i.e., the Toe-Hold

Payments) differ from the transfers sought in Count 4 (stock redemption and change of control

payments paid to Lyondell's pre-Merger directors and officers) and those addressed in the

Shareholder Fraudulent Transfer Decisions (stock redemption by Lyondell's former (non-D&O)

shareholders), they all relate to Merger consideration paid to Lyondell's shareholders pursuant to

the Merger.  And the factual allegations underlying the scienter for intentional fraudulent

---

[59]   *Price v. City of Troy N.Y.,* 2014 U.S. Dist. LEXIS 87443, at *9, 2014 WL 2926479, at *3 (N.D.N.Y June 26, 2014) (Hummel, M.J.) ("**Price**") (citations omitted).

[60]   *In re Fosamax Prods. Liab. Litig.*, 2013 U.S. Dist. LEXIS 177907, at *4-5 (S.D.N.Y. Dec. 18, 2013) (Keenan, J.) (internal quotations and citations omitted); *see also Allyn v. Rockland County*, 2012 U.S. Dist. LEXIS 179575, at *4-5, 2012 WL 5992735, at *2 (S.D.N.Y. Nov. 8, 2012) (Briccetti, J.) ("Motions pursuant to Rule 12(e) are disfavored and should not be granted 'unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.'") (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 233 F.R.D. 133, 134 (S.D.N.Y. 2005)); *accord Price*, 2014 U.S. Dist. LEXIS 87443, at *17 (granting 12(e) motion where "pleading was vague and ambiguous and does not satisfy the pleading requirements of Rule 8.")

conveyance are effectively the same—i.e., the alleged misconduct of Lyondell's pre-Merger

directors and officers in approving the "refreshed" projections and Merger.[61]

Thus, the Shareholder Fraudulent Transfer Decisions dictate the same conclusion vis-a-

vis the Toe-Hold Payments here.  The Trustee has not sufficiently alleged that a critical mass of

Lyondell's pre-Merger directors possessed an actual intent to "hinder, delay or defraud" creditors

in approving the Merger and LBO financing.

Accordingly, for the reasons stated in the Shareholder Fraudulent Transfer Decisions, the

Trustee's claim for intentional fraudulent conveyance in Count 2 is dismissed.

### III.

**Motions to Dismiss Counts 7, 14, and 18 (Access Defendants, Floor, and
Bigman), or in the Alternative, for a More Definite Statement of Count 18**

Counts 7, 14, and 18 of the Complaint assert claims against various defendants under the

laws of Luxembourg.  In addition, Count 18 references "applicable state law."

---

[61]    Defendants Blavatnik and Nell's motion to dismiss principally argues that the transferors of the Toe-Hold
Payments—Basell Funding and LB Finance—are not the Debtors and the monies transferred are not property of
the estate.  *See* Defs. Count 2 Br., filed Sep. 24, 2010 [Dkt. 410], at 7.  The Trustee counters that when analyzed
under the "Collapsing Doctrine" as merely another step in the integrated LBO scheme, the Toe-Hold Payments
"should be treated as transfers by Lyondell" and thus it is the intent of Lyondell (through its officers and
directors) that needed to be (and has been) pleaded.  *See* Trustee Count 2 Opp. Br., filed Nov. 23, 2010 [Dkt.
454], at 3.

The Collapsing Doctrine refers to the concept of "collapsing" a series of transactions as if they are phases in a
single integrated transaction in order to better analyze the overall economic effect of a multi-stepped
transaction.  *See, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).  This Court addressed a
similar motion to dismiss intentional fraudulent conveyance claims by certain defendants in the First
Shareholder Decision, dealing with a contention that the Debtors were not the transferors of the Merger
consideration paid to the Lyondell shareholders, but mere pass-throughs, because the funds for the Merger
consideration came from the financing banks.  In the First Shareholder Decision, the Court discussed at length
the caselaw governing the collapsing doctrine and its routine application by courts, in this and other circuits, to
LBO transactions in the context of fraudulent conveyances.  *See* First Shareholder Decision, 503 B.R. at 379-
381.  Although the arguments raised by defendants here vary somewhat from those in the First Shareholder
Decision, the Court concludes, as it did in the First Shareholder Decision, that the facts as alleged support the
Trustee's contention that "there was an intent to effect a unitary transaction" in the LBO—"which is not to say,
of course, that the LBO here necessarily must be collapsed," just that the Trustee has plausibly alleged facts
under which it might be.  *Id.* at 381.  Thus the Court can, and does, look to the intent of Lyondell as the
transferor of the Toe-Hold Payments for the purpose of this motion to dismiss Count 2.

15

Motions to dismiss Counts 7, 14, and 18 for failing to state a claim were filed by defendant Bigman and a group of defendants comprising Benet, Blavatnik, Alex Blavatnik, Kassin, Thorén, Access Holdings, Access Industries, AI International, and Nell (collectively, the "**Access Defendants**"). The Access Defendants also move, in the alternative, for a more definite statement of Count 18 pursuant to Fed. R. Civ. P. 12(e), primarily arguing that Count 18 is so vague and ambiguous as to be unintelligible.

For the reasons that follow, the motions to dismiss Count 7, are granted, but with leave to replead. The motion to dismiss Count 14 is denied. However, the parties are to submit, pursuant to Fed. R. Civ. P. 44.1, additional briefing regarding the applicability of Luxembourg law with respect to Count 14. And the defendants will be permitted to renew any motion to dismiss following the supplemental briefs. The motion to dismiss Count 18 is granted in part and denied in part, as discussed more fully below. The motion for a more definite statement of Count 18 under Fed. R. Civ. P. 12(e) is granted for the purpose of providing a more cogent and coherent presentation of the claim, as well as Luxembourg law.

A.      *Rule 44.1 – Applying Foreign Law*

Federal Rule of Civil Procedure 44.1, applicable here through Bankruptcy Rule 9017,[62] states in relevant part: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."[63]

---

[62]    *Bickerton v. Bozel, S.A. (In re Bozel S.A.)*, 434 B.R. 108, 111 (Bankr. S.D.N.Y. 2010) (Gonzalez, C.J.) ("***Bozel***") (applying Fed. R. Civ. P. 44.1 in bankruptcy adversary proceeding); *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 n.14 (Bankr. S.D.N.Y. 1986) (Beatty, J.) (same).

[63]    Fed. R. Civ. P. 44.1.

Courts have discretion when interpreting foreign law under Fed. R. Civ. P. 44.1.[64]  Under

the plain language of Rule 44.1, the determination of foreign law is a question of law for a court

to decide.[65]  A court is free to conduct its own research and interpretation into the content of

foreign law.[66]  When determining the contours of foreign law, if a court recognizes its own

ignorance of foreign law, it has the authority to direct the parties to brief the question.[67]  Where

research provided by counsel is deemed inadequate, a court can demand a more "complete

presentation by counsel."[68]  For example, a court may seek the aid of expert witnesses in

interpreting the law of a foreign state or of international law.[69]  The Second Circuit has explained

how courts should treat the testimony of experts on foreign law: "It is not the credibility of the

experts that is at issue, it is the persuasive force of the opinions they expressed."[70]  Although a

---

[64]  *Bozel*, 434 B.R. at 111 (citing *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 395 (S.D.N.Y. 2007); *Haywin Textile Prods. v. Int'l Fin. Inv. & Commerce Bank, Ltd.,* 137 F. Supp. 2d 431 (S.D.N.Y. 2001) (Robert Carter, J.) ("*Haywin*").

[65]  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) ("*Itar-Tass*") (citing *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir. 1970)); *Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 451 F. Supp. 2d 576, 582 (S.D.N.Y. 2006) (Sweet, J.) (citing *Ackermann v. Levine*, 788 F.2d 830, 838 n.7 (2d Cir. 1986)).

[66]  *See In re Tyson*, 433 B.R. 68, 78 (S.D.N.Y. 2010) (Cote, J.) (citing *Ackermann v. Levine*, 788 F.2d 830, 838 n.7 (2d Cir. 1986)).  *But see Enigma Holdings, Inc. v. Gemplus Int'l S.A.*, 2006 U.S. Dist. LEXIS 72996, at *23, 2006 WL 2859369, at *8 (N.D. Tex. Oct. 5, 2006) (Boyle, J.) ("*Enigma*") (noting that party seeking to apply foreign law has burden of proving its substance to a reasonable certainty) (citing *In re Avantel, S.A.*, 343 F.3d 311, 321-22 (5th Cir. 2003)).

[67]  *See Mackley v. Sullivan & Liapakis, P.C.*, 2001 U.S. Dist. LEXIS 21723, at *10-11, 2001 WL 1658188, at *4 (S.D.N.Y. Dec. 27, 2001) (S.D.N.Y. Dec. 17, 2001) (Kram, J.) (citation omitted).

[68]  *Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1193 (7th Cir. 1985) ("*Twohy*").  *See also Pfizer, Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1361 (D. Del. 1993) (Longobardi, C.J.) ("*Elan Pharmaceutical*") ("Nothing in Rule 44.1 requires a court to engage in private research; the rule preserves the court's right to insist upon a complete presentation by counsel on the foreign-law issue.").

