UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | Chapter 11 Case |
| ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, ) | No. 09-10023 (REG) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE ) OF THE LB LITIGATION TRUST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Adversary Proceeding |
| v. ) | |
| ) | No. 09-01375 (REG) |
| LEONARD BLAVATNIK, *et al.*, ) | |
| ) | |
| Defendants. ) | |

DECISION AND ORDER ON DEFENDANTS'
MOTION TO DISMISS COUNT 4

APPEARANCES:

BROWN RUDNICK, LLP
*Attorneys for Plaintiff Edward S. Weisfelner,*
*Litigation Trustee of the LB Litigation Trust*
Seven Times Square
New York, New York 10036
  By:    Sigmund S. Wissner-Gross, Esq. (argued)
          May Orenstein, Esq.
One Financial Center
Boston, Massachusetts 02111
  By:    Steven D. Pohl, Esq.

PORTER & HEDGES, LLP
*Attorneys for Former Lyondell Director and Officer Defendants*
Reliant Energy Plaza
1000 Main Street, 36th Floor
Houston, Texas 77002
  By:    John Higgins, Esq. (argued)
          Eric D. Wade, Esq.

DENTONS US LLP
*Attorneys for Former Lyondell Director and Officer Defendants*
1221 Avenue of the Americas
New York, New York 10020
By:    Peter D. Wolfson, Esq.
        Arthur H. Ruegger, Esq.

DEBEVOISE & PLIMPTON, LLP
*Attorneys for Defendant Stephen I. Chazen*
919 Third Avenue
New York, New York 10022
By:    Lorna G. Schofield, Esq.
        Tricia B. Sherno, Esq.
        Jessica Simonoff, Esq.

COVINGTON & BURLING, LLP
*Attorneys for Defendant C. Bart de Jong and Edward J. Dineen*
620 Eighth Avenue
New York, New York 10018
By:    Diane F. Coffino, Esq.
        Andres A. Ruffino, Esq.
        Andrea J. Gildea, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity controlled by Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company ("**Lyondell**"), a Delaware corporation headquartered in Houston—forming a new company after a merger (the "**Merger**"), LyondellBasell Industries AF S.C.A. (as used by the parties, "**LBI**," or here, the "**Resulting Company**"),[1] Lyondell's parent—by means of a leveraged buyout ("**LBO**").  The LBO was 100% financed by debt, which, as is typical in LBOs, was secured not by the acquiring company's assets, but rather by the assets of the company to be acquired. Lyondell took on approximately $21 billion of secured indebtedness in the LBO, of which $12.5 billion was paid out to Lyondell stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped Lyondell filed a petition for chapter 11 relief in this Court.[2]  Lyondell's unsecured creditors then found themselves behind that $21 billion in secured debt, with Lyondell's assets effectively having been depleted by payments of $12.5 billion in loan proceeds to stockholders. Lyondell's assets were allegedly also depleted by payments incident to the LBO and the Merger—of approximately $575 million in transaction fees and expenses, and another $337 million in payments to Lyondell officers and employees in change of control payments and other management benefits.

---

[1]  Acronyms make understanding difficult for readers who have not been living with a case. The Court tries to minimize their use. For readability, except where acronyms appear in quotations or have acquired obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the entity's role in the transaction.

[2]  Lyondell then filed along with 78 affiliates. About three months later, the Resulting Company and another Lyondell affiliate joined them as Debtors in this Court.

1

Those events led to the filing of what are now five adversary proceedings—three against shareholder recipients of that $12.5 billion, one dealing with unrelated issues,[3] and one other—this action, which was originally the first of the five—against Blavatnik and companies he controlled; Lyondell's officers and directors; and certain others.

In his Amended Complaint (the "**Complaint**") in this adversary proceeding (brought, like the others, under the umbrella of the jointly administered chapter 11 cases of Lyondell, the Resulting Company and their affiliates (the "**Debtors**")), Edward S. Weisfelner (the "**Trustee**"), the trustee of the LB Litigation Trust (one of two trusts formed to prosecute the Debtors' claims), asserts a total of 21 claims against the defendants in this action. The 21 claims variously charge breaches of fiduciary duty; the aiding and abetting of those alleged breaches; intentional and constructive fraudulent transfers, unlawful dividends, and a host of additional bases for recovery under state law, the Bankruptcy Code, and the laws of Luxembourg, under which several of the Basell entities were organized.[4] The Complaint also seeks to equitably subordinate defendants' claims that might otherwise be allowed.

