```
                        UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF NEW YORK
                                      .
                                      . Chapter 11
IN RE:                                .
                                      . Case No. 09-10023-mg
LYONDELL CHEMICAL COMPANY,            .
and MILLENNIUM CUSTODIAL              .
TRUST,                                . New York, New York
             Debtors.                 . Monday, July 11, 2016
. . . . . . . . . . . . . . . . . . . 10:06 a.m.
EDWARD S. WEISFELNER,                 .
as Litigation Trustee,               . Adv. Proc. 09-01375-mg
                                      .
                                      .
             vs.                      .
                                      .
                                      .
THE LEGAL REPRESENTATIVE OF           .
THE ESTATE OF RICHARD.                .
. . . . . . . . . . . . . . . . . .   .
WEISFELNER,                           .
                                      . Adv. Proc. 12-01570-mg
             vs.                      .
                                      .
                                      .
REICHMAN, et al.                      .
. . . . . . . . . . . . . . . . . .   .
WEISFELNER, et al,                    .
                                      . Adv. Proc. 10-04609-mg
             vs.                      .
                                      .
                                      .
CIBC WORLD MARKETS, et al.            .
. . . . . . . . . . . . . . . . . .   .
EDWARD S. WEISFELNER,                 .
as Litigation Trustee,               . Adv. Proc. 11-01844-mg
                                      .
                                      .
             vs.                      .
                                      .
                                      .
NAG INVESTMENTS, LLC                  .
. . . . . . . . . . . . . . . . . .   .
```

Audio Operator:            Electronically Recorded
                           by R. Liell, ECRO
(Cont'd on pg. 2)
                    AudioEdge Transcription, LLC
                  425 Eagle Rock Avenue - Suite 201
                     Roseland, New Jersey 07068
                          (973) 618-2310
                  www.audioedgetranscription.com
          Proceedings recorded by electronic sound recording,
        transcript produced by certified transcription service.

(Cont'd on pg. 2)

1       TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT FILED BY NELL
       LIMITED AND LEN BLAVATNIK REGARDING COUNTS 1 AND 2 OF THE

2                   AMENDED COMPLAINT
      HEARING RE: TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON COUNT

3             NINE OF THE AMENDED COMPLAINT
     MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT 3 OF THE SECOND

4          AMENDED COMPLAINT OF THE LG LITIGATION TRUST
       MOTION OF ACCESS INDUSTRIES HOLDINGS, LLC FOR SUMMARY

5           JUDGMENT ON COUNT NINE OF AMENDED COMPLAINT
     HEARING RE: MEMORANDUM OF LAW IN SUPPORT OF THE TRUSTEE'S

6      MOTION FOR SUMMARY JUDGMENT ON THE ACCESS DEFENDANTS'
         COUNTERCLAIM, DATED SEPTEMBER 9, 2011

7    THE LYONDELL DIRECTORS' MEMORANDUM IN SUPPORT OF THEIR MOTION
     FOR SUMMARY JUDGMENT ON COUNT 13 OF THE AMENDED COMPLAINT OF

8      THE LB LITIGATION TRUST, DATED SEPTEMBER 9, 2011
      MOTION TO ALLOW USE OF CERTAIN DEPOSITION TRANSCRIPTS AT

9           TRIAL IN LIEU OF LIVE TESTIMONY
     MOTION TO DISMISS ADVERSARY PROCEEDING FILED BY PHILIP D.

10           ANKER ON BEHALF OF GLENN H. ROTH
      MOTION TO DISMISS ADVERSARY PROCEEDING FILED BY PHILIP D.

11        ANKER ON BEHALF OF WILMER HALE DEFENDANTS
     HEARING RE: MOTION OF NAG INVESTMENTS, LLC TO DISMISS THE

12                AMENDED COMPLAINT
         BEFORE THE HONORABLE MARTIN GLENN

13           UNITED STATES BANKRUPTCY JUDGE

14

15  APPEARANCES:
    For the Plaintiff/

16

    Litigation Trust:        Sigmund S. Wissner-Gross, Esq.

17                    Steven D. Pohl, Esq.
                    BROWN RUDNICK, LLP

18                    Seven Times Square
                    New York, New York 10036

19

    For Various Defendants:   Philip Anker, Esq.

20                    Ross E. Firsenbaum, Esq.
                    WILMER, CUTLER, PICKERING HALE

21                    AND DOOR, LLP
                    Seven World Trade Center

22                    250 Greenwich Street
                    New York, New York 10007

23

24  (Appearances Continued)

25

```
 1   APPEARANCES:   (Continued)

 2   For Defendants Nell
     Limited, et al:            Susheel Kirpalani, Esq.
 3                              Richard I. Werder, Jr., Esq.
                                QUINN, EMANUEL, URQUHART &
 4                              SULLIVAN, LLP
                                51 Madison Avenue, 22nd Floor
 5                              New York, New York 10010

 6   For RIEF Trading, LLC:     Jeff J. Friedman, Esq.
                                Rebecca Kinburn, Esq.
 7                              KATTEN MUCHIN ROSENMAN, LLP
                                575 Madison Avenue
 8                              New York, New York 10022

 9   For Defendant Chazen:      Tricia Bozyk Sherno, Esq.
                                DEBEVOISE & PLIMPTON
10                              919 Third Avenue
                                New York, New York 10022
11
     For the Pioneer
12   Defendants:               P. Sabin Willett, Esq.
                                MORGAN, LEWIS & BOCKIUS, LLP
13                              One Federal Street
                                Boston, Massachusetts 02110
14
     For the Former Lyondell
15   Officers and Directors:    John F. Higgins, Esq.
                                Eric D. Wade, Esq.
16                              PORTER HEDGES, LLP
                                1000 Main Street, 36th Floor
17                              Houston, Texas 77002

18   Also Appearing:           Dianne Coffino, Esq.
                                COVINGTON & BURLING, LLP
19                              The New York Times Building
                                620 Eighth Avenue
20                              New York, New York 10018

21                              Michael A. Kleinman, Esq.
                                FRIED, FRANK, HARRIS, SHRIVER
22                              & JACOBSON, LLP
                                One New York Plaza
23                              New York, New York 10004

24

25
```

```
1                              INDEX

2

3                                                        Page

4
```

```
5   MOTION TO DISMISS RE:  SHAREHOLDERS                    6

6

7   NELL/BLAVATNIK MOTION FOR SUMMARY JUDGMENT            19

8

9   ACCESS MOTION/PREFERENCE MOTION/COUNT 9               53

10

11  FORMER DIRECTORS' MOTION FOR SUMMARY JUDGMENT/        110

12  COUNT 13

13

14  MOTION RE: ACCESS DEFENDANTS' COUNTERCLAIM           120

15

16  MOTIONS RE:  NAG                                     135

17

18  MOTION RE:  USE OF DEPOSITIONS/CONFERENCE            160

19

20  COURT DECISION                                (Reserved)
```

```
21

22

23

24

25
```

5

1        (Proceedings commence at 10:06 a.m.)

2            THE COURT:  All right.  Please be seated.

3            We're here in Lyondell Chemical, which is 09-10023.

4   We're here with motions in a large number of adversary

5   proceedings in the case.  When we go through each one, we'll

6   call each number.

7            MR. POHL:  Good morning, Your Honor.

8            THE COURT:  Good morning.

9            MR. POHL:  Steven Pohl, for the plaintiff Edward

10  Weisfelner, and my partner Sig Wissner-Gross is with me.

11  I'm just standing to be sure if you had any questions

12  regarding the agenda.

13           THE COURT:  No, the only -- a little bit of

14  confusion on my part.  I guess my clerks had received and

15  given to me, I guess came it from Mr. Kirpalani, was a timed,

16  proposed order timed agenda.  Was that a result of

17  conversations between both sides?

18           MR. POHL:  Yes, Your Honor.

19           THE COURT:  Okay.  The only -- and if I'm -- I think

20  I'm correct that what was not on that timed agenda were the

21  shareholder class actions --

22           MR. POHL:  Correct.

23           THE COURT:  -- which is Number 1 on your agenda --

24           MR. POHL:  That's correct.

25           THE COURT:  -- which is fine with me.  But I don't

1    have a time allocation, with respect to that.

2            But we'll go forward with that first and then -- is

3    there anything else that you want to add preliminarily?

4            MR. POHL:  No.

5            THE COURT:  Okay.  We've got a long day ahead.

6    We'll see -- we'll get through this.

7            MR. POHL:  Okay.  So I guess we did agree on 15

8    minutes each on this first matter.

9            THE COURT:  Okay.  That's fine.

10           MR. ANKER:  Good morning, Judge Glenn.  Phillip

11   Anker, Wilmer Cutler Pickering Hale and Dorr, for various

12   defendants in the two shareholder actions.

13           I imagine, Judge Glenn, this is going to be a long

14   day for you and with a lot of complicated matters.

15           THE COURT:  This one is not that complicated.

16           MR. ANKER:  You took the words out of my mouth; this

17   one isn't all that complicated.  Let me just provide one

18   minute of background.  I know you have lived these cases, but

19   you, obviously, are generally familiar with it.

20           THE COURT:  I'm really disappointed that I haven't

21   lived them until now, but ...

22           MR. ANKER:  It's been fun, yes, your Honor.

23           Under the Lyondell plan of reorganization, there was

24   the creation of a litigation trust, which succeeded to all

25   claims of the estate under 1123(b)(3), with the exception of

1  state law fraudulent transfer claims against the former

2  shareholders; those, the estate abandoned.  The creditors

3  were then deemed, under the plan, and assigned to a separate

4  trust, a creditor trust, and the creditor trust then pursued

5  those transactions.

6        So the litigation trust brought 548 claims both,

7  intentional, and constructive, and the creditor trust brought

8  both, initially and intentional and constructive, under state

9  law, same trustee, Mr. Weisfelner, same beneficiaries, same

10  funding.  For all practical purposes, one in the same.  And

11  this was an obvious attempt to work around the safe harbor.

12        There is no question -- there are two questions --

13  let me -- one more second on background.

14        THE COURT:  And those cases were moved to federal

15  court --

16        MR. ANKER:  Were moved to federal court.

17        THE COURT:  -- in front of Judge Gerber.

18        MR. ANKER:  Right.  On the 548 claim, the litigation

19  trust acknowledged after the interim decision that the safe

20  harbor barred the constructive fraudulent transfer 548 claim,

21  dismissed it or stipulated to its dismissal.  Judge Gerber,

22  then, subsequently dismissed the intentional fraudulent

23  transfer claim for failure to plead.  That's now on appeal in

24  the district court.

25        THE COURT:  Before Judge Cote.  Is that correct?

```
 1              MR. ANKER:  Before Judge Cote, exactly.

 2              THE COURT:  What -- just -- I know it's a little

 3    early.  What's the status of that?

 4              MR. ANKER:  Fully briefed, as of two months ago --

 5              MR. POHL:  Several months ago.

 6              MR. ANKER:  Ballpark, two months ago.  Not decided

 7    yet.

 8              THE COURT:  And Judge Cote, does she have scheduled

 9    argument in that?

10              MR. ANKER:  She has not.  My understanding is that

11    her practice is rarely to schedule argument.  Occasionally,

12    she does, but rarely.

13              And then on the state law, constructive fraudulent

14    transfer claims, the intentional fraudulent transfer claim

15    was dismissed, as well, given the rule by Judge Gerber, that

16    there had been a failure to plead the claim, leaving the one

17    claim left, constructive.

18              And our argument, among others, as to that is that

19    546(e) either, directly barred the claim or did so by reason

20    of preemption.  Judge Gerber disagreed, the but the Second

21    Circuit has now decided it should be on.

22              There really are, I think, two sets of issues in

23    front of you today.  The first is, is Tribune somehow

24    distinguishable, such that if you were to reach the merits,

25    you would deny our motion?
```

1           THE COURT:  You mean the fact that the Circuit

2   discussed Judge Gerber's decision in some length, and his

3   opinion in Tribune, I bet you think it's not distinguishable.

4           MR. ANKER:  You would win that bet.  And you're

5   right, I mean, it strikes me -- the Second Circuit would

6   discuss Lyondell -- issued a bright-line rule.

7           The second issue, which I think is going to take up

8   the bulk of my time today, is what do you dismiss or stay?

9   But let me spend one minute on the dismiss issue and whether

10  it's distinguishable.

11          The trustee proffers two arguments.  The first is

12  that, well, in Tribune, the creditors -- they are bondholders

13  -- brought only constructive fraudulent transfer claims and

14  the state would not construct of an intentional.  And since

15  here, they're bringing both, constructive and intentional --

16  originally, the creditor trust -- that's a distinction.

17          And it shouldn't matter because Congress, obviously,

18  doesn't care about bargaining intentional fraudulent transfer

19  claims.  It permitted 548(a)(1)(a) claims to be a carved out

20  from 546(e).

21          The short answer is, first, the intentional

22  fraudulent transfer claim brought by the creditor trust has

23  already been dismissed on independent grounds, and, two, in

24  any event, Congress chose to carve out in -- from 546(e),

25  intentional fraudulent transfer claims under federal law, not

1   intentional fraudulent transfer claims under state law and

2   every court to consider the issue, including Judge Chapman,

3   only two or three weeks ago, has held that 546(e) applies to

4   state law, constructive fraudulent transfer claims, when

5   brought by a bankruptcy trustee.  So the same conflict would

6   exist.

7          The second argument is that, well, in Tribune, the

8   creditor claims were being brought by bondholders, not by Mr.

9   Weisfelner wearing a different hat, and, therefore, there's a

10  unity of interests here.  I agree with the premise, there is

11  a unity of interests here.  I mean the notion that this is

12  really a creditors' set of claims, independent of a

13  bankruptcy estate, is elevating form over substance.

14         But in any event, there was an actual unity of

15  interest in the companion case to the Tribune case, the

16  SemGroup or Barclays case, Whyte being the plaintiff.  There,

17  it was the same trust that got assigned both, creditor claims

18  and estate claims, and the Second Circuit, in a one- or two-

19  sentence order said Tribune is controlling, as Judge Chapman

20  did.

21         There is no credible argument that Tribune, if it is

22  the -- remains the law of this circuit, is not controlling.

23  So that comes to the fundamental question:  Do you dismiss or

24  do you stay?

25         And it seems to me that the answer in this case is

1    like that of every other case.  We can always grant stays,

2    because heaven knows the Supreme Court may someday, change

3    the law in something.  Congress may change the law.  But if

4    that were the way we do things, we would never resolve any

5    litigation.

6         THE COURT:  Let me ask you this:  There is no split

7    in the circuits, with respect to the safe harbor and

8    constructive fraudulent conveyance claims.

9         MR. ANKER:  As Judge Winter correctly observed

10   Tribune.

11        Now, they will say that there's language in the

12   opinion, whether you apply a presumption or not apply a

13   presumption, as to which different Courts may have said

14   different things, but as to the fundamental holding, which is

15   what the Supreme Court has looked to on whether to grant cert

16   or not, the Second Circuit is the one and only circuit to

17   have reached the issue.  There is absolutely no split in the

18   circuits.

19        Your Honor knows that in terms of rehearing and

20   rehearing en banc, one never says never, but the Second

21   Circuit grants rehearing en banc less frequently than once a

22   year and it's got other sexier issues than the application of

23   546(e) to creditor trust claims.

24        Look, these cases have been around for six years.

25   There comes a point in time when you have to say enough is

1 enough.  If they really believe there is a distinction here

2 or maybe the Supreme Court will take cert and will reverse,

3 they can appeal.  But it cannot be the law that one simply

4 waits around and keeps a case on a docket, keeping my clients

5 in this matter, having to monitor it, you know, complete

6 financial statements and disclosures.  That can't be right.

7      And I will also note that what is unique here is

8 almost every case in which someone seeks a stay, it is the

9 defendant who says stay the action.  Here, you have the

10 plaintiff who's saying --

11      THE COURT:  Well, you asked it in the alternative

12 first.

13      MR. ANKER:  I asked in the alternative, but as a

14 secondary, not a primary relief.  And the party pressing it

15 here is the plaintiff.  Obviously, its interest in prompt

16 determination carries no weight because it doesn't want a

17 prompt determination.

18      None of the factors, that we've outlined in our

19 brief that favor a stay, apply here.

20      THE COURT:  Let me ask this question:  If I grant

21 your motion to dismiss it finally disposes of this action and

22 it raises the issue of whether I can enter -- if I rule in

23 your favor -- whether I can enter judgment dismissing the

24 action or whether I have to do proposed findings of fact and

25 conclusions of law.  There are no findings of fact -- I mean

1   it would be -- but nevertheless, this is the Stern v Marshall

2   issue, and, certainly, wellness indicates that with consent,

3   the Court can enter a final order of judgment.

4          What's your position on that?

5          MR. ANKER:  Yeah, I think we addressed this, albeit

6   only in a footnote and Your Honor has a lot to read.  We have

7   taken a position throughout that we do not consent.  Having

8   said that, I don't think one needs to make this document any

9   more complicated.

10         And as a practical matter, it makes no difference,

11  because if you were to --

12         THE COURT:  I agree.

13         MR. ANKER:  I mean they would -- both, a dismissal

14  order, as a matter of law, would go up for de novo review to

15  the District Court.  Proposed findings, conclusions would go

16  up de novo, and if they don't seek to object to it, it

17  becomes an order.

18         So, as a practical matter, I don't have the power,

19  nor do I have the chutzpah, if I can use that word, to

20  suggest that you had a right, but I think it's literally

21  adding a sentence in a decision, but that has been our view.

22         Unless Your Honor has questions about, sort of the

23  practical benefits or not of staying versus dismissing, I

24  will reserve whatever time I have left for reply.

25         THE COURT:  No.  Look, I -- my view is if any of

1  these cases are going to trial, they're going to trial in

2  October.  I don't expect the Supreme Court, whether, you

3  know, as an application for cert, this case isn't going to be

4  ready for trial in October.

5           MR. ANKER:  That's right, Your Honor.

6           THE COURT:  And so if the Circuit -- what's the

7  status?  The Circuit hasn't ruled on rehearing or rehearing

8  en banc, at this stage?

9           MR. ANKER:  A rehearing was sought only in the

10 Tribune case, not in the Whyte case.  It was filed in Tribune

11 in April.  We have not heard from the Circuit.

12          It took the Circuit 15 months, if I'm doing my math

13 correctly, from oral argument to issue its -- 16 months -- to

14 issue its decision on the merits.  Two of the judges on the

15 panel are on senior status; Judge Winter, Judge Hellerstein,

16 sitting by designation.  I just think this happened to be a

17 panel that has taken its time in the past to dispose of

18 things.

19          And then as to the cert petition in the Whyte case,

20 or potential cert petition, there, the plaintiffs who lost,

21 sought an extension to file cert.

22          THE COURT:  I saw the letter.

23          MR. ANKER:  Thank you, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          MR. POHL:  Good morning, again, Your Honor.  Steven

1    Pohl, for the plaintiff trustee.

2            Our papers are pretty obvious; we'd like a stay

3    rather than a dismissal.  We've tried to reach a stipulation.

4    That didn't happen.  We think there are, you know, a number

5    of reasons; we've said that in our papers; the principal one

6    being judicial efficiency.

7            Whether or not we believe that our constructive

8    fraud case is distinguishable, that we think there are some

9    grounds, I've seen this Court's view a couple times, based

10   upon being here, and I'm not going to sit and try to convince

11   this Court as to the constructive fraud claim that's

12   different.  We have an intentional fraud claim; that's not

13   before the Court.

14           And by way of efficiency, the defendants say there's

15   more work to do if they have to be in the case.  We would

16   suggest otherwise.  If they leave the case -- well, let me

17   put it this way:  If they remain in the case, because the

18   Court grants a stay, then they have to simply follow the

19   existing appeal before Judge Cote.  If they're in that, they

20   can't get out of that.  This Court stays it, there's nothing

21   to do.

22           If, on the other hand, the Court dismisses it and

23   we're left with the status of Tribune and Whyte, as the Court

24   is well aware of them, we have no choice but to appeal.

25           THE COURT:  No, I understand.  You've got to reserve

1  your rights and --

2      MR. POHL:  And so we go to Judge Cote.  We appeal,

3  and she either stays it or requires briefing, which seems to

4  be a little counterintuitive when everything's on appeal in

5  Whyte and Tribune.

6      So I think the Court has a couple of options which

7  may be between the defendants' view that they're going to

8  wait around for a year, and that's unfair, and the view that

9  the Court should immediately dismiss it.  You know, there can

10 be any number of court calendar ticklers, whether it be 60

11 days or 90 days to see what's happening in those cases.

12     But the only thing that happens if the Court

13 dismisses, is there's more activity, as opposed to a stay

14 where there is no activity.

15     THE COURT:  Not activity before me.

16     MR. POHL:  No, but activity, as to both parties, and

17 -- or for the District Court's docket and --

18     THE COURT:  Well, you can ask Judge Cote to stay it.

19     MR. POHL:  Well, that's what we'll have to do, which

20 is why we're suggesting it's more efficient to just leave it

21 sit here.  And you've seen our arguments --

22     THE COURT:  I have.

23     MR. POHL:  -- it's our view.  I'm not sure there's

24 more that I could say to move the Court one direction or

25 another.

1           THE COURT:  Okay.  Thanks very much.

2           All right.  I'll take it under submission.

3           MR. ANKER:  May I just make one final point, Judge?

4           THE COURT:  Yeah, go ahead.

5           MR. ANKER:  I mean one second -- and it will

6    literally be a second.

7           It strikes me as, when you think about the

8    efficiency question, you've got the trustee standing up here

9    saying, Tribune and SemGroup are distinguishable, so if you

10   wait until the very end and let's assume that cert is denied

11   in Tribune and SemGroup, you will then have to confront the

12   issues that they are raising.

13          They're not standing up here saying, we conceded

14   that if those cases remain the law, our complaint has to be

15   dismissed.  And since you're going to have to address the

16   issues anyway, it strikes me that we might as well bring it

17   on, and if they really want to make that argument -- assuming

18   Your Honor agrees with us that they are distinguishable -- if

19   they want to make them on appeal, we'd like to get those

20   issues resolved so we get the finality.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. ANKER:  Your Honor, one other thing just as a

24   housekeeping matter?

25          THE COURT:  Sure.

1          MR. ANKER:  May we be excused?

2          THE COURT:  Absolutely.

3          MR. ANKER:  Thank you, Your Honor.

4          THE COURT:  I'm sure you'd find it stimulating to be

5     here all day, but you're excused, okay?

6          MR. ANKER:  Thank you, Your Honor.

7          THE COURT:  All right.  Let's move on with the

8     agenda.  So, the Nell -- I'll wait for whoever's -- I don't

9     know who's arguing the Nell motions, but you can all change

10    places.

11         MR. KIRPALANI:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MR. KIRPALANI:  Susheel Kirpalani from Quinn Emanuel

14    Urquhart & Sullivan, on behalf of Nell Limited and Len

15    Blavatnik.

16         We do have some slides.

17         THE COURT:  I have never had anybody from your firm

18    argue before me without slides, so I would be disappointed if

19    I didn't --

20         MR. KIRPALANI:  Well, we all wanted to do something

21    else with our lives and we became lawyers, and so this is how

22    we live out those fantasies.

23         But -- so, can I hand up a hard copy, just in case

24    you want to keep them afterwards?

25         THE COURT:  Yes.  Thank you.

1        MR. KIRPALANI:  It actually is going to be better to

2   watch the screen because some of them animate --

3        THE COURT:  Okay.

4        MR. KIRPALANI:  -- but just so you have them, or in

5   case something malfunctions along the way.

6        THE COURT:  Okay.  I don't think I've had animations

7   in one of your presentations before.

8        MR. KIRPALANI:  All right.  See, new and improved.

9   You ready with that?

10        UNIDENTIFIED:  Yes.

11        MR. KIRPALANI:  Okay.  Your Honor, this is a motion

12   of Nell Limited and Len Blavatnik for summary judgment on

13   Count 1 that has to do with the toehold payments, and this is

14   a constructive fraudulent transfer case.

15        Judge, this lawsuit principally challenges the

16   decision by Basell, the then-largest European producer of

17   specialty plastics, to acquire Lyondell Chemical Company,

18   which was then, the third-largest independent publicly traded

19   chemical company in North America.  While the complaint casts

20   the transaction from Lyondell Chemical Company's perspective

21   as a leveraged buyout or an LBO, the transaction was

22   fundamentally an acquisition of Lyondell by Basell, which was

23   owned by our client Nell Limited, and a merger of those two

24   megacompanies to form a synergistic vertically integrated

25   enterprise.  It was a public M&A transaction valued at over

1  $30 billion.

2         The merger agreement was signed on July 16th, 2007.

3  Because approved by the public shareholders of Lyondell

4  Chemical Company, on November 20th, 2007, and ultimately

5  closed on December 20th, 2007.  All shareholders received $48

6  per share of Lyondell common stock, in order to consummate

7  the merger agreement.

8         Prior to the agreement to merge, on May 4th, 2007,

9  AI Chemical, an entity then owned by our client Len

10 Blavatnik, entered into a swap to buy nearly 21 million

11 shares of Lyondell in the future under a share-forward

12 contract with Merrill Lynch.  Then, after the merger

13 agreement was signed on August 21st, 2007, AI Chemical

14 acquired another almost 4 million shares of Lyondell common

15 stock, giving AI Chemical approximately 25 million shares, or

16 about 10 percent of the outstanding shares of Lyondell as a

17 so-called toehold stake for the acquisition.  This stake was

18 publicly disclosed and was even referenced in the proxy

19 materials for the shareholders.

20        So, you can see on the diagram, Your Honor, at $48

21 per share of Lyondell common stock, with 254 million total

22 shares outstanding, of the approximately 12.2 billion of

23 merger consideration paid to stockholders, the toehold stake

24 was worth about 1.2 billion.  It is that payment of 1.2

25 billion that Count 1 of the complaint seeks to avoid as a

1  constructive fraudulent transfer.

2       It's undisputed that the payments were part of the

3  merger consideration; in fact, we show you the complaint

4  itself says so.  Taking the two transfers separately, Toehold

5  Payment 1 was $523.8 million.  This transfer was made at

6  closing of the merger to Nell Limited, which was then the

7  owner of AI Chemical, after Mr. Blavatnik had contributed it

8  to Nell, and that payment was made, pursuant to a stock

9  purchase agreement, and we'll get into that in a few minutes.

10      But, notably, that transfer was actually made by a

11 nondebtor entity, but the trustee took the position that

12 which entity should be deemed the transferor from the

13 LyondellBasell family of businesses is a complex issue of

14 fact and that should not be decided by summary judgment.  So

15 we agreed with, that so for purposes of this argument, we've

16 assumed Nell Limited was paid Toehold Payment 1 by a debtor.

17 Toehold Payment 2, on the other hand, was not paid to Nell

18 Limited, but to Merrill Lynch, to settle AI Chemical's

19 share-forward contract.  That payment was $674.3 million.

20      As Your Honor well knows, to qualify for the safe

21 harbors of Section 546, the transfer must be by or to or for

22 the benefit of a financial institution or a financial

23 participant, and it must be either a settlement payment, a

24 payment in connection with a securities contract or a payment

25 in connection with a swap.

1          The standard for the safe harbor is broad and in the

2     Second Circuit, as Your Honor was just discussing with my

3     colleagues, is it's even broader than elsewhere; frankly, the

4     toehold payments are so squarely within the broad safe

5     harbors, that there is no good faith basis for even having

6     brought Count 1, and, certainly, there is none for continuing

7     to press it at this late stage, given where the case law is.

8          At first, Judge, the trustee even disputed that we

9     satisfied the first prong of the safe harbor, but leading up

10    to this hearing, thankfully, the trustee has now conceded

11    that the banks that made and received the toehold payments

12    were either financial institutions or financial participants,

13    so I guess that's progress.  He did this, of course, because

14    he had no choice after the Circuit Court confirmed that there

15    is no mere conduit argument in 2013 in the Quebecor World

16    case.

17         So, now, Judge, the trustee seems to advance a

18    strained reading of the statute that in order to be safe

19    harbored, the toehold payments have to be both, a settlement

20    payment and a payment in connection with the securities

21    contract.  That's simply not what the statute says.  The

22    defense is plainly available, if any one of the protected

23    transfers occurred, summary judgment should be granted on

24    Toehold Payment 1 and Toehold Payment 2, because we have

25    established the transfers fit the broad statutory

1    definitions.

2         With respect to Toehold Payment 2, moreover, summary

3    judgment should also be granted, because these payments to

4    Merrill Lynch were not made to or for the benefit of either,

5    Nell Limited or Mr. Blavatnik.  They were made for the

6    benefit of AI Chemical, which, at the time of the transfer,

7    it was actually owned by one of the debtors.

8         But, first, let's start with the settlement payments

9    of safe harbor Section 546(e).  As Your Honor recently wrote

10   in the Motors Liquidation case, the Circuit Court has

11   explained what a settlement payment is:

12        "A transfer of cash made to complete a securities

13        transaction."

14        That's from Quebecor World.  And there's no genuine

15   issue of fact why these payments were made.  The complaint,

16   itself, is clear on the point.  Here's what the trustee,

17   himself, alleged at Paragraph 265 of the second amended

18   complaint,:

19        "The facilities were used to pay the approximately

20        $1.2 billion of merger consideration due."

21        More could there ever be an issue of fact about

22   this, Judge, the contemporaneously created closing funds flow

23   statement made the purpose of the payment crystal clear; the

24   523.8-million-dollar transfer to Nell Limited at the closing

25   of the merger on December 20th, 2007, was:

1          "-- to purchase the toehold position."

2          And it doesn't pass the straight-face test for the

3  trustee to dispute this.  Even the merger agreement itself

4  made clear that every single share of Lyondell common stock

5  was being acquired by converting each share into the right to

6  receive $48 in cash.  That was the very definition of merger

7  consideration, which the trustee himself alleged the toehold

8  payments to be.

9          Simply put, Your Honor, Toehold Payment 1, the

10 523.8- million-dollar payment to Nell Limited was

11 consideration for the shares of Lyondell common stock, owned

12 by AI Chemical, and purchased, as part of the acquisition of

13 all of Lyondell's common stock.  That fits squarely into the

14 definition of a settlement payment.

15         So, then, we turn to whether Toehold Payment 2 was

16 also a settlement payment, and the inescapable conclusion is

17 that it was.  First, the complaint describes Toehold Payment

18 2 as being made to Merrill Lynch to satisfy an obligation of

19 AI Chemical.  What obligation was that?

20         Here's what the trustee says in Paragraph 333 of the

21 second amended complaint:

22         "The obligations, of course, is the share-forward

23         contract between AI Chemical and Merrill Lynch."

