Sigmund S. Wissner-Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel for Edward S. Weisfelner,*
*as Litigation Trustee of the LB Litigation Trust*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 09-10023 (CGM) |
| LYONDELL CHEMICAL COMPANY, *et al.*, | |
| | Chapter 11 |
| Debtors. | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, | (Jointly Administered) |
| Plaintiff, | Adv. Pro. No. 09-1375 (MG) |
| v. | |
| LEONARD BLAVATNIK, *et al.*, | |
| Defendants. | |


**<u>PLAINTIFF'S PRE-TRIAL BRIEF</u>**

# TABLE OF CONTENTS

Page

I.   Count 1 (Constructive Fraudulent Transfer).................................................................. 1

    A.   Interest of the Debtor in Property ............................................................. 2

        1.   Application of Collapsing Doctrine .................................................... 3

    B.   Insolvency ...................................................................................................... 6

        1.   Balance Sheet Test................................................................................. 6

        2.   Capital Adequacy Test........................................................................... 7

        3.   Cash Flow Test ....................................................................................... 9

    C.   Reasonably Equivalent Value ................................................................... 10

    D.   Section 546(e) Safe Harbor Issues........................................................... 12

        1.   LLC Interests as Securities ................................................................. 12

    E.   Recovery Under Section 550 ..................................................................... 14

II.  Count 2 (Intentional Fraudulent Transfer)............................................................... 16

    A.   Standard for Actual Intent........................................................................ 17

        1.   Legal Standard ..................................................................................... 17

        2.   Burden of Proof..................................................................................... 18

    B.   The Trustee Can Prove Actual Intent In Multiple Ways ....................... 19

        1.   Smith/Lyondell Intent .......................................................................... 19

        2.   Beyond Smith and Lyondell ................................................................. 22

    C.   Recovery Under Section 550 ..................................................................... 23

III. Counts 6 & 7 (Luxembourg Law)................................................................................ 24

IV.  Count 9 (Avoidable Preference) .................................................................................. 27

    A.   The October Transfer Is An Avoidable Preference Under Section 547(b)........... 27

        1.   The Transfer Funds Constitute Property Of Lyondell. ..................... 28

        2.   Lyondell Was Insolvent As Of The Transfer Date. ........................... 30

    B.   The October Transfer Is Not Protected By The Ordinary Course Defense. ......... 32

        1.   The Debt Was Not Incurred In The Ordinary Course Of Business. ......... 33

        2.   The October Transfer Was Not Made In The Ordinary Course. .............. 36

        3.   The October Transfer Was Not Made According To Ordinary
             Business Terms. ..................................................................................... 37

        4.   Other Factual Issues Raised In Summary Judgment Order ..................... 38

|   | C. | The October Transfer Is Not Protected By The "Contemporaneous Exchange For New Value" Defense. | 38 |
| V. | | Count 11 (Constructive Fraudulent Transfer) | 39 |
| | A. | The Transaction Fee Transfers Are Avoidable Under Section 548. | 39 |
| | | 1. Reasonably Equivalent Value | 39 |
| | | 2. Financial Condition of Debtors | 40 |
| | B. | Recovery Under Section 550 | 40 |
| VI. | | Count 12 (Breach of Contract) | 41 |
| VII. | | Count 18 (Aiding and Abetting) | 42 |
| VIII. | | NAG Investments, LLC Action Counts 1 & 2 (Fraudulent Transfer) | 44 |
| | A. | The Transfer Was A Fraudulent Transfer Under Section 548. | 44 |
| | | 1. Interest of the Debtor in Property | 44 |
| | | 2. Reasonably Equivalent Value | 46 |
| | | 3. Financial Condition of Debtor | 46 |
| | B. | Recovery Under Section 550 | 46 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.),
    404 B.R. 335 (S.D.N.Y. 2009)..................................................................................41

Adelphia Recovery Tr. v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp),
    512 B.R. 447 (Bankr. S.D.N.Y. 2014)....................................................................1, 3

Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.),
    75 F.3d 1447 (10th Cir. 1996) ................................................................................29

Archer Well Co. v. GW Holdings I LLC,
    No. 12 Civ. 6762(JSR), 2013 WL 2314271 (S.D.N.Y. May 21, 2013)...................14

ASARCO LLC v. Americas Mining Corp.,
    396 B.R. 278 (S.D. Tex. 2008) ...........................................................10, 17, 18, 19

Bakst v. Wetzel (In re Kingsley),
    518 F.3d 874 (11th Cir. 2008) ................................................................................40

Baldi v. Lynch (In re McCook Metals, L.L.C.).,
    319 B.R. 570 (Bankr. N.D. Ill. 2005) .....................................................................16

In re Bankest Capital Corp.,
    374 B.R. (Bankr. S.D. Fla. 2007)...........................................................................45

Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.,
    882 F.2d 1 (1st Cir. 1989)........................................................................................8

Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),
    195 B.R. 971 (Bankr. D. Mass. 1996) .....................................................................9

Bumgardner v. Ross (In re Ste. Jan-Marie, Inc.),
    151 B.R. 984 (Bankr. S.D. Fla. 1993)....................................................................18

Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship
    IV,
    229 F.3d 245 (3d Cir. 2000) ...................................................................................11

In re Chemtura Corp.,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................................................................32

iii

Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC),
    439 B.R. 284 (S.D.N.Y. 2010)......................................................................17, 22

Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),
    130 F.3d 52 (2d Cir. 1997) ......................................................................15

In re Condon,
    198 F. 947 (S.D.N.Y. 1912)......................................................................17

Credit Managers Ass'n of S.Cal. v. Fed. Co.,
    629 F. Supp. 175 (C.D. Cal. 1985) ..........................................................8

Diamond v. Empire Partners, Inc. (In re Empire Land, LLC),
    Case No.: 6:08-bk-14592-MH, Adv. No.: 6:09-ap-01235-MH, 2016 WL 1391297 (Bankr. C.D. Cal. Apr. 4, 2016)................................................11

Enron Corp. v. Port of Houston Auth. (In re Enron Corp.), Adv. Pro. No. 03-92511 (AJG), 2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006).................................29, 30

Estate of Ruffini v. Norton Law Grp. PLLC (In re Ruffini),
    Adv. Pro. No. 12-8396 (REG), 2014 WL 714732 (Bankr. E.D.N.Y. Feb. 25, 2014) ......................................................................................................1, 2

Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.),
    148 B.R. 97 (Bankr. D. Mass. 1992) ........................................................8

Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.),
    340 B.R. 266 (Bankr. M.D. Pa. 2006) ....................................................12

First Software Corp. v. Computer Assocs. Int'l, Inc.,
    107 B.R. 417 (D. Mass. 1989) ................................................................27

In re Fruehauf Trailer Corp.,
    444 F.3d 203 (3d Cir. 2006) ....................................................................11

Gordon v. Livecchi (In re Livecchi),
    No. 09-20897, 11-02027, 2014 WL 6668886 (Bankr. W.D.N.Y. Nov. 20, 2014) ....................................................................................................18

Gowan v. Amaranth LLC (In re Dreier LLP),
    452 B.R. 451 (Bankr. S.D.N.Y. 2011)....................................................15

Great Lakes Chem. Corp. v. Monsanto Co.,
    96 F. Supp. 2d 376 (D. Del. 2000)..........................................................13

Grogan v. Garner,
       498 U.S. 279 (1991) ..................................................................................................18

Gunten v. Neilson (In re Slatkin),
       243 F. App'x 255 (9th Cir. 2007) ............................................................................15

Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.),
       507 B.R. 452 (Bankr. S.D.N.Y. 2014) ...................................................................6, 7

Hassan v. Middlesex Cnty. Nat. Bank (In re Mystic Pipe & Supply Corp.),
       333 F.2d 838 (1st Cir. 1964) ......................................................................................6

HBE Leasing Corp. v. Frank,
       48 F.3d 623 (2d Cir. 1995) .....................................................................................3, 4

Hirsch v. Gersten (In re Centennial Textiles, Inc.),
       220 B.R. 165 (Bankr. S.D.N.Y. 1998) .....................................................................40

I. Appel Corp. v. Val Mode Lingerie, Inc.,
       Nos. 97 Civ. 6938 (LMM), 97 Civ. 8230 (LMM), 2000 WL 231072 (S.D.N.Y.
       Feb. 28, 2000) ..........................................................................................................44

Ingalls v. SMTC Corp. (In re SMTC Mfg. of Texas),
       421 B.R. 251 (Bankr. W.D. Tex. 2009) .....................................................................2

Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC),
       373 B.R. 283 (Bankr. S.D.N.Y. 2007) .................................................................6, 7, 8

Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP),
       518 B.R. 766 (Bankr. S.D.N.Y. 2014) .....................................................................11

Keith v. Black Diamond Advisors, Inc.,
       48 F. Supp. 2d 326 (S.D.N.Y. 1999) ...................................................................12, 13

Kirschner v. KPMG LLP,
       15 N.Y.3d 446 (2010) ................................................................................................4

Kramer v. Chin (In re Chin),
       492 B.R. 117 (Bankr. E.D.N.Y. 2013) .......................................................................2

Kramer v. Sooklall (In re Singh),
       434 B.R. 298 (Bankr. E.D.N.Y. 2010) .....................................................................21

Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),
       78 F.3d 30 (2d Cir. 1996) ...........................................................6, 7, 32, 33, 37, 38

Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
    Holdings Inc.),
    541 B.R. 551 (S.D.N.Y. 2015)......................................................................20, 22

Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger
    Inv. Co.),
    327 B.R. 537 (D. Del. 2005)....................................................................18

Marquette Bank Illinois v. Covey (In re Classic Coach Interiors, Inc.),
    290 B.R. 631 (Bankr. C.D. Ill. 2002)........................................................45

Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,
    926 F.2d 1248 (1st Cir. 1991)...................................................................18

In re MDIP,
    332 B.R. 129 (D. Del. 2005)......................................................................2

Meadows v. Hartford Life Ins. Co.,
    492 F.3d 634 (5th Cir. 2007)....................................................................42

Mellon Bank, N.A. v. Metro Commc'ns, Inc.,
    945 F.2d 635 (3d Cir. 1991)......................................................................6

Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In
    re R.M.L., Inc.),
    92 F.3d 139 (3d Cir. 1996).......................................................................11

Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC),
    426 B.R. 488 (Bankr. D. Del. 2010)...........................................................3

MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,
    910 F. Supp. 913 (S.D.N.Y. 1995)..........................................................8, 9

Moody v. Sec. Bus. Credit, Inc.,
    127 B.R. 958 (W.D. Pa. 1991)..................................................................10

Moody v. Sec. Pac. Bus. Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992)..................................................................7, 8

Murphy v. Meritor Savings Bank (In re O'Day Corp.),
    126 B.R. 370 (Bankr. D. Mass. 1991).........................................................9

Nickless v. Golub (In re Worcester Quality Foods, Inc.),
    152 B.R. 394 (Bankr. D. Mass. 1993).......................................................16

Nisselson v. Empyrean Invest. Fund, L.P. (In re MarketXT Holdings Corp.),
    376 B.R. 390 (S.D.N.Y. 2007).................................................................19

Nisselson v. Salim (In re Big Apple Volkswagen, LLC), Adv. Proc. No. 11-2251
      (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016)..................................................15

O'Toole v. Karnani (In re Trinsum Grp. Inc.),
      460 B.R. 379 (Bankr. S.D.N.Y. 2011).....................................................................................1

Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &
      Co. (In re Sunbeam Corp.),
      284 B.R. 355 (Bankr. S.D.N.Y. 2002).....................................................................................3

Official Comm. of Unsecured Creditors v. Citicorp N. Am. (In re TOUSA, Inc.),
      422 B.R. 783 (Bankr. S.D. Fla. 2009), quashed in part by 444 B.R. 613 (S.D.
      Fla. 2011), affirmed in part and reversed in part by 680 F.3d 1298 (11th Cir.
      2012). .......................................................................................................................................40

Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC),
      499 B.R. 542 (Bankr. S.D. Tex. 2013) ....................................................................................6

Orr v. Kinderhill Corp.,
      991 F.2d 31 (2d Cir. 1993) .......................................................................................................3

Osherow v. Hensley (In re Pace),
      456 B.R. 253 (Bankr. W.D. Tex. 2011)..................................................................................19

Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.),
      500 B.R. 371 (Bankr. S.D.N.Y. 2013)..................................................................................3, 5

In re PWS Holding Corp.,
      228 F.3d 224 (3d Cir. 2000) .....................................................................................................7

Revak v. SEC Realty Corp.,
      18 F.3d 81 (2d Cir. 1994) ..................................................................................................13, 14

