UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE                           : Chapter 11
                                :
LYONDELL CHEMICAL COMPANY       : Case No. 09-10023-mg
                                :
and MILLENNIUM CUSTODIAL TRUST, : New York, New York
                                : Monday, October 17, 2016
                                : A.M. Session
            Debtors.            : 9:43 a.m. to 12:52 p.m.
...............................  Volume 1.  Pages 1-119
EDWARD S. WEISFELNER,           :
as Litigation Trustee,          :
            vs.                 :
THE LEGAL REPRESENTATIVE OF     : Adv. Proc. 09-01375-mg
THE ESTATE OF RICHARD.          :
...............................
EDWARD S. WEISFELNER,           :
as Litigation Trustee           :
            vs.                 : Adv. Proc. 11-01844-mg
NAG INVESTMENTS, LLC, et al.    :
...............................

TRANSCRIPT OF TRIAL;
TRUSTEE'S MOTION IN LIMINE TO EXCLUDE (i) THE EXPERT
TESTIMONY OF PIETER VAN DER KORST AND (ii) CERTAIN DEPOSITION
TESTIMONY DESIGNATED BY THE ACCESS DEFENDANTS
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

LITIGATION TRUSTEE          BROWN RUDNICK
& CREDITOR TRUSTEE:         7 Times Square
                            New York, New York 10036
                            BY: SIGMUND S. WEISSNER-GROSS, ESQ.
                            BY JUSTIN WEDDLE, ESQ.
                            BY: STEVEN D. POHL, ESQ.
                            BY:  MAY ORENSTEIN, ESQ.
(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by F. Ferguson, ECRO

AudioEdge Transcription, LLC
23 Vreeland Road, Suite 204
Florham Park, NJ  07932
(973) 618-2310,  973) 618-2311 (Fax)
www.audioedgetranscription.com

Proceedings recorded by electronic sound recording,
transcript produced by certified transcription service.

APPEARANCES: (Continued)

ACCESS DEFENDANTS:          QUINN EMANUEL URQUHART &
                           SULLIVAN, LLP
                           51 Madison Avenue, 22nd Floor
                           New York, New York 10010
                           BY: SUSHEEL KIRPALANI, ESQ.
                           BY: RICHARD T. WERDER, JR., ESQ.
                           BY: REX LEE, ESQ.

NAG DEFENDANTS, et al:     KLEE TUCHIN BOGDANOFF & STERN, LLP
                           1999 Avenue of the Stars
                           Thirty-Ninth Floor
                           Los Angeles, California 90067
                           BY: KENNETH N. KLEE, ESQ.

3

I N D E X
(10/17/16, A.M. SESSION)

                                                              Page

OPENING STATEMENT BY MR. WISSNER-GROSS                          5

OPENING STATEMENT BY MR. KIRPALANI                             65

OPENING STATEMENT BY MR. KLEE                                 110

4

1          (Proceedings commence at 9:43 a.m.)

2          THE COURT:  Please be seated.  We're here in

3     Lyondell Chemical in Weisfelner v. Blavatnik, 09-01375, and

4     also Weisfelner v. NAG Investments, 11-01844.

5          I have listed appearances.  I apologize about the

6     problems we had getting started this morning.  But why don't

7     we begin with opening statements.

8          MR. WISSNER-GROSS:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MR. WISSNER-GROSS:  Sigmund Wissner-Gross for Ed

11    Weisfelner, Trustee of the LB Litigation Trust.  Mr.

12    Weisfelner is here with us in court.  In addition, I'll be

13    joined today by my partner Steven Pohl, Justin Weddle and May

14    Orenstein.

15         THE COURT:  Okay.

16         MR. WISSNER-GROSS:  Your Honor, just in terms of

17    the rules of the road, I think that you indicated each side

18    will have up to 90 minutes --

19         THE COURT:  Yes.

20         MR. WISSNER-GROSS:  -- for openings.  So I'm going

21    to remove my watch to keep track of the clock so when I get

22    behind I'll remind myself.

23         THE COURT:  All right.  Everybody stay seated.  I -

24    - there was one other thing I wanted to bring out with me.  I

25    didn't carry it out.  Just -- everybody stay seated.

1    (Pause in proceedings)

2    MR. WISSNER-GROSS:  Your Honor, we have a slide

3    deck.  It will be on the screen.  I can provide you, if you

4    think it would be helpful, just a -- it's a black and white

5    copy.

6    THE COURT:  Sure.  Why don't --

7    MR. WISSNER-GROSS:  We'll give you a color copy

8    during a break.

9    THE COURT:  Why don't you hand it up?  And we do

10   have one of the screens is set up for slides.

11   (Counsel confer)

12   MR. WISSNER-GROSS:  Your Honor, the first question

13   is why are we here and what are we trying to accomplish.  In

14   July 2007, Len Blavatnik and other Access defendants went

15   forward with a massive gamble.  Mr. Blavatnik already owned

16   Basell, a European-based petrochemical manufacturer.  The

17   Lyondell Chemical Company was a larger U.S.-based

18   petrochemical manufacturer with a large oil refinery located

19   on the Gulf Coast.  And during the course of the opening,

20   I'll show you some slides that discusses the assets of the

21   two companies.  I think it's probably helpful to set the

22   stage for this.

23   Basell, the smaller company; Lyondell much larger

24   company.  Basell was only a petrochemical company at the time

25   of the merger.  Lyondell had both petrochemical assets and a

1    refinery located on the Gulf Coast in Houston.

2              Significantly, both companies were experiencing the

3    peak of the notorious cyclical and highly volatile

4    industries.  This will be a theme you'll hear throughout the

5    trial, Your Honor.  This is not a typical industry.  Both the

6    refining industry and the petrochemical industry were subject

7    to a huge amount of volatility which impacted liquidity,

8    which impacted capitalization.  But significantly, the

9    petrochemical industry was at the peak of the cycle.

10             The defendants here bet against the odds that the

11   peak and adequate performance would continue though they were

12   aware the impending down-cycle was coming.  They bet the

13   risky bet of a highly leveraged acquisition funded entirely

14   by debt.  But this was not just any leveraged bet.  Mr.

15   Blavatnik more than doubled the overall debt of Lyondell and

16   Basell, that is he more than doubled the pre-merger aggregate

17   debt of Lyondell and Basell at the time of the merger, and at

18   the same time, he cut by more than half the overall liquidity

19   of Lyondell and Basell.

20             We could probably stop there, Your Honor.  Those

21   two facts alone in our view probably dictated the outcome

22   here in terms of the collapse of the company:  Doubling of

23   the debt from about 12 to 24 billion overall and halving,

24   more than halving the liquidity from approximately four

25   billion for the two companies together to approximately two

1    billion at the time of the merger.  But you'll -- as you'll

2    hear in testimony, when you take into account commitments

3    that Basell had made before the merger, it's probably closer

4    to a billion three of liquidity that was available at the

5    time of the merger.

6           Moreover, both companies were exposed, as I've

7    noted, to the extraordinary volatility of their industries

8    and were in desperate need for far more liquidity to operate

9    and survive.  But there was more here, Your Honor.

10          Their bet was also predicated using unreasonable,

11   if not inflated projections.  We will demonstrate, Your

12   Honor, in the course of this trial that management

13   projections should be accorded no deference here.  That will

14   apply both to Lyondell which you've heard about in prior

15   proceedings about the refreshing process, but also

16   significantly to Basell as well.

17          Moreover, Mr. Blavatnik even bet that the

18   performance of post-merger LBI would allow early amortization

19   of nearly $1.65 billion of debt in 2008.  That was a promise

20   he made to the lenders, and he made that promise as the

21   industry was heading into a forecasted downturn.  Not

22   surprisingly, within three months of the merger, that promise

23   was gone.  There was no early amortization of debt let alone

24   of 1.65 billion.

25          Your Honor, we are going to urge you to pay careful

1    attention to the testimony about what happened in the first

2    three months after the merger.  By February, March and early

3    April, Lyondell was in an epidemic in terms of liquidity

4    crisis.  By early April 2008, within months of the closing of

5    the merger, Lyondell and Basell, LBI, walked away from their

6    pre-merger projections.  This was a feckless and reckless bet

7    that failed, and failed big time.

8          The capital-intensive industries in which Lyondell

9    and Basell operated cannot plan assuming only good times.

10    They -- ignoring liquidity needs, ignoring industry

11    volatility, ignoring industry down-turns and warnings and

12    using unreasonable and inflated projections.  What happened

13    here in terms of this merger was a recipe for disaster at the

14    time of the merger.

15          If they wanted to stay in business, they needed to

16    plan for the protracted adverse conditions that those

17    industries have experienced historically.  And the trustee

18    here will demonstrate that the Access defendants' plans were

19    rash, reckless and extremely ill-conceived when formulated in

20    July 2007 when the merger agreement was signed, and were

21    ludicrous by the time the merger closed in December 2007.

22          Because the defendants were gambling with other

23    people's money, the losers here were the creditors.  We are

24    here today because over -- well over $2 billion of unsecured

25    debt was left unpaid following confirmation of the

1    reorganization of the debtors.

2         A major issue at this trial will be the cause of

3    that bankruptcy.  The evidence will show, among other things,

4    the debtors' collapse was the direct and foreseeable result

5    of unreasonably small capital.

6         In this opening, I'd like to accomplish three

7    things, Your Honor.  First, I want to give a quick overview

8    of the story of the events here.  This will only be a

9    snapshot.  It's not intended to be a substitute for the full

10    record.

11         Secondly, I'd like to discuss three main points

12    that we believe will come through in evidence that will show

13    that the defendants' arguments here hold no water.

14         And, finally, time permitting, I'd like to go

15    through some of the technical elements of the counts and how

16    we intend to prove them.

17         The story starts in 2005 when Mr. Blavatnik

18    acquired Basell.  In 2005, Mr. Blavatnik was already the

19    owner through Access, a company that he owned, a multi-

20    billion-dollar industrial global empire with operations in

21    oil, gas, mining and other industries.  He was able to buy

22    Basell in 2005 using only twenty-percent equity financing at

23    eighty-percent debt.  Blavatnik thought -- or bought Basell

24    during a period of strong performance by the petrochemical

25    industry during the up-cycle, the peak, towards the peak of

1    the cycle.  But by the end of 2006, Basell had annual

2    revenues in the order of 13 billion and had been able to pay

3    off some of its acquisition debt.  Mr. Blavatnik was eager to

4    use his increased equity in Basell as a source to re-leverage

5    and acquire another major petrochemical company, Lyondell,

6    primarily operated in the United States; Basell primarily

7    operated in Europe.  But Lyondell, at the end of 2006, had

8    revenues in the order of $21 billion, significantly larger

9    than Basell.

10           Lyondell was one of several companies Mr. Blavatnik

11   acquired -- or targeted for acquisition using Basell as a

12   platform.  In 2006, he made an offer for Lyondell in mid-2006

13   for about 26 or $28 per share which was rejected by Lyondell.

14   After being thwarted in his efforts to make other

15   acquisitions, he turned back to Lyondell.  You'll hear more

16   testimony about -- you'll hear testimony about this.  But in

17   a nutshell, by May 2007, Mr. Blavatnik bought as part of his

18   bet on Lyondell what is referred to as the toehold payment or

19   toehold in Lyondell, beneficial ownership of approximately

20   nine percent of the company.

21           In July, Mr. Blavatnik, negotiating directly with

22   Dan Smith, the chairman and CEO of Lyondell, agreed to

23   purchase Lyondell from its shareholders for $48 per share.

24   Mr. Blavatnik set the price.  He negotiated the terms.  He

25   dictated all of the terms.  He in fact did this all by

1    himself.  And you'll hear testimony on that.

2          Eager to sign the deal, he signed off on a final

3    and binding merger agreement only a few days after the Access

4    parties and their advisors were provided with non-public

5    information.  You'll hear testimony that the non-public

6    information was provided on a Saturday, and by Monday, the

7    merger agreement had to be signed.

8          On the strength of Lyondell's and Basell's assets

9    and projections, several banks agreed to underwrite the deal.

10   The two companies would merge and would end up with about $24

11   billion of total debt, as I said, more than double the pre-

12   merger aggregate debt of both companies.

13         By July 16th, 2007, the deal was announced to the

14   public and was set to close in 2007.  But what was the

15   context of the industry at the time of the signing of the

16   merger agreement?  By mid-July 2007, industry conditions had

17   already deteriorated and Lyondell's performance was not

18   tracking its management's projections.  Second-quarter

19   earnings which became available shortly after the deal was

20   signed included significant misses.  This reflected weak

21   performance in what is known as Lyondell's EC&D business.

22   That's an acronym that stands for ethylene co-products and

23   derivatives.  It was responsible for about 67 percent of

24   Lyondell's projected petrochemical EBITDA in 2007, and its

25   margins were already being squeezed as the company was unable

1   to pass along to customers the rising prices it was being

2   forced to pay for commodities used to manufacture

3   petrochemicals.  You'll hear a great deal of testimony about

4   in this business petrochemicals, in terms of the price for

5   production, are heavily dependent on energy costs.  So as oil

6   prices go up, the price of manufacturing petrochemicals goes

7   up.

8            At the same time, by August 2007, the credit

9   markets had started to tighten.  And there will be some

10  evidence in this case that by August of 2007, the financing

11  perhaps couldn't even necessarily have occurred, that there

12  was a major shift in the summer, in August of 2007.

13           In addition, during the fall of 2007, prices for

14  public companies in the petrochemical oil sectors declined

15  sharply.  It was in this environment the defendants started

16  Hedge -- Hedge, Mr. Blavatnik's major gamble, by increasing

17  leverage and extracting cash from Basell.  Remarkably,

18  Lyondell was not the only Basell asset acquisitioned in the

19  works.

20           Shortly after the merger agreement was signed, Mr.

21  Blavatnik allowed Basell to commit to the acquisition of

22  assets for another $900 million.  This included a problematic

23  and uncompetitive European refinery, the Bell -- it's called

24  a -- it's a refinery off the coast of France.  Though Basell

25  had been exploring this European refinery acquisition for

13

1    some time, the funding for this acquisition was not in place

2    when the merger agreement was signed.  Then, on December 7th,

3    the Access defendants caused Basell to pay a hundred-million-

4    dollar Euro dividend to NAG, Mr. Blavatnik's company, the

5    third such dividend that was paid since earlier in 2007.

6         The Access defendants also, in days before the

7    merger agreement, arranged for $125 million to be extracted

8    out of the companies on closing as a purported transaction

9    and management fee.  Mr. Blavatnik in addition made $334

10   million in short-term profits in the toehold position he had

11   acquired starting in May 2007.

12        THE COURT:  You need to slow down a little bit.

13        MR. WISSNER-GROSS:  I will.

14        That profit was attributable to the increase in

15   Lyondell's share price that was caused by Blavatnik having to

16   put the company in play.  Mr. Blavatnik used his control over

17   the funding of the transaction to apply part of the financing

18   secured by Lyondell to refinance his toehold-related debt.

19        In these ways, between signing and closing,

20   hundreds of millions of dollars were extracted and the amount

21   of debt needed to material -- needed was materially increased

22   from the commitment signed by the banks in July.

23        The merger closed on December 20th, 2007 with the

24   prospect of collapse already fully baked in.  Commodity

25   prices had continued to surge after the deal was signed and

1    Lyondell was unable to pass along these increases to

2    customers.  As a result, at the time of the merger, margins

3    on petrochemical prices were tightening, the banks were

4    unable to syndicate any pre-merger debt other than the most

5    highly secured tranches, the prospect for refinancing the

6    multi-billion-dollar bridge financing through a high-yield

7    note offering was vaporizing.

8              Liquidity, or more aptly the lack of it, is the key

9    here.  Liquidity figure for LBI -- that LBI uses for the

10   closing was that it had about $2.3 billion in liquidity.

11   This is approximately the pre-merger liquidity recorded by

12   Lyondell alone.  The number is highly misleading.  It was not

13   a real number because it did not account for known, planned,

14   non-deferrable obligations in the order of approximately $1

15   billion or more that would come due in the first quarter of

16   2008 or soon thereafter.  Plus it ignored another two-

17   hundred-fifty-million-dollar cash interest payment that it

18   was expected the banks would demand.

19             The dramatic under-capitalization baked into the

20   deal hobbled the mergered entity from the start.  The

21   evidence will show that by February 2008, the management of

22   LBI projected that the debtors would be unable to fund their

23   immediate working capital needs through the second quarter of

24   2008.  By February 29th, 2008, by management's own reckoning,

25   available liquidity had fallen to $320 million.  That may

1    seem like a cushion, but the number needs to be put in

2    perspective.

3         We are talking about a business enterprise with

4    combined revenues of 40 to $45 billion.  We are talking about

5    a business that saw cash outflows of $500 million on a single

6    day for the purchase of commodities.  We are talking about

7    billions of dollars of plants and equipment that cannot be

8    quickly idle or sold off to raise funds.

9         LBI needed a massive infusion of liquidity at the

10   time of the merger and didn't get it.  But what it did get in

11   March and April 2008 were a series of extremely cost-

12   expensive and ill-fitting Band-Aids.  These Band-Aids

13   actually increased the risk of collapse by increasing the

14   cost of funding and increasing dependence on inflexible

15   asset-based funding.

16        The first Band-Aid was a seven-hundred-and-fifty-

17   million-dollar contractual commitment from Access in late

18   2008 to fund a revolving credit facility.  As you will see

19   from evidence in the case, the Access revolver was absolutely

20   designed to allow Mr. Blavatnik to maintain the maximum

21   amount of optionality with regard to providing support for

22   LBI while patching the obvious liquidity hole, or attempting

23   to do so, that was about to be reported in the company's

24   annual report.

25        The second Band-Aid was to negotiate with the banks

1    to increase the size of the two-asset-backed facilities by

2    $600 million in April 2008.  Under the original credit

3    agreements from the merger, LBI was contractually permitted

4    to incur asset-based obligations, but the banks had no

5    obligation to fund them.  The evidence will show that the

6    banks extracted an exorbitant high price in exchange for

7    agreeing to up-size the ABL financing, and that the asset-

8    based facility was the wrong facility for LBI since borrowing

9    would shrink as the value of collateral collapsed, forcing

10   repayments.

