UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE | : Chapter 11 |
| | : |
| LYONDELL CHEMICAL COMPANY | : Case No. 09-10023-mg |
| | : |
| and MILLENNIUM CUSTODIAL TRUST, | : New York, New York |
| | : Monday, October 17, 2016 |
| | : P.M. Session |
| Debtors. | : 2:21 p.m. to 05:23 p.m. |

...............................
| | |
|---|---|
| EDWARD S. WEISFELNER, | : |
| as Litigation Trustee, | : |
| vs. | : |
| THE LEGAL REPRESENTATIVE OF | : Adv. Proc. 09-01375-mg |
| THE ESTATE OF RICHARD. | : |

...............................
| | |
|---|---|
| EDWARD S. WEISFELNER, | : |
| as Litigation Trustee | : Adv. Proc. 11-01844-mg |
| vs. | : |
| NAG INVESTMENTS, LLC, et al. | : |

...............................


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

| | |
|---|---|
| LITIGATION TRUSTEE | BROWN RUDNICK |
| & CREDITOR TRUSTEE: | 7 Times Square |
| | New York, New York 10036 |
| | BY: SIGMUND S. WEISSNER-GROSS, ESQ. |
| | BY JUSTIN WEDDLE, ESQ. |
| | BY: STEVEN D. POHL, ESQ. |
| | BY:  MAY ORENSTEIN, ESQ. |
| | BY: STEVEN D. POHL, ESQ. |

(Appearances Continued)

| | |
|---|---|
| Audio Operator: | Electronically Recorded |
| | by F. Ferguson, ECRO |

AudioEdge Transcription, LLC
23 Vreeland Road, Suite 204
Florham Park, NJ  07932
(973) 618-2310,  973) 618-2311 (Fax)
www.audioedgetranscription.com


Proceedings recorded by electronic sound recording,
transcript produced by certified transcription service.

A P P E A R A N C E S (Continued)


ACCESS DEFENDANTS:          QUINN EMANUEL URQUHART &
                            SULLIVAN, LLP
                            51 Madison Avenue, 22nd Floor
                            New York, New York 10010
                            BY: SUSHEEL KIRPALANI, ESQ.
                            BY: RICHARD T. WERDER, JR., ESQ.
                            BY: REX LEE, ESQ.


NAG DEFENDANTS, et al:   KLEE TUCHIN BOGDANOFF & STERN, LLP
                         1999 Avenue of the Stars
                         Thirty-Ninth Floor
                         Los Angeles, California 90067
                         BY: KENNETH N. KLEE, ESQ.

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| RALPH TULIANO | 131 | | | |

E X H I B I T S

| | IDENT | EVID |
|---|---|---|
| Tuliano Cross 1  Tuliano Work Papers | 132 | |
| Tuliano Cross 3  Chart of Cases | 154 | |
| Tuliano Cross 4  Chart of Cases | 158 | |
| Tuliano Cross 5  Chart of Cases | 192 | |
| Tuliano Cross 6  Chart of Totals | 193 | |
| Tuliano Cross 7  Calculations | 216 | |
| Tuliano Cross 8 Calculations | 220 | |

1          (Proceedings commence at 02:21 p.m.)

2               THE COURT:  All right, please be seated.

3               MR. WEDDLE:  Good afternoon, Your Honor, Justin

4     Weddle for the Trustee.

5               Just before we call our first live witness, I

6     wanted to take care of some formalities.  At this time, on

7     behalf of the Trustee we offer the deposition designations

8     that are included in the pre-trial order, Your Honor.

9               THE COURT:  All right.  The Court is in the process

10    of reviewing all of the designations, counter designations

11    and objections.

12              What I will do -- well, let me ask Mr. Kirpalani

13    what your view about is.  I mean I'm -- I am -- I intend to

14    rule on all of the objections.  I'm not in a position to do

15    it right at the moment, but I will be in the next day or two.

16              MR. KIRPALANI:  Yes, Your Honor.  Susheel Kirpalani

17    from Quinn Emanuel for the record.

18              I think Your Honor said during one of the last

19    status conferences that your practice is to provisionally

20    allow --

21              THE COURT:  Yes.

22              MR. KIRPALANI:  -- in circumstances like this.  We

23    of course have no objection to that.

24              THE COURT:  All right.  So that -- again, I had

25    made some comments during the last -- during the pre-trial

124

1    that I also want witnesses to come on once.  I essentially do

2    that with depositions as well.

3         So what I'm going to do is I'm going to

4    conditionally admit in evidence all of the designations and

5    counter designations testimony, subject to the Court's ruling

6    on the objections that have been made.

7         And what I will probably do is prepare an order

8    that refers by deposition page, whether as every line number

9    we'll see, with the ruling.  Just a very short ruling, you

10   know, sustained or overruled with respect to the objections

11   and one can look at the transcript.

12        It was very useful the way -- it was done the way I

13   wanted it to be done.  The depositions, clearly.  You know, I

14   have one set of transcripts that show the designations,

15   counter designations and where the objections are.  And we're

16   in the process of getting through that.  Almost there in

17   fact.  But I've get it down in an order.

18        So I will conditionally admit in evidence the

19   deposition designations and counter designations subject to

20   ruling on objections.  The depositions and counter

21   designations are all shown in the joint pre-trial order which

22   the Court entered.  Okay?

23        MR. WEDDLE:  Thank you, Your Honor.  And the couple

24   more that I think are even easier than that, which is to

25   offer the joint exhibits into evidence.  Those are listed in

1    the pre-trial order.

2         THE COURT:  Where, which tab on the pre-trial order

3    do I find those?

4         MR. KIRPALANI:  I think that's at D for the pre-

5    trial.

6         THE COURT:  D?

7         MR. KIRPALANI:  I'm sorry, Your Honor.  The

8    original order

9         THE COURT:  Mr. Kirpalani, your view?  No

10   objection, right?

11        MR. KIRPALANI:  Well, yeah, the joint exhibits, we

12   have no objection, yeah.

13        THE COURT:  Well, my only hesitancy, I am going to

14   admit them.  There are 100 exhibits listed on this joint

15   exhibit list.

16        What I've usually found is that the parties over

17   designate their exhibits, so I've got no pre-trial order, but

18   in total, I haven't tried to count the number of pages, but

19   it's huge.

20        And so, what -- in most cases, I'm usually

21   reluctant to do that.  You know, you want to -- if you refer

22   to an exhibit and want to offer it, fine, it will come in.

23   These are ones with no objection.  But I usually find less

24   than half of the exhibits that get pre-marked actually wind

25   up coming into evidence.  And there are an enormous number of

1      exhibits that each side has designated.  This hundred on the

2      joint list is a fairly small number.

3              I'll simply things by saying all right they will be

4      admitted into evidence.  I may come to regret it, but --

5      because I feel compelled to review each and every exhibit

6      that's admitted in evidence.

7              We shouldn't think that the same is going to apply

8      when you start going through your exhibit lists, even if

9      there are exhibits as to which there's no objection.  I just

10     -- because, you know, when you're preparing for trial you

11     list everything you conceivably think you may want to use and

12     I don't -- I don't let people just dump in every exhibit they

13     conceivably think they may want to use, because I'm going to

14     feel compelled before I rule to read every exhibit.  Okay?

15             MR. WEDDLE:  Thank you, Your Honor, that's very

16     helpful guidance.  And part of the reason that I'm doing

17     this, Your Honor, at this time, of course, is that we're

18     about to call a series of expert witnesses.

19             And of course it's not necessary for the documents

20     that they rely on to be admitted into evidence under Rule 703

21     and Your Honor's already indicated as much in your order.

22             THE COURT:  With limits I did.

23             MR. WEDDLE:  With limits of course.  And so you

24     know, that -- that's the issue, is the limits, Your Honor.

25     And so that's why we think, as we put in our briefs, that the

1    reports have been -- the admissibility of the reports has

2    been litigated, Your Honor's ruled on it.   We're about to

3    move to cross examination of Mr. Tuliano.  So the parts of

4    his report that Your Honor did not rule were excluded, we

5    think we're ready to go --

6          THE COURT:  Well, I wasn't going to make you go

7    ahead and re-do your reports, okay?  Because I think I can

8    decide -- I've said -- I've set out the principles that I'm

9    applying in deciding what was admissible and I said as to the

10   rest, it will be disregarded.

11         I wasn't going to go through and give you a list of

12   every page and line reference where that was the case.  I've

13   set out the principles that I'm applying.

14         If you're going to offer -- if you want the

15   exhibits that your experts rely on, you're going to have to

16   offer them.  I'm not -- I'm not -- particularly because part

17   of the objection from the Defendants was that there's

18   inadmissible hearsay and while yes, experts are entitled to

19   rely on certain hearsay, it's not an across the board ruling.

20         So you're going to have to move -- you can do it

21   after you, you know -- what I prefer is before a witness gets

22   off the stand, you've moved in evidence whatever -- whatever

23   you move in evidence.  If there are no objections, they'll

24   come in at that point.

25         But particularly in light of the motion in limine

1    that was made with respect to the expert reports and the

2    Court's ruling on it, I'm not simply going to say that every

3    document that an expert listed in their report is coming into

4    evidence.  There they were -- you know, there's serious

5    hearsay objections of things that don't go to expert opinion.

6    Okay?  That's --

7              MR. WEDDLE:  That's completely understood, Your

8    Honor.  But with respect to, for example, the joint

9    exhibits --

10             THE COURT:  I've already said the joint exhibits

11   are in, okay?

12             MR. WEDDLE:  Right.  And then in addition, Your

13   Honor, there are -- I'm not going to -- I take Your Honor's

14   guidance --

15             THE COURT:  Can we just get on with the evidence?

16             MR. WEDDLE:  We can, Your Honor.

17             THE COURT:  Because I'm making clear I'm not

18   admitting in evidence everything you have on your exhibit

19   list.  You're going to need to have to move it into evidence.

20   If there no objections, it will in all likelihood come in,

21   but I'm not -- you know, I'm not -- there are enormous

22   exhibit lists in this case.

23             MR. WEDDLE:  I understand that.

24             THE COURT:  And I'm not just simply agreeing

25   everything is in evidence, because I'm the one who's going to

1    bear the brunt of it at the end of the case when I've got to

2    go through and make sure I've read every exhibit.

3            MR. WEDDLE:  Thank you, Your Honor.

4            THE COURT:  Let's get on with the evidence.

5            MR. WEDDLE:  Thank you.

6            THE COURT:  Who for the Plaintiff is going to call

7    the first witness?

8            MR. POHL:  Good afternoon, Your Honor.  Steven Pohl

9    for the Trustee.  Our first expert witness is Ralph Tuliano,

10   formerly of Mesirow, now with FEM Consulting.

11           THE COURT:  Thank you.  Mr. Tuliano, would you come

12   up and be sworn?  If you would raise your right hand to be

13   sworn.  If you would stand, that's right  Thank you.

14   R A L P H   T U L I A N O, PLAINTIFF'S WITNESS, SWORN

15           THE COURT:  All right.  Please have a seat.  I saw

16   you brought your own water up.  There's water in the pitcher

17   if you need.

18           THE WITNESS:  Thank you.

19           THE COURT:  Thank you very much.  Go ahead, Mr.

20   Pohl.

21           MR. POHL:  Your Honor, given that the method here

22   is that the reports are in we'll tender them for cross, I'd

23   like to just approach Mr. Tuliano.  I have an agreement with

24   Defense counsel to give him his four reports.

25           THE COURT:  Absolutely.

1          THE WITNESS:  Thank you.

2          THE COURT:  Mr. Pohl, were they marked as exhibits?

3    I want to make sure.  I've got a lot of paper in here.  How

4    have -- how have they been identified?  Do I have -- go ahead

5    if you would, please.

6          MR. WERDER:  I don't think the expert reports have

7    been marked as exhibits, Your Honor.  I think maybe the --

8          THE COURT:  You had them attached to your motion in

9    limine.

10          MR. WERDER:  Yes.  We do have.  If the Court needs

11    copies, I think we have some spare --

12          THE COURT:  Yes, I would.  Yeah, that would be

13    great, Mr. Werder, I appreciate it.

14          MR. POHL:  I think we had sent all of ours to

15    chambers, all of our expert reports.  At different --

16          THE COURT:  I have a whole box of expert reports

17    and the exhibits to the expert reports.

18          MR. POHL:  Okay, I apologize, Your Honor.

19          THE COURT:  All right. So the record is clear, the

20    Tuliano -- how many reports are there, Mr. Pohl?

21          MR. POHL:  There's four, Your Honor.

22          THE COURT:  Okay.  The four Tuliano reports are in

23    evidence, except for those portions that have been ruled upon

24    and excluded in the order -- in the opinion on the motion in

25    limine.

1          MR. POHL:  Understood.

2          THE COURT:  All right.  Thanks very much.

3          MR. POHL:  With that we would tender out expert for

4    cross.

5          THE COURT:  Thank you very much.  Mr. Werder.

6          MR. WERDER:  Good afternoon, Your Honor, Rick

7    Werder from Quinn Emanuel for the Defendants.

8                         DIRECT EXAMINATION

9                          BY MR. WERDER

10   Q    Good afternoon, Mr. Tuliano.

11   A    Good afternoon, Mr. Werder.

12   Q    It's been a while.

13   A    It has.

14   Q    I think it was December of 2009.  A long time.

15   A    Good to see you again.

16   Q    Thank you.  For your work on this case you reviewed

17   various projections, correct, sir?

18   A    Yes.

19   Q    And you -- in at least one of your work papers, you

20   categorized those various projects into several different

21   categories, correct?

22   A    We differentiated between management base case

23   projections and the various downside projections that were

24   run.

25   Q    Exactly.  That was -- maybe my question was a little too

1   open ended, but you categorize certain projections as

2   management projections, correct?

3   A    There were management base case projections that were

4   performed by the company and I -- it wasn't my

5   classification, it was the company's classification that

6   these were the management projections.

7   Q    And in addition to management case projections, you also

8   reviewed certain projections that were designated as base

9   cases, correct?

