Sigmund S. Wissner-Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel for Edward S. Weisfelner,*
*as Litigation Trustee of the LB Litigation Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                                              Case No.  09-10023 (CGM)

LYONDELL CHEMICAL COMPANY, *et al.*,
                                                                    Chapter 11
Debtors.

-------------------------------------------------------------x

EDWARD S. WEISFELNER, AS LITIGATION            (Jointly Administered)
TRUSTEE OF THE LB LITIGATION TRUST,

Plaintiff,

                                                                    Adv. Pro. No. 09-1375 (MG)
v.

LEONARD BLAVATNIK, *et al.*,

Defendants.

-------------------------------------------------------------x

EDWARD S. WEISFELBER, AS LITIGATION
TRUSTEE OF THE LB LITIGATION TRUST,

Plaintiff,

                                                                    Adv. Pro. No. 11-1844 (MG)
v.

NAG Investments LLC,

Defendant.

-------------------------------------------------------------x

**PLAINTIFF'S POST-TRIAL BRIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ......................................................................... 1

PROPOSED CONCLUSIONS OF LAW ............................................................ 5

I.    Avoidable Preference (Count 9) .............................................................. 5

    A.    The October Transfer Is Not Protected By The Ordinary Course Defense............ 6

    B.    Insolvency and Other Section 547(b) Prerequisites Satisfied ............................... 19

    C.    The Transfer Involved an Interest in the Property Of Lyondell. .......................... 25

    D.    Recovery and Damages ................................................................... 27

II.   Constructive Fraudulent Transfer:  "Transaction Fees" (Count 11) ................... 28

    A.    Elements for Proving Constructive Fraudulent Transfer ..................................... 28

    B.    Financial Condition of the Debtors ................................................................ 29

    C.    Reasonably Equivalent Value ........................................................... 42

    D.    Recovery and Damages ................................................................... 44

III.  Constructive Fraudulent Transfer:  Toe-Hold (Count 1) ................................. 46

    A.    Financial Condition of the Debtors ................................................................ 46

    B.    Reasonably Equivalent Value ........................................................... 47

    C.    Interest of the Debtor in Property ................................................................ 48

    D.    Section 546(e) Safe Harbor Issues ................................................................ 52

    E.    Recovery and Damages ................................................................... 58

IV.   Tortious Misconduct of Luxembourg Fiduciaries (Counts 6 and 7); Aiding & Abetting (Count 18) ............................................................................... 63

    A.    Applicable Law (Counts 6 and 7) ................................................................ 64

    B.    Counts 6 and 7:  Nature of Legal Theories ..................................................... 65

    C.    Claim Set 1:  Tortious Misconduct By Blavatnik/Access as De Facto Director... 66

    D.    Claim Set 2:  GP Managers ............................................................ 75

    E.    Claim Set 3:  Post-Merger Supervisory Board ................................................ 76

    F.    Causation and Damages ................................................................. 77

    G.    Aiding and Abetting Violations of Luxembourg Duties (Count 18) ................... 78

    H.    Defendants' Release Argument Lacks Merit ................................................... 80

V.    Intentional Fraudulent Transfer:  Toe-Hold Payments 1 and 2 (Count 2) ............ 82

i

|       | A. | Standard for Actual Intent | 83 |
|       | B. | "Actual Intent" Has Been Established In Multiple Ways | 84 |
|       | C. | Recovery and Damages | 94 |
| VI.   |    | Constructive Fraudulent Transfer NAG Action Counts 1 & 2 | 95 |
|       | A. | The Distribution Was A Fraudulent Transfer Under Section 548. | 95 |
|       | B. | Recovery and Damages | 98 |
| VII.  |    | Breach of Access Revolver:  Restitutionary Damages (Count 12) | 98 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.),
    404 B.R. 335 (S.D.N.Y. 2009).................................................................98

Acticon AG v. China North East Petroleum Holdings Ltd.,
    692 F.3d 34 (2d Cir. 2012)....................................................................21

Adelphia Recovery Tr. v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp),
    512 B.R. 447 (Bankr. S.D.N.Y. 2014) .............................................38, 48

Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff
    Foodservices Corp.),
    56 B.R. 899 (Bankr. S.D.N.Y. 1986)........................................................21

Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.),
    75 F.3d 1447 (10th Cir. 1996) ...............................................................26

Anzalone v. Dulgerian (In re Dulgerian),
    388 B.R. 142 (Bankr. E.D. Pa. 2008)......................................................51

Archer Well Co. v. GW Holdings I LLC,
    No. 12 Civ. 6762 (JSR), 2013 WL 2314271 (S.D.N.Y. May 21, 2013)................54

ASARCO, LLC v. Americas Mining Corp.,
    396 B.R. 278 (S.D. Tex. 2008) ...................................................... passim

In re Bachrach Clothing, Inc.,
    480 B.R. 820 (Bankr. N.D. Ill. 2012)......................................................24

Baldi v. Lynch (In re McCook Metals, L.L.C.),
    319 B.R. 570 (Bankr. N.D. Ill. 2005)......................................................59

In re Bankest Capital Corp.,
    374 B.R. 333 (Bankr. S.D. Fla. 2007)......................................................96

BanxCorp v. Costco Wholesale Corp.,
    978 F. Supp. 2d 280 (S.D.N.Y. 2013)......................................................90

Bash v. Sun Trust Banks, Inc. (In re Ohio Bus. Machs.),
    No. 06-8005, 2007 WL 177941 (B.A.P. 6th Cir. Jan. 25, 2007) ...........................51

Baumgartner-Novak v. Eckman (In re Eckman),
    447 B.R. 546 (Bankr. N.D. Ohio 2010) ...................................................10

Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),
    397 B.R. 1 (S.D.N.Y. 2007)................................................................................................45

Begier v. I.R.S.,
    496 U.S. 53 (1990)............................................................................................................51

Boyer v. Crown Stock Distrib., Inc.,
    587 F.3d 787 (7th Cir. 2009) ............................................................................................32

Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),
    195 B.R. 971 (Bankr. D. Mass. 1996)..........................................................................31, 32

Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.),
    435 B.R. 819 (Bankr. N.D.N.Y. 2010) .............................................................................27

Buchwald Capital Advisors LLC v. Metl–Span I., Ltd. (In re Pameco Corp.),
    356 B.R. 327 (Bankr. S.D.N.Y. 2006) ..........................................................................16, 27

Bumgardner v. Ross (In re Ste. Jan-Marie, Inc.),
    151 B.R. 984 (Bankr. S.D. Fla. 1993)...............................................................................84

Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship
    IV,
    229 F.3d 245 (3d Cir. 2000)...............................................................................................47

Burtch v. Opus, LLC (In re Opus East, LLC),
    528 B.R. 30 (Bankr. D. Del. 2015) ...............................................................................27, 46

Caillouet v. First Bank and Trust (In re Entringer Bakeries, Inc.),
    347 B.R. 550 (Bankr. E.D. La. 2006), aff'd in part, vacated in part on other
    grounds, 548 F.3d 344 (5th Cir. 2008).............................................................................13

In re Capmark Fin. Grp., Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) ..................................................................................51

Cassirer v. Herskowitz (In re Schick),
    234 B.R. 337 (Bankr. S.D.N.Y. 1999) ..............................................................................17

Castro v. United Security, Inc.,
    No. 10 Civ. 6152 (LBS), 2012 WL 555701 (S.D.N.Y. Feb. 21, 2012) ...............................56

CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship,
    No. 12-CV-08087 CM SN, 2013 WL 2661037 (S.D.N.Y. June 12, 2013)............................65

Cede & Co. v. Technicolor, Inc. (Technicolor II),
    684 A.2d 289 (Del. 1996) ..................................................................................................30

In re Chemtura Corp.,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................................20

Chevron Corp. v. Donziger,
    974 F.Supp.2d 362 (S.D.N.Y. 2014)....................................................................90

Christian Bros. High School Endowment v. Bayou No Leverage Fund LLC (In re
    Bayou Grp., LLC),
    439 B.R. 284 (S.D.N.Y. 2010).................................................................45, 83, 93

Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner,
    Heine, Underberg, Manley, Myerson & Casey),
    130 F.3d 52 (2d Cir. 1997)....................................................................................58

In re Condon,
    198 F. 947 (S.D.N.Y. 1912)..................................................................................83

In re Cox Motor Express of Greensboro, Inc.,
    Case No. 14-10468, Adv. Pro. No. 15-02023, 2016 WL 4259801 (Bankr.
    M.D. N.Car. Aug. 9, 2016) .....................................................................................8

Credit Managers Ass'n of S. Cal. v. Fed. Co.,
    629 F.Supp. 175 (C.D. Cal. 1985) .............................................................22, 29, 30

Crescent Res. Litig. Trust v. Duke Energy Corp.,
    500 B.R. 464 (W.D. Tex. 2013).............................................................................54

Crews v. Truver (In re Flight Mgmt., Inc.),
    99 B.R. 477 (Bankr. M.D. Fla. 1989) .....................................................................9

Crystallex International Corp. v. Petroleos de Venezuela, S.A.,
    2016 WL 5724777 (D. Del. Sep. 30, 2016), appeal docketed, No. 16-4012 (3d
    Cir. Nov. 3, 2016) .................................................................................................96

Daley v. Chang (In re Joy Recovery Tech. Corp.),
    286 B.R. 54 (Bankr. N.D. Ill. 2002)......................................................................32

DeBenedictis v. Merrill Lynch & Co, Inc.,
    492 F.3d 209 (3d Cir. 2007)..................................................................................86

Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.,
    555 B.R. 70 (Bankr. D. Me. 2016).........................................................................32

Diamond v. Empire Partners, Inc. (In re Empire Land, LLC),
    No. 6:08-bk-14592, 2016 WL 1391297 (Bankr. C.D. Cal. Apr. 4, 2016)..............47

DiLaura v. Power Auth. of State of N.Y.,
    982 F.2d 73 (2d Cir. 1992).........................................................................................56

Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde
    Park, Inc.),
    360 B.R. 787 (Bankr. N.D. Ill. 2007), vacated and remanded on other grounds
    by, 619 F.3d 688 (7th Cir. 2010).............................................................................52

Enron Corp. v. Port of Houston Auth. (In re Enron Corp.),
    Case No. 01-16034 (AJG), Adv. Pro. No. 03-92511 (AJG), 2006 WL 2385194
    (Bankr. S.D.N.Y. June 2, 2006)............................................................................25, 26

In re Enron Cred. Recovery Corp.,
    651 F.3d 329 (2d Cir. 2011)......................................................................................58

In re Fannie Mae 2008 ERISA Litig.,
    No. 09 Civ. 1350 (PAC), 2014 WL 1577769 (Bankr. S.D.N.Y. Apr. 21, 2014)....................56

Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,
    689 F. Supp. 2d 585 (S.D.N.Y. 2010).......................................................................27

Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.),
    148 B.R. 97 (Bankr. D.Mass. 1992)...........................................................................32

Fidelity Bond and Mortg. Co. v. Brand (In re Fidelity Bond and Mortg. Co.,
    340 B.R. 266 (Bankr. E.D. Pa. 2006)....................................................................32, 47

First Software Corp. v. Computer Assocs. Int'l, Inc.,
    107 B.R. 417 (D. Mass. 1989) .................................................................................20

Gordon v. Livecchi (In re Livecchi),
    No. 09-20897, 2014 WL 6668886 (Bankr. W.D.N.Y. Nov. 20, 2014) ...............................84

Gowan v. Amaranth LLC (In re Dreier LLP),
    452 B.R. 451 (Bankr. S.D.N.Y. 2011) .......................................................................59

Great Lakes Chem. Corp. v. Monsanto Co.,
    96 F. Supp. 2d 376 (D. Del. 2000)...........................................................................54

Grogan v. Garner,
    498 U.S. 279 (1991)...............................................................................................84

Gunten v. Neilson (In re Slatkin),
    243 F. App'x 255 (9th Cir. 2007) .............................................................................59

Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.),
    956 F.2d 479 (4th Cir. 1992) ...................................................................................10

Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.),
    507 B.R. 452 (Bankr. S.D.N.Y. 2014) ...............................................................40, 41

Hassan v. Middlesex Cnty. Nat'l Bank (In re Mystic Pipe & Supply Corp.),
    333 F.2d 838 (1st Cir. 1964) ...................................................................................41

Hassett v. Goetzman (In re CIS Corp.),
    195 B.R. 251 (Bankr. S.D.N.Y. 1996) ...............................................................7, 17

HBE Leasing Corp. v. Frank,
    48 F.3d 623 (2d Cir. 1995)................................................................................48, 49

Hechinger Inv. Co. of Del. v. Universal Forest Prods., Inc. (In re Hechinger Inv.
    Co. of Del.),
    489 F.3d 568 (3d Cir. 2007)....................................................................................27

Henderson v. Buchanan (In re W. World Funding, Inc.),
    52 B.R. 743 (Bankr. D. Nev. 1985), rev'd on other grounds, 985 F.2d 1021
    (9th Cir. 1993)........................................................................................................10

In re Highland Fin. Corp.,
    216 B.R. 109 (Bankr. S.D.N.Y. 1997) ...................................................................56

Homeplace of Am. v. Salton, Inc. (In re Waccamaw's Homeplace),
    325 B.R. 524 (Bankr. D. Del. 2005) ......................................................................24

Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.),
    182 B.R. 728 (Bankr. W.D. Va. 1995)....................................................................10

I. Appel Corp. v. Val Mode Lingerie, Inc.,
    Nos. 97 Civ. 6938(LMM), 97 Civ. 8230(LMM), 2000 WL 231072 (S.D.N.Y.
    Feb. 28, 2000) ........................................................................................................96

Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.),
    421 B.R. 251 (Bankr. W.D. Tex. 2009)..................................................................28

Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v.
    Motorola, Inc. (In re Iridium Operating LLC),
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ......................................................30, 38, 41

Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP),
    518 B.R. 766 (Bankr. S.D.N.Y. 2014) ...................................................................47

Jacobs v. Gramercy Jewelry Mfg. Corp. (In re Fabrikant & Sons, Inc.),
    No. 06-12737, 2010 WL 4622449 (Bankr. S.D.N.Y. Nov. 4, 2010) .......................17

Jacobs v. Matrix Cap. Bank (In re AppOnline.com, Inc.),
    315 B.R. 259 (Bankr. E.D.N.Y. 2004).....................................................................8

Johnson v. Holder,
    564 F.3d 95 (2d Cir. 2009)...................................................................................56

Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.),
    798 F.3d 983 (10th Cir. 2015) ........................................................................11, 15

Kapila v. Media Buying, Inc. (In re Ameri P.O.S. Inc.),
    355 B.R. 876 (Bankr. S.D. Fla. 2006)..................................................................10

Keith v. Black Diamond Advisors, Inc.,
    48 F. Supp. 2d 326 (S.D.N.Y. 1999)....................................................................53

Kelley v. McCormack (In re Mitchell),
    548 B.R. 862 (Bankr. M.D. Ga. 2016).................................................................12

Kendall v. Sorani (In re Richmond Produce Co.),
    151 B.R. 1012 (Bankr. N.D. Cal. 1993)...............................................................46

KH Funding Co. v. Escobar (In re KH Funding Co.),
    541 B.R. 308 (Bankr. D. Md. 2015) ...............................................................12, 16

Kirschner v. KPMG LLP,
    15 N.Y.3d 446 (2010) ....................................................................................49, 79

Kleven v. Household Bank F.S.B.,
    334 F.3d 638 (7th Cir. 2003) ...............................................................................16

Kramer v. Chin (In re Chin),
    492 B.R. 117 (Bankr. E.D.N.Y. 2013).................................................................28

Kramer v. Sooklall (In re Singh),
    434 B.R. 298 (Bankr. E.D.N.Y. 2010).................................................................93

Laker v. Vallette,
    No. 92-1683, 1993 WL 114515 (E.D. La. Mar. 31, 1993), aff'd sub nom.
    Laker v. Vallette (In re Toyota of Jefferson, Inc.), 14 F.3d 1088 (5th Cir.
    1994) .....................................................................................................................10

Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),
    78 F.3d 30 (2d Cir. 1996)...................................................................6, 7, 17, 41

Lee's Place, Inc. v. Hawbaker (In re Lee's Place, Inc.),
    No. 92-4006, 1992 WL 164443 (C.D. Ill. June 26, 1992) ................................8, 10

In re Lehman Bros. Holdings Inc.,
    541 B.R. 551 (S.D.N.Y. 2015) ............................................................................91

Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger
    Inv. Co. of Del.),
    327 B.R. 537 (D. Del. 2005) ...............................................................................84

Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.),
    332 B.R. 129 (Bankr. D. Del. 2005) ....................................................................28

In re Livent, Inc.,
    360 F. Supp. 2d 568 (S.D.N.Y. 2005)..................................................................27

Marquette Bank Illinois v. Covey (In re Classic Coach Interiors, Inc.),
    290 B.R. 631 (Bankr. C.D. Ill. 2002) ..................................................................96

Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,
    926 F.2d 1248 (1st Cir. 1991) .............................................................................92

McCullough v. Garland (In re Jackson),
    90 B.R. 793 (Bankr. D.S.C. 1988) ......................................................................10

McHale v. Boulder Capital LLC (In re 1031 Tax Grp.),
    439 B.R. 84 (Bankr. S.D.N.Y. 2010) (Glenn, J.) ............................................27, 46

Meadows v. Hartford Life Ins. Co.,
    492 F.3d 634 (5th Cir. 2007) ...............................................................................79

Meeks v. Harrah's Tunica Corp. (In re Armstrong),
    231 B.R. 723 (Bankr. E.D. Ark. 1999), aff'd, 260 B.R. 454 (E.D. Ark. 2001),
    aff'd, 291 F.3d 517 (8th Cir. 2002)........................................................................7

Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In
    re R.M.L., Inc.),
    92 F.3d 139 (3d Cir. 1996)...................................................................................43

Mellon Bank, NA v. Metro Commc'ns, Inc.,
    945 F. 2d 635 (3d Cir. 1991)..............................................................38, 40, 43, 51

Merion Capital L.P. v. Lender Processing Servs., Inc.,
    C.A. No. 9320-VCL, slip op. (Del Ch. Dec. 16, 2016)........................................30

Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC),
    426 B.R. 488 (Bankr. D. Del. 2010) ....................................................................49

In re: Method of Processing Ethanol Byproducts and Related Subsystems ('858)
    Patent Litig.,
    No. 1:10-ml-02181-LJM-DML, 2016 WL 4919980 (S.D. Ind. Sept. 15, 2016) ....................90

MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,
    910 F.Supp. 913 (S.D.N.Y. 1995)...............................................................30, 31, 42

MicroStrategy Inc. v. Acacia Research Corp.,
    No. CIV.A. 5735-VCP, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010) ...................................82

Matter of Milwaukee Cheese Wis., Inc.,
    112 F.3d 845 (7th Cir. 1997) .................................................................................27

Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.),
    No. 98 C 5915, 2000 WL 988177 (N.D. Ill. July 18, 2000) ..................................................46

Moody v. Sec. Pac. Bus. Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992)............................................................................... passim

Murphy v. Meritor Sav. Bank (In re O'Day Corp.),
    126 B.R. 370 (Bankr. D. Mass. 1991).....................................................................31

In re Nellson Nutraceutical, Inc.,
    No. 06-10072, 2007 WL 201134 (Bankr D. Del. Jan. 18, 2007)............................................30

Nickless v. Golub (In re Worcester Quality Foods, Inc.),
    152 B.R. 394 (Bankr. D. Mass. 1993)....................................................................59

Nisselson v. Empyrean Invest. Fund, L.P. (In re MarketXT Holdings Corp.),
    376 B.R. 390 (S.D.N.Y. 2007)............................................................................84

Nisselson v. Salim (In re Big Apple Volkswagen, LLC),
    No. 11-2251, 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016) (Garrity, J.)..............58, 59

O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props.,
    LLC),
    488 B.R. 394 (B.A.P. 9th Cir. 2013).....................................................................54

Official Comm. of Unsec. Cred. of 360networks (USA) Inc. v. U.S. Relocation
    Servs. (In re 360networks (USA) Inc.),
    338 B.R. 194 (Bankr. S.D.N.Y. 2005) ...................................................................16

Official Comm. of Unsec. Creditors of Color Tile, Inc. v. Coopers & Lybrand,
    LLP,
    322 F.3d 147 (2d Cir. 2003).........................................................................56, 57

Official Comm. of Unsec. Creds. of Enron Corp. v. Martin (In re Enron Creditors
    Recovery Corp.),
    376 B.R. 442 (Bankr. S.D.N.Y. 2007) ...................................................................6, 8

Official Comm. of Unsec. Creds. of Toy King Distribs., Inc. v. Liberty Savings
    Bank (In re Toy King Distribs., Inc.),
    256 B.R. 1 (Bankr. M.D. Fla. 2000) ...........................................................................10

Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &
    Co. (In re Sunbeam Corp.),
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) .........................................................................48

Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.
    (In re TOUSA, Inc.),
    422 B.R. 783 (Bankr. S.D. Fla. 2009), affirmed in part and reversed in part by,
    680 F.3d 1298 (11th Cir. 2012) ............................................................................46, 51

Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC),
    499 B.R. 542 (Bankr. S.D. Tex. 2013) .........................................................................41

Orr v. Kinderhill Corp.,
    991 F.2d 31 (2d Cir. 1993) ............................................................................................48

Osherow v. Hensley (In re Pace),
    456 B.R. 253 (Bankr. W.D. Tex. 2011) ........................................................................83

Peltz v. Hatten,
    279 B.R. 710 (D. Del. 2002) .........................................................................................32

Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf
    Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.),
    444 F.3d 203 (3d Cir. 2006) ..........................................................................................43

Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.),
    500 B.R. 371 (Bankr. S.D.N.Y. 2013) .....................................................................48, 50

Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),
    773 F.3d 411 (2d Cir. 2014) ..........................................................................................58

Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech, Inc.),
    107 B.R. 698 (B.A.P. 9th Cir. 1988) ......................................................................6, 8, 10

Prest v. Petrodel,
    [2013] UKSC 34 ....................................................................................................60, 61

Pugh v. Tribune Co.,
    521 F.3d 686 (7th Cir. 2008) ........................................................................................21

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)......................................................................41

Redmond v. CJD & Assocs., LLC (In re Brooke Corp.),
    536 B.R. 896 (Bankr. D. Kan. 2015) .....................................................11

Redmond v. Ellis Cty. Abstract & Title Co. (In re Liberty Livestock Co.),
    198 B.R. 365 ..........................................................................................11

Revak v. SEC Realty Corp.,
    18 F.3d 81 (2d Cir. 1994)..................................................................53, 54

Richardson v. FDIC (In re M. Blackburn Mitchell Inc.),
    164 B.R. 117 (Bankr. N.D. Cal. 1994)....................................................45

Ruffini v. Norton Law Grp. PLLC,
    Adv. Pro. No. 12-8396-reg, 2014 WL 714732 (Bankr. E.D.N.Y. Feb. 25,
    2014) ......................................................................................................28

Salomon v. Kaiser (In re Kaiser),
    722 F.2d 1574 (2d Cir. 1983).............................................................92, 93

Savage & Assocs. v. Mandl (In re Teligent Inc.),
    380 B.R. 324 (Bankr. S.D.N.Y. 2008).....................................................27

Schlant v. Bartolucci (In re Gawronski),
    411 B.R. 139 (Bankr. W.D.N.Y. 2009) ...............................................7, 10

Schneider v. Barnard,
    508 B.R. 533 (E.D.N.Y. 2014) ................................................................83

Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    501 B.R. 26 (S.D.N.Y. 2013)...................................................................97

Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ....................................................58

Securities and Exchange Commission v. W.J. Howey Co.,
    328 U.S. 293 (1946).........................................................................53, 54

In re SemCrude L.P.,
    648 F. App'x 205 (3d Cir. 2016) .............................................................38

Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),
    348 B.R. 234 (Bankr. D. Del. 2005), modified on other grounds, 554 F.3d 382
    (3d Cir. 2009).........................................................................................20

Shubert v. Mull (In re Frey Mech. Grp., Inc.),
  446 B.R. 208 (Bankr. E.D. Pa. 2011)..........................................................................12

Simon v. JGM Associates, LP (In re Kiebler Recreation, LLC),
  Adv. Pro. No. 12-1138, slip. op. (Bankr. N.D. Ohio Feb. 28, 2013) .......................12

Sklar v. Susquehanna Bank (In re Global Protection USA, Inc.),
  546 B.R. 586 (Bankr. D. N.J. 2016) ..................................................9, 12, 20, 97

Southmark Corp. v. Grosz (In re Southmark Corp.),
  49 F.3d 1111 (5th Cir. 1995) .....................................................................................26

Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.),
  218 B.R. 390 (Bankr. S.D. Ohio 1998)......................................................................10

Stadtmueller v. Fitzgerald (In re Epic Cycle Interactive),
  Case No. 08-03289-CL, Adv. Pro. No. 11-90111, 2014 WL 2567170 (Bankr.
  S.D. Cal. Jun. 6, 2014) ...................................................................6, 8, 12, 16

Staehr v. Hartford Financial Services Group, Inc.,
  547 F.3d 406 (2d Cir. 2008)......................................................................................85

Stalnaker v. Gratton (In re Rosen Auto Leasing),
  346 B.R. 798 (B.A.P. 8th Cir. 2008)..........................................................................45

Stevenson v. Sensing (In re Herbison),
  Adv. Pro. No. 97-0104, 1998 WL 35324197 (Bankr. W.D. Tenn. Mar. 24,
  1998) ..........................................................................................................................11

Stoebner v. Lingenfelter,
  115 F.3d 576 (8th Cir. 1997) .....................................................................................45

Strauss v. Hollis (In re Matlock & Matlock),
  361 B.R. 879 (Bankr. W.D. Mo. 2007).......................................................................13

In re Taubman,
  160 B.R. 964 (Bankr. S.D. Ohio 1993).......................................................................42

Tavormina v. Weiss (In re Behr Contract., Inc.),
  79 B.R. 84 (Bankr. S.D. Fla. 1987).............................................................................59

Tianbo Huang v. iTV Media, Inc.,
  13 F. Supp. 3d 246, 258 (E.D.N.Y. 2014) .................................................................61

Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.),
  435 B.R. 866 (Bankr. S.D.N.Y. 2010) .......................................................................28

In re TOUSA, Inc.,
    680 F.3d 1298 (11th Cir. 2012) ................................................................51

Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines,
    Inc.),
    134 F.3d 188 (3d Cir. 1998)......................................................................20

In re Tribune Co. Fraudulent Conveyance Litig.,
    818 F.3d 98 (2d Cir. 2016).......................................................................48

Tronox Inc. v. Kerr McGee (In re Tronox Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ............................................... *passim*

In re Tyson,
    433 B.R. 68 (S.D.N.Y. 2010)....................................................................61

U.S. Philips Corp. v. Iwasaki Elec. Co.,
    607 F. Supp. 2d 470 (S.D.N.Y. 2009).......................................................27

U.S. v. Int'l Bus. Machs.,
    66 F.R.D. 154 (S.D.N.Y. 1974) ................................................................90

U.S. v. Leonard,
    529 F.3d 83 (2d Cir. 2008)........................................................................54

U.S. v. Myerson,
    18 F.3d 153 (2d Cir. 1994)........................................................................90

U.S. v. Rivernider,
    828 F.3d 91 (2d Cir. 2016)........................................................................83

U.S. v. Tabor Court Realty Corp.,
    803 F.2d 1288 (3d Cir. 1986)....................................................................48

U.S. v. Torres,
    845 F.2d 1165 (2d Cir. 1988)....................................................................90

U.S. v. U.S. Gypsum Co.,
    333 U.S. 364 (1948).................................................................................90

Union Bank of Switz. v. Deutsche Fin. Servs. Corp.,
    No. 98 Civ. 3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000) ....................41

Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,
    956 F.2d 1245 (2d Cir.1992)...............................................................56, 57

Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),
    872 F.2d 739 (6th Cir. 1989) ....................................................................11

Weisfelner v. Blavatnik, et al. (In re Lyondell Chem. Co.),
    543 B.R. 428 (Bankr. S.D.N.Y. 2016) ............................................................... *passim*

Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),
    543 B.R. 127 (Bankr. S.D.N.Y. 2016) ...................................................................98