[69]  *Ferguson v. Hannover Ruckversicherungs-Aktiengesellschaft*, 2007 U.S. Dist. LEXIS 61441, at *52-53 n.8, 2007 WL 2493692, at *18 n.8 (S.D.N.Y. Aug. 21, 2007) (Leisure, J.) (citing *U.S. v. Jurado-Rodriguez*, 907 F. Supp. 568, 574 (E.D.N.Y. 1995)).  Under exceptional circumstances, a court may also appoint a special master to determine applicable foreign law.  *Corporacion Salvadorena de Calzado, S.A. (Corsal, S.A.) v. Injection Footwear Corp.*, 533 F. Supp. 290, 293 (S.D. Fla. 1982).

[70]  *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 227 (S.D.N.Y. 2000) (quoting *Itar-Tass*, 153 F.3d at 92).  *See also Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 176 F.3d 601, 604-05 (2d Cir. 1999) (declining to uphold the district court's award of damages because the expert on foreign law provided "only very limited support," citing "no cases or legal authority to support his construction" of a statute); *Bozel*, 434 B.R. at 111 ("In making rulings regarding foreign law, courts have employed various methods: they have

court may enlist the parties in the effort to determine foreign law, ultimately the responsibility

for correctly identifying and applying foreign law rests with the court.[71]

Before a case has been fully tried, courts can permit parties to brief, further brief, or

submit evidence on questions of foreign law.[72]  According to the Seventh Circuit:

> The rare case in which there is a failure of proof [of foreign law]
> would be an especially unappealing case for holding that the party
> whose claim or defense is based on foreign law must lose because
> this would be a case in which the foreign law could not be
> ascertained despite the diligent efforts of both counsel and the trial
> judge.  It simply is not fair to bar a party from recovering when
> neither his attorney nor the court is able to conjure up the content
> of governing law.[73]

---

considered the plain text of applicable foreign law; made assumptions regarding the interpretation of translated foreign law sources; considered expert affidavits submitted by parties; evaluated experts' credibility; assessed experts' opinions and the basis of such opinions as supported by the foreign country's civil law, cases, treatises, and logic.") (internal citations omitted).

[71]  *In re Tyson*, 433 B.R. at 78 (citing *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 586 (2d Cir. 2005)).

[72]  *See, e.g.*, *FR 8 Singapore Pte. Ltd. v. Albacore Mar., Inc.*, 754 F. Supp. 2d 628, 637 (S.D.N.Y. 2010) (Holwell, J.) ("Although under Fed. R. Civ. P. 44.1, '[i]n determining foreign law, the court may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence,' and could therefore conduct its own foreign-law inquiry in this case, it seems more prudent to allow the parties to brief the issue of whether FR8 has adequately pleaded its veil-piercing claim under English law."); *Haywin*, 137 F. Supp. 2d at 435 (staying motion to dismiss pending additional submissions from the parties regarding Bangladeshi law); *Elan Pharmaceutical*, 812 F. Supp. at 1360-61 ("Under Rule 44.1, a court is not required to engage in its own research and has the right to insist that the proponent of the foreign law present evidence on the question.") (citing *Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 77 (W.D.N.Y. 1985)); *Prudential Lines, Inc. v. General Tire International Co.*, 440 F. Supp. 556, 560-61 (S.D.N.Y. 1977) (McMahon, J.) ("The parties, however, have failed to provide us with evidence sufficient to permit an informed decision on the Rumanian law.  In light of these deficiencies in the record, defendants' motions [for summary judgment] are denied.  At trial, the parties will be permitted to renew their contentions and to introduce evidence on the question whether the plaintiff could have limited its liability to $500 per package in an action against it in the courts of Rumania.").  *See also Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968) ("Though new Rule 44.1 establishes that courts may, in their discretion, examine foreign legal sources independently, it does not require them to do so in the absence of any suggestion that such a course will be fruitful or any help from the parties.").

[73]  *Twohy* 758 F.2d at 1193-94 (insertion of "of foreign law" in original) (citing 9 C. Wright & A. Miller, Federal Practice and Procedure: Jurisdiction § 2447, p. 416 (1982)).  *See also LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 233-34 (S.D.N.Y. 2007) (Haight, S.J.) ("*LaSala*") ("It is inadvisable for this Court to decide a case where legal experts disagree about critical points in the application of the foreign law.  It is even more inadvisable for this Court to decide issues of Swiss law that both experts *agree* are unsettled.") (emphasis in original) (internal citations omitted).

Here, submissions on the contours of relevant foreign law were provided in connection with the motions to dismiss. Bigman supplemented his motion with the affidavit of André Prüm (the "**Bigman Expert**"), a professor retained as an expert on Luxembourg law. The Access Defendants filed, with their motions, an expert declaration from Luxembourg attorney Guy Arendt (the "**Access Expert**"). The Trustee opposed those motions with a declaration of Luxembourg professor Jacquez Delvaux (the "**Trustee Expert**"). The Bigman Expert then filed a reply affidavit.

Unfortunately, these expert submissions passed each other like ships in the night in several key respects, as discussed more fully below. Moreover, many exhibits attached to the declarations lacked English translations or clear connections to the statements in the declarations. For example, as fairly characterized by the Access Defendants: "The [Trustee Expert] Declaration includes hundreds of pages of exhibits scantly mentioned in the declaration; of the 30 excerpts of Luxembourg and Belgian cases and scholarly work submitted as exhibits to his declaration, only five appear in the declaration itself."[74] As a result, the Court needs a more complete presentation by counsel. An examination of the record's deficiencies with respect to the laws of Luxembourg, by count, follows.

    *1.*     *Count 7: Tort under Luxembourg Law*

Count 7 asserts that defendants Benet, Bigman, Blavatnik, Kassin, and Floor[75] failed to exercise reasonable care and diligence in the direction and supervision of the business and affairs

---

[74]   *See* Access Defs. Lux. Reply Br., filed on Dec. 23, 2010 [Dkt. 471], at 5-6 (citations omitted).

[75]   With the exception of Bigman, these defendants were members of the Resulting Company's supervisory board effective December 20, 2007. *See* Cmplt. ¶¶ 54-57, 62.

of the Resulting Company in accordance with the Resulting Company's articles of incorporation,

Luxembourg Company Law, and articles 1382 and 1383 of the Luxembourg Civil Law.[76]

Neither the Trustee in his briefing nor the Trustee Expert in his declaration provided the

statutory text of articles 1382 and 1383 translated in English.  The Trustee Expert provided what

appears to be the statutory text, in a foreign language, in Exhibit F to his declaration (buried

amid other exhibits lacking clear organization or translation to English).  So that left the Court to

instead rely upon the Access Expert's "free translation" of articles 1382 and 1383, as follows:

> Article 1382.  Any act of man which causes harm to anybody else
> entails the obligation of the one by whose fault this act has
> happened to repair this harm.
>
> Article 1383.  Each person is responsible for the harm it has caused
> not only by its acts, but also by its negligence or by its lack of
> prudence.[77]

The Trustee Expert and the Access Expert generally agree that these articles require: (i) a

plaintiff's suffering of harm or damage, (ii) fault or the commission of wrongdoing personally by

the defendant (either actively or by omission), and (iii) a direct causal link between the

---

[76]  The Complaint specifically references Article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law in the heading for Count 7.  *See* Cmplt. ¶¶ 374-378.

[77]  *See* Arendt Decl. [Dkt. 415], ¶ 24.

The Access Expert followed up this translation with an exhibit that provided a somewhat different translation, though the substance of the meaning appears to be the same:

> Article 1382.  Any action made by a person causing another to suffer loss shall oblige the person whose fault caused it to repair the loss.
>
> Article 1383.  Every person is liable for the loss he has caused, not only as a result of his actions but also as a result of his negligence or his lack of prudence.

Exh. C to Werder Supp. Decl. [Dkt. 473] (furnishing translations for exhibits originally provided in the Werder Decl. [Dkt. 416]).  *See also* Hr'g Tr., dated March 10, 2011 [Dkt. 520], at 170 ("THE COURT: But there's no difference between the two sides as to how the language is translated into English?  MR. WERDER: I don't think there's any dispute, but if there is—I mean, there hasn't been any dispute that's been pointed out.  I think everybody is translating it essentially the same.").

wrongdoing and the harm.[78]  But the parties dispute how these requirements should apply, if at all, to the defendants here.

In particular, the defendants make three arguments.  First, they contend that the Trustee fails to allege specific tortious misconduct outside the scope of the defendants' contractual and statutory duties.[79]  The Court agrees.  Count 7 of the Complaint simply alleges that the defendants engaged in "tortious misconduct" by approving the terms of the Merger and the Merger Financing and "the other conduct alleged herein," without explanation as to how or why such conduct constitutes an extra-contractual tort outside the scope of their duties.  And the Trustee's opposition brief (which mostly focuses on the relationship between Count 6 and Count 7[80]) fails to address this issue other than by reference to the Trustee Expert.[81]  However, the Trustee Expert seems to suggest that the defendants' misconduct was *within* their contractual responsibility. [82]  At best, the Trustee Expert's analysis is too superficial to be helpful to the Court's analysis, and at worst, does nothing to advance the Trustee's position.  Thus, on the current record, the Trustee has not sufficiently pled the applicability of the Luxembourg Company Law to the facts alleged.