The Trustee's Complaint, in turn, engendered a large number of motions to dismiss. This is one of several opinions ruling on those motions[5]—here, the motion to dismiss Count 4, charging that Merger-related payments to Lyondell's Pre-Merger Directors and Pre-Merger Officers (each as defined below, and collectively, the "**Pre-Merger Ds & Os**") were intentional fraudulent transfers.

---

[3] *See Weisfelner v. NAG Investments, LLC*, Adv. Proc. 11-01844.

[4] A table listing all of the claims and the particular defendants against whom they were asserted appears in Appendix A. The Complaint numbers each claim using a Roman number. To make them easier to read, the Court has referred to the claims using Arabic ones.

[5] To avoid a decision of unwieldy length, the Court's rulings on the other motions in this action appear in separate decisions.

In deciding these motions, the Court does not write on a clean slate. It issued two earlier decisions (in three other Lyondell-related actions) dismissing other intentional fraudulent transfer claims—there, in actions against Lyondell's former shareholders.[6] Though the sums that were sought differed (as did the bases upon which each defendant was cashed out), the allegations supporting the requisite scienter in each largely overlapped with those here—particularly those as to the alleged conduct of the Pre-Merger Officers in fabricating certain "refreshed" projections to support the $48 per share Merger price, and of Pre-Merger Directors in sanctioning the "refreshed" projections.

While fully recognizing the seriousness of the allegations against some of the Pre-Merger Ds & Os (particularly Lyondell CEO Dan Smith)—and well understanding their relevance to claims for breach of fiduciary duty and fraud—the Court does not see these allegations as supporting claims for intentional fraudulent transfers. The reasons for that view largely appear in the Second Shareholders Decision, and need not be addressed at comparable length here.

For the reasons discussed in the Second Shareholders Decision and below, the Pre-Merger Ds & Os' motion to dismiss Count 4 of the Complaint is granted.

---

[6] *See Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014) (the "**First Shareholders Decision**"); *Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 541 B.R. 172 (Bankr. S.D.N.Y. 2015) (the "**Second Shareholders Decision**," and together with the First Shareholders Decision, the "**Shareholder Fraudulent Transfer Decisions**"). These two decisions were issued in the Trustee's adversary proceedings against Lyondell's former shareholder: (1) *Weisfelner v. Fund 1*, Adv. Proc. 10-04609; (2) *Weisfelner v. Reichman*, Adv. Proc. 12-01570; and (3) *Weisfelner v. Hofmann*, Adv. Proc. 10-05525 (collectively, the "**Shareholder Actions**").

3

Facts[7]

A.   *The Pre-Merger Ds & Os*

Before the events that are the subject of this action, Lyondell was a publicly traded chemicals company headquartered in Texas. Lyondell's Board of Directors at the time (collectively, the "**Pre-Merger Directors**") consisted of 10 elected outside directors (the "**Outside Directors**") and one additional director, Dan Smith ("**Smith**"), Lyondell's CEO. Lyondell's COO, Morris Gelb ("**Gelb**"), was not a director at the time of the Merger. But Gelb became one as of March 28, 2008, along with Edward Dineen ("**Dineen**"), who was Lyondell's former Senior Vice President of the Chemicals and Polymers business segment.

Gelb and Dineen were among the 12 senior Lyondell executives, including Smith (collectively, the "**Pre-Merger Officers**"), who collectively received over $158 million in "Change of Control" payments and over $93 million in Merger consideration pursuant to the Merger, on account of stock options, restricted stock, performance units, severance/retirement plans and other benefits.[8]

Similarly, Lyondell's Outside Directors received, as a result of the Merger, a total of approximately $19 million in Change of Control payments and Merger consideration.

B.   *Alleged Misconduct*

The allegations underlying the intentional fraudulent transfer claims essentially break down into two categories: (1) those speaking of Smith's actions in bringing about Lyondell's

---

[7]   Much of the factual and procedural background has been set forth in the Shareholders Fraudulent Transfer Decisions and the Court's separate decisions on other motions in this action (though the factual allegations in the Shareholder Actions vary somewhat from those in the Complaint in this action). In this decision, the Court discusses and cites only those facts relevant to the analysis of the Lyondell Pre-Merger Ds & Os defendants' motion to dismiss Count 4.