24         Let's look at that contract.  It specifically spoke

25 of settle in the trade and referred to the settlement payment

1   date.  There is just no legitimate issue of fact raised here.

2   The trade confirmation used all of the terms you would expect

3   to commonly see for a securities transaction like this.

4          So, in the end, with respect to settlement payments,

5   Toehold Payment 2 was the paradigm of a settlement payment.

6   But, even if the payments for the toehold stake were somehow

7   not considered settlement payments, were they were both,

8   indisputably, transfers in connection with one or more

9   securities contracts, and as to Toehold Payment 2, even a

10  swap agreement.

11         The case law is clear that a securities contract is

12  a "contract for the purchased sale or loan of a security or

13  any other agreement or transaction that is similar.

14         THE COURT:  That's the piece of the statute that I'm

15  not certain about what it means, but ...

16         MR. KIRPALANI:  Okay.  Well, let's see how it

17  applies here.  I think it -- --

18         THE COURT:  When you say that piece, it's the -- or

19  any other agreement or transaction that is similar.  The

20  first part, I think, contract for purchased sale alone, I

21  think that part, I don't have a problem with, but it's the

22  last piece of it that's less clear to me.

23         MR. KIRPALANI:  Okay.  Let's look at total payments,

24  1 and 2, were both payments made in connection with the

25  merger agreement.  The definitive proxy statement filed for

the merger even called out specifically the shares owned by
AI Chemical, which the proxy statement referred "owned by an
affiliate of buyer Basell," which was the case.
So, when you boil it all down, Your Honor, as an independent
basis for summary judgment, beyond the settlement payment
safe harbor, total of payments 1 and 2 were both made in
connection with the merger agreement.  The merger agreement
is a securities contract.

So, the trustee says, well, those two transfers,
they were not made, pursuant to or under the merger
agreement, per se, but that's not even the test, and the
trustee is rewriting the statute.  The Second Circuit in
Madoff puts to rest any lingering argument by the trustee
that in connection with requires anything more than being
related to or associated with a securities contract.

And in addition to being a transfer in connection
with the merger agreement, Judge, Toehold Payment 1 was also
a payment directly pursuant to and under another securities
contract, namely, the stock purchase agreement, executed on
the same date as the closing of the merger, on December 20th.
This was the transaction where Basell Funding purchased 100
percent of Nell Limited's equity in AI Chemical, in order to
acquired 25 million shares of common stock of Lyondell.

The payment of $523.8 million to purchase membership
units in AI Chemical, pursuant to the stock purchase

1    agreement, is a transfer in connection with a securities

2    contract.  Even if, for some reason, the transfer is, one,

3    not considered a settlement payment and, two, is deemed to be

4    a transaction divorced from the merger agreement, each of

5    which we obviously think is counterfactual and defies common

6    sense, but we make this stock purchase agreement as a third

7    safe harbor basis, with respect to Toehold Payment 1.

8         And we've got a similar third alternative basis for

9    the safe harbor for summary judgment, with respect to Toehold

10   Payment 2, the Merrill Lynch swap payment; that's Section

11   546(g) of the Bankruptcy Code.  The Merrill Lynch

12   share-forward contract meets the definition of a swap and the

13   confirmation itself was subject to the 1992 ISDA master

14   agreement.

15        And that -- not that we think the Court needs to

16   reach this issue, Judge, but Toehold Payment 2, by some

17   miracle is not safe harbored, there is still no basis for

18   transferee liability against Nell Limited or Mr. Blavatnik.

19   AI Chemical was the counterparty to the share-forward

20   contract, not Nell, its former owner, and not Mr. Blavatnik,

21   its original owner.

22        The $674.3-million-dollar transfer made to Merrill

23   Lynch to satisfy this obligation, at the time of that

24   transfer, AI Chemical was no longer even owned by Nell

25   Limited, because Nell had just received $523.8 million to

1   sell AI Chemical to Basell Funding.

2        I think, Judge, it would really help, so we tried to

3   put together -- this is the animation one -- to put together

4   to review these transfers in context so the Court can get a

5   picture of exactly what happened on December 20th, with

6   respect to the toehold payments.  This is how it all ties

7   together.  So you can see here, Judge there, was a sale of

8   the equity in AI Chemical by Nell, in exchange for Toehold

9   Payment 1, then AI Chemical was contributed down to LBIH,

10   which was one of the debtors, then AI Chemical's parent

11   settled the trade with Merrill Lynch, and then AI Chemical's

12   assets and liabilities were assumed by LBIH, and at that

13   point, AI Chemical was dissolved.

14        The result of all of these transfers on December

15   20th, 2007, of course, was Basell acquired 100 percent of the

16   shares of Lyondell Chemical Company and the merger agreement

17   was consummated and completed.

18        For all of these reasons, Your Honor, respectfully,

19   this is not a close call.  $1.2 billion is a lot of money at

20   stake, so I do appreciate you letting me go through the three

21   alternative safe harbor arguments that we believe shields

22   liability here.  Thank you.

23        THE COURT:  All right.  Let me -- just hold on and

24   --

25        MR. KIRPALANI:  Uh-huh.

1        THE COURT:  -- let me see if I have any questions

2    for you.

3        (Pause in proceedings)

4        THE COURT:  So, if the stock purchase agreement --

5        MR. KIRPALANI:  Uh-huh.

6        THE COURT:  -- called for the purchase of the

7    membership interests in AI Chemical.  Is that correct?

8        MR. KIRPALANI:  Right.  Uh-huh.

9        THE COURT:  And what's your authority an a

10   membership interest in a limited liability company

11   constitutes a security as -- within 546(e)?

12       MR. KIRPALANI:  Well, I think that -- you know,

13   there are two cases that had membership interests

14   transferred, and both were considered settlement payments.

15   Now, to be fair, neither of those cases analyzed the issue,

16   but, frankly, I think they didn't analyze it because it is a

17   similar payment.  It is similar to a securities transaction,

18   and those two were Crescent and --

19       THE COURT:  So, you're relying on that last part of

20   the section, the part that I said I fully don't grasp.

21       MR. KIRPALANI:  Yeah, I think I'm relying on that.

22   I also believe that it is -- so, the two cases, just to make

23   sure I finish the thought was Crescent Resources v Duke

24   Energy, and Crescent Resources, which we cite in our papers,

25   relied on the Verizon case; that was the Idearc Yellow Pages

1    big case in the Northern District of Texas.  And there,

2    Verizon were you sued for $2.4 billion for a spin-off

3    transaction.  That, too, had LLC membership interests that

4    were transferred.

5          But, yes, I think we do rely for that, on it's a

6    transaction that is similar to a securities contract, and,

7    moreover, it can still be a settlement payment because the

8    purpose of transferring those LLC membership interests was to

9    ultimately acquire the shares of Lyondell common stock; that

10   was the only asset of AI Chemical.  And in point of fact, on

11   the very same day, in the contemporaneous nanosecond of a

12   closing of a thirty-billion-dollar transaction, and as we

13   showed you with the animation, these entities -- the entity

14   was merged; Basell became one-hundred-percent owner of

15   Lyondell common stock.

16         So, the transaction was a step towards a more

17   integrated, larger acquisition of 100 percent of the shares

18   of Lyondell common stock, and the fact that it was done this

19   way for efficiency, tax, financings, whatever purposes,

20   doesn't matter.

21         THE COURT:  Okay.  I see -- let me see if I have

22   anything.  Just a second.

23         Okay.  Thank you.

24         MR. KIRPALANI:  Okay.  Thank you, Your Honor.

25         MR. WISSNER-GROSS:  Your Honor, Sigmund

1    Wissner-Gross for the trustee.  I have to apologize; I don't

2    have a slide deck or any electronics, but with the permission

3    of the Court, I would like to hand up two exhibits that were

4    part of the Count 11 summary judgment motion.

5              THE COURT:  Sure.

6              MR. WISSNER-GROSS:  The first is Exhibit 11 to my

7    declaration, which is a copy of the limited liability

8    agreement for AI Chemical, and the second document is Exhibit

9    24 to Mr. Kirpalani's declaration, which is the contribution

10   and subscription agreement, whereby Mr. Blavatnik transferred

11   his ownership interests in the units of AI Chemical to Nell.

12   I think these will bear on the question you raised and I

13   think will zero in on why we're going to focus on Toehold

14   Payment 1, why we think it is clearly not subject to 546(e).

15             THE COURT:  Do you agree that -- well, I'll wait to

16   get that.  What I was going to ask is, it seems to me that

17   Mr. Kirpalani's argument, with respect to Toehold Payment 2

18   is a much stronger argument under 546(g), and you're really

19   disputing that?

20             MR. WISSNER-GROSS:  Your Honor, I'll agree with you,

21   I think the argument on the second payment is a stronger

22   argument.  That's why we're going to focus on Toehold Payment

23   1, which --

24             THE COURT:  Okay.  All right.

25             MR. WISSNER-GROSS:  -- we think -- actually, we

1    don't think it's a close call and that it's not subject to

2    546(e).  After we're finished -- after I'm finished

3    addressing that, I'll briefly touch on Toehold Payment 2,

4    which -- but I don't disagree that I think he has a stronger

5    argument.  I think there are some distinctions that we can

6    make, but my focus will be on Toehold Payment 1.

7            Your Honor, for -- if you just step back for a

8    moment, I think it's really important to understand what was

9    Mr. Blavatnik trying to accomplish?  I don't disagree that

10   Mr. Blavatnik originally was making a play for Lyondell and

11   he close to do that through creating a special purpose

12   entity, SPV [sic], and AI Chemical is a Delaware LLC that has

13   its purpose to acquire the Lyondell stock.

14           It was formed in April 2007 and within approximately

15   a week after the closing of the merger, there was a

16   certificate of dissolution that was filed.  I think it's

17   important to follow the corporate chain that occurred,

18   because as Your Honor touched on, what actually occurred --

19   and I'm going to focus on Toehold Payment 1 -- was that the

20   payment that occurred when Mr. Blavatnik, on December 20th,

21   through a series of four steps, first, transferred his

22   interest in the units to Nell Limited, another

23   Blavatnik-owned entity, and then there was -- subsequently,

24   Nell Limited transferred those same units to a Basell entity

25   which provided $523 million in payment to Nell, done, really,

1  solely for the purpose of avoiding any tax slide.  Let's be

2  clear about it --

3         THE COURT:  So?

4         MR. WISSNER-GROSS:  -- it's America; that was the

5  sole purpose.

6         But what's significant is that the payment that

7  occurred was for the units of AI Chemical.  And if you follow

8  the corporate chain, you'll see that there was, at no time, a

9  payment for the Lyondell stock, the 25 million shares, that

10 AI Chemical held.  That's a critical, critical point.

11        It's critical for a couple of reasons.  First of

12 all, this is a Delaware LLC, and you -- in the terms of the

13 law governing Delaware LLCs, in particular, as we cited to

14 Your Honor, the Delaware UCC Section 8-103(c) makes crystal

15 clear that units of a Delaware LLC, are not to be considered

16 secured, because we're talking about the units in AI

17 Chemical.

18        THE COURT:  That was the reason for my question to

19 Mr. Kirpalani.

20        MR. WISSNER-GROSS:  Correct.  Correct.

21        There's a statute on point and there's case law on

22 point.

23        THE COURT:  Well, but that doesn't necessarily mean

24 it isn't a security within the meaning of the --

25        MR. WISSNER-GROSS:  I understand, Your Honor, but I

1    think in the first instance what you have to do is you have

2    to look and see within the statute -- within the governing

3    document, which is an LLC, which is subject to Delaware law,

4    you look to the operative statute in Section 8.103(c) of the

5    Delaware UCC expressly says that an LLC interest is not a

6    security unless one of three things occurs, which didn't

7    occur here; one, is it dealt in or traded on the securities

8    exchanges and securities markets?  The answer is no here,

9    with respect to these units.

10           Secondly, do its terms expressly provide that it's a

11   security governed by the Delaware LLC?  And for that, you

12   have to look at the LLC agreement, which I've given you.  And

13   I'll represent to Your Honor there's actually nothing in that

14   corporate document -- formation document that says that it's

15   to be treated as a security; in fact, if anything, it follows

16   the sort of the pattern of partnership related kind of

17   terminology.  But it is clear that under the formation

18   documents, the units are not to be treated as a security.

19           Or third, is an investment securing?  The answer is

20   now.

21           And so, there's nothing to change that equation.

22   The fact that in the third of four transactions occurred, as

23   there's an effort to transfer the units down the corporate

24   change of the Blavatnik entities, but a document involving a

25   transfer from Nell Limited to another Blavatnik entity is

1  called a "stock purchase agreement."  Under the case law that

2  doesn't change the equation.  You actually have to look at

3  the operative corporate documents appeared how they treat

4  these units.

5         There is a case, Your Honor, on the issue of whether

6  putting aside for a moment the corporate document, say it's a

7  security or not, and the answer here is no.  But there is a

8  case that's on point that addresses, okay, for purposes of

9  analyzing whether it should otherwise be treated as a

10 security, and that's Great Lakes Chemical Corp. v Monsanto,

11 96 F.Supp. 2d 376.

12        THE COURT:  Just give me the citing, 96 F.Supp.?

13        MR. WISSNER-GROSS:  96 F.Supp., it should be 376,

14 District of Delaware, 2000.

15        And, Your Honor, we submit that case has been

16 favorably cited in subsequent cases.  We think that case has

17 a fairly extensive discussion cited in our papers, where the

18 Court says, look, in there they found that the LLC interest

19 was not a security.  The Court went through a fairly

20 traditional analysis, a Howry-type-analysis (phonetic); how

21 do you determine whether an LLC unit should be treated as a

22 security or not.

23        And one of the basic tests is you look to see, well,

24 is it held by a number of people?  Is it a pooled investment?

25 Does it have the elements or attributes of a security?

1        One of those attributes are present here.  Mr.

2   Blavatnik, if you look at the last page of the stock purchase

3   agreement, you'll see that he owned 100 percent of the units,

4   a single investor.  The transfers that occurred on December

5   20th, the four transfers in the chain, all were to a single

6   entity holding 100 percent of the units.

7        Your Honor, we'd submit that, under Great Lakes, and

8   cases analyzing whether, independent of the LLC agreement and

9   the Delaware UCC statute have to say, if you look at the

10  structure of this particular investment, it actually -- it's

11  none of the traditional categories that would be required to

12  demonstrate that it was a security.  Now, that, I think,

13  takes you, in terms of 546(e), if you look at the definition

14  of security under the Code, LLC interest doesn't satisfy

15  those elements.  I think that you would have to go through

16  and establish to say that the transfer of the units somehow

17  would be subject to 546(e), that, in fact, it was a security,

18  that there was a securities contract at issue, the answer is

19  no, because in the end, the payment that occurs here on

20  December 20th is for the transfer of the units.  We don't

21  think that it's actually a close call in terms of whether or

22  not they can satisfy that element of the standard.

23        The second element, Your Honor, would be whether,

24  notwithstanding the fact that the actual transfer of units in

25  the LLC, that the fact that a merger agreement was involved

1   somehow, should be transformative and sweep in the payments

2   that were not to purchase the wind-up stock, but, in fact, he

3   purchased the LLC units.  And the fact of the matter is that

4   there are a variety of payments occurred in connection with

5   the merger that nobody on the defense side is contending were

6   subject to 546(e).

7           There were payments that were made to banks.  There

8   were transaction fees.  There was $125 million separately

9   that Mr. Blavatnik's entity received.  There are payments

10  that some of the directors and officers received for change

11  of control payments.  There were a whole host of other

12  payments that occurred in connection with the merger and none

13  of those implicate or trigger 546(e).

14          We think that, particularly with respect to Toehold

15  Payment 1, that the fact that Mr. Blavatnik for tax reasons

16  -- and it's America, it's a free country, he obviously has

17  the right to try to avoid having to pay taxes on the $332

18  million in short-term gain -- but the fact is that he

19  structured both, the formation of AI Chemical, the way in

20  which units were transferred, the way that there's no

21  evidence that the Lyondell stock that was held by AI Chemical

22  ever received any payment of merger consideration.  Take all

23  of those elements together, we don't think it's a close call

24  in terms of the toehold payment and we think that 546(e) does

25  not apply.

1          And we're not saying this to suggest that Tribune or

2     Madoff or Enron are -- while we have our issues with those

3     cases, we do ultimately have questions about those decisions,

4     but if you accept those decisions and you accept them as the

5     rule of law in the Second Circuit for argument's sake, total

6     payment just simply moves the bar too far; it's outside the

7     ambit of 546(e).

8          Your Honor, unless you have any further questions on

9     Toehold Payment 1, I'll briefly touch on Toehold Payment 2.

10          THE COURT:  Just bear with me for a second, okay.

11     (Pause in proceedings)

12          THE COURT:  You know, I commented a couple of times

13     today, the piece of 546(e) that I remain quite uncertain

14     about derives from the definition of securities contract in

15     741(7)(a)(vii); it's any other agreement or transaction that

16     is similar to an agreement or transaction referred to in this

17     subparagraph.

18          That's the piece Mr. Kirpalani briefly argued that,

19     well, even if I don't satisfy the other requirements, this is

20     a piece of the larger transaction, all of which happens,

21     basically, within a nanosecond or very short time or related,

22     and so this transfer of the membership interests is any other

23     agreement or transaction that is similar to an agreement or

24     transaction referred to in this subparagraph.

25          MR. WISSNER-GROSS:  Here's the problem with that.  I

1  think that if you --

2  THE COURT:  And that's the one area -- I mean I said

3  Motors Liquidation, but I don't --frankly, I don't know --

4  there isn't much law about what's similar and what Congress

5  meant by that.

6  MR. WISSNER-GROSS:  Your Honor, if you accept the

7  proposition that the transfer of the units, not withstanding

8  what I just identified to you as the LLC language, the

9  Delaware LLC provision, the Great Lakes decision is

10  nonetheless to be swept in, in terms of any other agreement

11  -- similar to a securities transaction, then basically

12  there's no end to the process.  There's no demarcation.

13  THE COURT:  Some people would read the Second

14  Circuit decisions as basically saying that there's no end to

15  the safe harbor.

16  MR. WISSNER-GROSS:  But here are the facts, with

17  respect to Toehold Payment 1, Mr. Blavatnik could have chosen

18  to just not go through those series of transfers.  He could

19  have chosen to structure AI Chemical differently.  He could

20  have chosen to have the units which held the 25 million

21  shares not transfer the interest and he could have chosen to

22  convert the AI Chemical entity to be treated as a security

23  and he didn't.

24  THE COURT:  Okay.

25  MR. WISSNER-GROSS:  And I think that that's the fact

 1    of what occurred here, and there's nothing in the definition

 2    of securities that suggests that you should ignore --

 3         THE COURT:  Well, it's the definition of securities

 4    contract.

 5         MR. WISSNER-GROSS:  Well, there's nothing in terms

 6    of securities contract that suggests that you should

 7    disregard the Delaware LLC case law; its case law

 8    interpreting what a security is, and, more importantly, the

 9    way that for the toehold payment, particularly Payment 1, the

10    way it was actually structured, we think is evidence that it

11    was removed, as a practical matter, the way that it was

12    structured from day one, from any coverage under 546(e).

13         THE COURT:  Okay.  So why don't you go on to Toehold

14    Payment 2.

15         MR. WISSNER-GROSS:  Very briefly.

16         THE COURT:  You've got a much tougher road here.

17         MR. WISSNER-GROSS:  Your Honor, I'm not going to

18    disagree there.  I would note that Judge Gerber, in his

19    decision on the motion to dismiss certain of the counts,

20    dated January 4th, 2016 -- it's Docket Entry 698 -- stated

21    that Nell assumed the AI liability under the forward

22    contract.

23         And I would submit, Your Honor, that notwithstanding

24    Mr. Kirpalani's representation to the Court, that if AI

25    Chemical, at all times, continued to own that it would be

1    responsible for that liability to Merrill.  In Exhibit 24 to

2    his declaration, which is the contribution of subscription

3    agreement, there is some ambiguity in that document, as well,

4    as to whether Nell assumed the obligation for the forward

5    contract.

6          Our point on that, Your Honor, is simply that if you

7    come to the conclusion that the units were not securities and

8    Toehold Payment 1 was not subject to --

9          THE COURT:  So, let me just stop you.  In oh I'm not

10   ruling at this point, okay -- my -- what I understand the

11   part Mr. Kirpalani to be arguing, it doesn't matter whether

12   it's a security within the definition of Delaware law; it's

13   part of a securities contract similar to.  Every piece of a

14   securities contract doesn't necessarily have to be a security

15   for 546(e), applying 741, to govern the transaction.

16         You're -- and I'm going to go back and look at this

17   again; I had a lot of stuff to read to prepare -- I want to

18   go back and look at Great Lakes and the Delaware statute.  I

19   think it's Exhibit 8-103(c).

20         MR. WISSNER-GROSS:  Yes.

21         THE COURT:  Okay.  I want to go back and look at

22   that.

23         I don't know whether the outcome of this issue

24   hinges on whether the membership interest is a security for

25   the securities contract part of 546(e) to apply.  I'm not

1  saying it does or doesn't; I'm going to go back and look at

2  it.

3       MR. WISSNER-GROSS:  Again, I come back to the point

4  that, what was being paid for?  I think that's the ultimate

5  question.

6       What was paid for were the units, and if you agree

7  with me that the documents reflect the -- are consistent with

8  the economics that the units were what were being paid for,

9  and under applicable law, units were at no point a security,

10  then that payment was not completing a "securities

11  transaction."

12       THE COURT:  Okay.

13       MR. WISSNER-GROSS:  That's our argument.  Thank you,

14  Your Honor.

15       THE COURT:  Thank you very much.

16       Very briefly, Mr. Kirpalani.

17       MR. KIRPALANI:  Yes.  Thank you, Your Honor.

18       Okay.  So, Judge, when you asked me before and I was

19  a little flat-footed about what cases I would talk about for

20  the securities contract, I knew there was one of the Circuit

21  Court cases talked at length about this, and it's the Picard

22  v The Ida Fishman --

23       THE COURT:  Yes.

24       MR. KIRPALANI:  -- case.  So, Second Circuit talking

25  about securities contract and the definition of that talks

1  about similar or related to, says that there's no word in the
2  English language that's broader than "any" and "similar" --
3  I'm not sure about similar, but I agree about any -- and
4  then, lastly, it says, in conclusion, the Second Circuit says
5  --
6        THE COURT:  I mean, I talked to you about Ida
7  Fishman and Motors Liquidation, but I didn't -- you know, I
8  know what it said, but -- go ahead.
9        MR. KIRPALANI:  I know you're familiar with this
10  area of the law.
11        THE COURT:  No, but go ahead.
12        MR. KIRPALANI:  I do.  I do.
13        THE COURT:  I haven't done the deep dive into it
14  that others have, but go ahead.
15        MR. KIRPALANI:  I want to highlight something,
16  though, that may not be completely clear from my opening
17  submission, despite my best efforts.  Whether the transfer of
18  the LLC interests under the stock purchase agreement itself
19  is a transfer in connection with the securities contract,
20  there's only the third alternative.  We don't even have to
21  get there.
22        It's absolutely a settlement payment, because it is
23  a transfer that was made to complete the securities contract.
24  So that was the merger agreement.  Mr. Wissner-Gross can't
25  seriously contend that that payment of $523.8 million, which

1   just coincidently, happens to match, exactly, the value of

2   $48 per share, less the liability of the share-forward

3   contract, has anything, but everything to do with the merger

4   agreement.  So, it's done at settlement payment.  It's done

5   at settlement payment.

6         And, secondly, it would be done if it's -- if the

7   merger agreement was a securities contract, which I don't see

8   any argument on that either, then we're stuck with, was it in

9   connection with or not?  And that's specifically been

10  addressed by the Second Circuit.  You don't have to show that

11  payment, specifically, was under the merger agreement,

12  because it was under some other agreement.  As long as it was

13  related to it, associated with it, that's what "in connection

14  with" means.  We don't even have to get to this third prong,

15  Your Honor.

16        THE COURT:  Okay.

17        MR. KIRPALANI:  Thank you, Your Honor.

18        THE COURT:  All right.  So what do we -- we move on

19  next to which of the motions?

20        MR. WISSNER-GROSS:  Next, Your Honor, I think is

21  Count 3.

22        THE COURT:  Count 1 and 2 or --

23        MR. WISSNER-GROSS:  That was Count 1 and 2.

24        THE COURT:  That was Count 1 and 2, all right.

25        MR. WISSNER-GROSS:  Just for clarity, Your Honor,

1  Count 2 was the intentional fraudulent transfer that was

2  dismissed, subject to Judge Cote's ruling; that may or may

3  not be reinstated.

4          THE COURT:  Okay.  Thanks very much.

5          MR. WADE:  Good morning, Your Honor.

6          Are you ready to proceed?

7          THE COURT:  Yes.

8          MR. WADE:  I'm Eric Wade.  I'm with Porter Hedges,

9  and along with my colleagues at Covington & Burling, and

10  Debevoise Plimpton, we represent the 19 former directors and

11  officers of Lyondell Chemical Company.

12          And, collectively, we filed a motion for partial

13  summary judgment on Claim 3 and 4.  Claim 4 was dismissed on

14  January 4th.  That leaves Claim 3 --

15          THE COURT:  Just give me a second to get my -- I got

16  it.  Go ahead.

17          MR. WADE:  That leaves Claim 3, and in Claim 3, the

18  trustee seeks to avoid, as a constructive fraudulent

19  transfer, certainly payments pursuant to Bankruptcy Code

20  Section 548.  Our motion for partial summary judgment

21  addresses two components of recovery that the trustee seeks;

22  payments for common stock and restricted stock, and the

23  second category, for payments of stock options paid in

24  connection with the merger.

25          I do have some good news, I believe, in our

1   discussions with the trustee, that the trustee no longer

2   opposes our motion for partial summary judgment, with respect

3   to common stock and restricted stock, which leaves us with

4   only the issue of the stock option payments for argument

5   today.

6           THE COURT:  Sig?

7           MR. WISSNER-GROSS:  Yes, Your Honor, briefly.

8           When we briefed this back in 2011, the underlying

9   case was still up, I think, or on bond consideration, and in

10  light of the outcome in that case, we've agreed with the

11  other side that we're not going to oppose their motion for

12  partial summary judgment, solely with respect to restricted

13  stock and common stock; that amounts to approximately $44

14  million of merger consideration that was received by the

15  Lyondell directors and officers.

16          We, obviously, opposed their motion for partial

17  summary judgment on the balance, and that's what we're

18  arguing on this morning.

19          THE COURT:  All right.  Go ahead.

20          MR. WADE:  So, Your Honor, I know you've heard a lot

21  about 546(e) this morning.  I want to address just a few of

22  the issues, with respect to the stock option payments.

23          We believe that they both, that they satisfy the

24  settlement payment defense and they're also securities

25  contracts under 546(e).

1          THE COURT:  Yeah, and, I mean on this argument, the

2    definition of securities contract in 741(7), which

3    specifically talks about option to purchase or sell interests

4    of security.  That's what I focused on so far.

5          Go ahead.

6          MR. WADE:  Yes.  I think when we really get down to

7    the key issue left in dispute on this issue of the stock

8    options is what happened with the option surrender agreement?

9    The option surrender agreement is referenced in the merger

10   agreement in Section 2.3, and the option surrender agreement

11   was designed to effectuate a way for the holders of options

12   to receive merger consideration, less the option price.

13          The option surrender agreement simply allowed the

14   holders of unexercised options to acknowledge that they want

15   to receive that merger consideration by signing the document.

16   The document went live the moment the merger closed and they

17   received their merger consideration, as outlined in merger

18   agreement Section 2.6, and they received their merger

19   consideration through the financial intermediaries, first,

20   Citibank, then Bank of America, and then the money was paid

21   to the option holders.

22          That option security agreement doesn't negate the

23   fact that we're paying -- the option surrender agreement

24   doesn't negate the fact that there's a payment on security,

25   so for that reason, and the reasons I think previously stated

1  in the Enron decision and other decisions we've discussed

2  today, we believe the payment of the options, pursuant to the

3  option surrender agreement satisfies a settlement payment,

4  pursuant to 546(e), and also because it's pursuant to the

5  merger agreement and the option security agreement -- the

6  option surrender agreement, they're securities contracts

7  under 546(e), so we satisfy both prongs.

8          THE COURT:  Okay.

9          MR. WADE:  If you have any other questions, I'm

10 happy to --

11         THE COURT:  No, thank you.

12         MR. WISSNER-GROSS:  Sigmund Wissner-Gross, again,

13 for the trustee.  Your Honor, this also involves an issue of

14 how does Enron, Madoff, and Tribune get applied and get

15 extended.  A couple of -- in this, involved $79 million of

16 payments that were made to the Lyondell directors and

17 officers.

18         First, the real issue as we see it is, whether an

19 option cancellation agreement or, in this case, it's an

20 option surrender agreement, has ever been treated as a

21 security for purposes of 546(e) or otherwise.

22         THE COURT:  Yeah, but here's where, in my comment

23 earlier that 741(7), which does specifically talk about

24 option to purchase or sell any such security, and in Ida

25 Fishman, the Second Circuit said:

1           "Thus, the terms securities contract expansively

2           includes contracts for the purchase or sale of

3           securities, as well as any agreements that are

4           similar or related to contracts for the purchase or

5           sale of securities."

6           While I've professed some uncertainty about what the

7    similar or related to means, I have less difficulty, with

8    respect to options, because 741(7) does specifically include

9    options.

10          MR. WISSNER-GROSS:  I'm not going to disagree that

11   the statute refers to options, and if what was at issue was

12   the payment, pursuant to the option, I wouldn't be standing

13   up here, but that's not what occurred.

14          And, again, I think what's critical for this

15   discussion is to look at what actually occurred.  And in the

16   case of these options, which were -- some were vested; some

17   were unvested -- the way in which the transaction occurred

18   was that these directors and officers of Lyondell signed an

19   option surrender agreement that resulted in the cancellation

20   of the options.  So none of them got paid for their options.

21   There was no exercising the option in payment, but that's not

22   what occurred.  They each signed an option surrender

23   agreement which, as a result, gave them the contractual light

24   to receive a payment in aggregate of $79 million.

25          There are some cases that I've looked at, of whether

1  an option surrender agreement or termination agreement can be

2  viewed as a security, and, fortunately, there are two cases

3  that I can call to Your Honor's attention that we cited in

4  our briefs.  One is KSC, 168 B.R. 991, (D. Colo. 1994) and

5  the second is the Gallagher case, 618 F.Supp. 1480, (W.D. Pa.