Salomon v. Kaiser (In re Kaiser),
      722 F.2d 1574 (2d Cir. 1983) ......................................................................................17, 21, 22

Schneider v. Barnard,
      508 B.R. 533 (E.D.N.Y. 2014) ...............................................................................................19

Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,
      234 B.R. 293 (Bankr. S.D.N.Y. 1999)....................................................................................15

Securities and Exchange Commission v. W.J. Howey Co.,
      328 U.S. 293 (1946).................................................................................................12, 13, 14

Southmark Corp. v. Grosz (In re Southmark Corp.),
      49 F.3d 1111 (5th Cir. 1995) ............................................................................................29, 30

Soza v. Hill (In re Soza),
    542 F.3d 1060 (5th Cir. 2008) ............................................................21

In re Taubman,
    160 B.R. 964 (Bankr. S.D. Ohio 1993)...............................................10

Tavormina v. Weiss (In re Behr Contract., Inc.),
    79 B.R. 84 (Bankr. S.D. Fla. 1987)....................................................16

Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.),
    435 B.R. 866 (Bankr. S.D.N.Y. 2010) ...................................................2

In re Tribune Co. Fraudulent Conveyance Litig.,
    818 F.3d 98 (2d Cir. 2016) ..................................................................3

Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013)................................................17

U.S. v. Leonard,
    529 F.3d 83 (2d Cir. 2008) ...........................................................13, 14

Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.,
    No. 98 Civ. 3251, 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000) .............6

United States v. Rivernider,
    2016 WL 3632496 (2d Cir. July 7, 2016)............................................17

United States v. Tabor Court Realty Corp.,
    803 F.2d 1288 (3d Cir. 1986) ...............................................................3

Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Resources,
    Inc.),
    354 F.3d 1246 (10th Cir. 2004) ..........................................................40

Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),
    543 B.R. 428 (Bankr. S.D.N.Y. 2016).........................................4, 5, 19, 42, 43, 44

Weisfelner v. Fund 1, et al. (In re Lyondell Chem. Co.),
    503 B.R. 348 (Bankr. S.D.N.Y. 2014)...................................................3

Weisfelner v. Hofmann (In re Lyondell Chem. Co.),
    16cv518, 2016 WL 4030937 (S.D.N.Y. July 27, 2016) ..........3, 4, 17, 18, 20, 21, 22

Whyte v. C/R Energy Coinvestment II, L.P. (In re SemCrude, L.P.),
    Case No. 08-11525 (BLS), Adv. No. 10-50840, Adv. No. 10-518808, 2013
    WL 2490179 (Bankr. D. Del. June 10, 2013).................................11, 12

*Whyte v. Ritchie SG Holdings LLC (In re Semcrude, L.P.)*,
    526 B.R. 556 (D. Del. 2014) ..................................................................................7

*Wiggains v. Reed (In re Wiggains)*,
    No. 13-33757-SGJ-7, 14-03064-SGJ, 2015 WL 1954438 (Bankr. N.D. Tex.
    Apr. 28, 2015) ..................................................................................18

*WRT Creditor's Liquidation Tr. v. WRT Bankr. Litig. Master File (In re WRT
    Energy Corp.)*,
    282 B.R. 343 (Bankr. W.D. La. 2001) ..................................................................................10

*Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight)*,
    124 B.R. 984,1001 (Bankr. S.D. Ohio 1990) ..................................................................................10

*Zazzali v. 1031 Exch. Grp. (In re DBSI, Inc.)*,
    476 B.R. 413 (Bankr. D. Del. 2012) ..................................................................................21

**Statutes**

11 U.S.C. § 101 ..................................................................................12, 13, 44

11 U.S.C. § 502 ..................................................................................2

11 U.S.C. § 523(a) ..................................................................................18

11 U.S.C. § 544 ..................................................................................1, 2, 39, 40, 41

11 U.S.C. § 546(e) ..................................................................................2, 12, 19

11 U.S.C. § 547 ..................................................................................*passim*

11 U.S.C. § 548 ..................................................................................*passim*

11 U.S.C. § 550 ..................................................................................*passim*

Del Code Ann. tit. 6 § 8-103(c) ..................................................................................14

Del Code Ann. tit. 6 § 1304(a)(1) ..................................................................................19

Del Code Ann. tit. 6 § 1305(a) ..................................................................................1

N.Y. Debt. & Cred. L. §§ 273-275 ..................................................................................1

N.Y. Debt. & Cred. L. § 276 ..................................................................................19

Tex. Bus. & Com. Code Ann. § 24.005 ..................................................................................2, 19

**Other Authorities**

Restatement, Restitution, § 150, cmt. a. (1937)..............................................................................41

Restatement (Second) of Torts ........................................................................................................17

Restatement (Second) of Contracts § 371 cmt. a. (1981) ..............................................................41

11 Fletcher Cyc. Cor. § 5322, n.8 (2011) .....................................................................................45

Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust (the "Trustee"),

submits this pre-trial brief pursuant to the Court's direction at the September 12, 2016 status

conference.

## I.    Count 1 (Constructive Fraudulent Transfer)

Count 1 seeks avoidance and recovery of the value of Toe-Hold Payment 1 under Section

548(a)(1)(B) and Section 544(b) against Nell Limited, Len Blavatnik and AI Chemical.  Under

Section 548(a)(1)(B), a transfer of an interest of the debtor in property may be avoided if:  (i) the

debtor did not receive "reasonably equivalent value" in exchange for the transfer ("REV"); and

(ii) the debtor (a) was insolvent on the date of the transfer or became insolvent as a result of the

transfer, (b) was engaged or was about to engage in a business or transaction for which any

property remaining with the debtor was unreasonably small capital or (c) intended to incur, or

believed it would incur, debts beyond its ability to pay as such debts matured.[1]

---

[1] For Count 1, because the Trustee will prevail under Section 548(a)(1)(B), there will be no need to reach Section 544(b) and state law issues.  However, the Trustee also would prevail under any relevant state law that the Court might apply under Section 544(b), for the same reasons that it will prevail under Section 548(a)(1)(B), as the state law standards are no different insofar as relevant to the facts at issue here.

New York law recognizes a transfer as a constructive fraudulent transfer where (i) the transfer was made without fair consideration; and (ii) either (a) the debtor was insolvent or was rendered insolvent by the transfer, (b) the debtor was left with unreasonably small capital, or (c) the debtor intended or believed that it would incur debts beyond its ability to pay as the debts matured.  See O'Toole v. Karnani (In re Trinsum Grp. Inc.), 460 B.R. 379, 390 (Bankr. S.D.N.Y. 2011); see also N.Y. Debt. & Cred. L. §§ 273-275.  "[T]he element of fair consideration requires both (1) fair equivalency of the consideration given for the transfer, and (2) good faith by both the transferor and transferee."  In re Trinsum Grp. Inc., 460 B.R. at 393; see also Estate of Ruffini v. Norton Law Grp. PLLC (In re Ruffini), Adv. Pro. No. 12-8396 (REG), 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014) ("Under the DCL, fair consideration also requires good faith on the part of the transferee.  This requirement may be satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent schemes.  Aside from the good faith element incorporated into New York law, courts use the term 'reasonably equivalent value' interchangeably with the DCL's 'fair consideration' for purposes of analyzing constructive fraud claims under both statutes") (internal citations omitted).

Under Delaware law, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.  See Del Code Ann. tit. 6 § 1305(a).  Further, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the

At trial, the Trustee will prove that Toe-Hold Payment 1 was a transfer of "an interest of the debtor in property" and that the REV and financial condition elements are satisfied. The Trustee will also prove that the AI Chemical units are not securities, such that Toe-hold Payment 1 is neither a settlement payment nor a transfer in connection with a securities contract under Section 546(e).[2]

## A.    Interest of the Debtor in Property

Toe-Hold Payment 1 represents a transfer in "an interest of the debtor in property," because under the collapsing doctrine, the transfer from Basell Funding to Nell cannot be considered in isolation.[3]

---

transfer or obligation, and the debtor (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Id. § 1304(a).

Under Texas law, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. See Tex. Bus. & Com. Code Ann. § 24.005. Further, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. Id. § 24.006.

Finally, in the event that reliance on Section 544(b) and state law is necessary, the Trustee will prove at trial that there existed actual creditors of the debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

[2] For constructive fraudulent transfer claims under Section 548(a)(1)(B), the burden of proof is a preponderance of the evidence. See Ruffini, 2014 WL 714732, at *6; Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.), 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010). While the Court need not reach the issue as the Trustee will prevail under Section 548(a)(1)(B), the standard under Section 544(b), whether applying New York, Texas, or Delaware law, is also a preponderance of the evidence. See Kramer v. Chin (In re Chin), 492 B.R. 117, 126 (Bankr. E.D.N.Y. 2013) (New York law); In re MDIP, 332 B.R. 129, 132 (D. Del. 2005) (Delaware law); Ingalls v. SMTC Corp. (In re SMTC Mfg. of Texas), 421 B.R. 251, 279 (Bankr. W.D. Tex. 2009) (Texas law).

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Trustee's Second Amended Complaint.

1.    <u>Application of Collapsing Doctrine</u>

As the Court has noted, "[c]ourts analyzing the effect of LBOs have routinely analyzed them by reference to their economic substance, 'collapsing' them . . . to consider the overall effect of multi-step transactions." <u>Weisfelner v. Fund 1, et al. (In re Lyondell Chem. Co.)</u>, 503 B.R. 348, 379 (Bankr. S.D.N.Y. 2014) ("<u>January 2014 Decision</u>")[4] (citing analysis of collapsing doctrine in <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623 (2d Cir. 1995); <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31 (2d Cir. 1993); and <u>Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)</u>, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)); <u>see also</u> <u>United States v. Tabor Court Realty Corp.</u>, 803 F.2d 1288, 1302-03 (3d Cir. 1986); <u>cf.</u> <u>Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)</u>, 500 B.R. 371, 380-81 (Bankr. S.D.N.Y. 2013).

Courts apply the collapsing doctrine where (i) the transferee had actual or constructive knowledge of the overall scheme or transaction at issue and (ii) each step in the transaction was part of a single integrated scheme. <u>See</u> <u>HBE Leasing Corp.</u>, 48 F.3d at 635-36; <u>see also</u> <u>Adelphia Recovery Tr. v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp)</u>, 512 B.R. 447, 489-90 (Bankr. S.D.N.Y. 2014) ("Courts have collapsed a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction.") (internal citations omitted); <u>Mervyn's LLC v.</u>

---

[4] While the Second Circuit in <u>In re Tribune Co. Fraudulent Conveyance Litig.</u>, 818 F.3d 98 (2d Cir. 2016), reached a contrary decision on the issue of preemption to that reached by this Court in the January 2014 Decision, the Second Circuit did not reject this Court's reliance on the collapsing doctrine; to the contrary, it cited this Court's reliance on collapsing doctrine in a footnote briefly explaining application of the doctrine to leveraged buyouts, <u>see</u> 818 F.3d at 119 n.7. Similarly, while the January 2014 Decision contains reasoning regarding imputation and actual intent that is not consistent with the District Court's <u>Hofmann</u> decision, <u>see</u> <u>Weisfelner v. Hofmann (In re Lyondell Chem. Co.)</u>, 16cv518 (DLC), 2016 WL 4030937, at *9-16 (S.D.N.Y. July 27, 2016), the District Court in <u>Hofmann</u> did not take issue with the Court's collapsing analysis.

Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC), 426 B.R. 488, 497-98 (Bankr. D. Del. 2010) (collapsing multiple transactions in spinoff, where the transferee had knowledge of the multiple steps in the transactions).

Here, the Court previously has applied the collapsing doctrine to the Toe-Hold Payments, ruling that, at the pleading stage, the Trustee had alleged adequate facts on which to use the collapsing doctrine to satisfy the "interest of the debtor in property" requirement.   See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), 543 B.R. 428, 441 n.61 (Bankr. S.D.N.Y. 2016).[5]   At trial, the Trustee will be able to prove the factual allegations that supported the Court's application of collapsing to Toe-Hold Payment 1 at the pleading stage.

More specifically, the Trustee will be able to prove that (i) the transferees had knowledge of the structure of the Merger and Toe-Hold Payment 1 and (ii) the Merger and Toe-Hold Payment 1 were carried out as an integrated scheme.