11          And as 2000 [sic] went on, performance continued to

12   fall below the extremely unrealistic if not inflated

13   projections that had been used to fund the merger and plan

14   for the capital structure of the company.  Oil prices

15   remained volatile as they had been historically.  They rose

16   in the first half of the year sharply forcing the company to

17   use its ABL facilities for liquidity.  Participants in

18   connection with the refinery, participants in the refining

19   industry expect earnings in cash to peak during the first --

20   during the spring of the year and to decline in the second

21   half of the year.  So to the extent there is any cash from

22   the refinery in the second quarter, it was somewhat

23   misleading.

24          By no later than September 2008, LBI management

25   conceded grave concerns about the company's continued

1    viability.  And by no later than the beginning of October,

2    Mr. Blavatnik and other Access defendants were actively

3    engaged in something called Project Quantum, which consisted

4    of work streams to explore different options for capital

5    restructuring, the sale of assets, and regarding how to

6    maintain control of the company following an inevitable

7    default on the merger financing.

8            After going up for most of 2008, oil prices

9    declined after the summer and the Band-Aid of liquidity --

10   Band-Aid of liquidity came back to bite LBI.  The ABL

11   financing was tied to inventory values which meant that the

12   borrowing base was unreliable, rising and falling with

13   prices.  LBI effectively faced margin calls on those

14   facilities just when the prices were falling.

15           In October, Lyondell drew for the first time on the

16   Access revolver, an event preceded by much hand wringing at

17   Access and LBI.  It -- Lyondell drew $300 million and paid it

18   back a few days later.

19           In December, the next time the company sought to

20   draw on the revolver, Mr. Blavatnik said no.  Rather than

21   shoring up the company to get it past the crisis brought by

22   over-reliance on asset-based financing, Mr. Blavatnik

23   positioned himself to invest his cash in the reorganized

24   debtor, and he actually made billions off this investment.

25   He'll claim, we expect, that he contributed Basell, which we

1    think he will overstate the value of at the time of the

2    merger, but the record will reflect that he actually was able

3    to eliminate over $20 billion of debt, invest in the

4    restructuring, and he's made billions off this investment.

5    By contrast, the creditors of this LBI were left holding the

6    bag.

7              So that's a brief overview, Your Honor.  Now if I

8    could turn to the three main points that we want to focus on

9    in the trial.

10              First, under-capitalization.  To address the issue

11    of the adequacy of capitalization, we're going to rely on our

12    experts.  Mr. Tuliano, our first live witness, is an expert

13    on capital adequacy with particular expertise derived from

14    analyzing some of the largest and most important bankruptcies

15    in recent memory.  Dave Witte, our petrochemicals industry

16    expert, and Gil Nebeker, our refining expert, are both highly

17    qualified experts who will testify about their respective

18    industries.  They will explain the factors, particular

19    cyclicality, price volatility and seasonality that result in

20    an enormous need for liquidity that characterize these

21    industries.

22              And as --

23              THE COURT:  Could you slow down?

24              MR. WISSNER-GROSS:  I will, Your Honor.  Thank you.

25              Anders Maxwell of P.J. Solomon will address balance

1    sheet insolvency both at the time of the merger and at the

2    time Lyondell paid back the three-hundred-million-dollar draw

3    on the Access revolver.  You have the reports, and I won't

4    summarize them.  But I will touch on a few key points that

5    are necessary to assess capital adequacy in the context of

6    the merger of Basell and Lyondell.

7            So let's talk a little bit about the companies.

8    And what I'd like to do, just direct your attention, Your

9    Honor, to the key parts of the company's structure.  On the

10   left-hand side is Basell.  This is pre-merger.  On the right-

11   hand side is Lyondell.  Lyondell, as I've noted on the right-

12   hand side, consists of both the petrochemical and refining

13   division.  EC&D is really going to be the key driver here,

14   and that's where you're getting most of the testimony about

15   the performance, projections and alleged inflated projections

16   with respect to EC&D. Poor or -- which is the second prong of

17   Lyondell's business, probably not that critical here for

18   purposes of our discussion.  And then refining, although it's

19   a small box, is actually a very large part of Lyondell's

20   business.

21           The refining portion of its business is based on

22   what's called the HRO or Houston refinery.  It generates both

23   gasoline and diesel as products.  But, significantly, it also

24   generates a number of other products which are typically

25   money-losing products, and that's something that will be

1    important in terms of, you know, the testimony Your Honor

2    will hear in terms of how do you plan for the -- the

3    projection, you know, period for the refinery, and what do

4    you have to do to take into account the actual overall

5    business refinery.

6          On the Basell side, if you look to the left-hand

7    side of the screen, you see PO Europe and PO North America

8    and PO International.  While pre-merger those were

9    denominated by different names than EC&D, effectively that's

10   the equivalent of the EC&D business on the Basell side.  APO

11   and technology are going to be much less a part of our

12   discussion.

13         You're going to hear testimony, Your Honor, that

14   prior to the merger agreement being signed, Lyondell had

15   artificially inflated its projections for EC&D by

16   approximately a billion dollars.  You're going to also hear

17   testimony that those were -- projections were reverse-

18   engineered.  You're going to hear testimony that in 2007

19   alone Lyondell -- where Lyondell in its 2007 business plan

20   had projected about a billion-four, a billion-five of EBITDA

21   for EC&D, by the end of 2007 Lyondell's EBITDA for EC&D was

22   six to $700 million, a collapse of about 50 percent.

23         You're going to hear further testimony that putting

24   aside whether the projections were reverse-engineered or

25   artificially inflated, the -- there was a failure by Lyondell

1    for 2008 at the time of the merger in December of 2007 to

2    properly adjust its projections for 2008.  As I said, the

3    companies were turning from peak heading into a trough and

4    you'll hear testimony that at a minimum, Lyondell by the time

5    of the merger agreements execute -- merger agreement's

6    consummation should have adjusted down the EBITDA projections

7    for 2008 to be no more than the latest estimate for the end

8    of the year for 2007.  And that, as you'll see in terms of

9    the cycle where the companies -- I think everybody is in

10    agreement at a minimum that at the time of the merger there

11    was an expectation that the petrochemical industry was going

12    into a trough, a deep trough in 2009 to '10, that it was a

13    serious error.  We think it was willful, but it was at a

14    minimum unreasonable and unpalatable for Lyondell to not have

15    made appropriate adjustments to its projections which would

16    have eliminated about a billion dollars of EBITDA by the time

17    of the merger consummation.

18         For refining, Your Honor, you're going to hear

19    testimony that after Mr. Blavatnik acquired his toehold

20    position, which was on -- filed a 13D on May 11th, 2015, the

21    next week Dan Smith, the CEO of Lyondell sits down with

22    Robert Salvin of Lyondell and within three days, Mr. Salvin

23    has generated a set of preliminary refresh projections adding

24    about $1.6 billion for refining EBITDA.  The argument there

25    that the trustee will advance is that this was just simply

22

1    artificially increasing EBITDA, that there was -- when you

2    understand the actual operation of the Houston refinery, the

3    importance, for example, of the products other than gas and

4    diesel that are manufactured by the Houston refinery and

5    understand the context of volatility for the market, the

6    trustee will establish that you can reach the conclusion that

7    management's efforts to add about a billion-six to the

8    Houston refinery projections are untenable on any one of a

9    number of grounds.

10           On the Basell side, you're going to hear testimony

11    that there was inflation as well of their projections.  And

12    the testimony will zero in on PO Europe where the testimony

13    you'll hear -- evidence you'll hear at trial is that what

14    Basell did is it artificially inflated for purposes of

15    projections its anticipated volumes for PO Europe.  It

16    assigned for purposes of the latest of the projections that

17    were delivered to the banks a set of assumptions that assume

18    that Basell PO Europe would operate at a capacity that it had

19    never operated at historically that was at variance with

20    Basell's own late 2007 long-range plan and added significant,

21    significant EBITDA that we contend was both unreasonable,

22    probably inflated.  When you add this all --

23           THE COURT:  When was that done?

24           MR. WISSNER-GROSS:  That was -- well, that was done

25    at the latest that you'll hear testimony in the CIM, the

23

1    confidential information memorandum, that was delivered to

2    the banks.  And the -- it was between the signing --

3    basically the signing of the merger agreement in July and

4    October when there was marketing to the banks.

5         But you will hear testimony that the assumptions

6    that Basell was giving even to CM&I which had performed a

7    report for -- for the lenders in the fall 2007, were

8    predicated on volume assumptions for PO Europe that were

9    fundamentally at variance with Basell's own long-range plan

10   from the preceding end of 2006 for the 2007 and succeeding

11   year period.

12        So that's a bit about the business segments.  Let's

13   talk a little bit about cyclicality.

14        This is a chart showing cyclicality going back to

15   1985.  And it's a good indicator, Your Honor, that the

16   petrochemical industry goes through peaks and troughs.  And

17   this is just a standard feature of this industry.

18        At the time of the merger agreement being signed,

19   the general view was that the petrochemical industry was at a

20   peak.  I think there was -- you'll see there was a full

21   expectation the trough was coming, bad times were coming.

22   The question was, when would it happen, first, and, secondly,

23   how severe would it be.  Historically, peak-to-trough

24   declines can go up to 80 percent or more.  And if you look at

25   the -- and I'm just going to jump a bit to the -- this is the

1    December 2006 long-range plan of Lyondell.  This was in

2    December of '06.  At the end of each year, Lyondell itself

3    would, as part of its capital planning, would put together

4    long-range plans.  And this is a replication of the long-

5    range plan that Lyondell had and what its expectations were

6    for the outlook period which is from 2007 through 2011.

7           If you look at the next slide, I've extracted EC&D

8    just to give you one sample indication.  This, again, was the

9    petrochemical division of Lyondell.  It is a major component

10   of Lyondell's business and Lyondell, in turn, is much larger

11   than Basell.  So how goes Lyondell's EC&D division would

12   materially impact how Basell goes.

13          You can see that in -- this is the outlook of

14   Lyondell in December of '06.  This is from their bottoms-up

15   process, their best effort to come out with an outlook back

16   in December of '06.  They were expecting for 2007 that the

17   EBITDA for the EC&D division would be $1.465 billion.  They

18   were expecting that 2008 was going to be what we call a

19   transition period.  They knew that the trough was coming.

20   They thought at the end of 2006 that it would be a little bit

21   softer landing, that there would be a decline in 2008.  But

22   they recognized, as you see here, in 2009 and 2010 and 2011,

23   the trough would be there.  So this was their expectation at

24   the time in December of '06.

25          Basell had a -- also in its long-range plan had an

1    expectation the trough was coming in 2009 and '10, although

2    they thought it would be a somewhat softer landing.

3        If you go back a moment, you see with respect to

4    refining, that's the bottom bar graph in red or purple.  I

5    can't tell the color, Your Honor.  But you can see that for

6    2007, the expectation was that refining, where Lyondell had

7    just acquired the balance of the minority interest of the

8    Houston refinery the prior summer from its Venezuelan co-

9    partner, it now owned the refinery 100 percent, the

10   expectation was they thought a billion three three three

11   would be the EBITDA for 2007.  And you see the outlook for

12   the succeeding years.

13       Our contention is that with respect to the

14   refinery, what Mr. Salvin did in May of 2007 is he took those

15   numbers and just simply artificially increased them so that

16   an aggregate over the outlook period, he added about a

17   billion six.

18       Our contention for the EC&D division is a little

19   bit different.  We argue and we will demonstrate through

20   evidence in the case that the end EBITDA, the end aggregate

21   EBITDA for the EC&D division through the refreshing process

22   ended up being almost to the dollar the same as the original

23   outlook from 2007 -- or December 2006.  So our point, Your

24   Honor, will be that even though events changed drastically in

25   the course of 2007 so that EC&D ended up 50 -- hitting 50

1    percent of its original targeted EBITDA, even though an

2    argument could be made that the trough was coming earlier and

3    that we think there will be strong evidence that Lyondell

4    should have revised its projections to project no more than

5    the six to $700 million it got in 2007 for 2008, that the net

6    effect of what Mr. Salvin and others did under Mr. Smith's

7    direction was to essentially replicate the end result for

8    EC&D to end up with the same aggregate number for the outlook

9    period notwithstanding a completely different environment by

10   the end of 2007.

11             When it -- the evidence will also show, as I said,

12   that Basell management in their 2007 long-range plan

13   anticipated the trough as well.

14             I just also want to note briefly with respect to

15   Basell to underscore its significance, Basell's PO Europe

16   division accounted for approximately 60 percent of Basell's

17   pre-merger earnings.  So it's a significant division.

18             By October 2007, after the deal was signed but

19   before the closing, Lyondell and Basell, notwithstanding the

20   evidence of the shifting performance of the petrochemical

21   division and the fact that the trough looked like it was

22   coming sooner and steeper and that the outlook needed to be

23   modified, were unrealistically projecting in their

24   confidential information memorandum, a twenty-to-thirty-

25   percent decline off the peak for petrochemical plastics,

1    significantly down from Lyondell's 2000 LRK and off of

2    Basell's own projections.

3    So what is the evidence going to demonstrate on

4    this point?  We think, Your Honor, that the evidence will

5    demonstrate that management's projections for EC&D and

6    refining for Lyondell and for a significant portion of

7    Basell's business were extraordinarily reasonable and should

8    be rejected for at least the following reasons.  First,

9    Lyondell's EC&D in 2007, as noted, was 50 percent off plan,

10   and there was a failure by Lyondell or LBI to adjust downward

11   its outlook for 2008 and the years afterwards.  And,

12   incredibly, you'll see that Lyondell or LBI actually raised

13   the trough years resulting in essentially no change to

14   cumulative EBITDA for 2007 to 2011.

15   Lyondell's refining projections were inflated by

16   about a billion-six in the matter of three days.  There's no

17   support for these inflated projections.  Basell's own PO

18   Europe volume assumptions were at variance with Basell's

19   historical operating history and assumed their plans could

20   operate at a level that they never had operated historically,

21   arguably adding as much as another billion-five of

22   unreasonable, if not inflated EBITDA.

23   Further, the trustee's experts will testify that

24   the methodology that was used by Lyondell in the refreshing

25   process was flawed.  The trustee's experts will testify that

1     both Lyondell's EC&D and refining projections were reverse-

2     engineered in a top-down process that should be accorded no

3     deference.

4              And, finally, as I've been saying all along, Your

5     Honor, we think the evidence will show that Lyondell and

6     Basell knew that the petrochemical industry was entering into

7     a trough and that Lyondell artificially took the position

8     without basis that the trough -- peak-to-trough percentage

9     drop would be significantly lower than historical troughs,

10    and Basell took the same unreasonable position as well.

11             With respect to the refinery, the refinery and the

12    -- that portion of the business which was only the Lyondell

13    side doesn't operate exactly in the same historical cycles

14    that we've seen here.  This is the petrochemical cycle.

15    There is definitely a history.  As costs go up, there is a

16    peak, there's a trough, there's an expectation there will be

17    a cycle.  And that was baked in with the recognition that

18    long-range plans of Lyondell of Basell.

19             The volatility aspect of the refinery and its

20    impact on the cost of petrochemicals, there is a tie-in.

21    There are going to be peaks and troughs in refining.  But

22    more to the point, there is huge, huge volatility.  I'll see

23    if I can get you a graph that will illustrate that.

24             This is an illustration or chart showing -- going

25    back to 1981, the twelve-month change for WTI crude oil

1    purchased on the stock market.  I think the simple point of

2    this chart which is in our expert's report is to illustrate

3    that if there's anything you know about the price of crude is

4    that it's hugely, hugely volatile.  The defendants are going

5    to argue, well, you know, their price went from, you know,

6    from a certain price at the time of the merger, maybe about

7    $60 per share up to $90 -- excuse me, $60 per barrel up to

8    $90 per barrel at the time of the closing of the -- of the

9    LBO, and that it shot up in 2008 to 140, $145 per share --

10   per barrel, and then plummeted.  So they're going to argue

11   that we've seen this already, that there was this volatility

12   no one could anticipate.

13          The reality is that if you look historically, there

14   was this volatility historically that happened all the time.

15   It was embedded in the cycle.  And the peak-to-trough

16   volatility in refining that happened in 2007 and 2008,

17   they're historical paradigms for that.  And the testimony

18   you'll hear, Your Honor, largely from our experts, is that

19   there should have been in corporate planning a build-in or a

20   factoring in of the reality in terms of this volatility in

21   the refining industry.

22          Here's another illustration.  Now, this shows for

23   the impact on petrochemicals of the cost of in this case

24   naphtha which is a product from crude oil -- crude oil

25   generates a lot of products.  I believe naphtha is sort of a

30

1    light oil that is used then in turn for the production of

2    petrochemicals.  But this shows that as the cost -- as

3    naphtha varies in cost, as the feedstock cost varies, there's

4    a major impact in the cash cost, in this case for ethylene in

5    western Europe.  My understanding, Your Honor, and you'll

6    hear evidence about this, is that as much as 80 or even 85

7    percent of the cost of manufacturing petrochemicals is tied

8    to energy costs.  Those costs are largely feedstock or the

9    oil has a -- as a feedstock, naphtha is a feedstock, and then

10   the day-to-day energy costs of operating a plant, major,

11   major input.  So for refining, volatility also is a heavy,

12   heavy factor.

13        So you combine the trough history and cyclicality

14   of petrochemical industry with the extraordinary volatility

15   of refining, and that's a toxic brew for a company that

16   doubled its debt and reduced by half its liquidity going into

17   the merger.