10  A    The management projections were designated, to my

11  knowledge, as base case projections, but yes, there's

12  different nomenclature that was used by different parties.

13          MR. WERDER:  May I approach the witness, Your

14  Honor.

15          THE COURT:  Yes, please.  Go ahead.  Thank you.

16          MR. WERDER:  Mark this for identification as

17  Tuliano Cross Examination Exhibit #1.

18      (Tuliano Cross Examination Exhibit 1 was marked for

19  identification)

20  BY MR. WERDER:

21  Q    This is one of your work papers, correct, Mr. Tuliano?

22  A    I'm sorry, it looks like it could be.  Typically on my

23  work papers there's a footer at the bottom that will say that

24  our firm prepared it, but I'll take your representation.

25  Q    All right.  And so if you look over in the far left hand

133

1    column, you see a number of B's, W's, D's, CRT's --

2    A    Yes.

3    Q    -- and M's, correct?

4    A    Yes, I do.

5    Q    And B stands for base, correct?

6    A    Yes.

7    Q    And D stands for downside?

8    A    I believe that's the case.

9    Q    And M stands for management, correct?

10    A    Yes.

11    Q    And CRT stands for credit stress, is that right?

12    A    Correct.

13    Q    And W, which I think is the last category, stands for

14    worst case, correct?

15    A    Yes.

16    Q    Okay.  Now the projections that you reviewed for your

17    work on this case were prepared by, among others, five

18    different banks, correct?

19    A    I believe that's correct.  I'm just trying to recall if

20    every bank had a set of projections, but --

21    Q    But some number of different banks?

22    A    Yes.

23    Q    All right.  And in addition to -- and you reviewed the

24    banks' credit memos, did you not?

25    A    Yes, I did.

134

1    Q    And in the banks' credit memos, they generally discussed

2    a management case and a base case and one or more downside

3    cases, correct?

4    A    Management memos varies in terms of their discussions

5    and they vary over different points in time, so there's

6    generally a discussion about the projections, some of which

7    will have a discussion of the management case, some of which

8    would have a discussion of downside cases, but I can't tell

9    you as I sit here that every set looked at all three, given

10   the nomenclature that is designated here.

11   Q    Sure, there's a lot of paper.  But if we look at what

12   I've marked for identification as Tuliano Cross Examination

13   Exhibit 1 and we look about mid way down the age, you see

14   three Merrill Lynch July 15th, 2007 cases that you have

15   reported there, correct?

16   A    Yes.

17   Q    And one of them is a management case, am I right?

18   A    Yes.

19   Q    And one of them is a base case and the last one is a

20   downside case, correct?

21   A    Yes.

22   Q    And the management case was in fact higher than what

23   Merrill was designating as the base case as of July 15th,

24   correct?

25   A    Yes.

1    Q    And you found that commonly, did you not, that certain

2    of the banks would have in their memos what they call the

3    management case and then they would have a separate base

4    case, correct?

5    A    Yes.  I think said another way the management case was

6    the highest case of all of the projections that were

7    evaluated and whether it was a base case or a downsize case,

8    it was a variation to the downside with respect to the

9    management case.

10   Q    Well, my question to you, sir, was that in the bank

11   credit memos that you reviewed, many of the banks had a

12   management case reported and then they had a separate base

13   case reported, am I right?

14   A    Yes.

15   Q    And in general, based upon your observation, the banks

16   base cases were somewhat more conservative than the

17   management case, correct?

18   A    I don't think, sir, I'd agree that they're both

19   conservative.  I think that the base cases in those memos

20   were somewhat lower than the management case, but I wouldn't

21   characterize either of them as conservative.

22   Q    Well, let me try it using your phrase then.  The bank

23   cases generally projected -- the bank base cases generally

24   projected, over the projection period, somewhat lower EBITDA

25   than the management case, correct?

1    A    That is correct.

2    Q    And those were the credit memos that were presented to

3    the bank credit committees when approval was sought for this

4    transaction, am I right?

5    A    I believe those memos were prepared in terms of

6    evaluating the credit and several of them were titled credit

7    memos.  I do not know specifically which of those were

8    presented to which credit approval committee for which bank.

9    Q    Okay.  That's fine.  But, sir, focusing on the bank base

10   cases, every bank reported on every bank case that LBI would

11   generate sufficient free cash flow to fund debt service and

12   capital expenditures, correct?

13   A    I'm sorry, sir.  I do not know that.  I have not gone

14   through each base case and tested the cash flow.  I will tell

15   you that the cash flow within the management case was

16   problematic for a number of reasons and therefore I would

17   expect those problems would extend to the base case

18   projections in terms on including or, in this case, the

19   management case, not including material items that the

20   company was aware of but did not include in the projections.

21   Q    My question, sir, was that every bank reported under

22   every bank base case the LBI would generate sufficient cash

23   flow to fund debt service and capital expenditures, did they

24   not?

25   A    I have not tested each of those base cases.  I test

1    downside cases in conjunction with the capital adequacy and

2    what I'm telling you is because the management, which is the

3    highest of all of these cases, had problems in terms of the

4    cash flow that was projected and things not being included in

5    that cash flow, then my conclusion would be, as I would

6    expect, given the base cases that the banks had, were lower

7    than the management case, that those cases would have the

8    same problem as the management case.

9              THE COURT:  I'm just looking at the Merrill Lynch

10   July 15th, 07 -- I'm looking at the management case, base

11   case, downside case, but for 2007 Merrill Lynch's base case

12   was higher than management case.

13             MR. WERDER::  Well, in 2007 it may have been -- let

14   me ask the witness a question about that.

15   BY MR. WERDER:

16   Q    You looked at metric called mid-cycle EBITDA, correct,

17   sir?

18   A    Yes, that is one of the metric.

19   Q    And that's the metric that's reported in the second last

20   column on the right hand side of Exhibit Cross Examination 1,

21   correct?

22   A    Correct.

23   Q    And if we look at the mid-cycle EBITDA or the July 15th

24   management case, that is higher than for the July 15th base

25   case, correct?

1    A    I'm sorry, for Merrill Lynch?

2    Q    Yes, for Merrill Lynch.  It's 47.58 for the management

3    case and 45.58 for the base case, correct?

4    A    Correct.

5    Q    And we'll talk a little bit more about that metric as we

6    move forward, but you're understanding, if you look across

7    the line of the Merrill base case versus the Merrill

8    management case, the base case has lower projections than the

9    management case, does it not, sir?

10    A    Yes.  Over the entirety of the period.

11    Q    Okay.  And you didn't independently test any of the

12    assumptions underlying any of the either base cases or

13    downside cases that's the banks reported in their credit

14    memos, did you, sir?

15    A    Well, I tested the downside cases.  I selected three

16    downside cases that --

17          THE COURT:  You know it would really help if you

18    listened to counsel's question.

19          THE WITNESS:  Okay.

20          THE COURT:  And answer the question that's asked

21    and then if the Plaintiff's counsel wants to ask you

22    additional questions, they can.  But cross examination goes

23    faster if you listen carefully to Mr. Werder's questions and

24    answer that.

25          MR. WERDER:  Thank you, Your Honor.

1    BY MR. WERDER:

2    Q    You didn't independently test any of the assumptions

3    underlying either the bank base cases or the bank downside

4    cases, did you, sir?

5    A    No, I accepted those projections.

6    Q    Thank you.  Now you've reported in your -- and we're

7    going to focus principally I think this afternoon, on your

8    opening in 2009 report which is the November 2009 report.

9         You reported in that report the results of various

10   financial analyses that you performed, correct, sir?

11   A    Yes.

12   Q    And one of the tests that you reported results on was

13   something that you called a cash flow adequacy test, correct?

14   A    Correct.

15   Q    And that cash flow adequacy test is an important of the

16   analysis that you performed for purposes of forming your

17   opinions in this case, is it not?

18   A    Yes.

19   Q    And your cash flow adequacy tests all start with

20   projected EBITDA, am I right?

21   A    Yes.

22   Q    And focusing on the cash flow tests that you did -- that

23   your reported in November of 2009 for the company as of

24   December 2007, all of the projections that you used were

25   labeled by the banks that created them either downside cases

1    or credit stress cases, correct?

2    A    Correct.

3    Q    Your report did not include the results of any cash flow

4    tests done on any bank's base case, am I right?

5    A    Yes.

6    Q    And all of the base cases that all of the banks

7    presented in the projections that you performed would have

8    passed your cash flow adequacy test as of December 20th of

9    2007, correct?

10   A    I do not know.

11   Q    You didn't perform that test?

12   A    I did not test the base case, it was the purpose of the

13   case flow adequacy test, it was to test in a downside,

14   contemporaneous downside, whether the business plan would be

15   able to function and fund itself, even if things did not got

16   as planned as represented in the base cases.

17   Q    All right.  So is it your testimony, sir, that you

18   can't, based on having performed the credit -- the cash flow

19   adequacy tests that you performed, you can't know just by

20   looking at those tests that the EBITDA projections in every

21   single one of the bank's base cases would have passed that

22   test?

23   A    I can't tell without performing the test.

24   Q    Okay.  Maybe we'll look at a couple of them a little bit

25   later.  Now your exhibit -- your report, I think you said you

1    identified 36 different sets of projections, correct?

2    A    That's correct.

3    Q    And those are the projections and you have them charted

4    in your report and we'll look at your chart momentarily.  But

5    the 36 sets of projections that you reported on in your

6    report are the 36 sets of projections that are summarized on

7    Exhibit Cross Examination 1, correct?

8    A    I'm sorry, I don't know without going through.  We

9    actually looked at more than 36 sets of projections.  There

10   were more sets.  We narrowed it down to 36.  This very well

11   could be the 36, but I'm sorry, I don't know whether these

12   are the precise 36 that we looked at.

13   Q    Well, you charted 36 cases at page 43 of your 2009

14   report, did you not, sir?

15   A    Yes.

16   Q    And you provided backup for your chart, which I will

17   represent to you -- page 44 actually, which I will represent

18   to you is what is sitting in front of you as Exhibit Cross

19   Examination 1.  So --

20   A    That's fine.

21   Q    -- in any event, it's 36 cases, correct?

22   A    Correct.

23   Q    And the sets of projections that you discussed in your

24   report, whether or not you looked at more and didn't discuss

25   them, you discussed 36 different sets of projections,

1    correct?

2    A    Yes.

3    Q    And the projections that you chose for your various

4    analysis, you picked from that group of 36 sets of

5    projections, right?

6    A    Yes.

7    Q    Now 16 of the 36 sets of projections on your chart were

8    prepared prior to July 15th of 2007, correct?

9    A    That looks right.

10    Q    Okay.  And I'm right, am I not, that none of the

11    projections that were prepared before July 15th of 2007 would

12    have reflected any consideration of Lyondell's managements

13    internal projections for the Lyondell business, correct?

14    A    I believe July 15th was the first time.  I think that's

15    correct.

16    Q    Okay.  Those internal Lyondell projections were in fact

17    not provided to Merrill Lynch, the banks, Access , Basell

18    until shortly before July 15th, correct?

19    A    Correct.

20    Q    And so the projections that were prepared, the 16 sets

21    of projections on your set of 36 that were prepared prior to

22    July 15th of 2007 would not have reflected any consideration

23    of Lyondell management's internal projections for its

24    business, correct?

25    A    Other than for the Houston Refinery, I think that's

143

1    correct.  There was a data room that was set up for the

2    Houston Refinery and, as I understand it, Basell had access

3    to that data room and would have evaluated potentially

4    purchasing that refinery, so they would have had access to

5    that information, that predated this, but with that

6    exception, you're correct.

7    Q    Okay.  And that was backed in 2006, correct?

8    A    Correct.

9    Q    And that was at the time when Lyondell was deciding

10   whether or not to sell or keep the Houston Refinery, right?

11   A    Correct.

12   Q    And ultimately they bought out their business partner

13   and increased their ownership in that refinery from 50

14   percent approximately to 100 percent, correct?

15   A    Correct.

16   Q    And that changed the economics of the operation of the

17   Houston Refinery from the perspective of the Lyondell

18   Chemical Company, correct?

19   A    Yes.

20   Q    All right.  Now, getting back to the chart, Exhibit

21   Cross Examination 1, it's also true is it not that none of

22   the projections that were prepared prior to July 15th

23   reflected the final synergy estimates that management

24   developed after the merger agreement, right?

25   A    That's correct.

1    Q    And the earliest projections that reflected or

2    considered managements final synergy estimates were the ones

3    that you refer to on your chart as the projections

4    presentation 9/26/07, correct?

5    A    I don't think that's correct.

6    Q    Which projections do you believe were prepared before

7    September 26, '07 that reflected the final synergy estimates,

8    sir?

9    A    I'm sorry, that's going the other way.  I believe the

10   November 29th -- there's a November set of projections that

11   reflected some implementation costs for those synergies that

12   were not reflected on that September.

13   Q    Thank you, you're correct and let me rephrase my

14   question.  Before -- none of the projections that were

15   prepared before November, are you saying, reflected

16   management's final synergy estimates?

17   A    That's -- I believe that's correct.  As it pertains to

18   those synergy estimates with implementation costs deducted

19   from those synergy estimates.

20   Q    And you're talking about the calculation that resulted

21   in a projection of net synergies 55 million for 2008 or 45

22   million after implementation costs, correct?

23   A    That's correct.

24   Q    The 420 million run rate synergies were estimated by

25   management and first included in the 9/26/07 projection set

145

1    that's listed on your chart, correct?

2    A    I believe that's correct.

3    Q    Okay.  Now the purposes of your cash flow adequacy test,

4    and frankly for purposes of all of the financial tests that

5    you reported in your report in November of 2009, you used

6    three sets of projections, correct?

7    A    I'm sorry, I think that's incorrect.  Not for -- for the

8    cash flow adequacy test, that's correct.

9    Q    Well, we'll look at the other tests.  Let me focus on

10   the cash flow adequacy test for present purposes.  For

11   purposes of your cash flow adequacy test, you used the April

12   10th Merrill Lynch credit stress case, correct?