Weisfelner v. Blavatnik (In re Lyondell Chemical Co.),
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) .....................................................................98

Weisfelner v. Fund 1, et al. (In re Lyondell Chem. Co.),
    503 B.R. 348 (Bankr. S.D.N.Y. 2014) ...................................................................48

Weisfelner v. Hofmann, et al. (In re Lyondell Chem. Co.),
    554 B.R. 635 (S.D.N.Y. 2016) ......................................................................... *passim*

Weisfelner v. LR2 Mgmt. (In re Lyondell Chem. Co.),
    No. 09-10023, 2015 WL 5560283 (Bankr. S.D.N.Y. Sept. 18, 2015) ....................17

Whyte v. C/R Energy Coinvestment II, L.P. (In re SemCrude, L.P.),
    No. 08-11525, 2013 WL 2490179 (Bankr. D. Del. June 10, 2013) ........................47

Wiggains v. Reed (In re Wiggains),
    No. 13-33757-SGJ-7, 2015 WL 1954438 (Bankr. N.D. Tex. Apr. 28, 2015) ........84

Wolkowitz v. Soll, Rowe, Price, Raffell & Browne, Inc. (In re Fink),
    217 B.R. 614 (Bankr. C.D. Cal. 1997) ...................................................................46

Wood v. Stratos Prod. Dev., LLC (In re Ahaza Systems, Inc.),
    482 F.3d 1118 (9th Cir. 2007) .........................................................................13, 15

Woodard v. Godsey (In re C.J. Spirits, Inc.),
    238 B.R. 889 (Bankr. M.D. Fla. 1999) ...............................................................9, 10

WRT Creditor's Liquidation Trust v. WRT Bankr. Litig. Master File Defendants
    (In re WRT Energy Corp.),
    282 B.R. 343 (Bankr. W.D. La. 2001) ...................................................................42

Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight),
    124 B.R. 984 (Bankr. S.D. Ohio 1990)...................................................................42

Youthland, Inc. v. Sunshine Girls of Fla, Inc. (In re Youthland, Inc.),
    160 B.R. 311 (Bankr. S.D. Ohio 1993)...................................................................7

Zazzali v. 1031 Exch. Grp. LLC (In re DBSI, Inc.),
    476 B.R. 413 (Bankr. D. Del. 2012) .......................................................................93

Zdanok v. Glidden Co.,
    327 F.2d 944 (2d Cir. 1964), cert. denied, 377 U.S. 934 (1964) ......................56, 57

## Rules

Fed. R. Civ. P. 44.1 .................................................................................................65, 71

Fed. R. Civ. P. Rule 54(b).................................................................................................56

N.Y. C.P.L.R. § 5004.................................................................................................27

## Statutes

6 Del. C. § 8-103(c) .................................................................................................54

11 U.S.C. § 101.................................................................................................20, 53, 54, 95

11 U.S.C. § 502.................................................................................................28

11 U.S.C. § 544.................................................................................................28, 47

11 U.S.C.§ 523(a) .................................................................................................84

11 U.S.C. § 541(a)(1).................................................................................................50

11 U.S.C.§ 546(e) .................................................................................................52, 55, 83

11 U.S.C. §547.................................................................................................*passim*

11 U.S.C.§ 548.................................................................................................*passim*

11 U.S.C.§ 550.................................................................................................*passim*

26 U.S.C. § 6621(a)(2).................................................................................................27

28 U.S.C. § 1961.................................................................................................27

Del Code Ann. tit. 6 § 1304(a)(1).................................................................................................83

N.Y. Debt. & Cred. L. § 276.................................................................................................83

Tex. Bus. & Com. Code Ann. § 24.005(a)(1).................................................................................................83

## Other Authorities

Boris J. Steffen, Reorganization Value: What It Is…..And Isn't, 30(3) ASS'N OF
    INSOLVENCY & RESTRUCTURING ADVISORS J., 14, 15 (2016) ................................24

Carsten Gerner-Beuerle, Philipp Paech and Edmund Philipp Schuster, April 2013,
    at A559, underline available at
    http://ec.europa.eu/internal_market/company/docs/board/2013-study-
    reports_en.pdf (last accessed Dec. 16, 2016).......................................................................73

Kristen Hays, <u>Billionaire buys into Lyondell; stock jumps: Right to acquire stake in chemical company sparks talk of takeover</u>, Houston Chronicle, May 12, 2007.................................................................................................................85

Restatement, Restitution, § 150, cmt. a. (1937)..........................................................98

Restatement (Second) of Torts.....................................................................................83

Restatement (Second) of Contracts § 351 cmt. b. (1981) ...........................................98

<u>Values: Enterprise Value, Firm Value and Market Cap</u>, Musings on Markets Blog (June 29, 2013), <u>http://aswathdamodaran.blogspot.com/2013/06/a-tangled-web-of-values-enterprise.html</u> ..............................................................24

Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust (the "Trustee"),

submits this post-trial brief.

## PRELIMINARY STATEMENT

On January 6, 2009, approximately one year after it was purchased by Basell AF S.C.A.

in a leveraged transaction orchestrated by Len Blavatnik, Lyondell management, and a series of

financing institutions, the Lyondell Chemical Company filed for protection under Chapter 11.  In

the years that followed, Blavatnik has attempted to place the blame for the failure of combined

company LyondellBasell Industries AF S.C.A. ("LBI") on a "perfect storm" of events.  Who

could have foreseen the Great Recession?  Who could have foreseen two hurricanes, a crane

accident, a downturn in crude oil prices?

At trial, the years of repetition of this self-exonerating explanation were at last replaced

by the sworn testimony of those who actually participated in these events, and contemporaneous

documentary evidence of their conduct.

What the trial record reveals is a "perfect storm" of an entirely different nature—a storm

of hasty and disastrous decision-making on the part of all three of the major participant groups

that structured the Transaction and its financing, as they acted to seize the opportunity they

perceived during a narrow and fast-receding window in the summer of 2007.  Each acting on its

own unique and compelling set of incentives, these participant groups—Blavatnik, Lyondell

management, and the third-party financing institutions—adopted decision after decision that

disregarded the known history of the industries in which they operated, the widely anticipated

petrochemical industry downturn, even their own public warnings to investors.

Motivated by his desire to build Basell into a global petrochemicals power, and his twin

desire to avoid contributing cash equity, Blavatnik targeted an acquisition of Lyondell funded

entirely by debt.    Motivated by the once-in-a-lifetime opportunity to cash out presented by Blavatnik's desire to consummate a major petrochemicals acquisition before the impending downturn, Smith hastily fabricated billions of dollars in projected EBITDA to justify the price he would demand from Blavatnik.    And motivated by the opportunity to secure a relationship with one of the world's wealthiest investors and earn significant fees, all while—most importantly— syndicating the debt to avoid carrying the risk themselves, the financing institutions adopted a let-it-slide approach, declining to require from Blavatnik the equity contribution they recommended, "accept[ing]" the M&A-driven refresh of management projections, and checking off "diligence" through an absurdly superficial weekend question-and-answer session.

The combined effect of this abdication of responsible decision-making by each of the major participant groups was the creation of a mammothly overleveraged petrochemicals and refining concern that was in serious trouble even before the transaction had closed.    A financing plan that relied heavily on asset-based lending rather than permanent financing, thus exposing the company to the evaporation of credit when asset prices inevitably would fall, was modified to become even more reliant on such lending.    LBI's budget ignored massive planned expenditures, propelling the newly minted company back to the banks for more money just weeks after the closing.    Indeed, starting just weeks after the Merger vote and continuing until the final collapse of LBI at the end of 2008, the trial record is littered with example after example of LBI employees, agents, investors and lenders expressing alarm over the company's liquidity and viability.    Ultimately, LBI's capital plan left it fundamentally ill-equipped to deal with the defining hallmarks of the industries in which it operated:    extreme volatility and cyclicality. When the downturn eventually arrived and deepened into the Great Recession, all of LBI's peer companies survived.    LBI failed.

To date, the Trustee has secured settlements with two of the three major participant groups responsible for the decision-making that felled LBI—*e.g.*, the financing parties and former Lyondell management.  Blavatnik, however, continues to disclaim all responsibility for his role.

As set forth herein, the evidence admitted at trial is more than adequate for the Trustee to prevail on a capital adequacy and causation analysis.  As further set forth herein, however, certain of the trial counts can be adjudicated even without reaching those issues.  Of relevance to such counts (as well as those that do require a causation or capital adequacy requirement), the trial has had a further salutary effect:  it wiped away many of the facile conceptual propositions upon which Blavatnik relied as a primary line of defense for years.

For example, the defense's primary line of argument with respect to the mismanagement claims against Blavatnik has long been that, although a "de facto director" doctrine indeed exists under Luxembourg law, it is of no use here because Blavatnik simply was not in charge of Basell decision-making in connection with the Merger—his subordinates were.  At trial, Blavatnik himself destroyed this story from the witness stand.  And his subordinates corroborated his testimony.

Similarly, with respect to the Trustee's preference claim for avoidance of Lyondell's repayment of its $300 million dollar draw on the Access Revolver in the final weeks before the Chapter 11 filing, defendants have long relied upon the proposition that the transaction was nothing more than "ordinary course."  But what the trial record demonstrates is an entity that was not a bank and had never offered anything remotely similar in size or terms to the Access Revolver, extending a $300 million draw to an affiliate, at a time of financial distress, when comparable credit was not available in the markets, and only after imposing requirements on the

affiliate that went beyond anything in the contract, including obtaining prior assurances that the debt would be repaid in advance of the borrower's commercial lending.

Likewise, the defense has come to rely more and more heavily upon the proposition that the post-confirmation performance of reorganized LBI proves the "industrial logic" of the Lyondell-Basell combination. But what the record instead shows is that the reorganized LBI has a financing structure completely unlike that orchestrated by the Transaction participants during the summer of 2007, including a substantial capital cushion—and only a small fraction of LBI's initial leverage.

*      *      *

Of all the positions taken by Access during the trial, perhaps most telling is the complaint that Dan Smith did not appear to testify live at trial. For the truth is, the most credible observation that Lyondell's CEO and Chairman could offer would be one made prior to the onset of litigation, prior even to Blavatnik putting Lyondell into play. And Smith did offer such an observation, publicly: "If you're a bondholder" and "you think you are going to have a down cycle in the chemical markets, I don't think you want to add $8 billion, $10 billion debt to this and live through that."

Smith's warning was prescient. Following a highly leveraged transaction, the bondholders suffered the very harm that Smith warned of, while Blavatnik, having ditched billions in inconvenient creditor liabilities by the side of the road in order to later repurchase the equity of the reorganized debtor, is now hailed for having made the "greatest deal in Wall Street history"—realizing a personal profit of over $4 billion.

For the reasons set forth herein and those to be presented at closing argument, judgment should be entered for the Trustee on all claims, on behalf of the creditors.

4

## PROPOSED CONCLUSIONS OF LAW

I.     <u>Avoidable Preference (Count 9)</u>

Count 9 seeks avoidance as a preference of the repayment to Access Industries Holdings LLC of a $300 million draw by Lyondell on the Access Revolver in mid-October 2008.[1]  For years, Access's primary defense to this claim has been that this was nothing more than an "ordinary course" transaction, protected by the Section 547(c)(2) ordinary course defense.  That defense has not survived trial.  On any credible view of the record, Access no longer can prove that the debt was incurred in the ordinary course.

On summary judgment, two additional issues were set for trial.  The first is balance sheet insolvency, as of the mid-October 2008 repayment date for the Revolver draw, *i.e.*, in the final weeks before the Chapter 11 filing, with Access already studying bankruptcy options.  The evidence is clear that Lyondell was insolvent at that time.  The second issue is whether an interest in debtor property was transferred.  Here, too, the record establishes both "control" and "legal title" on the part of Lyondell, satisfying the requirement.  Further, the "contemporaneous exchange for new value" defense is no longer viable, and is no longer pressed by Access in any event.  Finally, the Court's ruling that the remaining four affirmative elements of a Section 547 preference claim were satisfied need not be revisited, but in any event are confirmed by the record.

Finally, while the Court need not reach the point because Section 547 imposes no requirement that a transfer be "intended" as preferential, it is striking how clearly the record shows that a preference is what Access wanted, and a preference is what Access got.  Even before the agreement was signed, Access was brainstorming about ways to ensure "ability to

---

[1] With respect to Count 9, "Access" refers to Access Industries Holdings LLC, except where otherwise noted.

repay prior to secured Revolving and Term Bank Debt." See PF[2] ¶¶ 449-455; see also ¶ 468. And once the revolver was put in place, Access used its power as indirect owner of the borrower (a power not available to a commercial lender) to review the borrower's intended repayment plan and assure itself that the draw would be repaid rapidly and before Lyondell's commercial revolver was repaid. And that ultimately is what happened: on the petition date, the Access Revolver was fully repaid, while Lyondell's commercial revolving remained substantially drawn.

## A.    The October Transfer Is Not Protected By The Ordinary Course Defense.

The ordinary course of business defense is intended to leave undisturbed "normal financial relations," Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 41 (2d Cir. 1996), i.e., to protect "recurring, customary credit transactions." Official Comm. of Unsec. Creds. of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.), 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007). The defense "is not intended to shield stockholders from preference liability for short-term loans to the debtor to 'maintain operations despite capitalization problems.'" Stadtmueller v. Fitzgerald (In re Epic Cycle Interactive), Case No. 08-03289-CL, Adv. Pro. No. 11-90111, 2014 WL 2567170, at *14 (Bankr. S.D. Cal. Jun. 6, 2014) (quoting Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech, Inc.), 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988)).

Under Section 547(c)(2), a transfer will be protected by the ordinary course defense:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, **and** such transfer was—
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; **or**

---

[2] References to "PF" are to the Trustee's accompanying Proposed Findings of Fact.

(B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2) (emphasis added).

Thus, to prevail on the defense, a defendant must establish (i) that the debt was "<u>incurred</u>" in the ordinary course of business <u>and</u> (ii) that the transfer (i.e., <u>repayment</u>) was made in the ordinary course of business or according to ordinary business terms. As an affirmative defense, the burden to prove these prerequisites by a preponderance of evidence lies on defendants. <u>See</u> July 20, 2016 Order [Dkt. No. 771] ("<u>Count 9 SJ Order</u>") at *6, (citing <u>Roblin Indus.</u>, 78 F.3d at 39). In light of the policies underlying the preference statute, the defense is to be "narrowly construed," <u>Hassett v. Goetzman (In re CIS Corp.</u>), 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996).

Here, the Access Defendants cannot prove the "incurrence" element. Accordingly, the defense fails, even if Access could prove that the debt was repaid according to ordinary business terms or in the ordinary course of business. <u>See</u> 11 U.S.C. § 547(c)(2).

1.    <u>The Debt Was Not "Incurred" In The Ordinary Course Of Business.</u>

Courts have taken two approaches to analyzing whether the "incurrence" element is satisfied. Some courts view the element as requiring that the relevant debt be ordinary with respect to **<u>each</u>** of the debtor's and transferee's business generally. <u>See</u> <u>Schlant v. Bartolucci (In re Gawronski)</u>, 411 B.R. 139, 142 (Bankr. W.D.N.Y. 2009); <u>Meeks v. Harrah's Tunica Corp. (In re Armstrong)</u>, 231 B.R. 723, 730 (Bankr. E.D. Ark. 1999), <u>aff'd</u>, 260 B.R. 454 (E.D. Ark. 2001), <u>aff'd</u>, 291 F.3d 517 (8th Cir. 2002); <u>Youthland, Inc. v. Sunshine Girls of Fla, Inc. (In re Youthland, Inc.)</u>, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993). Other courts take the view that the relevant "ordinary course" under this prong is to be defined by reference to prior dealings

**between** the parties.  See Enron Creditors, 376 B.R. at 459; Jacobs v. Matrix Cap. Bank (In re AppOnline.com, Inc.), 315 B.R. 259, 283-84 (Bankr. E.D.N.Y. 2004).

Access cannot prove the incurrence element under either test.  But two factors, each dispositive, require dismissal before even reaching either test:  (i) the advance was a short-term injection of financial support amidst liquidity or capitalization issues, and (ii) the advance was a first-time transaction and an affiliate transaction.

> a.    Short-Term Cash Infusions to Address Capitalization or Liquidity Issues Are Not Protected.

As the Ninth Circuit's Bankruptcy Appellate Panel explained nearly 30 years ago:

> We do not believe that a short term loan made by a debtor's shareholder in order to allow the debtor to maintain operations despite capitalization problems falls within the ordinary course of business exception to § 547.

Pioneer Tech, 107 B.R. at 702.  In the decades since, courts have made clear that the defense does not protect short-term cash infusions to address a capitalization crunch.  See Epic Cycle, 2014 WL 2567170 at *14 (defense "not intended to shield stockholders from preference liability for short-term loans to the debtor 'to maintain operations despite capitalization problems')(quoting Pioneer Tech, 107 B.R. at 702); Lee's Place, Inc. v. Hawbaker (In re Lee's Place, Inc.), No. 92-4006, 1992 WL 164443, at *6-8 (C.D. Ill. June 26, 1992) (loans that arose as a result of "emergency situations" and were "intended to be short-term in nature and repaid within a few days" were not made in ordinary course); In re Cox Motor Express of Greensboro, Inc., Case No. 14-10468, Adv. Pro. No. 15-02023, 2016 WL 4259801, (Bankr. M.D. N.Car. Aug. 9, 2016) ("There is no dispute that the loans in this case were made by the Defendant as an insider, and the Defendant concedes that these loans were made to the Debtor to [address] capitalization and cash flow shortfalls of the Debtor.  These types of loans are not considered debts incurred in the

ordinary course of a debtor's business."); Woodard v. Godsey (In re C.J. Spirits, Inc.), 238 B.R.

889, 892-93 (Bankr. M.D. Fla. 1999) (short-term cash infusions by debtor's principal to finance

debtor were not incurred in ordinary course); Crews v. Truver (In re Flight Mgmt., Inc.), 99 B.R.

477, 480 (Bankr. M.D. Fla. 1989) (rejecting defense where loan made by insider was "emergency

bailout to keep the business running"); see also Sklar v. Susquehanna Bank (In re Global

Protection USA, Inc.), 546 B.R. 586, 615-18 (Bankr. D. N.J. 2016).

    This case law is directly on point here. There is no dispute that the payment was short-

term: it was repaid within days. See PF ¶¶ 510-511, 514-517. No other source of commercial

lending was available to Lyondell as of the mid-October 2008 draw. See id. ¶ 516. And it is

clear that as of mid-October 2008, Lyondell was facing material liquidity or capitalization issues,

with (i) Access employees notifying Blavatnik and Benet of LBI management's "deep concerns"

that "LBI is on the brink," see id. ¶ 519; (ii) Access employees discussing bankruptcy options for

LBI, see id. ¶¶ 518, 520; (iii) daily liquidity forecast to drop below $100 million (well below the

daily amount required just to satisfy intra-day swings), see id. ¶ 507; (iv) LBI's CFO having

stated days earlier that "under extreme circumstances" a draw on the revolver might be

necessary, "likely on or close to Chapter 11," see id. ¶¶ 508, 518; and (v) Lyondell just weeks

later filing for Chapter 11 protection, see id. ¶¶ 514-517, 528.[3] The defense should be dismissed.

    b.    First-Time Incurrences Between Affiliates Are Not Protected.

    The October Draw was a first-time transaction between two affiliated entities. Access

has not identified a case in which a first-time incurrence between two entities that were not in an

arm's-length relationship was protected by the defense. Access has observed that first-time

---

[3] A review of the circumstances under which the Access Revolver was put in place in March 2008 would only further support this conclusion. The Access Revolver was put in place a time of serious financial difficulty, with one

incurrences are sometimes protected, and that incurrences between non-arm's-length entities are sometimes protected. That misses the point: Access has identified no case applying the defense where <u>both</u> were true. This is hardly coincidental: it is these two features—(i) a pattern of prior transactions and (ii) an arm's-length relationship—that repeatedly have provided courts with the requisite assurance that the transaction was indeed an ordinary credit transaction.

The relevance of an arm's-length relationship is that without it, "the tension that commonly exists between debtor and creditor is absent." <u>Official Comm. of Unsec. Creds. of Toy King Distribs., Inc. v. Liberty Savings Bank (In re Toy King Distribs., Inc.)</u>, 256 B.R. 1, 114 (Bankr. M.D. Fla. 2000). Accordingly, absent an arm's-length relationship, the defense is commonly rejected. <u>See</u> <u>Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)</u>, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995) ("courts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace"); <u>Kapila v. Media Buying, Inc. (In re Ameri P.O.S. Inc.)</u>, 355 B.R. 876, 883 (Bankr. S.D. Fla. 2006) (courts examine whether the debt "was . . . incurred at arms length [sic]"); <u>Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)</u>, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998).[4]

To be sure, transactions between affiliates on occasion have been protected, but courts in such cases have been able to rely upon an established prior pattern of indistinguishable transactions between the affiliates. <u>See</u> <u>Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow</u>

---

intended effect of putting the Access Revolver in place being to assist in securing the banks' agreement to upsize the facility. <u>See</u> PF ¶¶ 444-453.

[4] <u>See also</u> <u>Pioneer Tech</u>, 107 B.R. 698 at 702; <u>Baumgartner-Novak v. Eckman (In re Eckman)</u>, 447 B.R. 546, 550 (Bankr. N.D. Ohio 2010); <u>Gawronski</u>, 411 B.R. at 142; <u>C.J. Spirits</u>, 238 B.R. at 892-93; <u>Lee's Place</u>, 1992 WL 164443 at *6-8; <u>Laker v. Vallette</u>, No. 92-1683, 1993 WL 114515, at *4 (E.D. La. Mar. 31, 1993), <u>aff'd sub nom.</u> <u>Laker v. Vallette (In re Toyota of Jefferson, Inc.)</u>, 14 F.3d 1088 (5th Cir. 1994); <u>McCullough v. Garland (In re Jackson)</u>, 90 B.R. 793, 797 (Bankr. D.S.C. 1988); <u>Henderson v. Buchanan (In re W. World Funding, Inc.)</u>, 52 B.R. 743, 787 (Bankr. D. Nev. 1985), <u>rev'd on other grounds</u>, 985 F.2d 1021 (9th Cir. 1993)).

10

Design Grp., Inc.), 956 F.2d 479, 488 (4th Cir. 1992) ("two years of regular payments on the debt . . . made in the same manner"); Waldschmidt v. Ranier (In re Fulghum Constr. Corp.), 872 F.2d 739, 743-44 (6th Cir. 1989) ("advances and repayments were 'recurring' in nature as demonstrated by over 100 such transactions" in year prior to preferential payment); Stevenson v. Sensing (In re Herbison), Adv. Pro. No. 97-0104, 1998 WL 35324197, at *6 (Bankr. W.D. Tenn. Mar. 24, 1998) (defendants "had made numerous personal loans to [the debtor] over the years" which "were handled the same way each time"); cf. Redmond v. Ellis Cty. Abstract & Title Co. (In re Liberty Livestock Co.), 198 B.R. 365, 374-75 (rejecting defense despite finding incurrence element satisfied, where lender made eight similar loans to that pre-dating preference period).[5]

Thus, in Redmond v. CJD & Assocs., LLC (In re Brooke Corp.), 536 B.R. 896 (Bankr. D. Kan. 2015), the court considered application of the ordinary course defense to a series of transfers between affiliated entities.  The Court observed that for a subset of the challenged transfers, there was a pre-preference period history of hundreds of near-identical payments setting a benchmark of prior transfers between the affiliates.  See Brooke, 536 B.R. at 900-01, 917.  With respect to this set of transfers, "[n]othing . . . changed" during the preference period— *i.e.*, the pattern of payments that existed between the affiliates prior to the preference period continued into the preference period.  See id. at 901.  For these transfers, the defense was available.  For a second subset of challenged transfers, where there was an absence of evidence of conformity to any pre-preference payment pattern, the defense failed.  See id. at 917[6]

---

[5] Similarly, first-time transactions have been protected, where there was an arm's-length relationship between the parties.  See, e.g., Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.), 798 F.3d 983, 992 (10th Cir. 2015) (citing as first circumstance in summary of evidence supporting application of defense to a first-time transaction that "[t]he purchase was an arm's length transaction").

[6] Illustrating the futility of Access's search for such a case, the best decision Access has identified is one in which the Court declines to apply the defense in circumstances involving the deeding of a mattress and other property in a domestic dispute, in which the court cites the "unique challenges" of such [consumer] cases, struggles through what

Here, there is no dispute that the entities were affiliates, see PF ¶¶ 26, 41, 43, and there is no evidence of prior lending between Access and Lyondell. The defense should be dismissed, with no need to reach either articulation of the incurrence test.

c.   Incurrence Test 1:  Debt Not Incurred in the Ordinary Course of *Each* of Access and Lyondell's Prior Business

Under the first articulation of the incurrence test, Access must show that the incurrence was ordinary in the prior course of its business <u>and</u> the prior course of Lyondell's business. It can show neither, much less both.

Most obviously, Access cannot prove that the incurrence was in the ordinary course of its own business. <u>First</u>, Access was not in the business of commercial lending. <u>See</u> PF Part XVI.D. Numerous cases reject application of the ordinary course defense to a loan where the transferor was not in business of lending money. <u>See</u> <u>Global Protection USA</u>, 546 B.R. at 616-17; <u>Epic Cycle</u>, 2014 WL 2567170, at *14; <u>Simon v. JGM Associates, LP (In re Kiebler Recreation, LLC)</u>, Adv. Pro. No. 12-1138, slip op. at 14-18 (Bankr. N.D. Ohio Feb. 28, 2013); <u>Shubert v. Mull (In re Frey Mech. Grp., Inc.)</u>, 446 B.R. 208, 216 (Bankr. E.D. Pa. 2011).

<u>Second</u>, Access never previously loaned or advanced money through any transaction resembling the Access Revolver. Indeed, the only transaction history that Access has been able to identify as of the time Lyondell drew on the Access Revolver is a series of small, largely un-papered cash advances to affiliates in the years preceding the revolver. Access failed to properly

---

it considers a "muddle" of case law, states that the defense could apply for first-time transactions, but then later in its decision notes that the defendant argues that the transaction was in fact arm's-length (and does not resolve the question), then progresses through a range of issues, offering observations on "trust and distrust" and "non-traditional living arrangements" and whether such arrangements are "unusual in today's world," and ultimately concludes that the record "leaves many questions unanswered," and declines to grant the defendant summary judgment. <u>See</u> <u>Kelley v. McCormack (In re Mitchell)</u>, 548 B.R. 862 (Bankr. M.D. Ga. 2016). Further, in <u>KH Funding Co. v. Escobar (In re KH Funding Co.)</u>, the court specifically explained that it was not addressing the incurrence element. <u>See</u> 541 B.R. 308, 313 (Bankr. D. Md. 2015).

admit much if any of the relevant information into evidence, see generally PF Part XIV.D, but even if considered, what the facts show is that these advances bear no resemblance whatsoever to the Access Revolver.  There is no evidence that any imposed a repayment date.  See id. ¶ 952. There is no evidence that any was documented by a credit agreement.  See id. ¶ 940.  There is no evidence that any required the payment of market interest.  See id. ¶¶ 951, 954.  Even the largest of these transactions were a tiny fraction of the size of the amount of the $300 million draw on the Access Revolver.  See id. ¶ 950; see also id. ¶ 972.  And the affiliates to which funding was advanced were not similarly situated to Lyondell.  See id. ¶¶ 955-956, 972.

That this history of small, un-papered, no-market-interest cash advances with no repayment date is what Access attempts to rely on as "past practice" shows the defense is without merit.  See Strauss v. Hollis (In re Matlock & Matlock), 361 B.R. 879, 882-84 (Bankr. W.D. Mo. 2007) (debts ranging from $1,500 to $12,000 not incurred in ordinary course where they were significantly greater than previous debts, which ranged from $50 to $200); Kiebler Rec., Adv. Pro. No. 12-1138, slip op. at 17-18 (challenged loans were "neither routine [nor] typical" and fact that loans were explicable as an extension of pre-existing business did not make transaction ordinary); Caillouet v. First Bank and Trust (In re Entringer Bakeries, Inc.), 347 B.R. 550, 560-61 (Bankr. E.D. La. 2006), aff'd in part, vacated in part on other grounds, 548 F.3d 344 (5th Cir. 2008); see also Wood v. Stratos Prod. Dev., LLC (In re Ahaza Systems, Inc.), 482 F.3d 1118, 1128 (9th Cir. 2007) (rejecting defense where transferee was in business of lending but there was no evidence that it had made loans under similar circumstances).