Second, the defendants assert that the Trustee unlawfully mixes principles of contract law and tort law by simultaneously basing Count 7 upon the Luxembourg Company Law, which regulates *contractual* duties, and the Luxembourg Civil Code, which regulates *tortious*

---

[78]    *See* Arendt Decl. ¶ 26; Delvaux Decl. [Dkt. 452-1] ¶ 39.  The Bigman Expert does not seem to address articles 1382 and 1383 of the Luxembourg Civil Code.

[79]    Access Defs. Lux. Reply Br., at 8.

[80]    Understandably, the Trustee needed to address the defendants' contention that Count 7 was duplicative of Count 6.  Given the amendment to Count 6, it is not clear what effect, if any, that has on the motions to dismiss Count 7 as the parties did not have the opportunity to brief such issue.

[81]    *See* Trustee Lux. Opp. Br. [Dkt. 452], at 15.

[82]    *See* Delvaux Decl. ¶ 22) ("Under Luxembourg law, the duty for making decisions to enter into transactions such as those described in the Amended Complaint lies with the GP as manager of the Company.").

misconduct independent of contractual duties.[83]   According to the defendants, when a plaintiff

mixes principles of Luxembourg law in a single claim, Luxembourg law entitles the defendant to

have such claim dismissed for failure to state a valid cause of action.[84]

But the Trustee responds to this by saying that the principles are pled in the alternative.

According to the Trustee Expert:

> Even though there exists under Luxembourg law a principle in
> civil liability not to mix contractual liability and extra-contractual
> liability, it remains possible for third parties, for wrongful acts that
> cause harm to them, to invoke, first the contractual liability and in
> the alternative, extra-contractual liability.  The movant may plead
> the contract and tort causes in the alternative, enumerating in its
> complaint the different causes of actions [sic] and their legal basis.
> The extra-contractual liability is residual.[85]

While combining multiple legal principles in Count 7 is not ideal, the Court is disinclined

to dismiss the entire claim merely because of an apparent inclusion of alternative legal

authorities.[86]   But the Trustee needs to clarify the specific legal theories and statutes upon which

Count 7 is based.  And if indeed he is pleading them in the alternative,[87] the Trustee needs to so

indicate in the Complaint, and present additional analysis on the application of the Luxembourg

Company Law to the factual allegations.

---

[83]   *See* Access Defs. Lux. Br., filed on Sep. 24, 2010 [Dkt. 414], at 7-9; Bigman Counts 6, 7, 14 Br., filed on Sep. 24, 2010 [Dkt. 423], at 4 (incorporating the Access Defendants' motion to dismiss).

[84]   Access Defs. Lux. Br. at 8 (citing Arendt Decl. ¶ 44).

[85]   Delvaux Decl. ¶ 41.

[86]   *See Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (citing *Newman v. Silver*, 713 F.2d 14, 15 n.1 (2d Cir. 1983)) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters.").

[87]   The Trustee's contention that he is pleading two alternative legal theories is undercut by his own submissions: (i) the Trustee's opposition brief on Count 7 only discusses the application of articles 1382 and 1383, and (ii) notwithstanding the reference to Article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law in Count 7's heading, there are no specific allegations supporting the contractual claim.  Similarly, the Trustee Expert's submission with respect to Count 7 contains no analysis of the Luxembourg Company Law.  Thus, the implication is that the Trustee relies solely upon articles 1382 and 1383 of the Luxembourg Civil Code in asserting Count 7.

Third, the defendants assert that articles 1382 and 1383 of the Luxembourg Civil Code do not apply to the defendants through the relevant corporate forms.  Specifically, as to Bigman, the argument is two-fold.  First, he contends that the Complaint is "utterly devoid of any allegations regarding commissions or omissions taken by Mr. Bigman while he was a manager for the general partner of [the Resulting Company]."[88]  Second, he contends that only the general partner of the Resulting Company (i.e., the GP itself), and not the managers of the general partner, may be sued under Luxembourg law.[89]  As to the Access Defendants, they likewise argue that liability in tort is personal, not vicarious.[90]

However, according to the Trustee Expert, "when an intentional and serious offense incompatible with the normal conditions of exercise of the mandate has been committed by the director," the director could find himself or herself "personally responsible alongside with the company" to third parties.[91]  The Trustee Expert goes on to say:

> In addition, the Amended Complaint alleges that Blavatnik controlled the decisions relating to the Merger and that such transaction was conducted in line with his instructions.  It follows from these allegations that there is a basis for liability under the general rules of civil liability under articles 1382 and 1383 of the Luxembourg Civil Code.[92]

---

[88]   Bigman Counts 6, 7, 14 Reply Br. [Dkt. 466], at 7.  As previously noted, Bigman was not a member of the supervisory board of the Resulting Company (*see* n.10, *supra*).

[89]   Bigman Counts 7, 14, 18 Br. at 4 (citing Prüm Aff. ¶¶ 28, 31, 82).  *See* n.10, *supra*, for the definition of the GP.

[90]   In support of this argument, the Access Defendants rely upon the Access Expert's view that directors' liability should be limited to serious faults that are either committed personally or detachable from their duties to a company.  *See* Access Defs. Lux. Reply Br. at 9; Arendt Decl. ¶ 30-31 ("A director will be liable toward third parties only if they committed a serious fault which they either committed personally, or which is detachable from their duty. . . . [T]he fault required under articles 1382 and 1382 of the Civil Code must have been committed <u>directly</u> by the person whose responsibility is sought.") (emphasis in original).

[91]   Delvaux Decl. ¶ 40.  In briefing, the Trustee addresses the defendants' corporate form arguments in the context of Count 6.  *See, e.g.*, Trustee Lux. Opp. Br. at 12-14.  Because of changes to Count 6, it is no longer clear how such arguments continue to apply, if at all.

[92]   Delvaux Decl. ¶ 46.

23

Frustratingly, the Trustee Expert does not provide the Court with an opportunity to understand the bases or implications of his analysis in this regard.  For example, the Trustee Expert does not explain *how* it "follows from these allegations" that there is a basis for liability.

On the other hand, the Access Expert offers a different interpretation, stating: "a general allegation of affiliation or control or dominance does not suffice to evidence the liability of the affiliated, controlling or dominant entity or person in respect of the wrongdoings of the affiliated, controlled or dominated wrongdoer."[93]

At present, the Court is unable to reconcile the Luxembourg experts' differences in their interpretation and analysis of the Luxembourg Civil Code with respect to Count 7, and is left with many unanswered questions.[94]  These incomplete expert presentations, coupled with the lack of specificity of both the factual allegations of extra-contractual tortious misconduct and the Luxembourg legal principles underlying Count 7, lead the Court to conclude that the Trustee needs a more cogent presentation of the facts and legal theories necessary to apply Luxembourg laws—whether in tort, contract, or otherwise.  Thus, the motions to dismiss Count 7 are granted, but with leave for the Trustee to replead.

---

[93]   Arendt Decl. ¶ 30.

[94]   Unanswered questions include, for example: What are "the general rules of civil liability" under articles 1382 and 1383 of the Luxembourg Civil Code? Whose liability is affected by Blavatnik's alleged control? If the Trustee is claiming that the other defendants under Count 7 (such as Benet, Bigman and Kassin) were acting in line with Blavatnik's instructions, does doing so constitute acting within a mandate? Or were such defendants acting within Blavatnik's instructions, but outside their mandate?

     2.     *Count 14: Luxembourg Law Unlawful Distribution and Extra-Contractual Tort*

Count 14 relates to the December Distribution[95] by Basell to its shareholders.  It is based

upon the same statutory predicates that underlie Count 7—articles 1382 and 1383 of the

Luxembourg Civil Code.[96]

But the Trustee Expert fails to discuss how or why Luxembourg Civil Code articles 1382

and 1383 apply to Count 14 and allegations relating to the December Distribution.  Instead, the

Trustee Expert rather summarily concludes that, because Count 14 seeks *damages*, rather than a

*reimbursement* of the amounts distributed, the allegations in Count 14 provide a basis for a claim

under Luxembourg law.[97]  The Trustee Expert's declaration focuses mainly on article 72-1 of the

Luxembourg Company Law.[98]  But since the filing of the Trustee Expert's declaration, the

Trustee is no longer bringing Count 14 under Luxembourg Company Law article 72-1.  The

scant attention paid to Luxembourg Civil Code articles 1382 and 1383 by the Trustee Expert is

insufficient to assist the Court.

But the Access Expert and Bigman Expert also fail to address this issue.  Instead, the

Access Expert states, with respect to articles 1382 and 1383: "I fail to see how the Luxembourg

courts could, on the basis of the asserted actual facts, determine that either Moving Defendant

had a personal involvement, and had committed a relevant wrongdoing, capable of triggering

their liability in tort."[99]  Then, quoting the Access Expert, the Trustee inexplicably argues that

---

[95]    The Trustee originally sought to recover all three of the 2007 Basell Distributions.  However, by stipulation dated March 18, 2011 [Dkt. 524], the Trustee agreed that Count 14 would continue only with respect to the December Distribution.