[8]   Smith, alone, in his dual capacities as both officer and director of Lyondell, received over $111 million in Change of Control payments and Merger consideration.

4

"refreshed" projections and the Merger, and (2) those speaking of Lyondell's Outside Directors in approving it. In particular, as to Smith, the Trustee alleges that—

(1) "Volker Trautz, the CEO of Basell, had flown to London at the request of Blavatnik and met with Smith … on June 7, 2007 … Smith then began negotiating and 'suggest[ed] a price of $48/share [for Lyondell] would be justified.' Trautz understood Smith to be communicating that if Blavatnik wanted to acquire Lyondell, he had to offer $48 per share."[9]

(2) "On June 18, 2007, less than two weeks after [Smith's meeting with Trautz] during which… Smith told Trautz that he needed an offer of $48 per share, Robert Salvin of Lyondell, who had been enlisted by Smith to assist in coming up with new projections, provided Kevin DeNicola with two new sets of projections ..."[10]

(3) "Such projections were 'developed' (actually, concocted) without any reliance on any third-party consultants or industry experts. In fact, the industry outlook implied by these projections was inconsistent with industry analysts' forecasts at the time, something known to Smith and his inner circle of Lyondell management confederates. Notably, and reflecting that, rather than being bona fide estimates developed using actual data, these projections had been pulled from a hat; the 'refreshed' refining projections were round numbers, crudely reflecting the arbitrary nature of the 'refreshed' projections..."[11]

---

[9] Cmplt. ¶ 169.
[10] Id. ¶ 147.
[11] Id. ¶ 148.

5

(4) "On July 9, 2007, Smith and Blavatnik met privately in New York at Access's offices in Manhattan … Smith suggested that if Blavatnik was serious, he needed to make his best offer. Smith had on previous occasion indicated that the Lyondell board would be looking for a 20% premium over market price, and had already told Trautz … that $48 per share was an appropriate price to purchase Lyondell."[12]

(5) "Blavatnik told Smith that if a deal was consummated, Blavatnik intended to appoint Trautz as CEO of the combined companies. In reality, Smith was not concerned about his potential role with the new company, or with the consequences of the inflated projections he had engineered, or with the consequences of LBI being unable to service its crushing debt. [F]or Smith, the transaction meant an opportunity to exit from his role as Lyondell's chief executive, and cash out with an enormous personal fortune."[13]

(6) "The sole due diligence meeting between Lyondell's management and the banks [financing the Merger] occurred … on Saturday, July 14, 2007. During this meeting, Lyondell's management team gave a PowerPoint presentation … to representatives of Basell, Access [and the banks]. The EBITDA projections for years 2008 through 2011 contained in the Lyondell Management Presentation were identical to the [refreshed projections] contained in the June 18 spreadsheet

---

[12] Id. ¶ 170.
[13] Id. ¶ 171.

6

from Robert Salvin of Lyondell, other than a downward adjustment of $100 million for EC&D in 2010."[14]

Then, with respect to Lyondell's Outside Directors, the Trustee alleges that:

(1) "On July 10, 2007, the Lyondell Board met in The Hague, and Smith reported on his discussions with Blavatnik, and it was decided that the Board would convene a special meeting the following day to further discuss the matter. At that meeting, the Lyondell Board also reviewed the 'refreshed' projections, the 2007 Long Range Plan, and historical analyses of Lyondell's performance. The 'refreshed' projections had changed so dramatically from the 2007 Long Range Plan, that the Lyondell Board knew or should have known that the 'refreshed' numbers were inflated, unreasonable, and unachievable."[15]

(2) "The members of the Board of Directors of Lyondell knew that the entire transaction would be financed with debt."[16]

(3) "The Lyondell Board also knew that the highly leveraged company would face significant barriers in obtaining additional financing in the highly foreseeable event that the liquidity available through the financing put in place upon the Merger was insufficient."[17]

(4) "[O]n July 16, 2007, at a special meeting of the Lyondell Board, the proposed transaction was unanimously approved by the Lyondell Directors. Notably, many

---

[14] *Id.* ¶ 190.

[15] *Id.* ¶ 183.