6  1988)[sic].

7          Your Honor, we've looked and we haven't found any

8  cases that stand for the proposition that an option

9  cancellation agreement like this has ever been considered a

10  security, whether for purposes of 546(e) or otherwise;

11  there's just no cases supporting that point.

12          THE COURT:  Either way?

13          MR. WISSNER-GROSS:  No, I think that the case --

14  there is some discussion in the cases about, I believe, about

15  whether termination agreements should be viewed as a

16  security, for purposes of 546(e), and I think the only -- to

17  the extent there's a discussion, similar to this situation, I

18  think Courts had found supporting our position, not in

19  support of the position advanced by the other side.

20          So, we would submit, Your Honor, that as to the

21  actual transaction that occurred, which was payment, pursuant

22  to the option surrender agreement, that it was payment for

23  contract rights, just as these Lyondell directors and

24  officers are also being sued on a clawback basis for other

25  payments they received.  For example, there were some change

1    of control employment related payments, about 144 million;

2    that's serious money.  They're not contending that those are

3    subject to 546(e), nor are they contending that since somehow

4    the payments occurred because there was a merger, that it

5    somehow related to or similar to a security or a security

6    agreement was involved; they're not advancing that.

7         Your Honor, we would submit that, again, by virtue

8    of how this payment was structured, that the fact that the

9    payment was structured as a payment pursuant to contractual

10   light, that resulted in the termination of the options or

11   contract right for payment, that that took this particular

12   payment clearly outside of 546(e).  And we would submit, Your

13   Honor, that at least with respect to their motion for partial

14   summary judgment directed at this transaction, that it is not

15   entitled to any benefit under safe harbor, whether under

16   Tribune, Madoff, or other cases.

17        Thank you, Your Honor.

18        THE COURT:  Thank you very much.

19        Mr. Wade?

20        MR. WADE:  Very briefly, yes.

21        Your Honor, with the two cases that Mr.

22   Wissner-Gross did refer -- just referred the Court to, with

23   regard to KCS [sic], that case is easily distinguishable.  In

24   that case, the security at issue wasn't in existence at the

25   time the contract at issue was executed.  The security at

1   issue sprung to life later on.

2          So, in our case, the security at issue is the

3   option; that was created long before this transaction was

4   contemplated and the merger agreement created the mechanism

5   to pay it.

6          And with regard to the Gallagher case, Your Honor,

7   that case offers no analysis of whether the transaction at

8   issue was a securities contract or not, for purposes of

9   Section 714 [sic].  So, we don't think the case law --

10         THE COURT:  741.

11         MR. WADE:  741, excuse me.  The case law is helpful

12  for Mr. Wissner-Gross in that regard.

13         If you have any other questions, I'm happy to answer

14  them.

15         THE COURT:  I don't.

16         MR. WADE:  Thank you very much, Your Honor.

17         THE COURT:  Okay.

18         MR. KIRPALANI:  Your Honor, can we just take a five-

19  minute bathroom break before the next count?

20         THE COURT:  Absolutely.

21         MR. KIRPALANI:  Thank you very much.

22         THE COURT:  Why don't we even take a ten-minute

23  break?

24         MR. KIRPALANI:  Okay.  Thanks.

25         THE COURT:  All right.  We'll take a ten-minute

1    recess.

2              THE CLERK:  All rise.

3        (Recess taken at 11:17 a.m.)

4        (Proceedings resumed at 11:30 a.m.)

5              THE COURT:  Please be seated.

6              MR. POHL:  Good morning, again, Judge, Steven Pohl

7    from Brown Rudnick for the plaintiff trustee.  We'll be

8    addressing Count 9 --

9              THE COURT:  Right.

10             MR. POHL:  -- a preference motion, and that will be

11   addressing our motion and the Access motion and maybe I'll

12   spend time on rebuttal.  I'm not sure.

13             As the Court knows from the pleadings, this is about

14   a three hundred-million-dollar advance by Access to Lyondell

15   and repayment during the preference period under the Access

16   revolver.

17             And before I get into case law and the myriad of

18   facts, a couple of upfront observations I wanted to make

19   about why this debt incurrence is not ordinary.  And the only

20   thing that is ordinary about it, is that it was

21   extraordinary; that's the only thing that's ordinary.

22             It was a loan made during a liquidity crunch.

23   First-time loan by Access to LBI, and Access, as the

24   controlling shareholder, never before provided a loan

25   remotely like this, to any affiliate.  No other source of

1   cash or credit was available at the time.  The phantom draw

2   of April 28th, 2008, it was discussed, Access reacts with

3   disbelief.  The October draw in 28 [sic], when it was finally

4   taken, was in an emergency need.  All parties at the highest

5   levels of Access, and importantly, at Lyondell, knew it was

6   bad to have to ask for that loan from the boss.

7           It was repaid immediately as a preference and we're

8   supposed to accept that this is order why?  Because we have a

9   kitchen sink of documents from Access where they try to weave

10  in as many facts as possible to try to make this, what really

11  is an extraordinary transaction, into something that somehow

12  "round peg fits into a square hole" of a preference.

13          But the laws, in fact, were written for exactly this

14  reason.  A little more about Access to put in context why

15  this loan is not ordinary.  And this is not meant to be very

16  pejorative in any sense -- because Access is very good at it

17  -- but what private equity firms do is they use other

18  people's money.  OPM was even a leasing case with that name

19  many years ago.

20          They put in as little equity as they can, and we saw

21  that in the Basell transaction, 20 percent equity, 80 percent

22  debt; that was the Basell acquisition in 2005.  And we saw

23  that here; no cash equity put in.  Access is always saying,

24  what we put in was Basell.  It may be true, but no cash

25  equity record reflected that the banks initially asked for

1   equity.

2          Why did they do that?  We all know private equity

3   firms' recoveries aren't based upon debt metrics; they're

4   based upon equity recoveries, and you boost those by using

5   leverage and debt, and Access fits this mold.  And we've seen

6   that because the only company remotely the size of Lyondell

7   was Basell.  So, all the evidence put in about advances to

8   affiliates, not a dollar ever to Basell; only equity, no

9   debt.

10          And as a final gut-check before we get into the law

11  and the real nitty-gritty of the facts, you know, what we

12  have here, Your Honor, is a

13  three-quarters-of-a-billion-dollar unsecured revolver behind

14  $20 billion of secured debt.  There's no evidence in the

15  record of any case law that is remotely similar to that.

16          A couple of overriding policies, with respect to

17  references, that I'd like the Court to have in mind when I

18  have in my mind when I think about it, and there's a recent

19  case -- at least, it was post the initial briefing; it was

20  noted in the supplements -- out of the Southern District of

21  California, the Epic Cycle case, that said:

22          "That the ordinary course defense is not intended to

23          shield stockholders from preference liability for

24          short-term loans to the debtor to maintain

25          operations, despite capitalization problems."

1        And further said that it's:

2        "-- designed to protect trade creditors and other

3        transactions in the ordinary course of the debtor

4        and creditor's business."

5        And there's a myriad of other cases that discuss

6   how, usually, what you see, like in Kelly's Chocolates, is

7   multiple transactions between a debtor and a creditor.

8        As I said, Your Honor, the record is somewhat

9   developed here, and we put together a few slides that we

10  thought would distill it for the Court, and I'd like to go

11  through them.

12       THE COURT:  I have it.  Just give one over to my law

13  clerks, okay?  Thank you.

14       MR. POHL:  I don't have this up on a screen, Your

15  Honor, so let me just get my copy.  I don't know what I did

16  with my copy.  It's right here.

17       So I'm going to try to flip through these pages

18  relatively quickly, because I know that the Court has seen a

19  lot of this.  So, just turning to Page 3, comparing

20  pre-merger liquidity to post-merger liquidity, a vast sea of

21  difference.

22  Page 4, details to the Court that as early as two months

23  after the closing of the merger, Lyondell, internally, LBI,

24  Access, all recognizing liquidity concerns.

25       Page 5 lays some of those out, and I thought for the

1  Court's reference, later on and after the hearing, you can

2  look back at some of the exhibits themselves; for example.

3          Page 6 is an exhibit from the treasurer department,

4  Karen Twitchell, at Lyondell.

5          And Page 7 is an email, internally, at Access,

6  talking about the liquidity crisis immediately post-merger.

7          This is largely in a chronological order.  At the

8  same time as the concerns within Access and LBI, it made its

9  way to lead arrangers.  They're flipped out.  They're

10  nervous.  There's a few exhibits there, as well.

11          Page 11 starts a few facts on why the incurrence is

12  not ordinary for Lyondell, and from these facts who are to

13  both, Lyondell and Access, I don't reference these twice,

14  Your Honor.  But, with respect to Lyondell, never before had

15  it borrowed money from an affiliate.

16          In March 2008 when they put the revolver in place,

17  at all levels, Kim Potter, who was a supervisory board

18  member, and even during the bankruptcy, became the CFO of

19  Lyondell, admitted this money was not available anywhere

20  else, other than a related party, and Page 14 highlights

21  that, from within Access itself, where Mr. Patel says there's

22  no liquidity anywhere, unless there's an alternative

23  universe.

24          And Page 15, you know, just provides the Court with

25  some of the factual background for that.  Because, I think I

1   said earlier, not only in connection with the acquisition of

2   Lyondell in 2007, did the banks want equity, but here, you

3   know, that foreshadowing came true and they were, again,

4   asking Access for equity.  Equity was not forthcoming, and

5   that's why the revolver was put in place.

6            Page 17, record is filled with indications that, you

7   know, we put this in place, but we don't expect you to draw

8   it.

9            Page 18, at the time of the April initial draw, a

10  lot of attention within Access, within Lyondell, trying to

11  reduce the chance that that draw would have to be taken; in

12  fact, they did reduce their chance of they didn't have to

13  draw it in April.

14           But they laid out on Page 19 how they're running the

15  company.  Head of Treasury, Karen Twitchell, doesn't run the

16  company or isn't (indiscernible) run the company, with the

17  anticipation that we're going to be able to draw on this

18  equity from our shareholder.  That's all in the record.

19           Outside of the contract, which simply says, if you

20  need money, give us one day's notice, draw.  It's yours.

21  There was a lot of extra contractual demands put on LBI to

22  report to Access, and they were able to get that cooperation,

23  because they own the company.  A third party wouldn't be able

24  to get that cooperation unless it was in the contract.

25           Again, the October draw, this is very bad.  This is

1  terrible.  And this wasn't just at the Access level.  That

2  was, you know, delivered to the most senior people at

3  Lyondell, and even if you look at Page 22 -- and I apologize

4  that I don't have this part circled -- but there's an email

5  from the CEO of LBI, Victor Crouch, to Mr. Blavatnik.  And he

6  says, at the end, that we still have a realistic chance not

7  to draw on the Access revolver.

8           Now, this is the CEO of the company that has the

9  right to draw the money, talking to his boss, hey, we might

10 be able to get away without it.  If it wasn't for the boss,

11 he could draw it any time he wanted, as long as he was not in

12 default.

13          Page 23 just goes through the facts of Access

14 putting itself in a position to get the money back

15 immediately, within a week, after the draw in October 2008;

16 emails that support that same notion.

17          And one of the interesting things that we found in

18 the record on Page 25, Your Honor, is -- and this would never

19 show up in a third-party arrangement -- Project Aquifer, sort

20 of an appropriate name for finding liquidity, says, hey, you

21 know, when we put this revolver in place, maybe in order to

22 ensure we get repaid, we'll talk about management penalties

23 for lack of timely repayment.  An interesting notion that I

24 think shows you, again, why this is extraordinary, and all

25 that's laid out further in the exhibit on Page 26.

1    I talked earlier about the response in April.  I did

2   mention that this made its way all the way up to Lyondell,

3   and that's shown on Page 28.  The internal discussions shown

4   in the email on Page 28 at Access were clearly made known to

5   Ms. Twitchell and maybe others.  As Mr. Patel indicates, he's

6   not in Houston sharing the emails, so the message is clear,

7   you know, you should not draw on this revolver; that would be

8   very bad.

9    Page 29 goes into Access and, you know, there's a

10   lot of information in the record with the Richard Storey

11   declaration, in response to our motion, where Access tries to

12   justify this as being ordinary, because that's what it does

13   with its other affiliates.  So, a little background that's in

14   our factual declarations that describe Access on its website,

15   what it does; you know, it's a private equity firm and here's

16   its investments.  It's not identified anywhere as a lender.

17   You know, this revolver was the first time a loan was ever

18   made as a revolver.

19    Prior advances, on Page 32, Your Honor, based upon

20   discovery from Mr. Storey, the CFO at Access, both by way of

21   documents and deposition, made clear that the prior

22   transfers, as best as we could tell from the discovery we

23   were given, Your Honor, were much, much smaller.  Whether

24   they were for startup companies or not, you know, we don't

25   have that level of data; it wasn't provided to us.  But to

1   pay specific bills, they had a couple different kinds of

2   advances and it's noted in our record, and it's noted here,

3   one was a two-page note.  I think we got 15 of those -- no

4   maturity, no interest -- and, eventually, the 15 notes were

5   turned into just book entries.

6           And the record has it in it, that we'd get a page

7   with multiple entries -- it was a general ledger -- and

8   that's how they maintained the other entries, which were not

9   by note and that was -- I don't know, we counted it up -- 250

10  or more over a period of time.  Small or exacting numbers.

11  None ever paid by the time the repayment was made under the

12  Access revolver.  No interest.

13          So, you think of them as startup companies, maybe

14  some were more mature and they were short-term loans, but

15  they were nothing like the Access LBI loan.

16          Page 33, we've noted this, you know, whether or not

17  this was just because it was easier to use the third-party

18  revolver that they had versus their own agreement, you know,

19  they, obviously, didn't have their own agreement.  They had a

20  two-page loan, so they had to crib it from the existing loan.

21          I talked about Page 34 already, Your Honor, as to

22  the background of the other loans that, here, are presented

23  as, you know, here are our analogies and why they should

24  count for us, no interest, no income.  The same with the

25  trade receivables, and on the bottom of Page 36 kind of gives

1   you the range.  Look, they're as small as $93.  They're as
2   big as five and a half million dollars, but, again, no
3   maturity, no repayments, no interest.
4           We've made it clear in our papers on Page 37, why
5   this is different.  It was because they needed to get an
6   additional upsizing of the asset-based revolver from the
7   banks.  We've noted in our pleadings that we haven't been
8   able to see from Access, because they refuse to give us
9   information on their affiliates.
10          And if you look at Page 38 -- this is kind of
11  interesting -- this is a letter exchanged between the
12  trustee's counsel at the top and the Access' counsel at the
13  bottom.  And if you look at the second sentence of the second
14  paragraph where it begins, "There simply is ..." it says:
15          "There is simply no basis in a relevant statute for
16          seeking discovery of an affiliate of the transferee"
17          --
18          Transferee, here, being Access.
19          "-- the statute plainly directs the inquiry to the
20          ordinary course of the business or financial affairs
21          of the debtor and the transferee."
22          Well, the briefing doesn't say that and we know the
23  law is different.  You know, as long as Access has to rely on
24  the debt incurrence prong of its business, because it can't
25  rely on the prong between it and Lyondell's business, it has

1    to show that its transfers within its business to others are

2    similar.  And there's case law that says similar in size,

3    similar position of transferees.

4         And we got sheets with names about the transfers,

5    but we didn't get evidence of what those companies do and how

6    they were similar, if at all, to LBI.

7         We've got in the record, information about liquidity

8    concerns.  We've got information in the record about the

9    liquidity both, in October and in April.

10        And on Page 42, you know, in the August time frame,

11   it was made after Access, internally, was already talking

12   about Chapter 11, so this was not a surprise.  This is not

13   completely a story where, you know, the world changed the day

14   after the transfer, you know, for the bankruptcy.  That's

15   what Access' papers are filled with.  This not news.  There's

16   no newsflash here.

17        On Page 43, you know, we have the only evidence in

18   the record by an expert that is hired to give an opinion of

19   the solvency on the transfer date.  There's a lot of expert

20   testimony that the Court will hear in October about solvency.

21   The December 2007, we have the only expert evidence on

22   solvency, as of the transfer date, and we put on Page 43 and

23   we have it in the record, what that says.

24        Starting on Page 45, Your Honor, this talks about

25   the repayment and whether the repayment transfer was

1  ordinary.  We don't think we have to get to that because we

2  proved the incurrence, but this is one of Access' defenses.

3  They say it was paid, but it was ordinary.  We say, not

4  really; they had a year and a half to pay, you made sure they

5  paid within a week.  You controlled the payment.  You're on

6  both sides of the equation.

7       And on Page 46, this is the dialogue about how they

8  made sure that they were going to be paid.

9       The rest of this deck, Your Honor, I don't want it

10 go through, other than to point out that on Page 51, this is

11 just one of the standards -- elements for preference that

12 unsecured creditors, which is unless we found a way to

13 subordinate the claim, it would have been an unsecured claim,

14 and they got around 17 cents on the dollar.

15      THE COURT:  Can I -- Mr. Pohl, you've focused your

16 entire argument on defeating the Access defendants motion for

17 summary judgment, which focuses on the ordinary course by

18 cross-motions.  I have your motion, which you haven't

19 addressed.

20      And it seems to me that, yes, you've established the

21 transfers were made by Lyondell to Access, a creditor, that

22 first.  Second, that the transfer was made on account of an

23 antecedent debt.  Third, the transfer was made within 90

24 days.  Fourth, the transfer enabled access -- this is the

25 point you were just addressing -- to recover more than it

1   would in a Chapter 7.

2           But the -- one of the focuses of their opposition to

3   your motion is that you failed to establish whether the

4   transferred property was property of Lyondell and that

5   Lyondell was insolvent at the time of the transfer.  You've

6   just addressed the issue that you have an expert who will say

7   they were, but it does seem to me that they've disputed --

8   and I know about the presumption and all that, but the issue

9   is, have they specially disputed the issue of whether

10  Lyondell was insolvent at the time of the transfer.

11          So, what I'd like for you to do is address both, the

12  issue of whether this was a transfer of property of Lyondell

13  and, also, whether Lyondell was insolvent at the time of the

14  transfer.  This is -- like I said, your entire argument was

15  addressed to their defenses, to defeat their motion for

16  summary judgment, but you haven't addressed your motion for

17  summary judgment.

18          MR. POHL:  Okay.  Sure.

19          But just to be sure that we're both on the same page

20  and I'm not getting this wrong --

21          THE COURT:  Okay.

22          MR. POHL:  -- our motion is focused on, not only

23  having to establish the five elements, but also showing that

24  the debt incurrence element of the ordinary course defense

25  cannot be met.  So their motion lays out the kitchen sink of

1   ordinary course that was incurred in the ordinary course,

2   repayment was made in the ordinary course, okay.

3          So, we're saying -- and I'm going to get to your

4   points -- we're saying if we established the five elements,

5   we also can establish that they don't have a defense, because

6   we simply have to show that as long as the debt was not

7   incurred in the ordinary defense [sic], that sinks their

8   entire defense.  So, the facts that I've laid out were

9   intended to go to that, and maybe I didn't make that clear.

10          They raised a couple of defenses, and I will take

11   them in the order that I think I heard you say.  They also

12   rate -- raised contemporaneous exchange.  You didn't mention

13   that, and so that, maybe, is a clue to me that you don't want

14   to hear it, but I have that hear and can make that, as well.

15          THE COURT:  Go ahead.

16          MR. POHL:  Well, so why don't we just take

17   contemporaneous exchange.  And I guess my response to that --

18   maybe because you didn't ask me -- is it simply can't be

19   serious and just shows their desperation.

20          This is a revolver.  When you want the money, you

21   take the money.  It gets paid when the debtor wants to repay

22   it.  That transaction of revolving credit, it screams up, I'm

23   a credit, I'm a credit transaction.  What else could I

24   possibly be?

25          The elements of this defense is that new value was

1  provided.  Well, there was no new value, and the case law

2  makes clear that if an antecedent debt is paid, that's not

3  new value, and nothing was given afterwards.  And the new ESA

4  case in the Fourth Circuit makes that clear.

5        Agriprocessors is another case, since the initial

6  briefing also makes clear that even if it's a short-term loan

7  for a day, that's a credit transaction.  I don't think I need

8  to say more about that.

9        With respect to the property interests, you know,

10  we've addressed that in our pleadings.  And the Fifth

11  Circuit, Southmark case from 1995 is probably one of the

12  leading cases, at least one of the leading cases that we

13  cite, and that makes clear that we have alleged -- we have

14  alleged in our pleading, legal title.

15        And what Southmark says is, even if there is a

16  centralized cash management system, as long as we, the payor

17  -- here, Lyondell -- has access to that centralized cash, it

18  can use that cash to pay its creditors, then the standard is

19  met.  The standard is met -- what the Court said is:

20        "The primary consideration in determining if funds

21        are property of the debtor's estate is whether the

22        payment of those funds diminished the resources from

23        which the debtor's creditors could have sought

24        payment."

25        The answer there is, clearly, yes.

1         We have cited, you know, other cases in our brief,

2    Your Honor, but we think we've properly alleged and the case

3    supports --

4         THE COURT:  Oh, I think you've alleged it; the

5    question is summary judgment.

6         MR. POHL:  No, I understand.  I know it's summary

7    judgment.

8         THE COURT:  I don't have any doubt that you've

9    alleged it.

10        MR. POHL:  So, I take that back.  I know that's a

11   motion to dismiss standard, but we think we've shown it, not

12   only with what we've said and what the facts are and what the

13   case law says.

14        THE COURT:  Well, the issue -- and I don't know

15   whether Mr. Kirpalani or somebody else is going to argue it

16   -- is whether they've shown that their disputed issues of

17   fact about whose property was transferred.  I -- there's no

18   question in my mind that you've properly alleged --

19        MR. POHL:  I understand.  I understand.  I

20   understand.

21        And we don't think there can be, given that the

22   funds that were paid were -- that Lyondell had the authority

23   to use it, and they used it and they paid us.  They paid

24   Access -- not us -- excuse me.

25        THE COURT:  Okay.  All right.  Go to the insolvency

1    issue.

2         MR. POHL:  On solvency, so, obviously, there's a

3    presumption; the Court is well aware of that and the standard

4    for Access to rebut the presumption; number one, Roblin tells

5    us that there has to be evidence of fair value; that is:

6              "If sold in a prudent manner, within a reasonable

7              period of time to pay the debtor's debts."

8         That's what Roblin says.  They don't have an expert

9    that says that and we have an expert that says otherwise.

10        And Emerald Oil tells us -- that's a Fifth Circuit

11   case -- that where the defendant doesn't have an expert to

12   testify about assets and liabilities, then the presumption is

13   not met.

14        What else does Roblin tell us and Emerald Oil?  That

15   the testimony and evidence has to be a seasonal appraisal or

16   expert testimony.  And Emerald Oil says, again, you can't

17   just poke holes in the plaintiff's evidence.  Access says

18   that all you need is minimal and we've met minimal and they

19   cite Roblin for that.

20        Roblin doesn't say minimal.

21        THE COURT:  It can't be that the only thing you can

22   put on is an expert to testify about values.  That may be, at

23   the end of the day, the most persuasive evidence, but does

24   that preclude a CFO from testifying, we were solvent because,

25   and laying it out?  I mean it can't be that the only way of

1  rebutting your evidence is through an expert.  It may be the

2  usually way.  It may be that the absence of an expert who's

3  going to testify ultimately will -- you know, I'll find their

4  lay witness testimony unpersuasive for the issue of summary

5  judgment.

6       MR. POHL:  Okay.  So let me try to address that.

7  One, we have the presumption.  So the question isn't, is an

8  expert witness for us enough?  We have the presumption, so

9  did they rebut it?

10      THE COURT:  That's the question.

11      MR. POHL:  And what we've said in our papers, and I

12 will make mention of all of it, everything that they've

13 thrown in -- and, you know, they've done a great job; there's

14 a kitchen sink here they've thrown in, I don't know how many

15 pages of exhibits and how many pages of fact, you know,

16 allegations, all of which we addressed -- all fit into the

17 following categories:  Expert opinion would help, following

18 Rule 26, without having an expert; improper lay opinion,

19 there's a lot of analysis done, not by an expert of -- on our

20 own expert's report, and derivations of that, and if we

21 assume this and we assume that DCF that we get here; or a

22 retrojection and projection from their own experts used -- to

23 be used at trial in October for the LBO [sic] insolvency

24 date; the Citibank valuation, rank, inadmissible, hearsay,

25 and many different flavors, based upon that.

1          Then there's a myriad of other sets of data, which

2    I'd like to address, because there's -- the case law

3    addresses whether that is good enough or not good enough.

4    Let me just run a few -- through a few of them, as to exactly

5    what Access provided.

6          Number one, book value of assets, look at Ames; that

7    tells you it's not enough.  You know, it shouldn't be as easy

8    as looking at -- we all know what large Chapter 11 cases look

9    like.  We all know that they say there's $40 billion of gap

10   assets and then two months after issuing those, we're in

11   bankruptcy with a first day declaration that says, the

12   secured debt is impaired.  So it's -- you can't just look at

13   those and say, we're done, it's in the SEC report, it's done.

14   The case law recognizes that that's not the case.

15         Bankruptcy schedules, same thing.  I mean, they're

16   really based upon the gap financials, at least when it comes

17   to -- and, Your Honor, I'm sure is familiar with this --

18   sure, you can list what your receivables are and you can make

19   assumptions as to what that's worth and compare that to the

20   gap financials that were maybe issued before and that has an

21   allowance for down flow accounts.

22         But, you know, what's a valuation of a company in

23   bankruptcy?  It's what does the business generate in cash to

24   reflect the valuation.  It's not driven by what does a

25   balance sheet say.  We know, that especially when we can look

1   at, you know, often, the biggest line item, and here, it

2   would be true as well.  Property, plant, and equipment, you

3   know, that is a historical number.  There isn't a requirement

4   that that be mark to market.

5          There are requirements, other parts of the balance

6   sheet, right; intangibles, where you have to look at goodwill

7   and mark down goodwill, but you don't have to mark down the

8   historical cost of gap property, plant, and equipment.  You

9   have to depreciate it.  And sometimes it could be worth more,

10  sometimes it could be worth less.

11         I've mentioned the Citigroup valuation; that's

12  hearsay.  The fact that LyondellBasell was in compliance with

13  its debt covenants, the Keydata case tells it, that's of no

14  help, you know, so what?  So what?

15         THE COURT:  Well, what you're arguing may be the

16  most persuasive at trial, but the issue is whether you've

17  satisfied a summary judgment standard of no material disputed

18  issues of fact.  That's what's bothering me.

19         MR. POHL:  I get that and I come to this Court

20  understanding that if I look at my own scorecard here, I

21  think I have a pretty solid case that this debt was not

22  incurred in the ordinary course.  And I know that the Court

23  has reams of data on solvency and, you know, may be

24  struggling with that.

25  We believe that --

 1          THE COURT:  I may not struggle with it at the trial,

 2   but this is summary judgment.

 3          MR. POHL:  So, the point I want to make, Your Honor,

 4   is a homerun, is we walk away with summary judgment in our

 5   favor.  A double might be more like the Court, you know,

 6   narrowing what needs to be addressed at trial.  There's, you

 7   know, a motion that the defense for ordinary course should

 8   save the day.  I think that motion should be rejected.

 9          Our motion for summary judgment that says the

10   incurrence test, pretty clearly, is not met.  We think we win

11   there.

12          The double would suggest that the Court makes us go

13   to trial on solvency.  We don't want that, but we recognize

14   that's a little bit more of a difficult thing for the Court

15   to get to today.  We still think the case law supports the

16   notion that presumption is not rebutted by the types of

17   evidence that have been thrown in.

18          But I can move on from solvency, if Your Honor likes

19   --

20          THE COURT:  Go ahead.

21          MR. POHL:  -- and move to the other elements of our

22   main case in chief.

23          So, I highlighted the facts that we think are

24   important to why the debt was not incurred in the ordinary

25   course of business and I'm not going to replay all of those.

1   But all we have to show, again, is in 547(c)(2), at least,

2   with respect to establishing as no defense, not with respect

3   to all of the elements of the preference.

4        To the extent that such transfer was in payment of a

5   debt incurred by the debtor in the ordinary course of

6   business or financial affairs of the debtor and transferee,

7   why did do we win?  Access has two choices here.  They have

8   to show that the revolver was incurred in the ordinary course

9   of business between Lyondell and Access or it was routine and

10  ordinary in the context of both parties' normal operations.

11  The first one is the between test.  The second one is the or

12  test.

13       Access latched on to one of our arguments, Your

14  Honor, that we highlighted that this was a first-time debt

15  between affiliates, and they latched on to that to say

16  there's no per se rule.  I just want to make clear that we're

17  not standing before this Court to suggest that there's a per

18  se rule.  We recognize that there isn't a per se rule.  But

19  that doesn't mean that if it's a first-time debt between

20  affiliates that the same standard does not have to be met,

21  which I will get to.

22       Now, as to the between test, I think it's pretty

23  clear that there's no prior history between Access and

24  Lyondell.  And the other cases that would tell you that you

25  can use the between test, Fuldom (phonetic) and Buckhead,

1    hundreds of transactions, so we can dispense with that.  It

2    doesn't apply.

3          So now what does Access have to do?  They have to

4    show that in the context of both parties, normal operations,

5    that this was consistent with their practices, routine and

6    ordinary for both, Access and LBI, in arm's-length.  That's

7    in any number of Circuit decisions -- the Hassan case of the

8    Ninth Circuit -- there's several others.

9          I'm going to wait until the end, Your Honor, but

10   because I think it would just disrupt, but we put together a

11   chart, which I'll hand up when I'm finished with the

12   argument, that lays out the case law in a graph between

13   arm's-length and prior history.  And it's like reading, you

14   know, that quadrant in your Marketing 101 book, where you try

15   to figure out which company is the cash cow and which isn't.

16   And they tell you down in the bottom-right quadrant, if you

17   have these two factors, you're a cash cow.  Well, if you look

18   at the quadrant that says, not arm's-length and first-time

19   transaction, that if we win.

20         I think that I've covered sufficiently in our

21   papers, and we'll rely on that why it is that, with respect

22   to Access' defense that the transfers, the repayments were

23   ordinary, we've laid that out.  I've got the facts that we

24   have in our papers.

25   I've got a few minutes for rebuttal, unless the Court has any

1  questions at this time?