First, while even constructive knowledge suffices to trigger collapsing, see HBE Leasing, 48 F.3d at 635, the Trustee will prove that Nell Limited and Blavatnik had actual or constructive knowledge of the structure (either directly or through their agents) of the Toe-Hold Payments and the Merger and the coordinated funds flows relating thereto.[6]

Second, the Trustee will prove that Toe-Hold Payment 1 and the Merger, although separate transactions, were carried out as an integrated scheme.  The Trustee will rely on, *inter*

---

[5] This decision dismissed Count 2 based on erroneous "actual intent" reasoning that was subsequently rejected by the District Court in the Hofmann decision.  Subsequent to issuance of the Hofmann decision, this Court reinstated Count 2 for trial.  Neither the District Court nor this Court have taken issue with the collapsing analysis in any of this Court's dismissal decisions in this action.

[6] The Trustee will be able to rely upon both Blavatnik's direct knowledge and the knowledge of his agents as charged to him under agency imputation doctrine.  See, e.g., Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466 (2010) ("where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals") (cited in Hofmann, 2016 WL 4030937, at *9).  Further, even if actual knowledge were not available, the Trustee would be able to prove that Blavatnik had constructive knowledge of the Merger and Toe-Hold Payment 1.

*alia*, evidence showing that prior to December 20, 2007, the choice was made by Blavatnik and/or his agents not to convert the Toe-Hold shares into $48 per share but instead to use proceeds of borrowings by the Debtors to refinance obligations of Blavatnik's non-Debtor affiliates and to fund a distribution to NAG Investments, LLC, one of the non-Debtor holding companies through which Blavatnik held his interests in the Debtors.

Finally, and beyond the threshold prerequisites for collapsing, Defendants' argument that the doctrine may not be applied in a case involving multiple entities, is a legal argument that already has been rejected by the Court and in any event lacks merit. See In re Lyondell Chem. Co., 543 B.R. 428, 441 n.61 (assuming that collapsing doctrine would apply under factual allegations advanced by Trustee at pleading stage); see also In re Waterford Wedgwood USA, Inc., 500 B.R. at 380-81 (finding that argument that application of collapsing applies only to "multiple transactions by the same debtor" is not supported by precedent and that "several cases in this district have applied the integrated transaction doctrine when multiple entities were involved," and rejecting the asserted "single entity" limitation to collapsing).

Because the collapsing doctrine applies with respect to the Toe-Hold Payments, and because multiple debtors were obligated to repay the borrowings used to fund the Toe-Hold Payments, Toe-Hold Payment 1 constitutes a transfer of an interest of the debtors in property.[7]

---

[7] Even if Toe-Hold Payment 1 were not considered along with the Merger under the collapsing doctrine, the doctrine still would provide a basis for finding that the transfer involved an interest of the debtors in property, because the doctrine would require that Toe-Hold Payment 1 be evaluated not simply as a transfer by Basell Funding to Nell, but as a series of integrated, sequential transfers by which funds were drawn down and transferred by Basell entities (including the debtor Basell Germany) to carry out payment of Toe-Hold Payment 1. Based upon the same sources of evidence that would support a broader collapsing analysis involving the Merger, the Trustee will be able to prove that Blavatnik and Nell had actual or constructive knowledge of this series of transfers effectuating Toe-Hold Payment 1, and that these transfers to carry out Toe-Hold Payment 1 were an integrated plan.

5

B.    **Insolvency**

A plaintiff can satisfy the financial-condition-of-the-debtor element under Section 548(a)(1)(B) in any of three ways:  (i) the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer ("Balance Sheet Test"), (ii) the debtor was engaged or was about to engage in a business or transaction for which any property remaining with the debtor was unreasonably small capital ("Capital Adequacy Test") or (iii) the debtor intended to incur, or believed it would incur, debts beyond its ability to pay as such debts matured ("Cash Flow Test").  The Trustee will prove all three conditions at trial.

1.    Balance Sheet Test

Under the Balance Sheet Test, the court measures whether the fair value of the debtor's assets exceeds the amount of the debtor's total liabilities.  See Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 648 (3d Cir. 1991).  Insolvency "is to be measured at the time the debtor transferred value or incurred an obligation."  Id.[8]

Courts within the Second Circuit adopt a "flexible approach to insolvency analysis," under which they "should consider the totality of the circumstances."  See Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (citing Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 38 (2d Cir. 1996); Union Bank of Switzerland v. Deutsche Fin. Servs. Corp., No. 98 Civ. 3251, 2000 WL 178278, at *8 (S.D.N.Y. Feb. 16, 2000)).  To prove insolvency, a "trustee may rely on balance sheets,

---

[8] If a trustee shows that the debtor was insolvent at a period after the alleged fraudulent transfer, the trustee must also show that the debtor's financial condition did not change during the interim period.  See Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.), 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014).  Moreover, courts have inferred insolvency even where the debtor's financial condition was unascertainable as of the relevant dates.  See Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC), 499 B.R. 542, 548-49 (Bankr. S.D. Tex. 2013); see also Hassan v. Middlesex Cnty. Nat. Bank (In re Mystic Pipe & Supply Corp.), 333 F.2d 838, 840 (1st Cir. 1964) ("Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed.").

financial statements, appraisals, expert reports, and other affirmative evidence." In re Jesup & Lamont, Inc., 507 B.R. at 473 (internal quotation marks omitted).  In general, courts look at a combination of valuation methodologies to determine valuation including: actual sale price, discounted cash flow method ("DCF"), adjusted balance sheet method, market multiple approach, comparable transactions analysis, and market capitalization. See In re Iridium Operating LLC, 373 B.R. at 344.

Fair valuation for a company that can continue day-to-day operations is based on a "going concern" or "market price" valuation. See id. (citing In re PWS Holding Corp., 228 F.3d 224, 233 (3d Cir. 2000)). When a business is a going concern, fair value is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts. See id. (citing In re Roblin Indus., Inc., 78 F.3d at 35).

At trial, the Trustee will prove through fact and expert testimony that Lyondell was insolvent under the Balance Sheet Test as of December 20, 2007.  The evidence will show that on December 20, 2007, the fair value of Lyondell's assets was less than Lyondell's total liabilities.

        2.    Capital Adequacy Test

While "unreasonably small capital" is not defined in the Code, courts in Section 548 cases have construed the term as referring to the inability to generate sufficient cash flow to sustain operations.  See Whyte v. Ritchie SG Holdings LLC (In re Semcrude, L.P.), 526 B.R. 556, 560 (D. Del. 2014) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992)). In Moody, the Third Circuit explained: "[b]ecause an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due,

unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency." <u>Moody</u>, 971 F.2d at 1070.    An entity that is technically solvent but that is nonetheless "doomed to fail" is one with unreasonably small capital.  <u>See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.</u>, 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

The inquiry under the capital adequacy test is highly fact-specific and courts will look to factors such as the "company's debt-to-equity ratio, its historical capital cushion, and the need for working capital specific to the industry at issue." <u>Id.</u>    The test centers on reasonable foreseeability, with a key question being whether company projections were reasonable.  <u>See Moody</u>, 971 F.2d at 1073.  The reasonableness of projections is tested by an objective standard anchored in the company's actual performance, taking into account cash flow, net sales, gross profit margins, and net profits and losses.  <u>See id.</u>  This objective standard cannot rely solely on historical data—parties must also account for difficulties that are likely to arise, incorporating some margin for error and including interest rate fluctuations and general economic downturns. <u>See id.</u>

The reasonableness of company projections must also be examined with respect to whether they were prudent when made.  <u>See In re Iridium Operating LLC,</u> 373 B.R. at 345 (citing <u>Credit Managers Ass'n of S.Cal. v. Fed. Co.</u>, 629 F. Supp. 175, 187 (C.D. Cal. 1985)). Courts will compare a company's projected cash inflows with the company's capital needs throughout a reasonable period of time after the questioned transfer. <u>See In re Iridium Operating LLC,</u> 373 B.R. at 345; <u>see also Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.</u>, 882 F.2d 1, 4 (1st Cir. 1989).  Projections may be found unreasonable if they fail to provide a "capital cushion" or "margin of error" to account for foreseeable fluctuations in the market.  <u>See Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)</u>, 148 B.R. 97, 125-26, 133 (Bankr. D. Mass. 1992)

(where debtor was manufacturer of cutting tools, projections were unreasonable because they provided no room for "normal fluctuations in the business cycle"); see also Murphy v. Meritor Savings Bank (In re O'Day Corp.), 126 B.R. 370, 406-07 (Bankr. D. Mass. 1991) (where debtor was boat manufacturer, rejecting argument that unforeseen factors were cause for debtor's decline where "labor problems, cost variances and cyclicality in the industry were the major contributors to O'Day's fiscal woes and were manifest and readily predictable prior to the LBO"); Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("[t]o be reasonable, the projections must leave some margin for error").

At trial, the Trustee will prove "unreasonably small capital" through fact and expert testimony. This evidence will show that (i) at the time the Merger closed, management earnings projections were understood to be unrealistic and that cash from operations would be far less than the amounts projected, (ii) the combined entity was overleveraged compared to comparable companies, (iii) the opening liquidity of pre-Merger Basell and Lyondell fell far short of liquidity available to the legacy companies and (iv) already-known factors and planned transactions threw the combined entities into a liquidity crisis within weeks of the closing, from which it never made a sustained recovery. Moreover, while Defendants blame a "perfect storm" of downturn in demand and other adverse events, they can point to no comparable petrochemicals company that did not survive these same adverse conditions.

     3.    Cash Flow Test

Under the Cash Flow Test, a transfer or obligation may be avoided when the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III). This is sometimes referred to as "equitable insolvency." See In re MFS/Sun Life Trust-High Yield

Series, 910 F. Supp. at 943; see also Moody v. Sec. Bus. Credit, Inc., 127 B.R. 958, 996 (W.D. Pa. 1991). While courts have required proof of the debtor's intent or subjective belief that it would incur a debt that was beyond its ability to pay, ASARCO LLC v. Americas Mining Corp., 396 B.R. 278, 399 (S.D. Tex. 2008), "courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." WRT Creditor's Liquidation Tr. v. WRT Bankr. Litig. Master File (In re WRT Energy Corp.), 282 B.R. 343, 415 (Bankr. W.D. La. 2001); see also Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight), 124 B.R. 984,1001 (Bankr. S.D. Ohio 1990); In re Taubman, 160 B.R. 964, 986-87 (Bankr. S.D. Ohio 1993).

At trial, the Trustee will prove through fact and expert testimony that, by incurring or intending to incur debts beyond its ability to pay as such debts matured, Lyondell was insolvent on December 20, 2007 under the Cash Flow Test. The evidence will show that on December 20, 2007, in light of the Merger financing, Lyondell incurred or intended to incur debts beyond its ability to pay as such debts matured.

## C.     Reasonably Equivalent Value

While the Code does not define "reasonably equivalent value," courts have established a two-part inquiry under Section 548(a)(1)(B)(i): first, the court must decide whether the debtor received any value; and second, the court must determine whether such value was reasonably equivalent to that transferred by the debtor. See Pension Transfer Corp. v. Beneficiaries Under

10

the Third Amendment to Freuhauf Trailer Corp. Retirement plan No. 003 (In re Fruehauf Trailer Corp., 444 F.3d 203, 212-13 (3d Cir. 2006).[9]

Courts consistently have held that distributions on account of equity interests are not supported by reasonably equivalent value based on either direct or indirect benefit to the debtor. See, e.g., Diamond v. Empire Partners, Inc. (In re Empire Land, LLC), Case No.: 6:08-bk-14592-MH, Adv. No.: 6:09-ap-01235-MH, 2016 WL 1391297, at *9 (Bankr. C.D. Cal. Apr. 4, 2016) ("[D]ividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value." (citing 5 Collier on Bankruptcy ¶ 548.05 (16th ed. 2015)); Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP), 518 B.R. 766, 789 (Bankr. S.D.N.Y. 2014) (transfers made as returns on capital contributions were not made in exchange for reasonably equivalent value because "[e]quity distributions are not ordinarily considered transfers made on account of an antecedent debt, and in turn, are not considered to be made in exchange for 'reasonably equivalent value'"); Whyte v. C/R Energy Coinvestment II, L.P. (In re SemCrude, L.P.), Case No. 08-11525 (BLS), Adv. No. 10-50840, Adv. No. 10-518808, 2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013) (no reasonably equivalent value provided to debtors in exchange for distributions on account of equity interests); Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 252-53 (3d Cir. 2000) (affirming bankruptcy court's conclusion that partnership "receives less than reasonably equivalent value when it redeems the equity interest of its

---

[9] For purposes of determining whether the debtor received any value, the court merely asks whether the debtor received "any benefit[,] . . . whether direct or indirect." Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 150 (3d Cir. 1996). In deciding whether the debtor received reasonably equivalent value, courts employ a "totality of the circumstances test," in which they examine the following factors: (i) the fair market value of the value received by the debtor; (ii) whether there was an arm's-length relationship between the debtor and the transferee; and (iii) the transferee's good faith. See id. at 148-49; see also Fruehauf, 444 F.3d at 213 ("[I]ndirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred.").

principals"); <u>Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)</u>, 340 B.R. 266, 286-87 (Bankr. M.D. Pa. 2006) (concluding that debtor did not receive reasonably equivalent value, either directly or in the form of indirect economic benefits, in exchange for cash and promissory notes transferred to shareholders in connection with leveraged buyout).