18        Another feature, Your Honor, which I think you'll

19   hear about some from the other side is that there -- for the

20   Houston refinery there are hurricane problems and other

21   disruptions.  We think the testimony and the evidence will

22   show that these kinds of events are part of the normal

23   planning and that should be an inherent part of any capital

24   planning for a company, let alone a company the size of

25   Lyondell with its Gulf Coast refinery.

1              A large portion of the U.S. refinery capacity, as

2     you'll hear, is clustered in the Texas and Louisiana site

3     near the Gulf Coast, exposing it to hurricanes.  Hurricanes

4     and other weather conditions impact infrastructures such as

5     pipelines that connect to the refineries and shipping.  In

6     2005, in fact, two years before the merger, Lyondell had to

7     shut down a major portion of its operation and incurred

8     substantial costs as a result of Hurricane Rita.  It was less

9     impacted by Katrina which impacted New Orleans.  But after

10    Hurricane Rita, refineries that maintained -- remained in

11    operation enjoyed success due to the lack of competition.

12    But Lyondell was negatively impacted by that hurricane.  So

13    our point here, Your Honor, is you'll hear a lot about the

14    perfect storm from the other side, that there were a series

15    of unforeseeable, unforeseen, unpredictable, unprecedented

16    events that all coalesced together, things like planning for

17    hurricanes, plants shut down and the like should be in fact

18    normal -- a normal basic part of capital planning.

19              In addition, plants like these have to be shut down

20    from time to time to be upgraded or repaired.  There are

21    safety issues that exist with manufacturing at these plants.

22    That also has to be factored in as part of capital planning.

23              Our position, Your Honor, and we believe the record

24    will show is that LBI was not capitalized to survive.  It was

25    not properly capitalized to adequately operate its business

1    let alone deal with reasonable foreseeable contingencies,

2    contingencies far less severe than those it did face.

3        The evidence will also show that LBI's capital

4    structure was so inflexible that the only way it could have

5    arguably survived if it experienced its best case scenario,

6    none of the factors impacting -- or negative factors

7    impacting the petrochemical and refining industry came into

8    play, the trough was pushed off, cost of feedstock somehow

9    was stabilized, all these things had to happen for it to

10   survive, and it had to have access to massive untapped

11   sources of new capital, none of which were the case.

12       Mr. Tuliano will testify that LBI had unreasonably

13   small capital from inception in 2000 -- December 2007.  And

14   we believe that the evidence will show that an industry down-

15   cycle, economic recession, business interruptions and rapid

16   changes in commodity prices all were known concrete risks at

17   the time of the merger.  Evidence will show that LBI had

18   severely inadequate capital liquidity, little or virtually no

19   free cash soon after the merger, and a capital structure that

20   ensured at the time of the merger they would have little

21   ability to borrow.

22       Evidence will show that its projections for future

23   earnings were grossly inflated and unreasonable, and they

24   were known to management, we believe, at the time to be

25   grossly inflated and unreasonable.  And during -- we think

1    the proof in the pudding on this is that during the first

2    quarter of 2008, management already was abandoning the very

3    projections used to finance the merger.  We urge the Court to

4    pay close, close attention to what occurred in February,

5    March and April 2008 when LBI management materially backed

6    off the very same projections that they are arguing here were

7    reasonable and that were the predicate for the merger.  By

8    April 2008, they said, forget about it.  Refining, they said,

9    we're back-pedaling materially, for petrochemicals we're

10   back-pedaling materially.

11        Moreover, the small amount of free cash available

12   during the first quarter after known and planned expenses was

13   committed under pre-merger financial modeling to significant

14   early debt amortization.  I mentioned that there was about a

15   billion-six of early debt amortization that was promised to

16   the lenders.  And in fact, that was -- as I understand it,

17   that was planned, committed.  None of that ever happened.

18   None of the early debt amortization ever occurred.

19        Turning, Your Honor, to our second large theme, and

20   that is Mr. Blavatnik.  This is not a trial focusing on the

21   Lyondell directors and officers.  We have settled with them.

22   There will be significant record evidence about the conduct

23   of the Lyondell directors and officers.  I think we have over

24   30 deposition designations and lots and lots of deposition

25   portions will be in evidence.  And Your Honor will have an

34

1    opportunity at your convenience to review a fairly

2    substantial we believe is largely undisputed record as to how

3    the projections got refreshed, what Mr. Salvin did, how he

4    came up with a set of refreshed projections in three days

5    adding a billion-six of refining EBITDA and so forth and so

6    on.

7            I expect that we may hear again from the other

8    side, where's Mr. Smith, why isn't he testifying.  Well, Your

9    Honor, with all due respect, we think that this case is --

10   this trial is about Mr. Blavatnik, what he did, what he

11   should have done, what he didn't do.  And evidence with

12   respect to Mr. Smith and his surrogates and his senior

13   associates at Lyondell, all that will be in evidence.  And

14   you'll hear about that at the appropriate time, Your Honor.

15           But let's talk about Mr. Blavatnik.  Mr. Blavatnik

16   is the boss.  Mr. Blavatnik owned all these entities at

17   issue.  There -- we recognize there is a complicated web of

18   corporations.  He has LLCs, trusts.  They're all part of the

19   Access group.  But the evidence will show that Mr. Blavatnik

20   and Mr. Blavatnik alone pulled the strings, called the shots.

21   It was his company.

22           First, he owned these companies.  He owned Access.

23   He owned Basell.  After the merger, it was his company, LBI.

24   From top to bottom for tax purposes, inheritance planning,

25   his holdings were aggregated in various trusts controlled by

1    him.  At each level of the chain between those trusts and the

2    Basell group of companies Mr. Blavatnik had indirect voting

3    control and almost 100 percent of the equity.

4         Second, he actively managed the strategic decisions

5    of Basell, and later, once they acquired Lyondell.  The

6    evidence that proves well-documented negotiation of the

7    merger largely accomplished directly between Mr. Blavatnik

8    and Mr. Smith.  As I commented, I think the record will be

9    undisputed that it was Mr. Blavatnik who set the price, who

10   negotiated the terms, who told Mr. Smith in early July, we

11   need to have a signed merger agreement within a week --

12        THE COURT:  I thought Smith is the one who set --

13   demanded the $48.

14        MR. WISSNER-GROSS:  Well, Mr. Smith -- the record

15   will show that in early June, Mr. Blavatnik dispatched Volker

16   Trautz, his CEO, to go meet with Mr. Smith, and they had a

17   meeting in London.  And during that meeting, Mr. Smith said,

18   if you want to buy Lyondell, I think you should pay 48 bucks

19   per share.  So in that sense, it was Mr. Smith who conveyed

20   that.  But when they -- when Mr. Blavatnik finally met with

21   Mr. Smith in early July and negotiated the purchase, Mr.

22   Blavatnik first tried a slightly lower number, and then

23   quickly ended up saying, okay, I'll pay $48 per share.

24        So my point is that the dialogue in terms of

25   negotiation and the end of -- the offer that was made was

1    made by Mr. Blavatnik.

2        Communications with Access Industries, the

3    management company through which Mr. Blavatnik took actions,

4    will demonstrate that Access Industry experts functioned

5    within the parameters and preferences established by Mr.

6    Blavatnik.  Those included the absolute refusal to commit

7    additional equity to LBI and the resistance to disclosure

8    about Access Industries.  The evidence will show that various

9    managers placed on the governing boards of the entities

10   linking Mr. Blavatnik with Basell and LBI were his close

11   personal associates, confidantes and employees, some

12   employees from Access, none of whom would have been able to

13   stay in a course of action contrary to any decision by Mr.

14   Blavatnik.

15       Let's talk about causation.  We expect we'll hear a

16   lot during this trial about the Great Recession and that the

17   trustee's argument is based on hindsight and it was not

18   foreseeable or known that LBI would fail.  They will point

19   out the depths of the great -- that the depths of the Great

20   Recession was not foreseen by many at the end of 2007 and

21   that LBI was brought down by a perfect storm, or they like to

22   say a perfect storm squared, unforeseen calamities in which

23   the Great Recession played a great role.

24       First, we submit, Your Honor, that these are

25   meritless arguments.  If the Great Recession caused LBI to

37

1    collapse, you would have expected other peer companies in

2    Lyondell's -- or LBI's industry to file for bankruptcy or

3    experience equivalent distress.  That didn't happen.  Out of

4    all of its peer companies, peer petrochemical and refining

5    companies, it's the only one that filed for bankruptcy.

6    We're not aware of any major peer petrochemical manufacturer

7    that filed for bankruptcy.

8              Now, they're quick to point out that other peer

9    companies experienced some difficulties.  But they were all

10   able to weather the storm.  And for this, Your Honor, we

11   thought that it would be helpful to give -- this is a very

12   highly technical part of our presentation.  It required a lot

13   of technical input.  But the bottles, if you see at the

14   bottom, represent -- and this actually derived from a chart

15   in the case.  But the bottles at the bottom are all either

16   petrochemical or refining companies.  You see LBI in the

17   middle.  And all of these companies were impacted by weather-

18   related events like the hurricane.  They all -- most of them

19   had assets, if not all of them, in the Gulf Coast.

20             In any event, all of these companies were similarly

21   situated in exposure to the Great Recession, to outages and

22   to hurricanes.  So let's take a quick technical detour to see

23   what happened as a result of the Great Recession and these

24   hurricane events on these companies.

25             We see a bird flying in.  We see outages coming in

1    with hurricanes, and we see the Great Recession.  Let's see

2    what the impact is.  Only Lyondell goes under.  Only Lyondell

3    goes under.

4         Your Honor, we think that that's really very

5    instructive.  This is their core defense.  Lyondell alone

6    goes under and files for bankruptcy.

7         Let me turn briefly to free cash flow.  Mr. Tuliano

8    will explain that in an environment of rising costs -- let me

9    back up a moment.

10         One of their key defenses, we expect to hear, is

11    that they were actually on plan in 2008.  We expect them to

12    argue that look at the performance of the company in the

13    first half of 2008, it actually did okay, it was actually on

14    plan.  We think the evidence will indicate that that's a

15    false narrative.  First, LBI did not come close to its plan

16    during 2008.  This defense will depend on the idea that FIFO

17    accounting provides an accurate picture of LBI's performance

18    in the first three quarters of 2008.  Our experts will

19    explain that this is untrue.  And I'm not going to even

20    attempt to get into a discussion here about FIFO versus LIFO.

21    But you will hear that LIFO accounting, which was Lyondell's

22    historical accounting treatment which is -- our experts will

23    testify is much more closely aligned with the actual cost

24    basis of the company, it's a much more actual picture of the

25    company, is the proper lens through which to look at its

1        performance in 2008.  And Mr. Tuliano will address that.

2                He will explain an environment of rising costs.

3        FIFO accounting for EBITDA veers off course from cash flow

4        and a company that can't pay its bills with FIFO earnings,

5        and that in a rising-cost environment, FIFO inflates a

6        petrochemical company's EBITDA by netting the cost of a

7        company's least expensive inventory from current earnings.

8                THE COURT:  Did Lyondell historically use FIFO

9        accounting?

10               MR. WISSNER-GROSS:  My understanding is it

11       historically used LIFO.

12               The problem is that these FIFO earnings do not

13       represent cash available to use to pay bills, and that

14       earnings are tied up in working capital and use of this

15       working capital may never result in profits.

16               Secondly, the financial modeling -- and I've

17       touched on this already -- used to obtain financing for the

18       merger depended on the achievement of early debt

19       amortization.  Before trough conditions set in the amount was

20       supposed to be a billion-six for 2008.  By April 2008, LBI

21       walked away from that.

22               During the trial, Your Honor, you'll see other

23       direct evidence of -- that Blavatnik's employees knew that a

24       huge chemicals company LBO at the beginning of an industry-

25       wide down-cycle was a bad idea.  And you're going to hear a

1    fair amount of evidence of concern, if not palpitations by

2    Access employees worried about the impending trough, worried

3    about the debt capacity being added, worried about what kind

4    of performance would have to occur for this company to

5    survive.

6              In any event, Your Honor, we're -- we submit that

7    the evidence will show that the reason LBI did not survive

8    the Great Recession or industrial accidents is not because of

9    the Great Recession or these other factors, while all of its

10   peers did, because LBI compared to those peer companies

11   heading into a downturn was, at a minimum, massively over-

12   leverages, had inadequate -- and had inadequate capital.

13             Next, why would Mr. Blavatnik risk his equity?  We

14   expect that you're going to hear the argument that although

15   he took out approximately a billion dollars through various

16   mechanisms prior to the merger, he contributed Basell, and he

17   ended up -- he will argue he lost Basell as a result of the

18   restructuring.  We think that argument lacks merit on a

19   number of grounds.

20             First, we submit that whatever evidence LBI will

21   submit as to the pre-merger value of Basell, we submit that

22   the defendants themselves, that Access itself internally knew

23   or acknowledged pre-merger that Basell was worth a lot less

24   than they claim now.

25             Mr. -- for Mr. Blavatnik, the failure of LBI was

1    not an end of the road.  Arguably, for him, it was the

2    beginning of LBI we'll call it Version 2.  In the end, he

3    earned the nickname given to him by his staff, and this is an

4    Access-denominated nickname, he was referred to ask the King

5    of Optionality.  Everything he did was motivated based on

6    that definition as keeping his options open.  He -- by

7    allowing LBI to fail, by participating and funding it out of

8    bankruptcy, optionality.  With the merger itself, he created

9    a lot of options for himself.  If LBI was able to make it and

10   succeed notwithstanding all the problems we've identified,

11   great.  But if things went south and as he had been warned by

12   his own internal confederates, LBI went under, he could

13   always file for bankruptcy, buy up the debt and try again.

14            And we believe the evidence will show there came a

15   time when he faced this very choice.  In late 2008, he chose

16   the first option:  Let LBI fail, creditors be damned, duties

17   to Luxembourg companies which I'll talk a little about be

18   damned, and his underlings let him make that choice.

19            Closely related to the argument that Mr. Blavatnik

20   would not have risked his equity in Basell is the argument we

21   anticipate that we're going to hear, that the success of the

22   reorganized debtors post-confirmation proves that Mr.

23   Blavatnik was right all along.  Post-bankruptcy, post-

24   confirmation, company's done pretty well in succeeding years.

25   They I think will use the phrase "industrial logic" for the

42

1       transaction.  We submit that if they advance that argument,

2       there are several basic questions Your Honor should consider

3       in response to that argument.

4              First, did LBI really work for all parties, or did

5       Mr. Blavatnik create a creditor calamity of historical

6       proportions because of the scenario that worked best for

7       himself pre-bankruptcy.

8              Secondly, what has the impact of the cycle itself,

9       which we said it goes down, it comes up, had on the post-

10      confirmation performance of LBI.  Has it benefitted from the

11      up-tick in the petrochemical cycle.

12             Third, what level of capacity liquidity does a

13      reorganized company have.  We submit that, actually, post-

14      confirmation, this company was more appropriately

15      capitalized.  And does the post-confirmation capitalization

16      bear any resemblance to the Lyondell that went into the

17      merger.  And we think the answer is no.

18             And, finally, as in any post-confirmation context,

19      what role did plant closings of inefficient or money-losing

20      plants, employee layoffs, contract restructurings and

21      something you may have heard about called fracking play in

22      LBI's new post-bankruptcy more positive results.  We submit

23      that if the defendants argue industrial logic of the

24      transaction and argue post-confirmation results, that it's

25      without merit.

1              We anticipate that the defendants also argue, look,

2    the banks put money into the deal, forget about us and forget

3    about all the internal moaning and groaning at Access and

4    concern and palpitations about doing the deal, the banks put

5    money into the deal, if they didn't -- they have skin in the

6    game, they put in over $20 billion, why shouldn't that

7    validate what the trustee says are otherwise unreasonable if

8    not inflated or fraudulent projections.

9              I expect that we'll hear that argument.  If you

10   hear, as I expect that argument, we'd ask you to consider

11   whether -- or how this deal was different from any other deal

12   in which you have a, you know, fraudulent conveyance claim.

13   Is there something different here about the fact that there

14   are lenders, advisors and professionals who are involved in a

15   deal who are going to be well-compensated if the deal goes

16   forward and who do go forward with it?  I think the answer is

17   no.

18             The evidence, we submit, will support the existence

19   of multiple economically rational motivations for funding

20   this deal even by banks aware of the foreseeability or risk

21   that it would fail.  They're going to be -- there will be

22   evidence of significant transaction fees.  There will be

23   evidence of the relationships that some of these banks had or

24   wanted to have with Access or Mr. Blavatnik in order to

25   commit to doing the financing.  And you will hear that going

1      into the merger agreement, the joint lead arrangers, as the

2      banks are oftentimes referred to, had every incentive or

3      intention to off load much of their risk through syndication

4      and through a high-yield debt offering that they had hoped

5      would refinance billions of dollars of bridge loan, and that

6      it was only because of the credit markets freezing in the

7      fall of 2007 and the horrible results that Lyondell was

8      announcing in late 2007 that syndication efforts did not go

9      forward as planned, and the banks ended up carrying much more

10     of the debt than they ever intended.

11            The Court should also pay attention if, as we

12     expect, this argument is advanced to the due diligence by the

13     banks, we submit that while the banks or some of them had

14     historical dealings with either Basell or Lyondell, there was

15     really only one due diligence meeting.  Quite astonishing.

16     One due diligence meeting for a few hours at Skadden Arps on

17     a weekend two days before the merger agreement was signed and

18     the bank financing was committed at which the refresh

19     projections were delivered.

20            You'll see and hear that there was no real

21     verification of Lyondell's or even Basell's refreshed

22     projections, no real due diligence done by the banks of that

23     prior to signing up to do the deal.

24            I also want to briefly touch on the role of CMAI

25     because we expect that we're going to hear -- and I hope we

45

1     don't hear it, but I expect -- we expect we probably will,

2     continued effort to attack CMAI.  Mr. Witte at the time he

3     tendered his first several expert reports was a high-level

4     manager at CMAI.  You'll hear testimony CMAI was relied on by

5     everybody in the industry.  They -- CMAI was a company that

6     would gather industry information and provide what are called

7     marker ala prices so that everybody in the petrochemical

8     industry could have an understanding of what an average cost

9     would be for a product, and then in their negotiations would

10    negotiate a discount off that marker.  Mr. Witte is an

11    accomplished petrochemical expert and provided several expert

12    reports here.