13   A    Yes.

14   Q    And then you used a July 10th Merrill Lynch downside

15   case, correct?

16   A    Correct.

17   Q    And you used a 7/15 -- July 15th Citi downside case,

18   correct?

19   A    Correct.

20   Q    Now you refer to these three sets of projections in your

21   report as contemporaneous down side projections, correct?

22   A    Correct.

23   Q    The Merrill Lynch credit stress case was prepared three

24   months or more prior to the closing of the deal, correct?

25   A    Well, three months prior to the signing of the merger

1    agreement, that's correct.

2    Q    Prior to the signing of the merger agreement, three

3    months in advance of that, correct?

4    A    Correct.

5    Q    And it was prepared six months in advance of the closing

6    -- eight months in advance, I'm sorry, of the closing of the

7    transaction, correct?

8    A    Correct.

9    Q    And the other two sets of projections that you used were

10   all prepared six months prior to the closing, correct?

11   A    That's correct.

12   Q    Okay.  And none of those --\

13   A    I'm sorry, five months from July to December?

14   Q    Let's say five and a half, I'll split it with you.  But

15   none of the projections, none of those three sets of

16   projections that were downside and credit stress projections

17   were built off of managements final base case, correct?

18   A    They were built off the July 15th case, that's correct.

19   Q    Okay.  And the latest downside case on your chart is

20   from Goldman's October 2nd credit memo, correct?

21   A    When you say the latest downside case.

22   Q    Well, if you look -- you have them organized

23   chronologically on your chart, do you not?

24   A    Yes.

25   Q    And the latest down -- the latest D that I see is

1    Goldman Sachs' 10/2/07 downside case, I'm right about that,

2    am I not?

3    A    Yes.

4    Q    Okay.  And that was something that you pulled from

5    Goldman Sachs' October 2nd 2007 credit memo, correct?

6    A    Correct.

7    Q    Did you review that memo, sir?

8    A    Yes.

9    Q    All right.  Do you like paper or electronic for purposes

10   of exhibits?

11   A    Either is fine.  Whatever is easier for you.

12   Q    Well, why don't I give you -- I 'll give you a set of

13   paper.  We're going to show them -- the paper is a little

14   long.

15            MR. WERDER:  May I approach, Your Honor.

16            THE COURT:  Yes, please.  Just for everybody's

17   benefit, you don't to ask permission to approach the witness

18   if you're bringing him documents or if you approach the

19   witness to show the witness something, you can do that.

20   Opposing counsel, if they wish, may approach as well.  Thank

21   you.

22   BY MR. WERDER:

23       Q    I want to direct your attention, sir, I'm going to

24   put it on the screen.  You can look at it in the binder if

25   you want as well.  But Defendant's Exhibit 180.  And that is

1    in fact the October 2nd, 2007 Goldman Sachs' memo from which

2    you drew the projections that we just looked at on your

3    chart, correct?

4    A    Correct.

5    Q    And in that memo, which was prepared in October,

6    Lyondell's under performance for the second and third

7    quarters was among the topic that Goldman discussed, correct,

8    sir?

9    A    Yes.

10    Q    And Goldman presented a downside case in those -- in

11    that memorandum that it described as a severe downside case,

12    correct?  Okay, so why don't we show that up on the screen?

13    A    Yes.

14    Q    And they reported that trough EBITDA in their downside

15    case reflected about a 40 percent drop from the levels in

16    2007, correct, sir?

17    A    I'm sorry, I'm not seeing where you're pulling that

18    from.  Correct.

19    Q    Okay, thank you.  Now the downside case is presented at

20    page 23 of their credit memo, am I right?

21    A    Yes.

22    Q    And we'll talk a little bit more about the mechanics of

23    your cash flow adequacy test later, but you didn't report the

24    results of running your cash flow adequacy case on the

25    downside case projections in Goldman's October 2nd credit

149

1    memo, did you sir?

2    A    No.

3         MR. WERDER:  Mark this for identification as

4    Tuliano Cross Examination Exhibit 2.

5         (Tuliano Cross Examination Exhibit 2 was marked for

6    identification)

7    BY MR. WERDER:

8    Q    You recognize the format of this document, do you not,

9    sir?

10   A    Yes.

11   Q    This is the format that you used to report the capital

12   adequacy or cash flow adequacy tests that you reported in

13   tables three through five of your 2009 report, correct?

14   A    Yes.

15   Q    And just a couple of questions about how you prepared

16   that analysis.  First of all you started with EBITDA

17   projections that you drew from one or more sets of

18   projections, correct?

19   A    Correct.

20   Q    And you calculated expenditures, anticipated

21   expenditures for debt service and capital expenditures based

22   on the final capital structure of the company, correct?

23   A    That is true with respect to interest.  Capital

24   expenditures we took from the case.

25   Q    If I said capital expenditures, I apologize.  With

1    respect to interest and debt service, you calculated

2    anticipated expenditure numbers based on the final capital

3    structure of the company, correct?

4    A    I believe that's correct.

5    Q    Okay.  And the number that you reported for capital

6    expenditures in tables three through five of your 2009

7    report, those capital expenditures were ones that you drew

8    off of the particular downside case that you were analyzing,

9    correct?

10   A    Correct.

11   Q    And then what you did was to compare the various

12   expenditure numbers to the -- and you made one other

13   adjustment.  Withdrawn, you made one other adjustment, did

14   you not, sir?

15   A    Yes.

16   Q    You adjusted for the Bear (phonetic) and Solvay

17   acquisitions?

18   A    Correct.

19   Q    Correct?  And then you reported the cash flow net of the

20   interest capital expenditures and debt repayment, right?

21   A    Correct.

22   Q    And, sir, do you have any doubt that using Goldman

23   Sachs' October 2007 downside case and your very analysis

24   shows a cumulative total surplus and a surplus in every year?

25   A    Well, I'm sorry, it shows a deficit in 2010.  It shows

1     roughly a very slight positive in 2011.  It shows a little

2     bit more positive in 2012.  And the debt to EBITDA ratios

3     were quite high with respect to this.

4     Q    The cumulative totals are positive across the board, are

5     they not, sir?

6     A    Yes.

7     Q    And the surplus or the -- I guess I call it surplus, the

8     cumulative total that's built up over the five year period is

9     almost $1.5 billion, correct, sir?

10    A    Assuming no early debt amortization, that would be

11    correct.

12    Q    And you didn't assume any early debt amortization other

13    than the debt repayment line in any of your cash flow

14    analysis, did you, sir?

15    A    No.

16    Q    Okay.  So this chart is apples to apples with tables

17    three to five of your November 2009 report, correct?

18    A    It looks right.

19    Q    And what it shows is that over the five year period,

20    using what Goldman characterized as a severe downside case

21    and the latest case on your chart, your cash flow adequacy

22    test is passed, correct, sir?

23    A    It shows positive cumulative cash flow.  I would want to

24    evaluate this in the context of the other projections that

25    were prepared whether this reflects a true downside scenario

152

1    as opposed to potentially Goldman's view.  The capital

2    expenditures here are extremely low and lower than amounts

3    people have listed in terms of Mr. Trout's has mentioned an

4    $800 million number for regulatory and safety purposes.

5        So I would want to evaluate the test in the context.

6    But to answer -- it's positive, if that's your question.

7    Q    Well, that's what your cash flow adequacy test was

8    attempting to show, correct?  Whether the number was positive

9    or negative?

10   A    I'm sorry, sir, but --

11   Q    Can you answer that yes or no?

12   A    I can't.

13   Q    Withdrawn.

14   A    I'm sorry.  No, I'll say no.

15   Q    Thank you, sir.

16   Q    The chart also includes an ABN AMRO downside case, does

17   it not, sir?

18   A    Yes.

19   Q    And that ABN AMRO case was taken from a July 21st ABN

20   AMRO credit memo, correct?

21   A    Yes.

22   Q    And you don't report the results of any of your tests

23   using that downside case either, do you, sir?

24   A    No.

25   Q    Do you have any doubt that it would pass, sir?

153

1    A    Based on this, I think the numbers would be positive.

2    Q    Thank you, sir.  Now, let's go back if we could to

3    Tuliano Cross Examination Exhibit 1.  And I started to ask

4    you about this a little bit earlier, but one of the pieces of

5    data that you show on your chart is mid-cycle EBITDA,

6    correct?

7    A    Correct.

8    Q    And mid-cycle EBITDA is defined as the average EBITDA

9    over a presumed peak to trough cycle, correct?

10   A    Correct.

11   Q    And mid-cycle EBITDA is a standard metric that used for

12   evaluating projections and results of a cyclical company like

13   Lyondell Basell, correct?

14   A    Correct.

15   Q    And you used the mid-cycle EBITDA metric to evaluate the

16   various sets of projections that you studied, correct, sir?

17   A    Correct.

18   Q    And if we look at figure six of your November 2009

19   report, that is a chart that you presented in your report

20   that contains the results or contains a line graph that shows

21   all 36 sets of --

22             MR. WERDER:  It's on page 44, Your Honor.

23             THE COURT:  Of which of these?

24             MR. WERDER:  Of the November 2009, they're not

25   dated on the cover evidently.

154

1          THE COURT:  No.  Hold on.

2          MR. WERDER:  It's November 7th, 2009.

3          THE WITNESS:  It should be the thickest report,

4    Your Honor.

5          THE COURT:  Okay.  And where on the thickest report

6    am I going to go?

7          MR. WERDER:  On page 44.

8          THE COURT:  Okay.  Just hold on.  Okay, I'm there.

9          MR. WERDER:  Very good.  Thank you, Your Honor.

10   BY MR. WERDER:

11   Q    So on figure six you have graphed the 36 sets of

12   projections that are the subject of your review, correct,

13   sir?

14   A    Correct.

15   Q    And you don't show it on your chart, but in point of

16   fact the three sets of projections that you use rank very low

17   on the chart, don't they, sir?

18   A    They are in the bottom 40 percent.

19   Q    All right.

20         MR. WERDER:  Mark this for identification as

21   Tuliano Cross Examination Exhibit 3.

22         (Tuliano Cross Examination Exhibit 3 is marked for

23   identification)

24   BY MR. WERDER:

25   Q    My graphics aren't quite as good as Mr. Kirpalani's from

1    this morning, but the -- you say, how did you characterize

2    them, in the bottom what?

3    A    40 percent.

4    Q    Bottom 40 percent.

5    A    Uh-huh.

6    Q    Okay, well, the -- two of them -- one of them is almost

7    the lowest of the low, isn't it, sir?

8    A    That's the credit stress test.

9    Q    Okay.  That's worse than in the bottom third or 40

10   percent, correct, sir?

11   A    I'm saying as a group, but yes.

12   Q    Okay.

13            MR. WERDER:  Yours is the red lines, correct?

14            THE WITNESS:  Correct.

15   BY MR. WERDER:

16   Q    All right.  So if we focus on the Merrill April 10th,

17   2007 credit stress case, that has almost the lowest projected

18   EBITDA of all 36 sets of projections that you reviewed,

19   correct, sir?

20   A    Yes.

21   Q    And you calculated the mid-cycle EBITDA for that

22   particular projection at 2788 million or 2.788 billion,

23   correct, sir?

24   A    Correct.

25   Q    And there were only, by my count, three lower

1   projections out of the 36 based on mid-cycle EBITDA, do you

2   agree with that, sir?

3   A    That sounds right.

4   Q    Okay.  The Merrill Lynch March 7 worse case; the Merrill

5   Lynch 3/29, March 29th worse case and the Merrill Lynch 4/1

6   worse case.  Those are the only three sets of projections out

7   of all 36 that are -- that project lower EBITDA than the

8   Merrill Lynch credit stress case that was subject of your

9   analysis, correct, sir?

10  A    Yes.

11  Q    And the three lower cases, as we just pointed out, were

12  all labeled worst cases, correct?

13  A    Yes.

14  Q    and they were all prepared even earlier in time than the

15  April 10th credit stress case, correct?

16  A    Yes.

17  Q    Okay.  Now of the 20 sets of projections that were

18  prepared on or after July 15th, the Citi downside case is the

19  lowest one on the chart, isn't it, sir?

20  A    So you're saying of the ones, the subsequent cases?

21  Q    Of all cases prepared on or after July 15th, the Citi

22  Downside case that you used for your analysis is the lowest

23  of the low, correct?

24  A    Correct.

25  Q    And the next lowest is what Merrill Lynch prepared that

1    they labeled an extreme worst case, correct?

2    A    Yes.

3    Q    All right.  And in terms of mid-cycle EBITDA, the mid-

4    cycle EBITDA that you calculated for the Citi case was 3526

5    million, correct, sir?

6    A    I'm sorry.  I see a lower -- on the Citibank downside

7    case it's 3286.

8    Q    Yes, you're right.  And I was mis-reading my notes.  The

9    3526 is the Citi downside case -- 3286 million is the Citi

10   downside case, correct?

11   A    Correct.

12   Q    And that's the lowest in terms of mid-cycle EBITDA of

13   any set of projections prepared on or after July 15th,

14   correct?

15   A    Yes.

16   Q    Okay.  And the next lowest case is the -- is the 3526 in

17   the Merrill Lynch extreme worse case analysis, correct?

18   A    I'm sorry, I'm having trouble lining it up, but yes,

19   that looks right.

20   Q    Okay.  Now -- and with respect to the July 10th Merrill

21   Lynch downside case, that one has the second lowest mid-cycle

22   EBITDA of any set of projections prepared in July or later,

23   correct, sir?

24   A    That looks right.

25   Q    Okay.  And the -- I know you didn't report this, but

1    will you trust my match and that the average mid-cycle EBITDA

2    for the 36 sets of projections that you reviewed is 3864

3    million?

4    A    I'll take your word for it.

5        MR. WERDER:  I'll label this for identification as

6    Tuliano Cross Examination Exhibit 4.

7        (Tuliano Cross Examination Exhibit 4 was marked for

8    identification)

9    BY MR. WERDER:

10   Q    The downside cases that you reviewed are all, in terms

11   of mid-cycle EBITDA, are hundreds of millions of dollars

12   below the average of all 36 cases, are they not, sir?