Because the first articulation of the incurrence test requires the transaction to be in the ordinary course of business of both transferor and transferee, it is not satisfied.

While the Court need not reach it, the debt also was not incurred in the ordinary course of Lyondell's business. Lyondell had never before relied upon affiliate support. See PF ¶¶ 957-958. Accordingly, it was not in the ordinary course of its business. Because Access cannot dispute this, it strains to argue that the loan was nevertheless materially the same as Lyondell's commercial bank revolver (the "Bank Revolver") (at the same time that it argues that the Access Revolver is the same as the small, un-papered, no-payment-date cash advances). But this comparison only underscores the differences.

First, no commercial lending was available to Lyondell at the time of the mid-October 2008 draw. See id. ¶¶ 516, 966. Second, the commercial revolver was between arm's-length parties, see id. ¶¶ 406, 408, 418-419, while the Access Revolver was between affiliates. Indeed, the purported arm's-length negotiation of the Access Revolver was a farce, with Blavatnik subordinates controlling both sides of the negotiation, and Blavatnik owning both opposing parties to the "negotiation." See id. ¶¶ 22, 23, 26, 30, 33, 417, 462-463, 467-469. Third, Access used its affiliate status (i.e., its indirect control) to impose upon Lyondell extra-contractual liquidity monitoring procedures not imposed by commercial lenders under the Bank Revolver. See id. ¶¶ 462-463, 483, 507-511 (requiring weekly liquidity updates and projections as to whether a draw was likely; contract imposed no such requirements). Fourth, it was not anticipated that the Access Revolver would be drawn upon. As discussed, it was put in place to assist with negotiations with the banks while avoiding drawing public attention to LBI's liquidity problems, see id. ¶¶ 449, 451-454, and the first time the lender indicated that it might do what borrowers on revolvers do (i.e., draw), in April 2008, employees of the lender reacted negatively; ultimately, no draw was requested at that time, see id. ¶¶ 483-485. And when Lyondell, in October 2008, indicated that it would need to draw on the revolver, Blavatnik commented "thats

very bad [sic]" and with the CEO of LBI replying "[i]t is not bad, it is terrible for me if it happens." See id. ¶ 509. Fifth, Access used its indirect control to become substantially involved in controlling the decision regarding the October Draw itself, and approved it only after forecasts of rapid repayment (not required under the terms of the contract) were provided. See id. ¶¶ 510-511. Sixth, at the bankruptcy filing, the entire amount of the Access Revolver was undrawn, while Lyondell's commercial revolving remained substantially drawn. See id. ¶ 975.

d.   Incurrence Test 2:  Not Incurred in the Ordinary Course *Between* Access and Lyondell

As noted, some courts, rather than evaluating incurrence by examining each of the lender and debtor's past business, instead examine the ordinary course of business between the two entities. See Part I-A-1, supra. Here, such analysis can be brief. There is no evidence of any history of incurrences between Access and Lyondell before the Access Revolver. See PF ¶¶ 943-944. While some courts have allowed the element to be proven in the absence of a prior pattern of incurrences between the entities, they have done so by reference to the prior histories of each entity's business. See C.W. Min. Co., 798 F.3d at 990 (citing Ahaza, 482 F.3d at 1126). As shown above, Access cannot satisfy that test.

e.   Irrelevance of Contractual Compliance to "Incurrence" Element

Access's lead argument on the incurrence element in its pre-trial brief cites no incurrence cases. See Def. Pre-Trial Br. [Dkt. No. 835] 71-72. Access instead leads with the notion that compliance with the terms of the contract (a fact which some courts have relied upon in assessing the "transfer" element) should be sufficient to establish the "incurrence" element. See id.[7] But

_____

[7] Access also invokes a principle of statutory construction that identical words and phrases in a statute should be given the same meaning. See Def. Pre-Trial Br. 72. But the two phrases at issues are not identical: one refers to "incurred" in the ordinary course, and one refers to a payment "made" in the ordinary course. "Incurred" and

no case Access cites adopts that approach,[8] and this is no surprise:  the approach would provide a simple means to render the incurrence element a nullity:  simply write out a contract first.[9]  In any event, a focus on compliance with the terms does not help Access:  the conduct here was most notable for how it diverged from anything required in the contract.  See Part I-A-2, infra.

> 2.    The "Transfer" Prerequisite Also is Not Satisfied.

Because the incurrence element cannot be satisfied, there is no need to reach the transfer element.  See 11 U.S.C. § 547(c)(2).  However, the transfer element is not satisfied either.  The element can be satisfied if:  (i) it was "made in the ordinary course of business or financial affairs of the debtor and the transferee" or (ii) it was "made according to ordinary business terms."  See 11 U.S.C. § 547(c)(2)(A), (B).  Access cannot establish either alternative.

> a.    Transfer Not "Made In Ordinary Course"

The first alternative for proving the transfer element (i.e., "made in the ordinary course") involves examination of several factors, including:  "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment."  Count 9 SJ Order at *7 (citing Buchwald Capital Advisors LLC v. Metl–Span I., Ltd. (In re Pameco Corp.), 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); Official Comm. of Unsec.

---

"made" do not mean the same thing, and the statutory canon provides no basis for ignoring the independent tests crafted by the courts for each element over several decades.

[8] In KH Funding, the court stated that because the defendant does not satisfy the "transfer" element, it need not address the "incurrence" element.  541 B.R. at 313.  The court considered that compliance with contractual terms was part of the "transfer" analysis.  See id. at 315.  In C.W. Min. Co., the court refers to the written terms of the transaction when discussing the "transfer" element.  See id. at 991.  It does not do so when discussing the incurrence element.  See id. at 992.  In Kleven v. Household Bank F.S.B., the court did not even analyze the incurrence element, and its analysis of compliance with the contract concerned the timing of repayment—i.e., relating to the transfer, not the original incurrence.  334 F.3d 638, 642-43 (7th Cir. 2003).

[9] Cf. Epic Cycle, 2014 WL 2567170, at *14 ("Defendant's primary argument is that she and Epic followed the note's terms to the letter.  But this alone is insufficient to trigger the defense.").

Cred. of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.), 338

B.R. 194, 210 (Bankr. S.D.N.Y. 2005); CIS Corp., 195 B.R. at 258).   This alternative is a

"subjective" test—*i.e.*, it examines the prior history between the actual parties—and requires the

defendant to establish a "baseline of dealings" between the parties to "enable the court to

compare the payment practices during the preference period with the prior course of dealing."

See Count 9 SJ Order at *7 (citing Jacobs v. Gramercy Jewelry Mfg. Corp. (In re Fabrikant &

Sons, Inc.), No. 06-12737, 2010 WL 4622449, at *3 (Bankr. S.D.N.Y. Nov. 4, 2010); Cassirer v.

Herskowitz (In re Schick), 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999)).

Here, there is no evidence that prior to the repayment of the draw under the Access

Revolver, Lyondell had ever repaid a debt to Access, see PF Part XVI.D—*i.e.*, there is no

"baseline of dealings" between them enabling the Court to "compare the payment practices

during the preference period with the prior course of dealing."

> b.    Transfer Not Made According to Ordinary Business Terms

The second alternative for proving the transfer element (*i.e.*, made "according to ordinary

business terms") is an "objective" test that "looks not to the specifics of the transaction between

the debtor and the particular creditor, but rather focuses on general practices in the industry."

See Count 9 SJ Order at *7-8 (citing Weisfelner v. LR2 Mgmt. (In re Lyondell Chem. Co.), No.

09-10023, 2015 WL 5560283, at *7 (Bankr. S.D.N.Y. Sept. 18, 2015)).   Under this test, "the

creditor's industry is the measure for ordinariness."  See id.  Further, "'ordinary business terms'

refers to the general practices of similar industry members, and . . . 'only dealings so

idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore

outside of the scope of subsection C.'"  See id. at 8 (citing Roblin Indus., 78 F.3d at 39-40).

Access cannot satisfy this test either, because the circumstances of the transaction diverged materially from any "ordinary" commercial revolver used in the industry. First, upon the event that would ordinarily be the hallmark of a revolving lending agreement (*i.e.*, a request for a draw), the lender reacted negatively. See PF ¶¶ 483, 485. Second, as discussed above, the lender used its control of the borrower to impose upon the borrower extra-contractual liquidity monitoring procedures. See id. ¶¶ 462-463, 483, 507-511 (requiring weekly liquidity updates and projections as to whether a draw was likely; contract imposed no such requirements). Third, the lender was substantially involved in controlling the decision regarding the draw itself and only approved it after borrower repayment forecasts not required under the terms of the contract were provided, and the lender assured itself that the draw would be repaid rapidly and prior to the borrower's actual commercial indebtedness (*i.e.*, in preferential fashion). See id. ¶¶ 510-511. This record of conduct stands out precisely for its departure from ordinary business terms.

3.    Other Factual Issues Raised In Summary Judgment Order

On summary judgment, the Court stated that "[p]ertinent to the Court's evaluation of the ordinary course defense is a determination of whether (i) Lyondell had access to other liquidity sources (*i.e.*, availability under the 2007 credit agreement) when the Transfers occurred, and (ii) borrowing under any of those sources of liquidity was subject to solvency conditions." Count 9 SJ Order, at *9. At the time of the October transfer, Lyondell had virtually exhausted its availability under the 2007 Credit Agreement and had no access to other sources of liquidity, see PF ¶¶ 516, and borrowings under Access Revolver did not require Lyondell's solvency as a condition precedent to a draw, see id. ¶¶ 460.[10]

---

[10] Access no longer asserts the Section 547(c)(1) contemporaneous exchange defense. See Joint Pre-Trial Order [Dkt. No. 848] Part V-D ("Issues to be Tried"); Def. Pre-Trial Br. 69-81; Joint Pre-Trial Order Ex. B ("Defendants' Contentions of Fact") at 35-38.

### B.   Insolvency and Other Section 547(b) Prerequisites Satisfied

Section 547(b) provides that certain transfers to repay antecedent debt are recoverable as avoidable preferences.  See 11 U.S.C. §547(b).  The section sets forth five prerequisites of an avoidable preference: (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made on or within 90 days before the date of the filing of the petition, or between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (v) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7 of this title, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of this title.  11 U.S.C. § 547(b).[11]  On summary judgment, the Court found that the Trustee has established four of the five elements of Section 547(b).  See Count 9 SJ Order at *4-5.  At trial, the Trustee carried his burden on the fifth, i.e., insolvency.

### 1.   Lyondell Was Balance Sheet Insolvent As Of The Transfer Date.

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation."  11 U.S.C. §101(32) (emphasis added); Global Protection USA, 546 B.R. at 609-10 (citing Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998)).  Courts have developed the "balance sheet" test for purposes of analyzing insolvency. See Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005), modified on other grounds, 554 F.3d 382 (3d Cir. 2009) ("This test of insolvency, the so-called 'balance sheet' insolvency, compares the 'fair value' of all of the debtor's assets with

the face or 'stated' value or its liabilities on the relevant date."). To use the balance sheet method, one first determines the enterprise value of the company being valued, and then subtracts from that the company's net debt. If the result is positive, the enterprise is solvent; if the result is negative, the enterprise is insolvent.

The Trustee's solvency expert, Anders Maxwell, applied this methodology to LBI as of the Transfer Date. As described more completely in the PJSC Opinion, Maxwell first determined the value of LBI's own businesses and then added to that the value of certain joint ventures and other assets to reach a "Total Asset Value" ("TAV"). PX841 [Report of Anders J. Maxwell, dated February 28, 2011], at 5. LBI's net debt was then subtracted from the TAV to determine solvency.

Three alternative valuation methods are generally recognized: (i) a comparison to public petrochemical companies and independent refiners similar to the main business segments of LBI ("Comparable Company" analysis); (ii) precedent sale transactions ("Transaction Comparables" analysis); and (iii) a discounted cash flow analysis ("DCF Valuation" analysis). PX841, at 4; see In re Chemtura Corp., 439 B.R. 561, 573 (Bankr. S.D.N.Y. 2010) (describing DCF, comparable companies and comparable transactions methods as "standard").

    a.    Evidence Admitted at Trial

The Trustee established the insolvency of LBI as of the Transfer Date through the expert report of PJSC and testimony provided by Anders Maxwell at trial shows that LBI was balance sheet insolvent. PX841, at 7. Data from the PJSC Report and other evidence establishes the

---

[11] The standard of proof is a preponderance of the evidence. See 11 U.S.C. § 547(g); First Software Corp. v. Computer Assocs. Int'l, Inc. (In re First Software Corp.), 107 B.R. 417, 420-21 (D. Mass. 1989).

standalone insolvency of Lyondell.   See PF ¶¶ 871-902.   Defendants did not offer expert

testimony in support of their assertion that LBI or Lyondell were solvent of the Transfer Date.

Maxwell concluded that on the Transfer Date, LBI's midpoint TAV was approximately

$22.3 billion, while its net debt as of such date was approximately $27.5 billion.  See PF ¶¶ 861.

Accordingly, LBI was balance sheet insolvent on the Transfer Date by approximately $5.2

billion.  See PF ¶¶ 861.  Lyondell, too, was balance sheet insolvent on the Transfer Date.  Based

on its contribution to LBI's EBITDA, Lyondell's midpoint TAV on the Transfer Date was, at

most, approximately $14.6 billion, while its net debt as of such date was approximately $19.6

billion.  See PF ¶¶ 901.  Therefore, Lyondell was balance sheet insolvent on the Transfer Date by

approximately $5.0 billion.  See PF ¶¶ 901.  Maxwell's conclusions as to insolvency on the

Transfer Date are further supported by the financial statements filed by each entity in or around

the Transfer Date.  Lyondell's Form 10-Q for the period ending September 30, 2008 reflects

negative stockholder's equity.  See PF ¶¶ 873.  LBI's financial statements for the year-ended

2008 include a write-down of good will in the amount of  approximately $5.2 billion.  See PF ¶¶

877.[12]  As further evidence of Lyondell's insolvency, the Court can take judicial notice of the fact

that Lyondell's publicly-traded debt securities were trading at deep distress levels prior to the

Transfer Date.  See PF  ¶¶ 865.[13]

---

[12] Further, LBI's insolvency as a consolidated group leads to the conclusion that Lyondell was insolvent on a stand-alone basis.  Lyondell was a borrower on a substantial portion of the merger debt, a guarantor on the rest of the merger debt, and an obligor on the $8 billion Related Party Note.  Under the "pro rata" approach, guarantors with higher net assets (such as Lyondell) will pay proportionately more than those with lower net assets.  See, e.g., Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff Foodservices Corp.), 56 B.R. 899, 906 (Bankr. S.D.N.Y. 1986) (in the absence of evidence regarding loan proceed allocation, calculating "pro rata" amount of loan allocable to debtor according to debtor's assets).  Lyondell's asset base, therefore, would be entirely depleted by virtue of its status as an obligor or guarantor on all of the merger debt and as an obligor under the Related Party Note.  Thus, under the pro rata approach, insolvency of LBI would necessarily lead to the insolvency of Lyondell.

[13] The price of a publicly traded security can be judicially noticed.  See Acticon AG v. China North East Petroleum Holdings Ltd., 692 F.3d 34, 37 n.1 (2d Cir. 2012) (court can "take judicial notice of well publicized stock prices"); accord Pugh v. Tribune Co., 521 F.3d 686, 691-92 and n.2 (7th Cir. 2008).

Access chose not to proffer expert testimony in support of solvency. Duff & Phelps, engaged to perform valuation of LBI as of January 6, 2009—less than 90 days following the Transfer Date—concluded that LBI had a midpoint enterprise value of $19.2 billion and Lyondell had a midpoint enterprise value of $11.0 billion. DX456.007. In view of the fact that LBI had $27.5 billion in net debt on October 20, 2008, no credible basis exists to refute the Trustee's proof of insolvency. See PF ¶ 861.

Nonetheless, the Trustee anticipates that Access will attempt to rely on subjective statements by some fact witnesses in support of solvency, such as LBI's former Chief Financial Officer, Alan S. Bigman. Mr. Bigman's testimony includes statements such as, for example, that LBI "was not insolvent under the very end of 2008 when demand for its products suddenly evaporated as a result of the Great Recession." See PF ¶ 862. Coordinated testimony is offered by LBI's former Treasurer, Karen Twitchell, who supplies a month-ending liquidity amount of $1.770 billion for October 2008 yet is silent about forecasted liabilities and the prospect for paying them. Notably, the record establishes that Ms. Twitchell became concerned *in July 2008* whether LBI's funds would be sufficient to fund seasonal liabilities anticipated during the first quarter of 2009—liabilities that Ms. Twitchell had foreseen as problematic. PF ¶¶ 775-789. Neither Ms. Twitchell nor Mr. Bigman testified as an expert, nor did either of them purport to perform any analysis in support of solvency. See PF ¶¶ 778, 862. Mr. Bigman's assertion that the failure of a business plan prepared by LBI management in December 10, 2008 to reflect the company's then-imminent collapse, somehow supports solvency, must be disregarded. PF ¶¶ 790-791. As explained infra at Part II-B-1, for projections to be used in a solvency analysis, "their reasonableness must be tested by an objective standard anchored in the company's actual performance." Moody, 971 F.2d at 1073 (citing Credit Managers Ass'n, 629 F. Supp. at 184-86).

22

Similarly bald assertions of solvency, made without reference to an enterprise's ability to pay its

to current and long-term liabilities, cannot rebut Maxwell's expert opinion that LBI was balance

sheet insolvent by approximately $5 billion or more as of the Transfer Date.  See PF ¶ 861.

To be sure, Access purported to find fault with Maxwell's methodology and exercises of

judgment.  None of the supposed defects call into question the ultimate conclusion of insolvency.

Notably, choices made by Maxwell, and criticized by Access, were consistent with the views and

practices of Access's own expert, Christopher J. Kearns ("Kearns"), who, of course, provided no

valuation on behalf of Access.  See PF ¶ 803.  For instance, while Access criticized Maxwell for

his rejection of certain management projections, Kearns testified that he too has disregarded

management projections in the past where they are deemed to be unreliable.  Similarly, Access's

challenge of Maxwell's use of a flat corporate tax rate in his DCF valuation, ignores that Kearns

made the same assumption in his valuation as of December 2007.  Access's other purported

criticisms of Maxwell are similarly frivolous.  While Access criticizes Maxwell for applying a

different weighting scheme in his October 2008 analysis than he applied in his December 2007

analysis, it is well-accepted that the weight given to different valuation methodologies is a matter

of judgment.  Maxwell explained at trial the basis for his exercise of judgment in the context of

the dynamic situation that existed during the fourth quarter of 2007.  See PF ¶ 852.  In any case,

the lower weighting applied to the DCF method in Maxwell's October 2008 opinion had no

impact on Maxwell's ultimate determination that LBI was insolvent on the Transfer Date.  See

PF ¶ 852.

Access also criticized Maxwell's inclusion of off-balance sheet liabilities in his

calculation of LBI's net debt; including, particularly, his inclusion of LBI's accounts-receivable

securitization facility (the "AR Facility").  See PF ¶ 859.  This is a frivolous argument.  First,

23

LBI included the AR Facility as debt in its November 2007 Confidential Information Memorandum.  DX-218.023 [Confidential Information Memorandum Public Side Presentation November 2007 ("November CIM")] (calculation of Total Debt includes amounts for "Existing Securitization Facility").  See PF ¶ 858.  Second, after the Petition Date, the AR Facility was paid off with the proceeds of the DIP Facility—demonstrating that it was, in fact, a claim on the estate.  See PF ¶ 821.  Third, Kearns himself included off-balance sheet liabilities in his computation of LBI's net debt.  See PF ¶ 822.  Finally, it is well-established in the case law[14] and other authoritative literature[15] that off-balance sheet liabilities are properly treated as debt in a solvency analysis.

In addition, Access argued that Maxwell should subtracted all LBI's cash from its debt to arrive at net debt.  See PF ¶ 820.  As Maxwell explained, this is neither correct nor is it practice in the valuation of an enterprise.  Restricted cash is the working capital needed to fund operations.  Its value is reflected in the EBITDA projections, much like plant and equipment. See PF ¶ 818.  For this reason, netting restricted cash off of liabilities would be double counting. But even if the Court were to accept Access's unorthodox proposal for the treatment of restricted cash, Maxwell's October 2008 opinion would be no different:  LBI was still balance sheet insolvent as of the Transfer Date.  See PF ¶ 857.

---

[14] See Homeplace of Am. v. Salton, Inc. (In re Waccamaw's Homeplace), 325 B.R. 524, 530 (Bankr. D. Del. 2005) (off-balance sheet liabilities appropriately included as debt in solvency analysis); In re Bachrach Clothing, Inc., 480 B.R. 820, 861 (Bankr. N.D. Ill. 2012) (same).

[15] Commentators have noted that off-balance sheet obligations should be included in the determination of total enterprise value: "Turning to the liabilities and capital side of the balance sheet, the claims on the value of the firm's assets include funded debt and equity . . . . Funded debt encompasses interest-bearing loans and financial obligations, such as bank debt, notes, bonds and off-balance sheet debt . . ."  Boris J. Steffen, Reorganization Value: What It Is…..And Isn't, 30(3) Ass'n of Insolvency & Restructuring Advisors J., 14, 15 (2016) (emphasis added).  In addition, Damodaran notes that failure to include off-balance sheet debt "will understate firm and enterprise values." Aswath Damodaran, A Tangled Web of Values: Enterprise Value, Firm Value and Market Cap, Musings on Markets Blog (June 29, 2013), http://aswathdamodaran.blogspot.com/2013/06/a-tangled-web-of-values-enterprise.html.

Finally, Access attempts to discredit Maxwell's October 2008 valuation opinion on the basis that it is only slightly lower than his December 2007 valuation opinion—a criticism that ignores the limited choice of projections available for selection by Maxwell to perform the October 20, 2008 valuation.   See PF ¶¶ 868-869.

Access's attempt to undermine Maxwell's credibility using a declaration submitted by Maxwell in February 2009 on behalf of the unsecured creditors' committee falls wide of the mark.   See PF ¶ 870.   Maxwell's declaration was submitted to raise questions connection with the Debtors' motion for debtor-in-possession financing (the "DIP Facility") and states explicitly that Maxwell was not performing a valuation of LBI.   See PF ¶ 870.   Moreover, as Maxwell explained during trial, the vast majority of his time during the early 2009 period was spent evaluating strategic alternatives to the DIP Facility—not, as Defendants' suggest, on performing a comprehensive valuation of LBI.   See PF ¶ 870.

## C.    The Transfer Involved an Interest in the Property Of Lyondell.

The Court at summary judgment noted the "gating issue" of whether the $300 million in funds transferred to Access in repayment of the October 2008 draw were property of Lyondell. Count 9 SJ Order, at *5.   Access does not dispute that an "interest of the debtor in property" was transferred—it disputes only whether the relevant debtor is LBI or Lyondell.   See Joint Pre-Trial Order Part V-D ("Issues to be Tried"); Def. Pre-Trial Br. 69-81; Joint Pre-Trial Order Ex. B ("Defendants' Contentions of Fact") at 35-38.

The relevant debtor is Lyondell.   Account funds are debtor property where the debtor can show (i) legal title to the account and (ii) control over the use of the account.   See Enron Corp. v. Port of Houston Auth. (In re Enron Corp.), Case No. 01-16034 (AJG), Adv. Pro. No. 03-92511 (AJG), 2006 WL 2385194, at *6 (Bankr. S.D.N.Y. June 2, 2006).   These prerequisites are

satisfied.  First, Lyondell held legal title.  Legal title refers to legal ownership of the account and is established where the account is created in the debtor's name.  See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1451 (10th Cir. 1996).  Access does not dispute that the draw was repaid from a Lyondell account,[16] and the record shows it was, see PF ¶ 971.  Second, Lyondell possessed the requisite control.  A debtor has control where it has the "unfettered discretion to pay creditors of its own choosing."  See In re Enron Corp., 2006 WL 2385194 at *6 (internal citations omitted) (citing Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 (5th Cir. 1995)).  Thus, "control" is established where the debtor has the ability to direct the funds to its own creditors.  See id. at *6-7 .  Courts also look to "whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment."  See Southmark, 49 F.3d at 1116-17.  Here, there is no dispute that Lyondell had such ability to pay creditors from the account—it repaid Access, the lender under the revolver, from the account.  See PF ¶¶ 971, 974.

Third, these requirements are sufficient even for an account with commingled funds.  See Southmark Corp., 49 F.3d at 1116-17 (transferred funds "indisputably belonged to Southmark's estate" based on legal title and Southmark's ability to pay its creditors from the account, notwithstanding that the funds had been transferred into the account by an affiliate through a cash management system used by "the Southmark family of companies"); In re Enron Corp., 2006 WL 2385194 at *6 (citing Southmark for proposition that "[e]vidence of an interest in a bank account is found where the party asserting the interest holds the legal title thereto, all other indicia of

---

[16] See Access (i) Response to the Trustee's Statement of Undisputed Facts in Support of the Trustee's Motion for Summary Judgment on Count 9 of the Amended Complaint and (ii) Statement of Additional Facts [Dkt. No. 605], (Oct. 18, 2011), at *45.

ownership, and the 'unfettered discretion to pay creditors of its own choosing,' even where the account contains commingled funds").

### D.    Recovery and Damages

Under Section 550(a), to the extent a transfer is avoided under Section 547 or Section 548, plaintiff may recover for the benefit of the estate the value of the property.  See 11 U.S.C. § 550(a).  Recoverable "value" under Section 550(a) includes prejudgment interest.  See McHale v. Boulder Capital LLC (In re 1031 Tax Grp.), 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (Glenn, J.) (Section 548 claim); Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.), 435 B.R. 819, 850-51 (Bankr. N.D.N.Y. 2010) (Section 547 claim); see also Hechinger Inv. Co. of Del. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del.), 489 F.3d 568, 579-80 (3d Cir. 2007) (Section 547 claim).  Thus, absent a reason to deny prejudgment interest, it should be awarded.  See Hechinger, 489 F.3d at 580 (citing Matter of Milwaukee Cheese Wis., Inc., 112 F.3d 845, 849 (7th Cir. 1997)); McHale, 439 B.R. at 87; Bruno Mach., 435 B.R. at 850.

Accordingly, upon avoidance, the Trustee is entitled to recovery of $300 million, plus prejudgment interest at the prime rate (or at minimum, the federal rate),[17] accrued from July 22, 2009, the date of the Committee's initial complaint containing the preference count.[18]

---

[17] As the Court observed in McHale, 439 B.R. at 88-90, there are multiple potential methodologies for determining the rate of prejudgment interest, including **(i)** Treasury-bill rate (28 U.S.C. § 1961), see, e.g., Bruno Mach. Corp., 435 B.R. at 851-52; Savage & Assocs. v. Mandl (In re Teligent Inc.), 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008); **(ii)** IRS fixed interest rate for calculating interest on tax underpayment (26 U.S.C. § 6621(a)(2)), see, e.g., Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 614-26 (S.D.N.Y. 2010); **(iii)** the forum state's prejudgment interest rate of 9% (N.Y. C.P.L.R. § 5004), see, e.g., In re Livent, Inc., 360 F. Supp. 2d 568, 572 (S.D.N.Y. 2005); and **(iv)** prime or market rate based on bank prime loan rate, see, e.g., McHale, 439 B.R. at 89-91; U.S. Philips Corp. v. Iwasaki Elec. Co., 607 F. Supp. 2d 470, 483 (S.D.N.Y. 2009).  With respect to preference claims, courts often award interest at the federal rate.  See Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 108-09 (Bankr. D. Del. 2015); Teligent, 380 B.R. at 344; Pameco Corp., 356 B.R. at 342.  However, in McHale, this court awarded interest at the prime rate in the context of fraudulent transfer claims, noting that "[a]pplication of the prime rate of interest better reflects the opportunity cost of the funds that were fraudulently transferred."  See McHale, 439 B.R. at 90.  For the same reason, the Court here should award the prime rate.