[96]    *See* Cmplt. ¶¶ 417-428.  *See also* 3/10/11 Hr'g Tr. at 190 ("Count 14 is relying on exactly the same Luxembourg law statutory predicate, 1382 and 1383, as was relied upon in Count 7."), at 210 ("The trustee . . . is now asserting Count 14 solely under Articles 1382 and 1383 of the Luxembourg Civil Code.").

[97]    *See* Delvaux Decl. ¶ 57 (emphasis added).

[98]    *See id.* ¶¶ 49-57.

[99]    Arendt Decl. ¶ 46.

the Access Expert "concedes as to tort liability that the question is instead whether a defendant 'had a personal involvement, and had committed a relevant wrongdoing, capable of triggering their liability in tort.'"[100]  But the Access Expert ultimately argues that even under that standard, no liability exists.  So it is not at all clear why or how the Trustee relies on the Access Expert's statements to establish liability.

In short, as with Count 7, the submissions provided by the Access Expert, the Bigman Expert, and the Trustee Expert are inadequate.  But unlike his allegations underlying Count 7, the Trustee's allegations underlying Count 14 are more comprehensive.  And dismissal of Count 14 based solely on deficiencies in the Luxembourg experts' analyses is overly harsh, unnecessary, and judicially inefficient.  Instead, the Court concludes that the parties should submit further briefing, pursuant to Fed. R. Civ. P. 44.1, to provide the Court with better analysis as to the applicability of Luxembourg law in Count 14 to the factual allegations in the Complaint.  Accordingly, the motions to dismiss Count 14 are denied—but without prejudice to renewal of these motions, following submission of the additional supplemental briefs.

### 3.      Count 18: Tort or Aiding and Abetting Breach of Fiduciary Duty

The Access Defendants move to dismiss Count 18 under Fed. R. Civ. P. 12(b)(6), or in the alternative, for a more definite statement of Count 18 under Fed. R. Civ. P. 12(e).  For the reasons that follow, the motion to dismiss Count 18 is granted as to the Trustee's claim for aiding and abetting under Luxembourg law.  It is granted in part and denied in part as to aiding and abetting liability under applicable state law.  The Access Defendants' motion for a more definite statement, under Rule 12(e), is granted.

---

[100]    Trustee Lux. Opp. Br. at 19.

        a.     *The Pleading of Count 18 under Luxembourg Law*

Count 18 is a claim for aiding and abetting breach of fiduciary duty under Luxembourg law and applicable state law.  But the Access Defendants contend that Luxembourg law does not recognize a claim for aiding and abetting breach of fiduciary duty.[101]   And the Trustee provides no basis for a view to the contrary.

In response, the Trustee counters that Count 18 "states a *direct* tort claim against these defendants under Luxembourg law.  However, if the Court were to conclude that the conduct engaged in by defendants in connection with the Merger and its related transactions falls under New York, Delaware or Texas law, rather than that of Luxembourg, Count 18 would state a cause of action under that law for aiding and abetting breach of fiduciary duty."[102]

Thus the Court is dismissing claims for aiding and abetting under Luxembourg law.

Given how Count 18 is pleaded, it is possible that the Trustee intended for Count 18 to plead an aiding and abetting claim under both Luxembourg and applicable state law—and that upon learning that Luxembourg law does not recognize aiding and abetting liability, the Trustee now seeks to bring a direct tort action against the defendants while maintaining an aiding and abetting claim under applicable state law.  But that is not what the Complaint now says.  Since the Court is permitting the Trustee to replead Count 7, and to provide a more complete expert analysis on the applicability of articles 1382 and 1383 of the Luxembourg Civil Code in Count 14, the more appropriate solution is to require the Trustee to provide a more definite statement of Count 18, pursuant to Fed. R. Civ. P. 12(e), as to how the alleged misconduct as currently pled in

---

[101]   Access Defs. Lux. Br. at 13 (citing Arendt Decl. ¶ 33).  The Access Defendants further argue that articles 1382 and 1383 of the Luxembourg Civil Code, which is the only Luxembourg law cited for Count 18, provides only for recovery as a direct tort, and cannot sustain a cause of action for aiding and abetting breach of fiduciary duty.  *See id.*

[102]   Trustee Lux. Opp. Br. at 20 (emphasis added).

Count 18 gives rise to a direct tort claim under articles 1382 and 1383 of the Luxembourg Civil Code.

### b.    Applicable state law

In addition to Luxembourg law, Count 18 also asserts a cause of action for aiding and abetting breach of fiduciary duty under applicable state law.  The parties dispute which state's law should apply.

For reasons this Court discussed at greater length in *Adelphia-Bank of America*,[103] normal "interest analysis" principles applicable in all tort cases should apply to claims for aiding and abetting breaches of fiduciary duty, warranting application of the law of the jurisdiction with the greatest interest in a particular case.[104]  The jurisdiction with the greatest interest is that of the principal place of business, where any injury as a consequence of any aiding and abetting would have been suffered.[105]

The parties briefed the law of aiding and abetting breach of fiduciary duties for four jurisdictions: Delaware, Luxembourg, New York, and Texas.  At the oral arguments hearing on this matter, the Access Defendants argued that Luxembourg law, or perhaps even Dutch law, should apply rather than Texas law, because the relevant fiduciary duties were owed to pre-Merger Basell corporations organized under Luxembourg law with principal operations in the

---

[103]  *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 39-40 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("***Adelphia-Bank of America***"), *aff'd as to all but an unrelated issue*, 390 B.R. 80 (S.D.N.Y. 2008) (McKenna, J.).

[104]  *See Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("***MagCorp***") (citing *Adelphia-Bank of America*, 365 B.R. at 39-40).  *See also Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 350 (Bankr. S.D.N.Y. 2010) (Gonzalez, C.J.) ("***Hydrogen LLC***"); *LaSala*, 510 F. Supp. 2d at 230-231; *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*, 383 B.R. 231, 271-72 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.); *Silverman v. H.I.L. Assocs. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 395-96 (Bankr. E.D.N.Y. 2008) (Stong, J.).

[105]  *MagCorp.*, 399 B.R. at 742-43.  *Accord In re Hydrogen, L.L.C.*, 431 B.R. at 350-51.

Netherlands.[106]  The Court is not persuaded.  The Access Defendants mischaracterize Count 18

by tying it to *pre-Merger Basell entities* when Count 18 actually invokes fiduciary duties owed

to two *post-Merger entities*: the Resulting Company and the GP.  While these two post-Merger

holding companies are organized under Luxembourg law, they sit atop a global enterprise

principally operating out of Texas.

Moreover, the Trustee has alleged in substance that the relevant principal place of

business is Texas:

-   "Although registered in Luxembourg, Basell had no personnel or physical offices

    located there and, upon information and belief, did not conduct any business there. . .

    In addition, the GP, like Basell, had no presence or activities in Luxembourg other

    than through the use of domiciliation services of Citadel Administration."[107]

-   "[O]n Sept. 14, 2007, Blavatnik told Kassin 'You should go to Houston-that's where

    the business is!!!'"[108]

Even when not included in the Complaint, the Court may take judicial notice of the

Debtors' principal place of business and the location of their principal assets, as such information

has been included in the petitions filed with this Court.[109]  In particular, the Court takes judicial

notice of Attachment 19a of the Statements of Financial Affairs for both the Resulting Company

---

[106]  3/10/11 Hr'g Tr. at 191-97.

[107]  *See* Rev. Cmplt. ¶ 360.  This allegation did not appear in the Complaint.

[108]  *See id.* ¶ 383.  This allegation did not appear in the Complaint.

[109]  *See Hydrogen, L.L.C.*, 431 B.R. at 350 n.7 (citing *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir.
2002)).  *See also Transp. Alliance Bank, Inc. v. Arrow Trucking Co.*, 766 F. Supp. 2d 1188, 1192 (N.D. Okla.
2011) (Frizzell, J.) ("The court takes judicial notice of the bankruptcy court filings."); *Airlines Reporting Corp.
v. Belfon*, 2010 U.S. Dist. LEXIS 97349, at *71-72, 2010 WL 3664065, at *20 (D.V.I. Sept. 16, 2010)
(Buchwalter, S.J.) ("Notably, and somewhat unusually, ARC fails to establish the place of incorporation for
each airline, a matter of which the Court will take judicial notice from public record."); *Breeden v. Sphere
Drake Ins. PLC (In re Bennett Funding Group, Inc.)*, 1999 Bankr. LEXIS 1857, at *10 n.1 (Bankr. N.D.N.Y.
Aug. 6, 1999) (Gerling, C.J.) ("Although the complaint in this adversary proceeding contains no discussion of
BFG's ownership, the Court takes judicial notice of BFG's List of Equity Security Holders, filed by the Trustee
on August 1, 1996, which lists Edmund and Kathleen Bennett as the sole shareholders as of the petition date.").

and the GP.[110]  Attachment 19a responded to question 19a's requirement that every debtor list

"all bookkeepers and accountants who . . . kept or supervised the keeping of books of account

and records of the debtor."  Each of the Resulting Company and the GP identified only Eberhard

Faller, Corporate Controller, who is located in Houston, Texas.[111]

The Court also takes judicial notice of the First Day Affidavit of Alan S. Bigman (the

"**Bigman Affidavit**"), which was filed on January 6, 2009 before being made applicable to the

Resulting Company and the GP by an interim order of this Court dated April 30, 2009.[112]

Schedule 6 of the Bigman Affidavit listed "property or premises owned, leased or held under

other arrangement by the Debtors from which the Debtors operate their businesses."  Under the

heading "Owned Real Property," the Bigman Affidavit identified 29 sites, all located in the

United States.  Of these, 16 were located in Texas.  No other state had more than two sites.