[16] *Id.* ¶ 213.

[17] *Id.* ¶ 214.

7

of the Lyondell Directors, including Smith, stood to earn huge sums of money on the deal."[18]

## Discussion

## I.

## Pleading Requirements

A.   *Standards Governing 12(b)(6) Motions*

The standards for deciding a motion to dismiss under Rule 12(b)(6) are well known. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[19] But legal conclusions couched as factual allegations are not entitled to the assumption of the truth.[20] "A claim has facial plausibility," the Supreme Court has explained:

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.[21]

Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[22]

---

[18]  *Id.* ¶ 201.

[19]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("***Iqbal***") (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("***Twombly***").

[20]  *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions").

[21]  *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

[22]  *Id.* at 679.

8

A trial court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."[23] A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[24] Where the plaintiff has relied "on the terms and effect of a document in drafting the complaint," the court may consider the document on a dismissal motion.[25] Defendants may raise affirmative defenses on a motion to dismiss, but only "if the defense appears on the face of the complaint."[26]

### B.    Heightened Requirement under Rule 9(b)

Additionally, when a claim is premised on fraud—and claims for intentional fraudulent transfer are in this category[27]—Fed. R. Civ. P. Rule 9(b), which imposes a heightened pleading requirement, applies. The more stringent standard of Rule 9(b) is essentially twofold. It requires a plaintiff to (i) plead "with *particularity*, the circumstances constituting fraud or mistake," and to (ii) establish the defendant's mental state.[28] While intent may be alleged generally, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations."[29]

---

[23]    *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[24]    *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("**Cortec Industries**").

[25]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("**Chambers**").

[26]    *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) ("**Color Tile**") (citations omitted).

[27]    *See Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) ("It is well-settled that the Rule 9(b) pleading requirements apply to claims of intentional fraudulent transfer.") (citation omitted).

[28]    *See* Fed. R. Civ. Proc. 9(b) (emphasis added); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

[29]    *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

9

Thus, to support a fraud claim, a complaint must "allege facts that give rise to a 'strong inference' of fraudulent intent."[30] The Supreme Court has interpreted "strong inference" as requiring an inference to be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."[31] In determining whether the pleadings give rise to a strong inference of scienter, courts "must take into account plausible opposing inferences."[32]

## II.

## Intentional Fraudulent Transfer

Count 4 seeks to recover, as intentional fraudulent transfers, approximately $271 million that was transferred to the Pre-Merger Ds & Os in the form of Change of Control payments and as Merger consideration for their Lyondell stock. The Pre-Merger Ds & Os move to dismiss under Rule 12(b)(6), contending that the Trustee has failed to put forward enough to plead actual intent to hinder, delay or defraud Lyondell's creditors. Even as to Smith (as to whom there are serious allegations in other respects), the Court agrees.

*A.     The Court's Earlier Rulings*

In the First Shareholders Decision, the Court determined, among other things, that in the context of intentional fraudulent transfers, the intent of a corporate transferor is determined by

---

[30]   *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ("***Acito***")).

[31]   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("***Tellabs***"). While *Tellabs* was a securities fraud case under the Private Securities Litigation Reform Act of 1995 Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (the "**PSLRA**"), the "strong inference" standard (originally established by the Second Circuit, and incorporated into the PSLRA by Congress) has been extended to apply to other (non-securities) fraud claims as well. *See e.g., Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 774 n.7 (Bankr. S.D.N.Y. 2008) (Bernstein, S.J.) ("***Musicland***"); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 17 (Bankr. E.D.N.Y. 2007) (Stong, J.) (requiring plaintiffs to allege facts that give rise to a strong inference of fraudulent intent involving claims for fraudulent transfer).

[32]   *Tellabs*, 551 U.S. at 323.

the intent of the natural person(s) in a position "to control the disposition of [the transferor's] property."[33] Thus, the Court found, with respect to the fraudulent transfer alleged—incident to the Merger and LBO—the Trustee had to establish that a "critical mass" of the Lyondell (pre-Merger) Board members had the requisite intent.[34] The Court dismissed the intentional fraudulent transfer claims in the complaint at that time with leave to replead.