2          THE COURT:  No, that's fine.  Thank you.

3          MR. KIRPALANI:  Good afternoon, Your Honor.  For the

4  record, Susheel Kirpalani from Quinn Emanuel, for Access

5  Industries Holdings.

6          Can I hand up my --

7          THE COURT:  Of course.

8          MR. KIRPALANI:  -- my goodie bag?

9          THE COURT:  Thank you.  And it's on my screen.

10         MR. KIRPALANI:  Thanks.

11         Not surprisingly, we have a very different view of

12 what the facts actually show about the Access revolver, so

13 I'd like to show you some history and some context.  Whether

14 it's at summary judgment or at trial, the facts, obviously,

15 do matter, more than the rhetoric; plus, all of Mr. Pohl's

16 storytelling amounts to drawing a lot of inference -- a lot

17 of inferences on what parties meant when they wrote emails,

18 and that he's asking the Court to draw those inferences in

19 his favor and that's the opposite of summary judgment.

20         When the disputed facts are reviewed, we think it's

21 clear that the trustee's motion for motion for summary

22 judgment cannot be granted, but despite the factual disputes,

23 these transfers at issue were absolutely ordinary course of

24 business, part and parcel of LyondellBasell Industries' usual

25 revolving credit transactions and not preferential in any

1  way.

2          So, let's remember that LyondellBasell, or LBI, was

3  born through a merger that closed on December 20th, 2007.

4  Mr. Pohl talked about Lyondell Chemical's history and the

5  nine years prior.  We're talking about a different company.

6  We're talking about the ordinary course of business of LBI,

7  and LBI was only born on December 20th.

8          The bank revolver signed on that date specifically

9  contemplated an additional unsecured debt facility of up to

10  $750 million and that's contemplated on day one of LBI's

11  existence.  But, for the first few months, there was just the

12  2007 revolver, provided by the banks, and we show that on the

13  right of the slide here; that's the 2007 bank revolver.

14  We're going to show you the Access revolver on top of that in

15  a second.

16          Starting at the end of the first quarter of 2008 --

17          THE COURT:  But does the fact that another revolver

18  was contemplated, make it ordinary course of business?

19          MR. KIRPALANI:  Well, there's several things

20  embedded in that question, Your Honor.  The actual facility

21  itself was ordinary and contemplated and anticipated, but the

22  statute, ordinary course, deals with the draw and the

23  repayment, not even the entry into it.  But I want to tell

24  you about the entry into it, and how it was contemplated

25  since LBI's beginning simply because it gives you the full

1  factual record of what we're talking about seven months

2  later.

3          So, starting at the end of the first quarter of

4  2008, LBI's group treasurer, Karen Twitchell, she was a

5  legacy Lyondell Chemical person -- not an Access person --

6  arranged to supplement LBI's overrule all liquidity options.

7  She did that in three ways over a several-week period in

8  March and April.  First, on March 27th, 2008, LBI obtained a

9  seven-hundred-and- fifty-million unsecured facility that was

10  contemplated by the bank revolver from Access Industries

11  Holdings.  That's the Access revolver that the trustee is

12  suing for here.

13          Then a couple of weeks later, in mid-April, LBI

14  amended its European securitization facility by upsizing its

15  150 million -- by $150 million.

16          And, third, also in April of 2008, LBI upsized its

17  asset-based loan facility by $600 million, pursuant to its

18  accordion feature.

19          So this history is important because it shows that

20  these three facilities were part and parcel of LBI's effort

21  to build in flexibility, as and when needed, for the new

22  megacompany, where cash needs could swing, according to Ms.

23  Twitchell, by half a billion dollars a day, on any given day.

24  But none of this suggests something untoward or improper;

25  it's just sound planning by a newly formed global business

1  enterprise.

2        Let's go to May 13th.  By May 13th, 2008, after all

3  the allegations that Mr. Pohl said was horrible and all the

4  bad things, there's no liquidity anywhere -- all these emails

5  that he wants you to draw inferences from -- on May 13th, LBI

6  had paid all outstanding amounts under its 2007 revolver with

7  the banks on the right there.  It's all repaid.

8        And from May 14th to July 27th, there were no draws

9  at all under the bank revolver.  The full revolving credit

10  facility and the supplemental Access revolving credit

11  facility, remained available to LBI from May 14th to July

12  27th, 2008, without any draws.

13        But as you would expect, and more importantly, this

14  fact is undisputed, LBI only drew an its revolving credit

15  facilities when it needed the cash and it repaid it as soon

16  as the cash was no longer needed for everybody.  In July

17  2008, the Houston refinery began its planned turnaround of

18  one of its units and that was expected to last 60 days and

19  cause a decrease in cash flow.  Then, on July 18th, the there

20  was a series crane accident at the Houston refinery, which

21  extended the duration of the turnaround.

22        By the end of July, LBI, once again, tapped its 2007

23  revolver, and at the end of August 2008, Hurricane Gustav hit

24  Houston and LBI drew 150 million on the 2007 revolver.  And

25  just two business days after that hundred and fifty-million-

1   dollar draw, LBA [sic] repaid the draw, because it didn't

2   need the cash anymore.

3          Later, in September, another hurricane hit Houston

4   and that caused most chemical plants in the Gulf Coast to be

5   shut down.  And then, of course, Your Honor knows that on

6   September 15th, 2008, Lehman Brothers filed for bankruptcy

7   and displaced much of what was known or was knowable in the

8   business world.  And while all of this was happening, LBI,

9   expectedly, began making more use of its revolving credit

10  facilities.  That's what revolving is there for.

11         And between September 9th and October 9th, 2008, LBI

12  tapped its bank revolver 11 times and that left only $11

13  million available under that primary facility, heading into

14  mid-October.  And so now we come to the draw and the

15  incurrence and whether it was ordinary or not.

16         So then what happens in October is what LBI expected

17  to happen from the get-go.  Seven months after the Access

18  revolver was put into place on October 9th, at the regular

19  weekly update between LBI's group treasurer, Karen Twitchell,

20  and Access Industries' chief financial officer, Rich Storey,

21  on Thursday, October 9th, LBI informs Access it will likely

22  need to tap the Access revolver mid-month and that cash would

23  be needed for a few days to cover an anticipated shortfall.

24         So, on October 15th, as projected by LBI's

25  treasurer, on Wednesday, October 15th, sent a letter -- sent

1  a draw request -- I'm sorry -- they sent a draw request to

2  Access Industries Holdings, in full compliance with the terms

3  of the Access revolver, and Access honored the draw and wired

4  the $300 million to the account designated in the request,

5  exactly in conformity with the revolver that's been in there

6  in place for seven months.

7          The next business day, on Thursday, October 16th,

8  LBI sent a formal notice of repayment, pursuant to the terms

9  of the Access revolver, and repaid 100 million.  The next

10 business day, on Friday, October 17th, LBI followed the same

11 course; issued a payment renotice and paid another $100

12 million.  And then on the next business day, Monday, October

13 20th, LBI issued another repayment notice and paid the

14 balance of the borrowing, reducing the Access revolver to

15 zero, but it doesn't stop there.

16         The repayment of the revolver draws was not unique

17 to Access.  LBI was in the process of building cash from the

18 operations and didn't unnecessarily carry revolving loan

19 balances.  Ms. Twitchell testified about this; it's

20 undisputed.

21         On November 4th, with $969 million drawn on the 2007

22 revolver, in the ordinary course of LBI managing its cash,

23 LBI repaid $140 million to the banks, and then three days

24 later, on November 7th, LBI repaid another $428 million on

25 the bank revolver, and then on November 17th, LBI repaid

1   another $100 million on the bank revolver.  All of this

2   activity was part and parcel of LBI's cash management and

3   prudent use of its revolving credit facilities and none of it

4   was unusual.

5        As the Court knows, if there are any genuine

6   disputed issues of material fact, summary judgment must be

7   denied.  And the trustee bears his burden of proof on all

8   elements of a preference.  As Your Honor correctly noted, we

9   did dispute two elements of the muddled factual record that

10  we believe must be tried to this Court to meet his burden.

11  And, in addition, we have two affirmative defenses that we

12  think precludes summary judgment in the trustee's favor and

13  one of them, ordinary course of business, we believe there

14  are no genuine issues of disputed facts and summary judgment

15  should be warranted for Access.

16        The first threshold element is, as to which we

17  believe there are open issues of fact, is whether Lyondell

18  Chemical Company had an interest in the property transferred.

19  According to both the Fifth Circuit and the Second Circuit,

20  which it was citing:

21        "There can be no preference when a debtor transfers

22         property in which the debtor had no equitable

23         interest."

24        That's the In re Ramba case, 437 F.3rd 457, 460,

25  citing the Second Circuit's decision, In re Bean, 252 F.3rd

1  113, 117.

2       Whether the subsidiary, 1 of 53 entities, whether

3  the subsidiary debtor Lyondell Chemical Company had an

4  interest in the property transferred is a disputed issue of

5  fact.  LBI, not Lyondell, at all times, controlled the

6  borrowing and the repayment of funds under the Access

7  revolver for over 50 affiliated entities and specifically

8  directed the draw and the repayment of the October 2007 time

9  period.

10       Second, even if Lyondell were considered the

11  transferor of its own property, the trustee's own insolvency

12  evidence shows there's a triable issue of whether Lyondell

13  was so underwater with joint and several secured debt from

14  the acquisition financing, that it may not have had any

15  equity in the property to have transferred either.

16       The threshold element, this threshold element of a

17  preference is not conceded, and it must be decided at trial

18  after the Court hears testimony of LBI's group treasurer and

19  the trustee's expert testimony about insolvency, and we can

20  try to thread the needle to explain how much secured debt was

21  actually on Lyondell Chemical Company, as of October 2008,

22  such that it still had an equity in the property that was

23  transferred.

24       Access has come forward with evidence, the

25  statements of Karen Twitchell, the group treasurer from LBI,

1    that suggests that cash was needed, not for LBI, as Mr. Pohl

2    -- I'm sorry -- for LBI, not for Lyondell, as Mr. Pohl tried

3    to say.  And further down in the same email chain -- this is

4    contemporaneous evidence -- she explains why.

5          LBI needed to tap the Access revolver to satisfy

6    high- dollar legacy Basell-side vendor payments.  But this is

7    not just about a couple of contemporaneous emails.  Ms.

8    Twitchell submitted a declaration to the same effect,

9    testifying that LBI was the borrower and the transferor,

10   because the whole liquidity issue was an LBI problem to begin

11   with.  These facts cannot just be glossed over on summary

12   judgment.

13         And none of this is surprising, given the size of

14   these companies and the group of companies that were

15   operating.  As the trustee, himself, admits, LBI reported and

16   forecasted its cash position, with respect to LBI as a whole,

17   and maintained a centralized cash management system that

18   swept Lyondell Chemical Company cash every day.

19         This is a significant issue for summary judgment,

20   Your Honor, and here's why; the only way the trustee can get

21   the benefit of a presumption of insolvency is by establishing

22   it was Lyondell Chemical Company that had an interest in the

23   property transferred.  Because just as the trustee contends

24   elsewhere -- remember the Toehold Payment 1 discussion from

25   this morning, that ownership of property -- of an interest in

1   property is a complicated issue for trial when it's a big

2   group; that's what they said when it came to Basell Funding.

3          The same is true for this transfer, especially in

4   light of the contemporaneous emails of Karen Twitchell and

5   her sworn testimony, suggesting the opposite.

6          The other disputed fact on Lyondell's interest in

7   property is that according to trustee, 100 percent of the

8   joint and several liabilities should be counted against every

9   debtor.  The trustee does not attempt to value Lyondell on a

10  standalone basis and, instead, urges that if LBI is

11  insolvent, well, then, Lyondell must be insolvent, too.

12         Well, we disagree that this is an appropriate method

13  to show the fair market value of Lyondell's assets, compared

14  with its probable liability on its debts, as of October 16th,

15  17th, and 20th, the factual record before the Court is

16  anything but clear and undisputed.  Taking the trustee's own

17  proffered evidence at face value, there's a triable issue of

18  whether Lyondell was so completely underwater in October 2008

19  by virtue of the secured debt, that it had no equitable

20  interest in the property transferred.  This issue, too, would

21  be resolved at trial and is not appropriate for summary

22  judgment.

23         Judge, fewer things are more quintessential fact

24  issues than valuation.  We do not agree that Lyondell or LBI

25  was insolvent on the three critical transfer dates.  So, to

1  get around --

2      THE COURT:  What evidence have you offered to show

3  that it was solvent?

4      MR. KIRPALANI:  Coming to that.

5      To get around the quintessential fact issue of

6  valuation, the trustee tries to rely on the presumption.  I

7  just want to clarify, Your Honor, there is no presumption of

8  insolvency for purposes of today if LBI was potentially the

9  transferor.

10     Although Lyondell Chemical Company -- the timeline

11  will show you in a second -- although Lyondell Chemical

12  Company filed for Chapter 11, within 90 days following the

13  October transfers, LBI did not.  LBI did not file until April

14  24th, 2009, and although Access Industries Holdings would

15  still be considered in the preference period because it's an

16  insider, there's no presumption of insolvency if LBI were the

17  transferor.

18     But, even if Lyondell Chemical Company is deemed to

19  be the transferor, Access Industries Holdings, and this is

20  what Your Honor was asking me, needs to come forward with

21  "some evidence of solvency" just to shift the burden back.

22  This is not a high standard, according to the Second Circuit

23  in Roblin Industries, 78 F.3d 30, 34, and once the

24  presumption is rebutted, it vanishes, and the trustee has to

25  meet his burden of proof at trial.

1    In our 56.1 response, in additional facts, the

2    Access has rebutted the presumption with, one, explaining

3    that Lyondell's probable liability on its liquidated and

4    contingent unliquidated debts needs to be evaluated, and we

5    go through that analysis, I'll go through it; Lyondell's

6    bankruptcy schedules, themselves, and the first day

7    affidavit; bookend valuations from December 2007 and February

8    2009 -- and this transfer was October 2008; business records,

9    including financial statements, SEC reports, internal

10   performance reports at LBI and business plans at LBI that are

11   contemporaneous with the time period.  All of this foregoing

12   evidence is credible evidence of solvency that at least

13   requires a trial on the issue.

14       But we start, Your Honor, as the case law permits

15   us, to rebut the presumption with Lyondell's bankruptcy

16   schedules.  In fact, the Second Circuit, the Roblin case, it

17   was Ford Motor Company who submitted the bankruptcy

18   schedules.  There was no expert Ford Motor Company hired.

19   That's all they did.

20       But let's look at the Lyondell schedules.  This is

21   Lyondell standalone, Your Honor.  They show only the maximum

22   total liabilities and more than half of it's scheduled as

23   contingent and unliquidated.  And in establishing solvency,

24   as the Court knows, only primary liabilities should be

25   considered in full.  Secondary liabilities must be evaluated

1  and assessed for their probable liability to account and to

2  account for the right of contribution that a particular

3  entity in a group might have.

4           So, we dug into the schedules further and we learned

5  from them that Lyondell's primary liabilities, according to

6  the schedules, was only $8.75 billion on a standalone basis.

7  And then we sought to tally up, from the scheduled,

8  contingent, and unliquidated joint obligation debt, how much

9  should be allocable to each entity.  And when we applied the

10  law -- this is just applying the law; we don't need an expert

11  for this -- of shared liabilities under a guarantee --

12  remember there are 53 obligor debtors and obligor nondebtors

13  -- there are unsecured creditors in the bucket, too -- we

14  come to a grand total of $9.1 billion of liabilities for

15  Lyondell Chemical Company on a standalone basis.  So that's

16  the liability side for on the standalone.

17           But to the extent that the trustee tries to suggest,

18  no, LBI, as a whole, was insolvent as of October 2008, he

19  can't get past the first day affidavit.  The first day

20  affidavit of the debtor's chief financial officer, just as

21  Your Honor was asking, couldn't the chief financial officer

22  come into court and say, well, I thought we were solvent --

23  the schedule attached to it showed 33 billion, some-odd

24  assets, 30 billion, some-odd liabilities.  That's for the

25  group.

1          To rebut the presumption, we also took the Citibank

2    valuation from December 2007, one of the few valuations that

3    actually did build a standalone value for Lyondell, not just

4    the group, and we applied the trustee's own expert's market

5    decline from December 2007 to October 2008.  They say they is

6    hearsay; it's not hearsay.

7          Mr. Massey (phonetic) of Citibank lives in the

8    United Kingdom; he testified at deposition.  That deposition

9    would absolutely be admissible evidence.

10         But this Lyondell standalone value shows Lyondell

11   being worth between $10.9 billion and $15.6 billion, as

12   compared with 9.1 billion of standalone liabilities.  This

13   shows Lyondell Chemical Company was in the black, as of

14   October 2008.

15         There's more than this.  We've got more evidence.

16   There are contemporaneous management presentations of LBI

17   showing projected positive EBITDA as of when?  October 23rd,

18   2008.  That's the nearest-in-time projection that we could

19   find, just three days after the last challenged transfer.

20   This internal report shows management's best current estimate

21   on what they used to call at LBI, the "now look" -- that's

22   what the NL stands for on the slide, now look -- that there

23   would be an incremental $570 million for the eight days of

24   EBITDA for the eight days in October and then for November

25   and December.  So that was at the moment in time in October.

1        Now, while in hindsight, as you can see, that turned

2   out to be incorrect.  There is nothing to suggest that the

3   projection was not reasonable when made in late October.  In

4   fact, the management team explained to the banks in real time

5   in December why their projections turned out to be wrong.

6   They did this in hindsight, but look at the highlighted

7   portion at the bottom.

8        Results is significantly reduced EBITDA, liquidity,

9   and access to credit when?  Particularly in November and

10  December.  That's not revisionist history by me, Your Honor;

11  that's what actually happened in real time.  And the

12  testimony submitted in this case further bolsters this

13  critical fact issue.

14       As explained by Edward Deneen, who was the chief

15  operating officer of LBI, quote -- this was from his

16  testimony:

17       "December earnings were roughly 10 percent of

18  October earnings."

19       It was in the last six weeks before the Chapter 11

20  cases were commenced, the company saw significant, rapid

21  decline in its liquidity position.  All of this evidence

22  certainly creates an issue of fact of the solvency of

23  Lyondell and of LBI, as of October 16th, 17th, and 20th.

24       LBI, as I mentioned with the timeline, is not

25  presumptively solvent, because it didn't file until April

1   2009, and we do, of course, as you know by know, dispute the

2   insolvency of Lyondell in any event, and we believe we've

3   come forward with a mountain of evidence to rebut the

4   presumption that would apply, even if Lyondell were the

5   transferor.

6          And I want to stress that here, just given the time,

7   and I timed this before we came today, I've only covered some

8   of the highlights, not all of the evidence that we amassed.

9   In our Rule 56.1 response, there's a mountain of evidence

10  there.

11         Shifting gears, Judge, we do submit that there's one

12  defense that warrants summary judgment for Access Industries,

13  and that's ordinary course of business in financial affairs.

14  While the application of the defense depends on the

15  particular facts of each situation, we think it's important

16  to reflect on what the policy behind it is.

17         As the Supreme Court has stated, the ordinary course

18  defense is designed:

19         "-- to encourage creditors to continue to deal with

20         troubled debtors on normal business terms, by

21         obviating any worry that a subsequent bankruptcy

22         filing might require the creditor to disgorge a

23         preference as an earlier received payment --

24         disgorge, as a preference, an earlier-received

25         payment."

1           That's the Barnhill against Johnson case, from the

2     Supreme Court.

3           And as the Second Circuit has reasoned, this

4     exception benefits all creditors by protecting payments

5     received by those creditors who remain committed to a debtor

6     during financial -- times of financial distress, while, at

7     the same time, affording a measure of flexibility to

8     creditors in dealing with the debtor, provided that the steps

9     taken are consistent with the customary practice among

10    industry participants.

11          THE COURT:  I don't dispute those cases as setting

12    forth the standard --

13          MR. KIRPALANI:  Okay.

14          THE COURT:  -- but the issue to me is whether you've

15    established undisputed facts, entitling you to summary

16    judgment, with respect to those elements, defenses, or as

17    part of the claim.

18          MR. KIRPALANI:  Absolutely.

19          THE COURT:  And that's why -- I'm not ruling from

20    the bench -- but just as with Mr. Pohl, I pushed back on

21    whether he's established insolvency for purposes of motion

22    for summary judgment, I'm pushing back on you as to whether

23    you've established for summary judgment purposes, ordinary

24    course of business.

25          MR. KIRPALANI:  Very fair, Your Honor.

1           In just a couple of minutes, I'm going to show you

2    15 facts that we believe are undisputed.  You can decide, and

3    Your Honor will decide whether I'm asking you to draw

4    inferences or whether these are, in fact, the facts, the

5    cold, hard facts.

6           The authorities explain, as Your Honor knows, the

7    focus of this inquiry should be on unusual action either in

8    the incurrence of the debt, which was here, the draw, or on

9    the prepayment -- the three repayments.

10          Now, prior to 2005 -- I think we can skip this;

11   let's go to Slide 38.

12          Our position, Your Honor, is that compliance with

13   the terms of the parties' agreement can define the

14   ordinariness of a transaction, as purported.  As both, the

15   Tenth Circuit and the Seventh Circuit, have held, there is no

16   reason why the ordinariness of first-time transactions should

17   not be determined in light of the parties' performance of

18   their preexisting agreement.

19          And the trustee does not dispute this.  You know

20   what he says?  He says, well, that only applies to the

21   payment prong, not to the incurrence debt prong.  He says the

22   performance of the agreement, that only applies on the

23   payment side, not on the incurrence side.

24          Now, let's take a look at the statute.  This

25   argument is belied by the text of the statute itself.  As the

1    Supreme Court tells us:

2              "A standard principal of statutory construction

3              provides that identical words and phrases in the

4              same statute should normally be given their same

5              meaning."

6              That's from Powerex against Reliant Energy, not a

7    very difficult proposition.

8              What's the relevant phrase here?

9              "Ordinary course of business or financial affairs of

10             the debtor and the transferee."

11             That is the exact same text in the transfer prong

12   that's in the incurrence prong, verbatim.

13             If the cases say -- and the trustee concedes this --

14   if the cases say compliance with the contract works for the

15   transfer prong, there is no reason in law or logic or in

16   reading the statute that it does not also work for the

17   incurrence prong.  In the cases that discuss, in the

18   trustee's brief, the first-time emergency loans, they're

19   distinguishable on this point, because unlike in those

20   situations, the Access revolver -- and this goes to why I was

21   telling you the history -- the Access revolver was already in

22   place for seven months before the debt.  The actual draw by

23   LBI in October was incurred.

24             Because it was a preexisting revolving credit

25   facility, a review of the parties' compliance with the

1   contract can and does define its ordinariness, so on our

2   affirmative motion for summary judgment, I want to highlight

3   one of my 15 undisputed facts that show ordinariness.

4           First, to give context to this whole arrangement,

5   we're talking about, was the facility ordinary -- there's not

6   even the draw yet -- but was the facility ordinary?  Because

7   I'm trying to show you're not going to run away from the

8   facts and circumstances relating to when the contract was

9   entered into.

10          The context of this whole arrangement, Access

11  revolver, or a similar seven hundred and fifty million

12  unsecured facility, Mr. Pohl said, this was 750 million and

13  it was unsecured behind 20.4 billion of secured debt; that's

14  not ordinary.  Whoa.  That very facility was expressly

15  contemplated on the birth of LyondellBasell Industries.

16          LBI, then, reported the customary nature of the

17  Access revolver to the SEC in its quarterly filing for the

18  period ending March 31, 2008.  LBI disclosed:

19              "The revolving credit facility has substantially the

20              same terms as a senior secured credit facility."

21          And, in fact, it was a carbon copy of the

22  preexisting bank credit agreement.

23          Next, LBI even obtained a fairness opinion for the

24  facility.  Why?  Because that was what was contemplated by

25  the bank financing documents for any affiliate transactions.

1   The facility had all of the hallmarks of an arm's-length loan

2   from an unaffiliated third party, and there's nothing, in

3   fact, about the loan that the trustee suggests was not at

4   arm's length.

5        Next, LBI paid customary fees, unused

6   (indiscernible) fees, in accordance with the Access revolver

7   in order to have this facility available as a standby

8   supplemental facility to the bank revolver, for the seven

9   months before the actual draw.  This is all highly relevant

10  context, because unlike an emergency loan stuffed in by an

11  insider, in an unusual manner, with not even a promissory

12  note to speak of, the Access revolver was an anticipated

13  facility, bargained-for, and performed by LBI and Access for

14  seven months before the debt was ever actually incurred.

15       And with that background, let's turn to the

16  incurrence of debt.  First, let's talk about timing, Your

17  Honor.  LBI borrowed, at exactly the time of the month --

18  exactly -- it expected to borrow, when the facility was

19  created seven months earlier; that is, on the 15th of month.

20       Let's talk about the process for making the draw.

21  LBI's treasure regroup established a weekly process for

22  communicating about potential needs to tap the Access

23  revolver.  This was done so that Access could prepare for the

24  funding, and it came at the parties' course of dealing over

25  seven months.  Since the inception of that facility, LBI

1  would tell Access every Thursday, what the Wednesday

2  afternoon forecast showed, in terms of cash flow, and whether

3  there would need to be a draw on the Access revolver the

4  following week.

5         This pattern and practice is the opposite of unusual

6  behavior; rather, it defines the ordinary course of business

7  or financial affairs of the parties.  Indeed, consistent with

8  this process, the October 15th draw followed the Wednesday,

9  October 8th report, and the Thursday, October 9th conference

10 call.  Ms. Twitchell testified about this and this is

11 undisputed.  It was during a regularly scheduled Thursday

12 call on October 9th, when LBI informed Access that it would

13 need to draw the following week.  And even the need for the

14 first-time draw under the Access revolver was ordinary and it

15 was precisely, as anticipated.

16        Why?  This is the relevance of the primary facility.

17 LBI had already borrowed from its bank lenders, to the extent

18 it could in October, just as it always did.  Even if the

19 purpose -- even that the very purpose of the draw was not

20 unusual in any way, it was simply a borrowing for normal

21 working capital purposes of LBI for an anticipated cash

22 shortfall.  And although this was a first-time draw under the

23 facility, the three hundred-million-dollar draw on October

24 15th was similar in size and time of the month as the only

25 other time LBI anticipated needing to tap the supplemental

1    facility back in April.

2           Furthermore, the incurrence was done in strict

3    compliance -- this is on the incurrence side -- strict

4    compliance with the terms of the Access revolver.  How?  By

5    LBI issuing a committed loan notice, in accordance with the

6    documents.  Put simply, there is nothing about the incurrence

7    of this debt on October 15th that was unusual or suggests

8    that it was anything, but precisely in the ordinary course of

9    business and financial affairs between LBI and Access.

10          As to the repayment side of the equation, LBI repaid

11   the draw in a few business days, just as it expected to repay

12   the contemplated April draw in a few days.  And, moreover,

13   that prompt repayment was consistent with LBI's own projected

14   repayment date, when it anticipated the borrowing the week

15   before.  There was no unusual activity when the loan was

16   outstanding and then suddenly there was a repayment; this was

17   all anticipated.  It was what the parties expected at the

18   moment of incurring the debt.  In fact, had this payment not

19   been repaid this week, that would have been unusual.  If you

20   stop and think of it, that would mean it would not have been

21   in ordinary course, because the parties had contemplated

22   something else.

23          And even when paying back the loan in three

24   installments, how did they do it?  LBI followed the terms to

25   the letter of the Access revolver, exactly, by issuing three

1   pay down requests, all in accordance with the Access

2   revolver, and then performed in accordance with the notices

3   that they just gave, and further demonstrating, Your Honor,

4   that all of this was part and parcel of LBI's management of

5   cash in the ordinary course of business, LBI then proceeded

6   to repay its bank revolver in October and November, when

7   liquidity permitted them to be able to repay those revolving

8   credit facilities too.

9        All of these undisputed facts -- those are my 15 --

10  tell a very straightforward story and it's a bit boring, but

11  the story is, nothing unusual happened on October 15th when

12  LBI incurred this debt.  And nothing unusual happened when

13  LBI repaid the debt on October 16th, 17th, and 20th.

14       With these facts in mind, we ask you, Your Honor,

15  does this sound like the devilish preferential transfer that

16  is alleged by the trustee in his complaint?

17       To the contrary, the avoidance of the Access

18  revolver payments would undermine the fundamental purpose of

19  the preference statute.  First, it would deter creditors from

20  complying with the terms of their pre-existing credit

21  facilities and not want them to do business with the debtors,

22  who are in danger of potentially filing for bankruptcy.

23       Second, it would clawback payments that did not harm

24  any creditors and did -- had no effect, no net effect on the

25  estate.

1           And third, it would disrupt exactly the kinds of

2    normal recurring transactions that the preference statute is

3    designed to protect.

4           I have a little animation for you here.  So, when

5    you look at what happened with the draws and repayments of

6    both credit facilities, we ask you to consider this, in the

7    context of revolvers, the use by LBI of the 2007 revolver as

8    its primary facility, and the Access revolver as a supplement

9    to that; the use by LBI of these credit facilities in this

10   way is exactly what is meant by ordinary course of business,

11   and on the basis of those undisputed facts, where we ask no

12   inferences be drawn -- these are just the facts -- we ask you

13   to grant summary judgment to Access Industries on the

14   ordinary course of business.

15          But before I forget, there is one more.  If we

16   haven't established ordinary course of business or financial

17   affairs as a defense, there is another defense that would at

18   least preclude judgment to the trustee, without having a

19   trial about it, and that is the contemporaneous exchange for

20   new value.  This is an intent-based defense, as we read the

21   statute, Your Honor, so we believe there are triable issues

22   of fact when you consider what really happened here.

23          But I want to show you how it looks, because the

24   absurdity of clawing back a transaction like this is obvious

25   when you consider how contemporaneous the inflow and outflows

1    of cash really were.  On October 15th, Access gave $300

2    million in cash to Lyondell.  Lyondell paid 100 million in

3    cash one business day later, a hundred million in cash one

4    business day after that, and the remaining hundred million

5    the following business day.

6              The trustee's primary contention throughout its

7    complaint -- if that were true -- we dispute this, of course

8    -- but it's his contention that the parties' never intended a

9    legitimate revolving credit facility, because immediate

10   repayment was a condition of any draw, they would never lend

11   the money unless they knew they were going to get the money

12   right back.  Well, that shouldn't be a preference, no matter

13   how you look at it.

14             Clawing back $300 million that LBI received from and

15   returned back to Access over a four-business-day period would

16   be nothing short of a gotcha.  This advances no bankruptcy

17   policy to call this one a preference, Your Honor.