Here, the Trustee will prove that Toe-Hold Payment 1 was a distribution to Blavatnik that, although structured so that it would not be a securities transaction (and involving instead the transfer of Delaware LLC units that were not securities), was in economic substance a distribution to Blavatnik on account of his ultimate beneficial ownership of both AI Chemical prior to until Dec 20, 2007 and of Nell. Accordingly, under the above principles regarding distributions, the Trustee will prove that the debtors received no value in exchange for Toe-Hold Payment 1.

### D.    Section 546(e) Safe Harbor Issues

The Court has ruled that Toe-Hold Payment 1 was not transferred "in connection with" the Merger Agreement for the purposes of the Section 546(e) safe harbor. <u>See</u> July 20, 2016 Order [Docket No. 772], at *8. The Court set for trial the question of whether the safe harbor is triggered on the theory that the AI Chemical units that were transferred under the December 20, 2007 "Stock Purchase Agreement" were securities. <u>See id.</u> at *8-11.

#### 1.    LLC Interests as Securities

The law provides that "LLC membership interests are not 'securities' unless they meet the four criteria of an 'investment contract' set forth in <u>Securities and Exchange Commission v. W.J. Howey Co.</u>," 328 U.S. 293 (1946). <u>Keith v. Black Diamond Advisors, Inc.</u>, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999); <u>see also</u> 11 U.S.C. § 101(49)(a)(xii). "The <u>Howey</u> test defines 'an investment contract as a contract, transaction or scheme whereby a person invests his money in a

common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." Keith, 48 F. Supp. 2d at 332 (quoting Howey, 328 U.S. at 298-99) (internal brackets omitted). Howey requires (i) that a purchaser give up some tangible and definable consideration in return for the interest obtained; (ii) the existence of either common interests between the investor and managers of the enterprise or a pooling of interests by members; (iii) an expectation of profit by the investor; and (iv) that the expectation of profit be derived from the entrepreneurial efforts of others. See id.; see also Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994) (interests are investment contracts only if they involve: "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."). The Second Circuit has "underscore[d] that, in applying the Howey factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions to evaluate whether the reasonable expectation was one of significant investor control." U.S. v. Leonard, 529 F.3d 83, 85 (2d Cir. 2008).

At trial, the Trustee will prove that the AI Chemical membership units were not "stock" (§ 101(49)(A)(ii)), "transferable shares" (§ 101(49)(A)(viii)), or any other types of interests listed as "securities" under the Bankruptcy Code. See 11 U.S.C. § 101(49). For example, no horizontal commonality (i.e., pooling of investment funds, shared profits and shared losses) existed with respect to the AI Chemical membership interests, as 100% of the membership units were held at all relevant times by a single holder. See Great Lakes Chem. Corp. v. Monsanto Co., 96 F. Supp. 2d 376, 390 (D. Del. 2000) (where investor bought 100% of membership interests in LLC, did not pool contributions with those of other investors, as is required for horizontal commonality). All of AI Chemical's membership interests were held by Blavatnik, and he maintained "significant investor control" and did not rely on the entrepreneurial or

managerial efforts of others.[10]  See, e.g., Leonard, 529 F.3d at 85; Revak, 18 F.3d at 87; Archer

Well Co.  v. GW Holdings I LLC, No. 12 Civ. 6762(JSR), 2013 WL 2314271, at *2 (S.D.N.Y.

May 21, 2013) ("[B]ecause Archer Well purchased the entirety of the membership interests in

the . . . LLCs, its investment fails to satisfy both the first and third Howey factors"; "the

Purchase Agreement effectuated a one-time sale of all interests in the transferred companies;

and, as the sole owner, Archer Well obtained total control over the . . . LLCs," thus it "cannot

claim that it expected to derive profits from the entrepreneurial or managerial efforts of others.")

(internal citations, quotation marks and brackets omitted).   Further, (i) the relevant LLC

agreement limits the transferability of the AI Chemical units and permits required consents for

transfer to be withheld for any reason; (ii) the AI Chemical units were not registered with the

SEC and (iii) there was no public market for the AI Chemical units and none was expected to

develop.

        Third, AI Chemical's LLC Agreement did not elect to provide that its membership

interests be securities under the Uniform Commercial Code as enacted in Delaware.  See 6 Del.

C. § 8-103(c) ("An interest in a . . . limited liability company is not a security unless it is dealt in

or traded on securities exchanges or in securities markets, its terms expressly provide that it is a

security governed by this Article, or it is an investment company security") (emphasis added).

        E.      **Recovery Under Section 550**

        Recovery under Section 550 is proper against Nell as the initial transferee of Toe-Hold

Payment 1.  See 11 U.S.C. § 550(a)(1) ("initial transferee").[11]  With respect to Blavatnik, an

entity "for whose benefit" the initial transfer was made is one of the potential sources of

---

[10] The Trustee will also prove that even after the AI Chemical units were transferred on December 20, 2007, they still were held by a single holder.

14

recovery of an avoidable transfer under 11 U.S.C. § 550(a)(1).    See, e.g., Sec. Investor Prot.

Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999).  The statute subjects

the "entity for whose benefit such transfer was made" to "strict liability."  Christy v. Alexander

& Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson

& Casey), 130 F.3d 52, 56-57 (2d Cir. 1997); see Nisselson v. Salim (In re Big Apple

Volkswagen, LLC), Adv. Proc. No. 11-2251 (JLG), 2016 WL 1069303, at *14 (Bankr. S.D.N.Y.

Mar. 17, 2016) (Garrity, J.) ("Under § 550(a)(1), the 'initial transferee' or the 'entity for whose

benefit the transfer was made' is strictly liable for an avoided transfer.") (citing cases).

    While the "quintessential example of an entity for whose benefit a transfer is made is a

guarantor," other examples exist, and "[t]he key to pegging the entity for whose benefit the

initial transfer was made has two sides: 1) the entity must be the intended beneficiary and 2) the

intended benefit must originate from the initial transfer."  Gowan v. Amaranth LLC (In re Dreier

LLP), 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (Glenn, J.); In re Big Apple Volkswagen, LLC,

2016 WL 1069303 at *18 n.38 (same) (quoting "two sides" formulation); see In re Finley,

Kumble, 130 F.2d at 57 (Section 550(a)(1)'s "'entity for whose benefit' phrase does not simply

reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or

otherwise, without ever holding the funds.") (citing cases).

    Thus, courts have relied on the "for whose benefit" theory where a defendant exercised

dominion and control over the initial transferee through ownership thereof.    See Gunten v.

Neilson (In re Slatkin), 243 F. App'x 255, 257-59 (9th Cir. 2007) (upholding determination that

transfer to corporation was for benefit of sole shareholder, director and officer who directed use

---

[11] The Trustee is entitled to recovery of pre-judgment interest on his claims, and reserves the right to brief the
applicable rate of such interest in his post-trial brief in the event that such rate is disputed.

of funds received by corporation); <u>Baldi v. Lynch (In re McCook Metals, L.L.C.)</u>, 319 B.R. 570, 592 (Bankr. N.D. Ill. 2005) (transfer to limited liability company was for benefit of individual who was managing member, chairman and owner of majority equity interest because transfer was, *inter alia*, a quantifiable benefit that individual could access based on controlling interest); <u>Nickless v. Golub (In re Worcester Quality Foods, Inc.)</u>, 152 B.R. 394, 403-04 (Bankr. D. Mass. 1993) (transfers to corporations were for the benefit of the owners of the corporations); <u>Tavormina v. Weiss (In re Behr Contract., Inc.)</u>, 79 B.R. 84, 87 (Bankr. S.D. Fla. 1987) (transfer to corporation that was fully owned by stockholder and had no assets or liabilities was for the benefit of the stockholder).

At trial, the Trustee will prove that Toe-Hold Payment 1 was made for the benefit of Blavatnik, who was the sole ultimate owner of Nell and whose subordinates and/or agents orchestrated the Toe-Hold Payments so that he would realize the gains therefrom while avoiding tax liabilities.[12]

## II.    **<u>Count 2 (Intentional Fraudulent Transfer)</u>**

Count 2 seeks avoidance and recovery of the value of Toe-Hold Payments 1 and 2 from Nell Limited, Blavatnik and AI Chemical under Section 548(a)(1)(A) and Section 544(b).  To prevail on Count 2, the Trustee will prove that Toe-Hold Payments 1 and 2 were made with actual intent to hinder, delay or defraud creditors.  There is no further element required to recover against Nell, the transferee of the immediate payments.  To recover against Blavatnik, the Trustee will prove that Toe-Hold Payments 1 and 2 were made for Blavatnik's benefit.[13]

---

[12] In the alternative, if the evidence at trial shows that Blavatnik was an immediate or mediate transferee of the initial transferee of Toe-Hold Payment 1, the Trustee will recover under Section 550 on that basis.  <u>See</u> 11 U.S.C. § 550(a)(2) ("immediate or mediate transferee").

[13] The Trustee has been advised that pursuant to a certificate of cancellation dated December 26, 2007, AI Chemical was dissolved; the Trustee has withdrawn his request to seek nullification of the certificate of cancellation.  <u>See</u> Letter to Hon. Robert E. Gerber, <u>Weisfelner v. Blavatnik</u>, (Bankr. S.D.N.Y. Dec. 22, 2015) [Docket No. 694].

## A.    **Standard for Actual Intent**

### 1.    Legal Standard

Under Section 548(a)(1)(A), a transfer may be avoided if it was made "with actual intent to hinder, delay, or defraud" creditors.  See 11 U.S.C. § 548(a)(1)(A); see also Hofmann, 2016 WL 4030937, at *11.  The actual intent "'need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor.'" Hofmann, 2016 WL 4030937, at *11 (citing Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 304 (S.D.N.Y. 2010)).

As articulated by the District Court in Hofmann, actual intent "may not be presumed" and instead requires a "mental apprehension" of consequences for creditors.  See Hofmann, 2016 WL 4030937, at *11-12 (citing, *inter alia*, In re Condon, 198 F. 947, 950 (S.D.N.Y. 1912) (Hand, J.) ("mental apprehension"); Restatement (Second) of Torts ("substantial certainty" standard); United States v. Rivernider, 2016 WL 3632496, at *6 (2d Cir. July 7, 2016) (requirement that defendant "contemplate" harm).

However, because "[f]raudulent intent is rarely susceptible to direct proof . . . courts have developed 'badges of fraud' to establish the requisite actual intent to defraud."  Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2d Cir. 1983) (cited in Hofmann, 2016 WL 4030937, at *13); see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.), 503 B.R. 239, 284 (Bankr. S.D.N.Y. 2013) (finding that "presence of sufficient badges of fraud" supported finding that plaintiffs established an actual intent to hinder and delay creditors under Oklahoma UFTA); ASARCO LLC, 396 B.R. at 370 (actual intent "may be proved circumstantially by presenting evidence of certain 'badges of fraud' that may cumulatively give rise to an inference of intent to hinder, delay or defraud").