13            But I think you're going to hear that shortly

14    before the merger, a European subsidiary of CMAI had issued a

15    report called Project Hugo that addressed 35 percent of

16    Lyondell's or LBI's assets.  It didn't cover the refinery.

17    It only covered 35 percent of the overall assets.  And I

18    expect the defendants will argue, well, this report is

19    support for the view of CMAI at the time that the management

20    projections were reasonable.

21            We submit the evidence will show that this was

22    highly prescribed exercise, that the actual margins on

23    performance of Lyondell and Basell were not provided to CMAI,

24    and that CMAI was asked at the time to assume all that

25    information which it did not actually know the actual

1    historical information and actually did not opine what the

2    defendants claim it opined in its report.

3           Several years later, when the creditors' committee

4    hired CMAI and tasked it to assist the creditors' committee,

5    it finally got -- it got access to that historical

6    information for the first time concerning actual business and

7    operating data.  And as you'll see in the expert reports of

8    Mr. Witte and Mr. Nebeker who addresses refining issues, Mr.

9    Witte has taken advantage of that historical information he

10    had access to, in his 2009 reports, provide a what's called a

11    due diligence model to test the CIM projections against what

12    he understood to be the actual performance of the company,

13    test it against or benchmark against CMAI's outlook at the

14    time and concluded in 2009 that the petrochemical projections

15    in the CIM were unreasonable and set forth his views for

16    that.  Mr. Nebeker did the same, but on refining based on

17    data that he obtained from the company concerning the

18    historical figures for the refinery.  In 2011, Mr. Witte and

19    Mr. Nebeker did a different task as experts.  Having had

20    discovery obtained on the refreshing process, they provided

21    reports focusing on the reasonableness or lack of that -- of

22    the refreshing process.

23           But in any event, we submit that Mr. Witte is a

24    superb expert and that to the extent the defendants try to

25    argue conflict on his part still, there is no conflict and --

1    and that his conclusions in 2009 and 2011 are amply supported

2    by the record.

3              Your Honor, in the time I have left, I'd like to

4    briefly -- and I think I have by my account I have about 30

5    minutes --

6              THE COURT:  You do.

7              MR. WISSNER-GROSS:  -- let me just go -- at a high

8    level, what I'm --

9              THE COURT:  Twenty-eight minutes.

10             MR. WISSNER-GROSS:  Twenty-eight minutes.  Thank

11   you.

12             I'll go at a high level --

13             THE COURT:  But who's counting?

14             MR. WISSNER-GROSS:  Who's counting?

15        (Laughter)

16             MR. WISSNER-GROSS:  A high level on the accounts.

17   So this is -- the chart shows what we have.  And, Your Honor,

18   as we know, Your Honor is familiar with these.  Count One,

19   that's our Toehold Payment 1.  The -- I'm just going to talk

20   at a high level and then come back to a couple points on

21   these counts.

22             Look, the central issues on Count One in light of

23   Your Honor's ruling are, first, was Toehold Payment 1 a

24   secured -- was the transaction involving a security.  And we

25   submit that it did not involve a security, that as you can

48

1      see, that AI Chemical which was the vehicle wherein --

2      through which Mr. Blavatnik acquired his toehold position,

3      this was a Delaware LLC.  And you'll see that this is the --

4      a copy of the LLC agreement.  And it was formed in April of

5      2007.  Mr. Blavatnik was the sole owner.  He owned 100 units

6      of the LLC.  That's it.  There's no other owner.  It wasn't a

7      shared or pooled investment.  It was his investment.

8               Not surprisingly, in May, more precisely on May

9      11th, when Mr. Blavatnik acquired the toehold position, he

10     filed the 13D.  He was required to do it.  He did it.  Here,

11     you see that the 13D, he signed it.  Well, it's signed, you

12     know, by -- as is done with a slash S.  AI Chemical, it was

13     done through AI Chemical.  Look who he picks as his manager?

14     It's none other than Lincoln Benet, the CEO of Access

15     Industry.  It's his colleague.  It's his employee.  Mr. Benet

16     actually -- and he went -- I think they went to business

17     school together.  So there's  no reasonable question that

18     this was his investment, his entity.

19               And, Your Honor, in terms of the events that

20     happened -- I'm just going to touch on this very lightly --

21     we know that in December of 2007, there were a series of

22     back-to-back-to-back transactions which we highlight on these

23     slides, the net result of which that -- is that Mr. Blavatnik

24     contributes his ownership of AI to Mel, another company he

25     owns, and Basell Funding, another company he effectively

1    owns, then guys AI from Mel.  There is $523 million paid for

2    that.  As we'll get into in a moment, we believe that it's

3    property of the debtor that's at issue.  But we can't forget

4    about the fact that he had a forward contract with Merrill

5    Lynch.  So that's taken care of through yet another

6    transaction where he has yet another entity he owns, picks up

7    the obligation and makes the payment.

8            And interestingly, the Lyondell shares that are

9    held by AI Chemical are never converted into cash.  The

10   merger agreement provides if it's not converted it

11   automatically gets canceled.  So what happens is that there's

12   never any payment, actual payment for the shares of Lyondell

13   as a result of this transaction.  And with the payment having

14   occurred a few days after December 20th, AI Chemical is

15   dissolved.

16           You'll hear a fair amount of testimony on this.  A

17   lot of it will be -- it's been already briefed, a lot of it

18   will be in post-trial briefing.  But, Your Honor, we would

19   submit that this is a very strong, strong claim.

20           I want to just briefly address a couple of other

21   related points on Count One:

22           First, we anticipate, even though the defendants

23   lost on summary judgment, they're going to still try again to

24   argue that this transaction was done in connection with the

25   merger agreement, and that issue is to be tried.  We believe,

1    Your Honor --

2            THE COURT:  Like I said, I needed -- I didn't have

3    a sufficient record.

4            MR. WISSNER-GROSS:  Right.  But we believe that the

5    record will show, when it's full in on this, that the units

6    of this LLC are not securities.  The evidence will show the

7    units were not associated with pooling of investments, nor

8    were shared profits or shared losses.  And instead, as I've

9    noted, the units, at all times, were held by a single owner;

10   that the transferability of the units was highly restricted,

11   that there was no public market for the units and none was

12   expected to develop.  Frankly, we don't think there should be

13   any dispute about these facts.

14           These units also were not registered with the SEC;

15   there should be no dispute about that.  And the LLC itself

16   did not elect to provide that its membership interest be

17   securities under the Delaware UCC, something that I think

18   Your Honor, in your opinion, had cited to the Delaware UCC.

19   We think that all of these factors -- really, we don't think

20   the facts should be in dispute -- strongly support our

21   position.

22           The second issue on Toehold Payment 1 is whether

23   the financial conditions under 548 of the Bankruptcy Code

24   have been satisfied; we think the answer is yes.  We

25   appreciate that there is still probably going to be an

1    argument byu the other side as to whether an interest in

2    debtor property is transferred.

3         We think that the evidence will show, and

4    applicable relevant legal standards will show that while

5    Basell Funding, the entity that made the transfer, although

6    owned by Mr. Blavatnik, was not itself a debtor.  It was

7    operating, and the reality of the facts are that it was

8    serving as a conduit for property of the debtor, and that the

9    funds used by Basell Funding to make the toehold payments

10   were indisputably drawn by the debtors under the credit

11   agreement, which is property in which the debtors clearly had

12   an interest.

13        We also expect that the defendants will argue,

14   well, if we lose on those points, we don't think there was

15   reasonably equivalent value.  Your Honor, we submit -- and

16   this -- we've briefed this a bit, and we'll probably post --

17   we'll brief it again in our post-trial briefs, that, just as

18   there is a well-recognized principle that a corporation never

19   receives value when it makes a distribution on its own stock,

20   the toehold payments, though arranged not to -- as to not be

21   a securities transaction, the same principle should apply and

22   -- on this issue.  And there's case support for this, as to

23   whether the transfer is of proceeds of debt to know.

24        There's also an issue, we believe, as to holding

25   Mr. Blavatnik liable.  We saw a little bit of this in their

1     pretrial briefs.  We submit that recovery against Mr.

2     Blavatnik will be proper under Section 550 as an entity for

3     whose benefit both transfers were made.

4                  THE COURT:  What about they argue that a

5     shareholder or a member, that you can't -- you have to pierce

6     the corporate veil if you want to do it; you can't just --

7     and they -- I'll be looking at -- I saw that argument in

8     their brief, and you'll have an opportunity to address it in

9     the closing briefs.  But why is that wrong?

10                 MR. WISSNER-GROSS:  Well, we don't think that

11    piercing the corporate veil is, in the end, going to be the

12    appropriate standard, and we'll brief that in post-trial

13    briefs.  We think that the proper way of looking at this is

14    whether it was done for the benefit of Mr. Blavatnik.

15                 And here, Mr. Blavatnik, we think the facts will

16    show, on an undisputed basis, that he benefitted by the use

17    of the payment to fund a capital account for redeemable

18    preferred stock of Mel that was owned by Mr. Blavatnik, and

19    to refund -- or to fund the repayment of an intercompany loan

20    by Mr. Blavatnik to one of his affiliates.

21                 But we agree, this is an issue we think we'll

22    probably have to brief --

23                 THE COURT:  Uh-huh.  Yeah.

24                 MR. WISSNER-GROSS:  -- in the post-trial briefs.

25                 Your Honor, briefly, on Count Two, I think I've

53

1     talked -- addressed this already.  We think that -- we

2     recognize that the standard under Kaufman will apply.  We

3     think that the record evidence will more than satisfy the

4     standard for imputation of Mr. Smith's knowledge to Lyondell.

5          And much of that will done through the -- I think

6     we have 36 depositions, where we've designated deposition

7     testimony.  A lot of exhibits will be in the record.  And we

8     think that the standard will be more than satisfied through

9     that record evidence.

10          We also think that, as an alternative -- and this

11    is something that, again, is probably going to be more of an

12    issue of post-trial briefing -- that, in the alternative,

13    that Mr. Blavatnik's knowledge itself, his intent, can

14    satisfy Count Two.  While we think that -- and that he had

15    actual intent sufficient for Count Two, for intentional

16    fraudulent transfer.

17          Although we submit that the evidence is going to

18    show a pretty overwhelming factual presentation through

19    undisputed factual testimony and documents that paint, we

20    think, a chilling story about the way in which the Lyondell

21    projections were artificially inflated by people extremely

22    close to Mr. Smith, over a very short period of time.  You

23    know, Mr. Smith directed, within days of the 13D being filed,

24    that inflated projections be generated, where there was no

25    real due diligence done, and where those projections were

1      really accomplished within the matter of a couple of days.

2              Your Honor, let me turn to some of the other

3      counts, briefly, in the less than 20 minutes I have.  I want

4      to talk briefly about the Luxembourg counts.  We, obviously,

5      have submitted expert reports.  We have our Luxembourg

6      expert; they have theirs.

7              But I do want to talk about some of the legal bases

8      for those because, actually, our view is that those counts

9      are --

10             THE COURT:  This is Counts Six and Seven, I think?

11             MR. WISSNER-GROSS:  Yes.  Are not really that

12     complicated.  There are really a couple of key concepts here;

13     first:  Did Mr. Blavatnik keep control over all material

14     strategic issues?  And we think the answer is yes.  That's

15     going to be a fact that under, we think, the relevant

16     Luxembourg law, will be directly relevant to Count Six and

17     Seven.

18             And secondly:  Was there inadequate capitalization

19     and insolvency?  Many of the same facts that will bear on

20     inadequate capitalization, leading up to the merger

21     agreement, and also into events in 2008, will apply, as well,

22     to -- ultimately, to your adjudication of the Luxembourg

23     claims.

24             First, on the issue of Count Six, that Mr.

25     Blavatnik acted as what's called a "*de facto* manager" of

1    Basell, and in that capacity, make the decision to acquire

2    Lyondell, and to capitalize the newly formed LBI with only

3    finance -- with only the financing that could be provided

4    based on the combined assets of the company.

5         We think the record is going to show that the

6    decision to do that was made by Mr. Blavatnik, who had no

7    formal position to exercise management authority on the

8    relevant Basell entity.  He didn't give himself a formal

9    position before the merger.  They'll argue that, well, even

10   though he did not get by a formal position at the level of

11   Basell AF, the entity that entered into the merger agreement,

12   that doesn't matter.  But actually, it does matter under

13   Luxembourg law.

14        We think the evidence will be as follows, and this

15   is just a snapshot of it:

16        First, the notion that he was not in charge of

17   Basell-side decisions is contradicted by the contemporaneous

18   record that shows, as I said, he personally negotiated all

19   key terms of the deal with Mr. Smith.

20        Secondly, the documentary evidence will show that

21   he repeatedly dictated terms and precise directives to

22   purported managers of Basell.

23        Third, he overruled their advice.

24        Fourth, he kept them in suspense.  That's actually

25   a phrase that they use, were "in suspense" over what Len was

1    going to tell us to do about material developments.

2              Next, he set deadlines against his -- their will.

3              He also got really granular; he involved himself in

4    travel schedules.  I've noted that he told Mr. Trautz, I want

5    you to go meet with Mr. Smith.

6              The documents also -- and these -- a lot of these

7    are contemporaneous emails.  And I appreciate my friends on

8    the other side will say, oh, you're taking them out of

9    context.  We submit, Your Honor, that the emails, which are

10   contemporaneous from the time often are the best indicators

11   of what people were thinking, what they were feeling, what

12   they were concerned about, and we think it paints a pretty

13   clear picture.

14             They were clearly taking orders from Mr. Blavatnik.

15   They were concerned that their reputations depended on what

16   he decided to do.  They will show that Mr. Smith, for his

17   part, recognized that Blavatnik was the decision-maker for

18   Basell.

19             And Mr. Blavatnik himself, at his deposition,

20   testified that the supervisory board on which he sat wouldn't

21   have approved the merger, if he hadn't wished it.  And he

22   further testified about various instructions he gave to Alan

23   Bigman, who was the CFO of Basell at the time, and also

24   purportedly on one of the boards, that he says, well, he was

25   really the true decision-maker at Basell.  We don't think

1    that the record will paint a picture of anything other than

2    he had complete control.  Now that's a *de facto* director.

3            There is also, if I could just jump to the

4    questions of -- this is more in terms of Count Seven.

5    Luxembourg law -- and we think this shouldn't -- it's not

6    really a controversial concept and should be straightforward

7    -- has a settled proposition that a manager of a Luxembourg

8    company has to act for the benefit of that entity.

9            Under Luxembourg law, where a manager is a *de facto*

10   manager, which would be the case of Mr. Blavatnik, he's held

11   to the exact same standard of management as a *de jure* or a

12   manager-at-law.  He has to act with prudence and diligence.

13   We submit that Mr. Blavatnik did the exact opposite.

14           In addition, as we've alleged in Count Seven, an

15   individual or entity can be liable on a simple tort theory

16   under Luxembourg law, where that individual or entity engages

17   in tortious behavior directed at a third party that causes

18   harm.  It's a fairly broad, broad standard.

19           Here, we submit, because of the corporate structure

20   of LBI under applicable Luxembourg law, that the *de jure*

21   managers of that entity was the general partner at LBI, and

22   that -- you know, and that, as a practical matter, the third

23   parties at LBI should be concerned about.

24           Finally, liability under Luxembourg law can be --

25   occur if a *de jure* manager of sales exercises independent

58

1       judgment, and allows someone else, who does not hold formal

2       management positions, to make decisions for the company.

3               So, as a practical matter, we think the evidence is

4       going to show that Mr. Blavatnik was the key decision-maker.

5       He was -- we think is indisputably acting pre-merger as a *de*

6       *facto* director.  He failed to plan for known and foreseeable

7       contingencies, the same kind of contingencies that we've --

8       I've spent quite a bit of time talking about.  Pre-merger,

9       all those were known to Basell, Access, to Mr. Blavatnik.  In

10      fact, there was a lot of hand-wringing by his employees at

11      Access about all the risks that they were facing.  And

12      notwithstanding all of that, he entered into the deal.  And

13      we think that, under applicable Luxembourg law, for his

14      conduct pre-merger and also post-merger, he has liability.

15              Your Honor, let me just --

16              THE COURT:  It's okay to finish early.

17          (Laughter)

18              MR. WISSNER-GROSS:  But your clock, how much time -

19      - by my clock, I have about 12 minutes left.

20              THE COURT:  Close enough.

21              MR. WISSNER-GROSS:  So I'll wrap it up, Your Honor.

22      I'll just go back to the ...

23              So, coming -- the remaining claims, Your Honor, are

24      set forth in the chart.  Count Nine -- well, we actually --

25      we spent a little time talking about Count Nine, which is the

1    preference.

2           Before I do that, we have the fraudulent transfer

3    claim, which is the hundred-and-twenty-eight-million-dollar

4    claim for the transaction fee, and the management fee that

5    Mr. Blavatnik received on December 20th, under this

6    purportedly new management agreement.  The same concept, in

7    terms of constructive fraudulent transfer.  We don't think

8    there's reasonably equivalent value.  We think, at a minimum,

9    the company was inadequately capitalized.

10          If you rule for us that -- on our Count One, for

11   example, that there was inadequate capitalization, we think

12   the same result will occur on the fraudulent -- twelve --

13   Count Eleven.

14          Aiding and abetting, breach of fiduciary duty,

15   Count Eighteen.  That's something that Judge Gerber had ruled

16   on, that the conduct of Access aiding and abetting the

17   underlying Luxembourg breach constitutes, itself, a viable

18   aiding and abetting claim.  We think the evidence strongly

19   supports that.

20          And then the other breach of contract and equitable

21   subordination claims are smaller, and we can address those

22   probably in terms of post-trial briefing.

23          So, with my remaining time, Your Honor, I want to

24   just talk a little bit about the preference claim.  I was

25   actually going to talk about the preference claim first, but

1    I got a little bit off course.  The preference claim involves

2    all the same themes that we've been talking about.  Mr.

3    Blavatnik in charge, inadequate capital, massive over ledge –

4    – over-leverage.  Mr. Blavatnik is the king of optionality.