13   A    Yes.

14   Q    The closest that any one of them comes is approximately

15   $400 million, correct, sir?  $300 million.  No, $400 million.

16   I'm sorry.

17   A    You're comparing the Merrill Lynch 7/10/07?

18   Q    Yes, comparing the Merrill Lynch 7/10/07 to the average

19   of all 36 cases, the gap is approximately $400 million,

20   correct, sir?

21   A    Yes.

22   Q    And comparing any of the sets to the average of the 20

23   sets of projections prepared on July 15th or later, there's

24   an enormous gap, is there not, sir?

25   A    It looks approximately 800 million.

1    Q    Okay.  And comparing, assuming again that our math is

2    right, which I think it is, since it's been checked about 100

3    times, the average of the seven downside cases prepared on

4    July 15th or later is 3705 million, correct, sir?

5    A    Yes.

6    Q    And that is hundreds of millions or dollars higher than

7    any of the three sets of projections that you used, correct,

8    sir?

9    A    That's 240 million.

10   Q    Okay.  You got the results that you got by picking the

11   lowest of the low projections, did you not, sir?

12   A    I don't agree with that.

13   Q    Well, you're not holding yourself out as a -- withdrawn.

14   Do you know, sir, whether projections that matched the

15   average EBITDA, the average mid-cycle EBITDA would pass your

16   cash flow test?  They would, wouldn't they?

17   A    Result in a -- it looks like it would result in a

18   positive number of all of the projections, not necessarily

19   all the downsides.

20   Q    Okay.  And positive number means passing your test as

21   you presented it, correct?

22   A    The test is designed to test downside projections.  It's

23   not a test of the base case projections.

24   Q    Now you're not holding yourself out as a petrochemical

25   or refining expert, are you sir?

160

1    A    No, I'm not.

2    Q    You're not an expert on preparing projections for

3    petrochemical or refining companies, are you?

4    A    Not for petrochemical or refining companies.  I have

5    substantial expertise in financial projections.

6    Q    Okay.  And you're not an expert in the kinds of

7    synergies that can reasonably be expected to be achieved in a

8    merger of petrochemical or refining companies, are you?

9    A    No.

10   Q    Okay.  And you learned as part of your work on the case

11   that after the merger agreement was signed, Basell's

12   management got together with Lyondell's management and worked

13   on potential synergies, correct?

14   A    Yes.

15   Q    And you're not offering any opinion, are you, as to

16   whether any or all of the potential synergies that they

17   identified were attainable?

18   A    I believe that I am.

19   Q    You're -- you're offering opinions with respect to the

20   projections as a whole, not with respect to line by line

21   analysis of the synergy component of those projections,

22   correct, sir?

23   A    Correct.

24   Q    So you're not offering -- you haven't looked at the line

25   items of the synergies that were identified and formed

1    opinions on which ones of those you believe were reasonably

2    attainable and which ones weren't, did you?

3    A    No, I did not.

4    Q    Okay.  You looked at the projections as a whole in which

5    the synergies were included and you've offered some opinions

6    with respect to that, correct?

7    A    Correct.

8    Q    Now, you've relied on CMAI's litigation report to inform

9    your opinions about LBI's management projections, have you

10   not?

11   A    In part, correct.

12   Q    And the industry views of CMAI that you relied on were

13   the ones that they set forth in their 2009 litigation report,

14   correct?

15   A    In part, yes.

16   Q    You didn't go back and compare what CMAI said in it's

17   2009 litigation report to what CMAI was saying in 2007, did

18   you, sir?

19   A    I did.  I did to that.  I did to that.

20   Q    You did do that?

21   A    I'm sorry, that's incorrect.

22   Q    Okay.

23        MR. WERDER:  December deposition.

24   BY MR. WERDER:

25   Q    I'm going to direct your attention, sir, to 147 and 148

1    of your December 2009.

2    A    Yes.

3    Q    And you're asked a question starting at line 19 on page

4    37 (sic):

5        "Q    I'm just asking about the synergies."

6        Answer:

7        "And I believe with respect I haven't formed an opinion

8    with respect to each specific component of the projections.

9    I've looked at the projections as a whole and have formed my

10    opinion with respect to those projections."

11        Correct?  That was your testimony, correct, sir?

12    A    Yes.

13    Q    Okay.  And in terms of your contention that the downside

14    and credit stress cases that you used and reasonably

15    considered to be base cases rather than downside cases, you

16    relied on CMAI, correct?

17    A    That is correct.

18    Q    Let's talk about the April 10, 2007 credit stress case.

19    Merrill -- did you review the testimony of Gunter Frankenberg

20    of Merrill Lynch?

21    A    It's been some time, but yes.

22    Q    All right.  And Mr. Frankenberg testified that the

23    credit stress test case was an extreme downside case,

24    correct, sir?

25    A    I believe that's correct.

163

1    Q    And he was one of the bankers who was involved in

2    preparing those projections, wasn't he, sir?

3    A    Yes.

4    Q    And he also testified that he didn't think that that was

5    a realistic case, didn't he, sir?

6    A    I don't recall.

7         MR. WERDER:  Let's take a look if we could.  Let's

8    just -- can we pop up the screen, Jason, Mr. Frankenberg's

9    2009 declaration, paragraph 43.

10   BY MR. WERDER:

11   Q    And he has testified that Chemicals Group at Merrill

12   Lynch almost never runs extreme downside cases at site levels

13   and he did not believe that this scenario was realistic.

14   That was his testimony, correct, sir?

15   A    I see that, yes.

16   Q    And he also testified that, as one of the people who

17   prepared the case, that he didn't think it was reasonable or

18   foreseeable, correct, sir?

19   A    I'm sorry.  What portion of the testimony --

20   Q    The portion of the case that is highlighted for us.

21        "We do not believe that's the worst case scenario --"

22   A    Oh, I see, thank you.

23   Q    "We did not believe that a credit stress test case was

24   reasonable or foreseeable."

25        Do you see that?

164

1     A     Yes.

2     Q     And in fact he testified, if we go to paragraph 41, that

3     they didn't view it as remotely likely, correct, sir?

4     A     Yes.

5     Q     And Mr. Melvani from Merrill Lynch offered similar

6     testimony concerning the credit stress case, am I right?

7     A     That may be right, I don't recall specifically his

8     testimony.

9     Q     Okay, did you --

10            THE COURT:  Did you review their testimony?

11            THE WITNESS:  I do.  I did, some of these it's been

12     some time though.

13            THE COURT:  I understand.

14            MR. WERDER:  We won't put that up, we'll just show

15     Mr. Melvani's testimony later in the case.

16     BY MR. WERDER:

17     Q     You also used the July 10th Merrill Lynch downside case,

18     correct?

19     A     Yes.

20     Q     And when you used that case, you knew that it was

21     prepared prior to the time that Merrill Lynch had access to

22     Lyondell's internal projections, correct, sir?

23     A     Yes.

24     Q     And you knew that five days after they prepared that

25     case, Merrill Lynch presented revised management, base and

1    downside cases to Access and Basell that took advantage of or

2    considered the information about Lyondell that had been

3    received in the interim, correct, sir?

4    A    Yes.

5    Q    And you didn't use in your analysis Merrill Lynch's

6    updated base case, did you base case, did you, sir?

7    A    I did not.  I used the Citi case at that point in time.

8    Q    Okay.

9    A    The Citi downside.  That would reflect the updated

10   information.

11   Q    You didn't use -- we'll talk about the Citi downside

12   case in a moment, but you didn't use the July 15th Merrill

13   Lynch downside case, did you, sir?

14   A    No.

15   Q    And that case would pass your cash flow adequacy test,

16   wouldn't it, sir?

17   A    I'm sorry, I can't tell without running the case.

18   Q    Okay.  Very good.  Maybe we'll look at it a little bit

19   later.  But let me just ask you a couple of questions about

20   both the July 10th and the July 15th Merrill Lynch cases.

21        And one of those questions is that neither of those sets

22   of projections included the full projected synergies that

23   management expected to attain from this merger after doing

24   the work that we previously discussed in the fall of 2007,

25   correct, sir?

166

1    A    I believe that's correct.

2    Q    Both of those Merrill cases used a $200 million a year

3    assumption for synergies, which was the assumption that

4    Merrill was using in the July time frame, correct, sir?

5    A    I believe that's correct, but it also doesn't reflect

6    the implementation costs either.

7    Q    Yeah.  So 200 million a year over five years is a

8    billion total, correct, sir?

9    A    That's correct, without the implementation costs.

10   Q    Right.  And then when the final estimates were done,

11   after the work that Lyondell and Basell did together, they

12   projected 45 million for 2008, 300 million for 2009 and 420

13   million for each of 2010 through 2012, correct?

14            THE COURT:  That's for synergies?

15            MR. WERDER:  Yes, Your Honor.

16            THE WITNESS:  I'm sorry, say the last three numbers

17   again.

18   BY MR. WERDER:

19   Q    Yes.  420 million for each of 2010, '11 and '12.

20   A    That sounds right.

21   Q    And the 45 million and the 300 million reflect, in 2008

22   and 2009, reflected implementation costs in 2008 and a build

23   up to the full synergies in 2009, correct, sir?

24   A    I believe the full synergies in 2010.

25   Q    Right.  And it was short of the full synergies by 120

1    million in 2009, because they assumed they wouldn't get to

2    the full number until 2010, right?

3    A    Correct.

4    Q    Okay.  Now let's discuss the July 15th Citi downside

5    case.  That case was presented in Citi's credit committee

6    approval memo on July 15th, correct?

7    A    Yes.

8    Q    And it was one of four sets of projections included in

9    that memorandum, wasn't it, sir?

10   A    I don't recall the number of sets, but I'll accept your

11   representation on that.

12   Q    Okay.  And it projected by far the lowest EBITDA of any

13   of the four sets of projections in Citi's memo, correct?

14   A    Correct

15   Q    And it wouldn't surprise you to learn, would it, that

16   the next lowest projection in that memorandum projected more

17   than 5 billion more of additional EBITDA over the period 2008

18   through 2012, correct?

19   A    Yeah, the difference being the downside versus a base

20   case, yes.

21   Q    All right.  But it wouldn't surprise you that that gap

22   was five billion over the period 2008 to 2012, would it, sir?

23   A    No.

24   Q    All right.  And if your cash flow test was done on any

25   of the other three cases, you'd show a positive number,

1    wouldn't you, sir?

2    A    Yes.

3    Q    All right.  Now Citi witness Rob Jeffries testified

4    concerning Citi's projections, did he not?

5    A    Yes.

6    Q    And you reviewed his testimony, didn't you?

7    A    Yes.

8    Q    And he was involved in preparing the projections, wasn't

9    he?

10   A    Yes.

11   Q    And he testified that the base case reflected Citi's own

12   view based on its due diligence and knowledge of the industry

13   as to the most accurate forecast of the company's future

14   performance, didn't he, sir?

15   A    I'm sorry, could you repeat that?

16        MR. WERDER:  Can we have Mr. Jeffries' declaration?

17   This is Mr. Jeffries December 2009 declaration, paragraph 23.

18   BY MR. WERDER:

19   Q    And he testified that the base case reflected Citi's own

20   view, based on its due diligence and knowledge of the

21   industry as to the most accurate forecast of the company's

22   future performance, correct, sir?

23   A    Yes.

24   Q    And if we look at paragraph 24, he described the

25   downside case as a stress test developed by Citi to determine

1    how the merged company would perform under severe economic

2    conditions, including conditions that would result in

3    breakage of financial covenants.  That was his testimony,

4    correct, sir?

5    A    Yes.

6    Q    And paragraph 24, he also testified that the downside

7    case was not designed to be a realistic assessment of

8    conditions LBI was likely to face, didn't he, sir?

9    A    Yes.

10   Q    And he testified that in fact the stress conditions

11   reflected in the downside case were considered highly

12   unlikely to occur, correct?

13   A    Yes.

14   Q    You didn't run --

15             MR. WERDER:  We can take that down, Jason.

16   BY MR. WERDER:

17   Q    You didn't run any of your tests of LBI's financial

18   condition on any sets of projections, any of the company's

19   projections developed after July 15th, correct, sir?

20   A    (No verbal response)

21             THE COURT:  I'm sorry, couldn't hear you.

22             THE WITNESS:  I'm sorry.  Correct.

23   BY MR. WERDER:

24   Q    And there were in fact later projections, weren't there,

25   sir?

170

1    A    There was a revision of the management case and

2    projections that was minor and then there were some

3    projections, I think as you see on the list that you have

4    here.  We focused on the management projections as of July

5    15th.  Our revisions afterwards were really into the

6    synergies.

7    Q    And you reviewed -- among the documents that you

8    reviewed as part of your work on this case was a November

9    2007 private supplement for the ABL facility, correct, sir?

10   A    Yes.

11   Q    And that was a document that was provided by the five

12   arranging banks to potential investors, correct?

13   A    Correct.

14   Q    And you in fact relied on that for certain aspects of

15   your 2009 report, correct?

16   A    Yes.

17   Q    And that set of projections included the synergy

18   estimates of 45 million for 2008, 300 million for '09 and 420

19   for 2010 to '12, correct, sir?

20   A    Yes.

21   Q    That was the estimate that the management teams had

22   developed once they got to know each other and once they sat

23   down and worked together, correct?

24   A    Yes.

25   Q    You didn't run any of your tests of the projections on

1    either the cases reported in the private supplement or on any

2    downside case developed off of those projections, did you,

3    sir?

4    A    That's correct.

5    Q    So to the extent that the November private supplement

6    reflects the final management projections, there wasn't any

7    downside case that you had available to you or that you

8    developed on your own or that somebody else on your team

9    developed that reflected a downside case off the final

10   management case, correct, sir?

11   A    Correct, but with an explanation, if I could.  May I,

12   Your Honor?

13   Q    Sure.

14        THE COURT:  Go ahead.

15        THE WITNESS:  It's just the only changes,

16   subsequent to the original management case, related to the

17   synergies and I was endeavoring to test downside cases and

18   synergies are notoriously suspect in terms of deals that are

19   put together, so a downside you would expect that the

20   synergies would be suspect.