[18] See Bruno Mach. Corp., 435 B.R. at 850; McHale, 439 B.R. at 89.  To the extent Access does not make immediate payment, the Trustee will be entitled to post-judgment interest at the federal rate.  See 28 U.S.C. § 1961(a).

27

## II.   Constructive Fraudulent Transfer:  "Transaction Fees" (Count 11)

The Trustee asserts three sets of constructive fraudulent transfer claims.  The first, discussed in this section, concerns the payment of $127.6 million in purported transaction fees to Nell on the closing date of the Transaction.[19]  The second, discussed in Part III, infra, concerns Toe-Hold Payment 1, by which Blavatnik's agents carried out a payment of $523 million to Nell. The third, discussed in Part VI, infra, involves the payment of €100 million to another Blavatnik entity, NAG Investments LLC, in the weeks before the closing of the Merger.  However documented, in substance each transaction was a distribution in exchange for which the transferor did not receive reasonably equivalent value.  And for each transaction, the financial condition test is satisfied.

### A.   Elements for Proving Constructive Fraudulent Transfer

Under Section 548(a)(1)(B), a transfer of an interest of the debtor in property may be avoided if:  (i) the debtor can satisfy at least one of the "financial condition" elements under Section 548(a)(1)(B) and (ii) the debtor did not receive "reasonably equivalent value" in exchange for the transfer.[20]  Both are satisfied here.[21]

---

[19] Count 11 also asserts a constructive fraudulent transfer claim against Perella Weinberg to recover the $500,000 payment to Perella Weinberg.  See PF ¶ 420(d).

[20] For Count 1, because the Trustee prevails under Section 548(a)(1)(B), there is no need to reach Section 544(b) and state law issues.  However, the Trustee also would prevail under any relevant state law that the Court might apply under Section 544(b), for the same reasons that it prevails under Section 548(a)(1)(B), as the parties agree that there are no material differences as to the substantive standards between Section 548(a)(1)(B) and state law.  Further, if reliance on Section 544(b) and state law were necessary, the evidence shows that there existed actual creditors of the debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

[21] For constructive fraudulent transfer claims under Section 548(a)(1)(B), the standard of proof is a preponderance of the evidence.  See Ruffini v. Norton Law Grp. PLLC,Adv. Pro. No. 12-8396-reg, 2014 WL 714732 at *6 (Bankr. E.D.N.Y. Feb. 25, 2014); Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.), 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010).  While the Court need not reach the issue as the Trustee prevails under Section 548(a)(1)(B), the standard under Section 544(b), whether applying New York, Texas, or Delaware law, is also a preponderance of the evidence.  See Kramer v. Chin (In re Chin), 492 B.R. 117, 126 (Bankr. E.D.N.Y. 2013) (New York law); Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.), 332 B.R. 129, 132 (Bankr. D. Del. 2005) (Delaware law); Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.), 421 B.R. 251, 279 (Bankr. W.D. Tex. 2009) (Texas law).

### B.    Financial Condition of the Debtors

A plaintiff can satisfy the financial-condition element under Section 548(a)(1)(B) in any of three ways:  (i) by proving that the debtor was engaged or was about to engage in a business or transaction for which any property remaining with the debtor was unreasonably small capital ("Inadequate Capital Test"), (ii) by proving that the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer ("Balance Sheet Test"), or (iii) by proving that the debtor intended to incur, or believed it would incur, debts beyond its ability to pay as such debts matured ("Cash Flow Test").

### 1.    Inadequate Capital Test

Section 548(a)(B)(ii)(II) provides for avoidance of certain pre-petition transfers made by a debtor who was "engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital."  11 U.S.C. §548(a)(B)(ii)(II).  While "unreasonably small capital" is not defined in the Bankruptcy Code, it is recognized to entail "difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future."  Tronox Inc. v. Kerr McGee (In re Tronox Inc.), 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) (internal citations omitted); Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992) ("unreasonably small capital denotes a financial condition short of equitable insolvency").

Whether a company is undercapitalized as a result of a leveraged buyout is a "question of fact that must be ascertained on a case by case basis" in light of factors including the reasonableness of company projections and the nature of the industry, as well as the post-transaction health of the company.  Credit Managers Ass'n of S. Cal. v. Fed. Co., 629 F.Supp. 175, 183 (C.D. Cal. 1985) (internal citations omitted); see, e.g., Tronox, 503 B.R. at 321 (finding

29

inadequate capitalization where debtor relied on "overly optimistic" management projections and merely "put off day of reckoning"); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (finding adequate capitalization where nature of the industry required only "minimal working capital").

### a.    Reasonableness of Projections

A "critical" factor in determining whether a transaction leaves a company with unreasonably small capital is "whether the parties' projections" used in facilitating the transaction were "reasonable." Moody, 971 F.2d at 1073; see also Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007). Courts have recognized that because "projections tend to be optimistic," "their reasonableness must be tested by an objective standard anchored in the company's actual performance." Moody, 971 F.2d at 1073 (citing Credit Managers Ass'n, 629 F. Supp. at 184-86).[22]

This objective standard involves reviewing the company's performance "in light of factors such as cash flow, net sales, gross profit margins, and net profits and losses." In re Tronox, 503 B.R. at 321. In considering whether projections are reasonable, Courts must only consider "those cash inflows that were reasonable for [the company] to have expected to receive," and must "test these projections against historical data." ASARCO, LLC v. Americas Mining Corp., 396 B.R. 278, 397 (S.D. Tex. 2008).

---

[22] Indeed, courts have recognized that projections and analyses of value must be updated to reflect actual conditions, and are not reliable if stale. See, e.g., In re Nellson Nutraceutical, Inc., No. 06-10072, 2007 WL 201134, at *43 (Bankr D. Del. Jan. 18, 2007) (in valuation context, noting that analyses based on flawed initial projections also failed to account for subsequent downward trend in results); Merion Capital L.P. v. Lender Processing Servs., Inc., C.A. No. 9320-VCL, slip op. at *51 (Del Ch. Dec. 16, 2016) (in appraisal context, noting that "if the value of the corporation changes between the signing of the merger and the closing, the fair value determination must be measured by the 'operative reality' of the corporation at the effective time of the merger") (citing Cede & Co. v. Technicolor, Inc. (Technicolor II), 684 A.2d 289, 298 (Del. 1996)).

Projections must be reasonable in light of the specific demands of the industry in which the debtor operates. This is because a reasonable projection must provide "some margin for error" that can "account for difficulties that are likely to arise." Moody, 971 F.2d at 1073; accord Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("[t]o be reasonable, the projections must leave some margin for error."). Accordingly, industry factors such as cyclicality must be taken into account. See, e.g., Murphy v. Meritor Sav. Bank (In re O'Day Corp.), 126 B.R. 370, 406-07 (Bankr. D. Mass. 1991) (among major contributors to debtor's financial woes that were "readily predictable prior to the LBO" was industry "cyclicality"; court found it "disingenuous for the Bank's expert to omit 1982 figures, which, in the opinion of the Court, shed a great deal of light on the prudence of the projections, given the cyclicality of the industry");[23] Tronox, 503 B.R. at 260, 321 (noting that market was "cyclical and dependent on the strength of the U.S. housing market"; concluding that transaction "thrust [the debtor] into a declining market with poor plants, high ongoing capital expenditure requirements, and no comprehensive business plan").[24]

---

[23] In O'Day, creditors of a bankrupt manufacturer of fiberglass boats brought an action for equitable subordination against the secured claim filed by a bank, which claim had been generated by a leveraged buyout. 126 B.R. at 372-73. There was significant evidence of the "cyclical nature of the industry and the company's earnings." Id. at 379-80. However, the company's projections of post-transaction performance indicated that "in a worst case scenario, O'Day would somehow match or exceed its best financial performance" of the decade. Id. at 406. At trial, the bank's experts justified the projections by stating that they were "extremely reasonable in light of O'Day's performance between 1983 and 1986." Id. However, the Court rejected the argument on the ground that the analysis had excluded the numbers for 1982 and 1987, which were clearly the downcycles in the industry, remarking that 1987 EBIT, which data was available when the projections were made, was "substantially below [the company's] worst case projection" and that "it is disingenuous for the Bank's expert to omit 1982 figures, which, in the opinion of the Court, shed a great deal of light on the prudence of the projections, given the cyclicality of the industry." Id. at 406-07. After concluding that the debtor was left with unreasonably small capital, the court ultimately granted an equitable subordination claim, noting the Bank's "disregard [of] the cyclical nature of the Debtor's business and the industry" and that "[t]he projections prepared by the Bank had no cushion, no room for error." Id. at 412.

[24] By contrast, in MFS/Sun Life, the industry expert testified that the company's remaining capital would be "sufficient" in light of "the minimal capital requirements of business in this industry." 910 F. Supp. at 928, 944-45.

   b.   <u>A Period of Post-Transaction Survival Does Not Prove Adequate Capital.</u>

A factor in analyzing the reasonableness of projections used in a highly leveraged transaction is the company's condition following the transaction.  See <u>HealthCo</u>, 195 B.R. at 981. However, a company's ability to survive for a period of time does not prove that it had adequate capital, because "an inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well." <u>Boyer v. Crown Stock Distrib., Inc.</u>, 587 F.3d 787, 795 (7th Cir. 2009) (affirming bankruptcy court holding that company was inadequately capitalized despite surviving for three and a half years prior to bankruptcy); <u>see also</u> <u>ASARCO</u>, 396 B.R. at 397-99 (comparing projected and actual cash flow and finding inadequate capital despite company surviving twenty-eight months after transfer); <u>Tronox</u>, 503 B.R. at 322-23 (finding inadequate capitalization despite Tronox surviving for nearly three years prior to bankruptcy); <u>Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)</u>, 148 B.R. 97, 133 (Bankr. D.Mass. 1992) ("The fact that Morse was able to remain afloat for over two years after the buyout does not establish that the buyout left Morse adequately capitalized to continue in business.).[25]

---

[25] Access's citation of <u>Daley v. Chang (In re Joy Recovery Tech. Corp.)</u>, 286 B.R. 54 (Bankr. N.D. Ill. 2002), does not help them.  In that case, the court found that "after the LBO, Joy compared favorably with other companies in its industry in terms of its working capital." 286 B.R. at 76.  Similarly, in <u>Fidelity Bond and Mortg. Co. v. Brand (In re Fidelity Bond and Mortg. Co.)</u>, 340 B.R. 266, 296 (Bankr. E.D. Pa. 2006), the court found that "the record here supports the reasonableness of the Projections."  Likewise, in <u>Peltz v. Hatten</u>, 279 B.R. 710, 746-67 (D. Del. 2002), the Court cites several pieces of evidence from the months prior to the market change, showing that the company was in fact adequately capitalized.  Finally, in <u>Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.</u>, 555 B.R. 70, 85 n. 11 (Bankr. D. Me. 2016), the court cited evidence that the company was adequately capitalized, and reasoned that the plaintiff "was not able to convincingly link" the challenged transfers to the payment failures).  None of these cases help Access, given the record of its unreasonable projections and deficient capital structure even before the Transaction closed.

c.    LBI Had Unreasonably Small Capital.

Here, the evidence admitted at trial established that LBI had unreasonably small capital.[26]

Any evaluation of what capital is required for the industries in which LBI operated must begin with these industries' defining feature:  their uniquely pronounced cyclicality, volatility, unpredictability, seasonality and vulnerability to disruption.  The evidence shows that this feature of massive volatility was well known to—and remarked upon, publicly and repeatedly, by—all three major participant groups to the Transaction, before entering into the Transaction.  Industry analysts shared this view.  It was simply common knowledge.  And it continues to be common knowledge.

Because of this unique volatility, it is crucial for participants in the industry to have a sufficient "capital cushion" to fund operations through periods when costs temporarily exceed revenue.  The need for such a cushion was, like the volatile nature of the industry, common knowledge.  It continues to be common knowledge.  Indeed, the reorganized LBI, which Access has touted as demonstrating the "industrial logic" of the Transaction, has such a cushion.

The LBI created by the Transaction, however, did not have such a cushion.  Its capital structure was not driven by prudent and deliberate management decisions; it was an artifact of Blavatnik's objective that Basell could be used as a platform to acquire Lyondell, a much larger company, without any investment of cash by Blavatnik.   A key, misguided assumption underlying the plan was that healthy margins would continue for a couple of years, thereby enabling some de-leveraging before the anticipated industry trough.  As modelled on spreadsheet after spreadsheet prepared at Access's request by financial advisor Merrill Lynch, the combined businesses seemed to work—or so the Defendants' witnesses assert.   But as the record

---

[26] The summary in this section is of facts set forth in the Trustee's Proposed Findings of Fact, Section IX.

demonstrates, the credit stress testing and "worst case scenarios" done by Access in collaboration with Merrill Lynch simply did not accurately reflect either the capital structure, the business plan or the industry environment in which the company would have to operate. Modelling done before the Merger Agreement was signed did not include a credit stress test that integrated the actual purchase price or reflected the large, known, non-contingent costs that LBI would be obligated to pay shortly after closing, such as the purchase of the Berre refinery at a cost of approximately $600 million and the Solvay plant for over $100 million.

There were other deficiencies in capital planning. The managements of both of the constituent companies to the Transaction were driven by different motives to inflate their projections. It is uncontroverted that immediately after Blavatnik filed a Schedule 13D announcing his intentions, Dan Smith directed Lyondell's projections to be "refreshed" to support the leverage Smith understood would be required for Blavatnik to finance the deal. As set forth in detail in the Proposed Findings of Fact, to create these "refreshed" projections, Robert Salvin, acting at the direction of Smith, set about fabricating purposely inflated numbers without the slightest resemblance to a process targeted to reflect management's best understanding of future performance. Blavatnik's Basell also inflated its projections, rendering projections for both companies unreasonable and unsuitable for capital planning. See Tronox, 503 B.R. at 298-99 (projections unreliable where debtor "abandoned its historical forecasting methodology" and created "inflated sell-side" projections, with certain figures "imposed at the direction of [the CFO]"). Lyondell's projections were sufficiently unreasonable that the inflated projections for 2007 petrochemical operations had to be reduced repeated between the signing and closing of the Merger Agreement. Notwithstanding a sustained trajectory of deteriorating performance through

2007, no adjustment to 2008 or 2009-2011 projections were made as the year advanced to its end and the Transaction closing approached.

There was a third major defect in the LBI capital plan, beyond the lack of capital cushion: the deterioration of the credit markets in August 2007 drove the financing parties to reconfigure the debt package and substitute highly volatile and variable asset-based lending for the greater amount of long-term stable credit the operation of LBI would require. This asset-based lending structure was anathema for LBI.

Further still, beyond the unsound nature of the borrowing, the combined LBI simply carried far too much leverage. Lyondell's CEO and Chairman Dan Smith, who had spent years leading Lyondell through industry cycles, had devised a strategy of de-levering for Lyondell, to prepare it for the inevitable downturn. Just three days before Blavatnik put Lyondell into play with his 13D filing, Smith warned of the consequences of adding billions in new leverage headed into an anticipated industry downturn: "If you're a bondholder" and "you think you are going to have a down cycle in the chemical markets, I don't think you want to add $8 billion, $10 billion debt to this and live through that." On the day Blavatnik filed his 13D, however, Smith went to work on consummating a transaction that added over $12 billion in leverage to Lyondell. Even if the Court were to credit Defendants' assertion that Basell "equity" should be taken into account (a problematic assertion), one still is left with a transaction that adds even more leverage than Smith warned would harm creditors. Among the many damaging results of this over-levering, LBI was foreclosed from access to adequate sources of credit at key moments in its short life.

As a result of these decisions—adding billions in new leverage, an illusory (and in fact sharply reduced) capital cushion, a borrowing base subject to severe contraction at the whim of market movements, and reliance upon phony management projections developed to assure

Transaction approval rather than to accurately predict the future—LBI as structured and financed was in trouble even before it left the dock.  Indeed, ominous indicators appeared months before the Transaction closed, but, starting a pattern that would continue until LBI's collapse, those who orchestrated the Transaction's financing chose short-term band-aids that exacerbated the problem over solutions that could have given LBI at least some chance of being taken off its fast-track to failure.  Most significantly, LBI's financing was modified, under terms intended to be more favorable to the banks' syndication efforts, but with the effect of making LBI even more dependent on highly volatile asset-based lending (and costing LBI hundreds of millions of dollars in higher interest rates and fees).  Meanwhile, critically needed liquidity was diverted to pay for the Berre acquisition, a massive expense that was known and non-contingent prior to the Transaction closing but not budgeted for.

Perhaps the most telling evidence, however, is what actually happened when LBI set out to sea hobbled by the decisions of those who orchestrated the Transaction.  Within weeks of closing, LBI was engulfed in a liquidity crunch.  During the first three quarters of 2008, *i.e.*, even before the extreme drop off in demand for its products, LBI was engaged in a losing battle to overcome its capital insufficiency.   The problem was temporarily mitigated by a rise in crude oil prices, supporting LBI's asset-based lending, but in the second half of 2008, crude oil prices declined, decimating LBI's borrowing base.  Already carrying excessive leverage, LBI was not able to access further credit in the markets.  See Tronox, 503 B.R. at 322-23 (citing debtor's inability to raise capital in the markets as evidence of inadequate capitalization).  And all the while, lingering over the fight for survival was the anticipated severe effect on LBI's business of a downturn long projected by industry analysts and even by Transaction participants (before they

36

approved the Transaction).  See Tronox, 503 B.R. at 322-23 (capital inadequate even though

debtor initially "put off the day of reckoning").

And the downturn came.  When it came, the combined effect of these decisions as to the

Transaction financing left LBI utterly unequipped to survive.  It staggered into a final decline and

its operating companies began filing for Chapter 11, done in by the perfect storm of disastrous

decisions adopted by those who structured the Transaction.   Meanwhile, all of its peer

companies, properly equipped to handle the sharp volatility that is the industry's defining feature,

survived the Great Recession.  In the words of the Tronox court:

> Admittedly, [the debtor's] bankruptcy took place in connection
> with a global financial crisis and a sharp down-turn in the market
> for its principal product. Nevertheless, all of [the debtor's]
> competitors were able to survive the challenging economic
> conditions.  It was not.

Tronox, 503 B.R. at 323.

Finally, while the Court need not reach the point, the record shows that the reorganized

and successful LBI, which Defendants cite as an indicator of the "industrial logic" of combining

Lyondell and Basell, carries the magnitude of capital cushion required to succeed in the industry

(which 2007 LBI did not)—and only a tiny fraction of LBI's initial leverage.

###### d.    Third-Party Lenders or Professionals as "Market Data"

Defendants have sought to rely on the fact that third-party banks lent into the transaction,

but the evidence shows any assurance to be taken from the banks' participation is illusory.

The inadequate capital analysis focuses heavily on the reasonableness of the debtor's own

projections.  See II-B-1, supra.  In the limited instances where courts as part of the capital

adequacy analysis look to the participation of third parties, a distinction emerges between (i)

cases in which the third parties engaged in a thorough, comprehensive vetting of the management

projections and (ii) cases in which the third parties relied heavily on flawed management

projections or otherwise performed incomplete diligence.  Compare Iridium, 373 B.R. at 295-96,

348 (court cited third parties' thorough independent vetting, "extraordinary amount of diligence,"

finding that market participants were not "misled" about expected performance, and finding third

parties' assessments provided ancillary support for conclusion on solvency); with Tronox 503

B.R. at 303-306, 321-22 (third-party analysis was "based . . . on [management's] overly

optimistic projections," and market did not know true extent of debtor's liabilities).[27]

Here, the evidence shows that participation by third-party lenders and professionals fall in

the latter category, and provides no basis to conclude that capital was adequate.[28]

First, the banks did not engage in a thorough, independent vetting of management's

projections.  The one-week deal deadline and weekend diligence session arranged to allow for

scrutiny of the projections was far too little to permit the kind of analysis needed to evaluate the

projections in any meaningful way (as even certain witnesses admitted, by describing what

proper diligence would have looked like).  By their own testimony, the banks (except Merrill,

discussed below) "accepted" and incorporated the inflated Lyondell and Basell management

projections into their models, compare Tronox, 503 B.R. at 321 (rejecting reliance on third-party

analyses because they were "based . . . on [management's] overly optimistic projections").

---

[27] Most of Defendants' cases do not even address the notion of third-party lending providing an independent
verification or vouching for a company's capital plan.  See In re SemCrude L.P., 648 F. App'x 205, 209-212 (3d Cir.
2016) (analyzing whether lower courts properly included third-party lending as a source of capital); Moody, 971
F.2d at 1073 (proper to include availability of credit in analyzing total capital available to debtor); Adelphia
Recovery Trust v. FPL Grp. (In re Adelphia Commc'ns Corp.), 512 B.R. 447, 478 (Bankr. S.D.N.Y. 2014) (agreeing
with expert's conclusion that debtor "would have adequate capital to maintain operations, based primarily on its
equity cushion and continued access to capital markets"); Mellon Bank, NA v. Metro Commc'ns, Inc., 945 F. 2d
635, 647 (3d Cir. 1991) (observing in context of REV analysis that "[t]he ability to borrow money has considerable
value in the commercial world").  Of course, the ability to use third-party lending as a source of capital is an entirely
different concept from the claim that third-party lenders conducted sufficient independent vetting of the debtor's
proprietary information that their participation provides independent verification of capital adequacy.

[28] The summary in this section is of facts set forth in the Trustee's Proposed Findings of Fact, Sections IV.J and V.E.

Indeed, bank witnesses testified that for the purposes of their models, they assumed the Lyondell management projections were a good faith effort at an actual projection—a fable not even indulged in by Access itself. Even the banks' "downside" cases were based upon the untested and overstated management projections. And beyond acceptance of the management projections, the third parties relied heavily on public data. None of this represents the type of independent third-party vetting that could provide any assurance on adequacy of capital.

Second, beyond their failure to perform a thorough independent vetting, the banks' models contained inexplicable omissions and shortcuts that had the effect of greasing the wheels for approval of the Transaction, including, e.g., (i) using arbitrarily small trough "haircut" figures that were wildly inconsistent with longstanding industry knowledge and experience regarding troughs; (ii) failing to account for the types of unplanned outages that are a consistent hallmark of the industry, including, e.g., equipment failures and weather-driven outages; (iii) failing to account for monthly cash flow needs on a month-to-month (rather than yearly) basis, effectively ignoring the known short-term swings characteristic of the industry; (iv) failing to test patently unsound assumptions regarding de-leveraging; (v) failing to model potential deterioration in trade credit terms; (vi) failing to account for the actual deal structure; and (vii) omitting known costs like the purchase of the Berre refinery.

Third, the banks' adoption of this haphazard approach likely owed to the banks' incentives, which under the circumstances of this particular transaction, heavily favored minimal scrutiny and diligence. The Transaction was an entrée to a relationship with Blavatnik, one of the wealthiest individuals in the world. The banks stood to significant fees from the transaction. And perhaps most critically in explaining their permissive approach, the banks did not intend to carry, as more than a limited amount, any of the risk themselves—they planned to syndicate it all.

39

These incentives are more than adequate explanation of the banks' acceptance of the truncated "diligence" weekend and acceptance of management projections without serious scrutiny.

Fourth, while Access has cited the participation of Merrill Lynch, the trial testimony on this point was quite damaging to Access. On the stand, the Merrill witness was taken through his model in detail, and ultimately forced to agree that the double-counting and similar errors in his model were so significant that the model was erroneous by—according to his own admission—"billions" of dollars. As further detailed in the Proposed Findings, the deep flaws in the Merrill analysis rendered it completely unreliable.

This is not a record of thorough, independent third-party vetting that validates the financial plan. It is a record of rushed acquiescence in order to close a deal.

Finally, while the Court need not reach it, a more telling data point would be not the participation of the lending institutions (which planned to offload their risk through syndication) but those market participants that were actually evaluating whether to take on the risk the banks were attempting to syndicate. On this score, the data could hardly be more clear: the syndication effort was a complete failure.

2.    Balance Sheet Test

While the Court need not reach the balance sheet test, because the "unreasonable small capital" test is satisfied, the evidence also supports a finding for the Trustee on the balance sheet test. Under this test, the court measures whether the fair value of the debtor's assets exceeds the amount of the debtor's total liabilities. See Metro Commc'ns, 945 F.2d at 648. Insolvency "is to be measured at the time the debtor transferred value or incurred an obligation." Id.[29]

---

[29] A plaintiff can show insolvency of an earlier period by proving that the debtor was insolvent at a later period and that there were no material changes to the debtor's financial condition between the earlier and later period. See Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.), 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014). Thus, even

Courts adopt a "flexible approach to insolvency analysis," under which they "should consider the totality of the circumstances." See Iridium, 373 B.R. at 344 (citing Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 38 (2d Cir. 1996); Union Bank of Switz. v. Deutsche Fin. Servs. Corp., No. 98 Civ. 3251 (HB), 2000 WL 178278, at *8 (S.D.N.Y. Feb. 16, 2000)).   To prove insolvency, a "trustee may rely on balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence." In re Jesup & Lamont, Inc., 507 B.R. at 473 (internal citations omitted).   In general, courts look at a combination of valuation methodologies to determine valuation including: actual sale price, discounted cash flow method ("DCF"), adjusted balance sheet method, market multiple approach, comparable transactions analysis, and market capitalization. See Iridium, 373 B.R. at 344.

Fair valuation for a company that can continue day-to-day operations is based on a "going concern" or "market price" valuation. See id. (citing In re PWS Holding Corp., 228 F.3d 224, 233 (3d Cir. 2000)). When a business is a going concern, fair value is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts. See id. (citing Roblin Indus., 78 F.3d at 35).

The evidence admitted at trial proves insolvency under the Balance Sheet Test as of December 20, 2007, with the fair value of assets considerably less than total liabilities. See PF Part XI.

---

where there is no direct proof of financial condition on the relevant date, insolvency can be inferred.  See Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC), 499 B.R. 542, 548-49 (Bankr. S.D. Tex. 2013); see also Hassan v. Middlesex Cnty. Nat'l Bank (In re Mystic Pipe & Supply Corp.), 333 F.2d 838, 840 (1st Cir. 1964) ("Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed.").

3.    <u>Cash Flow Test</u>

Under the cash flow test, a transfer or obligation may be avoided when the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III).  This is sometimes referred to as "equitable insolvency."  <u>See</u> <u>MFS/Sun Life</u>, 910 F. Supp. at 943; <u>see also</u> <u>Moody</u>, 971 F.2d at 1074-75 (affirming bankruptcy court description of equitable insolvency and distinguishing from capital inadequacy); <u>aff'g</u> 127 B.R. 958 (W.D. Pa. 1991).  "Courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." <u>WRT Creditor's Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343, 415 (Bankr. W.D. La. 2001); <u>see also</u> <u>ASARCO</u>, 396 B.R. at 399-401 (finding that debtor's management subjectively intended to injure creditors and could have no reasonable belief in its ability to pay debts); <u>In re Taubman</u>, 160 B.R. 964, 986-87 (Bankr. S.D. Ohio 1993); <u>Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight)</u>, 124 B.R. 984, 1001 (Bankr. S.D. Ohio 1990).

The evidence at trial is sufficient to prove that, by incurring or intending to incur debts beyond its ability to pay as such debts matured, Lyondell was insolvent on December 20, 2007 under the Cash Flow Test, and that in light of the Merger financing, Lyondell incurred or intended to incur debts beyond its ability to pay as such debts matured.

C.    <u>**Reasonably Equivalent Value**</u>

A constructive fraudulent transfer plaintiff also must show that the transferee did not receive "reasonably equivalent value" ("<u>REV</u>").  While the Code does not define REV, courts have established a two-part inquiry under Section 548(a)(1)(B)(i): first, the court must decide

whether the debtor received <u>any</u> value; second, the court must determine whether such value was reasonably equivalent to that transferred by the debtor. <u>See</u> <u>Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)</u>, 444 F.3d 203, 212-13 (3d Cir. 2006).[30]

Access has argued with respect to Count 11 that the REV element requires the Trustee to prove that the transaction fees that purportedly were paid in exchange for services provided under the December 11, 2007 Management Agreement ("<u>Management Agreement</u>") were not "market rate." <u>See</u> Def. Pre-Trial Br. 49.  But it does not matter if fees are "market rate," if no services are actually provided for them.  Here, the evidence admitted at trial shows that Nell provided no services in exchange for the fees.