Consideration of leased property would lead to no different conclusion.

Finally, a statement on Schedule 7 of the Bigman Affidavit once again tended to suggest

Texas as the locus of the Debtors' principal place of business and hence any resulting injury.  It

stated: "The Debtors' books and records are primarily located at One Houston Center, 1221

McKinney Street, Houston, Texas 77010."[113]

---

[110]  Statement of Financial Affairs for case numbers 09-12518 [Dkt. 4] and 09-12519 [Dkt. 4].

[111]  *See id.*

[112]  *See* First Day Affidavit of Alan S. Bigman, filed on January 6, 2009, in Case No. 09-10023 [Dkt. 11]; Motion for Order Making Certain Orders and Other Pleadings Entered or Filed in Chapter 11 Cases of Affiliated Debtors Applicable to Recently Filed Cases, filed April 24, 2009, in Case Nos. 09-12518 [Dkt. 2] and 09-12519 [Dkt. 2], at ¶ 3 ("This Motion seeks to have applied to [the Resulting Company] and [the GP] the [Bigman Affidavit]."); Interim Order dated April 30, 2009 in Case Nos. 09-12518 [Dkt. 3] and 09-12519 [Dkt. 3], at 3-4 ("ORDERED that the [Bigman Affidavit] is hereby made applicable to the Additional Debtors as if the Additional Debtors were Debtors referred to in such affidavit").

[113]  *See* Bigman Aff.

Given the Bigman Affidavit and the fact that the great majority of the Debtors' sites were located in Texas, the "Debtors" clearly operated their businesses primarily out of Texas.[114] Moreover, the Resulting Company and the GP identified Texas as the location of their accountants and bookkeepers. Accordingly, Texas law applies to Count 18.

   c.  *Applying Texas law to Count 18*

Under Texas law, where a third party knowingly participates in the breach of a fiduciary's duties, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.[115] To establish a claim for knowing participation in a breach of fiduciary duty under Texas law, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.[116]

For the first prong, the Trustee alleges that members of the Resulting Company's supervisory board (including Blavatnik), and certain managers of the GP (including Kassin and Bigman), owed fiduciary duties of good faith, loyalty, and due care to the Resulting Company.[117] That is fine, as far as it goes. But the Trustee must also allege facts underlying the *breach* of

---

[114] The Court recognizes that the Resulting Company and the GP sit atop a large corporate structure containing entities that did not file for bankruptcy relief and were not included in the term "Debtors" as such term is used in the Bigman Affidavit. However, the Court concerns itself primarily with the Debtors. The significance of any distinctions that might be drawn from the timing of the Bigman Affidavit, filed before the bankruptcy filings of the Resulting Company and the GP, are diminished by the Statements of Financial Affairs for each of the Resulting Company and the GP—which showed their accountants and bookkeepers were located in Houston, Texas.

[115] *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). *See also Woloshen v. State Farm Lloyds*, 2008 U.S. Dist. LEXIS 68647, at 5-6 n.3, 2008 WL 4133386, at *2 n.3 (N.D. Tex. Sept. 2, 2008) (Fitzwater, C.J.) (observing how this liability has been characterized as an "aiding and abetting" theory of liability).

[116] *Meadows*, 492 F.3d at 639 (citing *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App. 2001)). *See also Darocy v. Abildtrup*, 345 S.W.3d 129, 137-38 (Tex. App. 2011); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App. 2007) ("A cause of action premised on a contribution to a breach of fiduciary duty must involve the knowing participation in such a breach.").

[117] *See* Cmplt. ¶¶ 364-65.

those duties—how and by whom.  In briefing on Count 18, the Trustee explained that the

contours of the fiduciary relationships and their breaches were alleged in Count 6.[118]  But Count

6 was dramatically amended after the briefing and hearing on this matter.  Only the following

allegations in Count 6 of the Revised Complaint now mirror allegations in the earlier Complaint:

> The Merger and related transactions [were approved or ratified],
> including the agreements and other loan documents pursuant to
> which approximately $22 billion in obligations were incurred by
> LBI and/or its subsidiaries and affiliates in connection with the
> acquisition of Lyondell.[119]
>
> The business and affairs of [the Resulting Company were
> mismanaged], causing [the Resulting Company] and its
> subsidiaries to become insolvent, undercapitalized and to incur
> debt beyond their ability to pay when due and otherwise adversely
> affected the business and prospects of [the Resulting Company].[120]
>
> As a result of the imprudent, dishonest and reckless conduct
> authorized, directed, approved or acquiesced in, [the Resulting
> Company] was injured.  Injuries and prejudice to the business and
> affairs of [the Resulting Company] were the result of
> mismanagement.[121]

The last two paragraphs, stated in the passive voice, are too vague.  They reflect injury

but not breach of duty.  And the identities of the actors in the above allegations remain

ambiguous, because the old Count 6 was asserted against the "Supervisory Board and GP

Manager," whereas the revised Count 6 is now focused solely on Blavatnik.[122]  The actions are

too ambiguous as well.  If the breaches are anything other than incurring the $22 billion in debt,

---

[118]  *See* Trustee Lux. Opp. Br. at 23-24 ("Here, a primary breach of fiduciary duties owed to [the Resulting
Company] is alleged, including in Count VI. . . .  The first two elements are alleged in Count VI. . . .  Again,
fiduciary relationships are alleged here, including in Count VI . . . .").

[119]  Cmplt. ¶ 371.

[120]  *Id.* ¶ 372.

[121]  *Id.* ¶ 373.

[122]  While "Supervisory Board" was defined in the Complaint as the supervisory board to the Resulting Company
(*see* Cmplt ¶ 14; but even then this definition was used elsewhere in the Complaint to refer to the Supervisory
Board of Basell—*see e.g.*, Cmplt ¶ 205, 421), it was not so defined in the Revised Complaint.

the Court will need some clarity here, particularly as the case proceeds. But for now, given

practical considerations, it is sufficient that the Trustee has seemingly alleged that fiduciary

relationships to the Resulting Company were in existence and were breached by the incurrence

of approximately $22 billion in obligations in connection with the Merger, which the Trustee

alleges caused injury to the Resulting Company and its creditors.[123]

As to the second and third prongs—whether the defendants to Count 18 knew of the

fiduciary duties and knowingly participated in the breach of such duties—the allegations are

likewise deficient in material respects. The defendants named under Count 18 are Nell, Access

Holdings, Access Industries, AI International, and AI Chemical (though AI Chemical does not

move to dismiss Count 18[124]). But the Trustee's allegations are deficient as to Access Industries,

AI International and Nell. Other than conclusory statements in Count 18 that are not entitled to

an assumption of truth,[125] the Complaint does not allege any specific misconduct undertaken by

Access Industries constituting aiding and abetting breach of fiduciary duty. Similarly, the

allegations of AI International's conduct are conclusory as alleged in Count 18, and are

otherwise limited to AI International's role in rejecting Lyondell's request to draw down on the

Access Revolver just days before the Debtors filed for bankruptcy relief.[126] The Trustee does not

allege facts supporting AI International's knowledge of fiduciary relationships or an awareness

by AI International of its participation in the breach of such relationships. Allegations against

---

[123]  The Court is giving the Trustee considerable leeway on the conclusory allegations in the Complaint regarding
the existence of fiduciary duties and their breach in light of the amendments to Count 6 in the Revised
Complaint, including significantly more detailed supporting allegations.

[124]  *See* Trustee Lux. Opp. Br. at 20.

[125]  *See e.g., Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

[126]  *See* Cmplt. ¶ 311. The "Access Revolver" is the credit facility established pursuant to the credit agreement
dated March 27, 2008 between the Resulting Company, Lyondell and Basell Finance, as borrowers, and Access
Holdings (and by subsequent assignment, AI International), as lender. Facts pertaining to the Access Revolver
are set forth in detail in the Court's companion decision on the motions of Access Holdings and AI International
to dismiss Counts 12, 15 and 16 (which arise from AI International's failure to fund the Access Revolver).

33

Nell primarily concern Nell's conduct in the context of Count 2 and the Toe-Hold Payments—not as to Nell's knowledge of and knowing participation in any breach of fiduciary duties to the Resulting Company or the GP.  Accordingly, to the extent that Count 18 survives under Texas law, it cannot survive against Access Industries, AI International or Nell.[127]

The remaining defendant to Count 18 is Access Holdings.  Only as against Access Holdings does the Complaint contain allegations sufficient for Count 18 to survive under Texas law.