In the Second Shareholder Decision (issued on renewed dismissal motions filed after the Trustee had amended the earlier complaint in an effort to address deficiencies noted in the First Shareholders Decisions), the Court examined in great detail the nature of the intent required to establish claims for intentional fraudulent transfers. After doing so, the Court concluded that the Trustee had still "failed to satisfactorily plead factual allegations demonstrating a strong inference of an actual intent to hinder, delay or defraud creditors by a critical mass of Lyondell's board of directors."[35]

B.   *The Rulings Here*

Though the Trustee here seeks to recover Merger consideration and Change of Control payments received by the Pre-Merger Ds & Os (as contrasted to Merger consideration received by Lyondell's shareholders generally), the same facts underlie the claims of both types. In each case the intentional fraudulent transfer claims rest on:

---

[33]   First Shareholders Decision, 503 B.R. at 388-89 (citing *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983)).

[34]   First Shareholders Decision, 503 B.R. at 388-89.

[35]   Second Shareholders Decision, 541 B.R. at 197. The Court's analysis of fraudulent intent in the Second Shareholders Decision included discussions of the meaning of intent under the Restatement (Second) of Torts, and alternative means to establish that intent, including Badges of Fraud, "Motive and Opportunity," and reckless misconduct. Though the Court sees no need to repeat them, the Court applies those same principles here.

- alleged efforts by Smith and confederates to present fraudulent "refreshed" earnings projections;

- the presence of Pre-Merger Directors at Board meetings at which the "refreshed" projections were discussed;

- failures by Pre-Merger Directors to challenge Smith's allegedly inflated projections, and to engage in basic due diligence to satisfy themselves that the projections had a reasonable basis; and

- Pre-Merger Directors' acts to nevertheless approve the Merger and the terms of the LBO financing.

They differ, of course, in the exact amounts received, and because Pre-Merger Ds & Os received, in addition to payments for their stock, Change of Control Payments. But these payments were argued to provide motivation for action and inaction by Pre-Merger Ds & Os even with respect to payments to shareholders for their stock. And there are no additional allegations with respect to control by Smith over other Pre-Merger Directors, or that a critical mass of them otherwise intended to hinder, delay or defraud Lyondell creditors.[36]

Thus just as the Court determined that the allegations supporting the fraudulent transfer claims were insufficient vis-a-vis payments to shareholder defendants, the Court comes to the same conclusion vis-a-vis payments to Pre-Merger Ds & Os. While the factual allegations as to Pre-Merger Ds & Os continue to raise serious concerns over whether they breached fiduciary

---

[36] Nor would the result be different if Pre-Merger Ds & Os (*e.g.*, Smith) had the requisite intent as transferees. The intent must be the intent of the transferor. *See, e.g., Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) ("To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor.") (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (Gropper, J.) ("Cases under § 548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code.").

12

duties as directors and officers, those allegations are insufficient to demonstrate that a critical mass of the Lyondell Pre-Merger Directors (who were the ones in a position to control the transfer at issue) possessed an "actual intent to hinder, delay or defraud creditors" by their actions.

Accordingly, the Pre-Merger Ds & Os' motion to dismiss the intentional fraudulent conveyance claims against them is granted.

### Conclusion

For the reasons stated above, the Pre-Merger Ds & Os defendants' motion to dismiss Count 4 is granted.[37]

SO ORDERED.

Dated: New York, New York             *s/Robert E. Gerber*
       January 4, 2016                United States Bankruptcy Judge

---

[37] As with the claims addressed in the Second Shareholders Decision, dismissal is without leave to replead. Substantial discovery has already taken place in this adversary proceeding, and if there were factual allegations to support an actual intent to hinder, delay or defraud creditors on the part of Lyondell's Pre-Merger Directors, the Court believes that the Trustee's highly capable counsel would have already included them.

13

# APPENDIX A

Weisfelner v. Blavatnik, Adv. No. 09-01375

# APPENDIX A*

| Count | Claim | Defendant Parties |
|---|---|---|
| 1 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 2 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Nell, Limited; AI Chemical Investments LLC; and Leonard Blavatnik |
| 3 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers[1] |
| 4 | Intentional fraudulent transfer under the Bankruptcy Code and applicable state law | Lyondell Pre-Merger Directors and Lyondell Pre-Merger Officers |
| 5 | Breach of fiduciary duty | Lyondell Pre-Merger Directors |
| 6 | Mismanagement and breach of duty under Luxembourg law | Leonard Blavatnik[2] |
| 7 | Tort under Luxembourg law | Blavatnik;[3] the GP Managers; the Nominees; and the Successors[4] |

---

\*   Except as to Count 6, (*see* n.2, *infra*), counts and claims listed below are based on the amended complaint dated July 23, 2010 [Dkt. 381] (the "**Complaint**"). This table does not reflect subsequent dismissals of claims or defendants by stipulation of the parties or by order of the Court.