18             Thank you.

19             THE COURT:  Thank you, Mr. Kirpalani.

20             Mr. Pohl, briefly?

21             MR. POHL:  Just a couple points, Your Honor, in

22   response to some of the comments made by Access' counsel.

23             Mr. Kirpalani referred to the Ramba case, relevant

24   to property of interest, and that case, Your Honor, as you

25   know, was in connection with the sale of assets and the

1   purchaser paid off some unsecured debt.  The Court ruled that

2   that wasn't property of the debtor.

3        Here, the transfers were made by the debtor from its

4   own assets.  If the standard was that any company that has

5   liens that exceed the value of its assets can never have a

6   preference, then every liquidating trust that's formed would

7   have been formed improperly, including those that, I think,

8   Mr. Kirpalani was either the trustee or counsel to the

9   trustee.

10        Number two, Your Honor, Mr. Kirpalani referred to

11   Roblin again and said that the only evidence that the bank

12   provided and it was relied on, were the schedules.  That's

13   not true.  I mean there was a trial and the Trial Court's

14   finding of insolvency was based upon evidence that included

15   fair market value appraisals of the debtors' real and

16   personal property and other evidence that allowed the Court

17   to infer specific value, less than liabilities.

18        Number three, turning to the slide deck that Mr.

19   Kirpalani used, specifically at Page 22, it references the

20   schedules, which presumably are filed, you know, within 45

21   days or so of the bankruptcy and are intended to give the

22   reader a view of the value as of the filing and, of course,

23   it can never get to the filing.  We can never -- we can never

24   get the exact date filing, so we use November.

25        But that shows assets over liabilities, as of the

1  filing.  The filing was on January 6th, and it's in the

2  record -- I believe it's in Mr. Kirpalani's documents

3  included with the record -- that in connection with the

4  contested DIP, the first days of the case, as of January 6th,

5  the valuation was provided by the debtors' own expert at Duff

6  & Phelps.  And it was presented to Judge Gerber, at the

7  contested DIP hearing, and Judge Gerber relied on it in

8  making his rulings.

9         And those rulings included that the valuation,

10  essentially, had impaired some of the secured debt, in fact,

11  some of the first lien debt and found that the total

12  valuation for LBI, midpoint, was 19.2 billion, nowhere near

13  that 33.4 billion on this.  And that with respect to Lyondell

14  itself, the midpoint valuation was 11 billion, and that's

15  literally less than three months before the October transfer,

16  at a time when Access employees were already talking about

17  bankruptcy.

18         And last -- this is my last point, Your Honor --

19  there's a discussion about -- and I think this is included in

20  the slide deck at Page 38 -- it talks about the debt being

21  incurred in the ordinary course and using the same language

22  and two parts of the statute.  Well, the case law is clear

23  that it's not just between the parties; it has to be of the

24  parties.  We've been through that.  That's point number one.

25         Point number two on this is that the EPA case from

1   2014 makes clear that compliance with the contract alone is

2   not sufficient to evoke the defense.

3        But point three, and I think maybe more importantly,

4   is this whole notion of when the debt is incurred.  I don't

5   think there is really any case law that we came up with on

6   when it's incurred for the preference action.  Most case law

7   is in connection with the fraudulent transfer statute.

8   That's critically important.  It's usually when, perhaps,

9   there's been a lien granted by a guaranteeing sub and so the

10  Court wants to know if you are solvent or rendered insolvent.

11       And there's even cases that talk about in a revolver

12  -- I think it's the Rubin case of the Second Circuit -- that

13  when the debt is incurred -- and there's a divergence in

14  Circuits, and I think even under the forms of fraudulent

15  transfer statutes -- but in the Second Circuit, Rubin has

16  said that the debt is incurred under revolver for purposes of

17  a guarantor of that revolver, when drawn.  I get that.

18       It's a little bit different here.  We're looking

19  about when this debt was incurred and its circumstances, and

20  it would be -- I don't know what the right word is -- but,

21  certainly, oxymoronic to be able to put in place a revolver

22  -- and let's just say, and maybe you're going to rule against

23  me here -- but let's just take an example where that revolver

24  was put in place and it was, no question, equity.

25       Now, granted, we filed the motion in this case to

1  recharacterize it equity; Judge dismissed it.  But that's not

2  the standard we're looking at here.

3          Let's just say it was no question that this was

4  equity, we put in place the revolver, we keep the company

5  going.  Now I've got a contract and three months later, four

6  months later, I draw on it.  That can't, for preference

7  purposes, just magically convert something that was incurred

8  in such odd circumstances in the ordinary.

9          THE COURT:  I take it you don't dispute that all

10  conditions to withdraw were satisfied at the time that the

11  $300 million was drawn?

12          MR. POHL:  Well --

13          THE COURT:  Because sometimes you have an agreement,

14  but that doesn't necessarily mean that seven months later

15  when a loan draw is made, you have to look at the terms of

16  the agreement as to whether there was some condition to

17  withdraw that was or wasn't satisfied, whether you need

18  certificates from CFOs, et cetera.

19          MR. POHL:  Right.  Okay.  So let me answer that two

20  ways to make sure I'm not waiving anything here.

21          All the record evidence suggests that they went

22  through the ropes to submit the proper pieces of paper, and

23  if there were certificates, they probably submitted those.

24  But if one of the conditions was that LyondellBasell or

25  Lyondell were solvent, we don't -- we don't agree that that's

1  a fact just because somebody might have put it in a

2  certificate.

3            THE COURT:  Was it a condition to a loan draw?

4            MR. POHL:  I don't remember.  I think that the out

5  that was utilized in December of 2008 for not --

6            THE COURT:  That's not allowing another draw.  They

7  refused --

8            MR. POHL:  -- was maybe a material adverse change.

9            THE COURT:  Yes.

10           MR. POHL:  But I forget if there was also a solvency

11  --

12           THE COURT:  Maybe you can tell me this afternoon

13  whether there was --

14           MR. POHL:  I think it was cribbed -- well, because

15  it was cribbed, I think that might have been in the revolver

16  with the bank, so I'll find that out and tell Your Honor.

17           THE COURT:  Okay.  All right.

18           MR. POHL:  I have nothing else.

19           THE COURT:  All right.  So we're going to -- one

20  minute, Mr. Kirpalani.

21           MR. KIRPALANI:  Will do.  Can do.  Happy to do, and

22  thank you.

23           First, the Judge Gerber contested DIP hearing in

24  2009, the schedules are as of November 30th, 2008; the ones

25  that we used to rebut the presumption of insolvency.  And the

1  relevant period was October 2008, so Judge Gerber having a

2  trial on a DIP financing, I don't understand how that has

3  anything to do with the preference period.

4         And then the last thing is on Roblin.  I know Your

5  Honor too well, you will read the case -- 78 F.3d 34.  The

6  presumption was rebutted with the schedules.  There was a

7  two- day trial, which is what we think is necessary -- maybe

8  a little bit more than two days for this one --

9         THE COURT:  If the trial was two days, that would be

10 --

11        MR. KIRPALANI:  And so I just wanted to highlight

12 that, as well.

13        THE COURT:  Okay.

14        MR. KIRPALANI:  As for the notice -- the conditions

15 to withdraw, we do believe that there was a solvency rep

16 required.  It's not clean, but it's in our briefing.  It had

17 -- there was, originally --

18        THE COURT:  Giving the certificate, though, doesn't

19 make it so.

20        MR. KIRPALANI:  True.  And that's the point that Mr.

21 Pohl was saying, and we don't suggest that it is.

22        But if you were asking the question of what was

23 actually required --

24        THE COURT:  Uh-huh.

25        MR. KIRPALANI:  -- the original agreement required a

1  solvency rep and then for each draw -- whether it's for us or

2  the banks, it was the same document -- there had to be a rep

3  that there's no material adverse change.  So through that, we

4  suggest that solvency was a continuing requirement.

5          THE COURT:  Your argument hinges on, at the time

6  that the draw is made, compliance with the agreement --

7          MR. KIRPALANI:  Correct.  Correct.

8          THE COURT:  -- and so if at the time of the draw

9  there either was an implied or an express representation of

10 certificate of solvency and if the trustee were able to

11 establish that it was not solvent at the time, you would

12 agree that the debt was incurred in compliance with the

13 preexisting agreement?

14         MR. KIRPALANI:  I don't know that that's the case.

15 I don't think I would concede that, Your Honor.

16         THE COURT:  I wouldn't.

17         MR. KIRPALANI:  I think you understand.  I don't

18 think I would.

19         I think what matters is, were they performing it, in

20 accordance with the contract or not, and if they went through

21 the steps to perform it, which they did, as we showed you

22 with the 15 facts, then it's ordinary.

23         Thank you, Your Honor.

24         THE COURT:  All right.  Let me just think, what do

25 we have this afternoon?  We've got Count 13.  We've got --

109

1  what else do we have?  Access defendant's counterclaim.

2          Mr. Pohl?

3          MR. POHL:  No, I was waiting for Your Honor.  And we

4  have the NAG motion dismissed, and then something relating to

5  evidence at trial.

6          THE COURT:  Yeah, you said the depositions at trial.

7          MR. POHL:  Yes.  I think we've taken care of five

8  things and there's four more left.

9          THE COURT:  Okay.  So let's break until 2:15 --

10          MR. POHL:  May I just complete, just so I don't lie?

11          THE COURT:  Go ahead.  Yeah, go ahead, Mr. Pohl.

12          MR. POHL:  I have the org chart of the cases.

13          THE COURT:  Okay.  That's fine.  Thank you.

14          All right.  We'll take a recess until 2:15, okay?

15          MR. KIRPALANI:  Okay.  Thank you, Your Honor.

16      (Luncheon recess taken at 12:51 p.m.)

17                          AFTERNOON SESSION

18      (Proceedings resumed at 2:31 p.m.)

19          THE COURT:  Please be seated.

20          All right.  We're up to the Lyondell directors'

21  motion, as to Count 13.

22          MR. HIGGINS:  Good afternoon, Your Honor.  John

23  Higgins, Eric Wade, and Heather Hatfield from Porter Hedges,

24  on behalf of 10 of the 11 former directors of Lyondell.

25          One clarification, Your Honor.  There's been a

1  reference in some of the papers to the officers.  This motion

2  does not involve the officers; it's solely the directors.

3          THE COURT:  Okay.

4          MR. HIGGINS:  And, also, as co-movants with my firm

5  and the 10 directors we represent, the Debevoise firm,

6  represented by Joe Moodhe and Trisha Sherno, are also moving

7  on behalf of Stephen Chazen, one of the other remaining

8  directors.

9          Your Honor, we filed a motion for summary judgment

10  on Count 13 of the amended complaint, and the motion, in

11  summary, seeks to dispose of that count, because we do not

12  believe there are any contested issues of fact.  We believe

13  we're entitled to summary judgment as a matter of law.

14          Your Honor, Count 13 seeks to hold the directors

15  liable for approximately 12.2 to $12.5 billion in merger

16  consideration paid in connection with the closing of the

17  transaction.  And Mr. Kirpalani did a very, very good job

18  this morning of summarizing the transaction.

19          Effectively, what happened is, in fact, it was a

20  sale and a transaction consummated, pursuant to a merger.

21  There was no dividend.  There was no redemption of stock or

22  repurchase of stock, as the trustee's tried to allege in

23  Count 13.

24          Your Honor, the merger was consummated completely in

25  compliance with Section 251 of the Delaware general corporate

1    laws, which I'll refer to in shorthand as DGCL, and we

2    believe that under the doctrine of the independent legal

3    significance, that a transaction that is consummated, in

4    compliance with one particular section of the Delaware

5    statute, Section 251, in this case, cannot be held invalid

6    and challenged later by another unrelated section.

7        And, accordingly, we do believe we're entitled to

8    summary judgment.  Your Honor, I believe it would be helpful

9    to give just a quick, highlighted factual background.  On the

10   period of July 15 to July 16th, the merger was approved by

11   both, the supervisory board of Basell, which was the parent

12   of BIL Acquisition Holdings Limited.  An offer was made to

13   the Lyondell Chemical Company, the parent company of

14   Lyondell.

15       And on July 16th, 2007, upon receiving the merger

16   proposal, the Lyondell Board of Directors unanimously

17   approved the transaction and approved it to be consummated in

18   accordance with Section 251(b) of the DGCL.  On that date, a

19   merger agreement was signed and on October 12th, Lyondell

20   issued a proxy statement to its shareholders.

21       At a special meeting on November 20th of 2007, the

22   shareholders approved by almost overwhelmingly, by 99 percent

23   of the vote of the shareholders approved the transaction and

24   approved the merger.  The merger closed on December 20th,

25   2007, and as I've stated, the merger did close in accordance

1  with Section 251.  None of that is in dispute, Your Honor.

2        At the time of the merger, the shareholders were

3  entitled to receive, in exchange for their Lyondell share of

4  common stock, the payment of $48 per share.  Their share of

5  stock was actually converted into a right to receive payment.

6  There was, once again, no dividend.

7        Your Honor, we filed a statement of undisputed

8  facts.  There are approximately 19 itemized statements of

9  fact.  All 19 of those are not been contested by the trustee,

10  and we believe that the 19 uncontested facts, together with

11  the exhibits referenced and the corporate documents, the

12  merger agreement, et cetera, or the proxy, fully support our

13  argument, and there's no facts in dispute.

14        Turning quickly, Your Honor, the doctrine of

15  independent legal significance is a well-settled principle in

16  Delaware law.  It states, in summary, that an action taken in

17  accordance with one particular section is legally independent

18  and its validity is not dependent upon and shall not be

19  tested by the requirements of any other unrelated section at

20  a later date, upon which you might have obtained the same

21  result.

22  Lyondell certainly could have sought to redeem its shares by

23  a vote of the Board of Directors and paid them $48 a share,

24  but in that particular context, Your Honor, Lyondell would

25  have used its own cash on hand or financed cash, presumably,

1   to pay the shareholders and then redeem the stock, presumably

2   in some sort of going private transaction, but that's not

3   what happened here, Your Honor.  And as far as a dividend,

4   it's undisputed that there was no declaration of a dividend

5   by the Board of Directors.

6        Your Honor, in short, because Lyondell has

7   established that it has complied with 251 -- that is

8   undisputed -- of the DGCL, it should not be required to

9   defend its actions under other unrelated sections; in

10  particular, Section 160, 170, and 173 of the DGCL that have

11  been -- enumerated by the plaintiff's counsel.

12       In our papers, Your Honor, in summary, we have

13  highlighted that the doctrine has been upheld by a variety of

14  courts, including the Second Circuit.

15       THE COURT:  Including the Second Circuit in the

16  Roush case.

17       MR. HIGGINS:  The Roush case, Your Honor, in

18  particular, but also, the (indiscernible) the Delaware --

19  both the Chancery and Delaware Supreme Court have

20  acknowledged in support of the applicability of that

21  particular section.

22       Your Honor, the Board never approved a dividend.  It

23  never authorized Lyondell to redeem its stock or repurchase

24  its stock.  The merger was consummated in accordance with 251

25  and, therefore, the merger should not be tested under other

1  -- under any other unrelated section.  There's no genuine

2  issue of material facts, and the directors respectfully

3  request that the Court enter summary judgment.

4          THE COURT:  Thank you very much.

5          MR. WISSNER-GROSS:  Your Honor, good afternoon.

6  Sigmund Wissner-Gross, for the trustee, again.

7          There are, actually, some disputed issues of fact,

8  but I don't think those disputed -- that disputed issue of

9  fact doesn't really bear on this particular motion.  In the

10  element of a claim under Section 174 of the Delaware General

11  Corporation Law has, as an element, whether the result of the

12  unlawful dividend or the unlawful stock purchase or

13  redemption occurred renders the corporate entity insolvent.

14          Obviously, here, the theory is for the Lyondell

15  directors that approved the merger that is as a result of

16  that decision, Lyondell was rendered insolvent, as of the

17  time of the merger on December 20th, 2007.  That's an issue

18  that is disputed and would have to be tried.

19          The problem with the defendants' motion is that all

20  the cases they've cited, where the doctrine of independent

21  legal significance has been applied, involve shareholder

22  settings, and more specifically, they involve challenges by

23  shareholders, whether in Roush or in Rothschild, in Delaware,

24  in a variety of context where shareholders have challenged,

25  typically, a merger.

1        Rothschild is a Delaware Supreme Court case they've

2   cited is a good example.  There, the shareholders, the

3   preferred shareholders, didn't like the fact that a merger

4   provided for payment of $70 per share.  Upon the consummation

5   of the merger, the certificate of incorporation provided that

6   in the event of a liquidation, every preferred shareholder

7   get $100 per share.

8        They sought to challenge the merger, saying it was

9   really --

10       THE COURT:  So, you think that because it's the

11  trustee suing on behalf of the creditors that the independend

12  legal significance doctrine doesn't apply?

13       MR. WISSNER-GROSS:  Yeah.  Well, Your Honor, I think

14  if you look at the cases, they've cited not a single case

15  where --

16       THE COURT:  Do you have a case where creditors have

17  sued and the Court has declined to apply the independent

18  legal significance doctrine?

19       MR. WISSNER-GROSS:  Well, the cases that we're

20  relying on cases like Buckhead, from the Delaware the

21  District of Delaware, 178 B.R. 956 (1994) and the U.S.

22  Bankruptcy relies on the Northern District of Texas.

23       Your Honor, I think that the purpose of these

24  sections, 160, 170, 170 [sic], 173, and 174, are creditor

25  protections.  That's what they're there for and that's what

1    they're design for.

2            And we're not disputing that the merger occurred.  I

3    mean the fact that the merger occurred, although there might

4    have been technical compliance with another provision --

5            THE COURT:  You're not disputing that there was

6    technical compliance with the merger provisions of the

7    Delaware Corporation --

8            MR. WISSNER-GROSS:  No, we're not disputing that.

9    I think the issue that we're battling is whether there's any

10   authority for barring the right of creditors to be able to

11   pursue what are essentially protection, in terms of capital

12   protection provisions that are under 160, 170, 173, and 174.

13           THE COURT:  But isn't that what underlies the

14   independent legal significance doctrine?  If a transaction is

15   structured and completed in compliance with a portion of the

16   Delaware law and you can't do a roundabout effort to

17   challenge it under a different section?

18           MR. WISSNER-GROSS:  Well, shareholders have

19   appraisal rights, so in this particular case, when the share

20   -- when the proxy was issued, there was notice of appraisal

21   rights that were forwarded to shareholders.

22           With respect to creditors, the only section of the

23   DGCL that the other side has cited is Section 259, in terms

24   of protection of creditor rights, and that Section 259

25   provides that creditor rights are unimpaired on the

1    consequence or occurrence of a merger.

2            The purpose of the sections that we've sued under,

3    under Count 13, view with an entirely different concern.

4    They deal with that you can't -- you can have technical

5    compliance with the merger and the result of that could be to

6    render the company insolvent, as is alleged here.  There's

7    absolutely nothing in any of the authorities they've cited

8    that basically stands for the proposition that those

9    independent rights, and these are independent creditor rights

10   that are very specific and they're longstanding under

11   Delaware law -- should be abrogated or eviscerated simply

12   because of compliance with the formal requirements of Section

13   251.

14           THE COURT:  Okay.

15           MR. WISSNER-GROSS:  And, Your Honor, I think there's

16   good policy reasons for that and the concept, at least in

17   terms of the sections in Delaware that we've sued under in

18   Count 13 reflect very old and fundamental principles of

19   corporate law.  And the concept is that those who lead a

20   corporation should not be able to deplete its capital through

21   payments to shareholders, leaving the corporation unable to

22   meet its obligations.

23           Courts, including Courts in Delaware, interpreting

24   these provisions have taken a very expansive view of what

25   constitutes a dividend, what opportunities an unlawful stock

1  purchase or redemption.  It's not a narrow, technical

2  requirement that --

3          THE COURT:  Yeah, they have cases that say that a

4  message transaction involves a dividend or redemption?

5          MR. WISSNER-GROSS:  Your Honor, we don't have any --

6  we haven't identified any cases, other than the ones that

7  were in our responsive brief.  We certainly will look to see

8  if there's any updated authority, but I think it's fair to

9  say that what we briefed on this particular issue a couple

10 years ago stands as the law -- as good law.

11         And, Your Honor, I think the case law that we found

12 and identified strongly suggests that those provisions 160,

13 170, 173 are deliberately construed and they're to be

14 flexible in terms of their application.

15         THE COURT:  Anything else?

16         MR. WISSNER-GROSS:  No, I'm just looking at my

17 notes, Your Honor.

18         THE COURT:  Okay.

19         MR. WISSNER-GROSS:  Your Honor, I think that

20 basically covers it.

21         THE COURT:  Thanks very much.

22         MR. WISSNER-GROSS:  Thank you.

23         MR. HIGGINS:  May I be heard, Your Honor, briefly?

24         THE COURT:  Briefly.

25         MR. HIGGINS:  Quickly, Your Honor, we just note, as

1    we did in our response, that the Buckhead case, upon which

2    the plaintiffs rely, Verizon and Carruthers, all were motions

3    to dismiss.  And in each of those cases, either 251 or ILS

4    was not addressed, but in Buckhead in particular, the Court

5    noted that it was not going to adopt the ILS doctrine because

6    the defendants had failed to demonstrate compliance with any

7    other applicable provision of the DGCL, so it was just not

8    before the Court, and it was early in the case and certainly

9    not a motion for summary judgment.

10            And the last point, Your Honor, as I would note for

11   the Court, and I think it's important in this particular

12   context, the way plaintiff has postured his arguments, is

13   that this is -- this action is brought on behalf of the

14   litigation trust; it is not brought on behalf of the

15   creditors.  The creditors may be the beneficiaries, but the

16   litigation trust is just simply an assignee of the debtors'

17   causes of action.

18            This is not a bunch of creditors.  The creditors of

19   the estate --

20            THE COURT:  That argument, I don't find particularly

21   persuasive.

22            MR. HIGGINS:  I understand, Your Honor.

23            THE COURT:  Okay.

24            MR. HIGGINS:  Thank you.

25            THE COURT:  Thank you.  All right.

1          So we go next to the motion for summary judgment on

2     Access defendants' counterclaim.

3          MR. WISSNER-GROSS:  Your Honor, Sigmund

4     Wissner-Gross, again, for the trustee.

5          This one is one by us.  In response to an amended

6     complaint, back in, I think it was back in 2000, the Access

7     asserted -- the defendants asserted the counterclaim.  That

8     counterclaim advances its theory that there was a management

9     agreement that a Blavatnik entity had entered into at the

10    time of the acquisition of the sale that lasted for a few

11    years, and that at the time, just prior to the merger in 2007

12    and on December 11th, 2007, there was a new merger -- a new

13    management --

14         THE COURT:  It was a termination agreement and there

15    was new management.

16         MR. WISSNER-GROSS:  Right.  And then there was a

17    termination agreement.

18         Now, that termination agreement -- a couple of

19    interesting things that I should note at the outset, Your

20    Honor; the counterclaim plaintiffs here do not include Mr.

21    Blavatnik.  Mr. Blavatnik is a defendant in Count 6 and Count

22    7, but he is not a counterclaim plaintiff, nor is Mr. Chazen,

23    a counterclaim -- I'm sorry -- nor, is Mr. Chazen a

24    counterclaim plaintiff.

25         So, the counterclaim plaintiffs, in their

1   counterclaim, have largely advanced the theory that they

2   believe that the termination agreement -- and I'll get to the

3   terms of the termination agreement -- somehow cover claims

4   that are asserted against Mr. Blavatnik in Counts 6 and 7.

5   They're the wrong party to assert that.

6          It's just, simply, there's no basis for the

7   counterclaim plaintiffs to be able to assert claims against

8   the trustee, based on counts that are not asserted against

9   them.

10          Secondly, the termination agreement, which is dated

11   December 11th, 2007, is controlled by Delaware law.  And it's

12   a basic matter of Delaware law that you can't have a

13   prospective release, so to the extent there's conduct at

14   issue that involves performance parties after December 11th,

15   2007, that can't be covered by the release -- the purported

16   release under the termination agreement.

17          But more fundamentally, Your Honor, the problem with

18   the counterclaim is that when they're representative was

19   deposed during discovery, what the theory of the counterclaim

20   is, we were told that they don't have any damages, other than

21   maybe their -- some legal fees that were incurred by the

22   counterclaim plaintiffs, and, certainly, legal fees, incurred

23   in connection with Count 6 and 7 aren't covered, because the

24   counterclaim plaintiffs are defendants, in respect for that

25   particular count.

1           And in the counterclaim itself, there's a
2     distinction drawn in the addendum provision of the
3     counterclaim between damages, unspecified damages, that they
4     say they will prove at trial, and allowable attorneys' fees,
5     which they say they should be able to be awarded their
6     reasonable attorneys' fees.  Well, Delaware follows --
7     Delaware, which controls the termination agreement, follows
8     the American rule, which is, basically, that each side bears
9     its own costs.
10          And the termination agreement is interesting in that
11    it doesn't include any covenant not to sue.  It doesn't
12    include any provision that if there's a lawsuit, the
13    prevailing party will get its attorneys' fees.  It doesn't
14    include any of those provisions.
15          And as a result of that, in terms of what authority
16    exists under Delaware law, well, it's pretty well established
17    that if you're suing, as they've done here on a counterclaim,
18    based on alleged breach of release -- and this is what
19    they're seeking their attorneys' fees, that under the
20    American rule, they're not entitled to pursue -- we think
21    that, for example, there's a case that we cited, Case
22    Financial v Alden, 2001 Del. Ch. LEXIS 74, 2011, where even
23    though the plaintiff's claims were dismissed, based on a
24    release, the Court rejected the request for attorneys' fees,
25    based on the same concept of the American rule.

1         The only authority that they've cited that we're

2    aware of involving a release where there was an effort to

3    secure attorneys' fees, as a basis for damages, actually

4    included a case where there was a covenant not to sue.  And

5    the Court's theory for awarding damages, at least allowing

6    damages on summary judgment in that case in the form of

7    attorneys' fees, was the parties had actually included a

8    covenant not to sue and it was an unusual fact pattern where

9    the lender had extended credit and rolled over the credit a

10   number of times, based on a release that supposedly given by

11   the other side.

12        And when a lawsuit was brought, in connection with

13   the loan agreement, the lender, not surprisingly, said, wait

14   a second, you signed a covenant not to sue.  We've been -- we

15   have to defend this litigation.  Ultimately, it was

16   determined we hadn't engaged in economic duress for you to

17   take these long extensions, a very different fact pattern

18   from what we have here.

19        THE COURT:  Now, put aside the issue as of

20   attorneys' fees as recoverable damages, in many ways, I read

21   your argument as sort of this is recent fabrication and --

22        MR. WISSNER-GROSS:  Yes -- you know, I try to avoid

23   --

24        THE COURT:  -- that might be nice at trial, but not

25   on summary judgment, okay.  A recent fabrication requires me

1  to make certain fact finding, but that's what your argument

2  really sounds like.

3          MR. WISSNER-GROSS:  Well, Your Honor, I think what

4  you're hearing from me today is I'm arguing what the

5  termination agreement says, what it doesn't say, and I've

6  made the point that it's interesting that most of the

7  counterclaim relates to claims against Mr. Blavatnik, which

8  are, in fact, not a party -- he is not a counterclaim

9  plaintiff, and the fact that boiled down to its essence, the

10 damages that they're seeking are the attorneys' fees --

11         THE COURT:  Anything other than attorneys' fees that

12 they're seeking?

13         MR. WISSNER-GROSS:  No.  We -- that's the only

14 alleged damages they've identified through their 30(b)(6)

15 witness, and I don't think that's disputed.

16         And under those facts, Your Honor, while we do think

17 that the counterclaim was a more recent fabrication, and we

18 have our questions that the motive for it, but I'm not

19 standing here arguing on that basis, nor am I arguing over,

20 primarily, whether the fact that Mr. Blavatnik, as his

21 deposition said one thing, where he didn't claim to have any

22 knowledge of performance under the management agreement or in

23 his declaration said something different, nor am I

24 necessarily relying on the fact that on the invoice -- they

25 submitted some invoices, after the fact, to try to

1  demonstrate that there was performance under the management

2  agreement, going into 2007; although, interestingly, those

3  invoices that are attached to one of their declarations don't

4  reference, actually, any conduct by Mr. Blavatnik.  You don't

5  have to reach any of that.

6          I think, in essence, the problem with the

7  termination agreement theory that they've advanced is that

8  the only damages that they're seeking are attorneys' fees,

9  and I think that to the extent that they even try to seek

10  attorneys' fees for counts against Mr. Blavatnik, for which

11  the Access entity, which is a counterclaim plaintiff, is

12  suing over, well, they don't have any standing to sue for

13  damages, even in the form of attorneys' fees, for counts of

14  which they aren't a part.  Just doesn't exist.  There's no

15  basis for that.

16          Your Honor, in terms of the counterclaim, the

17  counterclaim plaintiffs, in their recent answer to our

18  complaint added one additional theory that was not in their

19  counterclaim back in 2000.  They've added an additional

20  paragraph, where they've alleged, well, they think now they

21  have a new theory, which is that the -- some of the claims,

22  as Count 6, and Count 7, and maybe Count 18, are in breach of

23  the merger agreement itself.  That wasn't a theory, I

24  articulated previously.

25          I've agreed with the other side that since we have

1  this teed up, fully briefed, based on the complaint of a

2  counterclaim that was operative for the past almost six

3  years, we would argue today on what we think is a lack of any

4  merit.  And to their existing counterclaim, we'd leave for

5  another day, this additional allegation that they've raised

6  in their amended counterclaim.

7          Your Honor, unless you have any questions, I --

8          THE COURT:  Just give me a second, okay.

9          So, the termination agreement was the same date as

10  the new management agreement, December 11th, 2007, right?

11          MR. WISSNER-GROSS:  That's correct.

12          THE COURT:  And the Basell transaction was

13  consummated on December 20th, 2007 --

14          MR. WISSNER-GROSS:  That's correct.

15          THE COURT:  -- after the original management

16  agreement was terminated and the new management agreement was

17  in place.

18          MR. WISSNER-GROSS:  That's correct.

19          So, Your Honor, whatever import should be given to

20  the termination agreement, it has no impact on the new

21  management agreement, in fact, the new -- and the

22  transactions that occurred under the new management

23  agreement.  And Count 6 and Count 7, for example, deal

24  extensively with conduct into 2008 --

25          THE COURT:  Right.

1    MR. WISSNER-GROSS:  -- a little after it, and the

2  new management agreement expressly includes a provision; for

3  example, that the $125 million in fees, the transaction fees

4  that were given or paid to Nell at the time of the merger --

5  120 million as a transaction fee, 25 million as new

6  management fee -- those were paid expressly under the terms

7  of the new management agreement.