Further, as the District Court explained in <u>Hofmann</u>, "[w]hile the presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." <u>Hofmann</u>, 2016 WL 4030937, at *14 (internal quotations omitted) (citing <u>Max Sugarman Funeral Home, Inc. v. A.D.B. Investors</u>, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

    2.    <u>Burden of Proof</u>

For claims under Section 548(a)(1)(A), a majority of courts hold that the ordinary "preponderance of evidence" standard applies. <u>See</u> <u>Gordon v. Livecchi (In re Livecchi)</u>, No. 09-20897, 11-02027, 2014 WL 6668886, at *10 (Bankr. W.D.N.Y. Nov. 20, 2014) ("The Trustee carries the burden of proof of showing, by a preponderance of the evidence, that the debtor effected a transfer with the requisite intent under § 548(a)(1)(A)."); <u>Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)</u>, 327 B.R. 537, 550 (D. Del. 2005) ("The Transaction can be avoided if plaintiff proves, by a preponderance of the evidence, that the Transaction was either intentionally or constructively fraudulent"); <u>Wiggains v. Reed (In re Wiggains)</u>, No. 13-33757-SGJ-7, 14-03064-SGJ, 2015 WL 1954438, at *11 (Bankr. N.D. Tex. Apr. 28, 2015) ("For Trustee to prevail under section 548(a)(1)(A), Trustee must show by a preponderance of the evidence that debtor effected a <u>transfer</u> of his <u>interest in property</u> . . . with the requisite intent.") (emphasis in original).[14]

---

[14] The majority approach applying the preponderance of evidence standard to Section 548(a)(1)(A) claims follows the decision in <u>Grogan v. Garner</u>, 498 U.S. 279 (1991), in which the Supreme Court unanimously held that the standard of proof for the dischargeability exceptions under Section 523(a) is a preponderance of the evidence. <u>See</u> <u>ASARCO</u>, 396 B.R. at 366 (noting that "most decisions" since <u>Grogan</u> have rejected application of a clear and convincing evidence standard for Section 548 claims, and stating that "[u]sing the rationale from <u>Grogan</u>, the Court concludes that the preponderance of the evidence standard would also apply to actual-intent fraudulent transfer under § 548"). Following <u>Grogan</u>, only a minority of courts apply the clear and convincing evidence standard to Section 548(a)(1)(A) claims. <u>See, e.g.</u>, <u>Bumgardner v. Ross (In re Ste. Jan-Marie, Inc.)</u>, 151 B.R. 984, 987 (Bankr.

Because the Trustee will prevail under Section 548(a)(1)(A), and because any relevant state law that would be applied under Section 544(b) likewise includes an "actual intent to hinder, delay or defraud creditors" requirement, see N.Y. Debt. & Cred. L. § 276 (New York law), Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Texas law), Del Code Ann. tit. 6 § 1304(a)(1) (Delaware law), there will be no need for the Court to reach Section 544(b) issues.[15]

### B.    The Trustee Can Prove Actual Intent In Multiple Ways

The Trustee can prove the "actual intent" element in multiple, independent ways.

####      1.    Smith/Lyondell Intent

#####           a.    Application of Collapsing Doctrine for "Actual Intent" Analysis

The question of whether the collapsing doctrine, if applicable under a given set of facts, can be relied upon by a plaintiff to prove "actual intent" (rather than merely, e.g., REV or "property of the debtor" prerequisites) is a pure question of law, and the Court already has ruled in the affirmative.   See In re Lyondell Chem. Co., 543 B.R. at 441 n.61 (where collapsing doctrine applicable, "the Court can, and does, look to the intent of Lyondell as the transferor of the Toe–Hold Payments for the purpose of this motion to dismiss Count 2").   Thus, if collapsing doctrine is applied to consider Toe-Hold Payments 1 and 2 in tandem with the Merger, then debtor intent regarding the Merger is relevant to the "actual intent" analysis.

---

S.D. Fla. 1993); cf. Nisselson v. Empyrean Invest. Fund, L.P. (In re MarketXT Holdings Corp.), 376 B.R. 390, 402 n.15 (S.D.N.Y. 2007) (for purposes of ruling on summary judgment for plaintiff, assuming that standard of clear and convincing evidence applies where New York DCL claim was asserted alongside Section 548(a)(1)(A) claim).

[15] As to Section 544(b) issues, for example, Section 546(e) expressly carves out from coverage claims asserted under Section 548(a)(1)(A), but its text specifies no carve-out for claims asserted under Section 544(b).  Further, while the burdens under Delaware and Texas law are the same as under Section 548(a)(1)(A), under New York law it would be higher.  See ASARCO LLC, 396 B.R. at 368-69 (Delaware law); Osherow v. Hensley (In re Pace), 456 B.R. 253, 267 (Bankr. W.D. Tex. 2011) (Texas law), Schneider v. Barnard, 508 B.R. 533, 542 (E.D.N.Y. 2014) (clear and convincing standard under New York law).  However, as noted above, because the Section 548(a)(1)(A) and the relevant state laws all impose the "actual intent" requirement, there will be no need to reach Section 544(b) issues for Count 2.

As noted above, the Trustee will prove at trial the facts forming the basis for applying collapsing doctrine.  See Part I-A, supra.[16]  Accordingly, and consistent with the Court's findings at the pleading stage, the intent of Lyondell with respect to the Merger can form a basis for satisfying the "actual intent" element with respect to the Toe-Hold Payments.

b.    The Hofmann "Actual Intent" Standard Will be Satisfied.

The District Court ruled at the pleading stage that the factual allegations concerning Lyondell CEO and Chairman Dan Smith and Lyondell management are sufficient to satisfy the legal standard for "actual intent."  See Hofmann, 2016 WL 4030937, at *11-16.  The Trustee will prevail on "actual intent" at trial by proving the factual allegations relied upon by the District Court, which allegations consist in large part of contemporaneous statements and communications taken directly from the documentary record.  Consistent with the District Court's findings at the pleading stage, the Trustee will show a clear "mental apprehension" of harm to creditors on the part of Smith and Lyondell, and the facts will show that Smith and Lyondell management had an obvious "intent to interfere with creditors' . . . rights for personal . . . ends."  Hofmann, at *11 (citing Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.), 541 B.R. 551, 575 (S.D.N.Y. 2015)).

Further, although not required (given the direct evidence of intent including, e.g., Smith's direct warning of creditor harm and deliberate use of inflated projections to lead Lyondell to approve the type of transaction he warned would harm creditors), the Trustee will also rely on indirect evidence, in the form of proving multiple badges of fraud.

Among the badges noted by the District Court in Hofmann were "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property

---

[16] The same sources of evidence that support application of the collapsing doctrine to Toe-Hold Payment 1 will

transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before

the transfer was made or obligation was incurred, the debtor had been sued or threatened with

suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the

debtor removed or concealed assets; (8) [whether] the value of the consideration received by the

debtor was reasonably equivalent to the value of the asset transferred or the amount of the

obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer

was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly

after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the

business to a lienor who transferred the assets to an insider of the debtor." Hofmann, 2016 WL

4030937, at *13-14.

       The badges enumerated in Hofmann were taken from the Texas version of the UFTA.

See Hofmann, 2016 WL 4030937, at *14 n.18.  While UFTA badges have been used in Section

548(a)(1)(A) cases, other courts analyzing the badges for Section 548(a)(1)(A) claims at times

have enumerated the following badges:  (i) lack or inadequacy of consideration; (ii) a close

relationship between the transferor and transferee; (iii) the retention of possession, benefit or use

of the property by the transferor; (iv) the financial condition of the transferor before and after the

transfer in question; (v) the existence or cumulative effect of a pattern or series of transactions or

course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat

of suits by creditors; and (vi) the general chronology of events and transactions under inquiry.

See Kramer v. Sooklall (In re Singh), 434 B.R. 298, 311 (Bankr. E.D.N.Y. 2010) (citing In re

Kaiser, 722 F.2d at 1582-83); Soza v. Hill (In re Soza), 542 F.3d 1060, 1067 (5th Cir. 2008);

Zazzali v. 1031 Exch. Grp. (In re DBSI, Inc.), 476 B.R. 413, 420 (Bankr. D. Del. 2012).

---

support application of the doctrine to Toe-Hold Payment 2.

Here, the Trustee will be able to prove several badges, including, *inter alia*, (i) transfers to insiders/close relationship between transferor and transferee, (ii) the transferor's financial condition/insolvency before or after the transfer, (iii) lack of reasonably equivalent value or adequate consideration, and (iv) a transfer of substantially all of the debtor's assets. Further, because "[f]raudulent acts are as varied as fish in the sea," In re Kaiser, 722 F.2d at 1583, courts have rejected the argument that facts must fit a "prototype," id., and have in recent years relied upon badges (*i.e.*, indicia) of fraud beyond the traditional list. See, e.g., In re Bayou Grp., LLC, 439 B.R. at 307 (recognizing as a badge of fraud "fraudulently inflated principal and profits"). Here, such an indicia is present in the form of the fabricated earnings projections that formed the basis for the Merger.

### 2.    Beyond Smith and Lyondell

While reliance on the intent of the Basell entities that made the transfers is not necessary, even if it were, the Trustee can prove actual intent at trial, because Basell Funding and Basell Finance were dominated and controlled by Blavatnik, such that his own "actual intent" is imputed to those entities.

As the District Court noted in Hofmann, the intent of a transferee may be imputed to the transferor for a Section 548(a)(1)(A) claim where the transferee has actual control over the transferor. See Hofmann, 2016 WL 4030937, at *11 (citing, *inter alia*, In re Lehman Bros. Holdings Inc., 541 B.R. at 576). Here, the Trustee will be able to prove that Blavatnik dominated and controlled Basell Funding and Basell Finance, as, *inter alia*, he was the sole ultimate owner of those entities. Further, the Trustee will be able to prove that Blavatnik possessed "actual intent" with respect to the Merger and the Toe-Hold Payments, with evidence that, *inter alia*, (i) Blavatnik became aware (directly and/or through his agents) that the Lyondell

earnings projections were inflated, yet despite the panicked reactions of his subordinates, ordered them to push the transaction to completion, knowing it was based on inflated numbers, and (ii) during the period following entry into the Merger Agreement, Blavatnik engaged in systematic efforts to reduce his exposure, extracting further capital from LBI and ratcheting up the danger to creditors further still.

Indeed, the Trustee can prove actual intent even without reliance on collapsing the Toe-Hold Payments into the Merger or entering direct evidence of Blavatnik's actual intent. The Trustee will be able to do so by proving multiple badges of fraud that relate to the Toe-Hold Payments themselves. For example, the Trustee will be able to prove that the transfers were to or for the benefit of an insider (Blavatnik, Nell Limited, AI Chemical); that the transfers were concealed (*i.e.*, structured to avoid, in the words of a Blavatnik subordinate, a "HUGE, UGLY disclosure"); that the transferor did not receive adequate compensation or reasonably equivalent value; the financial condition of the transferor(s) before and after the transfer, *i.e.*, insolvency and/or lack of adequate capitalization*;* and the retention of possession, benefit or use of the property by the transferor(s).

### C.    Recovery Under Section 550

Once adjudicated as being avoided or avoidable under Count 2, the Trustee may recover the value of Toe-Hold Payment 1 as against Nell and Blavatnik under Section 550, under the same theory as set forth above in connection with the "for whose benefit" analysis under Count 2. See Part I-E, supra.

While Toe-Hold Payment 2 was directed to Merrill Lynch, it satisfied an obligation of AI Chemical to Merrill Lynch. Because the Trustee will prove at trial that Blavatnik was the sole ultimate owner of AI Chemical and Nell, the Trustee may recover the value of Toe-Hold

Payment 2 under Section 550 under the same theory as set forth above in connection with the "for whose benefit" analysis under Count 2. See Part I-E, supra.

### III.    Counts 6 & 7 (Luxembourg Law)

Counts 6 and 7 seek judgment against Blavatnik and/or Access Industries, Inc. with regard to misconduct vis-à-vis the parent company of the Debtors (the "Parent Company"), named Basell AF S.C.A. ("Basell") prior to the Merger and thereafter renamed LyondellBasell Industries S.C.A. ("LBI").   Count 7 also seeks judgment against Philip Kassin, an officer of Access Industries, Inc. that served on the management board of the Parent Company prior to the Merger.  Because the Parent Company was a Luxembourg entity, the liability of Blavatnik and Kassin for misconduct in the role of fiduciaries to the Parent Company arises under Luxembourg law.[17]

Although Blavatnik retained ultimate decision-making control over the Parent Company and acted on its behalf in connection with the Merger, he chose not to accept a formal appointment as a manager of Basell GP, the entity that, under Luxembourg law, had sole authority to manage the Parent Company.  Instead, he used his power as the indirect controlling shareholder of the Parent Company and the Basell GP to have other persons, including Access Industries, Inc.'s Kassin, be appointed as GP managers even though they inevitably would defer to Blavatnik's decisions.  Under Luxembourg law, the doctrine that operates to impose duties on persons that control a corporate entity without formal authority is that of *de facto* directorship. Under the *de facto* director doctrine, Blavatnik may generally be held to account to the Parent Company to the same extent and applying the same standard as if he was a *de jure* director. Additionally, if the evidence indicates that Blavatnik (or other agents of Access Industries, Inc.)

controlled Basell in the capacity of agents of Access Industries, Inc., Access Industries, Inc. may be found to be a *de facto* director under Luxembourg law.  Alternatively, a person (such as the manager of a general partner) may be held accountable to third parties for tortious behavior that is directed at such third parties and that causes harm.  Here, the Basell GP is a third party vis-à-vis the Parent Company.  Accordingly, the Parent Company can seek tort damages from Kassin for breaches of duties owed to the Parent Company under general Luxembourg tort law.