5            But that claim, as Your Honor knows, because we

6    briefed the summary judgment motion on it, and it was argued

7    a couple of months ago, deals with the financial condition of

8    the company in October --

9            THE COURT:  This is the three-hundred-million-

10    dollar --

11            MR. WISSNER-GROSS:  Yes, yes.

12            THE COURT:  -- repayment.

13            MR. WISSNER-GROSS:  Yes, yes.

14            So, as Your Honor will recall, at summary judgment,

15    Your Honor set for trial two primary issues on this count;

16    first:  Was Lyondell, as borrower under the revolver,

17    insolvent at the time it made the three-hundred-million-

18    dollar repayment in October 2008?  And secondly:  Is the

19    repayment protected by the ordinary course of business

20    defense?

21            We submitted -- we'll have -- you will have expert

22    testimony from our side that, both on a combined,

23    consolidated basis, and also on a freestanding basis, that

24    Lyondell and LBI were grossly insolvent at the time that the

25    repayment was made.  And secondly, we think that there will

1    be overwhelming evidence that the repayment is, if anything,

2    not done in the ordinary course of business.

3         So let me just talk briefly, in the remaining time

4    I have, about the ordinary course of business prong and some

5    of the relevant facts.  So let's just talk a little bit about

6    the evidence.

7         First, we submit that the evidence will show that

8    the revolver was put into place to induce third-party lending

9    and to create the appearance of shareholder support.  Again,

10   Your Honor, we would urge you to look closely at what were

11   the facts and circumstances when the revolver was put in

12   place, I believe in March; that same time period, where all

13   kinds of hell is breaking loose at LBI over liquidity issues,

14   the OID payment of 250 million that was due, the need to pay

15   for the Bear facility, without the lack of -- without funds

16   being available.

17        We believe that the evidence will show that, in

18   February 2008, LBI projected an immediate exhaustion of

19   working capital, and entered into negotiations with its

20   lender for more funding if a covenant were late.  We believe

21   the evidence will show that the lenders wanted Mr. Blavatnik

22   to contribute equity to LBI.  There's going to be some record

23   evidence that they wanted him to put a billion dollars of

24   equity in, which he didn't want to do, but that he declined;

25   instead, chose to put in place a revolving credit facility,

1    under which Access Industry Holdings, one of his other -- one

2    of his companies, would commit to provide up to 750 million

3    to Lyondell and the Basell entity on a revolving basis.

4         It was done, we think the record will show, at a

5    time of financial distress.  It was done for the specific

6    purpose of creating the appearance of shareholder support and

7    to induce third-party lending.  That's the context for it.

8         So what are the other -- what other pieces of

9    evidence about it?  The debt was incurred at a time when LBI

10   was in an emergency situation, as I've stated.  This was a

11   first-time transaction for both Access and Lyondell,

12   including:

13        One, that Access was, in one participant's word --

14   words, quote, "not a bank."  It was not in the business of

15   making money by earning fees or charging interest on loans.

16        Next, that the interest-bearing seven-hundred-

17   fifty-million-dollar credit agreement bore no resemblance to

18   the intercompany advances Access used to fund its other

19   affiliates.

20        Further, Lyondell had never, pre-merger, obtained

21   funding from shareholders.

22        Beyond that, the evidence is going to show that, in

23   advance of the possible draw, Access, which is the lender,

24   was substantially involved in Lyondell, the borrower's

25   decision about whether to make the draw because it was

1    uncharted territory for access, which was not a bank.

2                Further, upon seeing news of the potential draw

3    request, Mr. Blavatnik commented -- and this is a quote from

4    Mr. Blavatnik -- "that's very bad."  And here was the

5    response of LBI's CEO to Mr. Blavatnik's comment that it's

6    "very bad," the CEO of LBI said it's not bad, it's terrible.

7    The draw was not approved until Access satisfied itself that

8    Lyondell would repay it in rapid, preferential fashion.

9                And finally, the decision to approve the draw was

10   presented personally to Blavatnik, and did not proceed until

11   he said, okay, I give approval.

12               So we think the evidence will show there's an

13   emergency, first-time loan between affiliates, with the

14   lender exercising substantial control over the borrower, both

15   owned by Mr. Blavatnik, and that the lender not approving --

16   and the lender not approving the incurrence until it was

17   satisfied, during a time when LBI was actively studying

18   bankruptcy options.  And there will be record evidence that

19   in -- certainly, by October, LBI was really looking at

20   bankruptcy options.  We also think there's going to be record

21   evidence that, back in March and April, there was actually

22   consideration of a restructuring.  So there is an awareness

23   at Access that this company was on the brink for quite some

24   time.

25               Was this an ordinary revolver?  Was it just an

1    recurring, customary credit transaction?  We submit the

2    evidence will show it was anything but ordinary, normal, or

3    customary.

4              Your Honor, I could address some other points about

5    Mr. Blavatnik's role in connection with this.  I think that

6    the -- a couple of brief points:

7              We think the evidence will show that the property

8    at issue was Lyondell property, and that the other side

9    advances that it -- we didn't satisfy -- or that there was a

10   contemporaneous exchange for value defense, we think that the

11   evidence will not support it.

12             The -- Lyondell had control over the property, it

13   had legal title to the property.  And you know, we think that

14   the law is pretty clear on this, that that doesn't change if

15   a centralized cash management system is used.

16             And as to the contemporaneous exchange defense, we

17   recognize it's largely a legal issue, but we think we'll

18   prevail on that, both because Access did not provide new

19   value to Lyondell; and separately, because the October 2008

20   draw was a short term between affiliates deal, inherently not

21   contemporaneous.

22             So, Your Honor, I think I finished within the time

23   limit.

24             THE COURT:  You did, you did.

25             MR. WISSNER-GROSS:  I thank you for your patience.

1              THE COURT:  Thank you.

2              MR. WISSNER-GROSS:  We look forward to presenting

3    our case.

4              THE COURT:  All right.  We'll take a fifteen-minute

5    recess, and then we'll resume with defendants' opening.

6          (Recess taken at 11:11 a.m.)

7          (Proceedings resume at 11:34 a.m.)

8              THE COURT:  Mr. Kirpalani?

9              MR. KIRPALANI:  Good morning, Your Honor.  Susheel

10   Kirpalani from Quinn Emanuel Urquhart & Sullivan for the

11   defendants.  With me at counsel table is my partner, Rick

12   Werder; the heart and soul of our team, Rex Lee; and my co-

13   counsel, Mr. Ken Klee.

14             I'd also like to introduce, Your Honor, that we

15   have our clients with us in the room today, Mr. Len

16   Blavatnik, who's sitting here, as well as Mr. Alejandro

17   Moreno, both of Access Industries.

18             Can I hand up some slides?

19             THE COURT:  Please.  Thank you.

20             MR. KIRPALANI:  Okay.  Thank you, Your Honor.

21             The first thing I'd like to do is talk a little bit

22   about the two companies that are really at issue in this

23   case.  You've heard about Basell and about Lyondell.  Just a

24   little bit more about that; Basell was Europe's leading

25   producer of polypropylene and advanced polyolefin products.

1    It was a leading supplier of these items and it was an

2    industry leader in licensing technology, because it was

3    simply the best in the business at doing these things.  It

4    was a European company.

5    Lyondell was North America's third-largest independent

6    publicly traded chemical company, and in addition to

7    chemicals, it was also, by 2007, the 100 percent owner of a

8    rare asset in North America called the "Houston refinery."

9    This refinery, unlike many in North America, could refine

10   even the heaviest, what they call "sour" crude oil from

11   Venezuela and other places.

12   Let's talk about what the transaction actually was, because

13   the trustee sometimes discusses it as an LBO and other times

14   says Basell made a bad business decision.  We need to talk

15   about this.  This is the transaction here; on the left-hand

16   side, you see that Basell AF S.C.A., that's the Luxembourg

17   company, owned a bunch of Basell entities, including Basell

18   Holdings, which was a Dutch company.  It acquired Lyondell

19   Chemical Company as sort of a sister-silo business and,

20   thereafter, it integrated operationally, both the specialty

21   plastics and chemical side of Basell, with the regular

22   chemicals and oil-refining side of Lyondell, and that's the

23   structure of the transaction.  It was an acquisition of

24   Lyondell by Basell.

25           Now, earlier this month, Your Honor had issued a

1    ruling and the Court quoted from an earlier decision on

2    motion to dismiss by Judge Gerber.  And it's important

3    because I understand Your Honor was not making any findings,

4    but rather was just quoting from Judge Gerber had done,

5    which, frankly, came from a motion to dismiss, so, of course

6    he was deferring to the plaintiff's view of the transaction.

7            And what they said, but it's important for trial,

8    which is incorrect, is that the LBO was 100 percent financed

9    by debt, which, as is typical in LBOs, was secured not by the

10   acquiring company's assets.  So the trustee is telling the

11   Court this transaction was not secured by Basell's assets,

12   but rather, only by the assets of Lyondell and we're going to

13   show you that that's actually incorrect.

14           Goldman Sachs realized this in reviewing whether or

15   not to make the loan in July of 2007.  Look at what Goldman

16   Sachs says:

17               "Basell will purchase the asset by re-levering

18               itself and using its unutilized leverage capacity

19               to fund the equity portion of the acquisition."

20           So this, of course, was Basell's contribution.  The

21   trustee wants, however, to shoehorn this transaction into the

22   LBO paradigm and he wants you to ignore Basell's

23   contribution, or at least sometimes he does.  The trustee

24   will say that Lyondell should be deemed the transferor of

25   every single dollar; every single dollar paid to consummate

1   the acquisition.  According to the trustee, that came from

2   Lyondell, even the dollars that were borrowed by Basell, even

3   the dollars that never touched a Lyondell bank account.

4          But is this just semantics and why does it really

5   matter?  It matters because if the trustee can call this an

6   LBO, he gets the benefit of two things, Judge.  First, he can

7   impute Dan Smith's intent to the transferor, because Dan

8   Smith was Lyondell's CEO and Lyondell was the target, and Dan

9   Smith is alleged by the truth to have done some pretty bad

10  things.

11         And he can ignore the intent of Basell, who was the

12  acquirer and who actually arranged the financing, but did

13  nothing wrong.  If the trustee conceded that Basell was the

14  transferor for the payments that are relevant in this case,

15  then Dan Smith's intent is irrelevant and he loses

16  intentional fraudulent transfer out of the gate.

17         Counsel said this morning that Basell inflated -- I

18  was writing it down -- Basell inflated its projections

19  sometime between July and December.  We double-checked --

20  this is the first we've ever heard of this; it's not in the

21  trustee's contentions of fact -- and then he says that you

22  will hear testimony about this.  We have no idea where he's

23  going to get this testimony.  He talked about propylene oxide

24  in Europe.  That's not even in the complaint, let alone, in

25  the contentions of fact, so we're looking forward to hearing

1      the story.

2                   But second reason why it's important to him to call

3      an LBO, if he can show the transaction was an LBO -- and you

4      heard him allude to this in the opening -- he can say he

5      doesn't need to prove lack of reasonably equivalent value

6      because in an paradigm LBO, the target just acquires its own

7      shares and nothing else really happens.  And then he can cite

8      you LBO case law on presumptions that, of course, would not

9      apply if this was a strategic acquisition.

10                  And this is very important, Judge; from a trial

11     strategy point of view, it's very important.

12                  THE COURT:  How much do you believe that Basell

13     injected in equity into the transaction?

14                  MR. KIRPALANI:  Six billion.

15                  It's very important, Judge, because the trustee

16     didn't bring any expert testimony on lack of reasonably

17     equivalent value.  So, instead, he's relying entirely on this

18     LBO paradigm or else it's over for him.

19                  So the trustee has to play a bit of a shell game

20     with his theories.  He says the Court should collapse the

21     transaction, but then he really doesn't want you to collapse

22     the totality of the transaction; he wants you to look,

23     myopically, just at one piece of it, the piece that Lyondell

24     was involved.

25                  The trustee, Your Honor, really is playing a shell

1    game with his allegations and contentions.  He sometimes

2    sells -- says LBO; sometimes, he said it's a bad business

3    decision by Basell.

4        THE COURT:  I'm glad to see you have this.  They

5    had bottles that were sinking and you have --

6        (Laughter)

7        MR. KIRPALANI:  We have (indiscernible) bottles,

8    Your Honor.

9        THE COURT:  Uh-huh.

10       MR. KIRPALANI:  Of course, as sometimes happens,

11   the tricks during a shell game forgets which shell had the

12   pea; that's what happened here.  Let's look at the trustee's

13   own contentions of fact and you'll see he ultimately has to

14   concede what was the true nature of the transaction.

15   Contention of Fact 10, now, he says and he agrees, prior to

16   its acquisition by the debtor parent company, Lyondell was a

17   publicly traded company.  The debtor parent company is

18   Basell, so now he is calling it an acquisition.

19       Paragraph 18, on December it 20th, 2007, the

20   transaction closed and Lyondell became an indirect subsidiary

21   of the debtor parent company.  Judge, that's the diagram I

22   showed you at the beginning.  I see -- I think we're at least

23   seeing eye to eye at this point.

24       And then for Paragraph 64, now he does agree; we

25   should view this from the perspective of Basell.  Okay.

1    We're off to a good start, Your Honor.  His experts never do

2    this, but at least at this point, prior to trial, he concedes

3    he's got to do that.

4           Let's talk about the world in 2007, because this is

5    the time frame that's relevant to the transaction.  To

6    evaluate the lion's share of claims brought by the trustee,

7    the Court will need to review the state of the world in 2007,

8    so I need to take you back in time a bit, if you'll bear with

9    me.

10          July 16th, 2007, was when the merger agreement was

11   signed.  That's the date, Judge, that Basell became

12   contractually bound to pay $48 per share for Lyondell stock.

13   And it's easy to forget sitting here today, where we were

14   more than nine and a half years ago, but in middle-2007, the

15   stock market was still climbing, global macroeconomic

16   activity was robust.  And that's particularly true for the

17   industrial sector like the demand for oil, for chemicals, and

18   for plastics, particularly relevant here.

19          Yes, of course, there were troubles -- we've all

20   seen the movie.  There were signs of trouble in the sub-prime

21   mortgage area, but most market participants believed at that

22   time that those troubles were going to be contained to the

23   sub-prime mortgage market.

24          The leveraged loan markets, of course, heavily

25   depended on what was happening there and so you did see

1    stress in terms of the bank's ability to syndicate loans and

2    it looks a bit challenging at the time.  But the key fact

3    here, Judge, is that the loan syndication markets have

4    nothing to do with what is the value of the third-largest

5    chemical company in the world.

6         Now, we also need to look a little bit at December

7    20th, 2007, because that's the closing date and that's when

8    most of the transfers at issue took place.  So by December

9    20th, 2007, the leveraged loan market continued to present

10   challenges, but regardless of the loan syndication problems,

11   the macroeconomic and industrial activity continued to be

12   robust and the price of oil had ratcheted higher than had

13   been expected back in July.  But what were people thinking at

14   the time?  That the price escalation had basically hit its

15   point and it was going to start tapering off in 2008.

16        We're going to show you evidence about all of this.

17   We'll show you, Judge, no one was expecting in December 2007,

18   the types of movements that were going to happen in 2008.  It

19   was a rise from $90 a barrel at closing in December to $145 a

20   barrel seven months later, and then a plunge to $34, five

21   months after that.  Oil prices were expected to move

22   moderately, but in the event they continued to escalate, what

23   would happen?  Access and the management teams negotiated,

24   thinking ahead, for flexibility with the lenders at closing,

25   in the event their inventory costs go up, because oil is a

1    feedstock for the chemicals companies, if the inventory costs

2    go up, we want to make sure, banks, you're going to be

3    flexible with us and you'll increase our borrowing.  And

4    that's what the management teams negotiated in December.

5              But either way, rising feed costs -- rising

6    feedstock costs wouldn't be expected to hurt profits in the

7    long run because of what?  Because LBI could eventually pass

8    along the increased inventory costs to its customers.

9              And while we do focus on December because, clearly,

10   that's the date of the transaction, the date of the

11   transfers, I don't want the Court to forget the July merger

12   agreement.  Because, remember, Basell had become bound to pay

13   $48 on that date and satisfying a contractual obligation to

14   pay the $48 in December is, of course, value to Basell.  The

15   trustee glosses over this completely.  The trustee never

16   tries to suggest that entering into the transaction in July

17   should be avoided; he never brought that count.

18             But regardless of which date is chosen for

19   evaluating the decision of Basell to buy Lyondell, no one

20   involved in the transaction in either July or December of

21   2007 had any concerns about the ability of LBI to service its

22   debt; not in 2008, 2009, 2010, 2011, or any other date for

23   that matter.

24             So let's talk about this from Basell's perspective

25   is first.  Why did Basell want Lyondell?  Basell was owned by

1       an American industrial holding company, Access Industries.

2       Let me tell you what Access is.  It's a privately held U.S.-

3       based industrial holding company with investments worldwide.

4       It has long-term strategic interests in oil, aluminum, coal,

5       petrochemicals, telecom, media, and real estate.  Len

6       Blavatnik founded the company in 1986 and Access has a track

7       record of investments in cyclical industrial enterprises.

8              This is important because you're being asked,

9       essentially, to second-guess or take the trustee's

10      second-guess of sophisticated investors who actually

11      understand this business.

12             In 2006 and 2007, Access was pursuing a potential

13      merger partner for one of its portfolio companies and that's

14      Basell.  So what was Basell?  And let's talk about the

15      industrial logic.  Basell, as I mentioned was the world's

16      largest manufacturer and marketer of polyolefins and advanced

17      polyolefins.  It was the leading developer and licenser of

18      technology, because it had state-of-the-art technology.  Its

19      products are widely used in consumer and industrial

20      applications, from food and beverage, housewares, medical,

21      automotive, construction materials.

22             Now, you'll see what I was alluding to earlier.

23      What were people thinking in July?  It was the financial

24      sector; it wasn't the whole consumer and industrial world.