21        There were no other changes other than to 2007,

22   which was not part of the ultimate testing.  The testing

23   started in 2008, so the projections subsequent to that date,

24   lower 2007 and added the synergies and those were the

25   changes.

1    BY MR. WERDER:

2        Q    Well, maybe we'll look at those projections in a

3    little bit more detail.

4              THE COURT:  You said the synergies are --

5              THE WITNESS:  Suspect.

6              THE COURT: -- suspect?

7              THE WITNESS: Yes.

8              THE COURT:  Did you include synergies at a lower

9    level than lower amounts than the company projected or did

10   you take them out?

11             THE WITNESS:  We took them out.

12             THE COURT:  So your assumption was no synergies

13   whatsoever?

14             THE WITNESS:  In a downside scenario, the

15   assumption is that companies that are put together over the

16   size many times do not realize synergies.  Realize increased

17   cost, there's only 45 million in the first year that was

18   budget.

19             THE COURT:  But the 400 million, so--

20             THE WITNESS:  Well, it's 45 in the first year,

21   because it's net of implementation costs.  Then it ramped up

22   to 100 million and then 400 after that.

23             THE COURT:  As your next question.

24   BY MR. WERDER:

25       Q    Well, the banks included some synergies in their

1    downside cases, did they not, sir?

2    A    I'd have to look at each of the downside cases.

3    Q    All right.  And I think you testified a few moments ago

4    that you're not an expert in synergies in the petrochemical

5    and refining industry, are you, sir?

6    A    No, I'm not.

7    Q    And you didn't look at the line items that management

8    was projecting that it could obtain through synergies, you

9    just threw them out based on what you just described to His

10   Honor?

11   A    Yes.

12   Q    Now each of the banks had credit approval processes, did

13   they not?

14   A    Yes.

15   Q    And each of those banks had their own credit approval

16   process, didn't they sir?

17   A    Yes.

18   Q    And you've reviewed the documentation that relates to

19   the credit approval process and you've also reviewed

20   testimony from the bank witnesses describing that process,

21   haven't you, sir?

22   A    Yes.

23   Q    And one of the things that the process included was

24   senior bank executives who weren't involved in the deal,

25   correct?

174

1    A    Yes.

2    Q    And each of these banks was well versed in the industry,

3    wasn't it, sir?

4    A    The banks had industry people within their respective

5    groups.

6    Q    Okay.  And each of the banks was well aware of economic

7    conditions and expectations, correct?

8    A    Yes.

9    Q    And each of the banks was well aware and very familiar

10   with the cyclicality of the petrochemical and refining

11   industries, weren't they, sir?

12   A    Yes.  Yes.

13   Q    Thank you.  Sorry, if I didn't hear you.  And each, I

14   think you've already testified to this, but each bank had

15   access to the views of its own industry consultants, correct?

16   A    Yes.

17   Q    And they had access to outside experts and consultants

18   as well, correct?

19   A    Yes.

20   Q    And each of those banks had the opportunity to consider

21   management's projections and form views about what they felt

22   about them, didn't they, sir?

23   A    Yes.

24   Q    And each of those banks also had the opportunity to

25   develop their own base cases that accepted, to more or less

175

1    degree at their choosing, what they wanted to accept of

2    management's management case, correct?

3    A    Yes.

4    Q    None of the banks reported in 2007, did they, sir, that

5    they felt that management's projections were inconsistent

6    with the known cyclicality or volatility of the refining and

7    petrochemical industries, correct?

8    A    I believe throughout there were commentary within those

9    memos as to concerns with respect to the cycle was at the

10   peak and where the company was, but then the memos also

11   offered some counterbalancing factors as well.  So these

12   memos had risk factors, then they also had counterbalancing

13   factors in the bank's consideration.

14   Q    Understood, sir, but the specific question was none of

15   the banks reported in 2007 that they had concluded, based on

16   their knowledge of cyclicality and volatility, etcetera that

17   they felt that management's projections were inconsistent

18   with the known cyclicality or volatility of the industries,

19   correct?

20   A    Correct.

21   Q    And we mentioned CMAI.  And you believe that CMAI is an

22   authoritative source that the company should have considered

23   in 2007, do you not, sir?

24   A    Yes.  And I think they had CMAI do some work as we

25   discussed.

1    Q    And CMAI in fact prepared a report for the banks in

2    November of 2007, correct?

3    A    Yes.

4    Q    And you've reviewed that report, have you not?

5    A    I have.

6    Q    And that report did not state that the projections were

7    unreasonable, did they, sir?

8    A    That's correct.

9    Q    And that report did not state that the company's

10   projections were somehow inconsistent with the known

11   cyclicality or volatility of the refining and petrochemical

12   industries, correct?

13   A    Yes.

14   Q    Basell and Lyondell also both had professional staffs

15   that were very experienced in preparing projections for their

16   business, correct, sir?

17   A    I believe that's the case.

18   Q    All right.  And the Citi credit memo that you reviewed

19   concerning Basell reported, among other things, that Basell

20   had a very good track record for meeting its projections, did

21   it not, sir?

22   A    I don't recall that specific statement.  If you want to

23   show it to me.

24   Q    Yeah, let's take a look if you would at Exhibit DX-130,

25   which is your book or we'll show it.

1            MR. WERDER:  Jason, show it up on the screen if you

2     would.

3     BY MR. WERDER:

4     Q    And we're looking at page 40 of the memo.  Belgian is

5     the code name that was used for Basell, correct, sir?

6     A    Correct.

7     Q    And Citi's evaluation of Basell said Basell has

8     consistently delivered on its financial plans from the time

9     of its acquisition by Access, correct?

10    A    Yes.

11    Q    And they characterize in A of that discussion Basell's

12    management projections, conservative and delivering, correct,

13    sir?

14    A    Yes.

15    Q    Now in deposition I asked you about Basell's projections

16    on a standalone basis -- well, withdrawn.  You didn't

17    investigate, did you, sir, sufficiently to opine in 2009 that

18    Basell's projections, separate and apart from Lyondell's

19    projections, were unreasonable, correct?

20    A    Correct.

21    Q    And your opinions in 2009, which are still your opinions

22    today, are based on the projections as a whole as opposed to

23    some conclusion that Basell's projections were unreasonable,

24    correct?

25    A    Correct.

1    Q    Now in part of your -- let me direct your attention if I

2    could to page 49 and 50 of your first 2009 report.    Are you

3    with me, sir?

4    A    I'm getting there.

5    Q    Okay.

6    A    Yes.

7    Q    And one of the things that you're discussing under

8    heading two there is failure to properly consider the

9    volatile nature of in stock costs?

10    A    Yes.

11    Q    And then if we go over -- well, if you start at the

12    bottom of the page there, you refer to a November 2006

13    presentation to the supervisory board.    Are you with me?

14    A    Yes.

15    Q    Okay.    And you reviewed that November 2006 presentation,

16    did you not?

17    A    Yes.

18    Q    And you cited in your report certain things that --

19    certain conclusions that you drew from it including you

20    state:    "Basell quantified the impact of 33 percent increase

21    in oil prices."    Correct?

22    A    Yes.

23    Q    In fact the document on which you rely says the impact

24    is up to that level, correct, sir?

25    A    That could be, yeah.

179

1    Q    Okay.  And the document --

2              MR. WERDER:  Let's take a look at JX-04, Jason.

3    Thank you.

4    BY MR. WERDER:

5    Q    This is the Basell business plan that you're citing at

6    pages 49 and 50 of your report, correct, sir?

7    A    Yes.

8    Q    Okay.  And if we go to page 14, that's the place in the

9    document from which you drew the conclusions, right?

10   A    I believe that's right.

11   Q    And this is under a discussion of plan sensitivity, is

12   it not?

13   A    Yes.

14   Q    And it indicates that the impact is up to the level that

15   you cite, correct, sir?

16   A    Correct.

17   Q    And it also indicates if we move up on the page to the

18   discussion of the sensitivities, that these sensitivities do

19   not take into account any additional measures to be taken in

20   an adverse business scenario, correct, sir?

21   A    Yes.

22   Q    Now as far as you're aware no Basell witness involved in

23   the preparation of this document has testified in this case

24   or will testify, correct, sir?

25   A    I don't know.

180

1    Q    Okay.  Basell's management, if we go to page 15,

2    Basell's management's conclusion from the sensitivities that

3    you cited was that the analysis shows that oil and commodity

4    prices have only limited affect on Basell's projected

5    results, whilst polymer demands and spreads are major key

6    determining factors with major impact on Basell's

7    profitability, correct?

8    A    Yes.

9    Q    Now you also refer, a little bit later on page 50, to a

10   W shaped volatility, correct?

11   A    Correct.

12   Q    And you drew that from -- from another Basell document,

13   correct?

14   A    Yes.

15   Q    The document from which you drew that citation doesn't

16   indicate, does it, sir, the size of the oil price movements

17   that were assumed in that sensitivity case, correct?

18   A    I don't recall.

19          MR. WERDER:  Let's take a look, if we could, Jason,

20   at PX-22.

21   BY MR. WERDER:

22   Q    This is the Basell business plan that you're citing for

23   the W shaped sensitivity on page 50 of your report, correct,

24   sir?

25   A    Yes.

1      Q     And if we go to page 29, that's the stress testing of

2      the business plan that you're referring to and from which you

3      derive the, quote, "W shaped volatility", correct?

4      A     Correct.

5      Q     And there isn't any indication there of the size of the

6      movements in either direction that are being studied under

7      that sensitivity case, correct, sir?

8      A     Correct.

9      Q     And you're not aware of any Basell witness involved in

10     preparing this document who has testified concerning what

11     sorts of assumptions may have gone into that case, correct,

12     sir?

13     A     Not as I sit here, no.

14             MR. WERDER:  Your Honor, whatever the Court's

15     pleasure is with respect to breaking is fine with me.  I'm

16     happy to keep going.

17             THE COURT:  Let's go to 4:00.

18     BY MR. WERDER:

19     Q     One of your criticisms, Mr. Tuliano, of management's

20     projections is that management didn't reduce its projections

21     for 2008 to 2011, based on Lyondell's performance after the

22     merger agreement was signed, correct, sir?

23     A     Yes.

24     Q     And management's reasons for not doing that were set

25     forth in various documents on which -- which you reviewed and

182

1    which you cited in your report, correct, sir?

2    A    Yes.

3    Q    And management set forth a number of reasons, as did the

4    banks, for not reducing the 2008 through 2011 projections,

5    based upon the short term under performance of Lyondell,

6    correct?

7    A    Based on the under performance of Lyondell for the

8    second half of 2007.

9    Q    And management and the banks -- you've reviewed plenty

10   of documents, haven't you, sir, where both management and the

11   banks are explaining why it is that they didn't feel it was

12   necessary to alter the 2008 to 2011 projections, based on

13   what they were observing of Lyondell in the second and third

14   quarters of 2007, correct?

15   A    Yes.

16   Q    And CMAI was in fact projecting in the fall of 2007 that

17   2008 was going to be a better year, margin wise for the

18   industry, than 2007, correct, sir?

19   A    I do not know what CMAI was projecting at that point.

20   Q    Let me ask you to take a look at -- Defendant's Exhibit

21   557.  You can either look at it there or we'll put it up on

22   the screen.

23   A    Yes.  I have it.

24   Q    Thank you.  So in the fall of 2007, CMAI was in fact

25   recognizing that the industry had encountered some head winds

1    in 2007, but predicting that 2008 was going to be a better

2    year, correct, sir?

3    A    Yes.

4    Q    And this is the type of information from industry

5    experts that you would expect a company or companies like

6    Lyondell and Basell to be taking into consideration in

7    deciding what to do with respect to their projections for

8    2008, correct, sir?

9    A    Yes.

10   Q    Now your evaluation of management's projections contains

11   a lot of discussion about a potential future trough in the

12   industry, correct?

13   A    Yes.

14   Q    And you're not contending, are you, sir, that Basell and

15   Lyondell didn't have informed views on that topic?

16   A    I'm contending that the views that they had on that

17   topic resulted in management projections that do not reflect

18   a peak to trough cyclicality that had been experienced

19   historically.  It's a relatively flat peak to trough that's

20   in the management projections.  The decline is approximately

21   nine percent for the peak to the trough, whereas in prior

22   troughs that the decline has been as much as 40 to 45 percent

23   from peak to trough.

24       So it was a very mild peak to trough projection within

25   the management case projections.  The management case

1    projections also had 2008 as the peak, whereas the other

2    cases had 2007 as the peak.  And that became much more

3    pronounced.

4              THE COURT:  When you say the other case, what do

5    you mean?

6              THE WITNESS:  The other cases that were evaluated

7    at the time by the banks and others.  And when the company

8    under performed in 2007, it really accentuated that peak,

9    effectively bringing 2007 down and making quite a slope into

10   2008 and then a gradual decline after that.

11             So that's my view with respect to the peak to

12   trough.

13   BY MR. WERDER:

14   Q    Well, I know you have a different view or you've

15   expressed a different view that the experts at Basell and

16   Lyondell had, but are you contending, sir, was my question

17   that the view that they had was not an informed view, even

18   though it's a different view than you're currently opining

19   to?

20   A    I'm sorry, I'm having trouble answering the question.

21   They certain had access --

22   Q    Withdrawn, withdrawn.  The views that management had

23   with respect to potential future trough conditions were

24   reported in, among other places, the November 2007 private

25   supplement that you cite and rely on, correct?

1    A    Yes.

2    Q    And as reported there, management expected trough

3    conditions for certain petrochemical products in 2010 and

4    2011, correct?

5    A    Yes.

6    Q    And as reported there, they expected that other products

7    In their portfolio, particularly products in the propylene

8    oxide chain, would continue to produce strong results because

9    of favorable supply and demand conditions, correct, sir?

10   A    I believe that's right.

11   Q    That was management's analysis of management's product

12   portfolio, correct?

13   A    Those were the views that were expressed in the

14   memorandum.