In particular, the evidence shows that although Nell agreed to provide and be compensated for a range of Merger-financing and integration-related services, in fact Nell provided no such services.  Instead, the evidence shows, (i) Nell had no employees or operating business during the term of the Management Agreement, <u>see</u> PF ¶ 987(c); (ii) the services that Nell agreed to provide were instead provided by Access (through Access employees including Kassin and Patel) and by Blavatnik, <u>see</u> <u>id.</u> ¶ 987(d); (iii) even those Access services were largely provided prior to the December 11, 2007 effective date of the Management Agreement, <u>see</u> <u>id.</u> ¶ 987(f);[31] (iv) no evidence supports the ex post facto explanation that Nell "delegated" its

---

[30] For purposes of determining whether the debtor received <u>any</u> value, the court merely asks whether the debtor received "any benefit[,] . . . whether direct or indirect." <u>Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)</u>, 92 F.3d 139, 150 (3d Cir. 1996). In deciding whether the debtor received <u>reasonably equivalent</u> value, courts employ a "totality of the circumstances test," in which they examine the following factors: (i) the fair market value of the value received by the debtor; (ii) whether there was an arm's-length relationship between the debtor and the transferee; and (iii) the transferee's good faith. <u>See</u> <u>id.</u> at 148-49; <u>see also</u> <u>Fruehauf</u>, 444 F.3d at 213 ("[I]ndirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred.") (citing <u>Metro Commc'ns</u>, 945 F.2d at 647).

[31] For example, prior to entering into the 2007 Management Agreement, Basell AF had entered into commitment letters to finance the merger of Lyondell and Basell with Citigroup, Goldman Sachs, Merrill Lynch, ABN AMRO,

responsibilities to Access or Blavatnik, see id. ¶ 987(e); and (v) ultimately there is no record of any services provided under the Management Agreement, between its effective date of December 11, 2007 and December 20, 2007, the date on which the "transaction fees" were paid and the Merger closed, see id. ¶¶ 987, 990(a)(vii).[32]

Thus, rather than providing services under the Management Agreement, Nell provided no services, and simply collected the fees as a distribution, while Access employees performed the types of services described in the agreement—concluding most of their work even before the date the "Management Agreement" was even entered into. Indeed, with respect to one component of the "fees"—i.e., the $25 million "periodic fee" component, Patel, an Access employee who performed services that Nell ostensibly was to perform, expressly admitted as much, stating that the $25 million "fee" was in fact "essentially a dividend." See id. Part XIV.E.[33] Simply put, Nell provided no value, much less reasonably equivalent value.[34]

### D. <u>Recovery and Damages</u>

1. <u>Section 548(c) Defense Not Available</u>

Access in its pre-trial brief suggests that if the Trustee prevails on the affirmative elements of Count 11, it still could invoke the Section 548(c) defense to reduce its liability to the

---

[32] and UBS. See JX11; JX13; JX22; see also JX26 and JX28. And many of the services to Basell AF that Mr. Blavatnik testified he performed like "understanding the strategic and business case for the acquisition, ensuring that Basell received financial advice from leading investment bankers, negotiating acquisition terms, and participating in the development of a financing package for the acquisition, occurred before the 2007 Management Agreement became effective on December 11, 2007. See PF ¶ 987.

[32] The Duff & Phelps opinion is not evidence that Nell provided reasonably equivalent value. Instead, the evidence makes clear that Duff & Phelps studied the fairness of the payments "from a financial point of view only" by comparing them to market evidence of management fee size. Duff & Phelps did not examine whether any services were actually provided by Nell. The Duff & Phelps opinion also does not address the terms of the 2007 Management Agreement and/or whether better terms could be obtained in an arms-length transaction. See PF ¶ 985.

[33] Indeed, as set forth below in connection with the analysis of Toe-Hold Payment 1, the cases consistently hold that even distributions on account of equity do not provide "reasonably equivalent value." See Part III-B, infra.

extent of value given.  But the defense is not available here.  To rely on the affirmative Section 548(c) defense, the defendant must prove both (i) that it did provided such value in exchange for the transfer and (ii) that it provided such value in good faith.  See 11 U.S.C. § 548(c).

As discussed above, Defendants provided no value for the "transaction fees."  See II-C, supra.  Accordingly, the defense is not available.  See Stalnaker v. Gratton (In re Rosen Auto Leasing), 346 B.R. 798, 806 (B.A.P. 8th Cir. 2008) ("To the extent [transferee] did not give value for purposes of determining whether he gave value under 11 U.S.C. § 548(a)(1)(B), he likewise did not give value for purposes of asserting a defense under 11 U.S.C. § 548(c)"); see also Stoebner v. Lingenfelter, 115 F.3d 576, 579 (8th Cir. 1997) (finding proof of good faith irrelevant where defendant failed to challenge value component of trustee's case); Richardson v. FDIC (In re M. Blackburn Mitchell Inc.), 164 B.R. 117, 122 (Bankr. N.D. Cal. 1994) (same).

Further, Nell and Blavatnik did not take "in good faith."  Defendants would need to show either that they lacked inquiry notice of the insolvency or fraudulent intent at the time of transfer, or that no diligent investigation would have disclosed those facts.  See Christian Bros. High School Endowment v. Bayou No Leverage Fund LLC (In re Bayou Grp., LLC), 439 B.R. 284, 308-13 (S.D.N.Y. 2010)); Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 22-23 (S.D.N.Y. 2007).  There is no credible argument that Nell and Blavatnik lacked knowledge or inquiry notice of the structure and nature of the transaction, including with respect to the combined company's solvency.  Thus, if the evidence shows that the debtors were insolvent and/or that the transaction was fraudulent, the defense also must be dismissed because Nell and Blavatnik did not take in good faith.

---

[34] The transfers also involved property of the debtors, as they were paid from the same financing sources on which the Debtors were obligated.

2.    Section 550(a) and Prejudgment Interest

As with the preference claim, for an avoidance under Section 548 the Trustee is entitled to recovery of the value of the fraudulent transfers, plus prejudgment interest at the prime rate, albeit accruing from the date of the transfers (December 20, 2007) rather than the date of the filing of the Committee's complaint in 2009.[35]  See Part I-D, supra; see also Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), 422 B.R. 783, 881, 886 (Bankr. S.D. Fla. 2009) (holding recovery under Section 550 "include[s] the various fees associated with the transaction itself" and ordering disgorgement of all fees "paid by the Debtors for professionals advising the [defendants]"), quashed in part by 444 B.R. 613 (S.D. Fla. 2011), affirmed in part and reversed in part by 680 F.3d 1298 (11th Cir. 2012).[36]

## III.    Constructive Fraudulent Transfer:  Toe-Hold (Count 1)

Count 1 seeks avoidance and recovery of the value of Toe-Hold Payment 1 under Section 548(a)(1)(B) and Section 544(b) against Nell Limited, Len Blavatnik and AI Chemical.

### A.    Financial Condition of the Debtors

As set forth above in connection with the analysis of the Nell "transaction fees" (Count 11), the Trustee has carried his burden on the financial condition element.  See Part II-B, supra.

---

[35] Because Count 11 sounds in fraudulent transfer, the Court should calculate prejudgment interest with an accrual date of the date of the fraudulent transfers, i.e., December 20, 2007.  See Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 109 (Bankr. D. Del. 2015) (awarding prejudgment interest on fraudulent transfer claims from the date of the transfers, at the federal rate applicable on the date of the transfer); Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.), No. 98 C 5915, 2000 WL 988177, at *14-15 (N.D. Ill. July 18, 2000) (affirming the bankruptcy court's award of prejudgment interest from the date of the constructively fraudulent transfers); Wolkowitz v. Soll, Rowe, Price, Raffell & Browne, Inc. (In re Fink), 217 B.R. 614, 623 (Bankr. C.D. Cal. 1997) (awarding prejudgment interest from the date of the fraudulent transfer); Kendall v. Sorani (In re Richmond Produce Co.), 151 B.R. 1012, 1022 (Bankr. N.D. Cal. 1993) (finding, with respect to constructive fraudulent transfer claims under § 548, "interest should accrue on the sum transferred from the transfer date"); see also McHale v. Boulder Capital LLC (In re 1031 Tax Grp.), 439 B.R. 84, 89 (Bankr. S.D.N.Y. 2010) ("There is authority that the appropriate date to begin accruing prejudgment interest is the date on which the fraudulent transfer occurred.  But since both parties agree that [the date the adversary proceeding commenced] is the appropriate date to begin accruing interest in this case, the Court will simply adopt the parties' position.").

B.    **Reasonably Equivalent Value**

Courts consistently have held that distributions on account of equity interests are not supported by reasonably equivalent value based on either direct or indirect benefit to the debtor. See, e.g., Diamond v. Empire Partners, Inc. (In re Empire Land, LLC), No. 6:08-bk-14592, 2016 WL 1391297, at *9 (Bankr. C.D. Cal. Apr. 4, 2016); Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP), 518 B.R. 766, 789 (Bankr. S.D.N.Y. 2014); Whyte v. C/R Energy Coinvestment II, L.P. (In re SemCrude, L.P.), No. 08-11525, 2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013); Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 252-53 (3d Cir. 2000); Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.), 340 B.R. 266, 286-87 (Bankr. M.D. Pa. 2006).[37]    Had Lyondell distributed $48 per share on account of Lyondell equity held by Blavatnik through AI Chemical, the above principle regarding distributions to equity holders would apply directly.  *A fortiori*, that Blavatnik instead chose to take a distribution of equal economic value (in fact, higher value, as he did not have to pay taxes on the profit), and directed that it go to a different one of his entities, in connection with a transfer of AI units, does not change the value analysis:  Blavatnik still received a distribution from LBI, the distribution simply was constructed so that it would not be a securities transaction and would have tax advantages—and LBI still received no value.

---

[36] Defendants state that they "reserve the right" to assert claims under Section 502(h) in the event they are required to satisfy any judgment.  See Def. Pre-Trial Br. 81.  The Trustee reserves the right to object to any such claims.

[37] The arguments presented by Access in its pre-trial brief concerning the purported value of shares, see Def. Pre-Trial Br. 44, fail to account for this principle.

### C.    <u>Interest of the Debtor in Property</u>

Toe-Hold Payment 1 represents a transfer in "an interest of the debtor in property," because under the collapsing doctrine, the transfer from Basell Funding to Nell cannot be considered in isolation.

### 1.    <u>Application of Collapsing Doctrine</u>

As the Court has noted, "[c]ourts analyzing the effect of LBOs have routinely analyzed them by reference to their economic substance, 'collapsing' them . . . to consider the overall effect of multi-step transactions."  <u>Weisfelner v. Fund 1, et al. (In re Lyondell Chem. Co.)</u>, 503 B.R. 348, 379-80 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("<u>January 2014 Decision</u>"), <u>abrogated on other grounds by</u> <u>In re Tribune Co. Fraudulent Conveyance Litig.</u>, 818 F.3d 98 (2d Cir. 2016)[38] (citing analysis of collapsing doctrine in <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623 (2d Cir. 1995); <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31 (2d Cir. 1993); and <u>Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)</u>, 284 B.R. 355 (Bankr. S.D.N.Y. 2002)); <u>see also</u> <u>United States v. Tabor Court Realty Corp.</u>, 803 F.2d 1288, 1302-03 (3d Cir. 1986); <u>cf.</u> <u>Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)</u>, 500 B.R. 371, 380-81 (Bankr. S.D.N.Y. 2013).

Courts apply the collapsing doctrine where the transferee had actual or constructive knowledge of the overall scheme or transaction at issue and each step in the transaction was part of a single integrated scheme.  <u>See</u> <u>HBE Leasing Corp.</u>, 48 F.3d at 635-36; <u>see also</u> <u>Adelphia</u>

---

[38] While the Second Circuit in <u>In re Tribune Co. Fraudulent Conveyance Litig.</u>, 818 F.3d 98 (2d Cir. 2016), reached a contrary decision on the issue of preemption to that reached by this Court in the January 2014 Decision, the Second Circuit did not reject this Court's reliance on the collapsing doctrine; to the contrary, it cited this Court's reliance on collapsing doctrine in a footnote briefly explaining application of the doctrine to leveraged buyouts, <u>see</u> 818 F.3d at 119 n.7.  Similarly, while the January 2014 Decision contains reasoning regarding imputation and actual intent that is not consistent with the District Court's <u>Hofmann</u> decision, <u>see</u> <u>Weisfelner v. Hofmann (In re Lyondell Chem. Co.)</u>, 554 B.R. 635, 647-55 (S.D.N.Y. 2016), the District Court in <u>Hofmann</u> did not take issue with the Court's collapsing analysis.

Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp), 512 B.R. 447, 489-90 (Bankr. S.D.N.Y. 2014) ("Courts have collapsed a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction.") (internal citations omitted); Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC), 426 B.R. 488, 497-98 (Bankr. D. Del. 2010) (collapsing multiple transactions in spinoff, where the transferee had knowledge of the multiple steps in the transactions).

Here, the Court previously has applied the collapsing doctrine to the Toe-Hold Payments, ruling that, at the pleading stage, the Trustee had alleged adequate facts on which to use the collapsing doctrine to satisfy the "interest of the debtor in property" requirement. See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), 543 B.R. 428, 441 n.61 (Bankr. S.D.N.Y. 2016).[39] The evidence at trial confirms the Court's conclusions at the pleading stage. First, the evidence shows that Toe-Hold Payment 1 and the Merger, although orchestrated by Blavatnik's agents to be separate transactions, involved payments from the same sources of funding. See PF ¶¶ 160-165, 420-432. Second, even constructive knowledge will suffice to trigger collapsing, see HBE Leasing, 48 F.3d at 635, and the evidence shows that Nell Limited and Blavatnik had both constructive and actual knowledge of the structure (either directly or through their agents) of the Toe-Hold Payments and the Merger and the coordinated funds flows relating thereto.[40] See PF

---

[39] This decision dismissed Count 2 based on erroneous "actual intent" reasoning that was subsequently rejected by the District Court in the Hofmann decision. Subsequent to issuance of the Hofmann decision, this Court reinstated Count 2 for trial. Neither the District Court nor this Court have taken issue with the collapsing analysis in any of this Court's dismissal decisions in this action.

[40] The Trustee will be able to rely upon both Blavatnik's direct knowledge and the knowledge of his agents as charged to him under agency imputation doctrine. See, e.g., Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466 (2010) ("where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their

¶¶ 160-165, 420-432, Part XIV.A.  Further, because Blavatnik dominated and controlled Nell, his actual knowledge is imputed to Nell.  See In re Lyondell Chem. Co., 554 B.R. at 649-50.

Finally, Defendants' argument that collapsing may not be applied in a case involving multiple entities, see Def. Pre-Trial Br. 10, 42 n.16, is a legal argument that already was rejected by the Court and in any event lacks merit.  See In re Lyondell Chem. Co., 543 B.R. at 441 n.61 (assuming that collapsing doctrine would apply under factual allegations advanced by Trustee at pleading stage); see also In re Waterford Wedgwood USA, Inc., 500 B.R. at 380-81 (finding that argument that application of collapsing applies only to "multiple transactions by the same debtor" is not supported by precedent and that "several cases in this district have applied the integrated transaction doctrine when multiple entities were involved," and rejecting the asserted "single entity" limitation to collapsing).  Because collapsing applies with respect to the Toe-Hold Payments, Toe-Hold Payment 1 constitutes a transfer of an interest of debtor property.[41]

### 2.    Pledge of Debtor Assets

The source of the funds used to make Toe-Hold Payment 1 was the same borrowing used to finance the Transaction, every dollar of which borrowing Lyondell and other debtors were obligated to repay, either as borrowers or guarantors under secured debt facilities.  A debtor's property includes "all legal or equitable interests of the debtor in property," 11 U.S.C. §

---

principals") (cited in In re Lyondell Chem. Co., 554 B.R. at 647).  Further, even if actual knowledge were not available, the Trustee would be able to prove that Blavatnik had constructive knowledge of the Merger and Toe-Hold Payment 1.

[41] While the record reflects that the Transaction was an LBO, even if Defendants' misguided contentions on that point were considered, the collapsing doctrine still would apply for the same reasons set forth by Judge Gerber.  See In re Lyondell Chem. Co., 543 B.R. at 441 n.61.  And even if Toe-Hold Payment 1 were not considered along with the Merger under the collapsing doctrine, the doctrine still would provide a basis for finding that the transfer involved an interest of the debtors in property, because the doctrine would require that Toe-Hold Payment 1 be evaluated not simply as a transfer by Basell Funding to Nell, but as a series of integrated, sequential transfers by which funds were drawn down and transferred by Basell entities (including the debtor Basell Germany) to carry out payment of Toe-Hold Payment 1.

541(a)(1), including "property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." Begier v. I.R.S., 496 U.S. 53, 58 (1990). Courts treat loan proceeds as the property of the borrower, and loan proceeds received by one co-borrower as property of the other co-borrowers. See Bash v. Sun Trust Banks, Inc. (In re Ohio Bus. Machs.), No. 06-8005, 2007 WL 177941, *5-6 (B.A.P. 6th Cir. Jan. 25, 2007); Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), 422 B.R. 783, 872-73 (Bankr. S.D. Fla. 2009); Anzalone v. Dulgerian (In re Dulgerian), 388 B.R. 142, 151 (Bankr. E.D. Pa. 2008). Thus, Lyondell as an obligor had a property interest in all funding used to make Toe-Hold Payment 1. Further, Toe-Hold Payment 1 diminished Lyondell's estate. See TOUSA, 422 B.R. at 874 n.57 ("The estates of the Conveying Subsidiaries were diminished by the payments to the Senior Transeastern lenders, because the Conveying Subsidiaries—which were not liable for any debt to them—received no value from the release of the Senior Transeastern Lenders' claims against others.").[42]

---

[42] Access's argument invoking the "savings clauses," see Def. Pre-Trial Br. 40-42, misses the mark entirely. As Defendants themselves have recognized, "[a] limiting clause in a contract operates entirely on the liability side of the balance sheet and thus has no impact on a 'debtor's interest in property.'" Def. Pre-Trial Br. 30 (emphasis added). Further, Defendants' argument depends on attacking Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), 422 B.R. 783 (Bankr. S.D. Fla. 2009), in which the court explained that "[i]f funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers has a property interest in the funds," concluded that this rule applies equally to co-guarantors, and determined that the savings clauses at issue were unenforceable. See In re TOUSA, Inc., 422 B.R. at 872-73 (avoiding transfers made by non-debtor parent obligor where debtors guaranteed repayment of funds used). The liability findings in TOUSA were affirmed by the Eleventh Circuit. See In re TOUSA, Inc., 680 F.3d 1298, 1313-16 (11th Cir. 2012) (finding, inter alia, that avoidance was available where the defendants benefited from liens granted to secure obligations to obtain financing). And with respect to In re Capmark Fin. Grp., Inc., 438 B.R. 471 (Bankr. D. Del. 2010), although the relevant guaranty agreements contained savings clauses, they were ultimately not dispositive in light of the court's conclusion regarding the debtor's financial condition. See id. at 517. Further, the savings clauses, forward-looking as they are, cannot alter the fact that Lyondell was already insolvent on December 20, 2007. See In re TOUSA, 422 B.R. at 863 (where debtor is insolvent prior to the challenged transaction, "the savings clauses have no effect at all."). And, even assuming, arguendo, that the savings clauses could operate to limit Lyondell's guaranty liability, that would impact only the amount of Lyondell's property interest in the Toehold Payments—not the fact of its property interest in such transfers. Ultimately, Defendants' preoccupation with the fact that Lyondell's obligation to repay the Merger Financing was substantially in the form of a contingent guaranty is irrelevant to determining Lyondell's property interest in the Toehold Payments. See Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 648 (3d Cir. 1991) (concluding with respect to a guarantor that the "contingent nature of the debt was illusory").

D.    **Section 546(e) Safe Harbor Issues**

Access has argued that Toe-Hold Payment 1 is protected from avoidance by the Section 546(e) safe harbor.  See Def. Pre-Trial Br. 6, 33-39.  But the safe harbor does not protect the transfer, because the transfer was neither (i) a transfer made "in connection with" a securities contract nor (ii) a "settlement payment."  At summary judgment, the Court (i) ruled that Toe-Hold Payment 1 was not made "in connection with" the Merger Agreement, but (ii) set for trial the question of whether the safe harbor is triggered on the theory that the AI Chemical LLC units transferred under the December 20, 2007 "Stock Purchase Agreement" constituted "securities."  See Count 9 SJ Opinion at *8-11.  Following trial, the evidence is clear that the AI Chemical LLC units were not securities.  Further, the evidence admitted at trial does not provide a basis for reliance on any exception to "law of the case" doctrine in order to reverse the Court's adjudication of the issue on summary judgment.

1.    Toe-Hold Payment 1 Was Not Made "In Connection With" a Securities Contract.

Blavatnik could have chosen for AI Chemical to receive $48 per share in the Merger for the Lyondell shares it held.  Instead he chose to take an economic distribution out of LBI, and structured it in a manner that was not a securities transaction, with the effect being a substantial benefit in tax treatment.  Despite this deliberate choice, Access continues to attempt to invoke the securities safe harbor, identifying two purported bases for finding that Toe-Hold Payment 1 was "in connection with" a securities contract:  (i) the transfer was made in connection with the

---

This is particularly true where, as here, there was no expectation that certain financing subsidiaries that technically were "Borrowers" under the facilities would have sufficient assets with which to repay the borrowings.  See Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.), 360 B.R. 787, 871 (Bankr. N.D. Ill. 2007) (considering guarantee to be "a direct obligation" of guarantor where primary obligor had no ability to repay), vacated and remanded on other grounds by, 619 F.3d 688 (7th Cir. 2010).

"Stock Purchase Agreement," which purportedly is a securities contract, and (ii) the transfer

purportedly was made "in connection with" the Merger Agreement. Neither basis is sound.

          a.       <u>"Stock Purchase Agreement" and LLC Units as Securities</u>

The premise of Access's argument that the Stock Purchase Agreement is a securities

contract is that the AI Chemical LLC interests transferred thereunder were securities. The

evidence admitted at trial shows that premise to be false.

"LLC membership interests are not 'securities' unless they meet the four criteria of an

'investment contract' set forth in <u>Securities and Exchange Commission v. W.J. Howey Co.</u>, [328

U.S. 293 (1946)]." <u>Keith v. Black Diamond Advisors, Inc.</u>, 48 F. Supp. 2d 326, 332 (S.D.N.Y.

1999); <u>see also</u> 11 U.S.C. § 101(49)(a)(xii). "The <u>Howey</u> test defines 'an investment contract as a

contract, transaction or scheme whereby a person invests his money in a common enterprise and

is led to expect profits solely from the efforts of the promoter or a third party . . . ." <u>Keith</u>, 48 F.

Supp. 2d at 332 (quoting <u>Howey</u>, 328 U.S. at 298-99) (internal marks omitted). <u>Howey</u> requires

(i) that a purchaser give up some tangible and definable consideration in return for the interest

obtained; (ii) the existence of either common interests between the investor and managers of the

enterprise or a pooling of interests by members; (iii) an expectation of profit by the investor; and

(iv) that the expectation of profit be derived from the entrepreneurial efforts of others. <u>See</u> <u>id.</u>;

<u>see also</u> <u>Revak v. SEC Realty Corp.</u>, 18 F.3d 81, 87 (2d Cir. 1994) (interests are investment

contracts only if they involve: "(i) an investment of money (ii) in a common enterprise (iii) with

profits to be derived solely from the efforts of others"). The Second Circuit has emphasized that,

"in applying the <u>Howey</u> factors, courts can (and should) look beyond the formal terms of a

relationship to the reality of the parties' positions to evaluate whether the reasonable expectation

was one of significant investor control." U.S. v. Leonard, 529 F.3d 83, 85 (2d Cir. 2008).[43]

The evidence shows that the AI Chemical LLC Units were not "stock" (§ 101(49)(A)(ii)),

"transferable shares" (§ 101(49)(A)(viii)), or any other types of interests listed as "securities"

under the Bankruptcy Code. See 11 U.S.C. § 101(49).

First, no "horizontal commonality"—i.e., pooling of investment funds, shared profits and

shared losses—existed with respect to the AI Chemical membership interests, as 100% of the

membership units were held at all relevant times by a single holder. See Great Lakes Chem.

Corp. v. Monsanto Co., 96 F. Supp. 2d 376, 390 (D. Del. 2000) (where investor bought 100% of

membership interests in LLC, did not pool contributions with those of other investors, as is

required for horizontal commonality). From AI Chemical's formation until contribution to Nell

on December 20, 2007, all of AI Chemical's membership interests were held by Blavatnik, and

he maintained "significant investor control" and did not rely on the entrepreneurial or managerial

efforts of others.[44] Second, AI Chemical's LLC agreement did not elect to provide that its

interests be securities under the UCC as enacted in Delaware. See PF Part XIV.A.1; see also 6

Del. C. § 8-103(c) ("An interest in a . . . limited liability company is not a security unless it is

---

[43] Defendants' reliance on O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC), 488 B.R. 394 (B.A.P. 9th Cir. 2013), is unavailing, as that case describes LLC interests is generic terms. As the facts here (and decisions such as Great Lakes Chem. Corp., cited supra) show, not all LLC units are the same. In Crescent Res. Litig. Trust v. Duke Energy Corp., 500 B.R. 464 (W.D. Tex. 2013), the initial LLC that started the complex series of transfers at issue was itself the successor of a Georgia corporation, and its predecessor's election to become a Georgia LLC involved the surrendering of its securities and common stock, putting the LLC interests at issue there on much different footing than AI Chemical's units.

[44] See PF ¶¶ 25, 162, 421-432, Part XIV.A. Access employees understood Blavatnik was the final decision maker. See id. ¶¶ 247-248, 281, Part XIV.A.1. At the time of the Stock Purchase Agreement, 100% of the units had been contributed by Blavatnik to his entity Nell. See id. ¶¶ 426, 430, Part XIV.A.1. While the Court need not reach the issue, the ownership of AI Chemical remained undivided even as it was transferred further down the line of Basell entities. See PF Part XIV.A.1. Due to their undivided ownership at all relevant times, the units cannot satisfy the Howey test. See, e.g., Leonard, 529 F.3d at 85; Revak, 18 F.3d at 87; Archer Well Co. v. GW Holdings I LLC, No. 12 Civ. 6762 (JSR), 2013 WL 2314271, at *2 (S.D.N.Y. May 21, 2013).

dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by this Article, or it is an investment company security") (emphasis added)).  Third, the units were not registered with the SEC.  See PF Part XIV.A.1.  Fourth, no public market existed with respect to the units and none was expected to develop.  See PF Part XIV.A.1.  Fifth, transferability of the units was severely restricted. See PF Part XIV.A.1.[45]  Sixth, the units were not denominated tock or securities.  See PF ¶¶ 162, 426, 429-431, Part XIV.A.1.[46]

This record is clear: under the relevant case law, these LLC units are not securities.[47]

    b.    "In Connection With" The Merger Agreement

On summary judgment, the Court ruled that Toe-Hold Payment 1 was not transferred "in connection with" the Merger Agreement itself, for the purposes of the Section 546(e) safe harbor.  See July 20, 2016 Order [Dkt. No. 772] ("Count 1 SJ Order") at *8.   This decision constitutes the law of the case.  While the law of the case doctrine affords a court discretion to reverse its own earlier judgment under limited circumstances, those circumstances are not present here.

---

[45] Access attempts to cast these severe restrictions on transferability as a reason to find that the interests are securities, portraying the restrictions as evidence that transfer was nevertheless possible, i.e., "contemplated."  See Def. Pre-Trial Br. 36. These transfer restrictions, however, show a very limited future possibility of any transfer, and the restrictions circumscribing the ability to transfer the AI Chemical Units are identified in each subsequent agreement as a reason why no market for the interests exists or is expected to develop.  See PF Part XIV.A.1.