Particularly relevant are the allegations surrounding Kassin as "Senior Vice President and head of Mergers and Acquisitions and Financing" at Access Holdings.[128]  The Trustee alleges that Kassin was a senior officer acting within the scope of his authority, and under general agency principles, Kassin's knowledge and knowing participation can be imputed to Access Holdings.  For example, the Trustee alleges that Kassin, while working for Access Holdings, was responsible for enhancing earning projections of Basell and the overall Resulting Company.[129] Kassin allegedly acknowledged that "erring on the side of being not too conservative helps [the Merger financing] greatly."[130]  The Complaint also references an email from Kassin that shows him struggling with the conflict of his fiduciary duties as a board member and his role as an officer of Access Holdings: "I am trying to separate my two roles—one deal weasel who will get this signed up in record time . . . vs. Board member with fiduciary role for the shareholder . . .

---

[127]  The Court refrains from prejudging the applicability of articles 1382 and 1383 of the Luxembourg Civil Code to Count 18 pending a more definite statement as discussed in the preceding section.  But the Court notes that it is highly unlikely that Count 18 will survive against Access Industries, AI International or Nell even under Luxembourg law given the failure of the Trustee to allege any specific tortious misconduct undertaken by these defendants.  As previously noted, the Trustee no longer can replead Count 18.

[128]  *See* Cmplt. ¶ 92.

[129]  *See id.* ¶¶ 225-26 (Kassin "set out his roadmap of how to goose the projections to get to the necessary magic numbers" to "sell 20b in debt.").

[130]  *See id.* ¶ 227.

this one will be tough."[131]  These quotes, coupled with imputation doctrine, sufficiently allege

that Access Holdings knew of and knowingly participated in the breach of fiduciary duties.

     Apart from Kassin acting as an agent for Access Holdings, the Complaint contains

allegations about the knowledge and conduct of Access Holdings directly.  For example, the

Trustee alleges that in July of 2007, in anticipation of Lyondell's board accepting the $48 per

share price, Access Holdings quickly lined up the lead bankers who would arrange the Merger

financing.[132]  "Access [Holdings], using privately held Basell as equity (which, based on

unrealistic earnings projections that failed to reflect the forecasted downturn, was given a

preposterously high and artificial valuation), had the ability to acquire billions of dollars of

equity in Lyondell for itself without risking any substantial capital of its own.  Merrill Lynch and

other lead arrangers could then off-load the junk into the market and earn huge fees."[133]

     On at least two occasions, it is alleged that Access Holdings supplied Merrill Lynch with

upward adjustments of Basell's forecasted earnings.[134]  Access Holdings's projections "largely

ignored the forecasted downturn and failed to reflect the sharp decrease in earnings that many of

Basell's facilities would foreseeably experience," failing to "reflect the reality of the business

cycle."[135]  Due diligence by Access Holdings was "perfunctory at best, and in material respects,

nonexistent."[136]  Access Holdings was present at the sole due diligence meeting between

Lyondell's management and the banks on July 14, 2007.[137]  "Since Blavatnik had insisted that

the Merger agreement had to be signed by Monday, July 16, 2007, there was no time for Access

---

[131]  *See id.* ¶ 188.

[132]  *See id.* ¶ 185.

[133]  *See id.* ¶ 120.

[134]  *See id.* ¶¶ 178, 196.

[135]  *See id.* ¶ 179.

[136]  *See id.* ¶ 199.

[137]  *See id.* ¶ 190.

to engage in further due diligence or reasoned analysis.  Instead, Access recklessly accepted

Lyondell's internal 'management projections' and used them to pump up the purported valuation

of Lyondell.  Greased in this way, the transactional wheels continued to move forward."[138]  By

September of 2007, management of Access knew of the heightened risks facing the Resulting

Company, including severely restrained liquidity.[139]

Despite these known risks, "Access management" began discussing a structure by which

value could be extracted for Blavatnik's personal benefit without resulting in a "HUGE, UGLY

disclosure."[140]  Ajay Patel, a Senior Vice President at Access Holdings, observed in a July 17,

2007 email on "marketing $20 billion of B-rated debt," that "the last thing you want the market

to think/see [is] that we're taking 'out' $333 million."[141]

Taken together, these allegations permit Count 18 to survive against Access Holdings for

aiding and abetting liability under Texas law.  They are sufficient to allege that Access Holdings

knew of the fiduciary duties and knowingly participated in the breach of such duties.  While the

specifics surrounding the fiduciary duty breaches are unclear in light of the revised Count 6, the

Court draws all reasonable inferences in favor of the Trustee on the present motions to dismiss.

Accordingly, Count 18 survives against Access Holdings under Texas law.

In sum, under Texas law, the claim for aiding and abetting breach of fiduciary duty

survives against AI Chemical and Access Holdings, but only as against those entities.  The

aiding and abetting claim is dismissed with respect to Access Industries, AI International, and

Nell.  The Access Defendants' motion for a more definite statement of Count 18 under Fed. R.

---

[138]  *See id.* ¶ 198.

[139]  *See id.* ¶¶ 244, 289; *see also* ¶ 221 ("Despite knowing by no later than mid-August that Lyondell would widely miss its third quarter projections, Smith did not disclose this information to anyone at Access until September 11, 2007.").

[140]  *Id.* ¶ 266.

[141]  *Id.*

Civ. P. 12(e) is granted with respect to the application of Luxembourg law to Count 18. All

other motions to dismiss Count 18 are denied, but without prejudice to renew such motions

following the Trustee's provision of a more definite statement of Count 18.

## IV.

### Motion to Dismiss Counts 6, 7, 14, and 18 under *Forum Non Conveniens*

The Access Defendants[142] move to dismiss Counts 6,[143] 7, 14, and 18 under the doctrine

of *forum non conveniens*, contending that the Trustee's choice of forum is entitled to minimal

deference; that an alternate forum in Luxembourg is adequate; and that the balance of public and

private factors weighs in favor of dismissal. For the reasons that follow, the Court denies that

motion.

The doctrine of *forum non conveniens* permits a court, in its discretion, to dismiss a civil

action even where venue is proper and jurisdiction exists. In considering a motion for that relief,

the court engages in a multi-step inquiry.[144] First, the court must determine the degree of

---

[142]  BI S.à.r.l. joined the Access Defendants in moving to dismiss Counts 6, 7, 14, and 18 under the doctrine of *forum non conveniens*. Thus, for ease of reference, the Access Defendants, as used in this section only, includes BI S.à.r.l.

[143]  As previously noted (*see* n.5 and n.13, *supra*), Count 6 was amended in accordance with this Court's order dated September 22, 2011 [Dkt. 597]. In a letter dated October 21, 2011, the Trustee informed the Court that Blavatnik, now the sole defendant in the current Count 6, does not intend to seek leave to file a motion to dismiss. Blavatnik and the Trustee have agreed that Blavatnik's time to respond to the amended Count 6 is extended until the Court issues this decision. However, the Court assumes that Blavatnik continues to challenge Count 6 under the doctrine of *forum non conveniens* because the Trustee continues to bring Count 6 under Luxembourg law and issues related to applying Luxembourg law in this Court remain. *See* Rev. Cmplt. ¶¶ 357-402. Therefore, Count 6 is included in this section for the limited purpose of applying the doctrine of *forum non conveniens*.

[144]  *Bancredit Cayman Ltd. v. Santana (In re Bancredit Cayman Ltd.)*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2-3 (Bankr. S.D.N.Y. Nov. 25, 2008) (Bernstein, J.) ("*Bancredit*") (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947) ("*Gilbert*"); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) ("*PT United*"); *Erausquin v. Notz, Stucki Mgmt. (Berm.)*, 806 F. Supp. 2d 712, 724 (S.D.N.Y. 2011) (Pauley, J.) ("*Erausquin*") ("The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.") (quoting *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) ("*Carey*")); *In re Alcon Shareholder Litig.*, 719 F. Supp. 2d 263, 279 (S.D.N.Y. 2010) (Marrero, J.) (dismissing *sua sponte* on *forum non conveniens* grounds); *Banco de Seguros del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 254 (S.D.N.Y. 2007) (Batts, J.).

deference to be given to the plaintiff's choice of forum.[145]  Second, the court must satisfy itself

that an adequate alternative forum exists.[146]  Third, the court must consider private and public

interest factors enumerated by the Supreme Court in *Gilbert*.[147]

    The movant bears the burden of showing that the plaintiff's chosen forum is not the

appropriate forum.[148]  In deciding a *forum non conveniens* challenge, a court may rely on

evidence outside the pleadings, including affidavits.[149]  Dismissal under *forum non conveniens* in

favor of an adequate alternative forum is appropriate only "where trial in the plaintiff's chosen

forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to

offer any specific reasons of convenience supporting his choice."[150]  Thus, unless the balance is

strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.[151]

---

[145]  *Bancredit*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2 (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc) ("***Iragorri***")); *Do Rosario Veiga v. World Meteorological Organisation*, 486 F. Supp. 2d 297, 301 (S.D.N.Y. 2007) (Marrero, J.) ("***Do Rosario Veiga***").

[146]  *Bancredit*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2 (citing *Gilbert*, 330 U.S. at 506-07); *PT United*, 138 F.3d at 73; *Do Rosario Veiga*, 486 F. Supp. 2d at 301; *Corporacion Tim, S.A. v. Schumacher*, 418 F. Supp. 2d 529, 531 (S.D.N.Y. 2006) (Marrero, J.) ("***Schumacher***").