[1]   Pre-Merger, in addition to chairman and CEO Dan Smith, Lyondell had ten outside directors on its Board of Directors: Carol Anderson, Susan Carter, Stephen Chazen, Travis Engen, Paul Halata, Daniel Huff, David Lesar, David Meachin, Daniel Murphy, and William Spivey (collectively, the "**Lyondell Pre-Merger Directors**"). The relevant Lyondell officers identified in the Complaint as named defendants are: James Bayer, T. Kevin DeNicola, Bart de Jong, Edward Dineen, Kerry Galvin, Morris Gelb, John Hollinshead, and W. Norman Philips (collectively, the "**Lyondell Pre-Merger Officers**").

[2]   This Count 6 is based upon the second amended complaint dated September 29, 2011 [Dkt. 598].

[3]   Although the Complaint did not specify whether Count 7 is asserted against Leonard Blavatnik or Alex Blavatnik, who is also a named defendant in this action, the Court understands this claim to be asserted against Leonard Blavatnik.

[4]   The "**GP Managers**" are identified in the Complaint as including: Alan Bigman, Richard Floor and Philip Kassin. The "**Nominees**" are defined in the Complaint as including: Simon Baker, Dawn Shand, and Bertrand Duc. The "**Successors**" are defined in the Complaint as including: Philip Kassin, Lincoln Benet, Lynn Coleman, and Richard Floor.

Richard Floor is deceased and Diane Currier has been appointed as the executor for the estate of Richard Floor.

Weisfelner v. Blavatnik, Adv. No. 09-01375

# APPENDIX A*

| Count | Claim | Defendant Parties |
|---|---|---|
| 8 | Breach of fiduciary duty | Subsidiary Directors[5] |
| 9 | Avoidance preference under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 10 | Equitable subordination under the Bankruptcy Code | AI International, S.à.r.l. |
| 11 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Nell Limited; Deutsche Bank Securities Inc.; and Perella Weinberg Partners LP |
| 12 | Breach of contract | Access Industries Holdings LLC; and AI International, S.à.r.l. |
| 13 | Illegal dividends or redemption | Lyondell Pre-Merger Directors |
| 14 | Unlawful distribution and extra-contractual tort under Luxembourg law | Leonard Blavatnik; the GP Managers; BI S.à.r.l.; Alan Bigman; Alex Blavatnik; Peter Thorén; Simon Baker; and the Nominees |
| 15 | Declaratory judgment for characterization of purported loan advances under the Access Revolver as capital contributions | Access Industries Holdings LLC; and the Lyondell Post-Merger Directors[6] |
| 16 | Illegal dividends | Lyondell Post-Merger Directors |
| 17 | Constructive fraudulent transfer under the Bankruptcy Code and applicable state law | Access Industries Holdings LLC |
| 18 | Aiding and abetting breach of fiduciary duty under applicable state law and Luxembourg law | Nell Limited; Access Industries Holdings, LLC; Access Industries, Inc.; AI International, S.à.r.l.; AI Chemical Investments LLC |

---

[5]  The "**Subsidiary Directors**" are identified in the Complaint as including: Kevin Cadenhead, Charles Hall, Rick Fontenot, and John Fisher Gray.

[6]  The "**Lyondell Post-Merger Director**" are identified in the Complaint as including: Alan Bigman, Edward Dineen, and Morris Gelb.

2

Weisfelner v. Blavatnik, Adv. No. 09-01375

# APPENDIX A*

| Count | Claim | Defendant Parties |
|---|---|---|
| 19 | Constructive fraudulent transfer under the Bankruptcy Code | BI S.à.r.l. |
| 20 | Breach of fiduciary duty | Dan Smith; T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |
| 21 | Aiding and abetting breach of fiduciary duty | T. Kevin DeNicola; Edward Dineen; Kerry Galvin; and W. Norman Phillips |