8       Well, Access doesn't even attempt to say that those

9  have been released, so we think that after you really distill

10  down what's actually at issue, that, in terms of Count 6,

11  Count 7, conduct in 2008, conduct, including the merger that

12  occurred after December 11th, even if we were to give

13  credence to their theory that there's somehow a release that

14  extends beyond what we think is unrelated conduct, that it

15  stops on December 11th, 2007.

16       But beyond, that Your Honor, even for the position

17  of the other side, that there is some conduct that was

18  released, we think the evidence is fairly strong that, in the

19  case of Mr. Blavatnik, for example, other than his affidavit

20  or declaration contradicting his deposition testimony and not

21  supported by invoices they provided as to alleged services

22  performed under the old management agreement, there's no

23  evidence supporting their theory, that anything Mr. Blavatnik

24  did was done under the old management agreement.  But we

25  would submit, Your Honor, that to dispose of this as summary

1    judgment, recognizing that the goal is not to identify

2    disputed issues of fact about whether performance was or was

3    not under the old management agreement, there really are a

4    couple of ultimate elements; one, that the damages that

5    they've identified through their 30(b)(6) witness, is only

6    attorneys' fees.  There's no other damages.

7    Secondly, the termination agreement has no covenant not to

8    sue, no provision for prevailing party receiving attorneys'

9    fees.  Delaware law is very clear; the American rule is

10   followed.  We think -- we do think it's a meritless

11   counterclaim.  We think it's underbrush.  We think if it's

12   disposed of now, that will help simplify the issues for

13   trial.

14           Thank you, Your Honor.

15           THE COURT:  Thank you very much.

16           MR. WERDER:  Good afternoon, Your Honor.  Rick

17   Werder from Quinn Emanuel.  I hope that Mr. Kirpalani will

18   not report back to management that I don't have a slide deck.

19      (Laughter)

20           THE COURT:  I'll restrain my comment -- you're the

21   first lawyer from your firm that's ever appeared before me

22   without a slide deck.

23           MR. WERDER:  Well, I hope Your Honor will forgive me

24   for that, then.

25           THE COURT:  I may be very pleased that they didn't

1   have a slide deck.  Let's see where you're going.

2        MR. WERDER:  Well, most of the arguments -- it

3   sounds like Mr. Wissner-Gross is not really relying on the

4   argument that was set forth --

5        THE COURT:  Let me ask you this.

6        MR. WERDER:  Yes, Your Honor?

7        THE COURT:  He really seems to be arguing, almost

8   exclusively -- not exclusively -- almost exclusively, that

9   attorneys' fees are not recoverable damages and that's the

10  only thing that you're seeking.  Is that correct?

11       MR. WERDER:  Well, that's kind of the way I

12  perceived it, Your Honor.  There were a couple of other

13  pieces of underbrush that maybe I would put away.  I think

14  that we --

15       THE COURT:  He may well be right about this issue

16  about the American rule and when attorneys' fees are

17  recoverable.  It wasn't under Delaware law, but recently, an

18  opinion in, In re Steinberg, in a denial of discharge

19  adversary proceeding, there was a counterclaim for recovery

20  of attorneys' fees, and I rejected the counterclaim.  It was

21  New York law applied, but it's similar to Delaware law, in

22  that unless there's an expressed contractual provision or a

23  statute providing for recovery of attorneys' fees, you can't

24  recover them.

25       So, you know, Mr. Wissner-Gross seems to be

1    focusing, today, principally on the only argument -- the only

2    eligible damages that you've identified is attorneys' fees,

3    and you would acknowledge that there's no attorneys' fees

4    clause, correct?

5           MR. WERDER:  I'm sorry?

6           THE COURT:  You would acknowledge, I take it, that

7    there is no prevailing party attorneys' fees clause here?

8           MR. WERDER:  In the termination agreement, there's

9    not, Your Honor --

10          THE COURT:  Yes.

11          MR. WERDER:  -- but there wasn't in the Edge of the

12   Woods case from Delaware, which we cited in our brief either,

13   and Mr. Wissner-Gross' distinction of that case appears to

14   rest on the fact that it had a release and a covenant not to

15   sue.  I don't think that the fact that there was a covenant

16   not to sue in the case was dispositive to the Court's

17   reasoning, nor does the existence of a covenant not to sue

18   versus just a simple release, go to the yeah or nay on

19   whether the American rule would preclude the recovery of

20   attorneys' fees for the breach of a release agreement or a

21   covenant not to sue, for that matter.

22          I think, we acknowledge, Your Honor, that there are

23   cases saying that -- and he cited at least one of them from

24   Delaware -- saying that you can't recover attorneys' fees for

25   a breach of a release agreement.  We cited a conflicting

1  case.  There -- maybe we need to flush that issue out as the

2  matter progresses, but right now, I think there is a dispute

3  in the authority over whether the American rule ought to be

4  applicable in a situation where the only expected damages or

5  the principle expected damages from breach of a release

6  agreement are going to be attorneys' fees.

7       THE COURT:  Let's just see.  You have not identified

8  any other allegedly recoverable damages, other than

9  attorneys' fees, correct?

10      MR. WERDER:  That is correct, Your Honor.  I think

11  --

12      THE COURT:  So it's not the question of leaving it

13  open to see what evidence about damages comes in.  There's

14  been discovery, you've responded and only identified

15  attorneys' fees, so the issue before me -- and you said

16  there's disputed authority in Delaware about it -- but that

17  would be the only issue as to whether or not attorneys' fees

18  are recoverable for breach of the termination agreement.

19      MR. WERDER:  Other than whether we could have a

20  counterclaim that would stand just for nominal damages, which

21  I think we probably could.

22      THE COURT:  Well, that's not what you've identified.

23  The argument before me was about whether --

24      MR. WERDER:  That's correct, Your Honor.

25      THE COURT:  -- the attorneys' fees were recoverable.

1  We're not changing pleadings.  We're going to trial in

2  October.

3          MR. WERDER:  No, that's fair.  But the pleading is

4  for those damages that are proved at trial.  Our witness

5  identified the damages --

6          THE COURT:  Yeah, but, you know, you've been --

7  you've had how many years of discovery -- and, well, this was

8  a late- added counterclaim -- but, you know, it's beyond the

9  point now of saying, well, maybe we'll be able to show

10 something at trial or not.

11         MR. WERDER:  No, we're not planning to quantify any

12 other form of damages, Your Honor.  I think the damages that

13 we intend to quantify at trial are the legal fees and

14 expenses, but what I was noting was that there is such a

15 thing as the recovery -- as establishing a breach of release

16 agreement, and that is a breach and a cause of action and

17 only nominal damages are --

18         THE COURT:  Would you like Mr. Wissner-Gross to take

19 a dollar out of his wallet and offer it to you now and have

20 this go away or ...

21         MR. WERDER:  No, we might like to just establish the

22 principle that he filed the case in breach of the agreement,

23 though, Your Honor.

24         THE COURT:  I've got enough to deal with here, other

25 than establishing a principle as to which a dollar would be

1    recoverable.  You know, I've got a chambers full of binders

2    and pleadings.

3         MR. WERDER:  No, the release is going to be

4    litigated, regardless, whether the counterclaim stands,

5    because the release is a defense, in addition to being an

6    affirmative claim.

7         THE COURT:  Right.

8         MR. WERDER:  But Mr. Wissner-Gross is correct that

9    the damages that we have identified, that we intend to

10   quantify at trial are the legal fees and expenses, and we

11   relied on the Delaware authority from the Edge of the Woods

12   to indicate that that form of damage is recoverable in a

13   situation involving the breach of a release agreement, even

14   if the absence of a contractual provision that sets forth a

15   separate provision concerning recovery of legal fees and

16   expenses.

17        THE COURT:  Okay.  Thank you.

18        Briefly.

19        MR. WISSNER-GROSS:  Thirty seconds.

20        Edge of the Woods, here is what the Court said, and

21   I'll read from the opinion as to the reason why it granted

22   the counterclaim:

23        "Defendant bargained for and relied on plaintiff's

24        promises not to sue."

25        That was the basis -- the Court found that --

1          THE COURT:  That's the breach of contract.  I mean
2    that's, you know --
3          MR. WISSNER-GROSS:  -- the Court said it was a
4    covenant not to sue case.
5          THE COURT:  Are there other covenant not to sue
6    cases that say attorneys' fees are recoverable for a breach
7    of a covenant not to sue, in the absence of a prevailing
8    party attorneys' fees clause?
9          MR. WISSNER-GROSS:  We haven't seen it, Your Honor.
10         Thank you.
11         THE COURT:  Thank you.  NAG?
12         MR. KIRPALANI:  It's an appropriate name for this
13   particular case.
14         THE COURT:  Is that another handout that you have
15   for me?
16         MR. KIRPALANI:  Actually, I do.
17      (Laughter)
18         MR. KIRPALANI:  Yeah, just give me one second.  I
19   have to grab a few copies.
20         THE COURT:  Sure.
21         MR. KIRPALANI:  May I approach?
22         THE COURT:  Please.
23         MR. KIRPALANI:  Okay, Your Honor.  So, this is a
24   separate complaint, a separate adversary proceeding, and this
25   is not about the merger.  This is not about December 20th,

1    2007.

2          This is about -- can we show the first slide --

3    okay, this is about Basell, Basell AF SCA, which was the

4    predecessor to LBI.  This was the holding company or the

5    Topco, if you will.  It declared and paid a hundred million

6    euro dividend under Luxembourg law, to its shareholder, BI,

7    that's Bis, another Luxembourg company, never been a debtor.

8          And then after, according to the complaint, is a

9    motion to dismiss, so there's a lot in that complaint that

10   don't add up factually, but we're going to assume that

11   everything there is accurate.

12         And then from BI S.a.r.l., the allegation is that

13   100 million euro to BI S.a.r.l.'s shareholder, which is a

14   U.S. company, called NAG, NAG Investments; that's according

15   to Paragraph 1 of the complaint, that this was a Basell

16   interest in property, Basell AF SCA interest in property.

17         And so this count, Count 1 is based on what I would

18   call, on the corporate formalities of the transaction, that

19   if you follow the paper trail and the declaration of

20   dividends under Luxembourg law, according to the paper trail,

21   the complaint says Basell declared a dividend, 100 million

22   euro in early December of 2007.  That money then went to its

23   shareholder, BI S.a.r.l., and then from that shareholder,

24   later to NAG.

25         They have an alternative count, which is -- this is

1   what I would call the "follow the cash" theory.  The first

2   one was "follow the documents"; this one is "follow the

3   cash."

4          The "follow the cash" theory, it's Basell

5   transferred interest in Basell property, how?  By telling

6   Basell Funding, a nondebtor, wire money to NAG.  So,

7   according to the trustee, that's a recoverable avoidance

8   action; he's got standing to bring that, according to him.

9          You know, actually, the original complaint on this

10   particular transfer talked about another nondebtor entity,

11   which was Basell Holdings BV, which was further down the

12   chain, below Basell Funding, because that's the one where the

13   documents show the wire going from.  And once we raised, you

14   don't even have standing to bring a lawsuit on Basell

15   Holdings BV, he said, oops, we'll drop that, scrap it, we'll

16   try again with a new complaint, and now it's a new theory

17   that Basell, the debtor, somehow told Basell Funding, make

18   sure that NAG gets paid.

19          But, notably, the complaint does not even say --

20   because it can't, in good faith -- that Basell Funding made a

21   transfer, because we know from the prior pleadings, it was

22   actually a further-down subsidiary that did it, which was

23   also not a debtor.

24          So these are the two theories, what I call "follow

25   the paper trail" corporate document, corporate proper

 1   formalities, and the other one is "follow the cash."

 2         So, we move to dismiss, Your Honor.

 3         THE COURT:  What you need to persuade me is that

 4   this motion -- why this motion isn't controlled by Judge

 5   Gerber's January 2004 decision -- 2014 -- excuse me --

 6   January 2014 decision.

 7         UNIDENTIFIED:  2016, right?

 8         MR. KIRPALANI:  2016, yes.

 9         THE COURT:  I have the wrong date, okay.  On my

10   notes, I've got the wrong date.

11         MR. KIRPALANI:  Are you talking about

12   extraterritoriality?

13         THE COURT:  Yes.

14         MR. KIRPALANI:  This is a different complaint.  This

15   is not that claim that was ruled on.  Frankly, that claim,

16   Your Honor, that might have been the BI S.a.r.l. lawsuit --

17   the lawsuit against BI S.a.r.l.

18         The reason I think it's important to remember is

19   because, well, first, you're not bound by Judge Gerber's

20   decision, obviously, but, secondly, the dicta on whether

21   extraterritoriality should be the law of this district,

22   notwithstanding Judge Brozman decision in 1994, it -- there

23   actually was no jurisdiction to decide that issue, because he

24   held there was no personal jurisdiction over the defendant,

25   and then went on in the decision to say, oh but, you know,

1  maybe if there's personal jurisdiction, extraterritoriality

2  should not really apply here because the gravamen of the

3  complaint or the gravamen of the things happened in the

4  United States and he deviated from what I would call better

5  law, in Judge Brozman's decision.

6          But it's certainly not binding on the Court and it's

7  a different -- it was a different transfer and a different

8  entity and in that case, I do remember when I read it, we

9  thought about moving for reconsideration -- actually, we did

10  move for reconsideration.  He denied it on his way out the

11  door and it was like within the two days after the decision

12  came out, before he left.

13          But, frankly, it didn't trouble us --

14          THE COURT:  But the ink is very dry on his decision,

15  so now you want me to do something different.

16          MR. KIRPALANI:  Well, Your Honor, I mean it,

17  sincerely, that that decision, it's not even appealable

18  because it can't be final, because there's no personal

19  jurisdiction.  He held there was no personal jurisdiction

20  over this defendant, but I'm going to say what I think anyway

21  on extraterritoriality.

22          We looked into this.  We researched whether we were

23  going to appeal it.  It has no bearing, is what I would say.

24  It has no bearing here.

25          So, we believe, Your Honor, we move to dismiss, that

1  Count 1 must be dismissed because the initial transfer --

2  this is a Luxembourg law dividend, was made by Luxco 1

3  (phonetic) to Luxco 2, Section 550 does not apply

4  extraterritorily.  The only cause of action in Count 1 is a

5  subsequent transferee claim and the trustee can't avoid the

6  initial transfer.

7        And the complaint admits the transferor and

8  transferee are both Luxembourg corporate entities, so I'm not

9  asking you to read anything outside the complaint.

10       Count 2, the alternative theory, we submit must be

11  dismissed because the transfer was not from a debtor.  Basell

12  Funding was never a debtor.  The transfer is alleged to have

13  been made by Basell Funding.  That can't be avoided by this

14  trustee.

15       And the notion that, well, Basell AF SCA -- that's

16  funny, because earlier today we were talking about who

17  controls the cash and whether that should matter -- here, the

18  trustee is saying who controls the cash should matter.  So in

19  the LBI-Lyondell Chemical battle, which is on summary

20  judgment, we were telling Your Honor that the decision there

21  was actually made by LBI, and, therefore, it was a transfer

22  of an interest of LBI.

23       Here, it looks like the trustee likes that type of

24  law for purposes of Basell AF SCA.  But we don't think the

25  complaint even alleges that it was an interest in property of

1   Basell; it just says, NAG received the transfer because

2   Basell said it should.

3          So, just very briefly -- I'm not going to go through

4   this in great detail -- I know you are familiar with the

5   area, but just to walk through it, notwithstanding Judge

6   Gerber's recent decision, we don't agree that the trustee can

7   avoid the initial transfer because it is extraterritorial --

8   oops, we went too far --

9          So, the legislation of Congress, unless the contrary

10  intent appears, is meant to apply only within the territorial

11  jurisdiction of the United States; that's the U.S. Supreme

12  Court, 2010.  This was the holding in Maxwell, and, here, I

13  think this is Judge Sheindlin in 1995.  In 1994, Judge Tina

14  Brozman had, actually, invited, I believe Professor Westbrook

15  to come and submit an amicus brief on the issue, and she put

16  a lot of time and thought into the first major transnational

17  bankruptcy of a U.K. plenary proceeding and a U.S. plenary

18  proceeding, and squarely held that preference law does not

19  apply extraterritorially, and we think that was correct, from

20  the correct rule of law.

21         But, in terms of the test, the first part of the

22  test was, was the conduct really extraterritorial?  This is

23  the center of gravity test.  This is a Luxembourg company

24  declaring a Luxembourg dividend paid to its Luxembourg

25  shareholder; that's the transfer.  The later transfer can't

1  be avoided if the initial transfer is not avoidable.

2          And Part 2, if the conduct was extraterritorial, did

3  Congress intend it to apply extraterritorially?  That's the

4  Judge Brozman, we believe, appropriate analysis.

5          Last month, the Supreme Court reaffirmed this

6  guiding principle in RJR Nabisco.  It was not a bankruptcy

7  case, but the same principle, and --

8          THE COURT:  But the -- Judge Gerber's point had to

9  do with 541, property of the estate.

10         MR. KIRPALANI:  Right.  Which the Second Circuit, in

11 Colonial Realty -- now you're reminding me, Your Honor -- the

12 Second Circuit, in Colonial Realty, which was cited by Judge

13 Brozman in 1994 said, no, that doesn't work that way.

14         THE COURT:  Yeah, you've got to recover it first

15 before it's property of the estate.

16         MR. KIRPALANI:  And I couldn't, for the life of me

17 -- I will ask him, now that he's in private practice -- you

18 know, what -- why that wasn't controlling, which is why we

19 sought to have it reconsidered and thought about whether to

20 appeal it or not and ultimately found it's just not worth it

21 at this point.

22         But we do think the Maxwell decision in 1994, by

23 Judge Brozman, which does cite Colonial Realty, for exactly

24 the proposition that you're talking about; it's not property

25 of the estate until it's recovered, so, therefore, this

1   expansive view of 541 can't save you, under an avoidance

2   action theory.  And that's been cited, favorably, in other

3   courts; most recently, and on point, in the Midland Euro

4   Exchange case in the Bankruptcy Court in the Central District

5   of California.

6          So, in terms of just one last bit of animation, in

7   this, we show that the reason why Basell can't recover the

8   100 million is because that first transfer was

9   extraterritorial, and if there's no avoidance, there can be

10  no recovery.  That's what the case law is.  I don't think the

11  trustee challenges that.

12         We can skip, I think, to Count 2.  This one is the

13  transfers from a nondebtor.  To state a claim for a

14  fraudulent transfer under Section 548, obviously the trustee

15  has to say there was an interest in property of the debtor.

16  Transfer covered some of this stuff earlier today in the

17  context of the preference summary judgment.

18         The trustee does not even allege that any of the

19  debtors made the transfers to NAG.  The trustee's allegations

20  are that nondebtor Basell Funding was the transferor, which

21  is contrary to his prior complaint in the same case, where he

22  said it was actually a further-down subsidiary that made the

23  wire, but now it's Basell Funding, because I guess that's the

24  subsidiary of Basell, but that's the one that made the

25  transfer and it was ordered by Basell to do that.

1        We think -- we submit that's insufficient, as a

2   matter of law, on the motion to dismiss, so just -- you know,

3   a similar idea.  Just to recap, you've got a nondebtor

4   transferring property of a nondebtor, 100 million euro, to

5   NAG.  That can't suffice, and, frankly, Your Honor I don't

6   think I need to belabor the point.

7        Those are our positions, with respect to this motion

8   to dismiss.  If Your Honor finds there are fact issues about

9   who owns the property, I mean, obviously, if that's the

10  ruling of the day, that's the ruling of the day, but we don't

11  think this is a clear case.

12       THE COURT:  Thank you.

13       Mr. Pohl?

14       MR. POHL:  Good afternoon, again, Your Honor.

15  Steven Pohl, for the trustee.

16       I have something that's between Mr. Kirpalani and

17  Mr. Werder, if I may approach the bench?

18       THE COURT:  Sure.

19       MR. POHL:  So, if we were to put this into context,

20  Your Honor, the left side is the "follow the cash"; the right

21  side is the corporate authority chain of distributions, all

22  is alleged in the complaint.  And in the very center in red

23  is Basell AF SCA, the debtor.

24       So, I'm going to go first, Your Honor, to Count

25  Number 2 and that is the count that walks up the chain on the

1   left, where a distribution is declared by the entity which is

2   below the debtor.  Basell Funding declares a distribution and

3   it's supposed to go to Basell the debtor.  And just to have

4   context here, this is the Basell debtor that, today, or

5   better yet, for Chapter 11 purposes is known as LBI.  And

6   this is the debtor that filed for Chapter 11 some three

7   months after the bankruptcy.  This is the debtor that,

8   earlier in this -- I'm not sure if Your Honor has managed to

9   spend more time than you want looking at the Chapter 11

10  proceedings -- but earlier on in the case, for context, there

11  were a lot of activities by creditors of LBI, the president

12  Luxembourg company at the time when it was not in Chapter 11.

13          During that time, there was a motion for a stay by

14  the debtors to apply the stay to its nondebtor Luxembourg

15  parent LBI, and in connection with that, the judge asked the

16  debtors for some information about transfers that might have

17  been made by LBI to affiliates, prior to bankruptcy.

18  Eventually when -- and the stay was granted for a period of

19  time -- eventually, when the stay wore off, LBI filed.

20          So, came to this Court to get the benefit of the

21  stay and interesting now there's a fair amount of fancy

22  footwork by this debtor to find a way to avoid 548.  But

23  that's really a side point.

24          But the main point about that is -- and that's in

25  our papers, and that's Exhibit D -- that these debtors or I

1    should say, Access came to the Court when asked what

2    transfers were made, and they said a transfer was made by our

3    debtor -- here, Basell AF SCA -- then, in the bankruptcy,

4    LBI, to Access or NAG, an affiliate of Access.  That was

5    their disclosure to Judge Gerber.

6            So, this is the left side of the chain, Your Honor.

7    When Basell Funding made the paperwork distribution to Basell

8    AF SCA and AF SCA, the debtor, was going to have funds coming

9    to it, it said, wait a minute, instead of giving me the

10   money, which is on my doorstep, send it up the chain to NAG,

11   and that's what it did.  And now we're in this --

12           THE COURT:  Well, you agree that the funds did not

13   come from LBI; they came from the Basell Funding --

14           MR. POHL:  Correct, as directed by the debtor.

15           THE COURT:  -- so you draw an arrow on your chart

16   from LBI to Basell Funding, but it's an arrow of what you've

17   described in the box as directing a transfer.

18           MR. POHL:  Yes, the downward is the direction --

19           THE COURT:  It's not -- the money doesn't move down

20   and then from Basell Funding up to NAG.

21           MR. POHL:  Correct.  I should have put a dollar sign

22   on the two upward arrows.

23           THE COURT:  Is that dispositive?

24           MR. POHL:  No, it's not dispositive.

25           THE COURT:  Tell me why not.

1        MR. POHL:  Because there's case law, and we've cited

2   it in our papers, where there's control by the debtor, as

3   there is here --

4        THE COURT:  Uh-huh.

5        MR. POHL:  -- the right to possession, which there

6   is here, and while it may not be Luxembourg law --

7        THE COURT:  Was there a right to possession?  What

8   does that derive from?

9        MR. POHL:  That derives from the fact that a

10  distribution was declared and they said -- and this is Alan

11  Bigman, on behalf of the debtor on its own letterhead --

12  yeah, that money is supposed to come to me, but I'm directing

13  you to send my money here.

14       THE COURT:  Okay.

15       MR. POHL:  They controlled it, had they not given

16  away their right to it, and --

17       THE COURT:  If they hadn't directed that it be

18  transferred to NAG, it should have been come to LBI.

19       MR. POHL:  That's correct.

20       And, you know, when you think about it from the

21  context -- I understand what Access would like to say, but

22  what if you were before this Court as the debtor and you're a

23  Chapter 11 debtor and you have this dividend coming your way.

24  Do you think you're going to say that's not your property?

25       Of course not, and we cite the cases -- I think,

1  granted it's a dividend case under Illinois law, but it says

2  once the dividend is declared, it's no longer the property of

3  the corporation who declared the dividend, but it's the

4  property of the shareholder, which is what we allege.  We

5  allege it in the complaint and we believe the law supports

6  it, so I don't think it's dispositive.

7         THE COURT:  Okay.

8         MR. POHL:  Next -- give me a moment, Your Honor.  I

9  just want to try to answer your questions, instead of the

10  others.

11         And we think that the authority is that NAG cites

12  all about property, really just go to the basic premise that,

13  sure, you have to allege a transfer by the transferor, and we

14  believe we've done that.

15         The next count is the "follow the paper trail" on

16  the right-hand side.  And I'll be honest with you, Your

17  Honor, I really didn't spend any time --

18         THE COURT:  Honest now, as opposed to before or --

19         MR. POHL:  No, no, no, maybe I should say, I'll be

20  frank --

21    (Laughter)

22         MR. POHL:  -- and having nothing to do with before,

23  but I find that being frank and honest about what I've done

24  before --

25         THE COURT:  So if anybody reads the transcript, they

1    have to understand that I'm trying to bring a little levity.

2          Go ahead, Mr. Pohl.

3          MR. POHL:  I didn't spend time on, really, on

4    extraterritoriality.  On the notion -- and I haven't looked

5    at the Maxwell case; I missed that last month -- because

6    Judge Gerber decided against, at that point, BI S.a.r.l. on

7    that.

8          THE COURT:  In pure dicta, because there was no

9    jurisdiction -- because he just ruled there was no

10   jurisdiction.

11         MR. POHL:  Well, you know, they -- Access did try to

12   get him to reconsider.  They did file a motion and he

13   rejected it.

14         THE COURT:  As I said, the ink is barely dry on his

15   opinion.  I'm disinclined to want to disagree with him.

16         MR. POHL:  And if there's, you know, something that

17   I need to say about Maxwell, I'd like the opportunity to

18   brief that, but, you know, we think that's the law of the

19   case, and --

20         THE COURT:  Well, Maxwell, you know, I didn't go

21   back and re-read it for this specific purpose, but Maxwell

22   involved an administration of one in the U.K. and a Chapter

23   11 here, and the trustee here sought to bring the 547

24   preference action, because U.K. law was not as favorable.

25   And Judge Brozman decided the choice of law issue that U.K.

1   law should apply.  Judge Scheindlin affirmed -- the Second

2   Circuit affirmed -- they actually -- the Second Circuit, when

3   it affirmed, actually decided it, I think, on the choice of

4   law issue.

5          But the -- what you're telling me is -- I'll go back

6   to it to look at it again -- you're saying that these funds

7   were controlled by a Chapter 11 debtor --

8          MR. POHL:  Yes.

9          THE COURT:  -- not by a foreign debtor; by a Chapter

10  11 debtor.

11         MR. POHL:  Well, they were -- it's a foreign

12  company.

13         THE COURT:  I understand, but it's a Chapter 11

14  debtor.

15         MR. POHL:  Yes.  Yes.  They elected to come here.

16  They got the benefit of the stay after its 105 stay wore out

17  --

18         THE COURT:  Right.

19         MR. POHL:  -- and somehow would like to find a way

20  to weave out of 548, which it bought into, when it filed.

21  And --

22         THE COURT:  And 541 reaches property of the debtor,

23  wherever located.

24         MR. POHL:  Judge Gerber said so, and we like his

25  opinion.  We might not like all his opinions, but we like

1   that one.  And when we briefed it, heavily, it was argued.

2          So, getting past that for the moment --

3          THE COURT:  Uh-huh.

4          MR. POHL:  -- we don't have BI S.a.r.l., the initial

5   transferee, the Luxembourg entity that Judge Gerber said

6   extraterritorial doesn't apply, but, you know what?  If you

7   want to re-plead your jurisdiction, re-plead it.  We elected

8   not to, so that claim that was in the Blavatnik case, we did

9   not pursue it; we're, instead, pursuing it in this complaint,

10  which it's just a separate complaint because otherwise we

11  would have had to go back and file the motion over and the

12  complaint, but we were bumping up against the statute of

13  limitations time period, so we didn't.

14         We would say that on the right side, Your Honor,

15  starting with the debtor, the first transfer is up to BI

16  S.a.r.l., and, ultimately, the immediate and subsequent

17  transfers make their way up to NAG.  And the question is

18  whether that transfer from the debtor to BI S.a.r.l. can be

19  attacked.

20         Now, we admit that they're not in the case, but we

21  believe, based on the extraterritoriality ruling, that it is

22  a claim that we can bring and it is avoidable.  I believe we

23  make all the allegations in the complaint that it is

24  avoidable, and so long as we can prove more 548 that it is

25  avoidable, we can recover it from the ultimate transferee,

1  NAG.  That's our case on Count Number 1.

2         And we've listed all the cases, the Madoff cases and

3  the other cases about all you have to do is prove it's

4  avoidable or allege and prove it's avoidable, then you can

5  recover.  With that, Your Honor, unless you have any

6  questions, that's my argument.

7         THE COURT:  I don't.  Thank you.

8         MR. KIRPALANI:  Just 30 seconds, Your Honor.

9         THE COURT:  Go ahead.

10        MR. KIRPALANI:  So, I like that my opposing counsel

11  gave something that I could look at to try to understand the

12  complaint.  So if we take a look at that piece of paper --

13        THE COURT:  Yep.

14        MR. KIRPALANI:  -- I think what's going on here is

15  he's trying to cover one eye and ask Your Honor to look at

16  one happened and then cover the other eye and look at what

17  happened.

18        THE COURT:  Well, let me ask you, do you agree that

19  the funds that Basell Funding transferred to NAG, otherwise,

20  were property of LBI?

21        MR. KIRPALANI:  No, we don't agree to that.  I mean

22  what's wrong with this -- what I meant by covering the eye

23  is, you see the green?  That little green arrow that caught

24  Your Honor's attention, that doesn't really belong there.

25  The only reason -- the only basis for that are the blue

1  arrows.  It's the blue arrows -- if you follow the corporate

2  formalities -- if the trustee is saying follow the corporate

3  formalities, Your Honor, this was a Basell distribution.

4        Well, if that's the case, then it's Basell

5  distributing a Luxembourg dividend to BI and then up the

6  chain.  He's trying to have it both ways.  He's trying to

7  say, well, for purposes of deciding who owned the

8  distribution, you can look at the blue side, but just bring

9  that arrow over to the left side, because if you don't follow

10 the cash, there's no dispute.  The cash did not come from

11 Basell.

12        THE COURT:  But, Mr. Pohl told me that LBI

13 controlled -- he used the term "control" -- controlled the

14 disposition of that money.