Liability as a *de facto* director requires a factual determination that (i) Blavatnik or Access Industries, Inc. affirmatively adopted the role of manager and (ii) his or its management of the Parent Company was in place of or "under cover of" the duly appointed management.

Liability in tort can be established by a factual determination that acts of Blavatnik or Access Industries, Inc. constituted misconduct and resulted in damages that are cognizable under Luxembourg law.  The conduct of a *de facto* director is assessed using the standard of a prudent and diligent director operating under the same circumstances.  Accordingly, the Court may find that based on Blavatnik's decision to proceed with the Merger on December 20, 2007, his failure to provide the combined companies with adequate capital, his failure to plan for known and foreseeable contingencies and his failure to minimize the harm to the entity and its creditors, he or Access Industries, Inc. may be liable in damages.  The Court also may consider, in assessing Blavatnik's conduct, Blavatnik's choice not to assume a *de jure* role reflecting his actual managerial power over the Parent Company.  Under Luxembourg law, exercise of management authority over the Parent Company was the obligation of the natural persons who were the managers of the GP.  The deliberate exercise of managerial functions by a person who is not a *de*

---

[17] The specific sections of the Luxembourg code and court decisions interpreting these statutory provisions are set forth in the Expert Report of Philippe Thiebaud and Mr. Theibaud's Supplemental Report.

*jure* manager is itself a factor to be taken into account in determining misconduct under Luxembourg corporate law.

Count 6 is alleged exclusively against Blavatnik and is based on the theory that his conduct violated an implied corporate mandate with the Company.  Such a claim is essentially one of implied contract.  Count 7, in addition to stating a claim against Blavatnik and Access Industries, Inc. as *de facto* directors, also includes a claim against Kassin as a *de jure* manager of the GP.  The gravamen of this claim is permitting Blavatnik to make determinative decisions regarding the Parent Company and contrary to its  interests.[18]

Under Luxembourg law, if liability is established for either of Count 6 or 7, the harmed entities may recover actual, direct damages suffered by them as a consequence of the misconduct proven.  To the extent that the misconduct causes economic harm, damages under Luxembourg law include both the financial losses incurred as a result of misconduct and the gain that has not been made.  At trial, the Trustee will prove damages under multiple theories, including (i) that the Merger Financing resulted in financial collapse causing harm to Lyondell and other debtors; (ii) the decline in recoveries of creditors of Lyondell and Basell, as compared to if the Merger had not taken place; (iii) costs that would not have been incurred but for the Merger; and (iv) pre-judgment interest.

---

[18] Count 7 also bases liability on the conduct of members of the Post-Merger Supervisory Board, including Blavatnik and Benet, in failing to properly exercise their duties in that capacity, insofar as they permitted approval of multiple harmful decisions, including, *inter alia*, upsizing of the ABL facility and approval of the Access Revolver.

IV.    **Count 9 (Avoidable Preference)**

A.    **The October Transfer Is An Avoidable Preference Under Section 547(b).**

Count 9 seeks judgment against Access Industries Holdings LLC ("Access") on the basis

that the $300 million October Transfer made by Lyondell to Access on October 16, 17, and 20,

2008 (collectively, the "Transfer Date") constitutes a preferential transfer pursuant to Section

547 that is subject to avoidance pursuant to Sections 547 and 550.    Section 547(b) provides that

certain transfers to repay antecedent debt are recoverable as avoidable preferences.    See 11

U.S.C. §547(b).    In order to find for the Trustee on Count Nine, the Court must find that each of

the five elements set forth in Section 547(b) are satisfied with respect to the October Transfer.

Section 547(b) sets forth the five elements of an avoidable preference as a transfer of an

interest of the debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer
>     was made;
> (3) made while the debtor was insolvent;
> (4) made—
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the
>         petition, if such creditor at the time of such transfer was an insider;
>         and
> (5) that enables such creditor to receive more than such creditor would receive if—
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the
>         provisions of this title.

11 U.S.C. § 547(b).

The Trustee bears the burden of proving each of these elements by a preponderance of

the evidence standard.    See 11 U.S.C. § 547(g); First Software Corp. v. Computer Assocs. Int'l,

Inc., 107 B.R. 417, 420-21 (D. Mass. 1989).

In this Court's July 20, 2016 Order Denying Cross Motions for Summary Judgment on Count 9 of the Amended Complaint [Docket No. 771] (the "Summary Judgment Order"), the Court found that the Trustee has established four of the five elements of Section 547(b), but that the issue of solvency remains a question of fact for trial.  Summary Judgment Order at *4-5 (finding that 11 U.S.C. §§ 547(b)(1), (2), (4), & (5) are satisfied with respect to the October Transfer).

Therefore, the October Transfer is an avoidable preference under 11 U.S.C. §547(b) if the Court finds that: (i) the $300 million in Transfer Funds (as defined below) constitute an interest of the debtor (*i.e.*, Lyondell) in property; (ii) Lyondell was insolvent when the transfer was made; and (iii) no affirmative defenses are available to Access under Section 547(c).  See generally Summary Judgment Order.  As demonstrated below, and as the Trustee will establish at trial, all three of these requirements are satisfied.

1.    The Transfer Funds Constitute Property Of Lyondell.

The Court noted in its Summary Judgment Order the "gating issue" of whether the $300 million in funds transferred from Lyondell to Access on account of the October Transfer (such funds, the "Transfer Funds") were indeed property of Lyondell, as opposed to property of an affiliate.  Summary Judgment Order, at *5.  As discussed below, and as the Trustee will establish at trial, the facts and law show that Lyondell possessed a property interest in the Transfer Funds.

The Trustee has briefed extensively why the Transfer Funds constitute an interest of Lyondell in property under Section 547(b).  See Tr. 01-03-12 Reply at 15-17.[19]  Funds in a bank account are an "interest of the debtor in property" where the debtor can show (i) legal title to the account and (ii) control over the use of the account.  See Enron Corp. v. Port of Houston Auth.

(In re Enron Corp.), Adv. Pro. No. 03-92511 (AJG), 2006 WL 2385194, *6 (Bankr. S.D.N.Y. June 2, 2006).  Legal title refers to legal ownership of the account and is established where the account is created in the debtor's name.  See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1451 (10th Cir. 1996).

A debtor "controls" an account where the debtor has the "unfettered discretion to pay creditors of its own choosing, even where the account contains commingled funds."  See Enron, 2006 WL 2385194, at *6 (citing Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 (5th Cir. 1995)).  In other words, "control" is established where the debtor has the ability to direct the funds to its own creditors.  See id. at *6-7 .  Courts have also approached the "control" question by analyzing "whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment."  See In re Southmark Corp., 49 F.3d at 1116-17.

In its Summary Judgment Order, the Court identified as an issue for further development at trial "whether the bank account, despite being owned by Lyondell, contained commingled funds from other affiliates."  Summary Judgment Order, at *5.  The Trustee will demonstrate at trial that the fundamental analysis described above does not change merely because the funds at issue were held in a centralized cash management system or similar type of joint bank account in which funds are held in a commingled nature (collectively, a "CMS").  See Tr. 01-03-12 Reply at 15-16 (citing cases).[20]  The Trustee will demonstrate at trial that the Transfer Funds were

---

[19] See Reply Memorandum of Law in Support of the Trustee's Motion for Summary Judgment on Count Nine of the Amended Complaint [Docket No. 675] (the "Tr. 01-03-12 Reply"), filed January 3, 2012.

[20] For example, in Southmark, cited with approval in this district, the Fifth Circuit found that funds in a payroll account that was part of a larger CMS used by the debtor and hundreds of its affiliates was part of the debtor's estate, whether or not the debtor actually owned the cash.  See In re Southmark Corp., 49 F.3d at 1116-17; In re Enron Corp., 2006 WL 2385194, at *6 (citing Southmark for proposition that "[e]vidence of an interest in a bank account is found where the party asserting the interest holds the legal title thereto, all other indicia of ownership,

property of Lyondell for purposes of Bankruptcy Code section 547(b) notwithstanding that they were held in a CMS account.  First, the "legal title" requirement is satisfied because the Transfer Funds were wired from an account legally owned and held exclusively in the name of Lyondell. See Tr. 01-03-12 Reply at 15.  Indeed, Access does not dispute this fact.  See Access Industries Holdings LLC's (i) Response to the Trustee's Statement of Undisputed Facts in Support of the Trustee's Motion for Summary Judgment on Count 9 of the Amended Complaint and (ii) Statement of Additional Facts [Docket No. 605], filed Oct. 18, 2011 ("AIH Response"), at *45.

Second, the "control" element is satisfied.  Access concedes that Lyondell was the legal borrower of the funds drawn from the Access Revolver under the October Draw.  See AIH Response, at *7-8.  As in Enron, Lyondell directed payment of the Transfer Funds to satisfy a debt owed to its own creditor (Access).  See In re Enron Corp., 2006 WL 2385194, at *6. Moreover, under Southmark, the Transfer Funds were "controlled" by Lyondell because payment of such funds diminished Lyondell's pool of funds available for distribution to other creditors.  See In re Southmark Corp., 49 F.3d at 1116-17.  Indeed, had the October Transfer not been made before Lyondell entered chapter 11, Access undoubtedly would have filed a $300 million general unsecured claim against Lyondell—not LBI or another affiliated Debtor.

2.     Lyondell Was Insolvent As Of The Transfer Date.

In order to find for the Trustee on Count Nine, the Court must find that the October Transfer was made "while the debtor was insolvent."  See 11 U.S.C. § 547(b)(3).  The issue of Lyondell's solvency at the time of the October Transfer is an issue for determination at trial. Summary Judgment Order, at *5.  As discussed below, and as the Trustee will establish at trial,

---

and the 'unfettered discretion to pay creditors of its own choosing,' even where the account contains commingled funds.").

Lyondell was insolvent on the Transfer Date based upon the Balance Sheet Test for insolvency, set forth above in connection with Count 1, see Part I-B, supra.[21]

The Trustee will prove at trial that the PJSC Opinion demonstrates by a preponderance of the evidence that Lyondell was insolvent on the Transfer Date.[22]  As described more completely in the PJSC Opinion, conducting the Balance Sheet Test is a two-part process, involving first determining an "Operating Enterprise Valuation" ("OEV") for the consolidated LBI enterprise, and second, adding to OEV the value of certain joint ventures and other assets to reach a "Total Asset Value" ("TAV").  The enterprise's net debt is then subtracted from the TAV to determine solvency.  Consistent with the general framework described above, if the enterprise's TAV is less than its net debt, the enterprise is insolvent.

To determine OEV for LBI, PJSC used a weighted-average of the results of three alternative valuation methods:  (i) a comparison to comparable public petrochemical companies and independent refiners (a "Comparable Company" analysis); (ii) precedent sale transactions (a "Transaction Comparables" analysis); and (iii) a discounted cash flow analysis (a "DCF Valuation" analysis).  These three valuation methodologies are widely-accepted and commonly-

---

[21] The Trustee has retained Anders J. Maxwell ("Maxwell") of Peter J. Solomon Company ("PJSC") as its expert witness with respect to the solvency of LBI as of October 16, 17, and 20, 2008—the respective dates of the October Transfer.  On February 28, 2011, PJSC submitted its Expert Report (the "PJSC Report").  On May 31, 2011, PJSC submitted its Expert Rebuttal Report (the "PJSC Rebuttal," and together with the PJSC Report, the "PJSC Opinion").

  Access has not identified a valuation expert for such purpose.  Likewise, none of the parties to this action, other than the Trustee, have identified an expert to testify as to the value of LBI or Lyondell as of the Transfer Date. While Access has identified Daniel R. Fischel of Compass Lexicon as a financial expert, Mr. Fischel's reports do not include an opinion as to the fair value of the assets of Lyondell or LBI as of the Transfer Date.  In addition, while Access has identified Christopher J. Kearns of Capstone Advisory Group, LLC, as a financial expert, Mr. Kearns' reports do not include an opinion as to the fair value of the assets of Lyondell or LBI as of the Transfer Date.

[22] The Court noted in its Summary Judgment Order that Access, by offering evidence of, among other things, "the Debtors' bankruptcy schedules, valuation, and business records," has "rebutt[ed] the presumption" of Bankruptcy Code section 547(f) that Lyondell was insolvent in the 90 days preceding the petition and has therefore "shift[ed] the burden of proof on insolvency to the Trustee."  Summary Judgment Order, at *5.  As trial, the Trustee bears the

used.  See In re Chemtura Corp., 439 B.R. 561, 573 (Bankr. S.D.N.Y. 2010) (describing DCF, comparable companies, and comparable transactions methods as "standard").