25             Let's talk about from Lyondell's perspective.

1    Lyondell was a global chemical company that manufactured and

2    marketed a variety of basic chemicals and gasoline-blending

3    products.  It was one of the largest independent chemical

4    companies and had approximately 11,000 employees.

5         It's refining operations included that rare asset,

6    as I mentioned, the Houston refinery, where it could take

7    even the most sour crude oil and turn it into usable end

8    product.  And even though the trustee, Judge, is challenging

9    today the business judgment of the people who decided to

10   pursue this merger, he has absolutely no evidence from anyone

11   that combining Lyondell and Basell was not a very good idea.

12        Now, the advice that Mr. Blavatnik got from the CEO

13   of Basell -- when he asked him in January of '07, he asked

14   the CEO of Basell, what is the best fit for Basell?  And this

15   is what Mr. Trautz had to say, as Basell's CEO, I would

16   choose Hugo -- Hugo was the code name for Lyondell, Your

17   Honor -- because it was fix our North America problem of

18   backward integration and create an even stronger

19   petrochemical industrial leader.

20        So why was Hugo, which is Lyondell, such a great

21   fit for Basell?  Well, UBS said it quite well in deciding

22   very late in the game, to sign up for participating in the

23   financing.  Combining these two businesses together, Judge,

24   would give you, number one, worldwide leadership in many

25   industries in the chemical sector, polyolefins, polyolefin

1    licensing catalysts, and it would give you number, 2, three,

2    four, and five in other areas, too.

3            And, significantly, what the combined company,

4    LyondellBasell, which by the way is in the S&P 500, what it

5    would do is it would give you the number three leading

6    chemicals company in the world, right behind DOW Chemical and

7    BS -- BASF.  That was what was at stake here.

8            Goldman Sachs had similar views in July when it was

9    reviewing the financing.  And look at these, Your Honor, not

10   only does it create one of the largest commodity companies

11   globally, not only would it be a world leader in ethylene,

12   but it's the asset richness; the richness of the assets of

13   the combined company.  And what that's significant for is

14   that -- and this is also important -- the combined business

15   would be less susceptible to the petrochemical cycles.

16           That was, essentially, the industrial logic, Your

17   Honor; that these two companies would be stronger together.

18   And Mr. Benet, the President of Access, will come and testify

19   -- here's his declaration -- more about this industrial

20   logic.  He's going to say, our advisors at Merrill Lynch

21   expressed the opinion that an acquisition of Lyondell would

22   be:

23           "The single most attractive transformational

24           acquisition opportunity for Basell and would result

25           in an integrated, well-diversified, and truly

1             global chemicals company with a meaningful

2             footprint in North America."

3        UBS has given the same advice.  This custom by

4    nation would create the third-largest chemicals company

5    globally.  It would be an improved product and geographic mix

6    -- not just Europe anymore.  The significant synergies were

7    possible in the combination.  It was the perfect

8    petrochemical asset fix and it would potentially create a

9    completely integrated value chain.  This combined company

10   would put these businesses on equal footing with DOB and

11   ENIOS.

12        Now, let's talk about Basell and where was Basell

13   in the mid-summer of 2007 or in the beginning of the summer?

14   Remember, Access had acquired Basell in 2005.  Basell

15   actually had its best performance in its history under

16   Access' sponsorship, and Basell used that outstanding

17   performance to pay off its debts and de-leverage.  And

18   beginning in June of 2007, Basell was now in a position to

19   make sizable cash dividends to its equity owners.

20        Let's take a look.  These figures are in Euros,

21   Your Honor, but they show that going into the end of '06,

22   these were the projections for how much money would be made

23   by equity holders of Basell if they just did nothing.  Stable

24   dividend income of hundreds of millions of Euros, each year

25   through 2010, and then 500 million more Euros in 2011 for a

1    total of about $1.2 billion Euros or about $1.6 billion in

2    dividends over a five-year period, just do nothing.  That's

3    what Basell equity holders stood to receive as of June of

4    2007.

5         And the evidence will establish that Mr. Blavatnik

6    was uninterested in short-term profits.  He wanted a

7    geographically diverse platform with vertical integration for

8    long-term positioning for Basell in the chemicals industry.

9         In fact, let's show what he rejected.  He rejected

10   this Goldman Sachs leverage recapitalization proposal that

11   was made at the end of '06, what was Goldman telling Mr.

12   Blavatnik and Access Industries that it could deliver.  It

13   could give 1.4 billion Euros in a dividend recapitalization

14   transaction by levering up the company and that would be

15   tax-free.

16        But Mr. Blavatnik did not want to just accept a

17   dividend recapitalization.  He wasn't interested in

18   short-term gains.  He wasn't interested in sitting back,

19   after having paid off all the debts -- not all -- but a

20   substantial amount of the debts at Basell so he could receive

21   a steady stream of dividend income.

22        He will come to court, Your Honor, and explain

23   Access' investment philosophy in his own words, but here's a

24   taste.  This is from the declaration that Mr. Blavatnik

25   submitted.  He'll explain:

1          "That Access does not have or seek outside

2           investors.  We do not manage other people's money.

3           Access acquired Basell.  It has no plans at all to

4           sell or even monetize its equity in Basell and we

5           turned down such offers when presented by

6           investment banks.  Access wishes" -- "wished to

7           combine Basell with a suitable merger partner to

8           create a long-term stable company."

9      Let's talk about these Luxembourg claims that I

10     know Your Honor is so eager to get into.  The trustee claims

11     that Mr. Blavatnik dominated and ordered the Basell

12     decision-makers, including, Judge, two independent managers

13     of Basell to sign on the line and improve Basell's

14     acquisition of Lyondell.

15     Let's look at what the trustee contends.  This is

16     Contention 57:

17         "As a result of the control exercised by Blavatnik

18          through the Access group, each of the GP managers"

19          -- those are the managers of pre-merger Luxco --

20          "was incapable of, incapable, and had no interest

21          in the independent exercise of judgment on behalf

22          of Basell."

23     But when the Court separates the wheat from the

24     chaff and looks at, what's the admissible evidence on this,

25     instead of the speculation?  The Court will hear from one of

1    the independent managers of Basell.  There were actually two,

2    Judge, but one of them, the late Richard Floor, who was a

3    partner in a prestigious law firm, he passed away before he

4    was ever deposed.

5              But this is Kent Potter.  Mr. Potter was never

6    affiliated with Access and he knew a whole heck of a lot

7    about the chemicals industry.  He got his engineering degree

8    from Berkeley in 1969.  He went back to school and got his

9    MBA from Berkeley in 1974.  The man served as Army officer in

10   Okinawa and Vietnam.  He spent 27 years at Chevron Phillips.

11   He was the post-petition CFO of the debtor-in-possession.  He

12   was one of the independent members of Basell Holdings; that's

13   the Dutch company where decisions were made pre-merger.  And

14   he was also an independent manager of the GP, which was

15   Luxco.

16             Mr. Potter was deposed and at the time he was

17   deposed, Judge, he was not a defendant in the lawsuit.  But

18   he was asked whether or not he was instructed to follow Mr.

19   Blavatnik's orders and here's what he has to say about that

20   contention:

21        (Recorded testimony of Ken Potter played at 11:56 a.m.

22   as follows:)

23   Q    "In performing your duties as a member of the

24   supervisory board, did you receive orders from Mr. Blavatnik

25   concerning what decision ought to be -- ought to be made?

1    A    No."

2    Q    "Did you receive orders from anyone acting on Mr.

3    Blavatnik's behalf?

4    A    No.  And to be clear, I never received an order to

5    approve or disapprove anything."

6    Q    "Very good.

7    A    From anyone."

8        (Recording concluded)

9        MR. KIRPALANI:  Judge, to the extent Your Honor was

10    wondering if there were any independent Basell board members

11    and managers who can testify as to the allegations of this

12    domination and control in his Luxembourg tort claims, Mr.

13    Potter's deposition will be must-read for the Court.

14        Let's talk about the Lyondell side of the equation.

15    Meet Dan Smith.  Actually, you won't.  That's because the

16    trustee decided not to call Mr. Smith as a witness, despite

17    having the ability to do so.  Instead, the trustee wants to

18    malign the man from afar, calling him a fraudster, who

19    intentionally inflated a public company's projections to get

20    a better price for Mr. Blavatnik, even though the price had

21    already been negotiated.

22        The trustee's tactical decision not to call Mr.

23    Smith or any member of Mr. Smith's so-called "inner circle"

24    speaks volumes of the trustee's theory.  Judge, this is as

25    close as the trustee wants you to get to Mr. Smith, but the

1    evidence will show that Smith was a veteran CEO who knew the

2    intrinsic long-term value of the public company he helped

3    build from scratch.  He also knew the combined company would

4    be a tremendous platform, in fact, the trustee will have no

5    answer at all at trial about if someone was intending to

6    defraud creditors, why would he want to stay on as the CEO of

7    the combined company, which is what he did want.

8            Smith and his CFO, Your Honor, had calculated what

9    would be an appropriate control premium, based on what Mr.

10   Blavatnik had recently been willing to pay for a lesser

11   company, Huntsman, and that's what got them to $48.  This

12   will be explained by our expert witness Mr. Reese (phonetic),

13   when he testifies about price fairness, Your Honor.

14           Mr. Reese will explain -- this is from his expert

15   report:

16              "Smith considered the approximately 33 percent

17              acquisition premium in the Basell offer for

18              Huntsman as indicative of the price of Lyondell in

19              an acquisition by Basell."

20           Of course, Judge, Mr. Smith held out for the best

21   possible price.  That's the very definition of an

22   arm's-length transaction.  If the price was not fair, then

23   the purchaser would have walked and taken his financing

24   sources with him.

25           In the end, despite all of the accusations and

1    speculation, there will be no evidence introduced that Mr.

2    Smith intended to hinder, delay, or defraud anyone.  In fact,

3    the Court will hear that Mr. Smith didn't even control how

4    the financing would be arranged.

5           This transaction was entirely arranged by Basell

6    and its equity sponsor Access, and this makes sense, because

7    when the jig is up, the evidence will demonstrate this was a

8    strategic acquisition by Basell of a complementary,

9    synergistic, geographically diverse, chemicals and

10   world-class oil-refining company.

11          Now, Judge, this is Robert Salvin.  Counsel

12   mentioned his name a couple of times in the opening.  He is

13   one of the alleged members of Mr. Smith's inner circle.  He

14   was a manager of portfolio planning at LBI and he had been a

15   longtime employee of Lyondell before that.  This man took his

16   job very seriously.  Here's what Mr. Salvin has to say about

17   being in Mr. Smith's inner circle.

18          (Recorded testimony of Robert Salvin played at 12 p.m.

19   as follows:)

20   Q    "At the time that you were asked to undertake this

21   project, did you -- did you report to Mr. Smith?

22   A    No.  I reported to Mario Portella."

23   Q    "And don't take this the wrong way, but were you a

24   close, personal confidante of Mr. Smith's at the time?

25   A    No, I wouldn't call myself that at all."

1    Q    "No?  Have you ever heard the phrase 'inner-circle'?

2    A    I've read it in the complaint, yes."

3    Q    "Yeah.  And were you part of Mr. Smith's --

4    A    No, I--"

5    Q    "-- inner-circle?

6    A    I would not consider myself part of that inner-circle,

7    if he had -- if he, indeed, had an inner-circle."

8         (Recording concluded)

9             MR. KIRPALANI:  Judge, the trustee contends that

10   this inner circle that Mr. Salvin is supposedly in, worked to

11   hit whatever numbers the boss wanted, and they did this by

12   refreshing the projections.  And here's what Mr. Salvin has

13   to say about that.

14        (Recorded testimony of Robert Salvin played at 12:01

15   p.m., as follows:)

16   Q    "And have you read, in particular, the portions of the

17   complaint that focus on the refreshed projection project?

18   A    Yes."

19   A    "And you've read some of the adjectives that have been

20   used --

21   A    Yes."

22   Q    "-- that have been applied to that project in the

23   complaint?

24   A    Uh-huh."

25   Q    "What's your reaction to that?

1    A    I'm very offended by the allegations.  I was offended by

2    a lot of the allegations in there."

3    Q    "Why were you offended?

4    A    Because it implied that we made up numbers to -- such

5    that what Dan wanted, and that was not the case."

6          MR. KIRPALANI:  Okay.  Your Honor, I want to talk

7    about the transaction participants and what they each risked:

8    Merrill Lynch, $4 billion; Citibank, $4 billion; Goldman

9    Sachs, $4 billion; ABN AMRO, $4 billion; UBS, $4 billion; and

10   of course, our client, Access Industries, $6 billion.

11         The question the Court's going to examine in this

12   case is whether the price that was negotiated for a public

13   company at arm's length was fair.  You know, Mark Twain said

14   it best -- the trust is going to bring in some experts --

15   Twain says, "An expert is just some guy from out of town."

16         We will show you why five of the world's leading

17   financial institutions and a sophisticated investor, parted

18   with $26 billion on the belief that this would be a great

19   company.  We will demonstrate through expert testimony that

20   the premium-free stock price was about $37 a share for

21   Lyondell at the time.  We will explain why a controlled

22   premium is appropriate, particularly when you're talking

23   about a synergistic acquisition, and when an acceptable

24   controlled premium is applied, Judge, to the premium-free

25   stock price, you get to $48.  And even if the starting point

1    was a little lower, the evidence will show that the price was

2    in the range; it was reasonably equivalent.

3         But what are you going to see from the trustee's

4    table?  You won't see any evidence of what the trustee

5    believed was a premium-free stock price for Lyondell.  You

6    won't see any evidence of what the trustee believes was a

7    reasonable control premium for Basell to pay.

8         Instead, as I mentioned, the trustee puts all his

9    eggs in the LBO basket and he takes the position he can just

10   skip over his burden of proof on reasonably equivalent value,

11   because in an LBO, some cases say reasonably equivalent value

12   is lacking, as a matter of law, because all that happened was

13   the company acquired its own shares.

14        The trustee will further ignore the terms of the

15   loan facilities that he said were so damaging to Lyondell and

16   he ignores the record of this adversary proceeding itself and

17   the fact that he already avoided in liability on the

18   guarantees provided for in the acquisition financing through

19   his prior settlement with the banks.  That settlement was

20   baked into the Chapter 11 plan, Your Honor.

21        And let's take a look, this is the settlement

22   agreement between the creditors' committee and was baked into

23   the plan.  What happened to the first lien claims?  The

24   senior secured claims that were part of the acquisition

25   financing, they got 66 cents on the dollar.  Well, what about

87

1   the deficiency claims?  Those got subordinated to the general

2   unsecured creditors -- subordinated.  And as for the bridge

3   debt, $8.3 billion, the banks took 6 cents on the dollar.

4   Well, what about the huge deficiency claims there?  Those

5   also got subordinated.  The trustee ignores all of this and

6   just wants to collect all the cash back, even though the

7   debtors were never liable to pay for that borrowing.

8           Ultimately, Judge, the trustee's short con of a

9   shell game to argue this is a classic LBO led by Dan Smith,

10  it won't work, and the trustee's own factual contentions will

11  bare that out.

12          So let's talk about what needs to be tried in this

13  case.  Fundamentally, the reasonableness of the projections;

14  what was foreseeable for 2008 and 2009.  What was the value

15  provided to Basell, the acquirer?  Was there good faith here?

16  What was the causation?  What are the damages?  Are there any

17  offsets?  And what are the remedies?

18          First thing let's talk about is foreseeability,

19  Your Honor.  This is what the trustee contends he can prove;

20  the combined post-transaction liquidity of the debtors was

21  grossly insufficient to fund operations through reasonably

22  foreseeable contingencies, including rise in commodity

23  prices, economic recession, and business interruption.

24          Well, let's talk about reasonable foreseeability

25  for a moment.  The trustee says what he needs to prove;

1        that's the standard.  The Court's going to hear uniform

2        testimony that the petrochemical business is cyclical and

3        there is an expected peak and trough and the cycle

4        predictably lasts a number of years and those patterns can be

5        observed decade in and decade out.

6                Well, wait a minute.  Didn't anyone think of the

7        cyclicality of the petrochemical business when they were

8        running these models?  Yes, Your Honor.  Actually, everyone

9        did.

10               Let me show you something.  This is a montage of

11       every scenario that was run between July of '07 and December

12       of '07.  You can see here on the left, that's EBITDA --

13       projected EBITDA and it's going forward.  Take a look at the

14       trajectory of all of the various scenarios, more than 30

15       scenarios that were run.

16               THE COURT:  Who ran the scenarios?

17               MR. KIRPALANI:  The banks -- the five banks and

18       management and Access, and I'll talk to you in a moment, Your

19       Honor, about independent consultants that were hired, gave

20       information and on the basis of that, the banks ran another

21       scenario.

22               So these were the projections that were run at the

23       time and you can see they all dip down because they're all

24       predicting the expected, foreseeable petrochemical trough.

25       That trough, Your Honor, historically comes in when new

1    supply comes online and the demand will take several years to

2    catch up.

3         But here's the thing, it's not a petrochemical

4    cycle that happened to LBI at all.  What happened at the end,

5    the very end of 2008 and throughout 2009 was truly

6    unforeseeable and it was not a petrochemical cycle trough.

7         So what did happen?  It was a combination of

8    things, Judge.  First, oil prices spiked.  We've heard about

9    that; I mentioned they spiked to a record high and then they

10   plunged five months later.

11        What else happened in 2008?  Remember Bear Stearns?

12   This was in the first quarter of -- or maybe just the second

13   quarter of 2008.  Certainly had an impact on liquidity

14   conditions and the bank situation, but not the broader sector

15   yet.  What else happened to LBI specifically?  They had a 30-

16   story crane collapse that killed four people and shut down

17   the Houston refinery.

18        What else?  There was not one, Judge, but two

19   hurricanes in the Gulf and one of them was considered by

20   National Geographic, "The Freak"; that Hurricane Ike was so

21   bad it shut down nearly 25 percent of all U.S. fuel oil

22   production.  Let's keep going.  Remember Lehman Brothers

23   filing for bankruptcy in September of 2008?  It was the

24   biggest bankruptcy in U.S. history.