15   Q    Okay.  And as set forth in that document, they didn't

16   expect the U.S. refining trough through 2011 because of

17   limited refining capacity in the United States and because of

18   the huge capital expense and long lead time to build new

19   refineries, correct, sir?

20   A    That may be the case, I don't recall a specific quote

21   from a sym, but that may be the case.

22   Q    Okay.  That may be the case.  And the banks all had

23   their own experts as well that were able to evaluate issues

24   concerning future trough conditions, correct?

25   A    Yes.

186

1    Q    And the banks, based upon the materials that you've

2    reviewed, were not expecting or anticipating a quick

3    petrochemicals trough, were they, sir?

4    A    I'd have to go back to the individual bank memos and as

5    I sit here, I don't recall which banks used outside experts

6    or had their own internal credit people and whether those

7    individual credit people were their petrochemical or refining

8    individuals or were people just from the credit side of the

9    house.  So there's a very a wide range of memos and people

10   working on this at the time.

11   Q    And does it refresh your recollection if I state that

12   for example Citibank, based on CMAI, was not projecting a

13   petrochemicals trough until 2011?

14   A    Oh, that -- that sounds right.

15   Q    Okay.  Let's take a look at figure seven in your 2009

16   report.

17   A    Yes.

18   Q    And one of the points that I think you made to His Honor

19   a few moments ago was that the management cases didn't

20   reflect, in your view, enough peak to trough cyclicality

21   impact, correct, sir?

22   A    Correct.

23   Q    And that's the point that you're trying to make with

24   your figure seven, correct?

25   A    Well, there are two points.  I think it's in the title.

1   The LBO was based on the most optimistic base case.  I'm

2   sorry.  The LBO was based on the most optimistic base case

3   projections.  So it's showing those management cases at the

4   very to.  And it reflected minimal peak to trough.

5   Q    Right.  And you have made the point, have you not that

6   the projections that the -- that were being made for this

7   combined company for the anticipated future trough were

8   higher than the actual results of the two companies operating

9   separately in 2003, correct?

10  A    Well, this shows historical EBITDA numbers and it

11  compares to the management case projections.

12  Q    And one of the points that you had made in criticizing

13  the management case projections is that in your view they

14  have a higher projected trough EBITDA than the two companies

15  achieved as separate companies when they were operating as

16  separate companies, correct?

17       And in fact that's exactly the point you made at the

18  bottom of page 44 of your November 2009 report, correct?

19  A    It was a comparison.

20  Q    Right.  So you're basically saying if we look at these

21  two companies operating separately in 2003, trough

22  conditions, they actually had, as separate companies,

23  significantly lower trough EBITDA than the management

24  projections were projecting for 2011 and that is somehow

25  problematic in your view, correct, sir?

1    A    It's an observation recognizing they were different

2    companies at that time, they had different sets of assets.

3    It was looking at the trough conditions at that time and

4    presenting the data for what it is and making the

5    observation.  I think my concern primarily related to the

6    slope of the management projections as opposed to that

7    particular observation.

8            THE COURT:  All right.  Let's take our 15 minute

9    recess.

10           MR. WERDER:  Okay, Your Honor.  Thank you.

11       (Recess taken 04:01 to 04:20)

12           THE COURT:  Please be seated.  Mr. Tuliano, you're

13   still under oath.  Mr. Werder.

14           MR. WERDER:  Thank you, Your Honor.

15   BY MR. WERDER:

16   Q    Mr. Tuliano, before the break we were talking about the

17   anticipated future trough conditions and when -- and in

18   particular we were talking about the point that you had made

19   on page 44 of your 2009, November 2009 report about comparing

20   the 2003 trough conditions to what management was projecting

21   for 2011.

22       And when you made that point, were you aware, sir, that

23   CMAI's Mr. Agawall (phonetic) advised in November 2007 that

24   CMAI expected the anticipated 2011 trough to be shallower

25   than the previous trough?

189

1   A    I believe that was in the CMAI report.

2   Q    So you were aware of that?

3   A    Yes.

4   Q    Okay.  And the November 2007 offering document that you

5   relied on specifically addressed the issue of bridging EBITDA

6   trough to trough, correct, sir?

7   A    Yes.

8   Q    And if we take a look at Exhibit DX-219, this is the

9   private supplement, the November 2007 private supplement, and

10  you relied on this document for various things, did you not,

11  sir?

12  A    Yes.

13  Q    And if we look at page 20 of the document, that presents

14  a bridge that takes the 2001 to 2003 trough and explains why

15  it is that management is expecting that the company -- the

16  combined company is going to perform much better in 2011 than

17  the two separate companies performed in 2001 through 2003,

18  correct?

19  A    Yes.

20  Q    And you understood that this presentation was a -- when

21  you did your work and you offered your opinions, you

22  understood that this presentation was a bridge between

23  2001/2003 and the trough that occurred there and the

24  anticipated 2011 trough, correct, sir?

25  A    Yes.

1     Q    And when you were asked in deposition in 2009, you had

2     not identified any of these bridge points that you rejected,

3     correct, sir?

4     A    I believe that's right.

5              THE COURT:  You say you believe that's right?

6              THE WITNESS:  Yeah, I didn't analyze each of these

7     at that point.

8     BY MR. WERDER:

9        Q    Okay.  So you're not offering any opinion that the

10    manner in which management bridged and explained the bridge

11    from the 2001/2003 trough to the anticipated 2011 trough was

12    incorrect, am I right, sir?

13    A    Yes.

14    Q    Let's take a look -- I want to turn the focus of the

15    discussion for a few minutes to your discussion of Lyondell's

16    projections.  And I want to direct your attention to figure

17    nine in your November 2009 report, sir.

18    A    Yes.

19              THE COURT:  On page 49?

20              MR. WERDER:  On page 49, Your Honor, yes.

21    BY MR. WERDER:

22    Q    And this chart relates to Lyondell's EBITDA projections,

23    correct, sir?

24    A    Yes.

25    Q    And in particular what you're attempting to do is to

1    compare various Lyondell management projections to what you

2    call Wall Street consensus, correct?

3    A    Yes.

4    Q    And you must think that's a probative comparison or you

5    wouldn't have made it, correct, sir?

6    A    Correct.

7    Q    And your point, I take it, is that management's

8    projections, particularly the July case, were higher than the

9    -- what you call the Wall Street consensus, am I right?

10   A    Yes, that and the long range plan, correct

11   Q    Right.  So both -- it appears from this -- am I reading

12   this correctly that you are -- the information that you're

13   providing is showing that both Lyondell's December 2006 long

14   range plan and the July 2007 case that they provided to

15   Access, Basell and the banks, were both above what you say is

16   the Wall Street consensus?

17   A    I think it's -- the analysis was presented, or the chart

18   was presented, to show the July '07 management case as

19   compared to the Wall Street consensus and also the pattern in

20   the long range plan.  So it's a look back at the long range

21   plan and also look at the Wall Street consensus.

22   Q    Now, sir, did you compare the projections for Lyondell

23   in any of the three downside cases that you used for your

24   analysis to what you call the Wall Street consensus?

25   A    I may have, I don't -- I don't recall.

1          MR. WERDER:  Excuse me, Your Honor.

2          THE COURT:  That's okay.

3          MR. WERDER:  I marked this for identification as

4     Tuliano Cross Examination Exhibit 5, I believe.

5          (Tuliano Cross Examination Exhibit 5 was marked for

6     identification)

7     BY MR. WERDER:

8     Q    And what we've done here, sir, is to take your Wall

9     Street consensus numbers and plot them next Merrill Lynch

10    credit stress case, the two Merrill Lynch July 10 cases and

11    the Citi downside case that you used.  And it's true, is it

12    not, sir, that the downside cases that you used as base cases

13    are all significantly lower than what you report at the Wall

14    Street consensus?

15    A    I did not use the downside cases as base cases, I used

16    them as downside cases.

17    Q    Well, whatever -- fine.  The downside cases that you

18    used for purposes of your analysis are all billions of

19    dollars below, in terms of projected EBITDA over the

20    projection period, than what you call the Wall Street

21    consensus, correct, sir?

22    A    I think that's incorrect.

23    Q    You think that's incorrect?

24    A    Yes.

25    Q    Well, certainly it's in the true of the case of the

1    Merrill Lynch  April 10th credit case test, is it not, sir?

2    A    Yes.

3    Q    And it's certainly true in the case of the Citi downside

4    case as well, is it not, sir?  Let me make it a little bit

5    easier.  I've got a chart that totals them all up.

6    A    That would be helpful.

7    Q    Sorry about that.  That's what I fumbling around for.

8         MR. WERDER:  I'll mark this for identification as

9    Tuliano Cross Examination Exhibit 6.

10        (Tuliano Cross Examination Exhibit 6 was marked for

11   identification)

12   BY MR. WERDER:

13   Q    So the -- assuming my math is right, the Merrill Lynch

14   credit stress case is more than $4 billion, in terms of its

15   projections for Lyondell, more than $4 billion short of the

16   Wall Street consensus projection for Lyondell over the period

17   2007 to 2011, correct, sir?

18   A    That's what the chart shows.  The number 8.2 looks or

19   8.3 looks low to me.  I would need to go back and check that,

20   the numbers you have for the Merrill Lynch case.

21   Q    Okay.

22   A    They do not look correct.

23   Q    All right.  And about the numbers for the Merrill Lynch

24   downside case and the Citi case, sir?  Assuming my math is

25   right, those are billions of dollars short over the period

194

1   2007 through 2011 of the Wall Street consensus, correct, sir?

2   A    On one case, the Merrill Lynch downside, it's 1.3

3   billion, assuming your math is right.  And the Citi case the

4   downside is approximately 3 billion, again assuming the math

5   is correct.  And that's relationship I would have expected,

6   given that these are downside cases.

7   Q    Okay.  And the Merrill Lynch base case from July 10th is

8   much closer to the Wall Street consensus than any of the

9   cases that you used for purposes of your testing, correct,

10  sir?

11  A    That's what this indicates.

12  Q    All right.  That Merrill Lynch base case would pass your

13  cash flow adequacy test, would it not, sir?

14  A    There's something going on with these numbers.  These

15  numbers don't look right to me.  I'm sorry.

16  Q    Okay.  We'll check them out overnight perhaps.  One of

17  the things that you rely upon for purposes of your opinion

18  that management's projections were overly optimistic and

19  unreasonable is a business outlook prepared by LBI in 2009,

20  correct, sir?

21  A    It may have been a document I looked at as a

22  reasonableness check, but I don't recall as a --

23  Q    Well, in your 2009 rebuttal report --

24  A    Yes.

25  Q    -- at Exhibit 1, you performed a comparison or you

1    illustrated a comparison of the downside cases and

2    management's projections and what you call LBI August '09

3    five year business outlook, correct, sir?

4    A    Yes.  That was done as a reasonableness check, it's

5    not --

6    Q    And that August 2000 -- withdrawn.  That business plan

7    was prepared in August 2009, two years after the July

8    management projections were prepared, correct, sir?

9    A    Correct.

10   Q    And it was prepared in the midst of the financial

11   crisis, was it not, sir?

12   A    Yes.

13   Q    And it was prepared in the midst of the great recession,

14   was it not, sir?

15   A    Yes.

16   Q    It was prepared while the company was in bankruptcy for

17   purposes of developing a bankruptcy exit plan, wasn't it,

18   sir?

19   A    Yes.

20   Q    You can put that aside.  I want to ask you a couple more

21   questions about your cash flow adequacy test.  And if we look

22   at your main November 2009 report -- withdrawn.

23       You're -- let's look at page 57 of your November 2009

24   report.  And that presents the results of your cash flow

25   adequacy tests, correct?

1    A    Correct.

2    Q    And the purpose for which you're presenting these, to

3    use your words, "is as tests of the company's ability to

4    withstand reasonably foreseeable downside stresses and

5    contingencies by measuring its net cash flows under various

6    scenarios", correct, sir?  Don't look on that page for it, I

7    was quoting from your deposition, I'm sorry.

8    A    Yes.  Yes.  Correct.

9    Q    So that was -- what these purport to be, and you are

10   explaining them and putting them forward as the evidence of

11   your opinions, is tests of the ability of the company to

12   weather reasonably foreseeable downside stresses and

13   contingencies, correct, sir?

14   A    Yes.

15   Q    And when you described them in your report, the

16   scenarios that you had run, you characterized them on page 54

17   as assessments of possible performance, correct, sir?

18   A    Yes.

19   Q    And you use your words very carefully when you write

20   your reports, don't you, sir?

21   A    Yes.

22   Q    And you're aware -- you were aware, at the time you

23   wrote the report, that witnesses from every bank that had

24   prepared every one of the projections that you relied on said

25   that they did not view those as reasonably foreseeable

1    scenarios, correct, sir?

2    A    I don't recall witnesses from every bank using those

3    words.  If you want to represent that to me, that's fine,

4    these were considered by the banks at the time.  And given

5    the range between these and the base projections, they

6    represented contemporaneous downsides that were considered.

7    Each projection has a set of assumptions associated with it

8    that I believe indicate that the banks considered the

9    assumptions under those projections.

10       And my experience in dealing with and I've been an

11   expert for bank groups and individual lenders on many cases,

12   is that they carefully consider these types of assumptions

13   and do not lend assumptions that they do not believe are

14   reasonably foreseeable.

15   Q    Well, you referenced all the banks.  The three cases

16   that you ran came from -- two of them from Merrill and one

17   from Citi, correct?

18   A    Correct.  I evaluated the other ones as well, but the

19   ones that I ran, that's correct.

20   Q    Understood.  But for the three cases that you ran, you

21   saw Mr. Melvani's testimony, Mr. Frangenberg's testimony, Mr.

22   Guthrie's (phonetic) testimony.  All of those people who were

23   involved in preparing these projections said that they don't

24   -- they weren't intended to represent reasonably foreseeable

25   scenarios, didn't they, sir?

198

1    A    That may be the testimony.  I think the commentary

2    underlying the projections tells a different story.

3    Q    Okay.  Let's turn to table five on page 57, if we could

4    for a moment.