[46] Contrary to Defendants' argument that managers and not members exercised control over AI Chemical, the record makes clear that AI Chemical's managers did not exercise independent management and instead deferred at every turn to Blavatnik and his agents.  For example, before Mr. Thoren signed the host of "resolutions, agreements, and other documentation relating to the Project Hugo restructuring that require[d] [his] signature"—including documents he was asked to sign in his capacity as manager of AI Chemical—which he was asked to sign by the Curtis, Mallet-Prevost, Colt & Mosle LLP firm (PF Part XIV.A.3, he (i) did not negotiate any of the terms of those documents PF Part XIV.A.3 (citing Nov. 2, 2016 Trial Tr. (Thoren) at 288:6-9)), and (ii) did not recall having a manager's meeting with Mr. Benet to discuss whether or not any of those documents should be negotiated or what the terms of the documents were (id. at 288:10-14).  Rather, he simply executed the documents subject to in-house counsel's sign-off. See PF Part XIV.A.1 and XIV.A.3 (citing Nov. 2, 2016 Trial Tr. (Thoren) at 288:15-289:8).

[47] This same evidence also provides an answer to the Court's question at summary judgment regarding whether the purposes of the safe harbor were implicated by the LLC units.  See Count 1 SJ Order 9-11.  The safe harbor was designed to afford a measure of protection to the securities markets, not to shield a transaction involving membership units all held by single owner, then transferred to another single owner, for which no public market existed or was expected to develop.

(i)      Law of the Case Doctrine

The law of the case doctrine encourages courts to maintain consistency in their legal holdings throughout a litigation.  See Official Comm. of Unsec. Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 166-68 (2d Cir. 2003) (citing Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.1992)); see also  Johnson v. Holder, 564 F.3d 95, 99-100 (2d Cir. 2009) (explaining doctrine in context of appellate and remand decisions); DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) (same).  The doctrine discourages reconsideration by the court of its own prior interlocutory decisions under Rule 54(b).  In re Highland Fin. Corp., 216 B.R. 109, 113 (Bankr. S.D.N.Y. 1997).

Under the doctrine, trial court judges should exercise restraint in reconsidering prior findings absent (i) a change of controlling law,[48] (ii) the need to correct a clear error or prevent manifest injustice,[49] or (iii) the availability of new evidence."[50]

The "new evidence" exception requires a showing that, after entry of the court's interlocutory order, the movant discovered evidence that was not previously extant or available. See Color Tile, 322 F.3d at 167-68; Highland Fin. Corp., 216 B.R. at 114.  The exception does

---

[48] To show a change of controlling law, it is not sufficient to show that appellate courts have applied prior existing substantive law to a persuasive fact pattern.  Rather, a party must demonstrate that an appropriate authority has mandated application of materially different substantive law.  See Color Tile, 322 F.3d at 167-68; In re Fannie Mae 2008 ERISA Litig., No. 09 Civ. 1350 (PAC), 2014 WL 1577769, at *3-4 (Bankr. S.D.N.Y. Apr. 21, 2014).

[49] Likewise, it is not sufficient to show that a court arrived at the wrong conclusion after applying the law to the facts. Rather, to prove clear error or manifest injustice, a party must show that the court affirmatively misstated or misapplied the law or the facts, resulting in a clearly unjust decision.  See Virgin Atl., 956 F.2d at 1254-55 (affirming ruling against party for re-submitting motion to dismiss, even though trial court erred in denying the initial motion to dismiss, because the court's "initial error in asserting jurisdiction was not so clear that the law of the case doctrine would be justifiably ignored"); Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964), cert. denied, 377 U.S. 934 (1964) ("a clear conviction of error on a point of law that is certain to recur . . . will prevail over 'the law of the case' whereas 'mere doubt' will not. In the former instance the court knows that later litigants will be governed by a different rule; in the latter that is only a possibility"); Castro v. United Security, Inc., No. 10 Civ. 6152 (LBS), 2012 WL 555701, *2 (S.D.N.Y. Feb. 21, 2012) (granting relief where court misapplied statute and thus dismissed suit as untimely).

[50] Color Tile, 322 F.3d at 167 (listing exceptions to law of the case doctrine).

not grant a "second bite at the apple" where the movant either failed to exercise sufficient diligence in discovery or made a strategic decision to request the interlocutory order prior to discovery.  See Color Tile, 322 F.3d at 167-68; Virgin Atl., 956 F.2d at 1255 ("where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again") (quoting Zdanok, 327 F.2d at 953).

Here, there is no basis for reversal of the Court's ruling that Toe-Hold Payment 1 was not made "in connection with" the Merger Agreement.   The judgment was predicated on the fact that the Toe-Hold Payment 1 was not "contemplated by the Merger Agreement," but was instead "independent" and "could have occurred in isolation from" the Merger Agreement.  See Count 9 SJ Decision, at *8.  The factual basis for that ruling has now been admitted into evidence.  The Merger Agreement does not require consummation of the Toe-Hold Payments.  See PF ¶ 327 Further, the evidence shows that Toe-Hold Payment 1, a $523 million payment to Nell orchestrated in all of its particulars by Blavatnik and his agents, could have been carried out in isolation from the contract.  See id. ¶¶ 327, 420-432.  The Court's judgment should stand.

The "new evidence" exception does not apply.  Access cannot identify material evidence that is newly discovered and previously was not available.  This is dispositive.  See Color Tile, 322 F.3d at 167-68; Virgin Atl., 956 F.2d at 1255; Zdanok, 327 F.2d at 953.  And even if that established principle were ignored, it would not help Access, because the evidence admitted at trial only confirms the factual predicates underlying the Court's summary judgment ruling: although sequenced at same time as the Merger Agreement, see PF ¶¶ 420-432, Toe-Hold Payment 1 was a substitute for a transaction that would have been a cash-out of Lyondell shares under the Merger contract.    See id. ¶¶ 160-165, 362, 421-432.   The particulars of this

distribution were entirely decided by Blavatnik and his advisors, and they could have carried it out as they wished.  See id. ¶¶ 160-165, 362, 421-432.

       2.      Toe-Hold Payment 1 Was Not a Settlement Payment

A "settlement payment" is a payment made "to complete a securities transaction."  Count 1 SJ Order at *10-11 (citing In re Enron Cred. Recovery Corp., 651 F.3d 329, 334 (2d Cir. 2011); Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC), 773 F.3d 411, 422 (2d Cir. 2014)).  As described above, the AI Chemical LLC interests are not securities, so payments effecting their transfer do not "complete a securities transaction."  Further, Toe-Hold Payment 1 was not made in connection with the Merger Agreement, much less made to "complete" the Merger Agreement.

### E.    Recovery and Damages

Recovery under Section 550 is proper against Nell as the initial transferee of Toe-Hold Payment 1.  See 11 U.S.C. § 550(a)(1) ("initial transferee").  With respect to Blavatnik, recovery on the "for whose benefit" theory under Section 550, or on an alter ego theory, is justified here.

       1.      "For Whose Benefit"

An entity "for whose benefit" the initial transfer was made is one of the potential sources of recovery of an avoidable transfer under 11 U.S.C. § 550(a)(1).  See, e.g., Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999).  The statute subjects the "entity for whose benefit such transfer was made" to "strict liability."  Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 56-57 (2d Cir. 1997); see Nisselson v. Salim (In re Big Apple Volkswagen, LLC), No. 11-2251, 2016 WL 1069303, at *14 (Bankr. S.D.N.Y. Mar. 17, 2016) (Garrity, J.)

("Under § 550(a)(1), the 'initial transferee' or the 'entity for whose benefit the transfer was made' is strictly liable for an avoided transfer.") (citing cases).

While the "quintessential example of an entity for whose benefit a transfer is made is a guarantor," other examples exist, and "[t]he key to pegging the entity for whose benefit the initial transfer was made has two sides: 1) the entity must be the intended beneficiary and 2) the intended benefit must originate from the initial transfer." Gowan v. Amaranth LLC (In re Dreier LLP), 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (Glenn, J.); In re Big Apple Volkswagen, LLC, 2016 WL 1069303 at *18 n.38 (same) (quoting "two sides" formulation).

Thus, courts have relied on the "for whose benefit" theory where a defendant exercised dominion and control over the initial transferee through ownership thereof. See Gunten v. Neilson (In re Slatkin), 243 F. App'x 255, 257-59 (9th Cir. 2007) (upholding determination that transfer to corporation was for benefit of sole shareholder, director and officer who directed use of funds received by corporation); Baldi v. Lynch (In re McCook Metals, L.L.C.), 319 B.R. 570, 592 (Bankr. N.D. Ill. 2005) (transfer to limited liability company was for benefit of individual who was managing member, chairman and owner of majority equity interest because transfer was, inter alia, a quantifiable benefit that individual could access based on controlling interest); Nickless v. Golub (In re Worcester Quality Foods, Inc.), 152 B.R. 394, 403-04 (Bankr. D. Mass. 1993) (transfers to corporations were for the benefit of the owners of the corporations); Tavormina v. Weiss (In re Behr Contract., Inc.), 79 B.R. 84, 87 (Bankr. S.D. Fla. 1987) (transfer to corporation that was fully owned by stockholder and had no assets or liabilities was for the benefit of the stockholder).

Here, the evidence admitted at trial shows that Toe-Hold Payment 1 was made "for the benefit of" Blavatnik.[51]  Blavatnik was the sole ultimate owner of Nell.  See PF ¶¶ 29, 431.e. Through Toe-Hold Payment 1, he obtained a payment equivalent to the economic value of an over $300 million profit on the AI Chemical-held Lyondell shares—while receiving the direct, quantifiable benefit of avoiding the tax payment that would have come due had he proceeded with a securities transaction.  See id. ¶¶ 421-432.  Blavatnik passed on and extinguished his liability to an Access entity under a pre-existing $189 million loan.  See id. ¶¶ 428, 431.c.-431.d., Part XIV.A.3.

2.    Alter Ego Theory

While Nell was the transferee for Toe-Hold Payment 1, the Court may recognize that Nell is a mere fiction designed to mask Blavatnik's equitable interest.  Accordingly, the Court may pierce the veil of Nell or award relief under a similar equitable theory, to recognize Blavatnik's direct interest.

Nell is incorporated in Gibraltar, a British overseas territory, and the parties agree that English law governs piercing its veil for substantive liability.  See Def. Pre-Trial Br. 45.  In Prest v. Petrodel, [2013] UKSC 34, ¶¶28, 35, [2013] 3 WLR 1, the UK Supreme Court rendered a decision that (i) limited veil-piercing to an "evasion" standard under which a plaintiff must prove that the defendant controlling the corporation was independently liable to the plaintiff prior to the interposition of the subject corporation, but (ii) preserved a wider range of similar equitable relief but stated that such relief, which sounds in "concealment," should not be considered "veil piercing."  Prest, [2013] UKSC 34, ¶¶ 28, 35; see also id. ¶ 31 (stating that in

---

[51] In the alternative, if the Court concludes that the evidence shows that Blavatnik was an immediate or mediate transferee of the initial transferee of Toe-Hold Payment 1, the Trustee may recover under Section 550 on that basis. See 11 U.S.C. § 550(a)(2) ("immediate or mediate transferee").

prior decision, court "considered that he was piercing the veil. But I do not think that he was . . . the correct analysis of the situation was that the court refused to be deterred by the legal personality of the company from finding the true facts about its legal relationship with [the executive].").  Both before and after Prest, U.S. courts have afforded relief against those who control U.K. corporations without clarifying whether such relief would fall under the Prest court's "evasion" or broader "concealment" equitable relief standard.  See, e.g., Tianbo Huang v. iTV Media, Inc., 13 F. Supp. 3d 246, 258 (E.D.N.Y. 2014) (denying motion to dismiss complaint against executive of BVI entity for breach of employment contract, where executive signed an employment agreement on behalf of the corporation and thereafter acted through third-party entities to prevent performance); In re Tyson, 433 B.R. 68, 93-94 (S.D.N.Y. 2010) (noting availability of equitable relief through showing of concealment).

Here, the court may grant relief against Mr. Blavatnik under either approach, as a result of his actions in control of Nell Limited.  Blavatnik is the ultimate owner of Nell and determines what actions it takes.  See PF ¶¶ 29, 431.e.  With respect to the Toe-Hold, Blavatnik on December 20, 2007 transferred all of the membership units he held in AI Chemical to Nell as a capital contribution.  See id. ¶¶ 426, Part XIV.A.3.  Immediately prior to the CSA, Blavatnik owed Access Industries Holdings, LLC ("AIH") approximately $189 million.  See id. ¶¶ 428, 431.c.-431.d. Part XIV.A.3.  Under the CSA, Nell assumed Blavatnik's approximately $189 million liability to AIH.  See id. ¶¶ 431.d., Part XIV.A.3.  Such evidence confirm the "true facts" of his relationship to Nell—i.e., he used Nell and other entities to conceal his own interests and protect "his" funds against liabilities.  See id. ¶¶ 431.c.-d., Part XIV.A.3.  Moreover, Blavatnik and his agents and subordinates acting on his behalf and at his direction aimed to conceal these "true facts."  See id. ¶ 362.  In addition, Blavatnik interposed Nell as part of the Toe-Hold

61

payment structure in order to avoid his personal liabilities, by causing Nell to assume his personal approximately $189 million debt to AIH.  See id. ¶¶ 428, 431.c.-431.d., Part XIV.A.3. U.K. law permits relief under these circumstances, and the Court should permit recovery from Blavatnik.

       3.    <u>Section 548(c) Defense Not Available</u>

As discussed above in connection with Count 11, the Section 548(c) affirmative defense is only available if the transferee (i) provided value and (ii) took in good faith.  As discussed, Nell and Blavatnik in economic effect took a distribution out of LBI through Toe-Hold Payment 1, and provided no value.  Further, as discussed in connection with Count 11, the notion that Nell and or Blavatnik lacked knowledge of the structure and financing of the Transaction (and/or, for Count 1, the Toe-Hold Payments specifically), including with respect to impacts on solvency, is unsupportable.  The Section 548(c) defense is of no assistance to Nell.

       4.    <u>Settlement Offset Under Section 550(d)</u>

Defendants contend that in light of the Lender Settlement, they are entitled to "a settlement credit under Section 550(d)," pursuant to which "the Court should reduce the notional liability of any transferee of the proceeds of the lenders' cash by the amount of the debt that was forgiven."  <u>See</u> Def. Pre-Trial Br. 64-66.  According to Defendants, a proper "settlement offset" that takes account of the Lender Settlement would result in each transferee here being liable for, at most, 20% of the amount it received, because "80% of the allegedly injurious loans used to fund shareholder payouts has already been discharged and subordinated to and for the benefit of all unsecured creditors."  This argument is not compelling.  The general principle for which Section 550(d) stands (<i>i.e.</i>, that "[t]he trustee is entitled to only a single satisfaction") is not controversial.  However, Defendants have cited no authority whatsoever supporting the approach

they propose for accomplishing this "settlement offset." Nor does Defendants' proposed methodology account for the fact that each cause of action here seeks recovery in a specific sum arising from a discrete transfer. Ultimately, Defendants have drawn no coherent connection between (i) the specific transfers to be avoided, (ii) the Lender Settlement and (iii) the calculations they offer concerning total amount of net debt obligations that may have been satisfied that would support a blanket 80% reduction of each transferee's liability.

     5.    Prejudgment Interest

For the same reasons as set forth in connection with Count 11, the Court should award recovery of the value of Toe-Hold Payment 1 plus prejudgment interest calculated at the prime rate, accruing as of the date of the transfers, December 20, 2007.

## IV.    Tortious Misconduct of Luxembourg Fiduciaries (Counts 6 and 7); Aiding & Abetting (Count 18)

The conduct by which those who made the key decisions on behalf of Lyondell and Basell in (i) recklessly structuring the Transaction, its financing and the diligence, (ii) developing and countenancing reliance on earnings projections known by them to contain billions in unsupported EBITDA and (iii) elevating their own personal interests above those of the company, are violations of the duties owed to corporate entities by those that control them. The Trustee already has settled his claims for breach of fiduciary duty with the Lyondell-side fiduciaries. For years, however, Blavatnik has attempted to avoid liability for the Basell-side decision-making on the theory that he was not in charge of those decisions—his underlings and business associates were. In advancing this argument, counsel at times offered accountings of the facts that directly contradicted their clients' prior sworn testimony. Ultimately, however, this confusing and increasingly absurd attempt at evasion was brought to a halt by Blavatnik himself, from the witness stand. Under questioning, Blavatnik clearly and repeatedly testified that he was

63

the ultimate decision-maker for the Basell side of the transaction.  And overwhelming evidence confirms that testimony.

As summarized below and detailed in the Proposed Findings of Fact,  under Luxembourg law's "de facto director" doctrine, Blavatnik is subject the same scrutiny for decisions made by him as would be a formal officeholder.  Under Luxembourg law, this scrutiny would result in liability given the powerful and wide-ranging evidence establishing:  (i) his extraction from Basell and LBI of over one billion dollars, *i.e.*, taking from Basell a substantial chunk of the cash cushion it would need to survive, a decision that cannot be explained or defended from the point of view of Basell's own interests, rather than Blavatnik's; (ii) the reckless imposition of a capital plan that left LBI wholly unprepared to deal with the hallmark characteristics of the industries in which it operated, including volatility and cyclicality (as discussed above); and (iii) the cutting of diligence to a matter of days, preventing third parties from uncovering the massive inflation in the management projections on which the third parties' models relied.  Further, the claims against formal managers of the Luxembourg entities also are well-supported in light of (i) their abdication of their formal roles, in favor of Blavatnik exercising de facto control and (ii) their facilitation of the Transaction's closing against their own judgment as evidenced by their contemporaneous expressions of alarm at Blavatnik's deal terms (including even an acknowledgement by one GP Manager that closing the deal would be "tough" to reconcile with his duties as a fiduciary to the Basell entities).  Taken as a whole, the evidence supports entry of judgment and damages as measured by the harm directly caused.

A.      **Applicable Law (Counts 6 and 7)**

Counts 6 and 7 are claims asserted under Luxembourg law against Blavatnik, Access Industries and Blavatnik subordinates Benet and Kassin in connection with conduct relative to

Basell and Basell AF GP S.a.r.l. (the "GP", which entity was the formal manager of Basell) or their management, mismanagement, and/or abdication of management responsibility for these entities.[52]  Because Basell and the GP were Luxembourg entities, the liability of these defendants arises under Luxembourg law.  Under Rule 44.1 of the Federal Rules of Civil Procedure, the Court may consider any relevant material or source in determining the relevant Luxembourg law.  See CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship, No. 12-CV-08087 CM SN, 2013 WL 2661037, at *5 (S.D.N.Y. June 12, 2013).

Luxembourg is a civil law country whose laws are largely derived from the law of Belgium and France.  Thiebaud 9.[53]  In addition, as the Luxembourg Companies act is derived from Belgian company law and influenced by French company law, Luxembourg courts customarily draw on French and Belgian case law and academic scholarship, an important source of guidance under the jurisprudence of these civil law countries.  Id.  Under civil law jurisprudence, a court is bound only by the statute; court precedent is influential but not binding. Id.  Thus, Luxembourg courts will look to the core principles set out in previous cases rather than factual similarities that might, under common law, result in a determination that a particular precedent is controlling.

### B.    Nature of Legal Theories

There are three sets of claims asserted in Counts 6 and 7.

First, Count 7 asserts against Blavatnik and Access Industries tort liability arising under Articles 1382 and 1383 of the Luxembourg Civil Code.  To establish this claim requires proof

---

[52] Kassin, Bigman, and the late Richard Floor were managers of the GP (the "GP Managers").  The Trustee has settled his claims under Luxembourg law with Bigman and the estate of Floor.

[53] The specific sections of the Luxembourg code and court decisions interpreting these statutory provisions are set forth in full in the Expert Report of Philippe Thiebaud ("Thiebaud") and Mr. Thiebaud's Supplemental Report ("Thiebaud Supp.")

that Blavatnik or Access Industries functioned as a de facto director of Basell, and engaged in misconduct in such role.   Count 6 asserts the same claim, against Blavatnik only, and on an alternative basis—if the Luxembourg de facto doctrine is understood as sounding in contract rather than tort.[54]   There are no other claims in Count 6.

Second, Count 7 asserts tort liability against the individual managers of the GP, which entity was the de jure manager of Basell.   While generally such managers are shielded from liability to third parties for their conduct, Luxembourg law provides for two exceptions:   (i) claims under Article 59 Paragraph 2 of the Companies Act, where brought by a third party (here Basell) against managers who personally engage in conduct in breach of the Companies Act or Articles of Association; and (ii) claims in tort, against managers who engage in "misconduct that can be separated from the functions of the director."   The claims against the managers of the GP are based upon these two exceptions.

Third, Count 7 asserts claims against Benet, Blavatnik and Kassin arising from their misconduct in their Post-Transaction roles as members of the Supervisory Board of LBI.

## C.    Claim Set 1:  Tortious Misconduct By Blavatnik/Access as De Facto Director

Under Luxembourg law, judgment may be entered against Blavatnik (or in the alternative, Access Industries, as explained below) for their conduct as de facto directors of Basell, if (i) Blavatnik or Access Industries affirmatively acted as de facto managers of Basell; (ii) the actions taken by Blavatnik or Access Industries as de facto directors constituted a "fault" or "misconduct" within the meaning of relevant Luxembourg law, and (iii) damages were suffered,

---

[54] Both parties agree that a Luxembourg court would most likely consider these claims tort claims rather than contractual claims.  See Thiebaud 20-21; Schmitt Report ¶ 26.

as a result of that fault, of a kind recoverable under Luxembourg law.  See Thiebaud 6; Schmitt

¶¶ 44, 74.  Each of these prerequisites is supported by the trial record.

    1.    <u>Blavatnik and Access Industries as De Facto Director</u>

Blavatnik was a de facto director of Basell if the Trustee has shown that he carried out in

fact the management of the company in place of the GP Managers or under cover of the GP

Managers.  See Thiebaud 12-13.[55]  This is a heavily factual inquiry.  See Thiebaud 16.

The guiding question is whether a person without official position exercises

"souveraineté"[56] over the affairs of the company, and a Luxembourg court will weigh (i) the

significance and materiality of the individual's acts of affirmative management and (ii) the

regularity and frequency of such acts of affirmative management.  See Thiebaud Supp. 7.[57]  A

review of the Luxembourg authorities illustrates four points:

<u>First</u>, even a single management decision may establish de facto management—so long as

the decision is material to the company.  <u>Id.</u> at 5 (single management decision that triggered

financial collapse of the company was sufficient to find de facto directorship); 5-6 (single

---

[55] The Thiebaud Report cites three Luxembourg cases for the definition of a 'de facto director': These decisions are: (i) Court of Appeal, 1 October 1997, nos. 12583, 12771, 12896, and 20243 (the "<u>1997 Decision</u>", attached to the Thiebaud Report as Schedule 4,A), (ii) Court of Appeal, 10 July 2002, nos. 23054, 24097, and 26382, B.I.J, 2004, p. 27 (the "<u>2002 Decision</u>", attached to the Thiebaud Report as Schedule 4,B); and Court of Appeal, 19 December 2012, no. 37857 (the "<u>December 2012 Decision</u>", attached to the Thiebaud Report as Schedule 4,C).  For clarity, this brief will use the same names to refer to these cases.  The Thiebaud Report attaches each case in the original French as well as an English translation.

[56] Schmitt argues that "substitution" rather than "control" is the relevant translation of the required amount of control to find de facto directorship.  Schmitt Declaration ¶¶ 52-60.  As Mr. Thiebaud sets forth in his supplemental report, this dispute over terminology does not appear to be meaningful and is instead merely different ways to describe the same underlying term of art (souveraineté), and the Court should rely on the principles set forth in the various decisions cited by Mr. Thiebaud interpreting it.  Thiebaud Supp. 15-16.  To the extent there is a substantive difference in the translation, the formulation set forth in the article quoted by Mr. Schmitt has not been used by courts and so it is most appropriate to use the "control" translation offered by Mr. Thiebaud.  <u>Id.</u> at 10-11.

[57] Carrying out in fact the management Basell in place of Basell GP means that Blavatnik/Access would make management decisions without the participation of Basell GP.  Carrying out in fact the management of Basell under the cover of Basell GP means that Blavatnik/Access issued binding instructions to the GP Managers who complied with them without exercising independent judgment.  See Thiebaud 15.

67

management decision to terminate a commercial lease was sufficient); 8 (Luxembourg court relied exclusively on materiality of single transaction).

Second, facts showing that a person acted as the true leader of the entity support a finding of de facto director, including, for example:  (i) the de facto director directly negotiated various agreements with third parties in the name of the company; (ii) third parties were aware that the de facto director held real power and would contact the de facto director before or instead of the de jure director; and/or (iii) management decisions, such as setting prices for trades, are made by the de facto director without interference from the de jure directors.  See Thiebaud 16-17.

Third, if the de jure directors follow the alleged de facto director's instructions rather than following their own independent judgment, the court will find the party is a de facto director.  In considering whether a de jure director was merely accepting advice rather than following direction, the court may consider if the de jure director knew the decision was a bad decision, but implemented it anyway.  In evaluating the circumstances, it also is relevant that the alleged de facto director was the owner of the company and had the ability to issue binding instructions to the de jure directors.  See Thiebaud 17.

Fourth, courts will find that an individual is a de facto director where management decisions were not in the corporate interest of the company but were in the interest of the de facto director.  See Thiebaud 17.

As detailed in the Trustee's Proposed Findings of Fact, an overwhelming record shows that Blavatnik was the de facto director of Basell.

First, Blavatnik testified that it was he who made the ultimate decisions for Basell.  This included the decision to purchase Lyondell.  See PF ¶ 247.  This alone should be sufficient to dispose of the "de facto" director issue.

Second, the record shows Blavatnik's independence in his interactions with Lyondell. Blavatnik was the unquestioned leader in the negotiations with Lyondell. He agreed to a handshake deal to purchase Lyondell without consulting the GP Managers. He set the purchase price without consulting the GP Managers, and none of them testified they were even aware of that price before the deal was made. The conduct and statements of Lyondell CEO and Chairman Dan Smith make clear that he understood that Blavatnik was the true decision-maker on the Basell side. After the meeting between Blavatnik and Smith, no board meeting of the GP was convened by any of the GP Managers to consider the offer and the transaction. See PF Part IV.K.3.

Third, Blavatnik dictated the deadline for deal completion. In so doing, he disregarded requests of the de jure managers to extend the deadline. See PF Part IV.H.

Fourth, Blavatnik could remove the GP Managers at will. And he controlled the employment and compensation of Kassin and Bigman. This explains why these purported managers waited in suspense for Blavtnik's decisions. See PF Part XIV.C.1. Indeed, Kassin testified that at times he did not distinguish between his mandate for the company and his role as Blavatnik employee, see id. ¶¶ 251, 259, a circumstance supporting the de facto conclusion, see Thiebaud 19.

Fifth, the independent judgment of GP Managers was thwarted by Blavatnik. Phillip Kassin concluded and stated that the Transaction on the terms agreed to by Blavatnik was not in the interests of Basell, and cited the difficulty of carrying forward with the Transaction given his fiduciary duties to Basell. Despite Kassin's views, he signed a document approving the Transaction. Further, in sworn testimony (on two separate occasions) closer in time to the relevant events, he made clear that he voted against the Transaction. That he has since recanted

this sworn testimony provides no ground to question it.  It only suggests the continuing influence over his actions by Blavatnik. The evidence regarding other GP Managers likewise fails to show them carrying out independent judgment.[58]  See PF Part XIV.C.1; compare Thiebaud Supp. 13 (considering "the fact that it has proceeded to the liquidation of the company whilst the de jure director was initially opposed to such liquidation").

Sixth, the GP Managers, at trial, were unable at multiple points even to identify the entities they supposedly were managing.  Again, this underscores the irrelevance of the corporate formalities.  See PF Part XIV.C.1.

In sum, the Trustee established that at trial that Blavatnik was a de facto director. Blavatnik's assertion that his participation in the business affairs of Basell was under a Basell management agreement does not alter the underlying analysis. The very existence of a contractual relationship used as a vehicle for fees to flow from Basell to Access is yet another indicia of Blavatnik's control.