[147]  *Bancredit*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2 (citing *PT United*, 138 F.3d at 73). *Accord, Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. Appx. 47, 49 (2d Cir. 2004).  *See also Gilbert*, 330 U.S. at 501.

[148]  *Bancredit*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2 (citing *PT United*, 138 F.3d at 73).  *See also Erausquin*, 806 F. Supp. 2d at 724 ("A defendant bears the burden at steps two and three.") (citing *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009)).

[149]  *Erausquin* 806 F. Supp. 2d at 724 (citing *Alcoa S. S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 158 (2d Cir. 1980) (en banc)).

[150]  *Bancredit*, 2008 Bankr. LEXIS 3544, at *6, 2008 WL 5396618, at *2 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981) ("***Piper Aircraft***")); *see also Ancile Inv. Co. v. Archer Daniels Midland Co.*, 2009 U.S. Dist. LEXIS 87385, at *9, 2009 WL 3049604, at *4 (S.D.N.Y. Sept. 23, 2009) (Crotty, J.) ("***Ancile***") ("The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable.") (quoting *Iragorri*, 274 F.3d at 74-75).

[151]  *Ancile*, 2009 U.S. Dist. LEXIS 87385, at *9, 2009 WL 3049604, at *4 (citing *Gilbert*, 330 U.S. at 508; *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000)).

A.    *Step 1 – Deference to Plaintiff's Choice of Forum*

While "there is ordinarily a strong presumption in favor of the plaintiff's choice of

forum,"[152] the Access Defendants contend that the presumption does not apply here because the

plaintiff is filing not on his own behalf, but as a representative entity.[153]  They argue that the

Trustee did not choose a New York forum in the traditional sense; rather, they argue, the claims

were originally filed here by the Debtors' Official Committee of Unsecured Creditors (the

"**Committee**"), an entity created in connection with the Lyondell bankruptcy case.[154]  The

underlying facts are true, but they point to a different conclusion.

Under the Debtors' chapter 11 plan, claims remaining from the Committee's original

litigation before this Court in the Debtors' bankruptcy cases were assigned to the LB Litigation

Trust.  Then the Trustee succeeded to them as the assignee of such claims.  Thus the claims in

this action have a bona fide connection to this forum.[155]  And there is no evidence of forum

shopping by the Trustee in choosing this venue.  So while the Trustee's forum choice is not

entitled to absolute deference, the Court sees no facts sufficient to rebut the strong presumption

in favor of the Trustee's forum.[156]

---

[152]  *Piper Aircraft*, 454 U.S. at 255.

[153]  *See* Defs. Forum Br., filed on Dec. 23, 2010 [Dkt. 475], at 5; Defs. Forum Reply Br., filed on Feb. 2, 2011 [Dkt. 499], at 12.

[154]  Defs. Forum Br. at 5.

[155]  "[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice, and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*."  *Iragorri*, 274 F.3d at 72.  *See also Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003) ("[A] plaintiff's choice to initiate suit in the defendant's home forum—as opposed to any other where the defendant is also amenable to suit—only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum.").

[156]  The Access Defendants also argue that the Trustee is akin to a large corporation "with all of the attendant resources at his disposal" and therefore to more easily handle litigation abroad.  Defs. Forum Reply Br. at 13 (citing *Carey,* 370 F.3d at 238).  The Court sees that as hyperbole, especially in light of the LB Litigation Trust's limited purpose and duration, and the Trustee's mandate to achieve cost effective results.  But even if the Trustee did enjoy such resources, the Court is not persuaded that this factor would materially affect its analysis.

B.    *Step 2 – Adequacy of the Alternate Forum*

"The adequate alternative venue requirement of the *forum non conveniens* doctrine is ordinarily satisfied if (1) the defendants are amenable to service of process there, and (2) the forum permits litigation of the subject matter of the dispute."[157]  A foreign forum is not inadequate simply because its judicial system differs from our own.[158]  Considerations of comity preclude a U.S. court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare.[159]

Here, the parties agree that Luxembourg provides an adequate alternative forum.[160]  But the Court need not dismiss for *forum non conveniens* merely because an adequate alternative forum exists.[161]

C.    *Step 3 – Gilbert Public and Private Factors*

Although there is still a strong presumption in favor of a plaintiff's choice of forum, the Supreme Court in *Gilbert* recognized that dismissal may nevertheless be appropriate where specified private and public interest factors point towards an alternative forum.[162]  The public interest factors include: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local

---

[157]  *Erausquin* 806 F. Supp. 2d at 726 (citing *DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir. 2000); *Schumacher*, 418 F. Supp. 2d at 532; *Ilusorio v. Ilusorio-Bildner*, 103 F. Supp. 2d 672, 674 (S.D.N.Y. 2000) (Marrero, J.).

[158]  *Bancredit*, 2008 WL 5396618, at *3 (citing *PT United*, 138 F.3d at 73).

[159]  *Id.*

[160]  *See* Defs. Forum Reply Br. at 11 ("The Trustee wisely does not dispute that Luxembourg would be more than adequate at resolving the issues at hand and admits that 'such claims could have been brought by the Trustee in Luxembourg had he chosen to do so.'") (quoting Trustee Forum Opp. Br. at 8).

[161]  *See Ancile*, 2009 U.S. Dist. LEXIS 87385, at *9, 2009 WL 3049604, at *3 (stating "although the parties agree that Brazil is an adequate alternative forum, this factor alone is not enough to warrant dismissal".).

[162]  *See Allstate Life Ins. Co. v. Linter Group, Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (citing *Gilbert*, 330 U.S. at 508-09); *Piper Aircraft*, 454 U.S. at 255).

interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law.[163]

A court must also consider the following private interest factors: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive.[164]  A defendant's burden with respect to these factors is high, and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."[165]

### 1.    Public Factors

The Access Defendants argue that the Luxembourg laws invoked by the Trustee raise novel or unsettled issues of foreign law, presenting the Court with too difficult a task of interpretation.[166]  The Access Defendants further contend that Luxembourg has a greater interest than the United States in matters that primarily involve internal corporate governance of Luxembourg companies.[167]

Addressing the latter point first, it is not clear that the claims based on Luxembourg law primarily involve matters of internal corporate governance.  Counts 7, 14, and 18 are asserted

---

[163]  *Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. Appx. 47, 51 (2d Cir. 2004) (citing *Gilbert*, 330 U.S. at 508-09) ("**Russian Aluminum**"); *Iragorri*, 274 F.3d at 74; *DiRienzo*, 294 F.3d at 31; *Blanco v. Banco Indus. De Venezuela, S.A.*, 997 F.2d 974, 980 (2d Cir. 1993) (citations omitted)).

[164]  *Russian Aluminum*, 98 Fed. Appx. at 50-51 (citations omitted).

[165]  *Irwin v. ZDF Enters. GmbH*, 2006 U.S. Dist. LEXIS 6156, at *36, 2006 WL 374960, at *12 (S.D.N.Y. Feb. 16, 2006) (Sweet, J.) (citing *Gilbert*, 330 U.S. at 508).

[166]  Defs. Forum Br. at 7-10; Defs. Forum Reply Br. at 2-6.

[167]  Defs. Forum Br. at 10-11; Defs. Forum Reply Br. at 6-7.  As for the remaining two of the four public interest factors—the administrative difficulties associated with court congestion and the unfairness of imposing jury duty—the Access Defendants contend that these factors "are at worst neutral."  Defs. Forum Reply Br. at 6 n.4.

under tort law, as opposed to corporation law.[168]  Moreover, in the factual environment here,

U.S. interests predominate.  The Debtors filed for bankruptcy in the United States; the acquired

Lyondell entities have substantial operations in Texas; Access Holdings and Access Industries

have operations in New York; Blavatnik is a United States citizen; Kassin is believed to reside in

New York; Thoren appears to live in New Jersey; Alex Blavatnik apparently lives in Florida and

New York; Bigman is thought to live in Texas; and while Nell Limited is a Gibraltar entity, it is

allegedly controlled by Blavatnik.[169]  Just as companies incorporate in Delaware but operate

elsewhere, it appears that many of the Basell entities are incorporated in Luxembourg with

employees based elsewhere.[170]  In sum, the Court is not persuaded that Luxembourg has a

materially greater interest than the United States in Counts 7, 14, and 18—counts which do not

exclusively involve the internal corporate governance of Luxembourg companies.

Cutting against those concerns is the need to apply Luxembourg law.  On balance, the

Court is disinclined to conclude that Luxembourg law is so vexing, novel, unsettled, or unusual

to render the task too difficult.  Federal courts in this and other districts have applied

Luxembourg law in other contexts.[171]  Though the Court is requiring the parties to submit

---

[168]  *See* Trustee Forum Opp. Br. at 13-14 ("The claims other than Count VI arise under tort law, not the law governing fiduciary duties, and concern the same Merger-related course of misconduct that heavily involves United States individuals, corporations and evidence.").

[169]  *See* Cmplt. ¶¶ 23-24, 30-34; Defs. Forum Reply Br. at 6 (conceding that Blavatnik is a United States citizen and Access is based in the United States); 3/10/11 Hr'g Tr. at 215-16.

[170]  *See* 3/10/11 Hr'g Tr. at 217.