15        Did it?

16        MR. KIRPALANI:  That's their allegation.  I'm not

17 even sure that's well pleaded, but, you know, I don't know

18 that that's -- well, I guess that would be an issue for trial

19 if Your Honor's saying --

20        THE COURT:  No, I think that --

21        MR. KIRPALANI:  -- but I can't refute that on the

22 allegations of his complaint.

23        THE COURT:  Okay.  So --

24        MR. KIRPALANI:  Because one would say the ultimate

25 shareholder, if it's the control test, then why isn't it the

1   ultimate shareholder?  Why is it just BI -- AF SCA?  Why

2   isn't it BI S.a.r.l. or Nell Limited or NAG itself?  I mean,

3   where does that end if that's the theory?

4         If it's whoever owns the shares does all the

5   controlling, that doesn't really seem like the right

6   analysis, because he certainly doesn't have standing to bring

7   a lawsuit on behalf of BI S.a.r.l. or Nell or NAG, so he's

8   picking one.  He's saying, oh, I'll pick that one.  I'll pick

9   Basell AF SCA, because that happens to be a Chapter 11

10   debtor, and I'll saying, well, along the way, I had the power

11   to control, too, and that's essentially what the theory is.

12         We think that that takes the theory too far, because

13   if you're talking about --

14         THE COURT:  Well, what was the -- do you know what

15   the source of the funds were that were transferred?

16         MR. KIRPALANI:  Not offhand.  I have looked at it,

17   if we ever have to get to it, I --

18         THE COURT:  Your colleague wants to tell you.

19         MR. KIRPALANI:  Ah, yes.  It came from another

20   nondebtor, which was their original complaint, which is

21   Basell Holdings BV, which is --

22         THE COURT:  Another step down.

23         MR. KIRPALANI:  -- below, and you can see it's here,

24   further down.

25         THE COURT:  Yeah.

1          MR. KIRPALANI:  And that cash -- that's the cash

2    that actually went, I believe, directly, from Basell Holdings

3    BV to NAG.  I don't believe it made a pitstop at Basell

4    Funding.  I think the chart may not be right, but, I mean if

5    this is their complaint, I can't tell you it's wrong.

6          To my understanding, it ran directly from Basell

7    Holdings BV to NAG.

8          THE COURT:  Well, so -- okay.  As you know, I have a

9    motion to dismiss --

10         MR. KIRPALANI:  Right.

11         THE COURT:  -- and I'll go back and look again, but

12   I've got to accept the well-pleaded allegations in the

13   complaint is true, does it state a plausible claim for

14   relief?

15         If your recitation of the flow of funds, the flow of

16   documents is correct, you'll prevail, but that doesn't answer

17   the question of whether they've stated a claim that survives

18   a motion to dismiss.

19         MR. KIRPALANI:  I understand that, Your Honor.  I

20   mean this is -- they're -- you'll look at the complaint

21   yourself.  I think it's unintelligible that this was a

22   transfer of interest in property of the debtor by their own

23   complaint.  We gleaned the two theories --

24         THE COURT:  Let me ask you this:  Would you agree

25   that if it was a transfer of an interest in property of

1  Basell AF SCA, a Chapter 11 debtor, even though the transfer

2  was in Luxembourg, that the trustee could assert his

3  avoidance claim?

4          MR. KIRPALANI:  I do not agree with that.

5          THE COURT:  And tell me why.

6          MR. KIRPALANI:  Because that would be the analogy to

7  Maxwell.

8          THE COURT:  I don't think so.  That's what -- I have

9  to go back and re-read Maxwell.

10          MR. KIRPALANI:  It was two English banks and one

11  French bank, who received almost admittedly preferential

12  transfers from a U.K. entity that was in Chapter 11.

13          THE COURT:  Was it the same U.K. entity that was

14  Chapter 11?

15          MR. KIRPALANI:  Uh-huh.

16          THE COURT:  That's why I have to go back and check

17  that.

18          MR. KIRPALANI:  Yeah.  The irony, I believe, that

19  Judge Brozman found was that you were appointed, pursuant to

20  the U.K. Court, and you're saying, don't use the law and

21  Court of where I came from; instead, just use Chapter 11 law,

22  and the Court just held that based on the gravity of the

23  facts, the center of interest and the center of gravity for

24  that transaction, this was really a U.K. transfer.

25          So, we would say, under your question, Your Honor,

1  even if Basell had an interest in property, that interest in

2  property was transferred under Luxembourg law to make a

3  Luxembourg dividend, which, of course, otherwise they would

4  have brought it, is now under Luxembourg law.

5          And so, to then engraft on it, well, no, but it

6  happened to file for Chapter 11, so maybe it's a 548

7  transfer, we think that that's an extraterritorial reach.

8          THE COURT:  And, of course, in Maxwell, there was a

9  U.K. proceeding.  The entity did the transfer --

10         MR. KIRPALANI:  But I don't think that's a

11  distinction with the difference, because that -- if anything,

12  that only gives them a little more of an argument.  I mean

13  the fact that Basell AF SCA didn't file a coupling proceeding

14  to try to recover value under its local law, I don't think

15  that should be dispositive as to whether the U.S. law should

16  apply extraterritoriality; that's the real question.

17         Does U.S. Bankruptcy Code avoidance action law apply

18  outside of the United States?  And we think that Judge

19  Brozman's case decision is correct.  We think the cases that

20  have cited it are correct.  We think it's consistent with

21  U.S. Supreme Court case law in the antitrust area, and in the

22  other areas, too, Your Honor.

23         But if Your Honor goes back and sees it.  You feel

24  that the well-pleaded allegations of the complaint

25  established this was an transfer of an interest in property

1    of Basell, I would concede.  I can't convince you at this

2    motion to dismiss stage.

3          THE COURT:  You might.  You know, I don't -- I'm not

4    sure.

5          MR. KIRPALANI:  I can't properly convince you at a

6    motion to dismiss stage that that's -- that you should just

7    ignore the allegation.  We don't even think the allegation is

8    made, and reason it's not made is because they know they've

9    got to comply with Rule 11 when they file a complaint, and

10   their prior complaint talked about -- I think they even

11   referenced the wire transfer going from Basell Holdings BV --

12         THE COURT:  And you're saying their chart is wrong;

13   it was actually funds from one step down, they start --

14         MR. KIRPALANI:  I think so.  I think so.

15         THE COURT:  Okay.

16         MR. KIRPALANI:  Thank you, Your Honor.

17         THE COURT:  Thank you.  Mr. Pohl, just --

18         MR. POHL:  One minute?

19         THE COURT:  Yes, please.

20         Did the transfer come from Basell Holdings BV?  That

21   was -- you know, Mr. Kirpalani didn't -- says he's not 100

22   percent sure, but he thinks that, rather than the transfer

23   being made from Basell Funding S.a.r.l. --

24         MR. POHL:  I think the record --

25         THE COURT:  -- it actually came from Basell Holdings

1    BV.

2         MR. POHL:  -- I think the record shows that it came

3    upstream from the very bottom.  The operating companies

4    generate the cash and then on up.  And the reason, of course,

5    we're focused on the debtor, because that was the top company

6    that's in bankruptcy; that's the only one we can look at.

7         THE COURT:  Uh-huh.

8         MR. POHL:  But just a couple of things that were

9    just mentioned.

10        THE COURT:  Sure.

11        MR. POHL:  Relative to the complaint, in Paragraph

12   17, we cite to the payment letter.  We attached the payment

13   letter as Exhibit C, and it says very clearly -- and this is

14   on debtor letterhead issued to --

15        THE COURT:  Debtor, Basell AF SCA?

16        MR. POHL:  Yeah.  And at that time, since it's pre-

17   Chapter 11, it's got that name -- pre-merger, it's got that

18   name, and it's addressed to the company below it, right, that

19   declared --

20        THE COURT:  Basell Funding.

21        MR. POHL:  -- the monies coming north, yes.

22        And it says, Basell, in connection with the

23   distribution, Basell AF -- that's the debtor -- hereby

24   directs you to wire transfer the distribution on its behalf,

25   to the following account of NAG Investments, et cetera, et

cetera.

        We cite that in Paragraph 17, and in our count,
Paragraph 27, we say, on or about November 7th, 2007, Basell
debtor, effected the transfer to NAG.

        And, you know, I try to avoid using this
terminology, but, you know, it's -- and we reference this in
our complaint, and I said before, it's attached, too, as
Exhibit D -- it's a fair amount of chutzpah to come into
court, make up -- with this version of the facts, after
February 24th, 2009, Cadwallader, debtor's counsel, writes a
letter to Judge Gerber, and in it they cite a bunch of
related-party payments.

        And there's a section for payments.  It reads,
"Related-party transaction and dividend payments by
LyondellBasell Industries AS FCA -- that's the same debtor --
to Access Industries or its affiliates since 2005, cited;
euro, one hundred-million-dollar dividend, paid December 7th,
2007."

        THE COURT:  Okay.  All right.  I have your point.

        Okay.  Like the others, I'm taking it under
submission.

        So, what, that leaves now, the use of the
depositions?

        MR. WERDER:  Yes, Your Honor.  Rick Werder from
Quinn Emanuel.

1        THE COURT:  Could you -- are these -- were these

2   depositions video or just --

3        MR. WERDER:  Unfortunately, Your Honor, it turns out

4   they weren't.  I was trying to figure out with my colleagues

5   why they weren't, because virtually all the depositions that

6   we, as the defendants, took in the case were videotaped, and

7   I think a lot of the depositions that the plaintiffs took

8   were maybe not videotaped.  But I haven't been able to

9   reconstruct, given that it's five or six years ago, why these

10  Mr. Ones weren't videotaped.

11       But we think, Your Honor, this motion is offering a

12  very pragmatic solution to what, otherwise, is a difficult

13  litigation call.

14       THE COURT:  Not so much.  Let me tell, I really

15  don't want to hear argument about this motion.

16       MR. WERDER:  Okay.

17       THE COURT:  Let me tell you about my trial

18  procedures and how I would like to deal with this issue.  I

19  would certainly -- so we're talking about five witnesses, as

20  I understand it, one of whom lives in London and may not be

21  available.

22       MR. WERDER:  One of them is definitely under the

23  unavailability rule for sure, Your Honor.  We're not sure

24  about the others.  We've been trying to -- you know, as hard

25  as it is to imagine, this case was once even larger than it

```
 1   is now.  We've been trying to --

 2          THE COURT:  You know, the fact that the papers

 3   indicated that people -- some have already settled, you know,

 4   I hope you're trying to see whether more entities can settle,

 5   but let's leave that aside.

 6          Okay.  All right.  So one or more of the deponents

 7   is unavailable.

 8          MR. WERDER:  At least one of them is unavailable.

 9          THE COURT:  Mr. Wissner-Gross?

10          MR. WISSNER-GROSS:  Yes.  Judge, we've checked into

11   this and four of the five live and work in New York.  One

12   appears to live and work in California -- in San Francisco.

13          THE COURT:  Okay.  San Francisco.

14          MR. WISSNER-GROSS:  And in our papers, we said

15   unless he comes voluntarily, he would be unavailable.

16          THE COURT:  Right.  It's similar to what, I think,

17   Judge Gerber was going to do in that phase during trial years

18   ago.  And I probably have raised this in this case with all

19   of you with the first hearing, I -- my strong preference is

20   to have written-down direct testimony, with the declarant in

21   the witness chair for cross-examination.

22          MR. WERDER:  We understood that, Your Honor, yes.

23          THE COURT:  And, you know, in your brief and reply,

24   make persuasive arguments why this would satisfy the

25   extraordinary circumstances that might give me the authority
```

1   to permit the deposition transcripts to be used, but I'm not

2   going to do it.

3           MR. WERDER:  Okay.

4           THE COURT:  Okay.  Let me finish --

5           MR. WERDER:  Yes, Your Honor.

6           THE COURT:  And I'll give everybody a chance to

7   speak some more.

8           Mr. Wissner-Gross, I can just tell you that one way

9   of getting me -- to have me totally lose my patience in a

10  trial that's already going to be complicated enough, is to

11  have these witnesses come i, you know, have their direct --

12  we'll come back -- I'll come back to this issue of whether

13  the direct written testimony, which was written for when they

14  were employed with the parties, which they no longer are --

15  but let's assume for -- that that's -- you're going to --

16  you're sponsoring that testimony and you're going to offer it

17  and the witnesses show up.

18          I'm going to run out of patience quickly, if, you

19  know, we get into the "I don't remember" or "It's too long

20  ago, I don't remember" and somebody's going to try to refresh

21  their recollection with the deposition.  In a responsive

22  reading of depositions, they're simply to refresh your

23  witness' recollection to what they said however many years

24  ago, and, you know, in an effort to impeach, et cetera.

25          My -- I only have limited patience for listening to

1    that, so it strikes me as a little surprising, Mr. Wissner-

2    Gross, that you haven't made a better effort to work this out

3    -- sit down -- to work this out, to permit the use of the

4    depositions.

5              You know, I did have the question of whether it a

6    video-deposition or not and these seem to be not.  I think

7    you're on solid legal ground in arguing, well, if they want

8    to use the written testimony, they've got to bring the

9    witness and more time to cross-examine them.

10             And that's always been my view.  I don't permit

11   written direct testimony of a witness who isn't going to show

12   up in my courtroom and be cross-examined.  They -- you know,

13   they've often been deposed before.  It's fine, okay.

14             I -- you know, I had concern when I read your

15   objection to their motion.  It said, well, we think a lot of

16   these witness statements are full of hearsay and it's not

17   relevant to the issues here and you may be right.  I don't

18   know.  And that's going to be something that if the

19   defendants are going to offer the written testimony that was

20   prepared for Phase I of the trial that didn't happen, that's

21   going to have to get teed up early and you're going to have

22   to give me a page and line number, objections to specific

23   portions of it, and we're going to have to respond to that.

24   But, so be it, if that's the case, okay.

25             With respect to the one who may be unavailable, you

1  know, somebody might persuade the person to come from

2  California.  It's an interesting question to me whether I

3  would permit the use of -- certainly, if the witness is

4  unavailable, the deposition is usable, okay, and, you know,

5  it's typical that I get designations, counter-designations,

6  objections, and I resolve as much of that before trial as

7  possible.

8          Interesting question, if the witness is unavailable

9  as to whether the written direct testimony that was to be

10 used at Phase I of the trial can be used or only the

11 deposition transcript, in the first instance, I would expect

12 you all to work that out, and I also don't know whether Mr.

13 Werder, what apparently doing is trying to get more written

14 testimony from four of the five witnesses or whether you're

15 going to rest on what they said before.

16          And, certainly, Mr. Wissner-Gross, to the extent

17 that four of the five live in New York, you can lay subpoenas

18 on them and drag them in here, if you want, as part of your

19 case in chief and we'll see where we go.

20          But I'm not -- what I'm not going to do -- and on

21 this I am firm on -- is I'm not going to order that the

22 deposition transcripts of witnesses who are within the

23 subpoena power of the Court, can be used in lieu of requiring

24 them to appear.  That's just (indiscernible).

25          My -- and I would prefer less trial time rather than

1   more trial time, but it's going to be long enough already,

2   you know, so a little longer -- and I tell you all that I

3   have no hesitancy whatsoever to (indiscernible) and shorten

4   cross- examination, if I believe it's duplicative or

5   unnecessary for me to hear, so we'll see.

6           Go ahead, Mr. Werder.

7           MR. WERDER:  So, Your Honor, one response to your

8   question and then one request for clarification.

9           THE COURT:  Okay.

10          MR. WERDER:  In response to your question about

11  whether we contemplated additional written directs from these

12  witnesses, we don't have any control over them; they're

13  third- party witnesses.

14          THE COURT:  Sometimes they're cooperative.

15          MR. WERDER:  We -- sometimes.

16          THE COURT:  Well, you can't force them to if they're

17  not your people.

18          MR. WERDER:  And I mean, we were satisfied with the

19  scope of the testimony that they previously offered and with

20  the deposition testimony, and so our intention would be to

21  have that scope be the scope, but, of course, Mr.

22  Wissner-Gross can ask them anything he wants.

23          But my question, Your Honor, is, given that these

24  are not witnesses who are under our control, I think what I

25  understood Your Honor to be suggesting is we could subpoena

1   them or, otherwise, secure their voluntary attendance and

2   proffer the written direct testimony that was prepared for

3   Judge Gerber's trial, and then it could be tendered for

4   cross- examination on the basis that that's their testimony?

5           THE COURT:  I'll hear from Mr. Wissner-Gross.  I

6   don't see why not.  I mean it -- there's -- so I'll listen to

7   Mr. Wissner-Gross, but, you know, I have had written direct

8   testimony in a trial, you know, that was not originally

9   prepared for my trial, but it was relevant material, et

10  cetera. It was -- you know, the statements were admissible.

11  The witness came to court, was cross-examined.

12          Where we're going to run into a problem, I don't

13  know -- so, somebody got their written direct and it was

14  going to be used for Phase I of the trial.

15          MR. WERDER:  Well, yeah, Your Honor.  So -- but

16  these witnesses, these five witnesses are from four of the

17  major banks that were defendants in the case at one point,

18  and, obviously, as the Court would expect, they were

19  vigorously represented by --

20          THE COURT:  Sure.

21          MR. WERDER:  -- able counsel at the time that they

22  were parties to the case.  And the witnesses and counsel were

23  spending, as we were, and as Mr. Wissner-Gross and his team

24  were, getting ready for the trial that was anticipated in

25  December of '09, were spending massive amounts of time,

1  energy, and effort to get ready for the trial, and result of

2  that effort, we submitted written direct testimonies for Len

3  Blavatnik and for Cole Kasen (phonetic), and for another

4  witness.  And Mr. Higgins submitted, on behalf of a number of

5  his clients, written direct testimony.  And the four banks

6  are represented by I forget, but Davis Polk, Sullivan, you

7  know, et cetera, a laundry list of very highly qualified,

8  very skilled lawyers presented the written directs on behalf

9  of these witnesses.

10         And so -- and, you know, we were in a joint defense

11  situation with them at the time, more or less, but they

12  prepared the -- you know, we didn't meet with their

13  witnesses, and so -- but our intention would be, and I think

14  the most efficient way to do this, given the way that --

15  given the passage of time, et cetera, would be -- you know,

16  we're not going to go and ask them to write new statements

17  nine years after the operative facts and seven years after

18  they wrote the last statements.

19         We would like to be in a position where we could

20  say, either subpoena them or call them up and say, look, we

21  want you to come and testify.  You've had a direct

22  examination that was previously prepared, please review it

23  and refresh yourself on it, because what we want to do is to

24  tender that to the Court as your direct examination and then

25  Mr. Wissner-Gross can kind of have at them, and then we'll do

1    our redirect.

2         THE COURT:  Well, let me ask this, because if you

3    all agree -- you obviously haven't to this date -- but if you

4    all agree exactly what you'll permit the other side to offer

5    that you wouldn't object to, life gets simpler, but, for

6    example, if you or another counsel elicited testimony from

7    the declarants in their deposition that goes beyond what's in

8    the written testimony, written narrative, and you're going to

9    offer it, you've got a problem because the rules permit you

10   to offer the deposition of a party for any purpose.

11        Well, they're not -- their employers are not parties

12   any longer, so if what your -- what either side wants to do

13   -- well, yeah, really, what either side wants to do, if what

14   you want to do is pick and choose from the deposition

15   transcripts -- you've got the same problem, Mr.

16   Wissner-Gross, these are not parties.  And so if -- I have a

17   feeling, you know, (indiscernible) the whole, there's things

18   you like in the transcript and things you don't like in the

19   transcript.  And you know, you're not in the position to

20   offer -- cross-examine them, and maybe want to impeach the

21   witness with it, or it was to refresh recollection, but

22   you're not in the position to offer the deposition testimony

23   of these employees of former parties who are not parties to

24   the action any longer.

25        That's one of the things that it seems to me that

1   both sides -- I'm not telling you that you have to do this,

2   but, I mean, you ought to give each other designations and

3   counter- designations and see whether you can come up with an

4   agreement for use of the transcripts.  And I'll just tell you

5   what I do in trials, to the extent the parties have

6   designated and counter-designated transcripts, I have always

7   reviewed it before taking the bench, so we don't have a

8   responsive reading of deposition transcripts taking up trial

9   time.

10          But, you know, if you don't come to an agreement --

11   and somebody may persuade me I'm wrong about this -- but none

12   of the parties who are in this courtroom today is in a

13   position to be able to offer, over objection, the deposition

14   transcripts of these five witnesses, because they're not

15   parties or employees of parties.

16          It frequently happens the parties usually work it

17   out and agree that if we have to go through this section -- I

18   don't know -- I don't know what's in the transcripts at this

19   point, okay.  But the one thing I want to be clear about is,

20   if I'm not aware of any rule that would prevent you from

21   using the written narrative testimony they gave however years

22   ago that was, and offering it here.  It may be subject to

23   objections and relevance or hearsay or whatever.

24          I didn't see in Mr. Wissner-Gross' papers saying

25   that you can't use it for any purpose.  Did they -- you don't

1   have that in your papers, right, Mr. Wissner-Gross?

2          MR. WISSNER-GROSS:  No, Your Honor.

3          THE COURT:  Okay.  You know, you'll have some shot

4   at them on the witness stand.  That's the way I understand it

5   and that's fine with me.

6          MR. WERDER:  We're actually fine with him having

7   whatever shot he wants to have with them, too.

8          What we were concerned about, Your Honor, frankly,

9   was that there might be, either A, we would have to try to

10  get new witness statements from them or, B, we would be in a

11  situation where we would have to try to drag out of them,

12  nine-year-old complex financial testimony in a way that would

13  be very difficult to do.

14         THE COURT:  I understand, but do you have any

15  objection to them using their old witness statements, other

16  than -- I mean you're preserving your objections, rather than

17  --

18         MR. WISSNER-GROSS:  No, Your Honor.  I think our

19  principal objection is that they were done -- they were done

20  when when they were parties, and there isn't a lot of

21  hearsay, and there's quasi-expert testimony.  As long as we

22  have the ability to make sure to pose any appropriate

23  objections to those declarations, we're fine with that.  Your

24  Honor, we want to obviously have the ability to cross them --

25         THE COURT:  Right.

1          MR. WISSNER-GROSS:  When I have the chance to take

2     the podium, I'll get some other, further contextual

3     observations.

4          THE COURT:  Okay.

5          MR. WERDER:  Perfect.  That's a better solution than

6     the one we were offering, from our perspective, in the first

7     instance, Your Honor.  So we're --

8          THE COURT:  Well, I don't know.  I mean, are there

9     things in the depositions that you want to be able to use

10    that's not in the written statement?

11         MR. WERDER:  Well, here's what happened, Your Honor,

12    with these witnesses.  First, they were deposed in 2009.

13    Then, they gave these witness statements, and then we have

14    the dialogue, back and forth, with Mr. Wissner-Gross about

15    whether the witness statements could be used at a subsequent

16    trial and we weren't able to come to agreement for whatever

17    reason, and so, then, we went out and took their depositions

18    to memorialize their declaration and give Mr. Wissner-Gross

19    an opportunity to cross-examine them.

20         Which -- so, the deposition was basically the second

21    depositions of these witnesses --

22         THE COURT:  Preservation of testimony for trial.

23         MR. WERDER:  Yeah, it was, basically, just running

24    through the declarations in a very, you know, frankly, a

25    tedious and painstaking way.

1       So if we can prepare --

2       THE COURT:  I'd probably be very unhappy if that's

3   what happens in my courtroom again, but, you know, so be it.

4       MR. WERDER:  Okay.  So, but -- so it sounds like

5   everyone, subject to Mr. Wissner-Gross reserving his

6   objections to the substance of any of the declarations, what

7   I'm hearing is that we can put -- we can find those

8   witnesses, secure their attendance, and we'll leave aside the

9   one who might be unsubpoenaable.  We can put their written --

10  their 2009 direct testimony forward as their direct

11  testimony.

12      THE COURT:  Subject to objections to specific --

13      MR. WERDER:  Subject to Mr. Wissner-Gross'

14  objections and Your Honor's ruling on them --

15      THE COURT:  Sure.

16      MR. WERDER:  -- and then we do our redirect.

17      THE COURT:  Yes.

18      MR. WERDER:  Perfect.  We're more than happy with,

19  that, Your Honor.  I think it's a better solution.

20      THE COURT:  I'm not sure it's better, but that's --

21  I mean that's what I do in all the cases, okay?

22      MR. WERDER:  Okay.  Thank you.

23      MR. WISSNER-GROSS:  Your Honor, first of all, let me

24  stress that our goal is to stay in your good graces for both

25  sides, and notwithstanding the disputes about it today, we've

1   actually been working in a very collegial fashion with

2   opposing counsel for many years.

3          THE COURT:  And I know that.  I do, okay.

4          MR. WISSNER-GROSS:  But, let me -- I want to draw

5   your attention to a -- just a larger issue to put this in

6   context.

7          THE COURT:  Okay.

8          MR. WISSNER-GROSS:  One of my concerns with these

9   five witnesses is that there were five declarations among

10  many declarations have been submitted and we didn't, among

11  other things, to have -- create a precedent until we saw

12  where the landscape was going to go with all the

13  declarations.

14         So, by way of illustration, most of the declarations

15  are party declarations that were prepared.  Mr. Werder, Mr.

16  Kirpalani had a number of declarations for their clients.

17  Mr. Higgins and other defense counsel had declarations for

18  their clients.

19         I have asked the other side, to the extent you're

20  going to have the witness at the trial, can you get me the

21  declarations two weeks before the commencement of trial.

22         THE COURT:  No, it should be more than that.  It

23  should be more than two weeks.  This is a big trial, okay --

24         MR. WISSNER-GROSS:  So, I will take --

25         THE COURT:  -- and I don't want to just -- no, it

 1  should be more than two weeks.

 2       MR. WISSNER-GROSS:  So, Your Honor, they had offered

 3  me three days.  I said, well, at least give me two weeks,

 4  which was a case management order with Judge Gerber.  I would

 5  take more than two weeks, given the size of the case.

 6       And, also, to the extent that they're going to be

 7  new -- for example, most of the declarations are going to be

 8  of people within their control.  They're going to be party-

 9  employees, former employees, who are still within their

10  control; that's the lion's share of the declarations.

11       As I'm sitting here today, I don't know if they're

12  just going to tender the original declaration or whether

13  they're going to submit a new one.  We think that Your Honor

14  should set a date so that those declarations are exchanged.

15       Among other things, obviously, to the extent there

16  are going to be objections to those declarations, we think it

17  would be most helpful for Your Honor to be able to have that

18  teed up as early as possible.  So we would ask, Your Honor,

19  if you could set a date for the exchange of declarations.

20       THE COURT:  Okay.  So, look, I went back and I --

21       MR. WERDER:  Your Honor, can I just address that

22  briefly?

23       THE COURT:  Yes, go ahead.  Go ahead, Mr. Werder.

24       MR. WERDER:  Here's the thing, Your Honor.  And I

25  don't -- I don't do gamesmanship, generally -- I haven't been

1  before Your Honor before -- but Mr. Wissner-Gross,

2  apparently, has no witnesses, other than his experts, so --

3  and he's the plaintiff, and so basically, what he's hoping

4  for is a week's in advance, full dress rehearsal preview of

5  the defendant's case, which is responding to his case, which,

6  frankly -- and I don't mean this in any pejorative way -- has

7  been somewhat of a moving target over time.

8          So, you know, in saying that -- I mean, basically,

9  what he's saying is that I ought to get the defendant's full

10  case laid out for me in writing in two weeks or more -- no,

11  he's saying two weeks, I guess, he wants two weeks up in

12  advance of the trial, whereas, because I have no witnesses, I

13  do nothing.

14          THE COURT:  Well, you've got his experts --

15          MR. WERDER:  We've got his expert reports, that is

16  true.  But there is an inbalance, and that's why we were

17  looking to have --

18          THE COURT:  It's not an inbalance.  I mean you have

19  witnesses and they don't.  I mean if your witnesses tell a

20  great story, you'll be thrilled that you have witnesses and

21  he doesn't, you know, what can I say?

22          MR. WERDER:  Well, we're happy with the fact that we

23  have witnesses, for sure.

24          THE COURT:  So, look --

25          MR. WERDER:  And let me make one other point, if I

1  could, Your Honor?

2          THE COURT:  Yes.  Go ahead.

3          MR. WERDER:  You know, there were three prior orders

4  for the case.  One had a, I think, a maybe

5  four-day-in-advance deadline.  One had, maybe a

6  week-in-advance deadline.  And then the last one had two

7  weeks -- 14 days-in-advance, and I'm not sure this was a

8  provision of all of them, but I'd request that it be a

9  provision of anything that's entered here, and that is that

10  the defendants are entitled, if they put in a witness

11  statement in advance to, before the witness takes the stand,

12  supplement it or add to it, in light of anything that's

13  happened in the trial before the witness testifies, because

14  -- and that was a provision in at least one, and maybe more,

15  of the prior orders.

16          And so, we would ask that if we are required to put

17  in witness statements two weeks before the start of trial,

18  that those statements could be supplemented within some

19  number of days in advance of the time that the witness is

20  anticipated testifying.  And that is consistent with the

21  procedure that was written into at least one of the prior

22  CMOs.

23          THE COURT:  So, the stipulation order amending the

24  case management and scheduling order that I signed on July

25  6th, 2016, recently, in Paragraph 10, on Page 5, required you

1  to exchange preliminary witness lists on October -- on

2  September 7th.

3         MR. WERDER:  Yes.

4         THE COURT:  Yes, I understand.

5         MR. WERDER:  Yes.

6         THE COURT:  And then in Paragraph 11 dealt with

7  experts, and it doesn't deal with when you have to exchange

8  --

9         MR. WERDER:  And that's because we were fussing with

10 each other about what that procedure would look like, Your

11 Honor, I believe.

12        THE COURT:  Okay.

13        MR. WERDER:  Mr. Wissner-Gross will correct me if

14 I'm wrong, but I think we didn't -- we hadn't reached

15 agreement on that provision.

16        MR. WISSNER-GROSS:  I -- that is true.  I did want

17 to include that.  I thought it was important.  We weren't

18 able to reach a resolution, and the concept was to address

19 that with Your Honor if we couldn't resolve it.

20        THE COURT:  Okay.  So, I -- I'm not holding you to

21 it, Mr. Werder, today, but can you give me an estimate for

22 how many witnesses you believe your side will call?

23        MR. WERDER:  Well, Your Honor, I'm going to defer to

24 Mr. Higgins to a certain extent, but Mr. Blavatnik will

25 certainly testify and Mr. Kasen will almost certainly

1  testify.

2         THE COURT:  Somehow, I feel there are more than two

3  witnesses on your side of the case, but --

4         MR. WERDER:  Yeah, I think we have -- we probably

5  have, from witnesses that are affiliated with Access, maybe

6  five, six witnesses, fact witnesses, and I think Mr. Higgins

7  may have a larger group.  I think he's probably got at least

8  probably 12, because I think he's contemplating -- and I'm

9  counting -- yeah, I think we're probably talking 20 fact

10 witnesses, Your Honor.

11        And I should say, Your Honor, there's the

12 possibility -- I'm not sure whether this is going to happen

13 or not -- but there's one or two witnesses that are

14 third-party witnesses that aren't affiliated with us that we

15 may not be able -- it may not be convenient for us to have a

16 written direct statement from them, that may be coming to

17 testify, even if they're coming to testify voluntarily, in

18 the case of one of them that I have in mind, it may not be

19 feasible to get a written direct statement from him.

20        THE COURT:  How many witnesses do you anticipate,

21 Mr. Wissner-Gross, fact or expert?

22        MR. WISSNER-GROSS:  Six or -- yeah, it's six or

23 seven.  They are expert witnesses.  Those are, obviously, the

24 only people we have in our control.

25        THE COURT:  And those have given reports already;

1   you've produced reports?

2           MR. WISSNER-GROSS:  Yes.  They've all exchanged

3   reports, in some cases, several reports.  They've all been

4   deposed.

5           As to whether they'd be any fact witnesses, the only

6   fact witnesses would be ones that we subpoena; in other

7   words, we don't have any control over any of the --

8           THE COURT:  I know.  Do you have an idea of how many

9   fact witnesses you expect to subpoena?

10          MR. WISSNER-GROSS:  Your Honor, we just -- that's

11  still to be determined.

12          THE COURT:  Okay.

13          MR. WISSNER-GROSS:  I mean we're in mediation with

14  Mr. Higgins and so some of that, it's a function of whether

15  we settle with his group or we don't settle.  We have to

16  report back on that, I guess, early August to you.

17          THE COURT:  Okay.

18          MR. WERDER:  If I could ask Mr. Wissner-Gross a

19  question based on what he just said?  I think it was implied

20  in it, but there was a cooperation agreement, or there is a

21  cooperation agreement, between the trustee and the

22  reorganized debtor, as I understand it, but I think I heard

23  Mr. Wissner- Gross saying that he's not expecting to use that

24  cooperation agreement to call witnesses from the reorganized

25  debtor?

1    MR. WISSNER-GROSS:  Actually, I didn't say anything
2    of the subject.  I just said that as to --
3    MR. WERDER:  Well, you said you don't control any
4    witnesses --
5    THE COURT:  Okay.  Stop.  Stop.
6    MR. WERDER:  Okay.
7    THE COURT:  Look, as things stand right at the
8    moment, you're obligated to exchange preliminary witness
9    lists on September 7th.  I'm going to require all written
10   direct testimony to be exchanged two weeks before trial,
11   okay.  With, potentially 20 witnesses, fact witnesses on the
12   defendant's side, I want the plaintiffs to be able to have
13   adequate testimony to know what their testimony is and
14   prepare to cross- examine them and et cetera, and, obviously,
15   it works both ways, okay.
16          And so, you run into a situation where Mr. Wissner-
17   Gross gives you a list on September 7th that includes six and
18   then two weeks before it's suddenly 20, there -- you
19   shouldn't count on being able to call the witnesses that he
20   didn't, all the while, the pretrial order says preliminary.
21   He's going to have some real convincing to do, that he isn't
22   hiding the ball.
23          But the one thing that -- it just -- to me, trials
24   just go more smoothly and I can reach the best decision when
25   neither side has been hiding the ball.  You lay your cards on

1    the table and I have -- because I read the witness testimony

2    in advance.  If you get them two weeks before, I'm going to

3    require any motions in limine to exclude any of that

4    testimony one week before.  Even that's cutting it short; it

5    could leave you with a lot to do in the week before trial and

6    it doesn't make me particularly happy, I've got to say.

7           You know, in Paragraph 14 of the pretrial order --

8    the case management order, it has trial starting on October

9    17th, and you've seen from the record I altered it a little

10   from what I told you, because I planned to be at the NCBJ

11   when I said that we wouldn't have trial the 26th through the

12   28th, because the NCBJ is meeting in San Francisco and I

13   expect to be there.  When I gave you the original dates, I

14   didn't have NCBJ on my calendar, so that's part of the count.

15          But I tried to at least make up for it by pulling

16   some dates the following week, although, I would, as you

17   probably know or could if you look, the Court is closed

18   November 8th for election day and the Court is closed

19   November 11th for Veterans Day, so the Court will be dark on

20   those two days; that potentially falls within the trial

21   period.

22          But, I suspect you all have looked by now at my

23   template for joint pretrial conference orders that appears on

24   the website with my chambers rules, and I expect it to be

25   followed.  And so, I need to set a date for when -- let me

1  see -- did I put a date for when the pretrial order will be

2  submitted?

3          MR. WISSNER-GROSS:  Your Honor, you set it for two

4  weeks before the commencement of trial.

5          THE COURT:  You know, and in that, there's a lot of

6  stuff that has to go into that and I expect it to all be in

7  there.

8          Yes, Mr. Werder?

9          MR. WERDER:  Your Honor, with respect to the

10 declarations and returning to a point made a little bit

11 earlier, can we have a provision comparable to what Judge

12 Gerber approved in his 2010 order that was the language, to

13 the effect that the defendants can amend -- had the right to

14 amend their witness declarations, in response to evidence

15 solicited at trial at any time, up to 24 hours before the

16 time that the relevant witness is made available for

17 cross-examination?

18         THE COURT:  Mr. Wissner-Gross?

19         MR. WISSNER-GROSS:  Those were exigent circumstances

20 back then.  There was a reason why everything was compressed

21 back then.  Now, I think -- now, Your Honor, I think that if

22 he has witnesses, it's just -- I don't think it's fair to

23 have a moving target like that for us, so we would object to

24 that at this point.

25         Certainly, a witness, if they're going to testify,

1  and they have anything to supplement, they'll be able to

2  address that at trial.

3  　　　　THE COURT:  And I think that's right, Mr. Werder.

4  If you're going to have a witness -- if you wish to do a

5  redirect of a witness to address evidence that has come into

6  trial up to that point that wasn't addressed in the written

7  statement, I'm going to permit you to do that.

8  　　　　MR. WERDER:  Okay.

9  　　　　THE COURT:  Okay?

10  　　　　MR. WERDER:  That's fine.

11  　　　　And does Your Honor -- I haven't tried a case in

12  front of Your Honor, and I suppose I could ask one of my

13  colleagues -- but when a witness, who's given a written

14  declaration takes the stand, does cross-examination commence

15  immediately or do they --

16  　　　　THE COURT:  Generally, yes.

17  　　　　MR. WERDER:  -- get a chance to kind of warm up in

18  the witness stand for a few minutes?

19  　　　　THE COURT:  No warm-up.

20  　　　　MR. WERDER:  Very good.

21  　　　　THE COURT:  Generally, what's happened is the

22  witness is sworn.  You tender that the -- I will have read it

23  and hopefully resolved any objections in advance -- sometimes

24  I can't resolve the objections in advance, sometimes with

25  issues of relevancy, I got to -- you know, I want to hear the

1   testimony and I'll reserve ruling, but, I don't know whether

2   that's responsive to your --

3           MR. WERDER:  I think that was responsive.

4           Mr. Kirpalani put another bug in my ear, which is,

5   he referenced --

6           THE COURT:  Does it have a PowerPoint to go with it

7   or ...

8           MR. WERDER:  Well, this one doesn't even need one, I

9   don't think, Your Honor.

10      (Laughter)

11          MR. WERDER:  This one could be done without a

12  PowerPoint.  And the question was, let's just assume that

13  something comes up during the trial before the witness

14  testifies that we would want to supplement with, can we do

15  that supplementation as we tender the witness and then tender

16  up for cross-examination?

17          Your Honor, that seems that's just a variant on what

18  you said you wouldn't permit --

19          THE COURT:  Look, because I've had people try and

20  give me this bare-bones written direct and they put their

21  witness on and they say, I've got a few questions, in light

22  of, you know, developments in the case --

23          MR. WERDER:  I hear you, Your Honor, but if you look

24  at the -- and you would have no reason to have done it -- but

25  if you look at the, I don't know, maybe 15 written directs

1   that were submitted to Judge Gerber in 2009, my version of it

2   is a double-space -- there's a double-sided binder that's

3   this thick.  I mean the declarations, some of them run to

4   hundreds of paragraphs.

5         So, it's not a question of sandbagging, but he is

6   beginning to put his case on first and there may be a desire

7   on our part, as the defendants, to be responsive to the case

8   that the plaintiff actually puts on at trial, and it seems to

9   me that if we've laid out a good faith written direct

10  statement, but things come up at trial that the witness could

11  address, and having them address it and be crossed once,

12  rather than tender them on one set of testimony, have them be

13  crossed, and then give them a direct examination unrelated to

14  the cross on some additional topics might be the more

15  efficient way to do that.

16        THE COURT:  And your position, Mr. Wissner-Gross?

17        MR. WISSNER-GROSS:  Well, I think it's still the

18  same issue, Your Honor.  It's, again, it's -- with 20

19  witnesses, what we don't want to have is one declaration and

20  then find out that we have a 15-page supplemental declaration

21  from every one of their witnesses.

22        MR. WERDER:  It's not going to be a supplemental

23  declaration.

24        THE COURT:  You told me that your -- well, it sounds

25  like your case is mostly expert witnesses and --

1      MR. WISSNER-GROSS:  Our case is mostly expert

2  witnesses.  This -- we're -- obviously, one issue is looking

3  at subpoenaing some of the people within the jurisdiction who

4  may be appearing as hostile witnesses, because these expert

5  reports are quite substantial, Your Honor, so the evidence is

6  quite significant for the expert testimony.

7      THE COURT:  Here's -- I may sound like I'm

8  (indiscernible) but what I'd really like to do is -- there's

9  enough time before I have to finally conclude this, I mean, I

10 think there's some persuasive arguments on both sides about

11 this, and I want the two of you, or your colleagues to meet

12 and confer and see whether you can come to an agreement about

13 it.

14      I get really unhappy, Mr. Werder, if what's

15 happening during the trial is I feel that one side or the

16 other is trying to sandbag the other side, okay.  You've got

17 their expert reports already and what you want your witnesses

18 to do is rebut expert reports they already have in hand, that

19 better be done.  It seems to me that you need to do that with

20 supplemental written testimony, okay.

21      It's one thing when, you know, if Mr. Wissner-Gross

22 subpoenas a bunch of witnesses he doesn't control and they

23 come and testify and stuff comes up in their testimony that

24 you want your declarants to address during trial, that's

25 fine; I have no problem with you ask them -- or put them on

1   the stand, introduce their written testimony, supplement the

2   testimony with direct testimony that's responsive to

3   testimony of the witnesses that you did not see the testimony

4   in advance.

5           But if you had the expert reports for months --

6           MR. WISSNER-GROSS:  Or years.

7           THE COURT:  -- or years, and, you know, for example,

8   earlier in the day, it was either Mr. Wissner-Gross or his

9   colleague argued that the only testimony on this is our

10  expert report; they put it in their experts.  And I made the

11  point, and Mr. Kirpalani addressed it, was, you know, you can

12  put a CFO to address the issues.

13          So you've got their expert reports.  If what you're

14  going to do is have your 20 witnesses --

15          MR. WERDER:  Yes.

16          THE COURT:  -- address facts that have been dealt

17  with in expert reports, you're going to need to do that in

18  writing.  You're going to need to provide that to Mr.

19  Wissner-Gross and his colleagues two weeks before; that, to

20  me, is the only thing that's a fair resolution of this.

21          MR. WERDER:  And I would never ask anything

22  inconsistent with that.  If -- when Your Honor sees some of

23  the witness statements from 2009, you'll see that they

24  address chapter and verse, the then-extant expert reports,

25  which are still live expert reports in some respect in the

1   case, and there have been supplements since then.  So,

2   presumably, the new witness statements will address the

3   additional.

4        THE COURT:  Yeah, I don't have any -- I guess,

5   here's the point, if you cross witnesses and you're hearing

6   their testimony for the first time at trial and you want one

7   or more of your witnesses to address what I've listened to,

8   fine, okay, I'm not -- you know, I'm not saying it has to be

9   in writing, okay?

10       But if it's anything -- if it's responding to

11  anything that's in writing --

12       MR. WERDER:  Understood.

13       THE COURT:  Okay.

14       MR. WERDER:  Let me -- can I ask one additional

15  question, Your Honor?

16       THE COURT:  Sure.

17       MR. WERDER:  And that is, there are perhaps fifteen

18  2009 witness statements that are existing, including Len

19  Blavatnik has one.  As I said, he's almost certainly going to

20  testify.

21       Does Your Honor have a preference about whether we

22  have him redo the 2009 statement, because 2009, the trial was

23  -- the case was phased.

24       THE COURT:  It was a different -- yeah, it was a

25  phase trial, I know.

1            MR. WERDER:  So, in 2009, there was going to be one

2   -- really, one issue, arguably, two issues addressed, but now

3   we've got additional issues.  So I think the easiest thing

4   from our perspective might be to have them do another witness

5   statement, but I'm not sure if that's easy for you.

6            THE COURT:  I haven't read -- it's not -- I'll tell

7   you one thing, I haven't read any of these witness

8   statements, so I'm going to read them when they're submitted,

9   and, you know, we can do new ones, that way I only have to

10  read one and not two.

11           And if it's, you know, Mr. Wissner-Gross, I think

12  you've left out five paragraphs of the Blavatnik declaration,

13  and he thinks you've left it out because he can be impeached

14  about it or he's going to impeach him by it, he can certainly

15  use the prior statement to -- for cross-examination.

16           But, yeah, life would be easier for me if I'm

17  reading one statement.  If you need two, it's okay, too.  I'm

18  not -- but -- so, it's my preference, but not strong.  Okay?

19           MR. WERDER:  All right.  Appreciate it, Your Honor.

20           THE COURT:  You may have very little patience from

21  some of the witnesses that you don't control to -- you don't

22  have to review an entirely new declaration, and they give --

23  be willing to give you a couple more pages with points, but I

24  -- you know, so I'm not (indiscernible) as to how you do

25  that.

```
 1            MR. WERDER:  Thank you.

 2            THE COURT:  Okay.

 3            MR. WISSNER-GROSS:  Your Honor --

 4            THE COURT:  Go ahead, Mr. Wissner-Gross.

 5            MR. WISSNER-GROSS:  -- one other housekeeping

 6   matter?

 7            THE COURT:  Sure.

 8            MR. WISSNER-GROSS:  I believe at our last conference

 9   you indicated your preference for experts was to have the

10   expert reports tendered as the direct.  Here, I will tell you

11   that some of the expert reports are quiet lengthy.  I think

12   it would probably be most efficient for both sides to follow

13   protocol, but I just wanted to confirm that that's what you

14   wanted.

15            THE COURT:  And I think what I said before is I

16   can't think of a trial on dealing with experts where the

17   parties did not agree to that, okay.  You know, there -- we

18   don't have a jury, so, you know, in jury cases, there's

19   issues that sometimes what's in an expert report is not

20   admissible.

21            In a bench trial, it just doesn't, frankly, come up,

22   and so what I'd like for you to do is you and opposing

23   counsel to try to reach an agreement.  If you can't, you'll

24   let me know.

25            I just -- because I will -- if both sides agree that
```

1    the expert reports will constitute their direct testimony, I

2    will have read them before, just as I read the written direct

3    before a witness takes the stand.  And, you know, we'll

4    proceed with cross-examination, and we'll go from there.  But

5    in the first instance, I want to give both sides a chance to

6    try to come to an agreement about it.

7         I -- with good counsel involved, it's my strong

8    preference to let counsel -- you each know what your case is.

9    You each know how you want to go about it.  There may be some

10   things that you're willing to trade off with each other.  If

11   I have to resolve it, I will, okay, but I want to give you

12   the chance.

13        I'm usually quite willing to proceed -- other than

14   some real -- you know, none of these issues have come up here

15   -- there's sometimes some issues that I feel so strongly

16   about that I just say, that's the way we're going to do it,

17   okay?  But, otherwise, I try to let counsel try to come to an

18   agreement about how you want to do it, so I'm not trying your

19   case.

20        MR. WISSNER-GROSS:  Your approach is fine with us,

21   Your Honor.

22        THE COURT:  Okay.

23        MR. WISSNER-GROSS:  We'll confer with the other side

24   on it.

25        THE COURT:  Okay.  All right.

1          Mr. Kirpalani?

2          MR. KIRPALANI:  Yeah, very, very briefly.  So that

3     was the -- what Mr. Wissner-Gross just mentioned about the

4     lengthiness of these expert reports, which we've learned

5     today, is his primary witnesses -- you probably won't

6     remember -- but that's why I rose the last time we -- the

7     first time we showed up here.

8          The issue is not going to be, can counsel agree that

9     expert testimony, that's truly expert opinion testimony,

10    could just be in the form of the report.  Of course we will.

11    Of course we will.

12         The problem that you're going to see is a preview to

13    what you're going to see in a motion in limine, is that Mr.

14    Wissner-Gross' entire case is essentially experts reviewing

15    emails and drawing inferences from the emails and trying to

16    tell a story as if they were a fact witness.  That's not

17    something that we or any of our co-defendants are going to

18    permit without a fight and --

19         THE COURT:  Well, if they're going to have a problem

20    with one of the underlying emails, it won't come into

21    evidence, but, you know ...

22         MR. KIRPALANI:  That's true.

23         And if the emails themselves are just being quoted,

24    that's another thing, but we'll see as the issue progresses.

25    We'll try to work it out, which portions of these very

```
 1  lengthy --
 2          THE COURT:  How long are they?
 3          MR. KIRPALANI:  These tomes?  These novels?
 4          THE COURT:  Now, I may want to reconsider what I
 5  said, right?
 6          MR. WISSNER-GROSS:  They're very large, Your Honor.
 7          MR. KIRPALANI:  He should know.  Mr. Wissner-Gross
 8  should know.
 9      (Laughter)
10          MR. KIRPALANI:  But, this is the problem, so we will
11  try to work it out and come up with which portions of it are
12  really proper expert opinion testimony -- I'm not trying to
13  hide-the-ball.  This is the issue, and that's why I raised it
14  last time, saying, do we have a chance to make sure that we
15  look at this expert report, because I know that this Court is
16  not going to allow the whole thing to come in, if there are
17  issues embedded in there, not firsthand --
18          MR. WISSNER-GROSS:  Your Honor --
19          THE COURT:  Well, I'm going to be very unhappy if
20  I've got to spend two weeks before trial going through
21  motions in limine, reviewing 300-page expert reports --
22          MR. WISSNER-GROSS:  Your Honor, our hope would be
23  that, with a lot of the facts at issue, that the parties are
24  going to be able to stipulate to the facts.  If they're not
25  going to be prepared to stipulate to a lot of basic facts in
```

1    the case, unfortunately, this will be a longer process, but

2    our -- I'm not disagreeing, in principle, to what Mr.

3    Kirpalani said about having to work out a protocol, which we

4    still have to negotiate, about how to deal with the parties

5    respective objections to reports, and it cuts the other way;

6    it's reciprocal, it cuts both ways.

7            There are issues with respect to his expert reports

8    that we may feel it's an effort at going beyond that's

9    appropriate, but I think this is something that we should be

10   able to work out, Your Honor.

11           THE COURT:  Do we have another date when you're

12   coming in?

13           MR. WISSNER-GROSS:  I don't think so.

14           MR. KIRPALANI:  No.  But you're missing us already;

15   that makes us happy.

16           And to think you thought this was a safe harbor

17   adversary proceeding that you were taking and nothing else.

18           THE COURT:  I want to schedule another case

19   management conference for Thursday, September 8th at 10:00

20   a.m.  It's the day after your witness lists are supposed to

21   be exchanged, and I'd like to hear some more then about this

22   concern about the expert reports.

23           Oh, wait, that's not -- that date's not going to

24   work.  I've got to check two calendars.  All right.  I've got

25   to get you another date.  Monday, September 12th at two

1    o'clock.

2             MR. POHL:  I'm sorry, what day?

3             THE COURT:  Monday, September 12th at two o'clock.

4             And, I guess I'd like to get the joint written

5    status report by five o'clock, Wednesday, September 7th, and

6    what I'm looking for in the status report is what agreements

7    you've reached about, you know, exchanging exhibits,

8    exchanging pretrial briefs, everything having to do with the

9    trial, what issues you disagree with.

10            Because, what I normally do is, before trial, I

11   enter usually two orders, one, a joint pretrial conference

12   order, and, second, an order with the procedures for trial.

13   In that order for procedures for trial usually has some dates

14   that aren't necessarily in the pretrial order.  You know, it

15   would cover making sure I have all of the exhibits in advance

16   and how they're numbered and so that's in the pretrial order.

17            But give me a written status report, and I'm

18   interested in knowing, obviously, what you've agreed on and

19   where the disagreements are, so I can try to resolve them,

20   okay.  It's a big trial and I'm not sure exactly how we're

21   going to move forward.

22            Anything else anybody wants to raise for today?

23            MR. KIRPALANI:  Nope.

24            THE COURT:  Somebody's coming up.

25            MR. KLEINMAN:  Good afternoon, Your Honor.  Michael

1  Kleinman of Fried Frank, on behalf of defendant Alan Bigman,

2  and I'll be extremely brief.

3          As Your Honor may be aware, there were two motions

4  filed; motions to dismiss Count 7, filed by Mr. Bigman, and

5  also by the estate of Mr. Floor (phonetic).  Motions were

6  filed on June 27th and --

7          THE COURT:  Yeah, I think he wanted me to schedule

8  him for today and I didn't want to do that.  I was asked if I

9  would hear him today, and I said no.  I guess I told my staff

10 that.

11         MR. KLEINMAN:  That's news to me, Your Honor.

12         THE COURT:  Well, now you know.

13         MR. KLEINMAN:  So --

14         THE COURT:  It's a little late in the day for me to

15 be hearing any motions to dismiss.

16         MR. KLEINMAN:  I just wanted to inquire about a

17 hearing date.  We had checked with your chambers when motions

18 were filed and told that there would be a hearing date to be

19 determined and this is the only cause of action --

20         THE COURT:  Why should I even hear your motions?

21 When were your clients sued?

22         MR. KLEINMAN:  The client -- my client has been in

23 the case since -- going back six years now, and there's leave

24 to replead granted against -- and in the second amended

25 complaint, we recently added a claim, again, under Luxembourg

```
 1   law, against Mr. Bigman and the estate of Mr. Floor.
 2           THE COURT:  When was that added?
 3           MR. KLEINMAN:  May -- I believe it was May 16th,
 4   Your Honor.
 5           THE COURT:  Mr. Wissner-Gross?
 6           MR. WISSNER-GROSS:  Your Honor, I --
 7           THE COURT:  I thought everybody agreed to take the
 8   Luxembourg claims out of the case?
 9           MR. WISSNER-GROSS:  What we did was we trimmed them
10   down, Your Honor.  We dropped --
11           MR. KIRPALANI:  I'm sorry, Your Honor.
12           THE COURT:  Go ahead, Mr. Wissner-Gross.
13           MR. WISSNER-GROSS:  The claims relating to that
14   dividend that you had argued about before today, based on our
15   conclusion that we didn't think there was a basis to plead
16   jurisdiction, with respect to the defendant.  We dropped some
17   of those claims, so the Luxembourg claim relating to the
18   hundred-million-dollar dividend, but Count 6 and Count 7 are
19   under Luxembourg law.
20           Count 6 was a count that, years ago, Judge Gerber
21   allowed to be amended.
22           I believe your client was in Count 7 --
23           MR. KLEINMAN:  Only in Count 7.
24           MR. WISSNER-GROSS:  Right.  So, in other words,
25   Count 7 has been in that case for years and --
```

1      THE COURT:  I'm not going to permit you to move to

2  dismiss Count 7 this late in the case; it's as simple as

3  that.  We're going to trial, okay.  We're going to trial.

4      Count 6, you said you added his claim?

5      MR. WISSNER-GROSS:  Count 6 was added in 2011.  It's

6  only against Mr. Blavatnik.  He has answered.

7      THE COURT:  Okay.

8      MR. WISSNER-GROSS:  And, actually --

9      THE COURT:  So --

10     MR. WISSNER-GROSS:  -- Mr. Werder has, with respect

11 to Count 7, Mr. Werder, on behalf of his clients has answered

12 that.

13     Mr. Bigman's counsel has moved to dismiss the count

14 -- the amended Count 7, which Count 7 was in the complaint --

15 it's been in the complaint for years.

16     THE COURT:  Okay.  I'm not permitting -- okay, your

17 motion is denied without prejudice.  We can take it up at

18 trial, okay.  This late in the case, I'm not permitting --

19 there aren't going to be any more motions to dismiss.  There

20 aren't going to be any motions for summary judgment.

21     We're going -- I'm going to make some last comments

22 about ruling on what I heard from today.  I'm not ruling from

23 the bench, but far too late in the day, and most of the

24 motions I heard today were fully briefed five years ago and

25 sat there.  I permitted some supplemental briefing.  Because

1    of changes in the law, there was some additional briefing.

2         We'll see you at trial, if you believe you have a

3    bases for prevailing, you'll file a pretrial brief, as to

4    why, but at this late in the case, for claims that have been

5    in case for years, there are no more motions.

6         MR. KLEINMAN:  Your Honor, if I might just have one

7    second, and perhaps you're already aware of this, but there

8    was a motion to dismiss that was filed, and it was granted

9    with leave to replead.  The new claim that was brought in May

10   of this year pled, pretty much exactly the same thing, and so

11   it's just -- our client has been in this case for six years.

12   This is the second motion to -- this is the second amended

13   complaint against our client and we have been moving to

14   dismiss and there's nothing new in this latest cause of

15   action that would change, and this might streamline the

16   parties for trial.

17        THE COURT:  What's really in the claim, Mr. Wissner-

18   Gross?

19        MR. WISSNER-GROSS:  Your Honor, there was a fair

20   amount added to the claim, but in terms of Mr. Bigman, I'm

21   not sure that the basic theory of Mr. Bigman has changed.  I

22   can give you the simplest thing is if Your Honor --

23        THE COURT:  Did you respond to his motion?

24        MR. WISSNER-GROSS:  No.  We have -- we didn't.  His

25   motion was filed.  We haven't responded.  We haven't -- he

1   has not -- we have not had a discussion about a briefing

2   schedule, with respect to that.

3          We are submitting on July 15th, our supplemental

4   Luxembourg expert reports that it's contemplated under the

5   additional scheduling order, that we'll touch on, we

6   anticipate, some of the issues that he's raised in his motion

7   to dismiss.  And my suggestion is that that's what is best

8   efforts might be used to respond to that if, through his

9   Luxembourg expert, if he thinks there's anything that he

10  takes issue with.

11         THE COURT:  Mr. Wissner-Gross, respond to the motion

12  by 5:00 p.m., Monday, July 25th.  You can file a reply by

13  5:00 p.m., Monday, August 1st.  If after receiving the

14  papers, I conclude that argument is necessary, I'll hear

15  argument on Monday, September 12th, when everybody is back

16  in.  I may just rule on papers.

17         MR. WISSNER-GROSS:  Perfect, Your Honor.

18         MR. KLEINMAN:  And, Your Honor, thank you very much.

19  I've been designated, for efficiency's sake to ask, by

20  counsel for the estate of Mr. Floor, I assume that the same

21  briefing schedule --

22         THE COURT:  It does.

23         MR. KLEINMAN:  Okay.  Thank you, Your Honor.

24         THE COURT:  All right.  Let me talk briefly about

25  everything that I heard today.

1          I think I indicated at an earlier hearing that it

2     was going to be my effort to -- it's my desire to dispose of

3     all the motions, which I was hearing today in orders, rather

4     than in lengthy written opinions.  I think some or all of

5     what I heard today, one can easily write lengthy opinions,

6     but I'm not going to do that.

7          It's my goal to get orders out in the next week and

8     a half.  In my view, it's important, as you all get ready for

9     trial, that you know what's going to be tried and what is not

10    going to be tried, and I've got a couple of motions to

11    dismiss, but I've got motions for summary judgment and, you

12    know, on some of the issues, you have very persuasive

13    arguments that may be persuasive arguments at a trial, that

14    reflect disputed issues of fact.

15         And, Mr. Kirpalani, you made a comment about this to

16    somebody else.  You laid out your 15 facts on your side that

17    you say are undisputed facts, but really may be an issue with

18    inferences that the Court's supposed to draw from those facts

19    and those inferences are quite disputed.

20         In any event, these are not going to be -- I mean,

21    they are not going to be exhaustive written opinions; it's my

22    goal to get -- everybody's going to know where they're going

23    from here.  In the amended pretrial order that I signed --

24    let me find a copy of it again -- bear with me a second --

25    Paragraph 13 reads:

1          "I reserve the right to file motions to withdraw the

2          reference by August" -- "on or before August 12th."

3          You clearly have those rights.  What I have -- I may

4   have made this comment to you before, motions to withdraw the

5   reference do not stay the matter before me, and what I had

6   done in at least one other case in the last year was, we just

7   pushed ahead with the pretrial.  And what I've said is if the

8   case goes through District Court, fine, but it's going to go

9   there with all of the pretrial work done; pretrial joint --

10  pretrial conference order, et cetera.

11         And that would be the way I would intend to proceed

12  here if, look, somebody will either file a motion to withdraw

13  the reference or they won't; that's up to you.  But don't

14  think that that's -- that doing so is going to alter the

15  schedule for getting everything else done and to be ready for

16  trial.

17         So, yes, I will -- my goal is to get all orders out,

18  disposing of everything today, by, you know, the next week

19  and a half, okay?

20         Thanks very much.

21         MR. KIRPALANI:  Thank you, Your Honor.

22         THE COURT:  All right.  We're adjourned.

23     (Proceedings concluded at 4:45 p.m.)

24                              * * * * *

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

*William J. Garling*                              July 20, 2016

William J. Garling, AAERT Cert. No. 543

AudioEdge Transcription, LLC

Certified Court Transcriptionist