These three valuation methods were then weighted to compute the OEV of LBI.  This resulted in an OEV range for LBI of $19.242 to $22.259 billion, with a midpoint of $20.750 billion.  To the OEV, PJSC added the value of joint ventures ($1.306 billion) and other assets ($0.213 billion) to derive a TAV range for LBI of $20.761 to $23.836 billion (midpoint of $22.299 billion).  Next, PJSC separately valued LBI's net debt and contingent liabilities, as of the Transfer Date, at $27.539 billion.

Based on (i) a TAV range of $20.761 to $23.836 billion (midpoint of $22.299 billion) and (ii) net debt and contingent liabilities of $27.539 billion, LBI was insolvent on the Transfer Date.  The Trustee will demonstrate at trial that because LBI was insolvent on the Transfer Date, it follows necessarily that Lyondell was insolvent on such date.  Access, which chose not to proffer an expert opinion addressing Lyondell's solvency on the Transfer Date, will be unable to offer any credible evidence at trial to contravene the PJSC Opinion.  The Trustee will therefore establish at trial by a preponderance of the evidence that Lyondell was insolvent on the Transfer Date, thereby satisfying the fifth and final requirement of Section 547(b).

### B.    The October Transfer Is Not Protected By The Ordinary Course Defense.

The October Transfer is an avoidable preference under 11 U.S.C. §547(b) unless Access can identify an affirmative defense under Section 547(c).  In the first instance, the Trustee will establish at trial that the October Transfer is not protected from preference liability by the "ordinary course" defense under Section 547(c)(2).

---

burden of proving insolvency by a preponderance of the evidence standard.  See In re Roblin Indus. Inc., 78 F.3d at 34.

As set forth briefly herein, and as the Trustee will demonstrate at trial, Access cannot establish the first mandatory element of that defense: that the debt was incurred in the ordinary course (the "Incurrence Element"). However, even if this Court were to find that Access can satisfy the Incurrence Element, the ordinary course defense is still unavailable because Access cannot satisfy either of the two other necessary elements to the defense: that the October Transfer was made in the ordinary course (the "Transfer Element"), or that the October Transfer was made according to ordinary business terms (the "Business Terms Element").

Section 547(c)(2) of the Bankruptcy Code provides that a trustee may not avoid a preferential transfer:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>>
>> (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2) (emphasis added).

Access, as defendant, bears the burden of proving either (i) the first and second or (ii) first and third statutory elements of Section 547(c)(2) by a preponderance of the evidence. Summary Judgment Order, at *6 (citing In re Roblin Indus. Inc., 78 F.3d at 39).

1.    The Debt Was Not Incurred In The Ordinary Course Of Business.

In order to succeed on its ordinary course defense, Access must first satisfy the Incurrence Element of Section 547(c)(2), i.e., that Lyondell's March 2008 entry into the Access Revolver and Lyondell's October 15, 2008 draw on the Access Revolver (the "October Draw") occurred in the ordinary course of business. Summary Judgment Order, at *6. The Trustee will

establish at trial that there are several fundamental reasons why the Incurrence Element is not

satisfied.

a.    Loans Made By Creditors Not In The Business Of Lending Are
Not Incurred In The Ordinary Course.

The Trustee has shown in its prior briefing, and will establish at trial, that the Incurrence

Element is not satisfied where the debt is incurred to a creditor that is not in the business of

commercial lending.  See Tr. 11-10-11 MOL at 33-39.[23]   Courts have rejected the ordinary

course defense with respect to the Incurrence Element where a loan was made by a defendant not

in the business of lending.   See Tr. 6-15-16 MOL at 3 (citing cases).[24]   The Trustee will

demonstrate at trial that because Access's business concededly did not include any commercial

lending, this fact alone is sufficient to defeat Access's purported ordinary course defense.

b.    First-Time Debts Incurred Between Affiliates Are Not Incurred In
The Ordinary Course.

In its prior briefing, the Trustee established the principle that courts will not find first-

time financing from an affiliate to have been incurred in the ordinary course.  See Tr. 11-23-11

MOL at 6-8.[25]   At trial, the Trustee will demonstrate that courts that have addressed the

confluence of two circumstances in particular—namely, (i) first-time debts that are (ii) incurred

between affiliates—have uniformly determined that such transactions are not in the ordinary

course.  The Trustee has shown in its prior briefing, and will further demonstrate at trial, that (i)

at the time the Access Revolver was executed in March 2008, Access and Lyondell were

affiliated entities under the control of Blavatnik, see Tr. 11-10-11 MOL at 22-23, and (ii) the

entry into the Access Revolver and the October Draw constitute the first incurrence of debt

---

[23] "Tr. 11-10-11 MOL" refers to the Memorandum of Law in Support of the Trustee's Motion for Summary Judgment on Count Nine of the Amended Complaint [Docket No. 640], dated November 10, 2011.

[24] "Tr. 6-15-16 MOL" refers to the Supplemental Memorandum of Law in Support of the Trustee's Motion for Summary Judgment on Count 9 of the Amended Complaint and in Opposition to the Motion of Access Industries Holdings LLC for Summary Judgment on Count 9 of the Amended Complaint [Docket No. 737], dated June 15, 2016.

[25] References to "Tr. 11-23-11 MOL" are to the Trustee's November 23, 2011 Memorandum of Law in Opposition to the Motion of Access for Summary Judgment on Count 9 of the Amended Complaint [Docket No. 669].

between Access and Lyondell.  See id. at 28.  Under these circumstances, Access cannot satisfy the Incurrence Element.

> c.    Emergency Cash Infusions From A Shareholder Are Not Incurred In The Ordinary Course.

The Trustee will further demonstrate at trial that courts have routinely concluded that emergency cash infusions into a financially-distressed debtor are not incurred in the ordinary course.  See Tr. 11-10-11 MOL at 29-30 (citing cases).  The Trustee will demonstrate at trial that the Access Revolver was executed and the October Draw occurred during an emergency liquidity crisis when no other sources of liquidity were available to Lyondell.  This fact alone forecloses Access from satisfying the Incurrence Element.

> 2.    The October Transfer Was Not Made In The Ordinary Course.

Even if the Court were to find that the Incurrence Element is satisfied, the Trustee will demonstrate at trial that the ordinary course defense is still unavailable because Access cannot satisfy the second statutory element of Section 547(c)(2)—that the October Transfer was made in the ordinary course.

In analyzing the Transfer Element under Section 547(c)(2)(A), courts examine several factors including "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment."  Summary Judgment Order, at *7 (citing cases).  The Transfer Element is a subjective inquiry: it asks whether the transfer was ordinary as between this transferor and this transferee.  See id. Accordingly, the defendant must establish a "baseline of dealings" between the parties in order to "enable the court to compare the payment practices during the preference period with the prior course of dealing."  See id. (citing cases).

The Trustee will demonstrate at trial that Access cannot satisfy the Transfer Element of Bankruptcy Code section 547(c)(2)(A).  Most fundamentally, this is because Access cannot show any "baseline of dealings" between it and Lyondell.  See 11-10-11 MOL at 28.  Moreover, Access's attempt to rely on its prior inter-affiliate "lending" history to claim that the Access Revolver and October Draw were ordinary is unavailing.  As the Trustee has previously briefed, the financial support Access allegedly provided to other affiliates bears no resemblance to the Access Revolver.  See id. at 34-35.  In any case, because the Transfer Element is a subjective inquiry, these intercompany advances to *other* entities are irrelevant to an analysis of Section 547(c)(2)(A).

        3.        The October Transfer Was Not Made According To Ordinary Business Terms.

The Trustee also will demonstrate at trial that even if the Court were to find that Access can satisfy the Incurrence Element, the ordinary course defense still is unavailable because (in addition to being unable to satisfy the Transfer Element) Access cannot satisfy the third statutory element of Section 547(c)(2)—that the October Transfer was made according to ordinary business terms.  The Business Terms Element, unlike the Transfer Element, requires an objective analysis.  See Summary Judgment Order, at *7 (citing cases).  The Second Circuit explained in Roblin Industries that "dealings so idiosyncratic . . . should be deemed extraordinary and therefore outside of the scope of subsection C."  Roblin Indus. Inc., 78 F.3d at 39-40.

The Trustee will demonstrate at trial that the October Transfer cannot satisfy Section 547(c)(2)(B)'s Business Terms Element.  The record reflects that the Access Revolver was never intended to actually be drawn upon, and that the October Draw was permitted only after Blavatnik had used his control over both sides of the transaction to ensure that the loan would be

repaid immediately and prior to Lyondell's other indebtedness.  See Tr. 6-29-16 Resp. at 4.[26]

Therefore, the "idiosyncratic" nature of these circumstances prevents Access from satisfying the

Business Terms Element.  See Roblin Indus. Inc., 78 F.3d at 39-40.

4.    Other Factual Issues Raised In Summary Judgment Order

In its Summary Judgment Order, the Court noted that "[p]ertinent to the Court's

evaluation of the ordinary course defense is a determination of whether (i) Lyondell had access

to other liquidity sources (*i.e.*, availability under the 2007 credit agreement) when the Transfers

occurred and (ii) borrowing under any of those sources of liquidity was subject to solvency

conditions."  Summary Judgment Order, at *9.  The Trustee will demonstrate at trial that (i) at

the time of the October Transfer, Lyondell had virtually exhausted its availability under the 2007

Credit Agreement and had no access to other sources of liquidity, and (ii) neither borrowings

under the 2007 Credit Agreement nor the Access Revolver required Lyondell's solvency as a

condition precedent to a draw.

**C.    The October Transfer Is Not Protected By The "Contemporaneous Exchange For New Value" Defense.**

In addition, the October Transfer is not protected from avoidance by the Section

547(c)(1) contemporaneous exchange defense cited by Access.  See Access Industries Holdings

LLC's Memorandum of Law in Opposition to the Trustee's Motion for Summary Judgment on

Count 9 of Amended Complaint [Docket No, 604], dated October 18, 2011, at 35-40.  In order to

prevail on that defense, Access must prove that such transfer was intended by the debtor and the

transferee to be a contemporaneous exchange for new value given to the debtor and was in fact a

substantially contemporaneous exchange.  See Tr. 6-15-16 MOL at 7.  The Trustee will

---

[26] "Tr. 6-29-16 Resp." refers to the Trustee's Response to Access Industries Holdings LLC's Notice of
Supplemental Authorities In Support of its Motion for Summary Judgment [Docket No. 758] dated June 29, 2016.

demonstrate at trial that Access's purported contemporaneous exchange defense is baseless. First, Access did not provide "new value" to Lyondell in exchange for the October Transfer, because a transfer made in satisfaction of antecedent debt is not "new value" under Section 547(a).  See Tr. 6-15-16 MOL at 7-8 (citing cases).  Second, because the October Draw was a short-term loan between affiliates, it is inherently not contemporaneous and therefore is not protected by the defense.  See id. at 8 (citing cases).

As Access also cannot prove any other affirmative defense, the Court should find that the October Transfer constituted a preferential transfer pursuant to Section 547 and avoid the October Transfer pursuant to Sections 547 and 550.

## V.    **Count 11 (Constructive Fraudulent Transfer)**

### A.    **The Transaction Fee Transfers Are Avoidable Under Section 548.**

Count 11 asserts claims against Nell Limited and Perella Weinberg on the basis that the payment of the $127.6 million payment to Nell Limited and the $500,000 payment Perella Weinberg (the "Transaction Fees") constituted a constructive fraudulent transfer, and avoidance and recovery is proper pursuant to Sections 544, 548 and 550 of the Code and applicable state law.  The prerequisites for constructive fraudulent transfer claims have been set forth above.  See Part I, supra.

#### 1.    Reasonably Equivalent Value

As set forth above in connection with Count 1, for a constructive fraudulent transfer claim a plaintiff must show that the transferee did not receive reasonably equivalent value.  See

Part I, supra.  The Trustee will demonstrate through expert testimony and factual evidence that LBI did not receive any value in exchange for the Transaction Fees.[27]

### 2. Financial Condition of Debtors

As set forth above in connection with Count 1, the Trustee plans to prove at trial that the debtor-financial-condition prerequisite is satisfied in multiple ways, including under the balance sheet insolvency test, the capital adequacy test and the cash flow test.  See Part I-B, supra.[28]

### B. Recovery Under Section 550

Once the trustee makes a prima facie case that a transfer is avoidable pursuant to Sections 544 or 548, and if the defendant cannot establish any affirmative defenses, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."  11 U.S.C. § 550(a).  Section 550 "is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." Hirsch v. Gersten (In re Centennial Textiles, Inc.), 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998); accord Bakst v. Wetzel (In re Kingsley), 518 F.3d 874, 877 (11th Cir. 2008); Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Resources, Inc.), 354 F.3d 1246, 1266 (10th Cir. 2004).  In order to restore the estate, recovery under Section 550 must therefore include all transactional fees paid by the debtors to professionals and entities associated with the transfer.  Official Comm. of Unsecured Creditors v. Citicorp N. Am., (In re TOUSA, Inc.), 422 B.R. 783, 885-86 (Bankr. S.D. Fla. 2009) (holding recovery under Section 550 "include[s] the various fees associated with the transaction itself" and ordering disgorgement of all fees "paid by the Debtors for

---

[27] The Trustee also will prove at trial that one or more of the Debtors effectuated the transfer, or that the transfer is one of an interest in Debtor property under the collapsing doctrine, the standards applicable to which are set forth above in connection with Count 1.  See Part I-A, supra.

[28] As noted above, the Court will not need to reach Section 544(b) issues as the same evidence that would satisfy the standards for constructive fraudulent transfer under state law applied by virtue of Section 544(b) would also satisfy Section 548(a)(1)(A).  See n.1, supra.

professionals advising the First Lien Term Loan and the Second Lien Term Loan Lenders [defendants]") <u>quashed in part by</u> 444 B.R. 613 (S.D. Fla. 2011), <u>affirmed in part and reversed in part by</u> 680 F.3d 1298 (11th Cir. 2012).

Therefore, if this Court finds that the payment of the Transaction Fees constituted a fraudulent transfer under Sections 544 or 548, the Court should find that the Trustee is able to recover such property under Section 550.

## VI.    <u>Count 12 (Breach of Contract)</u>

Count 12 seeks damages for the breach of the Access Revolver by Access and AI International, when they in December 2008 in bad faith refused to fund the Access Revolver following LBI's December 30, 2008 good faith request.  Ruling on a motion by Defendants to dismiss Count 12, the Court found that Count 12 would go forward only as to restitutionary damages. <u>See</u> Decision and Order on Defendants' Motions to Dismiss Counts 12, 15, and 16 [Docket No. 697], dated January 4, 2016 Decision, at 21, 41 (the "<u>Count 12 Decision</u>") ("[T]he Court agrees with the Trustee that the limitation on damages clause, even though the Court has found it to be enforceable, does not preclude recovery of restitution.  Accordingly, dismissal of Count 12 is denied to the extent the Trustee seeks damages for restitution.  It otherwise is granted.").

"Restitution . . . 'aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms.'"  Count 12 Decision, at 19 (quoting <u>360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)</u>, 404 B.R. 335, 341 (S.D.N.Y. 2009) and citing, *inter alia*, Restatement, Restitution, § 150, cmt. a. (1937) and Restatement (Second) of Contracts § 371 cmt. a. (1981)) (emphasis supplied by the Court)).  Here, the Trustee intends to prove at trial that

approximately $12 million in fees were paid by the Borrowers, which fees were not consequential damages resulting from the breach and are recoverable as restitutionary damages.

## VII.    Count 18 (Aiding and Abetting)

Count 18 asserts claims against multiple Access entities for aiding and abetting breaches of fiduciary duty by certain Basell entity fiduciaries.  Under the Court's January 4, 2016 ruling, Texas law governs the aiding and abetting claim.  See In re Lyondell Chem. Co., 543 B.R. at 452-56.[29]

Under Texas law, "where a third party knowingly participates in the breach of a fiduciary's duties, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." Id. at 452 (citing Meadows v. Hartford Life Ins. Co., 492 F.3d 634, 639 (5th Cir. 2007)). To establish a claim for knowing participation in a breach of fiduciary duty under Texas law, a plaintiff must assert:  (i) the existence of a fiduciary relationship; (ii) that the third party knew of the fiduciary relationship; and (iii) that the third party was aware that it was participating in the breach of that fiduciary relationship.  Id. (citing Meadows, 492 F.3d at 639).  Here, the Trustee will prove each of these "knowing participation" elements at trial.

First, the Trustee will prove the underlying breaches under Luxembourg law in connection with the proof he offers under Counts 6 and 7, which assert claims for breaches by Blavatnik, Access Industries, Inc. and various Basell entity fiduciaries of duties owed under Luxembourg law.  See Part III, supra.

---

[29] The Court's January 4, 2016 decision sustains Count 18 as against Access Industries Holdings LLC but dismisses it as against Access Industries, Inc.  However, a review of the reasoning of the decision indicates that the dismissal of Access Industries, Inc. was due to apparent confusion among similarly named Access entities, and that the reasoning of the decision, if applied to the evidence the Trustee expects to prove at trial, may in fact instead support a finding of liability against Access Industries, Inc.  To conform to the anticipated evidence, the Trustee accordingly in its Contentions of Fact, which supersede the allegations of the Second Amended Complaint, has identified Access Industries, Inc. as the correct Access entity responsibility for aiding and abetting liability on Count 18.  In the event it is established at trial that the correct Access entity which is liable for aiding and abetting liability on Count 18 is

Second, the Trustee will prove that Access Industries, Inc. "knew of the fiduciary relationship." The Trustee again will rely on evidence used in connection with Counts 6 and 7, to show, among other things, that Access Industries, Inc. agents knew of the duties owed to LBI. For example, as the Court explained in sustaining Count 18, the Trustee's complaint references an email from Philip Kassin (Senior Vice President and head of Mergers and Acquisitions and Financing) in which he candidly, in the Court's words, "struggle[es] with the conflict of his fiduciary duties as a board member and his role as an officer" of Access entities. In re Lyondell Chem. Co., 543 B.R. at 454. Relying on that email and similar evidence, the Trustee will prove trial that Kassin and other Access Industries, Inc. agents were fully aware of the duties owed to Basell entities. Further, because the Trustee will establish that Kassin (and other senior officers) were acting within the scope of their authority, under general agency principles, Kassin's knowledge and knowing participation can be imputed to the Access entities for which he served as an agent. See id.

Third, the Trustee will prove at trial that Access Industries, Inc. "was aware that it was participating in the breach" of the duties owed to LBI. In addition to Kassin's candid acknowledgement of the conflict involving the fiduciary duties owed to LBI, the Trustee will offer extensive evidence regarding knowing participation in the breaches by Access entities directly. For example, the Court included in its January 4 decision three paragraphs summarizing the Trustee's detailed allegations regarding how Access entity knowingly participated in the breaches by, inter alia, (i) securing damaging financing arrangements based upon inflated Basell earnings projections, without risking capital of its own; (ii) repeatedly supplying Merrill Lynch with inflated and unrealistic Basell earnings projections; (iii) recklessly

---

Access Industries, Inc. (not Access Industries Holdings LLC, which also is owned and controlled by Mr. Blavatnik),

accepting Lyondell's projections without meaningful diligence; and (iv) with awareness of severe risks to the combined company, structuring a massive extraction of capital through the Toe-Hold Payments in a way that would avoid disclosing to the market the extraction.  In sum, the Court found that such allegations were "sufficient to allege that Access Holdings knew of the fiduciary duties and knowingly participated in the breach of such duties." Id.  As these and similar factual allegations are taken directly from an extensive documentary record relying heavily on contemporaneous statements by agents of Access entities, the Trustee expects to prove them at trial.

## VIII.   NAG Investments, LLC Action Counts 1 & 2 (Fraudulent Transfer)

### A.    The Transfer Was A Fraudulent Transfer Under Section 548.

The Amended Complaint Against NAG Investments, LLC [Adv. Pro. No. 11-01844, Docket No. 9] seeks judgment against NAG Investments, LLC ("NAG") on the basis that the €100 million payment made to NAG (the "December Distribution") constitutes a fraudulent transfer pursuant to Section 548 and that is subject to recovery pursuant to Section 550.  The elements for Section 548 claims have been set forth above.

### 1.    Interest of the Debtor in Property

Section 101(54) of the Bankruptcy Code defines "transfer" broadly to include any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property . . . or an interest in property."  11 U.S.C. § 101(54)(D).  "According to the legislative history, the definition of transfer is 'as broad as possible.'"  I. Appel Corp. v. Val Mode Lingerie, Inc., Nos. 97 Civ. 6938 (LMM), 97 Civ. 8230 (LMM), 2000 WL 231072, at *6 (S.D.N.Y. Feb. 28, 2000) (internal quotations omitted).

---

the Court should amend its prior order and enter judgement against the correct Access entity.

It is well established that an interest in property passes from a corporation to its shareholders at the moment a dividend is declared, not when the dividend is later paid. See, e.g., 11 Fletcher Cyc. Cor. § 5322, n.8 (2011) ("The rights of the shareholders immediately vest the moment the dividend is declared. . . . From the moment a dividend is declared, the stockholder has a right thereto as a creditor of the company."); Marquette Bank Illinois v. Covey (In re Classic Coach Interiors, Inc.), 290 B.R. 631, 636 (Bankr. C.D. Ill. 2002) ("A dividend does not exist, of course, until the board of directors declares it. Once declared, but yet unpaid, the dividend constitutes a liability of the corporation. By no means is a declared but unpaid dividend an asset of the corporation, although it is an asset of the shareholders to whom it is owed . . . thus, the corporation's net worth declines upon declaration."). The Trustee will demonstrate at trial that Basell obtained a property interest in the December Distribution at the moment Basell Funding declared the dividend to Basell.

Furthermore, the Trustee will also prove at trial that Basell exercised significant control over the funds at issue, sufficient to demonstrate a property interest in the funds under the "control" test. See In re Bankest Capital Corp., 374 B.R. at 338-39 (Bankr. S.D. Fla. 2007). The dispositive question is whether the Debtor had control over the subject funds. See id. at 338. "Control has two components: first, the power to designate which party will receive the funds; and second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid." Id. at 365. The Trustee intends to prove that Basell not only had the power to designate the payee and control whether the payee would actually be paid, but it also exercised that power by ordering its subsidiary Basell Funding to wire transfer Basell's €100 million directly to NAG, rather than to Basell for Basell to wire transfer it upstream.

45

2.      <u>Reasonably Equivalent Value</u>

The legal standard governing reasonably equivalent value is set forth above.  <u>See</u> Part I-C, <u>supra</u>.  The Trustee intends to prove at trial through the use of fact witnesses and evidence that Basell received no value in exchange for the transfer of €100 million to NAG, and will demonstrate that the December Distribution was a dividend that does not constitute reasonably equivalent value.

3.      <u>Financial Condition of Debtor</u>

As set forth above, for a constructive fraudulent transfer claim under Section 548(a)(1)(B), a plaintiff may satisfy the financial condition element through the balance sheet insolvency test, capital adequacy test or cash flow test.  <u>See</u> Part I-B, <u>supra</u>.

At trial, the Trustee can prove that Basell satisfied each of these tests as of December 20, 2007 and that the financial condition of Basell did not materially change between December 7 and December 20, 2007, such that Basell satisfied each of these tests on December 7, 2007.

**B.      <u>Recovery Under Section 550</u>**

The Trustee has asserted alternate theories, and may recover under Section 550 against NAG under either theory.  Under Count 1, Basell transferred the €100 million to BI S.a.r.l., with NAG as the immediate or mediate transferee from whom recovery is sought.  <u>See</u> 11 U.S.C. § 550(a)(2) ("immediate or mediate transferee").   In the alternative, under Count 2, Basell transferred the €100 million to NAG, such that the Trustee may recover from NAG as the initial transferee.  <u>See</u> 11 U.S.C. § 550(a)(1) ("initial transferee").

Dated: New York, New York
      October 3, 2016

                                          Respectfully submitted,

                                          By: /s/ Sigmund Wissner-Gross
                                          Sigmund Wissner-Gross, Esq.
                                          May Orenstein, Esq.
                                          BROWN RUDNICK LLP
                                          Seven Times Square
                                          New York, NY 10036
                                          Telephone: (212) 209-4800
                                          Facsimile: (212) 209-4801

                                        -and-

                                        Steven D. Pohl, Esq.
                                          BROWN RUDNICK LLP
                                        One Financial Center
                                        Boston, MA 02111
                                        Telephone: (617) 856-8200
                                        Facsimile: (617) 856-8201

                                        *Counsel for Edward S. Weisfelner,*
                                        *as Litigation Trustee of the LB Litigation Trust*