25        What else?  AIG became known by the American

1    taxpayer, but the unforeseeable things didn't stop there.  No

2    matter intelligent a life form we are, Your Honor, there was

3    no way anyone could have predicted that the end of 2008 would

4    bring an unprecedented government bailout called TARP.  But

5    in all seriousness, the impact of TARP shook the markets, and

6    the result, everyone who lived through it will recall, was

7    utter and total free fall and dislocation.  Not just the

8    financial markets now, but one that eventually caused a

9    system-wide crisis of confidence that eventually spread

10   through the consumer and industrial sector around the whole

11   globe.

12          So much so that GM -- and I know you inherited that

13   case, too -- and the other two big automakers went to

14   Washington and asked for federal money.  And of course we now

15   know, sitting here today, that we suffered something

16   unprecedented and unforeseeable in 2008 and 2009, and what is

17   it?  It's the Great Recession, Your Honor.

18          And you might be saying to yourself, though, how

19   bad really was it?  Let's take a look at this chart from

20   Bloomberg.  They called it "Growth Planetary Shrinkage."

21   This crisis caused the first recorded instance of negative

22   global DBP growth rate.  That's right, the 2009 financial

23   crisis sent the world -- the world -- into recession for the

24   first time since GDP was being measured.

25          And take a look at the bottom right here, Judge.

1    The growth rate, globally, actually went negative, negative 2

2    percent; that's how bad it was.  And, Judge, every single

3    claim about the 2007 decision by Basell and Access to acquire

4    Lyondell in the hopes of building this great global

5    enterprise turns on whether all of these events were

6    reasonably foreseeable in 2007.

7         The trustee's counsel said that we keep calling it

8    the perfect storm squared.  Actually, we're not the ones that

9    call it the perfect storm squared.  It was people who were

10   never ever sued.  It was the CEO of Basell, Volker Trautz, he

11   called it -- it's his phrase -- the perfect storm squared.

12        And remember Mr. Potter, the Army officer, the

13   independent manager -- independent manager who has 27 years

14   of experience at Chevron Phillips, he also called it -- he

15   uses the term "the specific storm."  This testimony is

16   uncontroverted by anyone who actually lived through these

17   events in real time and witnessed their impact on LBI.

18        Let's take a look again at what the trustee says.

19   He says all of these things were reasonably foreseeable

20   contingencies, and this is the heart of the trial:  Was it or

21   wasn't it?  Foreseeability of these events will determine

22   once and for all whether LBI was solvent or insolvent,

23   whether LBI was adequately capitalized or not, and whether

24   the Court ever needs to learn the law of Luxembourg torts.

25        Unless the trustee can establish Contention 34,

1    it's game over on almost all of the claims.  The trustee also

2    concedes that to show unreasonably small capital from the

3    acquisition financing, he has to show causation.  He has to

4    say it was a direct result of the obligations being incurred

5    that led to the company's bankruptcy filing.

6              Now, he's got the contentions on the page, but he's

7    got no evidence, not even the trustee, not even in the expert

8    report that addresses the but-for causation.  So, how does he

9    go about his case?  How does he do it?  How's he going to

10   show in hindsight, the unreasonableness of the projections?

11             Well, he's got a few tricks.  Trick one, the

12   refreshed projections.  Judge, the trustee boldly alleges

13   that Dan Smith and his inner circle of Lyondell goosed the

14   projections in order for Lyondell to induce Access and Basell

15   to pay $48 a share, and that everyone knew by the time of the

16   closing that these numbers were inflated.  But in the end,

17   Judge, this whole refreshed projections thing is a red

18   herring.  First, I'll tell you why, two reasons:

19             Access, itself, didn't think the internal Lyondell

20   projections were materially different than Access' own

21   numbers, based on publicly available information for

22   Lyondell.  Here's what Mr. Kassin will have to say about

23   that; he was the head of M&A at Access and he says in his

24   declaration:

25             "I did not regard the July 15th projections --"

1          That's the Saturday projections that the trustee's

2     counsel was alluding to in a pejorative way -- the July -- he

3     didn't regard the July 15th projections as materially

4     different than the earlier projections and the differences

5     certainly were not essential to the approval process for the

6     transaction.

7          It's also a red herring, Judge, for a temporal

8     reason.  By the time everyone learned Lyondell had missed its

9     third-quarter projections and it was going to miss its

10    fourth-quarter projections -- and when I say everyone, I mean

11    everyone, Access, ABN, Merrill Lynch, Citibank, Goldman Sachs

12    -- all of the participants learned this in the fall.  They

13    all understood, what were the reasons that Lyondell

14    management gave and they were reasonable reasons.  They

15    understood these are one-time charges or things that really

16    don't signal any shift in the fundamentals of the business.

17         But I'm not asking you to draw inferences.  Let's

18    look at the testimony.  Here's Merrill Lynch.  Merrill Lynch

19    determined that the short fall did not materially change the

20    long-term fundamentals of the company.  This was after the

21    fact, after they saw them.

22         Merrill Lynch will also testify that the

23    fundamental strength of the business remained unchanged and,

24    therefore, Lyondell did not believe, and neither did Basell

25    or Merrill Lynch, that the projections for 2008 through 2011

1   needed to be revised.

2          Goldman Sachs had a similar conclusion.  Because it

3   was expected that oil price increases would eventually be

4   passed on to customers and because the relevant demand/supply

5   dynamics and sales volumes had not changed.  The projections

6   for Lyondell's business in subsequent years remained the same

7   as those set forth in July.  The indisputable evidence, Your

8   Honor, will show that while folks surely were disappointed

9   with the numbers, not one of them felt that the 2007 missed

10  projections were really a big deal.  Not a single participant

11  at the time felt that the longer-range projections should be

12  even adjusted.

13         And in terms of the immediate hit on the pro forma

14  combined business, Lyondell's business was actually mitigated

15  by Basell's own earnings during the period.  Here's UBS'

16  deposition:

17         "At the same time that Lyondell missed its

18  third-quarter projections, UBS recalled that Basell had

19  exceeded their projections for the quarter."

20         But this is exactly the point, Judge.  This is the

21  industrial logic.  These two companies would always be

22  stronger together.

23         Merrill Lynch had the same testimony:

24         "Basell had handily beaten its estimates and

25  projected a run rate that indicated a potential to

1    outperformed its estimates by fifty to $100 million, making

2    up for a significant part of Lyondell's short fall."

3            Let's look at Contention Number 3 of the trustee.

4    He says:

5            "That the financial projections used by Blavatnik,

6            the Access group, and the debtor parent company --"

7            that's Basell -- "to obtain financing for the

8            transaction were grossly inflated --" I don't know

9            where the evidence for that is -- "and objectively

10           unreasonable."

11           Well, we'll show you otherwise, Your Honor.  But

12    here's the thing that the trustee never has -- never tries to

13    wrestle with, what on Earth is he going to do with UBS?  This

14    is one of those unavoidable truths that no illusionist can

15    actually mask.  UBS only came to this transaction after the

16    third-quarter numbers and the downward fourth-quarter

17    projections had been disclosed.

18           They weren't even part of the deal before that.

19    Look at the date, October 31st is when UBS decided it wanted

20    to be part of this financing package.  And remember, UBS was

21    one of the original advisors explaining how transformative it

22    would be for these two companies to join.  They were one of

23    the ones advising that the industrial logic of this merger is

24    sound and they were willing to put $4 billion behind that.

25           Let's show what Mr. Lane, Douglas Lane from UBS's

1    deposition says about the missed projections:

2              "The presentation contained --" the one they used

3              to approve the financing -- "contained up-to-date

4              projections, including the lowered projections,

5              incorporating Lyondell's third-quarter performance,

6              which we incorporated into our modelling."

7         And yet UBS still wanted one fifth of the

8    commitment for the total financing; that's $4 billion.  Well,

9    so much for the refreshed projections tricks.

10        What else does he got?  He cherry-picked the

11   projections.  He does it with the emails.  He can do it with

12   the projections.

13        Remember, I previewed the evidence earlier that

14   there were numerous financial scenarios -- let's put that up

15   there -- this was that slide.  These were all the scenarios

16   that were run.  Here it is again, and all of these scenarios

17   run from July of '07 to December of '07 all looked like this.

18   They all expected there to be a trough by 2010.

19        This depicts not only each financial institution

20   and Access' base case and not only its downside case, but

21   also the management case.  Here's the management case in

22   blue.  And it also included, Judge, cases that were so severe

23   that the banks called them the credit stress cases.  These

24   were scenarios that were developed by the banks to show, how

25   bad do things need to get for the debt to start getting

1       stressed; that was the purpose of it.

2               One of the banks even everyday to it at its

3       deposition as the super-duper downside case.  But these

4       super-duper downside cases were not at all viewed at

5       probable, and running the math on a credit stress case

6       doesn't make the scenario reasonably foreseeable.

7               But how do we know that?  You can't take my word

8       for it.  How do we know they weren't reasonably foreseeable?

9       Well, I'll tell you, because the lenders at the time hired

10      the top industry consultants, CMAI and Turner Mason; CMAI was

11      chemicals and Turner Mason was oil.  And they hired these

12      consultants for a specific reason, to make sure that the

13      management projections were reasonable.

14              And if you look here on the graph now, this is what

15      happens when the banks plugged in those consultants' numbers

16      or assumptions into their model.  That's right; when the

17      banks ran a scenario based on the consultants' independent

18      work, it shows the management case, which is in blue, was not

19      only reasonable, but conservative.  And, yes, in case you

20      were wondering, those independent consultants did their work

21      after the Lyondell third quarter and fourth quarter

22      projection downward projection were known.  And they also

23      concluded they had nothing to do with the long-range view of

24      the company or of the industry.

25              So let's stop here for a second.  We covered what

1    the participants in the transactions actually did at this

2    point, so what's the trustee do with these various cases that

3    were evaluated in 2007?  He cherry-picks.  He cherry-picks

4    three of the lowest cases and then he models them as the base

5    cases.  He ignores management's projections.  He ignores each

6    institution's own current base case and each institution's

7    downside case and then, even the independent consultant's

8    green light case.

9         In these cherry cases -- these cherry-picked were

10   cases, again, developed specifically to show how bad do

11   things need to get before the model busts?  They were not

12   considered foreseeable by anyone.

13        And I know what you're thinking already, Judge.

14   You accountant just pick cases you like in hindsight and say,

15   well, those are the foreseeable base cases.  You need

16   projections.

17        Well, the trustee's valuation guys, Mr. Tuliano,

18   who you're going to hear from today, and Mr. Maxwell, which I

19   think they're pushing to the end of this week, they aren't

20   experts in this industry at all; they're bankruptcy guys.

21   They had no ability to generate reasonable projections.  So

22   these valuation experts need someone else to give them inputs

23   to develop projections that would contradict what management

24   was saying at the time and that would support their

25   cherry-pick.

1          Now this, this is classic.  This is the part of the

2     illusion, Judge, where the audience goes, oh, no -- oh, no,

3     he didn't just do that.  He did.

4          He hired CMAI as his expert.  We know it's hard to

5     assert that five of the world's most sophisticated financial

6     institutions risked $20 billion without adequate due

7     diligence and it's equally hard for him to deal with the fact

8     that Access Industries risked a six-billion-dollar cash cow

9     in Basell that was just about to start making a steady stream

10    of enormous dividend payments.  But at least the trustee can

11    cast dispersions at these people.  He can say they had

12    different motives.

13         What could he do with the fact that the leading

14    chemicals industrial firm that was the industry standard

15    signed off on the projections as imminently reasonable?  You

16    hire them, you undermine their contemporaneous work, and then

17    you claim it's confidential how we got there.

18         So going back to the actual events in October and

19    November of 2007, CMAI was engaged for the lenders, to check

20    the reasonableness of each of Lyondell's and Basell's

21    management projections.  And the lenders hired this guy here,

22    Arvind Agarwal.  He's a chemicals engineering veteran who

23    tested each company's projections and who worked with another

24    leading firm called Turner Mason.

25         Turner Mason gave the specialized input on the oil

1    refining industry so that the banks, Basell, Access, and

2    Access [sic] could create a consultant's sensitivity case if

3    they wanted to.

4          And CMAI knew exactly how much was riding on these

5    tires, Judge.  There was $26 billion being risked on the

6    basis of the reasonableness of these projections.  And let's

7    take a look at what CMAI presented as its final report on

8    November 1, 2007.  What they said, Judge, was that Lyondell's

9    projections were conservative in all categories.  That's the

10   final report of 2007 in November.

11         Now, the trustee's counsel tried to make light of

12   it, making it seem like there wasn't a lot of work done.

13   This was a 200-page report, Your Honor, that people were

14   given a reliance letter to go ahead and finance; this is a

15   green light.

16         Now, given how central third-party independent

17   advice is would be to the events here, we sought to take

18   CMAI's deposition, but when we did, we didn't get Arvind

19   Agarwal.  We got this guy.  Judge, we and the banks filed

20   motions to try and bring our concerns about the 30(b)(6)

21   bait-and-switch issue to the Court's attention back when

22   Judge Gerber was overseeing the case.  And Your Honor is

23   going to hear what the trustee and his counsel did with Mr.

24   Witte, when Mr. Witte testifies later this week.

25         The evidence will show that CMAI, at the trustee's

1    urging, completely changed its colors on what it said was

2    reasonably foreseeable, as of 2007.  And how did they do

3    that?  How did they develop projections that contradicted

4    everything that was said and done in 2007?  It's a black box.

5    It's some program called Cimbal.  Judge, CMAI didn't even own

6    Cimbal back in 2007.  And at the time he prepared his expert

7    report, Mr. Witte, he didn't even know how to operate the

8    program.

9           The evidence will show, Judge, what happened here

10   and it's not going to be pretty.  Remember we stayed that

11   foreseeability is key?  Well, Your Honor will see how the

12   trustee literally had CMI change its colors with this trick

13   here.  CMAI is a chameleon for money and this will be

14   exposed.

15          Let's shift gears and talk about liquidity versus

16   capitalization.  These are two different things.  Liquidity

17   means cash on hand and your committed credit lines.  But a

18   company is also capitalized with equity value over and above

19   its committed credit lines that would support additional

20   borrowings if they're needed.

21          So let's look at the capitalization of LBI at

22   closing.  This was Citibank.  Of course LBI could borrow more

23   money if it was needed, given that it had more than $10

24   billion of equity.  But let's turn to the open liquidity

25   itself, for a moment, at closing.  Liquidity was robust,

1    Judge, at the opening of January 2008.  It was robust at

2    closing.  It was deemed adequate by everybody.  It was over

3    $2 billion.

4              Sure, there was a risk that oil prices would

5    continue escalating, but actually, that wasn't the view, the

6    prevailing view at the time.  Here's CMAI, again, back in

7    November.  What was CMAI forecasting?  That the price of oil

8    was going to cap out at about $90 a barrel and hold and then

9    it would cool off and taper as the years progressed.

10             But what if it did spike?  LBI wasn't reckless.

11   They were fortunate, they had Basell's longtime CFO Alan

12   Bigman work with Lyondell's longtime treasurer Karen

13   Twitchell to think ahead and plan, what if there's an

14   increased cost of the inventory, of the feedstock.  And at

15   closing, LBI negotiated for an up-sizing of the liquidity

16   facilities in the event that feedstock prices kept climbing.

17             Here it is.  This is indisputable.  In the

18   commitment letter itself, the banks agree it could be up to

19   another 600 million of the ABL facility, asset-based loan, in

20   the event the feedstocks keep going up.  And in addition, at

21   closing, if the company wanted another 750 million of

22   unsecured debt, it had the right to go out and get that debt.

23   That ultimately became the Access recover revolver.

24             And oil prices did, indeed, escalate and LBI's

25   treasurer Karen Twitchell wanted to access those additional

1   credit lines and she had to make her case for it, Judge.  And

2   here's an email from April 10th.  She's frustrated.  She says

3   no one is truly listening.  The company needs more liquidity.

4   So then she went out and she got it.

5         And what does she testify in her declaration about

6   how she felt after that?  This is from Paragraph 83 of her

7   declaration:

8               "By the end of April 2008, LBI had added an

9               additional one and a half billion dollars of

10              liquidity.  After LBI added the liquidity, I no

11              longer had the concerns I raised earlier."

12        And this can't be disputed.  Let's look at what was

13   the liquidity as of closing versus as of July 1st, 2008.

14   They were equally robust, Your Honor -- equally robust, over

15   $2 billion.  This does not for a second suggest that

16   capitalization was unreasonably small.  It shows the

17   opposite.  It shows that LBI could raise financing even when

18   it was during an unprecedented credit crisis.  This was at

19   the period that Bear Stearns had collapsed.  This is when the

20   banks were saying, we don't know if we can lend more money;

21   that's the period.  And it had such heavy valuable equity

22   capital that it could borrow against it.

23        Let's talk briefly about the Access revolver.  That

24   was the seven-hundred-and-fifty-million-dollar facility that

25   was entered into at the end of March.  I said most of this

1   case is going to relate to 2007, what was foreseeable or

2   reasonably foreseeable then.  There are a couple of claims

3   that relate to LBI's use of the Access revolver.  This was

4   the one that was entered into at the end of March and it was

5   only used once in October.  The trustee asserts it was an

6   avoidable preference for LBI to draw and then repay the $300

7   million of the revolver in October of 2008.

8        Let me just remind the Court from summary judgment

9   what this transaction was.  Out of the seven fifty, Lyondell,

10  on the 15th of October borrows 300 million, realizes it

11  doesn't need it anymore, pays it back in a hundred million

12  the next business day, a hundred million the following

13  business day, and then a hundred million the next business

14  day.

15       And then Your Honor will hear the testimony and see

16  -- Ms. Twitchell will be here to explain her decision-making

17  on this, because she was the treasurer and why she even

18  proceeded to keep repaying the banks, because she just didn't

19  need the borrowing to be outstanding; she had plenty of cash.

20       This preference claim is largely separate, a

21  separate analysis from the rest of the evidence.  But the

22  Court will recall we rebutted the presumption of insolvency

23  at summary judgment, so now the trustee's expert has to

24  provide evidence that LBI or Lyondell, that the assets and

25  liabilities at a fair valuation, proved LBI was insolvent as

1     of when?  As of the middle of October 2008.

2              And who are they going to bring to demonstrate that

3     insolvency?  The same valuation expert who you're going to

4     see relies routinely on hindsight projections, rather than

5     information faithfully prepared by management at the time.

6              At trial, the trustee needs to prove insolvency as

7     of these dates.  How does he do it?  The trustee's expert

8     takes management projections that were first developed in

9     December of 2008 to show what was the value of the company in

10    the middle of October.  This is fundamental, Your Honor.

11    It's just wrong to use December projections to value a

12    company as of mid-October, and that especially wrong when

13    talking about the end of 2008.  In mid-October, management

14    had no reason to understand the Great Recession had begun, or

15    how big an impact it would have on LBI in November, and in

16    December, let alone 2009 and beyond.

17             But if the trustee somehow can establish

18    insolvency, remember, Your Honor, we have advanced the

19    ordinary course of business and financial -- or financial

20    affairs defense.  Your Honor will remember from summary

21    judgment, we can say we showed you, we can prove 14 different

22    facts of why this was ordinary.  And the Court denied summary

23    judgment on that, basically, because you can't credit our

24    facts without a trial.  So the Court will now hear the

25    evidence and decide for itself what really happened.

1        Your Honor did indicate there were two things in

2    your decision that you said would be pertinent to the Court's

3    evaluation of the ordinary course defense.  And the first one

4    was:  Did Lyondell have access to other liquidity sources;

5    availability under the 2007 credit agreement, for example,

6    when the transfers occurred?  And two:  Was borrowing under

7    any of these sources of liquidity subject to solvency

8    conditions?

9        THE COURT:  And I have the subsequent letter that

10   addressed the issue of whether there were --

11       MR. KIRPALANI:  Yes.  So look at number -- let's

12   look at point one.  On point one, Your Honor -- this is a

13   Lyondell internal document that Ms. Twitchell will come in

14   and explain.  You asked whether Lyondell had access to other

15   liquidity sources as of actual October 15th.

16       There were two other credit facilities that

17   provided liquidity, one was the ABF.  The ABF's borrowing

18   capacity, you'll see, Your Honor, at trial, was $7 million by

19   then.  And the cash revolver, that's the 2007 revolver, it

20   was done to $11 million.  So that's 18 million that was

21   available.  Ms. Twitchell will explain why she preferred to

22   access the Access revolver, when she wanted 300 million for a

23   short period of time.

24       LBI's treasurer, Ms. Twitchell, she is not a party,

25   she's not a defendant.  She has no affiliation with Access.

1    She was legacy Lyondell.  But she agreed to come from

2    Houston; she's retired now, she's coming to New York to

3    testify about her liquidity management and any other

4    questions the Court has for her.

5           On question one, I showed you what will be the

6    case.  On question two, here's that Brown Rudnick letter.  We

7    actually agree with the trustee, there were no solvency

8    requirements to drawing the Access revolver.  In fact, the

9    Access revolver was modeled exactly on the 2007 bank

10   revolver, except that it was unsecured and didn't have

11   subsidiary guarantees.  So, if the Court did find that LBI

12   was insolvent, it's not like the draw on the Access revolver

13   violated some contractual provision; it was ordinary.

14          Although the trustee is not going to shed any light

15   on the real reason why LBI was forced to file for bankruptcy,

16   we will.  Let's go one by one, each month.  Okay.

17          So this is -- the blue line, if you remember,

18   Judge, this is the management projections.  Okay?  So where

19   are we in January?  You can see, a little low, but pretty

20   much on track.  February, same thing; March, same thing.  And

21   in March was the Bear Stearns collapse.  That's when there

22   was no liquidity anywhere in the financial sector.  April,

23   let's keep going, May.  In June, you can see the actual

24   performance against management's projections.

25          Now this is -- remember, now, this was the -- what

1    trustee's counsel said in his opening, this was the hobbling

2    performance during this period, this is hobbled.  And July

3    18th, there was that crane collapse.  August 29th was the

4    first of two hurricanes within 20 days.  Another hurricane,

5    this was the freak hurricane, Ike.  And you can see how

6    performance is being affected.  September 15th, Lehman

7    Brothers filed.  September 16th, the Federal Reserve loans

8    AIG $85 billion.  October 3rd, TARP is signed, now we're in

9    October.

10            Now look at the performance in November and

11    December.  That's when demand really starts collapsing.  And

12    of course, the company does file in the beginning of January.

13    And of course, we can't forget what was going on with the

14    price of oil during this whole period of time.  And it was,

15    of course, spiking to $145, and then plunging to $33.87, and

16    no one had predicted that.

17            This is what we contend, Your Honor, the trustee

18    needs to prove was reasonably foreseeable.  And we think his

19    story has to go something like this:  We think he's going to

20    have to say, by the fall of 2008, Zoltar would have predicted

21    the following things will happen:

22            The credit market will completely freeze.  Oil will

23    spike to 145 bucks, and then quickly drop to 35 bucks.  Two

24    hurricanes will cause major disruption in the Gulf Region.  A

25    thirty-story crane accident will shut down the Houston

1      refinery for nearly four months.  The Great Recession will

2      cause worldwide contraction.  And demand for LBI's products

3      will plunge.

4                   Your Honor, I'd just like to leave you with a key

5      theme here.  Okay?  If I can leave you with three things to

6      think about and keep in mind over the last -- next three

7      weeks, they would be these:

8                   Five banks invested $20 billion for Basell to

9      acquire Lyondell.  Our client invested $6 billion junior to

10     the banks, in an arm's length transaction, to support the

11     financing.

12                  The Great Recession was not contemplated as of July

13     or December 2007, not by all of these sophisticated lenders

14     and investor, not by the independent consultants that were

15     hired, and not even by Nostredamus.

16                  We will bring in the banks to explain why they

17     invested $20 billion, and then wrote half of it off by the

18     end of 2009.  The trustee will have no answer for that.

19     We'll bring in Mr. Blavatnik to explain why would Access

20     invest $6 billion, and then lose it all by the end of 2009.

21     The trustee will have no answer for that.  When you stack it

22     up, Judge, this is what the evidence is going to look like.

23     Pretty sure it's all there, I didn't count it, but $26

24     billion against some cherry-picking.  That's what we think

25     this case is going to be about.

1      Your Honor, one of Merrill Lynch's lead advisors

2   will come to court and explain it.  This is his declaration,

3   and I think it sums it up quite well:

4          "Nobody, not Wall Street, not CMAI, not Access, not

5          Lyondell, not Basell, not Citi, not Goldman Sachs,

6          not ABN, not UBS, and not Merrill Lynch predicted

7          or could have predicted the combination of events

8          that put LBI into bankruptcy."

9      With that, Your Honor, I'd just like to introduce

10   my co-counsel Ken Klee.  He has a very short opening on the

11   NAG adversary proceeding.

12          Your Honor, can I approach?

13          THE COURT:  Thank you.

14      (Participants confer)

15          MR. KLEE:  Good afternoon, Your Honor.  Kenneth N.

16   Klee of Klee, Tuchin, Bogdanoff & Stern, for NAG Investments,

17   LLC, and the other defendants.

18      There is another adversary proceeding that Your

19   Honor is called on to try, and the trustee did not mention it

20   in his opening, probably because it pales in significance to

21   the other causes of action that the trustee has.

22   Nevertheless, it involves an alleged transfer of 100 million

23   Euros.

24      Now, before I get into the specifics, I just want

25   to say that what Mr. Kirpalani said to Your Honor can solve

1    this adversary proceeding.  If the Court finds solvency in

2    December of 2007, or that there was reasonable capital, then

3    the trustee loses these --

4                    THE COURT:  This is the --

5                    MR. KLEE:  -- claims for relief.

6                    THE COURT:  -- constructive fraudulent conveyance

7    claim.

8                    MR. KLEE:  Yeah, exactly, exactly, based on --

9                    THE COURT:  Two counts, I think it is, right?

10                   MR. KLEE:  Well, yeah, two counts; two different

11   theories, based on two different flows, neither of which

12   involve a transfer of property of the debtor.  So let's look

13   at the specifics of these two counts, and the theories of the

14   flows that underlie them.

15                   The first is a series of corporate resolutions, and

16   these are not contested.  These are dividend resolutions that

17   the trustee has put into evidence, and that are out there,

18   from a Dutch holding company that actually ran the operations

19   on the Basell side before the merger, up to funding; and then

20   from funding to Basell, the debtor in this case, a Luxembourg

21   company; and then from Basell to BIS, the Luxembourg non-

22   debtor, whom this Court had no jurisdiction over, personal

23   jurisdiction over it, and whom Judge Gerber dismissed the

24   action.  And then, either from BIS to NAG or BIS from Nell

25   [sic] to NAG, NAG is deemed to be the final recipient of this

1    dividend chain.  The trustee has introduced evidence of these

2    resolutions, but has not introduced evidence of any

3    transfers.

4          Second, the trustee looks at flow of funds.  So

5    what flows of funds?  Well, the trustee contends in the

6    amended complaint that Holdings dividended 100 million Euros

7    to Funding, and then Funding, based on the instructions of

8    Basell, wire-transferred money to NAG.  And so NAG is the

9    initial transferee, the immediate transferee of this payment

10   from Funding, but that Basell somehow controlled it.

11         Now let's go ahead and summarize the trustee's

12   theories.  Under Count One, the trustee alleges that Basell

13   transferred the 100 million Euros to BIS, and ultimately on

14   to NAG.  And then, under Count Two, that Basell transferred

15   the 100 million Euros to NAG by having exercised control over

16   Funding to cause that transfer to have occurred.

17         Summarizing the trustee's contentions, Count One,

18   the sale transfers 100 million Euros to BIS, and BIS

19   transfers these, directly or indirectly, to NAG; Count Two,

20   Basell exercises control over Basell Funding, to transfer 100

21   million Euros to NAG.  Those are the trustee's contentions.

22         However, Your Honor, the evidence will show that

23   the trustee cannot prove either Count One or Count Two.

24   Count One cannot succeed because the initial transfer from

25   Basell to BIS is between two Luxembourg companies, and it was

1   extraterritorial.  Count Two cannot succeed because the funds

2   were not property of the debtor or property controlled by a

3   debtor, and the transfer was not made by a debtor.

4           So let's get into the specifics.  Count One, the

5   initial transfer was extraterritorial.  So, in analyzing this

6   -- and the Court has already done this, in part, in denying

7   NAG's motion to dismiss.  But the Court did drop a Footnote 3

8   in that order, saying you could reconsider this at trial.

9           Whether a transaction is extraterritorial involves

10  two prongs:  First, you look to see if it's extraterritorial,

11  and then you look to see if the presumption against

12  extraterritorial application is waived.  So, here, there is

13  no question that the center of gravity from the transfer from

14  Basell, a Luxembourg entity, to BIS, a Luxembourg entity,

15  makes this extraterritorial.  Judge Gerber so found, and this

16  Court so found in the motion denying the motion to dismiss.

17          So the transferee Basell -- the transferor Basell

18  and the transferee BIS, both Luxembourg entities, nothing

19  touched the U.S., so the transfer is extraterritorial.  And

20  then the question is:  Does 548 of the Bankruptcy Code apply

21  extraterritorially?

22          Now the law is well-established, at the Supreme

23  Court level, under Aramco and Morrison, that federal statutes

24  are presumed not to be extraterritorial.  Unless a statute

25  gives clear indication of extraterritorial application, it

1      has none.  Cases in this district have held that neither 547,

2      nor 550 of the Bankruptcy Code apply extraterritorially.

3      There are some that go the other way, but the Maxwell

4      decision, and there are District Court decisions so holding.

5              Now Judge Gerber said that the text of 548 doesn't

6      contain any express indication that Congress intended the

7      statute to apply if the -- extraterritorially.  But how did

8      he, nevertheless, conclude that it should?  He looked to a

9      Fourth Circuit opinion, he looked to the French case out of

10     the Fourth Circuit which held that 548 applied

11     extraterritorially because it provides for the avoidance of

12     transfers of property that would have been property of the

13     estate.  Judge Gerber's --

14             THE COURT:  Don't I have to conclude that the law

15     of the case should not apply, because Judge Gerber resolved

16     this issue against your argument?

17             MR. KLEE:  Exactly.  You should conclude that the

18     law of the case does not apply.  And as you noted in Footnote

19     3 of your motion -- of the denial of the motion to dismiss,

20     the law of the case is not binding because it was dictum.

21             And Your Honor, it's not Judge Gerber's reputation

22     who's going to be at stake in front of the District Court and

23     the Second Circuit; it's going to be yours.

24             THE COURT:  And I'm not going to lose sleep over

25     it, Mr. Klee.

1        MR. KLEE:  Well, you might not lose sleep over it.

2    But Your Honor, in light of Colonial Realty, Colonial Realty

3    --

4        THE COURT:  I reread the argument, in fact, this

5    morning; I wanted to refresh myself.

6        MR. KLEE:  Well, all right.  I'm glad you've looked

7    at it because I think Colonial Realty undermines the

8    rationale of the French case and makes it wrong to rely on

9    the French case and its reasoning to apply 548

10   extraterritorially.  In any event, even if the -- even if 548

11   is going to apply extraterritorially, the trustee loses.

12        But let's move on to the next slide, and then let's

13   go on to Count Two.  You can't recover against BIS; BIS is

14   not a party.  And even if 548 could apply extraterritorially,

15   you then have the issue of:  Can you recover against a

16   subsequent transferee, if you can't recover against the

17   initial transferee?  And the courts are split on that.  But I

18   think the better textual reading is, is that you have to

19   first have avoided the transfer -- that's what 550 says --

20   before you can recover from a subsequent transferee.

21        Let's turn to Count Two.  No debtor transferred an

22   interest in property under Count Two.  The burden of proof is

23   on the trustee to show that NAG received property belonging

24   to a debtor.  And in the original NAG complaint, the trustee

25   had an Exhibit C that was a letter of instruction,

1      instructing Basell Holding to transfer 100 million Euros

2      directly to NAG, on the instruction of Basell Funding.

3      Basell itself, the debtor, wasn't involved.  So, if so,

4      Basell never had a property interest in the funds transferred

5      by Basell Holdings to NAG.  A corporation has no property

6      interest in the funds of its second-tier subsidiary.  It has

7      equitable interest, but it has not property interest.

8           So what did the trustee do?  The trustee amended

9      the complaint.  And now the trustee contends that Basell

10     instructed Basell Funding to wire the same 100 million Euros

11     to NAG.  And he cites a different letter of instruction.  But

12     the trustee's revised theory won't save his claim.

13          First of all, there's no evidence of any transfer.

14     There have been no wire transfer instructions produced;

15     they're just letters from which the Court can make inference.

16     But we have conflicting letters.  But even if Funding

17     transferred the 100 million Euros to NAG, the trustee cannot

18     show that Basell had control over those 100 million.

19          What does the trustee do?  The trustee says that

20     Basell, which is in a six-company chain, had a property

21     interest in the dividend when it was declared.  Well, that

22     may or may not be true under Luxembourg law.  But certainly,

23     based on the allegations, the -- Basell would have a claim as

24     a creditor against Funding, no trust fund set aside on the

25     money.

1          And because it, itself, was in a chain and had

2     declared a dividend to BIS, it was a conduit.  It never had

3     direct control over the funds.  And this controls with

4     establish law.  Even if funds are deposited in a debtor's

5     account with restriction -- and nothing was deposited in

6     Basell's account here, so far as we can see -- the debtor has

7     to have control over those funds to use it for another

8     purpose.

9          If it's part of a larger transaction, the Court

10    will look to the substance of the entire transaction.  Here,

11    the evidence will show that Basell Holdings, the original

12    company at the bottom of the chain, was the nerve center, as

13    Mr. Kirpalani previously told you, and is the place where

14    decisions were made, pre-merger.

15         So, in summary, Count Two, the debtor had no

16    control over the property interest in the funds.  If Basell

17    Funding transferred it, it was not property of the debtor;

18    and, therefore, it cannot be recovered against NAG.

19         Under Count Two, we cite the Eleventh Circuit case

20    of Nordberg v. Sanchez:

21              "In determining whether the debtor had control of

22              the funds transferred to a non-creditor, the Court

23              must look beyond the particular transfers in

24              question to the entire circumstances of the

25              transactions."

1          And that case, Your Honor -- it's an Eleventh

2     Circuit case, so it's not binding on you.  But the reasoning

3     of the Court in the Chase & Sanborn case was that it's a

4     different situation where you're transferring to a non-

5     creditor because the recovery of this transaction could

6     result in a windfall to creditors.  And I commend this case

7     to the Court for reading.

8          The trustee should not be able to recover just

9     because it happens to be in the middle of a chain, where it

10    had no ability to stop the 100 million Euros, if it ever went

11    to Basell, to use it for purposes of Basell and its

12    creditors.  So, Your Honor, we submit that, on both Count One

13    and Count Two, the trustee will be unsuccessful, and the

14    defendants should prevail.

15          THE COURT:  Okay.  Thank you, Mr. Klee.

16          MR. KLEE:  Thank you.

17          THE COURT:  All right.  Who's going to be the first

18    witness this afternoon?

19          MR. WISSNER-GROSS:  Your Honor, the first witness

20    will be Mr. Tuliano.  But before that, my partner Mr. Weddle

21    will want to address evidentiary issues, we want to -- we

22    think will probably be helpful to get some of the deposition

23    declarations in evidence.  But there are some procedural

24    things we'd like to address first.

25          THE COURT:  Okay.  We'll resume at 2:20.  We're in

1       recess.

2              (Luncheon recess taken at 12:52 p.m.)

3              (Proceedings continue in Volume 2, P.M. Session)

4                                    * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    _____        October 18, 2016

10   Coleen Rand, AAERT Cert. No. 341

11   Certified Court Transcriptionist

12   For AudioEdge Transcription, LLC