5    A    Yes.

6    Q    And table five is the results of the Citi downside --

7    your analysis of the Citi case, correct?

8    A    Correct.

9    Q    And that case shows over four and half billion of Kepex

10    in the five year projection period, does it not, sir?

11    A    That is correct.

12    Q    And when you looked at the Citi memo from which you drew

13    this, did you observe that Citi applied the same Kepex

14    numbers for all of its cases?

15    A    I don't recall.  That very well could be the case.

16    Q    And did you go back to the last trough period in 2001 to

17    2003 to make some assessment of what companies like Basell

18    and Lyondell and their peer group did with respect to Kepex

19    in trough situations?

20    A    I have not.

21    Q    Okay.  It wouldn't be surprising, would it, sir, that in

22    trough conditions people reduce their Kepex, particularly to

23    the extent that they have discretionary Kepex in their Kepex

24    expenditure plans, correct, sir?

25    A    Kepex is typically something that they will reduce, that

1     is correct.  In the context to a maintenance level, subject

2     to, as we talked about earlier, regulatory issues and things

3     like safety issues.

4     Q    And I was -- in terms of the synergy evaluation for the

5     Citi downside case, can you explain what you did there?

6     A    I'm sorry, I don't understand your question.

7     Q    Well, what synergies, what anticipated --

8          MR. WERDER:  I apologize for that, Your Honor.

9     BY MR. WERDER:

10    Q    What anticipated synergies are built in to this case?

11    A    I would have to look at the original case to be able to

12    tell you that.

13    Q    You know that they would not have been the full

14    synergies that management was expecting after the Lyondell

15    and Basell teams got together and put their heads together to

16    figure out the precise synergies that they were going to

17    pursue, correct, sir?  That estimate didn't exist at July

18    15th, right?

19    A    I think -- that's correct, but your question implies a

20    very detailed process to come up with those synergies and I

21    think the documentary -- the documents indicate something

22    different.

23    Q    My question was actually different.  Let me try it a

24    slightly different way.  Whatever synergies Citibank was

25    using for purposes of this case would not have been the final

1     synergies that management was anticipating after the work

2     that the Basell and Lyondell teams did together, correct?

3     A    Yes.

4     Q    In terms of management's projections, I know that you

5     had your opinions about them, but you haven't reported

6     anywhere in any of your reports any re-do that you did of

7     management projections to haircut them by some percentage

8     that you believe they should be haircutted by based on errors

9     that you've identified, that is not in any of your reports,

10    correct, sir?

11    A    Correct.

12    Q    And we can agree, can we not, that if you had used

13    management's projections or any of the base cases that any of

14    the banks formulated off of management's projections in your

15    cash flow test, you would -- the numbers would be positive,

16    correct?

17    A    On an annual basis, I think that's likely correct.

18    Q    And on a cumulative basis as well, correct?

19    A    On a cumulative basis.  I was thinking of the quarters

20    in terms of how those projections played out over the

21    quarters.  Many of the flaws in the management projections

22    related to the -- how the EBITDA and the cash flow was

23    projected within the first quarter of the year and the

24    omissions within that construct that resulted in the

25    liquidity crisis.

1    Q   Well, whatever flaws you may have identified in

2    management's projections, we can agree that they are set

3    forth in your reports, correct?

4    A   I believe that's the case.  I obviously have done work

5    since my reports and those observations that pertained to

6    some of them.

7    Q   Okay.  I'm not asking you about anything that's not in

8    your reports.

9    A   I understand.

10    Q   That criticism that you just raised concerning quarterly

11    issues is not in any report that you have submitted as your

12    direct testimony, is it, sir?

13    A   It was a consideration, but I would have to --

14         THE COURT:  Can you answer that question yes or no?

15         THE WITNESS:  I don't know.

16    BY MR. WERDER:

17    A   Okay.  All right.  Your reports will not speak for

18    themselves, but somebody can read them and form their own

19    conclusions with respect to them.

20    And nowhere in your report do we find any opinion with

21    respect to the percentage haircut that could be inflicted on

22    management's case and still pass your test, correct, sir?

23    A   That's correct.

24    Q   Now in your 2011 reports you offered some opinions

25    concerning LBI's financial condition in March 2008, correct?

1    A    Correct.

2    Q    And you relied in part on an April 2008 memorandum by

3    UBS, correct?

4    A    Yes.

5    Q    And that memorandum had some projections that UBS had

6    prepared apparently in or about April of 2008, correct?

7    A    Those projections were based on management's re-issuance

8    of projections that were done in the first quarter of 2008

9    and UBS took those projections and put them in their document

10    and then ran some analysis on those projections.

11    Q    Well, is it your recollection, as you sit here right

12    now, that the UBS memo just recited management's projections

13    and didn't report a new UBS base case and a new UBS downside

14    case?

15    A    No.

16    Q    They did, right?

17    A    Correct.

18    Q    Okay.  So in -- and you relied on that, right?

19    A    Yes.

20    Q    Okay.  And that memo by UBS was prepared four months

21    after the December 2007 closing, correct?

22    A    Yes.

23    Q    And it was prepared nine to 12 months after the downside

24    case projections that you relied on for your opinions as of

25    December 20th of 2007, correct?

203

1    A    I'm sorry, how many months?

2    Q    Nine to 12 months later than April to July of 2007?

3    A    Yes.

4    Q    I think my math would be right on that.

5    A    Yes.

6    Q    Okay.  All right.  And as of the time period when these

7    new UBS projections were prepared, the business environment

8    in the petrochemicals industry, was worse than it had been in

9    early to mid 2007, correct?

10    A    I believe that's correct.

11    Q    All right.  And oil prices, among other industry

12    metrics, by April of 2008 oil prices had risen significantly

13    over where they were in early to mid 2007, correct?

14    A    Yes.

15    Q    And if we take a look at -- let's take a look at Exhibit

16    DX-311.  This is the UBS memo that you relied on in your 2011

17    reports, correct, sir?

18    A    Yes.

19    Q    And at the time that it wrote this memo, UBS was well

20    aware of projections concerning oil prices, correct, sir?

21    A    Yes.

22    Q    And they were not anticipating oil prices going from

23    wherever they were in April of 2008 to $145 a barrel by July

24    of '08, were they, sir?

25    A    I don't recall within the context of the memo.

204

1      Q     Let's take a look, if we good, at page four of the

2      document.   That's a little hard to read, I realize, but UBS

3      was presenting a crude oil forecast based on CMAI information

4      and they certainly don't show it going to 145, since they

5      don't even have that on their graph, correct, sir?

6      A     That's correct.   They do show $130 a barrel in the

7      subsequent page on the -- in the exhibit.

8      Q     And the projection that they have here is showing oil

9      prices declining, does it not, sir?

10     A     I believe that's correct.

11     Q     And when UBS prepared this memo, they were well aware of

12     LBI's liquidity position, correct, sir?

13     A     Yes, I believe they understood the liquidity issues.

14     Q     And in fact the memo was prepared to evaluate the

15     company's request for additional liquidity, correct?

16     A     Correct.

17     Q     And there's nowhere in this memo, written in April of

18     2008, where UBS says that there is a liquidity crisis,

19     correct, sir?

20     A     I would have to go through the memo.   There is a number

21     of commentaries in the bank memos around this time about the

22     company being in a liquidity crisis.

23     Q     Well, the UBS conclusion, if we look at page eight, was

24     that the fundamental credit story remains sound, correct,

25     sir?

1    A    I'd characterize it as an observation.  I don't know if

2    it's a conclusion, but it's an observation.

3    Q    Okay.  It's words that the UBS team wrote on the page of

4    the memo that they drafted to seek approval from UBS'

5    management for participating in the up sizing of the ABL

6    facility, correct, sir?

7    A    Yes.

8    Q    And they indicate, if we go a little bit further down in

9    that paragraph, that they refer to a need to have close to a

10    billion five of liquidity to buffer it from future oil and

11    gas volatility and margin pressure, correct?

12    A    Yes.

13    Q    Then if we go over to the next page, they indicate that

14    the company should have approximately two billion of

15    liquidity after the ABL extension, which is in excess of the

16    1.5 billion needed to buffer oil and gas price volatility and

17    margin pressure, correct, sir?

18    A    Yes.

19    Q    Now when you did your analysis in 2009, you did some

20    work using UBS' new downside case, correct?

21    A    Correct.

22    Q    And you didn't test the assumptions in that case, you

23    took the assumptions as they were presented by UBS, correct?

24    A    Yes.

25    Q    And you were aware, when you did that, that UBS witness

206

1    Doug Lane had testified in detail about they prepare these

2    downside cases and the purpose for which they prepared --

3    they were prepared.  You were aware of that testimony when

4    you decided to use that case, correct, sir?

5    A    Correct.

6              MR. POHL:  Objection, Your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes.

9    BY MR. WERDER:

10   Q    Yes.  And Mr. Lane in fact described their downside

11   cases as a doom and gloom scenario, did he not, sir?

12   A    I don't recall the specific commentary.

13   Q    Let's take a look at Mr. Lane's declaration, paragraph

14   56.  And he's talking about the downside case that they

15   created in the fall of 2007, but it describes it -- which is

16   what he updated in April of 2008, correct, sir?

17   A    This is his recent declaration?

18   Q    He didn't file a recent declaration.  This is his

19   declaration from December of 2009.

20             THE COURT:  Had you reviewed that testimony?

21             THE WITNESS:  I reviewed those declarations.

22             THE COURT:  Thank you.

23             MR. POHL:  May I make a point, Your Honor.

24             THE COURT:  You can make an objection, if you have

25   a legal objection, but don't make a point.

207

1        MR. POHL:  Okay.  I'm objecting because --

2        THE COURT:  A legal objection calls for about two

3    words.  What's your legal objection?

4        MR. POHL:  Hearsay.

5        THE COURT:  Overruled.

6    BY MR. WERDER:

7    Q    So, Mr. Tuliano, when UBS prepared the -- you can keep

8    that up for a second.  When UBS prepared the April 2008 memo

9    that you relied on, they were updating their fall 2007 base

10   and downside cases, correct?

11   A    I don't believe that's correct.

12   Q    Okay.  Do you take issue with Mr. Lane's testimony that

13   when they prepared downside cases, they were doom and gloom

14   scenarios?

15   A    I don't take issue that he said it.  I do take issue

16   that the cases presented in these memos were -- the

17   implication that these were not reasonably foreseeable

18   downside cases and I think that has been pretty consistent

19   from the various financial institutions and yet these cases

20   were prepared, there are very detailed assumptions with these

21   cases.  They were run against the credit.  They represent, as

22   in many other cases, contemporaneous downside cases that the

23   lenders considered.

24        So I find the subsequent testimony to be inconsistent

25   with the level of detail that are in the assumptions and the

208

1    stated purpose of the cases.

2    Q    I see.  So did you go and examine the UBS downside case

3    to attempt to refute the testimony that Mr. Lane gave that

4    their downside cases were designed to take all reasonably

5    foreseeable risks and apply them all at once to the combined

6    company to see how it could perform if all those bad things

7    happened at once?

8              MR. POHL:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  I'm not sure what you're asking did I

11   do.  I considered his testimony.  I analyzed the cases.  He

12   talks about reasonably foreseeable risks.  And many times

13   reasonably foreseeable risks happen together and that's what

14   ultimately you want to make sure a company is capitalized to

15   be able to deal with is not only one adverse event, but a

16   potential confluence of adverse events and I think that's

17   essentially what he's saying.

18   BY MR. WERDER:

19   Q    My question was different though, sir.  My question

20   was did you go back and look at how UBS prepared its downside

21   cases in order to refute Mr. Lane's testimony about how they

22   were prepared?

23   A    I was not attempting to refute his testimony.

24   Q    Okay.  So you didn't do that?

25   A    No.

1    Q    Okay.  In addition to preparing a new downside case in

2    April of '08, UBS prepared a new base case as well, did they

3    not?

4    A    I believe that's correct.

5    Q    And if we go back to Exhibit DX-311 and take a look at

6    page 33, UBS is describing a management case, a UBS base case

7    and a UBS downside case, correct?

8    A    Yes.

9    Q    And the management case is the new management case that

10   management had put out in April of 2008, correct?

11   A    That's one of the cases they put in April.

12   Q    And the UBS base case is UBS' own base case, is it not,

13   sir?

14   A    I believe that's the case.

15   Q    And it's different than the management case, correct?

16   A    Yes.

17   Q    It's lower than the management case, correct?

18            THE COURT:  I'm sorry, did you answer?

19            THE WITNESS:  I didn't answer, I'm sorry.

20            MR. WERDER:  Yeah, we can --

21            THE COURT:  Stop.  Let him answer your question.

22            MR. WERDER: Sorry.  You know what, I'll withdraw

23   the question.

24            THE COURT:  Okay.

25            MR. WERDER:  Keep that page up there, would you,

210

1    Jason?  Thank you.

2    BY MR. WERDER:

3    Q    UBS' observation with respect to the new UBS base case

4    is that it provides for strong liquidity through the

5    projection period remaining greater than 1.9 billion,

6    correct, sir?

7    A    That is their observation, yes.

8    Q    And the projection period was a five year projection

9    period that ran out to 2012, am I right?

10   A    It goes to 2011.

11   Q    I stand corrected, thank you.

12   A    Oh, I'm sorry --

13   Q    No, the base case.

14   A    The management case goes to 2011, the base case --

15   Q    The company --

16              THE COURT:  One at a time.

17              MR. WERDER:  Sorry.

18              THE COURT:  One at a time.

19              MR. WERDER:  Yes.

20   BY MR. WERDER:

21   Q    The company's case ran to 2011, correct?

22   A    Yes.

23   Q    That was the management case.

24   A    Correct.

25   Q    The UBS base case and the UBS downside case both ran to

1    2012, correct?

2    A    That is correct.

3    Q    And if we look at -- well, I'm not going to do that,

4    withdrawn.

5              THE COURT:  Just so we're clear, we're going to go

6    to 5:20 today, because of the late start this morning, we'll

7    make up a little bit of that time.  We started this afternoon

8    at 2:20, we'll go to 5:20 and then break.

9              MR. WERDER:  Thank you, Your Honor.

10   BY MR. WERDER:

11   Q    Now in your February 2011 report at table 9, you

12   reported the result of running of your cash flow adequacy

13   test on UBS' new downside case, correct?

14   A    Yes.

15   Q    And that analysis was done from the perspective of April

16   2008, not from the perspective of December 2007, correct?

17   A    Yes.

18   Q    And you used their downside case, their new downside

19   case, not their new base case, am I right?

20   A    Yes.

21   Q    And you purported to show a cash flow deficit in 2008,

22   right?  The 147 million?

23   A    Yes.

24   Q    And Mr. Purchell (phonetic), when he commented on your

25   February 2011 report, identified an error in your

212

1    calculation, correct?

2    A    I believe that's right.

3    Q    And the error related to the manner in which you had

4    calculated the term loan A mandatory repayment schedule, am I

5    right?

6    A    I don't recall specifically.  We did submit an updated

7    exhibit.

8    Q    Right.  And that is in your report in June 2011, you

9    agreed, at page 11 of that report, that the error that Mr.

10   Purchell had identified was in fact an error, correct?

11   A    Yes.

12   Q    And you corrected that error with Exhibit II, Exhibit

13   Roman II, in your June 2011 report, correct

14   A    Yes.

15   Q    And when you corrected your error, the $147 million

16   deficit that you had claimed for 2008 became a 557 million

17   positive number, correct?

18   A    Yes.

19   Q    And the -- that's about a $700 million difference,

20   correct?

21   A    Yes.

22   Q    And when you corrected the error that Mr. Purchell had

23   identified for the five year projection period as a whole,

24   the deficit that you had previously asserted became a

25   positive number, correct?

1    A    Yes.

2    Q    And in fact what originally you had reported as a

3    cumulative deficit of 1.6 -- withdrawn.  When you corrected

4    the error, you didn't identify any deficit at all until 2011,

5    correct?

6    A    Yes.

7    Q    And the deficit that you are identifying --

8            THE COURT:  I'm sorry, on a cumulative basis, the

9    first deficit is in 2010.

10           MR. WERDER:  Are you looking at the June report,

11   Your Honor?

12           THE COURT:  No, I'm sorry.  What page?  I'm looking

13   at Exhibit 2.

14           THE WITNESS:  Yeah, I'm having a little trouble

15   with my own exhibits here too.

16           MR. WERDER:  We did submit that with the report,

17   Your Honor.

18           THE COURT:  The rebuttal report?

19           MR. WERDER:  Correct.

20           THE COURT:  I'd appreciate if you could tell me

21   what table -- the exhibit, what are you looking at it?

22           THE WITNESS:  Exhibit 2.

23           MR. WERDER:   The copies of the report -- do you

24   have it Your Honor?

25           THE COURT: Yes, I do.

1    BY MR. WERDER:

2    Q    And so the --

3         THE COURT:  Have you finished your answer?

4         THE WITNESS:  I'm not sure I have.

5    BY MR. WERDER:

6    Q    Yeah, go ahead.

7    A    What I was pointing out was that the deficit, the first

8    year of the deficit, was 2010, 750 million.  And at that

9    point in time the leverage ratio was up to 10.6 times, the

10   leverage ration, debt to EBITDA.

11        So this test is no more than just looking for a

12   cumulative deficit.  It looks at a number of factors

13   including individual deficits in an individual year, how much

14   cash flow is actually being generated by the business plan,

15   what the leverage ratios are and whether the company would be

16   bankable company at that point in time, keeping in mind that

17   the company is still carrying 24 billion in debit through

18   this process.  Leverage is increasing and the cash flow is

19   anemic and then goes negative.

20   Q    Well, UBS looked at the same downside case that you're

21   performing your analysis on here, didn't they, sir?

22   A    Yes.

23   Q    And they concluded, based on their analysis of their

24   downside case that the liquidity was going to be adequate,

25   correct and above what they believed was necessary?

215

1    A    We reviewed the commentary and those are the comments

2    that they made.  They have their comments in the memo as

3    well.

4    Q    And just so that we're clear about the UBS downside

5    case, that UBS downside case is showing synergies that were

6    not only well below what management was projecting, but well

7    below what the company was in fact achieving in 2008,

8    correct?

9    A    In the downside case?

10   Q    Yes.

11   A    Yeah, it was downside case for them as well.

12   Q    And the synergies --

13            THE COURT:  Hold it.  We may be ships passing in

14   the night.

15            MR. WERDER:  Sorry, Your Honor.

16            THE COURT:  I heard your question, I heard the

17   answer.  I don't think you got an answer to the question you

18   asked.

19            MR. WERDER:  No.  Let me rephrase the question.

20   BY MR. WERDER:

21   Q    Mr. Tuliano, I maybe have sped up a little bit for the

22   last 20 minutes.  The UBS downside case that you're analyzing

23   in your chart is a downside case that assumes synergies well

24   below both what management was projecting and well below what

25   was in fact being achieved, correct?

216

1    A    I think that's incorrect.

2    Q    Well, the projections were for a total -- were for 42.7

3    million in 2008, 130 million in '09 and 210 million in each

4    of 2010 through 2012.  That's well below what management was

5    projecting, is it not, sir?

6

7    A    I'm sorry, I'm not understanding your question.  I

8    thought those were the management.  You're looking at the

9    case -- in the downside case.  Yes, that's correct.

10   Q    Yes.  So the downside case that is the subject of your

11   presentation in Exhibit 2 is a downside case that considers

12   hundreds of millions of dollars less in synergies than what

13   management was expecting, correct, sir?

14   A    Correct.

15   Q    And you didn't run your cash flow on the April -- the

16   new April 2008 base case that UBS developed and put forward

17   to its credit committee, correct?

18   A    Correct.

19   Q    And if you had done that, if you had used that case,

20   what you called a cumulative deficit of 500 million would be

21   a cumulative positive number in the vicinity of 3.7 billion,

22   correct, sir?

23   A    I have not done the math.  If you have it, I'm happy to

24   look at it.  It is not downside case though, but happy to

25   look at your calculation.

1          MR. WERDER:  I'm going to mark this for

2     identification as Tuliano Cross Examination Exhibit 7.

3          (Tuliano Cross Examination Exhibit  7 was marked for

4     identification)

5     BY MR. WERDER:

6     Q    And obviously we prepared this, you didn't prepare this,

7     but using the EBITDA projections from the new base case and

8     otherwise duplicating your results, it would appear that your

9     cash flow test would generate a total cumulative surplus of

10    $3.7 billion over the period of time covered by the

11    projections, correct?

12    A    Yes.

13    Q    And the conclusions that UBS reached, based on its new

14    base case and its new downside case and the new management

15    case in April of 2008 are very different than the opinions

16    that you're offering here, correct?

17    A    Well, UBS has a number of observations.  I've not seen

18    them issue opinions as to capital adequacy of the nature that

19    I've issued.

20    Q    Well, let's look at Mr. Lane's declaration, which I

21    think we established earlier you had reviewed, correct?

22    A    Yes.

23    Q    And Mr. Lane testified in paragraph 78 of his

24    declaration that in April 2008 UBS continued to have a great

25    deal of confidence in the company on a long term basis in

1   terms of performance and a great deal of confidence that it

2   was adequately capitalized and had the ability to pay its

3   debts as they became due.  That was his testimony, correct?

4   A    Yes.

5   Q    And that was very consistent with the conclusions set

6   forth in the memo that UBS wrote for its credit committee,

7   where it commented on its expectations concerning liquidity,

8   correct, sir?

9   A    I don't agree with that.

10  Q    All right.  Let's turn to your covenant analysis in your

11  2009 report.  You -- let me have the right page.  I guess

12  we're in the leverage section, right?  Yeah, page 58.

13          MR. WERDER:  Which report are we looking at?

14          MR. WERDER:  This is November 2008 report, the

15  first report.

16          THE COURT:  2009.

17          MR. WERDER:  2009, yes.  November 7, 2009.

18  BY MR. WERDER:

19  Q    And you're here analyzing potential covenant breaches,

20  correct, sir?

21  A    Yes.

22  Q    And the banks that finance the deal evaluated potential

23  covenant breaches as well, did they not, sir?

24  A    Not in this way, but they certainly were involved in

25  setting the covenants.

1    Q    All right  The Citibank July 15th memo that you relied

2    on and from which you drew the downside case projections

3    contained a valuation of LBI, correct, sir?

4    A    I believe that's right.

5    Q    And on Citibank's valuation LBI was expected to have

6    billions of dollars of equity value, correct, sir?

7                MR. POHL:  Objection, Your Honor.  Hearsay.

8                THE COURT:  Overruled.  He said he considered this

9    in doing his report.  He did consider it.  Overruled.

10   BY MR. WERDER:

11       Q    The Citi memo that you relied on indicated that the

12   company would have billions of dollars of equity value,

13   correct, sir?

14   A    That very well may be.  I was focusing on capital

15   adequacy ultimately and there's another expert that will

16   address the valuation.

17   Q    Understood.  And your report doesn't set forth the

18   valuation, correct?

19   A    Correct.

20   Q    And it doesn't analyze or criticize the Citi valuation,

21   does it?

22   A    No.

23   Q    And for companies with billions of dollars in equity

24   value, violations of covenants are highly unlikely to lead to

25   the failure of the business, correct, sir?

220

1    A     That's correct.

2    Q     And companies with billions of dollars of equity have

3    lots of options for dealing with potential covenant

4    violations, don't they?

5    A     I believe that's correct.

6    Q     And if Citibank was right and all the other banks were

7    right that LBI at inception had significant equity value,

8    that would provide compelling evidence that it was adequately

9    capitalized and able to pay its debts as they mature, would

10   it not, sir?

11   A     I believe that's inconsistent with everything that I've

12   looked at.

13   Q     Well, I didn't ask you whether it was inconsistent, I

14   asked if Citi and the other banks were right that they were

15   significant equity value, then that would provide compelling

16   evidence that it was adequately capitalized and able to pay

17   its debits as they mature, correct?

18   A     I would have to see that equity value and compare it to

19   the overall leverage and the industry, the amount of leverage

20   that was taken in the industry and so forth.

21             MR. WERDER:   Mark this as Tuliano Cross Examination

22   Exhibit 8.

23        (Tuliano Cross Examination Exhibit 8 was marked for

24   identification)

25   BY MR. WERDER:

1    Q    And if we look at page 38 of your report, you state in

2    paragraph 100:

3        "As a threshold matter it is important to recognize that

4    for Adelphia, a company with over 3.7 billion in equity

5    value, a violation of financial covenants, which is in

6    essence a technical violation rather than a payment default,

7    would be highly unlikely to lead to the failure of the

8    business.  Unlike a company with little or no equity value,

9    Adelphia had a variety of options available to it in the

10    event of potential covenant issues, including obtaining any

11    necessary waivers, renegotiating such covenants to reflect

12    changing expectations with respect to the business, raising

13    equity and paying down debt, selling assets and paying down

14    debt or slowing its growth to preserve cash and reduce debt

15    needs."

16        Correct, sir?  That was your testimony, was is not?

17    A    Yes, absolutely.

18    Q    And it's true as a general -- this is not an opinion

19    that's specific to Adelphia, correct, sir?  LBI in fact had

20    billions of equity value, like the banks said that it did and

21    as Citi estimated in the document that you relied upon, that

22    would provide compelling evidence that it was adequately

23    capitalized and able to pay its debts when due, correct?

24    A    I can't agree with that.  Adelphia, the 3.billion

25    Adelphia had approximate 3 billion in debt.  This would be

222

1    the functional equivalent of LBI having 20 billion of equity

2    value.  Adelphia was a cable company in a market that was no

3    subject to trough conditions.  This transfer was as of 1999,

4    this was a very robust economy at that point in time.  Cable

5    companies have very robust valuations and ultimately very

6    different that LBI in the midst of a credit crunch as an LBO.

7    Adelphia was not a leveraged buyout.

8    Q    And if we look further down on the page in paragraph

9    101, you say:

10       "Additionally Professor Sheked (phonetic) dismisses

11   billions of dollars in equity value by virtue of his flawed

12   balance sheet analysis, which when properly considered

13   provides compelling evidence that Adelphia was adequately

14   capitalized."

15       That was your testimony in the Adelphia case, correct,

16   sir?

17   A    Correct.

18   Q    And is it your testimony here today that the presumed,

19   assumed for purposes of my question, existence of billions of

20   dollars of equity value as the banks indicated existed in LBI

21   does not provide compelling evidence of its ability to -- of

22   its adequate capitalization and it's ability to pay its

23   debits, when due, is that your opinion?

24   A    Yes.  Very different circumstances, very different

25   company, very different time, very different amount of

223

1    leverage, very different optionality.  With respect to the

2    company at that point in time, very different access to the

3    capital markets, completely different analysis.

4              MR. WERDER:  It's a good breaking point, Your

5    Honor.

6              THE COURT:  Thank you.  All right.  We'll recess

7    for the day.  We'll resume at 9:00 in the morning.  Hopefully

8    we'll end at 5:00 tomorrow.  I have another hearing at 5:30,

9    a first day hearing at 5:30.

10             You can leave everything in the courtroom.  I just

11   ask that tomorrow that you cover up anything that -- I don't

12   think it will be a very long hearing, but you should cover up

13   anything that you consider being sensitive or confidential

14   tomorrow, otherwise you can leave everything here.  The

15   courtroom will be locked up when everybody leaves.

16             MR. WERDER:  Are we on the usual rule of witnesses

17   on cross examination not consult with counsel?

18             THE COURT:  That's correct.

19             MR. WERDER:  Thank you, Your Honor.

20             THE COURT:  Thank you very much.  You're excused

21   for the day.  We'll resume tomorrow at 9:00.

22        (Court in recess at 05:23 p.m.)

23

24

25

224

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6      that I am not financially interested in the action.

7

8

9      _____        October 19, 2016

10     Jennifer Wilson, AD/T #623

11     Certified Court Transcriptionist

12     For AudioEdge Transcription, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25