In light of this evidence, Defendants take the approach of arguing that purported management discussion or activity at Basell B.V. frees Blavatnik of *de facto* director responsibility.  This sleight of hand misses the mark for two reasons.

First, it is legally irrelevant.  The question is whether Blavatnik was de facto director of Basell.  The settings and locations of discussions he conducted with his subordinates are beside the point, so long as he ultimately was making the decisions for Basell.  The above record shows that he was.  Thus, as the Trustee's Luxembourg expert explains at length, activities conducted

---

[58] Indeed, the GP Managers did not engage in any deliberation in respect of the transaction at a board meeting but instead the approval of the transaction was made by written resolutions.  See PF ¶¶ 358-360; see also Part XIV.C.

within the Basell B.V. subsidiary cannot be used to dodge the question imposed by the de facto director test. See Thiebaud Supp. 17-20.

Second, Defendants' latest factual narrative concerning Basell B.V. is full of holes. Defendants suggest that Basell B.V. was the locus for decision-making, yet the GP's document purporting to approve the Merger was executed on July 15, one day before Basell B.V. met to discuss and express support of the Merger. See PF Part XIV.C.2. Further, the testimony indicates that Blavatnik subordinates, whatever entity they purported to sit at, as a practice signed the documents they were given. See PF Part XIV.C.1. Ultimately, even aside from being based on improper sources,[59] this latest narrative is simply another iteration in Defendants' ever-shifting accounting of how the de jure management of Basell worked, with each revision only further underscoring the irrelevance of the de jure structures.

2.    Relevant Misconduct

As a de facto director, Blavatnik (or Access Industries) must be held to the same standard of conduct as a de jure director, and under that standard, he is liable for "fault" or "misconduct," including by (i) placing his own personal interests above those of Basell, by extracting over one billion dollars in capital from Basell/LBI—i.e. cash it needed; (ii) insisting on a reckless financing structure that added $12 billion of new debt, eliminated desperately needed liquidity, and utilized an asset-based facility that was toxic to LBI; and (iii) imposing a draconian one-

---

[59] The use of foreign law expert reports to testify as to facts and interpretations of facts is not permissible under FRCP 44.1, and this Court has already ruled that the Van der Korst declaration "may not be used to support the factual contentions on which van der Korst relies in providing opinions on Dutch law." Order Granting in Part and Denying in Part the Trustee's Motion in Limine to Exclude (I) The Expert Testimony of Pieter van der Korst and (II) Certain Deposition Testimony Designated by The Access Defendants, at 2 [Dkt. No. 866]. The response to these factual contentions is not a waiver of the Trustee's continuing objection to the attempted use of foreign law expert reports to prove factual matters by the Defendants.

week deadline to sign the Merger Agreement, with the effect of defeating meaningful diligence, including of the management earnings projections that he knew were, at minimum, not reliable.

a.   <u>Legal Standard for Misconduct</u>

With respect to claims asserted by the company (such as those here, through the Trustee), the de facto director is held to the same standard of conduct as a de jure director.  <u>See</u> Thiebaud 22-23.  Defendants' contention that a higher standard (under which fault must be "severable" from ordinary management conduct) conflates two concepts, and is completely unsupported by Luxembourg authorities.[60]

The standard applicable to de jure directors (and to de facto directors, when sued by or on behalf of the company rather than third parties) is often referred to as the "bon père de famille" standard.  It requires the director to act as a prudent and diligent person, and imposes liability if such a person would not have undertaken the action or omission if placed in the same circumstances.  Under this standard, mere negligence is enough.  Indeed, even the "lightest fault" is enough, so long as a causal connection (discussed <u>infra</u>) can be drawn.  <u>See</u> Thiebaud 22-23.[61] The conduct of the director should be evaluated as of the time it was undertaken (i.e., a prior, not a posteriori).  <u>See</u> Thiebaud 23.  Further, under Luxembourg's variation of the business judgment rule, while the director need not have made what in hindsight is the "best" decision, (*i.e.*, he is not automatically liable simply for mistakes), the rule does not shield him from liability where

---

[60] Defendants conflate two senses of the term "third party."  As background, the "severability" standard applies where a de jure manager is liable to a third party rather than to the company (*i.e.*, liable to someone who is not the company).  Here, as to a de facto director, as a technical matter one can say that the company itself is a "third party"—and Defendants attempt to use this sense of "third party" as a hook, ignoring that the "third party" is actually the company itself.  The result would be that a de facto director could escape liability more easily than a de jure director.  The Luxembourg, French and Belgian authorities do not endorse this maneuver.  <u>See</u> Thiebaud Supp. 23.

[61] In addition, a de facto director may be liable for the mere interference in the operation of the company itself, as such interference is a breach of Luxembourg law requiring companies to be governed by their duly appointed management pursuant to the Companies Act.  <u>See</u> Thiebaud 24.

his decision reflects a lack of diligence and prudence, or an elevation of other interests above the company's own interest; thus, a director will have engaged in misconduct if a Luxembourg court determines that he was not prudent and diligent in making a business decision, and that such decision was not the result of a mistake that could have committed by a prudent and diligent director.[62]

Three aspects of the standard are of particular relevance here: (i) in evaluating whether a decision was reasonable, a court may examine market practices and industry standards, (ii) the court should take into account any "specific knowledge" possessed by the director in evaluating whether they engaged in misconduct, and perhaps most critically, (iii) a director must act in the corporate interest of the company and hence, certainly may not elevate his personal interests above those of the company.  See Thiebaud 22-23.

Under this standard, the evidence supports a finding of fault by Blavatnik (or Access Industries) for at least three independent reasons.

First, Blavatnik set the parameters for funding the Transaction: no cash equity.  Under the prevailing conditions, that parameter meant that LBI would be overleveraged and be unable to access needed liquidity.  The manifest deficiencies in the capital plan are discussed above in connection with the constructive fraudulent transfer claims.  See Part II-C-1, supra.  Simply put, it does not conform to "industry standards" to approve a financing plan where (i) the director

---

[62] See Thiebaud 23-24, 28-29; see also 1997 Decision Section V.3.b., attached to the Thiebaud as Schedule 4.a (holding that the court properly applied the rule "by comparing the action [by defendants] with the action which would have been performed by diligent directors in the same circumstances after factoring in the right to make mistakes"); Annex to Study on directors' duties and liabilities, Carsten Gerner-Beuerle, Philipp Paech and Edmund Philipp Schuster, April 2013, at A559, available at http://ec.europa.eu/internal_market/company/docs/board/2013-study-reports_en.pdf (last accessed Dec. 16, 2016) ("Luxembourg courts take into account the fact that directors have a certain margin of appreciation (marge d'appréciation) in managing the company's business, meaning that they are only subject to an "obligation de moyens", i.e. a duty to use their best endeavors without being compelled to achieve a concrete result. Case law grants directors a certain "right to commit management errors" so long as they

knows from personal experience and direct knowledge that the earnings projections are (at minimum) totally unreliable and (ii) the plan fails to equip the company to deal with widely known, historical tendencies of the industries in which it operates.

Second, and even more stark than the approval of a reckless and unreasonable financing structure, Blavatnik withdrew over one billion dollars in liquidity from Basell and the combined company. See PF ¶¶ 420.c, 425; 427.f; see also ¶ 409. No defense of this conduct can be offered from the perspective of Basell.

Further, the notion that this withdrawal is mitigated because Blavatnik "contributed" Basell is nonsense: Blavatnik owned Basell before the Transaction and he owned it after. See PF ¶ 41. What changed is that Blavatnik removed over one billion dollars in liquidity. As the record shows, the funds that Blavatnik extracted were desperately needed after closing.

Taking into account what Blavatnik knew, what he was advised, what he did, and the total absence of benefits to Basell, Blavatnik's extraction of cash needed by Basell to survive was a critical and devastating elevation of his own interests above those of the company. Luxembourg and French authorities strongly support imposition of liability for such conduct, see Thiebaud 24-26, in certain cases even criminal liability, see id. 25.

Third, Blavatnik imposed an unreasonably short diligence time to complete the transaction. See PF ¶¶ 231; 258. The testimony indicates that a "full" price was proposed for Lyondell, see PF ¶¶ 328; 335, deterring any possible competing bids. Thus, as with the decision to extract Basell's cash cushion in the form of dividends and "fees," the decision to neuter the diligence cannot be defended from the point of view of the corporate entity Basell.

---

stay within the limits of their margin of appreciation so that they benefit from a sort of 'business judgment rule'.") (cited at Thiebaud 13).

Ultimately, as explained in greater detail in the Thiebaud reports (in which Thiebaud was commenting upon factual allegations, the most critical of which now have been proven), this conduct provides a sound basis for holding Blavatnik (or Access Industries, as discussed above) responsible for his decisions under Luxembourg law.

### D.    Claim Set 2:  GP Managers

Kassin and Bigman, as GP Managers, are liable under Luxembourg law for their abdications of duty in the conduct of their formal roles.  As detailed in the Thiebaud reports, there are two bases in Luxembourg law for this liability:  (i) under Article 59 Paragraph 2 of the Companies Act, and, in the alternative, (ii) under Articles 1382 and 1383 of the Luxembourg code.  See Thiebaud 33-34; Thiebaud Supp. 25.  Here, two aspects of the GP Managers' conduct provides a clear basis for their liability under these provisions.

First, the GP Managers permitted Blavatnik to run Basell as the de facto director.  See PF Part XIV.C.1.  This is a clear violation of Article 59 Paragraph 2 of the Companies Act.  See Thiebaud at 41.  Further, permitting Blavatnik to run the company as a de facto director also supports a finding of liability under Articles 1382 and 1383.  See Thiebaud 41-42.

Second, the GP Managers knew and repeatedly voiced concerns that the proposed Transaction terms were not in the best interests of Basell, yet they facilitated the closing of the Transaction.   The record contains clear, contemporaneous evidence of the GP Managers expressing alarm at the deal terms.  See PF Part IV.H.  Indeed, as work on the Transaction progressed, the record even shows Kassin's frank admission of the conflict between his duties to Basell and his task of pushing through the deal.  See PF ¶¶ 259.[63]  Despite this and similar evidence in the Proposed Findings of the GP Managers' awareness that the Transaction terms

---

[63] Attempts at trial to explain away these contemporaneous expressions of alarm were ineffective.  See PF ¶ 260.

were not in Basell's best interest, the GP Managers facilitated the closing, signing documents and otherwise working to facilitate closing of the financing arrangements and Transaction terms.  See PF ¶¶ 259, 338.

Ultimately, the key factual allegations that the Trustee's Luxembourg expert relied upon in opining that liability under both Article 59 and, in the alternative, Articles 1382 and 1383 was satisfied, see Thiebaud 42-43, have been proven at trial.

### E.    Claim Set 3:  Post-Merger Supervisory Board

The post-Merger LBI Supervisory board is liable for its failures following closing of the Transaction.   As detailed in the Thiebaud reports, the basis for such liability is Article 59 Paragraph 2 or, in the alternative, Paragraph 1 of the Companies Act, or in the alternative, Articles 1991 to 1997 of the Luxembourg Civil Code.

Here a series of decisions made afterr the closing support a finding of liability.  Most significantly, the members of the LBI Supervisory Board knew or should have known that upsizing the ABL facility did not resolve the inadequacies of LBI's liquidity position and placed LBI in peril given the volatility of the commodities market.   By failing to veto the use of proceeds from an unstable and toxic source of financing that LBi would be unable to pay when due, the LBI Supervisory Board put LBI in harm's way.  See PF ¶¶ 475, 523.  The Supervisory Board's failure to exercise veto rights was made at the direction of LBI's ultimate owner and shareholder, Blavatnik and Access.  This and similar conduct forms the basis for the liability of the Supervisory Board defendants, as detailed in the Thiebaud reports.  See Thiebaud 46-47; Thiebaud Supp. 36-37.

### F.   **Causation and Damages**

In order to recover damages, the Trustee must establish adequate causation, of harms that are cognizable under Luxembourg law.  The Trustee has done so.

1.   Causation

Luxembourg law uses the principle of "causalité adequate" (adequate cause), under which an actor is liable for all damages that are "causally linked" to their misconduct.  See Thiebaud at 26.  In applying this standard, a Luxembourg court will determine if the misconduct is the "likely" cause of a given harm, taking into account the ordinary course of events.  Id.

Critically, under Luxembourg law, if an event has multiple causes, any causes that made the harm more likely are considered direct causes:

> "Among the facts that played a role in the causation of the harm, a selection shall be made and shall be considered as direct causes only those who, virtually, could have made the harm likely according to the ordinary course of events."

Thiebaud at 26 (quoting Georges Ravarani, op. cit., no. 1000, p. 983) (emphasis added).

Here, examining all of "the facts that played a role in the causation of the harm" and making a "selection" of any Defendant conduct or decisions that "could have made the harm likely" is not difficult.  By dictating the terms and timing of the Transaction, by extracting over one billion dollars in liquidity that the company needed as a capital cushion, by imposing an inadequate capital structure, by failing to engage in a reasonable diligence process, Blavatnik (or Access Industries) engaged in conduct that "could have made the harm likely."  By abdicating their formal duties and letting Blavatnik push through a transaction that they were alarmed over and disagreed with (and knew were keenly aware would double LBI's debt despite an impending downturn), the formal managers engaged in conduct that "could have made the harm likely."  By

77

allowing LBI to undertake obligations (including obligations incurred under the ABL financing), the Supervisory Board defendants engaged in conduct that could have made the harm likely.

2.    Type of Harm and Extent of Damages

Once the "adequate causation" principle is satisfied, any harm is legally compensable so long as it is certain (as opposed to hypothetical), direct, and personal to the person that suffers the harm. See Thiebaud 26-27. Of relevance here, Luxembourg law permits the recovery of all costs incurred as a result of the Transaction, including the opening of Chapter 11 proceedings. Thiebaud 27.

At trial, Benet testified as to the extent of damages resulting from the costs incurred as a result of the Transaction and the opening of Chapter 11 proceedings. See PF Part XIV.C.3. As set forth in the Proposed Findings, damages include, *inter alia*, (i) $598.4 million in professional and other fees in connection with the Transaction (including approximately $127 million paid to Nell); (ii) at least $1 billion in additional interest expenses in 2008; (iii) at least $1.795 billion in additional interest expense during LBI's bankruptcy proceeding; (iv) $390 million of professional fees incurred and paid during the bankruptcy proceeding; and (v) $36 million in fees incurred in connection with the ABL upsizing (part of a total $230-$430 million in fees and interest expenses, which total includes interest expenses noted in the above categories).

G.    **Aiding and Abetting Violations of Luxembourg Duties (Count 18)**

Count 18 asserts claims against multiple Access entities for aiding and abetting breaches of fiduciary duty by certain Basell entity fiduciaries. Under the Court's January 4, 2016 ruling, Texas law governs the claim. See In re Lyondell Chem. Co., 543 B.R. at 452-56.[64] Under Texas

---

[64] The Court's January 4, 2016 decision sustains Count 18 as against Access Industries Holdings LLC but dismisses it as against Access Industries, Inc. However, the reasoning of the decision suggests that the dismissal of Access Industries, Inc. was due to apparent confusion among similarly named Access entities, and that the reasoning of the

law, "where a third party knowingly participates in the breach of a fiduciary's duties, such third

party becomes a joint tortfeasor with the fiduciary and is liable as such." Id. at 452 (citing

Meadows v. Hartford Life Ins. Co., 492 F.3d 634, 639 (5th Cir. 2007)).  To establish a claim for

knowing participation in a breach of fiduciary duty under Texas law, a plaintiff must assert:  (i)

the existence of a fiduciary relationship; (ii) that the third party knew of the fiduciary

relationship; and (iii) that the third party was aware that it was participating in the breach of that

fiduciary relationship. Id. (citing Meadows, 492 F.3d at 639).  Here, the Trustee has proven each

of these "knowing participation" elements.

First, as discussed above, the Trustee has proven the underlying breaches in connection

with the proof he offers under Counts 6 and 7, which assert claims for breaches by Blavatnik,

Access Industries, Inc. and various Basell-side decision-makers of duties owed under

Luxembourg law.

Second, the evidence shows that Access Industries, Inc. "knew of the fiduciary

relationship."  Kassin and other Access Industries, Inc. agents were fully aware of the duties

owed to Basell entities.  See PF ¶¶ 259.  Further, Kassin (and other senior officers) were acting

within the scope of their authority.  Thus, under general agency principles,[65] Kassin's knowledge

and knowing participation can be imputed to the Access entities for which he served as an agent.

Third, the evidence shows that Access Industries, Inc. "was aware that it was participating

in the breach" of the duties owed to LBI.  In addition to Kassin's candid acknowledgement of the

conflict involving duties to LBI, see PF ¶ 259, there is extensive evidence regarding knowing

---

decision, if applied to the evidence that has come in at trial, may in fact instead support a finding of liability against
Access Industries, Inc.

[65] See Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466 (2010) ("where conduct falls within the scope of the agents'
authority, everything they know or do is imputed to their principals").

participation in the breaches by Access entities directly.   See PF Parts IV.I; IV.J.2.b; VI.C (including (i) securing damaging financing arrangements based upon inflated Basell earnings projections, without risking capital of its own; (ii) repeatedly supplying Merrill Lynch with inflated and unrealistic Basell earnings projections; (iii) recklessly accepting Lyondell's projections without meaningful diligence; and (iv) with awareness of severe risks to the combined company, structuring a massive extraction of capital through the Toe-Hold Payments in a way that would avoid disclosing to the market the extraction).   This record presents more than sufficient evidence that Access was aware that it was participating in the breach.[66]

## H.   Defendants' Release Argument Lacks Merit

Defendants have at times asserted release as an affirmative defense.   In their Proposed Findings of Fact, the Defendants assert that one or more of the following may release one or more of the Defendants' from liability under the Luxembourg claims:   (i) a discharge from the April 2008 general meeting of shareholders; (ii) a September 2008 resolution of the GP's sole shareholder; (iii) post-bankruptcy releases by the liquidator of the GP, and (iv) releases contained in the Termination Agreement and the Merger Agreement.   None of these releases are sufficient to exempt Defendants for their liability under Luxembourg law.

As a threshold matter, it appears that no documents have been admitted to evidence to support the purported releases (the "Alleged Company Releases") listed above.   See Nov. 29, 2016 Order [Dkt. No. 901] (sustaining Trustee's objections to unproduced and unauthenticated documents purporting to be the Alleged Company Releases).   However, even if such releases

---

[66] Defendants' complaint that Access Industries is a defendant on both the underlying Luxembourg count and the aiding and abetting count, see Def. Pre-Trial Br. 92, misses the point.   The evidence supports holding Access Industries liable for the violations of Luxembourg law, but even if the Court were to conclude otherwise, the evidence would at minimum support a finding that Access Industries had aided and abetted Blavatnik and the other Basell fiduciaries in their violations.

were in evidence, they would be insufficient to discharge the Defendants for liability under Luxembourg law.

Blavatnik and Access cannot claim a discharge under the Alleged Company Releases for their pre-merger liability because, as de facto directors, any release would only operate for the benefit of the company's de jure directors. Thiebaud 27-28. The GP Managers cannot claim a release under the Alleged Company Releases for their pre-merger activity because a release granted by the GP cannot release tort claims held by LBI, a third party. Thiebaud 40-41. Finally, the Post-Merger Supervisory Board cannot claim the benefit of a release by LBI for their violation of the articles of incorporation unless the breach of the articles of association is expressly indicated in the convening notice, and no evidence has been proffered to suggest that it was. Thiebaud 27-28.

Finally, there is no basis for the claims of the Defendants that either the Termination Agreement or the Merger Agreement released the Luxembourg claims. Previously, the Defendants have suggested that Blavatnik acted in his capacity as an agent of AI Petrochemical, but that is an entity he was entirely unfamiliar with. See PF ¶ 354. Further, no evidence has been offered to support Defendants' implausible claim (save Blavatnik's self-serving declaration), and Defendants now claim that Blavatnik actually acted in his role as a member of the Supervisory Board of Basell B.V. See Schmitt Declaration; Van der Korst Declaration. Of course, Blavatnik has also asserted that he performed his services under the replacement merger agreement entered into with Nell. See PF ¶ 259. The record does not support any of this. As

discussed above, what the evidence shows is that Blavatnik controlled Basell and overrode the concerns of de jure management.[67]

## V.    Intentional Fraudulent Transfer:  Toe-Hold Payments 1 and 2 (Count 2)

As cases involving failed transactions go, this one is unusual.  <u>Prior</u> to the transaction, the CEO of one side warned publicly of the harm to creditors that would result from a transaction adding billions in additional leverage heading into an industry downturn.  But once his company was put into play, with the anticipated downturn approaching, that same CEO pushed his company to consummate a transaction adding billions in additional leverage.  And his method was to rush billions of dollars of unsupported projected EBITDA into company earnings projections that he knew the models of the company's combined success were based on.  Under these circumstances, the common defense to an intentional fraudulent transfer claim, that the transferor lacked any <u>prior</u> mental apprehension of creditor harm, falls flat.

The Court has already ruled that if collapsing doctrine applies to the Toe-Hold Payments, then proving Smith's intent would be sufficient to prove intent as to those payments.  For the reasons set forth above, collapsing doctrine does apply.  Accordingly, there is no need to (as Defendants suggest) "impute" Lyondell-side intent to Basell-side entities under agency imputation doctrine.  Further, even beyond the evidence of Smith's intent, the evidence provides

---

[67] Similarly, the release in the Merger Agreement does not shield Defendants.  The clause by its plain language shields Lyondell affiliates.  It is unclear on what basis the Defendants assert that this clause, where Basell and the Merger Sub waive claims against Lyondell affiliates, would shield Blavatnik or the GP Managers.  <u>See</u> Merger Agreement § 8.10.  The only plausible explanation, that Blavatnik was an indirect shareholder of Lyondell, through his ownership of the Toehold, is plainly unavailing.  The Merger Agreement Release Clause merely provides that the obligations and liabilities of Lyondell under the Merger Agreement will only be liabilities of Lyondell, rather than Lyondell's shareholders, directors, or officers.  Plainly, the Merger Agreement Release Clause does not act as a free-standing general release clause that allows any person who could conceivably be considered a shareholder of Lyondell to escape any liability that might conceivably be linked to the Merger Agreement.  <u>See MicroStrategy Inc. v. Acacia Research Corp.</u>, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *8 (Del. Ch. Dec. 30, 2010) (holding that a narrowly drawn release would be interpreted consistent with its plan language and the agreement as a whole to bar only the distinct claims listed in the release, rather than operating as a general release).

a clear, alternate basis for the Court to enter judgment for the Trustee: under the "badges of fraud" standard articulated in Hofmann, whether the Court analyzes the Toe-Hold Payments alongside the Merger under collapsing doctrine, or examines the Toe-Hold Payments in isolation.

### A.    Standard for Actual Intent

Under Section 548(a)(1)(A), a transfer may be avoided if it was made "with actual intent to hinder, delay, or defraud" creditors. See 11 U.S.C. § 548(a)(1)(A); see also In re Lyondell Chem. Co., 554 B.R. at 650. The actual intent "'need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor.'" In re Lyondell Chem. Co., 554 B.R. at 650 (quoting Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 304 (S.D.N.Y. 2010)).

As articulated by the District Court in Hofmann, actual intent "may not be presumed" and instead requires a "mental apprehension" of consequences for creditors. See In re Lyondell Chem. Co., 554 B.R. at 650-51 (citing, inter alia, In re Condon, 198 F. 947, 950 (S.D.N.Y. 1912) (Hand, J.) ("mental apprehension"); Restatement (Second) of Torts ("substantial certainty" standard); United States v. Rivernider, 828 F.3d 91, 104 (2d Cir. 2016) (requirement that defendant "contemplate" harm).[68]

---

[68] Because the Trustee prevails under Section 548(a)(1)(A), and because any relevant state law that would be applied under Section 544(b) likewise includes an "actual intent to hinder, delay or defraud creditors" requirement, see N.Y. Debt. & Cred. L. § 276 (New York law), Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Texas law), Del Code Ann. tit. 6 § 1304(a)(1) (Delaware law), there will be no need for the Court to reach Section 544(b) issues. As to Section 544(b) issues, for example, Section 546(e) expressly carves out from coverage claims asserted under Section 548(a)(1)(A), but its text specifies no carve-out for claims asserted under Section 544(b). Further, while the burdens under Delaware and Texas law are the same as under Section 548(a)(1)(A), under New York law it would be higher. See ASARCO LLC, 396 B.R. at 368-69 (Delaware law); Osherow v. Hensley (In re Pace), 456 B.R. 253, 267 (Bankr. W.D. Tex. 2011) (Texas law), Schneider v. Barnard, 508 B.R. 533, 542 (E.D.N.Y. 2014) (clear and convincing standard under New York law). However, as noted above, because the Section 548(a)(1)(A) and the relevant state laws all impose the "actual intent" requirement, there is no need to reach Section 544(b) issues for Count 2.

Critically, however, even for an intentional fraudulent transfer claim, the Court does not need to achieve certainty about what is in the transferor's mind.  As explained by the District Court, while the dispositive question is the transferor's intent, such intent "is rarely subject to direct proof" and thus "may be shown by circumstantial evidence."  In re Lyondell Chem. Co., 554 B.R. at 651 n.17.

Thus, while the District Court in Hofmann ruled that the "natural consequences" may not be used a legal standard that displaces the "actual intent" standard, the court nevertheless made clear that "proof of the natural consequences of one['s] acts may serve as circumstantial evidence that one appreciated those consequences."  Id.

Finally, with respect to claims under Section 548(a)(1)(A), a majority of courts hold that the ordinary "preponderance of evidence" standard applies.[69]

### B.    "Actual Intent" Has Been Established In Multiple Ways

The evidence establishes actual intent in multiple, independent ways.

---

[69] See Gordon v. Livecchi (In re Livecchi), No. 09-20897, 2014 WL 6668886, at *10 (Bankr. W.D.N.Y. Nov. 20, 2014) ("The Trustee carries the burden of proof of showing, by a preponderance of the evidence, that the debtor effected a transfer with the requisite intent under § 548(a)(1)(A)."); Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.), 327 B.R. 537, 550 (D. Del. 2005) ("The Transaction can be avoided if plaintiff proves, by a preponderance of the evidence, that the Transaction was either intentionally or constructively fraudulent"); Wiggains v. Reed (In re Wiggains), No. 13-33757-SGJ-7, 2015 WL 1954438, at *11 (Bankr. N.D. Tex. Apr. 28, 2015) ("For Trustee to prevail under section 548(a)(1)(A), Trustee must show by a preponderance of the evidence that debtor effected a transfer of his interest in property . . . with the requisite intent.") (emphasis in original).  The majority approach applying the preponderance of evidence standard to Section 548(a)(1)(A) claims follows the decision in Grogan v. Garner, 498 U.S. 279 (1991), in which the Supreme Court unanimously held that the standard of proof for the dischargeability exceptions under Section 523(a) is a preponderance of the evidence.  See ASARCO, 396 B.R. at 366-67 (noting that "most decisions" since Grogan have rejected application of a clear and convincing evidence standard for Section 548 claims, and stating that "[u]sing the rationale from Grogan, the Court concludes that the preponderance of the evidence standard would also apply to actual-intent fraudulent transfer under § 548").  Following Grogan, only a minority of courts apply the clear and convincing evidence standard to Section 548(a)(1)(A) claims.  See, e.g., Bumgardner v. Ross (In re Ste. Jan-Marie, Inc.), 151 B.R. 984, 987 (Bankr. S.D. Fla. 1993); cf. Nisselson v. Empyrean Invest. Fund, L.P. (In re MarketXT Holdings Corp.), 376 B.R. 390, 402 n.15 (S.D.N.Y. 2007) (for purposes of ruling on summary judgment for plaintiff, assuming that standard of clear and convincing evidence applies where New York DCL claim was asserted alongside Section 548(a)(1)(A) claim).

1.    <u>Powerful Evidence of Smith's Intent Satisfies the Hofmann Standard.</u>

Two aspects of the trial record provide an unusually compelling basis for a finding of actual intent:  (i) Smith announced his "mental apprehension" of creditor harm before the transaction, and (ii) a substantial contemporaneous record documents Smith then leading Lyondell into a transaction with the very characteristic he warned of, and doing so by rendering completely unreliable the projections on which models of the company's success were based.[70]

1.    <u>Smith's Warning</u>

As the District Court noted, critical to analysis of actual intent is the transferor's "mental apprehension." <u>In re Lyondell Chem. Co.</u>, 554 B.R. at 651-52.  Here, Smith publicly announced his mental apprehension, at an analyst conference:  "If you're a bondholder" and "you think you are going to have a down cycle in the chemical markets, I don't think you want to add $8 billion to $10 billion in debt to this and live through that."  <u>See</u> Kristen Hays, <u>Billionaire buys into Lyondell; stock jumps: Right to acquire stake in chemical company sparks talk of takeover</u>, Houston Chronicle, May 12, 2007, http://www.chron.com/business/energy/article/Billionaire-buys-into-Lyondell-stock-jumps-1822995.php;  Smith Dep. Tr. 129:11-130:16 ("I think the quotes that are in this are correct," regarding the Houston Chronicle article).[71]

---

[70] The intent of Smith and Lyondell is relevant under the collapsing doctrine.  In particular, the question of whether the collapsing doctrine, if applicable under a given set of facts, can be relied upon by a plaintiff to prove "actual intent" (rather than merely, <u>e.g.</u>, REV or "property of the debtor" prerequisites) is a pure question of law, and the Court already has ruled in the affirmative.  <u>See</u> <u>In re Lyondell Chem. Co.</u>, 543 B.R. at 441 n.61 (where collapsing doctrine applicable, "the Court can, and does, look to the intent of Lyondell as the transferor of the Toe–Hold Payments for the purpose of this motion to dismiss Count 2").  Thus, if collapsing doctrine is applied to consider Toe-Hold Payments 1 and 2 in tandem with the Merger, then debtor intent regarding the Merger is relevant to the "actual intent" analysis.  As noted above, the Trustee has proven the facts forming the basis for applying collapsing doctrine.  <u>See</u> III-C, <u>supra</u>.  The same evidence supporting the application of collapsing with respect to Toe-Hold Payment 1 supports the doctrine's application to Toe-Hold Payment 2.  Accordingly, and consistent with the Court's findings at the pleading stage, the intent of Lyondell with respect to the Merger can form a basis for satisfying the "actual intent" element with respect to the Toe-Hold Payments.

[71] While Smith's admitted deposition testimony that the article correctly quoted him makes it unnecessary, the Court can also take judicial notice of the article's publication.  <u>See</u> <u>Staehr v. Hartford Financial Services Group, Inc.</u>, 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take judicial notice of the fact that press

Smith's warning was not merely some ill-considered aside or out-of-context snippet. For years, precisely due to experience with industry troughs, the reduction of leverage was an important part of Lyondell's strategic plan. See PF ¶¶ 2, 75-76. Thus, when Smith warned publicly of creditor harm on May 9, 2007, his warning carried weight, borne of years of professional experience.

Defendants have attempted to evade this direct record of Smith's mental apprehension by positing that it referred only to a management-led LBO, not an leveraged transaction that involved a combination with a second company. But Smith's warning was simpler than that: it was about adding billions in additional leverage heading into an anticipated downturn. And there is no dispute that the Transaction did just that. Indeed, even if Defendants' misguided assertion that Basell's participation should be understood as a contribution of billions in "equity" (and it should not be, see PF ¶ 146), the net effect still would be to add the magnitude of leverage Smith warned of.

> 2.    What Smith Did After His Warning

What Smith did after his warning, once a chance to cash out at enormous personal wealth presented itself, was this: (i) lead Lyondell into a transaction that added the magnitude of new leverage he had warned of, and (ii) do so by manipulating the very earnings projections on which models for the combined company's post-transaction success were based.

> a.    A High-Leverage Transaction Despite Impending Industry Downturn

There is no dispute that Smith, by the time of the Lyondell Board vote, knew that the transaction would add over $12 billion in leverage. See PF ¶¶ 3, 335.e. Indeed, the evidence

---

coverage . . . contained certain information, without regard to the truth of their contents"); accord DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 214 (3d Cir. 2007) (taking judicial notice of newspaper and magazine articles).

shows that Smith knew earlier that such magnitude of leverage would be added through a transaction with Blavatnik, particularly given his experience with Blavatnik's offer in mid-2006. See id. ¶¶ 11, 13-135, 215. And the record is clear that an upcoming downturn in the industry was widely anticipated. See PF ¶¶ 2, 3, 94, 126, 128, 129, 141, 388.

> b.    The Projections

The manner in which Smith pursued his plan also speaks for itself. On May 11, 2007, just two days after Smith publicly delivered his warning regarding the dangers to creditors of a highly leveraged transaction, Blavatnik filed his 13D putting Lyondell into play. See id. ¶ 165. That same day, Smith's deputy was called into a meeting and told that Smith was going to want to take another look at Lyondell's earnings projections. See id. ¶¶ 166-167 Within a matter of days, Smith and his deputies had purported to locate approximately $1.6 billion in previously unknown projected refining EBITDA. See id. ¶¶ 166-182. The record shows that these figures were not based in reality and that in certain key instances, Smith simply dictated the numbers to Salvin ahead of time. See id. ¶¶ 166-176. This process was a marked departure from the orderly bottom-up forecasting process Lyondell ordinarily used. See id. ¶¶ 102, 104-119, 166-216.[72] And the manipulations continued even after the hasty addition of approximately $1.6 billion to the already-inflated projections. See id. ¶¶ 166-216.

Mindful of this evidence, Access has attempted to portray the Lyondell projections as in essence a sideshow, not particularly relevant to the ultimate success of LBI. But this ignores economic reality. Indeed, an entire body of case law recognizes the central importance of a company's earnings projections for a transaction of this nature—*i.e.*, the question of whether a

---

[72] Indeed, this approximately $1.6 billion in new projected EBITDA was added to earnings projections that evidence indicates were themselves already significantly inflated. See id. ¶ 175.

company had adequate capital to survive following a highly leveraged transaction generally focuses on the reasonableness of management projections. See Part II-B-1, supra. Defendants' attempts to portray the projections as irrelevant ignores the economic wisdom codified in these cases: the projections matter.

Ultimately, then, not only did Smith push the type of transaction as to which he publicly announced his mental apprehension of creditor harm, he did so by rendering unreliable the very projections on which models of success were based. By so doing, he cashed out with enormous personal wealth, while the creditors suffered the harm he warned of. If the intentional fraudulent transfer laws have any application to modern economic transactions, they must apply to this one.

Indeed, although there is no need to proceed further in light of the above, the District Court's analysis in Hofmann only further confirms this. At the conclusion of its decision, the District Court recited a series of allegations that it found were sufficient to plead that Smith "recklessly disregarded the likelihood that the LBO would quite quickly injure creditors" and "contemplated and believed that Lyondell would default on its obligations to its creditors within a very short period of time." In re Lyondell Chem. Co., 554 B.R. at 654. The District Court noted that this series of factual contentions were merely allegations. Id. With the trial record in, the most critical of these allegations have been proven,[73] and all are supported by evidence.

---

[73] For example: "Then, as the takeover process heated up in mid-2007, Smith caused those aggressive projections to be 'refreshed.'" See PF ¶¶ 166-216; "This created, without any careful analysis or justification, a grossly overstated set of projections." See id. ¶¶ 166-216, 291-298; "Smith knew that the refreshed projections were materially inflated and unjustified, but presented them to the Lyondell Board and caused them to be presented to Blavatnik's representatives and to the Lender Banks." See id. ¶¶ 166-216, 291-298; "Because of the pace of the July 2007 takeover negotiations, there was no opportunity for appropriate due diligence, none was done, and the falsified numbers were relied upon by each of the decision-makers, just as Smith intended they would be." See id. ¶¶ 287-335; "The takeover occurred at $48 per share, which reflected a substantial premium over both Blavatnik's initial bid of $28.50 in the Fall of 2006, and his early July 2007 offer of $40 per share." See id. ¶¶ 131, 225-281; "With the completion of the LBO, officers, directors, and shareholders received substantial payouts." See id. ¶¶ 420-432.; "Lyondell's then existing creditors were largely paid off, but the LBO created an enormous new debt burden for

88

c.    Nature of the Evidence; Reliance on Contemporaneous Documents

Given the volume of evidence regarding Smith and his deputies' conduct, Access has

focused on casting aspersions on the Trustee's strategic choices.   In particular, Access has

questioned why the Trustee did not call Smith and his deputies to testify live, and why the

Trustee relies heavily on contemporaneous documents rather than calling those who "refreshed"

the projections to the stand and letting them tell stories.  This is pure diversion.

The best testimony that Smith could provide regarding his view of leverage and creditor

harm would be a statement made before litigation, even before Blavatnik put Lyondell into play.

As discussed, he offered such a statement publicly.  Further, the means by which Smith and his

deputies rushed billions in new projected EBITDA into the projections are recorded in page after

page of contemporaneous documents and deposition testimony.  And Smith already has had an

opportunity to present his litigation-driven positions, through deposition testimony—which has

been admitted to evidence.  Given the combined impact of this evidence, it is more than fair for

the Trustee to conclude that calling Smith to testify would simply give him another chance to

present a new story—and if he did so, it would not be credible.

Indeed, it is possible that Access—which has presented no evidence that it was _itself_

unable to arrange for the live testimony of its former co-defendant Smith (and indeed _did_ arrange

for the testimony of Twitchell), with whom it is reasonable to assume Access had a cooperation

agreement for years and shared experts prior to the Trustee's settlement with the former Lyondell

directors and officers—may have reached the same conclusion about the value of any new

testimony Smith might present from the witness stand, and accordingly decided upon a course of

---

Lyondell."  See id. ¶¶ 3, 335.e., Part XI; "Because the majority of Lyondell's assets were subject to liens after the
LBO, the LBO had the effect of essentially stripping Lyondell of its assets."  See id. ¶¶ 1, 529, Part XI.

(i) not calling Smith to testify, while (ii) attempting to gain some mileage out of blaming Smith's non-appearance on the Trustee.[74]

More fundamentally, Defendants' implication that the Trustee's heavy reliance on contemporaneous documents rather than testimony delivered in court many years after the fact makes the case weaker rather than stronger has it exactly backwards. Courts repeatedly have observed that contemporaneous evidence is more powerful than conflicting and self-serving presented at trial. See, e.g., United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1948) ("On cross-examination most of the witnesses denied that they had acted in concert in securing patent licenses or that they had agreed to do the things which in fact were done. Where such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact."); United States v. Int'l Bus. Machs., 66 F.R.D. 154, 175 (S.D.N.Y. 1974) ("Where, as here, the court must choose between contemporaneous documents or the hindsight observations of an interested witness, the court is constrained to choose the former."); In re: Method of Processing Ethanol Byproducts and Related Subsystems ('858) Patent Litig., No. 1:10-ml-02181-LJM-DML, 2016 WL 4919980 at *9 (S.D. Ind. Sept. 15, 2016) (where witness testimony was "belied by contemporaneous documents," the "only reasonable inference" from evidence followed from the documents, not the testimony); cf. BanxCorp v. Costco Wholesale Corp., 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) ("[W]here the

---

[74] Indeed, courts reject the "gamesmanship" involved where one side attempts to invoke the "missing witness" doctrine to gain an advantage through an inference where **(i)** the witness was available to both parties, see U.S. v. Myerson, 18 F.3d 153, 157-159 (2d Cir. 1994); U.S. v. Torres, 845 F.2d 1165, 1170 (2d Cir. 1988) ("courts have been reluctant to find a witness practically unavailable when it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain a missing witness charge"); or **(ii)** strategic reasons existed not to call the witness, including that the testimony would be cumulative, see U.S. v. Myerson, 18 F.3d at 157-159; Chevron Corp. v. Donziger, 974 F.Supp.2d 362, 700-02 (S.D.N.Y. 2014). In any event, as noted above, any inference would likely be that Smith would merely present self-serving testimony, adding no value to the case—perhaps the reason that Access itself chose not to call him, as discussed above.

uncontroverted record clearly supports a [particular] finding, then plaintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact") (internal marks omitted).

    3.    <u>Beyond Smith and Lyondell</u>

Even if Basell-side "actual intent" were also required, following trial it is adequately proven, based upon Blavatnik's intent, which must be imputed to Basell Funding and Basell Finance because he had actual control over them. <u>See</u> In re Lyondell Chem. Co., 554 B.R. at 650 (regarding principle of imputation based upon control, citing, *inter alia*, <u>In re Lehman Bros. Holdings Inc.</u>, 541 B.R. 551, 576 (S.D.N.Y. 2015)); <u>see</u> PF ¶ 45.

Briefly, the evidence shows, *inter alia*, that (i) Blavatnik became aware (directly and/or through his agents) that the Lyondell earnings projections were inflated, yet despite the panicked, post-Lyondell-Board-vote reactions of his subordinates to this realization, caused them to progress the transaction to completion, knowing it was based on unreliable projections, <u>see</u> PF ¶¶ 369-388; and (ii) during the period following entry into the Merger Agreement, Blavatnik engaged in systematic efforts to reduce his exposure, extracting further capital from LBI, and agreeing to modifications of the financing arrangements that made LBI's viability even more dependent upon asset prices that were bound to fall. <u>See</u> <u>id.</u> ¶¶ 3, 409-416, 449-455, 457. As set forth in the Proposed Findings of Fact, Blavatnik's entire campaign of conduct subsequent to learning the Lyondell projections were bogus is a striking display of placing his personal fortune above the creditors, culminating in his decision to allow LBI to collapse into bankruptcy where he could purchase the equity of the reorganized debtor.

4.    The Badges of Fraud

In light of the record summarized above, there is no need to reach the badges of fraud. However, badges of fraud analysis supports a ruling for the Trustee in two further, independent ways:   (i) if the Toe-Hold Payments are considered alongside the Merger under collapsing doctrine, and (ii) if the Toe-Hold Payments are considered in isolation from the Merger.

a.    Badges of Fraud Standard

Because "[f]raudulent intent is rarely susceptible to direct proof . . . courts have developed 'badges of fraud' to establish the requisite actual intent to defraud." Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2d Cir. 1983) (cited in In re Lyondell Chem. Co., 554 B.R. at 652; see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.), 503 B.R. 239, 284 (Bankr. S.D.N.Y. 2013) (finding that "presence of sufficient badges of fraud" supported finding that plaintiffs established an actual intent to hinder and delay creditors under Oklahoma UFTA); ASARCO LLC, 396 B.R. at 370 (actual intent "may be proved circumstantially by presenting evidence of certain 'badges of fraud' that may cumulatively give rise to an inference of intent to hinder, delay or defraud").  Further, "[w]hile the presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose."  In re Lyondell Chem. Co., 554 B.R. at 653, at *14 (internal quotations omitted) (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)).

b.    Badges:  Toe-Hold Payments Collapsed With Merger

Among the badges noted in Hofmann were "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or

obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) [whether] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." In re Lyondell Chem. Co., 554 B.R. at 653. Courts have listed the badges in similar terms.[75]

Here, when the Toe-Hold Payments are considered alongside the Merger, the evidence proves several badges, including: (i) transfers to insiders/close relationship between transferor and transferee, see PF ¶¶ 29, 431.e., Part XIV.B.; (ii) transferor's financial condition/insolvency before or after the transfer, see id. Parts X., XI; (iii) lack of reasonably equivalent value or adequate consideration, see Part III-B, supra; and (iv) transfer of substantially all of the debtor's assets. Further, because "[f]raudulent acts are as varied as fish in the sea," In re Kaiser, 722 F.2d at 1583, courts have rejected the argument that facts must fit a "prototype," id., and have in recent years relied upon badges (i.e., indicia) of fraud beyond the traditional list. See, e.g., In re

---

[75] The badges enumerated in Hofmann were taken from the Texas version of the UFTA. While UFTA badges have been used in Section 548(a)(1)(A) cases, other courts analyzing the badges for Section 548(a)(1)(A) claims at times have enumerated the following badges: (i) lack or inadequacy of consideration; (ii) a close relationship between the transferor and transferee; (iii) the retention of possession, benefit or use of the property by the transferor; (iv) the financial condition of the transferor before and after the transfer in question; (v) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (vi) the general chronology of events and transactions under inquiry. See Zazzali v. 1031 Exch. Grp. LLC (In re DBSI, Inc.), 476 B.R. 413, 420 (Bankr. D. Del. 2012); Kramer v. Sooklall (In re Singh), 434 B.R. 298, 311 (Bankr. E.D.N.Y. 2010) (citing In re Kaiser, 722 F.2d at 1582-83).

Bayou Grp., LLC, 439 B.R. at 307 (recognizing as a badge of fraud "fraudulently inflated principal and profits"). The fabricated earning projections here are just such a badge.

c.    Badges:  Toe-Hold Payments Not Collapsed Into Merger

Even if the Toe-Hold Payments are not collapsed into the merger, multiple badges of fraud have been proven, relating to the Toe-Hold Payments themselves, including:  (i) transfers were to or for the benefit of an insider (Blavatnik, Nell Limited, AI Chemical), see id. ¶¶ 421-432, Part XIV.A; (ii) transfers were concealed (i.e., structured to avoid, in the words of a Blavatnik subordinate, bad "optics" because "the last thing you want the market to think / see [is] that we're taking 'out' $333 million"), see id. ¶ 362; (iii) transferor did not receive adequate compensation or reasonably equivalent value; the financial condition of the transferor(s) before and after the transfer, i.e., lack of adequate capitalization and insolvency, see Part III-A, supra; and (iv) retention of possession, benefit or use by the transferor, see PF ¶¶ 421-432.

**C.    Recovery and Damages**

1.    "For Whose Benefit" and Alter Ego

For Toe-Hold Payment 1, once adjudicated as being avoided or avoidable, the Trustee may recover the value of the transfer as against Nell as initial transferee, see 11 U.S.C. § 550(a), and against Blavatnik under either the "for whose benefit" theory or the alter ego theory, as set forth above in connection with Count 2.  See Part III-E, supra.  For Toe-Hold Payment 2, while payment was directed to Merrill Lynch, it satisfied an obligation of AI Chemical to Merrill Lynch.  Because Blavatnik was the sole ultimate owner of AI Chemical and Nell, the Trustee may recover the value of Toe-Hold Payment 2 under Section 550 under the same theory as set forth in connection with the "for whose benefit" analysis under Count 2.

2.      Section 548(c)

For the reasons set forth in connection with Count 1, the Section 548(c) defense does not apply, because (i) no value was provided for the Toe-Hold Payments, and in any event (ii) those against whom the Trustee seeks recovery did not take "in good faith."

3.      Prejudgment Interest

Under the principles as set forth in connection with Count 11, the Court should award recovery of the value of Toe-Hold Payments 1 and 2 plus prejudgment interest calculated at the prime rate, accruing as of the date of the transfers, December 20, 2007.  See Part II-E, supra.

## VI.    Constructive Fraudulent Transfer NAG Action Counts 1 & 2

### A.    The Distribution Was A Fraudulent Transfer Under Section 548.

The complaint against NAG Investments, LLC ("NAG") [Adv. Pro. No. 11-01844, Dkt. No. 9] seeks judgment against NAG on the basis that the €100 million payment made to NAG constitutes a fraudulent transfer pursuant to Section 548.  The Trustee has asserted alternate theories.  Under Count 1, Basell transferred the €100 million to BI S.a.r.l., with NAG as the "immediate or mediate transferee" from whom recovery is sought.  See 11 U.S.C. § 550(a)(2). Under Count 2, Basell transferred the €100 million to NAG, such that the Trustee may recover from NAG as the initial transferee.  See 11 U.S.C. § 550(a)(1).  The Trustee has proven that (i) the transfer involved an interest in debtor property and (ii) the REV and "financial condition" elements are satisfied.  Further, Defendants' arguments specific to Count 1 are without merit.

1.      Interest of the Debtor in Property

Section 101(54) of the Bankruptcy Code defines "transfer" broadly to include any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property . . . or an interest in property."  11 U.S.C. § 101(54)(D).  "According to the

legislative history, the definition of transfer is 'as broad as possible.'"  I. Appel Corp. v. Val

Mode Lingerie, Inc., Nos. 97 Civ. 6938(LMM), 97 Civ. 8230(LMM), 2000 WL 231072, at *6

(S.D.N.Y. Feb. 28, 2000) (internal quotations omitted).  It is well established that an interest in

property passes from a corporation to its shareholders at the moment a dividend is declared.  See,

e.g., Crystallex International Corp. v. Petroleos de Venezuela, S.A., 2016 WL 5724777, at *4 (D.

Del. Sep. 30, 2016) (declared but unpaid dividend was property of entity to whom dividend had

been declared), appeal docketed, No. 16-4012 (3d Cir. Nov. 3, 2016); Marquette Bank Illinois v.

Covey (In re Classic Coach Interiors, Inc.), 290 B.R. 631, 636 (Bankr. C.D. Ill. 2002) ("By no

means is a declared but unpaid dividend an asset of the corporation, although it is an asset of the

shareholders to whom it is owed."); 11 Fletcher Cyc. Corp. § 5322, n.8 (2011).

Basell Funding declared a dividend to Basell on December 7, 2007.  See PF ¶ 410.  Upon

the declaration, Basell obtained a property interest in the dividend.  Furthermore, the evidence

shows that Basell exercised significant control over the funds at issue, sufficient to demonstrate a

property interest.  See In re Bankest Capital Corp., 374 B.R. 333, 338-39 (Bankr. S.D. Fla. 2007).

"Control has two components: first, the power to designate which party will receive the funds;

and second, the power to actually disburse the funds at issue to that party."  Id. at 338-39.  Here,

the evidence shows that Basell not only had the power to designate the payee and control whether

the payee would actually be paid, see PF ¶¶ 410-413, but it also exercised that power by ordering

its subsidiary Basell Funding to wire transfer Basell's €100 million directly to NAG, rather than

to Basell for Basell to wire transfer it upstream.  See id. ¶¶ 410-413; see also PF Part XV.

### 2.      Reasonably Equivalent Value; Financial Condition of Debtor

Under the case law set forth above holding that distributions to equity do not provide

value, see Part III-B, supra, the transfer to NAG provided no value to the Debtors.  Further, as

demonstrated in connection with the Nell transaction fees, the financial condition element is satisfied as of December 20, 2007. See Part II-B, supra. Because the financial condition of Basell did not materially change, insofar as the relevant financial tests are concerned, between December 7 and December 20, 2007 (e.g., clauses in the Transaction contracts restricted the parties from breaking the deal, making it unreasonable to fail to consider the Transaction's imminent consummation), each of these tests is satisfied as of December 7, 2007.

3.    Defendants' Further Arguments Fail

Defendants also attack Count 1 on the theory that (i) the initial transfer must be avoided and was not, and (ii) the initial transfer is not even avoidable. Both arguments are without merit.

First, Access is not correct that recovery against a subsequent transferee is barred unless the plaintiff avoids the initial transfer. The majority of courts require simply that the initial transfer be "avoidable." Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 501 B.R. 26, 31 (S.D.N.Y. 2013) (Rakoff, J.) ("the majority of courts that have considered this issue have rejected the notion that a trustee must first avoid a transfer against an initial transferee prior to recovering that transfer from subsequent transferees"); In Re Glob. Prot. USA, Inc., 546 B.R. 586, 619 (Bankr. D.N.J. 2016).

Second, Defendants' argument that the initial transfer is not avoidable because the relevant Code provision cannot be applied extraterritorially is a legal argument that already has been rejected by this Court. None of the exceptions to the law of the case doctrine, see Part III-D-1, supra, justify a reversal of the Court's prior ruling on this legal question. There has been no change in controlling law.[76] There is no need to correct a "clear error" or prevent "manifest

---

[76] While here a bankruptcy court has issued a ruling subsequent to this Court's July 2016 decision that reaches a different result, that Court was constrained by a prior District Court decision in the Madoff litigation. See SIPC v.

injustice." And with respect to "new evidence," the prior decision was made on the basis of a legal principle—*i.e.*, Judge Gerber had already <u>rejected</u> the Trustee's argument that the transfer was not-extraterritorial based on the facts; this Court likewise ruled on the principle that the statute can be applied extraterritorially; new facts do not change that principle.[77]

### B.    Recovery and Damages

Under Count 1, the Trustee may recover against NAG as the immediate or mediate transferee. <u>See</u> 11 U.S.C. § 550(a)(2). Under Count 2, Basell may recover from NAG as the initial transferee. <u>See</u> 11 U.S.C. § 550(a)(1) ("initial transferee"). As with Count 11, the Court should award recovery of the value of the transfer plus prejudgment interest calculated at the prime rate, accruing as of the date of the transfer. <u>See</u> Part II-D, <u>supra</u>.

### VII.   Breach of Access Revolver:  Restitutionary Damages (Count 12)

Count 12 seeks damages for the breach of the Access Revolver by Access and AI International, when they in December 2008 refused to fund following LBI's December 30, 2008 request.[78] Here, the evidence shows that approximately $12 million in fees were paid by the

---

<u>Bernard L. Madoff Invmt. Secs., LLC (In re Madoff Secs.)</u>, Adv. P. No. 08-01789, Dkt. No. 14495, *24 (Nov. 22, 2016) (Bernstein, J.) (noting that "applying different rules would lead to conflicting decisions on the same facts).

[77] Even if revisited, Defendants' extra-territoriality argument fails on its substance. As explained in Judge Gerber's decision, adopted by this Court as persuasive, the Code applies extra-territorially in a case such as this. <u>See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)</u>, 543 B.R. 127, 153-54 (Bankr. S.D.N.Y. 2016) (Gerber, J.) (explaining and holding that Section 548 may be applied extraterritorially, and rejecting analyses to the contrary that misread <u>In re Colonial Realty</u>, 980 F.2d 125 (2d Cir. 1992)). Further, if the issue is re-opened, the Court may consider that the transfer had a sufficiently domestic center of gravity, in that key decisions were made in the United States, including by Blavatnik, who operated out of New York; further, the transfer depleted assets that would have been available to the combined LBI (a company with significant U.S. operations), and the effect of the transfer of those assets out of LBI was felt most directly by the creditors of LBI, many of whom are in the United States.

[78] Ruling on a motion to dismiss, the Court found that Count 12 would go forward, but only as to restitutionary damages. <u>See Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)</u>, 544 B.R. 75, 92 (Bankr. S.D.N.Y. 2016). "Restitution . . . 'aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, <u>without attempting to compensate her for consequential harms</u>.'" Count 12 Decision, at 19 (quoting <u>360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)</u>, 404 B.R. 335, 341 (S.D.N.Y. 2009) and citing, *inter alia*, Restatement, Restitution, § 150, cmt. a. (1937) and Restatement (Second) of Contracts § 351 cmt. b. (1981)) (emphasis in original).

Borrowers, see PF ¶ 996, which fees were not "consequential" damages resulting from the breach and are recoverable as restitutionary damages. Further, while Access attempts to invoke a "material adverse effect" clause, arguing that the absence of a material change is a contractual condition that was not satisfied in light of Lyondell's or LBI's financial condition, see Def. Pre-Trial Br. 94-95, that argument lacks merit, because, as discussed in connection with Count 9, Lyondell already was in a liquidity crisis from the moment the Access Revolver was put into place; indeed, that is what drove the upsizing and Access Revolver efforts. Accordingly, restitutionary damages should be awarded.

Dated: New York, New York
         December 16, 2016

                                    Respectfully submitted,

                                    By: /s/ Sigmund S. Wissner-Gross
                                    Sigmund S. Wissner-Gross, Esq.
                                    May Orenstein, Esq.
                                    BROWN RUDNICK LLP
                                    Seven Times Square
                                    New York, NY 10036
                                    Telephone: (212) 209-4800
                                    Facsimile: (212) 209-4801

                                    -and-

                                    Steven D. Pohl, Esq.
                                    BROWN RUDNICK LLP
                                    One Financial Center
                                    Boston, MA 02111
                                    Telephone: (617) 856-8200
                                    Facsimile: (617) 856-8201

                                    *Counsel for Edward S. Weisfelner,*
                                    *as Litigation Trustee of the LB Litigation Trust*