[171]  *See, e.g.*, *Guardian Indus. Corp. v. United States*, 477 F.3d 1368, 1371 (Fed. Cir. 2007) ("relying on the text of the Luxembourg statutes and regulations and on reports and declarations of several well-qualified experts in Luxembourg law presented by both sides"); *Enigma*, 2006 U.S. Dist. LEXIS 72996, at *23-24, 2006 WL 2859369, at *8 (applying the laws of Luxembourg to grant in part a motion to dismiss for failing to state a claim); *Bozel*, 434 B.R. at 113, 120 (enforcing contracts under Luxembourg law while directing defendants to withdraw complaints filed in Luxembourg); *Negrin v. Kalina*, 2010 U.S. Dist. LEXIS 71068, at *25-26, 2010 WL 2816809, at *8 (S.D.N.Y. July 14, 2010) (Jones, J.) ("Besides, the courts of this District are very well experienced in the determination and application of foreign laws, since so much of the commercial activity of this District involves foreign commerce.") (quoting *Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (America) Corp. Creditor Trust v. Daewoo Eng. & Constr. Co., Ltd.*, 375 F. Supp. 2d 257, 265 (S.D.N.Y. 2005)).

supplemental briefs and provide a more complete presentation on Luxembourg law's applicability to the factual allegations in the Complaint as to Count 14, largely similar briefing would presumably be necessary in either locale. This factor weighs in favor of dismissal,[172] but only modestly.

Thus the applicable public factors do not strongly support dismissal.

2.    *Private Factors*

The private factors largely involve issues of convenience and prejudice. The Access Defendants argue that the Trustee would not be prejudiced by bringing a separate suit before a Luxembourg court, and contend that they would suffer "extreme prejudice" should these claims proceed in New York.[173] Once again that is hyperbole. The facts here do not support this contention. First, most of the defendants to this action are based in the United States. Continued litigation in this forum hardly presents an "extreme prejudice," if it would result in prejudice at all. Second, the parties have already completed extensive discovery and pre-trial proceedings before this Court. It is inefficient to force the parties to interrupt this litigation and require a new court to acquaint itself with the issues. Such a suggestion ignores the import of the *Gilbert* private factors, which stress judicial economy and efficiency—interests that overwhelmingly favor litigating this action before this Court. The Court is unaware of anything that might be gained in terms of judicial economy, efficiency, convenience, or prejudice in having largely duplicative litigation proceeding on both sides of the Atlantic. The private factors strongly weigh against dismissal.

---

[172]    *Cf. LaSala*, 510 F. Supp. 2d at 233-34 ("It is inadvisable for this Court to decide a case where legal experts disagree about critical points in the application of the foreign law. It is even more inadvisable for this Court to decide issues of Swiss law that both experts *agree* are unsettled.") (emphasis in original) (internal citations omitted).

[173]    *See* Defs. Forum Reply Br. at 7-9.

On balance, the deference due to the Trustee's choice of forum should not be disturbed, and the motion to dismiss under the doctrine of *forum non conveniens* is denied.

Conclusion

For the reasons stated above, the motions to dismiss Counts 2, 7, 14 are granted in part and denied in part, as follows:

(1)     The motions to dismiss Count 2 for intentional fraudulent conveyance under applicable state law and the Bankruptcy Code are granted.

(2)     The motions to dismiss Count 7 for tort claim under Luxembourg law are granted. But that dismissal is with leave to replead.

(3)     The motions to dismiss Count 14 for unlawful distribution and extra-contractual tort are denied, without prejudice to renewal of such motions after the parties have provided supplemental briefing on the applicability of Luxembourg law to the factual allegations in Count 14.

(4)     a.    Insofar as Count 18 asserts liability for aiding and abetting breach of fiduciary duty under Luxembourg law, such claims are dismissed.

b.    Insofar as Count 18 asserts liability under articles 1382 and 1383 of the Luxembourg Civil Code, the Access Defendants' motion for a more definite statement, pursuant to Fed. R. Civ. P. 12(e) is granted.  The Trustee must clarify whether he is in fact alleging a direct tort liability (as opposed to liability for aiding and abetting) under Luxembourg law, and if so, how the factual allegations, as currently pleaded in Count 18, do so.  The defendants are granted leave to renew any motion to dismiss Count 18 vis-à-vis the Luxembourg Civil Code after the Trustee's submission of its more definite statement as to Count 18.

44

     c.      Insofar as Count 18 asserts liability for aiding and abetting breach of fiduciary duty under applicable state law (here, the Court concludes that Texas law applies), dismissal is granted as to the claims against defendants Nell, Access Industries, and AI International, but only as to them.

(5)     The motion to dismiss Counts 6, 7, 14, and 18 under the doctrine of *forum non conveniens* is denied.

SO ORDERED.

Date:  January <u>4</u>, 2016                  <u>***s/ Robert E. Gerber***</u>
       New York, New York            United States Bankruptcy Judge

# APPENDIX A

Weisfelner v. Blavatnik, Adv. No. 09-01375

## APPENDIX A*

| Count | Claim | Defendant Parties |
|---|---|---|
| 1 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 2 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 3 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers[1] |
| 4 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers |
| 5 | Breach of fiduciary duty | Lyondell Pre-Merger Directors |
| 6 | Mismanagement and breach of duty under Luxembourg law | Leonard Blavatnik[2] |
| 7 | Tort under Luxembourg law | Blavatnik;[3] the GP Managers; the Nominees; and the Successors[4] |

---

[*]    Except as to Count 6, (*see* n.2, *infra*), counts and claims listed below are based on the amended complaint dated July 23, 2010 [Dkt. 381] (the "**Complaint**"). This table does not reflect subsequent dismissals of claims or defendants by stipulation of the parties or by order of the Court.

[1]    Pre-Merger, in addition to chairman and CEO Dan Smith, Lyondell had ten outside directors on its Board of Directors: Carol Anderson, Susan Carter, Stephen Chazen, Travis Engen, Paul Halata, Daniel Huff, David Lesar, David Meachin, Daniel Murphy, and William Spivey (collectively, the "**Lyondell Pre-Merger Directors**"). The relevant Lyondell officers identified in the Complaint as named defendants are: James Bayer, T. Kevin DeNicola, Bart de Jong, Edward Dineen, Kerry Galvin, Morris Gelb, John Hollinshead, and W. Norman Philips (collectively, the "**Lyondell Pre-Merger Officers**").

[2]    This Count 6 is based upon the second amended complaint dated September 29, 2011 [Dkt. 598].

[3]    Although the Complaint did not specify whether Count 7 is asserted against Leonard Blavatnik or Alex Blavatnik, who is also a named defendant in this action, the Court understands this claim to be asserted against Leonard Blavatnik.

[4]    The "**GP Managers**" are identified in the Complaint as including: Alan Bigman, Richard Floor and Philip Kassin. The "**Nominees**" are defined in the Complaint as including: Simon Baker, Dawn Shand, and Bertrand Duc. The "**Successors**" are defined in the Complaint as including: Philip Kassin, Lincoln Benet, Lynn Coleman, and Richard Floor.

Richard Floor is deceased and Diane Currier has been appointed as the executor for the estate of Richard Floor.

Weisfelner v. Blavatnik, Adv. No. 09-01375

**APPENDIX A\***

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 8 | Breach of fiduciary duty | Subsidiary Directors[5] |
| 9 | Avoidance preference under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 10 | Equitable subordination under the Bankruptcy Code | AI International, S.à.r.l. |
| 11 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell Limited; Deutsche Bank Securities Inc.; and Perella Weinberg Partners LP |
| 12 | Breach of contract | Access Industries Holdings LLC; and AI International, S.à.r.l. |
| 13 | Illegal dividends or redemption | Lyondell Pre-Merger Directors |
| 14 | Unlawful distribution and extra-contractual tort under Luxembourg law | Leonard Blavatnik; the GP Managers; BI S.à.r.l.; Alan Bigman; Alex Blavatnik; Peter Thorén; Simon Baker; and the Nominees |
| 15 | Declaratory judgment for characterization of purported loan advances under the Access Revolver as capital contributions | Access Industries Holdings LLC; and the Lyondell Post-Merger Directors[6] |
| 16 | Illegal dividends | Lyondell Post-Merger Directors |
| 17 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 18 | Aiding and abetting breach of fiduciary duty under applicable state law and Luxembourg law | Nell Limited; Access Industries Holdings, LLC; Access Industries, Inc.; AI International, S.à.r.l.; AI Chemical Investments LLC |

---

[5]    The "**Subsidiary Directors**" are identified in the Complaint as including: Kevin Cadenhead, Charles Hall, Rick Fontenot, and John Fisher Gray.

[6]    The "**Lyondell Post-Merger Director**" are identified in the Complaint as including: Alan Bigman, Edward Dineen, and Morris Gelb.

Weisfelner v. Blavatnik, Adv. No. 09-01375

**APPENDIX A***

| Count | Claim | Defendant Parties |
|-------|-------|-------------------|
| 19 | Constructive fraudulent transfer under the Bankruptcy Code | BI S.à.r.l. |
| 20 | Breach of fiduciary duty | Dan Smith; T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |
| 21 | Aiding and abetting breach of fiduciary duty | T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |