**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                      Case No.  09-10023 (CGM)

LYONDELL CHEMICAL COMPANY, *et al.*,

                                                            Chapter 11

Debtors.

-------------------------------------------------------------

x

EDWARD S. WEISFELNER, AS LITIGATION              (Jointly Administered)
TRUSTEE OF THE LB LITIGATION TRUST,

Plaintiff,

                                                            Adv. Pro. No. 09-1375 (MG)

v.

LEONARD BLAVATNIK, *et al.*,

Defendants.

-------------------------------------------------------------x

EDWARD S. WEISFELNER, AS LITIGATION
TRUSTEE OF THE LB LITIGATION TRUST,

Plaintiff,

                                                            Adv. Pro. No. 11-1844 (MG)

v.

NAG Investments LLC,

Defendant.

-------------------------------------------------------------x

# APPENDIX VOL. 35

# (Designation Nos. 883-924)

# Designation No. 883

# CASE NO. 09-10023 (REG)

## IN THE UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

### LYONDELL CHEMICAL COMPANY, et al.,

Debtors.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of The Debtors'

Estates

Plaintiff,

v.

CITIBANK, N.A., LONDON BRANCH, CITIBANK INTERNATIONAL PLC, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK TRUST COMPANY AMERICAS, GOLDMAN SACHS CREDIT PARTNERS, L.P., GOLDMAN SACHS INTERNATIONAL, MERRILL LYNCH, PIERCE, FENNER, & SMITH INC., MERRILL LYNCH CAPITAL CORPORATION, ABN AMRO INCORPORATED, ABN AMRO BANK N.V., UBS SECURITIES LLC, LEONARD BLAVATNIK, AI CHEMICAL INVESTMENTS LLC, NELL LIMITED, ACCESS INDUSTRIES, INC., ACCESS INDUSTRIES HOLDINGS LLC, AI INTERNATIONAL, S.A.R.L., DEUTSCHE BANK SECURITIES, INC., PERELLA WEINBERG PARTNERS LP, DAN F. SMITH, CAROL A. ANDERSON, SUSAN K. CARTER, STEPHEN I. CHAZEN, TRAVIS ENGEN, PAUL S. HALATA, DANNY W. HUFF, DAVID J. LESAR, DAVID J.P. MEACHIN, DANIEL J. MURPHY, WILLIAM R. SPIVEY, MORRIS GELB, T. KEVIN DeNICOLA, EDWARD J. DINEEN, KERRY A. GALVIN, JOHN A. HOLLINSHEAD, JAMES W. BAYER, W. NORMAN PHILLIPS, C. BART de JONG, RICHARD FLOOR, R. KENT POTTER, LINCOLN BENET, LYNN COLEMAN, PHILIP KASSIN, ALAN S. BIGMAN, KEVIN R. CADENHEAD, CHARLES L. HALL, FRANCIS P. MCGRAIL, RICK FONTENOT, MICHAEL P. MULROONEY, KEVIN E. WALSH, JOHN FISHER GRAY, GARY L. KOEHLER, SIMON BAKER, DAWN SHAND, BERTRAND DUC, LEVERAGESOURCE III S.A.R.L., individually as a holder through purchase obligations under that certain Senior Credit Agreement dated as of December 20, 2007 between, inter alia, Citibank N.A., administrative agent and certain Debtors (the "Senior Credit Facility"), and as Class Representative for all other holders through purchase of obligations under the Senior Credit Facility, and BARCLAYS GLOBAL INVESTORS, N.A., individually and as Class Representative for all of the holders of Lyondell Common Stock who received proceeds from the consideration in payment for the purchase of their respective shares in connection with the acquisition of Lyondell Chemical Company by Basell AF S.C.A. Defendants.

## EXPERT REBUTTAL REPORT OF CHRISTOPHER J. KEARNS

CONFIDENTIAL

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 3

II. Summary of Opinions and Conclusions ............................................................. 3

III. The Projections .................................................................................................... 8

IV. The Maxwell Report ........................................................................................... 11

    A.  Maxwell's Valuation of LBI is Contrary to His February 2009 Valuation ........... 14

    B.  Factors Impacting All Maxwell Valuation Methods .............................................. 17

        i. Calculation of Total Debt ................................................................................... 17

    C.  DCF Analysis ........................................................................................................ 19

        i. Inappropriate Projections ................................................................................... 19

        ii. Terminal Value of Synergies ............................................................................ 20

    D. Guideline Company Analysis ................................................................................ 21

        i. Selection of Comparable Companies .................................................................. 21

        ii. Synergies ........................................................................................................... 24

        iii. Forward Multiples ............................................................................................ 25

        iv. LIFO/FIFO Adjustments .................................................................................. 26

        v. Control Premium ............................................................................................... 28

        vi. Exclusion of Unfunded Pension Liabilities in Determining Market Multiples .. 28

    E.  Comparable Transaction Analysis ......................................................................... 31

        i. Transactions Omitted in Kearns Report ............................................................. 32

    F.  Maxwell Exhibit E ................................................................................................ 33

    G.  Adjusted Balance Sheet Test ................................................................................. 34

V. The Tuliano Report .............................................................................................. 35

    A.  Tuliano Chronology .............................................................................................. 35

    B.  Financial Projections ............................................................................................. 36

    C.  Leverage ................................................................................................................ 42

    D.  Liquidity ................................................................................................................ 45

VI. Right to Supplement ............................................................................................ 62

Index To Exhibits ....................................................................................................... 63

**CONFIDENTIAL**

## I.    Introduction

I have previously issued a report in this matter dated November 7, 2009 (the "Kearns Report").[1] I have reviewed the reports prepared by Plaintiff's experts Ralph S. Tuliano ("Tuliano" or the "Tuliano Report"), Anders J. Maxwell ("Maxwell" or the "Maxwell Report") and the joint report of David Witte and H.G. Nebeker ("Witte/Nebeker" or the "Witte/Nebeker Report", collectively the "Plaintiff Expert Reports"). This report addresses and rebuts certain statements and conclusions presented in certain Plaintiff Expert Reports. To aid in my analysis, I have participated in additional interviews with Dan Smith, Karen Twitchell, Mario Portela, Norm Phillips, Edward Dineen and Charles Hall. I also have reviewed reports dated November 7, 2009, prepared by experts for Access, Daniel R. Fischel ("Fischel" or the "Fischel Report), and Robert Young ("Young" or the "Young Report") and the rebuttal reports of Thomas O'Connor ("O'Connor Rebuttal") and George Intille ("Intille Rebuttal"). I have reviewed additional documents since my initial report as indicated in Exhibit 8.

## II.    Summary of Opinions and Conclusions

On the whole, the Maxwell and Tuliano Reports contain numerous errors and fundamental flaws in methodology and judgment. The following is a summary of my rebuttal opinions and conclusions based on my review and analysis of the Maxwell and Tuliano Reports.

Maxwell:

1. As a threshold matter, Maxwell's valuation conclusion lacks credibility on its face. In connection with objections filed in February 2009 by the Unsecured Creditors Committee (the "UCC") to the Debtors' motion seeking approval of DIP financing and adequate protection payments, the UCC filed the sworn Declaration of Anders Maxwell, dated February 22, 2009 (the "Maxwell Declaration"). In his Declaration, Maxwell states that the enterprise value of the Company, as of February 2009, substantially exceeded the amount of debt that the

---

[1] Capitalized terms not defined within this report have the meaning ascribed to them in the Kearns Report.

**CONFIDENTIAL**

Company owed as of that time ($24.1 billion). This sworn statement cannot be reconciled with Maxwell's valuation of the Company in his Report; that it was worth only $22 billion as of the Acquisition in December 2007 and was insolvent as of that time. As discussed below, enterprise values of companies across the board fell in the latter half of 2008 because of the economic collapse that occurred during that time. Thus, if the Company was worth more than its debt as of February 2009, as Maxwell told the Court under oath, it also had to have been solvent as of December 2007, when the Company incurred debt as part of the Acquisition.

2. The valuation and solvency analyses prepared by Maxwell have several errors, and fundamental flaws in methodology and judgment. The cumulative effect of these errors and flaws is to reduce LBI's valuation by at least $7 billion.

    a.  DCF Analysis

- Maxwell based his DCF valuation conclusion on the wrong set of projections, which did not consider management's best informed estimate of future performance based on information available prior to the close of the Acquisition (i.e., the Projections).[3] Instead, he used out of date projections. Indeed, Maxwell ignored that CMAI in November 2007, when it had no stake in the outcome of its opinion, concluded, based on its independent analysis, that the petrochemical portion of the Projections was reasonable, if not conservative.

- Maxwell did not appropriately consider synergies in his terminal value calculation.

- Maxwell's WACC is high when compared to contemporaneous analyses.

---

[3] As defined in the Kearns Report, the "Projections" are the financial projections, prepared in connection with the October 2007 CIM, Kearns Report, page 5.

4                                                                    **CONFIDENTIAL**

b. Guideline Company Analysis

Maxwell makes numerous errors, each of which tends to reduce the total asset value.

- Maxwell's analysis is heavily skewed downward by the use of forward multiples applied to outdated projections and credit stress tests. Thus any conclusion of indicated value reached by Maxwell based on these projections is fatally flawed.

- Maxwell excludes from his analysis two entities - Celanese Corp. and Huntsman Corporation - that were commonly cited in 2007 as peer companies. This error is corroborated by Tuliano, who considers both of these companies to be peers in his analysis. Celanese and Huntsman had high EBITDA multiples relative to the chemicals peer group, and Maxwell's exclusion of these comparable companies distorts the multiple that should be used.

- Maxwell uses a guideline company in his analysis which is not comparable to the Company. Braskem SA, is a Brazilian chemical company that produces and sells products primarily in South America. This entity's EBITDA multiple is the lowest of Maxwell's chemical peer group. This error compounds the distortion described in the paragraph above.

- Maxwell fails to consider fully the impact of synergies in his analysis.

- Maxwell fails to make an adjustment in his analysis to address the fact that LTM ending September 30, 2007 and 2007 operating results of LBI and its peer companies included LIFO/FIFO adjustments.

- Maxwell does not apply a control premium.

- Maxwell does not consider the implication of material unfunded pension liabilities in deriving the multiples used in his guideline company analysis.

5                                                    **CONFIDENTIAL**

c. Comparable Transactions Analysis

- Maxwell omits a number of transactions without explanation from his analysis for the time period that he considered.

- Some of the multiples determined by Maxwell, on transactions common to both of our analyses clearly show a bias toward lower multiples. In one case he understates consideration paid, and in another case he calculates EBITDA in a manner inconsistent with other transactions in his analysis.

- Maxwell fails to consider fully the impact of synergies in his analysis.

- Remarkably the transactions selected by Maxwell feature lower average multiples than the guideline companies selected by Maxwell, even though merger transactions typically carry significant control premiums.

d. Debt

- Debt in the Maxwell analysis incorrectly includes $1.0 billion for an off-balance sheet receivables securitization facility.

Consequently, when corrected, Maxwell's valuation analysis shows that LBI was solvent on a balance sheet basis as of the Test Date.

2. Tuliano's analysis and, as a result, his conclusions contain many errors, fundamental flaws and irrelevant observations. His analyses, therefore, do not come close to demonstrating that the Company lacked adequate capital or was unable to pay its bills as they came due.

a. In an effort to conceal his failure to show inadequate capital, Tuliano devotes more than 20 pages of his report to reciting emails exchanged by various parties before and after the Acquisition. None of those emails, either by themselves or collectively, provide any support for Tuliano's analysis.

6                                                    **CONFIDENTIAL**

b. Like Maxwell, Tuliano disregards management's contemporaneous best estimates of future performance based on information available prior to the Acquisition – the Projections. Instead, he relies solely on outdated and downside cases. Both Intille and O'Connor have concluded that these downside cases were severe and unlikely to occur based on expected market conditions for LBI as of late 2007.[4]

c. Tuliano made incorrect conclusions regarding LBI's opening liquidity and ongoing liquidity needs based on erroneous interpretations of internal Company data and communications. In this regard, I have determined that certain of Tuliano's assertions are factually incorrect. I corroborated my findings during the interviews with the former treasurer Twitchell.

d. Tuliano selectively and inappropriately compares the Company's post-transaction leverage to the indebtedness of public companies, which were not the subject of a recent leveraged buy-out in the same space. More leverage by itself does not translate into excessive leverage.

Moreover, the approach to capital adequacy analysis that Tuliano describes[5] is the very method that I used in conducting my Stress Test and related analyses (see Kearns Report, Section VII).

3. I affirm my conclusions reached in the Kearns Report: (i) the fair value of the Company's assets exceeded its debts, on a consolidated basis as of December 20, 2007; (ii) the Projections, on which the capital structure was based, were prepared in a reasonable manner and utilized underlying assumptions that were based on events that were reasonably foreseeable at the time; (iii) LBI had adequate capital with which to operate its business as of December 20,

---

[4] O'Connor Report, page 42; Intille Report, page 32.
[5] Tuliano Report, pages 11 and 12 describe the objectives and methodology involved in evaluating the adequacy of a company's capital.

**CONFIDENTIAL**

2007 after considering underlying business assumptions that were based on conditions and events that were reasonably foreseeable at the time; and (iv) the Projections indicate that LBI had the ability to pay its debts as they came due.

## III.    The Projections

In the Kearns Report, I concluded that the Projections, on which the capital structure of the combined companies was based, (i) were prepared in a reasonable manner, and (ii) utilized underlying assumptions that were based on events that were reasonably foreseeable at the time.  Further, the Projections (i) were created based on a management process that included appropriate executive oversight and product line specific managerial input, (ii) were contemporaneously analyzed and found to be reasonable by industry analysts CMAI and Turner, (iii) were deemed reasonable by O'Connor and Intille, (iv) were independently assessed by each of the Lead Arrangers, who after having concluded as to the Projections' reasonableness invested risk capital in the financing, (v) appropriately included estimated synergies, and (vi) appropriately considered the Company's historical financial and operational performance.[6]

Tuliano and Maxwell chose other projections on which to base their analyses and conclusions, dismissing the Projections as unreliable and overly optimistic.  Their opinions and conclusions regarding the Projections are not supported by the factual record in this case.

Tuliano incorrectly states that the Projections were inconsistent with the known cyclicality and volatility of the refining and petrochemical industries.[7]  As discussed in the Kearns Report and below (as well as O'Connor, Intille and Young Reports), the Projections assumed trough conditions in 2010/2011 reflecting an aggregate three year drop of 29% for EBITDA, consistent with general market expectations of late 2007.  In addition, the Projections reasonably incorporated the impact of positive

---

[6] Kearns Report, pages 7 – 8.
[7] Tuliano Report, page 2.

**CONFIDENTIAL**

changes to LBI's business model and other market dynamics that were expected to result in more stable results through the next trough (see Kearns Report, Section VII).

In late 2007, when it was acting independently, CMAI agreed with this assessment of market dynamics. CMAI's outlook was largely based on the expectation that global demand for chemicals and plastics would remain strong, with significant contribution from the world's fastest growing economies.[8] The information set forth in the monthly reports that CMAI published at the end of 2007 generally express the same expectations.

Tuliano states that the Projections did not appropriately consider deteriorating 2007 economic and industry conditions.[9] This conclusion is primarily based on the fact that Lyondell missed its earnings expectations in the 2007 third and fourth quarters. As discussed in the Kearns Report, this financial result was due in part to Lyondell's use of the LIFO method of accounting for inventory and margin compression related to the price adjustment lag under the sales contracts in petrochemicals.[10] The 2007 third and fourth quarter earnings shortfall appropriately did not change management's long-term outlook.

Below is a summary of Lyondell's 2007 EBITDA adjusted for the impact of LIFO. This chart demonstrates that, on a FIFO basis (adjusting for the accounting impact of rising crude oil prices), Lyondell's 2007 third and fourth quarters substantially exceeded forecasts.[11]

---

[8] Young Report, page 16.
[9] Tuliano Report, page 2.
[10] Kearns Report, page 71.
[11] See Young Report, page 46 for a similar analysis.

**CONFIDENTIAL**



### Lyondell Proforma 2007 EBITDA (FIFO basis)
### Compared to Projected 2007 EBITDA

*($ in millions)*

|  | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| EBITDA | $ 396 | $ 826 | $ 694 | $ 304 | $ 2,220 |
| Adjustment to FIFO | 90 | 203 | 145 | 431 | 869 |
| **EBITDA - FIFO** | **$ 486** | **$ 1,029** | **$ 839** | **$ 735** | **$ 3,089** |

| **Projected Q3-07 & Q4-07 EBITDA** | Q3 | Q4 |
|---|---|---|
| As of July 2007 | $ 818 | $ 916 |
| As of 9/19/07 | 670 | 687 |

By adjusting for the LIFO accounting method, the projections were exceeded.

**Sources:**
EBITDA (LIFO) - Twitchell Ex. 35, p. 3 LYO-UCC 00390506 at 00390508; FIFO Adjustments - Lyondell 12/31/07 10-K, Lyondell 3/31/08 10-Q, Lyondell 6/30/08 10-Q, and Lyondell 9/30/08 10-Q; Projected Q3-07 & Q4-07 EBITDA as of Jul-07 - Management Presentation July 2007, DBSI_00000007 at 00000087; Projected Q3-07 & Q4-07 EBITDA as of 9/19/07 - 9/19/07 Business Performance Update, LYO-UCC 00489121 at 00489123; Projected Q4-07 EBITDA as of 11/8/07 - 11/8/07 Business Performance Update, LYO-UCC 00489359 at 00489361.

Even late in 2007, crude oil forward curves communicated the market's expectation that crude oil costs would remain relatively flat (to slightly declining) well into 2008 and beyond.[12]  In reliance on those forward curves, Lyondell management concluded that the compressed product margins that it had experienced during the latter half of 2007 (as reported on a LIFO basis) would be short lived, and that margins in 2008 and beyond would return to levels commensurate with the market's expectations - flat to slowly declining feedstock costs.

Considering the foregoing (and as discussed in the Intille and Young Reports), Lyondell management was justified in not changing the 2008 EBITDA reflected in the Projections for the effects of the 2007 third and fourth quarter (LIFO) earnings shortfalls.  For example, Young concludes that because sales volumes remained unchanged and demand expectations remained steady, it was reasonable to assume

---

[12] Very few industry analysts in late 2007 were projecting crude oil prices to continue to increase.  For example, according to a December 2007 WSJ survey, Ms. Diane Swonk, Chief Economist at Mesirow, projected that crude oil prices would drop to $85 per barrel by June 30, 2008.  Moreover, as shown in the Kearns Report, page 81, the December 2007 forward curve was anticipating a modest decline in crude oil prices through 2009.

that raw material costs would stabilize, prices charged to customers would catch up and 2008 would proceed as previously anticipated.[13]

In addition, O'Connor concludes that U.S. and global refining margins had moved to a higher level during the 2004 to 2007 period and were positioned to be sustained or improved over the 2008 to 2012 period.[14]

Maxwell "finds projections developed by Merrill Lynch and Basell after July 10[th] inadequate and unreliable for valuation purposes."[15] It is counterintuitive to reject projections prepared after July 10, 2007 in favor of those prepared without any input from Lyondell management and before adjustment by Basell management to consider improved Basell performance in the 2007 first half and before adjustments for synergies.

As an initial matter and as discussed in the Kearns Report, the first projections that were prepared with input from management teams of both Lyondell and Basell were the July 15 management case projections, which were subsequently updated to incorporate, among other things, (i) the impact of increasing hydrocarbon prices in 2007 and the subsequent anticipated stabilization of Lyondell pricing, (ii) updated synergies, and (iii) the exclusion of Basell joint venture dividends from EBITDA.[16] As a result of this update process, management prepared the Projections in September 2007. The Projections were contemporaneously vetted by third party industry experts (including CMAI), reviewed by each of the Lead Arrangers, and have been deemed reasonable by O'Connor, Intille and Young.[17]

## IV.    The Maxwell Report

The table below provides a comparison of the indicated value (and value in excess of debt) determined under each valuation approach in the Kearns Report and the Maxwell Report.[18]

---

[13] Young Report, page 44.
[14] O'Connor Report, page 4.
[15] Maxwell Report, page 12.
[16] Kearns Report, pages 53-54.
[17] O'Connor Report, pages 3 and 4; Intille Report, page 3; and Young Report, page 6.
[18] Maxwell Report, page 27; Kearns Report, page 30.

CONFIDENTIAL

*(S in millions)*

| Valuation Approaches | Maxwell Midpoint Value[1] | | | Kearns Value[2] | | |
|---|---|---|---|---|---|---|
| | Total Asset Value | Weight | Weighted Value | Total Asset Value | Weight | Weighted Value |
| Market Approach - Guideline Companies | $22,123 | 25% | $5,531 | $33,100 | 20% | $6,620 |
| Market Approach - Comparable Transactions | 22,490 | 25% | 5,623 | 37,400 | 20% | 7,480 |
| Income Approach - Discounted Cash Flow | 20,582 | 50% | 10,291 | 32,000 | 60% | 19,200 |
| Joint Venture | 1,259 | 100% | 1,259 | | | - |
| Total Value | | | 22,703 | | | 33,300 |
| Debt and Liabilities | | | 25,765 | | | 24,828 |
| Value in Excess of Debt | | | ($3,062) | | | $8,472 |

Notes:
(1) See Maxwell, page 7.
(2) See Kearns, page 6.

As discussed in the Kearns Report, I applied various conservative assumptions in preparing my valuation analysis, including, but not limited to (i) a terminal growth rate in my DCF analysis at the low end of the range, (ii) application of the incremental tax rate of 35% in my DCF analysis, as opposed to the lower effective tax rate of 32%, (iii) application of a 10% discount to the median multiples of the Guideline Companies, and (iv) application of a 10% discount to the median multiples of the comparable transactions. As described in the following table, my concluded fair market value ("FMV") of TIC was reduced by $2.6 billion as a result of applying certain of these conservative assumptions:

**Impact of Conservative Assumption Inputs to Kearns FMV of TIC**

*($ in millions)*

| Valuation Approaches | TIC per Kearns Report | Alternate TIC | Impact | Weight | Weighted Value |
|---|---|---|---|---|---|
| Market Approach - Guideline Companies | $33,100 | $37,700 | $4,600 | 20% | $920 |
| Market Approach - Comparable Transactions | 37,400 | 41,600 | 4,200 | 20% | 840 |
| Income Approach - Discounted Cash Flow | 32,000 | 33,400 | 1,400 | 60% | 840 |
| Total Impact of Conservative Assumption Inputs | | | | | $2,600 |

In my opinion, Maxwell's analysis contains several fundamental flaws in methodology and judgment, as summarized in the following table and described in the sections that follow. I have quantified the specific and overall impact of each

flaw in two categories: (1) the impact of using appropriate projections in the DCF and (2) the impact of discrete adjustments to various inputs.

## Modifications to Maxwell Analysis
*($ in millions)*

| | Impact on Maxwell's Specific Analysis | Impact on Maxwell's Overall Analysis |
|---|---|---|
| **(1)  DCF: Use of the Projections** | $ 8,397 | $ 4,199 |
| **(2)  Discrete Input Changes** | | |
| 1.   DCF: Terminal Value Synergies | 396 | 198 |
| 2.   Guideline Companies: Including Huntsman and Celanese[a] | 1,377 | 344 |
| 3.   Guideline Companies: Including Huntsman and Celanese, and Excluding Braskem[a] | 1,774 | 443 |
| 4.   Guideline Companies & Transactions: Including Synergies | 1,683 | 842 |
| 5.   Guideline Companies: Including LIFO to FIFO Adjustment | 1,576 | 394 |
| 6.   Guideline Companies: Adding Unfunded Pension Liability | 522 | 131 |
| 7.   Transactions: Correction of Multiples | 3,805 | 951 |
| 8.   Guideline Companies: Including Cash in TEV Determination[b] | 479 | 120 |
| 9.   Guideline Companies: Including Control Premium | | |
| 10.  Debt: Excluding Off-balance Sheet A/R Securitization Facility | 1,000 | 1,000 |

<u>Notes:</u>
(a) Overlapping modifications.
(b) LBI cash ($560) less Maxwell's Usable Cash ($81, page 26).

In addition to the items listed above, Maxwell's guideline companies and transactions analyses are skewed by his use of forward multiples applied to the wrong sets of projections.    Thus, Maxwell's valuation conclusion after appropriate corrections indicates that LBI was solvent on a Balance Sheet Test basis as of the Acquisition date.

                    **CONFIDENTIAL**

## A. Maxwell's Valuation of LBI is Contrary to His February 2009 Valuation

Maxwell's conclusions regarding LBI's valuation as of the Acquisition appear suspect and not credible because they are contrary to the sworn statement that he gave to the Court in February 2009 in connection with the Debtor's motion for approval of DIP financing. In the Maxwell Declaration, he opined that the value of the Company as of January 2009 was "more than sufficient" to cover [its] existing debt of $24.1 billion, even after suffering a significant decline in its value as a result of the economic collapse in the latter part of 2008. Yet, in his Report, Maxwell now states that LBI's value as of the time of the Acquisition in December 2007, some thirteen months earlier, was $22.7 billion.[19] The valuation that Maxwell provides now, in support of the litigation against the Lead Arrangers, cannot be reconciled with his earlier February 2009 sworn statement. I believe it is not credible that the Company's enterprise value actually increased between December 2007 and January 2009 in light of the intervening events between those two timeframes.

In February 2009, the Company filed a Motion for an Order (i) Authorizing Debtors (A) to Obtain DIP Facility Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(2), 364(e), (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) to Purchase Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (the "DIP Motion"). In support of the DIP Motion, the Company submitted a report prepared by Duff & Phelps ("Duff"), dated January 6, 2009 (the "Duff Report"). The Duff Report expressed a value for the Company as of January 6, 2009, and concluded that the midpoint of its analysis of business enterprise value ("BEV") of the Company was $19.2 billion.[20]

In connection with its objections to the DIP Motion, the UCC (for whom Maxwell has submitted his current Report) disagreed with the Duff's BEV conclusion, asserting that the Duff Report substantially understated the Company's January 2009 BEV. In support of that contention, the UCC submitted the Maxwell Declaration.

---

[19] Calculated as the mid-point of Maxwell's range.
[20] Duff Report, page 6.

**CONFIDENTIAL**

In the Maxwell Declaration, Maxwell stated that he had not had sufficient time to conduct a formal valuation of the Company.[21]  Nevertheless, Maxwell went on to state that he had questions about the methodology employed by Duff, and concluded that the Duff Report understates the Company's BEV.  Maxwell identified six basic flaws that he perceived in the Duff Report.  In those various points, Maxwell stated under oath that each of the errors resulted in a substantial understatement of the Company's value.  Maxwell concludes his analysis of the Duff Report by stating:

> taking into account the adjustments preliminarily suggested by the Bank Presentation projections, including consideration of the Comparable Transactions and Other Assets, removing the Distressed Company Premium from the WACC, and applying different weighting to valuation methods, from the [Duff] Report, suggests that the [Company] may have more than sufficient enterprise value to cover its existing debt of $24.1 billion, as reflected in Exhibit 3, pages 13 and 14.  Once again, it's important to qualify these preliminary views given the lack of time, information and resources available to PJ Solomon.[22]

The implication of that statement is that Maxwell believed that the Company's BEV as of January 2009 was, at a minimum, in excess of $24.1 billion.  Further, at pages 13 and 14 of Exhibit 3 of his declaration, which Maxwell cites as support, Maxwell states that, after making the required adjustments to Duff's BEV, the Adjusted Value of the Company was $30.5 billion in February 2009.[23]

It is illogical that Maxwell believes that the Company's BEV as of January 2009 exceeded the existing debt, but that the BEV of the Company as of the Acquisition was less than its debt, thereby leaving the Company insolvent in December 2007.  Given Maxwell's acknowledgement that the Company's BEV declined from December 2007 to January 2009, if the Company's BEV valuation exceeded its debt as of that time, it also did so as of December 2007, the date of the Acquisition.  Consequently, according to Maxwell's sworn statement in February 2009, the Company was solvent at the time of the Acquisition.  This conclusion is further supported by the following factors:

---

[21] Maxwell Declaration ¶ 8.
[22] Maxwell Declaration ¶ 17.
[23] Ibid, Exhibit 3 at 14.

**CONFIDENTIAL**

1. As discussed in the Kearns Report, Section VIII, major events not foreseeable in late 2007, occurred in 2008, including a complete shut down of the credit markets and demand by LBI's customer base melting away in the fourth quarter. The culmination of all such adverse events severely impacted the Company's business and by inference its enterprise value.

2. By way of comparison, the effect of such adverse market conditions on other participants during this tumultuous period resulted in the significant loss of enterprise value:

   a. The total enterprise value of The Dow Chemical Company, a petrochemical Guideline Company used in both the Maxwell and Kearns Reports, decreased from $47.8 billion on December 20, 2007 to $25.5 billion on January 6, 2009, a 47% decline.

   b. The total enterprise value of Valero Energy Corp., a refining Guideline Company used in both the Maxwell and Kearns Reports, decreased from $42.3 billion on December 20, 2007 to $16.6 billion on January 6, 2009, a 61% decrease.

   The following table illustrates the drop in total enterprise value for all of the Guideline Companies as calculated by Capital IQ.

**CONFIDENTIAL**

**Guideline Companies**
**Change in Total Enterprise Value**
*($ in millions)*

|  | 12/20/2007 | 1/6/2009 | % Change |
|---|---|---|---|
| Nova Chemicals Corp. | $    4,498 | $    2,179 | -51.5% |
| The Dow Chemical Company | 47,881 | 25,532 | -46.7% |
| Celanese Corp. | 9,255 | 5,063 | -45.3% |
| Huntsman Corporation | 9,472 | 4,712 | -50.3% |
| Westlake Chemical Corp. | 1,443 | 1,586 | 9.9% |
| Eastman Chemical Co. | 5,889 | 3,586 | -39.1% |
| **Average** |  |  | **-37.2%** |
|  |  |  |  |
| Valero Energy Corp. | $    42,280 | $    16,583 | -60.8% |
| Tesoro Corporation | 7,993 | 3,393 | -57.5% |
| Sunoco Inc. | 10,441 | 7,009 | -32.9% |
| Frontier Oil Corp. | 4,076 | 1,425 | -65.0% |
| Holly Corp. | 2,669 | 1,588 | -40.5% |
| Western Refining Inc. | 2,801 | 1,916 | -31.6% |
| Alon USA Energy, Inc. | 1,797 | 1,670 | -7.0% |
| **Average** |  |  | **-42.2%** |

**Source:**
Capital IQ.

Thus, given Maxwell's belief that the Company was worth in excess of $24.1 billion as of January 6, 2009, and assuming hypothetically that the Company's enterprise value declined in line with the peer companies following December 20, 2007, Maxwell likely implicitly had to have valued the Company over $30 billion as of the date of the Acquisition.

## B. Factors Impacting All Maxwell Valuation Methods

Maxwell made several flawed assumptions that impact each of his valuation methodologies.

### i. Calculation of Total Debt

Maxwell overstates the Company's total Debt by approximately $1.0 billion. He includes a line item for "Lyondell Off-Balance Sheet A/R Facility" in the amount of

CONFIDENTIAL

$1 billion.[29] The sold receivables and associated debt are not included in its audited financial statements.[30] I believe that it is improper to include in a valuation analysis prepared for a going concern an off-balance sheet debt without also considering the value of the assets collateralizing that debt and/or cash flows associated with those assets. As of December 31, 2007, the most recent date after the Acquisition date which data is available, the amount outstanding on the facility of $1.0 billion is collateralized by $2.4 billion in receivables. Therefore, the facility was overcollateralized in excess of 2:1.[31] The Company received a "True Sale" opinion[32] and a "Substantive Non-Consolidation" opinion[33] from their attorneys at the Acquisition date, which indicate that the debt is not an obligation of the Company, nor are the associated assets property of the Company. If properly excluded from his debt calculation, the value of equity capital reported by Maxwell would increase by $1.0 billion.[34]

If I adopted Maxwell's treatment of this debt as an alternative approach, the inclusion of this amount as Debt in my analysis would not change any of my conclusions that LBI was solvent, on a balance sheet basis, as of the Acquisition date (see Exhibits 5 and 5A).

### ii. Discrete Assets not Included in the Valuation Analysis [to be moved]

The Company had additional discrete assets (considered in my capital adequacy analysis – see Section V) that were not included in either Maxwell's or my valuation analysis.

The first is a Lyondell asset related to Bayer litigation in a 2006 judgment that was received in December 2008, and which was not included in the Projections. The second is a $79 million insurance claim recovery by Basell that apparently was

---

[29] Maxwell Report, page 26.
[30] Lyondell 10-K for December 31, 2007, page 73.
[31] LYO-UCC 00652438.
[32] LYO-UCC 00458587 – 00458615.
[33] LBI/BONY 013341 – 013376.
[34] Of the $337 million of letters of credit outstanding as of December 31, 2007, $200 million relate to the BASF litigation which is included in my estimate of Debt. Assuming 50% of the remaining $137 million letters of credit are related to standby letters of credit that would not be expected to be drawn against, the impact on my concluded fair market value in excess of debts is a reduction of $69 million.

**CONFIDENTIAL**

included in the Projections, but is not reflected in my Market Approach analysis. The impact of the inclusion of these two discrete assets would increase my concluded fair market value of TIC in excess of debts of by more than $100 million (roughly $150 million discounted at 50%, plus $80 million weighted at 40% for the market approach).

## C. DCF Analysis

### i. Inappropriate Projections

Projections utilized by Maxwell to perform his DCF analysis were inappropriate for use in a Balance Sheet Test. Maxwell utilized three sets of projections to perform his DCF analysis: (i) the July 10, 2007 base case, prepared by Merrill Lynch; (ii) the July 10, 2007 sensitivity case, prepared by Merrill Lynch; and (iii) the CMAI 2007 Due Diligence Model.[35] The first two projection sets were prepared on July 10, 2007. (As discussed above in Section III, it is inappropriate to use those projections.) They do not consider management's best estimate of future performance based on the information available prior to the close of the Acquisition.

The third set of projections, although named the "CMAI 2007 Due Diligence Model" was prepared by CMAI only in 2009 in connection with this litigation[36] and are inconsistent with the contemporaneous review performed by CMAI in late 2007 (as well as the market forecasts that CMAI prepared in late 2007 for its subscribers), on which the Lead Arrangers relied during the actual due diligence. In late 2007, CMAI concluded that the petrochemical portion of the Projections were reasonable, if not conservative. O'Connor and Intille have reviewed the CMAI 2009 Litigation Model in their respective rebuttal reports. With respect to the refining-related projections included therein, O'Connor concludes that the arguments put forth in the Witte/Nebeker Report are (i) inconsistent with the actual performance of the Houston refinery; (ii) are inconsistent with the performance of global markets prior to the

---

[35] Maxwell Report, pages 50 - 52.
[36] To avoid confusion with its work actually performed in 2007, I have defined the new projections prepared by CMAI in connection with this litigation as the "CMAI 2009 Litigation Model."

**CONFIDENTIAL**

major financial collapse in the 2008 second half; and (iii) uses an underlying refining model that is unreliable.[37]

Intille concludes with respect to the CMAI 2009 Litigation Model that, among other things: (i) the assessment of LBI's competitive position is inconsistent with historical facts and CMAI's own assessment from 2007; (ii) CMAI's use of forecasted cash cost curves is flawed; (iii) the volume and operating rate projections are unreasonable and inconsistent; and (iv) the price and margin assumptions are unsupported.[38]

To rely on projections that deliberately exclude Lyondell data prepared by company management and that were available well before the Test Date ignores basic information consistent with proper due diligence. To further rely on projections prepared in 2009 that contradict the same preparer's 2007 work is problematic and an inappropriate use of subsequent information.

The flawed selection of guideline companies by Maxwell also impacts the conclusion of value in his DCF approach. Using exit mulitples, which exclude Celanese and Huntsman, to calculate the terminal value in the DCF understates the multiple and the resultant terminal value.

Using the Projections combined with Maxwell's DCF methodology increases Maxwell's indication of value under his DCF approach by approximately $8.4 billion. See Exhibit 1A.

### ii. Terminal Value of Synergies

Maxwell understates the terminal year value of synergies, driving down the enterprise value in his DCF analysis. He derives the terminal year synergies value by taking the average synergies over the forecast period, which includes the ramp up and one time implementation costs in the first two years, and therefore does not take into account the synergies that the Company will experience into perpetuity.[39] Maxwell's treatment of synergies makes little sense because the Company will benefit from synergies year after year. By understating his terminal year synergies value, he

---

[37] O'Connor Rebuttal Report, page 1.
[38] Intille Rebuttal Report, pages 6, 9, 16 and 18.
[39] Maxwell Report, pages 50 - 52.

**CONFIDENTIAL**

reduces his calculated value under his DCF approach by $400 million. See Exhibit 1B.

### iii. WACC

Maxwell's WACC is expressed as a range – 10.25% to 10.75%,[40] with a mid-point of 10.5%. This mid-point is the same as the highest WACC used in any relevant 2007 valuation analyses. Deutsche Bank's ("DB") DCF analysis in its fairness opinion report to Lyondell reflected a range of 9.5% to 11.5%,[41] with a mid-point of 10.5%. It is significant to note that DB's analysis was of only legacy Lyondell. As discussed in the Kearns Report (Section III), the merged entity would be a globally diversified company, with decreased earnings volatility and substantial synergies, that operated in different segments of the petrochemical and refining industries. This concept also is discussed in the Intille and Young Reports.[42] Thus, all else being equal, one would reasonably expect the WACC for the merged entity to be lower than the WACC for Lyondell on a stand-alone basis. Consequently, in this context the WACC applied by Maxwell in his DCF analysis is too high and is not credible.

### D. Guideline Company Analysis

#### i. Selection of Comparable Companies

Although there is substantial overlap between Maxwell's comparable companies and the Guideline Companies used in my analysis, Maxwell makes a fundamental error by excluding Huntsman and Celanese from his valuation and by including Braskem SA.[43] In addition, I disagree with his inclusion of BASF SE. The two companies that he excludes (Huntsman and Celanese) have the highest TIC/EBITDA multiples out of all Guideline Companies, while the two companies that he includes (BASF and Braskem SA) have the lowest multiples of his comparable companies.

---

[40] Ibid.
[41] Deutsche Bank, Project Safari presentation, DBSI_00000136.
[42] Intille Report, page 27; Young Report, pages 49 – 57.
[43] Maxwell Report, page 40.

CONFIDENTIAL

Use of this inappropriate set of guideline companies results in lower median multiples being applied and a significantly lower indication of value.

Exhibit 2 sets forth the comparable companies that are cited by various analysts and are used in various contemporaneous valuation analyses.

Celanese and Huntsman are appropriate comparable companies given the substantial product and geographic overlap with LBI. Intille cites Celanese and Huntsman as peer companies.[44] Interestingly, of the six transactions that Maxwell considers to be relevant in arriving at an indication of value for LBI, Hunstman was the seller in three of them. Moreover, even Tuliano includes both Huntsman and Celanese as comparable chemical companies for comparison with LBI.[45] Their inclusion in Maxwell's analysis (even assuming that BASF SE and Braskem SA are kept in the group) results in an average Enterprise Value increase of $1.38 billion, before including any control premium, as shown in the following table:

### Maxwell's Guideline Company Analysis:
### Impact of Including Celanese & Huntsman

| ($ in millions) | LTM 9/30/2007 | 2007 | 2008 |
|---|---|---|---|
| **Implied Midpoint Multiples (Petrochemical)** | | | |
| Maxwell Multiple | 5.8x | 5.3x | 5.5x |
| Including Celanese & Huntsman, and excluding Braskem | 6.4x | 5.7x | 6.0x |
| **Implied Enterprise Value ($)** | | | |
| Maxwell Value | $ 24,551 | $ 20,765 | $ 21,054 |
| Adjusted Value | 26,465 | 21,726 | 22,312 |
| **Impact on Value ($)** | 1,914 | 961 | 1,257 |
| **Average Impact on Value** | | $ 1,377 | |

Note that the table above does not adjust for errors and bias in Maxwell's use of forward multiples, discussed below.

---

[44] Intille Report, page 12.
[45] Tuliano Report, page 63.

**CONFIDENTIAL**

One of the companies that Maxwell incorrectly includes in his analysis, Braskem SA, should not be included in his comparable company analysis.[46] Braskem SA is headquartered in Brazil, and has minimal geographic overlap with LBI. Almost all of its operations are in and serve the South American market. In 2006, European sales comprised only 6.4% of Braskem's total sales.[47] Inclusion of Braskem SA as a comparable company disregards significantly higher sovereign and currency risk. Analyses performed in connection with the Acquisition indicate that very few participants considered Braskem SA to be a comparable company, as just 2 of the 26 valuations performed by interested parties included Braskem in their analyses.[48] Further, Intille also does not consider Braskem SA a peer company.[49]

Maxwell also uses BASF SE as a guideline company. As discussed in the Kearns Report, I considered BASF SE but did not include it as a Guideline Company since roughly half of 2006 operating profits before tax were derived from an oil and gas segment that includes exploration, transport and storage. My overall conclusions regarding balance sheet solvency would not have changed had I included BASF SE to determine indicated value of TIC in my analysis. See Exhibit 3A.

Further, if the median multiple in Maxwell's comparable company analysis for petrochemicals is adjusted by (i) removing Braskem (i.e. the lowest implied multiple) and (ii) including Celanese and Huntsman (but also keeping BASF in the analysis), Maxwell's indicated value under the guideline company approach (with no additional adjustment for errors and bias in Maxwell's use of forward multiples), is increased by $1.77 billion, before considering any control premium, as shown in the following table:

---

[46] Braskem SA's enterprise value as a multiple of EBITDA is 3.5x, while the next lowest multiple of Maxwell's comparable companies is 5.2x, and all of the remaining comparable companies fall in the range of 5.2x – 7.1x.
[47] Braskem SA, Form 20-F, year ended December 31, 2006.
[48] See Exhibit 2.
[49] Intille Report, page 12.

CONFIDENTIAL

**Maxwell's Guideline Company Analysis:**
**Impact of Including Celanese & Huntsman and Excluding Braskem**

| ($ in millions) | LTM 9/30/2007 | 2007 | 2008 |
|---|---|---|---|
| **Implied Midpoint Multiples (Petrochemical)** | | | |
| Maxwell Multiple | 5.8x | 5.3x | 5.5x |
| Including Celanese & Huntsman, and excluding Braskem | 6.6x | 5.8x | 6.0x |
| **Implied Enterprise Value ($)** | | | |
| Maxwell Value | $ 24,551 | $ 20,765 | $ 21,054 |
| Adjusted Value | 27,103 | 22,137 | 22,451 |
| **Impact on Value ($)** | **2,552** | **1,373** | **1,397** |
| **Average Impact on Value** | | **$ 1,774** | |

### ii.  Synergies

I do not agree with Maxwell's treatment of synergies in his valuation analysis. Maxwell incorrectly includes only the one-time net effect of year-one synergies in his market approach of guideline companies and comparable transactions.[50] Consequently, Maxwell undervalues the impact of synergies.  In addition to the factors related to synergies discussed in the Kearns and Intille reports, see the Young report, which includes a benchmarking analysis of the synergies and concludes that they are reasonable and conservative.[51]

I include the full non-revenue enhancing synergies in EBITDA in my guideline company and comparable transactions approaches.  Maxwell's omission of the non-revenue enhancing synergies, net of one time implementation costs of $195 million, understates the implied Enterprise Value under the guideline approach and the transaction approach by an average of $1.68 billion, as shown in the following table:

---

[50] Maxwell Report, pages 20 and 22.
[51] Young Report, pages 55-57.

**CONFIDENTIAL**

## Maxwell's Guideline Company and Transaction Analyses:
## Impact of Including Synergies

| ($ in millions) | Maxwell Mid Point Values | Adjusted Mid Point Values[1] | Impact on Value |
|---|---|---|---|
| **Guideline Company Approach** | | | |
| LTM 9/30/07 | $ 24,550 | $ 26,275 | $ 1,725 |
| 2007 | 20,765 | 22,489 | 1,725 |
| 2008 | 21,055 | 22,531 | 1,476 |
| Guideline Average | | | 1,642 |
| **Guideline Transaction Approach** | | | |
| LTM 9/30/07 | 23,585 | 25,310 | 1,725 |
| 2007 | 21,395 | 23,119 | 1,725 |
| Transaction Average | | | 1,725 |
| **Combined Average Synergy Value Impact** | | | **$ 1,683** |

**Note:**
(1) Calculated by applying 5.5x multiple as used by Maxwell to $349 million of synergies ($420 million less revenue enhancement synergies of $71 million), then reducing each concluded value by total implementation costs of $195 million.

### iii. Forward Multiples

Maxwell elects to use *forward* EV/EBITDA multiples in his guideline company analysis, incorporating 2007 and 2008 estimates in his analysis, as well as actual LTM September 30, 2007 and full year 2007 results.[52]

A key premise of the market approach is its reliance on factual, publicly filed financial data. As stated in a prominent valuation textbook, "Unlike the current pricing multiples used in the market approach, that future multiple can't be directly observed in the marketplace. Rather, it must be estimated."[53] This is one of the reasons why IRS Rev-Ruling 59-60 shows a preference for the use of historical data.[54] I believe that forward-looking values generally are best captured in the Income Approach, rather than in the Guideline Company Approach.

---

[52] Maxwell Report, page 17.
[53] **Valuing a Business: The Analysis and Appraisal of Closely Held Companies** (fifth edition) by Pratt and Niculita, page 252.
[54] IRS Rev-Ruling 59-60.

**CONFIDENTIAL**

Maxwell utilizes improper projections of EBITDA to which he applies the forward multiples and, consequently realizes lower values. As described in Section D(iv) below, 2007 (particularly the fourth quarter) was significantly impacted by LIFO/FIFO differences, for which he apparently made no adjustments. The 2008 estimates used by Maxwell are from the CMAI 2009 Litigation Model. As discussed above, this "model" is fatally flawed; thus any value conclusion derived therefrom is not a valid measure. As a sensitivity analysis I applied his forward multiples to my Guideline Company Approach; the resulting indication of value is substantially consistent with the indication of TIC value using under the market approach as reflected in the Kearns Report. See Exhibit 3B.

### iv. LIFO/FIFO Adjustments

In order for guideline companies to be properly compared, it is necessary to view them under the same basis of accounting.[55]  Otherwise, it is not possible to make a valid comparison.  To eliminate differences in accounting methods, guideline company valuation methodology requires that the subject company's EBITDA and the guideline companies' reported EBITDA all be determined using a common accounting method.  Most of the Guideline Companies applied LIFO accounting to at least a portion of their inventory.  Therefore, in order to be consistent, I made adjustments such that all guideline companies and the Company were on a FIFO basis. (See Kearns Report, Exhibit M.)

The result of these adjustments decreases the EBITDA multiples of the Guideline Companies, but increases the Company's EBITDA to which those multiples are applied.  Following is a comparison of the September 30, 2007 guideline companies' EV/EBITDA multiples with and without adjustments to LIFO, and the resulting impact on value.

---

[55] **Valuing a Business: The Analysis and Appraisal of Closely Held Companies** (fifth edition) by Pratt and Niculita, pages 288 and 302.

**CONFIDENTIAL**

### Maxwell's Guideline Company Multiples: LIFO to FIFO Adjustment

| | LTM EV / EBITDA | |
|---|---|---|
| | Maxwell Guideline Company Multiples | Adjusted Guideline Company Multiples[1] |
| **Petrochemical Companies:** | | |
| BASF SE | 5.2 | 5.2 |
| The Dow Chemical Company | 7.1 | 7.1 |
| Eastman Chemical Co. | 6.2 | 6.1 |
| Braskem S.A. | 3.5 | 3.5 |
| Nova Chemicals Corp. | 6.6 | 6.6 |
| Westlake Chemical Corp. | 5.2 | 5.2 |
| **Median** | **5.8x** | **5.7x** |
| | | |
| **Refining Companies:** | | |
| Valero Energy Corp. | 4.9 | 3.9 |
| Sunoco Inc. | 5.3 | 3.7 |
| Tesoro Corporation | 5.1 | 4.7 |
| Frontier Oil Corp. | 4.9 | 4.9 |
| Holly Corp. | 4.8 | 4.8 |
| Western Refining Inc. | 5.3 | 4.7 |
| Alon USA Energy, Inc. | 5.1 | 4.5 |
| **Median** | **5.1x** | **4.7x** |

Note:
(1) Change in LTM LIFO Reserve is added to Maxwell's LTM EBITDA (calculated from EV and EV/EBITDA multiples as listed on page 40 & 41 of Maxwell Report).

### Maxwell's Adjusted Conclusion of Value based on LIFO to FIFO Adjustment

| ($ in millions) | Petrochem | Refining | Total |
|---|---|---|---|
| LTM EBITDA[1] | $ 3,190 | $ 1,186 | $ 4,376 |
| TTM 9/30/07 LIFO to FIFO Adjustment[2] | 350 | 130 | 480 |
| Adjusted LTM EBITDA | 3,540 | 1,316 | 4,856 |
| Adjusted LTM EBITDA Multiple | 5.7x | 4.7x | 5.4x |
| Maxwell Adjusted Conclusion | 20,004 | 6,121 | 26,125 |
| Maxwell Concluded Value | 18,501 | 6,049 | 24,550 |
| **Impact on Value** | $ 1,503 | $ 73 | $ 1,576 |

Notes:
(1) Total EBITDA allocated using LTM 9/30/07 adjusted EBITDAs, Maxwell Report, page 20.
(2) See Kearns Report, page 73 ($3,425- 2,945= $480).

As shown in the above table, had Maxwell properly adjusted EBITDA in his comparable company analysis to normalize the effects of LIFO, the implied Enterprise Value under the guideline company approach would increase by $1.58 billion.

CONFIDENTIAL

### v. Control Premium

In applying the Guideline Company method, public company prices reflect publicly reported share prices on a minority, freely traded basis. Consequently, it is necessary to apply a control premium to determine an indication of value when using the Guideline Company method. According to McKinsey's textbook on valuation, "to gain control of the target, the acquirer must pay a premium over the current market value (known as the control premium). Although premiums can vary widely, the average control premiums have been fairly stable, near 30 percent of the preannouncement price of the target's equity."[56] I applied a control premium of 22% in my Guideline Company Approach, as described in Exhibit Q to the Kearns Report. Since the control premium is applied to equity value, and Maxwell calculates negative equity value for the Company under all scenarios, adding a control premium could not increase his overall Total Asset Value. If, however, the corrections discussed above are made in order to remedy errors in Maxwell's analysis, adding the control premium could have a significant impact on his Total Asset Value and Maxwell's overall conclusion.

### vi. Exclusion of Unfunded Pension Liabilities in Determining Market Multiples

In deriving the market multiples of comparable companies, Maxwell inappropriately excludes unfunded pension liabilities from the calculation of total enterprise value.[57] By excluding unfunded pension liabilities, Maxwell has understated enterprise value for his comparable companies and has therefore understated the indicated multiples, and consequently the values in his guideline company approach.

Much like the other debt used in the calculation, the unfunded pension liability reflects a claim on the Company's assets and should also be included. McKinsey

---

[56] Valuation – Measuring and Managing the Value of Companies (fourth edition), McKinsey & Company, page 435.
[57] Maxwell Report, pages 40-41.

CONFIDENTIAL

states "…we treat unfunded pension expense and unfunded postretirement medical expenses as a debt equivalent…it is as if the company must borrow money to fund the plan."[58] I have included the unfunded pension liabilities in the derivation of the market multiples for comparable companies.

Following is a comparison of the LTM September 30, 2007 guideline companies' EV/EBITDA multiples with and without adjustments to include unfunded pension liabilities, and the resulting impact of Total Asset Value.

### Maxwell's Guideline Company Multiples: Unfunded Pension Liabilities

| | LTM EV / EBITDA | |
|---|---|---|
| | Maxwell Guideline Company Multiples | Adjusted Guideline Company Multiples [1] |
| **Petrochemical Companies:** | | |
| BASF SE | 5.2 | 5.3 |
| The Dow Chemical Company | 7.1 | 7.5 |
| Eastman Chemical Co. | 6.2 | 6.6 |
| Braskem S.A. | 3.5 | 3.5 |
| Nova Chemicals Corp. | 6.6 | 6.9 |
| Westlake Chemical Corp. | 5.2 | 5.3 |
| **Median** | **5.8x** | **5.9x** |
| | | |
| **Refining Companies:** | | |
| Valero Energy Corp. | 4.9 | 5.0 |
| Sunoco Inc. | 5.3 | 5.5 |
| Tesoro Corporation | 5.1 | 5.2 |
| Frontier Oil Corp. | 4.9 | 4.9 |
| Holly Corp. | 4.8 | 4.8 |
| Western Refining Inc. | 5.3 | 5.3 |
| Alon USA Energy, Inc. | 5.1 | 5.1 |
| **Median** | **5.1x** | **5.1x** |

<u>Note:</u>

(1) Adjusted multiple is calculated as original Maxwell Enterprise Value (pages 40 & 41) plus FY2006 Unfunded Pension Liability (sourced from the FY 2006 10Ks or 20-Fs) divided by Maxwell's LTM EBITDA (calculated from EV/EBITDA multiple, pages 40 & 41).

---

[58] Ibid, page 172.

**CONFIDENTIAL**

### Maxwell's Adjusted Conclusion of Value based on Unfunded Pension Liabilities Adjustment

| ($ in millions) | Petrochem | Refining | Total |
|---|---|---|---|
| LTM EBITDA[1] | $ 3,190 | $ 1,186 | $ 4,376 |
| Adjusted LTM EBITDA Multiple | 5.9x | 5.1x | 5.7x |
| Maxwell Adjusted Conclusion | 18,969 | 6,103 | 25,072 |
| Maxwell Concluded Value | 18,501 | 6,049 | 24,550 |
| **Impact on Value** | $ 468 | $ 54 | $ 522 |

**Note:**
(1) Total EBITDA allocated using LTM 9/30/07 adjusted EBITDAs, Maxwell Report, page 20.

As shown in the above table, had Maxwell properly adjusted EBITDA in his comparable company analysis for Unfunded Pension Liabilities, his analysis of indicated value would increase by $520 million.

### vii.   TEV Cash Treatment

Maxwell's comparable company analysis applies a "TEV" multiple derived by subtracting cash from the enterprise value of the peer companies. However, Maxwell's use of this approach is flawed because he does not utilize the full amount of LBI cash in reaching his related conclusions of its indicated value. A consistent treatment of cash following Maxwell's TEV approve would result in a higher indication of value by $479 million.

### viii.   Foreign Exchange Differences

When comparing the Maxwell Report to my report, I observed a difference in the exchange rates used to determine LBI's EBITDA. In determining the LBI 2006 and LTM September 30, 2007 EBITDA, I used the spot rate as of September 30, 2007, which was used by LBI in its unaudited pro forma combined financial statements and is generally consistent with the translation method used by Capital IQ. In his guideline company analysis, Maxwell applied a foreign exchange rate based on the average daily exchange rate for 2006 and the LTM September 30, 2007 period to the Basell historical financials. If I used Maxwell's approach as opposed to the approach

**CONFIDENTIAL**

descrived above, it would have resulted in a lower concluded value of TIC in my analysis of only $400 million.[59]

### E. Comparable Transaction Analysis

The comparable transactions presented in Maxwell's report do not appear to follow any prescribed screening process to determine comparability. My analysis lays out a comprehensive approach for identifying all publicly available information proximate to the Test Date and identifies a larger group of comparable transactions. In reviewing the footnote disclosures of his Transaction Comparables exhibit,[60] it is clear that Maxwell inconsistently and selectively uses EBITDA and other assumptions regarding the respective acquisition targets, including outdated financial information, which results in lower multiples. See the summary comparison – Exhibit 4.

Maxwell uses LTM September 30, 2007 petrochemical multiples that are lower than the multiples used in his guideline company analysis over the same period.[61] Maxwell's results are illogical. Since transaction multiples reflect the value associated with obtaining a controlling interest in a company, and the comparable company analysis reflects trading values that represent a minority interest, all else being equal, transaction multiples would be higher than comparable company multiples.

Maxwell's comparable transaction analysis also contains several errors, which when corrected increase his Total Asset Value. First, Maxwell's calculation of the INEOS/Innovene transaction is presented incorrectly at 5.2x[63] compared to my calculated multiple of 6.2x ($10.7 billion transaction value divided by $1.7 billion in LTM EBITDA).[64] Correcting for this error would increase Maxwell's median

---

[59] Applying the average daily exchange rates for the respective periods in computing the LBI combined EBIT and EBITDA, my indication of value under the guideline company and transaction methods would change from $33.1 billion to $32.0 billion, or a decrease of 3.3% and from $37.4 billion to $36.5 billion, or a decrease of 2.4%, respectively, resulting in a hypothetical total adjustment to indicated FMV of TIC of only $400 million.
[60] Maxwell Report, pages 44-45.
[61] Maxwell Report, pages 20 and 22.
[63] Maxwell Report, page 44.
[64] Kearns Report, Exhibit S.

**CONFIDENTIAL**

petrochemical multiple from 5.2x to 6.2x,[65] resulting in an approximate 20% increase in indicated value under that portion of Maxwell's calculation.

Second, in calculating the EBITDA multiple for Lyondell's acquisition of the remaining 41.25% stake in the Houston refinery, Maxwell's attempts to annualize the EBITDA based on year-to-date results through June 30, 2006.[66] It appears that Maxwell simply doubled the June 30, 2006 EBITDA. The correct approach is to utilize the EBITDA from the last twelve months as of the transaction date. Correcting for this error increases the multiple for that transaction from 5.7x to 9.1x. (See Exhibit 4.)

The impact of making the above two modifications to Maxwell's comparable transactions analysis increases his value by $3.81 billion, as shown in the following table.

### Maxwell's Transaction Analysis:
### Impact of Modifying INEOS/Innovene & Lyondell/Citgo

| ($ in millions) | Petrochem | Refining |
|---|---|---|
| **Implied Midpoint Multiples** | | |
| Maxwell Multiples | 5.2x | 5.9x |
| Modifying INEOS/Innovene & Lyondell/Citgo | 6.2x | 6.6x |
| **Implied Enterprise Value ($)** | | |
| Maxwell Value | | 22,490 |
| Adjusted Value | | 26,295 |
| **Impact on Value** | | $ 3,805 |

### i. Transactions Omitted in Kearns Report

I note that the Maxwell report includes two transactions that I did not use. First, I did not include the Access acquisition of Basell in 2005 because, after considerable research, I could not find public disclosure of the transaction details needed to determine the multiples. Had I included that transaction and used the 7.1x multiple cited by Maxwell, then the median chemical multiple in my Comparable Transaction analysis would change from 7.4x to 7.1x, the selected multiple changes from 7.1x to

---

[65] The Duff Report analysis also uses a multiple of 6.2x.
[66] Maxwell Report, page 45.

**CONFIDENTIAL**

6.9x and the corresponding weighted indication of value would change from $37.4 billion to $36.4 billion, or a decrease of 2.67%.

The second transaction used by Maxwell is the Westlake acquisition of Eastman in October, 2006. Capital IQ did not identify EBITDA multiples for this transaction and, hence, I used only the disclosed EBIT multiple of 3.3x in my calculation. The Maxwell report shows a TEV/EBITDA multiple of 3.2x which he appears to have miscalculated (as TEV/EBITDA multiples are generally greater than the corresponding EBIT multiples). Had I used Maxwell's calculation of this multiple along with the 7.1x Basell multiple, then my median chemical multiple hypothetically would have been 7.0x, the Selected Multiple would be 6.9x and the corresponding weighted indication of value would change from $37.4 billion to $36.4 billion, or a decrease of 2.67%. Applying this $1 billion change in indicated value under the Guideline Transaction Approach to the 20% weighting I attribute to this approach, results in a hypothetical adjustment of $200 million to my TIC fair market value conclusion.

## F. Maxwell Exhibit E

Maxwell Exhibit E presents a comparison of equity analysts' EBITDA earnings estimates of Lyondell for 2007 and 2008 to the July 15, 2007 Management forecast.[67] Exhibit E illustrates selected equity analysts' EBITDA estimates for 2007 and 2008, made between April 12, 2007 and July 17, 2007. Maxwell's analysis fails to consider evaluating equity analysts' earnings trend estimates during the remainder of 2007. As outlined in Exhibit D to the Kearns Report, analysts' earnings trends estimates in 2007 reveal that some analysts maintained or increased their EBITDA earnings estimates for the Company's peers during the course of the year. In addition, as discussed in the Kearns Report (as well as by Intille and Young), market expectations of the timing of the next anticipated trough was being extended since capacity, particularly in the Middle East, was not coming on line as quickly as expected.

---

[67] Maxwell Report, page 34.

**CONFIDENTIAL**

### G. Adjusted Balance Sheet Test

Although Maxwell does not perform an adjusted balance sheet test, he states that the Company's balance sheet at December 20, 2007 supports his overall solvency analysis, and that the Company had "a negative tangible net worth of $5.8 billion."[68] This assertion fails to consider a number of factors. The basis of presentation of the audited consolidated balance sheet at December 31, 2007 (Exhibit F to the Kearns Report) was:

- Assets and liabilities of LBI's predecessor – legacy Basell – were reported on an historical basis since its incorporation in 2005 (see footnote 1 to the consolidated financial statements).

- The accounts of Lyondell (the acquired entity for financial reporting purposes) reflected the allocation of the purchase price of the Acquisition to the assets acquired and liabilities assumed at December 20, 2007 (see footnotes 2 and 3 to the consolidated financial statements).

The adjusted balance sheet test, however, does not support Maxwell's analysis. The consolidated stockholder's equity as of December 31, 2007 was $1.921 billion, i.e., the amount by which total assets exceeds total liabilities under generally accepted accounting principles ("GAAP"). In my opinion, after performing the adjusted balance sheet test, the amount by which the fair value of total assets exceeds total liabilities at that time would substantially exceed $6 billion,[69] since among other things:

- The amounts reflected for legacy Basell's total assets (roughly $9 billion) are recorded under GAAP at their historical cost. The fair value of legacy Basell's total assets less liabilities would exceed the book value, prepared on a GAAP basis, of $1.9 billion, as reflected in my valuation analysis and as determined by Merrill Lynch based on their valuation analysis in April 2007 (before the increase in Basell's 2007 results as compared to 2006 – see

---

[68] Maxwell Report, page 5.
[69] Comprised of the sum of (i) stockholder's equity, (ii) add back for deferred taxes related to purchase accounting, at a minimum and (iii) estimated value of synergies, less OID as reflected in the consolidated balance sheet.

**CONFIDENTIAL**

Section VII E). Consequently, it is reasonable to assume that fair value of legacy Basell's assets would be substantially higher than book value reflected on a GAAP basis at the Acquisition date for legacy Basell (see section III C).

- Deferred tax liabilities include an allocation of $4.1 billion pertaining to accounting for the allocation of the Acquisition purchase price (including step up, for accounting purposes, of Lyondell's acquired assets), which liability is not a Debt for solvency purposes.

- There is no value reflected on a consolidated balance sheet on a GAAP basis for synergies.

- Debt would need to be increased to consider OID of $200 million.

## V.    The Tuliano Report

I reviewed the Tuliano Report, and I affirm my conclusions reached in the Kearns Report. The Company was adequately capitalized as of the Test Date, December 20, 2007, and had the ability to pay its debts as they came due. In reaching his conclusions regarding the Company's level of capital and its ability to pay its debts as they come due, Tuliano makes several assumptions that I believe are not only inconsistent with the facts in this case, but are internally inconsistent within the context of his report. He also misinterprets facts, draws conclusions based on sound-bites and innuendo, and uses selective data mining to make certain points.

### A.    Tuliano Chronology

Section V A through E of the Tuliano Report discusses a chronology of events leading up to the Acquisition. This section includes numerous pages with dozens of excerpts of emails from Access employees and, to a lesser extent, the Lead Arrangers. Generally speaking, these emails can be categorized as discussions of, among other things, (i) consideration of an equity contribution by Access, (ii) issues related to the ultimate Acquisition price of $48/share, (iii) leverage, (iv) cyclicality, (v) the Berre refinery and (vi) changes to projections.

This discussion in the Tuliano Report does not contribute to a determination as to whether the Company had adequate capital. I simply note the following:

35                                                   **CONFIDENTIAL**

- With respect to emails concerning an equity contribution Access, as discussed in the Kearns Report, page 16, Access contributed its substantial equity interest in Basell to the Acquisition.

- With respect to emails among Access defendants regarding the price to be paid for Lyondell, I understand that "concerns" raised by Access personnel regarding share price all pertained only to the impact that a higher share price would have on Access' return on this equity investment.

- With respect to emails concerning cyclicality, see the Kearns Report, Section VI, for a discussion of potential risks (including cyclicality and leverage) and related mitigants assessed by the Lead Arrangers.

- With respect to the Berre refinery, my Stress Tests considered the impact to liquidity of the Berre acquisition (see Kearns Report, Section VI).

- With respect to emails concerning the Projections, as discussed in my report (as well as the O'Connor, Intille and Young Reports), the Projections were prepared based on appropriate management practice, reflect key underlying assumptions that were reasonable at the time and were vetted contemporaneously by CMAI and Turner.

### B.    Financial Projections

Tuliano concludes that management's financial projections supporting the Acquisition were unreasonable and that contemporaneous downside projections fail tests for capital adequacy and ability to pay debts as they come due.[70] Tuliano's conclusions are incorrect and misleading due to his failure to consider and analyze the most appropriate set of financial projections. For his capital adequacy analysis, Tuliano places unfounded (if not 'cherry picked') reliance on outdated and underdeveloped downside cases (all of which predated the Projections). I disagree with his choice of projections and his assessment of their reliability relative to other available projections, namely the Projections.

The three sets of projections used by Tuliano include: (i) the Merrill Lynch April 10, 2007 Credit Stress Test, (ii) the Merrill Lynch July 10, 2007 Downside Case, and

---

[70] Tuliano Report, page 2.

(iii) the Citibank July 15, 2007 Downside Case.[72]  The extreme conditions modeled in the downside cases include the following:

- The April 10, 2007 ML Credit Stress Test Case was based on ". . . trough conditions that far exceed the levels seen in the 2002/2003 trough."[73]

- The July 10, 2007 ML Downside Case was a heavily sensitized update to an earlier Merrill Lynch presentation.[74]

- The July 15, 2007 Citibank Downside Case was developed to simulate a covenant violation as part of the Citibank credit approval process.

According to Tuliano, "[a] downside scenario is not necessarily a forecast of what most likely will happen, however, it is an assessment of *reasonably anticipated downside risks*."[75] (Emphasis added.)  Tuliano, however, does not evaluate whether the downside cases that he uses are based on "reasonably anticipated downside risks." In fact, Intille referred to the market conditions in the Citibank Downside Case as too severe and extremely unlikely to occur based on the information available in 2007.[76] O'Connor concluded that the Citibank Downside Case was very severe, given the market conditions prevailing in 2007.[77]

Tuliano fails to consider the available liquidity as of the Acquisition date in his "analysis" of the downside cases described above – which I correctly factored into my analysis based on the Stress Tests.  Adjusted liquidity as of December 31, 2007 was approximately $2.14 billion (Kearns Report, Exhibit E).

Tuliano also misunderstands the purpose of financial covenants.  Financial covenant violations do not indicate that a company is insolvent (many companies today would be insolvent by that measure).  Instead, financial covenants are designed to protect lenders, and are early warning mechanisms designed to alert lenders that additional measures may be needed to protect their investment in the company. Contrary to Tuliano's assertions, a covenant breach does *not* by itself suggest that a

---

[72] Tuliano Report, page 54.
[73] LYO-UCC00018310 – LYO-UCC00018327.
[74] LYO-UCC00019166 – LYO-UCC00019184.
[75] Tuliano Report, page 12.
[76] Intille Report, page 32.
[77] O'Connor Report, page 42.

**CONFIDENTIAL**

company is inadequately capitalized, is unable to pay its debts or is on the verge of failure.

Indeed, it is not uncommon for a company to request covenant amendments from its lenders during trough earning periods. Included in Exhibit 6, I have shown a listing of senior loan covenant amendment requests made by chemical companies in the last petrochemical trough (2001 to 2003) and during the period commencing September 2008. This analysis shows that many borrowers were able to secure multiple covenant amendment relief from their senior lenders, indicating a willingness on the part of their lenders to work through the trough with the borrower.

Tuliano states that "An evaluation of adequacy of capital should involve an assessment of the type and magnitude of setbacks that managers in a given industry have reason to anticipate in the course of operating a company over the course of a full business cycle."[78] Further, he states ". . . a company should consider the impact of reasonably large unfavorable swings in prices. For an industry subject to operational disruptions due to weather, accidents, or other factors, a company should consider the impact of unplanned shutdowns and other *reasonably foreseeable contingencies.*"[79] (Emphasis added). Tuliano ignores the fact that, while certain setbacks may individually be reasonably foreseeable, a near simultaneous *combination* of all of those setbacks would be exceedingly rare, and therefore not reasonably foreseeable. I developed my Stress Test Model to test the Company's tolerance for extreme conditions of lower EBITDA and increasing crude oil prices. The targeted minimum desired liquidity used in my Stress Tests (as discussed in the Kearns Report, Section VII and later in this report) appropriately considered unplanned shut downs and reasonably foreseeable contingencies. My Stress Test cases are compared to the downside cases prepared by the Lead Arrangers in the Kearns Report. As my Stress Tests demonstrate, the Company had sufficient liquidity to operate while meeting is financial covenants, but for the significant impact of unforeseeable events in late 2008.

---

[78] Tuliano Report, page 12.
[79] Ibid.

**CONFIDENTIAL**

**Peak to Trough Comparison**

Tuliano argues that the Management case projections (July 15 and September 26, 2007) failed to assume a sufficiently deep trough, based on the Company's combined pro forma results from the 2001 to 2003 trough.[80]  This is an invalid and misleading comparison, as the Company's operations and industry dynamics changed significantly since 2003 (e.g., the 2006 acquisition of the remaining interest in the Houston refinery and the change to the PDVSA contract, expanded joint ventures in Saudi Arabia and changes to Basell's physical plants).  Moreover, this argument also ignores the operational and cost-related synergies resulting from the Acquisition.  I discussed many of the key changes to the business since the 2003 trough, and how the combination of Lyondell and Basell would help the combined entity better weather the next trough in the Kearns Report.[81]

Some of the key differences between 2003 and the 2011 trough forecast are highlighted in the following summary, prepared by LBI:



[Source: LYO-UCC 00350340.]

---

[80] Tuliano Report, page 44.
[81] Kearns Report, pages 57 - 60.

**CONFIDENTIAL**

In addition to the information reflected in the preceeding chart, as discussed in the Intille and Young Reports, the combination of Lyondell and Basell created an entity positioned to better weather industry troughs because it was more diversified.[82] Complementary in geography, scale and integration, the combination of the two companies provided: (i) fuller market coverage; (ii) asset optimization opportunities; (iii) the ability to diversify product-specific trough risks; (iv) product line diversification; (v) technology leverage opportunities; and (vi) greater purchasing power. For example, Basell's position in international operations was primarily centered in Europe in contrast to its relatively small operations in the U.S. In contrast, Lyondell had a leading position in the U.S. Additionally, a well-integrated petrochemical company can generate incremental profits by optimizing how its plants and equipment are configured and connected. The Company's integration of the crude oil/chemical interface enabled the Company to capture the entire value chain between refinery-cracker-petrochemicals, and reduced its exposure to feedstock supplier issues. Also, the Houston Refinery "has demonstrated reliable operations in processing a low cost, heavy, sour crude slate for many years," and this capacity gives it a strategic advantage relative to many other U.S. refineries; and it "was well postured due to its size, complexity and location to be a significant USGC competitor for many years to come."[83]

The EBITDA peak to trough reductions in the Projections by segment are shown on the following figure:[84]

---

[82] Intille Report, page 27; Young Report, pages 49 - 57.
[83] Young Report, page 37.
[84] Maxwell Expert Report, pages 50-53; CIM; Merrill Lynch Debt Markets Commitment Committee, July 15, 2007; UBS Project Leo Final Global Syndicated Finance Commitment Committee Memorandum; Goldman Sachs Credit Review Basell/Lyondell, October 25, 2007; Citi Commitment Committee Approval Memorandum, July 15, 2007; and ABN AMRO Credit Memorandum, July 21, 2007.

**CONFIDENTIAL**





LBI Primary Segments: Peak to Trough EBITDA Change

Calculated based on maximum EBITDAs in 2007-08 and minimum EBITDAs in 2010-11

The peak to trough EBITDA levels included in the Projections were deemed reasonable by O'Connor, Intille and Young.[85]

Tuliano contends that management's projections reflect a 9% peak to trough decline using 2007 as the peak year.[86] This contention is misleading because the peak year was projected to be 2008 (see Section III). In fact, the Projections show an aggregate 29% EBITDA drop from the overall petrochemical 2008 peak forecast to the 2011 trough (excluding synergies). Each business segment was forecasted to have a different peak to trough EBITDA change, as well as timing differences. For example, the PO and EC&D segments were forecasted to drop up to 48% from the peaks to the troughs in either 2010 or 2011, whereas the specialized APO and PO&RP segments, which are less cyclical, were forecasted to remain stable or modestly grow during the petrochemical cycle. These specialty chemicals demonstrate diversity in LBI's overall business.

The refining segment EBITDA changes do not mirror the petrochemical segment changes because refining EBITDAs vary based on seasonality, as well crack spreads. In the Projections, refining EBITDAs were forecasted to drop 24% from the 2008 peak to the 2011 trough due to the expected tightening of crack spreads. O'Connor

---

[85] O'Connor Report, page 35, Intille Report, page 3, and Young Report, page 14.
[86] Tuliano Report, page 48.

41                                                                              **CONFIDENTIAL**

concludes that U.S. and global refining margins had moved to a higher level during the 2004 to 2007 period, and were positioned to be sustained or improved over the 2008 to 2012 period.[87]

## C.    Leverage

Tuliano indicates that LBI was overleveraged, and that its "borrowing capacity was substantially exhausted at the inception of the (Acquisition),"[88] and that the combination of Lyondell and Basell was solely financed with debt.[89]  He states that this high leverage would constrain the Company's ability to access additional bank borrowings, bond offerings, equity offerings and other potential sources of additional capital, and that its high leverage would impact the Company's trade credit.[90]

In reaching this conclusion, Tuliano ignores the fact that the Credit Agreement included two very significant liquidity sources; the ABL accordion feature ($600 million) and the indenture basket ($750 million).[91]  These two features provided LBI with access to an additional $1.3 billion of additional liquidity.  The accordion was funded in April 2008,[92] and the indenture basket was utilized in the form of the Access Revolver.

Tuliano concludes that LBI was excessively leveraged based on the fact that LBI's post-transaction debt burden was higher relative to other companies in the chemical and refining industries.[93]  His conclusion is based on a comparative ratio analysis of various metrics used to measure leverage, including debt, equity and coverage ratios.[94]  The seven chemical and seven refining companies on which Tuliano based his ratio analysis generally are comparable for valuation purposes, since they operate in the same industries as LBI.  However, for purposes of comparing leverage, it is appropriate to examine a broader universe of companies.

---

[87] O'Connor Report, page 4.
[88] Tuliano Report, page 2.
[89] Tuliano Report, page 62.
[90] Tuliano Report, page 2.
[91] Kearns Report, pages 17 and 33.
[92] Kearns Report, page 93.
[93] Tuliano Report, page 63.
[94] These ratios are Debt to EBITDA, Debt to Equity (book value), Tangible Equity (book value) to Tangible Assets, EBITDA less Capital Expenditures to Interest Expense and Debt to Total Assets and Liabilities to Tangible Assets.

**CONFIDENTIAL**

Tuliano's leverage analysis and discussion confirms only the obvious: LBI had higher post-transaction leverage compared to (1) LBI's pre-transaction levels and (2) the selected guideline companies, because of the undisputed fact that the LBI Acquisition was predominantly financed with debt.



The conclusion drawn from the comparison in the above chart is further corroborated by the charts in Exhibit 7. When analyzing metrics commonly used to assess leverage (most specifically Total Debt / EBITDA and ( EBITDA – Capex ) / Interest Expense), LBI's leverage is consistent with the leverage of companies from similarly cyclical industries. The ratios presented for tangible equity and tangible assets by Tuliano are not reported by Capital IQ. In my experience, these ratios may not provide a meaningful basis of comparison principally due to the effects of purchase accounting. My analysis included companies who provide publicly available financial statements.

Tuliano's leverage analysis is based on an application of selective comparables and circumstances. In particular, Tuliano's leverage analysis:

**CONFIDENTIAL**

1. Did not include a reasonable set of LBO comparables reflective of a similar capital structure to LBI.[95]

2. Did not include the expected Acquisition synergies and LIFO inventory adjustment that would increase LBI's EBITDA, and thereby reduce the implied leverage.

More leverage relative to other industry participants does not equal excessive leverage, as Tuliano improperly concludes.[96] More leverage simply means less available capital and less after debt free cash flow, but not failure or failure of relevant tests. More leverage does not equate to excessive leverage and adequate capital can still result, especially if the projections based on underlying assumptions reasonably foreseeable at the time demonstrate cash flow sufficient to service the increased leverage and operate the business.

A more meaningful and appropriate analysis of leverage looks at leverage over time. As illustrated below, it was expected that LBI would have substantial free cash flow in the near term to pay down its debt load significantly, which would decrease LBI's Debt to EBITDA ratio.

---

[95] I acknowledge that the Huntsman capital structure presented in Tuliano's report does not reflect a new LBO capital structure, such as the Company's.
[96] Tuliano Report, pages 63-64.

**CONFIDENTIAL**



In addition, LBI's post-transaction ratios presented by Tuliano are not representative of a more normalized capital structure that was projected for the Company. Tuliano acknowledges that, in structuring an LBO, careful attention is paid to ensure that a company is left with adequate capital.[97] In fact, many sophisticated parties involved with the Acquisition paid careful attention to the transaction and projected cash flow. In Section VI of the Kearns Report regarding my Stress Test analysis, I assessed and concluded that LBI had the ability to pay debts as they came due while still maintaining adequate liquidity and meeting covenants.

Although LBI was clearly a much different company than legacy Lyondell or legacy Basell, I observed that Lyondell managed its operations during past business down cycles with significant leverage.

### D.    Liquidity

Tuliano concluded that the Company had insufficient liquidity to fund its business.[99] I have considered Tuliano's report in which he described the process through which he reached the above conclusion, and have determined that his

---

[97] Tuliano Report, page 1.
[99] Tuliano Report, page 3.

45                                    **CONFIDENTIAL**

conclusions result from a combination of factual inaccuracies, erroneous assumptions and misleading interpretations of internal Company data and communications.

### Definition of Liquidity

Despite emphasizing the critical importance of liquidity in determining capital adequacy, Tuliano doesn't specifically define the term as it relates to the Company.

The Company defined liquidity and fully disclosed it in every month's controlling report. Therein, liquidity was defined to be "... the global cash balance plus availability remaining under the combined AR, inventory, revolver and Access revolver taking into account the borrowings, letters of credit and the minimum excess availability of the (ABLs) of $100 million." Consistently employing that definition, the Company quantified and disclosed its liquidity ('Liquidity') as being a *historical snapshot of cash availability as of a single date* (i.e., at a single point in time).[100]

### The Tuliano Concept of "Excess Liquidity"

Tuliano introduces the concept of "excess liquidity," and uses that term extensively to assert that the Company was not adequately capitalized and didn't have the ability to pay debts as due.[101] As more fully described below, Tuliano draws erroneous conclusions based on misinterpretations of internal company data and communications.

Tuliano concluded that the Company's December 20, 2007 opening balance of liquidity ($2.3 billion) was misleading and/or erroneous because it did not factor in a number of *future cash outflows and other deductions* including, but not limited to:[102]

- March 31, 2008 funding for the Berre acquisition - $535 million
- February 29, 2008 funding for the Solvay acquisition - $130 million
- Transaction expenses expected to be paid prior to March 31, 2008 - approximately $300 million.
- Seasonal cash requirements including property taxes, bonuses, customer rebates and other uses of cash.

---

[100] See, for example, page 11 of the Company's June 2008 controlling report.
[101] Tuliano Report, pages 25, 96-97.
[102] Tuliano Report, page 3.

**CONFIDENTIAL**

Tuliano then described "excess liquidity," which has nothing to do with actual liquidity on the indicated date, but essentially represents *his projection* of an amount that began with the Company's reported Liquidity and artificially reduced that Liquidity by certain expected *future cash outflows* from operations (taxes, rebates, bonuses) and from financing and investing activities.[103]

The following table demonstrates Liquidity reported by the Company at December 20, 2007 compared to the excess liquidity amount determined by Tuliano.[104]

### LBI Liquidity vs. Tuliano "Excess Liquidity"

| ($ in millions) | LBI | Tuliano | Reasons for Differences Factual Errors | Other | Notes |
|---|---|---|---|---|---|
| Gross liquidity at 12-20-07 | $ 2,428 | $ 2,428 | | | |
| Add / (Deduct): | | | | | |
| Availability constraint | (100) | (100) | | | |
| Basell non-pooled cash | | (40) | $ (40) | | 1 |
| Subtotal | 2,328 | 2,288 | | | |
| Unfunded commitments at 12-20-07 | | | | | |
| $300m transaction expenses | | (300) | | $ (300) | 2 |
| Reserve for Solvay acquisition | | (130) | | (130) | 2 |
| Reserve for Berre acquisition | | (535) | | (535) | 2 |
| Uncertain timing of daily collections, etc. | | (300) | (300) | | 3 |
| Receivables and inventory availability constraints | | (50) | (50) | | 4 |
| Basell non-pooled cash | | (47) | (47) | | 1 |
| **Liquidity at 12-20-07** | $ 2,328 | $ 926 | $ (437) | $ (965) | |

**Notes:**
(1) These amounts are erroneously deducted from Liquidity. Twitchell stated that non-pooled and in-transit cash items in fact were available to be used for operations.
(2) These differences represent expenditures that Tuliano deducts from December 20, 2007 Liquidity despite the fact that these payments were to be paid at various dates through March 31, 2008.
(3) This is not an expected expenditure at all, but rather a reminder for Twitchell to notify Access management and instruct them, if requested, to advance funds to the Company.
(4) This is not an expected expenditure at all, but rather a reminder for Treasury personnel to exercise caution in the event they projected that availability under the combined receivable and inventory ABLs fell below $150 million.

Three of Tuliano's deductions in the table above warrant special discussion: uncertain timing of daily collections ($300 million), receivables and inventory availability constraints ($50 million) and Basell pooled/non-pooled/in-transit cash

---

[103] Tuliano Report, pages 80-82.
[104] Tuliano Report, pages 80-82.

**CONFIDENTIAL**

($87 million), the sum of which totaled $437 million at December 20, 2007.[105] Tuliano took these three items from Twitchell deposition Exhibit 34 and concluded that they represented prudent and required deductions from Liquidity.

During her November 13, 2009, interview Twitchell confirmed that Tuliano misinterpreted Exhibit 34, and that these three items should not be excluded from liquidity. Specifically, she noted that: (i) The Basell pooled/non-pooled cash items were in fact accessible, but required management to consider the process required to transfer the funds, and (ii) the $300 million timing uncertainty and the $50 million availability constraint represented nothing more than internal notification reminders to treasury personnel. The timing uncertainty, for example, was merely a reminder for Twitchell to notify Access management if liquidity approached $300 million. Tuliano's projected analysis of "excess liquidity" also ignores the Company's expectation for the generation of free cash flows in 2008.

Tuliano's analysis is inconsistent in that he reduces opening liquidity for future *uses* of liquidity to which LBI is committed (e.g., the Berre and Solvay acquisitions), yet he does not increase opening liquidity for future *sources* of liquidity.[107] For example, Tuliano's "excess liquidity" omitted the following five cash inflows that were likely to occur during the same period as his outflows:

### 1. Upsizing of the Inventory ABL Facility

At the Acquisition date, the Company had the contractual right to upsize its ABL Inventory facility by $600 million. See the related discussion in the Kearns Report.[108] From inception, the senior secured inventory-based credit agreement expressly gave the Company the right to increase this facility by $600 million, at terms and conditions identical to those in the existing Inventory ABL. During her interview, Twitchell noted that all parties had understood, from the beginning, that the Company intended to upsize the facility in the event that escalating hydrocarbon feedstock costs neccesitated additional liquidity to finance the Company's increasing working capital.

---

[105] In future months, however, the total of these items changed, depending upon the amount of Basell cash that Tuliano excludes. For example, the adjustment for these three items grows to $529 million, $559 million, $575 million and $512 million at the end of December 2007, January 2008, February 2008 and March 2008, respectively.

[107] Tuliano Report, pages 80-82.

[108] Kearns Report, page 95.

**CONFIDENTIAL**

Tuliano asserts that the upsizing of the ABL facility "ultimately placed LBI at an even greater liquidity risk" because, if oil prices declined, the Company's inventory borrowing capacity would likewise decline.[109] This assertion is misleading. While it is true that declining oil prices lead to a decline in inventory (and its related borrowing base), the net value of the remaining two working capital components (accounts receivable and accounts payable) in fact increases. This is because accounts receivable decline later than do inventory costs (since customer price reductions lag inventory cost decreases), whereas accounts payable decline contemporaneously with inventory costs.

I discussed this concept with Mario Portela in the context of management's sensitivity analysis of the liquidity impact of an increase in the price of crude oil (see Kearns Report, page 38). Portela indicated that the liquidity impact of an increase in crude oil prices (negative net cash flow of $19.3 million for $1 per barrel increase) would be mirrored by a similar decrease in oil prices – positive net cash flow of $19.3 million for every $1 per barrel *decline*.

Notwithstanding the dramatic decline in crude oil prices, at every month end from the closing date through October 31, 2008, the collateral value of inventories exceeded the maximum borrowing capacity of the facility. Furthermore, the new collateral added in connection with the April 30, 2008 ABL upsizing consisted of less volatile chemical segment inventories, which in turn reduced the volatility of the collateral base. By adding this collateral, the Company reduced its exposure to sudden swings or repayments under its ABL inventory facility.

ABL facilities in this context are thus not a "gamble" as Tuliano suggests.

At the same time as the Company expanded this Inventory ABL facility, it entered into other modifications of its arrangements under the senior secured loan agreement. Among other things:

- The Company obtained additional liquidity and contingent liquidity as follows:
  o The right to further expand the Inventory ABL facility by an additional $500 million,

---

[109] Tuliano Report, page 94.

**CONFIDENTIAL**

- An immediate $250 million expansion of its "debt basket" included in the revolving credit agreement,

- Expansion of the definition of eligible collateral to include a $150 million increase in high seas inventory.

- The banks modified the terms of the financial covenants by allowing the Company to employ FIFO inventory accounting when submitting required financial information.

- The Company agreed to a LIBOR floor of 3.25% on the Term Loan B facility for three years.[110]

Although Tuliano invokes certain payments and modifications made at the time that the accordion was implemented, when concluding that LBI obtained no meaningful increase in credit during the April 2008 negotiation he failed to consider the additional liquidity and agreements set forth above, and other potential liquidity sources.

## 2. Access Unsecured Revolving Credit Facility

At the Acquisition date the senior secured credit agreement provided a $750 million debt basket for the Company's use. Ms. Twitchell noted that the March 2007 addition of the Access Revolving Credit Facility took advantage of that debt basket. Tuliano states that the liquidity represented by the Access Revolver was "largely illusory,"[111] due at least in part to a material adverse change clause ("MAC") in the credit agreement.[112]    A MAC is a common clause included in credit agreements. Indeed, MAC clauses were included in the credit agreements involving the Financing Party Defendants, none of which used their MAC clauses to withhold funding. In fact, Access funded the Revolver in October 2008, and only invoked the MAC in late December 2008, shortly before the Debtors filed for bankruptcy protection.    The inclusion of a MAC is not an indication that the lender will refuse to provide financing under the agreement, as Tuliano concludes.

---

[110] The LIBOR curve in April 2008 was below this floor.  However, the LIBOR rate used in my Stress Tests is 4.4% (see Kearns Report, Exhibit E), substantially above 3.25%.
[111] Tuliano Report, page 95.
[112] Tuliano Report, page 95.

CONFIDENTIAL

As noted in the Kearns Report, page 40 and Exhibit E, I did not include availability under the Access Revolver in my determination of liquidity.

### 3. Proceeds from Bayer litigation

In 2006, Lyondell had obtained an arbitration award related to a contract dispute with Bayer. The amount of the award was $144 million plus interest from the date of the award. Bayer appealed the award, but ultimately withdrew the appeal, and paid LBI $157 million in 2008 as a final settlement.[113]

### 4. Sale of Legacy Lyondell's TDI Business

LBI's third quarter 2008 financial statements disclosed that on September 1, 2008 LBI closed on the sale of its Toluene Diisocyanate ("TDI") business. LBI received $113 million in proceeds from this sale, subject to adjustment based upon the agreed value of working capital at the closing date.[114] Based on email correspondence and my interview with Dan Smith, I understand that Lyondell management had been actively pursuing this sale prior to the Acquisition date.[115]

### 5. Insurance proceeds

Prior to the Acquisition, legacy Basell had filed an insurance claim for damages sustained in 2005 at a German polymers plant. LBI received proceeds of $79 million in 2008 (including $52 million in May 2008).[116]

Tuliano's determination of "excess liquidity" did not consider any of these anticipated cash receipts. Indeed, had Tuliano included only the inventory ABL $600 million upsizing in his analysis, there would have been positive "excess liquidity" (as used by Tuliano) throughout the period shown in Figures 27 and 28 of the Tuliano Report.

---

[113] LBI Consolidated Financial Statements for December 31, 2008, page 21.
[114] LBI Quarterly financial report for September 30, 2008, page 11
[115] LYO-UCC 00132606.
[116] LBI Consolidated Financial Statements for December 31, 2008, page 19.

**CONFIDENTIAL**

Although not set forth in his "excess liquidity" tables, Tuliano stated that LBI's opening Liquidity was insufficient to fund what he characterized as a group of one-time seasonal items which he totals as $470 million.[117] This amount includes $185 million related to bonuses, which included payouts for the change of control triggers in certain Lyondell personnel compensation agreements. Consequently, one half to two thirds of these bonus payments were one-time events, outside of the ordinary course, and thus non-recurring.[118] In addition, this amount includes $179 million for product rebates, which would be reduced in a "stressed" period with lower sales volume. I considered the recurring ordinary course need for those seasonal items (and minimum liquidity at year-end of $1.4 billion, which assumes no availability under the Access Revolver) in my Stress Tests. (See Kearns Report, pages 39 and 40 for a discussion of the amount of first quarter, ordinary course, seasonal liquidity needs of $300 million to $400 million considered in my Stress Tests.)

While he does not reduce liquidity for this amount, Tuliano further asserted that the Company should have set aside sufficient opening Liquidity to pay $250 million of original issue discount ("OID") in the event the lenders had not syndicated the debt by June 2008.[119] My interviews with Dan Smith, Karen Twitchell and Charles Hall revealed that, at the Acquisition date, there was no indication that the Company would have to pay this contingent payment. At that time, Company management was informed that the Lead Arrangers had determined to wait until the spring 2008 to syndicate the Term B. In December 2007, the Lead Arrangers had determined that the syndication markets would improve after the new year.[120] For example, Citibank was of the view that LBI was a better syndication deal than others in the market at the time due to its lower leverage, better rating and inclusion of covenants in its structure.[121] The Lead Arrangers viewed the syndication challenges as a function of the generally weak capital markets rather than a reflection on the Company's creditworthiness or the deal.[122] Neither the Company's audited financial statement

---

[117] Tuliano Report, page 81.
[118] Per interview with Karen Twitchell.
[119] Tuliano Report, page 4.
[120] Deposition of Douglas Lane, page 115.
[121] Deposition of Robert Jeffries, page 241
[122] Deposition of Robert Jeffries, pages 242 and 256.

**CONFIDENTIAL**

disclosures regarding contingent liabilities (as required by generally accepted accounting principles), nor Lyondell's disclosures in its Form 10-K (as required by the SEC), made any mention of this OID as being contingent.

Tuliano's notion of excess liquidity ignored the reality of the Company's business. Tuliano knew that the Company would both disburse cash and collect cash during the projection period, but his conclusions depended upon his omission of the latter. The following chart is a summary of the items not included in Tuliano's opening liquidity.

### Increases to Opening Liquidity Excluded by Tuliano
*($ millions)*

| Description | | Value |
|---|---|---|
| Inventory ABL Facility Upsizing[1] | $ | 564 |
| Access Unsecured Revolving Credit Facility | | 750 |
| Proceeds from Sale of TDI Business | | 113 |
| Proceeds from Basell Insurance Settlements | | 79 |
| Sub-total | | 1,506 |
| Proceeds from Bayer Arbitration Award | | 144 |
| Increases to Liquidity Reasonably Anticipated as of Transaction Date | $ | 1,650 |

**Notes:**
(1) ABL facility of $600 million *less* one-time facility cost of $36 million.
(2) Dollars in millions.

## Minimum Liquidity

My analysis of the Company's opening balance sheet has shown that the Company had sufficient Liquidity to operate the business. At the Acquisition date, the Company needed liquidity in an amount sufficient to fund (a) its expected financing and investing needs, including one-time costs, net of expected one-time cash inflows, and (b) its ongoing normal operating needs thereafter.

CONFIDENTIAL

### a. Known one-time cash inflows and outflows:

Below is a summary of one-time cash outflows and inflows, known to the Company and considered in my analysis of liquidity in my Stress Tests (Kearns Report, Section VII):

#### Adjustments to Opening Liquidity for Known One-time Cash Inflows and Outflows

*($ millions)*

|  | Actual | | Kearns | |
|---|---|---|---|---|
| Berre Acquisition | $ | (535) | $ | (535) |
| Solvay Acquisition | | (130) | | (130) |
| Basell Insurance Proceeds[1][2] | | 79 | | |
| | | | | 115 |
| TDI Net Sale Proceeds[2][3] | | 113 | | |
| Bayer Litigation[4] | | 144 | | - |
| **Reduction to Opening Liquidity** | $ | (329) | $ | (550) |

(1)   LBI U.S. GAAP Quarterly Financial Reports for:
      Q1 -   $52   million (p. 23 Insurance Claims)
      Q2 -     9   million (p. 30 Other Income)
      Q3 -   <u>18</u>   million (p. 39 Other Income)
         $79   million total proceeds

(2)   In my opening liquidity analysis given that these proceeds were reasonably foreseeable, I used 60% of actual proceeds as a proxy for contemporaneous expected additional liquidity as of December 31, 2007.

(3)   LBI U.S. GAAP Quarterly Financial Report for Q3, footnote 4 on page 11.

(4)   Kearns excludes any benefit from the anticipated Bayer Litigation proceeds.

In my Stress Tests and analysis of opening liquidity net of one-time events, I determined that $550 million would have been a reasonable estimate of known one-time net cash outflows at December 31, 2007.

### b. Ongoing normal operating needs:

The Company needed sufficient liquidity to finance its ongoing needs, including:

- Seasonally high cash outflows during the first quarter of each year,

- Liquidity cushion to protect against unexpected, infrequently occurring events (e.g., scheduled and unplanned plant outages, weather-related events, etc.).

**CONFIDENTIAL**

**"Contingent Liquidity Needs"**

Tuliano references a liquidity analysis created by Lyondell in December 2006 and concludes that Lyondell alone needed up to $1.675 billion of contingent liquidity.[123] To reach that conclusion, he would have to be able to assume that management believed that all of these contingencies were likely to occur nearly simultaneously.

During her interview, Karen Twitchell indicated that this schedule was developed in response to Lyondell business units' requests to enter into energy hedges.[124] Twitchell stated that she did not intend for this schedule to represent an estimate of the minimum liquidity needs of the business as Tuliano suggests. Twitchell further emphasized that the chart was not intended to be additive and was simply a "what if" type of analysis that she prepared for the sole purpose of discussing the aforementioned hedge requests. I have reproduced and adjusted the chart below to consider potential contingent needs of LBI:

**LBI Contingent Liquidity Needs**
*($ in millions)*

| | Per LBI April 2008 Lyondell (Dec 2006)[1] | | Adjusted Lyondell[2] | | Implied Basell[3] | | Total Pro Forma LBI | |
|---|---|---|---|---|---|---|---|---|
| | Lo | Hi | Lo | Hi | Lo | Hi | Lo | Hi |
| Unplanned Downtime (one plant)[4] | $150 | $350 | $150 | $350 | $0 | $0 | $150 | $350 |
| Large Turnarounds[5] | 75 | 175 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weather[6] | 150 | 500 | 150 | 250 | 0 | 0 | 150 | 250 |
| Margin Calls[7] | 150 | 250 | 150 | 250 | 0 | 0 | 75 | 125 |
| Working Capital[8] | 200 | 400 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | $725 | $1,675 | $450 | $850 | $0 | $0 | $375 | $725 |
| | | | | | | Average | $550 | |

Notes:
(1) Source: April 2008 Report slide titled "Legacy Lyondell Contingent Liquidity - Dec 2006" (LYO-UCC 00385980).
(2) Based on conversations with D&O's of Lyondell/Basell.
(3) Basell did not face the same associated contingent factors.
(4) Unplanned downtime not included for Basell as it is intended for one plant (i.e. Houston Refinery or Channelview).
(5) Large turnarounds are reflected in the capital expenditure budget and are excluded in the Adjustments.
(6) Weather not applicable to Basell due to location of most plants in Western Europe; Weather contingency only applicable to Hurricane Season (normally August-October).
(7) Margin calls are related to December 2006 LYO presentation contemplating entering into crude forward contracts and the potential impact on liquidity.
(8) Working Capital is excluded from our calculation as Capstone stresses for changes in working capital in its model that measures minimum liquidity levels.

---

[123] Tuliano Report, pages 41 and 42.
[124] These hedge contracts were being contemplated to lock in margin around the time that Lyondell had recently closed on the remaining interest in the Houston refinery and renegotiated the PDVSA contract.

**CONFIDENTIAL**

i. Large turnarounds are planned months or years in advance. Twitchell noted that the $75 million to $175 million estimate included in her December 2006 schedule would have included both Capex spending, maintenance expenses and some lost opportunity costs. Twitchell confirmed that these items would have been included in the operating plan (a planned impact on EBITDA and planned Capex) and would have been absorbed over many months, and thus would not create an immediate hit to liquidity. Therefore, on this basis, the large turnaround category is excluded from my adjusted contingent liquidity needs.

ii. The "weather" contingency line item represented the potential impact of a hurricane on Gulf Coast facilities, particularly the Houston refinery. The high end of the range of $500 million represented Lyondell's self-insurance amounts in 2007. The locations of Basell's primary facilities are such that "weather" is a Lyondell-specific concern. Twitchell noted that LBI's insurance coverage was improved in November 2007, reducing the self-insurance amounts to approximately $250 million, which went into effect in early 2008. The combination of amounts for unplanned downtime and weather coincidentally approximates 2008 losses related to the crane accident and two hurricanes.[125] O'Connor states that, while it is a given that hurricanes and unscheduled outages are facts of life in refining, the coincident series of events that occurred in 2008 was far more than normal planning contingencies would include.[126]

iii. The margin calls contingent line item represented the high end of potential exposure under oil hedges being considered in late 2006. LBI did eventually implement a trading program in 2008 although its program did not approach the magnitude of this range. Thus, I have included 50% of the 2006 estimated range in the pro forma LBI amounts.

---

[125] Kearns Report, pages 88 and 89. Also, note that substantially all of LBI's EBITDA shortfall vs. plan in the 2008 third quarter pertained to these related losses - $499 million.
[126] O'Connor Report, page 51.

**CONFIDENTIAL**

iv.   Working capital requirements from changing commodity prices are incorporated in my Stress Tests and therefore also not included in adjusted contingent liquidity.

All of the factors discussed in this section support my conclusion regarding the amount of minimum liquidity at year-end - $1.4 billion, which assumes no availability under the Access Revolver – as used in my Stress Test analysis.

## Tuliano's Assertions Regarding the Company's Minimum Liquidity

Tuliano concludes that the Acquisition left LBI with "… insufficient liquidity to fund its business …."[127]   To prove his point, Tuliano notes the significant difference between the Company's liquidity at the Acquisition Date (which he incorrectly shows as $1.3 billion – see discussion above) and the $3.6 billion sum of Lyondell's and Basell's separate company liquidities at September 30, 2007.[128]   Tuliano's conclusion, therefore, relies on his implicit assertion that the two companies' stand-alone liquidities were sufficient and that the Acquisition, alone, caused liquidity to be insufficient.

However, the two companies' combined decrease in liquidity between September 30 and the Acquisition date are explained not by the transaction itself, but rather by an examination of the underlying drivers of liquidity.  Indeed, Basell/Lyondell's combined liquidity declined from $3.6 billion at September 30, 2007 to $2.8 billion the day prior to the transaction - December 19, 2007 - due principally to increasing hydrocarbon costs.  Tuliano never defines what the Company's minimum liquidity should have been.  I have done this analysis, described herein and in the Kearns Report (Section VI) in my Stress Tests and related analyses.

---

[127] Tuliano Report, page 89.
[128] Tuliano Report, page 82.

**CONFIDENTIAL**

**Vendor Credit**

Tuliano asserts that the Company's liquidity was harmed by contractions in vendor credit, and that this threat should have been, but was not, taken into account in capital adequacy planning.[132]  The facts, however, do not support Tuliano's assertion.

During the first half of 2008, LBI was able to maintain its vendor relationships under stressed market conditions.  LBI's liquidity crisis with respect to its vendors began late in 2008, after the Standard and Poor's downgrade of the Company's credit rating.  Indeed, at the time of the downgrade, the Company was substantially tracking the EBITDA Projections and had funded and survived the crude oil price peak.[133]

Despite the credit downgrade, LBI continued to be able to purchase the feedstocks it needed to conduct its operations.  Even as LBI management was reporting losses of trade credit in internal memoranda, hydrocarbon feedstock costs were rapidly descending from their July 2008 peak.

The following graph reflects (i) the percentage change, during the period from December 2007 through December 2008, in the per barrel price of crude oil compared to (ii) the percentage change, during that same period, in LBI's consolidated trade accounts payable.  The graph clearly demonstrates that (a) through September 2008 the Company had sufficient trade credit, and in fact, for most of that period, had greater trade credit than it did at the time of the Acquisition, and (b) LBI's decline in trade accounts payable in the 2008 fourth quarter was similar to the market decline in hydrocarbon feedstock prices.  Thus, although LBI was losing its ability to finance *dollars* of feedstock purchases, it was **not** losing its ability to finance *units* of feedstock purchases.

---

[132] Tuliano Report, page 92.
[133] Kearns Report, page 87.

**CONFIDENTIAL**



**Notes:**
Per monthly stand alone financial statements and monthly consolidated income statements.
Average monthly WTI spot prices (Cushing, OK WTI Spot Price FOB): Energy Information
Administration (www.eia.doe.gov).

The conclusions in this chart are corroborated by Twitchell. During her
interview, Twitchell noted that throughout this period the Company continued to
operate its business in the normal course. Despite ongoing discussions with trade
creditors, the Company was able to maintain sufficient amounts of vendor credit
(adjusted only by changes in feedstock unit costs), as it had before the S&P credit
downgrade. Accordingly, Tuliano's assertion regarding the impact on liquidity of
reductions in vendor trade credit is refuted by the evidence.

**Tuliano's makes erroneous observations on Bond Market indications**

Tuliano asserts that the trading prices of Lyondell's legacy bonds "… provided an
indication of the view of market participants regarding the likelihood that LBI would
be able to pay its debt as due."[134]  By showing only Lyondell bond pricing
information, Tuliano fails to disclose that similar movements were observed in
market indices of comparably rated debt instruments. Yields on non-investment
grade debt increased (i.e., prices dropped) from the middle of 2007 through the end of
the year and into the first quarter of 2008, as reflected by the Merrill Lynch US High
Yield Master II index. Lyondell's legacy debentures exhibited similar movements. I
have also analyzed pricing data for the Merrill Lynch C Index, which includes

---

[134] Tuliano Report, page 93.

**CONFIDENTIAL**

performing debt instruments rated CCC or lower. For all of 2007 and through the first quarter of 2008, Lyondell's debentures traded at a lower yield (i.e., a higher price) than the Merrill Lynch C Index, reflecting that market participants believed these securities were of a higher credit quality. This data is inconsistent with the implication that Tuliano makes, namely that the contemporaneous market data supports his view of insolvency. The chart below shows the yield to worst on the aforementioned indices as well as the yield to worst on the legacy debentures.



In addition, Tuliano references bond issues of two of Lyondell subsidiaries: Millenium America Inc's 7.625% Senior Debentures due in 2026 (the "Millenium Debentures") and Equistar Chemical LP's 7.55% Senior Notes dues 2026 (the "Equistar Senior Notes").

Tuliano incorrectly infers that the secondary market pricing for the Millenium Debentures and the Equistar Senior Notes from July 2007 through December 2008 reflects the market's lack of confidence in LBI's ability to pay its debts. In making this inference, Tuliano does not appear to consider the general change in pricing of

60                                                        **CONFIDENTIAL**

publicly traded high yield debt during this period. My analysis here is supported by the Fischel Report, in particular Exhibits D through G, which I have adopted. In Exhibit D, Fishel shows the yield to maturity between July and December 2007. This analysis shows that the relative required return between both Millenium and Equistar moved substantially in line with the market for comparable securities during this period.

**Working Capital**

Tuliano repeatedly notes that, according to LBI management, the Company would experience a "$30 to $40 million" increase in working capital for every dollar increase in oil prices.[135] He concludes that the Company failed to consider the impact of the volatile nature of feedstock prices when assessing capital adequacy. My Stress Tests specifically address this issue, however, and conclude that the Company's capital structure and its liquidity were sufficient to survive the impact of significant increases in oil prices reasonably foreseeable in late 2007.[136] Tuliano's "$30 to $40 million" increase in working capital per dollar of oil prices further represents an incomplete description of the cash flow impact to the Company of changes in oil prices.

As discussed in the Kearns Report, Section VII and Exhibit E, the total cash flow impact to the Company of a $10 increase in crude oil prices would be a $193 million outflow, which is the net effect of increased working capital, offset by cash inflow arising from increased EBITDA (i.e. operating margin from price increases). This sensitivity was fully considered in my Stress Tests.

---

[135] Tuliano Report, pages 41 and 50.
[136] Kearns Report, page 37.

**CONFIDENTIAL**

## VI.    Right to Supplement

My work in this matter is ongoing.  To the extent that additional facts, documents, other information or other expert materials in this action may become available in the future, I reserve the right to modify or supplement my conclusions accordingly.  My conclusions are also subject to modification or supplementation based on further analysis of the data and information that have already been provided to me.

Respectfully Submitted,

Christopher J. Kearns

New York, New York
Dated *November 20, 2009*

**CONFIDENTIAL**

# Index To Exhibits

1. Analyses of the Impact of Modifications to Maxwell's Analyses

    A.  Use of Appropriate Projections

    B.  Synergies – Terminal Value

2. Summary of Analyst/Valuation Cites of Guideline Companies

3. Kearns Alternative Guideline Company Analysis

    A.  BASF included as a Guideline Company

    B.  Use of 2007 and 2008 Forward Multiple

4. Transaction Approach Summary Matrix

5. Sensitivity – Alternate Total Debts

6. Covenant Relief for Chemical Companies

7. Leverage Charts

8. Additional Documents Considered

**CONFIDENTIAL**

**EXHIBIT 1A**

**CONFIDENTIAL**

**LyondellBasell Industries AF S.C.A.**
**Enterprise Value based on Projections (using Maxwell's Methodology)**

| ($ in millions) | | 2008 | 2009 | 2010 | 2011 | Terminal EBITDA | Notes |
|---|---|---|---|---|---|---|---|
| Basell & Lyondell Petrochemical | | 3,478 | 2,797 | 2,409 | 2,410 | | 2008-11 from CIM |
| JV Dividends | | 1,700 | 1,600 | 1,500 | 1,300 | 1,525 | Excluded in Maxwell Analysis / 2008-11 from CIM  Terminal Value average of 2008-11 |
| HRO | | 45 | 300 | 420 | 420 | | 2008-11 from CIM |
| Synergies | | | | | | | |
| EBITDA | | 5,223 | 4,697 | 4,329 | 4,130 | 4,595 | Terminal Value average of 2008-11 |
| EBIT | | 3,821 | 3,284 | 2,948 | 2,744 | | |
| Taxes | 35% | 1,337 | 1,149 | 1,032 | 960 | | |
| Tax-Adjusted EBIT | | 2,484 | 2,135 | 1,916 | 1,784 | | 2008-11 from CIM naive model (see Kearns Report Exhibit I) |
| Depreciation & Amortization | | 1,402 | 1,413 | 1,381 | 1,386 | | 2008-11 from CIM |
| Capital Expenditures | | (1,196) | (953) | (625) | (555) | | Calculated 2008-11 from CIM naive model balance sheet (see Kearns Exhibit J) |
| Change in Net Working Capital | | 526 | 266 | 179 | (129) | | 2008-11 from CIM |
| Deferred Charges/Income | | 23 | (14) | 11 | (1) | | 2008-11 from CIM |
| Employee Benefits/Bonus | | (41) | (23) | (34) | (24) | | 2008-11 from CIM |
| Other | | (97) | (178) | (145) | (99) | | 2008-11 from CIM |
| Free Cash Flow | | 3,101 | 2,645 | 2,683 | 2,361 | 0.70 | |
| Present Value Factor | Low 10.75% | 0.95 | 0.86 | 0.77 | 0.70 | | Maxwell Discount Rate, pages 50-52 |
| Present Value Factor | High 10.25% | 0.95 | 0.86 | 0.78 | 0.71 | 0.71 | Maxwell Discount Rate, pages 50-52 |
| PV of FCF - Low | | 2,947 | 2,270 | 2,079 | 1,652 | | |
| PV of FCF - High | | 2,953 | 2,285 | 2,102 | 1,678 | | |

| | Low | High | | | | |
|---|---|---|---|---|---|---|
| | Low | High | Mid Point | | | |
| Cumulative PV of FCF | | 8,947 | 9,019 | | | |
| PV of Terminal Value (Chemical) | 6.0 | 7.0 | 12,884 | 15,271 | | Maxwell Terminal Multiples, pages 50-52 |
| PV of Terminal Value (Refining) | 5.0 | 6.0 | 5,334 | 6,503 | | Maxwell Terminal Multiples, pages 50-52 |
| Enterprise Value based on Projections (using Maxwell Methodology) | | 27,164 | 30,793 | 28,979 | | |

| | | | |
|---|---|---|---|
| Mid-point Enterprise Value based on Projections | 28,979 | | Maxwell Report, page 25 |
| less Average of Maxwell DCF Composite | 20,582 | | |
| Difference Due to Use of Projections | 8,397 | | |

**EXHIBIT 1B**

**CONFIDENTIAL**

LyondellBasell Industries AF S.C.A

## Maxwell DCF Analysis: Exhibit P

*($ in millions)*

### Solomon Exhibit P: Detailed DCF – July 10th Base Case

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|
| BtioII | 1,483 | 1,353 | 1,168 | 1,358 | 1,410 | 1,471 | |
| JV Dividends | (99) | (95) | (129) | (151) | (151) | (151) | |
| LYO | 1,553 | 1,031 | 869 | 848 | 1,249 | 1,556 | |
| IBO3 | 1,219 | 1,294 | 1,258 | 1,132 | 1,019 | 917 | 1,140 |
| Synergies | 45 | 301 | 428 | 420 | 420 | 420 | |
| EBITDA | 4,181 | 3,883 | 3,526 | 3,607 | 3,947 | 4,213 | 1,893 |
| EBIT | 2,379 | 2,470 | 2,145 | 2,221 | 2,561 | 2,827 | |
| Taxes | 573 | 865 | 751 | 777 | 806 | 980 | |
| Tax-Adjusted EBIT | 1,806 | 1,606 | 1,394 | 1,444 | 1,665 | 1,838 | |
| Depreciation & Amortization | 1,402 | 1,413 | 1,381 | 1,386 | 1,386 | 1,386 | |
| Capital Expenditures | (991) | (837) | (822) | (841) | (795) | (795) | |
| Deferred Charges | (126) | (155) | (146) | (72) | (72) | (72) | |
| Change in Net Working Capital | 428 | 179 | 199 | 129 | (214) | (214) | |
| Free Cash Flow | 2,509 | 2,206 | 1,956 | 1,730 | 1,970 | 2,143 | |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.57 | 0.57 |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.58 | 0.58 |
| PV of FCF – Low | 2,384 | 1,892 | 1,516 | 1,210 | 1,244 | 1,222 | |
| PV of FCF – High | 2,390 | 1,905 | 1,533 | 1,229 | 1,270 | 1,253 | |

| | Low | High | | | | Low | High |
|---|---|---|---|---|---|---|---|
| Cumulative PV of FCF | 9,468 | 9,579 | | | | | |
| PV of Terminal Value (Chemical) | 9,420 | 11,267 | | 6.0 | 7.0 | 0.57 | |
| PV of Terminal Value (Refining) | 3,250 | 3,899 | | 5.0 | 6.0 | 0.58 | |
| **Enterprise Value** | **22,139** | **24,845** | | | | | |

### Solomon Exhibit P: Detailed DCF – July 10th Scenario Case

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|
| BtioII | 1,394 | 877 | 735 | 810 | 934 | 1,224 | |
| JV Dividends | (99) | (413) | (129) | (151) | (151) | (151) | |
| LYO | 1,487 | 1,013 | 707 | 809 | 1,213 | 1,502 | |
| IBO3 | 1,056 | 1,200 | 1,060 | 962 | 866 | 779 | 969 |
| Synergies | 45 | 449 | 420 | 420 | 420 | 420 | |
| EBITDA | 3,660 | 3,495 | 2,962 | 2,880 | 3,282 | 3,734 | 3,272 |
| EBIT | 2,267 | 2,382 | 1,484 | 1,492 | 1,896 | 2,368 | |
| Taxes | 793 | 624 | 538 | 512 | 664 | 836 | |
| Tax-Adjusted EBIT | 1,474 | 1,138 | 963 | 952 | 1,232 | 1,532 | |
| Depreciation & Amortization | 1,402 | 1,411 | 1,381 | 1,386 | 1,386 | 1,386 | |
| Capital Expenditures | (991) | (837) | (822) | (841) | (795) | (795) | |
| Deferred Charges | (126) | (155) | (146) | (72) | (72) | (72) | |
| Change in Net Working Capital | 428 | 179 | 199 | 129 | (214) | (214) | |
| Free Cash Flow | 2,177 | 1,738 | 1,525 | 1,258 | 1,537 | 1,857 | |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.57 | 0.57 |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.58 | 0.58 |
| PV of FCF – Low | 2,068 | 1,500 | 1,184 | 881 | 971 | 1,059 | |
| PV of FCF – High | 2,073 | 1,509 | 1,195 | 865 | 991 | 1,086 | |

| | Low | High | | | | Low | High |
|---|---|---|---|---|---|---|---|
| Cumulative PV of FCF | 7,651 | 7,743 | | | | | |
| PV of Terminal Value (Chemical) | 7,982 | 9,527 | | 6.0 | 7.0 | 0.57 | |
| PV of Terminal Value (Refining) | 2,762 | 3,298 | | 5.0 | 6.0 | 0.58 | |
| **Enterprise Value** | **18,298** | **20,568** | | | | | |

## Maxwell DCF Analysis: Exhibit P Adjusted for Terminal Synergies

*($ in millions)*

### Solomon Exhibit P: Detailed DCF – July 10th Base Case (Adjusted)

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|
| BtioII | 1,483 | 1,353 | 1,168 | 1,358 | 1,410 | 1,471 | |
| JV Dividends | (99) | (95) | (129) | (151) | (151) | (151) | |
| LYO | 1,553 | 1,031 | 869 | 848 | 1,249 | 1,556 | |
| IBO3 | 1,219 | 1,294 | 1,258 | 1,132 | 1,019 | 917 | 1,140 |
| Synergies | 45 | 301 | 428 | 420 | 420 | 420 | |
| EBITDA | 4,181 | 3,883 | 3,526 | 3,607 | 3,947 | 4,213 | 1,975 |
| EBIT | 2,379 | 2,470 | 2,145 | 2,221 | 2,561 | 2,827 | |
| Taxes | 573 | 865 | 751 | 777 | 806 | 980 | |
| Tax-Adjusted EBIT | 1,806 | 1,606 | 1,394 | 1,444 | 1,665 | 1,838 | |
| Depreciation & Amortization | 1,402 | 1,413 | 1,381 | 1,386 | 1,386 | 1,386 | |
| Capital Expenditures | (991) | (837) | (822) | (841) | (795) | (795) | |
| Deferred Charges | (126) | (155) | (146) | (72) | (72) | (72) | |
| Change in Net Working Capital | 428 | 179 | 199 | 129 | (214) | (214) | |
| Free Cash Flow | 2,509 | 2,206 | 1,956 | 1,730 | 1,970 | 2,143 | |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.57 | 0.57 |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.58 | 0.58 |
| PV of FCF – Low | 2,384 | 1,892 | 1,516 | 1,210 | 1,244 | 1,222 | |
| PV of FCF – High | 2,390 | 1,905 | 1,533 | 1,229 | 1,270 | 1,253 | |

| | Low | High | | | | Low | High |
|---|---|---|---|---|---|---|---|
| Cumulative PV of FCF | 9,468 | 9,579 | | | | | |
| PV of Terminal Value (Chemical) | 9,393 | 11,695 | | 6.0 | 7.0 | 0.57 | |
| PV of Terminal Value (Refining) | 3,250 | 3,899 | | 5.0 | 6.0 | 0.58 | |
| **Enterprise Value** | **22,421** | **25,182** | | | | | |

### Solomon Exhibit P: Detailed DCF – July 10th Sensitivity Case (Adjusted)

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|
| BtioII | 1,394 | 877 | 735 | 810 | 934 | 1,224 | |
| JV Dividends | (99) | (413) | (129) | (151) | (151) | (151) | |
| LYO | 1,517 | 1,013 | 707 | 809 | 1,213 | 1,502 | |
| IBO3 | 1,056 | 1,200 | 1,060 | 962 | 866 | 779 | 969 |
| Synergies | 45 | 349 | 420 | 420 | 420 | 420 | |
| EBITDA | 3,660 | 3,495 | 2,962 | 2,880 | 3,282 | 3,734 | 3,355 |
| EBIT | 2,267 | 2,382 | 1,484 | 1,492 | 1,896 | 2,368 | |
| Taxes | 793 | 624 | 538 | 512 | 664 | 836 | |
| Tax-Adjusted EBIT | 1,474 | 1,138 | 963 | 952 | 1,232 | 1,532 | |
| Depreciation & Amortization | 1,402 | 1,411 | 1,381 | 1,386 | 1,386 | 1,386 | |
| Capital Expenditures | (991) | (837) | (822) | (841) | (795) | (795) | |
| Deferred Charges | (126) | (155) | (146) | (72) | (72) | (72) | |
| Change in Net Working Capital | 428 | 179 | 199 | 129 | (214) | (214) | |
| Free Cash Flow | 2,177 | 1,738 | 1,525 | 1,258 | 1,537 | 1,857 | |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.57 | 0.57 |
| Present Value Factor | 0.95 | 0.86 | 0.78 | 0.71 | 0.64 | 0.58 | 0.58 |
| PV of FCF – Low | 2,068 | 1,500 | 1,184 | 881 | 971 | 1,059 | |
| PV of FCF – High | 2,073 | 1,509 | 1,195 | 865 | 991 | 1,086 | |

| | Low | High | | | | Low | High |
|---|---|---|---|---|---|---|---|
| Cumulative PV of FCF | 7,654 | 7,743 | | | | | |
| PV of Terminal Value (Chemical) | 8,164 | 9,765 | | 6.0 | 7.0 | 0.57 | |
| PV of Terminal Value (Refining) | 2,762 | 3,298 | | 5.0 | 6.0 | 0.58 | |
| **Enterprise Value** | **18,580** | **20,596** | | | | | |

*Notes:*
*(1) Terminal value Net-ebwdand and Other Adjustment calculated by setting 2008-13 to synergies to $420 million and re-calculating the terminal value*
*(2) Differences due to rounding*

**EXHIBIT 1B**

**CONFIDENTIAL**

LyondellBasell Industries AF S.C.A.

*($ in millions)*

## Maxwell DCF Analyses: Exhibit P

| Solomon Exhibit P: Detailed DCF – €MM | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|---|
| Basell | | 1,304 | 932 | 784 | 791 | | | |
| PV Dividends | | (72) | (92) | (155) | (154) | | | |
| LYO | | 1,645 | 1,256 | 932 | 910 | | | |
| IBID | | 944 | 786 | 670 | 537 | | | |
| Other | | (18) | (18) | (18) | (18) | | | 712 |
| Synergies | | (41) | 300 | (20) | (20) | | | 3,033 |
| EBITDA | | 3,908 | 3,084 | 2,633 | 2,586 | | | |
| EBIT | | 2,936 | 1,671 | 1,232 | 1,120 | | | |
| Taxes | | 877 | 585 | 438 | 392 | | | |
| Tax-Adjusted EBIT | 35% | 1,829 | 1,086 | 811 | 728 | | | |
| Depreciation & Amortization | | 1,402 | 1,413 | 1,381 | 1,386 | | | |
| Capital Expenditures | | (1,196) | (953) | (625) | (555) | | | |
| Deferred Charges | | (120) | (155) | (156) | (72) | | | |
| Change in Net Working Capital | | 328 | 179 | 139 | (214) | | | |
| Free Cash Flows | | 2,037 | 1,570 | 1,571 | 1,273 | | | |
| Present Value Factor | Low | 0.95 | 0.86 | 0.77 | 0.70 | | | 0.70 |
| Present Value Factor | High | 0.95 | 0.86 | 0.76 | 0.71 | | | 0.71 |
| PV of FCF – Low | | 1,936 | 1,347 | 1,218 | 890 | | | |
| PV of FCF – High | | 1,940 | 1,356 | 1,232 | 905 | | | |

| | Low | High |
|---|---|---|
| Cumulative PV of FCF | 5,392 | 5,433 |
| PV of Terminal Value (Discount) | 6.0 / 7.0 | 10,261 | 12,162 |
| PV of Terminal Value (Rolling) | 5.0 / 6.0 | 2,489 | 3,035 |
| **Enterprise Value** | **17,622** | **20,015** |

| | Low | High | Midpoint |
|---|---|---|---|
| Maxwell DCF 24h 10th Base Case | 22,149 | 24,815 | 23,492 |
| Maxwell DCF 24h 10th Sensitivity Case | 18,298 | 20,568 | 19,433 |
| Maxwell DCF €MM (Too Diligence) | 17,622 | 20,015 | 18,818 |
| **Average of Three Maxwell Analyses** | | | **20,581** |

## Maxwell DCF Analyses: Exhibit P Adjusted for Terminal Synergies

| Solomon Exhibit P Detailed DCF – €MM (Adjusted) | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Terminal Value |
|---|---|---|---|---|---|---|---|---|
| Basell | | 1,391 | 932 | 784 | 791 | | | |
| PV Dividends | | (72) | (92) | (155) | (154) | | | |
| LYO | | 1,645 | 1,256 | 932 | 910 | | | |
| IBID | | 944 | 786 | 670 | 537 | | | |
| Other | | (18) | (18) | (18) | (18) | | | 712 |
| Synergies | | (41) | 300 | (20) | (20) | | | 3,337 (1) |
| EBITDA | | 3,908 | 3,084 | 2,633 | 2,586 | | | |
| EBIT | | 2,936 | 1,671 | 1,232 | 1,120 | | | |
| Taxes | | 877 | 585 | 438 | 392 | | | |
| Tax-Adjusted EBIT | 35% | 1,829 | 1,086 | 811 | 728 | | | |
| Depreciation & Amortization | | 1,402 | 1,413 | 1,381 | 1,386 | | | |
| Capital Expenditures | | (1,196) | (953) | (625) | (555) | | | |
| Deferred Charges | | (120) | (155) | (156) | (72) | | | |
| Change in Net Working Capital | | 328 | 179 | 139 | (214) | | | |
| Free Cash Flows | | 2,037 | 1,570 | 1,571 | 1,273 | | | |
| Present Value Factor | Low | 0.95 | 0.86 | 0.77 | 0.70 | | | 0.70 |
| Present Value Factor | High | 0.95 | 0.86 | 0.76 | 0.71 | | | 0.71 |
| PV of FCF – Low | | 1,936 | 1,347 | 1,218 | 890 | | | |
| PV of FCF – High | | 1,940 | 1,356 | 1,232 | 905 | | | |

| | Low | High |
|---|---|---|
| Cumulative PV of FCF | 5,392 | 5,433 |
| PV of Terminal Value (Discount) | 6.0 / 7.0 | 10,261 | 12,162 |
| PV of Terminal Value (Rolling) | 5.0 / 6.0 | 2,489 | 3,035 |
| **Enterprise Value** | **18,142** | **20,630** |

| | Low | High | Midpoint | Difference |
|---|---|---|---|---|
| Maxwell DCF 24h 10th Base Case (Adjusted) | 22,421 | 25,183 | 23,802 | |
| Maxwell DCF 24h 10th Sensitivity Case (Adjusted) | 18,580 | 20,906 | 19,743 | |
| Maxwell DCF €MM (Too Diligence) (Adjusted) | 18,142 | 20,630 | 19,386 | |
| **Average of Three Maxwell Analyses (Adjusted)** | | | **20,977** | **396** |

Notes:
(1) Terminal value Reinvestment and Other Adjustment calculated by setting 2008-11 Synergies to $420 million, and re-calculating the terminal value.
(2) Difference due to rounding.

**EXHIBIT 2**

**CONFIDENTIAL**

**LyondellBasell Industries AF S.C.A.**
**Peer Companies Cited in Third-Party Reports**

| Chemical | American Appraisal | Citi | Deutsche Bank | Duff & Phelps | Goldman Sachs | HSBC | LBI[1] | Merrill Lynch | UBS | Cited in Report[2] | Used in Valuation | Maxwell | Tufiano[3] | Fischel | Initile[a] | O'Connor[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Nova Chemicals | V | V | V | V | V | V | V | V | V | 9 | 9 | X | X | X | X | X |
| 2 Dow Chemical | V | V | V | V | V | V | V | V | P | 9 | 9 | X | X | X | X | X |
| 3 Celanese | V | V | V | V | V |  | V | V | P | 8 | 7 |  | X | X | X | X |
| 4 Huntsman | V | V | P | V | V |  | P | V | P | 8 | 5 |  | X | X | X | X |
| 5 Westlake Chemical | V | V | V | V | V | V |  | V | V | 7 | 7 | X | X | X | X | X |
| 6 Eastman Chemical | V | V | P | V | V |  |  | V | V | 7 | 6 | X | X | X | X | X |
| 7 BASF | P | P |  | P | P | V | V |  | P | 6 | 3 | X | X | X | X | X |
| 8 DuPont | P | P | P | V | V |  | P |  | P | 6 | 2 |  |  | X |  |  |
| 9 Georgia Gulf | V | V | P | V | V |  |  |  | V | 4 | 3 |  |  | X |  |  |
| 10 Rohm &Haas |  |  | P |  | V |  |  | V | P | 4 | 2 |  |  | X |  |  |
| 11 Exxon Mobil | V | P |  |  |  |  | P | P | P | 4 | 1 |  |  |  |  |  |
| 12 Total SA | V | P |  |  |  |  | P | P | P | 4 |  |  |  |  |  |  |
| 13 Ineos |  | P |  |  | V |  | P | P | P | 3 | 0 |  |  |  |  |  |
| 14 Air Products |  |  |  |  | V |  |  | V | P | 3 | 2 |  | X |  |  |  |
| 15 Tronox |  |  |  |  | V |  |  | V | P | 3 | 2 |  |  |  |  |  |
| 16 Chevron | V |  |  |  |  |  | P |  | P | 3 | 1 |  |  |  |  |  |
| 17 Formosa Plastics |  | P |  |  |  |  | P |  | P | 3 | 0 |  |  |  |  |  |
| 18 Akzo Nobel |  | P |  |  |  |  | P |  | P | 3 | 0 |  |  | X |  |  |
| 19 Solvay |  | P |  |  |  |  | P |  | P | 3 | 0 |  |  | X |  |  |
| 20 SABIC |  | P |  |  |  |  | P |  | P | 3 | 0 |  |  |  |  |  |
| 21 PPG Industries |  | P |  | V |  |  |  |  | P | 2 | 1 |  |  | X |  |  |
| 22 Braskem | P | P | P |  |  |  |  |  | P | 2 | 1 | X |  |  |  |  |
| 23 Methanex |  | V |  |  |  |  |  |  | P | 2 |  |  |  |  |  |  |
| 24 Hexion |  |  |  |  |  |  |  | P | P | 2 | 0 |  |  |  |  |  |
| 25 Shell Chemical Company |  |  |  |  |  |  |  |  | P | 2 | 0 |  |  |  |  |  |
| 26 Bayer |  | P |  |  |  |  |  |  |  | 2 | 0 |  |  | X |  |  |
| 27 PQ Corp |  |  |  |  | V |  |  |  |  | 2 | 1 |  |  |  |  |  |
| 28 Praxair |  |  |  |  |  |  |  |  |  | 1 | 1 |  |  | X |  |  |
| 29 Wellman |  | V |  |  |  |  |  |  |  | 1 |  |  |  |  |  |  |
| 30 Reliance Industries |  | P |  |  |  |  |  |  |  | 1 | 0 |  |  |  |  |  |
| 31 IRPC |  | P |  |  |  |  |  |  |  | 1 | 0 |  |  |  |  |  |
| 32 SIDPEC |  | P |  |  |  |  |  |  |  | 1 | 0 |  |  |  |  |  |
| 33 Indian Petrochemicals |  | P |  |  |  |  |  |  |  | 1 | 0 |  |  |  |  |  |
| 34 PTT |  | P |  |  |  |  |  |  |  | 1 | 0 |  |  |  |  |  |
| 35 Kronos |  |  |  |  |  |  |  |  | P | 1 | 0 |  |  |  |  |  |

Notes:

"V"= used in valuation, "P"= cited as peer
(1) LBI Presentation to Moody's dated 10/23/2007
(2) Either used in valuation and/or cited as peer in third-party report.
(3) Used in comparative leverage ratios by segment (Tufiano, page 65)
(4) Included in segment peer group
Sourced from various third-party valuation and other reports listed on Exhibit 8   Dated 2006-2009.

**EXHIBIT 2**

**CONFIDENTIAL**

LyondellBasell Industries AF S.C.A.
Peer Companies Cited in Third-Party Reports

| | American Appraisal | Citi | Deutsche Bank | Duff & Phelps | Goldman Sachs | HSBC | LBI[1] | Merrill Lynch | UBS | Count Cited in Report[2] | Used in Valuation | Maxwell | Tufiano[3] | Fischel | Initile[4] | O'Connor[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Refining** | | | | | | | | | | | | | | | | |
| 1 Valero | V | V | V | V | V | V | | V | V | 8 | 8 | X | X | X | | X |
| 2 Tesoro | V | V | V | V | V | V | | V | V | 8 | 8 | X | X | X | | X |
| 3 Frontier Oil | V | V | V | V | V | V | | V | V | 8 | 8 | X | X | X | | X |
| 4 Sunoco | | V | V | V | V | V | | V | V | 7 | 7 | X | X | X | | X |
| 5 Holly | | V | V | V | V | | | V | | 7 | 7 | X | X | X | | X |
| 6 Western Refining | | V | P | P | V | | | V | | 5 | 4 | X | X | | | X |
| 7 Alon | | V | | | V | V | | V | | 4 | 4 | X | X | X | X | X |
| 8 Delek | | V | | | V | V | | V | | 4 | 4 | | | | | |
| 9 Giant | | P | | | | V | | V | | 3 | 2 | | | | | |
| 10 CVR | | P | | | V | | | | | 2 | 1 | | | | | |

Notes:

"V"= used in valuation, "P"= cited as peer

(1) LBI Presentation to Moody's dated 10/23/2007.

(2) Either used in valuation and/or cited as peer in third-party report.

(3) Used in comparative leverage ratios by segment (Tufiano, page 65).

(4) Included in segment peer group.

Sourced from various third-party valuation and other reports (listed on Exhibit 8. Dated 2006-2009.

EXHIBIT 3A

**LyondellBasell Industries AF S.C.A.**                    **Sensitivity - with BASF**
**Guideline Company Indications of Value**
**As of December 20, 2007**

| ($ in millions) | Lyondell Basell Variable | Selected Multiple | Indicated Value | Weighting | Weighted Indicated Value |
|---|---|---|---|---|---|
| **Total Invested Capital to EBITDA** [1] | EBITDA | | | | |
| Latest Fiscal Year | $ 5,032 | 6.3 x | $ 31,705 | 40% | $ 12,682 |
| Latest 12 Months | 5,291 | 5.9 x | 31,218 | 60% | 18,731 |
| | | | | 100% | $ 31,413 |
| **Total Invested Capital to EBIT** [1] | EBIT | | | | |
| Latest Fiscal Year | $ 3,361 | 8.3 x | $ 27,894 | 40% | $ 11,157 |
| Latest 12 Months | 3,528 | 8.2 x | 28,930 | 60% | 17,358 |
| | | | | 100% | $ 28,515 |

Notes:
(1) Includes equity income from affiliates. Also, adjusts guideline companies with LIFO inventory accounting from LIFO to FIFO
by adding the change from beginning of period LIFO reserve to end of period LIFO reserve to the period's EBITDA and EBIT.
See EXHIBIT H of Kearns Report for LBI EBITDA and EBIT.

**CONFIDENTIAL**

EXHIBIT 3A

CONFIDENTIAL

**Sensitivity - with BASF**

LyondellBasell Industries AF S.C.A.
Guideline Company Multiples

| | Chemicals Median | Refining Median | Selected Multiples after 10% Discount | | | | Weighted Multiple |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Chemical | | Refining | | |
| **Total Invested Capital to EBITDA** [1] | | | | | | | |
| Latest Fiscal Year | 7.1 x | 6.6 x | 70% | 6.4 x | 30% | 5.9 x | 6.3 x |
| Latest 12 Months | 7.2 x | 5.1 x | 70% | 6.5 x | 30% | 4.6 x | 5.9 x |
| **Total Invested Capital to EBIT** [1] | | | | | | | |
| Latest Fiscal Year | 10.1 x | 7.3 x | 70% | 9.1 x | 30% | 6.6 x | 8.3 x |
| Latest 12 Months | 10.6 x | 5.6 x | 70% | 9.5 x | 30% | 5.0 x | 8.2 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBIT and EBITDA have been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period.

Source:
Capital IQ.

EXHIBIT 3A

CONFIDENTIAL

LyondellBasell Industries AF S.C.A.
Guideline Company Multiples

Sensitivity - with BASF

| | Chemicals (Commodity and Diversified) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Nova Chemicals Corp. [2] | The Dow Chemical Company | Celanese Corp. | Huntsman Corp. | Westlake Chemical Corp. | Eastman Chemical Co. | BASF SE [3] |
| **Total Invested Capital to EBITDA** [1] | | | | | | | |
| Latest Fiscal Year | 8.3 x | 6.9 x | 9.0 x | 9.4 x | 4.2 x | 7.1 x | 5.8 x |
| Latest 12 Months | 6.9 x | 7.3 x | 8.7 x | 10.7 x | 6.2 x | 7.2 x | 5.4 x |
| **Total Invested Capital to EBIT** [1] | | | | | | | |
| Latest Fiscal Year | 16.5 x | 9.4 x | 11.9 x | 16.2 x | 5.3 x | 10.1 x | 8.4 x |
| Latest 12 Months | 10.7 x | 10.3 x | 11.3 x | 19.0 x | 9.9 x | 10.6 x | 7.4 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary
and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBIT and EBITDA
have been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period.
(2) Nova EBITDA and EBIT adjusted to US GAAP basis.
(3) BASF LTM EBIT and EBITDA have not been adjusted to US GAAP since BASF's quarterly statements do not
provide detailed US GAAP information. BASF's US GAAP adjustment for FY 2006 did not affect the selected median
multiple. We believe the LTM US GAAP impact would be similar to the FY 2006 impact, and therefore, would not have
a material impact on the concluded multiple.

Source:
Capital IQ.

EXHIBIT 3A

CONFIDENTIAL

**LyondellBasell Industries AF S.C.A.**
**Guideline Company Multiples**

Sensitivity - with BASF

| | Refining | | | | | | |
| | Valero Energy Corp. | Tesoro Corp. | Sunoco Inc. | Frontier Oil Corp. | Holly Corp. | Western Refining Inc. | Alon USA Energy, Inc. |
|---|---|---|---|---|---|---|---|
| **Total Invested Capital to EBITDA** [1] | | | | | | | |
| Latest Fiscal Year | 5.1 x | 5.3 x | 5.2 x | 7.5 x | 6.6 x | 10.2 x | 7.7 x |
| Latest 12 Months | 4.0 x | 5.2 x | 3.8 x | 5.8 x | 5.1 x | 7.9 x | 4.5 x |
| **Total Invested Capital to EBIT** [1] | | | | | | | |
| Latest Fiscal Year | 5.7 x | 6.0 x | 6.8 x | 8.3 x | 7.3 x | 10.7 x | 8.9 x |
| Latest 12 Months | 4.4 x | 6.1 x | 4.5 x | 6.3 x | 5.6 x | 8.8 x | 5.2 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBIT and EBITDA have been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period.

Source:
Capital IQ.

EXHIBIT 3A

**LyondellBasell Industries AF S.C.A.**
**Summary of Balance Sheet Test Based on TIC**
**As of December 20, 2007**

**Sensitivity - with BASF**

| | | Weighted Indication of Value | | |
|---|---|---|---|---|

| *(S in millions)* | Indicated FMV of TIC | | Weight | Weighted Value |
|---|---|---|---|---|
| Market Approach - Guideline Companies | $ 32,300 | (A) | 20% | $ 6,460 |
| Market Approach - Comparable Transactions | 37,400 | | 20% | 7,480 |
| Income Approach - Discounted Cash Flow | 32,000 | (B) | 60% | 19,200 |
| | | | 100% | 33,140 |

| | |
|---|---|
| **Indicated Fair Market Value of TIC** [(1)] | **33,140** |

| | |
|---|---|
| **Less: Total Debts** [(2)] | **24,828** |

| | |
|---|---|
| **Fair Market Value of Assets in Excess of Debts** | **$ 8,312** |

Notes:

(1) Represents the Fair Market Value of Total Invested Capital ("TIC") determined on a controlling, going concern basis. TIC represents equity (common, preferred and minority interests) plus total interest-bearing debt and capital leases plus unfunded pension and other post-retirement pension obligations.

(2) See EXHIBIT G of Kearns Report.

(A) Consistent with Kearns Report, a 10% discount has been applied to the median multiple. The calculated indicated FMV of TIC assuming 0% discount to the median is $36.7 billion.

(B) No change to 10% WACC. Consequently, no change to indicated FMV of TIC under DCF.

**CONFIDENTIAL**

EXHIBIT 3A

**LyondellBasell Industries AF S.C.A.**                                    **Sensitivity - with BASF**
**Reconciliation of Guideline Company Indication of Value**
**As of December 20, 2007**

| ($ in millions) | Total Invested Capital | Weight | Indicated Value |
|---|---|---|---|
| Total Invested Capital to EBITDA | $ 31,413 | 90.0% | $ 28,272 |
| Total Invested Capital to EBIT | 28,515 | 10.0% | 2,852 |
| | | 100.0% | |
| | | | |
| Indicated Value of Total Invested Capital on a Non-Controlling Basis | | | $ 31,123 |
| Less: Total LyondellBasell Debt, as of 12/31/07[1] | | | 24,828 |
| Implied equity value on a non-controlling basis | | | $ 6,295 |
| Plus: Premium for Control, applied to equity[2] | | 22% | 1,385 |
| Implied equity value on a controlling basis | | | 7,680 |
| Plus: Total LyondellBasell Debt as of 12/31/07 | | | 24,828 |
| Indicated Value of Total Invested Capital on a Controlling Basis | | | $ 32,508 |
| Less: One-time cost of synergies[3] | | | (195) |
| **Indicated Value of Total Invested Capital on a Controlling Basis** | | | **$ 32,313** |
| | | | |
| **Indicated Value of Total Invested Capital on a Controlling Basis, rounded** | | | **$ 32,300** |

Notes:
(1) Includes short-term and long-term debt including OID and accrued interest, unfunded pension and other post-retirement
obligations, commitments, contingencies and other liabilities and minority interests.
(2) Represents 22% control premium based on the Mergerstat control premiums for 2007 for transactions in
the Chemicals, Paints and Coatings, Oil & Gas and Energy Services industries.
(3) Represents total one-time costs of synergies related to the total estimated combined companies' synergies of $420 million as
estimated and revised by the Company's management on or around October 2, 2007, according to the Goldman Sachs Credit
Review dated October 2, 2007, page 21 [GSCP_LYON00043570].

**CONFIDENTIAL**

EXHIBIT 3A

**LyondellBasell Industries AF S.C.A.**                    **Sensitivity - with BASF**
**Summary of Balance Sheet Test Based on TIC**
**As of December 20, 2007**

| | | Weighted Indication of Value | | |
|---|---|---|---|---|

| *(S in millions)* | | Indicated FMV of TIC | Weight | Weighted Value |
|---|---|---|---|---|
| Market Approach - Guideline Companies | $ | 32,300 [(A)] | 20% | $ 6,460 |
| Market Approach - Comparable Transactions | | 37,400 | 20% | 7,480 |
| Income Approach - Discounted Cash Flow | | 32,000 [(B)] | 60% | 19,200 |
| | | | 100% | 33,140 |

| **Indicated Fair Market Value of TIC [(1)]** | | | | **33,140** |
|---|---|---|---|---|

| **Less: Total Debts [(2)]** | | | | **24,828** |
|---|---|---|---|---|

| **Fair Market Value of Assets in Excess of Debts** | | | | **$ 8,312** |
|---|---|---|---|---|

Notes:

(1) Represents the Fair Market Value of Total Invested Capital ("TIC") determined on a controlling, going concern basis. TIC represents equity (common, preferred and minority interests) plus total interest-bearing debt and capital leases plus unfunded pension and other post-retirement pension obligations.

(2) See EXHIBIT G of Kearns Report.

(A) Consistent with Kearns Report, a 10% discount has been applied to the median multiple. The calculated indicated FMV of TIC assuming 0% discount to the median is $36.7 billion.

(B) No change to 10% WACC. Consequently, no change to indicated FMV of TIC under DCF.

**CONFIDENTIAL**

EXHIBIT 3B

**LyondellBasell Industries AF S.C.A.**
**Summary of Balance Sheet Test Based on TIC**
**As of December 20, 2007**

**Sensitivity- Forward EBITDA Multiples**

|  | | Weighted Indication of Value | | | |
|---|---|---|---|---|---|
| (S in millions) | | Indicated FMV of TIC | Weight | | Weighted Value |
| Market Approach - Guideline Companies | $ | 33,800 | 20% | $ | 6,760 |
| Market Approach - Comparable Transactions | | 37,400 | 20% | | 7,480 |
| Income Approach - Discounted Cash Flow | | 32,000 | 60% | | 19,200 |
| | | | 100% | | 33,440 |

| **Indicated Fair Market Value of TIC [(1)]** | **33,440** |
|---|---|

| Less: Total Debts [(2)] | 24,828 |
|---|---|

| **Fair Market Value of Assets in Excess of Debts** | **$    8,612** |
|---|---|

Notes:
(1) Represents the Fair Market Value of Total Invested Capital ("TIC") determined on a controlling, going concern basis. TIC represents equity
(common, preferred and minority interests) plus total interest-bearing debt and capital leases plus unfunded pension and other post-retirement pension
obligations.
(2) See EXHIBIT G of Kearns Report.

**CONFIDENTIAL**

EXHIBIT 3B

**LyondellBasell Industries AF S.C.A.**
**Reconciliation of Guideline Company Indication of Value**
**As of December 20, 2007**

**Sensitivity- Forward EBITDA Multiples**

| ($ in millions) | | Indicated Value |
|---|---|---|
| Total Invested Capital to EBITDA- FY 2006 | $ | 8,304 |
| Total Invested Capital to EBITDA- LTM | | 7,805 |
| Total Invested Capital to Projected 2007 EBITDA | | 7,745 |
| Total Invested Capital to Projected 2008 EBITDA | | 8,449 |
| | | |
| Indicated Value of Total Invested Capital on a Non-Controlling Basis | $ | 32,302 |
| Less: Total LyondellBasell Debt, as of 12/31/07[1] | | 24,828 |
| Implied equity value on a non-controlling basis | $ | 7,474 |
| Plus: Premium for Control, applied to equity[2]      22% | | 1,644 |
| Implied equity value on a controlling basis | | 9,119 |
| Plus: Total LyondellBasell Debt as of 12/31/07 | | 24,828 |
| Indicated Value of Total Invested Capital on a Controlling Basis | $ | 33,947 |
| Less: One-time cost of synergies[3] | | (195) |
| **Indicated Value of Total Invested Capital on a Controlling Basis** | **$** | **33,752** |
| | | |
| **Indicated Value of Total Invested Capital on a Controlling Basis, rounded** | **$** | **33,800** |

Notes:
(1) Includes short-term and long-term debt including OID and accrued interest, unfunded pension and other post-retirement
obligations, commitments, contingencies and other liabilities and minority interests.
(2) Represents 22% control premium based on the Mergerstat control premiums for 2007 for transactions in
the Chemicals, Paints and Coatings, Oil & Gas and Energy Services industries.
(3) Represents total one-time costs of synergies related to the total estimated combined companies' synergies of $420 million as
estimated and revised by the Company's management on or around October 2, 2007, according to the Goldman Sachs Credit
Review dated October 2, 2007, page 21 (GSCP_LYON00043570).

**CONFIDENTIAL**

EXHIBIT 3B

**LyondellBasell Industries AF S.C.A.**          **Sensitivity- Forward EBITDA Multiples**
**Guideline Company Indications of Value**
**As of December 20, 2007**

| ($ in millions) | | Lyondell Basell Variable | Selected Multiple | Indicated Value | | Weighting | Weighted Indicated Value | |
|---|---|---|---|---|---|---|---|---|
| **Total Invested Capital to EBITDA** [1] | | EBITDA | | | | | | |
| Latest Fiscal Year | $ | 5,032 | 6.6 x | $ | 33,214 | 25% | $ | 8,304 |
| Latest 12 Months | | 5,291 | 5.9 x | | 31,218 | 25% | | 7,805 |
| | | | | | | | | |
| **Total Invested Capital to Projected 2007 EBITDA** | | | | | | | | |
| Projected 2007 EBITDA | | $ 5,079 | 6.1 x | $ | 30,982 | 25% | $ | 7,745 |
| | | | | | | | | |
| **Total Invested Capital to Projected 2008 EBITDA** | | | | | | | | |
| Projected 2008 EBITDA | | $ 5,632 | 6.0 x | $ | 33,795 | 25% | $ | 8,449 |
| | | | | | | | $ | 32,302 |

Calculation of LyondellBasell Projected EBITDA

| | | 2007 | | 2008 |
|---|---|---|---|---|
| Proforma EBITDA before Synergies | $ | 4,613 | $ | 5,178 |
| Gross Synergies | | 420 | | 420 |
| Synergy Adjustment [2] | | -71 | | -71 |
| Dividends from Associates [3] | | 117 | | 106 |
| EBITDA | $ | 5,079 | $ | 5,632 |

Notes:

(1) Includes equity income from affiliates. Also, adjusts guideline companies with LIFO inventory accounting from LIFO to FIFO by adding the change from beginning of period LIFO reserve to end of period LIFO reserve to the period's EBITDA. See Exhibit H of Kearns Report for LBI EBITDA.

(2) See Exhibit H- note 8 of Kearns Report for support.

(3) 2007 projected dividends from associates of $117 from LYO-UCC00092606; 2008 equity in earnings of affiliates of $106 from ACC00142175.

Source: LYO-UCC00092606 & ACC00142175.

**CONFIDENTIAL**

**EXHIBIT 3B**

**CONFIDENTIAL**

LyondellBasell Industries AF S.C.A.
Guideline Company Multiples

## Sensitivity- Forward EBITDA Multiples

| | Chemicals Median | Refining Median | Selected Multiples after 10% Discount | | | | | Weighted Multiple |
|---|---|---|---|---|---|---|---|---|
| | | | Chemical | | Refining | | | |
| **Total Invested Capital to EBITDA** [1][2] | | | | | | | | |
| Latest Fiscal Year | 7.7 x | 6.6 x | 70% | 6.9 x | 30% | 5.9 x | | 6.6 x |
| Latest 12 Months | 7.2 x | 5.1 x | 70% | 6.5 x | 30% | 4.6 x | | 5.9 x |
| **Total Invested Capital to Projected 2007 EBITDA** [3] | | | | | | | | |
| 2007 Projected | 7.3 x | 5.6 x | 70% | 6.6 x | 30% | 5.0 x | | 6.1 x |
| **Total Invested Capital to Projected 2008 EBITDA** [3] | | | | | | | | |
| 2008 Projected | 7.4 x | 5.1 x | 70% | 6.7 x | 30% | 4.6 x | | 6.0 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary
and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBITDA
has been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period
(2) Nova EBITDA is adjusted to US GAAP basis.
(3) EBITDA values are calculated from Maxwell Report. EBITDA values for Celanese and Huntsman are
median of analyst reports from Thomson Reuters, dates 8/6/07 through 12/20/07. EBITDA is not adjusted for
LIFO/FIFO and it is unknown if EBITDA includes equity income from affiliates or dividends from JVs.

Source:
Capital IQ, Maxwell Report, Thomson Reuters.

**EXHIBIT 3B**

**CONFIDENTIAL**

## Sensitivity- Forward EBITDA Multiples

LyondellBasell Industries AF S.C.A.
Guideline Company Multiples

| | Chemicals (Commodity and Diversified) | | | | | |
|---|---|---|---|---|---|---|
| | Nova Chemicals Corp. | The Dow Chemical Company | Celanese Corp. | Huntsman Corp. | Westlake Chemical Corp. | Eastman Chemical Co. |
| **Total Invested Capital to EBITDA [1][2]** | | | | | | |
| Latest Fiscal Year | 8.3 x | 6.9 x | 9.0 x | 9.4 x | 4.2 x | 7.1 x |
| Latest 12 Months | 6.9 x | 7.3 x | 8.7 x | 10.7 x | 6.2 x | 7.2 x |
| **Total Invested Capital to Projected 2007 EBITDA [3]** | | | | | | |
| 2007 Projected | 5.7 x | 7.5 x | 9.3 x | 10.5 x | 5.4 x | 7.1 x |
| **Total Invested Capital to Projected 2008 EBITDA [3]** | | | | | | |
| 2008 Projected | 6.2 x | 7.6 x | 8.2 x | 9.2 x | 5.9 x | 7.2 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBITDA has been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period.
(2) Nova EBITDA is adjusted to US GAAP basis.
(3) EBITDA values are calculated from Maxwell Report. EBITDA values for Celanese and Huntsman are median of analyst reports from Thomson Reuters, dates 8/6/07 through 12/20/07. EBITDA is not adjusted for LIFO/FIFO and it is unknown if EBITDA includes equity income from affiliates or dividends from JVs.

Source:
Capital IQ, Maxwell Report, Thomson Reuters.

**EXHIBIT 3B**

**CONFIDENTIAL**

LyondellBasell Industries AF S.C.A.

**Sensitivity- Forward EBITDA Multiples**

Guideline Company Multiples

| | Valero Energy Corp. | Tesoro Corp. | Sunoco Inc. | Frontier Oil Corp. | Holly Corp. | Western Refining Inc. | Alon USA Energy, Inc. |
|---|---|---|---|---|---|---|---|
| **Refining** | | | | | | | |
| **Total Invested Capital to EBITDA [1][2]** | | | | | | | |
| Latest Fiscal Year | 5.1 x | 5.3 x | 5.2 x | 7.5 x | 6.6 x | 10.2 x | 7.7 x |
| Latest 12 Months | 4.0 x | 5.2 x | 3.8 x | 5.8 x | 5.1 x | 7.9 x | 4.5 x |
| **Total Invested Capital to Projected 2007 EBITDA [3]** | | | | | | | |
| 2007 Projected | 5.1 x | 5.6 x | 5.1 x | 5.6 x | 5.4 x | 6.3 x | 5.9 x |
| **Total Invested Capital to Projected 2008 EBITDA [3]** | | | | | | | |
| 2008 Projected | 5.1 x | 4.9 x | 5.1 x | 6.7 x | 6.5 x | 6.2 x | 4.8 x |

Notes:
(1) Includes equity income from affiliates. Excludes non-operating income and expenses and extraordinary and certain unusual charges. Also, for guideline companies with LIFO inventory accounting, EBITDA has been adjusted to a FIFO basis by adding the change in LIFO reserve for the respective time period.
(2) Nova EBITDA is adjusted to US GAAP basis.
(3) EBITDA values are calculated from Maxwell Report. EBITDA values for Celanese and Huntsman are median of analyst reports from Thomson Reuters, dates 8/6/07 through 12/20/07. EBITDA is not adjusted for LIFO/FIFO and it is unknown if EBITDA includes equity income from affiliates or dividends from JVs.

Source:
Capital IQ, Maxwell Report, Thomson Reuters.

**LyondellBasell Industries AF S.C.A.**
**Comparable Transaction Multiples- Chemical**

| Date Announced | Date Closed | Acquirer | Target | Maxwell Report Included | Maxwell Report Multiple | Kearns Report Included | Kearns Report Multiple |
|---|---|---|---|---|---|---|---|
| Sep-08 | | BASF SE | Ciba Holdings Inc. | | | | - |
| Jul-08 | | Ashland Inc | Hercules Inc | | | | |
| Jul-08 | | Dow Chemical Co. | Rohm & Haas Co | | | | |
| Oct-07 | | OM Group Inc | Rockwood Specialties Group | | | | |
| | Aug-07 | Saudi Basic Industries Corp | GE Plastics. Inc (nka:SABIC Innovative Plastics) | | | X | 10.5 |
| | Aug-07 | Olin Corp. | Pioneer Companies Inc. | | | X | 4.8 |
| Aug-07 | | Petroleo | Suzano Petroquimica S A | | | | |
| Jul-07 | | Basell AF S.C A | Lyondell Chemical Company | | | | |
| Jul-07 | | Hexion Specialty Chemicals, Inc | Huntsman | | | | |
| | May-07 | Cristal Global | Millennium Inorganic Chemicals, Inc. | | | X | 13.0 |
| | Feb-07 | Permira Advisers Ltd : Vienna Capital Partners Private Equity | BorsodChem Zrt | | | X | 9.3 |
| Dec-06 | | The Blackstone Group | Celanese Corp. | | | | |
| Oct-06 | Nov-06 | Westlake Chemical Corp. | Eastman Chemical (Polyethylene Business) | X | 3.2 | X | n/a |
| Sep-06 | Dec-06 | Saudi Basic Industries Corp. | Huntsman Corp (U K Petrochemicals Business) | X | 4.6 | X | 4.7 |
| | Sep-06 | Croda International plc | Uniqema Nederland BV | | | X | 8.4 |
| | Apr-06 | Akzo Nobel NV | Sico Inc | | | X | 11.9 |
| Apr-06 | | Braskem S A. | | | | | |
| Feb-06 | Jun-06 | Texas Petrochemicals, Inc | Huntsman Corp (U.S. Butadiene & MTBE Business) | X | 6.4 | X | 6.1 |
| | Oct-05 | OMV Aktiengesellschaft: International Petroleum Investment Company | Borealis AG | | | X | 5.0 |
| Oct-05 | Dec-05 | INEOS | Innovene | X | 5.2 | X | 6.2 |
| | Jul-05 | Celanese Corp | Acetex Corp | | | X | 7.0 |
| | Jul-05 | Crompton Corp. (nka:Chemtura Corporation) | Great Lakes Chemical Corp | | | X | 13.9 |
| | Jun-05 | Texas Pacific Group (nka:TPG); TPG Partners IV. L.P. | British Vita Group Sarl | | | X | 7.8 |
| May-05 | | Access Industries | Basell Industries | X | 7.1 | | |
| Feb-05 | Feb-05 | J P Morgan Partners. LLC | PQ Corporation | | | X | 6.3 |
| Feb-05 | | Basell | Access Industries | | | | |
| Mar-04 | | Lyondell Chemical Company | Millennium Chemicals | | | | |
| Jan-02 | | Lyondell Chemical Company | Equistar Chemicals | | | | |
| Jun-99 | | Dow Chemical Corporation | Union Carbide Corp | | | | |
| Jun-98 | | Lyondell Chemical Company | Arco Chemical Company | | | | |
| | | | | Median | 5.2 | Median | 7.4 |

← Maxwell appears to have used the implied equity value ($9,000 million) instead of the correct Enterprise Value ($10,700 million) as used by Kearns  The financial information was obtained from Capital IQ

CONFIDENTIAL

EXHIBIT 4

**LyondellBasell Industries AF S.C.A.**
**Comparable Transaction Multiples- Refining**

| Date Announced | Date Closed | Acquirer | Target | Maxwell Report Included | Multiple | Kearns Report Included | Multiple | |
|---|---|---|---|---|---|---|---|---|
| Aug-07 | | Basell Industries | Shell Berre-L'Etang Refinery | X | 7.4 | | | |
| Jan-07 | | Tesoro Corporation | Shell Oil - LA Refinery and Retail Sites | X | 3.7 | | | |
| Aug-06 | May-07 | Western Refining | Giant Industries | X | 7.0 | X | 9.4 | |
| Aug-06 | | Harvest Energy Trust | North Atlantic Refining Limited | X | 5.9 | | | |
| Aug-06 | Jul-06 | Lyondell Chemical Co. | Lyondell-Citgo Refinery | X | 5.7 | X | 9.1 | ← Maxwell calculated EBITDA by annualizing the YTD 6/30/06 data for a full year, whereas Kearns utilized the LTM EBITDA as provided by Capital IQ |
| Jun-05 | | Kelso & Co / Goldman Sachs & Co. | Coffeyville Resources LLC | X | 5.8 | | | |
| Apr-05 | Sep-05 | Valero Energy Corporation | Premcor Inc. | X | 6.6 | X | 5.7 | |
| | Jul-06 | Alon USA Energy, Inc. | Paramount Petroleum Corporation | | | X | 15.1 | |
| | Jun-05 | Marathon Oil Corporation | Marathon Ashland Petroleum, LLC (nka Marathon Petroleum Company) | | | X | 2.0 | |
| | | | | **Median** | **5.9** | **Median** | **9.1** | |

**CONFIDENTIAL**

**LyondellBasell Industries AF S.C.A.**
**Covenant Relief for Chemical Companies Summary During Prior Trough (2001-2003)**

| Date | Company | Amendment Request |
|------|---------|-------------------|
| 02/01/01 | Solutia | Interest Coverage and Leverage Ratio Covenant Relief |
| 03/31/01 | PolyOne Corporation | Interest Coverage and Leverage Ratio Covenant Relief |
| 06/30/01 | Chemtura (Crompton) | Leverage Ratio Waiver |
| 08/31/01 | Ferro Corporation | Fixed Charge and Leverage Ratio Covenant Relief |
| 09/24/01 | Chemtura (Crompton) | Leverage Ratio Covenant Relief |
| 11/21/01 | PolyOne Corporation | Interest Coverage and Leverage Ratio Covenant Relief |
| 12/14/01 | Millennium Chemicals | Interest Coverage and Leverage Ratio Covenant Relief |
| 12/21/01 | Chemtura (Crompton) | Interest Coverage and Leverage Ratio Covenant Relief |
| 03/28/02 | PolyOne Corporation | Leverage Ratio Waiver & Covenant Relief |
| 06/19/02 | Millennium Chemicals | Interest Coverage and Leverage Ratio Covenant Relief |
| 07/25/02 | Solutia | Credit Agreement Restatement & Interest Coverage and Leverage Ratio Covenants Amended |
| 12/24/02 | Solutia | Interest Coverage and Leverage Ratio Covenant Relief |
| 12/26/02 | PolyOne Corporation | Interest Coverage and Leverage Ratio Covenant Relief |
| 12/27/02 | Ferro Corporation | Fixed Charge and Leverage Ratio Covenant Relief |
| 04/25/03 | Millennium Chemicals | Interest Coverage and Leverage Ratio Covenant Relief |
| 05/06/03 | PolyOne Corporation | Credit Agreement Restatement & Interest Coverage and Leverage Ratio Covenants Amended |
| 06/30/03 | Chemtura (Crompton) | Leverage Ratio Covenant Relief |
| 06/30/03 | Solutia | Interest Coverage and Leverage Ratio Covenant Relief |
| 09/23/03 | Nova Chemicals | Interest Coverage Covenant Relief |
| 09/29/03 | Solutia | Interest Coverage and Leverage Ratio Covenant Relief |
| 09/30/03 | Ferro Corporation | Fixed Charge and Leverage Ratio Covenant Relief |
| 10/17/03 | Chemtura (Crompton) | Interest Coverage Covenant Waiver |
| 11/10/03 | Chemtura (Crompton) | Interest Coverage and Leverage Ratio Covenant Relief |
| 12/18/03 | Nova Chemicals | Interest Coverage Covenant Relief |

Source:
Capstone Advisory Group, LCD Comps & Citibank.

**CONFIDENTIAL**

**LyondellBasell Industries AF S.C.A.**
**Covenant Relief for Chemical Companies Summary During Current Period, September 2008- Present**

| Date | Company | Amendment Request |
|---|---|---|
| 09/11/08 | Georgia Gulf | Interest Coverage and Leverage Ratio Covenant Relief |
| 11/03/08 | Tronox | Interest Coverage and Leverage Ratio Waivers (Amendments previously obtained in Jan/Feb 2008) |
| 12/10/08 | Ineos | Leverage Ratio Covenant Relief |
| 01/07/09 | Chemtura | Interest Coverage and Leverage Ratio Waivers |
| 01/28/09 | Nova Chemicals | Interest Coverage and Debt/Cash Flow Ratio Covenant Relief |
| 03/04/09 | Dow Chemical | Leverage Ratio Covenant Relief |
| 03/11/09 | Ferro | Fixed Charge and Leverage Ratio Covenant Relief |
| 03/17/09 | Georgia Gulf | Interest Coverage and Leverage Ratio Covenant Relief |
| 04/17/09 | Huntsman | Leverage Ratio Waiver & Covenant Relief |
| 05/15/09 | Cytec | Leverage Ratio Covenant Relief |
| 07/01/09 | Celanese | Leverage Ratio Covenant Relief |
| 07/23/09 | Polymer Group | Interest Coverage and Leverage Ratio Covenant Relief |
| 10/15/09 | Solutia | Fixed Charge and Leverage Ratio Covenant Relief |
| 10/26/09 | Ferro | EBITDA Definition Modification & Fixed Charge Covenant Relief |

Source:
Capstone Advisory Group, LCD Comps & Citibank.

**CONFIDENTIAL**

**EXHIBIT 7**

**CONFIDENTIAL**



# FY 2007 Total Debt to EBITDA

Source: Capital IQ.

**EXHIBIT 7**

**CONFIDENTIAL**



# FY 2007 Debt to Equity (Book Value)

| Company | Value |
|---|---|
| Graphic Packaging Holding Company | 1304% |
| Newpage Holding Corporation | 600% |
| LBI | 340% |
| Polymer Holdings LLC | 295% |
| Ryerson Inc. | 246% |
| WII Components Inc. | 145% |
| CPG International, Inc. | 145% |
| Hexion Specialty Chemicals, Inc. | -268% |
| Cognis Gmbh | -289% |
| AMH Holdings LLC | -2062% |
| Preisop Holding AB | -5351% |

Source: Capital IQ.



FY 2007 Tangible Equity to Tangible Assets

EXHIBIT 7

CONFIDENTIAL

- Ryerson Inc. — 17%
- Polymer Holdings LLC — 12%
- Newpage Holding Corporation — 11%
- LBI — -2%
- WII Components Inc. — -31%
- Graphic Packaging Holding Company — -32%
- Cognis Gmbh — -41%
- Hexion Specialty Chemicals, Inc. — -50%
- Prisop Holding AB — -70%
- AMH Holdings LLC — -78%
- CPG International, Inc. — -90%



Source: Capital IQ.



FY 2007 EBITDA less Capex to Interest

- LBI - Including LIFO Adjustment: 2.27
- Ryerson Inc.: 1.73
- Hexion Specialty Chemicals, Inc.: 1.56
- AMH Holdings LLC: 1.55
- Cognis GmbH: 1.49
- Graphic Packaging Holding Company: 1.48
- WII Components Inc.: 1.36
- CPG International, Inc.: 1.34
- Newpage Holding Corporation: 1.02
- Pasniop Holding AB: 0.85
- Polymer Holdings Llc: 0.70

CONFIDENTIAL

EXHIBIT 7

Source: Capital IQ.

**EXHIBIT 7**

**CONFIDENTIAL**



# FY 2007 Debt to Total Assets

Source: Capital IQ.

EXHIBIT 7

CONFIDENTIAL



## FY 2007 Liabilities to Tangible Assets

Source: Capital IQ.

# Additional Documents Considered

## Expert Reports

Expert Report and Exhibits of Anders J. Maxwell, dated November 7, 2009

Expert Report and Exhibits of Daniel R. Fischel, dated November 7, 2009

Expert Report and Exhibits of David H. Witte and H.G. Nebeker, dated November 7, 2009

Expert Report and Exhibits of Ralph S. Tuliano, dated November 7, 2009

Expert Report and Exhibits of Robert Young, dated November 7, 2009

Rebuttal Report and Exhibits of George Intille, dated November 20, 2009

Rebuttal Report and Exhibits of Thomas O'Connor, dated November 20, 2009

## Court Documents

In Re: Lyondell Chemical Company, Declaration of Anders J. Maxwell, February 22, 2009

In Re: Lyondell Chemical Company, Deposition of Anders J. Maxwell, February 19, 2009

In Re: Lyondell Chemical Company, Transcript of Final Hearing on Motion for Post Petition Financing, February 26, 2009

In Re: Lyondell Chemical Company, Objection of the Official Unsecured Creditors Committee, February 22, 2009

## Interviews

Interview with Charles Hall, November 13, 2009

Interview with Dan Smith, November 12, 2009

Interview with Dan Smith, November 16, 2009

Interview with Ed Dineen, November 13, 2009

Interview with Karen Twitchell, November 13, 2009

Interview with Mario Portela, November 12, 2009

Interview with Norm Phillips, November 13, 2009

## SEC Filings and Other Financials

BASF Corporation Form 20-F, filed March 14, 2007

BASF Corporation Interim Financial Statements for the period July through September 2007, published October 30, 2007

Braskem S.A. Form 20-F, filed June 7, 2007

Braskem S.A. Form 20-F/A, Amendment No. 1, filed September 30, 2009

LyondellBasell Industries AF S.C.A. Financial Report, September 30, 2008

## Other Documents

Capital IQ

Chemical Companies Loan Amendments and Covenant Relief Summary, November 2009 (Citibank, Capstone Advisory Group, LCD Comps)

CMAI; Economy & Energy Overview, August 30, 2007, Vol 7, Issue , August 30, 2007

CMAI; Economy & Energy Overview, December 18, 2007, Vol 7, Issue 12, December 18, 2007

CMAI; Economy & Energy Overview, July 30, 2007, Vol 7, Issue 7, July 30, 2007

CMAI; Economy & Energy Overview, November 30, 2007, Vol 7, Issue 11, November 30, 2007

CMAI; Economy & Energy Overview, October 30, 2007, Vol 7, Issue 10, October 30, 2007

CMAI; Economy & Energy Overview, September 30, 2007, Vol 7, Issue 9, September 28, 2007

Harvard Business School; Workout vs. Bailout: Should Government take Advantage of the Buffet Effect?, dated October 2, 2008 (by Jim Heskett)

IRS Revenue Ruling 59-60

Lyondell Companies Daily Cash -- December 19, 2007

Peter J Solomon Company; "It's Credit Stupid!", By Peter J. Solomon and Anders J. Maxwell, September 25, 2008

CONFIDENTIAL

| Bates Ranges |
| --- |
| ACC00031968 - 2063 |
| ACC00033796 - 3833 |
| ACC00087660 - 7721 |
| ACC00088131 - 8177 |
| ACC00142175 |
| ACC00204333 |
| APOLLO-LYO_0000938 - 0950 |
| CITI_LYO_0038867 - 8923 |
| D&P_L003519 - 3571 |
| DBSI_00000007 - 0089 |
| GSCP_LYON HC00000305 - 0310 |
| LBI/BONY 013341 - 3376 |
| LYO-UCC 00122220 - 2325 |
| LYO-UCC 00132606 |
| LYO-UCC 00163795 - 3836 |
| LYO-UCC 00170257 - 0264 |
| LYO-UCC 00231744 - 1760 |
| LYO-UCC 00238739 - 8772 |
| LYO-UCC 00246400 - 6424 |
| LYO-UCC 00253512 - 3578 |
| LYO-UCC 00268955 - 8961 |
| LYO-UCC 00438993 - 8994 |
| LYO-UCC 00458587 - 8615 |
| LYO-UCC 00489051 - 9108 |
| LYO-UCC 00489359 - 9408 |
| ML-2004-039020 - 9031 |
| UBS2004-0025698 - 5787 |
| UBS2004-0045218 - 5255 |
| UBS2004-0045488 - 5500 |

**CONFIDENTIAL**

# Designation No. 884

# IN THE UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LYONDELL CHEMICAL COMPANY., *et al.,* | Case No. 09-10023 (REG) |
| Debtors. | (Jointly Administered) |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, Plaintiff, | **Adversary Proceeding No. 09-1375 (REG)** |
| - v - | |
| LEONARD BLAVATNIK, *et al.,* | |
| Defendants. | |

## SUPPLEMENTAL EXPERT REPORT OF CHRISTOPHER J. KEARNS

_____

Christopher J. Kearns

<u>April 15, 2011</u>

Updated as of May 23, 2011

Date

**CONFIDENTIAL**

# Table of Contents

I.     INTRODUCTION AND QUALIFICATIONS ........................................................... 1

II.    SUMMARY OF OPINIONS AND CONCLUSIONS .............................................. 3

III.   BACKGROUND ........................................................................................................ 7

    A.   LEGACY LYONDELL .......................................................................................... 7

        i.   A History of Successful Acquisitions and Divestitures ........................... 7

        ii.   Lyondell was Led by an Experienced Management Team ...................... 7

    B.   LEGACY BASELL ................................................................................................ 8

    C.   THE ACQUISITION ............................................................................................. 8

    D.   MANAGEMENT'S INVESTMENT PARTICIPATION IN LBI ................................. 9

IV.   THE BUDGETING AND FORECASTING PROCESS AT LYONDELL ......................... 11

    A.   SUMMARY OF OPINIONS AND OVERVIEW ...................................................... 11

    B.   ADDITIONAL ANALYSIS .................................................................................. 11

    C.   THE ANNUAL LRP PROCESS ......................................................................... 13

    D.   BUSINESS PERFORMANCE MEETINGS AND REPORT DEVELOPMENT ............. 16

        i.   Business Performance Meetings ........................................................... 16

        ii.   Development of Business Performance Meeting Reports ..................... 16

    E.   UPDATES TO LRP PROJECTIONS .................................................................... 18

V.    LYONDELL'S DEVELOPMENT OF PROJECTIONS IN 2007 ........................................ 19

    A.   THE 2007 LRP ................................................................................................. 19

    B.   INDUSTRY CONSULTANT VIEWS, SENSITIVITY CASES, AND SUPPLY/DEMAND EXPECTATIONS ............................................................................................... 20

    C.   UPDATES TO THE 2007 LRP PROJECTIONS ................................................... 22

        i.   The Spring 2007 Rating Agency Presentation ..................................... 22

        ii.   2007 Weekly Business Performance Meetings - Lyondell Actively Monitored Its Operations Following the 2007 LRP ............................. 24

        iii.   Lyondell's Cost Optimization and Revenue Enhancement Program ................. 27

        iv.   Lyondell Appropriately Updated its Projections in Response to the 13D Filing 27

        v.   Preparation of the Refreshed Projections ............................................. 28

        vi.   Refreshed Projections for Refining ...................................................... 30

        vii.   Refreshed Projections for EC&D ......................................................... 36

i

CONFIDENTIAL

       **viii.**  **The September 2007 Projections** ............................................................................ 39

**VI.**  **SUPPLEMENTAL ANALYSIS OF ADEQUATE CAPITAL AND ABILITY TO PAY DEBTS AS THEY CAME DUE** .................................................................................... 41

    **A.**  **LBI** HAD ADEQUATE CAPITAL AND THE ABILITY TO PAY ITS DEBTS AS THEY CAME DUE AT THE ACQUISITION DATE ............................................................. 41

    **B.**  **LBI** HAD ADEQUATE CAPITAL AND THE ABILITY TO PAY ITS DEBTS AS THEY CAME DUE AT MARCH 31, 2008 ......................................................................... 42

    **C.**  APRIL 2008 PROJECTIONS ............................................................................ 44

       **i.**  **April 2008 Conservative Case** ....................................................... 45

       **ii.**  **LBI 2008 First Half EBITDA Compared to April 2008 Projections** .................... 46

    **D.**  APRIL 2008 CREDIT REVIEW PROCESS BY THE LEAD ARRANGERS ................... 48

    **E.**  MARCH 2008 STRESS TESTS ...................................................................... 49

    **F.**  STRESS TESTS: KEY MODEL ASSUMPTIONS ................................................ 50

       **i.**  **Opening Liquidity as of April 1, 2008** ........................................ 51

       **ii.**  **The Impact of Changes in Oil Prices on LBI's Liquidity** ..................... 52

       **iii.**  **My Desired Minimum Liquidity is Conservative When Compared to the Views of UBS** ......................................................................... 53

       **iv.**  **Capital Expenditure Requirements Included in My Collective Stress Tests** ...... 54

       **v.**  **Interest Expense Calculation in My Collective Stress Tests** ................ 55

**VII.**  **WEIGHTED AVERAGE COST OF CAPITAL CALCULATIONS (CORRECTION TO THE KEARNS INITIAL REPORT)** ................................................................................ 64

**VIII.** **RESPONSE TO FLAWED CONCLUSIONS IN THE TULIANO REPORTS** .................. 65

    **A.**  TULIANO'S FLAWED CONCLUSIONS RELATED TO LIQUIDITY, LEVERAGE AND OIL PRICE VOLATILITY ............................................................................ 65

       **i.**  **Opening Liquidity in My December 2007 Stress Tests and March 2008 Stress Tests Appropriately Includes the Incremental Liquidity of the Accordion** ........ 65

       **ii.**  **Tuliano's Conclusions Regarding LBI's Liquidity and Leverage are Flawed and Misleading** ......................................................................... 66

       **iii.**  **Tuliano's Concept of Excess Liquidity is Misguided** ......................... 68

       **iv.**  **Tuliano Misrepresents LBI's Liquidity Position in Early 2008** .............. 69

       **v.**  **Tuliano Incorrectly Concludes that LBI was Excessively Leveraged** ........... 69

       **vi.**  **Tuliano's Observations on Oil Price Volatility are Misleading** .............. 70

    **B.**  TULIANO IGNORES KEY ANALYSES AND CONCLUSIONS MADE BY UBS ............ 72

    **C.**  TULIANO IGNORES KEY ANALYSES AND CONCLUSIONS MADE BY APOLLO ......... 76

**IX.**  **SUPPLEMENTAL VALUATION ANALYSIS AND RESPONSE TO PLAINTIFF'S ALLEGATIONS** .................................................................................................... 81

**CONFIDENTIAL**

**A.**    RESPONSE TO FLAWED CONCLUSIONS IN THE MAXWELL REPORTS ............................... 81

**X.**    **RIGHT TO SUPPLEMENT** .................................................................................................. 85

**CONFIDENTIAL**

## Index to Appendices and Schedules

### Appendices

A.  Curriculum Vitae of Christopher J. Kearns

B.  Documents/Interviews Considered and Relied Upon

### Schedules

1.  List of Officers

2.  Mapping of Legacy Lyondell and Basell Segments to LBI

3.  Assumptions in the December 2007 Stress Tests v. the March 2008 Stress Tests

4.  March 2008 Stress Tests

5.  April 2008 UBS Credit Memo, Exhibit D

6.  Revised WACC Calculation

7.  Kearns Reliance on Young v. Intille

8.  Explanation of LIFO v. FIFO

9.  EIA Oil Volatility Statistical Analysis

10. One Year Call Options at Various Strike Prices

11. Individuals Involved in the Process which Resulted in the Refreshed Projections

**CONFIDENTIAL**

## I. INTRODUCTION AND QUALIFICATIONS

I have been retained by counsel for the Lyondell D&O Defendants Group as defined in the Amended Case Management Order)[1] and for the benefit of the Access Defendants Group to submit this supplemental expert report (the "**Kearns Supplemental Report**" or "**Supplemental Report**").

I was previously retained in this matter by counsel for Citibank, N.A. ("**Citi**") in its capacity as former administrative agent for the Senior Credit Facility and Merrill Lynch Capital Corporation ("**Merrill**" or "**ML**") in its capacity as administrative agent for the Bridge Loan Facility (collectively, the "**Administrative Agents**"), on behalf of counsel for ABN Amro, Inc. ("**ABN AMRO**"), UBS Securities, LLC ("**UBS**"), Goldman Securities International, Goldman Sachs Credit Partners, L.P. (together with Goldman Sachs International, "**Goldman Sachs**" or "**GS**," and collectively with ABN AMRO, Citi, Merrill Lynch and UBS, the "**Lead Arrangers**"), Leverage Source III S.á.r.l., and the Ad Hoc Group of Senior Secured Lenders and for the benefit of the Lyondell D&O Defendants Group. I submitted an initial expert report on November 7, 2009 (the "**Kearns Initial Report**") and a rebuttal report on November 20, 2009 (the "**Kearns Rebuttal Report,**" together the "**Kearns Reports**"). The Kearns Reports, including all defined terms, are incorporated herein by reference.

In addition to those listed in the Kearns Reports, I have considered and relied upon certain additional documents and witness declarations in the preparation of this report, and I have conducted interviews with certain former Lyondell Chemical Company ("**Lyondell**") and LyondellBasell Industries AF S.C.A.'s ("**LBI**" or "**the Company**") executives. A list of the additional documents and interviews is attached hereto as Appendix B. I also have reviewed and relied upon reports prepared by other experts in this matter, including expert, rebuttal and supplemental reports prepared by Thomas O'Connor ("**O'Connor**")[2] and Robert Young ("**Young**").[3]

---

[1] Amended Case Management Order, as amended and supplemented August 2, 2010, docket number 383.

[2] O'Connor has prepared an expert report, dated November 7, 2009 (the "**O'Connor Initial Report**"), a rebuttal report dated November 20, 2009 (the "**O'Connor Rebuttal Report**"), and a supplemental report dated April 15, 2011 (the "**O'Connor Supplemental Report,**" collectively the "**O'Connor Reports**").

[3] Young has prepared an expert report, dated November 7, 2009 (the "**Young Initial Report**"), a rebuttal report dated November 20, 2009 (the "**Young Rebuttal Report**"), and a supplemental report dated April 15, 2011 (the "**Young Supplemental Report,**" collectively the "**Young Reports**"). I understand that George Intille, ("**Intille**") on whose reports I previously relied, is now employed by a firm previously retained by the Debtors, and may not be used as an expert in this proceeding. Young, who is retained by the Access Defendants Group, opined on

1

Additionally, I have relied extensively on knowledge and experience gained through my work experience and consultancy, including in the areas of business turnaround and restructuring situations, out-of-court workouts, bankruptcy matters, crisis management, transaction advisory and due diligence services and litigation support.  A current copy of my curriculum vitae is attached hereto as Appendix A.

My billing rate for this assignment is my standard rate of $760 per hour.  My fee is in no way contingent on the outcome of this proceeding or the nature of my opinions.  I was assisted by others at Capstone Advisory Group, LLC ("**Capstone**"), who worked at my direction and under my supervision.

---

substantially the same issues as Intille.  I have reviewed the Young Reports to assure myself that, with respect to those issues and conclusions of Intille's on which I relied, Young's opinions are consistent, and do not change my opinions expressed in the Kearns Reports.  To the extent that such reliance is reiterated in this Supplemental Report, I have cited my reliance on the Young Reports, rather than those of Intille.  Also see Schedule 7.

2

**CONFIDENTIAL**

## II. SUMMARY OF OPINIONS AND CONCLUSIONS

In the Kearns Reports, I reached the following conclusions:[4]

1. The fair value of LBI assets exceeded its debts, on a consolidated basis, as of December 20, 2007.[5]

2. LBI had adequate capital with which to operate its business as of December 20, 2007 after considering underlying business assumptions based on conditions and events reasonably foreseeable at the time.

3. The Projections[6] prepared in connection with the October 2007 Confidential Information Memorandum ("**CIM**"), indicate that LBI had the ability to pay its debts as they came due. The Projections (i) were prepared in a reasonable manner, (ii) were created based on a management process that included appropriate executive oversight and product-line specific managerial input, (iii) incorporated appropriate corporate planning and financial disciplines, (iv) appropriately considered the Company's historical financial and operational performance, and (v) utilized underlying assumptions that were based on events that were reasonably foreseeable at the time.[7]

4. Tuliano's analyses and conclusions regarding liquidity and capital adequacy contain many errors, fundamental flaws and irrelevant observations. Tuliano's analyses fail to demonstrate that the Company lacked adequate capital or was unable to pay its debts as they came due as of December 20, 2007.

5. LBI was performing substantially in accordance with its EBITDA plan through July 2008 despite unprecedented rising crude oil prices. However, the economic environment, as well as the industry and the company-specific dynamics in the 2008 second half were radically different from those in 2007 as a result of a confluence of events that were not

---

[4] Kearns Initial Report, pages 6-10; Kearns Rebuttal Report, page 6-7.

[5] LBI's capitalization included the equity interest of Access Industries Holdings, LLC ("**Access**") in Basell AF S.C.A.'s ("**Basell**"), which had a value of at least $3.9 billion to $4.6 billion.

[6] As defined in the Kearns Initial Report, the "**Projections**" are the financial projections prepared in connection with the CIM.

[7] Prior to the Acquisition, the Projections were independently analyzed by industry consultants Chemical Market Associates, Inc. ("**CMAI**") and Turner Mason & Co. ("**Turner**"), engaged by an affiliate of Basell and by Lyondell, respectively, for their own purposes and for the benefit of the Lead Arrangers. The analyses undertaken in late 2007 by CMAI and Turner indicated that the Projections, on an overall basis, were reasonable and, for the petrochemical business, were conservative.

**CONFIDENTIAL**

reasonably foreseeable at the time of the Acquisition.[8]  The following chart summarizes 2008 EBITDA performance and crude oil price volatility.



**YTD 2008 EBITDA: October 2007 CIM Projections vs. Actual[9]**



Subsequent to filing the Kearns Reports, counsel for the Lyondell D&O Defendants Group requested that I address the following questions in response to certain allegations in the Amended Complaint and certain related opinions of Plaintiff's experts Ralph S. Tuliano ("**Tuliano**"),[10] Anders J. Maxwell ("**Maxwell**"),[11] H.G. Nebeker ("**Nebeker**") and David Witte ("**Witte**")[12] in their respective supplemental reports:[13]

    1. Was the process used by Lyondell to create the projections presented to Basell as part of the management presentation on July 14, 2007 (the "**Refreshed Projections**") a

---

[8] As defined in the Kearns Initial Report, the "**Acquisition**" is the December 20, 2007 transaction pursuant to an agreement and plan of merger, whereby Basell acquired Lyondell for $48 per share.

[9] Trautz Exhibit 5; Average monthly WTI spot prices (Cushing, OK WTI Spot Price FOB): Energy Information Administration (www.eia.doe.gov).

[10] Tuliano has prepared the "**Tuliano Initial Report**," dated November 7, 2009, the "**Tuliano Rebuttal Report**," dated November 20, 2009, and the "**Tuliano Supplemental Report**," dated February 28, 2011, collectively the "**Tuliano Reports**."

[11] Maxwell has prepared the "**Maxwell Initial Report**," dated November 7, 2009, the "**Maxwell Rebuttal Report**," dated November 20, 2009, and the "**Maxwell Supplemental Report**," dated February 28, 2011, collectively the "**Maxwell Reports**."

[12] Witte and Nebeker have prepared the "**Witte/Nebeker Initial Report**," dated November 7, 2009, the "**Witte/Nebeker Rebuttal Report**," dated November 20, 2009, and the "**Witte/Nebeker Supplemental Report**," dated February 28, 2011, collectively the "**Witte/Nebeker Reports**."

[13] The "**Amended Complaint**" is the Amended Complaint filed in this matter on July 23, 2010, by Edward S. Weisfelner, as litigation trustee of the LB Litigation Trust.

**CONFIDENTIAL**

reasonable process, typical for an organization of the size and complexity of Lyondell, under the circumstances existing at the time?[14]

2. Did LBI have adequate capital with which to operate its business as of March 31, 2008?

3. Did LBI have the ability to pay its debts as they came due as of March 31, 2008?

4. Was the process used by LBI to create the April 11, 2008 projections (the "**April 2008 Projections**") a reasonable process typical for an organization of the size and complexity of LBI under the circumstances existing at the time?

5. Does the Tuliano Supplemental Report, including the analysis of LBI's liquidity and capital adequacy as of March 31, 2008, suffer from the same errors and fundamental flaws included in his analysis of capital adequacy as of the Acquisition date?

6. Does the Maxwell Supplemental Report, including the valuation analysis and conclusions as of October 20, 2008, contain certain assumptions, methodologies and conclusions that further undermine his valuation analysis and conclusion as of the Acquisition date?

In my opinion:

1. The Refreshed Projections were created based on a management process that incorporated appropriate corporate planning and financial disciplines as well as management practices and institutional knowledge from (i) Lyondell's long-range planning process ("**LRP**") and (ii) weekly planning meetings (the "**Business Performance Meeting**" or "**BPM**").  The Refreshed Projections were prepared in a reasonable manner and utilized underlying assumptions that were based on conditions and events that were reasonably foreseeable at the time.

2. LBI had adequate capital with which to operate its business as of March 31, 2008 after considering underlying business assumptions based on conditions and events that were reasonably foreseeable at the time.

3. LBI had the ability to pay its debts as they came due as of March 31, 2008.

4. The April 2008 Projections were developed in the ordinary course of business using LBI's forecasting process, including input from the requisite business units and corporate functions within LBI.  The April 2008 Projections incorporated LBI management's view,

---

[14] As described above, I have previously opined on the process by which the Projections were prepared.

5

**CONFIDENTIAL**

after considering macroeconomic, industry and LBI-specific issues, and the views of industry consultants.

5. Tuliano's analysis of liquidity and capital adequacy as of March 31, 2008 follows the same fundamentally flawed approach he used as of the Acquisition date. Moreover, Tuliano's supplemental analysis selectively relies on contemporaneous analyses and downside cases prepared by UBS and Apollo, while ignoring their salient conclusions and analyses that contradict Tuliano's related inferences and opinions.

6. Maxwell's valuation analysis as of October 20, 2008 includes certain assumptions, methodologies and conclusions that further undermine his valuation conclusion as of the Acquisition date.

**CONFIDENTIAL**

## III. BACKGROUND

The Kearns Initial Report discusses the background of legacy Lyondell, Basell and the Acquisition.[15]   In light of certain allegations in the Amended Complaint, I have provided additional background information below.

### A. LEGACY LYONDELL

#### i. A History of Successful Acquisitions and Divestitures

In the years leading up to the Acquisition, Lyondell had a successful track record integrating large acquisitions and completing divestitures.

- In July 1998, Lyondell acquired ARCO Chemical Company for approximately $5.9 billion.[16]

- In August 2002, Lyondell acquired a 29.5% stake in Equistar Chemicals, LP ("**Equistar**") from Occidental Petroleum Corporation for approximately $440 million.  After the acquisition, Lyondell had a 70.5% interest in Equistar.[17]

- In November 2004, Lyondell acquired Millennium Chemicals, Inc. ("**Millennium**") for approximately $1.5 billion.[18]

- In August 2006, Lyondell acquired the 41.25% interest in Houston Refining LP ("**Houston Refining**") held by CITGO Petroleum Corporation ("**CITGO**") for approximately $2.6 billion.[19]

- In May 2007, Lyondell sold its worldwide inorganic chemicals business, ("**TiO2**") which was part of Millennium, for approximately $1.3 billion.[20]

#### ii. Lyondell was Led by an Experienced Management Team

Lyondell was led by an experienced and highly qualified management team comprised of industry veterans.  Many of the officers were with Lyondell prior to its spin-off from the Atlantic Richfield Company ("**ARCO**") in 1989.  A partial list of those executives, along with their

---

[15] Kearns Initial Report, pages 10-17.

[16] Lyondell Form 10-K for the year ended December 31, 2000.

[17] Lyondell Form 10-K for the year ended December 31, 2003.

[18] Lyondell Form 10-K for the year ended December 31, 2004.

[19] Lyondell Form 10-K for the year ended December 31, 2006.

[20] Lyondell Form 10-K for the year ended December 31, 2007.

**CONFIDENTIAL**

respective length of service is included in the table below.  Expanded biographies are included in
Schedule 1.

## Partial List of Lyondell Executives

| Executive | Title | Length of Service |
|---|---|---|
| Dan Smith ("**Smith**") | Chief Executive Officer | 32 years |
| Morris Gelb ("**Gelb**") | Chief Operating Officer | 38 years |
| Edward Dineen ("**Dineen**") | Senior Vice President of Intermediates & Performance Chemicals | 32 years |
| Norman Phillips ("**Phillips**") | Senior Vice President of Fuels and Pipelines | 31 years |
| Kevin DeNicola ("**DeNicola**") | Chief Financial Officer | 17 years |
| Karen Twitchell ("**Twitchell**") | Vice President and Treasurer | 7 years |
| Mario Portela ("**Portela**") | Vice President of Corporate Development | 18 years |
| Kerry Galvin ("**Galvin**") | Senior Vice President and General Counsel | 17 years |
| Jim Bayer ("**Bayer**") | Senior Vice President of Manufacturing and Health, Safety and Environment | 32 years |
| John A. Hollinshead ("**Hollinshead**") | Senior Vice President of Human Resources | 29 years |
| Charles Hall ("**Hall**") | Vice President and Controller | 6 years |
| Bart de Jong ("**de Jong**") | Vice President of Technology | 12 years |

## B.  LEGACY BASELL

Basell was formed in September 2000 through a combination of businesses owned by BASF
and Shell Chemicals.  Basell was owned by Access, which had investments in natural resources
and chemicals industries, media communications and real estate.[21]

## C.  THE ACQUISITION

Lyondell and Basell merged on December 20, 2007.  The Acquisition is fully described in
the Kearns Reports, the key points of which are as follows:

- The Acquisition was funded with $20.8 billion of debt ($7.5 billion of which was used to
  refinance then existing debt).[22]

- The Acquisition was further capitalized by Access' significant equity position in Basell.
  In April 2007, Merrill Lynch estimated the equity value of Basell to be in the range of
  $3.9 billion to $4.6 billion.[23]

- At closing, LBI had approximately $2.3 billion of available liquidity, comprised of $1
  billion of cash and approximately $1.3 billion in undrawn credit facilities.[24]  In addition,
  the Inventory ABL[25] and the Receivable ABL[26] contained accordion features that

---

[21] GSCP_LYON00076394.

[22] Excludes refinancing of intercompany debt.

[23] Kearns Initial Report, page 16.

[24] LYO-UCC 00263750 - 00263751.

[25] As defined in the Kearns Initial Report, the "**Inventory ABL**" is a $1 billion Inventory Asset Backed Loan.

8

**CONFIDENTIAL**

provided LBI the option to access additional loan commitments under either facility of up to $600 million on a combined basis (the "**Accordion**").[27]

Prior to the Acquisition, Lyondell had three reportable segments: (i) ethylene, co-products and derivatives ("**EC&D**"), (ii) propylene oxide ("**PO**") and related products ("**PO&RP**"), and (iii) refining ("**Refining**").    Prior to the Acquisition, Basell had three business segments: (i) Polyolefins, (ii) Advanced Polyolefins, and (iii) Technology, all of which are described in the Kearns Initial Report.[28]    See Schedule 2 for a "merging" of the business segments of the two legacy companies into LBI's business segments.

The combination of Lyondell and Basell was expected to create a company that (i) was more globally diversified, (ii) had less earnings volatility, and (iii) would be well positioned to take advantage of expanding Asian markets.    Indeed, following the Acquisition, as part of the diligence performed by Apollo Management, L.P. (collectively with its affiliates, "**Apollo**") in connection with the acquisition of a portion of the financing from Citi, the investment team at Apollo remarked:

> …the combination of Lyondell and Basell creates a global powerhouse which has a dominant position in each of its core product offerings.

> …the acquisition of Lyondell provides Basell with a captive source of propylene in North America.

> …the backward integration to refining will likely dampen the cyclicality of the petrochemical business, and the strong refining spread outlook will offset the olefin/polyolefin cycle which is expected to turn towards a trough in 2010 and 2011.[29]

**D.  MANAGEMENT'S INVESTMENT PARTICIPATION IN LBI**

The Amended Complaint alleges that members of Lyondell management breached their fiduciary responsibilities as officers of Lyondell in order to "cash out."[30]    Several of the senior

---

[26] As defined in the Kearns Initial Report, the "**Receivable ABL**" is a Receivables Asset Backed Loan.

[27] D&P_L028353.

[28] Kearns Initial Report, pages 13-15.

[29] LS0002130.

[30] Amended Complaint, para. 85.

9

**CONFIDENTIAL**

Lyondell officers, including Dineen, Gelb, Phillips, Portela, and Twitchell,[31] remained with LBI after the Acquisition and invested in LBI, including but not limited to:[32]

- Dineen invested over $1.1 million of his personal assets in LBI in March 2008.[33]

- Phillips invested $420,000 of his personal assets in LBI in March 2008.[34]

- Portela invested approximately $600,000 of his personal assets in LBI in either March or April 2008.[35]

- Twitchell invested $327,024 of her personal assets in LBI in April 2008.[36]

These individuals[37] voluntarily invested in LBI with full knowledge of the Lyondell pre-merger projections. These equity investments were made in or around March and April 2008, a period during which the Plaintiff alleges that LBI was experiencing a liquidity crisis. The contention in the Amended Complaint that any of these individuals would knowingly invest their personal assets in a doomed enterprise based on inflated projections, during a liquidity crisis, is illogical.

---

[31] Portela and Twitchell are not defendants and have not been accused of any breach of their fiduciary duties.

[32] Smith had also expressed his desire to remain as the CEO of LBI in a letter to Blavatnik dated September 17, 2007 ACC00060873.

[33] Declaration of Edward Dineen, January 15, 2010, para. 10; COV00591.

[34] Declaration of Norm Phillips, January 15, 2010, para. 5.

[35] Deposition of Mario Portela, February 18, 2011, page 249.

[36] Declaration of Karen Twitchell, December 10, 2009, para. 6.

[37] I also understand that Gelb invested as well.

10

**CONFIDENTIAL**

## IV.   THE BUDGETING AND FORECASTING PROCESS AT LYONDELL

### A.   SUMMARY OF OPINIONS AND OVERVIEW

In the Kearns Reports, I discussed the budgeting and forecasting process at Lyondell and Basell and concluded that the Projections (i) were prepared based on reasonable underlying assumptions, (ii) considered events and circumstances that were reasonably foreseeable at the time, and (iii) appropriately considered historical operating results for the combined entities.[38] Further, I concluded that the Projections were prepared in a reasonable manner, consistent with prior practice, and included realistic synergy assumptions.[39]

### B.   ADDITIONAL ANALYSIS

After the filing of the Kearns Reports, and in response to certain allegations contained in the Amended Complaint, I performed additional analyses related to the budgeting and monitoring processes at Lyondell including, among other things, a review of documents produced in this litigation and interviews with Smith, Twitchell, Galvin, Dineen, Phillips, Bayer, Hall, Alan Bigman ("**Bigman**") and Portela.

The budgeting and monitoring process at Lyondell included three interrelated processes: (i) the annual Long Range Plan, (ii) the weekly Business Performance Meeting (and related reports), and (iii) an update process, usually driven by significant events.   The LRP, Business Performance Meetings, and periodic updates were part of an in-depth, continuous and ongoing process used by Lyondell to budget and track current and future performance and cannot be analyzed in isolation:

(i)   As discussed in the Kearns Initial Report, the annual bottom-up LRP process involved personnel at all levels of Lyondell.   Detailed analysis underlying the business plan focused on both resource allocation and the development of Lyondell's long-term view of the industry.[40]   It also provided a foundation for the ongoing analysis of the business outlook throughout the subsequent year.[41]

---

[38] Kearns Initial Report, pages 48-49.

[39] Kearns Initial Report, page 49.

[40] Declaration of Edward Dineen, January 15, 2010, para. 69; Kearns Initial Report, pages 50-51.

[41] Deposition of Joseph Tanner, January 25, 2011, page 21; 20-25; & page 22; 2.

**CONFIDENTIAL**

(ii)  Weekly Business Performance Meetings provided a forum for a cross-functional communication whereby Lyondell management gained both insights and operating and market information from each of the business units.    These meetings served to regularly update management's short-term outlook, including any issues affecting the execution of the business plan, as well as decisions related to product demand, price increases, margins, operating rates, production volumes, optimization, working capital and liquidity.[42]   The weekly Business Performance Meetings were a forum in which Lyondell management exchanged views on the state and direction of Lyondell's business and developments in the chemical and refining industries.[43]

(iii)  An update to the financial projections was undertaken as warranted by events such as annual rating agency presentations, acquisitions, divestitures and/or financing transactions.[44]   For example, an update was performed prior to Lyondell's acquisitions of (i) the minority interest in Houston Refining in 2006,[45] (ii) Millennium Chemicals in 2004,[46] and (iii) the interest held by Lyondell's joint venture partner (Occidental Petroleum Corporation) in Equistar in 2002.[47]   Typically, such updates involved revisions to the short-term outlook, long-term projections, or both.  The specific process to update projections was driven by the purpose and use of the projections.

The following chart includes an overview of the sets of projections developed during the period from the purchase of CITGO's interest in Houston Refining ("**Project Quincy**") to the April 2008 Projections.

---

[42] Deposition of Edward Dineen, January 13, 2010, pages 28-31.

[43] Deposition of Edward Dineen, January 13, 2010, page 31.

[44] Deposition of Edward Dineen, January 13, 2010, pages 40-42.

[45] Deposition of Norm Phillips, January 13, 2010, pages 48-49.

[46] Deposition of Dan Smith, October 16, 2009, pages 58-59.

[47] Id.

12

**CONFIDENTIAL**



**Projections Timeline**

### C. THE ANNUAL LRP PROCESS

The annual LRP incorporated Lyondell management's view of long-term market fundamentals, in particular the path and shape of the industry cycle for the ensuing five years. In incorporating such views, management would consider the totality of the trend of the projections, particularly for years two through five, rather than focusing on each of those years in isolation. Given that the market was the main determinant of product pricing and volumes (effectively Lyondell was a price taker for certain of its products), the directional trend of the market and industry cycle were primary factors in each year's LRP development. As a consequence, Lyondell focused on controllable factors such as capital spending and cost management, particularly in the first forecast year.

The purpose of the bottom-up portion of the LRP process was to communicate an integrated set of corporate and functional priorities and expectations throughout the organization, from executive management to individual contributors. To accomplish that goal, the LRP process engaged the entire organization in extensive two-way communication and created clear ownership and accountability for managing controllable resources, primarily expense and capital budgets. Performance in these areas was monitored and managed through the ongoing management, accounting and reporting system, which was incorporated in the Business Performance Meetings.

13

**CONFIDENTIAL**

The LRP also served to (i) provide an outlook for the upcoming year; (ii) achieve strategic alignment of operating goals and objectives across the organization;[48] (iii) identify capital resource allocation and industry trends for a five-year period; and (iv) address anticipated financing needs.[49]  The development of the LRP took place over several months and involved hundreds of people across the organization including executive management and personnel in Corporate Development, Treasury, the Controller's Group and the business units.[50]

Each year, the LRP process began with the development of macroeconomic assumptions (*e.g.,* GDP growth, inflation, energy prices) for the LRP period by Lyondell executive management with Corporate Development.

Lyondell management typically developed its macroeconomic assumptions for the LRP by July,[51] so that all of the business units utilized a common set of underlying assumptions.  Based on these expectations, Lyondell management began the process of developing industry specific forecasts (*e.g.,* product slates or mix, operating rates, margins) and comparing them to views of economic and industry consultants for the outlook period.[52]  Below, is a non-exhaustive list of independent data sources typically considered by Lyondell management for macroeconomic and industry-specific outlooks:

- Macroeconomic: Global Insight, Organization of Economic Cooperation and Development, Oxford Economics;

- Chemicals: Cambridge Energy Research Associates ("CERA"), CMAI, ChemData, SRI Consulting, and Nexant; and

- Refining: Petroleum Industry Research Associates ("PIRA"), Turner Mason, Purvin & Gertz, Wood MacKenzie, and Muse Stancil.

---

[48] Deposition of Edward Dineen, January 13, 2010, page 35; Declaration of Norm Phillips, January 15, 2010, para. 25; Deposition of Dan Smith, October 16, 2009, page 36.

[49] Deposition of Karen Twitchell, October 13, 2009, page 115.

[50] Declaration of Dan Smith, December 10, 2009, paragraph 34.

[51] Long Range Planning Process – LBTR000191179.

[52] The Chemicals and Refining divisions routinely engaged industry consultants to visit Lyondell to present their views of industry conditions and expectations.  The objective of these presentations was to enhance Lyondell management's understanding of the related markets.  For example, in May 2007 both PGI and Turner gave presentations to Lyondell discussing their outlook for the refining industry. CMAI also presented to Lyondell management in May 2007 regarding its outlook for the chemicals industry.

14

**CONFIDENTIAL**

The macroeconomic assumptions developed by Lyondell management provided the foundation for the volume and margin assumptions made by executive management and the leaders of the individual business segments. The business units were responsible for developing cost budgets and estimates for capital spending on a plant-by-plant basis.

The business unit leaders worked closely with analysts in the Business Decision Analysis ("**BDA**") group, which was part of Corporate Development. Each business unit at Lyondell was assigned a BDA analyst who was responsible for coordinating the development of the LRP projections.[53] Each analyst collaborated with the business unit to assist in the development of the forecasts for margins, volumes, operating rates and supply/demand dynamics. In developing these forecasts, the analysts considered (i) external consultant industry data, (ii) historical peak to trough performance, (iii) the business unit manager's view of the competitive landscape,[54] and (iv) historic reliability and known improvements in the applicable plant.[55] While the analysts "provide[d] insight and influence,"[56] the business segment heads (with input from the business unit managers), determined the accepted outlook, including volume and margin calls.[57]

Once complete, the data from the individual business unit models was used to prepare profit and loss models by analysts in the Business Performance Analysis and Reporting ("**BPAR**") group. These models were then combined to yield the consolidated EBITDA projections for Lyondell.[58] Corporate finance and cash management plans (including capital expenditures, debt issuance/repayment, working capital needs, etc.) were then incorporated based on input from the business units and Treasury.[59] Through Lyondell's iterative LRP process, projections were challenged by successive levels of management, including the executive officers. Finally, a summary of the LRP was presented to the Lyondell Board of Directors (the "**Board**"). The Board considered the LRP in determining whether to approve the upcoming year's capital expenditure budget.[60]

---

[53] Deposition of Kim Foley, January 24, 2011, pages 13, 22.

[54] Deposition of Kim Foley, January 24, 2011, pages 22-23 & 76-77.

[55] Deposition of Kim Foley, January 24, 2011, pages 51-52.

[56] Deposition of Kim Foley, January 24, 2011, page 41.

[57] "Margin calls" is a term frequently used within Lyondell to refer to estimates of future margins.

[58] Deposition of Kim Foley, January 24, 2011, pages 84-85.

[59] Deposition of Karen Twitchell, October 13, 2009, pages 115-116.

[60] Deposition of Karen Twitchell, October 13, 2009, pages 117-118.

CONFIDENTIAL

## D.  BUSINESS PERFORMANCE MEETINGS AND REPORT DEVELOPMENT

### i.  Business Performance Meetings

On a weekly basis, Lyondell executive management met to review and discuss current and expected future business performance.[61]  The Business Performance Meetings and related reports provided Lyondell management with real-time data on companywide operations and industry developments.  In these meetings, Lyondell management regularly updated its short-term outlook for the business and discussed larger Lyondell-specific and industry trends, including, among other things, changes in commodity prices, movements in supply and demand trends, recent operating performance, status of ongoing initiatives, and unusual or one-time items.[62]  In addition, management would review and discuss changes in the long-term outlook, driven by items such as changes in economic demand, supply or capacity.[63]  The Business Performance Meetings and related reports effectively were an extension of the LRP development process.

During the Business Performance Meetings, Lyondell officers discussed recent results and their thoughts about the direction of Lyondell and the refining and petrochemical industries.[64]  Additionally, the managers of individual business units frequently attended the Business Performance Meetings and provided Lyondell management with detailed presentations regarding their business unit's performance and outlook.[65]  Such regular, detailed business unit information afforded Lyondell management a real-time view of manufacturing operations, market position, ongoing corporate initiatives and the outlook for each business unit.

### ii.  Development of Business Performance Meeting Reports

The Business Performance Meeting Reports were prepared by the Business Performance Analysis and Reporting group, which during the relevant period was led by Joseph Tanner ("**Tanner**") who reported to the Controller, Charles Hall.[66]  The Business Performance Meeting

---

[61] Deposition of Joe Tanner, January 25, 2011, pages 181-183.

[62] Deposition of Joe Tanner, January 25, 2011, pages 20-23.

[63] Interview with Dan Smith, April 15, 2011.

[64] Deposition of Joe Tanner, January 25, 2011, pages 181-183.

[65] Deposition of Edward Dineen, January 13, 2010, pages 25-26; Deposition of Joe Tanner, January 25, 2011, page 181.

[66] Tanner was responsible for compiling the projections and data that appeared in the Business Performance Meeting Reports.  He acted as an aggregator, receiving and incorporating forecasts from the business segments.  While the meetings were held weekly, the forecasts were updated bi-weekly.

16

**CONFIDENTIAL**

Reports were reviewed by the heads of the Chemicals and Fuels divisions to ensure that assumptions were consistent prior to distribution to other members of executive management.[67] In addition, Treasury reviewed the reports or met with the BPAR group in advance of each Business Performance Meeting to ensure that the cash forecasts produced by Treasury took into consideration the outlook contained in the Business Performance Meeting Reports.

In preparing the Business Performance Meeting Reports, management utilized its weekly Feedstock and Fuels Point of View Report (the "**Point of View**").[68] The BDA and BPAR groups prepared the Point of View by gathering market data such as actual and forecasted spot prices of feedstocks and fuels as well as actual and forecasted crack spreads. This data was used as a source to develop the margin forecasts utilized for the current outlook included in the Business Performance Meeting Reports.[69]

Information included in the Business Performance Meeting Reports generally included, but was not limited to:[70]

- Updated forecasts for the current and upcoming quarter (*i.e.,* a "current outlook") for each segment and a comparison to historical EBITDA;
- Prices, spreads and volume detail (by month) for major product categories;
- Measures of supply and demand;
- EBITDA bridge analyses that explained variances between the previous Business Performance Meeting forecast and the prior quarter;
- Analyses of recent and expected prices for feedstocks (including the Point of View); and
- Analyses of historical price/margin trends.

The Business Performance Meeting Reports also incorporated operating, investing and financing cash flow forecasts for the current quarter by legal entity, including a detailed analysis of the expected changes in working capital.

---

[67] Treasury and Business Performance Analysis and Reporting also reconciled the month end cash presented in the forecast.

[68] LBTR 00035996-7. In the Kearns Initial Report, page 51, I identify a document as a Point of View (POV), but it is actually a Business Performance Meeting Report.

[69] Interview with Mario Portela, March 28, 2011.

[70] LYO-UCC 00488543-52; LYO-UCC 00488553-608.

17

**CONFIDENTIAL**

## E.  UPDATES TO LRP PROJECTIONS

As described above, Lyondell also updated its short- and long-term projections when warranted by events such as acquisitions, financing transactions and/or presentations to ratings agencies.[71]  When an update to the projections was required, Lyondell updated the assumptions used in the LRP process with Lyondell management's most current outlook.  The process that resulted in the Refreshed Projections used management's knowledge of Lyondell and its industries, as well as the "building blocks" from the LRP and the Business Performance Meeting processes.[72]  Consequently, the Refreshed Projections were developed with and resulted from these "building blocks" and reflected management's view considering the most current data available.  In my opinion, the integrity of the process resulting in the Refreshed Projections is supported by the very detailed nature of both the LRP and the weekly Business Performance Meeting processes.  In fact, a number of individuals involved in assembling the LRP and the Business Performance Meeting Reports actively participated in the weekly Business Performance Meetings and in the process that resulted in the Refreshed Projections (see Section V.C. for further discussion).  Accordingly, these individuals had intimate and detailed knowledge of both business results and future expectations, thus providing a solid and credible basis for the Refreshed Projections.

---

[71] Deposition of Edward Dineen, January 13, 2010, pages 40-42.

[72] For example, the plant-by-plant cost budgets developed as part of the LRP process would not materially change any updated projections, absent a significant unplanned event.

**CONFIDENTIAL**

## V.    LYONDELL'S DEVELOPMENT OF PROJECTIONS IN 2007

### A.  THE 2007 LRP

The 2007 LRP presented to the Board on December 6, 2006 included the following projections (the "**2007 LRP Projections**"):

### 2007 Long Range Plan EBITDA[73]

*$ in millions*

|              | 2006LE | 2007E | 2008E | 2009E | 2010E | 2011E | Total |
|--------------|-------:|------:|------:|------:|------:|------:|------:|
| EC&D         | $ 1,295 | $ 1,465 | $ 1,295 | $ 599 | $ 564 | $ 518 | $ 5,736 |
| PO&RP        | 753 | 712 | 657 | 664 | 701 | 676 | 4,163 |
| Refining     | 618 | 1,333 | 1,324 | 1,375 | 1,110 | 932 | 6,692 |
| MCH [(1)]    | 146 | 197 | 215 | 261 | 282 | 299 | 1,400 |
| **LYO EBITDA** | **$ 2,812** | **$ 3,707** | **$ 3,491** | **$ 2,899** | **$ 2,657** | **$ 2,425** | **$ 17,991** |

**Notes:**

(1) - The inorganics business, which was part of Millennium Chemical ("MCH"), was sold in May 2007 for $1.3 billion.

The 2007 LRP Projections incorporated Lyondell management's expectations at the time after considering, among other things, the views of industry consultants.

At the beginning of 2007, the general outlook was that the petrochemical industry was coming off of a cyclical peak and new capacity would come on-line in late 2008 or early 2009.[74] However, as 2007 progressed, the consensus industry expectation for a supply-driven trough was pushed further into the future due to better than expected strength in demand and delays in new capacity additions, particularly in the Middle East.[75]   In addition, consensus industry expectations predicted a less severe trough than previously anticipated.[76]  This expectation of a shallower trough, predicted at that time for 2010 and 2011, was consistent with Lyondell management's view that the following would occur:  (i) an increase in petrochemical demand

---

[73] Lyondell Chemical Company 2007 Operating Plan, Financial Plan, & Capital Budget.  (LYO-UCC 00484464.)

[74] Young Initial Report, page 17.

[75] Young Initial Report, pages 18-19.

[76] Young Initial Report, page 16.

**CONFIDENTIAL**

due to global economic growth, particularly in China and India, and (ii) a combination of delays in the completion and reliable utilization of new Middle East capacity.[77]

In preparing the Refining segment of the 2007 LRP Projections, Lyondell management considered the outlook of independent consultants that demand for refined products would increase over the ensuing years, driven by meaningful growth in developing economies and, albeit moderate, continued growth in the developed world. Additionally, Lyondell management incorporated the outlook that new refining capacity would not begin to come on-line until 2009 and beyond.[78] Consequently, the 2007 LRP outlook for Refining was that earnings would be steady through 2009 and would then begin to decline moderately, beginning in 2010 and 2011. Lyondell also incorporated the benefits of the planned turnaround of the fluid catalytic cracker ("**Fluid Unit**" or "**FCC**") in early 2007. Lyondell utilized a detailed model that was developed to evaluate the purchase of the remaining 41.25% interest in Houston Refining and to forecast its Refining earnings in the 2007 LRP Projections. The Refining segment of the 2007 LRP Projections underestimated the earnings capacity of Refining because it did not fully incorporate the refinery's ability to produce higher quality products that commanded higher prices in the market.[79]

## B.  INDUSTRY CONSULTANT VIEWS, SENSITIVITY CASES, AND SUPPLY/DEMAND EXPECTATIONS

Lyondell management tested its 2007 LRP Projections for reasonableness by considering numerous factors. Lyondell management was cognizant of the cyclical nature of the chemicals industry and tested the projections developed in the LRP process by comparing them to prior petrochemical cycles.[80] Further, from time to time, Lyondell management ran alternative projections, including sensitivity cases, with different assumptions[81] in order to test Lyondell's ability to comply with loan covenants or planned debt repayment schedules under less favorable

---

[77] Young Supplemental Report, Section 2.2.

[78] Declaration of Norm Phillips, January 15, 2010, para. 30; O'Connor Supplemental Report, Chapter 2, Section B.

[79] O'Connor Supplemental Report, Chapter 3, Section B.

[80] Deposition of Kim Foley, January 24, 2011, pages 22-23.

[81] Deposition of Skip Teel, January 12, 2011, pages 77-78; Deposition of Joe Tanner, January 25, 2011, page 151; Deposition of Mario Portela, February 18, 2011, page 77.

CONFIDENTIAL

or more optimistic conditions.[82]  Lyondell developed other sensitivity analyses that incorporated assumptions provided by outside consultants,[83] such as the "Alternate Case" developed in late 2006, to compare Lyondell's outlook to other views in the industry.[84]  Sensitivity cases did not represent Lyondell's current outlook.  In contrast, the 2007 LRP Projections were based on management's "best beliefs,"[85] what they considered "most likely"[86] and represented Lyondell's "best view of what the future looks like for each one of the businesses."[87]

Nebeker asserts that Lyondell ignored consultants' views on refining margins and implies that Lyondell management should have blindly adopted consultants' outlooks in its projection and planning processes.[88]  I disagree with these assertions for a number of reasons:

- Financial statements are management's responsibility.  Consequently, management (not its outside consultants) is accountable to its stakeholders to "deliver" operating results.

- As discussed at length in this report, Lyondell appropriately considered consultants' views in its LRP and BPM processes, as well as the process that resulted in the Refreshed Projections and the Projections.

- O'Connor concludes that Lyondell's 2007 view that demand for petroleum products would continue to rise was reasonable and consistent with consultants' views.[89]

- Young concludes that the use of external consultants was customary for the petrochemical and refining industries.  He also concludes that management developed reasonable forecasts for the LBI businesses based on prevailing industry outlooks and the assets within the LBI portfolio.[90]

- Management has the most complete view of its operating capabilities and other propriety issues, such as resource allocation and customer and supply agreements.

---

[82] Declaration of Edward Dineen, January 15, 2010, para. 72.

[83] Id.

[84] Chazen, Exhibit 4.

[85] Deposition of Robert Salvin, February 2, 2011, pages 120-121.

[86] Id.

[87] Deposition of Mario Portela, February 18, 2011, page 73.

[88] Nebeker Supplemental Report, pages 56 and 57.

[89] O'Connor Supplemental Report Chapter 2, Section A.

[90] Young Supplemental Report 1.2 and 2.2.

**CONFIDENTIAL**

- If one accepts Nebeker's premise which suggests the combined management teams abdicate their projection processes to blindly adopt the views of the outside consultants, the Projections for the merged company would have been higher than management's projections, overstating EBITDA by hundreds of millions (because the contemporaneous Consultants' Sensitivity Case in October 2007 projected significantly higher levels of EBITDA over the projection period).[91]

## C. UPDATES TO THE 2007 LRP PROJECTIONS

### i. The Spring 2007 Rating Agency Presentation

Lyondell typically made presentations to the rating agencies at least once a year, usually in the spring after the Form 10-K was issued. At the rating agency meetings, Lyondell presented an overview of its business segments and industries, management's long-term view on the supply/demand balance in the industry and its outlook regarding key metrics such as operating rates.

Smith, DeNicola and Twitchell gave presentations to the rating agencies on April 30 and May 1, 2007 (the "**Spring 2007 Rating Agency Presentation**").[92] The presentations included industry information referencing CMAI, ChemData, PIRA Energy Group and Energy Information Administration among others. The following chart compares the 2007 LRP Projections (adjusted for the sale of the inorganics business) to the Spring 2007 Rating Agency Presentation.

---

[91] Kearns Initial Report, page 75.
[92] LYO 00163394-466.

**CONFIDENTIAL**

**Comparison of 2007 LRP Projections to Spring 2007 Rating Agency Presentation[93]**
*($ in millions)*

**2007 LRP Forecast**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| EC&D | $ 1,465 | $ 1,295 | $ 599 | $ 564 | $ 518 | $ 4,441 |
| PO&RP | 712 | 657 | 664 | 701 | 676 | 3,410 |
| Refining | 1,333 | 1,324 | 1,375 | 1,110 | 932 | 6,074 |
| **Total** | **$ 3,510** | **$ 3,276** | **$ 2,638** | **$ 2,375** | **$ 2,126** | **$13,925** |

**Spring 2007 Rating Agency Presentation**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| EC&D | $ 1,263 | $ 1,329 | $ 626 | $ 578 | $ 535 | $ 4,331 |
| PO&RP | 681 | 657 | 664 | 701 | 676 | 3,379 |
| Refining | 1,377 | 1,324 | 1,375 | 1,110 | 931 | 6,117 |
| **Total** | **$ 3,321** | **$ 3,310** | **$ 2,665** | **$ 2,389** | **$ 2,142** | **$13,827** |

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| **Change** | **$ (189)** | **$ 34** | **$ 27** | **$ 14** | **$ 16** | **$ (98)** |
| *% Change* | *-5.4%* | *1.0%* | *1.0%* | *0.6%* | *0.8%* | *-0.7%* |

In the Spring 2007 Rating Agency Presentation projected 2007 EC&D EBITDA was adjusted downward due to increasing feedstock prices from late 2006 through the date of the presentation. PO&RP EBITDA also was adjusted slightly lower for 2007 as that segment's continuing solid operating performance was offset by one-time settlement costs.[94]   Refining EBITDA was adjusted slightly upward for 2007 based on year-to-date results which were exceeding the 2007 LRP Projections.  With the exception of changes in the EC&D projections for 2008 to 2011 the long-term projections were unchanged, primarily because (i) the refinery turnaround was ongoing and (ii) management's view, as compared to the 2007 LRP, was unchanged regarding long-term petrochemical fundamentals, particularly related to capacity utilization and margins.

---

[93] Lyondell Chemical Company 2007 Operating Plan, Financial Plan, & Capital Budget – LYO-UCC 00484464; and Rating Agency Briefing, Spring 2007, LYO-UCC 00163394.

[94] 2007 First Quarter Lyondell Earnings Press Release, "Lyondell Reports First Quarter Results" April 26, 2007. Settlement costs relate to the shutdown of Lyondell's Lake Charles facility in 2005.

**CONFIDENTIAL**

### ii. 2007 Weekly Business Performance Meetings - Lyondell Actively Monitored Its Operations Following the 2007 LRP

In the 2007 first and second quarters, Business Performance Meeting Reports[95] indicate that Lyondell was generally performing in line with the 2007 LRP Projections on an overall basis, with Refining, in particular, exceeding the 2007 LRP Projections. The chart below illustrates the development of Lyondell's 2007 second quarter Refining EBITDA forecast, as referenced in the Business Performance Meeting Reports.

**Forecasts of Q2-07 Refining EBITDA[96]**



Source: BPM Reports

For the 2007 second quarter Lyondell's initial forecast for Refining EBITDA was $348 million.[97] However, due to improvements in margins and outperformance following the completion of the Fluid Unit turnaround in early April, by the middle of June Lyondell was projecting 2007 second quarter Refining EBITDA of up to $473 million. Importantly, this

---

[95] LYO-UCC 00487993, LYO-UCC 00488051, LYO-UCC 00488111, LYO-UCC 00488269, LYO-UCC 00488207, LYO-UCC 00488145, LYO-UCC 00488341, LYO-UCC 00488353, LYO-UCC 00488413, LYO-UCC 00488475, LYO-UCC 00488485, LYO-UCC 00488555, LYO-UCC 00488633, LYO-UCC 00488699, LYO-UCC 00488823, LYO-UCC 00488755, LYO-UCC 00488851, LYO-UCC 00488921.

[96] The Maya 2-1-1 spread is calculated as the WTI 2-1-1 spread plus the WTI spot price less the Maya spot price differential. The WTI 2-1-1 spread, WTI spot prices and Maya spot prices are from Bloomberg.

[97] As a matter of course, Lyondell would prepare a new short-term outlook for the next quarter approximately midway through the current quarter. In this case, the initial forecast for the 2007 second quarter Refining EBITDA was prepared as of February 8, 2007.

**CONFIDENTIAL**

outlook was reduced to reflect adjustments related to the turnaround which extended ten days into April and resulted in a $30 million reduction in EBITDA. These adjustments suggest that, without the turnaround, pro forma 2007 second quarter EBITDA would have exceeded $500 million. Smith explained the strength of Refining and its earnings capability and discussed the refining industry in general on Lyondell's earnings call on April 26, 2007:

> Yes, we think it [Refining performance] is stronger. Frankly, the supply/demand fundamentals that we saw at the time [August 2006] we made those statements, we were very sure of the point of view, but all we've [seen] since that point in time is supply/demand get even tighter because you had continued growth of the products, primarily gasoline, both here and in Asia, particularly. We've not seen meaningful supply changes, we don't see that you're going to get meaningful supply changes in the midterm. So this balance just stays tight, actually is getting tighter and absent a collapse in the economy that would greatly take demand down, I don't see anything that's going to go the other direction. I think you're seeing that play out.[98]

In the 2007 first quarter, Lyondell's ethylene operating rates were approaching 95%, levels that typically resulted in higher margins.[99] However, due to consistent oil price increases throughout the first half of the year, Lyondell's EC&D earnings lagged the 2007 LRP Projections, which assumed steady state feedstock costs. Similar to other chemical producers, Lyondell's ethylene contracts generally were structured so that customer prices reset every 30 days.[100] This lag between the time of increased feedstock costs and when Lyondell could pass the price increases on to its customers compressed margins in the short-term.[101] This concept is illustrated in the chart below, where Lyondell's projected EC&D EBITDA in the Business Performance Meeting Reports was decreased as the spot price of oil increased.

---

[98] Lyondell Chemical Company Co. Earnings Conference Call, April 26, 2007.

[99] Lyondell Chemical Company Co. Earnings Conference Call, April 26, 2007; Young Initial Report, page 18.

[100] Declaration of Edward Dineen, January 15, 2010 para. 77.

[101] Young Initial Report, page 43.

**CONFIDENTIAL**

**Forecasts of Q2-07 EC&D EBITDA**



Source: BPM Reports

Notably, operating rates remained high throughout the first half of 2007. In its July 2007 Monomers Market Report, CMAI thought this trend would continue and it forecasted ethylene effective operating rates of 95.4% in 2007 and 95.6% in 2008.[102] Typically, at these levels, chemical producers like Lyondell would have pricing power to pass through prior cost increases under normal market conditions.[103] Consequently, Lyondell management believed that the compression in margins was temporary and would begin to rebound in the second half of 2007 and that margins would remain elevated in 2008.[104]

The PO&RP segment exhibited limited volatility and was expected to be a steady performer for Lyondell. Through the end of June 2007, PO&RP was performing in line with the 2007 LRP Projections and, as a consequence, there were no changes to the PO industry outlook.[105]

---

[102] CMAI Monomers Market Report, July 31, 2007, page 16 (CMAI014838).
[103] Young Initial Report, page 18.
[104] Young Initial Report, page 44.
[105] Young Initial Report, page 43.

**CONFIDENTIAL**

### iii.  Lyondell's Cost Optimization and Revenue Enhancement Program

In late 2006 Lyondell began to implement a cost optimization and revenue enhancement program ("**CORE**").  CORE was a company-wide effort to reduce costs (including variable processing costs, energy costs and fixed costs), improve efficiency and enhance margins through contract restructuring, manufacturing enhancements and product portfolio upgrades.[106]

The cost optimization/revenue enhancement initiatives focused on (i) higher valued products, (ii) olefin feedstock flexibility optimization, (iii) logistics and purchasing improvements, (iv) higher reliability, (v) energy and yield improvements, (vi) management of benefits escalation, (vii) higher productivity, (viii) refinery improvement and synergies, (ix) commercial contract structure, and (x) volume improvement.[107]

At the time that CORE was being developed and implemented at the organization level, the 2007 LRP process was already underway.  During 2007, benefits from CORE's implementation became more readily apparent.  CORE benefits were incorporated into Lyondell's current outlook in the 2007 BPM process and were an integral part of senior management's assumptions when developing the EC&D projections in the Refreshed Projections and the Projections.[108]

### iv.  Lyondell Appropriately Updated its Projections in Response to the 13D Filing

On May 11, 2007 AI Chemical Investments LLC ("**AI Chemical**"), an entity controlled by Leonard Blavatnik ("**Blavatnik**") filed a Schedule 13D with the Securities and Exchange Commission indicating that it had entered into a forward transaction to acquire Lyondell common stock.[109]  On the same day, Lyondell received a letter sent on behalf of AI Chemical and Blavatnik indicating interest in acquiring a controlling number of shares in Lyondell.[110] Based on this overture, it was prudent for Smith to request that the Lyondell projections be updated to consider changes in the business and the market subsequent to the preparation of the

---

[106] Declaration of Edward Dineen, January 15, 2010, para. 24.
[107] LYO-UCC00001395; LYO-UCC00403114.
[108] Interview with Edward Dineen, April 14, 2011.
[109] Schedule 13D, May 11, 2007, Items 2 and 6.
[110] Lyondell Schedule 14A, dated October 12, 2007, page 20.

27

**CONFIDENTIAL**

2007 LRP Projections and to provide a current valuation for the Board.[111]   These changes included, but were not limited to, the following:[112]

    a. Lyondell management's improved understanding of the operations and earnings capacity of Refining, including the ability to maximize value by selling to the market on a merchant basis;[113]

    b. Updated 2007 earnings estimates based on current market conditions, including the impact of the increase in feedstock costs since the preparation of the 2007 LRP Projections;

    c. Changing industry views on the timing and depth of the upcoming petrochemical trough;[114]

    d. The strength of the current refining environment; and

    e. The sale of the TiO2 business in May.

### v. Preparation of the Refreshed Projections

Following the filing of the Schedule 13D on May 11, 2007, Lyondell began the process of gathering information in order to update its long-term projections.  This information included the assumptions used to prepare the 2007 LRP Projections, as well as updated outlooks for each business segment.  Over the ensuing weeks, members of Corporate Development, and the Business Decision Analysis and Business Performance Analysis and Reporting groups, the same groups that were integral in preparing the 2007 LRP Projections, assembled the information necessary to update the long-term projections for all segments.[115]

Plaintiff's experts, Witte and Nebeker incorrectly suggest that the process that resulted in the Refreshed Projections was performed solely by Robert Salvin ("**Salvin**"),[116] and instead should have mimicked the process used to develop the LRP.[117]  The Amended Complaint describes the process by which the Refreshed Projections were prepared as "perfunctory," and implies that the

---

[111] Declaration of Dan Smith, December 10, 2009, para. 57.

[112] Declaration of Dan Smith, December 10, 2009, para. 57.

[113] Deposition of Norm Phillips, January 13, 2010, page 88; Deposition of Robert Salvin, February 2, 2011, pages 142-143.

[114] Deposition of Edward Dineen, January 13, 2010, page 80.

[115] See Schedule 11.

[116] Salvin was a manager of portfolio planning who was in the Corporate Development group.

[117] Witte/Nebeker Supplemental Report, page 10.

28

**CONFIDENTIAL**

process should have involved a "bottoms-up, plant-by-plant analysis of earnings."[118]   The development of the Refreshed Projections was not performed solely by one individual.  Rather, my review of email communications, internal Lyondell documents, my interviews with various members of the Lyondell management team and deposition testimony all establish that the process involved numerous members of the Lyondell team who possessed the industry knowledge and experience necessary to develop an updated outlook for Lyondell.   The Refreshed Projections used the LRP and Business Performance Meeting processes as "building blocks," and incorporated input from numerous senior people from across Lyondell, including many of the same people responsible for LRP development.  A bottom-up process, which would involve hundreds of people and take months to prepare, was unnecessary and unrealistic.[119]

The chart below is a partial list that identifies some of the Lyondell personnel who provided information and input considered in the development of the Refreshed Projections.  See Schedule 11 for additional details.

---

[118] Amended Complaint, para. 146.

[119] Due to the confidential nature of the purpose for preparing the Refreshed Projections (and the potential disruption to the organization), certain individuals providing information and input may not have been aware of the specific purpose of information requests made during the process that resulted in the Refreshed Projections.

**CONFIDENTIAL**

**Refreshed Projections: Lyondell Personnel Providing Information**

| Contact Name | Contact's Title/Group | Role/Type of Information Provided |
|---|---|---|
| Kimberly Foley | Director, BDA | 2007 LRP assumptions |
| Gregory Helma | Manager, BDA | 2007 LRP assumptions |
| Allan Skakun | BDA Sr. Consultant, Ethylene/Propylene | CMAI presentations |
| Steven Ebel | BDA Consultant, Raw Material | Refinery variable margin |
| Joseph Tanner | Director, BPAR | 2007 LRP assumptions |
| Clark Boudreaux | BPAR Consultant, Refining | Refinery variable margin |
| Koy Schoppe | BPAR Consultant, PO | Margin call for PO&RP |
| Lindley Reubin | BPAR Consultant, EC&D | Margin call for EC&D |
| Ron Smith | Director, Refined Product Sales | Relationship between refinery variable margin and crack spread |
| David Kinney | Corp Development Consultant (as of 6/21/06) | Relationship between refinery variable margin and crack spread |
| Mike Culver | Business Manager of Houston Refinery | Refinery variable margin |
| Joanne Pruitt | Marketing Manager, Refined Products | Refinery variable margin |
| Skip Teel | Business Director, Refining | Refinery variable margin; industry outlook reports |
| Gregory Grannen | Treasury | Spring Rating Agency Presentation Financial Statements |
| Jesus Chagoya | Treasury | CF model for 2007 LRP |
| Robert Salvin | Manager of Portfolio Planning | Aggregated information from Business Units, BDA, and BPAR |
| Dan Smith | CEO | Review of Refreshed Projections |
| Kevin DeNicola | CFO | Provided input, reviewed and presented the Refreshed Projections |
| Edward Dineen | SVP, Intermediates and Performance | Provided input, reviewed and presented the Refreshed Projections |
| Norm Phillips | SVP, Fuels and Pipelines | Provided input, reviewed and presented the Refreshed Projections |
| Mario Portela | VP, Corporate Development | Review of Refreshed Projections |
| Doug Pike | Director of Investor Relations | Review of Refreshed Projections |

### vi. Refreshed Projections for Refining

In August 2006, during the 2007 LRP planning process, Lyondell acquired CITGO's 41.25% interest in Houston Refining.[120]   Prior to this acquisition, the crude supply agreement ("**CSA**") with PDVSA Petróleos de Venezuela, S.A. ("**PDVSA**")[121] was a "netback" contract, which included a predetermined target margin designed to provide Lyondell with relatively stable margins and cash flows.[122]   Under this agreement, Lyondell purchased 85% to 100% of the required crude oil from PDVSA and then sold 100% of the refined products to CITGO's end customers.  Lyondell did not have control over the sales and marketing of Refining's products to CITGO's end customers.[123]

---

[120] Lyondell Form 10-K for the year ended December 31, 2006.

[121] CITGO is wholly owned U.S. subsidiary of PDVSA.

[122] Declaration of Norm Phillips, January 15, 2010, para. 14.

[123] Interview with Norm Phillips, March 28, 2011.

**CONFIDENTIAL**

The legacy CSA with PDVSA was terminated in connection with the acquisition of Houston Refining, at which time, Lyondell and PDVSA entered into a new market-based contract. For a ninety day transition period, however, products were sold to CITGO. During that time Lyondell was subject to limitations on third party sales and CITGO continued to direct the product mix. It was not until the end of this transition period in mid November 2006 that Lyondell was free from the burdens of the CSA and assumed full sales and marketing responsibility for the refinery, including marketing for 100% of the output of the refinery under the new contract.[124] As a result, at the time the 2007 LRP Projections were finalized, Lyondell had full control of the refinery for less than two months. Consequently, Lyondell had limited data available at that time to estimate the operating and earnings capacity of Refining without the restrictions of the CSA. By assuming complete control of the refinery and terminating the prior crude supply contract, Lyondell increased the profit potential of the asset.[125] The refinery's capabilities enabled it to produce higher quality products, such as ultra low sulfur diesel ("**ULSD**") and reformulated blendstock for oxygenate blending ("**RBOB**") which have higher prices than traditional products.[126]

Lyondell management based its 2007 LRP assumptions for Refining on operating performance for the first six months of 2006, when product mix was controlled by CITGO,[127] adjusted for the anticipated benefit of terminating the old fixed margin supply agreement. Further, the assumptions underlying Refining's 2007 LRP Projections reflected a product mix similar to the product mix under the old agreement.

Numerous documents were considered in the development of Refining's Refreshed Projections, including but not limited to:

1. The 2007 LRP Projections.
2. Lyondell's "Refined Products Business Overview," dated May 17, 2007, a document that contained the latest information on the refining industry, including details about the pricing and spread trends for the refinery's key products.[128]

---

[124] Bloomberg, *Lyondell to speed debt cuts with refinery, Smith says*, August 17, 2006.

[125] Declaration of Norm Phillips, January 15, 2010, paras. 15-18.

[126] O'Connor Supplemental Report, Chapter Three, Section B.

[127] Id.

[128] LBTR00106603-624.

31

**CONFIDENTIAL**

3. Refining reports provided by Skip Teel ("**Teel**"), the Business Director for Refining, including a March 1, 2007 presentation by PIRA to Lyondell titled "Long Term World Oil Market Dynamics," and a May presentation by PGI to Lyondell entitled "Overview of Heavy Crude Oil Markets"[129] and Teel's latest outlook on Refining's earnings in which he stated that he believed 2007 and 2008 would be better than expected in the 2007 LRP Projections.[130]

4. A May 24, 2007 Turner Mason refining report titled "Refining Industry Outlook."[131]

5. The latest Business Performance Meeting Reports, which included detailed information on current operations for Refining, as well as near-term forecasts for margins and volumes, incorporating market data from the Point of Views.[132]

By the 2007 second quarter, Lyondell was better positioned to realize and forecast increased profitability for the Refining Segment.[133]  Refining margins in the 2007 first half were trending higher compared to the 2006 first half (approximately $1.50 per barrel higher)[134] in contrast to Nebeker's assertions that the 2007 LRP was "overly optimistic."  This ultimately was borne out by Refining's outperformance of the 2007 LRP Projections in the 2007 first half.  LBI management attributed Refining's higher performance to, among other things, a shift to higher value-added products and the addition of a sales and marketing team.  In an email to Ron Smith, Director of Refined Products, on May 17, 2007, David Kinney, Corporate Development Consultant stated, "we underestimated the shift in [Refining's] product mix from lower value products."[135]

---

[129] Email from Skip Teel dated May 15, 2007 (LBTR00197653); "Overview of Heavy Crude Oil Markets" attachment (LBTR00197654-759) and; "Long Term World Oil Market Dynamics" attachment (LBTR00197760-922).

[130] Teel informed Salvin that "2007, 2008 will be stronger" than the LRP projections.  Teel Exhibit 6.

[131] LBTR00187212-308.

[132] Lyondell Business Performance Meeting, May 24, 2007 (LYO-UCC 00488558-61).

[133] O'Connor Supplemental Report, Chapter 3, Section B.

[134] Salvin, Exhibit 21.

[135] Id.

**CONFIDENTIAL**

*Nebeker's conclusions are inaccurate*

The refining and fuels BPAR analysts provided guidance on how to translate the Maya 2-1-1 margin to a Refining EBITDA forecast. Joanne Pruitt, Marketing Manager, Refined Products, provided Salvin with a high-level formula to arrive at EBITDA based on the variable margin multiplied by volume less approximately $200 million in costs.[136] Salvin also reviewed the May 23, 2007 Business Performance Meeting Report which contained monthly EBITDA forecasts, volumes, and Maya 2-1-1 margins. From these reports he used the guidelines from Refining and BPAR that the variable margin was approximately 70% of the Maya 2-1-1 forecast and that fixed costs were approximately $20 million per month.[137]

Nebeker states that Lyondell utilized "a simplified methodology to estimate EBITDA based on the simplified and inaccurate assumption that the refinery would capture 70% of the sum of the WTI 2-1-1 crack spread and the difference between WTI and Maya crude oil as variable margin."[138] He cites April 2007 as an example, stating that this methodology overestimated actual EBITDA by 29%.[139]

However, Nebeker's criticism of the ability to estimate the April 2007 EBITDA fails to consider the impact of a ten day shutdown of the refinery's Fluid Unit in April 2007. As a result of the shutdown, the April 2007 results were negatively impacted by $30 million.[140] When I adjust for the $30 million in April that Nebeker omitted, Salvin's EBITDA estimate for April is only 3% higher than operating results shown in the May 23, 2007 Business Performance Meeting Report:

---

[136] Teel Exhibit 7.

[137] Deposition of Robert Salvin, February 14, 2011, page 434.

[138] Witte/Nebeker Supplemental Report, page 47.

[139] Witte/Nebeker Supplemental Report, pages 46-48.

[140] ACC 00006183.

**CONFIDENTIAL**

**Refining ProForma April 2007 EBITDA (as adjusted)**
**Comparison of Actual to Estimate**

*$ in millions*

| | | |
|---|---|---|
| Actual April 2007 EBITDA | $ | 122 |
| Adjustment for impact of refinery turnaround (10 days in April) | | 30 |
| Adjusted April 2007 EBITDA | | 152 |
| Salvin's April 2007 EBITDA estimate | | 157 |
| **EBITDA Differential** | $ | 5 |
| **% Variance to Actual** | | **3%** |

Further, correcting Figure 26 of the Witte/Nebeker Supplemental Report for the $30 million turnaround impact shows that the "formula" to estimate Refining EBITDA was within 5% of the Business Performance Meeting estimated/forecast EBITDA for the six-month period to September 2007. I have recreated and adjusted Nebeker's calculation in the analysis below:

**Witte/Nebeker Supplemental Report, Figure 26, as Adjusted**

| | Actual BPM Reported | Estimated & Forecast | | | | | Total April - Sept |
|---|---|---|---|---|---|---|---|
| | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | |
| WTI 2-1-1 | $ 20.75 | $ 26.00 | $ 20.00 | $ 18.00 | $ 16.50 | $ 12.50 | |
| Maya - WTI | $ 11.56 | $ 10.00 | $ 14.00 | $ 15.00 | $ 15.00 | $ 15.00 | |
| Total Spread Maya 2-1-1 | $ 32.31 | $ 36.00 | $ 34.00 | $ 33.00 | $ 31.50 | $ 27.50 | |
| **Estimated EBITDA $MM** | | | | | | | |
| 70% of Total Spread | $ 22.62 | $ 25.20 | $ 23.80 | $ 23.10 | $ 22.05 | $ 19.25 | |
| Volume, MPD [1] | 261 | 280 | 278 | 275 | 275 | 275 | |
| $MM Factored Estimate Margin | $ 177 | $ 212 | $ 198 | $ 191 | $ 182 | $ 159 | |
| Less Cash Costs $MM | $ 20 | $ 20 | $ 20 | $ 20 | $ 20 | $ 20 | |
| Estimated EBITDA $MM | $ 157 | $ 192 | $ 178 | $ 171 | $ 162 | $ 139 | |
| BPM Package EBITDA $MM [2] | $ 152 | $ 187 | $ 164 | $ 150 | $ 161 | $ 135 | $ 949 |
| **EBITDA Differential $MM** | $ 5 | $ 5 | $ 14 | $ 21 | $ 1 | $ 4 | $ 50 |
| **% above Actual/Estimate & Forecast** | 3% | 3% | 9% | 14% | 1% | 3% | 5% |

1. Volume is expressed in thousands of barrels per day.

2. April EBITDA was negatively impacted by $30M due to the Fluid Unit turnaround. EBITDA shown is equal to actual ($122 million) plus $30 million.

Nebeker also claims that in preparing the Refreshed Projections, Lyondell ignored general industry consensus that refining margins had peaked in 2006.[141] Industry expectations for supply

---

[141] Witte/Nebeker Supplemental Report, page 44.

**CONFIDENTIAL**

and demand of refined products were supportive of the margins incorporated into the Refreshed Projections for Refining.[142]  Turner Mason confirmed this outlook for a tight supply environment in its May 24, 2007 Refining Industry Outlook presentation to Lyondell management.[143]  Turner Mason also noted that due to sustained economic growth in many regions of the world, the industry's capacity to produce refined products would continue to be stressed until several large projects came online by 2011-2012.[144]  Consequently, Lyondell had a reasonable basis to increase its EBITDA projections for 2008 – 2011 as compared to the 2007 LRP for the Refining segment.  In addition, Lyondell reasonably expected that new capacity would come online later than projected by some consultants.[145]  Dan Smith summarized this outlook in his comments on the 2007 first quarter earnings call and in his declaration.

> But I think if you look to the fundamentals, I would expect this gasoline season is going to be stronger than last and if the economies keep chugging along as people are forecasting them to do, I would expect next year to again be stronger than this year. [146]

> We expected that again in 2008 as supply additions were not likely to provide an impact before 2009 – 2010 and demand would remain high for petroleum products because of continued Asian demand growth.[147]

Lyondell management updated its long-term view for the Refining segment by applying current and expected future Refining spreads and considering independent market research.  The EBITDA projection included in the Refreshed Projections reflected the view that Refining was performing better than anticipated in the 2007 LRP Projections and that margins for 2007-2011 would be stronger than originally perceived in late 2006.  As a result of all these factors, the Refreshed Projections for the Refining segment were higher than the 2007 LRP Projections. These projections represented a reasonable outlook, when prepared in mid-2007.[148]

---

[142] O'Connor Supplemental Report, Chapter One.

[143] Turner Mason Refining Industry Outlook Report, (TM 000177-273).

[144] Id.

[145] O'Connor Supplemental Report, Chapter Two, Section B.

[146] 2007 First Quarter Earnings Conference Call.

[147] Declaration of Dan Smith, December 10, 2009, para. 57.

[148] O'Connor Supplemental Report, Chapter One.

**CONFIDENTIAL**

A comparison of the Refreshed Projections to the 2007 LRP Projections for Refining is presented below:

**Refining EBITDA[149]**

*$ in millions*

|  | **2007** | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|---|
| 2007 LRP | $ 1,333 | $ 1,324 | $ 1,375 | $ 1,110 | $ 932 |
| Refresh Projections [1] | 1,568 | 1,700 | 1,600 | 1,500 | 1,300 |
| $ Change | $ 235 | $ 376 | $ 225 | $ 390 | $ 368 |

[1] Refreshed EBITDA includes a $170 million adjustment to reflect downtime in the 2007 first half for the Fluid Unit turnaround.

### vii.  Refreshed Projections for EC&D

Management developed the Refreshed Projections for EC&D by updating the 2007 LRP Projections to consider (i) actual 2007 year-to-date results, (ii) changes in market conditions including significant increases in feedstock costs, and (iii) the updated industry view.  Numerous documents were considered in the preparation of the EC&D Refreshed Projections, including, but not limited to:

1. Information from a recent CMAI presentation to Lyondell, which included CMAI's Optimistic Case.[150]

2. Assumptions supporting the 2007 LRP Projections for the EC&D segment, including volumes and margins for the olefins and polyolefins segments.[151]

3. Updated CMAI outlooks for the EC&D segment prices and margins.[152]

4. Assumptions supporting the "Alternate Case" produced in late-2006.[153]

5. The latest Business Performance Meeting Reports, which included detailed information on EC&D's current operations and near-term forecasts for margins and volumes, and incorporated market data from the Point of View reports.[154]

---

[149] LYO-UCC 00484464; ACC 00017490.

[150] SUB-RES 000000004-12.

[151] SUB-RES 000000277-279.

[152] SUB-RES 000000004-12.

[153] LBTR00053952-59.

[154] Lyondell Business Performance Meeting, May 24, 2007, (LYO-UCC 00488558-61).

**CONFIDENTIAL**

### *Consideration of CMAI's Optimistic Case*

Lyondell's outlook for the EC&D segment in the Refreshed Projections considered industry consultant's views.  The underlying assumptions are comparable to those in CMAI's Optimistic Case, which was presented in December 2006 and updated in May 2007.  CMAI explained that this case was based on two underlying assumptions:[155]

1. "Stronger [than expected] demand growth resulting in a less severe build up of surplus capacity"; and

2. "A less aggressive capacity schedule due to increased capital investments" that "may lead to some companies to hold up the final decisions for funding some projects."[156]

Lyondell management agreed with both of these assumptions, as reflected in the current outlook at the time the EC&D Refreshed Projections were prepared.

The Refreshed Projections reflected Lyondell management's view that demand for petrochemicals would remain robust during the outlook period, driven by growth in developing economies, particularly in China and India.[157]  This demand growth was expected to absorb some of the additional capacity expected to come online in the 2009-2011 period, making the expected trough shallower than in prior troughs.

In addition to continued strength in demand, the Refreshed Projections reflected Lyondell management's view that EC&D capacity additions scheduled to come online in the Middle East would be delayed and such new plants would not operate at full capacity for some period of time, consistent with historical experience.[158]  Consequently, Lyondell management believed that new capacity additions would continue to be delayed due to increases in capital costs and other factors and that these delays would reduce margin pressure during the trough.  Lyondell management summarized its view in an internal presentation, which stated:

- …there will be a significant wave of new Middle East olefin capacity.

[155] SUB-RES 000000004-12.

[156] Id.

[157] Declaration of Dan Smith, December 10, 2009, para. 57.

[158] Deposition of Edward Dineen, January 13, 2010, pages 80-81.

37

**CONFIDENTIAL**

- However, due to limited resources, qualified personnel, political uncertainty, & infrastructure issues, delays will continue.

- Due to capacity cost escalation, additional projects may be cancelled.

- In addition to the Middle East, Asian olefin's capacity additions play a significant role in the total amount of world expansion.[159]

### Consideration of Assumptions Supporting the 2007 LRP Projections

The 2007 LRP Projections had assumed that olefin feedstock costs would remain stable. However, feedstock costs increased through the 2007 first quarter, which had a negative impact on margins. Still, demand remained strong and industry wide (including Lyondell) ethylene operating rates were approaching 95% through the 2007 first half.[160] CMAI confirmed this analysis in its July 2007 Monomers Market Report:

> The surplus effective capacity levels during first half 2007 suggest sellers should have leverage to raise price and cash margins. However, with sudden increases in production costs, higher prices did not keep pace with costs and margins were not as strong as the supply/demand fundamentals would suggest.[161]

Lyondell management incorporated its outlook for volume and margins from the 2007 LRP Projections as updated in the Business Performance Meeting Reports. In fact, the 2007 Refreshed Projections for 2007 second and third quarters were taken directly from the Business Performance Meeting Reports.

In the Refreshed Projections, EBITDA for 2007 and 2008 was reduced from the 2007 LRP Projections. The Refreshed Projections for 2008 reflected a slight improvement over 2007 actual performance. Lyondell reasonably expected that feedstock costs would moderate, operating rates would remain high, and therefore EC&D margins would recover. Lyondell's EC&D EBITDA expectations for 2009-2011 were adjusted to (i) consider the ongoing benefits of CORE,[162] (ii) reflect the view that the beginning of the next trough would begin later than assumed in the 2007 LRP Projections (*e.g.*, the outlook for 2009 considered the expectation of

---

[159] LBTR 00060590.

[160] CMAI Monomers Market Report, July 31, 2007, page 18.

[161] Id.

[162] Interview with Edward Dineen, April 14, 2011.

38

**CONFIDENTIAL**

slower supply growth in the Middle East),[163] and (iii) reflect the view that the trough would be less severe than in previous petrochemical cycles.  Dan Smith summarized Lyondell's updated outlook for the EC&D segment in his declaration as follows:

> We expected the margins to recover and remain at the same level in 2008 – 2011 as projected in the 2007 LRP. We also did not expect the downturn in the chemicals market to be as severe as we had previously expected in late 2006 because the new capacity, primarily in the Middle East, that would increase supply continued to lag expectations as to completion while demand continued to grow (especially in Asia) resulting in a tighter supply/demand balance throughout the period than previously expected.[164]

A comparison of the Refreshed Projections to the 2007 LRP Projections for EC&D is presented below:

### EC&D EBITDA[165]

*$ in millions*

|  | **2007** | | **2008** | | **2009** | | **2010** | | **2011** |
|---|---|---|---|---|---|---|---|---|---|
| 2007 LRP | $ | 1,465 | $ | 1,295 | $ | 599 | $ | 564 | $ | 518 |
| Refresh Projections | | 950 | | 1,150 | | 800 | | 600 | | 600 |
| $ Change | $ | (515) | $ | (145) | $ | 201 | $ | 36 | $ | 82 |

**viii.   The September 2007 Projections**

The Refreshed Projections were provided to Basell on July 14, 2007 and the EBITDA projections (with certain modifications for actual results in 2007 described below) ultimately were used, along with projections for Basell and synergies, in the October 2007 CIM.  Dineen, Phillips and Twitchell, among others, participated in the presentation of these projections to the Lead Arrangers at a September 26, 2007 bank meeting.  The Projections were vetted by CMAI and Turner Mason, diligenced and stress tested by the Lead Arrangers, and relied upon by sophisticated investors.   The Projections included in the October 2007 CIM included the following changes as compared to the Refreshed Projections:[166]

---

[163] Young Supplemental Report, Section 2.4.2.

[164] Declaration of Dan F. Smith, December 10, 2009, para. 57.

[165] LYO-UCC 00484464, LYO-UCC00001404.

[166] Lyondell did not materially change its estimates for 2008-2011 due to expectations that product prices would catch up to input prices, which would result in margins more reflective of industry operating rates.  Lyondell and Basell September 26, 2007 Bank Meeting, (LYO-UCC00061926 – 00061965).

**CONFIDENTIAL**

1. Rising feedstock costs at EC&D,[167] taken together with an earlier than expected seasonal decline in gasoline margins at Refining negatively impacted 2007 third quarter earnings. Therefore, Lyondell reduced its EBITDA estimates for the 2007 second half. Lyondell lowered, but did not materially change, its estimates for 2008-2011 due to (i) expectations that feedstock costs would stabilize or decline, (ii) anticipated low ethylene inventory levels, (iii) forecasted growth in North American polyethylene demand, (iv) lack of scheduled turnarounds, (v) continued demand growth in emerging markets, (iv) continued delays in capacity additions, and (v) consideration of the ongoing benefits of CORE.[168]

2. Estimated operating synergies and associated costs and timing were updated based on an underlying financial analysis performed by the Lyondell and Basell synergy task force.[169]

3. The Basell update excluded joint venture dividends of $95-$151 million per year from EBITDA and included modestly conservative growth assumptions.[170]

In September 2007, while finalizing its 2008 LRP, Lyondell highlighted the following points from CMAI's outlook for North American ethylene production:[171]

1. The North American ethylene trade balance was now forecast to be positive through 2011 compared to CMAI's 2007 outlook of a negative balance beginning in 2009.

2. This change would have a substantial impact on operating rates, including increases of 5.5% and 8.5% to North American operating rate forecasts in 2009 & 2011, respectively.

3. CMAI attributed this increase to "expensive capital causing delays and cancellations" and "higher demand growth, driven by developing economies."

CMAI indicated that this would have a positive impact on margin forecasts compared to prior forecasts.

---

[167] See Schedule 8 for an example of how LIFO inventory accounting has a negative impact on reported earnings in an environment of rising inventory (*e.g.*, feedstocks) costs.

[168] Interview with Edward Dineen, April 14, 2011;

[169] Lyondell and Basell September 26, 2007 Bank Meeting, (LYO-UCC00061958-961).

[170] Lyondell and Basell September 26, 2007 Bank Meeting, (LYO-UCC00061964).

[171] Email from Robert Ernst to Mario Portela and Robert Salvin with a CMAI update presentation attached, dated September 18, 2007, (SUB-RES 00008778-8796).

**CONFIDENTIAL**

## VI.  SUPPLEMENTAL ANALYSIS OF ADEQUATE CAPITAL AND ABILITY TO PAY DEBTS AS THEY CAME DUE

### A. LBI HAD ADEQUATE CAPITAL AND THE ABILITY TO PAY ITS DEBTS AS THEY CAME DUE AT THE ACQUISITION DATE

In the Kearns Reports, I concluded that LBI was adequately capitalized and had the ability to pay its debts as they came due as of the Acquisition date, December 20, 2007.  My complete conclusions are set forth in the Kearns Reports; several of the key points are as follows:[172]

- The Projections were prepared based on an appropriate management process, included realistic synergies and reflected key underlying assumptions that were reasonable at the time.  The Projections indicate that the Company had sufficient capital to operate its business and was able to pay its debts as they came due.  The Projections were reviewed by independent industry analysts who concluded that the Projections, on an overall basis, were reasonable and, for the petrochemical business, were conservative.

- At closing, LBI had approximately $2.3 billion of liquidity.[173]  While a portion of LBI's capital ostensibly was earmarked for acquisitions to which Basell was committed, LBI's financing arrangements with its Lenders included the Accordion to the Inventory ABL for additional working capital financing of $600 million to address potential post-closing increases to commodity prices.[174]  In addition, the Credit Agreement included an "indenture basket," providing for additional permitted indebtedness of $750 million.[175]  Neither of these items was included in LBI's $2.3 billion liquidity as of the closing.

- The Lead Arrangers, who undertook significant due diligence of the transaction, considered the potential risks of the Acquisition and performed stress tests of the Company's capital structure based on certain downside assumptions.  The Lead Arrangers' downside case assumptions were reviewed by O'Connor and Young and deemed to be unlikely to occur based on expected market conditions as of late

---

[172] Kearns Initial Report, pages 31-32.

[173] April 2008 – January 2009 Control Reports.  Trautz Exhibit 5.

[174] Declaration of Karen Twitchell, December 10, 2009, para 52.

[175] LYO-UCC 00244433 – 00244642.

**CONFIDENTIAL**

2007.[176]  These downside cases indicate that there was adequate liquidity and ability to pay debts as they came due when considering possible stresses to the Projections.

- I performed my own stress test analyses (the "**December 2007 Stress Tests**"), which assumed business conditions that would have resulted in the Company performing at a level at or below that considered by the Lead Arrangers' downside cases.  Even at my stress tested levels, the Company had adequate liquidity in most scenarios.[177]

- Intervening 2008 events, which were not foreseeable in late 2007, forced the Company to fund significant EBITDA losses in the 2008 fourth quarter, contributing to an unforeseeable liquidity crisis that eventually led the Company to seek protection under chapter 11 of the Bankruptcy Code on January 6, 2009.

## B.  LBI HAD ADEQUATE CAPITAL AND THE ABILITY TO PAY ITS DEBTS AS THEY CAME DUE AT MARCH 31, 2008

I have concluded that, as of March 31, 2008 (i) the Company was adequately capitalized after considering underlying business assumptions based on conditions and events reasonably foreseeable at the time, and (ii) had the ability to pay its debts as they came due.  My conclusions are based on the following:

- **The April 2008 Projections were reasonable:**  The April 2008 Projections were prepared based on an appropriate management process, and reflected key underlying assumptions that were based on conditions and events that were reasonably foreseeable at the time.  The April 2008 Projections indicate that the Company had sufficient capital to operate its business and was able to pay its debts as they came due.

  - O'Connor concluded that the April 2008 Projections were prudent and reasonable based on the outlook for the refining industry at the time.[178]

  - Young concluded that the petrochemical projections in the April 2008 Projections were developed in a reasonable manner and represented a reasonable outlook at the time.[179]

---

[176] Young Supplemental Report, Section 5.2.

[177] Kearns Initial Report, pages 36-48 and Exhibit E.

[178] O'Connor Supplemental Report, Chapter Four, Section F.

[179] Young Supplemental Report, Section 5.3.

**CONFIDENTIAL**

- As discussed previously, pro forma EBITDA through July 2008 was tracking closer to the Projections (*i.e.*, ahead of the April 2008 Projections).

- **LBI had adequate liquidity at March 31, 2008:**  As of March 31, 2008, LBI had approximately $2.2 billion of liquidity.  This amount included the $750 million Access Revolver which closed on March 27, 2008 and the Accordion.

- **My March 2008 Stress Tests demonstrate that LBI had adequate liquidity:**  I performed my own stress tests (the "**March 2008 Stress Tests**" and together with the December 2007 Stress Tests, the "**Collective Stress Tests**"), applying methodologies generally consistent with my December 2007 Stress Tests.  The March 2008 Stress Tests assume business conditions that would have resulted in LBI performing at a level below those considered by most of the Lead Arrangers.  Even at my stress tested levels, LBI had adequate liquidity.

- **LBI had the ability to pay its debts as they came due, as indicated by the April 2008 Projections.**

- **O'Connor and Young have concluded that the Lead Arrangers' downside cases were unlikely to occur.**[180]

- **Contemporaneous analysis of LBI prepared by Apollo in connection with their investment in the debt of LBI:**[181]  Apollo performed its own analysis of the April 2008 Projections, which included a stress test.  The Apollo documents, which Tuliano references, reflect an independent assessment by a debt investor of LBI's liquidity and business prospects in April 2008.  Prior to making its investment, Apollo determined that LBI had *"ample liquidity."*[182]  Further, Apollo's independent analysis demonstrated that LBI would have sufficient liquidity even under its "*deep trough*"[183] case.  The "deep trough" case was more severe in the projected trough year than the individual stress cases prepared by any of the Lead Arrangers.

---

[180] Young Supplemental Report, Section 5.2; O'Connor Supplemental Report, Chapter Four, Section F; Kearns Initial Report, page 36.

[181] Apollo, a large investment fund that is widely acknowledged as a sophisticated market participant, made a significant investment in LBI's debt in April 2008.

[182] LS0010155-62 (emphasis added).

[183] LS0053619 (emphasis added).

43

**CONFIDENTIAL**

## C. APRIL 2008 PROJECTIONS

The April 2008 Projections were developed to update the Lead Arrangers on LBI's outlook in connection with modifications to the credit agreements, including the Accordion, and in anticipation of the loan syndication process.[184]    The April 2008 Projections essentially updated the pre-Acquisition Projections to take into account changes in business conditions subsequent to the Acquisition.    The April 2008 Projections incorporated LBI management's view, after considering macroeconomic and industry consultants (*e.g., Turner Mason, CMAI, Chem Data, and Global Insight*) and LBI specific views.    The April 2008 Projections were developed in the ordinary course of business using LBI's forecasting process, with input from the requisite business units and corporate functions within LBI,[185] including business finance (formerly Business Performance Analysis and Reporting) and Corporate Development.

A significant change in market conditions in the 2008 first quarter was an increase in the average price of crude oil to $105/bbl in March 2008.    This change in feedstock costs increased working capital requirements and resulted in temporary margin pressure in LBI's ethylene business in the 2008 first quarter.    Historically, ethylene producers that used liquid feedstocks (i.e. oil based) were able to attain margins greater than ethylene producers who used natural gas based feedstocks.    Consistent with this historical performance, when preparing the Projections, LBI assumed that ethylene facilities, which utilized liquid feedstocks, would maintain a similar margin advantage compared to natural gas facilities.    However, oil prices unexpectedly continued to increase in the 2008 first quarter while natural gas prices moderated.    This resulted in the loss of LBI's liquid feedstock advantage that management had included in the Projections.[186]

The April 2008 Projections incorporated the outperformance of the APO, Polymers, and Technology businesses, all of which were performing better than the Projections.    Refining margins were modestly behind the Projections in the first quarter.    Downward adjustments were made to global growth assumptions in 2008 and 2009, which negatively impacted volume

---

[184] Interview with Alan Bigman, April 5, 2011.

[185] Interviews with Alan Bigman, April 5, 2011; Portela, March 28, 2011; Twitchell, March 31, 2011; Dineen, March 28, 2011; and Phillips, March 28, 2011.

[186] Young Supplemental Report, Section 5.3.

**CONFIDENTIAL**

forecasts in the Chemicals (includes EC&D) and Polymers businesses.[187]  Changes were made to the 2010 and 2011 forecasts in the Fuels segment (includes Refining) due to an expectation for modestly lower margins, in addition to an unplanned 2008 downtime for the refinery's Fluid Unit and coker.[188]  The April 2008 Projections also were updated to include the two newly acquired entities: Berre and Solvay.  The table below presents a summary of the changes to the 2008 – 2011 projections by LBI segment:

### April 2008 Projections – Summary of Projected EBITDA Changes

*($ in millions)*

|  | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|
| **CIM Projections (before Synergies)** | $ 5,198 | $ 4,415 | $ 3,927 | $ 3,728 |
| - Chemicals | (500) | (190) | - | - |
| - Fuels | (400) | (290) | (180) | (25) |
| - Polymers | 100 | - | - | - |
| - Technology | 40 | 35 | 25 | 20 |
| **April 2008 Update Case** | 4,438 | 3,970 | 3,772 | 3,723 |
| - Berre and Solvay | 94 | 125 | 125 | 125 |
| - Synergies | 45 | 300 | 420 | 420 |
| **New EBITDA** | $ 4,577 | $ 4,395 | $ 4,317 | $ 4,268 |

### i.   April 2008 Conservative Case

It was common practice for Lyondell to run sensitivity analyses and "test" the baseline projections as part of its planning process.  Consistent with this practice, LBI developed a conservative case in April 2008 (the "**April 2008 Conservative Case**" or the "**Conservative Case**").  This case was more pessimistic than the April 2008 Projections and did not take into account LBI's outperformance in certain segments in the 2008 first quarter.  The Conservative Case showed lower projected 2008 and 2009 EBITDA in the Fuels, Chemicals and Polymers segments as compared to the baseline April 2008 Projections.  Downward adjustments also were made to 2010 and 2011 Chemicals EBITDA.  Below is a comparison of April 2008 Projections to the Conservative Case.

---

[187] LYO-UCC 00467889.

[188] O'Connor Supplemental Report, Chapter Four, Section E.

**CONFIDENTIAL**

**Comparison of April 2008 Projections to Conservative Case**

*($ in millions)*

|  | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| **April 2008 Projections** | $ 4,577 | $ 4,395 | $ 4,317 | $ 4,268 |
| Chemicals | (50) | - | (230) | (230) |
| Fuels | (150) | - | - | - |
| Polymers | (115) | (115) | (80) | (80) |
| Technology | - | - | - | - |
| Other | (18) | (16) | (16) | (16) |
| **Subtotal** | $ 4,244 | $ 4,264 | $ 3,991 | $ 3,942 |
| - Berre and Solvay | 31 | - | - | - |
| - Synergies | - | - | - | - |
| **Conservative Case EBITDA** | $ 4,275 | $ 4,264 | $ 3,991 | $ 3,942 |

Source: LYO-UCC 00467913, LYO-UCC 00385993

### ii.  LBI 2008 First Half EBITDA Compared to April 2008 Projections

Actual 2008 second quarter results exceeded the April 2008 Projections by 22.7% when LBI achieved pro forma EBITDA of $1.55 billion.[189]  This outperformance was driven primarily by relative strength in the fuels segment (includes Refining), which reported second quarter 2008 pro forma EBITDA of $933 million.[190]

As shown below, LBI exceeded its April 2008 Projections through July 2008 before LBI was impacted by a confluence of unforeseeable events that negatively impacted earnings, as described in the Kearns Initial Report.[191]

---

[189] Pro forma EBITDA includes an $18 million adjustment related to an unplanned outage at the Houston refinery and $11 million related to Accounts Receivable Facility Yield.

[190] LyondellBasell AF S.C.A. Second Quarter Review, August 19, 2008.

[191] Kearns Initial Report, page 87, as adjusted to include the April 2008 Projections.

46

**CONFIDENTIAL**

### YTD July 2008 EBITDA: April 2008 Projections vs. Actual[192]



Source: Average monthly WTI spot prices (Cushing, OK WTI Spot Price FOB): Energy Information Administration (www.eia.doe.gov).

LBI also exceeded its 2008 second quarter liquidity forecast despite unprecedented increases in oil prices.  At June 30, 2008 LBI had $2.8 billion of available liquidity, a 47% improvement over the April 2008 Projections of liquidity of $1.9 billion.[193]

---

[192] Trautz Exhibit 5; LYO-UCC 00467906; Average monthly WTI spot prices (Cushing, OK WTI Spot Price FOB): Energy Information Administration (www.eia.doe.gov).

[193] LYO-UCC 00467906.  Forecasted 2008 second quarter liquidity adjusted to include the Accordion less related transaction fees of $36 million.

**CONFIDENTIAL**



**LBI Liquidity: March 2008 to December 2008**[194]



Forecasted Liquidity as of Qtr End       ◆ Actual Liquidity as of Month End

## D.  APRIL 2008 CREDIT REVIEW PROCESS BY THE LEAD ARRANGERS

The Lead Arrangers re-evaluated LBI's financial outlook in April 2008 in connection with the Accordion commitment, including a review and analysis of the April 2008 Projections.[195] The Lead Arrangers recognized that LBI was operating in an environment of increasing and volatile feedstock prices in the 2008 first quarter, which had an impact on results in Chemicals and put pressure on LBI's liquidity.[196]  Goldman Sachs attributed LBI's weak 2008 first quarter performance primarily to the rapid rise in the price of oil and the impact on EC&D (part of LBI's Chemicals segment),[197] but recognized that expectations were for "margins in the North American base chemical business to begin to recover in the second quarter of 2008 as markets appear reasonably balanced and as the industry catches up with the higher feedstock costs with pricing initiatives."[198]  This view was based on industry expectations that oil prices would moderate and decline below April 2008 levels by the end of 2008.  In Appendix D to its April 23, 2008 credit memorandum (the "**April 2008 UBS Credit Memo**"), UBS noted that consensus oil price estimates from 31 market analysts ranged from a low of $70 to a high of $102, with an

---

[194] Trautz Exhibit 5.  Liquidity also includes availability under the Access Revolver.

[195] LyondellBasell Industries April 2008 Update, April 11, 2008 (LY0-UCC 00467887 and ML-ADPRO-0017902).

[196] ABN Amro Credit Memo, "LBI Industries," April 15, 2008 (ABN LYNB 00028716-732).

[197] Confidential Capital Committee Memo, April 9, 2008 (GSCP_LYON HC 00002309).

[198] April 2008 UBS Credit Memo (UBS2004-0045561).

**CONFIDENTIAL**

average of $91.09 for 2008.[199]  Similarly, Citi also commented that any "decrease in the price of crude would reduce working capital thereby increasing/restoring liquidity to higher levels."[200]

While reviewing the Accordion, Citi recognized that crude oil price increases "had the simultaneous effect of increasing inventory values which could be pledged as additional collateral."[201]  In April 2008, LBI had more than enough inventory available to draw down the entirety of the $600 million Accordion.[202]

Additionally, as part of its credit review analysis, UBS updated its previous downside case, and determined that LBI had sufficient liquidity and strong cash flow generating capability.[203] While the remaining Lead Arrangers did not update their original stress tests (*e.g.,* Citi and Goldman Sachs considered the Conservative Case, and Merrill considered a prior stress test),[204] some of them specifically considered the impact of ongoing oil price increases on LBI's liquidity.  UBS stated that "the company feels that obtaining additional liquidity would provide additional operating flexibility that may be needed should the feedstock environment remain volatile."  UBS noted that it believed that LBI needed "close to $1.5 billion of liquidity to buffer it from future oil and gas price volatility as well as margin pressure."[205]  Merrill and UBS also considered LBI's analysis of the impact to net cash flow of an increase in oil prices (see Section VIII for further discussion).

### E.  MARCH 2008 STRESS TESTS

I independently applied stress tests to analyze LBI's liquidity, as of March 31, 2008, under a number of scenarios to determine whether, as of that date, LBI:

    (i)      had adequate capital; and

    (ii)     had the ability to pay its debts as they came due.

---

[199] April 2008 UBS Credit Memo (UBS2004-0045578).  I have included this appendix as Schedule 5 to this report.

[200] Citi April 21, 2008 Credit Committee Approval Memorandum (CITI_LYO_0112025).

[201] Id.

[202] April 2008 Inventory Borrowing Base Certificate (AHG_000073285).

[203] UBS2004-0045561-62.

[204] Gunter Fragenberg, a Director in Merrill's Global Industrials Group, testified that the downside case was modeled based on the worst ethylene trough in recent history, 1992/1993.  (See Kearns Initial Report, page 34.)

[205] UBS Project Leo, Global Syndication Finance Commitment Committee Addendum #1 (Senior Management Memo) UBS2004-0045561.

**CONFIDENTIAL**

As a general matter, stress tests seek to examine the limits of a given company's financial condition under a range of adverse conditions. I analyzed LBI's ability to withstand oil price increases, many of which were beyond the range of consensus estimates as of March 31, 2008,[206] and therefore not reasonably foreseeable at the time. I performed two sets of stress tests: the "**Liquidity Stress Tests**," and the "**Covenant Stress Tests**."

- **Liquidity Stress Tests** – I determined the minimum level of Cash EBITDA[207] that LBI would need to generate each year in order to maintain a desired level of liquidity as of December 31 of each year of $1.4 billion, excluding any impact of changes to oil prices (the "**Desired Minimum Liquidity**").[208]
- **Covenant Stress Tests** – I determined the minimum level of Cash EBITDA that LBI would need to generate in order to remain in compliance with its financial covenants for leverage and debt service in its senior debt agreements.

## F.  STRESS TESTS: KEY MODEL ASSUMPTIONS

The following are descriptions of certain key assumptions underlying my March 2008 Stress Tests. A complete comparison of the assumptions in my March 2008 Stress Tests to those in my December 2007 Stress Tests is included at Schedule 3.[209] The key model assumptions described below are (i) opening liquidity as of March 31, 2008; (ii) the impact of changes in oil prices on LBI's liquidity; (iii) Desired Minimum Liquidity; (iv) capex requirements; and (v) interest expense assumptions.

---

[206] The highest price level of oil for 2008 considered in the summary consensus of 31 analysts as shown in the April 2008 UBS Credit Memo was $102/bbl.

[207] Cash EBITDA is independent of FIFO/LIFO inventory accounting as my Collective Stress Tests separately reflect the impact of oil price changes on operating cash flow (working capital changes net of related price increases). For further detail, see the table showing the cash impact of such oil price changes to working capital and EBITDA under FIFO and LIFO in Section VIII.

[208] See Kearns Initial Report, pages 39-41 for a description of my rationale for LBI's minimum liquidity of $1.4 billion.

[209] My March 2008 Stress Tests utilize the same model that I used for my December 2007 Stress Tests as updated.

50

**CONFIDENTIAL**

### i. Opening Liquidity as of April 1, 2008

Opening liquidity utilized in my March 2008 Stress Tests is $2.2 billion. LBI's liquidity for my March 2008 Stress Tests is based on LBI's reported[210] liquidity, including the Access Revolver (committed on March 27, 2008), and the Accordion,[211] consistent with my December 2007 Stress Tests.[212] This amount is comprised of the following:

**Liquidity at March 31, 2008**
*($ in millions)*

|  |  |  |  |
|---|---|---|---|
| Revolver Facility Size | (a) | $    1,000 | |
| Less: Outstanding Balance | (a) | (858) | |
| Less: Normalized LOC's Outstanding | (b) | (20) | |
| Revolver Cash Draw | | | 122 |
| Inventory ABL Facility Size | (a) | 1,000 | |
| Plus: Accordion Feature | (c) | 600 | |
| Less: Outstanding Balance | (a) | (360) | |
| Less: Normalized LOC's Outstanding | (b) | (300) | |
| Less: Trigger Covenant Buffer | (d) | (100) | |
| Inventory ABL Cash Draw | | | 840 |
| AR ABL Facility Size | (a) | 1,150 | |
| Less: Outstanding Balance | (a) | (1,010) | |
| AR ABL Facility Cash Draw | | | 140 |
| Insurance and TDI Sale Proceeds | (e) | | 84 |
| Cash | (a) | | 290 |
| | | | $    1,476 |
| Access Revolver | | | 750 |
| **Total Liquidity at March 31, 2008** | | | **$    2,226** |

(a) Source: LBI March 31, 2008 balance sheet.

(b) My assumption for normalized letters of credit of $320 million is consistent with my December 2007 Stress Tests.

(c) I have included $36 million of Accordion fees in the 2008 cash flows.

(d) I have adjusted my covenant buffer liquidity reserve to $100 million to conform with the liquidity disclosure on page 33 of the LBI March 31, 2008 Quarterly Financial Report.

(e) Refer to Kearns Rebuttal Report page 51-54. I updated the original calculation for first quarter 2008 insuran proceeds and Berre and Solvay acquisitions, which were funded at or before March 31, 2008.

---

[210] LyondellBasell AF S.C.A. Second Quarter Review, August 19, 2008.

[211] Note that while I included the full $600 million for the Accordion, I assume a use of cash in the first period equal to the $36 million facility fee.

[212] Please refer to Section VIII for my analysis of Tuliano's estimate of liquidity at March 31, 2008.

**CONFIDENTIAL**

Subsequent to the Acquisition, LBI amended its European Accounts Receivable Securitization Facility to include certain legacy Lyondell European entities. The process of amending the facility began as early as December 2007 and closed on April 14, 2008.[213] I did not include this increased availability in my Collective Stress Tests primarily because any upsizing could be used to fund the post-closing working capital (inventory) adjustment related to the acquisition of the Berre refinery. The Berre working capital adjustment was expected to be funded in the Fall of 2008. The chart below presents a summary of additional sources of liquidity that I considered, but did not include, in my opening liquidity for my March 2008 Stress Tests.

**Additional Sources of Liquidity Considered, but not Utilized in my March 2008 Stress Tests**

*($ in millions)*

|  |  | 3/31/2008 |
|---|---|---|
| European A/R Securitization Upsizing | (a) | $     150 |
| Bayer Litigation | (b) | 135 |
| Berre Working Capital Adjustment | (b) | (117) |
| 40% of Remaining TDI Sale Proceeds | (c) | 45 |
| 40% of Remaining Basell Insurance Proceeds | (c) | 11 |
| **Total** |  | $     224 |

(a)  LBI's European A/R facility upsizing was in process at March 31, 2008 and closed shortly thereafter on April 14, 2008. By June 30, 2008, LBI had drawn an additional $304 million in liquidity from this facility (source: LBI March 31, 2008 and June 30, 2008 Quarterly Financial Reports).

(b)  Estimate by the Company at March 31, 2008.

(c)  The expected proceeds were reasonably foreseeable by the Company at March 31, 2008.

## ii.  The Impact of Changes in Oil Prices on LBI's Liquidity

In my Collective Stress Tests, I consider the potential impact of rising commodity prices, utilizing the analysis developed by LBI, which captured the relationship between changes in feedstock prices (*i.e.,* the price of a barrel of crude oil) and operating cash flow. Consistent with

---

[213]  Declaration of Karen Twitchell, December 10, 2009, para.66.

**CONFIDENTIAL**

LBI's analysis,[214] my Collective Stress Tests assume a negative cash flow impact of $19.3 million for each $1 increase in the price of oil, which is a combination of the following factors:[215]

    a. My Collective Stress Tests assume that for each $1 increase in the price of a barrel of crude oil, $38.9 million in cash is needed to fund increases in working capital on a FIFO basis.

    b. My Collective Stress Tests assume that there is a mitigating increase in cash flow (in an amount equal to $19.6 million for each $1/barrel increase) arising from FIFO EBITDA (effectively LBI's monetization of the gain from held inventory created by the resulting price increase associated with the increase in feedstock costs).[216]

My Collective Stress Tests calculate the Cash EBITDA needed to sustain the net effect of the aforementioned impact of changes in oil prices while maintaining the Desired Minimum Liquidity of $1.4 billion at year-end.

### iii.    My Desired Minimum Liquidity is Conservative When Compared to the Views of UBS

As fully described in the Kearns Reports, my December 2007 Stress Tests maintain $1.4 billion of Desired Minimum Liquidity at each year end. In the April 2008 UBS Credit Memo (a document on which Tuliano relies), UBS stated that LBI required "…close to $1.5 billion [of liquidity] to buffer it from future oil and gas volatility as well as margin pressure."[217] This statement indicates that UBS believed that LBI needed $1.5 billion of minimum liquidity which included a cushion against the impact of oil price changes. In contrast, my Collective Stress Tests separately determine the increased liquidity needs resulting from higher oil prices and make corresponding reductions in Cash EBITDA based on Lyondell's analysis. Therefore, my Desired Minimum Liquidity of $1.4 billion at year-end represents the minimum liquidity needed by LBI excluding any impact of oil and gas volatility, as well as margin pressure, which is

---

[214] LBI's analysis was presented to the rating agencies and also was accepted and utilized by Merrill (ML-ADPRO-0017919) and UBS (UBS2004-0045579) in their April 2008 credit review processes.

[215] Pike Exhibit 21. My Collective Stress Tests further assumes that the increased price of oil is effective on April 1, 2008. The net cash flow impact is the same under LIFO and FIFO.

[216] Also, see Section VI for FIFO/LIFO differences on working capital net of price increases. The net impact on liquidity – i.e. $19.3 million for each $1/bbl increase – is the same under LIFO and FIFO.

[217] UBS2004-0045561.

**CONFIDENTIAL**

analyzed separately.[218]  Consequently, UBS's contemporaneous analysis of minimum liquidity (i) further demonstrates the conservative nature of my Desired Minimum Liquidity requirement of $1.4 billion and (ii) undermines Tuliano's claims that LBI needed in excess of $3 billion of liquidity at all times.[219]

### iv.    Capital Expenditure Requirements Included in My Collective Stress Tests

Capital expenditures ("**Capex**") are a significant cash outflow for LBI in most years.  For my Collective Stress Tests, I concluded that, to conserve liquidity in a distressed earnings environment, LBI would be able to defer and or reduce certain annual Capex spending.

LBI's capital expenditures can be broken down into three major categories: (i) Health, Safety and Environmental ("**HSE**") (ii) Maintenance and Turnaround, and (iii) Investment and Growth.[220]  The first two categories are considered "core" to LBI's operations and such capital expenditures are not easily reduced or deferred.  However, under certain scenarios, (*e.g.* in a period with lower operating rates), the Company could reduce spending on turnarounds and temporarily delay certain HSE and Maintenance and Turnaround expenditures to preserve liquidity.  Investment and Growth Capex are more discretionary and could be delayed more readily by LBI.  In fact, LBI had the ability to defer certain discretionary projects in-process until a later date.[221]

Consistent with my December 2007 Stress Tests, my March 2008 Stress Tests assume that 100% of management's projections for core Capex is spent during the forecast period.  However, in my Collective Stress Tests, I reduced the level of discretionary Capex by 25% in 2008, 90% in 2009 and 100% in each year thereafter based on my analysis of how certain petrochemical peers reduced their discretionary Capex during the trough period that occurred in 2001-2002.[222]  In the Projections, LBI forecasted discretionary Capex in expected peak years (2008-2009) with little to no discretionary spending during expected trough years (2010-2011).  I also updated my original

---

[218] Note that it appears that the downside case run by Merrill determined net cash flow (EBITDA net of interest, taxes and capex) needed to maintain minimum liquidity of $1.1 billion – see Kearns Initial Report, page 35.

[219] Tuliano Initial Report, page 5.

[220] Interviews with Edward Dineen and Jim Bayer, March 28, 2011.

[221] Id.

[222] Kearns Initial Report, pages 40-41.

**CONFIDENTIAL**

Capex calculation for incremental Capex related to the Berre and Solvay acquisitions, as well as for the actual Capex spending in the 2008 first quarter.

### April 2008 Capital Expenditure Projections

|  | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|
| *Core Capex* | | | | |
| Core | $    649 | $    606 | $    611 | $    555 |
| Implied Insurance Settlements | 107 | 27 | - | - |
| Berre & Solvay Core | 19 | 19 | 19 | 19 |
| **Total Core Capex** | **775** | **652** | **630** | **574** |
| *Discretionary Capex* | | | | |
| Profit Enhancement | 413 | 198 | - | - |
| Investment | 27 | 122 | 14 | - |
| Berre & Solvay Discretionary | 11 | 11 | 11 | 11 |
| **Total Discretionary Capex** | **451** | **331** | **25** | **11** |
| **Total Capex with Settlements** | **1,226** | **983** | **655** | **585** |
| *Reduction in Discretionary Capex* | *25.0%* | *90.0%* | *100.0%* | *100.0%* |
| **Updated Stress Tests Capex Calculation** | **1,113** | **685** | **630** | **574** |
| Capex Spend in Q1 2008 | 236 | - | - | - |
| **Stress Tests Capex Assumption 3/31/08** | $    877 | $    685 | $    630 | $    574 |

Source: LYO-UCC 00467887-923

Consistent with and supportive of my assumptions for reducing discretionary Capex during periods of stress, I note that Young confirms such reductions and delays in discretionary Capex as reasonable.[223]

### v.    Interest Expense Calculation in My Collective Stress Tests

My March 2008 Stress Tests include calculations of interest expense on LBI's outstanding debt based on contractual rates of interest, contractual amortization schedules, and market expectations for forward LIBOR rates as of March 31, 2008.   This calculation also includes undrawn line fees on the Access Revolver (all other facilities are assumed to be fully drawn on the first day of my Collective Stress Tests).   Interest expense on LBI's Bridge Loan is assumed at

---

[223] Young Supplemental Report, Section 3.1 and 3.2.

55

**CONFIDENTIAL**

12% per annum, beginning on July 1, 2008.[224]   The interest expense calculations for the Revolver, Term Loan A, and Term Loan B include an additional 0.5% in contractual spreads associated with the Lead Arrangers flex rights, as well as a 3.25% LIBOR floor on the Term B loan.[225]

### Liquidity Stress Tests: Cash EBITDA Required to Maintain Desired Minimum Liquidity of $1.4 billion

My March 2008 Stress Tests calculate the amount of Cash EBITDA necessary to maintain $1.4 billion in Desired Minimum Liquidity as of each year-end in the projection period at various price sensitivities for crude oil.  See Schedule 4 for detailed examples of my calculations and analysis.  A summary of the Cash EBITDA required under the March 2008 Stress Tests compared to the April 2008 Conservative Case and the April 2008 Projections is shown below.

**March 2008 Stress Tests**
($ in millions)

| Oil Price Scenarios | 2008 | 2009 | 2010 | 2011 | Cumulative |
|---|---|---|---|---|---|
| Model Oil @ $105.45 | $ 2,877 | $ 3,117 | $ 3,254 | $ 3,170 | $ 12,417 |
| Model Oil @ $115 | 3,062 | 3,117 | 3,254 | 3,170 | 12,602 |
| Model Oil @ $130 | 3,351 | 3,117 | 3,254 | 3,170 | 12,891 |
| Model Oil @ $145 | 3,669 | 3,117 | 3,254 | 3,170 | 13,209 |
| | | | | | |
| April 2008 Conservative Case | 4,275 | 4,264 | 3,991 | 3,942 | 16,472 |
| April 2008 Projections | 4,577 | 4,395 | 4,317 | 4,268 | 17,557 |

The March 2008 Stress Tests demonstrate that:

- Assuming that oil prices stay at $105.45/bbl (March 2008 average price), to maintain $1.4 billion of liquidity, LBI would need to generate Cash EBITDA of $2.877 billion in 2008 and $12.417 billion in Cash EBITDA cumulatively through 2011.

- Assuming that oil prices rise to and stay at $130/bbl, to maintain $1.4 billion of liquidity, LBI would need to generate Cash EBITDA of $3.351 billion in 2008 and $12.891 billion in Cash EBITDA cumulatively through 2011.

---

[224] This assumption is consistent with the April 2008 Projections which contemplated paying the 12% rate due in the event of a failed syndication, even though LBI disputed the Lead Arrangers claims of a failed syndication.

[225] This assumption is consistent with the assumptions of the April 2008 Projections.

**CONFIDENTIAL**

*March 2008 Stress Tests results compared to Management's April 2008 Projections*

Shown below is a comparison of the Cash EBITDA levels shown above as a percentage of the April 2008 Projections.

**March 2008 Stress Tests**
(% of April 2008 Projections)

| Oil Price Scenarios | 2008 | 2009 | 2010 | 2011 | Cumulative |
|---|---|---|---|---|---|
| Model Oil @ $105.45 | 63% | 71% | 75% | 74% | 71% |
| Model Oil @ $115 | 67% | 71% | 75% | 74% | 72% |
| Model Oil @ $130 | 73% | 71% | 75% | 74% | 73% |
| Model Oil @ $145 | 80% | 71% | 75% | 74% | 75% |
| | | | | | |
| April 2008 Conservative Case | 93% | 97% | 92% | 92% | 94% |

Based on this analysis, I have concluded that:

(i)    Assuming no increase in oil prices from $105.45/bbl, LBI would only need to generate 63% of its projected Cash EBITDA to maintain its Desired Minimum Liquidity at the end of 2008. Expressed another way, this analysis shows that the Company had sufficient liquidity to withstand a 37% Cash EBITDA shortfall in 2008 as compared to the April 2008 Projections. Furthermore, the Company had sufficient liquidity to withstand a cumulative shortfall of Cash EBITDA of 29% over the four-year projection period.

(ii)    In scenarios where oil prices are assumed to escalate up to $130/bbl, my analysis shows that the Company would only need to generate 73% of its projected 2008 Cash EBITDA to maintain the Desired Minimum Liquidity, and 73% cumulatively over the four-year projection period. Expressed another way, my analysis shows that even at $130/bbl crude oil, the Company had sufficient liquidity to withstand up to a 27% Cash EBITDA shortfall in 2008 as compared to the April 2008 Projections.

*March 2008 Stress Tests results compared to the Lead Arrangers' Downside Cases*

I compared the minimum Cash EBITDA required to maintain Desired Minimum Liquidity of $1.4 billion under my March 2008 Stress Tests, at the indicated oil price levels, to the EBITDA levels included in the April 2008 Projections, the Conservative Case, the April 2008 UBS

**CONFIDENTIAL**

downside case, the Apollo projections and the Lead Arrangers' October 2007 downside cases.[226]
I also ran my March 2008 Stress Tests at a price of $91.09/bbl, which is the average for 2008
shown by UBS in its April 2008 survey of oil analysts.  I have ranked and summarized my
comparison of my March 2008 Stress Tests results by cumulative EBITDA over the projection
period:

**Comparison of March 2008 Stress Tests to the Lead Arranger Downside Cases & Apollo Base Case**
($ in millions)

| Oil Price Scenarios | 2008 | 2009 | 2010 | 2011 | Cumulative |
|---|---|---|---|---|---|
| UBS Downside | 3,982 | 3,337 | 2,148 | 2,525 | 11,993 |
| Citi Downside | 3,599 | 2,827 | 2,493 | 3,131 | 12,050 |
| **Model Oil @ $91.09** | **2,600** | **3,117** | **3,254** | **3,170** | **12,140** |
| **Model Oil @ $105.45** | **2,877** | **3,117** | **3,254** | **3,170** | **12,417** |
| ML Downside | 3,784 | 3,124 | 2,772 | 2,874 | 12,554 |
| **Model Oil @ $115** | **3,062** | **3,117** | **3,254** | **3,170** | **12,602** |
| **Model Oil @ $130** | **3,351** | **3,117** | **3,254** | **3,170** | **12,891** |
| Apollo Projections | 3,585 | 3,390 | 2,950 | 3,100 | 13,025 |
| **Model Oil @ $145** | **3,669** | **3,117** | **3,254** | **3,170** | **13,209** |
| GS Downside | 3,896 | 3,256 | 3,075 | 3,145 | 13,372 |
| ABN Downside | 4,700 | 3,639 | 3,404 | 3,320 | 15,063 |
| **April 2008 Conservative Case** | **4,275** | **4,264** | **3,991** | **3,942** | **16,472** |
| **April 2008 Projections** | **4,577** | **4,395** | **4,317** | **4,268** | **17,557** |

The comparison of the results of my March 2008 Stress Tests to the Lead Arrangers'
downside cases and Apollo projections demonstrates the following:

- Assuming that oil prices rise and stay at $145/bbl (a price level that was not reasonably
  foreseeable in March 2008 as explained below), in order to maintain $1.4 billion of
  liquidity at each year end, LBI needed to generate Cash EBITDA of $13.209 billion
  through 2011 (75% of LBI's projected EBITDA during the period).

- Even at a $145/bbl through 2011, my March 2008 Stress Tests show that the Cash
  EBITDA required to maintain $1.4 billion of liquidity was only 10.1% higher than the
  lowest EBITDA forecast from the most severe of the Lead Arrangers' downside cases,
  UBS.

- At $91.09/bbl, the average in the April 2008 UBS summary of oil analysts, my March
  2008 Stress Tests show that the Cash EBITDA required to maintain $1.4 billion of

---

[226] UBS was the only one of the Lead Arrangers that updated its downside case at April 2008.

**CONFIDENTIAL**

liquidity was below the downside cases of most Lead Arrangers and only $147 million more on a cumulative basis through 2011 than the severe UBS downside case.

The following chart ranks the results of my March 2008 Stress Tests for 2008.  The chart also shows, for each oil price scenario, the percentage of the full-year 2008 EBITDA projected under the April 2008 Projections needed to maintain liquidity of $1.4 billion, after considering the fact that LBI had already achieved $1.024 billion in EBITDA (or 22% of the April 2008 Projections) through March 31, 2008:

**Summary Comparison of Model Stress Tests to**
**Lead Arranger Downside Cases & Apollo Base Case**
($ in millions)

| Oil Price Scenarios | Full Year 2008 | | % of April 2008 Projections | | |
| --- | --- | --- | --- | --- | --- |
| | $ | % April 2008 Projections | Q1 2008 Actual | Required Q2-Q4 2008 | |
| Model Oil @ $91.09 | 2,600 | 57% | 22% | 34% | (a) |
| Model Oil @ $105.45 | 2,877 | 63% | 22% | 40% | (a) |
| Model Oil @ $115 | 3,062 | 67% | 22% | 45% | |
| Model Oil @ $130 | 3,351 | 73% | 22% | 51% | |
| Apollo Projections | 3,585 | 78% | | | |
| Citi Downside | 3,599 | 79% | | | |
| Model Oil @ $145 | 3,669 | 80% | 22% | 58% | |
| ML Downside | 3,784 | 83% | | | |
| GS Downside | 3,896 | 85% | | | |
| UBS Downside | 3,982 | 87% | | | |
| April 2008 Conservative Case | 4,275 | 93% | | | |
| April 2008 Projections | 4,577 | 100% | | | |
| ABN Downside | 4,700 | 103% | | | |

(a) Does not cross foot due to rounding.

The chart above demonstrates that:

- When considering LBI's liquidity for 2008, the first year following the Acquisition, Cash EBITDA required under my March 2008 Stress Tests at oil prices up to $130/bbl was below all of the Lead Arrangers' downside cases and the Apollo projections for the year.

- Assuming that oil prices rise and stay at $145/bbl (a price level that was not reasonably foreseeable in March 2008 as explained below), in order to maintain $1.4

**CONFIDENTIAL**

billion of liquidity at year end 2008, LBI only needed to generate $3.669 billion of EBITDA (80% of the April 2008 Projections). However, given that LBI had already generated $1.024 billion of EBITDA in the first quarter of 2008 (or 22% of full-year 2008 EBITDA per the April 2008 Projections), in order to maintain Desired Minimum Liquidity, LBI would only need to generate $2.645 billion (58% of full-year 2008 EBITDA as forecast under the April 2008 Projections) in the remaining three quarters of 2008.

Based on my Liquidity Stress Tests, I have concluded that:

i.  LBI had sufficient liquidity under my March 2008 Stress Tests, which demonstrate that LBI could operate at lower Cash EBITDA levels than those indicated in most of the downside cases referred to above and still maintain Desired Minimum Liquidity. Therefore, I have concluded LBI had sufficient liquidity as of March 31, 2008 even assuming that the price per barrel of crude oil increased to levels that were not reasonably foreseeable at the time.

ii. As discussed in the Kearns Initial Report and by O'Connor and Young,[227] the downside cases considered by the Lead Arrangers, including UBS, reflect assumptions unlikely to occur based on information known in late 2007 and early 2008.

iii. The UBS downside case was the most severe of the Lead Arrangers' downside cases. However, as discussed further in Section VIII, the consensus oil price estimates in the April 2008 UBS Credit Memo from 31 analysts predicted that oil prices would stabilize and likely decline. Under such a stabilizing and declining oil price environment, my March 2008 Stress Tests demonstrate that LBI had sufficient liquidity to maintain Desired Minimum Liquidity even at EBITDA levels which approximate the "doom and gloom" UBS downside case.[228]

---

[227] Young Supplemental Report, Section 5.2 and 5.3; O'Connor Initial Report Chapter 4, Section E; O'Connor Supplemental Report Chapter 4 Section F.
[228] Deposition of Douglas Lane, October 21, 2009, page 308; 22-25.

**CONFIDENTIAL**

***In March 2008, an increase in 2008 oil prices to $145/bbl was not reasonably foreseeable***

While my December 2007 Stress Tests and March 2008 Stress Tests consider scenarios where oil prices rise to $145/bbl, such an occurrence was not reasonably foreseeable at either time. I have calculated that, as of March 31, 2008, the probability of oil exceeding $145/bbl at the end of 2008 was no more than 3.5% (at December 31, 2007 this probability was no more than 1.2%). This calculation is based on the implied volatility of future oil prices as indicated by options on oil futures contracts traded at March 31, 2008 using a normal probability curve. The probability calculations do not consider expectations for declining oil prices generally anticipated at the time and therefore are conservative.[229]

### Probability of Oil Reaching Price Levels by December 31, 2008

| Price Level | at December 31, 2007 | | at March 31, 2008 | |
| --- | --- | --- | --- | --- |
| | % Change | Probability | % Change | Probability |
| $101.54 | 5.8% | 39.9% | 0.0% | 50.0% |
| $115.00 | 19.9% | 19.1% | 13.3% | 28.7% |
| $130.00 | 35.5% | 5.9% | 28.0% | 11.7% |
| $145.00 | 51.1% | 1.2% | 42.8% | 3.5% |

Additionally, at March 31, 2008 there was a probability of no more than 11.7% that oil prices would be above $130 at the end of 2008. As shown on Schedule 5, the oil price estimates of 31 analysts cited in the UBS April 2008 Credit Memo indicate that the overwhelming consensus was for stable to decreasing oil prices. Consequently, I believe that a scenario where the price of oil is at or above $145/bbl at the end of 2008 was not reasonably foreseeable based on market expectations as of December 2007 and March 2008, as well as my own probability analysis.

Schedule 9 shows an analysis that was prepared by the Energy Information Administration ("EIA") as of December 2007. EIA applies similar statistical methods to determine the probability of oil price changes for an ensuing twelve month period using a 95% confidence interval. According to EIA calculations, there was a 95% chance of oil closing between $55.80 and $132.60 by the end of 2008. EIA's conclusions are generally consistent with my

---

[229] Source: Bloomberg, LP; See Schedule 9 for Historical Oil Price and Implied Volatility Charts.

**CONFIDENTIAL**

conclusions as shown above and clearly indicate that the prospect of oil prices rising above $145/bbl by the end of 2008 was not reasonably foreseeable.

### Covenant Stress Tests: Cash EBITDA required to remain compliant with senior loan covenants

To test LBI's ability to comply with senior loan covenants, I calculated the minimum required level of Cash EBITDA together with the associated level of liquidity assuming oil does not increase above $105.45/bbl, the average price in March 2008.  The results of these calculations are shown below:

**Cash EBITDA Required to Maintain Senior Covenant Compliance**
($ in millions)

|  | 2008 | 2009 | 2010 | 2011 | Cumulative |
|---|---|---|---|---|---|
| Cash EBITDA | 3,567 | 3,244 | 3,461 | 3,459 | 13,731 |
| % of April 2008 Projections | 78% | 74% | 80% | 81% | 78% |
| Liquidity Assuming Oil @ $105.45 | 2,090 | 2,217 | 2,425 | 2,714 |  |
| Excess over Minimum Liquidity | 690 | 817 | 1,025 | 1,314 |  |

Under my Covenant Stress Tests the above table demonstrates that:

- In order to remain compliant with its senior debt covenants existing at March 31, 2008, in a stable oil price environment (with oil prices staying at $105.45/bbl), LBI would need to generate $3.567 billion of Cash EBITDA in 2008.  Under this scenario, liquidity in 2008 would be approximately $2.1 billion, $700 million more than Desired Minimum Liquidity.

- Assuming no increase in crude oil prices above $105.45, LBI would need to generate 78% of its projected 2008 Cash EBITDA to be in compliance with its senior covenants.  Expressed another way, my analysis shows that LBI would be in compliance with its senior covenants provided that the EBITDA shortfall in 2008 did not exceed 22% as compared to the April 2008 Projections.  Likewise, LBI would have been in compliance with its senior covenants, provided that the EBITDA shortfall did not exceed 26% in 2009, 20% in 2010, and 19% in 2011.[230]

---

[230] See Kearns Rebuttal Report, pages 37-38 and Exhibit 6 for a discussion of the purpose of financial covenants and examples of companies obtaining companies obtaining covenant amendment relief from their lenders.

**CONFIDENTIAL**

➤ However, given that LBI had already generated $1.024 billion of EBITDA in the 2008 first quarter, (or 22% of full-year 2008 EBITDA per the April 2008 Projections), my analysis shows that LBI would only need to generate $2.543 billion in the remaining three quarters of 2008 (or 56% of its 2008 full-year projection), in order to be in compliance with its senior covenants.

- Assuming LBI generated Cash EBITDA necessary to be in compliance with its covenants as shown above, there would be sufficient liquidity to fund an increase in crude oil of 34% over the average March 2008 price. Expressed another way, this analysis shows that LBI could have remained compliant with its senior debt covenants, even if oil prices rose to $141.30/bbl.

**Covenant Stress Test Liquidity Cushion**

($ in millions)

|  | __2008__ |
|---|---|
| Covenant Scenario Liquidity | 2,090 |
| Less: Minimum Liquidity | 1,400 |
| Equals: Excess Cash | 690 |
| Net Cash Impact for $1 Oil Change | 19.3 |
| Sustainable WTI Price Increase $ | 35.8 |
| Divided by: Beginning WTI Price | 105.5 |
| Equals: Sustainable WTI Price Increase % | *34%* |

Please refer to my Rebuttal Report and Section VIII for a discussion of Tuliano's mischaracterizations of covenant defaults and their implications. Also see Section VIII for a discussion of Apollo's analysis and conclusion that LBI would be able to manage its cash flow to avoid a covenant default.

63

**CONFIDENTIAL**

## VII.  WEIGHTED AVERAGE COST OF CAPITAL CALCULATIONS (CORRECTION TO THE KEARNS INITIAL REPORT)

In preparing my weighted average cost of capital ("**WACC**") calculations as part of my DCF analysis in the Kearns Initial Report, I incorporated several conservative assumptions related to risks specific (including omitting a size discount)[231] to the Company and market required rates of return on equity investments.  These assumptions are consistent with the conservatism I used in applying the market approach (for example, I applied discounted multiples in the Guideline Company and Comparable Transaction approaches, even though I do not consider there to be a demonstrable difference between those comparable companies and LBI).  However, I included erroneous data in my calculations of the betas of the Guideline Companies in my WACC analysis, as I did not adjust betas for companies that were not public for the five-year period considered in my analysis.  Recalculating the WACC using the corrected betas, together with the conservative assumptions noted above, results in an overly conservative (*i.e.* high) WACC for a company of LBI's size and risk profile.

To confirm the reasonableness of my original 10% WACC, I reviewed studies related to systematic risk for the industries in which LBI operates.  Industry risk premiums and calculations of industry betas are methods of quantifying the systematic risk of an entity to determine an appropriate adjustment to the equity risk premium considering entities operating in that industry.  The Ibbotson Valuation Yearbook for 2008 presents contemporaneous data on industry risk premiums.  I found industry premiums in the three main industries in which LBI operates to be negative.  This indicates that an investor in the equity of LBI would require a lower return than an investor in the market as a whole and implies a beta of less than 1.  Applying such a weighted Industry Risk Premium results in a concluded cost of equity of 11.3%, which is comparable to my cost of equity of 11.7% applied in the Kearns Initial Report.

The Ibbotson data on industry risk supports my original conclusion of Cost of Equity for LBI and has not changed my opinion regarding the reasonableness of a 10% WACC assumption in my DCF analysis.  See Schedule 6 for a revised WACC calculation and a comparison to contemporaneous WACC determinations by American Appraisal, Deutsche, Citi and Merrill.

---

[231] Maxwell did not consider a specific risk premium (i.e., my assumption in this regard is more conservative).

64

**CONFIDENTIAL**

## VIII.   RESPONSE TO FLAWED CONCLUSIONS IN THE TULIANO REPORTS

### A. TULIANO'S FLAWED CONCLUSIONS RELATED TO LIQUIDITY, LEVERAGE AND OIL PRICE VOLATILITY

#### i.   Opening Liquidity in My December 2007 Stress Tests and March 2008 Stress Tests Appropriately Includes the Incremental Liquidity of the Accordion

My capital adequacy analyses include the incremental liquidity provided by the Accordion. Tuliano asserts that the $600 million upsizing should not have been included as opening liquidity in the December 2007 Stress Tests primarily because the Accordion was "uncommitted" as of these test dates.[232]  However, LBI had the contractual right to solicit from the Lead Arrangers, or other sources, an increase in the ABL facilities of up to $600 million, without requiring an amendment to the Credit Agreement.  The existence of the Accordion option was disclosed in the Form 10-K for the year-end December 31, 2007 and was noted in several of the credit documents including the following:

- December 20, 2007 Credit Agreement[233]
- October CIM [234]
- November ABL CIM [235]
- October 2007 Citi credit committee memo[236]
- October 2007 Goldman Sachs credit committee memo[237]

In addition, Bigman, Twitchell and Pike indicated in their witness declarations or depositions that they believed that the Accordion would be available if the Company required additional liquidity due to a continued increase in feedstock prices.[238]

Each of the Lead Arrangers evaluated LBI in connection with the Accordion upsizing in April 2008 (commitment was on or about April 30, 2008).  LBI paid a 6% facility fee (which is considered in my March 2008 Stress Tests) and agreed to a LIBOR floor of 3.25% on its Term B facility for three years.[239]  However, as more fully explained in the Kearns Rebuttal Report, LBI

---

[232] Tuliano Rebuttal Report, page 10.

[233] Senior Secured Inventory-Based Credit Agreement dated December 20, page 74.

[234] LYO_UCC00121435.

[235] CITI_LYO_0001359.

[236] CITI_LYO_0000949.

[237] GSCP_LYON00072869.

[238] Bigman 2004, page 174; Declaration of Karen Twitchell, December 10, 2009, para. 52; Deposition of Doug Pike, October 15, 2009, page 190; 5-16.

[239] December 2007 Stress Tests assumed Libor at 4.4% in December 2007.

**CONFIDENTIAL**

received certain benefits including an increase in the Accordion of $500 million, the expansion of its debt basket by $250 million, an increase in eligible collateral and changes to debt covenants, in addition to the liquidity provided by the Accordion.[240]

Tuliano states that the inclusion of the Accordion in the capital structure was inappropriate because it "significantly increased LBI's risk profile" and failed to match long-term financing needs with long-term liquidity.[241]   This assertion is ill founded.   As the price of feedstocks increased, the collateral backing the ABL including the Accordion would increase in tandem, providing LBI with the ability to fund its working capital needs (see Section VI for a discussion of similar conclusions reached by Citi).   Additionally, the Accordion (which was part of the Inventory ABL) was among the lowest cost financing provided to LBI with an interest rate of LIBOR + 2%.

### ii.    Tuliano's Conclusions Regarding LBI's Liquidity and Leverage are Flawed and Misleading

Tuliano states that the Company's liquidity as of March 31, 2008 was only $709 million. This conclusion is incorrect and misleading.  As in his previous reports, Tuliano never defines "adequate liquidity" and ignores several sources of liquidity, including the Accordion.   As discussed previously, as of March 31, 2008, LBI had liquidity of approximately $2.2 billion including the Access Revolver (which was committed on March 27, 2008) and the Accordion.   A comparison of liquidity considered in my Collective Stress Tests and Tuliano's adjusted liquidity are as follows:

---

[240] Kearns Rebuttal Report, pages 49-50.
[241] Tuliano Supplemental Report, page 4.

66

**CONFIDENTIAL**

### Comparison of the Collective Stress Tests Opening Liquidity to Tuliano's Opening Liquidity

*($ millions)*

|                                                        | 12/31/2007 | 3/31/2008 |
|--------------------------------------------------------|-----------:|----------:|
| **Collective Stress Tests Opening Liquidity** [1]      | $   2,240  | $   2,226 |
| Access Revolver                                        | -          | (750)     |
| Accordion                                              | (600)      | (600)     |
| Transaction Related Expenses                           | (238)      | -         |
| TDI Sale and Basell Insurance Proceeds                 | (115)      | (84)      |
| Difference in Receivables ABL Availability             | (90)       | (66)      |
| Variance Due to Normalized Letters of Credit           | (18)       | (17)      |
| **Tuliano's Liquidity** [2]                            | $   1,179  | $    709  |

**Notes:**

(1) December 2007 Stress Tests opening liquidity is from Exhibit E of the Kearns Initial Report.  March 2008 Stress Tests opening liquidity is from Section VI.

(2) Tuliano's liquidity as of December 31, 2007 is from the Tuliano Initial Report. Tuliano's liquidity as of March 31, 2008 is from the Tuliano Supplemental Report, pages 7 and 8.

Tuliano understated liquidity at December 31, 2007 and March 31, 2008 by $1.1 billion and $1.5 billion, respectively.  In addition, as discussed in the Kearns Rebuttal Report, Tuliano's analysis of liquidity is inconsistent in that he reduces opening liquidity for future *uses* of liquidity yet does not increase opening liquidity for future *sources* of liquidity.[242]  Below is a description of comparative differences.

a.  **Access Revolver:**  Tuliano incorrectly excludes the $750 million Access Revolver from liquidity as of March 31, 2008.  The Access Revolver was committed on March 27, 2008, and therefore, the associated liquidity was available to LBI at March 31, 2008.

b.  **Accordion:**  As explained previously, Tuliano incorrectly excludes the $600 million Accordion.

c.  **Transaction Related Expenses:**  Tuliano deducts transaction related expenses of $238 million from liquidity at December 31, 2007.  LBI had forecast these cash outflows to occur during the 2008 first quarter.  Therefore, I included transaction related expenses in 2008 cash flows in my December 2007 Stress Tests.

---

[242] Kearns Rebuttal Report, pages 46-48.

67

**CONFIDENTIAL**

d. **TDI Sale and Basell Insurance Proceeds:**  I included a portion of the sale of the TDI business and Basell insurance proceeds, since these proceeds were reasonably foreseeable at each date.  I used 60% of the actual proceeds (*i.e.*, a 40% discount) as a proxy for the contemporaneous additional liquidity expected as of December 31, 2007[243] and March 31, 2008.

e. **Difference in Receivables ABL Availability:**  Tuliano does not include the full Receivables ABL commitment of $1.15 billion to calculate availability under the facility, which results in lower liquidity as of December 31, 2007 and March 31, 2008 of $90 million and $66 million, respectively.  I assumed a sufficient borrowing base in my Collective Stress Tests, to take account of a rising oil environment, whereby the value of LBI's receivables would correspondingly rise to a level that would enable LBI to utilize the entire $1.15 billion commitment.

f. **Variance Due to Normalized Letters of Credit:**  I assumed a normalized level of letters of credit outstanding of $320 million at all times.[244]  The variances at December 31, 2007 and March 31, 2008 represent the difference between the normalized level assumed in my Collective Stress Tests and the actual amounts outstanding.

### iii.    Tuliano's Concept of Excess Liquidity is Misguided

In the Tuliano Supplemental Report, Tuliano continues to discuss his concept of "excess liquidity."[245]  As discussed in the Kearns Rebuttal Report, Tuliano's excess liquidity begins with liquidity as defined by the Company and is reduced by certain expected future cash outflows.  In assessing liquidity as of the Acquisition date, Tuliano misinterprets LBI documents addressing cash flows,[246] ignores over $1.5 billion of liquidity sources and reduces liquidity by future cash outflows.  These future cash outflows were paid in the 2008 first quarter, and were substantially included in the Collective Stress Tests.[247]

---

[243] Kearns Rebuttal Report, page 54.

[244] I rounded the letters of credit balance at December 31, 2007 to $320 million and assumed that was the amount outstanding at all times for my December 2007 Stress Tests and March 2008 Stress Tests.

[245] Tuliano Supplemental Report, page 5.

[246] These amount to over $490 million in additional deductions that, as explained in the Kearns Rebuttal Report, represent accounting placeholders and not actual reductions in available liquidity.

[247] Kearns Rebuttal Report, page 46.

68

**CONFIDENTIAL**

In addition, Tuliano continues to assert that a $1 increase in oil consumes $30 million to $40 million of liquidity.[248]  This conclusion (apparently using FIFO), is incorrect and ignores the increase in liquidity resulting from the Company's monetization of the gain in held inventory due to the implementation of price increases.  The more appropriate net liquidity impact of a $1 increase in the price of oil is $19.3 million based on the Company's analysis as described in the Kearns Reports and summarized herein.  The Company's methodology and analysis was presented to the rating agencies, and was utilized by Merrill as well as UBS (in the April 2008 UBS Credit Memo, a document on which Tuliano relies).

### iv.    Tuliano Misrepresents LBI's Liquidity Position in Early 2008

Tuliano's misrepresentation of excess liquidity is demonstrated when he suggests that the Company had "excess liquidity" of $(215) million as of February 2008.[249]  In the 2008 first quarter, LBI experienced a decrease in liquidity primarily due to increasing feedstock costs, the funding of two acquisitions, funding of merger related costs and payment of recurring costs such as insurance payments, property taxes, customer rebates, pay downs on the European Securitization, and bonus payments.[250]  Each of these items is accounted for in my Collective Stress Tests.[251]  Even with this activity, LBI had actual liquidity of $1 billion at the end of February 2008, as indicated in LBI's Quarterly Financial Report[252] (excluding the Accordion and the Access Revolver).  During this period, the Company took the prudent decision, primarily as a result of increases in feedstock costs, to seek more operating flexibility and proceeded to close on (i) the Accordion, (ii) the upsizing of the European Accounts Receivable Facility and (iii) the Access Revolver.

### v.    Tuliano Incorrectly Concludes that LBI was Excessively Leveraged

In addition, Tuliano concludes that LBI was excessively leveraged based on the fact that LBI's post-transaction debt burden was higher relative to other companies in the chemical and

---

[248] Tuliano Supplemental Report, page 3.

[249] Tuliano Supplemental Report, page 5.

[250] Declaration of Karen Twitchell, December 10, 2009, para. 68.

[251] Kearns Initial Report, pages 39-40.

[252] Trautz Exhibit 5.

CONFIDENTIAL

refining industries.[253]    As discussed in the Kearns Rebuttal Report, the chemical and refining companies on which Tuliano based his ratio analysis are generally comparable for valuation purposes.  However, for purposes of comparing leverage, it is more appropriate to compare LBI to leveraged companies in similar cyclical industries.  This approach also was used by Goldman Sachs, Merrill and Citi.[254]

### vi.    Tuliano's Observations on Oil Price Volatility are Misleading

Tuliano states that, "On December 20, 2007, NYMEX listed option contracts for twelve-month delivery with strike prices ranging up to $200 per barrel."[255]  Tuliano implies that the existence of such options suggests that the likelihood of oil prices reaching $200/bbl was reasonably foreseeable at a time when oil was trading at $90.88/bbl in the spot market.  This implication is wrong for a number of reasons.

First, in reviewing the December 20, 2007 WTI crude options summary provided by Tuliano, I noted that there also were options struck at $36.  The availability of options struck at a particular price has little relevance to reasonable expectations of future oil prices.

Second, the availability of options with a $200 strike price, which had a remote possibility of ever being in-the-money, is not a valid consideration to determine capital adequacy based on reasonably foreseeable increases in feedstock prices.  Tuliano's characterization of the options market in this regard is misleading.  In addition, the settle price for a single $200 option contract on December 20, 2007 was just 24 cents.

Third, in addition to the consensus oil price estimates discussed in the April 2008 UBS Credit Memo, a December 2007 Wall Street Journal Forecasting Survey demonstrated that, of 43 economists who provided a forecast for crude oil prices for June 30, 2008, only three predicted crude oil prices in excess of $100/bbl (the highest prediction was $110/bbl).  The vast majority of those surveyed predicted crude oil prices between $75 and $85/bbl by June 30, 2008.[256]

Tuliano states that the "Pricing of options in late 2007 indicate significant expected volatility (even exceeding the expected volatility of the S&P 500 stock market index)."  In making this

---

[253] Tuliano Initial Report, page 63.

[254] GSCP_LYON 00044718-751; ML-2004-227994-8047; CITI_LYO_0038867-923.

[255] Tuliano Rebuttal Report, page 21.

[256] December 2007 WSJ survey. I noted that Diane Swonk, Tuliano's lead economist at Mesirow Financial was predicting oil prices to be $85 by June 30, 2008.

CONFIDENTIAL

statement, Tuliano compares the "Oil VIX index" which measures the market's expectation of 30-day short term volatility[257] to the VIX index which is based on the S&P 500. Tuliano's statement is misleading and incorrect, because it is meaningless to compare the short-term volatility expectations of futures contracts of a single commodity to a highly diversified equity index like the S&P 500. While the market based indicator of expected volatility is the options market, a more appropriate measure of oil price volatility is the open interest levels in the one year at-the-money option at various oil prices. Shown below is a summary of open interest at December 20, 2007.

**One Year Call Options at Selected Strike Prices**
Market Data as of December 20, 2007

| Strike Price | Settle Price | Open Interest | % of Open Interest |
|---|---|---|---|
| $    5.00 | $   83.55 | 0 | 0.00% |
| 50.00 | 38.55 | 250 | 0.12% |
| 100.00 | 3.71 | 26,256 | 12.22% |
| 150.00 | 0.53 | 1,234 | 0.57% |
| 200.00 | 0.24 | 5,433 | 2.53% |

Source: Refer to Schedule 10.

Tuliano's conclusion that the market expected significant oil price volatility is also incorrect and misleading. In fact, as the chart below demonstrates, market expectations for oil price volatility at December 20, 2007 and March 31, 2008 were comparable to their historic levels. It was not until the 2008 third quarter that market participants began to price higher levels of expected volatility into the options market. Also see Section VI for a summary, at December 2007 and March 2008, of the probability of oil reaching $130/bbl or higher in 2008.

---

[257] CBOE Crude Oil Volatility Index (OVX), December 2010.

**CONFIDENTIAL**



**Historic Implied Volatility of 1 Year At-The-Money Call Options on WTI Crude**

January 1, 2006 through December 31, 2008

Source: Bloomberg LP

**Tuliano asserts that LBI "continued to apply unreasonable assumptions" in the April 2008 Projections**

New executive management developed and approved the April 2008 Projections, not the same Lyondell management team that developed the Refreshed Projections and the legacy Lyondell portion of the Projections. LBI appointed a new CEO and CFO who reported to a new supervisory board as opposed to Lyondell's ten independent board members. It is entirely unconvincing for Tuliano to imply that the replacement executive team and the new supervisory board continued to manipulate the Company's projections.

**B. TULIANO IGNORES KEY ANALYSES AND CONCLUSIONS MADE BY UBS**

Tuliano concludes that the April 2008 Projections were "unreasonable as they failed to reflect the widely anticipated peak to trough conditions."[258] While Tuliano never provides any quantitative analysis to support his conclusion, he determines that the UBS downside case "reflected a projected downturn consistent with the industry" and utilizes this downside case to

---

[258] Tuliano Supplemental Report, page 27.

72

**CONFIDENTIAL**

test for capital adequacy as of March 27, 2008.[259]   However, Tuliano improperly relies on the downside cases of the Lead Arrangers as reasonably foreseeable in his capital adequacy analysis:

> There is clearly a lot of effort put into these cases, and to develop these cases a lot of documentation surrounding the assumptions that went into these cases, which would indicate that these are contemporaneous downside cases reasonably foreseeable at the time of the transaction.[260]

Tuliano's characterization of the UBS downside case (the most severe of the downside cases in the deepest trough year among the Lead Arrangers) is at odds with the testimony of Doug Lane, a member of UBS's investment banking division, who referred to the UBS downside case included in UBS's October 2007 memo as a *"doom and gloom"* scenario. [261]

Tuliano indicates that the UBS downside case was prepared in April 2008.  However, the UBS April 2008 downside case is identical to the October 2007 downside case (Doug Lane's "doom and gloom" scenario) and was updated only to include LBI's actual results for the 2008 first quarter, acquisitions, interest rate changes and the Accordion.[262]   Consequently, the UBS downside case is based on the same key underlying stress assumptions as the October 2007 UBS downside case, which incorporated a protracted trough, simultaneous troughs for the refining and petrochemical industries and a six-month shutdown of the refinery without the receipt of any insurance proceeds during the projection period.[263]   O'Connor and Young reviewed these assumptions and determined them to be unlikely to occur based on market expectations as of late 2007 and in April 2008.[264]

Tuliano selectively relies on the April 2008 UBS Credit Memo, but ignores or misinterprets several of UBS's key conclusions:

---

[259] Tuliano Supplemental Report, page 28.

[260] Deposition of Ralph Tuliano December 3, 2009, pages 349; 23-350; 5.

[261] Deposition of Doug Lane, October 21, 2009, page 308; 24-25 (emphasis added).

[262] Project Leo: Global Syndicated Finance Commitment Committee Memorandum Addendum 1, (UBS2004-0045552-605).

[263] Interview with Karen Twitchell, March 31, 2011.  LBI had business interruption insurance and it would be highly unlikely to have a six-month shutdown of the refinery with no insurance proceeds within the five-year projection period.

[264] Young Supplemental Report, Section 5.3 and 5.4; O'Connor Initial Report Chapter 4, Section E; O'Connor Supplemental Report Chapter 4 Section F.

**CONFIDENTIAL**

1. UBS indicated that under its updated projections, LBI "has strong cash flow generation capacity" and that UBS "continue(s) to see strong cash flow generation from this business."[265]

2. UBS included a summary of consensus oil estimates by industry analysts in Appendix D to the April 2008 UBS Credit Memo. It is clear from these estimates that the prevailing industry view in April 2008 was for stable to declining oil prices in 2008 continuing in 2009, 2010 and 2011.[266]

**April 2008 UBS Credit Memo - Summary of Appendix D: Crude Oil Price Forecasts**

| ($ / bbl) | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|
| Average | $91.09 | $86.94 | $83.38 | $81.00 |
| High | $102.00 | $105.00 | $97.30 | $95.00 |
| Low | $70.00 | $70.00 | $70.00 | $66.00 |
| Sample Size | 31 | 29 | 13 | 9 |

| **WTI Closing Price (4/11/2008):** | **$110.14** |
|---|---|

3. The April 2008 UBS Credit Memo also considered the impact of changes in oil prices on LBI's liquidity. UBS noted that for every $1 per barrel increase in the price of oil, LBI's liquidity decreases by $17.6 million.[267] I noted that Merrill considered the same analysis in its April 2008 credit memo.[268] This analysis is consistent with the information provided in LBI's April 11, 2008 update to the Lead Arrangers, and includes a minor update to the more conservative assumption in my Collective Stress Tests, which assumes a change of $19.3 million as shown below.

---

[265] April 2008 UBS Credit Memo, pages 8 and 9.

[266] UBS concluded that "if oil costs decline, significant cash flow and liquidity should be released from the business," (UBS2004-0045561).

[267] April 2008 UBS Credit Memo, Appendix E: Crude Oil Price/Working Capital Sensitivity Analysis.

[268] April 22, 2008 Merrill Credit Committee Memorandum, page 17.

74

**CONFIDENTIAL**

**Cash Inflow (Outflow) per $1/bbl Change:[269]**

| $ in millions | Kearns Stress Test | | UBS |
|---|---|---|---|
| | LIFO | FIFO | FIFO |
| Working Capital | $    (6.1) | $    (38.9) | $    (37.0) |
| EBITDA | (13.2) | 19.6 | 19.4 |
| FCF | $    (19.3) | $    (19.3) | $    (17.6) |

From his analysis of the UBS downside case, Tuliano concludes that the Company would have $1.69 billion of negative cash flow from April 2008 through 2012.[270]  However, Tuliano inappropriately excludes $872 million of additional sources of liquidity through 2012:

    i.   Tuliano appears to incorrectly assume an additional 50 basis points of interest rate "flex" on over $20 billion of secured debt – *i.e.* Tuliano adds "flex" to a UBS assumption that already included flex ($422 million);[271]

    ii.   Tuliano excludes LBI's forecast for net positive working capital cash flow ($166 million);  and

    iii.   Tuliano excludes other sources of liquidity that were reasonably foreseeable on March 31, 2008 ($284 million).[272]

In addition, Tuliano's cash flow analysis includes roughly $700 million for 2008 acquisitions which had been funded in the first quarter.  Lastly, Tuliano ignores LBI's substantial liquidity position of over $2 billion as of March 31, 2008, which was *after* funding the acquisitions of Berre and Solvay.

---

[269] Pike 21.

[270] Tuliano Supplemental Report, page 28.  I have adjusted Tuliano's analysis to account for 2008 first quarter results.

[271] Tuliano's interest expense is taken from the May 2008 CIM (SUB-RES 00052948) which appears to already incorporate the 50bps of flex on the secured credit facilities.  Tuliano inappropriately adds an additional 50 bps to his interest calculation.

[272] Includes 100% of insurance settlements, TDI sale and Bayer litigation proceeds.  Kearns Rebuttal Report, pages 46-54.

**CONFIDENTIAL**

### Tuliano's Tests for Capital Adequacy and Ability to Pay Debts are Flawed and Misleading

In Tuliano's test for capital adequacy and ability to pay debts as they come due, he attempts to calculate the debt service covenant ratio using the April 2008 UBS downside case. However, his calculation, and related conclusion, is wrong. In Tuliano's analysis of the debt service covenants under the Senior Secured Credit Agreement, (the "**Credit Agreement**") he states, "[Based] on the projections in the UBS Downside Case, LBI would fail its debt coverage ratio in 2008, and in each year from 2010 to 2012."[273] The ratio, as defined in the Credit Agreement, is formulated as:

$$\text{Debt Service Coverage} = (\text{Consolidated EBITDA} - (\text{Capital Expenditures} + \text{Taxes})) / (\text{Net Interest Expense} + \text{Amortization})^{274}$$

Tuliano fails to accurately reflect the terms of the Credit Agreement in making his covenant calculation. Consequently, Tuliano overstates the required EBITDA for 2008 Debt Service Coverage by incorrectly including the Berre and Solvay investments as Capital Expenditures. The definition of "Capital Expenditure" in the Credit Agreement expressly excludes certain permitted investments under Section 7.02(e), with the Berre and Solvay investments of $841 million specifically excluded. Therefore, correcting for Tuliano's $841 million overstatement of such Capital Expenditures in his calculation of 2008 Debt Service Coverage, the Company has an EBITDA cushion – *i.e.* does not default - of $272.2 million, or 6.7%, even under the UBS downside case in 2008.

### C.  TULIANO IGNORES KEY ANALYSES AND CONCLUSIONS MADE BY APOLLO

Tuliano states that LBI's April 2008 Projections were inconsistent with the contemporaneous projections prepared by third parties. As support for his conclusion, Tuliano selectively uses information contained in the Apollo documents and ignores certain related analyses and conclusions made by Apollo.[275]

---

[273] Tuliano Supplemental Report, page 28.
[274] Senior Secured Credit Agreement.
[275] Tuliano Supplemental Report, page 26.

76

**CONFIDENTIAL**

It is evident that Apollo had a conservative outlook for LBI.  Despite this more conservative outlook, Apollo's investment team was confident that LBI was adequately capitalized and would generate positive cash flow over the projection period.

In a memorandum dated April 25, 2008, the Apollo team commented on the positive aspects of the merger (including the complementary nature of the Refining and petrochemical segments) and how the upcoming petrochemical trough's impact on LBI would be offset by expected strength in Refining:

> The combination of Lyondell and Basell creates a global powerhouse which has a dominant position in each of its core product offerings …the backward integration to refining will likely dampen the cyclicality of the petrochemical business, and the strong refining spread outlook will offset the olefin/polyolefin cycle which is expected to turn towards a trough in 2010 and 2011.[276]

Apollo's investment team also independently created a "deep trough case" which, in their opinion, represented a "worst case scenario."[277]  This "deep trough case" forecasted annual EBITDA of just $2.3 billion (lower than any single year projection in virtually all of the Lead Arranger downside cases), and free cash flow in the trough year that was lower than even the UBS "doom and gloom" case.  Still, the Apollo team noted that LBI was expected to have ample liquidity and cushion under this case:

> Even assuming a deep cyclical trough in which EBITDA falls to $2.3 billion, the Company should have the ability to meet its interest payments and capex.  In addition, the Company has ample liquidity in the form of a $1 billion revolver and $1 billion of additional availability under the ABL.  As such, we believe that the likelihood of a restructuring is remote without a major exogenous shock.
>
> While clearly operating in a cyclical industry, the Company's strong free cash flow profile, ample liquidity, large scale, geographic diversity and backwards integration to petroleum position it well to withstand a downturn in the cycle.[278]

Shown below is a summary of Apollo's April 2008 base case projections as well as Apollo's Deep Trough Case.[279]

---

[276] LS0053623-4.

[277] LS0053619.

[278] LS0010161-62.

[279] Note that Apollo's assumed business segments are based on the legacy companies.

77

**CONFIDENTIAL**

## Apollo April 2008 Base Case Projections[280]

| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | Deep Trough Case (2010) |
|---|---|---|---|---|---|---|---|
| | | | **EBITDA by Segment** | | | | |
| EC&D | $500 | $450 | $250 | $250 | $650 | $2,100 | $200 |
| PORP | 550 | 550 | 450 | 500 | 550 | 2,600 | 350 |
| Refining | 1,100 | 1,000 | 900 | 800 | 700 | 4,500 | 600 |
| Other | (25) | (25) | (25) | (25) | (25) | (125) | (25) |
| Basell | 1,000 | 900 | 800 | 1,000 | 1,000 | 4,700 | 600 |
| Dividends | 110 | 90 | 80 | 80 | 80 | 440 | 50 |
| Acquisitions | 75 | 75 | 75 | 75 | 75 | 375 | 75 |
| Synergies | 275 | 350 | 420 | 420 | 420 | 1,885 | 420 |
| | | | | | | | |
| Total | $3,585 | $3,390 | $2,950 | $3,100 | $3,450 | $16,475 | $2,270 |

| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | Deep Trough Case (2010) |
|---|---|---|---|---|---|---|---|
| | | | **Free Cash Flow Summary** | | | | |
| EBITDA | $3,585 | $3,390 | $2,950 | $3,100 | $3,450 | $16,475 | $2,270 |
| *Less:* | | | | | | | |
| Interest | 2,051 | 2,050 | 2,099 | 2,095 | 2,110 | 10,405 | 2,099 |
| Capex | 800 | 600 | 450 | 500 | 600 | 2,950 | 450 |
| Cash Taxes | 90 | 77 | 0 | 0 | 0 | 167 | 0 |
| Changes in WC | 23 | (21) | (355) | 135 | 294 | 76 | 0 |
| Other | 289 | 134 | 134 | 134 | 134 | 825 | 0 |
| Mandatory Amortization | 190 | 190 | 295 | 395 | 545 | 1,615 | 0 |
| **Free Cash Flow** | **$142** | **$360** | **$327** | **($159)** | **($233)** | **$437** | **($279)** |

O'Connor has reviewed Apollo's April 2008 base case projections and found them to be a conservative outlook for LBI at the time of preparation.[281]   Apollo's 2008 forecast for Refining of $1.1 billion significantly underestimated the segment's earning power at the time.   Through July 2008, year-to-date EBITDA for the Refining segment was $955 million.[282]   Apollo's annual forecast of $550 million for the PO&RP segment also was conservative.   Through June 2008, the PO&RP segment generated EBITDA of $525 million (PO: $255 million; OxyFuels: $270 million), which is almost equal to Apollo's full year forecast for the segment.   The Apollo projections also appear to understate the earnings capacity at the time for Basell's assets.   Through July 2008, the APO and Technology legacy Basell segments generated combined

---

[280] LS 0053618-9.

[281] O'Connor Supplemental Report, Chapter Four, Section E.

[282] LYO_UCC 00162357-385.

**CONFIDENTIAL**

EBITDA of $452 million (APO: $190 million; Tech: $262 million).[283]  This is nearly half of Apollo's full year projections and does not include results from the European olefins and polymers segments, which represented approximately 70% of Basell's October 2007 Projections.[284]

Notwithstanding Apollo's ostensibly conservative projections, its investment team was still confident that, under this lower projection, LBI had adequate liquidity and would generate substantial positive cash flow.  Apollo also noted that, in the event of a deeper than expected trough, LBI still would be well capitalized and able to withstand unforeseen events:

> FCF [free cash flow] is very powerful here, with significant positive FCF generated in every year of the cycle.[285]

> We built a super deep cycle to try and stress the business, and could barely develop a scenario where the business crossed FCF B/E [free cash flow break even] with $2bn available liquidity, company is in excellent shape even if that super-trough occured [sic].[286]

> …we believe that it is in a strong position to ride out a prolonged cyclical trough.[287]

Apollo also considered the possibility of LBI breaching its secured debt covenants, but felt that the Company would be able to manage its cash position to avoid such a "breach."  Apollo's investment team considered Access's ability and willingness to cure any defaults:

> While the Company has plenty of room under its leverage covenant (which only includes first lien debt), they may hit against the interest coverage ratio in 2010. Given that the margin is very small, we expect that the Company would be able to manage its cash flow to avoid a breach.  In addition, Access has the ability to cure (with equity or with subordinated debt of the type recently committed by them), and we are confident that they would do so if there was a risk of a covenant default.[288]

---

[283] April 2008 – January 2009 Control Reports.  Trautz Exhibit 5.

[284] November 2007 Private Side Supplement.  CITI_LYO_0001248-73.

[285] LS0015653.

[286] Id.

[287] LS0053619.

[288] Id.

**CONFIDENTIAL**

Tuliano states that Lead Arrangers made "a special exception for 2007 only" to allow the Company to calculate covenant ratios using Lyondell's 2007 earnings, adjusted to reflect FIFO inventory accounting.[289]   However, this assertion is misleading.  As Citi noted in April 2008, it "is highly customary in many de novo leveraged buyouts" to "insert historical fixed numbers for future covenant calculations."[290]   In addition, Citi noted that the Company would be reporting on FIFO for SEC purposes in 2009.[291]

Additionally, as discussed in the Kearns Rebuttal Report, a covenant breach does not indicate that a company is on the verge of failure, as Tuliano alleges.  In fact, in prior petrochemical troughs, a number of chemical companies obtained covenant relief.  Similar covenant relief was obtained in the period beginning in September 2008 as well.[292]

---

[289] Tuliano Rebuttal Report, page 14.

[290] Citi April 21, 2008 Credit Committee Approval Memorandum (CITI_LYO_0112026).

[291] CITI_LYO_0112025.

[292] Kearns Rebuttal Report, pages 37-38 and Exhibit 6.

**CONFIDENTIAL**

## IX.  SUPPLEMENTAL VALUATION ANALYSIS AND RESPONSE TO PLAINTIFF'S ALLEGATIONS

### A.  RESPONSE TO FLAWED CONCLUSIONS IN THE MAXWELL REPORTS

Maxwell's conclusion that LBI's total asset value was $22.7 billion as of the Acquisition date is not credible in light of his valuation as of October 20, 2008 and his previous valuation conclusions in this case.   In the Kearns Rebuttal Report, I cited many flaws in Maxwell's methodology and conclusions.   I also noted that Maxwell's $22.7 billion valuation as of December 20, 2007 was not credible because it contradicts his sworn statement given to the Court in February 2009 in connection with the Debtor's motion for the approval of DIP financing.[293]   At that hearing Maxwell questioned the valuation methodology employed by the debtor's financial advisor, Duff & Phelps ("**Duff**") and concluded that the Duff valuation of $19.2 billion as of January 6, 2009 significantly undervalued the Company.   Maxwell then stated that the value of the Company was "more than sufficient" to cover its existing debt of $24.1 billion.[294]

In the Maxwell Supplemental Report, Maxwell concludes that the total asset value of LBI was $22.3 billion as of October 20, 2008.   As support for this valuation, he points out that this conclusion is lower than his December 20, 2007 valuation of $22.7 billion and higher than the Duff valuation of $19.2 billion as of January 6, 2009, which he previously criticized.[295]   The following chart compares the valuations prepared or cited by Maxwell.

---

[293] Kearns Rebuttal Report, pages 3-4.

[294] Declaration of Anders Maxwell, February 22, 2009, para. 17; Exhibit 3, pages 13-14 (emphasis added).

[295] Maxwell Supplemental Report, page 7.

81

**CONFIDENTIAL**

**Timeline of Maxwell Valuations** ($ in billions)[296]



Maxwell concludes that LBI's total asset value decreased by only $400 million (or 1.8%) from the Acquisition date through October 20, 2008. Yet, during the intervening ten months, LBI was severely impacted by an oil price spike and crash, a deadly crane accident which limited operations at the refinery for five to six months, two hurricanes and the economic collapse of late 2008.[297] Note that Citi concluded that LBI's Total Enterprise Value exceeded $34 billion in April 2008.[298] In addition, Maxwell's own analysis shows that the value of the comparable companies he identified decreased by 38.5% for chemical comparables and by 70.5% for refining comparables, between December 2007 and October 2008, as shown below:[299]

---

[296] Maxwell Initial Report, page 7; Maxwell Supplemental Report, page 7; Declaration of Anders Maxwell, February 22, 2009, para. 17.

[297] Stephen Cooper, acting as a member of the LBI Supervisory Board, the Restructuring Committee, and the Litigation Subcommittee, summarized the Company's view of the intervening events as follows: *"The members of the Litigation subcommittee also considered their own knowledge of the petrochemical and refinery business, as well as the massive and, in our collective view, unforeseeable deterioration in the economy in the second half of 2008 and the impact that had on Lyondell's business performance"*. Declaration of Stephen F. Cooper, December 23, 2009, para. 20 (emphasis added).

[298] CITI_LYO_0112015-070.

[299] Maxwell Supplemental Report, page 11.

**CONFIDENTIAL**



Chemical and Refining Companies – December 20, 2007 to October 20, 2008

It is difficult to rationalize how Maxwell can reasonably conclude that LBI was insolvent as of the Acquisition date based on his analysis and valuation conclusion as of October 20, 2008 as well as prior testimony regarding valuation as of January 6, 2009.  In addition, certain of Maxwell's key assumptions to his value conclusion as of these dates are inconsistent with his December 20, 2007 valuation as follows:

- It is generally accepted valuation practice to incorporate management's best estimate of future performance in the discounted cash flow ("**DCF**") approach.  However, as I discussed in the Kearns Rebuttal Report, in arriving at his valuation conclusion, Maxwell disregarded management's contemporaneously prepared projections, instead relying on lower downside projections prepared by third parties.

- Maxwell's October 20, 2008 valuation is based on the Company's own projections prepared contemporaneously.  Paradoxically, in his December 20, 2007 valuation in the Maxwell Initial Report, Maxwell chose to use outdated projections, downside sensitivity projections, and the new model CMAI created for use in this litigation in 2009 (which reached conclusions that were inconsistent with the conclusions CMAI shared with the Lead Arrangers, Basell and Lyondell in the fall of 2007 as part of the diligence for the Acquisition).  None of these projections were prepared by the Company.  Had Maxwell relied on management's Projections in the Maxwell Initial Report, the indication of value under his DCF approach would increase by approximately $8.4 billion and the post

83

**CONFIDENTIAL**

weighting indicated value would increase by $4.2 billion.  This change alone would cause Maxwell's midpoint conclusion to reflect that LBI was balance sheet solvent at December 20, 2007.[300]

- In an additional inconsistency, I note that Maxwell changes his weighting of the valuation methods to favor those methods indicating lower values.  Specifically, the DCF weighting was adjusted down from 50% to 40% and the market methods were increased from 25% each to 30% each.

- Maxwell includes Huntsman as a comparable company in his October 20, 2008 guideline company analysis.  This is in direct contradiction to his conclusion of value at December 20, 2007 and his comments in the Maxwell Rebuttal Report that it would be inappropriate to use Huntsman given its "divergent business."[301]  Additionally, in the Maxwell Rebuttal Report, Maxwell also claims Huntsman was inappropriate to use because it had an "artificially high valuation in late 2007" given its then pending merger with Hexion and because its stock price dropped by approximately 50% when the merger was cancelled in June 2008.  I note that four of the five other comparable chemical companies in Maxwell's own analysis reflected total enterprise value ("**TEV**") decreases of 21% to 36% between December 20, 2007 and October 20, 2008.[302] Huntsman's drop in TEV during the same period generally is consistent with market performance.   The eventual cancellation of the Hexion merger was unknown to market participants and, as such, Maxwell is considering events subsequent to the valuation date in his December 20, 2007 analysis.  Therefore, it is appropriate to include Huntsman in his guideline comparable companies at December 20, 2007.

- In his October 20, 2008 valuation, Maxwell continues to omit valid comparable companies such as Celanese, and to include non-comparable companies such as Braskem SA. It is notable that Tuliano includes both Huntsman and Celenese and does not include Braskem SA in his comparable company group when performing his analysis of capital adequacy.  The Kearns Rebuttal Report shows that, had Maxwell included Huntsman and Celenese and excluded Braskem SA in his Guideline Company method in his December

---

[300] Kearns Rebuttal Report, Exhibit 1A, pages 13 and 20.

[301] Maxwell Rebuttal Report, page 8.

[302] Maxwell Supplemental Report, page 34.

**CONFIDENTIAL**

20, 2007 analysis, his indication of value would have been approximately $1.8 billion higher and the post weighting indication of value approximately $440 million higher.

Therefore, Maxwell's concluded total asset value at October 20, 2008 seriously undermines his calculated value as of the Acquisition date.

## X.    RIGHT TO SUPPLEMENT

My work in this matter is ongoing.  To the extent that additional facts, documents, other information, or other expert materials in this action may become available in the future, I reserve the right to modify or supplement my conclusions accordingly.  My conclusions are also subject to modification or supplementation based on further analysis of the data and information that have already been provided to me.

CONFIDENTIAL

**Christopher J. Kearns**

Manager and Member of the Firm
Capstone Advisory Group, LLC
104 W 40th Street, 16th Floor
New York, NY 10018
212-782-1409
CKearns@CapstoneAG.com

## SUMMARY

Mr. Kearns is a Managing Member of the Firm and co-founder of Capstone Advisory Group, LLC ("Capstone" or the "Firm"). He is a CPA, a Certified Turnaround Professional, a Certified Insolvency and Restructuring Advisor and a Certified Fraud Examiner. He specializes in providing financial restructuring advisory services and crisis management services in the troubled company environment. He has represented all parties-in-interest in various complex matters and has rendered expert testimony on various issues.

## PROFESSIONAL EXPERIENCE

**Capstone Advisory Group, LLC – January 2004 – Present**

Managing Member of the Firm

**FTI Consulting, Inc. (and predecessor firms) – 1991 – January 2004**

Senior Managing Director

At Capstone, FTI and predecessor firms, provided financial advisory and crisis management services in the troubled company environment. Assignments have included service as Responsible Officer and Trustee. Also have rendered expert testimony in various jurisdictions on matters involving valuation, lost profits, liquidation and recovery analysis, and other issues regarding distressed situations. Sample assignments include:

- *Mirant Corporation* (2004-2006) – Financial advisor to Unsecured Creditors Committee in Chapter 11 proceeding for a multinational energy company with generation capacity of 18,000 megawatts. Reorganization value upon emergence $11.5 to $12.0 billion.
- *Centro Group (2007-2009)* – Financial advisor to US lenders (debt of approximately $2.2 billion) in connection with the restructuring of a multinational commercial real estate company.
- *SEMGroup (2008-2009)* – Financial advisor to Secured Lenders (aggregate indebtedness of nearly $3 billion) in a Chapter 11 proceeding for a company engaged in the transport, storage and distribution of petroleum products in the North American energy corridor.
- *NRG Energy* (2002-2003) – Financial advisor to Global Lenders (aggregate indebtedness of over $3 billion) in a Chapter 11 proceeding for a multinational energy company.
- *Xerox* (2002) – Financial advisor to the Lenders in connection with the successful restructuring of a $7 billion credit facility for this multinational company.
- *Nortel (ongoing)* – Financial advisor to the Unsecured Creditors Committee in Chapter 11 proceeding for a multinational telecommunications company.

**CONFIDENTIAL**

**APPENDIX A**

**Christopher J. Kearns**

**(continued)**

- *Superior Essex Communications LLC (f/k/a Superior Telecommunications)* (2001-2002) – Financial advisor to the Lenders (debt of approximately $1 billion) in a Chapter 11 proceeding for a manufacturer of wire and cable.

- *Schwinn/GT* (2001) - Financial advisor to the Debtor in a Chapter 11 proceeding for a manufacturer and distributor of bicycle and fitness products.

- *Heilig-Meyers and The RoomStore* (2001-2005) – Financial advisor to the Debtors in a Chapter 11 proceeding for a furniture retailer.

- *Starter Corporation* (1999) – Financial advisor to the Debtor in a Chapter 11 proceeding for an apparel and retail company.

**Other restructuring and bankruptcy assignments include:**

- aaiPharmaceutical – Advisor to the Lenders
- Aerospace contractor – Advisor to the Lenders
- Advanced Glassfiber Yarns – Advisor to the Lenders
- Aircraft parts and maintenance company – Advisor to the Lenders
- Allied Holdings – Advisor to the Company and Lenders (separate matters)
- Boscov's – Advisor to the Debtor
- Bridge and tunnel construction company – Advisor to the Lenders
- Buddy L, Inc. – Advisor to the Debtor and Trustee
- Building products company – Advisor to the Company
- Calpine Corporation – Advisor to five ad hoc noteholder committees
- Channel Master – Advisor to the Debtor
- Chemtura Corporation – Adviser to the Lenders
- Direct marketing company – Advisor to the Lenders
- Extended Stay Hotel – Adviser to various Lenders
- Gas importer/retailer – Advisor to the Lenders
- Kasper A.S.L. – Advisor to the Lenders
- Privately owned hotel chain – Advisor to the Lenders
- KPNQwest – Advisor to the Lenders
- Maxxim Medical – Advisor to the Lenders
- Marvel Avoidance Litigation Trust – Trustee
- Mid-stream oil and gas company – Adviser to Lenders
- Mid-stream oil and gas company - Adviser to Lenders
- Monet Group – Advisor to the Debtor
- Multinational manufacturer – Advisor to the Company
- Non public business development company – Advisers to the Lenders

**CONFIDENTIAL**

**Christopher J. Kearns**

**(continued)**

- Non-public Specialty Chemicals company – Adviser to the Lenders
- Nutritionals manufacturer – Advisor to the Company
- Pathnet – Advisor to the Debtor
- PCB manufacturer – Advisor to the Lenders
- Pharmaceutical company – Advisor to the Company
- Privately owned pharma and contract research company - Lenders
- Real estate/hotel company – Advisor to the Note holders
- Rhodia Inc. – Advisor to the Lenders
- Schein Pharmaceutical – Advisor to the Lenders
- Sharp International – Responsible Officer
- Singer Company – Advisor to the Unsecured Creditors Committee
- SLM International – Advisor to the Company
- Spiegel – Advisor to the Lenders
- Transportation company – Advisor to the Company
- Winter Group – Chief Restructuring Officer
- Women's apparel manufacturer – Advisor to the Company

**Litigation related assignments / Expert testimony:**

− Arbitrator, American Arbitration Association

− Testimony (dates are approximate)

> 2010: In re Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) – make whole damages for noteholders

> 2009: In re Lyondell Chemical Company, et al; Official Committee of Unsecured Creditors v. Citibank N.A., et al – solvency and valuation analysis

> 2007: Phar-Mor vs. McKesson – solvency and valuation analysis

> 2007: Northwestern Corporation – rebuttal on structured finance and restructuring related matters

> 2007: In re Calpine Corporation – solvency analysis and make whole damages for certain noteholders

> 2006 and 2007: In re: Enron Securities Litigation – rebuttal on solvency and valuation matters

> 2005: Maxxim Medical, Inc. vs. Professional Hospital Supply (Plaintiff – Middle District of Florida) – lost profits and business valuation

> 2001 and 2005: Heilig-Meyers and The RoomStore (Virginia) – KERP program, asset sales, business valuation and for plan proponent

> 2001: Schwinn/GT (Colorado) – KERP program, liquidation analysis and creditor recoveries, sale of assets, and for plan proponent

> 2000: Monet Group (Delaware) – Sale of assets and for plan proponent

**CONFIDENTIAL**

2000: Nature's Best Group Inc. v. Best Foods et al (Nassau County, NY State) – Deposition testimony for defendant; lost profits and business valuation

**Christopher J. Kearns**

**(continued)**

1999: Starter Corp. (Delaware) – KERP program, liquidation and creditor recoveries analysis, and for plan proponent

1998: Fletcher et al v. Liggett Group Inc.(Defendant - Alabama) – business valuation, bankruptcy and restructuring recoveries, and intellectual property analysis

1995: Buddy L, Inc. (Delaware) – for Chapter 11 plan proponent

## Bristol-Myers Company – 1988-1991

**Assistant Controller: 1990-1991**

- Responsible for SEC reporting for the corporation and internal reporting and analysis for senior management
- Principal corporate financial interface with accounting and finance function for major divisions /subsidiaries
- Managed all corporate disbursements

**Director – Internal Audit: 1988-1990**

- Managed audits and special projects at corporate and multinational subsidiary levels for the Company's pharmaceutical, healthcare and consumer products businesses

## Arthur Andersen & Company – 1978-1988

**Manager: 1983-1988**

- Managed numerous audit engagements, including overall engagement responsibility for ITT Corporation, Grumman Corporation and Signal Companies
- Advised major investment banks in connection with merger and acquisition structure and techniques.

**BOARDS OF DIRECTORS**

**Corporate**

aaiPharmaceutical, Inc. 2006-2009

Outsourcing Solutions, Inc. 2003-2005

Supradur Company – 1992-1993

**Non-profit**

Leukemia and Lymphoma Society

- National Board of Representatives 2005 – present

**CONFIDENTIAL**

**APPENDIX A**

- NY Chapter - Chairman Emeritus, past President and Trustee 1995-present

Make-A-Wish Foundation of Metro New York – 1992-1994

Turnaround Management Association – NY Chapter past President

**CONFIDENTIAL**

**APPENDIX A**

**Christopher J. Kearns**

**(continued)**

## MEMBERSHIPS

Turnaround Management Association (past president – New York)

Association of Certified Insolvency and Restructuring Advisors

American Institute of Certified Public Accountants

NY State Society of CPA's

National Association of Certified Fraud Examiners

American Bankruptcy Institute

## EDUCATION AND PROFESSIONAL CERTIFICATIONS

Iona College – BBA Accounting with honors 1978

Certified Public Accountant

Certified Turnaround Professional

Certified Insolvency and Restructuring Advisor

Certified Fraud Examiner

**CONFIDENTIAL**

| Documents/Interviews Considered and Relied Upon | Date | Bates Range |
|---|---|---|
| Declaration of Ajay Patel | 12/10/2009 | n/a |
| Declaration of Anand Melvani | 12/10/2009 | n/a |
| Declaration of Dan Smith | 12/10/2009 | n/a |
| Declaration of Douglas Lane | 12/9/2009 | n/a |
| Declaration of Edward Dineen | 1/15/2010 | n/a |
| Declaration of Gunther Frangenberg | 12/10/2009 | n/a |
| Declaration of John Vaske | 12/4/2009 | n/a |
| Declaration of Karen Twitchell | 12/10/2009 | n/a |
| Declaration of Len Blavatnik | 12/10/2009 | n/a |
| Declaration of Norman Phillips | 1/15/2010 | n/a |
| Declaration of Philip Kassin | 12/10/2009 | n/a |
| Declaration of Anders Maxwell | 2/22/2009 | n/a |
| Declaration of Stephen F. Cooper | 12/23/2009 | n/a |
| Deposition of Norm Phillips | 1/13/2010 | n/a |
| Deposition of Edward Dineen | 1/13/2010 | n/a |
| Deposition of Skip Teel | 1/12/2011 | n/a |
| Deposition of Kimberly Foley | 1/24/2011 | n/a |
| Deposition Joseph Tanner | 1/25/2011 | n/a |
| Deposition of Robert Salvin | 2/2/2011 | n/a |
| Deposition of Robert Salvin | 2/14/2011 | n/a |
| Deposition of Mario Portela | 2/18/2011 | n/a |
| Deposition of Ralph Tuliano | 12/3/2009 | n/a |
| Interview of Dan Smith | 3/28/2011 | n/a |
| Interview of Dan Smith | 4/15/2011 | n/a |
| Interview of Kerry Galvin | 3/28/2011 | n/a |
| Interview of Edward Dineen | 3/28/2011 | n/a |
| Interview of Edward Dineen | 4/14/2011 | n/a |
| Interview of Norman Phillips | 3/28/2011 | n/a |
| Interview of Mario Portela | 3/28/2011 | n/a |
| Interview of Jim Bayer | 3/28/2011 | n/a |
| Interview with Charles Hall | 3/31/2011 | n/a |
| Interview of Karen Twitchell | 3/31/2011 | n/a |
| Interview of Alan Bigman | 4/5/2011 | n/a |
| Amended Complaint | 7/23/2010 | n/a |
| Maxwell Initial Report | 11/7/2009 | n/a |
| Maxwell Rebuttal Report | 11/20/2009 | n/a |
| Maxwell Supplemental Report | 2/28/2011 | n/a |
| O'Connor Initial Report | 11/7/2009 | n/a |
| O'Connor Rebuttal Report | 11/20/2009 | n/a |
| O'Connor Supplemental Report | 4/15/2011 | n/a |
| Tuliano Initial Report | 11/7/2009 | n/a |
| Tuliano Rebuttal Report | 11/20/2009 | n/a |
| Tuliano Supplemental Report | 2/28/2011 | n/a |
| Witte/Nebeker Initial Report | 11/7/2009 | n/a |
| Witte/Nebeker Rebuttal Report | 11/20/2009 | n/a |
| Witte/Nebeker Supplemental Report | 2/28/2011 | n/a |
| Young Initial Report | 11/7/2009 | n/a |
| Young Rebuttal Report | 11/20/2009 | n/a |
| Young Supplemental Report | 4/15/2011 | n/a |
| Houston Refining 2008 LRP Review | 9/14/2007 | LYO-UCC 00238605 - 20 |
| Anton de Vries Letter to LBI Employees | 2008 | LYO-UCC 00259214 - 5 |
| Alan Bigman Letter to LBI Employees | 2008 | LYO-UCC 00259211 - 3 |
| Ed Dineen Letter to LBI Employees | 2008 | LYO-UCC 00298991 - 2 |
| Norm Phillips Letter to LBI Employees | 2008 | LYO-UCC 00259218 - 9 |
| Volker Trautz Letter to LBI Employees | 2008 | LYO-UCC 00298986 |
| Lyondell CORE Presentation | 9/1/2007 | LYO-UCC 00403113 - 22 |
| Email from Dineen to Trautz re decline of job offer | 10/29/2007 | LYO-UCC 00447538 - 9 |
| LBI Roadshow Q&A | 5/6/2008 | GS_LYON0077420 - 4 |
| DeNicola presentation at JPM Basics & Industrials Conference | 6/11/2008 | LYO-UCC 00012502 - 49 |
| Preview of CMAI Update | | LYO-UCC 00319320 - 8 |
| HRO Crane Event Financial Impact Estimate | | LYO-UCC 00411809 - 14 |
| 2008 LRP CMAI Comparison | 9/20/2007 | LYO-UCC 00319278 - 91 |
| Smith presentation at UBS Global Basic Materials Conference | 6/6/2007 | LYO-UCC 00647778 - 804 |
| Analyst Report from ML - "Heavy Liquids Advantage To Return in Q2… and Beyond" | 4/27/2007 | APOLLO-LYO_0002015 - 22 |
| Email from Lazard to Blavatnik re potential cash infusion | 12/18/2008 | ACC00207136 - 8 |
| Basell / Lyondell Model Assumptions Summary - Indicative Sensitivity Case | 11/8/2007 | ML-2004-121810 - 8 |
| LBI 2Q 2008 Synergy Update | 7/24/2008 | LYO-UCC 00654042 - 50 |
| Emails re synergies being realistic between Portela and Galvin | 9/6/2007 | LYO-UCC 00406505 |
| CMAI vs LYO PO Industry Supply and Demand | 10/1/2007 | LYO-UCC 00319292 - 306 |
| Project Safari Presentation | | LYO-UCC 00001627 - 33 |
| Email from Ralph Schoenrock (UBS) to Mark Crameri (UBS) et al. | 4/23/2008 | UBS00067209-10 |
| Lyondell's Purchase of CITGO's LCR Interest presentation | August 2006 | LBTR00197595 - 643 |
| Lyondell's Earnings Cases | 11/2/2006 | LBTR 00065295 - 312 |
| Email from Robert Salvin (LYO) to Gregory Helma (LYO) et al. with Treasury board slides attachment | 5/14/2007 | LBTR 00053952 |

CONFIDENTIAL

APPENDIX B

| Documents/Interviews Considered and Relied Upon | Date | Bates Range |
|---|---|---|
| Email from Corry Lang (LYO) to Ed Dineen (LYO) et al. with Consultant View attachment | 11/28/2006 | LBTR 00215901 - 2 |
| Email from Kathryn Redman (LYO) to Robert Salvin (LYO) | 8/15/2007 | LBTR 00111656 |
| Email from Robert Salvin (LYO) to Skip Teel (LYO) | 5/15/2007 | LBTR 00106241 |
| Email from Clark Boudreaux (LYO) to Robert Salvin (LYO) et al. | 5/21/2007 | LBTR 00107070-1 |
| Email from Clark Boudreaux (LYO) to Robert Salvin (LYO) et al. | 5/22/2007 | LBTR 00107079-81 |
| Email from Steven Ebel (LYO) to Skip Teel (LYO) et al. | 6/1/2007 | LBTR 00036611-2 |
| Email from Joe Lee (LYO) to Skip Teel (LYO) et al. | 1/26/2007 | LBTR 00028843 |
| Email from Skip Teel (LYO) to Norman Phillips (LYO) et al. | 7/10/2007 | LBTR 00201250 |
| Email from Craig Leaseburge (LYO) to Skip Teel (LYO) et al. | 6/8/2007 | LBTR 00203391-2 |
| Email from Skip Teel (LYO) to Norman Phillips (LYO) et al. | 9/18/2007 | LBTR 00078475 |
| Email from Kimberly Foley (LYO) to Gregory Helma (LYO) et al. with 2008 LRP Timeline attachment | 6/20/2007 | LBTR00217690-3 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) | 5/14/2007 | LBTR 00106118-9 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) et al. | 5/15/2007 | LBTR 00053964-5 |
| Email from Kimberly Foley (LYO) to Kevin DeNicola (LYO) et al. with LRP assumptions attachment | 5/16/2007 | LBTR 00197435-6 |
| Email from Robert Salvin (LYO) to Kimberly Foley (LYO) | 5/16/2007 | LBTR 00053966 |
| Email from Robert Salvin (LYO) to Kimberly Foley (LYO) | 5/17/2007 | LBTR 00054166-8 |
| Email from Kimberly Foley (LYO) to Robert Salvin (LYO) with "Refining Products Business Review" attachment | 5/17/2007 | LBTR 00106602-24 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) et al. with 2007 LRP Base Case attachment | 5/18/2007 | LBTR 00054188-95 |
| Email from Robert Salvin (LYO) to Sami Ahmad (LYO) et al. with CMAI Cases attachment | 7/13/2007 | LBTR 00192174-227 |
| Email from Robert Salvin (LYO) to Karen Twitchell (LYO) et al. with budgets attachment | 7/13/2007 | LBTR 00192666 |
| Email from Sami Ahmad (LYO) to Joseph Tanner (LYO) et al. with Projections (EBITDA) 071307 attachment | 7/13/2007 | LBTR 00202905-16 |
| Email from Dave Kinney (LYO) to Robert Salvin (LYO) with board presentation attachment | 9/21/2006 | LBTR 00096800 - 17 |
| Email from Kevin Goodwin (LYO) to Robert Salvin (LYO) et al. with Quincy model attachment | 9/28/2006 | LBTR 00096990 - 9 |
| Email from Robert Salvin (LYO) to Gregory Helma (LYO) et al. with Treasury board slides attachment | 5/14/2007 | LBTR 00053952 |
| Email from Robert Salvin (LYO) to Rick Thomas (LYO) et al. with Board presentation attachment | 12/2/2006 | LBTR 00065822 - 31 |
| Robert Salvin's notes | | SUB-RES00063339 - 58 |
| Email from Jesus Chagoya (LYO) to Robert Salvin (LYO) with rating agency presentation attachment | 5/7/2007 | LBTR 00105827 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/11/2007 | LBTR 00106094 |
| Email from Robert Salvin (LYO) to Diane Salvin | 5/11/2007 | LBTR 00106095 |
| Email from Robert Salvin (LYO) to Kimberly Foley (LYO) et al. | 5/11/2007 | LBTR 00053947 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) et al. | 5/13/2007 | LBTR 00053948 - 9 |
| Email from Robert Salvin (LYO) to Gregory Helma (LYO) et al. | 5/13/2007 | LBTR 00106106 - 7 |
| Email from Robert Salvin (LYO) to Paul Smith (Citi) | 5/14/2007 | LBTR 00106126 - 7 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) | 5/14/2007 | LBTR 00106188 - 9 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) et al. | 5/15/2007 | LBTR 00053962 - 3 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) et al. | 5/15/2007 | LBTR 00053964 - 5 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/15/2007 | LBTR 00106237 - 9 |
| Email from Robert Salvin (LYO) to Skip Teel (LYO) | 5/15/2007 | LBTR 00106241 |
| Email from Gregory Grannen (LYO) to Robert Salvin (LYO) with rating agency financials attachment | 5/16/2007 | SUB-RES00000280 - 8 |
| Email from Kimberly Foley (LYO) to Kevin DeNicola et al. with LRP assumptions attachment | 5/16/2007 | SUB-RES00000277 - 9 |
| Email from Kimberly Foley (LYO) to Robert Salvin (LYO) | 5/17/2007 | LBTR 00106591 - 3 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) | 5/16/2007 | LBTR 00106563 - 5 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) et al. | 5/16/2007 | LBTR 00054160 |
| Email from Steven Ebel (LYO) to Robert Salvin (LYO) with 2-1-1 spread forward curve attachment | 5/17/2007 | SUB-RES00000075 - 8 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) et al. with 2007 LRP base case assumptions attachment | 5/23/2007 | LBTR00196356 - 7 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) et al. with Lyondell valuation attachment | 6/18/2007 | LYO-UCC 00163387 - 91 |
| Email from Robert Salvin (LYO) to Kevin DeNicola (LYO) et al. with draft July board presentation attachment | 6/20/2007 | LYO-UCC 00163175 - 93 |
| Email from Robert Salvin (LYO) to Sami Ahmad (LYO) with draft July board presentation attachment | 6/29/2007 | LBTR 00108282 - 9 |
| Email from Robert Salvin (LYO) to Mary Wix (LYO) et al. with draft board presentation & valuation scenarios attachments | 7/11/2007 | LYO-UCC 00163359 - 76 |
| Email from Robert Salvin (LYO) to John Anos (Deutsche Bank) with valuation data attachment | 7/12/2007 | LYO-UCC 00163213 - 21 |
| Email from Robert Salvin (LYO) to John Anos (Deutsche Bank) with capital plan attachment | 7/12/2007 | LYO-UCC 00163208 -12 |
| Email from Robert Salvin (LYO) to John Anos (Deutsche Bank) | 7/12/2007 | LYO-UCC 00163358 |
| Lyondell Valuation Back Up Materials | 7/12/2007 | LYO-UCC00001474 - 90 |
| Email from Robert Salvin (LYO) to John Anos (Deutsche Bank) with two board presentation attachments | 7/13/2007 | LYO-UCC 00163467 - 91 |
| Email from Robert Salvin (LYO) to Sami Ahmad with Lyondell valuations data | 7/13/2007 | LBTR 00108955 - 63 |
| Email from Robert Salvin (LYO) to John Anos (Deutsche Bank) with two board presentation attachments | 7/13/2007 | LBTR 00109413 - 37 |
| Lyondell segment EBITDA | | ACC00017490 - 2 |
| Lyondell Summary Top Level Data | | DBSI_00000632 - 41 |
| Email from Kimberly Foley (LYO) to Robert Salvin (LYO) with variance from Safari to current LRP call attachment | 9/19/2007 | LBTR 00113831 - 7 |
| Email from Joseph Tanner (LYO) to Robert Salvin (LYO) | 7/12/2007 | SUB-RES00005089 |
| Robert Salvin's notes | | SUB-RES00063469 - 88 |
| 2007 Lyondell LRP Major Assumptions | 5/30/2007 | LBTR 00183203 |
| Email from Chermaine Hu (Morgan Stanley) to Mario Portela (LYO) et al. | 4/30/2006 | LBTR 00061480 - 1 |
| Email from Joseph Tanner (LYO) to Dan Smith (LYO) et al. | 5/1/2006 | LBTR 00000122 - 62 |
| Email from Bob Salvin (LYO) to Mario Portela (LYO) | 5/23/2006 | LBTR 00062614 - 33 |
| Email from Chermaine Hu (Morgan Stanley) to Mario Portela (LYO) et al. | 5/26/2006 | LBTR 00062740 |
| Email from David Harpole (LYO) to Dan Smith (LYO) et al. | 7/19/2006 | LBTR 00064187 - 8 |
| Muse Stancil, "Crude and Condensate Market Study" | June 2006 | Portela Exhibit 6 |
| Email from Robert Salvin (LYO) to Steve Martinez (Apollo) et al. | 9/6/2006 | LBTR 00065060 |
| Email from Michelle Miller (LYO) to Kimberly Foley (LYO) et al. | 9/25/2006 | LBTR 00065221 - 2 |
| Email from Mario Portela (LYO) to Robert Salvin (LYO) | 9/28/2006 | LBTR 00096989 |
| Email from Candice Kemp (LYO) to Mario Portela (LYO) et al. with board presentation attachment | 10/4/2006 | LBTR 00097755 - 804 |
| Email from Mario Portela (LYO) to Joseph Tanner et al. | 10/8/2006 | LBTR 00098126 |
| Email from Joseph Tanner (LYO) to Michelle Miller et al. | 10/16/2006 | LBTR 00001794 |

2

**CONFIDENTIAL**

| Documents/Interviews Considered and Relied Upon | Date | Bates Range |
|---|---|---|
| Email from Kevin Goodwin (LYO) to Mario Portela (LYO) with Lyondell Earnings Case attachment | 11/2/2006 | LBTR 00065294 - 312 |
| Email from Robert Salvin (LYO) to Rick Thomas (LYO) et al. with board presentation attachment | 12/2/2006 | LBTR 00065822 - 86 |
| Email from Michelle Miller (LYO) to Kerry Galvin (LYO) et al. | 11/3/2006 | LBTR 0009934 - 4 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/11/2007 | LBTR 00106094 |
| Email from Doug Pike (LYO) to Dan Smith (LYO) et al. | 5/11/2007 | LBTR 00067322 |
| Email from Robert Salvin (LYO) to Joseph Tanner (LYO) et al. | 5/15/2007 | LBTR 00053962 -3 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/15/2007 | LBTR 00106237 - 9 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/19/2007 | LBTR 00107032 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 5/22/2007 | LBTR 00107078 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) et al. with Access Materials and BOD presentation attachments | 6/25/2007 | LBTR 00067625 - 72 |
| Email from Kevan Guag (Money Concepts) to Mario Portela (LYO) with financial planning presentation attachment | 7/2/2007 | LBTR00206580 - 607 |
| Email from Joseph Tanner (LYO) to Kevin DeNicola (LYO) et al. with volume and margin data attachment | 7/14/2007 | LBTR 00004222 - 4 |
| Email from Joseph Tanner (LYO) to Ed Dineen (LYO) et al. with 2008 LRP attachment | 12/18/2007 | LBTR 00005670 - 81 |
| Email from Robert Salvin (LYO) to Mario Portela (LYO) | 9/6/2007 | LBTR 00112681 |
| Email from Joseph Tanner (LYO) to Karen Twitchell (LYO) et al. with Safari LT Plan attachment | 9/11/2007 | LBTR 00068316 - 8 |
| Email from Robert Salvin (LYO) to Steven Ebel (LYO) | 5/21/2007 | LBTR00196993-5 |
| Email from Koy Schoppe (LYO) to Robert Salvin (LYO) | 5/16/2007 | LBTR00197459-60 |
| Email from Robert Salvin (LYO) to Jesus Chagoya (LYO) | 5/16/2007 | LBTR00197470 |
| Apollo Update Memorandum | 4/25/2008 | LS0053616-29 |
| Apollo email from Brenna Haysom (Apollo) to Dan Bellissimo (Apollo) re: Basell | 5/16/2008 | LS0011933-4 |
| Apollo email from Scott Kleinman (Apollo) to Josh Harris (Apollo) re: Len | 10/17/2008 | LS0013378 |
| Apollo investment memorandum | 2/27/2008 | LS0010150-65 |
| Apollo investment memorandum | 1/25/2008 | LS0002126-34 |
| Apollo investment memorandum | | LS0015653 |
| Apollo investment memorandum | 3/13/2008 | LS0010209-43 |
| Apollo email from George Klavdianos (Apollo) to Scott Kleinman (Apollo) | 5/9/2008 | LS0019526-7 |
| Apollo email from Scott Kleinman (Apollo) to Josh Harris (Apollo) | 3/14/2008 | LS0010282-84 |
| Project Aquifer Presentation | 3/12/2008 | ACC00152477 |
| D&P Fairness Opinion Related to Access Revolver | 3/27/2008 | D&P_L046553 |
| UBS Global Syndicated Finance Commitment Committee Memo Addendum #1 | 4/23/2008 | UBS2004-0045552-605 |
| Supervisory Board Meeting Presentation | 12/10/2008 | ACC00106026-177 |
| Aquifer - The Dream Scenario Presentation | 3/14/2008 | LYO-UCC 00335376-91 |
| Duff & Phelps Valuation letter | 1/6/2009 | LYO-UCC 00622458 |
| Duff & Phelps Valuation report | 1/6/2009 | LYO-UCC 00622465 |
| Finance Organization presentation | | LBTR 00110308-37 |
| Corporate Development and Business Decision Analysis Organization Charts | 6/21/2006 | LBTR 00063412-13 |
| Corporate Development presentation | 5/10/2007 | LBTR 00067300-21 |
| Benefits of the Business Decision Analysis Experience Presentation | 2/16/2007 | LBTR 00052530-44 |
| Controller's Organization presentation | | SUB-RES00011132-54 |
| Business Performance Meeting | 2/8/2007 | LYO-UCC 00487991-8047 |
| Business Performance Meeting | 2/15/2007 | LYO-UCC 00488049-107 |
| Business Performance Meeting | 2/22/2007 | LYO-UCC 00488109-18 |
| Business Performance Meeting | 3/1/2007 | LYO-UCC 00488267-326 |
| Business Performance Meeting | 3/15/2007 | LYO-UCC 00488205-66 |
| Business Performance Meeting | 3/29/2007 | LYO-UCC 00488143-204 |
| Business Performance Meeting | 4/12/2007 | LYO-UCC 00488339-49 |
| Business Performance Meeting | 4/19/2007 | LYO-UCC 00488351-410 |
| Business Performance Meeting | 4/26/2007 | LYO-UCC 00488411-72 |
| Business Performance Meeting | 5/3/2007 | LYO-UCC 00488473-82 |
| Business Performance Meeting | 5/10/2007 | LYO-UCC 00488483-542 |
| Business Performance Meeting | 5/17/2007 | LYO-UCC 00488543-52 |
| Business Performance Meeting | 5/24/2007 | LYO-UCC 00488553-608 |
| Business Performance Meeting | 6/14/2007 | LYO-UCC 00488631-84 |
| Business Performance Meeting | 6/28/2007 | LYO-UCC 00488697-752 |
| Business Performance Meeting | 7/12/2007 | LYO-UCC 00488821-48 |
| Business Performance Meeting | 7/19/2007 | LYO-UCC 00488753-808 |
| Business Performance Meeting | 7/26/2007 | LYO-UCC 00488849-906 |
| Business Performance Meeting | 8/9/2007 | LYO-UCC 00488919-76 |
| Feedstocks & Fuels Point of View (POV) | 5/22/2007 | LBTR 00035996-7 |
| Deutsche Bank Engagement Letter | 7/14/2007 | DBSI_0000001- 6 |
| Deutsche Bank Preliminary Discussion Materials | 7/2/2007 | LYO-UCC 00163225-163261 |
| Email from Salvin to Deutsche Bank | 7/2/2007 | LYO-UCC 00163223-4 |
| Deutsche Bank Presentation | 7/2/2007 | LYO-UCC 00001437-1473 |
| Dineen & Mulrooney Letter (re Integration & Transition Teams) | 8/9/2007 | ACC00070695-97 |
| LBI Offer Letter to Edward Dineen | 1/11/2008 | COV00579-582 |
| LBI Offer Letter to Edward Dineen | 11/2/2007 | COV00596-597 |
| Dineen Integration Letter to Employees | 9/6/2007 | ACC00097284-97285 |
| Dineen Investment in LBI | 3/24/2008 | COV00591-593 |
| Article on Outlook of Price of Oil | 4/9/2008 | UBS00119683-119687 |
| 2009-2013 Business Plan | 6/1/2008 | ACC00202491-202507 |
| Assumptions for 2010 LRP | 7/10/2009 | LYO-UCC 00570833-00570848 |
| EIA's International Energy Outlook | 5/1/2007 | AHG_2_000001244-1456 |
| Global Insight- Macroeconomic Assumptions for 2007 LRP | 7/26/2008 | LYO-UCC 00014047-14090 |
| Global Insight- World Economic Outlook | 7/9/2008 | ACC00202508-202567 |

CONFIDENTIAL

| Documents/Interviews Considered and Relied Upon | Date | Bates Range |
|---|---|---|
| Email from Allan Skakun (LYO) to Kimber Foley et al. with Expansions attachment | 10/11/2007 | LBTR 00060589-92 |
| Email from Allan Skakun (LYO) to John Deasy (LYO) et al. with 2007 vs 2008 EBITDA Comparison attachment | 9/24/2007 | LBTR 00059651-3 |
| Email from Candice Kemp (LYO) to Mario Portela (LYO) et al. with 2008 LRP Olefins - CMAI Compare - Ver 2 attachment | 11/1/2007 | SUB-RES00009379-9405 |
| Email from Robert Salvin (LYO) to Doug Pike (LYO) with Chart - CMAI Sept vs 08 LRP attachment | 9/19/2007 | LBTR 00113824-6 |
| CMAI Middle East Ethylene memo | | CMAI002349 |
| Amended Case Management Order Dated August 2, 2010 | 8/2/2010 | n/a |
| Smith letter to Blavatnik | 9/17/2007 | ACC00060873 |
| Email from Rick Thomas (LYO) to Robert Salvin (LYO) et al. with "Strategy Review - Part 2" presentation attachment | 12/5/2006 | LBTR 00065911-72 |
| Debt Markets Commitment Committee | 4/22/2008 | ML-ADPRO-17900-20 |
| ABN Amro Credit Memo, "LBI Industries" | 4/15/2008 | ABN_LYNB00028716-32 |
| Goldman Sachs:  Confidential Information Memorandum - Structure and S&U slide | 10/1/2007 | GSCP_LYON00072869 |
| Rating Agency Briefing, Spring 2007 | April 2007 | LYO-UCC 00163394-466 |
| Senior Secured Inventory-Based Credit Agreement | 12/20/2007 | n/a |
| Senior Secured Credit Agreement | 12/20/2007 | n/a |
| CMAI Monomers Market Report | 7/31/2007 | CMAI014823-61 |
| Lyondell Form 10-K | 12/31/2000 | n/a |
| Lyondell Form 10-K | 12/31/2003 | n/a |
| Lyondell Form 10-K | 12/31/2004 | n/a |
| April 2008 Inventory Borrowing Base Certificate. | 4/1/2008 | AHG_000073285 |
| Long Range Planning Process presentation | | LBTR000191179 |
| Lyondell Chemical Company Co. Earnings Conference Call | 4/26/2007 | n/a |
| Lyondell Chemical Company Co. Earnings Conference Call | 7/26/2007 | n/a |
| LyondellBasell AF S.C.A. First Quarter Review | 5/20/2008 | n/a |
| LyondellBasell AF S.C.A. Second Quarter Review | 8/19/2008 | n/a |
| LyondellBasell AF S.C.A. Third Quarter Review | 11/18/2008 | n/a |
| Bloomberg article, "Lyondell to Speed Debt Cuts With Refinery, Smith Says (Update1)" | 8/17/2006 | n/a |
| Email from Skip Teel dated May 15, 2007 | 5/15/2007 | LBTR00197653 |
| Purvin & Gertz, Inc, "Overview of Heavy Crude Oil Markets" Presentation to Lyondell | 5/4/2007 | LBTR00197654 – 759 |
| PIRA, "Long Term World Oil Market Dynamics" Presentation to Lyondell | 3/1/2007 | LBTR00197760 – 922 |
| Turner, Mason & Company, "Refining Industry Outlook" Presentation to Lyondell | 5/24/2007 | LBTR00187212-308 |
| Email from Kimberly Foley (LYO) to Robert Salvin (LYO) with cash margins attachment | 5/18/2007 | SUB-RES 000000003-12 |
| Email from Robert Ernst (LYO) to Mario Portela et al. with CMAI View Update 2007-09-18 | 9/18/2007 | SUB-RES 00008778-8806 |
| Confidential Information Memorandum Private Side | May 2008 | SUB-RES00052948-69 |
| American Appraisal Report - Lyondell Chemical Company Tangible and Intangible Assets and Investments | 5/13/2008 | LYO-UCC 00122220-325 |
| CBOE Crude Oil Volatility Index (OVX) | 12/1/2010 | n/a |
| U.S. Energy Information Administration (www.eia.doe.gov) | | n/a |
| CME Datamine | | n/a |

CONFIDENTIAL

**SCHEDULE 1**

# List of Officers

**Dan Smith** – Smith was the Chief Executive Officer and Chairman of the Board, and had been employed by ARCO/Lyondell since 1975. He served in several positions, including Chief Financial Officer and Chief Operating Officer and was a member of the Lyondell Board of Directors (the "Board") since 1988. At the time of the Acquisition, Smith had been CEO of Lyondell for 11 years.

**Morris Gelb** – Gelb was the Executive Vice President and Chief Operating Officer since December 1998, and had been employed by Lyondell and predecessors for over 38 years. He was named Vice President for Research and Engineering of ARCO Chemical in 1986 and Senior Vice President of ARCO Chemical in July 1997.

**Edward Dineen** – Dineen was the Senior Vice President of Intermediates and Performance Chemicals at Lyondell at the time of the Acquisition, and had been employed by the Company or its predecessors for over 32 years. Subsequent to the Acquisition, Dineen remained with LBI as President of the Chemicals Division and later became Chief Operating Officer.

**Norman Phillips** – Phillips was the Senior Vice President of Fuels and Pipelines for Lyondell at the time of the Acquisition, and had been employed by Lyondell/ARCO for approximately 31 years. Phillips remained with LBI after the Acquisition as President of the Fuels Division.

**Kevin DeNicola** – DeNicola was the Chief Financial Officer, and was an employee of Lyondell for approximately 17 years at the time of the Acquisition. He had been the CFO since 2002.

**Karen Twitchell** – Twitchell was the Vice President and Treasurer of Lyondell for seven years at the time of the Acquisition. Subsequent to the Acquisition, Twitchell remained with LBI as its Treasurer. She is not a defendant in this case.

**Mario Portela** – Portela was the Vice President of Corporate Development at the time of the Acquisition and had been employed by Lyondell/ARCO for approximately 18 years. Portela remained with LBI after the Acquisition as Vice-President of Corporate Development. He is not a defendant in this case.

**Kerry Galvin** – Galvin was the Senior Vice President and General Counsel of Lyondell at the time of the Acquisition and had been employed by Lyondell for 17 years. She served as Vice President and General Counsel since July 2000. In addition, Galvin served as Secretary of Lyondell from July 2000 until May 2006 and Secretary of Equistar and Millennium from December 2004 until May 2006.

**CONFIDENTIAL**

**SCHEDULE 1**

**Jim Bayer** – Bayer was the Senior Vice President, Manufacturing and Health, Safety and Environment at the time of the Acquisition and had been employed by Lyondell/ARCO for 32 years. He was the Senior Vice President, Manufacturing since October 2000 and prior to that he was Vice President of Health, Safety, Environmental and Engineering of Lyondell.

**Charles Hall** – Hall was the Vice President and Controller at the time of the Acquisition and had been employed by Lyondell for six years. Hall came to Lyondell from BP, formerly BP Amoco, in Chicago, where he served 16 years in a variety of financial roles, including Controller of Amoco Chemical Company and Assistant Controller of Amoco Corporation. Prior to his service with BP, Hall spent 10 years with Arthur Young & Company in Kansas City. Hall was a Certified Public Accountant (CPA).

**Bart de Jong** – de Jong was the Vice President of Technology, and had been employed by Lyondell for approximately 12 years at the time of the Acquisition.

**John A. Hollinshead** – Hollinshead was Senior Vice President of Human Resources at the time of the Acquisition, and had been employed by Lyondell for approximately 29 years.

**CONFIDENTIAL**

**SCHEDULE 2**

## Mapping of Legacy Lyondell and Basell Segments to LBI[1]



[1] LBI Lenders Presentation (June 2008)

**CONFIDENTIAL**

SCHEDULE 3

**Assumptions in the December 2007 Stress Tests v. the March 2008 Stress Tests**

| | December 2007 Stress Tests | March 2008 Stress Tests |
|---|---|---|
| **Start Date** | December 31, 2007 | March 31, 2008 |
| **Baseline Crude Oil Price ($/bbl)** | $91.69 (Avg. WTI Crude Closing Price Dec. 2007) | $105.45 (Avg. WTI Crude Closing Price March 2008) |
| **Oil Price Change Date** | Assumes oil prices change on day one of the Stress Tests. | No change to assumption. |
| **Sensitivity for Oil Price Changes** | Based on LBI's analysis: oil price increase of $1/bbl decreases cash flow from operations by $19.3 million. | No change to assumption. |
| **Starting Liquidity** | $2.14 billion. No additional availability assumed under European A/R Securitization Facility. | $2.23 billion. Includes $750 million Access Revolver available but undrawn. No additional availability assumed under European A/R Securitization Facility even though the Company draws an additional $304 million of liquidity from this facility in Q2 2008. |
| **Acquisition of Berre and Solvay** | Included $535 million for Berre and $130 million for Solvay as a deduction from opening liquidity. | Acquisitions had been funded prior to March 31, 2008 and therefore do not affect the updated analysis. |
| **ABL Covenant Buffer** | Excluded $200 million availability under ABL facility as liquidity covenant buffer. | Excluded $100 million availability under ABL facility to be consistent with available liquidity disclosure in March 31, 2008 10Q. |
| **Insurance and TDI Sale Proceeds** | Estimated insurance proceeds of $79 million and TDI sale proceeds of $113 million included at 60% as source of opening liquidity. | Updated calculations reflect first quarter insurance receipts, with $27 million insurance proceeds and $113 million TDI proceeds remaining as of March 31, 2008. Despite closer proximity to actual cash receipts, no change to 40% discount. |
| **Bayer Litigation** | Potential proceeds from Bayer litigation not included. | No change to assumption. |
| **Minimum Liquidity** | $1.4 billion at year end excluding any sensitivity for changes to feedstock costs which are stressed separately. | No change to assumption. |
| **Cash Taxes** | Included at 35% of pre-tax income. | No change to assumption. |
| **Capital Expenditure** | Discretionary capex per the CIM Projections reduced by 25% in 2008 and 90% in 2009 (no discretionary capex projected in 2010 or 2011). | December 31, 2007 calculation updated for acquisition of Berre and Solvay and adjusted for actual Q108 capex of $236 million. |
| **Transaction Costs** | Included in Q1 cash flows primarily related to pay down of Millennium notes. | Transaction costs had been funded prior to March 31, 2008 and therefore do not affect the updated analysis. |
| **LIBOR for Floating Rate Loans** | 4.4% (LIBOR on or about December 31, 2007) flat rate assumed for duration of forecast period. | LIBOR forward curve as of March 31, 2008 used to project interest expense quarterly which is less than the 4.4% assumption for the December Stress Tests. |
| **Bridge Loan Interest Rate** | Bridge Loan interest calculated at L+5.625% for duration of projection period. | Bridge Loan interest calculated based on L+4.625%, increasing to a fixed rate of 12% on July 1, 2008 due to the claim of a failed syndication by the Lead Arrangers. |
| **Revolver, Term Loan A, and Term Loan B** | Revolver, Term Loan A, and Term Loan B interest calculated at L+3%, L+3%, and L+3.25% respectively. | Revolver, Term Loan A, and Term Loan B interest calculated at L+ 3.5%, L+3.5%, and L+3.75% respectively due to flex. Term Loan B calculation includes LIBOR floor of 3.25%. |
| **Scheduled Debt Amortization** | Includes contractual amortization on term loans and redemption of senior notes due 2010. | No change to assumption. |
| **Lead Arrangers Downside Case** | July and October 2007 Lead Arranger downside cases, CIM Projections. | Updated UBS downside case from April 2008, other Lead Arrangers' downside cases from July and October credit memos. |
| **Additional Loan Facilities** | Assumes no additional loan facilities regardless of expected increases to collateral base. | No change to assumption. |
| **Contingent Liquidity Needs** | Contingencies for unplanned downtime for the refinery and weather considered in Stress Test and minimum liquidity needs. | Included in stressed EBITDA consistent with the approach by UBS per the April 2008 UBS Credit Memo and the UBS downside case. |

**CONFIDENTIAL**

**March 2008 Stress Tests**                                                                 **SCHEDULE 4**

### Calculation of EBITDA to Maintain $1.4B in Liquidity
### Oil Modeled at $105.45
($ in millions)

| Cash EBITDA Required to Maintain $1.4B in Liquidity | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Cash Needed to Maintain $1.4B Liquidity | (H) | $ 1,853 | $ 3,117 | $ 3,254 | $ 3,170 |
| Cash Needed to Fund Net Working Capital Increase | (I) | - | - | - | - |
| Total Cash Needs Before Paying Taxes | (J) | 1,853 | 3,117 | 3,254 | 3,170 |
| Cash Taxes | (K) | - | - | - | - |
| **Required Cash EBITDA** | (L) | **$ 1,853** | **$ 3,117** | **$ 3,254** | **$ 3,170** |
| Modeled Crude Oil Price ($/bbl) | | **$ 105.45** | | | |
| Baseline Crude Oil Price ($/bbl) | | 105.45 | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | | 19.3 | | | |

| Annual Cash Flows | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Starting Liquidity (Cash) | (A) | $ 2,226 | $ 1,400 | $ 1,400 | $ 1,400 |
| Cash Outflows | | | | | |
|     Interest Expense | (B) | 1,516 | 2,136 | 2,179 | 2,228 |
|     Capital Expenditures | (C) | 877 | 685 | 630 | 574 |
|     Scheduled Debt Payments | (D) | 142 | 190 | 395 | 395 |
|     Other Cash Flow Adjustments | (E) | 144 | 106 | 50 | (27) |
| Sub-total | (F) | (453) | (1,717) | (1,854) | (1,770) |
| Cash Needed to Maintain $1.4B Liquidity | (H) | 1,853 | 3,117 | 3,254 | 3,170 |
| **Ending Liquidity (Cash)** | (G) | **$ 1,400** | **$ 1,400** | **$ 1,400** | **$ 1,400** |

| Tax Calculation | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Required Cash EBITDA | (J) | $ 1,853 | $ 3,117 | $ 3,254 | $ 3,170 |
|   less Depreciation | | 1,049 | 1,398 | 1,365 | 1,335 |
|   less Interest Expense | | 1,516 | 2,136 | 2,179 | 2,228 |
| Taxable Income | | - | - | - | - |
| Cash Taxes | (K) | $ - | $ - | $ - | $ - |
| Tax Rate | 35% | | | | |

(A)  Starting Liquidity per Kearns at March 31, 2008.
(B)  Interest Expense as calculated by Kearns.
(C)  Capital Expenditures projected per October 2007 CIM as adjusted by Kearns.
(D)  Contractually required amortization payments per debt indentures.
(E)  Other cash flow items including Accordion availability fees, joint venture income, and other cash items per April Projections.
(F)  = (A)-(B)-(C)-(D)-(E) = Beginning Liquidity adjusted for non-operating income cash flows.
(G)  Desired Minimum Liquidity per Kearns.
(H)  = (G)-(F) = After-tax Cash EBITDA needed to maintain Desired Minimum Liquidity at year end.
(I)  Cash flow adjustment for oil price scenario (negative $19.3 million for each $1/bbl increase in oil price).
(J)  = (H)+(I) = Pre-tax Required Cash EBITDA.
(K)  Estimated Cash Taxes at EBITDA of (J).
(L)  = (J)+(K) = Required Cash EBITDA needed to maintain Desired Minimum Liquidity

**CONFIDENTIAL**

**March 2008 Stress Tests**                                                                    **SCHEDULE 4**

### Calculation of EBITDA to Maintain $1.4B in Liquidity
### Oil Modeled at $91.09
($ in millions)

| Cash EBITDA Required to Maintain $1.4B in Liquidity | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Cash Needed to Maintain $1.4B Liquidity | | $ 1,853 | $ 3,117 | $ 3,254 | $ 3,170 |
| Cash Needed to Fund Net Working Capital Increase | | (277) | - | - | - |
| Total Cash Needs Before Paying Taxes | | 1,576 | 3,117 | 3,254 | 3,170 |
| Cash Taxes | | - | - | - | - |
| **Required Cash EBITDA** | | $ 1,576 | $ 3,117 | $ 3,254 | $ 3,170 |
| Modeled Crude Oil Price ($/bbl) | $ 91.09 | | | | |
| Baseline Crude Oil Price ($/bbl) | 105.45 | | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.3 | | | | |

| Annual Cash Flows | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Starting Liquidity (Cash) | | $ 2,226 | $ 1,400 | $ 1,400 | $ 1,400 |
| Cash Outflows | | | | | |
|     Interest Expense | | 1,516 | 2,136 | 2,179 | 2,228 |
|     Capital Expenditures | | 877 | 685 | 630 | 574 |
|     Scheduled Debt Payments | | 142 | 190 | 395 | 395 |
|     Other Cash Flow Adjustments | | 144 | 106 | 50 | (27) |
| Sub-total | | (453) | (1,717) | (1,854) | (1,770) |
| Cash Needed to Maintain $1.4B Liquidity | | 1,853 | 3,117 | 3,254 | 3,170 |
| **Ending Liquidity (Cash)** | | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 |

| Tax Calculation | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Required Cash EBITDA | | $ 1,576 | $ 3,117 | $ 3,254 | $ 3,170 |
|   less Depreciation | | 1,049 | 1,398 | 1,365 | 1,335 |
|   less Interest Expense | | 1,516 | 2,136 | 2,179 | 2,228 |
| Taxable Income | | - | - | - | - |
| Cash Taxes | | $ - | $ - | $ - | $ - |
| Tax Rate | 35% | | | | |

| Calculation of Cash Needed to Fund Net Working Capital Increase | |
|---|---|
| Modeled Crude Oil Price ($/bbl) | $ 91.09 |
| Less: Baseline Crude Oil Price ($/bbl) | 105.45 |
| Equals: Change in Crude Oil Price ($/bbl) | (14.36) |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.30 |
| Cash Needed to Fund Net Working Capital Increase | $ (277.23) |

**CONFIDENTIAL**

**March 2008 Stress Tests**                                    **SCHEDULE 4**

### Calculation of EBITDA to Maintain $1.4B in Liquidity
### Oil Modeled at $115.00
($ in millions)

| Cash EBITDA Required to Maintain $1.4B in Liquidity | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Cash Needed to Maintain $1.4B Liquidity | $ | 1,853 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| Cash Needed to Fund Net Working Capital Increase | | 184 | | - | | - | | - |
| Total Cash Needs Before Paying Taxes | | 2,038 | | 3,117 | | 3,254 | | 3,170 |
| Cash Taxes | | - | | - | | - | | - |
| **Required Cash EBITDA** | $ | **2,038** | $ | **3,117** | $ | **3,254** | $ | **3,170** |
| Modeled Crude Oil Price ($/bbl) | $ 115.00 | | | | | | | |
| Baseline Crude Oil Price ($/bbl) | 105.45 | | | | | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.3 | | | | | | | |

| Annual Cash Flows | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Starting Liquidity (Cash) | $ | 2,226 | $ | 1,400 | $ | 1,400 | $ | 1,400 |
| Cash Outflows | | | | | | | | |
| Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Capital Expenditures | | 877 | | 685 | | 630 | | 574 |
| Scheduled Debt Payments | | 142 | | 190 | | 395 | | 395 |
| Other Cash Flow Adjustments | | 144 | | 106 | | 50 | | (27) |
| Sub-total | | (453) | | (1,717) | | (1,854) | | (1,770) |
| Cash Needed to Maintain $1.4B Liquidity | | 1,853 | | 3,117 | | 3,254 | | 3,170 |
| **Ending Liquidity (Cash)** | $ | **1,400** | $ | **1,400** | $ | **1,400** | $ | **1,400** |

| Tax Calculation | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Required Cash EBITDA | $ | 2,038 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| less Depreciation | | 1,049 | | 1,398 | | 1,365 | | 1,335 |
| less Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Taxable Income | | - | | - | | - | | - |
| Cash Taxes | $ | - | $ | - | $ | - | $ | - |
| Tax Rate | 35% | | | | | | | |

| Calculation of Cash Needed to Fund Net Working Capital Increase | | |
|---|---|---|
| Modeled Crude Oil Price ($/bbl) | $ | 115.00 |
| Less:  Baseline Crude Oil Price ($/bbl) | | 105.45 |
| Equals:  Change in Crude Oil Price ($/bbl) | | 9.55 |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | | 19.30 |
| Cash Needed to Fund Net Working Capital Increase | $ | 184.24 |

**CONFIDENTIAL**

**March 2008 Stress Tests**                                                                                                                    **SCHEDULE 4**

### Calculation of EBITDA to Maintain $1.4B in Liquidity
### Oil Modeled at $130.00
($ in millions)

| Cash EBITDA Required to Maintain $1.4B in Liquidity | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Cash Needed to Maintain $1.4B Liquidity | $ | 1,853 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| Cash Needed to Fund Net Working Capital Increase | | 474 | | - | | - | | - |
| Total Cash Needs Before Paying Taxes | | 2,327 | | 3,117 | | 3,254 | | 3,170 |
| Cash Taxes | | - | | - | | - | | - |
| **Required Cash EBITDA** | $ | **2,327** | $ | **3,117** | $ | **3,254** | $ | **3,170** |
| Modeled Crude Oil Price ($/bbl) | $ 130.00 | | | | | | | |
| Baseline Crude Oil Price ($/bbl) | 105.45 | | | | | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.3 | | | | | | | |

| Annual Cash Flows | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Starting Liquidity (Cash) | $ | 2,226 | $ | 1,400 | $ | 1,400 | $ | 1,400 |
| Cash Outflows | | | | | | | | |
| Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Capital Expenditures | | 877 | | 685 | | 630 | | 574 |
| Scheduled Debt Payments | | 142 | | 190 | | 395 | | 395 |
| Other Cash Flow Adjustments | | 144 | | 106 | | 50 | | (27) |
| Sub-total | | (453) | | (1,717) | | (1,854) | | (1,770) |
| Cash Needed to Maintain $1.4B Liquidity | | 1,853 | | 3,117 | | 3,254 | | 3,170 |
| **Ending Liquidity (Cash)** | $ | **1,400** | $ | **1,400** | $ | **1,400** | $ | **1,400** |

| Tax Calculation | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Required Cash EBITDA | $ | 2,327 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| less Depreciation | | 1,049 | | 1,398 | | 1,365 | | 1,335 |
| less Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Taxable Income | | - | | - | | - | | - |
| Cash Taxes | $ | - | $ | - | $ | - | $ | - |
| Tax Rate | 35% | | | | | | | |

| Calculation of Cash Needed to Fund Net Working Capital Increase | | |
|---|---|---|
| Modeled Crude Oil Price ($/bbl) | $ | 130.00 |
| Less:  Baseline Crude Oil Price ($/bbl) | | 105.45 |
| Equals:  Change in Crude Oil Price ($/bbl) | | 24.55 |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | | 19.30 |
| Cash Needed to Fund Net Working Capital Increase | $ | 473.74 |

**CONFIDENTIAL**

**March 2008 Stress Tests**                                                    **SCHEDULE 4**

### Calculation of EBITDA to Maintain $1.4B in Liquidity
### Oil Modeled at $145.00
($ in millions)

| Cash EBITDA Required to Maintain $1.4B in Liquidity | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Cash Needed to Maintain $1.4B Liquidity | $ | 1,853 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| Cash Needed to Fund Net Working Capital Increase | | 763 | | - | | - | | - |
| Total Cash Needs Before Paying Taxes | | 2,617 | | 3,117 | | 3,254 | | 3,170 |
| Cash Taxes | | 28 | | - | | - | | - |
| **Required Cash EBITDA** | $ | **2,645** | $ | **3,117** | $ | **3,254** | $ | **3,170** |
| Modeled Crude Oil Price ($/bbl) | $ 145.00 | | | | | | | |
| Baseline Crude Oil Price ($/bbl) | 105.45 | | | | | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.3 | | | | | | | |

| Annual Cash Flows | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Starting Liquidity (Cash) | $ | 2,226 | $ | 1,400 | $ | 1,400 | $ | 1,400 |
| Cash Outflows | | | | | | | | |
| Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Capital Expenditures | | 877 | | 685 | | 630 | | 574 |
| Scheduled Debt Payments | | 142 | | 190 | | 395 | | 395 |
| Other Cash Flow Adjustments | | 144 | | 106 | | 50 | | (27) |
| Sub-total | | (453) | | (1,717) | | (1,854) | | (1,770) |
| Cash Needed to Maintain $1.4B Liquidity | | 1,853 | | 3,117 | | 3,254 | | 3,170 |
| **Ending Liquidity (Cash)** | $ | **1,400** | $ | **1,400** | $ | **1,400** | $ | **1,400** |

| Tax Calculation | | L9M of 2008 | | 2009 | | 2010 | | 2011 |
|---|---|---|---|---|---|---|---|---|
| Required Cash EBITDA | $ | 2,645 | $ | 3,117 | $ | 3,254 | $ | 3,170 |
| less Depreciation | | 1,049 | | 1,398 | | 1,365 | | 1,335 |
| less Interest Expense | | 1,516 | | 2,136 | | 2,179 | | 2,228 |
| Taxable Income | | 80 | | - | | - | | - |
| Cash Taxes | $ | 28 | $ | - | $ | - | $ | - |
| Tax Rate | 35% | | | | | | | |

| Calculation of Cash Needed to Fund Net Working Capital Increase | | |
|---|---|---|
| Modeled Crude Oil Price ($/bbl) | $ | 145.00 |
| Less: Baseline Crude Oil Price ($/bbl) | | 105.45 |
| Equals: Change in Crude Oil Price ($/bbl) | | 39.55 |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | | 19.30 |
| Cash Needed to Fund Net Working Capital Increase | $ | 763.24 |

**CONFIDENTIAL**

**March 2008 Stress Tests**                                                                SCHEDULE 4

**Calculation of Liquidity in Order to Maintain Senior Covenant Compliance**

($ in millions)

| Cash EBITDA Required to Maintain Senior Covenant Compliance | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Starting Liquidity (Cash) | $ 2,226 | $ 2,090 | $ 2,217 | $ 2,425 |
| Cash Flow | (136) | 127 | 208 | 290 |
| **Ending Liquidity (Cash)** | **$ 2,090** | **$ 2,217** | **$ 2,425** | **$ 2,714** |

| Annual Cash Flow Calculation | | L9M of 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Required EBITDA to Meet Covenants | | $ 2,543 | $ 3,244 | $ 3,461 | 3,459 |
| Cash Needed to Fund Net Working Capital Increase | | - | - | - | - |
| Cash Taxes | | - | - | - | - |
| Interest Expense | | 1,516 | 2,136 | 2,179 | 2,228 |
| Capital Expenditures | | 877 | 685 | 630 | 574 |
| Scheduled Debt Payments | | 142 | 190 | 395 | 395 |
| Other Cash Flow Adjustments | | 144 | 106 | 50 | (27) |
| Cash Flow | | $ (136) | $ 127 | $ 208 | $ 290 |
| Modeled Crude Oil Price ($/bbl) | $ 105.45 | | | | |
| Baseline Crude Oil Price ($/bbl) | 105.45 | | | | |
| Net Cash Flow Impact per $1/bbl Crude Oil Increase | 19.3 | | | | |

| Covenant Calculation | | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **First Lien Senior Secured Leverage Ratio --7.11 (a)** | | | | | |
| Consolidated First Lien Senior Secured Debt | | $ 11,437 | $ 11,120 | $ 10,518 | $ 9,834 |
| Divided by: Consolidated EBITDA (LTM) | | 3,567 | 3,244 | 3,461 | 3,459 |
| First Lien Senior Secured Leverage Ratio | | 3.21 | 3.43 | 3.04 | 2.84 |
| Financial Covenant Target (max.) | | 3.75 | 3.75 | 3.75 | 3.75 |
| Compliance | | *Yes* | *Yes* | *Yes* | *Yes* |
| **Consolidated Debt Service Ratio --7.11 (b)** | | | | | |
| LTM Consolidated EBITDA | | $ 3,567 | $ 3,244 | $ 3,461 | $ 3,459 |
| Minus: LTM Capital Expenditure | | 1,113 | 685 | 630 | 574 |
| Minus: LTM Cash Taxes | | 0 | 0 | 0 | 0 |
| Divided by the sum of: Consolidated Interest Expense | | 2,035 | 2,136 | 2,179 | 2,228 |
| and: LTM Scheduled Amortization | | 190 | 190 | 395 | 395 |
| Consolidated Debt Service Ratio | | 1.10 | 1.10 | 1.10 | 1.10 |
| Financial Covenant Target (min.) | | 1.10 | 1.10 | 1.10 | 1.10 |
| Compliance | | *Yes* | *Yes* | *Yes* | *Yes* |

**CONFIDENTIAL**

**April 2008 UBS Credit Memo, Exhibit 5**                                        **SCHEDULE 5**

## Consensus Oil Estimates ($ / bbl)

| Contributor | As of | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Westpac Banking Corp | 4/14/2008 | 92.00 | 99.00 | | |
| Fortis | 4/14/2008 | 96.40 | | | |
| Citigroup | 4/10/2008 | 96.00 | 88.00 | 75.00 | |
| Credit Suisse | 4/10/2008 | 90.73 | 90.00 | 90.00 | 75.00 |
| LCA Constructions | 4/9/2008 | 95.80 | 98.70 | 83.90 | |
| UniCredit Markets & Investment Banking | 4/8/2008 | 100.00 | 105.00 | | |
| Standard Chartered Bank | 4/7/2008 | 86.00 | 80.00 | | |
| Barclays PLC | 4/3/2008 | 100.80 | 93.80 | 97.30 | |
| KeyBanc Capital Markets | 4/2/2008 | 86.72 | 77.00 | | |
| Societe Generale | 4/1/2008 | 101.24 | 100.00 | 70.00 | 72.00 |
| Friedman Billings Ramsey & Co | 4/1/2008 | 90.00 | 85.00 | 85.00 | |
| Economist Intelligence Unit | 4/1/2008 | 93.00 | 86.70 | | |
| Deutsche Bank | 3/28/2008 | 95.75 | 102.50 | 95.00 | 90.00 |
| Raiffeisen Zentralbank Osterreich | 3/27/2008 | 92.00 | 85.00 | 89.00 | 92.00 |
| Natixis Bleichroeder | 3/27/2008 | 70.00 | 70.00 | | |
| Sanford C Bernstein | 3/26/2008 | 92.30 | 85.00 | 81.70 | 80.00 |
| HSH Nordbank | 3/25/2008 | 93.00 | 87.00 | | |
| Wachovia | 3/19/2008 | 96.50 | 90.00 | | |
| Commerzbank | 3/19/2008 | 90.60 | 88.30 | | |
| ING Wholesale Banking | 3/18/2008 | 93.00 | 80.50 | 71.00 | 66.00 |
| Merrill Lynch & Co | 3/17/2008 | 102.00 | 90.00 | | |
| JPMorgan Chase & Co | 3/17/2008 | 90.50 | 80.00 | | |
| SunTrust | 3/14/2008 | 80.00 | 80.00 | 80.00 | 80.00 |
| RBC Capital Markets | 3/11/2008 | 88.00 | 85.00 | | |
| Raymond James & Associates | 3/11/2008 | 91.43 | 100.00 | | |
| Lehman Brothers | 2/19/2008 | 86.00 | 78.00 | | |
| National Australia Bank | 2/12/2008 | 85.17 | 75.00 | | |
| UBS Securities LLC | 1/17/2008 | 85.00 | 78.00 | 76.00 | 79.00 |
| McKinnon & Clarke | 1/10/2008 | 80.00 | 85.00 | 90.00 | 95.00 |
| Goldman Sachs Group | 12/12/2007 | 95.00 | | | |
| BNP Paribas | 11/5/2007 | 88.80 | 78.90 | | |

| Summary | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Average | 91.09 | 86.94 | 83.38 | 81.00 |
| High | 102.00 | 105.00 | 97.30 | 95.00 |
| Low | 70.00 | 70.00 | 70.00 | 66.00 |

**CONFIDENTIAL**

**Revised WACC Calculation**                                                                 SCHEDULE 6

**Lyondell Basell Industries AF S.C.A.**
**As of December 20, 2007**

**After-Tax Cost of Equity**

| | | |
|---|---|---|
| Market Risk Premium (a) | 7.05% | |
| Risk Free Rate:  Long Term Treasury Bonds (b) | 4.03% | |
| Subtotal | 11.1% | |
| Industry Premium (c) | -0.75% | |
| Size Premium (d) | 0.00% | |
| Unsystematic Risk Factor (e) | 1.00% | |
| **Cost of Equity** | **11.3%** | |

**After-Tax Cost of Debt**

| | |
|---|---|
| Pretax Cost of Debt (f) | 6.55% |
| Estimated Future Tax Rate (g) | 35.0% |
| **After-Tax Cost of Debt** | **4.3%** |

**Weighted Average Cost of Capital:**

| Type of Capital | % of Total | After-Tax Return | Weighted Return |
|---|---|---|---|
| Equity | 74.7% | 11.3% | 8.5% |
| Debt | 25.3% | 4.3% | 1.1% |
| | 100.0% | | 9.54% |
| | | **WACC (Rounded):** | **9.5%** |
| | | **Used in DCF Analysis:** (h) | **10.0%** |

**Notes:**

(a) Source: 2008 Valuation Yearbook by Ibbotson Associates, Long-horizon expected equity risk premium (historical).

(b) Yield on 10 Year US Treasury Bond, Capital IQ, as of:    12/20/2007

(c) Buildup method relied on Industry Premia as reported in the 2008 Valuation Yearbook by Ibbotson Associates to adjust market risk premium for industry risk.

| Industry Risk Premium Weighting | | Weighting | |
|---|---|---|---|
| **Petrochemicals** | | | |
| Plastic Materials Synthetic Resins and Non Vulcanizable Elastomers | -0.39% | | |
| Industrial Organic Chemicals | -0.09% | | |
| Average | -0.24% | 70% | -0.17% |
| **Refining** | | | |
| Petroleum Refining | -1.94% | 30% | -0.58% |
| | | **Total** | **-0.75%** |

(d) Source: 2008 Valuation Yearbook by Ibbotson Associates, size premium for companies with market capitalization between $20.4 billion - $472.5 billion is negative 0.34%.  For purposes of
this analysis, since LyondellBasell's market capitalization falls in the largest decile assuming the industry Debt to TIC ratio, I have not applied a size premium in determining the cost of equity.

(e) Reflecting risks specific to subject company.  While quantitative analysis strongly suggests no company specific risk premium, to be conservative and to consider that LBI is a merging entity,
I have included a company specific risk premium comparable to the discount to the median guideline company multiples in the market approach.

(f) Moody's BAA Corporate Bond Yield.

(g) Assumes a tax rate of 35% based on the April 2, 2008 Management presentation (LYO-UCC00256870).

(h) Rounding up WACC by 0.46% is analogous to increasing the unsystematic risk factor from 1.00% to 1.61%.

**CONFIDENTIAL**

**Revised WACC Calculation**                                                    **SCHEDULE 6**

### Summary of WACC's Employed in Contemporaneous Valuations

| Report | Valuation Date | WACC Low | High |
|---|---|---|---|
| American Appraisal Valuation of Lyondell Tangible and Intangible Assets & Investments, 12/20/2007 | 12/20/2007 | 9.1% | 9.1% |
| Citi - Valuation Assessment, December, 2007, Lyondell/Basell | 12/14/2007 | 8.5% | 9.5% |
| Deutsche Bank Project Safari, Presentation to the Board of Directors (July 16, 2007) & Opinion of Deutsche Bank Securities Inc. (July 16, 2007) | 7/16/2007 | 9.5% | 11.5% |
| Citi - Valuation Discussion- July 2007, Valuation of Basell | 7/20/2007 | 8.5% | 9.5% |
| ML - Presentation to Athens Regarding Project Hugo, March 27, 2007 | 3/23/2007 | 8.5% | 9.0% |
| **Median** | | **8.5%** | **9.5%** |

| | |
|---|---|
| **WACC Used in Kearns DCF Analysis** | **10.0%** |

**Sources:**
American Appraisal Report - LYO-UCC00122220-325.
Citi Valuation Assessment December 2007 - ACC-00101479.
Deutche Bank, Project Safari, July 16, 2007 - LYO-UCC00120901.
Citi Valuation Discussion - ACC00011342.
March 27 Presentation to Athens - LYOUCC00014364.

**CONFIDENTIAL**

**SCHEDULE 7**

**Kearns' Reliance on Young v. Intille**

| Kearns Reliance | | Previous Reference | | Current Reference | |
|---|---|---|---|---|---|
| Quote | Document/Page Reference | Quote | Document/Page Reference | Quote | Document/Page Reference |
| "Intille concluded that the Projections, as they relate to the petrochemicals segment, were reasonable based on the product demand growth, crude oil price forecasts and GDP projections available at the end of 2007." <br><br> "For the purpose of my DCF analysis (as well as my analysis of capital adequacy and ability to pay debts), I used the Projections. As described in Section VII, the Projections (i) were prepared by the management teams of Lyondell and Basell, incorporating appropriate corporate planning and financial disciplines, (ii) vetted by third party industry analysts, (iii) deemed reasonable by O'Connor and Intille, and (iv) appropriately considered the Company's historical performance." | Kearns Report, pp. 8 & 49 <br><br> Kearns Report, p. 18 | "…these drivers [of the petrochemicals projections] are GDP growth, crude oil prices, and operating rates (derived from demand volumes and capacity). As discussed below, forecasts from SRIC, as well as those from CMAI and other economic and industry analysts like the American Chemistry Council ("ACC") and the International Monetary Fund ("IMF"), all support my conclusion that management's projections were reasonable based on information available at the time they were made." | Intille Initial Report, pp.14 - 15 | "The LBI combined company EBITDA projections at the time of the merger were reasonable and justified… LBI management used well-accepted approaches, opinions, and data, available at the time of the transaction, to determine the forecasts for the products in the LBI portfolio." | Young Initial Report, p. 14 |
| "Intille concluded that the consensus petrochemical industry outlook at and around the time of the Acquisition was generally positive and consistent with realistic economic expectations for a successful Lyondell-Basell merger outcome." | Kearns Report, p. 9 | "These contemporaneous predictions by many leading industry analysts further support the reasonableness of the EBITDA projections made at the time of the LBI merger. These industry analysts had forecasts for GDP growth and Middle East on-stream delays, as well as specific petrochemical demand forecasts that were consistent with the views of SRIC and CMAI in late 2007." "Producer and economist comments from late 2007 demonstrate that it was expected that the industry would continue to grow in 2008." | Intille Initial Report, pp. 24 - 25 | "The LBI Projection reflects a cautious optimism that was consistent with the industry perspective at that time and my own view. Viewed in this context, management's projections were reasonable and in line with the perspectives of contemporary industry observers." | Young Initial Report, p. 14 |
| "… the precipitous crash in the global petrochemical industry was unforeseeable and was not forecasted by any industry participants, analysts or experts at the time of the merger of Lyondell and Basell." | Kearns Report, p. 9 | "While there were concerns during late 2007 that economic activity may be negatively impacted by the increase in oil, there were no changes in the market fundamentals that warranted a substantial alteration of the forecasts for the foreseeable future. In fact, many industry analysts - including SRIC and CMAI - forecasted at the time that there would be some recovery of margins in 2008 based on the assumption that crude oil prices would stabilize in 2008, allowing product margins to recover to historical levels that were consistent with the high level of operations that were expected to continue in 2008." | Intille Initial Report, p.34 | "The sudden and dramatic drop in LBI's 2008 performance was not, nor could it have been, reasonably anticipated. The rapid and unexpectedly high spike in oil prices followed by an equally rapid decline in those prices, and a global economic collapse, affected LBI product sales, EBITDA, and available capital in a manner that was not, and could not have been, anticipated." | Young Initial Report, p. 6 |

**1**                                                                                         **CONFIDENTIAL**

SCHEDULE 7

### Kearns' Reliance on Young v. Intille

| Kearns Reliance | | Previous Reference | | Current Reference | |
|---|---|---|---|---|---|
| Quote | Document/Page Reference | Quote | Document/Page Reference | Quote | Document/Page Reference |
| "See discussion in the Intille Initial Report for his analysis of the petrochemical projections (which he states were reflective of industry assumptions at the time), and his discussion of the extent to which the severity of the stress case assumptions considered by the Lead Arrangers were extremely unlikely to occur based on information available in 2007."<br><br>"Intille concludes that the stress cases considered by each of the Lead Arrangers were extremely unlikely based on information available in 2007, particularly regarding the integrated margins for ethylene and propylene."<br><br>"In fact, Intille referred to the market conditions in the Citibank Downside Case as too severe and extremely unlikely to occur based on the information available in 2007." | Kearns Report, pp. 32 & 36<br><br>Kearns Rebuttal Report, p. 37 | "…UBS's downside case assumed LBI's petrochemical EBITDA would fall 37% in 2008 from 2007 levels.  UBS's downside case also assumed that EBITDA in the 2010 trough year would be 51% below the 2007 level.  Similarly, Citibank's downside assumption was that 2008 petrochemical EBITDA for LBI would fall 15% below the company's estimate for 2007 and 2010 EBITDA would be 38% below the 2007 level."<br><br>"…The 2007 ethylene and propylene margins - which, again, SRIC and other analysts believed would undergo a temporary dip - were also near SRIC's forecast of the next trough, beginning in 2010. Therefore, scenarios that assumed an additional 38% to 51% drop in profits from 2007 levels (as the banks were assuming in their downside scenarios) were too severe and extremely unlikely based on the information available in 2007." | Intille Initial Report, pp.31 - 32 | Young concludes that the Citi downside case for EC&D was "…harsher than what was generally expected at the time and therefore unlikely to occur." and notes that LBI's Chemicals segment included a number of less cyclical business where were expected to lessen the severity of the trough for the business as a whole.  With respect to refining, Young concludes that the LBI forecast was "unreasonably severe based on historic precedent."<br><br>Regarding the UBS downside case, Young concludes that, "The margin reduction in Chemicals was… greater than generally anticipated at the time and therefore unlikely to occur" and, with respect to refining, "unduly severe, based on the prevailing fundamentals which could be analyzed at that time." | Young Supplemental Report, p. 33 |
| "Note also that Intille states that (i) the petrochemical industry was experiencing strong operating rates in 2007, and (ii) the depth of the next projected trough was not expected to be as severe as prior troughs." | Kearns Report, p. 33 | "In 2007, the petrochemical industry was experiencing strong operating rates, which are a key driver for healthy margins.  Both CMAI and SRIC consistently predicted that operating rates for the petrochemical products in LBI's portfolio would decline gradually with the expected trough in the industry in 2010/2011 (as discussed below), due to expected increases in capacity in the Middle East and Asia." | Intille Initial Report, p.20 | "With respect to the longer-term view, at the end of 2007 observers expected that the petrochemical industry would not enter a supply-driven trough until 2009–2011… An important part of the industry view was the presumption that delays in the Middle East, particularly in Iran, because of operating issues and feedstock availability, would sustain operating rates at higher levels than previously expected, pushing the anticipated excess capacity back to 2009.  Weakness in the markets of the Americas was expected, but the decline forecast by CMAI was softer than the decline experienced in the 1993–2001 petrochemical cycle downturns." | Young Initial Report, pp.17-19 |
| "Intille opines that Capex savings of as high as 75% of planned discretionary expenditures can generally be eliminated when margins are compressed." | Kearns Report, p. 41 | "…if margins are expected to be compressed for periods beyond 12 months, a petrochemical manufacturer can reduce substantial amounts of discretionary capital expenditures by eliminating those previously planned outlays.  Moreover, when necessary, petrochemical companies can temporarily defer discretionary maintenance capital expenditures." | Intille Initial Report, p.33 | Young indicates that "When planning for capital expenditure during a typical trough, it is reasonable to expect that capital could be reduced to levels of that expended in prior years" and indicates that the combined Capex spending of Lyondell and Basell was $570 million in 2004, when both predecessor companies were emerging from the most recent trough. | Young Supplemental Report, pp. 22-25 |
| "Intille opines that temporary shifts in industry dynamics during 2007 generally did not have long-term effects and did not warrant downgrading previous expectations for 2008. He also states that prospects for 2008 remained similar to those that had been predicted for the previous years." | Kearns Report, p. 53 | "The compression of margins in the petrochemical industry in the second half of 2007 did not indicate that the margins would remain compressed in 2008 and beyond." | Intille Initial Report, p.25 | "Neither the fact that Lyondell fell short of 2007 projections nor that Basell exceeded them merited re-evaluation of the forecast."<br><br>"Lyondell did not meet its Q2 and Q3 forecasts for 2007.  It has been alleged that these "EBITDA misses" should have prompted management and/or the bankers to reduce the forecasts for the period 2008–2011.  I disagree. It is my opinion that as of late 2007, these deviations from the changes were attributable to the increasing cost of crude oil, which because it was expected to stabilize made the explanation offered by Lyondell management at the time credible." | Young Initial Report, p. 42 |
| "As a result, of the foregoing, and as summarized in the Intille and O'Connor Reports, in late 2007 it was reasonable for Lyondell management to reconfirm its 2008 EBITDA and earnings estimates." | Kearns Report, p. 73 | "The compression of margins in the petrochemical industry in the second half of 2007 did not indicate that the margins would remain compressed in 2008 and beyond." | Intille Initial Report, p.25 | | |

2

**CONFIDENTIAL**

**Kearns' Reliance on Young v. Intille**

| Kearns Reliance | Document/Page Reference | Previous Reference | Document/Page Reference | Current Reference | Document/Page Reference |
|---|---|---|---|---|---|
| Quote | | Quote | | Quote | |
| "Intille notes that world ethylene operating rates were expected to decline from their relatively high 2007 levels of 93% to a low of 86% in 2010 and 2011. Similarly, Intille notes that world polyethylene operating rates were expected to decline from 86% in 2007 to 82% in 2010. He concludes that the operating rate assumptions used to prepare the Projections were generally consistent with these assumptions and were therefore reasonable when prepared in late 2007." | Kearns Report, p. 56 | [Ethylene and Polyethylene operating rates charts on pp. 20 & 21, respectively]<br><br>"In assessing the reasonableness of these EBITDA projections, I have reviewed: (1) the EBITDA models of LBI's petrochemical business, which were also the underlying assumptions used to generate CMAI's EBITDA forecasts. In particular, these drivers are GDP growth, crude oil prices, and operating rates (derived from demand volumes and capacity). As discussed below, forecasts from SRIC, as well as those from CMAI and other economic and industry analysts like the American Chemistry Council ("ACC") and the International Monetary Fund ("IMF"), all support my conclusion that management's projections were reasonable based on the information available at the time they were made." | Intille Initial Report, pp. 14 - 15 & 20 - 21 | "The product I looked to as an indicator of LBI future profitability was ethylene, as ethylene and its derivatives constitute a considerable portion of the Lyondell portfolio. I compared industry margin forecasts for ethylene to the Lyondell olefin EBITDA forecasts... When compared to industry-observer forecasts for ethylene, the LBI Forecast for Lyondell's Olefins EBITDA margins falls well inside the band of industry-observer forecasts, as shown on the next figure." | Young Initial Report, pp. 19 & 32 |
| "Intille analyzed margin assumptions for LBI's major petrochemical product categories: ethylene, high-density polyethylene and polypropylene. Intille concludes that margins utilized in the Projections were reasonable given the industry outlook at the time. He indicates that margin forecasts properly reflect an increase in supply and a minor decline in economic activity, which was consistent with the general outlook at the time." | Kearns Report, p. 56 | "In 2007, the petrochemical industry was experiencing strong operating rates, which are a key driver for healthy margins. Both CMAI and SRIC consistently predicted that operating rates for the petrochemical products in LBI's portfolio would decline gradually with the expected trough in the industry in 2010/2011 (as discussed below), due to expected increases in capacity in the Middle East and Asia. This consistency is shown in figures 10, 11, 12, and 13 below for the primary products of LBI: (1) ethylene, (2) polyethylene, (3) propylene oxide and (4) polypropylene. Both CMAI and SRIC forecasted that product demand would increase in the forecast period, despite the unexpected rise in crude prices in 2007." | Intille Initial Report, pp. 20-22 | "Management developed reasonable forecasts for the LBI businesses based on the prevailing industry outlooks and the products within the LBI portfolio." | Young Initial Report, p.26 |
| "According to Intille, during 2007 it was generally believed that the petrochemical industry was coming off of a peak, and that new capacity would be coming on line would put downward pressure on petrochemical operating rates and profits. During 2007, however, construction delays at new plants in the Middle East caused analysts to change their estimate regarding when new capacity would actually come on line." | Kearns Report, p. 57 | "These contemporaneous predictions by many leading industry analysts further support the reasonableness of the EBITDA projections made at the time of the LBI merger. These industry analysts had forecasts for GDP growth and Middle East projected on-stream delays, as well as specific petrochemical demand forecasts that were consistent with the views of the SRIC and CMAI in late 2007." | Intille Initial Report, p.24 | "With respect to the longer-term view, at the end of 2007 observers expected that the petrochemical industry would not enter a supply-driven trough until 2009–2011... An important part of the industry view was the presumption that delays in the Middle East, particularly in Iran, because of operating issues and feedstock availability, would sustain operating rates at higher levels than previously expected, pushing the anticipated excess capacity back to 2009. Weakness in the markets of the Americas was expected, but the decline forecast by CMAI was softer than the decline experienced in the 1993–2001 petrochemical cycle downturns." | Young Initial Report, pp.17-19 |
| "Intille reviewed CMAI's contemporaneously prepared industry forecasts, and determined that they were consistent with the assumptions underlying the Projections." | Kearns Report, p. 57 | "Both of these sets of trough projections were consistent with the trough predictions in CMAI's Hugo Report that forecasted EBITDA for Basell's and Lyondell's products. Moreover, based on these projections by CMAI and SRIC, the predicted EBITDA drop of 24% from 2007 to 2010 was reasonable and sound when made in late 2007." | Intille Initial Report, p.24 | "After giving consideration to all of the factors listed above, CMAI concludes that Lyondell and Basell's EBITDA forecasts are reasonable. First addressing Lyondell, CMAI concludes that "[t]he Lyondell view is conservative compared to CMAI." The CMAI summary figure highlighting this conclusion is shown on Figure 13. With regard to Basell's European produced products, CMAI determined that although the CMAI view was more conservative than the Basell EBITDA forecast, when the forecast is adjusted for Basell's historically-consistent outperformance of CMAI's margin assumptions, the Basell EBITDA "shows a significant uplift."" | Young Initial Report, pp.35-36 |

**CONFIDENTIAL**

SCHEDULE 7

### Kearns' Reliance on Young v. Intille

| Kearns Reliance | | Previous Reference | | Current Reference | |
|---|---|---|---|---|---|
| Quote | Document/Page Reference | Quote | Document/Page Reference | Quote | Document/Page Reference |
| "Intille notes that the severity of the trough would be reduced by the broadening of the product portfolio to include higher technology products such as advanced polyolefins, which have more stable earnings profiles and the cross transfer of technology across product lines and regions. The merger created opportunities to reduce overlaps in the polymers businesses of the combined companies." | Kearns Report, pp. 59 - 60 | "The merger created a broader product portfolio with less pure commodity products, ultimately reducing exposure to the petrochemical cycle. For example, the Advanced Polyolefins and Technology divisions of Basell are less typical "commodity" type businesses, such as ethylene. These "higher" technology content divisions had more stable earnings profiles."<br><br>"Lyondell and Basell operated as independent business units during the last 2001-2003 petrochemical trough. For the reasons described above in my discussions surrounding synergies, LBI was better positioned to offset potential earnings fluctuations resulting from future margin troughs. Moreover, specific developments in the chemical industry also contributed to expectations for a less severe trough relative to 2001-2003. In my opinion, some of the key areas which supported this stronger earnings profile are the following..." | Intille Initial Report, p.27 & 31 | "The Lyondell assets also brought a greater degree of asset integration to the combined enterprise. A well-integrated company can add a great deal of profit through its physical asset configuration (having the right plants joined together in the right way) and its asset optimization (which effectively means having the molecules shared between plants driven to the highest possible value)... Lyondell more than other potential chemical targets (e.g., GE Plastics or Huntsman) had the potential to add great value to both the base and expanding Basell operations over time."<br><br>"LBI's Projection for petrochemical products was consistent with industry projections, and toward the end of 2007 the consensus view of the petrochemical industry, which I shared, was that we were just passing through a peak period and that a mild "trough" lay ahead." | Young Initial Report, pp. 50 & 15 |
| "The peak to trough EBITDA levels included in the Projections were deemed reasonable by O'Connor, Intille and Young." | Kearns Rebuttal Report, p. 41 | "The forecasts by CMAI and SRIC in 2007 were also consistent in describing the depth" of this expected 2010/2011 margin trough. According to CMAI's World Report, CMAI projected drops in margins for LBI's primary products from 2007 to 2010/2011 that were consistent with the troughs projected by SRIC in late 2007." | Intille Initial Report, p.23 | "LBI's Projection for petrochemical products was consistent with industry projections, and toward the end of 2007 the consensus view of the petrochemical industry, which I shared, was that we were just passing through a peak period and that a mild "trough" lay ahead." | Young Initial Report, p. 15 |
| "Intille states that in August 2007 IBIS reported that petrochemical ethylene prices had risen for six consecutive months, boosted by healthy domestic and international demand for ethylene and its derivatives. At this time, while 2007 had seen signs of possible oversupply, IBIS reported that by 2010 there could be another period of oversupply and subsequent drop in profitability. Intille concludes that the IBIS demand forecasts were generally consistent with the underlying assumptions utilized in the Projections." | Kearns Report, p. 60 | "My assessment of the companies' 2008-2011 EBITDA projections is also supported by the forecasts and predictions of industry analysts and other market researchers in 2007. These contemporaneous predictions by many leading industry analysts further support the reasonableness of the EBITDA projections made at the time of the LBI merger." | Intille Initial Report, p.24 | "...in light of anticipated global demand, product supply, and anticipated margins for its mix of products, Lyondell's 2008 chemicals and polymers forecast was reasonable and generally consistent with the industry outlook at the time."<br><br>"Overall, in light of anticipated global demand, product supply, and anticipated margins for its mix of petrochemical products, Basell's 2008 forecast was reasonable and entirely consistent with the industry outlook at the time. Further it is consistent with Lyondell's forecast for its petrochemical business segments and was also in accord with the industry outlook for petrochemicals at the time." | Young Initial Report, pp.30-31 |
| "Intille commented in his report that an industry-wide driver of the petrochemical industry is the price of crude oil and the state of world and regional economic growth. Intille stated that the level of GDP determines the level of petrochemicals containing fabricated packaging, tires consumed or other product demands of the consumer." | Kearns Report, pp. 60 - 61 | "Petrochemical products are chemical products made by the refinement of crude oil and natural gas. Petrochemical products are ultimately used to produce a variety of manufacturing and consumer goods such as piping, housing materials, plastic bags, tires, solvents, and paints. Crude oil and natural gas are the primary "feedstocks" used to manufacture these consumer products... The growth in GDP is the principal indicator of product demand. This is true because petrochemical products are widely used in most manufactured goods and consumer products. As a result, as GDP grows, the demand for petrochemicals generally grows as well." | Intille Initial Report, pp. 5 & 7 | "In assessing the prospects for an ongoing petrochemical business, investment, or acquisition, the first and most fundamental indicator to be scrutinized is that of end-use demand. Petrochemical demand is directly affected by consumer spending patterns in areas such as groceries, personal care, construction, consumer goods, automotive, and durable goods. At the end of 2007, the expectation was that the U.S. economy would grow at more or less the same levels as the previous three years, 2–3%, and the global economy would also grow at about 5%. I am not aware of any credible forecast that predicted the unprecedented economic decline that was witnessed in 2008." | Young Initial Report, p. 17 |

4

**CONFIDENTIAL**

SCHEDULE 7

**Kearns' Reliance on Young v. Intille**

| Kearns Reliance | | Previous Reference | | Current Reference | |
|---|---|---|---|---|---|
| Quote | Document/Page Reference | Quote | Document/Page Reference | Quote | Document/Page Reference |
| "The Intille Initial Report states that changing crude oil prices have an immediate and important impact on the financial profitability and performance of many of Lyondell's and Basell's manufacturing operations. The financial performance also is impacted by the global and regional supply/demand balance for the commodity and fuel products produced by the two companies in their respective regional markets where their manufacturing facilities are located." | Kearns Report, p.63 | "Crude oil is the primary raw material for petrochemical products. However, the absolute price of crude is not the key consideration important in forecasting margins for these products. Rather, these margins are generally determined by the supply and demand dynamics of the products (like volume and operating rates), instead of absolute crude oil prices. Nonetheless, because product price changes generally lag behind raw material cost changes, the volatility in crude oil prices can impact product margins, albeit temporarily. Therefore the trajectory and direction of crude oil prices, rather than the actual prices themselves, are an important driver of margin forecasts." | Intille Initial Report, p.7 | "Specifically, as of late 2007, forecasters expected raw material costs to plateau in the range of $50–$90 per barrel (see the 2007 oil price forecasts on Figure 23). A leveling off of costs in 2008 would have given Lyondell's selling prices an opportunity to close the gap between costs and price increases. Margins would then be expected to recover to more steady-state levels." | Young Initial Report, p. 44 |
| "Based on my review of the Intille and O'Connor Reports, Lyondell's overall product margins generally were expected to increase in 2008 due to anticipated price increases, which had been lagging feedstock cost increases throughout 2007 second half." | Kearns Report, p.72 | "By December 20, 2007, crude oil prices had increased from $61 at the end of 2006 to $91 per barrel as shown in Figure 7 below. The prevailing expectation in the industry as well as the forward markets was that these prices would remain relatively stable and gradually decrease in 2008 and the forecast period. This crude oil price stability would have had a positive impact on margins, as petrochemical prices would catch up to the prior rise in crude prices." | Intille Initial Report, p.18 | "...because sales volumes remained unchanged, and demand expectations remained steady (economic outlook was still robust), it was reasonable to anticipate that raw material costs would stabilize, prices would catch up, and that 2008 would proceed as previously anticipated. Specifically, as of late 2007, forecasters expected raw material costs to plateau in the range of $50–$90 per barrel (see the 2007 oil price forecasts on Figure 23). A leveling off of costs in 2008 would have given Lyondell's selling prices an opportunity to close the gap between costs and price increases. Margins would then be expected to recover to more steady-state levels." | Young Initial Report, p. 44 |
| "Intille concludes that the merger provided the critical competitive advantage of the combined business, in terms of competitive position and geographic diversification. Intille also states that the merger provided opportunities to (i) reduce overhead, (ii) leverage combined technologies across plants, (iii) increase purchasing power and (iv) achieve transportation cost savings." | Kearns Report, p.64 | "In assessing the forecasts for LBI, it is important to note that the merger improved the competitive advantage of the combined businesses as compared with the two independent operations, in several critical ways: (i) The merger enhanced LBI's competitive position in many product lines. As a result of the merger, LBI enjoyed enhanced product diversification, which strengthened the company's market positions and insulated it from volatility; (ii) The merger provided opportunity to reduce overhead and management cost for the combined companies. (iii) The integrated company's global reach could expect to enjoy marketing advantages with large customers with a global presence. (iv) The merged company's large purchasing power could reduce overall feedstock purchase costs. (v) LBI could achieve transportation cost savings through locational swaps to reduce transit, tariff, and tax costs. (vi) The combined company had joint ventures in key growing regions, which reduced exposure to regional demand fluctuations, including... (vii) The merger created a broader product portfolio with less pure commodity products, ultimately reducing exposure to the petrochemical cycle." | Intille Initial Report, p.27 | "Lyondell represented an excellent strategic and operational fit with Basell… The combination of Lyondell and Basell was grounded in strong industrial logic and created a leading global chemical company with geographic reach, integration advantages, and operational synergies."<br><br>"The combination created a geographically diverse company, with critical mass in the biggest markets in the world, the Americas and Europe, and a position in the rapidly growing Middle Eastern and Asian markets."<br><br>"...the areas of respective technology strengths were relatively clear-cut, with Lyondell's position in the refining, steam cracking, and PO technologies well ahead of Basell's, and with the reverse being true on polyethylene and polypropylene process technology."<br><br>"LBI's overall synergy target of $420 M represented 0.9% of revenue, a level that in my opinion is reasonable. It also falls within the range of estimates for three recent deals in the petrochemical industry: Mitsubishi Rayon / Lucite Technologies, Dow / Rohm & Haas and BASF / Ciba, where synergy estimates ranged from 0.7 – 2.1% of revenue." | Young Initial Report, pp. 49-50, 54 & 56 |
| "As discussed in the Kearns Report (Section III), the merged entity would be a globally diversified company, with decreased earnings volatility and substantial synergies, that operated in different segments of the petrochemical and refining industries. This concept also is discussed in the Intille and Young Initial Reports." | Kearns Rebuttal Report, p.21 | | | | |

**CONFIDENTIAL**

SCHEDULE 7

**Kearns' Reliance on Young v. Intille**

| Kearns Reliance | | Previous Reference | | Current Reference | |
|---|---|---|---|---|---|
| Quote | Document/Page Reference | Quote | Document/Page Reference | Quote | Document/Page Reference |
| "See the O'Connor and Intille Initial Reports for further discussion and analysis of Turner and CMAI, respectively." | Kearns Report, p.74 | "The projections developed by Basell and Lyondell in their joint October 2007 Confidential Information Memorandum for their respective petrochemical businesses for the period from 2008 to 2011 were reasonable and were reflective of industry assumptions at the time. These projections were consistent with the demand, crude oil price, and operating rate forecasts available at the time, including those issued by Chemical Market Associates, Inc. ("CMAI"), SRIC, and others who follow the industry. CMAI developed its own EBITDA forecasts for Lyondell's and Basell's petrochemical businesses for 2008 to 2011. These forecasts were consistent with the EBITDA forecasts of the company as stated in the Confidential Information Memorandum of October 2007 and were based on sound and reasonable methodologies that are consistent with what SRIC would have done." | Intille Initial Report, p.3 | "After giving consideration to all of the factors listed above, CMAI concludes that Lyondell and Basell's EBITDA forecasts are reasonable. First addressing Lyondell, CMAI concludes that "[t]he Lyondell view is conservative compared to CMAI." The CMAI summary figure highlighting this conclusion is shown on Figure 13. With regard to Basell's European produced products, CMAI determined that although the CMAI view was more conservative than the Basell EBITDA forecast, when the forecast is adjusted for Basell's historically-consistent outperformance of CMAI's margin assumptions, the Basell EBITDA "shows a significant uplift."" | Young Initial Report, pp.35-36 |
| "The Intille Initial Report discusses that global petrochemical demand experienced a historic decline during the 2008 second half." | Kearns Report, pp. 78 - 79 | "Global petrochemical demand witnessed a historic decline during the second-half of 2008 as a worsening global recession and financial crisis ensued and caused product demand to drop sharply. Based on data published by the ACC, global chemical output in 2008 failed to grow from the volumes seen in 2007. As shown in Figure 19 below, global output in 2008 fell 6% from 2006 levels - an unprecedented drop in recent history." | Intille Initial Report, p.34 | "The numbers encompass a relatively strong first three quarters of the year—and then a fourth quarter that was among the worst the industry has ever experienced." - Chemical & Engineering News<br><br>"2008 started out strong for the ICIS top 100 Chemical Companies, but was a year of unprecedented turmoil and change. . . " - ICIS<br><br>"In fact, 2008 turned out to be the first year since at least 1991 to show a contraction in global ethylene demand." | Young Initial Report, pp.58-59 |
| "Intille concludes with respect to the CMAI 2009 Litigation Model that, among other things: (i) the assessment of LBI's competitive position is inconsistent with historical facts and CMAI's own assessment from 2007; (ii) CMAI's use of forecasted cash cost curves is flawed; (iii) the volume and operating rate projections are unreasonable and inconsistent; and (iv) the price and margin assumptions are unsupported." | Kearns Rebuttal Report, p.20 | "In the 2009 CMAI/PGI Report, CMAI claims that LBI has a "below-average" competitive position in the chemicals industry. As outlined below, this is not supportable, and is inconsistent with CMAI's own published reports… CMAI's reliance solely on cash costs as a measure of business competitiveness is not appropriate. Given the variances in production methods and in grades of products under a single banner, a more appropriate indicator of competitiveness would be average cash margins... the volume forecasts CMAI uses in the 2009 CMAI/PGI Report are not company-specific forecasts. Rather, CMAI uses industry-average numbers and that analysis has generated EBITDA forecasts that are lower than both the 2007 management forecasts and CMAI's own forecasts in its 2007 CMAI Hugo Report... In addition, as shown in Table 5 below, the price discounts and premiums that CMAI uses in its 2009 CMAI/PGI Report vary from 2006 to 2007. The 2007 discounts are typically larger than the 2006 discounts, and the premiums are typically smaller." | Intille Rebuttal Report, pp. 6, 9, 16 & 18 | "The CMAI PG approach is not consistent with custom and practice for transactions of this sort."<br>"CMAI PG projections understate near-term actual LBI results"<br>"When calibrated using CMAI's own historical analysis, the CMAI PG projection more closely approximates the LBI projection."<br>"The CMAI PG Projections assume that Management would have continued to run loss-making facilities for the forecast period, which is not realistic."<br>"Assumptions made by CMAI PG to calculate cash margins are neither transparent nor reasonable."<br>"Temporary margin squeeze was thoroughly characterized by LBI."<br>"CMAI PG's 2009 projections and assumptions contradict its 2007 views."<br>"It is incorrectly asserted that cyclicality was not considered in developing LBI's Projections." | Young Rebuttal Report, pp.8-25 |

6

**CONFIDENTIAL**

**SCHEDULE 8**

**Explanation of LIFO v. FIFO**

|  |  | FIFO | LIFO |
|---|---|---|---|
| **Balance Sheet** |  |  |  |
| Beginning Inventory (A) | (100 units @ $1) | $ 100 | $ 100 |
| + Purchases | (100 units @ $2) | 200 | 200 |
| - Cost of Goods Sold | (Sell 100 units) | (100) | (200) |
| **Ending Inventory (B)** |  | **$ 200** | **$ 100** |
|  |  |  |  |
| **Income Statement** |  |  |  |
| Sales [1] | 100 units @ $3 | $ 300 | $ 300 |
| Cost of Goods Sold |  | (100) | (200) |
| **Gross Profit** |  | **$ 200** | **$ 100** |
|  |  |  |  |
| **Statement of Cash Flows** |  |  |  |
| Gross Profit |  | $ 200 | $ 100 |
| - Change in Inventory (B - A) |  | (100) | - |
| **Cash Flow** |  | **$ 100** | **$ 100** |

**Notes:**
(1)  Assumes constant selling prices (i.e. no product price increases are assumed to have been implemented).

The table illustrates the impact that inventory accounting has on reported earnings and cash flow. This example assumes that the example company is operating in an environment of increasing feedstock costs.

In an environment of increasing feedstock costs, a company that utilizes the LIFO method of inventory accounting, instead of the FIFO method, will experience the following:

-   **Higher cost of goods sold**, resulting in a lower gross profit, since the recent, more expensive purchases (i.e. the "Last In") are included in the income statement first (i.e. the "First Out"); and

-   **A lower reported investment in ending inventory**, since the first, less expensive purchases remain on the example company's balance sheet.

Excluding the potential tax impact of LIFO accounting, there is no difference in the resulting operational cash flow under the two methods.

Although LIFO produces lower reported operating profit and ending inventory values, **cash flow is the same**, whether the example company uses the FIFO or LIFO method of inventory accounting.

**CONFIDENTIAL**

EIA Oil Volatility Statistical Analysis          SCHEDULE 9

## *Short-Term Energy Outlook*

West Texas Intermediate crude oil price
and NYMEX 95% confidence intervals

January 2007 – December 2008

U.S. Energy Information Administration
*Independent Statistics & Analysis*



Historical WTI price and 95% NYMEX
Confidence Interval, December 2007



CONFIDENTIAL    1

**SCHEDULE 10**

## One Year Call Options at Various Strike Prices
Market Data as of 12/20/2007

| Strike Price | Settle Price | Volume | Open Interest | % of Open Interest |
|---|---|---|---|---|
| $ 200.00 | $ 0.24 | 310 | 5,433 | 2.53% |
| 175.00 | 0.33 | 0 | 1,012 | 0.47% |
| 150.00 | 0.53 | 60 | 1,234 | 0.57% |
| 140.00 | 0.69 | 0 | 40 | 0.02% |
| 135.00 | 0.80 | 0 | 26 | 0.01% |
| 130.00 | 0.95 | 0 | 1,235 | 0.57% |
| 120.00 | 1.41 | 0 | 4,753 | 2.21% |
| 115.00 | 1.76 | 0 | 1,000 | 0.47% |
| 114.00 | 1.84 | 0 | 2 | 0.00% |
| 113.50 | 1.88 | 0 | 2 | 0.00% |
| 110.00 | 2.22 | 0 | 4,164 | 1.94% |
| 107.50 | 2.51 | 0 | 25 | 0.01% |
| 105.00 | 2.85 | 5 | 426 | 0.20% |
| 104.00 | 3.00 | 0 | 3 | 0.00% |
| 103.00 | 3.16 | 0 | 8 | 0.00% |
| 102.50 | 3.25 | 0 | 10 | 0.00% |
| 102.00 | 3.33 | 0 | 3 | 0.00% |
| 101.50 | 3.42 | 0 | 9 | 0.00% |
| 101.00 | 3.51 | 0 | 5 | 0.00% |
| 100.50 | 3.61 | 0 | 1 | 0.00% |
| 100.00 | 3.71 | 700 | 26,256 | 12.22% |
| 99.00 | 3.91 | 0 | 502 | 0.23% |
| 98.50 | 4.02 | 0 | 1 | 0.00% |
| 98.00 | 4.13 | 0 | 207 | 0.10% |
| 97.50 | 4.25 | 0 | 1 | 0.00% |
| 97.00 | 4.36 | 0 | 503 | 0.23% |
| 96.00 | 4.61 | 0 | 4 | 0.00% |
| 95.50 | 4.74 | 0 | 3 | 0.00% |
| 95.00 | 4.87 | 5 | 6,392 | 2.98% |
| 94.50 | 5.03 | 0 | 2 | 0.00% |
| 94.00 | 5.20 | 0 | 407 | 0.19% |
| 93.50 | 5.37 | 0 | 6 | 0.00% |
| 93.00 | 5.55 | 35 | 43 | 0.02% |
| 92.50 | 5.73 | 0 | 5 | 0.00% |
| 92.00 | 5.91 | 0 | 5 | 0.00% |
| 91.50 | 6.10 | 0 | 8 | 0.00% |
| 91.00 | 6.30 | 0 | 3 | 0.00% |
| 90.50 | 6.50 | 0 | 10 | 0.00% |
| 90.00 | 6.70 | 0 | 16,631 | 7.74% |
| 89.50 | 6.91 | 25 | 625 | 0.29% |
| 89.00 | 7.13 | 985 | 1,751 | 0.82% |
| 88.50 | 7.35 | 475 | 1,375 | 0.64% |
| 88.00 | 7.57 | 0 | 2,939 | 1.37% |
| 87.50 | 7.80 | 0 | 1,433 | 0.67% |
| 87.00 | 8.04 | 0 | 2,249 | 1.05% |
| 86.50 | 8.28 | 0 | 477 | 0.22% |
| 86.00 | 8.52 | 0 | 2,165 | 1.01% |
| 85.50 | 8.79 | 0 | 1,642 | 0.76% |
| 85.00 | 9.06 | 0 | 9,475 | 4.41% |
| 84.50 | 9.33 | 0 | 2,940 | 1.37% |
| 84.00 | 9.61 | 0 | 1,425 | 0.66% |
| 83.50 | 9.89 | 0 | 200 | 0.09% |
| 83.00 | 10.18 | 0 | 5 | 0.00% |
| 82.50 | 10.48 | 0 | 2,375 | 1.11% |
| 82.00 | 10.78 | 0 | 142 | 0.07% |
| 81.50 | 11.08 | 0 | 200 | 0.09% |
| 81.00 | 11.38 | 0 | 302 | 0.14% |
| 80.50 | 11.69 | 0 | 0 | 0.00% |
| 80.00 | 12.00 | 0 | 18,664 | 8.69% |
| 79.50 | 12.32 | 0 | 1,375 | 0.64% |
| 79.00 | 12.67 | 0 | 1,543 | 0.72% |
| 78.50 | 13.02 | 0 | 425 | 0.20% |
| 78.00 | 13.37 | 0 | 1,735 | 0.81% |
| 77.50 | 13.73 | 0 | 5 | 0.00% |
| 77.00 | 14.09 | 0 | 650 | 0.30% |
| 76.50 | 14.46 | 0 | 204 | 0.09% |

| Strike Price | Settle Price | Volume | Open Interest | % of Open Interest |
|---|---|---|---|---|
| $ 76.00 | $ 14.83 | 0 | 1,554 | 0.72% |
| 75.50 | 15.20 | 0 | 2,925 | 1.36% |
| 75.00 | 15.58 | 0 | 5,083 | 2.37% |
| 74.50 | 15.96 | 0 | 829 | 0.39% |
| 74.00 | 16.35 | 0 | 1,300 | 0.61% |
| 73.50 | 16.74 | 0 | 1,875 | 0.87% |
| 73.00 | 17.13 | 0 | 2,708 | 1.26% |
| 72.50 | 17.53 | 0 | 3,158 | 1.47% |
| 72.00 | 17.93 | 0 | 5,080 | 2.37% |
| 71.50 | 18.34 | 0 | 3,303 | 1.54% |
| 71.00 | 18.75 | 0 | 4,905 | 2.28% |
| 70.50 | 19.16 | 0 | 2,685 | 1.25% |
| 70.00 | 19.58 | 0 | 10,429 | 4.86% |
| 69.50 | 20.00 | 0 | 2,635 | 1.23% |
| 69.00 | 20.42 | 0 | 3,655 | 1.70% |
| 68.50 | 20.85 | 0 | 1,725 | 0.80% |
| 68.00 | 21.28 | 0 | 4,925 | 2.29% |
| 67.50 | 21.71 | 0 | 2,107 | 0.98% |
| 67.00 | 22.15 | 0 | 2,120 | 0.99% |
| 66.50 | 22.59 | 0 | 1,550 | 0.72% |
| 66.00 | 23.03 | 0 | 2,449 | 1.14% |
| 65.50 | 23.48 | 0 | 1,150 | 0.54% |
| 65.00 | 23.93 | 0 | 2,252 | 1.05% |
| 64.50 | 24.38 | 0 | 100 | 0.05% |
| 64.00 | 24.84 | 0 | 1,900 | 0.88% |
| 63.50 | 25.30 | 0 | 2,325 | 1.08% |
| 63.00 | 25.76 | 0 | 200 | 0.09% |
| 62.50 | 26.23 | 0 | 1,300 | 0.61% |
| 62.00 | 26.70 | 0 | 773 | 0.36% |
| 61.50 | 27.17 | 0 | 150 | 0.07% |
| 61.00 | 27.64 | 0 | 125 | 0.06% |
| 60.50 | 28.12 | 0 | 50 | 0.02% |
| 60.00 | 28.60 | 0 | 1,425 | 0.66% |
| 59.50 | 29.09 | 0 | 850 | 0.40% |
| 59.00 | 29.57 | 0 | 526 | 0.24% |
| 58.50 | 30.06 | 0 | 350 | 0.16% |
| 58.00 | 30.56 | 0 | 560 | 0.26% |
| 57.50 | 31.05 | 0 | 300 | 0.14% |
| 57.00 | 31.55 | 0 | 0 | 0.00% |
| 56.50 | 32.05 | 0 | 275 | 0.13% |
| 56.00 | 32.55 | 0 | 625 | 0.29% |
| 55.00 | 33.55 | 0 | 500 | 0.23% |
| 54.00 | 34.55 | 0 | 0 | 0.00% |
| 52.00 | 36.55 | 1,500 | 1,100 | 0.51% |
| 50.00 | 38.55 | 0 | 250 | 0.12% |
| 49.50 | 39.05 | 2,000 | 1,000 | 0.47% |
| 49.00 | 39.55 | 0 | 0 | 0.00% |
| 48.50 | 40.05 | 2,750 | 1,104 | 0.51% |
| 45.50 | 43.05 | 100 | 100 | 0.05% |
| 43.50 | 45.05 | 100 | 100 | 0.05% |
| 43.00 | 45.55 | 0 | 0 | 0.00% |
| 42.50 | 46.05 | 0 | 0 | 0.00% |
| 42.00 | 46.55 | 2,250 | 750 | 0.35% |
| 41.50 | 47.05 | 0 | 0 | 0.00% |
| 41.00 | 47.55 | 0 | 0 | 0.00% |
| 40.50 | 48.05 | 500 | 300 | 0.14% |
| 40.00 | 48.55 | 0 | 0 | 0.00% |
| 37.50 | 51.05 | 1,700 | 550 | 0.26% |
| 36.50 | 52.05 | 0 | 0 | 0.00% |
| 36.00 | 52.55 | 100 | 100 | 0.05% |
| 34.00 | 54.55 | 0 | 0 | 0.00% |
| 26.00 | 62.55 | 0 | 0 | 0.00% |
| 10.00 | 78.55 | 0 | 0 | 0.00% |
| 5.00 | 83.55 | 0 | 0 | 0.00% |

Source:  CME Datamine.

**CONFIDENTIAL**

**SCHEDULE 11**

**Individuals Involved in the Process which Resulted in the Refreshed Projections**

| Contact Name | Contact's Title/Group | Role/Type of Information Provided | Reference |
|---|---|---|---|
| Kimberly Foley | Director, BDA | 2007 LRP assumptions | LBTR00053962-3 |
| Gregory Helma | Manager, BDA | 2007 LRP assumptions | LBTR00053962-3 |
| Allan Skakun | BDA Sr. Consultant, Ethylene/Propylene | CMAI presentations | LBTR00197158-68 |
| Steven Ebel | BDA Consultant, Raw Material Supply/Principal | Refinery variable margin | LBTR00196993-95 |
| Joseph Tanner | Director, BPAR | 2007 LRP assumptions | LBTR00200102 |
| Clark Boudreaux | BPAR Consultant, Refining | Refinery variable margin | LBTR00196993-95 |
| Koy Schoppe | BPAR Consultant, PO | Margin call for PO&RP | LBTR00197459 |
| Lindley Reubin | BPAR Consultant, EC&D | Margin call for EC&D | LBTR00053962-3 |
| Ron Smith | Director, Refined Product Sales | Relationship between refinery variable margin and crack spread | LBTR00106591-3 |
| David Kinney | Corp Development Consultant (as of 6/21/06) | Relationship between refinery variable margin and crack spread | LBTR00106591-3 |
| Mike Culver | Business Manager of Houston Refinery Products | Refinery variable margin | LBTR00197211-33 |
| Joanne Pruitt | Marketing Manager, Refined Products | Refinery variable margin | LBTR00196993-95 |
| Skip Teel | Business Director, Refining | Refinery variable margin; industry outlook reports | LBTR00106241, LBTR00197653-922 |
| Gregory Grannen | Treasury | Spring Rating Agency Presentation Financial Statements | SUB-RES00000282-8 |
| Jesus Chagoya | Treasury | CF model for 2007 LRP | LBTR00197470 |
| Robert Salvin | Manager of Portfolio Planning | Aggregated information from Business Units, BDA, and BPAR | Salvin Deposition, 2/14/11, pages 408-419 |
| Dan Smith | CEO | Review of Refreshed Projections | Salvin Deposition, 2/2/11, pages 43-45 |
| Kevin DeNicola | CFO | Provided input, reviewed and presented the Refreshed Projections | LBTR00196356-7 |
| Edward Dineen | SVP, Intermediates and Performance Chemicals | Provided input, reviewed and presented the Refreshed Projections | 4/14/11 Interview |
| Norm Phillips | SVP, Fuels and Pipelines | Provided input, reviewed and presented the Refreshed Projections | 3/28/11 Interview |
| Mario Portela | VP, Corporate Development | Review of Refreshed Projections | LBTR00196356-7 |
| Doug Pike | Director of Investor Relations | Review of Refreshed Projections | LBTR00196356-7 |

**CONFIDENTIAL**

# Designation No. 885



## Expert Report of M. Freddie Reiss

In re: Lyondell Chemical Company, et al., Debtors.  Edward S.
Weisfelner as Litigation Trustee of the LB Litigation Trust, Plaintiff

v.

Leonard Blavatnik, et al., Defendants

April 15, 2011

Highly Confidential, For Professional Eyes Only

## Table of Contents

I.      M. Freddie Reiss Qualifications and Scope……………………...…..…………………….  8

II.     Executive Summary……………………………………………………………………………….  10

III.    Description of Basell's Acquisition of Lyondell …………………………………………  12

IV.     Funding of the Toe-Hold Payments……………………………………………………………  19

V.      Reasonably Equivalent Value……………………………………………………………………  24

        A.    Fair Market Value…………………………………………………………………………  25

        B.    The Acquisition was an Arm's Length Transaction…………………………….  41

        C.    Use of Forward Contracts and a Gibraltar Company Does Not

              Suggest Bad Faith ………………………………………………………………………  44

VI.     Access Revolver Draw and Repayment…………………………………………………….  50

VII.    Conclusions……………………………………………………………………………………………  58

Highly Confidential, For Professional Eyes Only

**List of Exhibits**

| | |
|---|---|
| Exhibit 1 | Curriculum Vitae for M. Freddie Reiss |
| Exhibit 2 | List of Materials Relied Upon and Considered |
| Exhibit 3-A | Pre-Acquisition Basell Organizational Structure |
| Exhibit 3-B | Pre-Acquisition Lyondell Organizational Structure |
| Exhibit 3-C | Newly Formed Basell Entities |
| Exhibit 3-D | Post-Acquisition Organizational Structure |
| Exhibit 4-A | Summary of Flow of Funds in Acquisition |
| Exhibit 4-B | List of Guarantors for Senior Credit Facilities |
| Exhibit 4-C | List of Guarantors for Bridge Loan |
| Exhibit 4-D | 2007 Income Statement and Balance Sheet for LyondellBasell Industries Holdings B.V. |
| Exhibit 5-A | Lyondell Pre-Acquisition Trading Volume as a Percent of Shares Outstanding |
| Exhibit 5-B | Analysis of Acquisition Premium |
| Exhibit 5-C | Comparable Transactions from Capital IQ Used for Acquisition Premium |
| Exhibit 5-D | Analysis of Pre-Announcement Lyondell Stock Price and Acquisition Premium |
| Exhibit 5-E | Reverse Triangular Merger: Basell Acquisition of Lyondell |
| Exhibit 5-F | Litigation Trust's Characterization of Lyondell Transaction as Either a Merger or an Acquisition |
| Exhibit 6-A | Chemical and Refining Industry Revolving Credit Facilities |
| Exhibit 6-B | Chemical and Refining Industry Asset Based Facilities |
| Exhibit 6-C | Declaration of Richard Storey Regarding Access Industries Holdings LLC |

Highly Confidential, For Professional Eyes Only

## Key Defined Terms

**Access Borrowers:**  Collectively, LyondellBasell Industries AF S.C.A., Lyondell Chemical Company, and Basell Finance Company, B.V.

**Access:**  Access Industries Holdings LLC

**Access Revolver:**  $750 million revolving facility between Access (as lender) and LyondellBasell Industries AF S.C.A., Lyondell Chemical Company, and Basell Finance Company, B.V. entered into on March 27, 2008

**ABL Facilities:**  Collectively, the Inventory ABL and the Receivable ABL

**Acquisition:**  The acquisition of the shares of Lyondell by Basell and its affiliates, which closed on December 20, 2007

**Acquisition Premium:**  See discussion in Section V

**Acquisition Share Price:**  The price at which Lyondell's shares outstanding were acquired per the terms of the Acquisition ($48 per share)

**AI Chemical:**  AI Chemical Investments LLC

**AI International:**  AI International S.à.r.l.

**Amended Complaint:**  The amended complaint filed by Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust against Leonard Blavatnik and related defendants, dated July 23, 2010

**Arm's Length Transaction:**  As discussed in Section V, per Black's Law Dictionary: "An arm's-length transaction is "[a] transaction between two unrelated and unaffiliated parties" or "[b] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises."

**Bank Revolver:**  Part of the Senior Credit Facilities, this was a $1.0 billion revolving credit facility issued to Lyondell Chemical Company, Basell Holdings B.V., Basell Finance Company B.V. and Basell Germany Holdings GmbH on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-B

**Basell:**  Basell AF S.C.A.

**Basell Finance:**  Basell Finance Company, B.V.

**Basell Funding:**  Basell Funding S.à.r.l.

**Basell Holdings:**  Basell Holdings B.V.

Highly Confidential, For Professional Eyes Only

| | |
|---|---|
| **Basell Germany:** | Basell Germany Holdings GmbH |
| **BIL:** | BIL Acquisition Holdings Limited |
| **Blavatnik:** | Len Blavatnik, Chairman and President of Access |
| **Bridge Loan:** | An $8 billion loan issued to LyondellBasell Finance on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-C |
| **Break-Up Fee:** | A mechanism to provide compensation to a proposed acquirer in the event that its offer is later spurned due to a higher offer made by another party |
| **CIM:** | Confidential Information Memorandum |
| **Citigroup:** | Citigroup Global Markets Inc. |
| **Dutch Tranche A Term Loan:** | Part of the Senior Credit Facilities, this was a $500 million loan issued to Basell Holdings on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-B |
| **DBSI:** | Deutsche Bank Securities Inc. |
| **German Tranche B Term Loan:** | Part of the Senior Credit Facilities, this was a €1.3 billion loan issued to Basell Germany on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-B |
| **Goldman Sachs:** | Goldman Sachs International |
| **Guarantors:** | The entities which guaranteed the Senior Credit Facilities and the Bridge Loan. These entities can be found on Exhibits 4-B and 4-C respectively |
| **HSR:** | The Hart-Scott Rodino Act |
| **Huntsman:** | Huntsman International LLC |
| **Inventory ABL:** | $1.0 Billion, Inventory Credit Facility issued on December 20, 2007 to Basell USA Inc. and Lyondell and its subsidiaries. This facility would later be increased to $1.6 billion on April 30, 2008 |
| **JV:** | Joint Venture |
| **LB Finance:** | LyondellBasell Finance Company |
| **LBI:** | LyondellBasell Industries AF S.C.A. |
| **LBO:** | Leveraged Buyout |
| **Litigation Trust:** | LB Litigation Trust, Edward S. Weisfelner as Litigation Trustee |

Highly Confidential, For Professional Eyes Only

| | |
|---|---|
| **Lyondell:** | Lyondell Chemical Company |
| **MACs:** | Material Adverse Effect Clauses |
| **Merger Agreement:** | Agreement and Plan of Merger, dated July 16, 2007 between Basell AF S.C.A., BIL Acquisition Holdings Limited, and Lyondell Chemical Company |
| **Merrill Lynch:** | Merrill Lynch Capital Corporation |
| **ML Derivatives:** | Merrill Lynch Equity Derivatives |
| **Nell:** | Nell Limited |
| **NYSE:** | New York Stock Exchange |
| **Occidental Petroleum:** | Occidental Petroleum Corporation |
| **Premium-Free Stock Price:** | The stock price of a target at a time when the market is not including any Acquisition Premium in such stock price |
| **Reasonably Equivalent Value:** | See discussion in Section V |
| **Receivable ABL:** | $1.150 Billion, Accounts Receivable Facility issued on December 20, 2007 to LyondellBasell Receivables I, LLC and Lyondell Chemical Company |
| **Senior Credit Facilities:** | The combination of Citigroup, Goldman Sachs and Merrill Lynch's 1st lien term loans and revolving credit facility, which provided approximately $7.8 billion of required funding.  These facilities are defined elsewhere as Dutch Tranche A Term Loan, U.S. Tranche A Term Loan, German Tranche B Term Loan, and U.S. Tranche B Term Loan |
| **Smith:** | Dan F. Smith, Chief Executive Officer of Lyondell prior to the Acquisition |
| **Smith Declaration:** | Declaration of Dan F. Smith, dated as of December 10, 2009 |
| **Solomon Report:** | The expert report prepared by Peter J. Solomon Company, L.P., dated November 7, 2009 |
| **Second Solomon Report:** | The expert report prepared by Peter J. Solomon Company, L.P., dated February 28, 2011 |
| **Toe-Hold Payment I:** | Basell Funding's purchase of Nell's 100% interest in AI Chemical for $523,822,505, pursuant to a Stock Purchase Agreement between Nell and Basell Funding |

Highly Confidential, For Professional Eyes Only

**Toe-Hold Payment II:**     $674,328,055 transfer from LB Finance's escrow account at Citibank to Merrill Lynch's account at Chase Manhattan Bank

**Toe-Hold Payments:**     Toe-Hold Payment I and Toe-Hold Payment II

**Toe-Hold Position:**     The position established by AI Chemical through a postpaid share forward contract agreement with Merrill Lynch International, in which AI Chemical would have the ability to acquire 20,990,070 shares of Lyondell's common stock, representing approximately, 8.3% of Lyondell's total outstanding shares, or to receive or pay the change in the value of the underlying shares, or to receive or deliver shares with a value equal to such a change in value of the underlying shares, in May 2008 or at an earlier date elected by AI Chemical. This position was subsequently supplemented by an additional purchase of shares described in the Amended 13D filed on August 21, 2007

**UBS:**     UBS Investment Research

**U.S. Tranche A Term Loan:**     Part of the Senior Credit Facilities, this was a $1.5 billion loan issued to Lyondell on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-B

**U.S. Tranche B Term Loan:**     Part of the Senior Credit Facilities, this was a $7.6 billion loan issued to Lyondell on December 20, 2007. A list of guarantors for this loan can be found on Exhibit 4-B

Highly Confidential, For Professional Eyes Only

I.        **M. Freddie Reiss Qualifications and Scope**

*Qualifications of M. Freddie Reiss*

1.        I am a Senior Managing Director in the Corporate Finance Practice of FTI Consulting, Inc. ("FTI").

I have been a Senior Managing Director with FTI since August 30, 2002 and prior to that a Partner for

over fourteen years with PricewaterhouseCoopers' Business Recovery Services Practice ("BRS").  As of

August 30, 2002, PricewaterhouseCoopers entered into a definitive agreement to sell its BRS practice to

FTI.  I was a Member of the Financial Advisory Services Executive Committee at PricewaterhouseCoopers

and I am currently on the Management Group for FTI's Corporate Finance/Restructuring Practice.  I

received my bachelor's degree in business administration from the City College of New York in 1967, and

my M.B.A. from Baruch College of the City University of New York in 2000.  I am a Certified Public

Accountant ("CPA") licensed in the states of California and New York, hold a certificate as a Certified

Insolvency and Reorganization Advisor, and a certificate as a Certified Turnaround Professional.  My

curriculum vitae is attached as Exhibit 1.

2.        During my career, I have served in numerous capacities as a financial advisor and solvency

expert both in bankruptcy related and forensic accounting matters in formal proceedings and in out of

court workouts.  I have also advised boards of directors with regard to future financial policy, and have

provided independent expert opinions based on reviewing financial information about a company, its

business plans and financial projections.

3.        I have been involved with more than 100 bankruptcy or bankruptcy related matters in the

varying capacities described above.  In that time, I have advised boards of directors, general

management teams, debtors and trustees, as well as creditors and their committees in almost equal

numbers.  I have also represented equity investors in their due diligence for potential debt or equity

investments.  Some of the cases in which I have been involved include: Carter Hawley Hale; Circle K.;

Daewoo Motor Corporation; First Executive Corporation; Leasing Solutions, Inc.; Maxicare Health Plans;

America West Airlines; American Continental/Lincoln Savings & Loan; Baldwin Builders; Thaxton Group

Inc.; Greyhound Bus Lines; New Generation Software; Orange County Investors' Pool; Pacific Gas &

Electric; Thrifty Oil; Tucson Electric and Power; Edwards' Theatres, Inc.; and WestStar Theatres.  I have

also advised numerous other companies in private workouts.  Those companies whose financial affairs I

helped to restructure out of court and that would permit disclosure of their identity include:  Affiliated

Medical Enterprises; Musicland; EuroDisney; Intermark; Playa Vista; Lusk Company; Mrs. Fields;

Thermadyne; and Western Dental.

Highly Confidential, For Professional Eyes Only

4.      I am affiliated with numerous accounting and financial restructuring related associations and groups both as a member and in leadership positions.  I am a member of the American Institute of CPA's; the California Society of CPA's; the Los Angeles Bankruptcy Forum; and I am a Fellow inducted in to the American College of Bankruptcy.  I previously served a six-year term as a Board Member of the American Bankruptcy Institute and a member of its Strategic Planning Committee.  In addition, I have served as a Board Member for the Association of Insolvency & Restructuring Advisors ("AIRA"), and the Turnaround Management Association ("TMA"), Los Angeles Bankruptcy Forum, as well as a past president and board member of the Los Angeles Venture Association.

5.      I have published several times on financial restructuring and bankruptcy related issues.  For example, I authored Chapter 14 – "Asian Markets" – of Workouts & Turnarounds II – Global Restructuring Strategies for the Next Century in April, 1999.  I also co-authored Chapter 1 – "Identifying a Troubled Company" – of The Handbook of Restructuring and Investing in Distressed Companies in January, 1991, and Chapter 34 – "Forensic Accounting and Litigation Consulting Services" – of the Accountant's Handbook in November, 1990.  I also co-authored an article for the California Bankruptcy Journal in June, 1993, entitled "SOP 90-7."  I also co-authored the AICPA Bankruptcy Guide.  I have appeared on panels at conferences sponsored by the TMA, American Bankruptcy Institute, Association of Insolvency and Restructuring Advisors, the National Conference of Bankruptcy Judges, Valcon, and other industry groups.

6.      I consider myself an expert in, among other areas, the fields of corporate finance; restructuring; valuation; taxation and tax planning in connection with insolvent and troubled companies; the practice of analyzing and synthesizing complex business transactions; accounting; corporate acquisitions and mergers; corporate governance; the use of revolving credit agreements in liquidity management; and damage analysis and assessment.  In the course of my work, and throughout my career, I have been and am often called upon to review and analyze business plans, restructuring plans, and transactions (actual and anticipated), including with respect to accounting, tax, valuation, and economic profitability issues. This work often entails review and analysis of complicated business structures and transaction documentation, determination of value with respect to assets and business enterprises and purchase price, and I am routinely called upon to describe the structures and transactions, and at times their likelihood of success, to my clients as well as to courts of law. I also have negotiated corporate acquisitions and other transactions as a financial consulting practitioner, reviewed corporate transactions and corporate financial disclosures either as a CPA or as a consultant and as a Senior Managing Director of FTI, and addressed conflict-of-interest situations in both public and private

Highly Confidential, For Professional Eyes Only

companies. I have served as an expert witness in all of these areas, and have testified for both plaintiffs and defendants, debtors, creditors and creditors' committees. Specifically, I have been qualified as an expert in a number of bankruptcy cases. Additional information regarding my qualifications and prior testimonial experience is included in Exhibit 1 of this Report.

*Assignment*

7.      I have been retained as an expert in this case by Quinn Emanuel Urquhart & Sullivan, LLP ("Counsel"), counsel to Access and related defendants. I have been asked to render opinions related to the following issues:

- What were the sources of funding of the payments made to Nell and ML Derivatives which the Amended Complaint refers to as the "Toe-Hold Payments," and were these payments funded by borrowings against Lyondell's assets?

- When it acquired Lyondell's stock,[1] did Basell Funding and its affiliates receive Reasonably Equivalent Value for the $48 per share price paid?

- Did Basell and its affiliates' acquisition of the shares of Lyondell in the Acquisition constitute an LBO for the purposes of considering an exchange of value?

- Was the Acquisition an Arm's Length Transaction?

- Did Access' affiliates' use of a forward contract for the Toe-Hold Position or of a Gibraltar based company to receive the Toe-Hold Payments suggest bad faith?

- Were the draw and repayments on the Access Revolver in October 2008 done in the ordinary course of business or financial affairs?

## II.    **Executive Summary**

8.      Below is a summary of my conclusions, which will be detailed in this report:

- Toe-Hold Payment I was funded by the Dutch Tranche A Term Loan to non-debtor Basell Holdings[2] and the German Tranche B Term Loan to Basell Germany, while Toe-Hold Payment II was funded by LB Finance out of the proceeds of a draw by LB Finance on the Bridge Loan.

- Both Toe-Hold Payment I and Toe-Hold Payment II were funded through borrowings in which the borrower was not Lyondell. Rather in the case of Toe-Hold Payment I it was Basell entities

---

[1] In the case of the Toe-Hold Position, the stock was acquired indirectly as Basell Funding acquired 100% of the equity of AI Chemical, the value of which was equal to the Lyondell shares it owned or had the right to acquire.
[2] The funds borrowed by Basell Holdings were transferred to Basell Funding to purchase the Toe-Hold Position.

Highly Confidential, For Professional Eyes Only

borrowing based on their own borrowing capacities and in the case of Toe-Hold Payment II, it was an entity whose borrowing was collateralized by the equity value in Lyondell.

- Considering the totality of the circumstances, Basell received Reasonably Equivalent Value for the $48 per share paid as part of the Acquisition.

- An appropriate Premium-Free Stock Price for Lyondell shortly before the announcement of the Acquisition would have been approximately $37 per share based on both an analysis of Lyondell's stock price fluctuations and contemporaneous stock market analyst reports.

- Applying a reasonable Acquisition Premium based on similar transactions to the Premium-Free Stock Price for Lyondell clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.

- Applying a range of Acquisition Premiums to Lyondell's stock price metrics in May, June, and early July 2007[3] (prior to the signing of the execution of the Merger Agreement) clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.  Contemporaneous analyst reports and other indicators support this conclusion.

- The transaction that closed on December 20, 2007, which resulted in the acquisition and cancellation of all outstanding shares in Lyondell by Basell, was a strategic acquisition of one operating company by another, not an LBO.

- The Acquisition was an Arm's Length Transaction.

- The use of a forward contract for the Toe-Hold Position and the use of a Gibraltar based Company to receive the Toe-Hold Payments were normal business decisions driven by regulatory and tax considerations.

- It was in the ordinary course of business or financial affairs of Lyondell and Access for Lyondell to incur $300 million in indebtedness under the October 15, 2008 borrowing on the revolving credit facility it had with Access ("Access Revolver").  Moreover, the October borrowing was consistent with Access' practice of advancing funds to its affiliates for working capital purposes on an as needed basis.

- It was in the ordinary course of business or financial affairs of Lyondell and Access for Lyondell to repay the October borrowing,

- The borrowing and repayment were consistent with ordinary industry practices and were made according to ordinary business terms.

---

[3] After July 2007, Lyondell's stock price would have reflected the Merger Agreement.

Highly Confidential, For Professional Eyes Only

### III.    Description of Basell's Acquisition of Lyondell

*Background - Basell*

9.    Before its Acquisition of Lyondell, Basell, headquartered in the Netherlands, was the world's largest manufacturer and marketer of polypropylene. Basell's operations were divided into three major operating segments: (i) Polyolefins; (ii) Advanced Polyolefins; and (iii) Technology.[4]

10.    Polyolefins, Basell's largest operating segment, included the manufacture and marketing of polypropylene and polyethylene and related marketing and selling activities. Basell's Advanced Polyolefins segment manufactured and sold specially engineered polyolefins and compounds with a wide range of performance characteristics. Basell's Technology segment developed and licensed process technology.[5]

11.    Prior to the Acquisition, Basell's operating assets were wholly owned by Basell Holdings, which was wholly owned by Nell, which was owned by Access and AI International. Exhibit 3-A illustrates Basell's pre-Acquisition organizational structure.

12.    In 2006, the year prior to the Acquisition, Basell's annual revenue was approximately $13.8 billion and Basell held approximately $11.3 billion of assets on its balance sheet.[6]

*Background - Lyondell*

13.    Lyondell was a global petrochemical company, headquartered in Houston, Texas. Lyondell's operations were divided into three major operating segments: (i) Ethylene, Co-Products, and Derivatives; (ii) Propylene Oxide and Related Products; and (iii) Refining.[7]

14.    Through its Ethylene, Co-Product and Derivatives operating segment, Lyondell was the leading North American producer of ethylene, propylene, polyethylene, ethylene glycol and acetyls. Lyondell's other segments produced fuel products, gasoline, heavy sulfur and ultra low sulfur diesel, jet fuel, lubricants, and aromatics.[8]

15.    Exhibit 3-B illustrates Lyondell's pre-Acquisition organizational structure.

---

[4] Senior Managing Agent Confidential Information Memorandum; October 2007 (the "Senior Agent Memo"), (ML-2004-0090459-545) at ML-2004-090504-505.
[5] Id.
[6] Basell Annual Report for the year ended 12/31/2006 at 26; Basell AF S.C.A, Consolidated Interim Financial Statements - Third quarter and nine-months 2007 results at 6.
[7] Lyondell Chemical Company Form 10-Q for the quarter ended September 30, 2007 at 5, 22
[8] Senior Agent Memo at ML-2004-090504-505.

Highly Confidential, For Professional Eyes Only

16.     Prior to the Acquisition, Lyondell was publicly traded on the NYSE, and generated approximately $22.2 billion in revenue in 2006, and reflected approximately $16.5 billion of assets on its balance sheet.[9]

*Basell's Early Interest in Lyondell*

17.     Although Basell's acquisition of Lyondell closed on December 20, 2007, Basell's interest in acquiring Lyondell started at least as early as 2006.

18.     On April 10, 2006, Dan Smith (President and CEO of Lyondell) met with Blavatnik (Chairman of Access) and Philip Kassin (Senior Vice President and Head of M&A and financing of Access), in an introductory meeting that was requested by Blavatnik.  A little more than a week after the introductory meeting, Kassin contacted Smith and Kevin DeNicola (CFO of Lyondell), where Kassin informally indicated that Access (through Basell), was interested in potentially acquiring Lyondell, and later in the month reaffirmed their interest at a potential purchase price of $24 to $27 per share.[10]

19.     At the May 4, 2006 regularly scheduled Lyondell board meeting, Smith conveyed Access' and Basell's interest in acquiring Lyondell to Lyondell's board.  However, the Lyondell board deemed Kassin's $24 to $27 price range to be insufficient, and Smith later relayed this position to Blavatnik.[11]

20.     On August 10, 2006, Access and Basell sent Smith an indication of interest letter, which proposed a potential purchase price for all of Lyondell's outstanding shares for $26.50 to $28.50 per share.  Afterwards, on August 14, 2006, a special meeting of Lyondell's board was held to discuss the indication of interest.  Lyondell's board determined that it was not in the best interest of Lyondell's shareholders and declined to pursue the proposal any further.[12]  Afterwards, on August 17, 2006, Smith delivered a letter to Blavatnik and Trautz, informing them of the board's position.[13]

21.     No additional indications of interest would be made known to Lyondell until the following year, however Basell and its financial advisor, Merrill Lynch, continued to analyze a potential acquisition in the intervening months.

---

[9] Lyondell Chemical Company Annual Report for the year ended 12/31/2007 at 86, Lyondell Chemical Company Form 10-Q for the quarter ended September 30, 2007 at 2.

[10] Schedule 14A: Lyondell Chemical Company Proxy Statement, dated October 12, 2007 (the "Proxy Statement"), (ACC00107291-429)  at ACC00107312.

[11] Id.

[12] Id. at ACC00107313.

[13] Id.

Highly Confidential, For Professional Eyes Only

*Basell's Acquisition of Lyondell*

22.      On May 4, 2007, AI Chemical entered into a postpaid share forward agreement with Merrill Lynch International, whereby AI Chemical would have the ability to acquire 20,990,070 shares of Lyondell's common stock ("Toe-Hold Position"), representing approximately 8.3% of Lyondell's total outstanding shares, at $32.11 per share, or to receive or pay the change in the value of the underlying shares, or to receive or deliver shares with a value equal to such change in value of the underlying shares, in May 2008 or at an earlier date elected by AI Chemical.[14]  On May 11, 2007, AI Chemical and Blavatnik filed a Schedule 13D with the SEC which disclosed the forward contract with Merrill Lynch.[15] On the same day, Blavatnik called Smith to let him know that he would have preferred to give Smith advance notice of the filings as a courtesy, but was unable to do so because Smith had been traveling.[16]

23.      On July 9, 2007, Blavatnik met with Smith and indicated that Basell might be interested in purchasing all of Lyondell's outstanding shares, initially suggesting a price of $40.00 per share.  After discussing the matter with Smith, Blavatnik increased the offer to $44.00 - $45.00 per share.  Smith then informed Blavatnik that he should make his best offer because Smith did not believe that the Lyondell board would accept a $44.00 - $45.00 offer.  Blavatnik then increased the potential offer to $48, under the condition that Lyondell would have to sign an agreement by July 16, 2007.  Smith then indicated he would convey the offer to Lyondell's board of directors, who on July 11, 2007, gave Smith permission to continue discussions with Blavatnik.[17]

24.      On July 12, 2007, a confidentiality agreement was signed between Basell and Lyondell, and Lyondell began to provide materials to Basell and Access based upon their due diligence requests.[18] Between July 12, 2007 and July 15, 2007, meetings between representatives from Basell, Access and Lyondell took place, as Basell and Access continued their due diligence.[19]

25.      On July 16, 2007, Citigroup, Goldman Sachs, and Merrill Lynch provided Basell with a debt "Commitment Letter," which indicated that the banks would act as joint lead arrangers in providing the capital commitments necessary to fund the Acquisition.[20]

---

[14] Id. at ACC00107315.
[15] Schedule 13D: AI Chemical Investments LLC, dated May 11, 2007 (ACC00107573-96).
[16] Proxy Statement at ACC00107315.
[17] Id. at ACC00107317.
[18] Id.
[19] Id.
[20] Project Hugo Commitment Letter from Citigroup, Goldman Sachs and Merrill Lynch to Alan Bigman, Basell AF (ACC00107430-476).

Highly Confidential, For Professional Eyes Only

26.    On July 16, 2007, a special meeting of the Lyondell board of directors was held to review and consider the proposed transaction.  At the meeting, DBSI gave a presentation to the board of directors of Lyondell which provided their opinion that the acquisition price that would be paid to Lyondell shareholders was fair.  After discussion and consideration of the proposed Acquisition, Lyondell's board of directors voted unanimously in favor of the transaction. [21]

27.    On July 16, 2007, Basell, BIL and Lyondell entered into a definitive agreement and plan of merger, pursuant to which Basell would acquire and cancel all of Lyondell's outstanding common shares for $48 per share, and BIL would be merged with and into Lyondell.  Each share of BIL would be converted into one share of Lyondell, leaving only the BIL shares that were converted into Lyondell shares, which would be entirely held by Basell.[22]

28.    After the Merger Agreement was signed by all parties on July 16, 2007, the Merger Agreement effectively required each party to take the steps necessary to consummate the Acquisition.  Assuming that Lyondell fulfilled all of its obligations under the Merger Agreement and sought to consummate the Acquisition, Basell and BIL had a severely limited ability to terminate the Agreement.  Although there were material adverse effect clauses (or "MACs") written into the Merger Agreement that could potentially allow for Basell and BIL to walk away from the transaction without penalty, eleven (11) broad-based exceptions to the MACs (i.e., provisions preventing the exercise of a MAC) were written into the Merger Agreement:

- *(a) any occurrence, condition, change, event or effect resulting from or relating to general economic or financial market conditions, including fluctuations in currency exchange rates,*

- *(b) any occurrence, condition, change, event or effect that affects the chemical industry or refining industry generally (including changes in commodity prices, general market prices and regulatory changes affecting the chemical industry or refining industry generally),*

- *(c) the outbreak or escalation of hostilities involving the United States, the declaration by the United States of a national emergency or war or the occurrence of any natural disasters and acts of terrorism (but not any such event resulting in any damage or destruction to or loss of the Company's [Lyondell's] or its Subsidiaries' physical properties to the extent such change or effect would otherwise constitute a Company Material Adverse Effect),*

---

[21] Proxy Statement at ACC00107318.
[22] Agreement and Plan of Merger, dated as of July 16, 2007 (the "Merger Agreement"), (ACC00107011-80)  at ACC00107020.

Highly Confidential, For Professional Eyes Only

- *(d) any changes resulting from the consummation of the Transactions contemplated by, or the announcement of the execution of this Agreement,*

- *(e) change in GAAP, or in the interpretation thereof, as imposed upon the Company [Lyondell], its Subsidiaries or their respective businesses,*

- *(f) any change in law or regulation, or in the interpretation thereof,*

- *(g) the downgrade in rating of any debt securities of the Company [Lyondell] or any of its Subsidiaries by Standard & Poor's Rating Group, Moody's Investor Services, Inc. or Fitch Ratings,*

- *(h) changes in the price or trading volume of the Company's [Lyondell's] stock,*

- *(i) any legal proceedings made or brought by any of the current or former stockholders of the Company [Lyondell] (on their own behalf or on behalf of the Company [Lyondell]) arising out of or related to this Agreement or any of the Transactions,*

- *(j) any failure by the Company [Lyondell] to meet projections of revenues or earnings for a period ending after the date of this Agreement or*

- *(k) any occurrence, condition change, event or effect resulting from compliance by the Company [Lyondell] and its Subsidiaries with the terms of this Agreement and each other agreement to be executed and delivered in connection herewith and therewith (collectively, the "Transaction Agreements");*

- *except with respect to (a) – (c) and (f), in the event, and only to the extent, that such occurrence, condition, change, event or effect has had a disproportionate effect on the Company and its Subsidiaries, taken as a whole, as compared to other Persons engaged in the chemical industry or refining industry in the same geographic regions and segments as the Company and its Subsidiaries and except with respect to (g), (h) and (j), provided that nothing in any such clauses shall prevent a determination that any underlying causes of such changes resulted in a Company Material Adverse Effect.[23]*

29.     These eleven broad-based exceptions significantly narrowed the scenarios whereby Basell and BIL could terminate the Merger Agreement, and therefore increased the likelihood that once the Merger Agreement was executed, Basell and BIL would be bound to fulfill the terms of the contract.

30.     Furthermore, the Merger Agreement did not contain what is typically referred to as a "Financing Out" provision.  A Financing Out Provision would permit the acquirer to walk away from an acquisition, in the event that the financing for the acquisition fell through.  Under the terms of the Merger

---

[23] Id. at ACC00107027.

Highly Confidential, For Professional Eyes Only

Agreement, if the contemplated financing became unavailable, Basell was obligated to continue to use its reasonable best efforts to arrange alternative financing.[24] The absence of a Financing Out provision was also noted by DBSI in its analysis as to the fairness of the terms of the Acquisition.[25] The exclusion of a Financing Out provision, together with the broad exceptions to the MACs in the Merger Agreement, meant that the Merger Agreement effectively unconditionally obligated Basell to purchase the shares of Lyondell provided that Lyondell fulfilled its commitments in the Merger Agreement.

31.     On August 21, 2007, AI Chemical and Blavatnik filed an amendment to their May 11, 2007 Schedule 13D, which disclosed that AI Chemical had acquired an additional 3,971,400 shares of Lyondell common stock through open market transactions at an average acquisition price of $44.21 per share.  In addition, the amended Schedule 13D stated that AI Chemical had given irrevocable notice to Merrill Lynch that it would physically settle the postpaid share forward agreement with them.[26] This additional share acquisition increased AI Chemical's Toe-Hold Position to 24,961,470 shares (or approximately 9.85% of Lyondell's total outstanding common shares).[27]

32.     On October 12, 2007, Lyondell filed a Schedule 14A proxy statement, which included a detailed description of the Acquisition (and a copy of the Merger Agreement), an acquisition price fairness opinion letter from DBSI and a recommendation from Lyondell's board of directors that Lyondell's shareholders vote in favor of the approval and adoption of the Merger Agreement.[28]

33.     On November 20, 2007, a special meeting was held for Lyondell's shareholders to vote on the Acquisition, in which the majority vote of shareholders needed to approve the Merger Agreement was obtained.[29]

34.     On December 20, 2007, the Acquisition closed.[30]

_Mechanics of Transaction – Merging of BIL and Lyondell_

35.     Prior to closing the Acquisition, Basell created the following new entities: LB Finance, LBI Acquisition, LBIH LLC and BIL, which were directly or indirectly held entirely by Basell Funding as illustrated in Exhibit 3-C.[31]

---

[24] Id. at ACC00107066.
[25] Presentation to the Board of Directors, dated July 16, 2007 (LYO-UCC00120874-921) at LYO-UCC00120880.
[26] Proxy Statement at ACC00107319.
[27] Schedule 13D/A:  AI Chemical Investments LLC dated August 21, 2007 (ACC00107601-4).
[28] Proxy Statement at ACC00107292.
[29] Letter from Lyondell Chemical Company to NYSE Group, Inc. dated December 14, 2007 (ACC00107618-619) at ACC00107618.
[30] LyondellBasell AF S.C.A., Management Report for the year ended December 31, 2007 at 10.

Highly Confidential, For Professional Eyes Only

36.    Pursuant to the Merger Agreement, BIL (one of the newly created entities) was merged into and with Lyondell.  BIL then ceased to exist and Lyondell continued as the surviving corporation,[32] where each share of BIL was converted into one share of Lyondell and all outstanding Lyondell shares prior to the merger received $48 in cash and were cancelled, leaving only the BIL shares that were converted into Lyondell shares.  Ownership of these converted BIL shares (and thus Lyondell) would then flow up to Basell through the newly created entities.

37.    A chart summarizing the post-merger entities is presented in Exhibit 3-D.

_Mechanics of Transaction – Financing_

38.    The primary cost of the Acquisition was the cost to acquire all of the outstanding shares of Lyondell, which was approximately $12.5 billion.  Of this amount, approximately $1.2 billion was related to the purchase of the pre-Acquisition Toe-Hold Position owned by AI Chemical.[33]

39.    The second largest use of proceeds was to retire both Lyondell and Basell existing debt, approximately $7.2 billion and $447 million, respectively, which totaled approximately $7.6 billion.[34]

40.    The remainder of the cost of the Acquisition related to various fees, expenses, and closing costs associated with the transaction (approximately $233 million).[35]

41.    In summary, the total funding of the Acquisition was approximately $20.3 billion (net of lender underwriting fees), of which approximately $12.5 billion was for existing equity, net of debt repayments, closing costs, and professional fees totaling $7.8 billion.

42.    In order to fund the Acquisition, a group of lenders led by Citigroup, Goldman Sachs, and Merrill Lynch, and ultimately joined by ABN Amro Incorporated and UBS Securities LLC,[36] agreed to provide a combination of 1st lien term loans and a revolving credit facility (collectively referred to as the "Senior Credit Facilities").  The Senior Credit Facilities provided approximately $11.3 billion of the required funds at closing.[37]

43.    In addition to the Senior Credit Facilities, approximately $7.8 billion of the required financing was sourced from an $8 billion 2nd lien bridge facility ("Bridge Loan").[38]

---

[31] PricewaterhouseCoopers LLC, Project Hugo: Final Draft at Closing, dated December 19, 2007 ("PwC Hugo Final Draft"), (LYO-UCC – 00264550) at LYO-UCC 00264552.
[32] Merger Agreement at (ACC00107019).
[33] Funds Flow Memorandum at ACC00107510.
[34] Id.
[35] Id.
[36] See Senior Credit Facility and Bridge Loan
[37] Funds Flow Memorandum at ACC00107510.
[38] Id.

Highly Confidential, For Professional Eyes Only

44.      Lastly, an additional $160 million would be drawn at closing from a $1.0 billion inventory credit

facility ("Inventory ABL") and another $1.0 billion would come at closing from a $1.150 billion accounts

receivable facility ("Receivable ABL") (collectively, the "ABL Facilities").[39]

45.      A summary of the sources and uses of cash for the Acquisition is presented in the table below,

while an illustrative chart tracing the sources and uses of cash between entities is shown in Exhibit 4-A.[40]

| Sources and Uses of Acquisition Financing | |
|---|---|
| **Sources (net of underwriting and other fees)** | **Amount** |
| Term Loan A | $     1,970,000,000 |
| Term Loan B | 9,186,196,500 |
| Bridge Loan | 7,839,945,000 |
| Asset Based Loan Facility - Receivable | 1,042,600,000 |
| Asset Based Loan Facility - Inventory | 159,850,000 |
| Secured Revolving Credit Facility | 114,800,000 |
| **Total Sources** | **$   20,313,391,500** |
| | |
| **Uses** | **Amount** |
| Payment to Lyondell Shareholders | $  (11,256,717,120) |
| Payment to Nell Ltd (Toe-Hold) | (523,803,305) |
| Payment to ML Derivatives (Toe-Hold) | (674,328,055) |
| Repayment of Lyondell Debt | (7,178,017,071) |
| Repayment of Basell Debt | (447,127,226) |
| Payment of Closing Costs and Professional Fees | (219,214,201) |
| Unidentified Uses of Financing | (14,184,522) |
| **Total Uses** | **$  (20,313,391,500)** |
| | |
| USD/EUR Exchange Rate (midpoint) on 12/20/07 | 1.4398 |
| | |
| Source: Closing Funds Flow Memorandum - Final Version (ACC00107510-26) | |

### IV.      Funding of the Toe-Hold Payments

46.      I have researched the sources of the funds which went to make the Toe-Hold Payments

discussed in the Amended Complaint.  The two Toe-Hold Payments, Toe-Hold Payment I and Toe-Hold

Payment II, were made on December 20, 2007 to Nell and Merrill Lynch Equity Derivatives, respectively.

---

[39] Id.

[40] The referenced table and chart only depict sources and uses of cash associated with the Acquisition.  In addition
to cash, Access contributed Basell to the transaction, which, as shown in Section 5 of this Report and based on the
calculations of the Peter J. Solomon Company, L.P, had an estimated equity value of approximately $4.0 - $5.6
billion.

Highly Confidential, For Professional Eyes Only

47.    A full diagram of the transfers occurring on December 20, 2007 can be found on Exhibit 4-A. A summary of the loan draws occurring on that date is below:

| Transfers Occurring on December 20, 2007 | | | |
|---|---|---|---|
| Name of Facility | Borrower | Amount (1) | Guarantors |
| Bridge Loan | LyondellBasell Finance Company | $ 7,839.9 | 51 entities - see Exhibit 4-C |
| Dutch Tranche A Term Loan | Basell Holdings B.V. | $ 492.5 | 51 entities - see Exhibit 4-B |
| U.S. Tranche A Term Loan | BIL Acquisition Holdings Ltd | $ 1,477.5 | 51 entities - see Exhibit 4-B |
| German Tranche B Term Loan | Basell Germany Holdings GmbH | € 1,267.5 | 51 entities - see Exhibit 4-B |
| U.S. Tranche B Term Loan | BIL Acquisition Holdings Ltd | $ 7,361.3 | 51 entities - see Exhibit 4-B |
| Secured Revolver | BIL Acquisition Holdings Ltd | $ 114.8 | 51 entities - see Exhibit 4-B |
| Inventory ABL | BIL Acquisition Holdings Ltd | $ 159.9 | 51 entities - see Exhibit 4-B |
| Accounts Receivable ABL | LyondellBasell Receivables I, LLC | $ 1,042.6 | 51 entities - see Exhibit 4-B |

Notes:
(1) Amounts in millions. Net of underwriting, commitment, take-down, and administrative fees.
Source: Closing Funds Flow Memorandum - Final Version (ACC00107510-26)

Sources: Loan agreements and Flow of Funds Memorandum

Toe-Hold Payment I

48.    Nell received a transfer of $523.8 million on December 20, 2007 in what is referred to as Toe-Hold Payment I.  This payment was made from Basell Funding.  The sources of these funds were $23.8 million received from Basell Finance and $500.0 million from non-debtor Basell Holdings.

49.    The source of funds for the transfer from Basell Finance to Basell Funding was a €1,267.5 million transfer from Basell Germany, which came from a draw on the German Tranche B Term Loan in the same amount (net of underwriting fees).

50.    The source of funds for the transfer from Basell Holdings to Basell Funding was a $492.5 million draw on the Dutch Tranche A Term Loan and a $7.5 million transfer from Basell Finance.

51.    The only two original sources of cash for the $523.8 million Toe-Hold Payment I were the Dutch Tranche A Term Loan to Basell Holdings and the German Tranche B Term Loan to Basell Germany.

52.    Basell Holdings was a Netherlands based company which held substantially all of the operating assets of Basell.  Basell Germany was a German subsidiary of Basell Holdings which held certain of Basell's operating assets.[41]

53.    Attached as Exhibit 4-D is an excerpt from the financial statements of Basell Holdings as of December 31, 2007.  The balance sheet included therein indicates that there was $2.6 billion in positive

---

[41] See Deposition of C. Kent Potter, October 20, 2010 (LYO-UCC 00000409) at 128-129.

Highly Confidential, For Professional Eyes Only

equity as of December 31, 2007 (converted to USD from €1.8 billion using the exchange rate as of December 31, 2007).  The liabilities reflected on this balance sheet include the obligation for the Dutch Tranche A Term Loan, for which Basell Holdings was the borrower, but not obligations for which Basell Holdings was only a guarantor.

54.    The analysis included in the expert report prepared by Peter J. Solomon Company, L.P. (the "Solomon Report") dated November 7, 2009, also indicates that Basell Holdings had significant equity value at the time of the Acquisition.[42]  Below is an equity value calculation for Basell as of December 20, 2007 (immediately prior to the Acquisition) using the amounts from the Solomon Report.  Basell Holdings held most of the operating assets of Basell.  The Solomon Report indicated values for Basell based on the comparable transactions and comparable publicly traded companies' analyses.  Weighting the comparable transactions and comparable publicly traded companies analyses from the Solomon Report equally results in an enterprise value of Basell of $7.5 to $9.0 billion, prior to the inclusion of the value of JV interests.  The Solomon Report valued the JV interests held by Basell at approximately $1.3 billion.  After adding the value of the JV interests (per the Solomon Report) and subtracting the value of Basell debt as of 9/30/07,[43] Basell's equity value is estimated as $4.0 - $5.6 billion, with a mid-point of $4.8 billion.  For purposes of this analysis, I have not deducted any cash on hand from the debt amount, though excess cash should reduce the net debt for the purpose of valuing Basell Holding's equity value. I also noted that the debt amount that I used may be slightly overstated (thereby understating equity value), as the $4.7 billion estimate for Basell's debt includes a €361 million balance for the Multi-Currency Revolver as of September 30, 2007, while the Amended Complaint notes that the Multi-Currency Revolver balance as of the Acquisition date was down to €311 million.[44]  This result appears to be conservative relative to investment banking analyses done in July 2007.  For instance, in July 2007, Citigroup issued a presentation to Basell which valued Basell's equity at €6.0 – €7.2 billion (over $8 billion).[45]

---

[42] The analysis performed by Peter J. Solomon Company, L.P. are referenced here to provide perspective on what the valuation would be according to their assumptions and would be relevant in the event that the Court accepts their analysis.  While this confirms my view that Basell had billions of dollars of equity in December 2007, my reference to this analysis should not be interpreted as accepting the Solomon Report, its conclusions, or its analyses.

[43] See Exhibit AF from the Expert Report of Daniel R. Fischel, dated November 7, 2009.

[44] See Amended Complaint at ¶ 263.

[45] See Citigroup Valuation Discussion (CITI_LYO_0132406) at 413

Highly Confidential, For Professional Eyes Only

| Basell Valuation Based on Solomon Expert Report Dated November 7, 2009 | | | | |
|---|---|---|---|---|
| $ in Millions | Low | Midpoint | High | Weight |
| **Valuation Date: 12/20/2007** | | | | |
| Comparable Public Companies - LTM (1) | $ 8,776 | $ 9,604 | $ 10,432 | |
| Comparable Public Companies - CY 2007 (1) | 7,387 | 8,157 | 8,926 | |
| Comparable Public Companies - CY 2008 (1) | 6,175 | 6,793 | 7,410 | |
| Comparable Public Companies - Average | 7,446 | 8,184 | 8,923 | 50% |
| | | | | |
| Comparable Transactions - LTM (1) | 7,782 | 8,610 | 9,438 | |
| Comparable Transactions - CY 2007 (1) | 7,233 | 8,003 | 8,772 | |
| Comparable Transactions - Average | 7,508 | 8,307 | 9,105 | 50% |
| | | | | |
| **Weighted Average** | **$ 7,477** | **$ 8,245** | **$ 9,014** | |
| | | | | |
| Plus: JV Interests Valuation (1) | 1,259 | 1,259 | 1,259 | |
| Less: Interest Bearing Debt (2) | (4,710) | (4,710) | (4,710) | |
| | | | | |
| **Value of Equity Capital** | **$ 4,026** | **$ 4,794** | **$ 5,563** | |

**Notes:**
(1) Amounts are per Solomon Expert Report dated November 7, 2009
(2) Per Exhibit AF from the Expert Report of Daniel R. Fischel dated November 7, 2009

55.    Based on the analyses described above, it appears that the Toe-Hold Payment I was funded by the borrowings of Basell Holdings and its subsidiaries. These entities borrowed the funds used for the Toe-Hold Payment I directly and had sufficient equity value to support these borrowings. Therefore, these borrowings were achieved from Basell side entities only, with no reliance on Lyondell's assets.

56.    Lyondell was a guarantor of the borrowings of Basell Holdings and Basell Germany under the Senior Credit Facilities and Bridge loan, and likewise Basell Holdings and Basell Germany were guarantors of Lyondell's obligations under the same facilities.

57.    However, the Senior Credit Facilities and Bridge Loan credit agreements each contained a "Carveback" or "Savings Clause" in sections 11.08 and 9.08 respectively. The full text from these sections is transcribed below:

> *In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 9.01 (Section 11.01 for Senior Credit Facilities) would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 9.01 (Section 11.01 for Senior Credit Facilities), then, notwithstanding any other provision to the contrary, the amount of such liability*

Highly Confidential, For Professional Eyes Only

*shall, without any further action by such Guarantor, any Loan Party or any other Person, be*
*automatically limited and reduced to the highest amount (after giving effect to the right of*
*contribution established in Section 9.10 (Section 11.01 for Senior Credit Facilities) that is valid*
*and enforceable and not subordinated to the claims of other creditors as determined in such*
*action or proceeding.*

For the purpose of my analysis, Counsel has instructed me to assume that these Savings Clauses would be upheld by a court, and thereby limit the amount of any guarantee to the extent such obligation constituted a fraudulent transfer (i.e., to the extent a Guarantor would be rendered insolvent and was not receiving Reasonably Equivalent Value in exchange for incurring such obligation).  Assuming, without performing a solvency analysis, that Lyondell would be rendered insolvent by guaranteeing Basell Holdings and Basell Germany's borrowings, the proceeds of which were used to acquire AI Chemical, whose sole assets were positions in Lyondell shares, and further assuming that Lyondell did not receive Reasonably Equivalent Value for such guarantee or the use of such proceeds, Lyondell would not be liable on such a guarantee and Lyondell's assets would not have been encumbered to support such a guarantee.

Toe-Hold Payment II

58.     Toe-Hold Payment II was a $674.3 million payment made from LB Finance to ML Derivatives. The Toe-Hold Payment II was funded as part of a draw of $7,839.4 million on the Bridge Loan.  The remainder of the funds from the draw on the Bridge Loan was transferred to BIL Acquisition Holdings Ltd. (which merged into and with the surviving entity with Lyondell's assets).

59.     LB Finance, the payor of Toehold Payment II, was an entity whose primary asset, as a result of the Acquisition, was the equity in LyondellBasell Industries Holdings, which owned the equity of Lyondell Chemical.[46]  It is important to note that LB Finance indirectly owned the equity, not the assets, of Lyondell.  As an equity holder, LB Finance was only entitled to the value of Lyondell's assets to the extent that they exceeded Lyondell's liabilities to its creditors.

60.     Similar to Toe-Hold Payment I, LB Finance was a Guarantor of the obligations under the Senior Credit Facilities, and Lyondell was a guarantor of LB Finance's obligations under the Bridge Loan, however the Savings Clauses or Carvebacks described above limited these guarantees to the extent they would have made the Guarantor insolvent.

---

[46] See Schedules of Assets and Liabilities for LB Finance, No. 09-10066 (REG) (Bankr. S.D.N.Y.).  Information in the related Statement of Financial Affairs indicates that no material transfers were made preceding the bankruptcy.

Highly Confidential, For Professional Eyes Only

61.    LB Finance drew on the Bridge Loan for the purpose of acquiring Lyondell stock at $48 per share and making Toe-Hold Payment II.  The collateral for this loan was LB Finance's assets, primarily the equity in Lyondell.

62.    It is clear that both Toe-Hold Payment I and Toe-Hold Payment II were funded through borrowings in which the borrower was not Lyondell.  Rather in the case of Toe-Hold Payment I it was Basell entities borrowing based on their own borrowing capacities, and in the case of Toe-Hold Payment II, it was an entity whose borrowing was collateralized by the equity value in Lyondell and therefore was behind Lyondell's creditors in terms of absolute priority.  While all parties to the Senior Credit Facilities and Bridge Loan guaranteed each other's obligations, these guarantees were not valid to the extent that any Guarantors were insolvent or that the guarantees made any Guarantors insolvent.

## V.    Reasonably Equivalent Value

63.    For this report, I have analyzed the value of the Lyondell stock transferred by Nell to Basell Funding (either directly or indirectly, through Basell Funding's purchase of AI Chemical) to determine whether these shares provided Reasonably Equivalent Value to Basell when compared to the $48 per share that Nell received for them (which was the same price that all other shareholders also received).[47]

64.    My understanding of the term Reasonably Equivalent Value as used in this context is that Reasonably Equivalent Value requires consideration of the "totality of the circumstances."[48]  In connection with this inquiry, I understand that courts will assess, among other things, (A) the Fair Market Value of the asset transferred as compared with the value of the consideration received, (B) whether the transaction was an Arm's Length Transaction, and (C) whether the transferee acted in good faith.

---

[47] Payments to Nell for the acquisition of AI Chemical, which held the Toe-Hold shares, by Basell were in the same amount (per share) as payments to all other shareholders of Lyondell.  Notwithstanding that Nell's interest in a portion of the Toe-Hold Position was through a forward purchase agreement, Nell would be responsible for any losses or gains on the Toe-Hold Position.  Therefore, Nell was in substantially the same position as any other Lyondell shareholder who acquired Lyondell shares at the same price as Nell did.

[48] In re Gonzalez, 342 B.R. 165,173 (Bankr. S.D.N.Y. 2006)

Highly Confidential, For Professional Eyes Only

A.      **Fair Market Value**

**(1) The Fair Market Value of the Lyondell Stock Transferred to Basell Funding was Reasonably Equivalent to the $48 per Share Paid for the Lyondell Stock**

*Overview of Reasonably Equivalent Value Based on Stock Price Analysis*

65.      My understanding is that the test for Reasonably Equivalent Value does not require a transferee to provide the entire "Fair Market Value" of the asset transferred, but that Reasonably Equivalent Value may include a significant discount to "Fair Market Value."  For instance, I understand that in ASARCO LLC v Americas Mining Corp, the United States District Court for the Southern District of Texas (the "ASARCO Court") held that consideration for a stock transaction valued at 85% to 90% of the market value of the stock transferred constituted Reasonably Equivalent Value.[49]  The ASARCO Court held that "The law does not demand that a plaintiff receive an amount equal to the fair market value of the asset it transfers; the consideration must only be reasonably equivalent."[50]

66.      In order to assess the value of the shares of Lyondell stock that were transferred by Nell, I performed an analysis based on the publicly traded stock price of Lyondell.  If Lyondell's stock was trading in an efficient market, then the trading price of Lyondell's stock would give an accurate fair market value for a marketable, minority interest in Lyondell's equity.  As IRS Revenue Ruling 59-60 points out, "the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented."

67.      Publicly traded stock prices generally reflect transactions where a minority of shares are traded for any given company.  It is generally accepted in the finance community that the value of a company's equity derived from the sum of its outstanding publicly traded shares multiplied by the share price reflects a freely traded, marketable, minority interest.  When an acquirer, such as Basell, acquires a company in a related industry in its entirety, such as Lyondell, it is acquiring a controlling, synergistic interest.  The fair market value standard for a controlling, synergistic value is greater than the fair market value for a freely traded non-controlling interest.  This is generally why companies that are taken private are acquired at a premium to their most recent stock price.   Historically, this premium has often

---

[49] ASARCO LLC v Americas Mining Corp., 396 B.R. 278, 364 (S.D. Tex. 2008).
[50] Id.

Highly Confidential, For Professional Eyes Only

been referred to as a "Control Premium", but to avoid confusion, since there are two elements to the premium, I will refer to it as an "Acquisition Premium."

68.    The two elements to an Acquisition Premium are (i) control and (ii) synergies.  Among other things, control allows the acquiring party to appoint boards, set policy and make management decisions, decide on the timing of dividends and investments, control decisions to liquidate, dissolve, sell, recapitalize, or otherwise encumber all or a portion of the company, and register the company for public offerings.   In this instance, synergies primarily refer to reducing overhead by the consolidation of operations and other benefits that can be achieved due to the size of the combined entity and any overlap in pre-existing costs.[51]

69.    There is ample evidence that quantifiable Acquisition Premiums are common and should generally be applied to minority interests to estimate the value of a controlling, synergistic interest.  As valuation expert Shannon Pratt has indicated, "most analysts concur that it is perfectly rational for acquirers to pay transaction prices that include (1) a non-controlling ownership value plus (2) an ownership control premium plus (3) an additional acquisition price premium (above the control premium) related to the expected economic benefits of the merged companies."[52]  Per the Association of Insolvency and Restructuring Advisors, Mergerstat Review is "a well-known source for information on acquisition premiums."[53]  In its 2008 annual review, Mergerstat found that in 2007, the average and median premiums in acquisitions which Mergerstat included in its review were 31.5% and 24.7%, respectively.[54]

70.    In addition, the facts presented with respect to the events surrounding the Acquisition show that Acquisition Premiums were considered appropriate by a number of parties;

- Smith considered the approximately 33% Acquisition Premium in the Basell offer for Huntsman as indicative of the price of Lyondell in an acquisition.[55]

- Blavatnik clearly expected that Basell would need to pay more than the current trading price of Lyondell shares.[56]

---

[51] See for instance page 346 of "Valuing a Business: The Analysis and Appraisal of Closely Held Companies", Fourth Edition by noted valuation expert Shannon P. Pratt, as well as Robert F. Reilly.
[52] Id. at 353
[53] See Certification in Distressed Business Valuation Part 2 materials, at Ch. 6, pg. 4.
[54] "Valuing a Business: The Analysis and Appraisal of Closely Held Companies", Fourth Edition by noted valuation expert Shannon P. Pratt, et al.  In his discussion, on page 354, of Mergerstat Review Studies, Shannon Pratt notes that Mergerstat tracks transfers of ownership which involve over 10% of a company's equity, where one of the parties (at least) is a U.S. entity, and where the transaction purchase price is over $1 million.
[55] See Email from Dan Smith to Kevin DeNicola, dated June 26, 2007 (LYO-UCC00123366).

Highly Confidential, For Professional Eyes Only

- Apollo/Hexion's offer for Huntsman exhibited an Acquisition Premium of over 37% from the Huntsman stock price thirty days earlier.[57]

- The expectation of an Acquisition Premium can also be implied from the stock price fluctuations of Lyondell's shares.  For instance, on May 11, when AI Chemical issued its Schedule 13D and announced publicly that it intended to acquire interests in over 5% of Lyondell's shares (and that it was an affiliate of Blavatnik), Lyondell's stock price increased 11%.  At this point, no transaction had been announced in its Schedule 13D, but Basell had indicated that it could acquire over 50% of Lyondell's shares.  In fact, in talking points for Basell management about the acquisition of the Toe-Hold shares, it was specifically stated that if asked whether Basell or its affiliates would make an offer for Lyondell that management should respond that no decision had been made.  Therefore, this increase was likely speculation that there was a chance that Lyondell would be acquired at a price that would reflect an Acquisition Premium.  Similarly, on June 26, 2007, when Basell announced its agreement for an acquisition of Huntsman (thereby making an acquisition of Lyondell unlikely), Lyondell's stock price dropped 5%.

71.    An example of how market participants included the Acquisition Premium in their analyses can be found in UBS's July 17, 2007 report.  UBS states therein that "We are increasing our target price to $48 per share, based on the offer, up from the previous $44 per share. Our prior target was based on our DCF model result of $39/s (sic) plus a $5/share allowance for a potential takeover premium. This additional $5/share was equal to a 50% probability of a $10/share takeover premium."  This indicates that in UBS' view the non-controlling share value of Lyondell should have been $39 per share.  Additionally, UBS had expected a $10 per share "takeover premium" (this is the same as an Acquisition Premium), which would have brought the price up to $49 per share.  However, UBS was not sure that an acquisition would occur and therefore discounted the Acquisition Premium by 50%.  It is important to note that UBS' $44 per share estimate was issued on July 5, 2007, after Apollo/Hexion had announced its offer for Huntsman, thereby making a Basell acquisition of Lyondell more likely (but before Basell's $48 per share offer for Lyondell was made public).  Other investors and analysts were no doubt making similar calculations – estimating a value for a publicly traded non-controlling share and adding some amount based on the probability of an Acquisition Premium.

---

[56] See discussion on comparable transactions, in which Blavatnik stated "in reality the only opportunity to buy Lyondell was at 48." Deposition of Len Blavatnik, May 27, 2009 ("Blavatnik Dep.") at 239:23-24.
[57] See Exhibit 5-C "Comparable Transactions from Capital IQ Used for Acquisition Premium".

Highly Confidential, For Professional Eyes Only

72.    Therefore, to value Lyondell's shares to an acquirer such as Basell, I first considered whether Lyondell's stock price was traded on an efficient market.  Then I considered what constitutes an appropriate Acquisition Premium.  Finally, I considered what an appropriate Premium-Free Stock Price (as explained below) was for Lyondell's stock and applied the Acquisition Premium to that price.

*Lyondell was Trading on an Efficient Market*

73.    It is clear that Lyondell's stock was traded on an efficient market.  A number of easily ascertainable factors support this opinion.  For instance, Lyondell's stock was traded on the NYSE, a prominent, significant, and widely followed exchange.  Trading on the NYSE creates the presumption of an efficient market because, among other things, (i) the NYSE maintains stringent listing requirements, (ii) listed companies on the NYSE must file regular reports with the U.S. Securities and Exchange Commission, and (iii) listing on the NYSE allows companies to access significant liquidity.  However other factors also clearly favor the conclusion that Lyondell traded on an efficient market.  For instance, the chart below shows analyst reports that I have identified which were issued for Lyondell's stock from April 1, 2007 through July 16, 2007, along with the price target of what the analyst thought Lyondell's price would achieve.  The chart clearly shows that in a span of three and a half months, 14 reports on Lyondell's stock were issued by eight different firms.  This is a broad range of coverage and reflects Lyondell's significant market capitalization, which was always at least $9 billion in June and July 2007.  Broad analyst coverage increases my confidence that Lyondell was trading on an efficient market.

| Stock Analyst Reports from April 1, 2007 Through July 16, 2007 | | |
| --- | --- | --- |
| Firm Name | Date | Price Target |
| CitiGroup | 7/12/07 | $        41.00 |
| Credit Suisse | 7/9/07 | 44.00 |
| UBS | 7/5/07 | 44.00 |
| HSBC | 6/13/07 | 38.00 |
| BB&T Capital Markets | 6/6/07 | 44.00 |
| UBS | 5/24/07 | 39.00 |
| CitiGroup | 5/14/07 | 34.00 |
| Morgan Stanley | 5/14/07 | 41.00 |
| Goldman Sachs | 4/27/07 | 37.00 |
| CitiGroup | 4/27/07 | 34.00 |
| Banc of America | 4/27/07 | 32.00 |
| UBS | 4/26/07 | 37.00 |
| Morgan Stanley | 4/23/07 | 38.00 |
| CitiGroup | 4/12/07 | 34.00 |

Highly Confidential, For Professional Eyes Only

74.      Furthermore, an analysis of the trading in Lyondell's shares shows that Lyondell was actively traded.  As shown in Exhibit 5-A, in January through June 2007, the average weekly volume as a percentage of total outstanding shares was 6.9%.[58]  In addition, it is clear that Lyondell's stock price showed a clear empirical relationship between unexpected events and an immediate response in the stock price.  For instance, as noted above, Lyondell's stock clearly responded to the announcement that Basell affiliates would be taking an interest of over 5% in Lyondell and later that Basell had agreed to purchase Huntsman.  Another example occurred on May 3, 2007, when the Associated Press reported that JP Morgan upgraded Lyondell's stock and Lyondell's stock price correspondingly rose almost 9%.  Taken together, these factors make clear that Lyondell was traded on an efficient market.

*Determining the Appropriate Acquisition Premium*

75.      I consulted several sources to estimate the appropriate Acquisition Premium.   No two companies and no two transactions are the same, and therefore without considering the actual Acquisition Premium paid for a company, an Acquisition Premium must be estimated.  Acquisition Premiums are generally estimated based on a comparison of the stock price for a target company a certain number of days prior to the announcement of an acquisition to that acquisition's price per share.  I focused on two commonly calculated Acquisition Premium time periods: one week before the announcement and one month before the announcement.

76.      Acquisition Premiums vary based on the specifics of the target company and the acquirer, the industry, the size of the transaction, stock market valuation levels at the time, potential synergies, and other factors.  Fortunately, in this instance, there is one very comparable transaction which was announced at approximately the same time as the Basell acquisition of Lyondell was announced – the Apollo/Hexion acquisition of Huntsman.  As the economy deteriorated in 2008, this transaction did not close.  However, at the time of its announcement on July 3, 2007, this transaction represented current market characteristics.  In addition to occurring around the same time as the announcement for the Basell acquisition of Lyondell, the Apollo/Hexion announced acquisition of Huntsman also featured a target in a similar business to Lyondell and a transaction that was also valued at over $10 billion.  Because of Basell's earlier agreement to purchase Huntsman (on June 26, 2007), the one week Acquisition Premium for the Apollo/Hexion announced acquisition of Huntsman is not instructive, because Huntsman's stock price already incorporated the potential Acquisition Premium related to

---

[58] As noted by the ASARCO Court, "Courts have found that a trading volume of 1% justifies a substantial presumption of market efficiency."  ASARCO, 396 B.R. at 343.

Highly Confidential, For Professional Eyes Only

Basell's proposed acquisition of Huntsman.  However, the one month Acquisition Premium for this transaction was 37.4%.

77.    As shown in Exhibit 5-B, in addition to considering the Apollo/Hexion/Huntsman Acquisition Premium, I considered Acquisition Premium information from two reputable sources: the 2008 Mergerstat Review and my own research using Capital IQ.

78.    As noted above, the Mergerstat Review is a widely used and referenced source for estimating Acquisition Premiums.  Mergerstat's calculations are based on the seller's closing price five business days before the announcement date.  Therefore, I have considered these as 1-week premiums.  As shown in Exhibit 5-B, I considered the average and median premiums for all industries in 2007 per Mergerstat, as well as the 2006, 2007, and average 2003-2007 premiums for the Chemicals, Paints, & Coatings and Oil & Gas industries.  In addition, I identified nine strategic (as opposed to financial), U.S. and Canadian acquisitions, with more than $100 million in total consideration to shareholders, announced in related industries in 2006 and 2007.  For this purpose, I noted that Lyondell's SIC code was listed in SIC code range 2860-2869 (organic chemicals) and considered any transactions where the target either (i) had a primary industry classification in Capital IQ's database of "Oil and Gas Refining and Marketing" or "Chemicals" or (ii) had a primary SIC code of either 2900 (Petroleum refining and related industries) or any SIC code beginning with 28 excluding pharmaceuticals or related industries.[59]  While no single one of these transactions can provide a perfect analogy for the Acquisition, considering the most closely related data points can provide a reasonable range.  The list of transactions is included as Exhibit 5-C.  I considered the median and average for all nine of these transactions, as well as just for the five transactions announced in 2007 (recognizing that the 2007 transactions are in both sets).

79.    After reviewing the research described above, I determined that an accurate but conservative range for an Acquisition Premium for Lyondell (assuming a strategic acquirer such as Basell) would have been 25% - 35% above the share price for both one week before the announcement of the acquisition and one month before the announcement of the acquisition.

### *A Premium-Free Stock Price for Lyondell in June 2007 Was Approximately $37 per Share*

80.    I will refer to a stock price with no or minimal Acquisition Premium included within it as a "Premium-Free Stock Price."  I considered a number of possibilities for the Premium-Free Stock Price of

---

[59] The SIC codes beginning with 28 are categorized as "Chemicals and allied products", however I noted that pharmaceutical and related companies were included in this grouping.  Acquisitions of these companies often showed high Acquisition Premiums and therefore in the interest of conservatism I have excluded them.

Lyondell.  As shown in Exhibit 5-D, I calculated the result of applying the Acquisition Premium to each of the following stock prices (all prices are closing prices for the day noted):

    a.   July 16, 2007, the day before the announcement of the Merger Agreement;

    b.   The 20-day, 30-day, and 60-day trailing averages of Lyondell stock as of July 17, 2007;

    c.   June 26, 2007, the day Basell announced its offer for Huntsman;

    d.   A five-day average of Lyondell stock prices from June 26, 2007 to July 2, 2007.  This is after the announcement of the Basell acquisition agreement for Huntsman, but before the announcement of the Apollo/Hexion offer;

    e.   May 11, 2007, once the market had learned of the Toe-Hold Position;

    f.   A five-day average of the most recent closing prices for Lyondell shares as of May 11, 2007 (prior to the announcement of the Toe-Hold Position).

81.     After considering the facts surrounding the days in question, I believe that the appropriate Premium-Free Stock Price would be $36.92, the average price for the five days after Basell's announcement of its acquisition of Huntsman.  Between the time that the Toe-Hold Position was announced and June 26, 2007, Lyondell's stock price may have reflected some expectation of an Acquisition Premium.  However, due to the recognized extremely low probability that Basell would acquire both Huntsman and Lyondell around the same time, after Basell announced its acquisition agreement for Huntsman, the expectation of an Acquisition Premium should have been priced out of Lyondell's stock.   As noted above, on June 26, 2007, Lyondell's stock fell by approximately 5% to $35.76.  While I considered using $35.76 as the Premium-Free Stock Price, I believe that the prices over the next five days would have best reflected the stock market's assessment of the situation.  I considered using the Lyondell stock price from shortly prior to the announcement of the Toe-Hold ($33.57); however, while this would also have been a premium-free price, it is 68 days or more prior to the announcement of the Merger Agreement leaving too much room for price adjustments for reasons unrelated to an Acquisition Premium.  For example, on May 15, 2007, Lyondell completed the sale of its inorganic chemicals business, which included nine factories in six countries, to a Saudi Arabian company.[60]

82.     Contemporaneous stock analyst reports support the use of a Premium-Free Stock Price of around $37 per share.  Even in April, well before the announcement of the Toe-Hold purchase, and three months before the announcement of the Merger Agreement, several stock analysts were targeting a price of $37-$38 per share for Lyondell stock, with the average target price of all reports issued in April being above $35 per share.  In May and June, the average target price in analyst reports

---

[60] See Lyondell Earnings release supplementary Microsoft Excel tables – Second Quarter Report.

Highly Confidential, For Professional Eyes Only

issued for Lyondell was over $39 per share.  While this may have included some possibility of an Acquisition Premium, any factoring of the Acquisition Premium into the price targets would have been speculative.  Smith himself has indicated that until early July 2007, he did not believe that Blavatnik would be "in position to purchase Lyondell in the immediate future."[61]  There is evidence that stock analysts viewed Lyondell's stock price as headed to the high thirties even with no Acquisition Premium. For instance, see the UBS July 17, 2007 report referenced above which indicated that they had believed a price of $39 per share was appropriate prior to applying an Acquisition Premium.  Earlier, on May 24, 2007, UBS issued a report with a price target of $39 per share even though UBS noted that the "Potential combination with Basell is not compelling."[62]

*Applying the Appropriate Acquisition Premium to the Premium-Free Stock Price Indicates that $48 per share was Reasonably Equivalent Value*

83.    Applying the selected Acquisition Premium of 25%-35% to the Premium-Free Stock Price of $36.92 results in an estimated value of Lyondell equity of $46.15 - $49.84 per share (with a mid-point of $48.00), or 96% - 104% of the Acquisition price of $48 per share.  However, it should be noted that, as shown below and in more detail in Exhibit 5-D, when the appropriate Acquisition Premium is applied to all of the dates considered, the result is that the value of the Lyondell shares was reasonably equivalent to $48 per share considering the totality of the circumstances.

---

[61] See Dan F. Smith Declaration, dated December 10, 2009 ("Smith Declaration"), at ¶ 60.
[62] See UBS analyst report, dated May 24, 2007.

Highly Confidential, For Professional Eyes Only

| Lyondell Stock Value Based on Stock Price and Acquisition Premium Range as a % of $48 | | | |
|---|---|---|---|
| | | As a % of $48 | |
| Closing Stock Price on: | Low | Mid | High |
| 7/16/07    Day Prior to Announcement of Merger Agreement | 104% | 109% | 113% |
| 6/18 - 7/16 20-Day Trailing Average | 100% | 104% | 108% |
| 6/4 - 7/16 30-Day Trailing Average | 99% | 103% | 107% |
| 4/20 - 7/16 60-Day Trailing Average | 95% | 99% | 102% |
| 6/26/07    Announcement of Basell offer for Huntsman | 93% | 97% | 101% |
| 6/26 - 7/2 5 Day Average After 6/26/07 | 96% | 100% | 104% |
| 5/11/07    13D Announces Toe-Hold | 96% | 100% | 103% |
| 5/4 - 5/10 5-Day Average Prior to 13-D | 87% | 91% | 94% |
| | | | |
| Average | 96% | 100% | 104% |
| Median | 96% | 100% | 104% |
| Minimum | 87% | 91% | 94% |
| Maximum | 104% | 109% | 113% |
| Source for stock prices:  Capital IQ | | | |

84.    Even using the lowest stock price considered (the average from 5/4/07 to 5/10/07), at the lowest end of the Acquisition Premium range (25%) would yield a stock price value that was approximately 87% of $48 per share.  Considering the efficient market for Lyondell stock and the arm's length nature of the transaction, this is clearly Reasonably Equivalent Value.

*Contemporaneous Analyst Reports, the Negotiation of Certain Items in the Merger Agreement, and the Implied Results of Analyses in the reports of the Peter J. Solomon Company, L.P., Support the Conclusion that $48 per share was Reasonably Equivalent Value*

85.    Commentary that accompanied many of the analyst reports which were issued during May through July 2007 supports this conclusion.  For instance, after the purchase of the Toe-Hold shares was made public but prior to the announcement of the Merger Agreement, on May 14, 2007, Morgan Stanley raised their target price for Lyondell to $41 per share, but noted that "LBO screens bring out a range of possible values for LYO between $42 and $46/share, depending upon whether the transaction would go to a private equity or a strategic buyer."  Basell was a strategic buyer who would have been on the upper end of that range.  After the announcement of the Merger Agreement, Citigroup issued a report which indicated that the price for Lyondell offered by Basell was a twenty percent premium over the prior day's close and 6.5 times Citigroup's 2008 EBITDA estimates for Lyondell.  Citigroup noted that the price "may appear cheap at first glance when compared to HUN (9.1x EBITDA) or GE Plastics (10.5x EBITDA) multiples," but concluded that the price was fair considering how much of Lyondell's EBITDA

Highly Confidential, For Professional Eyes Only

was generated from refining.  Citigroup also speculated that companies like PIC (a Kuwaiti company), Reliance, or Sinopec may also make a bid.  Similarly, on July 17, 2007, Morgan Stanley issued an analyst report which indicated that it thought the deal price was fair, but that it would "not be surprised if another strategic buyer like India's Reliance or a Middle East investment consortium stepped in with a price in the low-50s."  It wasn't until August 1, 2007, that Morgan Stanley felt compelled to issue an updated analyst report indicating that a "Higher Bid Appears Unlikely."  Morgan Stanley referenced that initially it believed that "the bid may be sweetened given unhappiness of some investors at the takeout price and the potential for a higher offer from another strategic buyer."  As a result of no additional bids coming in since the Merger Agreement was announced, Morgan Stanley revisited this conclusion.

86.     Solomon's analysis also provides comfort that $48 dollars per share constituted Reasonably Equivalent Value.  While the Solomon Report, which valued LBI as of December 2007, indicated lower values for LBI and Lyondell, the information in the Second Solomon Report implies that the value of Lyondell in December 2007 was significantly above $48 per share.  As shown in the chart below, the Second Solomon Report indicated a value for the operating enterprise value of LBI of $19.2 billion to $22.3 billion as of October 2008.[63]  The Second Solomon Report also indicated that between December 2007 and October 2008, the chemicals industry suffered a value decline of approximately 39% while the refining industry suffered a value decline of approximately 71%.  In his April 15, 2011 expert report, Daniel Fischel conservatively estimated that these declines implied a decline in value for LBI of at least 40.3%.  Assuming this would be the decline in value for LBI implies an operating enterprise value for LBI as of December 2007 of $32.2 to $37.3 billion.  Based on amounts in the Solomon Report, this implies an enterprise value of $20.3 billion to $23.5 billion for Lyondell in December 2007, which in turn (as shown below) implies a per share value of Lyondell of $47 - $60 dollars.  While the high end of this range appears too high for Lyondell in December 2007, this rough analysis based on the work of the Peter J. Solomon Company, L.P. gives further confidence that $48 per share was Reasonably Equivalent Value for Lyondell.

---

[63] Note that this amount excludes the value of joint ventures and assets held for sale per the Second Solomon Report.

Highly Confidential, For Professional Eyes Only

| Lyondell Value Implied by Solomon Analysis as of December 2007 | | | | | | |
|---|---|---|---|---|---|---|
| ($ in Billions) | | | | | | |
| | | | Low | | Midpoint | High |
| LBI Operating Enterprise Value, October 2008 (1) | | | $ 19.2 | $ | 20.8 | $ 22.3 |
| Calculated LBI Value Decrease 12/07 to 10/08 Implied by Solomon (2) | 40.3% | | | | | |
| LBI Operating Enterprise Value as of 12/07, Implied by February 28, 2011 Solomon Report (3) | | | 32.2 | | 34.8 | 37.3 |
| Percentage of Operating Enterprise Value Attributed to Lyondell (4) | | | 63% | | 63% | 63% |
| PJSC Implied Operating Enterprise Value of Lyondell as of December 2007 | | | 20.3 | | 21.9 | 23.5 |
| Less:  Approximate Lyondell Debt (pre-Acquisition) (5) | | | (8.0) | | (8.0) | (8.0) |
| Estimated Equity Value of Lyondell Implied by PJSC as of December 2007 | | | 12.3 | | 13.9 | 15.5 |
| Estimated Lyondell Shares Outstanding (millions) (6) | | | 260 | | 260 | 260 |
| Value per Share of Lyondell Stock as of December 2007 | | | $ 47 | $ | 54 | $ 60 |

(1) - From Solomon Report dated February 28, 2011, page 25.
(2) - Per analysis in the Expert Report of Daniel R. Fischel dated April 15, 2011.
(3) - Calculated based on a 40.3% decline in value and the LBI operating enterprise value as of October 2008.
(4) - Based on Solomon Report dated November 7, 2009, pages 20 and 22.
(5) - Based on Funds Flow Memorandum (for amounts paid off in Acquisition) and LBI AF SCA Consolidated
      Financial Statements for year ending December 31, 2007.
(6) - Based on $12.5 billion (per Amended Complaint, paragraph 263) of total compensation to Lyondell
      shareholders divided by $48 per share.

87.    Finally, I also considered the fact that both Basell and Lyondell considered the possibility of another bidder outbidding Basell to indicate that $48 per share was Reasonably Equivalent Value.[64]  The potential that another acquirer would attempt to purchase Lyondell at a higher price was contemplated by the inclusion of provisions regarding that possibility in the Merger Agreement, as well as in various presentations and reports at the time.[65]  Basell and Lyondell negotiated and included in the Merger Agreement clauses designed to limit the possibility that Basell would be outbid by another party.  For instance, section 4.2 provides that Lyondell could not solicit any other parties for a "Takeover Proposal," in essence a higher bid for a substantial portion of Lyondell.  In addition, the "Company Termination Fee" found in section 7.3(b) of the Merger Agreement clearly shows that the parties to the Merger Agreement anticipated that a higher bid for Lyondell was a possibility.  Basell initially requested a $400 million Company Termination Fee (also known as a "Break-Up Fee"), which during the course of negotiations was revised to $385 million.  The Break-Up Fee's purpose is to provide compensation to the proposed acquirer if its offer is later spurned for a higher offer made by another party.  For instance,

---

[64] As Smith notes, certain shareholders of Lyondell also sued certain directors of Lyondell arguing that the $48 per share price was too low.  Smith Declaration at ¶ 94.

[65] See, e.g., Merrill Lynch, "Accumulation of Toehold Position", dated April 7, 2007 at 3; Morgan Stanley research report, dated July 17, 2007.

Highly Confidential, For Professional Eyes Only

Basell earned a $200 million[66] Break-Up Fee from its spurned offer for Huntsman after Huntsman accepted the competing offer from Apollo/Hexion.  Basell and Access had learned that it was quite possible to be overbid by a competitor and therefore important to have a significant Break-Up Fee.  Had there been very limited risk of higher competing offers, there would have been no need to negotiate the Break-Up Fee.  However, as noted in the Smith Declaration, increasing the ability of Lyondell to seek higher offers and reducing the Break-Up Fee encompassed three of the four points that Smith attempted to negotiate with Blavatnik.[67]

### (2) The Transaction was an Acquisition of a Company and not an LBO

88.     In considering whether Basell received value in the Acquisition, it is important to consider the structure of the transaction.  I understand that the plaintiffs are suggesting that the Acquisition is a "Leveraged Buyout" or LBO, presumably to obfuscate the fact that value was transferred to Basell as a result of the Acquisition.  However  the acquisition that was executed was in fact an acquisition and merger and differed in several material aspects from an LBO.

89.     The Oxford Dictionary of Finance and Banking defines an LBO as (emphasis added):

> *The acquisition of one company by another through the use of borrowed funds.  The intention is that the loans will be <u>repaid from the cash flow of the acquired company</u>.  In the 1980s many takeovers in the USA were financed by the issue of \*junk bonds in highly leveraged buyouts.  More recently, <u>LBOs have become associated with the activities of \*private equity firms</u>.*[68]

90.     This definition is consistent with other corporate finance texts which describe LBOs as follows (emphasis added):

> *In a leveraged buyout, the cash-offer price is financed with large amounts of debt.  LBOs have recently become quite popular because <u>the arrangement calls for little equity capital.  This equity capital is generally supplied by a small group of investors</u>, some of whom are likely to be managers of the firm being purchased. . . As with a merger, the acquirer profits only if the synergy created is greater than the premium.  Synergy is quite plausible in a*

---

[66] <u>See</u> Amended Complaint at ¶167.
[67] Smith Declaration at ¶ 76.
[68] Oxford Dictionary of Finance and Banking at 258 (Rev. Ed. 2008).

Highly Confidential, For Professional Eyes Only

*merger of two firms . . . However, it is much more difficult to explain synergy in an LBO, because only one firm is involved.*[69]

91.     The above descriptions are generally consistent with my understanding and experience in analyzing acquisitions, mergers and LBOs.  Put another way, in an LBO, a financial investor (typically a private equity firm) seeks to acquire a target company by increasing the debt levels on the target company's assets and using the proceeds from the financing to help pay for the cost of acquiring the target company's outstanding shares.  Therefore, there are no significant assets or business operations merged with the target corporation since the acquirer is generally a financial investor.  As a result, the target corporation of an LBO continues to operate as a stand-alone business, and only the ownership and financing structure changes.  The distinction of lack of an acquiring company to be merged with the target company in a leveraged buyout is further emphasized in a finance text (emphasis added):

*Buyouts share some characteristics with acquisitions, but they also vary on a couple of important ones.  The absence of an acquiring firm, the fact that the managers of the firm are its acquirers, and the conversion of the acquired firm into a private business all have implications for value.*[70]

92.     This is materially different from what actually transpired in the Acquisition, where Basell was a multi-billion dollar (or euro) petrochemical company whose operations would be integrated with Lyondell, and therefore was in fact a strategic investor and not a financial investor.

93.     As previously described, Basell simultaneously acquired Lyondell (by acquiring all outstanding shares for $48 per share) and merged one of its subsidiaries (BIL) with Lyondell.  The surviving entity, called Lyondell Chemical Company, became a Basell subsidiary.

94.     Basell structured the Acquisition as a "Reverse Triangular Merger."  In a Reverse Triangular Merger, a subsidiary of the acquiring corporation merges into and with the target corporation.  The acquiring subsidiary's stock is converted into the target stock, and the former target's shareholders receive the merger consideration in exchange for their target stock.[71]

95.     Pursuant to the executed Merger Agreement among Basell, BIL, and Lyondell, Basell executed the Acquisition as a Reverse Triangular Merger.  The merger subsidiary (BIL) of the acquiring corporation

---

[69] Corporate Finance.  Fifth Edition.  Ross, Westerfield and Jaffe at 780.

[70] Investment Valuation.  Second Edition.  Aswath Damodaran at 724.

[71] See Martin D. Ginsburg and Jack S. Levin, Mergers, Acquisitions and Buyouts, Vol. 1, Ch. 1-5 at 2-17 (January 2009) (describing reverse subsidiary merger, also known as a reverse triangular merger); C-T of Virginia, Inc., v. Euroshoe Associates Limited Partnership, 762 F.Supp. 675, 678-79 (W.D. Va. 1991).

Highly Confidential, For Professional Eyes Only

(Basell) merged into and with the target corporation (Lyondell).  BIL then ceased to exist and Lyondell

continued as the surviving corporation,[72] where each share of BIL was converted into one share of

Lyondell.  All of the outstanding shares of Lyondell prior to the merger were converted into the right to

receive $48 in cash ("Acquisition Share Price"), and all such shares were then cancelled and ceased to

exist, leaving only the BIL shares that were converted into Lyondell shares.  These surviving Lyondell

shares would be entirely held by Basell through its affiliates.[73]

96.    Exhibit 5-E illustrates the transaction.

97.    A major premise behind the Acquisition to begin with was to expand Basell's existing

petrochemical operations.[74] Phil Kassin, Executive Vice President and head of M&A and financing at

Access at the time, testified:

> *We constantly monitored acquisition candidates to grow our chemical business.  Lyondell*
> *was considered one of the better fits in terms of industrial logic.  So Lyondell, among a*
> *variety of other chemical companies and chemical assets, were monitored for possible*
> *acquisition.[75]*

Volker Trautz, CEO of Basell also indicated that acquiring Lyondell "was, from a strategic perspective,

looking with Basell eyes, a perfect fit."[76]

98.    Another major goal of the Acquisition was to also unlock additional value of the combined entity

by achieving synergistic cost reductions which could be unlocked through the elimination of duplicative

costs or achieving cost reductions through economies of scale. [77] These goals of the Acquisition are well

documented in the confidential information memorandums ("CIMs") that were prepared for the post-

acquisition Senior Credit Facilities and ABL facilities.[78] Furthermore, these goals are also evidenced by

---

[72] Merger Agreement at ACC00107019.

[73] Id. at ACC00107020.

[74] "We constantly monitored acquisition candidates to grow our chemical business.  Lyondell was considered one of the better fits in terms of industrial logic.  So Lyondell, among a variety of other chemical companies and chemical assets, were monitored for possible acquisition." Deposition of Phil Kassin, dated May 13,2009 ("Kassin Dep.") at 34:6-12.

[75] Id.

[76] Deposition of Volker Trautz, dated May 20, 2009, at 43.

[77] The presence of potential synergies of the Acquisition was something that was discussed between Access and Lyondell prior to entering into the Merger Agreement.  Kassin Dep. at 200:24-201:2.

[78] Confidential Information Memorandum, Basell/Lyondell Merger, Senior Secured Credit Facilities, October 2007, at 27; Confidential Information Memorandum, Basell/Lyondell Merger, Asset Based Loan Facilities, November 2007, at 19.

Highly Confidential, For Professional Eyes Only

the fact that earlier in 2007, Basell had tried unsuccessfully to acquire Huntsman,[79] whose business was similar to Lyondell's.[80]

99.    The second material difference is that in an LBO, the acquirer borrows against the target corporation's assets in order to acquire all of the outstanding shares of the target corporation. Thus, only the assets of the target corporation are put at risk by any debt placed on the target corporation's assets.[81] This point is emphasized in the following finance text:

> *However, the essence of an LBO is that <u>only Newco and/or Target is liable to the lender for the borrowed money</u>. That is, no PE/VC guarantees Newco's debt (other than possibly a guarantee with recourse only to Newco's stock owned by the guarantor, which does not expose the PE/VC's assets other than its Newco investment).*[82]

100.    In this respect, the Acquisition clearly differs from an LBO, because Basell pledged billions of dollars worth of assets to support the Acquisition financing, which put Basell's assets and billions of dollars in equity value at risk in the event of default.[83] Indeed, as noted in Section IV above, prior to the consummation of the Acquisition, Basell had approximately $4.0 - $5.6 billion of equity and as noted in Section III above, as of December 31, 2006 Basell had approximately $11.3 billion in assets.[84]

101.    Furthermore, at the time of the Acquisition, it appears that most parties referring to the Acquisition generally referred to it as an acquisition or merger. For example, at the time of the Acquisition, numerous documents (including the proxy statement announcing the Acquisition,[85] the Merger Agreement,[86] and LBI's financial statements[87]) and parties knowledgeable about the Acquisition[88] were referring to it as either an acquisition or a merger.

---

[79] Proxy Statement at ACC00107318.

[80] "And Huntsman is definitely very similar business to Lyondell with Lyondell assets more superior to Huntsman." Blavatnik Dep. at 239:7-9.

[81] Jack S. Levin, Structuring Venture Capital, Private Equity, and Entrepreneurial Transactions at 1-10 (2006).

[82] Id.

[83] See Section V for a detailed discussion of the Basell assets that were pledged and limited guarantees that were put into place in conjunction with the Acquisition financing.

[84] See paragraph 12 of this report.

[85] Proxy Statement.

[86] Merger Agreement.

[87] LyondellBasell Industries AF S.C.A., Condensed Consolidated Interim Financial Statements and Management's Report, First quarter results 2008, at 8.

[88] "We constantly monitored acquisition candidates to grow our chemical business. Lyondell was considered one of the better fits in terms of industrial logic. So Lyondell, among a variety of other chemical companies and chemical assets, were monitored for possible acquisition." Kassin Dep. at 34:6-12.

Highly Confidential, For Professional Eyes Only

102.    Kevin McQuilkin, employed by DBSI, worked on the DBSI engagement team that reviewed the terms of the Acquisition and ultimately provided a fairness opinion to Lyondell's board of directors regarding the Acquisition price of $48 per share.  At his deposition, McQuilkin stated that the Acquisition was certainly an acquisition and technically a merger,[89] but he did not consider it to be an LBO.[90]  This testimony is consistent with the DBSI acquisition fairness opinion presentation given to Lyondell's board, which specifically stated that the proposed Acquisition was a "reverse triangular one-step merger."[91]

103.    Most notably, LBI's lenders, who provided the financing needed to facilitate the Acquisition, were well aware that the transaction was an acquisition or merger, and referred to it as such in their internal credit commitment memoranda which authorized them to provide the financing.[92]

104.    In addition, at least three of the major investment banks covering Lyondell at the time the Acquisition was announced referred to the Acquisition as an acquisition, combination or merger, but did not refer to it as an LBO.[93]

105.    Lastly, even the Litigation Trust has characterized the Acquisition as either an acquisition or a merger in documents it has filed in this case.  As a matter of fact, the very first sentence of paragraph 1 of the Litigation Trust's Amended Complaint dated July 23, 2010 states the following (emphasis added):

> *This action arises from the December 2007 **acquisition** of Lyondell Chemical Company ("Lyondell"), formerly North America's third-largest independent, publicly-traded chemical company, by Basell AF S.C.A., a Luxembourg entity, thereafter renamed LyondellBasell Industries AF S.C.A. (prior to its **acquisition** of Lyondell, "Basell," and, thereafter, "LBI").  On July 16, 2007, the board of directors of Lyondell, headed by chairperson Dan F. Smith, authorized a cash out **merger** of Lyondell shareholders (the "**Merger**" or the "Transaction") pursuant to which Lyondell would be **acquired** by Basell.*

---

[89] Deposition of Kevin McQuilkin, November 11, 2010 ("McQuilkin Dep.") at 72:18-24.

[90] Id. at 73:1-8.

[91] Presentation to the Board of Directors, July 16, 2007 (LYO-UCC00120874-921) at LYO-UCC00120880.

[92] Merrill Lynch, Debt Markets Commitment Committee, July 15, 2007, at 1, 18;  Confidential Capital Committee Memo, July 16, 2007, Goldman Sachs, (GSCP_LYON00038030-49), at 2-3; Credit Memorandum, July 21, 2007, ABN-AMRO, (ABN_LYNB00013493-509), at 1-2; Credit Memorandum, October 23, 2007, ABN-AMRO, (ABN_LYNB00003366-70)at 1; UBS Investment Bank, Final Global Syndicate Finance Commitment Memorandum, October 24, 2007 (UBS2004-0016589-645) at UBS2004-0016589; Citibank, Commitment Committee Approval Memorandum, December 13, 2007, (CITI_LYO_0000794-805) at 3.

[93] See Citigroup report dated July 17, 2007; Morgan Stanley report dated July 17, 2007.  Although the UBS report dated July 17, 2007 is titled "Buy-Out Offer by Basell is Accepted," the report refers to the Acquisition as an acquisition or merger throughout the document and makes no references to the acquisition as being an LBO.

Highly Confidential, For Professional Eyes Only

106.    As shown above, the Amended Complaint actually defines the Acquisition as "Merger" (or "Transaction"), and goes on to refer to the Acquisition as such throughout the entire complaint. Actually, one needs to look no further than the table of contents to the Amended Complaint, where every single one of the section headers underneath "Factual Background" (Sections I-VII) refers to the acquisition as either "merger" or "acquisition."[94]

**B.    The Acquisition was an Arm's Length Transaction**

107.    The ASARCO Court referred to the following definition of an Arm's Length Transaction from Black's Law Dictionary: An arm's-length transaction is "[a] transaction between two unrelated and unaffiliated parties" or "[b] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises."  Related to this, a commonly cited definition of Fair Market Value is found in IRS Revenue Ruling 59-60 which reads "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

108.    Pursuant to the Merger Agreement, which was entered into on July 16, 2007, Basell was obligated to purchase all shares of Lyondell stock, including those shares owned or controlled by Nell through its subsidiary, AI Chemical.  In December 2007, when the Acquisition closed, Basell was only fulfilling its pre-existing obligation to acquire all Lyondell shares, by acquiring those shares owned or controlled by Nell, through AI Chemical.

109.    Significant evidence supports the fact that the Merger Agreement was an Arm's Length Transaction between an unrelated willing buyer (Basell) seeking to minimize the acquisition price and a willing seller (Lyondell) seeking to maximize the acquisition price.  While AI Chemical, and later Nell, which are affiliates of Basell did own some Lyondell shares, as discussed below, the negotiations leading to the Merger Agreement make clear that this was an Arm's Length Transaction in which affiliates of Basell were not able to exercise any influence on Lyondell's actions and negotiating positions.

110.    Lyondell clearly negotiated to obtain as high a price as it could.  As noted in paragraph 104 of the Amended Complaint, in April 2006, Basell made an offer to acquire Lyondell for $24 to $27 dollars per share and this amount was deemed by Lyondell's board to be too low.  Lyondell's board did not

---

[94] Amended Complaint at i-ii.  Exhibit 5-F provides additional examples of the Litigation Trust referring to the Acquisition as either an acquisition or a merger.

Highly Confidential, For Professional Eyes Only

even respond with a counter-proposal.  Subsequently, in August 2006, Access sent a letter to Lyondell offering $26.50 to $28.50 per share of Lyondell, and this offer, also, was rejected.[95]  Smith has indicated that he subsequently informed Blavatnik in July 2007 that Blavatnik's suggested acquisition prices of $40.00 per share and $44.00-$45.00 per share were also likely to be insufficient.[96]  Finally, after Blavatnik offered $48 per share, Smith indicates that he attempted to further negotiate the terms of the transaction, including asking for a higher purchase price.[97]

111.    The Amended Complaint points out that Smith also observed that the $48 per share was consistent with the amount based on the Acquisition Premium implied by the Basell offer for Huntsman.[98]  This can be seen in Smith's email to Kevin DeNicola of Lyondell on June 26, 2007.  In that email, Smith forwards another email which contains information showing that Basell's offer for Huntsman represented over a 33% premium to the most recent closing price of Huntsman's stock.  On June 26, 2007, Lyondell's stock price fell by almost 5%, closing at $35.76 per share.  Lyondell's stock had increased in value when Basell had announced that its affiliates had purchased more than 5% of Lyondell's stock.  This was likely the result of speculation that Basell would acquire Lyondell, thereby adding speculation about an Acquisition Premium to the Lyondell stock value.  When Basell announced that it had agreed to buy Huntsman, the market would have assumed that Basell would not be acquiring Lyondell, as acquiring two companies the size of Huntsman and Lyondell simultaneously would have been a significant challenge.[99]  As a result, the stock price at the close of business on June 26, 2007 would no longer have included speculation about an Acquisition Premium.  When Smith applied the Acquisition Premium of over 33% from the Basell agreement to purchase Huntsman to Lyondell's $35.76 current stock price, he concluded to DeNicola that "By the way that premium is equal to about 48 for us."[100]

112.    In order to induce Basell's offer and lock in the $48 per share price, Lyondell had to act fast and agree not to market itself to any other potential acquirers.  Lyondell's board of directors approved the $48 per share price prior to entering into the Merger Agreement.

113.    Basell, Access, and Blavatnik all sought to reduce the per share price that Basell would pay to acquire Lyondell's stock.  Basell and Access began negotiating with Lyondell over a year before Basell and Lyondell entered into the Merger Agreement.  Initially, they attempted to acquire the Lyondell stock

---

[95] See Smith Declaration, at ¶¶ 48 – 50.
[96] Id. at ¶62.
[97] Id. at ¶ 76.
[98] Amended Complaint at ¶165.
[99] Id.
[100] See Email from D.Smith to K. DeNicola, dated June 26, 2007 (LYO-UCC00123366).

Highly Confidential, For Professional Eyes Only

at $24 to $27 dollars per share, and they made repeated attempts to acquire Lyondell for less than $48 per share.  Blavatnik indicated in his deposition[101] that he wanted to avoid an auction or a situation where Lyondell was shopped to other buyers and attempted to use the outstanding Basell offer for Huntsman as leverage against Smith to that end.  Further in the Blavatnik deposition,[102] Blavatnik makes clear that he went up to $48 per share for the Lyondell equity based on the valuations implied by the Sabic acquisition of GE Plastics and by the Apollo/Hexion[103] acquisition of Huntsman, as well as Smith's comments that Lyondell would not accept less than $48 per share.[104]  Basell had attempted to consummate both of these acquisitions, but was subsequently outbid in both transactions.  The valuations of those transactions (based on EBITDA multiples) led Blavatnik to believe that "in reality the only opportunity to buy Lyondell was at $48."  The Blavatnik deposition shows that there was a real concern on the part of Blavatnik that Basell may get outbid for the Lyondell shares.  Blavatnik's deposition also makes clear[105] that Blavatnik (and therefore Access and Basell) would have preferred a lower price for the Lyondell equity (i.e. one in the mid 30s), but that Blavatnik did not think that price would be sufficient.  It is clear that Basell, Access, and Blavatnik would have preferred to pay less for the Lyondell shares, but believed that (i) $48 per share was justified based on recent transactions, (ii) $48 a share was necessary to obtain a deal with Lyondell's board, and (iii) there was a risk that, particularly if Lyondell was shopped around, Basell would be outbid as it was for Huntsman and GE Plastics.

114.    As noted above, Apollo/Hexion's acquisition of Huntsman, which was used as a reference point for both Blavatnik and Smith was at over a 37% premium to the stock price of Huntsman 30 days before the announcement of the Apollo/Hexion offer (and before the announcement of the Basell offer).[106]  This implied a share price for Lyondell around the high 40's.  In addition, as noted above, even Basell's lower offer for Huntsman implied a price of $48 per share.  Both parties appear to have used this transaction as a reference point in determining a fair price for Lyondell.

---

[101] Blavatnik Dep. at 203-05.

[102] Id. at 237-40.

[103] Hexion is now known as Momentive Specialty Chemicals Inc.  For clarity, I am referring to this proposed transaction as Apollo/Hexion in the text as that is consistent with how the proposed transaction was viewed at the time.  Capital IQ refers to the purchaser in this transaction as Momentive Specialty Chemicals Inc., and therefore that name appears in Exhibit 5-C.

[104] Blavatnik Dep. at 73-74.

[105] Id. at 230-31.

[106] Because of the prior Basell agreement to purchase Huntsman, which added elements of an Acquisition Premium to Huntsman's stock price, using a one week Acquisition Premium is not instructive.  One-month Acquisition Premiums are also commonly used.

Highly Confidential, For Professional Eyes Only

115.    The Amended Complaint alleges[107] that "Blavatnik (was) determined to do the deal at any price provided only that he was not required to invest any incremental equity."  However, this does not appear to have been Blavatnik's approach to potential acquisitions.  For instance, Basell walked away from the acquisition of Huntsman, a similar company to Lyondell because they were not willing to pay as much as was necessary to be the highest bidder in that acquisition.[108]  The Huntsman bid was effectively contemporaneous to the Lyondell execution of the Merger Agreement and presumably Basell could have increased its offer for Huntsman.  Similarly, Basell could have increased its offer for GE Plastics. Moreover, the Amended Complaint strangely alleges that because Basell chose to walk away, rather than increase its offers, from the Huntsman and GE Plastics transactions, Blavatnik "was on a 'losing' streak."[109]  However, in my experience the willingness to walk away from transactions rather than offer more than what one considers a fair price is generally regarded as an admirable trait in the context of mergers and acquisitions.

116.    The per share price in the Merger Agreement appears to be the result of active negotiations between two well informed and well advised parties who agreed on a price that each thought was justified and necessary, and was based on recent market information.  Basell actively and aggressively tried to lower the price and Lyondell sought to increase it.  <u>While the preceding analysis illustrated that the value of the Lyondell shares implied by objective market data was approximately $48 per share</u>, this was an Arm's Length Transaction, and therefore the circumstances of the transaction strongly imply that the even if the value received for the Lyondell shares was below $48 per share, the Court should consider the value received to be <u>Reasonably Equivalent Value</u>.


**C.        Use of Forward Contracts and a Gibraltar Company Does not Suggest Bad Faith**

117.    Finally, as part of my analysis of Reasonably Equivalent Value, to the extent the Court deems it relevant based on applicable law,  I have analyzed arguments in the complaint suggesting that Basell's structuring of the transaction indicates bad faith.


*<u>The Use of a Forward Contract for the Toe-Hold Purchase</u>*

118.    A "toe-hold" is an acquisition technique that refers to "an initial stake in a company obtained as a prelude to an acquisition attempt." [110]

---

[107] Amended Complaint at ¶124.
[108] Blavatnik Dep. at 107.
[109] Amended Complaint at ¶168.
[110] <u>Oxford Dictionary of Finance and Banking</u> (2008)

Highly Confidential, For Professional Eyes Only

119.     Obtaining a toe-hold such as the one obtained by AI Chemical is a common and effective method for initiating an acquisition and for improving the odds (and lowering the cost) of successfully acquiring the target.  Studies have noted that the initial bidders in roughly half of all takeover attempts have a toe-hold[111] and that toe-holds typically lower the probability of management resistance[112] and increase the probability of a single-bid contest by lowering the chance of entry by a rival bidder.[113]  In this respect, the use of a toehold was not only in good faith, but also advantageous to the post-merger company and its stakeholders.  By reducing the odds of management resistance, Basell's shareholder shortened the time period for completing the transaction, thereby providing a cost savings in professional fees. Furthermore, the Toe-Hold Position also reduced the odds of a competing bid (a rival acquirer would be less likely to conduct diligence once it was known that Basell's shareholder had already acquired a minority stake) that could have caused the final purchase price to exceed $48 per share.

120.     In addition to the benefits previously mentioned, in the event that AI Chemical were to be outbid by a rival acquirer, the profits from the Toe-Hold Position would serve as a return of investment, opportunity cost, and expenses.  This also serves as a return for the lost opportunity of deploying capital elsewhere and the cost of the due diligence conducted before and during the bidding process.

121.     My research indicates that the driving factor behind the use of a forward contract for the acquisition of the Toe-Hold Position was the regulatory framework of the Hart-Scott-Rodino Act ("HSR"). A forward contract is "the purchase or sale of a specific quantity of commodity, government security, foreign currency, or other financial instrument at the current, or 'spot price,' with delivery and settlement at a specified future date."[114]  It is my understanding that if an active investor intends to purchase more than 5% of a public company's shares, the acquirer must file a Schedule 13D and get clearance before proceeding with the acquisition pursuant to HSR.

122.     Due to the size of Lyondell, Basell's shareholder was also subject to a more stringent "size of transaction" test than the standard 5%.  Effective February 21, 2007 (which predates the acquisition of the Toe-Hold Position), the Federal Trade Commission announced that the threshold for an active investor acquiring shares in a public target without disclosure (in addition to the percent ownership test)

---

[111] "Toeholds and Takeovers", Journal of Political Economy, Bulow, Huang & Klemper, referencing Betton and Eckbo (1997) at 429.
[112] Id. at 430, referencing Walkling and Long (1984) and Jennings and Mazzeo (1993) at 430.
[113] Id., referencing Betton and Eckbo (1997).
[114] Barron's Dictionary of Financial and Investment Terms at 280-281.

Highly Confidential, For Professional Eyes Only

was $59.8 million (up from $56.7 million).[115] This meant that at market prices in early April 2007, Basell could acquire no more than approximately 1.9 million shares (or less than 1%) of Lyondell without obtaining HSR clearance.

123.    On April 7, 2007, Merrill Lynch approached Basell's shareholder with a proposal to allow for an accumulation of an economic position in excess of 5% while remaining in compliance with applicable disclosure and anti-trust regulations, including HSR.[116] Merrill Lynch's proposal was to enter into a derivative trade to allow Basell's shareholder to obtain the economic benefits of the ownership of (and have the future right to acquire) up to 14.9% of the outstanding stock of Lyondell.

124.    Merrill Lynch would facilitate the transaction by purchasing 7 million shares from the seller in this arrangement, Occidental Petroleum, and enter into an equity swap transaction with respect to the remaining 14 million shares.  Separately, Merrill Lynch would enter in to a forward purchase agreement with an entity owned or controlled by Basell's shareholder.

125.    The seller, Occidental Petroleum, had 21 million shares of Lyondell stock that it was looking to monetize, but it was subject to limitations created by Securities and Exchange Commission Rule 144 regarding the sale of restricted and controlling securities.  This meant that Occidental Petroleum could only sell up to one week's worth of average trading volume in any three month period.[117] The equity swap transaction allowed Occidental Petroleum to transfer the economic risk associated with owning the entire block of stock without violating any regulations.

126.    According to a Merrill Lynch presentation to Occidental Petroleum on April 20, 2007, "Merrill Lynch and outside counsel have reviewed the structure in detail and are of the view that it is in full compliance with the applicable timing and liquidity constraints."[118] Additionally, Merrill Lynch noted that the "[Federal Trade Commission] has provided informal approval of structure on no-names basis."[119]

127.    Shortly after the equity swap and forward purchase agreements were in place, an affiliate of Basell's shareholder, AI Chemical, filed a Schedule 13D and subsequently obtained HSR approval.

128.    Having found a seller willing to monetize its shares at roughly the market price, AI Chemical entered into an arm's length transaction with an unrelated entity at no additional cost to Lyondell or

---

[115] "Hart-Scott- Rodino Thresholds Continue to Rise Based Upon Annual Indexing", Foley & Lardner LLP, Legal News-Anti-Trust, dated January 1, 2007, available at
http://www.foley.com/files/tbl_s31Publications/FileUpload137/4212/AntitrustLegalNews%20_ January2007.pdf.
[116] "Presentation to Athens – Accumulation of Toehold Position", dated April 7, 2007 (ACC00101238-42).
[117] "Presentation to Occidental Petroleum Corporation – Proposed Monetization of Stake in L Company", dated April 20, 2007 (ACC00098669-ACC00098678) at ACC00098671.
[118] Id.
[119] Id.

Highly Confidential, For Professional Eyes Only

Basell, remaining in compliance with the applicable regulations.  On December 20, 2007 the shares that were acquired by AI Chemical via the forward contract with Merrill Lynch were acquired by Basell Funding for $48 each, the same price as every other Lyondell share.

129.    It should be noted that the Toe-Hold Position and forward contract resulted in AI Chemical's bearing the risk of any loss of value in the subject shares.  In addition to the potential capital loss at the time of settlement that would occur in the event that the Lyondell stock price decreased in value, the forward contract also required cash collateral provided by AI Chemical amounting to 25% of the notional value of the shares identified in the contract, which at the time of signing was in excess of $168 million.[120]  Had the Lyondell shares declined in value, AI Chemical would have had to contribute additional cash collateral to carry the trade and would bear the losses upon settlement of the forward contract.

130.    Accordingly, Merrill Lynch was able to initiate a transaction, using customary options products, to serve the needs and goals of both Basell's shareholder and Occidental Petroleum.

_The Tax Impact of a Gibraltar Company Receiving Payments_

131.    As part of my analysis of the Acquisition, I have also analyzed the allegations in the Amended Complaint that Blavatnik attempted to circumvent U.S. tax liability by receiving payments related to the Acquisition through Nell, a Gibraltar based company.  For example, the Amended Complaint states that "Blavatnik also made sure to try to avoid any tax liability and arranged whenever possible to have payments to him made on his behalf to Nell Limited, his Gibraltar entity."[121]

132.    Nell was not created for the purpose of acquiring Lyondell.  Nell was formed in 2005, and was a part of Basell's pre-existing corporate ownership structure at the time of the Acquisition.  Nell was formed under the laws of Gibraltar, a member of the European Union,[122] to create a tax effective holding company for the Luxembourg corporate parents of Basell.[123]  Forming Nell under Gibraltar law prevented the imposition of Dutch income tax withholding at the source on any distributions by the

---

[120] "Confirmation of OTC Postpaid Share Forward", dated May 4, 2007 (ML-2004-236338-57) at ML-2004-234344.

[121] See also, Amended Complaint at ¶¶ 268(providing "Blavatnik's army of lawyers concocted an elaborate tax scheme involving several Blavatnik-controlled entities that sought to permit him to avoid any tax liability on the gain from the Toe-Hold Shares"), 272 (providing "In an attempt to further avoid United States tax liability, Nell Limited (not Access) was paid a $100 million transaction fee for the Merger").

[122] See On Business, at http://www.gibraltar.gov.gi/on-business (last visited Apr. 13, 2011).

[123] Blavatnik Dep. at 14.  Nell was formed in 2005 as part of the structure for the acquisition of Basell.

Highly Confidential, For Professional Eyes Only

Luxembourg corporate parents of Basell which would otherwise apply if Nell was not organized under the laws of a European Union nation.[124]

133.    In connection with the acquisition of Basell by Access, all but one of the material, foreign, corporate subsidiaries of Nell, including Basell, which were guarantors on the loan documents, elected to be treated as "disregarded entities" for U.S. income tax purposes under our so-called "check-the-box" regime.[125]  Nell in turn elected to be treated as a partnership for U.S. income tax purposes under the same regime.[126]  As a consequence, all of these foreign subsidiaries and Nell were not regarded as separate tax paying entities for U.S. income tax purposes.  The shareholders of Nell as "partners" in a partnership for U.S. income tax purposes, however, were and are subject to U.S. income tax on their "share" of any income earned or received by Nell or such foreign corporate subsidiaries - regardless of the country in which they were formed.  Consequently, the use of a Gibraltar holding company was tax neutral from a U.S. tax perspective.

134.    In structuring the acquisition of Lyondell, tax professionals, including PricewaterhouseCoopers, worked to develop a structure which produced the greatest amount of cash available to repay indebtedness by reducing taxes payable by the combined company on its worldwide operations.[127]  With that goal in mind, and as part of a well thought out and legitimate strategy to rationalize the U.S. and foreign operations of the combined company, it was determined that the proper funding of Toe-Hold Payment I to Nell was with cash provided through loans made to Basell Holdings and Basell Germany. The deductions for interest payable on these loans enabled these corporations to reduce local corporate income tax payable to the maximum extent permitted under German and Netherlands tax laws. [128]  The structuring was communicated to the lenders who were financing the Acquisition, several of whom signed an "Assumption of Contractual Duty" for PricewaterhouseCoopers in order to obtain PricewaterhouseCoopers' analysis of the proposed tax structure.[129]  The overall strategy to rationalize the U.S. and foreign operations of the combined company and to structure the financing necessary to fund the acquisition of Lyondell in the most cash and tax efficient fashion is common, and indeed appropriate, where a multinational corporation doing business directly or indirectly in many countries is

---

[124] See PwC Hugo Final Draft at LYO-UCC00264550 (discussing EU Parent/Subsidiary Directive).
[125] Id. at 15. The one exception noted was Basell Bayreuth Chemie GMBH which was a partnership.
[126] See Nell Form 8832, Entity Classification Election, dated 7/15/05.
[127] See PwC Hugo Final Draft.
[128] See Principal Worldwide Tax Objectives in 2007-8-11 Prelim Tax Summary Outline (LYO-UCC 00400755-62) at LYO-UCC00400757.
[129] See 2007-10-26 PWC letter (ML-2004-243624-33).

Highly Confidential, For Professional Eyes Only

acquired.[130]  Of critical importance, the amount of the overall borrowing by the combined company did not change, but rather the borrowers with respect to the loans which funded the Toe-Hold Payment I to Nell were specifically chosen for legitimate tax reasons.

135.    Transfers from Basell to Nell at the time of the Acquisition, including Toe-Hold Payment I, the transaction advisory fee, and the management fee,[131] would not have been considered taxable transactions for U.S. income tax purposes.  However, this result is not a function of the fact that Nell is a Gibraltar corporation, but rather that these transfers to Nell from its indirect foreign subsidiary, Basell Funding, were from a corporate subsidiary of Nell that had elected to be treated as a disregarded entity back in 2005.  For U.S. income tax purposes, the income and expenses of a disregarded entity flow through to the entity's owners.  Therefore, transactions between a disregarded entity and its owner have no U.S. income tax consequences.  These transfers, as well as the transfer of the Toe-Hold Position by Nell to Basell had no U.S. tax consequences because all of the foreign subsidiaries of Nell, including Basell and Basell Funding were disregarded entities.  Any distributions of cash, so received by Nell, to its U.S. shareholders in the future may be subject to income taxes when received.

136.    Effective tax planning is not prohibited under U.S. tax law.  The type of tax planning that occurred in connection the Acquisition is common and indeed appropriate for large U.S. and foreign corporations.  This type of tax planning minimizes tax payments to the extent permitted by applicable tax laws.

<b>Reasonably Equivalent Value:  Conclusion</b>

137.    Based on my experience and the research and analyses described above, it is my opinion that:

    a.  The totality of the circumstances indicates that a Basell received Reasonably Equivalent Value for the $48 per share paid for Lyondell stock.

    b.  In 2007, prior to the closing of the Acquisition, Lyondell's stock was traded in an efficient market.

    c.  An appropriate Premium-Free Stock Price for Lyondell shortly before the announcement of the Acquisition would have been approximately $37 per share both based on an analysis of Lyondell's stock price fluctuations and contemporaneous stock market analyst reports.

---

[130] See, e.g., October 8, 2007 email from Russ Bunting and tax presentation from Citibank (CITI_LYO_050039).
[131] See Amended Complaint at ¶ 263 (setting forth the Trustee's allegations regarding the transfer of the transaction advisory fee and management fee from Basell to Nell).

Highly Confidential, For Professional Eyes Only

d.  Applying a reasonable Acquisition Premium based on similar transactions to the Premium-Free Stock Price for Lyondell clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.

e.  Applying a range of Acquisition Premiums to Lyondell's stock price metrics in May, June, and early July 2007 clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.

f.  The transaction was an Acquisition, not an LBO.

g.  The Acquisition was an Arm's Length Transaction.

h.  The use of a forward contract for the Toe-Hold Position and the use of a Gibraltar based Company to receive the Toe-Hold payments appear to be normal business decisions driven by regulatory and tax considerations and not bad faith.

## VI.    Access Revolver Draw and Repayment

*Access Revolver – Background*

138.    On March 27, 2008, Access entered into a revolving credit agreement (the "Access Revolver") where Access committed to provide Lyondell and Basell Finance (collectively, the "Access Borrowers") up to $750 million.[132]

139.    Typical of revolving credit agreements, under the terms of the agreement, the Access Borrowers were allowed to borrow, repay and borrow again funds on any business day until the maturity date of the agreement without penalty.[133]  After the Access Revolver was put in place, LBI and Access typically would discuss LBI's liquidity on a weekly basis, usually on Thursdays after LBI issued its Wednesday liquidity forecast.[134]

---

[132] Access Revolving Credit Agreement dated as of March 27, 2008 (ACC00108525-617).  The Access revolver would later be amended on April 30, 2008 (see Letter of Consent to Amending Revolving Credit Agreement, dated April 30, 2008 at LYO-UCC 00417560) to conform with the amendments of the credit agreement governing the Senior Credit Facilities (which was also amended on April 30, 2008), but would largely retain the same terms as the original agreement, including interest rate and borrow and repayment terms.  The Access Revolver was "amended to (i) conform to certain of the amendments to the Senior Secured Credit Facility and (ii) make other changes, including technical and typographical corrections." (See Lyondell Chemical Company 10-Q for the quarter ended June 30, 2008 at 15.)

[133] Revolving Credit Agreement, dated March 27, 2008, as amended on April 30, 2008 ("the Revolving Credit Agreement") at 39-40.

[134] See Deposition of Ann P. Graves, October 20, 2009 ("Graves Dep.") at 47- 48.

Highly Confidential, For Professional Eyes Only

140.    Although the Access Revolver was in place and available to the Access Borrowers to be drawn upon as of March 27, 2008, the Access Borrowers did not draw any amounts from the facility until October of the same year.

141.    Earlier in the year, however, there was one occasion where the Access Borrowers thought they would have to draw on the Access Revolver, and even advised Access that such a draw request might occur, but ultimately did not make any draw until October 15, 2008.  On Thursday, April 10, 2008, Karen Twitchell, Vice President and Treasurer of LBI (previously of Lyondell Chemical), had a phone conversation with Richard Storey, Senior Vice Present and Finance Director of Access, and let him know that based on the liquidity forecast that Lyondell routinely prepared, LBI might need to draw on the Access Revolver the following week.[135]  However, Twitchell advised him that she would speak to him the following Monday, once she obtained information critical to determining whether or not LBI would need to draw on the Access Revolver.[136]  It is important to note that the amount and duration of the draw contemplated in April 2008 ($135 - $310 million, with at least the majority repaid in approximately the next week) was consistent with the draw in October 2008.[137]  The following Monday, Twitchell did speak to Storey, but advised him that they no longer needed to borrow under the Access Revolver that week.[138]  LBI no longer needed to draw on the Access Revolver because cash receipts were greater than expected and LBI was able to close on an amendment to its European Accounts Receivable Securitization Program to add certain of its Lyondell subsidiaries as sellers under the programs, which added availability under the program of approximately $150 million.[139]  Furthermore, LBI's records indicate that cash flow was such that liquidity increased $81 million from Thursday to Monday, and LBI was even able to reduce its borrowings under the Bank Revolver by $87 million on that Monday.[140]  By the end of the week, LBI's liquidity increased by an additional $185 million, and LBI further reduced its Bank Revolver loan balance by $135 million.[141]  As a matter of fact, after April 10, 2008, the next time LBI's liquidity decreased to levels at or below its liquidity level on April 10, 2008, was on October 15, 2008, the first time LBI drew on the Access Revolver.[142]

---

[135] Deposition of Karen Twitchell, October 13, 2009 ("Twitchell Dep.") at 61-62.
[136] Id. at 62:16-20.
[137] See Email from P. Kassin to K. Twitchell, dated April 10, 2008, at ACC00178448- ACC00178451.
[138] Twitchell Dep. at 63:5-9.
[139] Declaration of Karen Twitchell, dated December 10, 2009 ("Twitchell Declaration") at ¶ 77.
[140] Total Daily Liquidity Spreadsheet ("Total Daily Liquidity"),(LYO-UCC00263750-891) at LYO-UCC 00263753-4.
[141] Id.
[142] Id. at 54 and 60.

Highly Confidential, For Professional Eyes Only

142.    After the near draw on April 15, 2008, the pattern and practice of Thursday discussions following Wednesday forecasts continued.  During a the weekly call on Thursday October 9, discussing a Wednesday October 8, forecast, Twitchell advised Storey of the need to draw on the Access Revolver the following week. [143]

143.    On October 15, 2008, and per the terms of the loan agreement, Lyondell submitted a written draw request (Committed Loan Notice) to Access in the amount of $300 million.[144]  Access honored the draw request, and transmitted $300 million to Lyondell on the same day.[145]

144.    Lyondell would later repay the $300 million amount it had drawn in three $100 million increments over the course of the next three business days, October 16, 17 and 20.[146]  In accordance with the terms of the loan agreement, on each of the three repayment dates Lyondell provided written notice to Access specifying the dates when Lyondell would make the payments,[147] and Lyondell made the payments on those dates.[148]

145.    The October 15, 2008 draw was the only time any portion of the Access Revolver was drawn upon.[149]

### *It Was In the Ordinary Course of Business or Financial Affairs of Lyondell and Access for Lyondell to Incur Indebtedness, and for Access to Advance Funds to Enhance Lyondell's Liquidity*

146.    Prior to the October draw, LBI had managed its cash balances by borrowing under its Bank Revolver, Inventory ABL and Receivable ABL loan facilities.  LBI borrowed under these facilities to ensure that it had sufficient cash on hand to fund wire transfers or checks clearing and other cash needs on a daily basis, in the event that cash on hand or receipts credited earlier in the day were insufficient to cover such disbursements.[150]

---

[143] Twitchell Declaration at ¶ 86.

[144] Committed Loan Notice Revolver, dated October 15, 2008 (LBI/PPD-00000372-3).

[145] Email from Aaron Skidmore (LBI) to Javier Martinez (Access) (ACC00007316-333) at ACC00007323.

[146] October 18 and October 19, 2008 were non-business days (Saturday and Sunday, respectively).

[147] Revolving Credit Agreement at 41.

[148] Revolving Paydown Request, October 16, 2008 (LBI/PPD-00000476), Revolving Paydown Request, October 17, 2008 (LBI/PPD-00000477), Revolving Paydown Request, October 20, 2008 (LBI/PPD-00000478).

[149] On December 30, 2008, Lyondell submitted a written draw request to draw the entire $750 million loan commitment (Committed Loan Notice, December 30, 2008, ACC00000189).  However, the draw request was not honored by AI International, which responded with a formal letter indicating the reasons for not honoring the draw request (ACC00010581).

[150] Lynn Coleman, member of LBI supervisory board, testified, "The purpose of a revolver is to help you in meeting your liquidity requirements.  And at that time with the oil price being as it was and has been, it would be difficult to predict exactly what your liquidity needs would be or perhaps even what your liquidity resources would be very

Highly Confidential, For Professional Eyes Only

147.    Furthermore, the use of revolving credit and/or asset based facilities to manage near-term liquidity was common in the refining and chemical industries at the time.  As illustrated in Exhibit 6-A, all 22 of the companies that I researched in the refining and chemical industries[151] had one or more revolving credit facilities in 2008, and the majority of these companies had outstanding borrowings under these credit facilities on either September 30, 2008 or December 31, 2008 (the quarterly reporting dates immediately preceding and following the October Access Revolver draw).  In addition, seven of these companies also had asset-based loan facilities at the time, which similarly had balances as of September 30, 2008 or December 31, 2008 (see Exhibit 6-B).  Based upon the existence and prevalent use of revolving and asset based credit facilities within the industry at the time, I would have expected LBI to incur indebtedness under the Access Revolver when and if needed for working capital purposes.

148.    Furthermore, the Access Revolver (or a facility like it) was expressly allowed under the Bank Revolver, which specifically carved out up to $750 million in additional indebtedness (the same amount as the maximum commitment under the Access Revolver) that LBI or its subsidiaries would be allowed to incur.[152]  The Access Revolver credit agreement shared many similar (if not identical) terms as the Bank Revolver credit agreement, including: borrowing and repayment procedures and the ability to re-borrow, timing of interest and commitment fee payments, financial covenants, events of default and remedies to the lender upon an event of default.  Indeed, LBI's financial reports filed with the SEC disclosed that the Access Revolver had substantially the same terms as the Bank Revolver, except that it was unsecured and not guaranteed by the subsidiaries of LBI.[153]  Moreover, as noted above, obtaining an additional $750 million in debt for LBI was specifically contemplated by and provided for in the Senior Credit Facilities in section 7.03.[154]  The structure and terms of the revolving credit agreement were typical of the numerous revolving credit agreements I have reviewed over the course of my career, and as previously discussed, it was common for companies within the chemical and refining industries to enter into such borrowing arrangements.

149.    Since the Acquisition and prior to the October Access Revolver draw, LBI would borrow, repay and re-borrow varying amounts under its Bank Revolver.  The balance drawn under the Bank Revolver

---

far into the future.  That is -- that condition which most companies have is why people have credit revolvers."
Deposition of Lynn Coleman, dated February 15, 2011 at 91:14-23.

[151] The companies that I researched were identified as comparable chemical or refining companies in the Expert Report of Daniel R. Fischel, dated November 7, 2009.

[152] Senior Credit Agreement, dated as of December 20, 2007 (ACC00112427-636) at ACC00112563.

[153] Lyondell Chemical Company 10-Q for the quarterly period ended March, 31, 2008, at 14.

[154] See 7.03(l) in the 12-20-2007 Credit Agreement.

Highly Confidential, For Professional Eyes Only

would change over time based upon repayments or additional borrowings. After the Acquisition closed and prior to the October draw, LBI incrementally drew against its Bank Revolver 15 different times, and repaid its Bank Revolver balance from the prior day's balance a total of 17 times over the same time period.[155]

150.    It was clearly anticipated that if LBI required the liquidity, it would draw on the Access Revolver and Access would fund as needed.   As noted in the deposition of Ann Graves,[156] a weekly process was instituted to communicate Lyondell's liquidity position to Access, including "to give [Access's Rich Storey] an indication of what sort of borrowing need there may be in the future, in the near future." In her deposition on October 13, 2009, Karen Twitchell also confirmed "After the Access revolver was put in place in March, we, the Treasury Group, agreed to have a weekly call with Rich Storey to briefly go through the cash flow forecasts, and I believe we agreed to do it on Thursday afternoon so that we would have the Wednesday afternoon forecast. And so we talked to him on Thursday afternoon and tell him whether or not we thought that there was a likelihood of having to borrow the following week. Just sort of a standard, weekly procedure that we put in place." In fact, consistent with this pattern and practice, the October 15 draw followed the Wednesday October 8 report and Thursday October 9 conference call.[157]

151.    On the day that Lyondell drew the $300 million from the Access Revolver, the remaining availability under LBI's asset-based loan facilities (the Inventory ABL and the Receivable ABL) and Bank Revolver were insufficient, both individually and in the aggregate, to provide Lyondell with the $300 million liquidity it sought to borrow.[158]   However, with $750 million in committed funds yet undrawn and available under the Access Revolver, the Access Revolver provided Lyondell with a single source to borrow the $300 million it sought, and still left up to $450 million in additional availability under the Access Revolver, if needed.  As such, because the $300 million was not available under the ABL Facilities or the Bank Revolver, LBI borrowed the amount under the Access Revolver, just as it normally would under its Bank Revolver in order to manage its liquidity.  LBI's October borrowing under the Access Revolver was logical under the circumstances, and something that I would have expected given the insufficient availability under the other credit facilities at the time.

---

[155] Total Daily Liquidity at LYO-UCC 00263751-9.
[156] Graves Dep. at 47-48.
[157] Twitchell Declaration at ¶86.
[158] On October 15, 2008, the Bank Revolver, Inventory ABL and Receivable ABL had $11 million, $29 million and $128 million in availability, respectively. Total Daily Liquidity at LYO-UCC 00263759.

Highly Confidential, For Professional Eyes Only

152.    In allowing Lyondell to borrow $300 million on October 15, 2008, Access was honoring a draw request under the terms of an executed credit agreement that it had previously entered into with the Access Borrowers.  Having agreed in March 2008 to the terms of the Access Revolver, and having thereby committed itself to extending revolving credit according to the terms of the Access Revolver, Lyondell's draw on the Access Revolver and Access' extension of revolving credit under the Access Revolver in October 2008 in response to Lyondell's draw request, was plainly in the ordinary course of business or financial affairs of both Lyondell and Access.

153.    In addition, it was ordinary practice for Access to advance funds to its affiliates when such borrowings were needed for corporate purposes.  Furthermore, some of these advances were made to Access affiliates within the oil and gas industry.[159]  These loans were made when Access' affiliates needed advances to fund working capital (as in Lyondell's case) or other investments on an as needed basis.[160]  This loan activity demonstrates Access' pattern of practice of regularly providing loans to affiliates when needed.

154.    To summarize, Access honored a draw request under the terms of a pre-established formal agreement with the Access Borrowers, a practice that is similar to how the Access Borrowers made requests under the Bank Revolver, and consistent with the practice of others in the petrochemical industry.  Access honored the draw request consistent with its contractual commitment established between the parties since the execution of that contract, and consistent with its practice of advancing funds to affiliates.  Therefore, it is my opinion that in drawing on the Access Revolver, Lyondell incurred debt in the ordinary course of  business or financial affairs of Lyondell and Access.


_It Was In the Ordinary Course of Business or Financial Affairs of Lyondell and Access for Lyondell to Repay the October Draw_

155.    As previously mentioned, prior to the October draw, on numerous occasions LBI would fluctuate its Bank Revolver balance by borrowing and repaying amounts in an effort to maintain its desired cash balance of $300 million - $500 million.[161]  Furthermore, it was common for LBI to increase the amount borrowed under the Bank Revolver, only to repay some or all of the incremental amount borrowed over

---

[159] Declaration of Richard Storey on behalf of Access Industries Holdings LLC, dated April 15, 2011, at ¶ 3.  annexed hereto as Exhibit 6-C.
[160] Id.
[161] In the Declaration of Karen Twitchell, paragraph 66, she notes "On a daily basis, LBI could generally operate with $300 million to $500 million of liquidity.  While LBI generally did not need more than approximately $300 million in liquidity in a single day, it would typically need more liquidity on the 15th and 30th of each month."

Highly Confidential, For Professional Eyes Only

the course of the next few business days or even the very next business day.[162]  As a matter of fact, after the Acquisition closing and prior to the October draw, there were eight separate occasions where LBI fully repaid incremental borrowings that it had made within five business days of the borrowings, and of those eight occasions, six were instances where the incremental borrowings were repaid within two business days.[163]  Therefore, repaying the Access Revolver October draw within three business days was similar to the timing of repayments that LBI had made under its Bank Revolver on several occasions earlier in the year.

156.    LBI would borrow the funds available under its revolving credit facilities to make sure enough cash was available to cover any disbursements reasonably expected to clear that day.  Once the need to cover disbursements had passed, any cash in excess of what LBI felt it needed the next day would be used to pay down its revolving borrowings.  This is logical and customary behavior for companies with interest-bearing revolving credit facilities, because borrowings incur interest, and revolving borrowings can be repaid with the ability to re-borrow funds again in the future,[164] companies are incentivized to minimize interest cost by borrowing only when they have a need.[165]  Thus, when Lyondell repaid the October draw, it was only doing what it would have normally done if it had borrowed the $300 million from the Bank Revolver (although on October 15, 2008, there was insufficient availability under the Bank Revolver) or from any interest-bearing revolving loan agreement for that matter.  As a matter of fact, *after* Lyondell fully repaid the October Access Revolver draw, LBI did in fact pay down its Bank Revolver loan balance by $668 million in the month of November, as its cash-on-hand needs lessened.[166]

---

[162] For example, on March 7, 2008, LBI borrowed an additional $128 million on its Bank Revolver, bringing the Bank Revolver loan balance up to $351 million, only to repay $145 million (more than the amount it had just incrementally borrowed) the very next business day. Total Daily Liquidity at LYO-UCC 00263753.

[163] See Total Daily Liquidity at LYO-UCC 00263751-9.

[164] When asked if it was Access' expectation that the $300 million draw would be repaid quickly, Alexander Blavatnik, Executive Vice President of Access and member of the Access Investment Committee, responded, ". . . just in general . . . my personal expectation was it wouldn't be something that would be outstanding for months and months and years, you know.  Because it is a revolver, I think it just kind of revolves.  So, you know, that's -- that's what it's for."  Deposition of Alexander Blavatnik, dated November 10, 2010 at 112: 12-23.

[165] Alan Bigman, CFO of LBI, when asked if it was LBI's practice to pay down the Bank Revolver when there were funds available to do so, testified, "It was normal practice to avoid having negative carry by having funds on deposit while at the same time borrowing."  Deposition of Alan Bigman, dated March 3, 2011 at 116:24-25 through 117:2-5.

[166] On November 4, 7 and 17, 2008, LBI repaid and decreased its Bank Revolver loan balance by $140 million, $428 million and $100 million, respectively. Total Daily Liquidity at LYO-UCC 00263759-761.

Highly Confidential, For Professional Eyes Only

157.    It made perfect sense for LBI to prioritize paying down the Access Revolver as opposed to its ABL Facilities or the Bank Revolver, since the Access Revolver carried a higher interest rate than these three other credit facilities (see table below).[167, 168]

| LBI Revolving and Asset-Based Credit Facilities as of October 16, 2008 | | | | |
|---|---|---|---|---|
| Tranche | Receivable ABL | Inventory ABL | Secured Revolver | Access Revolver |
| Maximum Commitment | $1,150 million | $1,600 million | $1,000 million | $750 million |
| Base Rate Loan Pricing | BASE + 1.00% to BASE + 0.50% | BASE + 1.25% to BASE + 0.75% | BASE + 2.50% to BASE + 2.00% | BASE + 5.00% to BASE + 4.50% |
| Euro Rate Loan Pricing | LIBOR + 2.00% to LIBOR + 1.50% | LIBOR + 2.25% to LIBOR + 1.75% | LIBOR + 3.50% to LIBOR + 3.00% | LIBOR + 6.00% to LIBOR + 5.50% |

158.    Lastly, in accordance with the terms of the Access Revolver credit agreement,[169] Lyondell provided written notice to Access of repayment and repaid the $300 million borrowing on each of the three repayment dates.[170]  In addition, the contemplated draw and repayment in April was similar to the October draw and repayment in terms of timing and amount.

### The Borrowing and Repayment were Made in Accordance with Ordinary Business Terms

159.    The practice of extending a revolving credit facility to an affiliate in the petrochemical industry was not just limited to LBI's revolver with Access.  As a matter of fact, Kent Potter, current CFO of LBI, mentions in his deposition that Chevron Philips entered into a revolving credit facility with its subsidiary CPChem to assist with working capital needs.  Potter further noted that this facility was in place and drawn upon at Chevron Philips.[171]

160.    As previously discussed, the use of revolving credit and asset based facilities to manage near-term liquidity was common in the refining and chemical industries at the time.  Every chemical or refining industry peer company that I researched had at least one revolving credit facility in place and the majority of these facilities had outstanding borrowings at the end of the quarters immediately preceding and following the October borrowing (see Exhibit 6-A).  As such, Lyondell's ability to borrow

---

[167] Javier Martinez, Associate at Access, testified, "You wouldn't draw a more expensive liquidity facility if you didn't need it.  It was more expensive than the ABF [Asset Based Facility] that they had and they had access to." Deposition of Javier Martinez, dated November 5, 2010 at 240:6-13.

[168] Ann Graves, Assistant Treasurer of LBI, testified, ". . . if we borrowed on an external facility, particularly the Access revolver that was expensive, we would pay quite a bit for it." Graves Dep. at 25:4-10.

[169] Access Revolving Credit Agreement dated as of March 27, 2008, as amended as of April 30, 2008, p. 41.

[170] Revolving Paydown Request, October 16, 2008 (LBI/PPD-00000476), Revolving Paydown Request, October 17, 2008 (LBI/PPD-00000477), Revolving Paydown Request, October 20, 2008 (LBI/PPD-00000478).

[171] Deposition of C. Kent Potter, dated October 20, 2010 at 204:11-22.

Highly Confidential, For Professional Eyes Only

and repay amounts under the Access Revolver to manage liquidity was consistent with the ability (and therefore borrowing and repayment terms) of its industry peers.

161.    In addition to looking at companies in LBI's industry, one can also compare the terms of the Bank Revolver that LBI had in place (and was using) against that of the Access Revolver.  The Bank Revolver was a revolving credit agreement that was separately negotiated at arm's length and entered into with third party lenders when the Acquisition closed and thus prior to the Access Revolver.  As previously mentioned, the Access Revolver agreement shared many similar (if not identical) terms as the Bank Revolver agreement, more notably of which were the terms that allowed for daily borrowing, repayment and re-borrowing of the committed amounts if all other terms under the credit agreements were satisfied.

162.    Lastly, LBI's ability to borrow and repay amounts from Access, an affiliate company, was consistent with other companies in the petrochemical industry where companies were borrowing and repaying amounts from affiliates, such as the one at CPChem discussed above.  In addition, as previously discussed, Access would similarly make advances to its affiliates (including oil and gas affiliates) when needed for working capital or other purposes.

## VII.    Conclusions

Based on the analyses and research referenced in this Report, I have reached the following conclusions:

163.    *What were the sources of funding of the payments made to Nell (Toe-Hold Payment I) and ML Derivatives (Toe-Hold Payment II) which the Amended Complaint refers to as the "Toe-Hold Payments," and were these payments funded by borrowings against Lyondell's assets?*

- Toe-Hold Payment I was funded by the Dutch Tranche A Term Loan to Basell Holdings and the German Tranche B Term Loan to Basell Germany, while Toe-Hold Payment II was funded by LB Finance out of the proceeds of a draw by LB Finance on the Bridge Loan.

   o    Basell Holdings was a Netherlands based company which held substantially all of the operating assets of Basell, and had billions of dollars of positive equity as of December 2007.  Basell Germany was a German subsidiary of Basell Holdings which held certain of Basell's operating assets.  These entities borrowed the funds used for Toe-Hold Payment I directly (and transferred these funds to Basell Funding) and had sufficient equity value to support these borrowings.  Therefore, these borrowings were achieved from Basell side entities, with no reliance on any of Lyondell's assets.

Highly Confidential, For Professional Eyes Only

- o   LB Finance's primary asset, and therefore the collateral for the Bridge Loan, is the equity in an entity that owned Lyondell's stock.  Therefore, the collateral for the borrowing which funded the Toe-Hold Payment II was only the equity of Lyondell, which was behind Lyondell's creditors in terms of priority of repayment.  As such, assets available to pay Lyondell creditors were not pledged to pay Toe-Hold Payment II.

- It is clear that both Toe-Hold Payment I and Toe-Hold Payment II were funded through borrowings in which the borrower was not Lyondell, but rather in the case of Toe-Hold Payment I it was Basell entities borrowing based on their own borrowing capacities and in the case of Toe-Hold Payment II, it was an entity whose borrowing was collateralized by the equity value in Lyondell.

- All of the parties to the Senior Credit Facilities and Bridge Loan guaranteed each other's obligations.,  Due to the Carveback or Savings Clauses in these agreements, however, these guarantees were not valid to the extent that any Guarantors were insolvent or that the guarantees made any Guarantors insolvent.

164.    *When it acquired Lyondell's stock through its purchase of 100% of the equity of AI Chemical, the value of which was equal to the shares it owned or had the right to acquire, did Basell Funding and its affiliates receive Reasonably Equivalent Value for the $48 per share price that they paid?*

- The totality of the circumstances indicates that Basell and its affiliates received Reasonably Equivalent Value for the $48 per share paid for Lyondell stock.

- In 2007, prior to the closing of the Acquisition, Lyondell's stock was traded in an efficient market.

- An appropriate Premium-Free Stock Price for Lyondell shortly before the announcement of the Acquisition would have been approximately $37 per share both based on an analysis of Lyondell's stock price fluctuations and contemporaneous stock market analyst reports.

- Applying a reasonable Acquisition Premium based on similar transactions to the Premium-Free Stock Price for Lyondell clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.

- As shown in the chart below, applying a range of Acquisition Premiums to Lyondell's stock price metrics in May, June, and early July 2007 (prior to the execution of the Merger Agreement) clearly indicates that Lyondell's shares were reasonably equivalent to $48 per share.

Highly Confidential, For Professional Eyes Only

| Lyondell Stock Value Based on Stock Price and Acquisition Premium Range as a % of $48 | | | |
|---|---|---|---|
| | | As a % of $48 | |
| Closing Stock Price on: | Low | Mid | High |
| 7/16/07    Day Prior to Anouncement of Merger Agreement | 104% | 109% | 113% |
| 6/18 - 7/16 20 Day Trailing Average | 100% | 104% | 108% |
| 6/4 - 7/16 30 Day Trailing Average | 99% | 103% | 107% |
| 4/20 - 7/16 60 Day Trailing Average | 95% | 99% | 102% |
| 6/26/07    Anouncement of Basell offer for Huntsman | 93% | 97% | 101% |
| 6/26 - 7/2  5 Day Average After 6/26/07 | 96% | 100% | 104% |
| 5/11/07    13-D Anounces Toe Hold | 96% | 100% | 103% |
| 5/4 - 5/10  5 Day Average Prior to 13-D | 87% | 91% | 94% |
| Average | 96% | 100% | 104% |
| Median | 96% | 100% | 104% |
| Minimum | 87% | 91% | 94% |
| Maximum | 104% | 109% | 113% |

Source for stock prices:  Capital IQ

- <u>Contemporaneous analyst reports (as well as other indications) support that the value of the shares was reasonably equivalent to $48 per share.</u>
  - o  For example, in UBS's July 17, 2007, UBS indicated that in their view the non-controlling share value of Lyondell should have been at $39 per share.  In addition to that, UBS had expected a $10 per share "takeover premium" (Acquisition Premium), which would have brought the price up to $49 per share.  However, UBS was not sure that an acquisition would occur and therefore discounted the Acquisition Premium by 50%.
  - o  After the Acquisition was announced, at least two firms issued stock analyst reports contemplating potential higher offers from competitors.

165.  *Was the Acquisition an Arm's Length Transaction?*

- <u>As demonstrated by the interaction between Access and its affiliates and representatives and Lyondell and its representatives, the Acquisition was an Arm's Length Transaction.</u>

166.  *Did Basell and its affiliates' acquisition of the shares of Lyondell in the Acquisition constitute an LBO for the purposes of considering an exchange of value?*

- <u>The transaction that closed on December 20, 2007, which resulted in the acquisition and cancellation of all outstanding shares in Lyondell by Basell, was an acquisition, not an LBO.</u>

Highly Confidential, For Professional Eyes Only

- An LBO is typically carried out by a financial investor, which exclusively uses the assets of the target company as collateral for the debt needed to facilitate the acquisition of the target company's outstanding shares.

- Basell was not a financial investor, but instead a strategic buyer that acquired Lyondell to expand its existing petrochemical operations.

- In further contrast to an LBO, in addition to using Lyondell's assets as collateral for the acquisition financing, Basell pledged its own assets as collateral (thereby placing billions of dollars of its own assets and the residual equity of its shareholder (Nell) at risk, and not just those of the company that it was acquiring).

167.  *Did Access' affiliates' use of a forward contract for the Toe-Hold Position or of a Gibraltar based company to receive the Toe-Hold Payments suggest bad faith?*

- The use of a forward contract for the Toe-Hold Position and the use of a Gibraltar based Company to receive the Toe-Hold payments appear to be normal business decisions driven by regulatory and tax considerations.

  - Obtaining a toe-hold such as the one obtained by AI Chemical is a common and effective method for initiating an acquisition and for improving the odds (and lowering the cost) of successfully acquiring the target.

  - The driving factor behind the use of a forward contract for the acquisition of the Toe-Hold Position was compliance with regulations pursuant to the Hart-Scott-Rodino Act, which limited the amount of shares that Basell and its affiliates could take possession of prior to obtaining HSR approval.

  - Transfers from Basell to Nell at the time of the Acquisition, including the Toe-Hold Payment I, the transaction advisory fee, and the management fee, would not have been considered taxable transactions for U.S. income tax purposes.  However, this is not a function of the fact that Nell is a Gibraltar corporation, but rather these transfers to Nell from its indirect foreign subsidiary, Basell Funding, were not treated as taxable transactions for U.S. tax purposes because each of the corporate subsidiaries of Nell had elected to be treated as a disregarded entity back in 2005.  For U.S. income tax purposes, the income and expenses of a disregarded entity flow through to the entity's owners.  Therefore, transactions between a disregarded entity and its owner have no U.S. income tax consequences.  These transfers, as well as the transfer of the Toe-Hold

Highly Confidential, For Professional Eyes Only

Position by Nell to Basell had no U.S. tax consequences because all of the foreign subsidiaries of Nell, including Basell and Basell Funding were disregarded entities.

168.    *Were the draw and repayments on the Access Revolver in October 2008 done in the ordinary course of business or financial affairs?*

- It was in the ordinary course of business or financial affairs of Lyondell and Access for Lyondell to incur indebtedness through the October 2008 borrowing, and the October advance was consistent with Access' practice of providing advances to its affiliates for working capital (including some affiliates in the oil and gas industry).

    o   It was customary business practice for LBI to use its revolving credit facilities to manage its day-to-day liquidity requirements by drawing against its revolving credit facilities when additional liquidity was needed.  The October borrowing of the Access Revolver was a continuation of this customary business practice, where LBI instead utilized the Access Revolver, because the availability under its other revolving credit facilities was insufficient to cover the $300 million in additional liquidity LBI sought to have.

    o   The draw request was consistent with the past practice between Lyondell and Access in that, among other things, Lyondell told Access on Thursday October 9, based on the Wednesday October 8 forecast, that it would be making the draw the following week.  It is also similar in timing and size to the draw that Lyondell almost made in April.

    o   The Access Revolver borrowing and repayment terms were similar to those of LBI's Bank Revolver, which had been separately negotiated with third party lenders and put in place prior to the Access Revolver.

- This additional indebtedness was expressly permitted under LBI's existing Senior Credit Facility. It was in the ordinary course of business or financial affairs of Lyondell and Access for Lyondell to repay the October borrowing.

    o   LBI's repayment of the Access Revolver was ordinary business practice, because LBI normally repaid borrowings on its revolving credit facilities when such borrowings were in excess of its daily cash needs, in order to minimize interest costs (especially since Access carried the highest interest rate among its revolving credit facilities).

    o   LBI's customary practice of repaying excess borrowings under its revolving credit agreements is easily observed when reviewing the numerous instances LBI repaid

Highly Confidential, For Professional Eyes Only

borrowings under the Bank Revolver prior to its October 2008 Access Revolver draw and repayment.

- o Lyondell's draw on the Access Revolver, and Access' extension of revolving credit under the Access Revolver in response to Lyondell's draw request, was plainly in the ordinary course of business or financial affairs of both Lyondell and Access.

- The borrowing and repayment were made in accordance with ordinary business terms.
  - o Many companies in chemical and refining industry had similar revolving credit agreements in place and made use of these facilities (to borrow and repay amounts as needed) at the time of the October 2008 Access revolver borrowing and repayment.
  - o Other companies in the petrochemical industry had entered into similar affiliate loan agreements, such as Chevron Philips.

I reserve the right to update or modify the analyses and conclusions presented in this report to the extent that additional information becomes available, or based on further analysis of the data and information that has been provided to me.

Respectfully Submitted,

M. Freddie Reiss
April 15, 2011

Highly Confidential, For Professional Eyes Only

**EXHIBIT 1**

**Curriculum Vitae for M. Freddie Reiss**

Highly Confidential, For Professional Eyes Only



# M. Freddie Reiss, CPA, CIRA, CTP

### Senior Managing Director - Corporate Finance

freddie.reiss@fticonsulting.com

633 West 5th Street
Suite 1600
Los Angeles, CA  90022
Tel: (213) 452-6001
Fax: (213) 452-6099

**Certifications**
Certified Public Accountant

Certified Insolvency and Restructuring Advisor

Certified Turnaround Professional

Forensic and Valuation Services • FVS

**Professional Affiliations**
American Institute of Certified Public Accountants

California and New York Societies of Certified Public Accountants

Los Angeles Bankruptcy Forum

American Bankruptcy Institute

American College of Bankruptcy

Association of Insolvency and Restructuring Advisors

Turnaround Management Association

**Education**
M.B.A., City University of New York, Baruch College

B.B.A., Bernard Baruch School of Business, City College of New York

M. Freddie Reiss is a senior managing director in FTI's Corporate Finance practice and the national leader of company-side practice and is based in Los Angeles. Mr. Reiss has 30 years of experience in strategic planning, cash management, liquidation analysis, covenant negotiations, forensic accounting and valuation. He specializes in advising on bankruptcies, reorganizations and business restructurings and in providing expert witness testimony for underperforming companies. He has also acted as interim management, a fiduciary, chief restructuring officer and trustee in various troubled situations.

Mr. Reiss' industry experience includes real estate, manufacturing, healthcare, entertainment, retail, financial services, municipalities, natural resources and energy, and nonprofit and government services. He has provided expert testimony on insolvency, fraudulent transfers, cash collateral, debtor-in-possession lending claims and damages matters, plans of reorganization, substantive consolidation and valuation issues.

Mr. Reiss has advised on more than 100 bankruptcy-related matters. Some of his most notable engagements include PG&E, America West, K-Mart, Circle K, Daewoo Motors America, Orange County Investors' Pool and Executive Life, Refco and Iridium. He has also advised on multiple out-of-court restructurings for corporations such as Euro Disney, Musicland, K-Mart, Syncora, Tower Records and Edwards Theatres. His merger and acquisition transaction advisories include Edwards Theatres and Resort Theaters.

Prior to joining FTI, Mr. Reiss was a partner and west region leader at PricewaterhouseCoopers, where he co-founded the Business Restructuring Services practice.

Mr. Reiss is a recognized expert in the field of financial restructuring. He has given presentations and speeches on various topics for 20 years as well as authored articles and chapters in financial publications. His most recent topics include "Workout Strategies for CRE Problem Loans", "U.S. Economic Overview, Corporate Credit Markets Update and Commercial Real Estate Sector Trends", "Where are the Future Insolvencies? Perspectives on the State of the Restructuring Industry for the New Millennium" and "Perspectives on the State of the Restructuring Industry – A New Millennium." He co-authored the American Institute of Certified Public Accountants' Bankruptcy Guide. He authored a chapter entitled "Asian Markets" in *Workouts & Turnarounds II* (Jon Wiley & Sons, Inc., 1999) and has been a panelist and moderator at conferences and symposiums across the United States.

Mr. Reiss holds a M.B.A. from City University of New York's Baruch College and a B.B.A. from City College of New York's Bernard Baruch School of Business. He is a certified public accountant in New York and California, a certified insolvency and restructuring advisor and a certified turnaround professional.

Mr. Reiss is a member of the American Institute of Certified Public Accountants, the New York and California Societies of Certified Public Accountants. He previously served on the board of the American Bankruptcy Institute, the American College of Bankruptcy, the Los Angeles Venture Association where he was also the former president, the Association of Insolvency and Restructuring Advisors, the Los Angeles Bankruptcy Forum and the Turnaround Management Association.  He currently is on the Board of Trustees for the Baruch College Fund and the



www.fticonsulting.com

M. Freddie Reiss

Brentwood Country Club where he is also Treasurer.

## Professional Experience

### Reorganization and Bankruptcy

- Real Estate - REITs, land development, multifamily, retail and industrial operating properties.

- Healthcare - Knox Keene licensed prepaid healthcare plans, medical groups, etc.

- Entertainment - theme parks, hotels, movie theatre chains.

- Retail - department stores, convenience stores, specialty boutiques, manufacturers utilizing factoring, etc.

- Financial Services - large investment advisory services, money management firms, private hedge funds, mutual funds, interest rate swap dealers and principals, merchant bankers, mortgage brokers, etc.

- Manufacturing - furniture industry, paper and packaging, computer and disk drive companies, other high technology products, consumer products, etc.

- Municipalities - represented creditors' group in Orange County Investors' Pool, California's largest municipality Chapter 9 in history.

- Service Industry - travel, legal firm services, royalty audits, retailing, steel distribution centers, etc.

- Natural Resources - farming, agricultural distribution, utilities, energy producers.

- Nonprofit and Governmental Services - California Lottery Commission, various federally and state funded drug addiction treatment centers and services.

### Bankruptcy or Bankruptcy Related Matters

- Debtor/Trustee

    - Advent Management/Coastal Insurance

    - Allisons Place

    - Anchor Glass  (testified)

    - Ardent Inc.

    - Arizona Biltmore

    - Boyd Furniture Inc.  (testified)

    - Brobeck, Phleger & Harrison LLP  (testified)

    - Budget Furniture Rentals  (testified)

    - Care Incorporate  (testified)

    - Carter Hawley Hale

    - Clark Retail Enterprises  (testified)

    - Continental Capital Credit Inc.



Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

-   Daewoo Motors America Inc.  (testified)

-   Drew National Corporation

-   Edwards Theatres  (testified)

-   Fairlight Instruments

-   Financial Corporation of America  (testified)

-   First Capital Holdings  (testified)

-   First Executive Corporation

-   First Lenders Indemnity  (testified)

-   Galletti Brothers Foods, Inc.

-   Halcyon (Terminator Salvation)

-   Home Systems Inc.

-   International Cook King, Inc.

-   Leasing Solutions  (testified)

-   Marina Cabrillo

-   Maxicare Health Plans

-   Megafoods

-   Meruelo Maddux Properties, Inc.

-   Micropolis

-   Mortgage & Realty Trust  (testified)

-   National Money Order  (testified)

-   Northpoint Communications

-   David Orgell Inc.

-   Orchid Paper Products

-   Ownit Mortgage Trust

-   Pure Sweat, Inc.

-   Resort Theatres  (testified)

-   Royal Seafoods

-   Shooster dba Sunny Gas Co.

-   Solid Waste Transporters

-   Sprouse-Reitz

-   Stations Casino

-   United Security Mortgage Corporation



www.fticonsulting.com

Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

- Western Federal Holdings – Assignee
- World Duty Free Americas  (testified)

- Creditor
    - America West Airlines
    - American Continental/Lincoln Savings & Loan  (testified)
    - Baldwin Builders  (testified)
    - Barry's Jewelers  (testified)
    - Bramalea
    - California Coastal Communities
    - Circle K Corporation  (testified)
    - Clothestime
    - Commercial Acceptance Corporation
    - Commercial Money Center  (testified)
    - Consolidated Allied Corporation
    - Cumberland Farms
    - Falcon Products
    - Foam Merchants  (testified)
    - Fulton Homes
    - House of Fabrics  (testified)
    - Jack Friedman  (testified)
    - Greyhound Bus Lines
    - Hotel Hollywood, Inc.  (testified)
    - Iridium v. Motorola  (testified)
    - IT Group v. Duratek  (testified)
    - JT Thorpe  (testified)
    - Lexicon v. Ingram Micro  (testified)
    - Mann Theatres
    - Maui & Sons
    - Namco Capital
    - New Generation Software
    - Orlando Twin Towers Hotel  (testified)



Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

- Orange County Investors' Pool  (testified)

- Pacific Gas & Electric

- Pegasus Gold

- Peregrine Software

- Pivotal Group – Promontory

- Quality Home Loans

- Standard Brands Paint Co.  (testified)

- Stratosphere Hotel Corporation

- Sun World

- The Thaxton Group, Inc.  (testified)

- Thrifty Oil  (testified)

- Tripar Building Maintenance

- Tucson Electric and Power

- Winn Dixie Stores, Inc. (testified)

- Yari Films


• Workouts/Distressed Investor

  - Affiliated Medical Enterprises

  - Blackmore Partners LP v. Link Energy LLC  (testified)

  - DFA/BAA Holdings (testified)

  - Edison Mission Midwest Holdings

  - EuroDisney

  - Florica v. WPW/Wolfgang Puck (testified)

  - Intermark

  - Itronix

  - Musicland

  - National Amusements Inc.

  - Playa Vista

  - Project Cross

  - Project Five & Dime

  - Project Pacific

  - Project Tower



Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

- Lusk Company

- Mrs. Fields

- Project Poetry

- Qwest

- Reed Slatkin  (testified)

- Standard Pacific Homes

- Syncora (formerly Security Capital Assurance)

- Thermadyne

- Tower Records

- Western Dental

## Presentations and Publications

- "Workout Strategies for CRE Problem Loans", SAMA Conference, May 13, 2010

- "Why Law Firms Fail", Northern California Judicial Conference, April 10, 2010

- "U.S. Economic Overview, Corporate Credit Markets Update and Commercial Real Estate Sector Trends", American College of Bankruptcy Ninth Circuit Dinner, February 11, 2010

- "Water in the Sahara:  What's Next in the Credit , DIP Lending and Exit Financing Markets?", The American Bankruptcy Institute's 27th Annual Spring Meeting, April 2, 2009

- "Real Estate: State of the Industry", Valcon 2009, February 26, 2009

- "Blood From a Stone: Hidden Value in Distressed Assets", TMA 2008 Webinar Series, May 29, 2008

- "News from the Bankruptcy Bar and Restructuring", CLE International Subprime Lending Litigation Conference, May 9, 2008

- "The Pink Panther Strikes Again – Sub-Con After Owens", 22nd Annual AIRA Bankruptcy Restructuring Conference, June 10, 2006

- "A Gift by Any Other Name: Absolute Priority Rule after Armstrong World," 2005 American Bankruptcy Institute Winter Leadership Conference, December 2, 2005.

- "Unique Aspects on Valuing Professional Firms," panel, Valcon: The Conference on Bankruptcy Valuations, March 2005.

- "Can It Be Done By the Numbers," Turnaround Management Association, March 11, 2003.

- "Is it Malpractice to File Chapter 11 in Delaware?" Financial Lawyers Conference, January 16, 2003.

- "Ethics and Conflict in Bankruptcy Proceedings and Sarbanes-Oxley Act of 2002," Turnaround Management Association, January 14, 2003.

- "Corporate Governance Issues in a Turnaround," Turnaround Management Association, October 25, 2002.



Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

- "Everything Old is New Again: (Re) Emerging Issues in Troubled Industries," National Conference of Bankruptcy Judges, October 4, 2002.

- "Pyramids on the Nile," California Bankruptcy Forum, May 17, 2002.

- "Now Playing at Theatres Everywhere: The Prisoner's Dilemma – How the Bankruptcy Process is Saving the Motion Picture Exhibition Industry (and One Company in Particular)," co-author, *Institutional Investor,* Turnaround Management Association, March 2002.

- "Lights Out:  Restructuring Issues in the Movie Exhibition Industry," Turnaround Management Association, January 8, 2002.

- "Understanding Financial Statements" and "Current Economic Outlook," Klee Tuchin Bogdanoff & Stern, July 7, 2001.

- "Where are the Future Insolvencies? Perspectives on the State of the Restructuring Industry for the New Millennium," Orange County Bankruptcy Forum, June 13, 2000.

- "Perspectives on the State of the Restructuring Industry – A New Millennium," Los Angeles Bankruptcy Forum, January 10, 2000.

- "Tax Issues in Corporate Restructuring," authored term paper, Baruch College, City University of New York, January, 2000.

- "Asian Markets," author of Chapter 14, *Workouts & Turnarounds II–Global Restructuring Strategies for the Next Century,* 1999.

- Speech on restructuring to MBA students, Baruch College, September 15, 1999.

- "Providing Bankruptcy and Reorganization Services," co-author of AICPA Guide, 1998.

- Foreign Debt Trading Symposium – Panelist on Asia, June 9, 1998.

- Conference on Corporate Reorganizations – Panelist on Asia, June 11, 1998.

- Price Waterhouse Corporate Recovery Symposium – Speech on Asia Crisis, March 9, 1998.

- "Battling for a Bigger Piece of the Pie," panelist at the American Bankruptcy Institute's Fifth Annual Bankruptcy Battleground West, March 21, 1997.

- "Controversial Issues," panel moderator, Price Waterhouse 1997 Corporate Recovery Symposium February 11, 1997.

- "Obtaining Control or Maximizing Returns through Successfully Managing the Bankruptcy Court Process," moderator, Strategic Research Institutes Third Annual Conference on Distressed Debt, December 10, 1996.

- "Real Estate Legacies of the Early 90's; Restructuring Yesterday's Restructured and High Yield Debt," moderator, Price Waterhouse LLP 1996 Corporate Recovery Symposium, February 5, 1996.

- "Is There a Chapter 9 In Your Future?" panelist, Turnaround Management Association, December 5, 1995.

- "Early Warning Signs of Troubled Companies," Speech to the National Food Manufacturers Credit Group (NFMCG), October 10, 1995.

- "The Art of Making The Deal," moderator, and "Managing Business Risks in the DA & CR



www.fticonsulting.com

Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

Practice," panelist, Financial Advisory Services Management Group Seminar (FASMGS), August 30, 1995.

- Speech to the California Assembly Select Committee on Insolvency of Orange County - addressed issues regarding the financial problems of Orange County and possible solutions, March 30, 1995.

- "Controversial Issues," moderator, Price Waterhouse 1995 Corporate Recovery Symposium, March 14, 1995.

- "Interest Rate Methodologies," Bank of America, July 12, 1994.

- "Controversial Issues," moderator, Price Waterhouse 1994 Corporate Recovery Symposium, February 8, 1994.

- "Identifying a Troubled Company," Los Angeles Venture Association, September 14, 1993.

- "SOP 90-7," co-authored article with Professor Grant Newton, Pepperdine University, *California Bankruptcy Journal,* June 1993.

- "Dispute Resolution" and "Expert Witness--A Judges View," moderator, 9th Annual Reorganization and Bankruptcy Conference, Association of Insolvency Accountants, April 21, 1993.

- "Business Plan and Reorganization Strategies," panelist, UCLA Bankruptcy Institute, April 2, 1993.

- "Current Developments in Bankruptcy Financial Reporting for Companies in Reorganization," moderator, Price Waterhouse Bankruptcy Conference, February 20, 1993.

- "Financial Reporting for Troubled Companies," panelist, State Bar of Arizona, January 22, 1993.

- "Strategies for Troubled Companies," panelist, Price Waterhouse Alumni Reunion, January 6, 1993.

- "Sampling and Its Application to Bankruptcy and Claims Exemption," instructor, Price Waterhouse Litigation Managers Group Seminar, July 13, 1992.

- "Financial Restructuring - A Corporation's Perspective," moderator, California Society of CPA's, 1992 Entertainment Industry Conference, June 16, 1992.

- "Trading Claims," moderator, Price Waterhouse National Reorganization and Bankruptcy Conference, February 28, 1992.

- "Expert Witness Testimony on Insolvency Issues," panelist, The Association of Insolvency Accountants - 7th Annual Reorganization & Bankruptcy Conference, April 25, 1991.

- "Maximizing Recovery in Bankruptcies, Turnarounds and Restructurings," panelist, The Association for Corporate Growth; Los Angeles Chapter - Seminar: Mergers and Acquisitions: Contemporary Issues and Opportunities, April 11, 1991.

- "Crisis Management: Steering the Troubled Company Toward a Successful Reorganization," panelist, Orange County Bankruptcy Forum, February 12, 1991.

- "Forensic Accounting for Creditors Committees," California Society of Certified Public Accountants, Los Angeles Chapter Litigation Services Committee, January 22, 1991.



www.fticonsulting.com

Highly Confidential, For Professional Eyes Only

M. Freddie Reiss

- Chapter 1: "Identifying a Troubled Company," co-author, *Workouts and Turnarounds: The Handbook of Restructuring and Investing in Distressed Companies,* January 1991.

- "Forensic Accounting and Litigation Consulting Services," co-author, Chapter 34 of *Accountant's Handbook*, November 1990.

- "Bankruptcy," California Society of Certified Public Accountants - 1990 Litigation Consulting Conference, San Francisco/Universal City, November 19/20, 1990.

- "Bankruptcy Accounting," California CPA Foundation, 1990 Litigation Consulting Conference, April 27, 1990.

- "Accountants' Liability," panelist, Practicing Law Institute Seminar, August 17/18, 1989.

- "Bankruptcy Reorganizations," Workshop 3 of the Taxation Section of the State Bar of California - Corporate Tax Planning Workshops, June 28, 1989.

- Los Angeles Bankruptcy Forum Mock Trial in Bankruptcy Court, expert witness, June 24, 1989.

- Orange County Bankruptcy Forum Mock Trial in Bankruptcy Court, expert witness, May 20, 1989.

- "Basic Bankruptcy Code," panel moderator, Association of Insolvency Accountants Conference, April 26, 1989.

- "Accountants' Role in Bankruptcy," panelist, Orange County Bankruptcy Forum, April 21, 1989.

- "Accountants Liability," panelist, Practicing Law Institute Seminar, San Francisco, August 18 & 19, 1988.

- "Survival," article on bankruptcy, *Century City News,* March 1988.

- "Litigation Night," panel moderator and organizer, California Society of CPAs, November 19, 1987.



Highly Confidential, For Professional Eyes Only

**M. Freddie Reiss**

**Expert Witness Engagements Which Involved Deposition and/or Testimony**

| Debtor/Trustee | Court | Juristiction | Index |
|---|---|---|---|
| Anchor Glass | U.S. Bankruptcy Court | Middle District of Florida | 02-07233-8C1 |
| Blackmore Partners, L.P. v. Link Energy LLC et al | Court of Chancery | State of Delaware in and for New Castle County | 454-N |
| Brobeck Phleger & Harrison LLP | U.S. Bankruptcy Court | Northern District of California | 03-32715-DM7 |
| Clark Retail Enterprises | U.S. Bankruptcy Court | Northern Distric of Illinois | 02-40045 (JHS) |
| Daewoo Motors America Inc. | U.S. Bankruptcy Court | Central District of California | LA-02-244110-BB |
| Edwards Theatres | U.S. Bankruptcy Court | Central District of California | SA 00-16475 JR |
| First Lenders Indemnity | U.S. Bankruptcy Court | Central District of California | SA 97-16576-RA |
| Imperial Credit Industries, Inc v. Perry A. Lerner et al | U.S. Bankruptcy Court | Central District of California | SA 03-19407 ES |
| Man Group v Freightliner et al | Circuit Court | State of Oregon | 0412-13050 |
| Meruelo Maddux Properties, Inc. | U.S. Bankruptcy Court | Central District of California | 1:09-bk-13356-VK |
| Resort Theatres | U.S. District Court | Central District of California | LA 00-38815-ES |
| Six Flags Trust | Superior Court | County of Los Angeles | BP081460 |
| SW Boston Hotel Venture, LLC | U.S. Bankruptcy Court | District of Massachusetts Eastern Division | 10-14535 (JNF) |

| Creditor | | | |
|---|---|---|---|
| Ezri Namvar, an individual/Namco Capital Group, Inc. | U.S. Bankruptcy Court | Central District of California | 2:08-bk-32333-BR |
| Florica Inc. v. WPW/Wolfgang Puck | U.S. Bankruptcy Court | Central District of California | 2:06-bk-13630-RN |
| Iridium v. Motorola | U.S. Bankruptcy Court | Southern District of New York | 99-45005-CB |
| IT Group v. Duratek | U.S. Bankruptcy Court | District of Delaware | 02-10119 (MFW) |
| JT Thorpe | U.S. Bankruptcy Court | Central District of California | LA 02-14216BB |
| Lexicon v. Ingram Micro | U.S. Bankruptcy Court | Central District of California | LA 01-14524-BB |
| Thaxton Group, Inc. | U.S. Bankruptcy Court | District of Delaware | 03-13182 Through 03-13212 (PJW) |
| Thaxton Group, Inc. | U.S. District Court | District of South Carolina | 04-2612-13 |
| Refco Inc. et al | U.S. Bankruptcy Court | Southern District of New York | 05-60006 |
| Ore Hill v Primus Telecommunications Group | U.S. District Court | Southern District of New York | 07CV647 |

| Workouts/Distressed Investor | | | |
|---|---|---|---|
| Blackmore Partners, LP v Link Energy, LLC | Court of Chancery of the State of Delaware | New Castle County | Case No. 454-N |
| WDFA/BAA Holdings | The Cicuit Court for Anne Arundel County, Maryland | The Cicuit Court for Anne Arundel County, Maryland | C-2002-79742-OT |
| Reed Slatkin | U.S. Bankruptcy Court | Central District of California - Northern Division | ND-01-11549-RR |

Highly Confidential, For Professional Eyes Only

**EXHIBIT 2**
**List of Materials Relied Upon and Considered**

Highly Confidential, For Professional Eyes Only

## Materials Relied Upon and Considered

| Title of Document | Bates Range |
| --- | --- |

*Depositions and Declarations*
April 15, 2011 Declaration of Richard Storey
December 10, 2009 Declaration of Dan F. Smith
December 10, 2009 Declaration of Karen Twitchell
December 10, 2009 Declaration of Philip Kassin
February 14, 2011 Deposition of Robert Salvin
February 15, 2011 Deposition of Lynn R. Coleman
February 2, 2011 Deposition of Robert Salvin
January 11, 2011 Deposition of Lawrence Teel
January 13, 2011 Deposition of Joseph Lee
January 24, 2011 Deposition of Kim Foley
March 3, 2011 Deposition of Alan Bigman
May 13, 2009 Deposition of Philip Kassin
May 20, 2009 Deposition of Volker Trautz
May 27, 2009 Deposition of Len Blavatnik
November 10, 2010 Deposition of Len Blavatnik
November 11, 2010 Deposition of Kevin McQuilkin
November 5, 2010 Deposition of Javier Martinez
October 13, 2009 Deposition of Karen Twitchell
October 20, 2009 Deposition of Ann P. Graves
October 20, 2009 Deposition of C. Kent Potter
October 25, 2007 Deposition of Dan Forester Smith

*FTI Created*
Historical Lyondell Trading Data from Capital IQ

*News Items*
Announcement J.P. Morgan Upgrade of Lyondell Stock Dated 5/3/2007
Announcement of Lyondell Third Quarter 2007 Earnings Dated 10/19/2007
Government of Gibraltar Information Services (http://www.gibraltar.gov.gi/on-business)

*Other*
Acquisition Premium Data Obtained from Capital IQ
Bankruptcy Court filings for LyondellBasell including Plan and Disclosure Statement
ASARCO LLC v. America's Mining Corporation August 30, 2008 (396 B.R. 278)
ElkCorp_Transaction Details
Englehard_BASF_Transaction Details
Form 8832 Filed by Nell Limited on July 15, 2005
Giant Industries_WesternRefining_Transaction Details
Gonzalez v. Wells Fargo Bank, N.A. May 19, 2006 (342 B.R. 165)
Great Lakes Carbon_Transaction Details
Historical Exchange Rates Information from x-rates.com
IRS Revenue Ruling 59-60
LESCO_Transaction Details
PioneerCos_Olin Corp_Transaction Details
Org Charts Produced in Court on March 10, 2011
SICO_Akzo Nobel_Transaction Details
US BioEnergy_Transaction Details

*Produced Documents*

| | |
| --- | --- |
| 11-7-07 Email from Francesco Svelto | ACC00142591 - 93 |
| 2007-12-19 pre-merger org chart | LYO-UCC 00000409 |
| ABL-Inventory Credit Agreement Dated 12/20/2007 | ACC00150689 - 840 |
| ABN-AMRO Credit Memorandum Dated July 21, 2007 | ABN_LYNB00013493 - 509 |
| ABN-AMRO Credit Memorandum Dated October 23, 2007 | ABN_LYNB00003366 - 70 |
| Access Industries Revolver Draw Denial Dated December 31, 2008 | ACC00177547 |
| Agreement and Plan of Merger Dated July 16, 2007 | ACC00107011 - 80 |
| Analysis of Daily Liquidity and Impact of Access Revolver | LYO-UCC 00263750 - 891 |
| August 2007 Preliminary Tax Summary Outline | LYO-UCC 00400755 - 62 |
| Basell/Lyondell Merger Model | ACC00148585 |
| Basell AF SCA Information relating to Lyondell Chemical Company as of November 28, 2007 | LYO-UCC00318737 - 772 |
| Bridge Loan Agreement Dated 12/20/2007, amended on 4/20/2008 and 10/17/2008 | ACC00106211 - 389 |
| Citi Commitment Committee Approval Memorandum Dated December 13, 2007 | CITI_LYO_0000794 - 805 |
| Citigroup Valuation Assessment | ACC00216867 - 889 |
| Citigroup Valuation Discussion | CITI_LYO_0132406 - 427 |
| Closing Cash Flow Mechanics 12-19-07 1000 (2) | ACC00182792 |

Highly Confidential, For Professional Eyes Only

## Materials Relied Upon and Considered

| Title of Document | Bates Range |
|---|---|
| Closing Funds Flow Memorandum | ACC00107510 - 26 |
| Credit Agreement Dated 12/20/2007, amended on 4/30/2008 | ACC0112215 - 426 |
| Debt Markets Commitment Committee Presentation Dated July 15, 2007 | ML-2004-227994 - 8047 |
| December 14, 2007 Lyondell Letter to NYSE Regarding Expected Closing Date | ACC00107618 - 19 |
| December 19, 2007 PricewaterhouseCoopers Final Draft at Closing | LYO-UCC 00264532 - 600 |
| December 20, 2007 Schedule 1.01H Attached to Credit Agreement | ACC00112789 - 90 |
| December 20, 2007 Schedules Attached to Bridge Loan Agreement | ACC00106390 - 620 |
| EBITDA Assets | ACC00142594 |
| Emails Between Dan Smith and Kevin DeNicola Dated June 26, 2007 | LYO-UCC00123366 - 67 |
| FAQ Guide for Basell Employees Regarding Lyondell Acquisition | ACC00028664 - 66 |
| Financing Options Presentation | ACC00217824 - 843 |
| Goldman Sachs Confidential Capital Committee Memo Dated July 26, 2007 | GSCP_LYON00038030 - 49 |
| Investment Banking Presentations to Access | Varied |
| LBI Overview December 2007 | ACC00135452-493 |
| Lyondell Chemical Committed Loan Notice Dated October 15, 2008 | LBI/PPD-00000372 |
| Lyondell Chemical Company Schedule 13D | ACC00107573 - 96 |
| Lyondell Chemical Company Schedule 13D-A filed 8/21/07 | ACC00107601 - 04 |
| Lyondell Chemical Company Schedule 14A | ACC00107291 -429 |
| Lyondell Chemical Revolver Draw Request Dated December 30, 2008 | ACC00000189 |
| Lyondell Chemical Revolver Paydown Request Dated October 16, 2008 | LBI/PPD-00000476 |
| Lyondell Chemical Revolver Paydown Request Dated October 17, 2008 | LBI/PPD-00000477 |
| Lyondell Chemical Revolver Paydown Request Dated October 20, 2008 | LBI/PPD-00000478 |
| March 27, 2008 Access Industries Revolving Credit Agreement | ACC00108525 - 617 |
| Merrill Lynch Presentation to Access Industries | LYO-UCC00102824 - 885 |
| Merrill Lynch Presentation to Access Industries, July 9. 2007 | LYO-UCC00101434 - 447 |
| Merrill Lynch Presentation to Access Industries, July 10, 2007 | LYO-UCC00019166 - 184 |
| Merrill Lynch Confirmation of OTC Postpaid Share Forward Dated May 4, 2007 | ML-2004-236338 - 57 |
| Merrill Lynch Presentation to Occidental Dated April 20, 2007 | ACC00098669 - 78 |
| Merrill Lynch Toehold Presentation Dated April 7, 2007 | ACC00133932 - 36 |
| November 2007 Confidential Information Memorandum - ABL | ACC00149938 - 50152 |
| October 2007 Confidential Information Memorandum - Senior Secured Credit Facilities | ML-2004-090460 - 545 |
| October 8, 2007 Russ Bunting Email to Banks with Presentation Attached | CITI_LYO_0050039 - 40 |
| PricewaterhouseCoopers Letter to Merrill Lynch Dated October 26, 2007 | ML-2004-243624 - 33 |
| Project Hugo Commitment Letter | ACC00107430 - 31 |
| Project Hugo Projections Presentation | LYO-UCC00092604 - 644 |
| Project Safari - DBSI Presentation to the Board of Directors 7/16/2007 | LYO-UCC00120874 - 921 |
| Senior Credit Agreement Dated December 20, 2007 | ACC00112427 - 636 |
| Skimore Email to Martinez Dated December 30, 2008 | ACC00007316 - 30 |
| UBS Credit Committee Memorandum Dated October 24, 2007 | UBS2004-0016589 - 645 |

*Professional Reports*

Expert Report of Christopher J Kearns 11/7/09
Expert Report of Daniel Fischel 11/7/09
Expert Report of Daniel Fischel 4/15/11
Expert Report of George Intille 11/7/2009
Expert Report of Ralph S. Tuliano 11/7/09
Expert Report of Ralph S. Tuliano 2/28/11
Expert Report of Robert Young 11/7/2009
Expert Report of Thomas O'Connor 11/7/2009
Fischel Expert Report Dated 4/15/2011
Peter J. Solomon Company Expert Report 11/7/09
Peter J. Solomon Company Expert Report 2/28/11
Peter J. Solomon Company Rebuttal Expert Report 11/20/09
Peter J. Solomon LB Litigation Trust Expert Report 2/28/11
Rebuttal Expert Report of Christopher J Kearns 11/20/09
Rebuttal Expert Report of Daniel Fischel 11/20/09
Rebuttal Expert Report of Ralph S. Tuliano 11/20/09
Rebuttal Report of George Intille 11/20/2009
Rebuttal Report of Robert Young 11/20/2009
Rebuttal Report of Thomas O'Connor 11/20/2009
Revised Expert Rebuttal Report of CMAI 11/20/2009
Revised Expert Report of CMAI, Inc. 11/7/2009
Supplemental Expert Report of CMAI and PGI 2/28/11

*Analyst Reports and Financial Literature*

Barron's Dictionary of Finance and Investment Terms
Bulow, Huang & Klemperer, Toeholds and Takeovers
CDBV Study Course, Part II: Advanced Business Valuation

Highly Confidential, For Professional Eyes Only

**Materials Relied Upon and Considered**

| Title of Document | Bates Range |
|---|---|
| Citigroup 4/12/07 Analyst Report | |
| Citigroup 4/27/07 Analyst Report | |
| Citigroup 5/14/07 Analyst Report | |
| Citigroup 7/12/07 Analyst Report | |
| Citigroup 7/17/07 Analyst Report | |
| Credit Suisse 7/9/07 Analyst Report | |
| Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of *Any* Asset | |
| Foley, New Size of Transaction Threshold | |
| Goldman Sachs 4/27/07 Analyst Report | |
| Levin, Mergers, Acquisitions and Buyouts | |
| Levin, Structuring Venture Capital | |
| Mergerstat Review 2008 | |
| Morgan Stanley 4/23/07 Analyst Report | |
| Morgan Stanley 5/14/07 Analyst Report | |
| Morgan Stanley 7/17/07 Analyst Report | |
| Morgan Stanley 8/1/07 Analyst Report | |
| Oxford Dictionary of Finance and Banking | |
| Pratt & Reilly, Valuing a Business: The Analysis and Appraisal of Closely Held Companies | |
| Ross, Westerfeld & Jaffe, Corporate Finance | |
| UBS 4/26/07 Analyst Report | |
| UBS 5/24/07 Analyst Report | |
| UBS 7/17/07 Analyst Report | |
| UBS 7/5/07 Analyst Report | |

### *SEC Filings and Financial Statements*

| Title of Document | Bates Range |
|---|---|
| Air Products and Chemicals, Inc. 10-K for the Fiscal Year Ended September 30, 2008 | |
| Akzo Nobel 2008 Report | |
| Alon USA Energy, Inc. 10-K for the Fiscal Year Ended December 31, 2008 | |
| Alon USA Energy, Inc. 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Basell 2006 Annual Report | |
| Basell AF SCA Consolidated Interim Financial Statements - Third quarter and nine-month 2007 results | |
| Basell AF SCA Interim Financial Statements - Second Quarter and Half-Year 2007 results | |
| Basell AF SCA Interim Financial Statements - Three and Nine-Month September 30, 2006 | |
| Basell AF SCA Interim Financial Statements - Three and Twelve-Month December 31, 2006 | |
| BASF 2008 Report | |
| Bayer 2008 Annual Report | |
| Celanese Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Celanese Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Eastman Chemical Company 10-K for the Fiscal Year Ended December 31, 2008 | |
| Eastman Chemical Company 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Frontier Oil Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Frontier Oil Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Georgia Gulf Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Georgia Gulf Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Holly Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Holly Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Huntsman Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Huntsman Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| LBI AF SCA (Formerly Basell AF SCA)  Unaudited Pro Forma Combined Statement Of Income | |
| LBI AF SCA Consolidated Financial Statements for year ending December 31, 2007 | |
| LBI Condensed Corporate and Capital Structure as of 12-30-2007 | |
| LBI Financial Statements for Year Ended 12/31/2008 With Report of Independent Auditors | |
| LBI Interim Financial Statements and Management's Report, First Quarter Results 2008 | |
| LBI Interim Financial Statements and Management's Report, Second Quarter Results 2008 | |
| LBI Interim Financial Statements and Management's Report, Third Quarter Results 2008 | |
| LBI Quarterly Financial Report for the Period Ended June 30, 2008 | |
| LBI Unaudited Income for 12-31-2006 | |
| LBI Unaudited Income for 2007 | |
| Lyondell Chemical Company 12/31/06 10-K | |
| Lyondell Chemical Company 3/31/08 10-Q | |
| Lyondell Chemical Company 9/30/07 10-Q | |
| LyondellBasell AF SCA Management report for the Year Ended December 31, 2007 | |
| LyondellBasell Consolidated Financial Statements for year ending December 31, 2007 | |
| LyondellBasell Consolidated Interim Financial Statements and Management's Report for the first quarter 2008 | |
| LyondellBasell Industries AF SCA (formerly Basell AF SCA) Financial Statements YE 12-31-2006 and 12-31-2007 with Independent Auditor's Report (Final and Signed) | |

Highly Confidential, For Professional Eyes Only

## Materials Relied Upon and Considered

| Title of Document | Bates Range |
|---|---|
| LyondellBasell Management report for the Year Ended December 31, 2007 | |
| Nova Chemicals 2008 Annual Report | |
| Nova Chemicals Third Quarter 2008 News Release | |
| PPG Industries, Inc. 10-K for the Fiscal Year Ended December 31, 2008 | |
| Praxair, Inc. 10-K for the Fiscal Year Ended December 31, 2008 | |
| Rohm and Haas Company 10-K for the Fiscal Year Ended December 31, 2008 | |
| Rohm and Haas Company 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Schedule and SOFA of LyondellBasell Finance | |
| SIC Codes Present on SEC Website | |
| Solvay Global 2008 Annual Report | |
| Sunoco, Inc. 10-K for the Fiscal Year Ended December 31, 2008 | |
| Sunoco, Inc. 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Supplementary Tables for Lyondell Second Quarter 2007 Report | |
| Tesoro Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Tesoro Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| The Dow Chemical Company 2008 10-K and Stockholder Summary | |
| Valero Energy Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Valero Energy Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |
| Westlake Chemical Corporation 10-K for the Fiscal Year Ended December 31, 2008 | |
| Westlake Chemical Corporation 10-Q for the Quarterly Period Ended September 30, 2008 | |

### *Legal Pleadings*

Access Defendants' Answer and Counterclaim Dated 10/10/2010

Corrected Notice Of Supplemental Authority Regarding Nell Limited and Len Blavatnik's Motion to Dismiss Count II Of The Amended Complaint

July 23, 2010 Amended Complaint Against Leonard Blavatnik et al.

Memorandum in Opposition to Defendants Alan S. Bigman Edward J. Dineen, And Morris Gelb's Motion to Dismiss Counts Edward J. Dineen, and Morris Gelb's Motion to Dismiss Counts

Memorandum of Law of Alan S. Bigman, Edward J. Dineen And Morris Gelb In Support of Motion to Dismiss Counts XV And XVI of the Amended Complaint

Reply Memorandum of Law of Alan S. Bigman, Edward J. Dineen and Morris Gelb in Further Support Of Motion to Dismiss Counts XV And XVI of the Amended Complaint

Highly Confidential, For Professional Eyes Only

**Exhibit 3-A**
**Pre-Acquisition Basell Organizational Structure**

Highly Confidential, For Professional Eyes Only

**Pre-Acquisition Basell Organizational Structure**



**Source:**
Project Hugo, Final Draft at Closing, PricewaterhouseCoopers, December 19, 2007, p. 15.

Highly Confidential, For Professional Eyes Only

**Exhibit 3-B**
**Pre-Acquisition Lyondell Organizational Structure**

Highly Confidential, For Professional Eyes Only

**Pre-Acquisition Lyondell Organizational Structure**



**Source:** Project Hugo, Final Draft at Closing, PricewaterhouseCoopers, December 19, 2007, p. 16.

**Exhibit 3-C**
**Newly Formed Basell Entities**

Highly Confidential, For Professional Eyes Only

**Newly Formed Basell Entities**



**Source:** Project Hugo, Final Draft at Closing, PricewaterhouseCoopers, December 19, 2007, p. 18.

Highly Confidential, For Professional Eyes Only

**Exhibit 3-D**
**Post-Acquisition Organizational Structure**

Highly Confidential, For Professional Eyes Only

### Post-Acquisition Organizational Structure



**Source:** Project Hugo, Final Draft at Closing, PricewaterhouseCoopers, December 19, 2007, p. 37.

**EXHIBIT 4-A**
**Summary of Flow of Funds in Acquisition**

Highly Confidential, For Professional Eyes Only



**Following the merger of BIL Acquisition Holdings Ltd in to Lyondell Chemical Company:**



**Notes:**
Gray Entities: Non-LBI Affiliates
Blue Entities: LBI Affiliates
All loan proceeds are shown net of underwriting, commitment, take-down, and admin fees
Payments related to the satisfaction of closing costs and professional fees have been excluded
(1) Also known as "Merger Sub".  Believed to merge into Lyondell Chemical Company.
(2) There were a series of payments made to related entities as a result of what was known in the Funds Flow Memorandum as the "Restructuring of Lyondell Foreign Subsidiaries"

Highly Confidential, For Professional Eyes Only

**EXHIBIT 4-B**
**List of Guarantors for Senior Credit Facilities**

Highly Confidential, For Professional Eyes Only

## SCHEDULE 1.01H

## GUARANTORS[1]

1. Basell Asia Pacific Limited
2. Basell Bayreuth Chemie GmbH
3. Basell Canada Inc.
4. Basell Europe Holdings B.V.
5. Basell Finance & Trading Company B.V.
6. Basell Finance Company B.V.
7. Basell Finance USA Inc.*
8. Basell Funding S.á.r.l.
9. Basell Germany Holdings GmbH
10. Basell Holdings B.V.
11. Basell International Holdings B.V.
12. Basell North America Inc.*
13. Basell Polyolefine GmbH
14. Basell Polyolefins UK Limited
15. Basell Sales & Marketing Company B.V.
16. Basell UK Holdings Limited
17. Basell USA Inc.*
18. Equistar Chemicals, LP
19. Houston Refining LP
20. LBI Acquisition LLC*
21. LBIH LLC*
22. Lyondell Chemical Company (formerly BIL Acquisition Holdings Limited)*
23. Lyondell Chemical Nederland, Ltd.*
24. Lyondell Chemical Products Europe LLC*
25. Lyondell Chemical Technology 1 Inc.*
26. Lyondell Chemical Technology Management, Inc.*
27. Lyondell Chemical Technology, L.P.*
28. Lyondell Chimie France LLC*
29. Lyondell Equistar Holdings Partners*
30. Lyondell Europe Holdings Inc.*
31. Lyondell Houston Refinery Inc.*
32. Lyondell LP3 GP, LLC*
33. Lyondell LP3 Partners, LP*
34. Lyondell LP4 Inc.*
35. Lyondell (Pelican) Petrochemical L.P.1, Inc.*
36. Lyondell Petrochemical L.P. Inc.*
37. Lyondell Refining Company LLC*
38. Lyondell Refining I, LLC*
39. LyondellBasell Finance Company*

---

[1] Entities marked with an asterisk are U.S. entities.

151

Highly Confidential, For Professional Eyes Only

ACC00112789

40. LyondellBasell Industries AF S.C.A.*
41. LyondellBasell Netherlands Holdings B.V.*
42. Millennium America Holdings Inc.*
43. Millennium America Inc.*
44. Millennium Chemicals Inc. *
45. Millennium Petrochemicals GP LLC*
46. Millennium Petrochemicals Inc.*
47. Millennium Petrochemicals Partners, LP*
48. Millennium Specialty Chemicals Inc.*
49. Millennium US Op Co LLC*
50. Millennium Worldwide Holdings I Inc.*
51. Nell Acquisition (US) LLC*

152

Highly Confidential, For Professional Eyes Only

ACC00112790

**EXHIBIT 4-C**
**List of Guarantors for Bridge Loan**

Highly Confidential, For Professional Eyes Only

**SCHEDULE 1.01(c)**

**GUARANTORS[1]**

1.    Basell Asia Pacific Limited
2.    Basell Bayreuth Chemie GmbH
3.    Basell Canada Inc.
4.    Basell Europe Holdings B.V.
5.    Basell Finance & Trading Company B.V.
6.    Basell Finance Company B.V.
7.    Basell Finance USA Inc.*
8.    Basell Funding S.ár.l.
9.    Basell Germany Holdings GmbH
10.  Basell Holdings B.V.
11.  Basell International Holdings B.V.
12.  Basell North America Inc.*
13.  Basell Polyolefine GmbH
14.  Basell Polyolefins UK Limited
15.  Basell Sales & Marketing Company B.V.
16.  Basell UK Holdings Limited
17.  Basell USA Inc.*
18.  Equistar Chemicals, LP
19.  Houston Refining LP
20.  LBI Acquisition LLC*
21.  LBIH LLC*
22.  Lyondell Chemical Company (formerly BIL Acquisition Holdings Limited)*
23.  Lyondell Chemical Nederland, Ltd.*
24.  Lyondell Chemical Products Europe LLC*
25.  Lyondell Chemical Technology 1 Inc.*
26.  Lyondell Chemical Technology Management, Inc.*
27.  Lyondell Chemical Technology, L.P.*
28.  Lyondell Chimie France LLC*
29.  Lyondell Equistar Holdings Partners*
30.  Lyondell Europe Holdings Inc.*
31.  Lyondell Houston Refinery Inc.*
32.  Lyondell LP3 GP, LLC*
33.  Lyondell LP3 Partners, LP*
34.  Lyondell LP4 Inc.*
35.  Lyondell (Pelican) Petrochemical L.P.1, Inc.*
36.  Lyondell Petrochemical L.P. Inc.*
37.  Lyondell Refining Company LLC*
38.  Lyondell Refining I LLC*

---

[1] Entities marked with an asterisk are U.S. entities.

16

641664.05-London Server 1A

MSW - Draft December 24, 2007 - 11:08 AM

Highly Confidential, For Professional Eyes Only

ACC00106405

39.   LyondellBasell Finance Company*
40.   LyondellBasell Industries AF S.C.A.*
41.   LyondellBasell Netherlands Holdings B.V.*
42.   Millennium America Holdings Inc.*
43.   Millennium America Inc.*
44.   Millennium Chemicals Inc. *
45.   Millennium Petrochemicals GP LLC*
46.   Millennium Petrochemicals Inc.*
47.   Millennium Petrochemicals Partners, LP*
48.   Millennium Specialty Chemicals Inc.*
49.   Millennium US Op Co, LLC*
50.   Millennium Worldwide Holdings I Inc.*
51.   Nell Acquisition (US) LLC*

17

Highly Confidential, For Professional Eyes Only

ACC00106406

**EXHIBIT 4-D**

**2007 Income Statement and Balance Sheet for LyondellBasell Industries Holdings B.V.**

Highly Confidential, For Professional Eyes Only

LYONDELLBASELL INDUSTRIES HOLDINGS B.V.

**INCOME STATEMENT**

| | Note | 2007 | 2006 |
|---|---|---|---|
| (€'000) | | | |
| Results on investments in subsidiaries and associates | [11] | 386,036 | 50,489 |
| Interest and similar income | [12] | 46,322 | 20,012 |
| Interest and similar charges | [13] | (210,591) | (183,974) |
| Net currency exchange results | | 26,015 | 25,553 |
| Other financial income | [14] | 4,453 | 366 |
| **Net financial income / (expense)** | | **252,235** | **(87,554)** |
| Other operating income | [15] | 21,024 | 9,350 |
| Other operating expense | [16] | (2,967) | – |
| General and administrative expenses | | (14,776) | (23,867) |
| **Result before taxation** | | **255,516** | **(102,071)** |
| Taxation | [17] | 55,194 | 69 |
| **Net result after taxation** | | **310,710** | **(102,002)** |

Page 3

Highly Confidential, For Professional Eyes Only

LYONDELLBASELL INDUSTRIES HOLDINGS B.V.

**BALANCE SHEET**
*(before appropriation of result)*

| | Note | 31 December 2007 | 31 December 2006 |
|---|---|---|---|
| *(€'000)* | | | |
| **Fixed Assets** | | | |
| Financial fixed assets | [4] | 4,770,018 | 3,363,475 |
| **Current assets** | | | |
| Receivables | [5] | 150,388 | 142,823 |
| Available-for-sale financial assets | [6] | 7,255 | 1,868 |
| Cash | [7] | 150 | 132 |
| | | 157,793 | 144,823 |
| **Current liabilities** | [8] | 1,474,324 | 1,016,831 |
| ***Current assets less current liabilities*** | | (1,316,531) | (872,008) |
| **Total assets less current liabilities** | | 3,453,487 | 2,491,467 |
| Long term liabilities | [9] | 1,662,881 | 1,682,319 |
| **Net assets** | | **1,790,606** | **809,148** |
| **Shareholder's equity** | [10] | | |
| Share capital | | 96 | 91 |
| Share premium | | 1,704,113 | 1,014,930 |
| Accumulated deficit | | (213,215) | (111,213) |
| Fair value/hedging reserve | | 10,048 | 7,342 |
| Unappropriated net result | | 289,564 | (102,002) |
| | | **1,790,606** | **809,148** |

Page 2

Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-A**

**Lyondell Pre-Acquisition Trading Volume as a Percent of Shares Outstanding**

Highly Confidential, For Professional Eyes Only



Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-B**
**Analysis of Acquisition Premium**

Highly Confidential, For Professional Eyes Only

**FTI Consulting, Inc.**
**Lyondell Chemical Company**
**2007 Acquisition Premium**
**Comparable Transactions Analysis**

|  | 1 Week Premium (%) | 1 Month Premium (%) |
|---|---|---|
| **Best Comparable Transaction** | | |
| Hexion Acquisition of Huntsman (1) * | N/A [2] | 37.4 |
| | | |
| **Mergerstat Summary Results (3) **** | | |
| All Premiums 2007 Average | 31.5 | |
| All Premiums 2007 Median | 24.7 | |
| Chemicals, Paints, & Coatings | | |
| 2007 Premium | 27.5 | |
| 2006 Premium | 19.4 | |
| 2003-2007 Average of Annual Premiums | 24.4 | |
| 2003-2007 Median of Annual Premiums | 27.5 | |
| | | |
| Oil & Gas | | |
| 2007 Premium | 35.2 | |
| 2006 Premium | 48.2 | |
| 2003-2007 Average of Annual Premiums | 46.3 | |
| 2003-2007 Median of Annual Premiums | 35.2 | |
| | | |
| **Selected Comparable Transactions *** | | |
| Average for 5 Strategic Transactions Announced 2007 (4) | 24.31 | 29.01 |
| Median for 5 Strategic Transactions Announced 2007 (4) | 19.56 | 31.46 |
| Average for 9 Strategic Transactions Announced 2006 and 2007 (4) | 27.57 | 33.03 |
| Median for 9 Strategic Transactions Announced 2006 and 2007 (4) | 22.07 | 31.46 |
| Average | 29.53 | 32.47 |
| Median | 27.50 | 31.46 |
| Minimum | 19.40 | 29.01 |
| Maximum | 48.20 | 37.39 |

|  | | |
|---|---|---|
| **Selected Range** | | |
| **High** | 35.00 | 35.00 |
| **Mid** | 30.00 | 30.00 |
| **Low** | 25.00 | 25.00 |

* Source:  Capital IQ Transaction Screening Report
** Source:  Mergerstat Review 2008

(1) - Hexion/Huntsman was selected as the most comparable transaction based on the transaction size, similar business, and similar timing.

(2) - Hexion/Huntsman 1 week premium is not instructive because these amounts were after the Basell bid for Huntsman.

(3) - Mergerstat calculations are based on the seller's closing price  five business days before the announcement date.  Therefore, they have been included as 1 week premiums.

(4) - Includes Hexion proposed acquisition of Huntsman, the Basell proposed acquisition of Huntsman has been excluded.  One other transaction has been excluded in an instance
   where it was superseded by a second, included transaction.  Transactions included have shareholder consideration over $100 million only, with the target located in the U.S.
   or Canada, in related industries as discussed in the Report.

Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-C**

**Comparable Transactions from Capital IQ Used for Acquisition Premium**

Highly Confidential, For Professional Eyes Only

**FTI Consulting, Inc.**
**Lyondell Chemical Company**
**2007 Acquisition Premium**
**Comparable Transactions Analysis - Strategic U.S. and Canada Transactions**

| Target | Buyer | Seller | Transaction Value (USD mm) | Announcement Date | Closing Date | Stock Premium % 1- Week | Stock Premium % 1-Month |
|--------|-------|--------|---------------------------|-------------------|--------------|-----------------------|------------------------|
| Huntsman Corporation (NYSE:HUN) | Momentive Specialty Chemicals Inc. | MatlinPatterson Global Advisers LLC | $ 10,335 | 7/3/2007 | Cancelled | 15.65 | 37.39 |
| US BioEnergy Corp. | VeraSun Energy Corporation | CHS, Inc.; Capitaline Advisors, LLC | 1,039 | 11/29/2007 | 3/31/2008 | 22.07 | 18.87 |
| Great Lakes Carbon Income Fund | Oxbow Carbon & Minerals Holdings, Inc. | Rain Commodities, Inc. | 686 | 3/6/2007 | 5/8/2007 | 19.56 | 31.46 |
| Pioneer Companies, Inc. | Olin Corp. (NYSE:OLN) | - | 616 | 5/20/2007 | 8/31/2007 | 19.25 | 17.77 |
| LESCO Inc. | Deere & Company (NYSE:DE) | - | 167 | 2/19/2007 | 5/7/2007 | 45.00 | 39.56 |
| | **Average for 5 Strategic Transactions Announced 2007** | | | | | **24.31** | **29.01** |
| | **Median for 5 Strategic Transactions Announced 2007** | | | | | **19.56** | **31.46** |
| | | | | | | | |
| BASF Catalysts LLC | BASF SE (DB:BAS) | - | 5,727 | 1/9/2006 | 6/6/2006 | 29.35 | 30.26 |
| Giant Industries, Inc. (1) | Western Refining Inc. (NYSE:WNR) | - | 1,410 | 8/26/2006 | 5/31/2007 | 18.30 | 23.73 |
| ElkCorp | Building Materials Corporation of America | - | 1,005 | 11/15/2006 | 2/22/2007 | 34.05 | 55.36 |
| Akzo Nobel Canada Inc. | Akzo Nobel NV (ENXTAM:AKZA) | - | 276 | 4/4/2006 | 4/25/2006 | 44.93 | 42.86 |
| | **Average for 9 Strategic Transactions Announced 2007 and 2006** | | | | | **27.57** | **33.03** |
| | **Median for 9 Strategic Transactions Announced 2007 and 2006** | | | | | **22.07** | **31.46** |

Source: Capital IQ
**Notes:**
(1) The acquisition premiums for Giant Industries are calculated based on the initial announced price of $83. It was later reduced to $77 due to a fire destroying certain assets, but that is irrelevant with respect to the intial valuation.

Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-D**

**Analysis of Pre-Announcement Lyondell Stock Price and Acquisition Premium**

Highly Confidential, For Professional Eyes Only

**FTI Consulting, Inc.**
**Lyondell Chemical Company**
**Stock Price Analysis**

Lyondell Chemical Company
Acquisition Announcement Date                                          7/17/07

| Closing Stock Price on: | | Stock Price | Approx. Avg. Days to Announcement | Acquisition Premium | | | Stock Price With Premium | | | As a % of $48 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| 7/16/07 | Day Prior to Announcement of Merger Agreement | $ 40.12 | 1 | 25% | 30% | 35% | $ 50.15 | $ 52.16 | $ 54.16 | 104% | 109% | 113% |
| 6/18 - 7/16 | 20-Day Trailing Average | $ 38.44 | 15 | 25% | 30% | 35% | $ 48.05 | $ 49.97 | $ 51.90 | 100% | 104% | 108% |
| 6/4 - 7/16 | 30-Day Trailing Average | $ 38.15 | 22 | 25% | 30% | 35% | $ 47.69 | $ 49.59 | $ 51.50 | 99% | 103% | 107% |
| 4/20 - 7/16 | 60-Day Trailing Average | $ 36.43 | 45 | 25% | 30% | 35% | $ 45.54 | $ 47.36 | $ 49.18 | 95% | 99% | 102% |
| 6/26/07 | Announcement of Basell offer for Huntsman | $ 35.76 | 21 | 25% | 30% | 35% | $ 44.70 | $ 46.49 | $ 48.28 | 93% | 97% | 101% |
| 6/26 - 7/2 | 5 Day Average After 6/26/07 | $ 36.92 | 18 | 25% | 30% | 35% | $ 46.15 | $ 48.00 | $ 49.84 | 96% | 100% | 104% |
| 5/11/07 | 13D Announces Toe-Hold | $ 36.75 | 67 | 25% | 30% | 35% | $ 45.94 | $ 47.78 | $ 49.61 | 96% | 100% | 103% |
| 5/4 - 5/10 | 5-Day Average Prior to 13-D | $ 33.57 | 71 | 25% | 30% | 35% | $ 41.96 | $ 43.64 | $ 45.32 | 87% | 91% | 94% |
| | Average | | | | | | $ 46.27 | $ 48.12 | $ 49.97 | 96% | 100% | 104% |
| | Median | | | | | | $ 46.04 | $ 47.89 | $ 49.73 | 96% | 100% | 104% |
| | Minimum | | | | | | $ 41.96 | $ 43.64 | $ 45.32 | 87% | 91% | 94% |
| | Maximum | | | | | | $ 50.15 | $ 52.16 | $ 54.16 | 104% | 109% | 113% |

Source for stock prices:  Capital IQ

Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-E**
**Reverse Triangular Merger: Basell Acquisition of Lyondell**

Highly Confidential, For Professional Eyes Only

## Reverse Triangular Merger: Basell Acquisition of Lyondell



Highly Confidential, For Professional Eyes Only

**EXHIBIT 5-F**
**Characterization of Lyondell Transaction As**
**Either A Merger Or An Acquisition**

Highly Confidential, For Professional Eyes Only

**Litigation Trust's Characterization of Lyondell Transaction As
Either A Merger Or An Acquisition**

I.  <u>Final Amended Complaint</u>, dated July 23, 2010 ("Complaint") consistently characterizes
the transaction as either a merger or an acquisition

    A.  "This action arises from the December 2007 acquisition of Lyondell Chemical
Company ("Lyondell"), formerly North America's third-largest independent,
publicly-traded chemical company, by Basell AF S.C.A., a Luxembourg entity,
thereafter renamed LyondellBasell Industries AF S.C.A. (prior to its acquisition of
Lyondell, "Basell," and, thereafter, "LBI").  On July 16, 2007, the board of
directors of Lyondell, headed by chairperson Dan F. Smith, authorized a cash out
merger of Lyondell shareholders (the "Merger" or the "Transaction") pursuant to
which Lyondell would be acquired by Basell."  Complaint at ¶ 1.

    B.  "Although Blavatnik may have targeted Lyondell even earlier, the origins of the
acquisition of Lyondell by Basell can be traced to . . . ."  Complaint at ¶ 100.

    C.  "On November 20, 2007, the merger between Lyondell and Basell was approved
at a meeting of Lyondell shareholders."  Complaint at ¶ 246.

    D.  "On December 20, 2007 (the "Merger Closing"), pursuant to the Merger
Agreement, an indirect merger subsidiary of Basell was merged into Lyondell,
and all of Lyondell's 253,535,778 outstanding shares of common stock, including
restricted stock, were converted into the right to receive $48 in cash and Basell,
which thereupon changed its name to LyondellBasell Industries A.F. S.C.A.,
became, through an intermediate holding company, the corporate parent of
Lyondell."  Complaint at ¶ 258.

II.  Complaint indicates that Lyondell was not interested in leveraged buy-back of its stock
(a "going private" transaction)

    A.  "At around the same time that Blavatnik signaled his interest in acquiring
Lyondell, Smith rejected an overture by Joshua Harris from Apollo to consider a
"going private" transaction . . . .  [Smith] determined that it would be far better
to be bought out in a leveraged transaction than to be left, in a management-led
LBO, with a company crippled by acquisition debt."  Complaint at ¶ 130.

III.  Certain of the Litigation Trust's memoranda in opposition to the defendants' various
motions to dismiss similarly provide that Lyondell transaction was an acquisition.

    A.  <u>Memorandum In Opposition To Defendants' Motions To Dismiss Counts VI, VII,
XIV AND XVIII</u>, dated November 23, 2010 (the "Luxembourg MTD")

Highly Confidential, For Professional Eyes Only

1.   "Basell AF S.C.A. . . . a Luxembourg company' acquired Lyondell Chemical
     Company in December 2007."  Luxembourg MTD at 1.

2.   "This action arises from the December 2007 acquisition of Lyondell
     Chemical Company . . . by Basell AF S.C.A. . . .  a Luxembourg entity,
     thereafter renamed LyondellBasell Industries AF S.C.A. . . ."  Luxembourg
     MTD at 3.

Highly Confidential, For Professional Eyes Only

**EXHIBIT 6-A**
**Chemical and Refining Industry Revolving Credit Facilities**

Highly Confidential, For Professional Eyes Only

**Chemical and Refining Industry Revolving Credit Facilities**
**Amounts in Millions**

| Company (1) | Industry | Secured / Unsecured | Currency | Borrowing Capacity | Amount Drawn as of 9/30/08 | Amount Drawn as of 12/31/08 |
|---|---|---|---|---|---|---|
| Air Products and Chemicals, Inc | Chemical | Not Disclosed | USD | 1,450 | - | Not Disclosed |
| Akzo Nobel | Chemical | Not Disclosed | EUR | 1,500 | Not Disclosed | - |
| Alon USA Energy Inc | Refining | Secured | USD | 240 | 126 | 118 |
| Alon USA Energy Inc | Refining | Not Disclosed | USD | 300 | 23 | 12 |
| Alon USA Energy Inc | Refining | Secured | USD | 250 | 105 | 147 |
| BASF | Chemical | Not Disclosed | EUR | 6,758 | Not Disclosed | Not Disclosed |
| Bayer | Chemical | Not Disclosed | EUR | 9,900 | Not Disclosed | 4,400 |
| Celanese Corp | Chemical | Not Disclosed | USD | 650 | - | Not Disclosed |
| Dow Chemical Co | Chemical | Not Disclosed | USD | 3,000 | Not Disclosed | - |
| Eastman Chemical Co | Chemical | Not Disclosed | USD | 125 | 85 (2) | 84 (2) |
| Eastman Chemical Co | Chemical | Not Disclosed | USD | 575 | 85 (2) | 84 (2) |
| Eastman Chemical Co | Chemical | Not Disclosed | EUR | 60 | 85 (2) | 84 (2) |
| El DuPont de Nemours & Co | Chemical | Not Disclosed | USD | Not Disclosed | Not Disclosed | Not Disclosed |
| Frontier Oil Corp | Refining | Not Disclosed | USD | 500 | - | - |
| Georgia Gulf Corp | Chemical | Secured | USD | 375 | 126 | 126 |
| Holly Corp | Refining | Secured | USD | 175 | - | - |
| Holly Corp | Refining | Secured | USD | 300 | 195 | 200 |
| Huntsman Corp | Chemical | Secured | USD | 650 | 354 | - |
| Nova Chemicals Corp | Chemical | Unsecured | USD | 68 | 249 (3) | 143 (3) |
| Nova Chemicals Corp | Chemical | Secured | USD | 350 | 249 (3) | 143 (3) |
| Nova Chemicals Corp | Chemical | Unsecured | USD | 65 | 249 (3) | 143 (3) |
| Nova Chemicals Corp | Chemical | Unsecured | USD | 100 | 249 (3) | 143 (3) |
| Nova Chemicals Corp | Chemical | Unsecured | USD | 100 | 249 (3) | 143 (3) |
| PPG Industries Inc | Chemical | Not Disclosed | USD | 1,000 | Not Disclosed | - |
| PPG Industries Inc | Chemical | Not Disclosed | EUR | 650 | Not Disclosed | 368 |
| Praxair Inc | Chemical | Not Disclosed | USD | 400 | Not Disclosed | - |
| Praxair Inc | Chemical | Not Disclosed | USD | 200 | Not Disclosed | 94 |
| Praxair Inc | Chemical | Unsecured | USD | 1,000 | Not Disclosed | - |
| Praxair Inc | Chemical | Unsecured | USD | 245 | Not Disclosed | - |
| Praxair Inc | Chemical | Not Disclosed | EUR | 450 | Not Disclosed | 450 |
| Rohm & Haas Co | Chemical | Not Disclosed | USD | 750 | - | 177 |
| Solvay | Chemical | Not Disclosed | EUR | 165 | Not Disclosed | Not Disclosed |
| Solvay | Chemical | Not Disclosed | EUR | 80 | Not Disclosed | Not Disclosed |
| Solvay | Chemical | Not Disclosed | EUR | 350 | Not Disclosed | 300 |
| Sunoco Inc | Refining | Unsecured | USD | 1,300 | Not Disclosed | - |
| Sunoco Inc | Refining | Not Disclosed | USD | 400 | 101 | 323 |
| Sunoco Inc | Refining | Not Disclosed | USD | 100 | - | - |
| Tesoro Corp | Refining | Secured | USD | 1,950 | - | 66 |
| Valero Energy | Refining | Unsecured | USD | 2,500 | Not Disclosed | - |
| Valero Energy | Refining | Not Disclosed | CAD | 115 | 16 | - |
| Westlake Chemical Corp | Chemical | Secured | USD | 400 | 6 | - |

**Notes:**
Reflects revolving credit facilities that existed during calendar year 2008
(1) Reflects comparable chemical and refining companies referenced in the expert report of Daniel Fischel (11/7/2009)
(2) Represents the amount drawn in aggregate on the three Eastman Chemical revolving credit facilities
(3) Represents the amount drawn in aggregate on the five Nova Chemicals revolving credit facilities

# EXHIBIT 6-B
# Chemical and Refining Industry Asset Based Facilities

Highly Confidential, For Professional Eyes Only

**Chemical and Refining Industry Asset Based Facilities**
**Amounts in Millions**

| Company (1) | Industry | Facility Name | Currency | Borrowing Capacity | Amount Drawn as of 9/30/08 | Amount Drawn as of 12/31/08 |
|---|---|---|---|---|---|---|
| Eastman Chemical Co | Chemical | Accounts Receivable Securitization Program | USD | Not Disclosed | 200 | 200 |
| Georgia Gulf Corp | Chemical | Accounts Receivable Securitization | USD | 165 | 165 | 111 |
| Huntsman Corp | Chemical | Accounts Receivable Securitization Program | USD | 575 | 422 | 446 |
| Nova Chemicals Corp | Chemical | Receivables Securitization Program | USD | 300 | Not Disclosed | 175 |
| Rohm & Haas Co | Chemical | Receivables Securitization Agreements | USD | 39 | Not Disclosed | 20 |
| Sunoco Inc | Refining | 364-day Receivables Securitization Facility | USD | 200 | - | - |
| Valero Energy | Refining | Accounts Receivable Sales Facility | USD | 1,000 | 100 | 100 |

**Notes:**
Reflects asset based facilities that existed during calendar year 2008
(1) Reflects comparable chemical and refining companies referenced in the expert report of Daniel Fischel (11/7/2009)

Highly Confidential, For Professional Eyes Only

**EXHIBIT 6-C**

**Declaration of Richard Storey Regarding Access Industries Holdings LLC**

Highly Confidential, For Professional Eyes Only

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re: LYONDELL CHEMICAL
COMPANY, et al.,

           Debtors.

             :   Case No. 09-10023 (REG)

             :   Chapter 11

             :   (Jointly Administered)

------------------------------------------------------------x

EDWARD S. WEISFELNER, AS LITIGATION
TRUSTEE OF THE LB LITIGATION TRUST,

           Plaintiff,

v.

LEONARD BLAVATNIK, et al.

           Defendants.

             :   Adv. Pro. No. 09-01375 (REG)

------------------------------------------------------------x

## DECLARATION OF RICHARD STOREY REGARDING
## ACCESS INDUSTRIES HOLDINGS LLC

I, Richard Storey, under penalty of perjury, declare as follows:

1.     I am the Chief Financial Officer of the Access Industries Group, which includes Access Industries Holdings LLC ("Holdings").

2.     My responsibilities as Chief Financial Officer include managing the finance and investment activities of Holdings.  In this capacity, I became aware of the facts and circumstances surrounding the Revolving Credit Agreement, dated March 27, 2008, by and among LyondellBasell Industries AF S.C.A. (as the Company), Lyondell Chemical Company ("LCC") (as the U.S. Borrower), Basell Finance Company, B.V. (as the Foreign Borrower), and Holdings (as the Lender) (the "Access Revolving Credit Agreement").  I also am aware of LCC's request on October 15, 2008 to draw $300 million under the Access Revolving Credit Agreement

03402.61450/4075814.4

Highly Confidential, For Professional Eyes Only

(hereinafter, the "Draw Request"), and Holdings' honoring that Draw Request on the same day by making an advance in the same amount (the "Advance").

3.     The Advance provided by Holdings to LCC to meet its working capital need is similar to the support Holdings provides to its other affiliates, to whom it similarly makes advances for working capital and to fund investments on an "as needed" basis.  The affiliated companies that receive or have received such funds from Holdings include companies operating in capital-intensive industries (e.g., commercial real estate, hotel and condominium development, and oil and gas (including extraction (wells) and distribution (piping)).

4.     These loans may be documented by note agreements that take two forms, such as those attached hereto as Exhibits A and B.

5.     In the period between October 1, 2006 through and including March 31, 2011, in addition to the Advance to LCC in response to the Draw Request, Holdings made over 50 advances under note agreements to its affiliates, including, among others, AI Petroleum Holdings LLC, AI Petrochemicals LLC, Saxony Beach, LLC, and Access Tubulars, LLC.  These loans are listed on the spreadsheet attached hereto as Exhibit C.[1]

6.     In addition to these loans documented through note agreements, in the period between October 1, 2006 through and including March 31, 2011, Holdings routinely advanced funds to affiliates for working capital.  Holdings records these advances by marking them on its books as intercompany trade receivables owing to Holdings from the affiliate that received the loan.  The borrowing affiliate reflected the loan as an intercompany trade payable.

---

[1]     As indicated in the spreadsheet, some advances made by Holdings were originally recorded as loans on Holdings' books.  On or about December 31, 2007, these loans were reclassified in Holdings' books as intercompany trade receivables owing from its affiliates.

Highly Confidential, For Professional Eyes Only

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the forgoing is true and correct.

Executed on April 15, 2011 in New York, New York

Richard Storey

Highly Confidential, For Professional Eyes Only

**Exhibit A**

Highly Confidential, For Professional Eyes Only

# PROMISSORY NOTE

$11,880,000                                        Effective as of October 29, 2009

    1.  Principal.   FOR VALUE RECEIVED, the undersigned, AI Petroleum Holdings LLC, a limited liability company organized under the laws of the state of Delaware, c/o Access Industries Management, LLC, 730 Fifth Avenue, 20th Floor, New York, New York 10019 (the "Maker"), by this promissory note (the "Note") hereby unconditionally promises to pay to Access Industries Holdings LLC, a limited liability company organized under the laws of the state of Delaware, c/o Access Industries Management, LLC, 730 Fifth Avenue, 20th Floor, New York, New York 10019 (the "Payee"), on October 29, 2012 (the "Maturity Date"), in such funds as at the time of payment shall be legal tender in the United States of America for the payment of public and private debts, the aggregate principal sum of Eleven Million Eight Hundred Eighty Thousand United States Dollars ($11,880,000).

    2.  Interest.  The Maker also unconditionally promises to pay interest to the Payee on the unpaid principal amount hereof, which interest shall accrue from the date hereof until payment in full of the principal amount outstanding hereunder and shall be equal to 0.75%, compounded annually, which is the short-term, Applicable Federal Rate published by the United States Internal Revenue Service for the month of October 2009.

    3.  Method of Payment.  The principal of and interest on this Note shall be payable to the Payee at the address set forth in paragraph 1 above, or at such other place as may be designated by the Payee or the holder hereof, by written notice to the Maker.

    4.  Payment Without Setoff.  The principal of and interest on this Note shall be paid without setoff or counterclaim and free and clear of and exempt from, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, deductions, withholdings or other charges of whatsoever nature imposed, levied, collected, withheld or assessed by any government or any political subdivision or taxing authority thereof.  In the event that, subject to the provisions of the preceding sentence, any payments made under this Note on account of principal or interest shall not be made free and clear and exempt from and without deduction for, or on account of, any such taxes or other charges of whatever nature, then and in any such event the Maker shall pay such additional amounts as may be necessary in order that each net payment made hereunder, after payment or deduction or withholding for, or on account of, any such taxes or other charges of whatever nature will not be less than the amount otherwise provided in this Note to be then due and payable.

    5.  Optional Prepayments.  The Maker shall have the right to prepay this Note in whole or in part at any time prior to the Maturity Date, without premium or penalty.  All partial prepayments shall be applied to the payment of the principal due on this Note.

    6.  Events of Default.  If any of the following events (herein referred to as "Events of Default") occur, the Payee or the holder hereof may, by written notice to the Maker sent by registered or certified mail, declare the entire unpaid principal balance of this Note and all interest then accrued hereon to be due and payable, and upon such declaration the entire

Highly Confidential, For Professional Eyes Only

unpaid principal balance of and interest accrued on this Note shall become due and payable upon the date that such written notice is received (unless prior to such date all Events of Default in respect of this Note shall have been cured):

    a)    If the Maker fails to pay any or all of the principal amount of this Note when due;

    b)    If the Maker fails to pay any or all of the interest accrued on this Note when due; or

    c)    If the Maker becomes insolvent (where insolvency means either the excess of liabilities over assets or the inability to pay debts as they come due) or makes a general assignment for the benefit of creditors, or files a petition in bankruptcy, or if a petition in bankruptcy should hereafter be filed against it, or if a receiver of substantially all its property or assets should hereafter be appointed and such petition or appointment is not vacated or otherwise stayed within sixty (60) days thereafter.

Any overdue principal of this Note shall bear interest, until paid, at the rate specified in paragraph 2 hereof, plus 2%. If at any time after the principal of this Note shall have been so declared due and payable and before any judgment or decree for the payment of moneys due thereon shall have been entered, all arrears of interest upon this Note and other sums due in respect thereof, except any principal payments which shall not have matured by their terms, shall have been duly paid by the Maker and all other Events of Default hereunder shall have been cured, the holder of this Note, by written notice given to the Maker, may rescind such declaration, but no such rescission shall impair any right of the Payee or the holder hereof with respect to any subsequent Event of Default.

    7.  <u>Expenses for Collection</u>. In case of any proceedings to collect when the principal or interest of this Note becomes due, the Maker shall be responsible for payment of all costs and expenses for collection, including reasonable attorneys' fees.

    8.  <u>A Valid Obligation</u>. The Maker hereby represents, warrants, certifies and declares that all acts, conditions and things required to be done and performed and to have happened precedent to the execution and delivery of this Note and to constitute this Note a legal, valid and binding obligation of the Maker in accordance with its terms have been done, performed and have happened in compliance with all applicable laws.

    9.  <u>Governing Law and Submission to Jurisdiction</u>. This Note shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law provisions thereof. By execution of this Note the Maker hereby agrees that any legal action or proceeding arising out of this Note shall be instituted in the state or federal courts sitting in the county and state of New York, and in connection therewith, the Maker hereby irrevocably submits to the exclusive jurisdiction of any such court in any action, suit or proceeding.

    10.  <u>No Waiver</u>. No course of dealings between the Maker and the Payee or the holder hereof or any delay on the part of the Payee or the holder hereof in exercising any rights

Highly Confidential, For Professional Eyes Only

hereunder shall operate as a waiver of any rights of the Payee or the holder hereof, except to the extent expressly waived in writing by the Payee or the holder hereof.

11. <u>Loss, Theft, Destruction or Mutilation of Note</u>.  Upon receipt by the Maker of evidence reasonably satisfactory to the Maker of the loss, theft, destruction or mutilation of this Note, and, in case of loss, theft or destruction, upon receipt of indemnity or security reasonably satisfactory to the Maker or, in case of mutilation, upon surrendering this Note for cancellation, and upon reimbursement to the Maker of all reasonable expenses incidental thereto, the Maker will make and deliver a new note of like tenor in lieu of this Note.  Any note made and delivered in accordance with the provisions of this paragraph shall be dated as of the date to which interest has been paid on this Note, or, if no interest has theretofore been paid on this Note, then dated as of the date hereof.

12. <u>Legal Holidays</u>.  In any case where the date of maturity of the principal of or interest on this Note or the date fixed for payment or prepayment of this Note shall be, at any place of payment, a Sunday, a legal holiday or a day on which banking institutions in the State of New York are authorized or obligated by law or regulation to close, then payment of principal or interest need not be made on such date at such place but may be made on the next succeeding day that is not at such place of payment a Sunday, a legal holiday or a day on which banking institutions are authorized or obligated by law or regulation to close, with the same force and effect as if made on the Maturity Date or the date fixed for payment or prepayment, and no interest shall accrue for the period after such date.

13. <u>Waiver of Presentment, etc</u>.  The Maker hereby waives presentment, demand for payment, notice of dishonor, notice of protest and protest, and all other notices or demands in connection with the delivery, acceptance, performance or default of this Note, except as herein set forth.

14. <u>Assignments</u>.  The Payee may at any time assign any of its rights hereunder, in whole or in part.

15. <u>Notice</u>.  Except as otherwise provided in this Note, all notices, other communications, and legal process shall be in writing and shall be personally delivered, transmitted by postage prepaid, registered or certified mail with return receipt requested, or transmitted by facsimile, receipt confirmed, addressed as follows:

<u>If to the Payee</u>:

Access Industries Holdings LLC
c/o Access Industries Management, LLC
730 Fifth Avenue, 20th Floor
New York, New York 10019
Phone:  (212) 647-6400
Facsimile:  (212) 977-8112
Attention:  Alejandro Moreno

Promissory Note by AI Petroleum Holdings LLC in favor of Access Industries Holdings LLC for $11,880,000 (October 2009)

Highly Confidential, For Professional Eyes Only

<u>If to the Maker</u>:

AI Petroleum Holdings LLC
c/o Access Industries Management, LLC
730 Fifth Avenue, 20th Floor
New York, New York 10019
Phone:  (212) 647-6400
Facsimile:  (212) 977-8112
Attention:  Alejandro Moreno

Notices shall be deemed to have been given on the date of receipt if delivered personally, or on the date mailed, if sent by postage paid, registered or certified mail, return receipt requested. Any party hereto may change its address for purposes hereof by notice to the other parties hereto.

      16. <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Note are for convenience only and shall not be deemed to constitute a part hereof.

      17. <u>Counterparts</u>.  This Note may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same note.  A signed copy of this Note delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Note.

*[signature page follows]*

Highly Confidential, For Professional Eyes Only

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of the day and year first above written.

**AI PETROLEUM HOLDINGS LLC**
By:    Access Industries Management, LLC
       Its Manager

By: _____
Name:     Alejandro Moreno
Title:      Senior Vice President

By: _____
Name:     Richard B. Storey
Title:      Senior Vice President

Highly Confidential, For Professional Eyes Only

**<u>Exhibit B</u>**

03402.61450/4075814.4

Highly Confidential, For Professional Eyes Only

## GRID PROMISSORY NOTE

1. <u>Principal</u>.   FOR VALUE RECEIVED, the undersigned, Access Tubulars, LLC, a limited liability company organized under the laws of the state of Delaware, c/o Access Industries Management, LLC, 730 Fifth Avenue, 20th Floor, New York, New York 10019 (the "Maker"), by this promissory note (the "Note") dated August 25, 2009, hereby unconditionally promises to pay to Access Industries Holdings LLC, a limited liability company organized under the laws of the state of Delaware, c/o Access Industries Management, LLC, 730 Fifth Avenue, 20th Floor, New York, New York 10019 (the "Payee"), on August 25, 2012 (the "Maturity Date"), the aggregate unpaid principal amount of all loans made by the Payee to the Maker ("Loans"), together with accrued interest on such amounts from time to time outstanding hereunder at the rate provided below, in such funds as at the time of payment shall be legal tender in the United States of America for the payment of public and private debts, as detailed and evidenced on <u>Schedule I</u> attached hereto.

2. <u>Interest</u>.   The Maker also unconditionally promises to pay interest on the unpaid principal amount of each Loan from and including the date of such Loan up to, but excluding, the payment date at the Applicable Federal Rate (as defined below).  Interest shall be calculated for each Loan on the basis of the actual number of days elapsed over a 365-day year and the principal amount of such Loan outstanding on each such day, and shall compound annually.  The Maker shall pay all accrued and unpaid interest on the Maturity Date.  For purposes of this paragraph 2, the term "Applicable Federal Rate" means, with respect any Loan, the applicable federal short-term (0-3 years) rate with annual compounding in effect for the month during which such Loan is made, as published from time to time by the U.S. Internal Revenue Service under Section 1274 of the Internal Revenue Code of 1986.

3. <u>Method of Payment</u>.   The principal of and interest on this Note shall be payable to the Payee at the address set forth in paragraph 1 above, or at such other place as may be designated by the Payee or the holder hereof, by written notice to the Maker.

4. <u>Payment Without Setoff</u>.   The principal of and interest on this Note shall be paid without setoff or counterclaim and free and clear of and exempt from, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, deductions, withholdings or other charges of whatsoever nature imposed, levied, collected, withheld or assessed by any government or any political subdivision or taxing authority thereof.  In the event that, subject to the provisions of the preceding sentence, any payments made under this Note on account of principal or interest shall not be made free and clear and exempt from and without deduction for, or on account of, any such taxes or other charges of whatever nature, then and in any such event the Maker shall pay such additional amounts as may be necessary in order that each net payment made hereunder, after payment or deduction or withholding for, or on account of, any such taxes or other charges of whatever nature will not be less than the amount otherwise provided in this Note to be then due and payable.

Highly Confidential, For Professional Eyes Only

5. <u>Optional Prepayments</u>. The Maker shall have the right to prepay this Note in whole or in part at any time prior to the Maturity Date, without premium or penalty. All partial prepayments shall be applied to the payment of the principal due on this Note.

6. <u>Events of Default</u>. If any of the following events (herein referred to as "Events of Default") occur, the Payee or the holder hereof may, by written notice to the Maker sent by registered or certified mail, declare the entire unpaid principal balance of this Note and all interest then accrued hereon to be due and payable, and upon such declaration the entire unpaid principal balance of and interest accrued on this Note shall become due and payable upon the date that such written notice is received (unless prior to such date all Events of Default in respect of this Note shall have been cured):

    (a)    If the Maker fails to pay any or all of the principal amount of this Note when due;

    (b)    If the Maker fails to pay any or all of the interest accrued on this Note when due; or

    (c)    If the Maker becomes insolvent (where insolvency means either the excess of liabilities over assets or the inability to pay debts as they come due) or makes a general assignment for the benefit of creditors, or files a petition in bankruptcy, or if a petition in bankruptcy should hereafter be filed against it, or if a receiver of substantially all its property or assets should hereafter be appointed and such petition or appointment is not vacated or otherwise stayed within sixty (60) days thereafter.

Any overdue principal of this Note shall bear interest, until paid, at the rate specified in paragraph 2 hereof, plus 2%. If at any time after the principal of this Note shall have been so declared due and payable and before any judgment or decree for the payment of moneys due thereon shall have been entered, all arrears of interest upon this Note and other sums due in respect thereof, except any principal payments which shall not have matured by their terms, shall have been duly paid by the Maker and all other Events of Default hereunder shall have been cured, the holder of this Note, by written notice given to the Maker, may rescind such declaration, but no such rescission shall impair any right of the Payee or the holder hereof with respect to any subsequent Event of Default.

7. <u>Expenses for Collection</u>. In case of any proceedings to collect when the principal or interest of this Note becomes due, the Maker shall be responsible for payment of all costs and expenses for collection, including reasonable attorneys' fees.

8. <u>A Valid Obligation</u>. The Maker hereby represents, warrants, certifies and declares that all acts, conditions and things required to be done and performed and to have happened precedent to the execution and delivery of this Note and to constitute this Note a legal, valid and binding obligation of the Maker in accordance with its terms have been done, performed and have happened in compliance with all applicable laws.

9. <u>Governing Law and Submission to Jurisdiction</u>. This Note shall be governed by and construed in accordance with the laws of the state of New York, without regard to the

Highly Confidential, For Professional Eyes Only

conflicts of law provisions thereof. By execution of this Note, the Maker hereby agrees that any legal action or proceeding arising out of this Note shall be instituted in the state or federal courts sitting in the county and state of New York, and in connection therewith, the Maker hereby irrevocably submits to the exclusive jurisdiction of any such court in any action, suit or proceeding.

10. <u>No Waiver</u>. No course of dealings between the Maker and the Payee or the holder hereof or any delay on the part of the Payee or the holder hereof in exercising any rights hereunder shall operate as a waiver of any rights of the Payee or the holder hereof, except to the extent expressly waived in writing by the Payee or the holder hereof.

11. <u>Loss, Theft, Destruction or Mutilation of Note</u>. Upon receipt by the Maker of evidence reasonably satisfactory to the Maker of the loss, theft, destruction or mutilation of this Note, and, in case of loss, theft or destruction, upon receipt of indemnity or security reasonably satisfactory to the Maker or, in case of mutilation, upon surrendering this Note for cancellation, and upon reimbursement to the Maker of all reasonable expenses incidental thereto, the Maker will make and deliver a new note of like tenor in lieu of this Note. Any note made and delivered in accordance with the provisions of this paragraph shall be dated as of the date to which interest has been paid on this Note, or, if no interest has theretofore been paid on this Note, then dated as of the date hereof.

12. <u>Legal Holidays</u>. In any case where the date of maturity of the principal of, or interest on, this Note or the date fixed for payment or prepayment of this Note shall be, at any place of payment, a Sunday, a legal holiday or a day on which banking institutions in the state of New York are authorized or obligated by law or regulation to close, then payment of principal or interest need not be made on such date at such place, but may be made on the next succeeding day that is not at such place of payment a Sunday, a legal holiday or a day on which banking institutions are authorized or obligated by law or regulation to close, with the same force and effect as if made on the Maturity Date or the date fixed for payment or prepayment, and no interest shall accrue for the period after such date.

13. <u>Waiver of Presentment, etc</u>. The Maker hereby waives presentment, demand for payment, notice of dishonor, notice of protest and protest, and all other notices or demands in connection with the delivery, acceptance, performance or default of this Note, except as herein set forth.

14. <u>Assignments</u>. The Payee or the Maker (with the Payee's consent) may at any time assign any of its rights hereunder, in whole or in part.

15. <u>Amendment and Modification</u>. No amendments, changes, modifications or supplements to this Note shall be valid unless in writing and signed by a duly authorized representative of each of the parties hereto.

16. <u>Notice</u>. Except as otherwise provided in this Note, all notices, other communications, and legal process shall be in writing and shall be personally delivered, transmitted by postage prepaid, registered or certified mail with return receipt requested, or transmitted by facsimile, receipt confirmed, addressed as follows:

Highly Confidential, For Professional Eyes Only

<u>If to the Payee:</u>

Access Industries Holdings LLC
c/o Access Industries Management, LLC
730 Fifth Avenue, 20th Floor
New York, NY 10019
Phone: (212) 247-6400
Facsimile: (212) 977-8112
Attention: Alejandro Moreno

<u>If to the Maker:</u>

Access Tubulars, LLC
c/o Access Industries Management, LLC
730 Fifth Avenue, 20th Floor
New York, NY 10019
Phone: (212) 247-6400
Facsimile: (212) 977-8112
Attention: Alejandro Moreno

Notices shall be deemed to have been given on the date of receipt if delivered personally, or on the date mailed, if sent by postage paid, registered or certified mail, return receipt requested. Any party hereto may change its address for purposes hereof by notice to the other parties hereto.

17. <u>Headings</u>. The headings of the paragraphs and subparagraphs of this Note are for convenience only and shall not be deemed to constitute a part hereof.

18. <u>Counterparts</u>. This Note may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same note. A signed copy of this Note delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Note.

*[signature page follows]*

Highly Confidential, For Professional Eyes Only

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of August 25, 2009.

ACCESS TUBULARS, LLC
By:     Access Industries Management, LLC,
        Its Manager

By: _____
Name:       Richard B. Storey
Title:      Vice President


**ACKNOWLEDGED AND AGREED:**

ACCESS INDUSTRIES HOLDINGS LLC
By:     Access Industries Management, LLC,
        Its Manager

By: _____
Name:       Richard B. Storey
Title:      Vice President

— 5 —

Highly Confidential, For Professional Eyes Only

Schedule I

## Grid Promissory Note – Schedule of Loans

**Access Industries Holdings LLC to Access Tubulars, LLC**
**(Originally dated as of August 25, 2009,**
**updated as of August 25, 2009)**

| Date of Loan | Amount of Loan | Interest Rate[1] | Date of Prepayment | Amount of Prepayment | Principal Amount Outstanding |
|---|---|---|---|---|---|
| 8/25/2009 | $640,091.31 | 0.83% | | | $640,091.31 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | **Aggregate Unpaid Principal:** | $640,091.31 |

---

[1]  The interest rate shall be the applicable federal short-term (0-3 years) rate with annual compounding in effect for the month during which such loan is made, as published from time to time by the U.S. Internal Revenue Service under Section 1274 of the Internal Revenue Code of 1986.

Highly Confidential, For Professional Eyes Only

Schedule I

## Grid Promissory Note – Schedule of Loans

### Access Industries Holdings LLC to Access Tubulars, LLC
**(Originally dated as of August 25, 2009,**
**updated as of October 2, 2009)**

| Date of Loan | Amount of Loan | Interest Rate[1] | Date of Prepayment | Amount of Prepayment | Principal Amount Outstanding |
|---|---|---|---|---|---|
| 8/25/2009 | $640,091.31 | 0.83% | | | $640,091.31 |
| 10/2/2009 | $1,900,000 | 0.75% | | | $1,900,000.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Aggregate Unpaid Principal: | $2,540,091.31 |

---

[1]  The interest rate shall be the applicable federal short-term (0-3 years) rate with annual compounding in effect for the month during which such loan is made, as published from time to time by the U.S. Internal Revenue Service under Section 1274 of the Internal Revenue Code of 1986.

– 6 –

Highly Confidential, For Professional Eyes Only

## **Exhibit C**

Highly Confidential, For Professional Eyes Only

**Advances Loaned to Affiliates through Various Note
Agreements with Access Industries Holdings LLC (Lender)
from 10.1.2006-3.31.2011**

| AI International Holdings LLC (Borrower)[1] | |
|---|---|
| Date | Amount |
| 3/13/2007 | 236,724.74 |
| 3/20/2007 | 175,869.36 |
| 3/27/2007 | 121,373.90 |
| 4/2/2007 | 71,280.00 |
| 4/10/2007 | 176,859.23 |
| 4/17/2007 | 40,000.00 |
| 4/24/2007 | 30,000.00 |
| 5/2/2007 | 130,000.00 |
| 5/8/2007 | 38,000.00 |
| 5/15/2007 | 110,000.00 |
| 7/17/2007 | 200,000.00 |
| 7/25/2007 | 500,000.00 |
| 8/8/2007 | 1,000,000.00 |
| 10/17/2007 | 1,000,000.00 |
| 12/12/2007 | 1,000,000.00 |

| Access Private Equity LLC (Borrower) | |
|---|---|
| Date | Amount |
| 11/29/2006 | 1,500,000.00 |

| AI SMS Limited (BVI) (Borrower) | |
|---|---|
| Date | Amount |
| 9/21/2009 | 486,381.00 |

| AI Petroleum Holdings LLC (Borrower) | |
|---|---|
| Date | Amount |
| 10/29/2009 | 11,880,000.00 |
| 11/3/2009 | 870,471.00 |
| 11/18/2009 | 369,709.00 |
| 11/23/2009 | 1,900,000.00 |
| 12/1/2009 | 25,298.00 |
| 12/2/2009 | 888,195.00 |
| 12/15/2009 | 1,650,000.00 |
| 12/22/2009 | 1,199,672.00 |
| 12/22/2009 | 30,512.24 |
| 1/5/2010 | 1,500.00 |
| 1/12/2010 | 26,065.72 |
| 1/12/2010 | 8,624.04 |
| 2/13/2010 | 2,860.50 |
| 2/24/2010 | 147,169.46 |
| 3/9/2010 | 21,150.00 |

Highly Confidential, For Professional Eyes Only

| Date | Amount |
|---|---|
| 3/9/2010 | 25,932.04 |
| 3/17/2010 | 262,189.00 |
| 3/30/2010 | 66,585.23 |
| 3/30/2010 | 152.00 |
| 4/27/2010 | 203,055.19 |
| 5/4/2010 | 277,174.89 |
| 5/11/2010 | 150,000.00 |
| 5/19/2010 | 20,000,000.00 |
| 5/25/2010 | 101,535.56 |
| 7/19/2010 | 9,928,704.72 |
| 7/14/2010 | 15,000,000.00 |
| 9/10/2010 | 19,000,000.00 |
| 7/19/2010 | 71,295.28 |
| 7/28/2010 | 74,682.99 |
| 8/10/2010 | 154,580.63 |
| 8/17/2010 | 360,867.24 |
| 8/31/2010 | 118,449.47 |
| 9/8/2010 | 244,315.35 |
| 9/14/2010 | 5,625.00 |
| 9/29/2010 | 45,612.80 |
| 9/29/2010 | 491,346.57 |
| 10/12/2010 | 289,820.51 |
| 10/19/2010 | 35,848.79 |
| 11/2/2010 | 22,917.11 |
| 11/4/2010 | 316,967.00 |
| 11/9/2010 | 10,000.00 |
| 11/10/2010 | 276,973.00 |
| 11/10/2010 | 1,401,000.00 |
| 11/10/2010 | 32,378.10 |
| 11/30/2010 | 304.29 |
| 12/7/2010 | 163,454.23 |
| 12/21/2010 | 2,179.19 |
| 12/21/2010 | 1,020,669.30 |
| 1/11/2011 | 13,915.14 |
| 1/11/2011 | 810,000.00 |
| 1/18/2011 | 90,000.00 |
| 3/1/2011 | 148,911.00 |
| 3/1/2011 | 1,139,000.00 |
| 3/9/2011 | 8,250.00 |
| 3/9/2011 | 17,925.00 |
| 3/22/2011 | 1,560,000.00 |

| Al Petrochemicals LLC | |
|---|---|
| Date | Amount |
| 3/5/2009 | 12,931,279.00 |

Highly Confidential, For Professional Eyes Only

| Saxony Beach, LLC | |
|---|---|
| **Date** | **Amount** |
| 10/20/2009 | 51,990.74 |

| Access Tubulars, LLC | |
|---|---|
| **Date** | **Amount** |
| 8/25/2009 | 640,091.31 |
| 10/2/2009 | 1,900,000.00 |

[1] Advances originally recorded as loans in Holdings' books; on or about December 31, 2007, the loans were reclassified as intercompany trade recievables owing to Holdings from the affiliates.

Highly Confidential, For Professional Eyes Only

# Designation No. 886

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:  Lyondell Chemical Company, et al.,     :          Case No. 09-10023 (CGM)
                                                            :
             Debtors.                               :          Chapter 11
                                                            :
------------------------------------------------------------x          (Jointly Administered)
                                                            :
EDWARD S. WEISFELNER, AS LITIGATION     :
TRUSTEE OF THE LB LITIGATION TRUST,      :
                                                            :
             Plaintiff,                             :          Adv. Pro. No. 09-01375 (MG)
                                                            :
v.                                                         :
                                                            :
LEONARD BLAVATNIK, et al.,                   :
                                                            :
             Defendants.                           :
                                                            :
------------------------------------------------------------x

### EXPERT DECLARATION OF PIETER VAN DER KORST

I, Pieter Jan van der Korst, under penalty of perjury under the laws of the United States

of America, declare as follows:

1.  I am an attorney and a partner at Lemstra Van der Korst, a Dutch law firm that is

recognized in publications such as Chambers Europe and Chambers Global as the leading

boutique litigation practice in the Netherlands, where I have been practicing since its formation

in 2010.  Before that time, I was a corporate litigation partner at Houthoff Buruma, one of the

leading law firms in the Netherlands, and at the predecessor firm of the Dutch office of DLA

Piper.  I am based in Amsterdam.  I have a corporate and financial litigation practice.  In

addition, I regularly advise in corporate investigation, arbitration and corporate governance

matters and act as arbitrator. I hold a PhD on the subject of "Trade secrets and transparency obligations" and I am a senior lecturer at the Van der Heijden Institute at the Radboud University Nijmegen law school. I am also a lecturer at the law schools at both Erasmus University of Rotterdam and Vrije Universiteit, Amsterdam. I regularly publish in leading Dutch legal periodicals on corporate legal, corporate governance and corporate litigation matters. I am editor of the monthly legal journal, Civil & Fiscal Capital. I graduated from Utrecht University law school and have been admitted to the Amsterdam bar since 1988. My curriculum vitae is attached as Exhibit A.

2. I have been retained on behalf of the Access Defendants to provide opinions based on my expertise in Dutch law and Dutch corporate governance practice relating to the corporate governance and operation of the business of the Basell group of companies during 2007. My opinions are offered in relation to parts of Counts 6 and 7 of the Second Amended Complaint (the "Complaint"). A list of documents I have reviewed is attached as Exhibit B.

3. I am being compensated for my work on this matter at my usual hourly rate of EUR 395. My compensation is not contingent on the outcome of the case. I have not served as an expert witness in any other case in the past five years.

4. I understand that before the December 2007 merger transaction through which Basell acquired Lyondell Chemical Company ("Lyondell"), the Basell group of companies included, among others, Basell Holdings B.V. ("Basell B.V."), a company incorporated in the Netherlands that was the immediate parent of virtually all of the Basell operating companies, and Basell AF S.C.A. ("Basell AF"), a holding company incorporated in Luxembourg. Basell Funding S.à.r.l. ("Basell Funding"), a subsidiary of Basell AF organized under Luxembourg law,

was the sole shareholder of Basell B.V.  I am advised that Basell AF was privately owned by Nell

Limited (an affiliate of Access Industries, Inc., which I am advised is part of a group of

companies owned by Len Blavatnik and his family), and that Basell AF was formed in connection

with the 2005 acquisition of Basell by Nell Limited.  I further understand that, immediately

following the acquisition of Basell in 2005, Basell B.V. became an indirect wholly-owned

subsidiary of Basell AF, and remained one thereafter.

5.  I am advised that Basell B.V. was never a debtor in the U.S. bankruptcy cases that

gave rise to the Trustee's lawsuit, nor did Basell B.V. ever commence restructuring proceedings

under Dutch law.

6.  The Complaint asserts various claims under Luxembourg law against persons who

were involved in approving the 2007 merger of Basell and Lyondell, including persons who

participated in the corporate governance of Basell B.V.  These individuals include Len

Blavatnik—the only defendant against whom Count 6 is asserted and one of the defendants

named in Count 7.  I have reviewed the Complaint, and the Trustee's claims under Luxembourg

law.  I will not offer opinions on Luxembourg law, but it is clear from my review that the

Luxembourg law claims asserted by the Trustee regarding pre-merger activities do not take

account of what I believe based on my experience are two important facts.  First, the Complaint

largely ignores the fact that the position of Basell AF (the company that was later named

LyondellBasell Industries AF S.C.A. ("LBI AF") and whose claims under Luxembourg law the

Trustee is pursuing) in the ownership structure of Basell was as a second- or third-tier holding

company and that Basell AF sat in the corporate governance structure above the Dutch

company, Basell B.V., the direct holding company of the Basell operating subsidiaries and the

entity where the business of the Basell group of companies was run.  Second, the Complaint

ignores the fact that—as a matter of corporate governance—substantive corporate strategies

for the pre-merger Basell group of companies appear (rightly) to have been formed, and major

corporate decisions were apparently (and rightly) largely made at the level of the Dutch

company, Basell B.V.

7.  I understand from my review that before the December 2007 merger transaction,

virtually all of Basell's business—with the exception of its small U.S. operations—was under

Basell B.V. and that virtually all operational companies were subsidiaries of Basell B.V.  The

Basell group's business was headquartered in the Netherlands, and I am advised that Basell had

no facilities, personnel, or operations in Luxembourg.  Basell B.V. was managed by a

Management Board (consisting of the company's top executives), which was supervised by a

non-executive Supervisory Board.  Minutes of the meetings of the Supervisory Board of Basell

B.V. in the period between August 2005 and November 2007 indicate that major business or

strategic decisions affecting the Basell group of companies were actively and thoroughly

discussed in those meetings.

8.  Based on my review, I understand that Basell AF was a Luxembourg holding company

with no business operations, sources of income, or assets of its own other than its ownership

interests in subsidiaries (and intercompany obligations).  Its main asset was its indirect

ownership (through Basell Funding) of the shares of Basell B.V.  All of Basell AF's business

operations were conducted by its subsidiaries.

9.  I am not an expert on Luxembourg law, and I do not intend to opine on issues of

Luxembourg law.  I note, however, that the use of Luxembourg holding company structures by

companies whose business is actually located and conducted in another country, such as the

Netherlands, is not uncommon.  There are ample examples of the use of such a corporate

group structure, including the holding structures through which many private equity firms hold

portfolio companies and the structures through which multinationals hold international

subsidiaries.  Most of these structures involve privately held companies.  However, newspaper

clippings have referred to Luxembourg entity structures involving, among others, leading global

groups such as Koch Industries, Heinz, Amazon, Apple, Accenture, Ikea, Pepsi, Burberry, Walt

Disney, Procter & Gamble, Skype, Shire Pharmaceuticals, Icap and JP Morgan Chase.  (Of

course, in each of these examples, the role of the Luxembourg entity may differ.)  There are a

variety of reasons why companies may place a Luxembourg holding company in a corporate

structure above, for example, a Dutch company where the assets and personnel are located

and the business is actually run.  By way of example, certain companies have found that the use

of a Luxembourg holding company structure in their corporate chain of ownership may provide

various tax advantages.  Regardless of the reasons for the use of such a corporate group

structure, it is well recognized and in no way improper under Dutch law or corporate practice,

or under European practice generally.

    10.  Before the December 2007 merger transaction, Basell B.V., like numerous

companies incorporated under the laws of the Netherlands (and like by far most of the larger or

publicly traded companies incorporated under the laws of the Netherlands), employed a two-

tier or dualistic model of governance with a Management Board and a Supervisory Board.

While a Management Board is responsible for the day-to-day management activities and the

overall strategic direction of the company, a Supervisory Board is responsible for supervising

the course of action taken by a Management Board and advising the Management Board.  *See*, article 2:250 paragraph 2 of the Dutch Civil Code ("DCC").  These powers have been further developed and expanded in case law and legal doctrine and in practice.  The Dutch Supreme Court specified in the ABN AMRO case (Ruling of 13 July 2007, JOR 2007/178) that the determination of the strategy of a Dutch company in principle is the responsibility of the managing board, whereby the supervisory board is responsible for the supervision and may be granted specific responsibilities, and the shareholders meeting may express its opinion via the rights granted to it by law in the articles of association.  Case law and legal doctrine make clear that members of the Supervisory Board are expected to play an active role in connection with any major acquisitions and investments, as I will address below.

11.  Dutch practice recognizes that, in companies like Basell B.V., which effectively have a single shareholder, as a general matter, the shareholder may be closely involved in the supervision of the company's management.  Regardless whether the company uses a one-tier or two-tier governance model, such shareholder involvement is not considered improper.  At the same time, in practice, the one-tier and two-tier models "appear to be growing closer to one another" and the Supervisory Board "is expected to play a more active role" in companies with a two-tier structure.  *See*, Geert Raaijmakers and Marlies Stek, "Netherlands," in Willem J L Calkoen, THE CORPORATE GOVERNANCE REVIEW at 251 (4th ed. Mar. 2014).  *See, also*  Ch. E. Honeé, "Corporate governance, een vogelvlucht", Ondernemingsrecht 2016/67.

12.  Active involvement of Supervisory Board members in connection with, for example, major acquisitions and investments or other transformative transactions is not improper, and is in fact expected.  *See amongst others*: Asser/Maeijer, Van Solinge & Nieuwe Weme 2-II 2009,

no. 487; M.W. Josephus Jitta & B.R. van der Klip, "De rol van het bestuur en de raad van

commissarissen bij een openbaar bod", Handboek Openbaar Bod (Nieuwe Weme et al., eds.),

Deventer: Kluwer 2008, para 8.4 and in particular para 8.4.2; G.A. ter Neuzen, "De rol van de

raad van commissarissen bij een openbaar bod", V&O 2008/11, p. 232 et seq.; M.M. Stolp, "De

zorg van een zorgvuldig commissaris", WPNR 2015/7045; W. van Hassel, Toolkit Commissariaat,

Nationaal Register (October 2013), para 9.3; J.J.A. Sombezki, "Evaluatierapport corporate

governance code", V&O 2008/7-8, p. 162; M. Koelemeijer, "De commissaris anno 2013", TvOB

2013/2, p. 56; M.A. Hendrikse, "De commissaris in crisis: code geel, oranje of rood?", TOP

2014/5.

    13.  Such active involvement of the members of the Supervisory Board is also seen in

practice. *See*, for instance, the 2007 discussions that ultimately led to the EUR 71 billion

acquisition of ABN AMRO, the largest bank of the Netherlands at the time, by a consortium

consisting of Royal Bank of Scotland, Santander, and Fortis.  In an interview with Arthur

Martinez, the then-Chairman of the Supervisory Board of ABN AMRO, published by NRC

Handelsblad (a leading Dutch newspaper) on November 1, 2007, Mr. Martinez (a US citizen

residing close to New York City) stated that he flew to Amsterdam in relation to the discussions

sixteen times up until that time in 2007.  In the interview, Mr. Martinez is quoted as saying that

he was the one receiving the call on March 9, 2007 from Michel Tilmant, the CEO of ING at the

time, in which Mr. Tilmant told Mr. Martinez that ING would not continue its merger talks with

ABN AMRO.  When he received that call, Mr. Martinez was just preparing himself in ABN

AMRO's London office jointly with ABN AMRO's then-CEO Rijkman Groenink for a meeting with

a number of investors.  It also follows from the interview that it was Mr. Martinez who received

the call from Chuck Prince, then the CEO of Citigroup, asking Mr. Martinez "Can I get in?", upon

which Mr. Martinez laid out what it would take for Citigroup to get into the bidding process that

then involved Barclays and (soon thereafter) the consortium of Royal Bank of Scotland,

Santander, and Fortis.  Moreover, it also explicitly follows from the decisions in the ABN AMRO

case rendered by both the Amsterdam Court of Appeals and the Supreme Court of the

Netherlands (of May 3, 2007 and July 13, 2007, respectively) that Mr. Martinez fulfilled a lead

role in the negotiations.  In these legal proceedings, the preeminent role of Mr. Martinez in the

negotiation of a prospective transformative deal was never challenged by any party or the

court.  It was accepted as a given; if Mr. Martinez would not have assumed an active role, he

might actually have exposed himself to potential mismanagement allegations.  Even so, in an

article dated June 11, 2010 in the Dutch newspaper De Volkskrant, it was argued that Mr.

Groenink had not been challenged enough by Mr. Martinez.  And from a February 5, 2010

article in NRC Handelsblad, it is apparent that Mr. Martinez, too, regrets that he and the other

Supervisory Board members had not taken an even more active role.  Similarly, it is clear from

press releases and news articles published at the time that Mr. Jos Streppel, the Chairman of

the Supervisory Board of KPN, played a key role in the process dealing with América Móvil's

contemplated unsolicited public bid for all shares in the capital of KPN, in 2013.  For instance,

an article in the Trouw newspaper dated October 19, 2013 notes how América Móvil proposed

a bid of EUR 2.30 per share in a conversation with Streppel that took place on August 7, 2013.

Of course, Messrs. Martinez and Streppel acted in their formal capacities for the target

company and not for the bidder.  This particular distinction, however, is not relevant in this

case: in the context of a major acquisition, the members of a Supervisory Board need to play an active role.

14.    In the Dutch Corporate Governance Code, as in force from January 1, 2009 onward, the timely and close involvement of the Supervisory Board in takeover situations was codified as a best practice (*see*, no. II.1.10), confirming existing practice at that time.  For the avoidance of doubt, I note that the Corporate Governance Code is not a formal law or code; it is a body of soft law (a form of self-regulation) which does, however, have anchor points in formal law and doctrine.  For example, listed public companies need to comply with the Corporate Governance Code, or explain in their annual accounts why they do not (*see* article 2:391, paragraph 5, DCC in conjunction with the "Besluit nadere voorschriften inhoud jaarverslag" dated December 23, 2004 (as amended on December 10, 2009: Stb. 2009, 545)).  When so applicable, Management Board and Supervisory Board actions are tested against the provisions of the Corporate Governance Code by the courts.  The Corporate Governance Code is also considered to "fill out" the standards of reasonableness and fairness which are applicable on the basis of article 2:8 of the DCC (*see*, for instance, Dutch Supreme Court 9 July 2010, NJ 2010, 544 (*ASMI*)).  In the currently pending proposal to amend the Corporate Governance Code, the timely and close involvement of the Supervisory Board in takeover situations is yet again prescribed as a best practice (*see*, no. 2.7.1).  In case of a major acquisition, the suggested amendments to the Corporate Governance Code set out that a special committee is to be appointed, consisting of both managing directors and Supervisory Board members, with the Chairman of the Supervisory Board also being the committee chairman.  In practice, such a special takeover committee has already been established on several occasions, *e.g.*, by KPN, in 2012, during the

9

non-solicited takeover attempt by América Móvil; and by Unit4 in 2013 and Nutreco in 2014 in connection with public offers.  All of the above, in my view, highlights that Supervisory Board members and, in particular, their Chairman, are expected to play a central and active role in connection with major acquisitions and investments.  Furthermore, the active involvement of the Chairman is conducive to negotiations: the Chairman can explore various positions that do not yet necessarily have support within the company—to his counterparty, it may be apparent from the Chairman's formal role that he is not necessarily putting forward a proposal that is potentially immediately binding, but that he is suggesting to bring up such a position in internal discussions, if the counterparty indicates that such a position may in fact be acceptable.

15.  Also, more generally, the notion that the Supervisory Board can be closely involved in determining the policy set out by the Management Board in certain circumstances, without thereby acting as a de-facto managing director under Dutch law, is well-established.  *See*: J.M. Blanco Fernandez, De raad van commissarissen bij NV en BV; Uitgave vanwege het Instituut voor Ondernemingsrecht Rijksuniversiteit Groningen (no. 19), Deventer: Kluwer 1993, ch. 1, p. 7. *See* also, K. Rutten, "Intensief toezicht maakt van RvC geen feitelijk beleidsbepaler", TOP 2012/1, p. 32 *et seq.*

16.  In fact, authoritative writers endorse that the Supervisory Board ought to take a *leading* role in acquisition scenarios, not only in cases in which the Management Board members may have interests of their own in deciding whether or not to accept a bid for the company, but also in other takeover situations.  *See*: P. van Schilfgaarde, Van de BV en de NV, Deventer: Kluwer 2013, p. 251 (top); M.W. Josephus Jitta & B.R. van der Klip, "De rol van het bestuur en de raad van commissarissen bij een openbaar bod", Handboek Openbaar Bod

(Nieuwe Weme et al., eds.), Deventer: Kluwer 2008, para 8.4 and in particular para 8.4.2 (ending).

17.   At the time the merger of Basell and Lyondell was negotiated and the July 2007 Merger Agreement was entered into, the members of the Supervisory Board of Basell B.V. were Len Blavatnik, Lincoln Benet, Richard Floor, Philip Kassin, and Kent Potter.  I understand that Len Blavatnik was the Chairman of the Supervisory Board, in accordance with article 30.1 of the articles of association in force at the time.  I am advised that Messrs. Blavatnik, Benet, and Kassin were affiliated with Access Industries, while the other two were not.

18.   On my review of the Complaint, I did not identify any allegations that the Management Board or Supervisory Board of Basell B.V.—or the members of those boards— would have acted outside the bounds of their authority under Dutch law.

19.   I have reviewed the "Background of the Merger" section set forth at pages 17 through 24 of the proxy statement filed by Lyondell on October 12, 2007.  For purposes of my opinions, I assume that the chronology of events set forth on those pages is generally accurate.

20.   I have reviewed the Merger Agreement, to which the holding company, Basell AF, became a party.  That agreement was preceded by, among other things, a July 11, 2007 confidentiality agreement entered into between Lyondell and Basell B.V. and a July 16, 2007 definitive offer letter signed jointly on behalf of Access Industries (by its Chairman, Len Blavatnik) and Basell B.V. (by its CEO, Volker Trautz).  It bears emphasis that these two documents signed in connection with the negotiation of the Merger Agreement were signed and sent by Basell B.V. rather than by Basell AF.  (I am advised that Messrs. Trautz and Blavatnik had signed an August 2006 offer letter to Lyondell and a June 25, 2007 offer letter to Huntsman

Corporation in the same capacities.)  On July 16, 2007, according to minutes that I have

reviewed, the Supervisory Board of Basell B.V. discussed and supported the acquisition of

Lyondell ("Project Hugo") at a price of $48 per share.  I do not find the fact that the

confidentiality and offer letters were signed by Basell B.V. rather than by Basell AF, or that the

offer letter signed by Basell B.V. was proposing a merger transaction involving the holding

company Basell AF to be in any way irregular in light of the fact that Basell B.V. was the

company through which the Basell group's business was run.

22. 21.    On September 17, 2007, according to minutes that I have reviewed, the Supervisory

Board of Basell B.V. reviewed and discussed, among other things, the integration process for

the Lyondell merger, the financing for the Lyondell acquisition, and the process of developing a

combined business plan for Basell and Lyondell.

22.    On December 14, 2007, Basell Funding in its capacity as sole shareholder of Basell

B.V. adopted a shareholders resolution approving the merger between Basell and Lyondell.  (I

am advised that resolutions were also adopted at the Luxembourg holding company level.)  This

resolution adopted by the shareholder of Basell B.V. stated, among other things, that the

Management Board of Basell B.V. was proposing that Basell AF and other Basell group

companies enter into the transaction documents necessary to effectuate the merger with

Lyondell.  The fact that the resolution approving the Lyondell merger was (also) adopted at the

Basell B.V. level of the Basell group of companies is consistent with the fact that the business of

Basell was run through the Dutch company.

23.    The Complaint puts much emphasis on the allegation that Len Blavatnik negotiated

the price of the acquisition with Dan Smith, the CEO of Lyondell.  In my opinion, this was

consistent with appropriate corporate governance practice in the context of a major acquisition

and not improper.  Mr. Blavatnik was the owner and chairman of Access Industries and a

member and the Chairman of the Supervisory Board of Basell B.V.  He therefore held a key

position in the governance structure of the Basell group of companies.  Mr. Blavatnik's

discussions with Mr. Smith in advance of the July 16, 2007 offer letter did not create any legally

binding obligation for the Basell group, and the legally binding offer was made following the

July 16, 2007 meeting of the Supervisory Board.  In my opinion, therefore, the Complaint's

allegation that Mr. Blavatnik acted without any official capacity in connection with the pursuit

and approval of the acquisition of Lyondell by Basell is not correct and ignores his position on

the Supervisory Board of the Dutch company, which was the company through which the Basell

group's business was run before the merger.  The Complaint makes a number of allegations

concerning Mr. Blavatnik's active participation in evaluating the Lyondell acquisition,

negotiating some of the terms (especially price) with Lyondell's CEO, and structuring and

approving Basell's offer to acquire Lyondell.  Under Dutch law, these activities by a Supervisory

Board member in Mr. Blavatnik's position would not support a conclusion that he exceeded his

authority as a Supervisory Board member or acted outside the scope of that authority.  Also,

further to what I discussed above in paragraphs 10 through 16, it is generally accepted that the

duties of Supervisory Board members extend to the entire group of companies to which the

entity on which board the director sits belongs, not just to the holding company in which the

Supervisory Board is formally established (*see*: Supreme Court 10 January 1990, NJ 1990, 466

(OGEM), J.B. Huizink, GS Rechtspersonen, artikel 2:140 BW, aant. 4b; E.J.J. van der Heijden,

W.C.L. van der Grinten & P.J. Dortmond, Handboek voor de besloten en de naamloze

vennootschap, Deventer: Kluwer 2013, no. 274).

24.   After the Supervisory Board of Basell B.V. approved the merger of Basell and

Lyondell, Basell Funding (the sole shareholder of Basell B.V.) passed resolutions approving the

merger.  It is noteworthy, I believe, that the actions taken by Basell Funding were confirmed by

BI S.à.r.l., a company in the ownership chain above Basell AF that owned all but one of the

shares of Basell AF, when it approved the merger.  It is therefore clear that there was a highly

interrelated approval process that involved each of Basell B.V., its Luxembourg-based

shareholder Basell Funding, and the top Luxembourg holding BI S.à.r.l., which is what I would

expect in light of the corporate structure of the Basell group.

25.   Counts 6 and 7 of the Complaint set forth claims under Luxembourg law.  I will leave

it to an expert on Luxembourg law to comment on the Luxembourg law issues raised by Counts

6 and 7.  But several aspects of Counts 6 and 7 are notable from my perspective as a Dutch

lawyer familiar with the type of corporate structure and governance procedures employed by

the Basell group in the pre-merger period.

26.   First, paragraph 360 seems to imply that it is somehow noteworthy, in a negative

sense, that, "Although registered in Luxembourg, Basell had no personnel or physical offices

located there and, upon information and belief, did not conduct any business there."  As I have

already noted, the holding company structure employed for the Basell group following the 2005

acquisition by an affiliate of Access Industries, Inc. was (and is) common practice.  In addition,

the use of "the services of a domiciliation service" in such circumstances was (and remains,

today) common, if not routine.  In my experience, such domiciliation services typically facilitate

the implementation—consistent with Luxembourg law—of corporate decisions that have been

considered substantively and made at a different level of the corporate governance structure—

in this case, decisions made at the level of Basell B.V. with the input and participation of the

company's management team in the Netherlands.

27.    Second, paragraph 362 asserts that Mr. Blavatnik was a "de facto" manager of

Basell AF before the merger and a member of the Supervisory Board of LBI AF, the successor to

Basell AF, after the merger.  This paragraph ignores the fact that Mr. Blavatnik was a member of

the Supervisory Board of Basell B.V. before the merger—which is noteworthy, as paragraph 378

in fact acknowledges that Mr. Blavatnik was a member of that Supervisory Board, and that the

pre-merger membership of that Supervisory Board "overlapped substantially" with the

managers of the entity charged under Luxembourg law with the management of Basell AF—*i.e.*,

Basell AF GP S.à.r.l. (the "GP").  In my experience, it is not unusual in a holding company

structure such as the one established for Basell before the merger for corporate decisions to be

made at the Dutch company level of the structure (where management resided and the

business was run) and implemented in accordance with Luxembourg law at the Luxembourg

holding company level of the governance structure.  Structuring corporate decision making in

this way facilitates the involvement of key operating personnel in the process, and avoids

duplicate processes that would not likely enhance the quality of decision making.

28.    Third, paragraph 386 asserts that Mr. Blavatnik acted in respect of Basell "in his

individual capacity."  Paragraph 408, contained in Count 7 but describing and summarizing

Count 6, states that Mr. Blavatnik "was without formal authority."  These allegations are

elaborated in various paragraphs, including paragraph 414, which alleges that, "To the extent

that it is determined that Blavatnik directed and controlled the GP or, after the Merger, the

Supervisory Board [of LBI AF], in his individual capacity, he was a de facto or 'shadow' manager

of LBI." I express no opinion on whether this is a correct statement of Luxembourg law. I note,

however, that this allegation again ignores the fact that Mr. Blavatnik acted in respect of Basell

in an official and significant capacity (which is in fact acknowledged in paragraph 378)—as a

member, and the Chairman, of the Supervisory Board of Basell B.V., the company in the Basell

family where strategic decisions were discussed and approved. Similarly, paragraph 415 implies

that Mr. Blavatnik's participation in corporate decision making for Basell must have been in one

of only two possible capacities—"either in his individual capacity or as chief executive of Access

Industries." But this allegation, like others in the Complaint, ignores Mr. Blavatnik's role as a

member (and the Chairman) of the Supervisory Board of Basell B.V. It appears to be a premise

of Counts 6 and 7 that Mr. Blavatnik must have been acting in a "non-official capacity (either in

his individual capacity or as chief executive of Access Industries)" (Complaint, ¶ 417; *see also id.*

¶¶ 408, 418, 419) in connection with the consideration and approval of the Lyondell

transaction. But this premise ignores Mr. Blavatnik's "official" capacity in connection with the

Supervisory Board of Basell B.V. The apparent suggestion that Mr. Blavatnik was some sort of

interloper with no officially recognized role in the corporate governance of Basell is simply

incorrect in light of his role on Basell B.V.'s Supervisory Board, which role is—at the same

time—explicitly acknowledged elsewhere in the Complaint (paragraph 378).

29. It is not my place to comment as a matter of Luxembourg law on the approval

process for the merger of Basell and Lyondell at the Luxembourg holding company level. I note,

however, that, in my experience, truncated approval processes at holding company levels

further removed from the operation of the business for companies that utilize a multi-tiered

governance structure comparable to that of pre-merger Basell are common and consistent with

accepted practice in the Netherlands and elsewhere in Europe.  This is consistent with the fact

that the principal assets of Luxembourg holding companies such as Basell AF are the shares of

their subsidiaries, which may include companies organized under the laws of other countries

(such as the Netherlands) where management resides and the business is actually run.  As the

Complaint notes (at ¶ 378), the pre-merger managers of the GP (the Luxembourg entity

charged under Luxembourg law with managing the Luxembourg holding company, Basell AF)

were also members of the Management Board or Supervisory Board of Basell B.V. and

participated in various meetings at which the merger was discussed and approved at the Basell

B.V. level of Basell's corporate governance structure.  Particularly in that circumstance, the fact

that these individuals, acting in their capacity as managers of the GP of the Luxembourg holding

company, would approve a merger that was also discussed and approved at the Basell B.V. level

of the governance structure is not at all surprising, and does not in my opinion suggest that

they were improperly controlled by Mr. Blavatnik.

     I declare under penalty of perjury under the laws of the United States that the foregoing

is true and correct.

Executed on August 22, 2016

Pieter Jan van der Korst

**Exhibit A**

**CURRICULUM VITAE**

Name:        Pieter Jan van der Korst
Age:         54
E-mail:      p.vanderkorst@lvdk.com

## Education

| | |
|---|---|
| 1985 | Master Dutch Law, State University Utrecht |
| 1987 | Grotius Academy (post academic education of one year), with honors |
| 2007 | PhD, Radboud University Nijmegen (Trade secrets and transparency obligations) |

## Work history

| | |
|---|---|
| 1985 - 1986 | Military service, captain Royal Dutch Army |
| 1988 - 1991 | Associate law firm Schut c.s. |
| 1991 - 1993 | In house counsel merchant bank Pierson Heldring & Pierson |
| 1993 - 1994 | Manager Price Waterhouse (PwC) |
| 1994 - 2004 | Partner law firm Schut & Grosheide (presently: DLA Piper) |
| 2004 - 2010 | Partner law firm Houthoff Buruma |
| 2010 to current | Partner law firm Lemstra Van der Korst |

## Expertise

*Corporate transactions*
Highlights include the following:
— advising majority shareholders on the sale of a majority stake in the publishing house PCM Holding to De Persgroep;
— advising Thermphos International on the acquisition of Dequest, a world leader in phosphonates, from Solutia Inc.;
— advising Jones Lang LaSalle on the acquisition of Troostwijk Makelaars Onroerend Goed B.V.

*Corporate litigation*
Highlights include the following:
— representing Unilever shareholders in a class action regarding a proposed conversion of their cumulative preference shares into ordinary shares;
— representing KLM shareholders in various class actions regarding dividend policy;
— representing Versatel shareholders in a class action regarding a public offer by Tele2;
— representing shareholders of SNS REAAL (Dutch listed bank & insurance company) in various class actions regarding the expropriation (nationalization) by the Dutch State;
— representing Staples Inc. in a dispute regarding the sale of one of its European divisions;
— representing minority shareholders in a class action against Equity One, Inc.

**Academic activities**

| | |
|---|---|
| 2003 to current | Senior lecturer Van der Heijden Instituut, Radboud University Nijmegen |
| 2006 to current | Lecturer Vrije Universiteit Amsterdam |
| 2007 to current | Editor 'Civiel en fiscaal tijdschrift Vermogen ftV' |
| 2014 to current | Lecturer Erasmus University Rotterdam |

**Exhibit B**

**List of Documents Reviewed**

|  | Description | Date |
|---|---|---|
| 1. | Management Agreement entered into between Nell Acquisition S.a.r.l., Nell AF S.a.r.l. Nell Funding S.a.r.l., Nell Bidco B.V., Nell (US) Acquisition S.a.r.l., Nell Acquisition (US) LLC and AI Petrochemicals LLC | 8.1.2005 |
| 2. | A letter from Merrill Lynch & Co. to Access Industries Inc. | 8.10.2006 |
| 3. | Articles of Association of Basell Holdings B.V. executed on June 21, 2007 | 6.21.2007 |
| 4. | Confidentiality Agreement entered into between Lyondell Chemical Company and Basell Holdings B.V. | 7.11.2007 |
| 5. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 7.16.2007 |
| 6. | Letter re. proposed merger between Lyondell Chemical Company and Basell AF signed by Basell Holdings B.V. and Access Industries | 7.16.2007 |
| 7. | Agreement and Plan of Merger entered into between Basell AF, BIL Acquisition Holdings Limited and Lyondell Chemical Company | 7.16.2007 |
| 8. | Definitive Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed by Lyondell Chemical Company | 10.12.2007 |
| 9. | Resolutions of the Managers of BI S.a.r.l. | 12.7.2007 |
| 10. | Termination Agreement entered into between BI S.a.r.l., Basell AF S.C.A., Basell Funding S.a.r.l., Basell Holdings B.V., Nell Acquisition (US) LLC and AI Petrochemicals LLC | 12.11.2007 |
| 11. | Agreement entered into between Basell AF S.C.A., its current and future (in)direct subsidiaries and Nell Limited | 12.11.2007 |
| 12. | Resolution of the sole shareholder of Basell Holdings B.V. | 12.14.2007 |
| 13. | Pre-merger Basell organizational chart | 12.19.2007 |
| 14. | Resolution of the sole shareholder of LyondellBasell Industries Holdings B.V. | 1.15.2009 |
| 15. | Second Amended Complaint by Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust | 5.13.2016 |

**Corporate resolutions, etc.**

|  | Description | Date |
|---|---|---|
| 1. | Shareholder resolution of Nell Bidco B.V. (Basell Holdings B.V.) a.o. authorizing amendment to the Articles of Association, forming a Supervisory Board and appointing the initial members of the Supervisory Board | 8.18.2005 |
| 2. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 8.31.2005 |
| 3. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 10.10.2005 |
| 4. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 11.30.2005 |
| 5. | Resignation of A. Bigman as a Supervisory Director of Basell Holdings B.V. | 12.20.2005 |
| 6. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 3.6.2006 |
| 7. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 5.8.2006 |
| 8. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 6.26.2006 |

| 9. | Partial minutes of the Supervisory Board of Basell Holdings B.V. | 6.27.2006 |
|---|---|---|
| 10. | Shareholder resolution of Basell Holdings B.V. appointing L. Benet to the Supervisory Board | 8.31.2006 |
| 11. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 9.18.2006 |
| 12. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#6) | 9.19.2006 |
| 13. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#7.a.) | 11.17.2006 |
| 14. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 11.27.2006 |
| 15. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 11.28.2006 |
| 16. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (# 7.b.) | 11.28.2006 |
| 17. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#8) | 2.19.2007 |
| 18. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 3.7.2007 |
| 19. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#9) | 3.7.2007 |
| 20. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#10) | 6.19.2007 |
| 21. | Draft minutes of the Supervisory Board Finance and Investment  Committee of Basell Holdings B.V. | 6.19-20.2007 |
| 22. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 6.20.2007 |
| 23. | Draft minutes of the Supervisory Board of Basell Holdings B.V. | 7.16.2007 |
| 24. | Draft minutes of the Supervisory Board Finance and Investment Committee of Basell Holdings B.V. | 9.17.2007 |
| 25. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#11) | 9.18.2007 |
| 26. | Draft minutes of the Supervisory Board Audit Committee of Basell Holdings B.V. (#12) | 11.23.2007 |
| 27. | Draft minutes of the Supervisory Board Finance and Investment Committee of LyondellBasell Industries AF S.C.A. | 12.21.2007 |
| 28. | Draft minutes of the preparatory meeting of the Supervisory Board Audit Committee of LyondellBasell Industries AF S.C.A. | 1.30.2008 |
| 29. | Draft minutes of the preparatory meeting of the Supervisory Board Audit Committee of LyondellBasell Industries AF S.C.A. | 2.13.2008 |
| 30. | Draft minutes of the preparatory meeting of the Supervisory Board Audit Committee of LyondellBasell Industries AF S.C.A. | 3.7.2008 |
| 31. | Draft minutes of the Supervisory Board Audit Committee of LyondellBasell Industries AF S.C.A. | 3.28.2008 |
| 32. | Draft minutes of the Supervisory Board Audit Committee of LyondellBasell Industries AF S.C.A. | 4.28.2008 |
| 33. | Draft minutes of the Supervisory Board Finance and Investment Committee of LyondellBasell Industries AF S.C.A. | 6.19.2008 |
| 34. | Draft minutes of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 6.19-20.2008 |
| 35. | Draft minutes of the Supervisory Board Finance and Investment Committee of LyondellBasell Industries AF S.C.A. | 7.31.2008 |
| 36. | Draft minutes of the Supervisory Board Finance and Investment Committee of LyondellBasell Industries AF S.C.A. | 9.22.2008 |

| 37. | Draft minutes of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 9.23.2008 |
| 38. | Draft minutes of the Supervisory Board Finance and Investment Committee of LyondellBasell Industries AF S.C.A. | 12.9.2008 |
| 39. | Draft minutes of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 12.10.2008 |
| 40. | Draft joint Board minutes of the Supervisory Board (LBI AF S.C.A.), the Management Board (LBI AF GP S.a.r.l.), the Board of Directors of Basell Germany Holdings GmbH & the Board of Directors for designated subsidiaries of LBI AF S.C.A. | 1.6.2009 |
| 41. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 1.8.2009 |
| 42. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 1.20.2009 |
| 43. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 1.28.2009 |
| 44. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 1.31.2009 |
| 45. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 2.12.2009 |
| 46. | Draft minutes of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 4.17.2009 |
| 47. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 8.12.2009 |
| 48. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 8.28.2009 |
| 49. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 8.28.2009 |
| 50. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 9.4.2009 |
| 51. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 9.4.2009 |
| 52. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 9.11.2009 |
| 53. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 9.11.2009 |
| 54. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 9.18.2009 |
| 55. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 9.18.2009 |
| 56. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 10.1.2009 |
| 57. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 10.1.2009 |
| 58. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 10.7.2009 |
| 59. | Draft minutes of the Restructuring Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. | 10.7.2009 |
| 60. | Draft joint minutes of the Supervisory Board (LBI AF S.C.A.) and the Management Board (LBI AF GP S.a.r.l.) | 10.27.2009 |
| A. | • Amendment to the Articles of Association of Basell Holdings B.V. (fka Nell Bidco B.V.; fka Copperwell B.V.) with English translation of original Copperwell Articles of Association | 4.25.2005 |

| | | | |
|---|---|---|---|
| | • | Amended Articles of Association of Nell Bidco B.V. (Dutch original) | 4.25.2005 |
| | • | Amended Articles of Association of Nell Bidco B.V. (Dutch original with English translation) | 8.29.2005 |
| | • | Draft Amended Articles of Association of Basell Holdings B.V. (English translation) | 2.19.2008 |
| B. | • | Articles of Association of Nell AF S.a.r.l. | 4.20.2005 |
| | • | Amended & Restated Articles of Association of Nell AF S.a.r.l. | 7.26.2005 |
| | • | Amended & Restated Articles of Association of Nell AF S.a.r.l. | 8.1.2005 |
| | • | Amended & Restated Articles of Association of Basell AF S.C.A. (fka Nell AF S.a.r.l.) | 10.13.2005 |
| | • | Amended & Restated Articles of Association of LyondellBasell Industries AF S.C.A. (fka Basell AF S.C.A.) | 12.20.2007 |

# Designation No. 887

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                  :

In re:  Lyondell Chemical Company, et al.,     :     Case No. 09-10023 (CGM)

                 :

        Debtors.                :     Chapter 11

                 :

------------------------------------------------------------------x     (Jointly Administered)
                 :

EDWARD S. WEISFELNER, AS LITIGATION  :
TRUSTEE OF THE LB LITIGATION TRUST,  :

                 :

        Plaintiff,            :     Adv. Pro. No. 09-01375 (MG)

                 :

v.                       :

                 :

LEONARD BLAVATNIK, et al.,       :

                 :

        Defendants.         :

                 :

------------------------------------------------------------------x

---

**EXPERT DECLARATION OF ALEX SCHMITT**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND ASSIGNMENT ....................................................................1

PROFESSIONAL BACKGROUND AND QUALIFICATIONS ..................................1

SUMMARY OF RELEVANT ALLEGATIONS .........................................................3

    A.    Factual Background ........................................................................3

    B.    The Trustee's Claims Under Luxembourg Law .....................................4

SUMMARY OF CONCLUSIONS .............................................................................5

EXPERT OPINION ..................................................................................................6

I.    ANALYSIS OF THE LEGAL BASES INVOKED IN COUNT VI BY THE TRUSTEE ........................................................................................................6

    A.    Article 59 ¶ 1 Is Limited to the Contractual Liability of Directors to Their Company .............................................................................................8

    B.    *De Facto* Directors May Not Be Held Liable Under Article 59 ¶ 1 Because They Lack a Contractual Relationship with the Company ......................8

    C.    Articles 1992 to 1997 Do Not Provide an Independent Basis of Liability ...........10

II.    ANALYSIS OF THE TORT CLAIM PLEADED AGAINST MR. BLAVATNIK AND ACCESS IN COUNT VII BY THE TRUSTEE .......................................11

    A.    The *De Facto* Director Doctrine Under Luxembourg Law ...................................11

         1.    Substitution of Management Is Required for a Finding of De Facto Liability .....................................................................................13

         2.    The Trustee's Allegations Do Not Rise to the Level of "Substitution of Management" ..................................................15

         3.    Blavatnik and the GP Managers' Shared Membership on the Supervisory Board of Basell's Subsidiary, Basell B.V. Is a Fact that Plausibly Explains His Alleged Influence on the GP .........................16

    B.    The Required Elements of Tort Liability Under Articles 1382 and 1383 ............18

         1.    The Trustee Is Required to Establish "Fault" Under the Heightened Standard Applicable to Third Party Claims in Tort Against Company Directors ......................................................................18

         2.    The Trustee Is Required to Establish That a Legally Cognizable Harm to the Company Was Caused by the Fault ......................................21

III.    ANALYSIS OF THE COUNT VII CLAIMS PLEADED AGAINST THE GP MANAGERS BY THE TRUSTEE ...................................................................22

    A.    The Trustee's Tort Claim Under Article 59 ¶ 2 Against the GP Managers...........24

i

       1.       The Trustee Cannot Bring a Contractual Claim for Mismanagement ..................................................................................24

       2.       The Trustee Must Evidence a Breach of the GP's Articles of Association or the Company Law by the GP Managers ..........................25

   B.      The Trustee's Tort Claim Under Articles 1382 and 1383 Against the GP Managers .................................................................................................28

       1.       The "Fault" Requirement Under Articles 1382 and 1383 ........................28

       2.       The Requirement of Establishing Legally Cognizable Damages ..............28

IV.    ANALYSIS OF THE COUNT VII CLAIMS PLEADED AGAINST THE MEMBERS OF THE SUPERVISORY BOARD BY THE TRUSTEE ............................29

   A.      The Trustee Does Not Fulfill the Required Elements for Liability Under Article 59 ¶¶ 1 or 2 ..............................................................................30

       1.       Supervisory Board Liability Under Article 59 ¶ 1 Liability Requires a Successful Demonstration of a Failure to Execute the Supervisory Mandate ..............................................................................30

       2.       Supervisory Board Liability Under Article 59 ¶ 2 Requires Demonstrating a Breach of a Mandatory Obligation ...............................32

       3.       Supervisory Board Liability Under Article 59 ¶¶ 1 or 2 Requires Demonstrating that the Supervisory Board's Failure to Exercise Their Alleged "Veto Rights" Was the Proximate Cause of Damages to LBI .................................................................................33

   B.      Articles 1991 to 1997 Do Not Provide an Independent Basis of Liability ...........33

SUPPLEMENTATION ..............................................................................................34

I, Alex Schmitt, under penalty of perjury under the laws of the United States of America, declare as follows:

## INTRODUCTION AND ASSIGNMENT

1.     I have been retained by Access Industries Holdings LLC ("**Access**"), Len Blavatnik, Lincoln Benet, and Philip Kassin (the "**Access Defendants**") to render opinions based on my expertise in Luxembourg law in the above-captioned action (the "**Adversary Proceeding**").[1]

2.     Specifically, I have been asked to (i) opine on the application of Luxembourg law to Counts VI and VII in the Second Amended Complaint dated May 13, 2016 (the "**Second Amended Complaint**") filed by Plaintiff Edward S. Weisfelner, as litigation trustee of the LB Litigation Trust (the "**Trustee**"), and (ii) assess the conclusions in the report submitted in the Adversary Proceeding by the Trustee's expert, Mr. Philippe Thiebaud, on July 15, 2016 (the "**Thiebaud Report**").

3.     I have prepared this report on the basis of my experience as a Luxembourg-qualified attorney, my review of the Thiebaud Report and the materials cited therein, my review of the Second Amended Complaint, and the research I have conducted into relevant laws and regulations, case law, and legal scholarship.  I have also reviewed certain documents that were provided to me by counsel for the Access Defendants relating to the December 2007 acquisition of U.S.-based Lyondell Chemical Company ("**Lyondell**") by Basell AF S.C.A., a Luxembourg company  ("**Basell**"), as well as the Declaration of Mr. Pieter van der Korst dated August 22, 2016 (the "**van der Korst Declaration**"), providing opinions on Dutch law.  The full set of information, authorities, and sources on which I rely are reflected in the body of this Declaration and the accompanying appendices.

4.     The opinions contained in this report are based upon the information available to me at this time.  If I become aware of acts, evidence, and/or other information not presently available to me, I reserve the right to supplement and/or revise my report and to revise my conclusions if warranted. I also reserve the right to supplement this report to take into account any testimony or opinions offered by any other expert in this case.

5.     Capitalized terms used in this report or terms otherwise introduced in bolded typeface are defined in this report.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

6.     I am an attorney-at-law and name partner of Bonn & Schmitt, a Luxembourg law

---

[1]     The Access Defendants previously retained Mr. Guy Arendt, my former partner at Bonn & Schmitt, to serve as an expert in Luxembourg law in this Adversary Proceeding.  In December 2015, Mr. Arendt was appointed as Luxembourg's Secretary of State for Culture. This appointment precludes him from providing further expert testimony in this Adversary Proceeding.

firm that advises on all aspects of business law.  The firm's offices are located at 148, Avenue de la Faïencerie, L-1511 Luxembourg, Grand Duchy of Luxembourg.

7.    I am regularly appointed as an independent expert on Luxembourg law in international judicial disputes before foreign courts or in international arbitration proceedings, including in proceedings before the International Centre for Settlement of Investment Disputes, the London Court of International Arbitration, the Commercial Court of Madrid, and the Grand Court of the Cayman Islands.  In these appointments, I have been asked to opine on issues concerning Luxembourg corporate law, securitization law, financial collateral arrangements, and bankruptcy law.

8.    I also actively represent clients in both an advisory and litigation role in each of these areas of law in private practice at Bonn & Schmitt.

9.    In recent years, I have served on two expert committees established by the Luxembourg financial regulator, the *Commission de Surveillance du Secteur Financier* (CSSF): from its inception in 2002 to date, I have served as a member of the Committee of Experts on Securitization, and from 1994 to date, I have served as a member of the Committee of Experts on Undertakings for Collective Investment.

10.    Since 2009, I have taught classes as a Lecturer in Banking and Financial Law at the University of Luxembourg, and in the late 1990s I taught classes as a Lecturer in Public and Private Luxembourg Law at the Free University of Brussels.

11.    I also have extensive experience personally discharging corporate duties under Luxembourg law, having served as a member of the board of directors of over thirty Luxembourg companies, including ING Luxembourg S.A., the Luxembourg-based affiliate of the Dutch-based financial services and insurance conglomerate ING Group, Mediobanca International (Luxembourg) S.A., the Luxembourg-based affiliate of the largest Italian investment bank, and four Luxembourg-based affiliates of the Generali Group, the world's third largest insurance company.

12.    I graduated from Harvard Law School in 1981 with a Master of Laws (LL.M.) degree.  I received graduate degrees in law from the Institute of European Studies and the Free University of Brussels in 1980 and 1978, respectively.  I was admitted to the Brussels Bar in 1979, and was admitted to the Luxembourg Bar in 1983.

13.    My *curriculum vitae*, attached as **Appendix 1** to this report, further describes my professional background and qualifications.

14.    I am being compensated for my work on this matter at an hourly rate of EUR 550. Certain of my colleagues at Bonn & Schmitt assisted me in this assignment, working under my direction and supervision.  The hourly rate of the colleagues who assisted me range from EUR 400 to EUR 150 per hour.  My compensation is not contingent in any way on the outcome of this litigation or the conclusions I reach as to the issues addressed herein.

## SUMMARY OF RELEVANT ALLEGATIONS

### A.   Factual Background

15.     The claims asserted by the Trustee in the Adversary Proceeding arise in the context of the December 20, 2007 acquisition of Lyondell by Basell (the "**Merger**"), a Luxembourg partnership limited by shares (in French, a *société en commandite par actions*, or S.C.A.) registered with the Luxembourg Trade and Companies Register under number B107.545.

16.     I understand that Basell was a holding company with no business operations or assets other than ownership interests in its subsidiaries and certain intercompany obligations. It was managed by its sole general partner (*associé gérant commandité*), Basell AFGP, S.à r.l. (the "**GP**").[2]  Its main subsidiary was a Dutch company.  Following the Merger, Basell was renamed LyondellBasell Industries AF S.C.A. ("**LBI**"), and continued to be managed by its sole general partner, which was renamed LyondellBasell AFGP (the "**LBI GP**") following the Merger.[3]

17.     At all relevant times before the Merger, the appointed managers of the GP were Philip Kassin, Richard Floor, Alan Bigman, and Kent Potter (the "**GP Managers**").[4]  Following the Merger, Mr. Bigman continued as an appointed manager of LBI GP, but Messrs. Kassin, Floor, and Potter were replaced on the LBI GP by new appointees.[5]

18.     Under Luxembourg law and their articles of association, Basell and LBI, as S.C.A.s, were also required to appoint a minimum of three statutory auditors to a "supervisory board" (*conseil de surveillance*).[6]  Following the Merger, LBI's supervisory board was initially comprised of Messrs. Blavatnik, Floor, Kassin, Potter, and Lincoln Benet (the "**Supervisory Board**").[7]

19.     As described in detail in the van der Korst Declaration, before the Merger, Basell

---

[2]     Second Amended Complaint ¶ 359.

[3]     *Id.* ¶ 399.

[4]     Public deed of September 29, 2005, published in the *Mémorial C, Recueil des Sociétés et Associations* of January 27, 2006, No. 193 p. 9255 (annexed hereto as **Exhibit A**).

[5]     Public deed of December 20, 2007, published in the *Mémorial C, Recueil des Sociétés et Associations* of January 24, 2008, No. 189 p. 9049 (annexed hereto as **Exhibit B**).

[6]     Article 109 of the Luxembourg Company Law of August 10, 1915, as amended (annexed hereto as **Exhibit C**).  The version applicable to these proceedings does not include the amendments to the Company Law as of July 12, 2013 on alternative investment fund managers because the 2013 amendments postdate the facts giving rise to these proceedings.

[7]     Public deed of December 20, 2007, published in the *Mémorial C, Recueil des Sociétés et Associations* of January 24, 2008, No. 193 p. 9237 (annexed hereto as **Exhibit D**). Lynn Coleman was subsequently added as a member of the Supervisory Board.  *See* Minutes of the general meeting of shareholders on March 12, 2008, published in the *Mémorial C, Recueil des Sociétés et Associations* of July 2, 2008, No. 1622 p. 77825 (annexed hereto as **Exhibit E**).

Holdings B.V. ("**Basell B.V.**"), a Dutch limited liability company, was an indirect wholly-owned subsidiary of Basell, and the immediate parent of virtually all the operating companies that carried out the Basell group's business (with the exception of its small U.S. operations).[8] At all relevant times before the Merger, Messrs. Blavatnik, Kassin, Benet, Potter, and Floor were members of the supervisory board of Basell B.V.[9]

20.    On January 9, 2009, several entities belonging to the LyondellBasell group, including Lyondell, filed for bankruptcy. On April 24, 2009, LBI was voluntarily added to these proceedings.[10] Basell B.V. was never a debtor in the bankruptcy cases that gave rise to the Adversary Proceeding, nor did Basell B.V. ever commence restructuring proceedings under Dutch law.[11]

### B.    The Trustee's Claims Under Luxembourg Law

21.    In Counts VI and VII of the Second Amended Complaint, the Trustee asserts certain claims under Luxembourg law. The legal bases invoked by the Trustee are provisions of the Luxembourg Company Law of August 10, 1915, as amended (the "**Company Law**") and the Luxembourg Civil Code (the "**Civil Code**").

22.    In Count VI, the Trustee asserts that Mr. Blavatnik is liable for mismanagement while acting as the *de facto* manager of Basell (before the Merger) and LBI (following the Merger).[12]  The bases for liability invoked in Count VI are Article 59 ¶ 1 of the Company Law ("**Article 59 ¶ 1**") and Articles 1992 through 1997 of the Civil Code ("**Articles 1992 to 1997**").

23.    In Count VII, the Trustee asserts, *first*, that Mr. Blavatnik and Access are liable in tort under Articles 1382 and 1383 of the Civil Code ("**Articles 1382 and 1383**"), once again in their alleged capacities as *de facto* managers of Basell and LBI.  *Second*, the Trustee asserts that the GP Managers are liable in tort for their pre-Merger conduct both pursuant to Articles 1382 and 1383 and, independently, pursuant to Article 59 ¶ 2 of the Company Law ("**Article 59 ¶ 2**," and together with Article 59 ¶ 1, "**Article 59**") and the articles of association of the GP.  *Third*, the Trustee asserts that members of the post-Merger Supervisory Board (of LBI) are contractually liable for breach of their mandate as provided in LBI's articles of association, Article 59, and Articles 1991 through 1997 of the Civil Code ("**Articles 1991 to 1997**").

24.    In the table below, I summarize the claims asserted by the Trustee under Luxembourg law.  The first column identifies the corresponding Count in the Second Amended Complaint.  The second column lists the Defendants against whom the claim is asserted.  The third column states the basis of liability asserted by the Trustee.  And finally, the fourth column,

---

[8]    Van der Korst Declaration ¶ 4.

[9]    Second Amended Complaint ¶ 378.

[10]    *Id.* ¶ 2.

[11]    Van der Korst Declaration ¶ 5.

[12]    Second Amended Complaint ¶ 357.

4

"Expert Opinion," provides an internal cross-reference to the Section in my report in which I address each claim.

| Count | Defendant(s) | Claimed Basis of Liability | Expert Opinion |
|---|---|---|---|
| VI | Blavatnik | Contractual liability under Article 59 ¶ 1 for mismanagement of Basell and LBI as *de facto* director | *See* Sections I.A-B. |
| VI | Blavatnik | Agency law liability under Articles 1992 to 1997 | *See* Section I.C. |
| VII | Blavatnik/ Access | Tort liability under Articles 1382 and 1383 as a *de facto* director of LBI | *See* Part II. |
| VII | GP Managers | Tort liability under Article 59 ¶ 2 and articles of association of the GP | *See* Section III.A. |
| VII | GP Managers | Tort liability under Articles 1382 and 1383 | *See* Section III.B. |
| VII | Supervisory Board | Contractual liability under Article 59 ¶ 1 and articles of association of LBI | *See* Sections IV.A.1 & 3. |
| VII | Supervisory Board | Contractual liability under Article 59 ¶ 2 for mismanagement of LBI | *See* Sections IV.A.2-3. |
| VII | Supervisory Board | Agency law liability under Articles 1991 to 1997 | *See* Section IV.B. |

## SUMMARY OF CONCLUSIONS

25.    As set forth in detail in this Declaration, I believe that claims asserted by the Trustee in the Second Amended Complaint, even if proved, do not provide a basis for liability under any provision of Luxembourg law.

26.    *First*, Count VI of the Second Amended Complaint fails at the threshold because it is predicated on allegations that Mr. Blavatnik acted as a *de facto* manager, and under Luxembourg law, claims against *de facto* managers—who do not owe contractual duties to their company—can be brought only in tort. As the putative basis for Count VI, Article 59 ¶ 1, gives rise only to contractual liability, Count VI (which is brought only against Mr. Blavatnik) has no basis in law.

27.    *Second*, the Trustee's claims against Mr. Blavatnik and Access in tort, asserted in Count VII under Articles 1382 and 1383, suffer from several independent defects. This claim too relies on a finding that Mr. Blavatnik acted as a *de facto* manager of Basell and LBI; *i.e.*, that he actually substituted for management in its strategic and operational decision-making. The theory advanced by the Trustee (and endorsed by Mr. Thiebaud)—that *de facto* management can be established solely through allegations of "control" rather than substitution—has never been recognized by a Luxembourg court. Moreover, even if Mr. Blavatnik were found to have acted as a *de facto* manager, he would only be liable under applicable Luxembourg tort principles for misconduct "severable" from the ordinary functions of a manager of the company—an extremely high standard that is almost never met in Luxembourg and is certainly not met by the Trustee's allegations, which, at best, appear to challenge business judgments relating to the approval and financing of the Merger.

28.    *Third*, the Trustee's claims against the GP Managers would fare no better in a Luxembourg court.  The Trustee posits that LBI is a third party in relation to the pre-merger GP Managers because the GP Managers' contractual relationship was with the GP rather than with Basell.  Tort claims against the managers of a GP are extremely rare and, in this case, plainly seem intended to evade the effect of discharges given by LBI to the GP and by the GP to the GP Managers in respect of governance activities carried out in 2007.  Specifically, third party tort claims under Article 59 ¶ 2, the Trustee's first asserted basis of liability, are restricted to "extremely severe faults, which constitute a violation of the 'social pact' or the provisions of the [Company Law] that protect the public and the shareholders."  The Trustee's theory that the GP Managers' failure to "actively manage" the GP establishes such a violation has never been recognized by the Luxembourg courts under Article 59 ¶ 2, because this theory of liability would only be available to the company (if at all) in contract under Article 59 ¶ 1.  In any case, the Trustee's claim fails to meet the requirement that the alleged "fault" contravene a positive and mandatory obligation of the Company Law.  And the Trustee's claim against the GP Managers asserted under Article 1382 and 1383 would be rejected for the same reason as the tort claim against Mr. Blavatnik:  It does not allege that the GP Managers took actions "severable" from, or outside, their ordinary functions; rather it seeks to second-guess the decisions they made in the course of their management.

29.    *Fourth*, I am not aware of any successful contractual claim that has been sustained against a statutory auditor such as the post-Merger Supervisory Board under the theories of liability advanced by the Trustee.  To be liable under Article 59 ¶ 1, members of the Supervisory Board must have violated their narrow mandate—*i.e.*, principally to "supervise" by rendering advice—owed to LBI by failing to exercise their alleged "veto right" over post-Merger financing decisions.  This claim rests both on a false predicate—that the Supervisory Board owned such a "veto right"—and a misapprehension that even if such a "veto right" existed, it would result in a substantial (and heretofore unrecognized) expansion of their mandate.  Moreover, any actions of the Supervisory Board within their mandate would in any event be protected under the recognition of the business judgment rule by the Luxembourg courts.  And the Trustee's Article 59 ¶ 2 claim is predicated on the same false theory as his claim against the GP Managers that the alleged violation can be of a silent or implied (rather than an express, positive, and mandatory) obligation stated in the Company Law.

## **EXPERT OPINION**

## I.    **ANALYSIS OF THE LEGAL BASES INVOKED IN COUNT VI BY THE TRUSTEE**

30.    In Count VI of the Second Amended Complaint, the Trustee alleges that Mr. Blavatnik "mismanaged the business and affairs of LBI," while "act[ing] as the manager of LBI under Luxembourg's *de facto* director doctrine."[13]  He invokes Article 59 ¶ 1 and Articles 1992

---

[13]      *Id.* ¶ 362.

to 1997 as claimed bases for liability.[14]

31.    To assess the merits of this claim, it is unnecessary to reach the question of whether or not Mr. Blavatnik's conduct rendered him a *de facto* manager.    According to Luxembourg law, the legal bases invoked by the Trustee in Count VI cannot support his claim,

---

[14]    In addition to Article 59 ¶ 1 and Articles 1992 to 1997, the Complaint identifies Articles 51bis, 60bis-16, 62, 74 ¶ 2, 102, 103, 107, 109, and 192 of the Company Law as additional bases for liability.  Mr. Thiebaud addresses none of these provisions on his report, and none of them provides an independent basis for liability:

- Article 51bis of the Company Law requires a legal person appointed as a director to manage a public limited company (in French, a *société anonyme*, or S.A.) to designate a permanent representative to account for that legal person's decisions.   It is an open question whether this provision applies to an S.C.A. by application of the general reference under Article 103 of the Company Law, but it does not in any event provide an independent basis for liability; the Luxembourg District Court held, in a decision rendered on December 23, 2015 (the *Hellas* decision, published in *JTL* 2016, No. 44, p. 60), that the failure to designate a permanent representative carries no sanction in the Company Law.

- Article 60bis-16 of the Company Law is only applicable to an S.A. having opted for a two-tier form of governance (*i.e.,* a management board and a supervisory board). This form of governance is different from that of an S.C.A. such as Basell.   In any event, this provision does not provide an independent basis for liability.

- Article 62 of the Company Law provides that the liability of a company's statutory auditors (*commissaires*) should be assessed in the same manner as the liability of directors.  This article does not provide an independent basis for liability; rather, it merely specifies that liability for statutory auditors should be assessed in accordance with other provisions of the Company Law, such as Article 59 ¶ 1, in the same manner, *i.e.,* the liability based on a contractual mandate.

- Article 74 ¶ 2 of the Company Law provides for the discharge of directors of an S.A. by its shareholders convened in a general meeting.   This article does not provide an independent basis for liability.

- Articles 102, 103, 107, 109, and 110 of the Company Law define the form of an S.C.A. and provide certain rules pertaining to its internal operations.   None of these Articles provides an independent basis for liability.

- Article 192 of the Company Law states that managers of a private limited liability company (in French, a *société à responsabilité limitée*, or S.à r.l.) are liable in accordance with Article 59.  As with the above, no supplemental basis for liability can be found in this provision.

**(Ex. C.)**

7

because a *de facto* manager can only be held liable in tort pursuant to Articles 1382 and 1383.[15] Notably, Mr. Thiebaud shares the same opinion: as he acknowledges, under Luxembourg law, *de facto* managers cannot be held liable under Article 59 ¶ 1 or Articles 1992 to 1997.

### A. Article 59 ¶ 1 Is Limited to the Contractual Liability of Directors to Their Company

32.    Article 59 ¶ 1 provides as follows:

> The directors shall be liable to the company in accordance with general law for the execution of the mandate given to them and for any misconduct in the management of the company's affairs.[16]

33.    By its plain language, directors' liability under Article 59 ¶ 1 is restricted to claims brought by "the company" itself.  Article 59 ¶ 1 governs the *contractual* liability of directors or managers to their company, based on the principle that directors are agents who have entered into "mandate" by contract to "manage[] . . . the Company's affairs."[17]    Indeed, throughout the Company Law, these managers are referred to as "*mandataires*" in the original French.[18]

34.    Therefore, a director's breach of his mandate to the company can give rise to contractual liability under Article 59 ¶ 1.  But because a director does not owe contractual duties to third parties—*i.e.*, his mandate runs to the company—third parties cannot seek relief under Article 59 ¶ 1.[19]

### B. *De Facto* Directors May Not Be Held Liable Under Article 59 ¶ 1 Because They Lack a Contractual Relationship with the Company

35.    As Mr. Thiebaud recognizes in his report, "neither Blavatnik nor Access formally held office as a manager of the Company."[20]    Accordingly, the Trustee's claim is brought under the theory of *de facto* liability, *i.e.*, "legal consequences [that] attach to a person that *in fact*

---

[15]    I address Mr. Thiebaud's opinion that the allegations in the Second Amended Complaint are, if proved, sufficient to characterize Mr. Blavatnik as a *de facto* manager of Basell and LBI in Section II.A, *infra*, concerning the Trustee's Count VII claims against Mr. Blavatnik under Articles 1382 and 1383.

[16]    Article 59 ¶ 1 (A. PRÜM and Ph. HOSS, *Code des sociétés – Company Law Code 2015, Les Codes Promoculture-Larcier*, 2015 (unofficial English translation)) (annexed hereto as **Exhibit F**).

[17]    *Id.*

[18]    *See, e.g.*, Article 50 of the Company Law (**Ex. C**).

[19]    *Compare with* Article 59 ¶ 2 (**Ex. F**) (explicitly providing for liability to third parties under certain circumstances).

[20]    Thiebaud Report at 12.

8

carries out the management of a company even though not formally appointed."[21]

36.     With respect to the Trustee's Count VI Article 59 ¶ 1 claim, however, it is enough to state that an alleged *de facto* manager such as Mr. Blavatnik (by definition) lacks a contractual relationship with his company.  Luxembourg courts have held that *de facto* directors are considered as third parties, inasmuch as they have no mandate with the company they manage "in fact."[22]  For the sake of completeness, I note that certain authors have explored the theoretical possibility that a *de facto* director could be bound by an "implicit" mandate, thus creating contractual liability for violation of their "implicit" duty—but these same authors have also recognized that this theory is not accepted under Luxembourg law.[23]

37.     Accordingly, Mr. Blavatnik, as an alleged *de facto* manager, may not be found contractually liable to Basell or LBI under Article 59 ¶ 1 (or any other contractual basis for managerial liability).[24]

38.     In his report, Mr. Thiebaud acknowledges the foregoing limitation on the liability of alleged *de facto* managers, and for that reason "do[es] not include legal background in respect of a claim made by a company against a *de facto* director on the basis of article 59 [¶ 1]."  As the basis for this opinion, Mr. Thiebaud states as follows:

---

[21]     Thiebaud Report at 14 (emphasis in original).

[22]     *See* Court of Appeal, October 1, 1997, No. 12583, 12771, 12859, 12896 and 20243, *Legicorp* ID: 17898 (annexed hereto as **Exhibit G**); Court of Appeal, July 10, 2002, *BIJ,* 2004, pp. 27 ff. (annexed hereto as **Exhibit H**).

[23]     A. CABANNES, "*Le dirigeant de fait", ACE Comptabilité, Fiscalité, Audit, Droit des affaires au Luxembourg,* 2013/1, p. 10 (annexed hereto as **Exhibit I**) who states (i) that a *de facto* director does not carry out his duties pursuant to any mandate granted to him by the company and (ii) that as a consequence, the *de facto* director cannot be held liable according to article 59 ¶ 1; P. METZLER and F. PIRET, "*Le dirigeant de fait : critères de la notion et réflexions sur la responsabilité", Droit bancaire et financier au Luxembourg,* ALJB, vol. 3, 2014, pp. 1417 ff, and particularly pp. 1540 & 1541 (annexed hereto as **Exhibit J**) who refer to the decision rendered by the Luxembourg Court of Appeal on October 1, 1997 whereby the court stated that an action aiming at having a *de facto* director contractually liable was not admissible.

[24]     *See* Court of Appeal, October 1, 1997, *op. cit.* (**Ex. G**), which held that the liability of a *de facto* director is of a tortious nature, *i.e.* delictual or quasi-delictual; Court of Appeal, July 10, 2002, *op. cit.* (**Ex. H**).  Luxembourg authors share the same view.  *See* G. RAVARANI, *La responsabilité civile des personnes privées et publiques,* Pasicrisie luxembourgeoise, 3rd ed., 2014, No. 628 p. 647 (annexed hereto as **Exhibit K**); A. CABANNES, *op. cit.,* p. 10 (**Ex. I**); A. KOCH, "*Responsabilité des administrateurs et autres organes sociaux (y compris conflits d'intérêts)",* in *Un siècle d'application de la loi du 10 août 1915 sur les sociétés commerciales,* Wolter Kluwers, 2015, pp. 205 ff, and particularly p. 219 (annexed hereto as **Exhibit L**); P. METZLER and F. PIRET, *op. cit.,* pp. 1417 ff, and particularly pp. 1540 & 1541 (**Ex. J**).

While there may be a basis under particular factual circumstances to find liability on the part of a *de facto* director based on contract, the more accepted view under Luxembourg case law is that the liability of a *de facto* director rests on tort law. My opinion is based on the following: (a) There is no formal contractual relationship between the *de facto* director and the company given that the *de facto* director is not appointed as director pursuant to the applicable procedure set out by law; as a result, a *de facto* director cannot commit any breach of any contractual obligation to manage the company (as opposed to a *de jure* director). (b) This view is supported by current Luxembourg case law, which is constituted by the 1997 Decision and the 2002 Decision.  To our knowledge, there has been no conflicting decision of the Luxembourg courts on this subject matter since 1997.  (c) This view is supported by Luxembourg legal authors.[25]

39.     The Trustee's previous Luxembourg law expert, Jacques Delvaux, acknowledged the same limitation in a textbook prepared for his lecture to Luxembourg "candidate" (*i.e.*, articling) lawyers, recognizing that "action against . . . a [*de facto*] director cannot be an *actio mandati*, a contractual relationship never having existed with the *de facto* director." [26]

40.     The Trustee's experts and I are in agreement.  Count VI cannot be sustained against Mr. Blavatnik on the basis of Article 59 ¶ 1 of the Company Law.

### C.     Articles 1992 to 1997 Do Not Provide an Independent Basis of Liability

41.     The final remaining stated basis for liability in Count VI is Articles 1992 to 1997.[27]  Mr. Thiebaud does not address these provisions in respect of Count VI.  But as Mr. Thiebaud elsewhere notes, these provisions "are applicable to the obligations of an agent under a mandate agreement," but "[a] Luxembourg court . . . would not make its determination solely on articles 1991 to 1997 . . . without making any reference to [A]rticle 59."[28]  This can be explained by the fact that Articles 1991 to 1997 simply establish the general principles of agency law in Luxembourg, and do not provide an additional basis of liability or otherwise modify the duties and liabilities under Article 59.

42.     Accordingly, if a claim against a director asserted under Article 59 ¶ 1 fails, that claim cannot be sustained in the alternative under Articles 1992 to 1997.  As the Trustee has failed to state an Article 59 ¶ 1 claim in Count VI (as explained above), his claim under Articles 1992 to 1997 likewise fails.

---

[25]     Thiebaud Report at 21 (citations omitted).

[26]     C. DELVAUX, in association with J. DELVAUX, *La société anonyme,* textbook, 2009, ¶ 4.2.5.4.3, p. 354  (annexed hereto as **Exhibit M**).

[27]     Second Amended Complaint, p. 117.

[28]     Thiebaud Report at 45.

## II.    ANALYSIS OF THE TORT CLAIM PLEADED AGAINST MR. BLAVATNIK AND ACCESS IN COUNT VII BY THE TRUSTEE

43.    In Count VII of the Second Amended Complaint, the Trustee asserts a claim against Mr. Blavatnik and Access[29] for breach of Articles 1382 and 1383, the general basis for tort liability in Luxembourg, predicated on Mr. Blavatnik and Access' alleged "reckless, negligent and imprudent actions" taken while "Blavatnik exercised control over the business and affairs of LBI."[30]

44.    To prevail on this claim, the Trustee has the burden of proving *both* that: (i) although neither Mr. Blavatnik nor Access were managers of Basell (pre-Merger) or LBI (post-Merger), they acted as *de facto* managers by effectively directing the affairs of the company; and (ii) the actions taken by Mr. Blavatnik and Access as *de facto* managers satisfy the elements for liability in tort under Articles 1382 and 1383.  This second element is crucial because, as Mr. Thiebaud admits, an individual's status as a *de facto* manager by itself is not a ground on which to impose liability under Luxembourg law.  As set forth in detail below, the allegations in the Second Amended Complaint, even if proved, do not enable the Trustee to meet his burden as to either required proof.

### A.    The *De Facto* Director Doctrine Under Luxembourg Law

45.    Mr. Thiebaud opines that "certain allegations included in the [Second] Amended Complaint, if proven to be true, supply a legal basis under Luxembourg law to characterize Blavatnik as the *de facto* director of the Company."[31]  I disagree.  In my opinion, while Luxembourg law does recognize *de facto* liability in tort, it does so extremely rarely and in narrow circumstances not present here.[32]

46.    Initially, the existence of *de facto* management is never presumed; rather, the person alleging *de facto* liability bears the burden of proof, including rebutting the presumption

---

[29]    Mr. Thiebaud asserts that "[t]he Complaint leaves open the question of whether in conducting the affairs of the Company, Blavatnik was acting in a personal capacity, as the indirect owner Basell, or was acting in his official capacity as an officer of Access."  *Id.* at 12.  As noted by Mr. van der Korst, this assertion ignores a third possibility—that Mr. Blavatnik was acting in his capacity as a member of the supervisory board of Basell B.V.  Van der Korst Declaration ¶ 23.

[30]    Second Amended Complaint ¶¶ 413-26.

[31]    Thiebaud Report at 28.

[32]    J.-F. GOFFIN, *"Responsabilités des dirigeants de sociétés"*, Larcier, 3rd ed., 2012, No. 52 p. 78 (annexed hereto as **Exhibit N**); N. DEDESSUS-LE-MOUSTIER, *"La responsabilité du dirigeant de fait"*, Rev. des sociétés, 1997, p. 499, No. 19 (annexed hereto as **Exhibit O**).  The French Supreme Court, likewise, has recognized the theory "only under exceptional circumstances."  J.-J. ANSAULT, *"La notion de dirigeant de fait n'a rien d'un sésame"*, Bull. Joly Sociétés, April 1, 2016, No. 4 (annexed hereto as **Exhibit P**).

11

that the appointed *de jure* directors carried out the management of the company.[33]

47.     Second, under Luxembourg law, to establish that a person was acting as a *de facto* director of a company, two mandatory conditions must be evidenced: (i) the alleged *de facto* director must have engaged in affirmative conduct, beyond the provision of advice or influence, concerning matters impacting the fate of the company; and (ii) the alleged *de facto* director must have substituted himself for the duly appointed managers of the company by implementing, on a continuous basis, the operations and business decisions of the company (in lieu of the appointed managers).[34]

48.     On legal parameters of the first condition, I believe that Mr. Thiebaud and I are in broad agreement.  Mr. Thiebaud acknowledges in his report that neither "the mere giving of advice" nor "the mere influence by a person on a director is . . . sufficient" to establish *de facto* liability.[35]  He further acknowledges that "[t]he affirmative action requirement limits *de facto* directors to persons actively engaged in management," and that "[h]ence, a person cannot be . . . held a *de facto* director based on omissions."[36]

49.     However, as to the second condition, I do not share Mr. Thiebaud's very broad and general view that liability can be found where the alleged *de facto* director acts "under the cover of the management through an exercise of actual control over management."[37]  Mr. Thiebaud proposes this "under cover of management scenario" based on a theory of "actual

---

[33]     P. METZLER and F. PIRET, *op. cit.*, No. 27 p. 1538 (**Ex. J**).

[34]     J.-L. JASPAR and A. DE SMETH, *"La notion de gérant de fait"*, *Journal des Tribunaux*, 1984, p. 645 (annexed hereto as **Exhibit Q**).  Apart from these conditions, no other criteria should be determinative to establish the existence of *de facto* management.  In particular, I note that the Trustee contends in the Second Amended Complaint that Basell had no physical offices located in Luxembourg since these entities were domiciled with a domiciliary agent. Second Amended Complaint ¶ 360.  This fact is not relevant to the determination of *de facto* management.  The domiciliation of companies is legally accepted under Luxembourg law and does not support the conclusion that such entity is managed by a third party other than its *de jure* managers.  *See, e.g.*, the Law of May 31, 1999 governing the domiciliation of companies, as amended (annexed hereto as **Exhibit R**).  Likewise, Mr. Thiebaud suggests that the Trustee's allegations that Mr. Blavatnik, *inter alia*, "was able to obtain substantial personal gain through the Toe-Hold and Basell dividends," supply a legal basis to characterize him as a *de facto* manager."  Thiebaud Report at 28-29 (citing Second Amended Complaint ¶¶ 92 & 204).  No Luxembourg court has ever identified the realization of a "personal gain" as a relevant fact as such to the determination of *de facto* management, and in my opinion "personal gain," even if proved, is not a relevant fact.

[35]     Thiebaud Report at 14; *see also* P. METZLER and F. PIRET, *op. cit.*, No. 10 p. 1524 & 1525 (**Ex. J**); J.-L. JASPAR and A. DE SMETH, *op. cit..*, p. 645 (**Ex. Q**).

[36]     Thiebaud Report at 14; *see also* A. CABANNES, *op. cit.*, p. 5 (**Ex. I**); P. METZLER and F. PIRET, *op. cit.*, No. 10 p. 1524 (**Ex. J**).

[37]     Thiebaud Report at 28.

control" over management, as an alternative to the requirement that the *de facto* director must have substituted himself for the appointed managers of the company. His conclusions as to the sufficiency of the Trustee's allegations appear to rely on this scenario.[38] In fact, no Luxembourg court has ever premised liability solely on a theory that a *de facto* director exercised "actual control," as I explain in further detail below in examining the case law cited by Mr. Thiebaud.[39] When recognizing a scenario of *de facto* management "under cover of management," Luxembourg courts have always done so while relying on facts evidencing *substitution* of the *de jure* management by the *de facto* director.

50.    To be clear, while Luxembourg courts and scholars have used various formulations and terminology to express the legal requirements for a finding of *de facto* management, the case law has always turned on the same substantive question: did the alleged *de facto* director actually *exercise* the powers reserved to the *de jure* directors, thereby supplanting (*i.e.*, acting in substitution of) their role. The manner or form in which the alleged managerial acts occurred—*e.g.*, in full public view or "under cover"—is legally irrelevant to the substantive question of whether the alleged *de facto* director actually exercised the powers, or did not. And, as explained above, allegations of "actual control" do not on their own suffice to answer this substantive question in the affirmative.

51.    With this point of correction, the Trustee's allegations do not, in my view, satisfy the required conditions for a finding of *de facto* directorship as to Mr. Blavatnik or Access.

### 1.    Substitution of Management Is Required for a Finding of De Facto Liability

52.    Although certain Luxembourg laws, in the areas of criminal law and bankruptcy, make reference to *de facto* management,[40] the term has not been defined by the legislature and is only clarified by the Luxembourg case law. The prevailing definition in the case law[41] derives from the writings of the French legal scholar J.-L. Rives-Lange (here translated from the French): "the *de facto* manager is he who in all sovereignty and independence carries out affirmative management activities."[42]

53.    Ordinarily, only the directors of a company have the authority to make binding decisions on behalf of the company. But to the extent that a person engages in conduct that would cause a third party to reasonably believe that it is in fact *he* "who in all sovereignty and

---

[38]    *Id.* at 17, 28-30.

[39]    *See infra* ¶¶ 55-60.

[40]    *See, e.g.*, Articles 495 and 495-1 of the Luxembourg Code of Commerce (annexed hereto as **Exhibit S**).

[41]    *See, e.g.*, Court of Appeal, July 10, 2002, *op. cit.* (**Ex. H**).

[42]    J.-L. RIVES-LANGE, "*La notion de dirigeant de fait au sens de l'article 99 de la loi du 13 juillet 1967 sur le règlement judiciaire et la liquidation des biens*", *D.* 1975, chr., p. 41, specifically No. 5 p. 42 (annexed hereto as **Exhibit T**).

13

independence carries out affirmative management activities"—*i.e.*, in substitution of the *de jure* directors of the company—that person may be liable for the impugned conduct as a *de facto* director. Thus, the essence of *de facto* management is that the alleged *de facto* manager behaved as if he was the *de jure* director of a company,[43] while making binding management decisions in lieu of the *de jure* managers.[44]

54.    To establish liability, this condition necessarily requires that the *de facto* director acted in absolute freedom and authority and made decisions that have impacted the fate of the company, either in spite of the contradictory views of the *de jure* directors or without obtaining their input.[45]  Moreover, the *de facto* director must have exercised its powers on the operational management of the company on a repeated and continuous basis.[46]  Isolated or occasional managerial conduct is not sufficient to establish *de facto* management.[47]

55.    By contrast, and contrary to Mr. Thiebaud's opinion, *de facto* management cannot be established under Luxembourg law based solely on allegations that the alleged *de facto* director exercised "control" over the *de jure* managers of a company.[48]  Indeed, to the best of my knowledge (and based on a review of the case law), no Luxembourg court has *ever* recognized *de facto* management predicated solely on a theory of "control" over the *de jure* directors. Moreover, a controlling shareholder will not be liable as a *de facto* director solely on the basis that he provided "instructions" to the *de jure* directors.[49]

56.    Mr. Thiebaud cites two decisions of the Luxembourg Court of Appeal and one from the French Supreme Court, ostensibly in support of the Trustee's "control" theory for a finding of *de facto* management.[50]  However, each of these cases was decided on the basis of exceptional facts not present here, evidencing that the alleged *de facto* directors were acting in *substitution*—not in "control"—of the *de jure* directors of the company.

57.    In the 1997 Luxembourg case, a bank was held as *de facto* director of a company where two of its employees were appointed as *de jure* directors of the company, comprising a majority of the company's three-person board, and exercised their mandate in the sole interest of their employer (the bank) by approving transactions that benefited the bank at the expense of the company.  The 2006 French Supreme Court decision was decided under extremely similar facts

---

[43]    P. METZLER and F. PIRET, *op. cit.*, No 11 p. 1525 (**Ex. J**).

[44]    *Id.*; J.-L. JASPAR and A. DE SMETH, *op. cit.*, p. 645 (**Ex. Q**).

[45]    *Id.*

[46]    A. CABANNES, *op. cit.*, p. 5 (**Ex. I**); P. METZLER and F. PIRET, *op. cit.*, No. 13 p. 1527 (**Ex. J**).

[47]    *Id.*

[48]    Thiebaud Report at 28 (stating that *de facto* management can be established through a demonstration of "an exercise of actual control over the management").

[49]    *See* A. CABANNES, *op. cit.*, p. 5 (**Ex. I**).

[50]    *See* Thiebaud Report at 17-19.

concerning a bank being held liable as *de facto* director.

58.    The facts in the 1997 Luxembourg and 2006 French decisions are distinguishable from the Trustee's allegations in the Second Amended Complaint.  In both cases, operational and strategic decisions on behalf of the company were taken by the bank in substitution of the appointed managers, and the *de jure* directors were mere instrumentalities of the bank and charged with advancing the bank's sole interest (in contravention of the interest of the company).

59.    The 1985 Luxembourg case, Mr. Thiebaud's third and final support for his "control" theory, concerned the illegal exercise of banking activities by a company (*i.e.*, without a proper license from the regulator).  The court relied on a number of facts evidencing substitution of management in determining that the company's controlling shareholder acted as its *de facto* director.  In particular, the *de facto* director was found to have on hand undated signed resignation letters from the directors, to have possessed signatory powers over bank accounts, to have hired all employees, and to have made day-to-day operational and strategic decisions for the company.  Moreover, as noted by Mr. Thiebaud, the *de jure* managers were required to obtain *prior authorization* from the controlling shareholder before taking any management action.  The 1985 case was therefore clearly predicated on facts, unlike those alleged here, evidencing that the *de facto* director could exercise all the prerogatives of the *de jure* directors and substituted himself for them.

60.    In my opinion, the foregoing decisions confirm, rather than refute, that actual substitution of management is required for a finding of *de facto* management.

## 2.    *The Trustee's Allegations Do Not Rise to the Level of "Substitution of Management"*

61.    In pages 28-30 of his report, Mr. Thiebaud identifies the allegations in the Second Amended Complaint that he opines are sufficient to support a finding of *de facto* management as to Mr. Blavatnik and Access.  As described above, Mr. Thiebaud examines these allegations through the lens of "control" rather than "substitution."  The allegations in the Second Amended Complaint do not amount to substitution of management, as that theory is understood under Luxembourg law, since the role of the *de jure* managers to make the final binding decision on behalf of the company was not supplanted and indeed they continued to exercise their corporate powers.  That is, the GP made the final binding decisions for Basell, and the GP Managers made the final binding decisions for the GP.

62.    To the contrary, the Trustee's allegations, even if proved, only suffice to establish that Mr. Blavatnik *participated in* management activities (*e.g.*, by helping to secure merger financing),[51] *influenced* decisions of the *de jure* manager,[52] and *instructed* the *de jure* managers

---

[51]    *See* Second Amended Complaint ¶ 381 ("Blavatnik . . . became personally involved in communicating with the banks . . .").

[52]    *See id.* ¶ 379 (citing Blavatnik testimony regarding approval of Basell B.V. supervisory board that "if I didn't agree with this, the board would not agree to this").

on the management decisions he believed should be taken.[53] Common to and implicit in all of these allegations is that Mr. Blavatnik's participation in (or influence or instruction of) management decisions did not supplant the role of the *de jure* managers to make final binding decisions on behalf of Basell or LBI. Accordingly, the Trustee's allegations, even if proved, are not sufficient to demonstrate substitution of management and hence cannot establish Mr. Blavatnik as the *de facto* manager of Basell or LBI.

### 3.   *Blavatnik and the GP Managers' Shared Membership on the Supervisory Board of Basell's Subsidiary, Basell B.V. Is a Fact that Plausibly Explains His Alleged Influence on the GP*

63.   In the context of a parent-subsidiary relationship, Luxembourg law recognizes that a parent company will ordinarily exercise control over the operations of their subsidiaries to ensure that such subsidiary operates within the overall economic and strategic interest of its affiliates.[54] The exercise of such control is not tantamount to the *de facto* management of the subsidiaries.[55]

64.   Likewise, management decisions made by a subsidiary, particularly where operations are conducted at the subsidiary level, will frequently be adopted or ratified by the management of the parent holding company, consistent with the purpose of maintaining strategic unity across entities in the corporate structure. The fact that such strategic decisions originated at the subsidiary level does not, in itself, render the managers of the subsidiary potentially liable as *de facto* managers of the parent.

65.   In this connection, it is important to note that the business affairs of the Basell group before the Merger appear largely to have been conducted at the level of the Dutch company, Basell B.V. I understand that Basell B.V. played a central role in the Basell group before the Merger, inasmuch as it was the holding company of virtually all the operational units. Basell's corporate headquarters were also in the Netherlands. A Luxembourg holding company (Basell) sat above the Dutch holding company—a structure that is likewise not uncommon in my experience.

66.   I am not aware of any Luxembourg case, or any case from any jurisdiction on which a Luxembourg court is likely to rely, in which *de facto* manager liability was imposed at the level of a Luxembourg holding company, on persons holding official positions in a corporate

---

[53]   *See id.* ¶ 369 (citing Blavatnik comment that "[w]e should get [the deal] done by Monday").

[54]   S. OOSTVOGELS and D. BOONE, "*De l'intérêt social à l'intérêt de groupe en droit des sociétés: perspectives luxembourgeoises*", *Droit Bancaire et Financier au Luxembourg*, ALJB, 2004, Vol. 3, p. 1037 (annexed hereto as **Exhibit U**).

[55]   M.-B. NOBLE and Ch. DE KERCHOVE, "*La gestion de fait – Aperçu des critères, contours et responsabilité du dirigeant de fait*", *Guide des comptes annuels pour le Luxembourg,* Wolters Kluwer, May 2016, p. 3 (annexed hereto as **Exhibit V**); N. DEDESSUS-LE-MOUSTIER*, op. cit.,* No 10 (**Ex. O**).

ownership chain at a level below the level of the Luxembourg holding company and who were properly involved in management at that level of the corporate governance structure. I am not a Dutch lawyer and will not offer opinions on Dutch law, but if Mr. Blavatnik was properly conducting his role as a supervisory board member of Basell B.V. and was involved in major strategic decisions of the Basell group by virtue of that position, no relevant authorities of which I am aware suggest that activities in which he engaged in that capacity could form the basis for a claim of *de facto* management of a Luxembourg holding company like Basell that sat above Basell B.V. in the corporate ownership chain.

67.     I have reviewed minutes of meetings of the supervisory board of Basell B.V. and I have also reviewed the confidentiality agreement dated July 11, 2007 between Lyondell and Basell B.V. and the definitive offer letter signed jointly on July 16, 2007 on behalf of Access and Basell B.V. These documents make clear that strategic decisions in relation to the Merger were taken and implemented largely at the Basell B.V. level of the corporate governance structure and involved its supervisory board, of which Mr. Blavatnik was a member.

68.     I have also noted that Messrs. Kassin, Floor, and Potter were members of the supervisory board of Basell B.V. before the Merger and that they simultaneously served as managers of the GP, while post-Merger they served as members of the Supervisory Board of LBI. The fourth manager of the GP, Mr. Bigman, was also a manager of Basell B.V. before the Merger and participated in supervisory board meetings of Basell B.V. in that capacity.

69.     In light of these facts, it is plausible to conclude that Mr. Blavatnik's alleged pre-Merger behaviors and discussions with Messrs. Kassin, Floor, and Bigman,[56] as well as any discussions that he may have had with Mr. Potter, took place at the level of Basell B.V. by virtue of Mr. Blavatnik's role as supervisory board member of that entity rather than at the level of the Luxembourg holding company, Basell. After the Merger, it appears that issues of a type that had previously been considered at the supervisory board of Basell B.V. were considered at the Supervisory Board of LBI, of which Mr. Blavatnik served as Chairman.

70.     Furthermore, the approval of the Merger by Basell is consistent with the fact that three of the four managers of the GP were also members of the supervisory board of Basell B.V., the entity in the corporate structure where it appears the Merger was substantively discussed. The fourth GP manager was a manager of Basell B.V. and participated in the discussions concerning the Merger as a member of management and at Basell B.V.'s supervisory board in that capacity. As a consequence, it is logical and not problematic from the perspective of Luxembourg law that, if a business decision had been taken for the entire group and that the same persons were carrying out functions in different entities of the group, the entry into the Merger Agreement by Basell B.V. would be ratified by its direct and indirect shareholding.

71.     As I have already indicated, I am aware of no relevant authorities supporting a claim that a person, such as Mr. Blavatnik, who was properly involved in key strategic decisions taken by a group by virtue of a position on the supervisory board of the member of a group where substantive corporate decisions were made, could be found liable as a *de facto* manager of

---

[56]     *See, e.g.*, Second Amended Complaint ¶¶ 174, 365-66, 377.

17

a Luxembourg holding company positioned above that member of the group in a corporate ownership chain.  None of the authorities cited by Mr. Thiebaud involve fact patterns remotely resembling the facts of this case.

### B.    The Required Elements of Tort Liability Under Articles 1382 and 1383

72.    A finding of *de facto* management as to Mr. Blavatnik or Access does not establish their liability.  Under Luxembourg law, a *de facto* manager will not be sanctioned solely because he carried out actions amounting to *de facto* management.[57]  Thus, the Trustee also bears the independent burden of proving that the actions taken by Mr. Blavatnik and Access as *de facto* managers satisfy the elements for liability in tort under Articles 1382 and 1383.

73.    Articles 1382 and 1383 provide as follows (translated from the French):

> Art. 1382:  Any act whatsoever of man, which causes damage to another, shall be compensated by whomever caused the fault by which the damaged occurred.

> Art. 1383:  A person is liable for the damage he causes not only by his intentional act, but also by his negligence or his imprudence.

74.    Mr. Thiebaud and I are in agreement that there are three elements that must be proved to establish liability under Articles 1382 and 1383:  (i) that Mr. Blavatnik or Access committed a "*fault*" within the meaning of these Articles; (ii) that the *damages* suffered were of the kind recoverable under Articles 1382 and 1383; and (iii) that there is a *causal link* between the fault they committed and the damages suffered.[58]

75.    However, I disagree with Mr. Thiebaud that the Trustee has adequately alleged facts that would satisfy the foregoing elements.  In particular, Mr. Thiebaud's conclusion is predicated on a misstatement of the standard for "fault" applicable to third-party tort actions against a *de facto* manager under Luxembourg law.  As described below, under the correct standard for "fault," Mr. Blavatnik and Access' alleged actions, even if proved, would not give rise to liability under Articles 1382 and 1383.  Section B.1 below addresses the standard of "fault" applicable to the Trustee's claim; Section B.2 addresses the elements of damages and causality.

### 1.    The Trustee Is Required to Establish "Fault" Under the Heightened Standard Applicable to Third Party Claims in Tort Against Company Directors

76.    As Mr. Thiebaud acknowledges, the manager of a company is only liable to a third party (such as the Trustee here) on the basis of Articles 1382 and 1383 if he commits a

---

[57]    A. CABANNES, *op. cit.*, p. 9 (**Ex. I**).

[58]    *See* Thiebaud Report at 22.

"fault" that is "severable from his functions" (*faute séparable de ses fonctions*).[59]   This heightened standard of liability was imported to Luxembourg in 2007 from the French case law,[60] and since that date has been universally adopted by the Luxembourg courts.[61]

77.     Under this standard, "fault" will only be established under the exceptional circumstances where each of the following conditions is satisfied as to the putative misconduct: it is (i) intentional; (ii) of a particularly serious nature; and (iii) incompatible with the normal exercise of the manager's corporate functions.[62]   These three conditions are very difficult to fulfill, and as a result, Luxembourg courts very rarely find directors liable on this basis.

78.     While Mr. Thiebaud applies the heightened standard for manager liability to third parties to the Trustee's Articles 1382 and 1383 claim against the GP Managers,[63] he does not do so for the Articles 1382 and 1383 claim asserted against Mr. Blavatnik and Access.   Instead, without explanation, he applies the ordinary standard of liability, asserting that "[m]ere negligence . . . can amount to a fault" and "[t]he lightest fault . . . is sufficient."[64]

79.     Mr. Thiebaud should not apply this lower standard to the Trustee's Articles 1382 and 1383 claim against Mr. Blavatnik and Access.   His apparent basis (albeit not explicitly stated) is that the Luxembourg authority recognizing the heightened standard did so in the context of claims against *de jure* managers (like the GP Managers), rather than alleged *de facto* managers (like Mr. Blavatnik and Access).   In my opinion, there is no logical basis for this distinction, and Mr. Thiebaud provides none.

80.     In particular, the Luxembourg Court of Appeal has explicitly held that a *de facto* manager is legally equivalent to a *de jure* manager in respect of his liability in tort.[65]   And while, to the best of my knowledge, there is no published Luxembourg court decision which addresses this specific standard in the context of a third party claim against a *de facto* manager, the weight

---

[59]     *Id.* at 36.

[60]     *See, e.g.*, French Court of cassation, May 20, 2003, *Seusse*, D. 2003, p. 2623 (annexed hereto as **Exhibit W**).

[61]     *See, e.g.*, Luxembourg District Court, November 28, 2007, *Legicorp* ID: 11064; Luxembourg District Court, October 24, 2008, *BIJ*, 2009, p. 29 (annexed hereto as **Exhibit X**); Luxembourg District Court, December 23, 2015, No. 145724 and 145725, *JTL* 2016, No. 44, pp. 57 ff (the "***Hellas* Decision**," annexed hereto as **Exhibit Y**).

[62]     *See, e.g.*, Luxembourg District Court, November 28, 2007, *Legicorp* ID: 11064 (**Ex. X**); Luxembourg District Court, October 24, 2008, *BIJ*, 2009, p. 29 (annexed hereto as **Exhibit Z**).

[63]     *See* Thiebaud Report at 36, 41-42.

[64]     Thiebaud Report at 22.

[65]     Court of Appeal, December 19, 2012, No. 37857 (annexed hereto as **Exhibit AA**); *see also* Thiebaud Report at 36 ("This development should be followed by the Luxembourg courts going forward as it is in particular supported by leading Luxembourg authors.").

of Luxembourg legal scholarship supports extending the standard to such claims against *de facto* managers.[66]

81.    Moreover, a decision of the French Supreme Court—a court on which Luxembourg courts often rely— supports the rule that the liability of a *de facto* manager cannot be found absent a predicate finding of fault severable from his functions.[67]    In light of the Luxembourg courts' general reliance on the French case law, and particularly because the standard is derived from the French case law in the first instance, I believe that a Luxembourg court would follow the French decision (along with the weight of Luxembourg legal scholarship) and hold that the Trustee's claim against Mr. Blavatnik and Access would be adjudicated against the heightened standard of "fault."

82.    And, based on the foregoing review of the relevant authority applying that heightened standard, it is my strong opinion that the Trustee's allegations cannot support a finding of "fault" against Mr. Blavatnik and Access.    The allegations cited by Mr. Thiebaud, which he erroneously assesses under a "mere negligence" standard, are quintessentially *compatible* with the normal exercise of a manager's corporate functions and would be judged under Luxembourg's business judgment rule which provides substantial deference for corporate decision-making.

83.    While the Trustee contends that Mr. Blavatnik and Access acted negligently (and even recklessly) in allegedly directing Basell to enter into the Merger and approve the Merger financing, these contentions do not suffice to establish a fault severable from their (alleged) corporate functions.    Under the relevant authority, there can be no serious dispute that the decisions allegedly made by Mr. Blavatnik and Access were within the scope of the normal exercise of the corporate functions of a company's managers.

84.    The facts established in the two French cases cited by Mr. Thiebaud as examples of where a court had found a fault "severable" from the director's functions are of an entirely different kind and gravity than the facts alleged in the Second Amended Complaint, and demonstrate the extraordinary evidence of fault that is necessary to meet the heightened standard.[68]

85.    In the first case, decided in May 2010, the directors of a landscaping company had approved a construction project despite warnings from the company's engineer and two independent experts that the project was ill-advised and dangerous, and separately failed to obtain the mandatory insurance required to perform the construction.    The managers were held

---

[66]    P. METZLER and F. PIRET, *op. cit.,* No. 45 p. 1546 to No. 59 p. 1551 (**Ex. J**); N. DEDESSUS-LE-MOUSTIER, *op. cit.*, No. 36 (**Ex. O**).

[67]    French Court of cassation, March 8, 1982, No. 79-104712 (annexed hereto as **Exhibit BB**).

[68]    Thiebaud Report at 37-38.

liable when a neighboring building collapsed in the construction.[69]

86.    The second case cited by the Trustee, decided in December 2013, also involved a director's failure to exercise the basic duties compatible with his function.  After the director sold goods to a party, he intentionally neglected to record the sale in the company's books.  After the director left the company, his successor sold the same goods to another party.[70]

87.    In short, both of the cases cited by the Trustee implicated a director's failure, with grave consequences, to exercise the basic duties compatible with his function.  The allegations in the Second Amended Complaint, even if proved, do not satisfy this standard.

### 2.    *The Trustee Is Required to Establish That a Legally Cognizable Harm to the Company Was Caused by the Fault*

88.    As Mr. Thiebaud correctly summarizes in his report, it is not enough for liability under Articles 1382 and 1383 that a manager is found to have committed a "fault."[71]  In addition, the Trustee must prove that any fault committed by Mr. Blavatnik and Access caused a legally cognizable harm under the Civil Code.[72]

89.    The foregoing comprises two separate elements.  *First*, the tort plaintiff can only recover compensatory damages.  That is, the tort plaintiff can only recover those damages that were proximately caused by the tortious conduct, so as to restore him to the economic position he occupied but for the fault.  As the Luxembourg Court of Appeal has held, "[t]he amount of the compensation includes only the compensation for an actual, certain, direct, and immediate damage."[73]  In particular, damages are only considered to be "certain" when the existence of the damages has been established and can be quantified (*i.e.*, they are not speculative).[74]  Furthermore, because any awarded damages must be the direct consequence of the fault, remote damages will not be compensated.[75]

---

[69]    French Court of cassation, Commercial Chamber, May 18, 2010, No. 09-66172 (annexed hereto as **Exhibit CC**).

[70]    French Court of cassation, Commercial Chamber, December 17, 2013, no. 12-25638 (annexed hereto as **Exhibit DD**).

[71]    Thiebaud Report at 22.

[72]    Thiebaud Report at 26-27.

[73]    Court of Appeal, November 18, 1887, *Pas.* 2, p. 547 (annexed hereto as **Exhibit EE**).

[74]    French Court of cassation, March 16, 2000, No. 15/00 (annexed hereto as **Exhibit FF**); G. RAVARANI, *op. cit.*, No. 1109, pp. 1084-85; No. 1237, p. 1191 (**Ex. K**); Luxembourg District Court, March 31, 2006, No. 89/06 (annexed hereto as **Exhibit GG**).

[75]    Court of Appeal, February 20, 2002, No. 24911 (annexed hereto as **Exhibit HH**); G. RAVARANI, *op. cit.*, No. 1001, pp. 986-87; No. 1119, pp. 1104-05 (**Ex. K**).

90.    *Second*, there must be a causal link between the fault and the damages suffered. Luxembourg courts require a showing of "adequate causality" (*théorie de la causalité adéquate*), which includes as a required element that the fault have proximately caused the damages. As has been stated by the Luxembourg Court of Appeal, a "claim may only be asserted if a direct link of cause and effect exists between the fault and the damage suffered."[76]    Factors which are less likely to have given rise to the alleged damages (*i.e.*, non-primary or indirect causes) will not be taken into account.[77]

91.    I note that in his report, Mr. Thiebaud concludes that the existence of damages and a causal link is sufficiently alleged in the Second Amended Complaint in relation to the faults allegedly committed by Mr. Blavatnik.[78]    It is outside of my mandate as an independent Luxembourg law expert to assess the existence or the relevance of the facts asserted in the Trustee's pleadings.   However, as explained above, the person alleging the existence of damages must demonstrate with sufficient evidence that such prejudice is of a certain, direct, and personal nature.   Similarly, sufficient evidence of the  existence of the causal link in light of the theory of the adequate causality must also be demonstrated.   In my view, the allegations in the Second Amended Complaint, even if proved, do not meet these conditions, inasmuch as the Trustee has not sufficiently alleged under Luxembourg law that the insolvency proceedings initiated in respect of LBI are the direct and certain consequence of the faults alleged to have been committed by Mr. Blavatnik.   Moreover, insofar as Mr. Thiebaud relies on the insolvency proceedings as a basis for damages, his opinion also fails to account for the benefits to the company that were obtained as a result of those proceedings, as any such benefits would have to be deducted from the claimed damages.

## III.    ANALYSIS OF THE COUNT VII CLAIMS PLEADED AGAINST THE GP MANAGERS BY THE TRUSTEE

92.    In Count VII of the Second Amended Complaint, the Trustee brings tort claims against three of the four GP Managers (Messrs. Bigman, Kassin, and Floor) based on allegations of their pre-Merger conduct as members of the GP's board of managers.

93.    As described *supra* Section I.A, under Luxembourg law, third parties generally may not bring direct claims against a company's directors when alleging harm caused by the company.   This rule is an application of the *théorie de l'organe*, which holds that a company will generally be bound by the actions taken by its managers, and an injured third party will therefore be limited to seeking redress from a company rather than its managers.[79]   In his report, Mr.

---

[76]    Court of Appeal, April 2, 1952, *Pas.* 15, p. 352 (annexed hereto as **Exhibit II**).

[77]    Court of Appeal, November 21, 2001, No. 25025 (annexed hereto as **Exhibit JJ**); Court of Appeal, February 20, 2002, No. 24991 (**Ex. HH**); Court of Appeal, December 11, 2002, *Pas.* XXXII, p. 313 (annexed hereto as **Exhibit KK**); G. RAVARANI, *op. cit.*, No. 999, p. 982; No. 1001, pp. 986-987 (**Ex. K**).

[78]    Thiebaud Report at 31-32.

[79]    This "theory of the organ" was recently reaffirmed by the Luxembourg District Court in the *Hellas* Decision (**Ex. Y**).

Thiebaud cites the same principle, stating that "there is a general principle whereby the actions made by directors in the exercise of their mandate shall be considered as made by the company they manage and, as a result, *directors cannot be held individually liable to third parties* for actions made by them in the exercise of their mandates".[80]

94.    This general principle, as Mr. Thiebaud also acknowledges, is subject to only "two exceptions"[81]:  (i) claims in tort pursuant to Article 59 ¶ 2, which must "consist[] of committing a breach of the Compan[y] [Law] or the articles of association" that is "so severe" as to usurp the general principle of non-liability to third parties;[82] and (ii) claims in tort pursuant to Articles 1382 and 1383, which must consist of a "fault" that is severable from the manager's functions.  Under either exception, the third party plaintiff must also prove the other elements of tort liability under Luxembourg law, *i.e.*, that the damages are of the kind that is personal to the third party, certain, direct and quantifiable, and that there is a causal link between the fault that the manager committed and the damages suffered by the third party.[83]

95.    The two foregoing exceptions are interpreted in a restrictive manner by the Luxembourg courts, and I do not believe that the allegations in the Second Amended Complaint, even if proved, are sufficient to establish the liability of the GP Managers under either of them.

96.    The Trustee's Article 59 ¶ 2 claim is, as alleged, a claim predicated on the mismanagement of the GP Managers in approving the Merger.  But the Trustee appears to have confused the various legal bases to ground his action against the GP Managers:  a claim for mismanagement is precisely the kind of contractual claim that can only be asserted by the GP itself under Article 59 ¶ 1.  In his report, Mr. Thiebaud attempts to recast the allegations as the GP Manager's *failure* to manage the GP in deference to Mr. Blavatnik.  But Luxembourg law does not recognize such an attempt to circumvent the legal rules, which would turn Article 59 on its head, and neither the law nor case authority cited by Mr. Thiebaud supports his opinion.

97.    The Trustee's Articles 1382 and 1383 claims fare no better.  As with the overlapping claims against Mr. Blavatnik, the Trustee was required to show that the "fault" allegedly committed by the GP Managers was severable from their functions, meaning that it was not only intentional and severe, but also incompatible with the normal exercise of their corporate functions.  And, for the reasons described above in respect of the claims against Mr. Blavatnik, it cannot be seriously contended that the deliberation and approval of a merger, even if reckless or (in hindsight) erroneous, was incompatible with the normal functions of the GP Managers.

---

[80]    Thiebaud Report at 34 (emphasis added).

[81]    *Id.*

[82]    *Id.* at 36.

[83]    *See* Luxembourg District Court, July 3, 1987, *Legicorp* ID: 10442 (annexed hereto as **Exhibit LL**), which held that in case of *actio mandati* or *actio ex delicto*, the existence of three independent elements must be demonstrated by the plaintiff, namely (i) a fault, (ii) damages, and (iii) a causal link between the fault and the damages.

### A.    The Trustee's Tort Claim Under Article 59 ¶ 2 Against the GP Managers

#### 1.    *The Trustee Cannot Bring a Contractual Claim for Mismanagement*

98.    The GP was organized as an S.à r.l. (limited liability company).    Under Luxembourg law, as managers of an S.à r.l., the GP Managers owed contractual duties of loyalty and due care in the performance of their mandate only to the company which granted the mandate to them, *i.e.,* the GP itself.  Because the Trustee represents the interests of Basell (the S.C.A.), he cannot assert a contractual breach of duty claim against the GP Managers.

99.    Specifically, as described *supra* Section I.A, Article 59 ¶ 1 restricts standing to bring contractual claims against a company's directors to "the company" itself:  "[t]he directors shall be liable *to the company* in accordance with general law for the execution of the mandate given to them and for any misconduct in the management of the company's affairs."[84] Accordingly, the company is the only person entitled to invoke Article 59 ¶ 1, which is the legal basis for contractual liability of directors.  By application of this provision to managers of an S.à r.l. (such as the GP),[85] only the S.à r.l. itself is authorized to bring contractual claims against its managers for mismanagement.  There is thus no basis in Luxembourg law for the Trustee to bring an Article 59 ¶ 1 claim against the GP Managers in respect of their pre-Merger conduct on the board of managers of the GP, and the Trustee does not advance such a claim.[86]

100.    Article 59 ¶ 2, the companion provision to Article 59 ¶ 1, provides a limited legal basis for claims brought against the managers of an S.à r.l. by third parties:  "[t]he directors shall be jointly and severally liable towards the company *and any third parties* for damages resulting from the violation of this law or the articles of the company."[87]  Pursuant to the express terms of the provision, a third party's claim against directors may be brought *only* for damages resulting from a violation of the articles of association of the S.à r.l. or a provision of the Company Law itself.  Under Luxembourg law, an Article 59 ¶ 2 claim asserted by a third party is considered as a tort claim, inasmuch as there is no contractual relationship between the managers and the third party.

101.    As the language of Article 59 makes clear, *no* claim for mismanagement or for failure to execute their mandate can be brought by a third party against the managers of an S.à r.l.  A claim for mismanagement is within the exclusive bailiwick of the S.à r.l. itself, pursuant to Article 59 ¶ 1.  As a threshold matter, therefore, the Trustee must establish that his allegations concerning the GP Managers are sufficient to state a claim predicated on a breach of

---

[84]    Article 59 ¶ 1 (emphasis added) (**Ex. F**).

[85]    Article 59 ¶ 1 is applicable to an S.à r.l. pursuant to Article 192 of the Company Law.

[86]    *See* Second Amended Complaint p. 133 n.26 (noting that the allegations lodged by LBI against the GP Managers are based in tort on Article 59 ¶ 2 or Articles 1382 and 1383, "because there is no contractual relationship between LBI and the GP Managers.").

[87]    Article 59 ¶ 2 (emphasis added) (**Ex. F**).

the express terms of GP's articles of association or the Company Law.  To the extent that those allegations make out a claim for mismanagement for failure to execute their mandate, such a claim is of contractual nature, and cannot be brought by the Trustee.

### 2. The Trustee Must Evidence a Breach of the GP's Articles of Association or the Company Law by the GP Managers

102.    The Luxembourg District Court has recently explained that an Article 59 ¶ 2 claim brought by a third party does not concern ordinary management faults but is reserved for "extremely severe faults, which constitute a violation of the 'social pact' or the provisions of the [Company Law] aimed at protecting the public and the shareholders."[88] To establish a breach of Article 59 ¶ 2, the third party asserting the claim must prove that the manager infringed a *mandatory* prescription (*commis des infractions*) of the Company Law or the company's governing articles.[89]    Luxembourg courts interpret this requirement extremely strictly.    For instance, in the same recent District Court decision, the court held that the obligation to publish the annual financial statements of the company was not breached, to the extent that the managers remedied such breach by the publication of these financial statements at a later stage, before the decision was handed down.[90]

103.    In respect of his Article 59 ¶ 2 claims, the Trustee alleges that the GP Managers "abdicated their responsibility and simply followed the direction of Blavatnik" in taking "such steps as were necessary to cause the Merger and related transactions to occur."[91]  Mr. Thiebaud opines that these allegations, if proved, would constitute breaches of Article 191 of the Company Law and Article 9.1 of the GP's articles of association.[92]    I disagree strongly with Mr. Thiebaud's opinion.

104.    Article 191 of the Company Law provides, in relevant part: "S.à r.l.s are managed by one or more agents, who may but are not required to be members of the S.à r.l., and who may be paid or unpaid.  They are nominated by the partners . . . for a determined or undetermined period."[93]    And Article 9.1 of the GP's articles of association provides as follows:  "The Company is managed by no fewer than one (1) and no more than five (5) managers, whether chosen from the associates or not, appointed by a resolution of the sole associate or the general manager representing the more than half of the corporate capital.  If two (2) or three (3) or four (4) or five (5) managers have been appointed, they will constitute a board of managers which

---

[88]    Luxembourg District Court, February 26, 2015, No. 142277, p. 5 (annexed hereto as **Exhibit MM**).

[89]    *Id.*

[90]    *Id.,* p. 12.

[91]    Second Amended Complaint ¶ 406.

[92]    Thiebaud Report at 39, 41.

[93]    Article 191 of the Company Law (**Ex. C**).

will manage the affairs of the company."[94]

105.    The theory advanced by the Trustee (and adopted by Mr. Thiebaud) appears to be that the GP Managers' failure to actively manage the GP—*i.e.*, their alleged "failure to exercise their mandates as GP managers diligently"—in deferring to Mr. Blavatnik constitutes a violation of the foregoing provisions.  As an initial matter, however, it should be noted that neither Article 191 of the Company Law nor Article 9.1 of the GP's articles of association imposes *any* mandatory obligation on the GP Managers to "exercise their mandates as GP managers diligently"; nor certainly do they impose a negative obligation not to defer to the influence or instruction of a non-manager.  Rather, these provisions are simply *descriptive* of the management of the GP (or of an S.à r.l. generally).

106.    Moreover, Mr. Thiebaud's reasoning improperly conflates liability under Article 59 ¶ 1 with liability under Article 59 ¶ 2.  As explained above, any misconduct committed by the GP Managers in the execution (or non-execution) of their mandate is a contractual breach of that mandate and can only be sanctioned in accordance with Article 59 ¶ 1.  A claim predicated on the GP Managers' "failure to exercise their mandates" is quintessentially a contractual claim under Article 59 ¶ 1, which expressly provides that "[t]he directors shall be liable to the Company in accordance with general law *for the execution of the mandate given to them . . .*"[95] Such a claim, as explained above, is unavailable to the Trustee as a third party.  It is not permissible under Luxembourg law for the Trustee to circumvent this prohibition by attempting to transform a contractual breach of mandate claim into a tort claim under Article 59 ¶ 2 merely by citing provisions of the Company Law or the articles of association of the GP which detail how that mandate should be exercised.  If the alleged violation sounds in contract, it cannot be the basis for liability in tort.

107.    I also believe that the distinction that Mr. Thiebaud purports to draw between "mismanagement" and "failure to manage" (or "execution of a mandate" and "failure to exercise [a] mandate") is entirely without a difference.  Whichever terminology is used to describe the fault, the acts that the GP Managers allegedly committed relate to the agency agreement entered into between the GP and its Managers.  Such claims necessarily fall within the scope of Article 59 ¶ 1, and cannot be asserted under Article 59 ¶ 2.  It is worth noting that many, if not all mismanagement claims involve an act of omission—such as the alleged failure of diligence committed by the GP Managers here—on the part of the manager.  Luxembourg law treats such wrongful omissions in management identically to wrongful commissions, and both are subject to liability for mismanagement exclusively under Article 59 ¶ 1.[96]

108.    Mr. Thiebaud acknowledges in his report that no Luxembourg court has ever

---

[94]    Article 9.1 of the GP's articles of association (annexed hereto as **Exhibit NN**).

[95]    Article 59 ¶ 1 (emphasis added) (**Ex. F**).

[96]    *See* J. R. NLEND, *Responsabilité des dirigeants de sociétés en droit luxembourgeoi*s, Ecoconsult S.C.P., 1997, pp. 57-59 (annexed hereto as **Exhibit OO**), who states that a management fault does not necessarily require a positive action taken by the director but can consist of, *inter alia*, negligence or an omission.

endorsed the Trustee's theory that "a *de jure* director can be held liable to third parties for a breach of article 59 [¶] 2" for failing to "actually manage the company."[97] However, he cites two Luxembourg court decisions that he claims "can be interpreted" to provide support for the theory.[98] Mr. Thiebaud's interpretation is incorrect: both decisions were predicated on a positive breach of a mandatory prescription of the Company Law.

109.    In the first decision (Luxembourg District Court, May 30, 1980, confirmed by the Court of Appeal in a decision rendered on March 1, 1982), a director was found to have breached multiple mandatory provisions of his company's articles of association and the Company Law. First, the director performed banking activities (namely, the receipt of deposits from the public) in breach of the limitation of the corporate object of the company as expressly defined in its articles of association.[99] In addition, the director breached express provisions of the Company Law in failing to (i) convene the annual general meeting of the shareholders of the company to approve the annual financial statements of the company, and (ii) publish the balance sheet and the profit and loss account of the company in the Luxembourg official gazette.[100]

110.    The second decision (Luxembourg District Court, August 14, 2001) likewise found liability under Article 59 ¶ 2 based on a breach of an express provision of the Company Law, namely the failure to prepare the financial statement of the company and submit them to the general meeting of the shareholders for their approval and subsequent publication in the Luxembourg official gazette.[101]

111.    Common to both cases cited by Mr. Thiebaud, and the Luxembourg jurisprudence on Article 59 ¶ 2 more broadly, is that liability is only imposed based on the failure to comply with an express and mandatory duty imposed by the Company Law or the articles of association of the relevant entity.[102]

---

[97]    Thiebaud Report at 39.

[98]    *Id.*

[99]    Luxembourg District Court, May 30, 1980, *Bulletin du Cercle François Laurent*, 1987, pp. 67 ff, and in particular, p. 77 (annexed hereto as **Exhibit PP**). As the court found, the corporate object of the company, defined in its articles of association, limited its activities to those of a holding company in accordance with the law of July 31, 1929 on holding companies. Therefore, pursuant to that provision of its articles of association, the company was prohibited from performing any banking activities.

[100]    *Id.*, p. 79.

[101]    *Id.*, footnote 108: Luxembourg District Court, August 14, 2001, Legicorp ID: 10283 (annexed hereto as **Exhibit QQ**).

[102]    This rule is also summarized in a recent article by a Luxembourg legal scholar, which states that liability based on Article 59 ¶ 2 can only concern faults which are committed outside the scope of the corporate mandate and which are unrelated to the managers' functions as agents of the company. A. KOCH, *op. cit.*, p. 219 (**Ex. L**) (referring to the abovementioned decision rendered by the Luxembourg District Court on November 28, 2007 (**Ex. X**)).

**B.      The Trustee's Tort Claim Under Articles 1382 and 1383 Against the GP Managers**

112.      In the alternative, the Trustee asserts a tort claim against the GP Managers under Articles 1382 and 1383, which requires proof of the three elements described in detail above, namely:  (i) the existence of a fault severable from the corporate functions; (ii) damages suffered by Basell that are personal, direct, certain, and quantifiable; and (iii) a causal link between the fault and the damages.[103]

*1.      The "Fault" Requirement Under Articles 1382 and 1383*

113.      For the reasons described above in Section II.B.1 (with respect to the Articles 1382 and 1383 claims pleaded against Mr. Blavatnik), I do not believe that the Trustee has adequately alleged facts which, if proved, would constitute a fault severable from the GP Managers' functions and hence satisfy the first required element for liability.

114.      Once again, it is important to emphasize that fault severable from the function is found extremely rarely by the Luxembourg courts.  I further note that, in respect of the claims against the GP Managers specifically, there is an immediate irreconcilable tension between the Trustee's theory that the GP Managers should be liable for their alleged failure to exercise their corporate mandate (under Article 59 ¶ 2), on the one hand, and yet also liable for the commission of an "intentional" and "particularly serious" tort that is "incompatible with the normal exercise of [their] corporate functions" (as required under Articles 1382 and 1383), on the other.

115.      I do not believe that allegations of failure to execute a mandate can form the basis of liability under Articles 1382 and 1383, as such allegations effectively refute both the requisite intentionality and incompatibility with normal corporate functions which are required elements for liability. Indeed, the Trustee's theory of liability—*i.e.*, that the GP Managers "failed to execute their mandate"[104]—is in my view antithetical to a finding of intentionality.

*2.      The Requirement of Establishing Legally Cognizable Damages*

116.      Under either of Article 59 ¶ 2 or Articles 1382 and 1383, the Trustee must separately prove that any fault committed by the GP Managers caused Basell a legally cognizable harm.  As described *supra* Section II.B.2, this requires proof of (i) actual, certain, direct, and immediate damage suffered by Basell, (ii) directly and proximately caused by the fault committed by the GP Managers in accordance with the theory of adequate causation.

117.      As described above in my discussion of the Trustee's Articles 1382 and 1383 claim against Mr. Blavatnik,[105] the onus to establish the existence of the two foregoing conditions rests with the Trustee.  With respect to the claims against the GP Managers

---

[103]      *See supra* Section II.B.

[104]      Second Amended Complaint ¶¶ 409-11; *see also* Thiebaud Report at 5.

[105]      *See supra* ¶ 74.

specifically, the Trustee must demonstrate with sufficient certainty that (i) LBI's insolvency proceedings were directly caused by a fault committed by the GP Managers (*e.g.*, their alleged "failure to manage" Basell in connection with the approval of the Merger); and independently, (ii) the existence, extent, and certainty of the harm suffered as a result of the GP Manager's specific fault. For instance, the Trustee cannot simply state that the GP Managers are liable for all losses allegedly caused by the approval of the Merger. He must, to the contrary, provide a detailed calculation of the actual costs and losses incurred as a result of the GP Manager's fault. Moreover, as part of that damages calculation, he must subtract any profits or gains that LBI would not have obtained but for the approval of the Merger.

## IV. ANALYSIS OF THE COUNT VII CLAIMS PLEADED AGAINST THE MEMBERS OF THE SUPERVISORY BOARD BY THE TRUSTEE

118. In Count VII of the Complaint, the Trustee also asserts claims against the members of the LBI Supervisory Board under Article 59 ¶¶ 1 or 2, and (in the alternative) under Articles 1991 to 1997.[106]

119. As described above, the Supervisory Board, which was initially comprised of Messrs. Blavatnik, Kassin, Floor, Potter, and Benet, performed the function of the "statutory auditor" of LBI, principally responsible in that role for supervising the preparation of LBI's financial statements and management's compliance with applicable law, including LBI's articles of association. Actual management authority in LBI was not, as a matter of Luxembourg law, within the mandate of the Supervisory Board, but rather exclusively within the mandate of LBI's general partner (renamed after the Merger as LyondellBassell AFGP S.à r.l., and referred to herein as the LBI GP). None of the members of the Supervisory Board served as members of the LBI GP.

120. The Trustee's post-Merger Supervisory Board claim is predicated on the allegedly "deleterious decisions" made by LBI to "upsize the ABL Facility and . . . approv[e] . . . the Access Revolver."[107] Notably, the Trustee does not allege that the acts approving these decisions were taken by the Supervisory Board; rather, they were taken by the GP, acting through its managers.

121. Nevertheless, the Trustee advances the theory that the members of the Supervisory Board are subject to liability under Article 59 for failing to exercise their "veto rights" under LBI's articles of association to block the ABL upsizing and Access Revolver. And in his report, Mr. Thiebaud opines that this theory, if proved, could supply a basis for liability under Luxembourg law.[108]

122. For the reasons set forth below, I am of the strong opinion that the Trustee's theory, and Mr. Thiebaud's opinion, rely on a fundamental misapprehension of Luxembourg law

---

[106]    Second Amended Complaint ¶¶ 427-30.

[107]    *Id.* ¶ 427.

[108]    Thiebaud Report at 48.

on the role (and attendant liabilities) of a statutory auditor generally and of the Supervisory Board of LBI specifically.  The Supervisory Board's mandate (*i.e.*, to "supervise") does not amount to a "veto right" over management acts, much less confer any authority to engage in management acts, and relevant decisional authority does not regard it as such.  To the contrary, the supervisory mandate is understood by the Luxembourg courts as an "advisory" or "oversight" role over designated management activity; the only liability that may therefore attach is for a failure of diligence in *overseeing* those designated management acts.

### A.    The Trustee Does Not Fulfill the Required Elements for Liability Under Article 59 ¶¶ 1 or 2

123.    The Trustee invokes both subsections of Article 59 in respect of his allegations against the Supervisory Board.  To prevail on a claim under Article 59 ¶ 1, the Trustee bears the burden of proving each of the following elements:  (i) that the member of the Supervisory Board failed to execute his supervisory mandate (as set forth in the Company Law and LBI's articles of association) as a reasonably diligent statutory auditor would in like circumstances; (ii) that there was direct, personal, and certain damage caused to LBI; and (iii) that such damage was proximately caused by the member's failure to perform his mandate.

124.    The Trustee's claim under Article 59 ¶ 2 also requires proof of three elements, the last two of which are identical to (ii) and (iii) above.  The first prong, however, is slightly different:  as described *supra* Section III.A.2, the Trustee must prove that (i) the member of the Supervisory Board committed a violation of a *mandatory* prescription of the Company Law or of LBI's articles of association.

#### 1.    *Supervisory Board Liability Under Article 59 ¶ 1 Liability Requires a Successful Demonstration of a Failure to Execute the Supervisory Mandate*

125.    As stated above, LBI is organized as an S.C.A., or a corporate partnership limited by shares.  The management and supervisory mandates of an S.C.A. are expressly delineated in the Company Law.  Pursuant to Article 107 of the Company Law, management authority of an S.C.A. resides with its general partner.[109]  And pursuant to Article 109 of the Company Law, an S.C.A. must be "supervised" by a minimum of three statutory auditors,[110] whose principal function is to supervise the financial accounts of the company.[111]  Article 110 of the Company Law expressly provides, in addition, that "the supervisory board may give its advice on matters referred to it by the managers and may authorize acts which fall outside their [*i.e.*, the

---

[109]    Article 107 of the Company Law ("Management of the company is carried out by one or more members designated by the articles.") (**Ex. C**).

[110]    Article 109 of the Company Law (**Ex. C**).

[111]    A. STEICHEN, *Précis de droit des sociétés*, ed. Saint-Paul, 2006 (1st ed.), pp. 818-19 (annexed hereto as **Exhibit RR**); J.-P. WINANDY, *Manuel de droit des sociétés*, Legitech, 2012, p. 612 (annexed hereto as **Exhibit SS**).

managers'] powers."[112]

126.    Therefore, under the express terms of governing Luxembourg law, the supervisory mandate of the statutory auditors of an S.C.A. is limited to the giving of "advice" both on matters traditionally assigned to it (*e.g.*, the company's financial statements) and on matters "referred to it by the managers."  To be clear, even in the latter circumstance where a "nontraditional" matter is referred to them, the statutory auditors' role is strictly an advisory one; they may not perform or "veto" the management act under consideration and do not become "co-managers" of the company.[113]  To the contrary, the board of managers of the S.C.A. continues to have the sole management power over the company.  Should the board of managers disregard the advice rendered by the statutory auditors, the managers' act in contravention of that advice will be binding on third parties.  The only consequence for disregarding the advice of the statutory auditors is that, under certain circumstances, the board of managers (and not the statutory auditors) may be held liable for acting in breach of the company's articles of association.

127.    In light of the foregoing, the Trustee's allegations—endorsed by Mr. Thiebaud—that the Supervisory Board members could be liable for a failure to execute their mandate because they did not "exercise their veto rights" relies on a false predicate.  The Trustee points specifically to language in Article 16 of LBI's articles of association, which provides that certain management acts "shall be submitted by the managers to the Supervisory Board for prior approval."[114]  But this language, which is commonly adopted by Luxembourg S.C.A.s, is simply an application of Article 110 of the Company Law's provision that "the supervisory board may give its advice on matters referred to it by the managers and may authorize acts which fall outside their powers."[115]  Article 16 of LBI's articles of association does not confer any veto power on the Supervisory Board that would prevent the GP from taking management act in contravention of their advice, and no Luxembourg court would read it to do so.

128.    The Trustee's proposed interpretation is also directly contradicted by the preceding Article of LBI's articles of  association, which expressly limits the authority of the Supervisory Board according to the statutory scheme provided in the Company Law:

> The Supervisory Board shall carry out the permanent supervision of the management of the Company by the manager *(without being authorised to interfere with such management)*, including the supervision of its operations and the business of the company as well as its financial situation, including more in

---

[112]    Article 110 of the Company Law (**Ex. C**); A. STEICHEN, *op. cit.*, pp. 818-19 (**Ex. RR**); J.-P. WINANDY, *op. cit.*, p. 612 (**Ex. SS**).

[113]    A. STEICHEN, *op. cit.*, p. 819 (**Ex. RR**).

[114]    *See* Second Amended Complaint ¶ 392.

[115]    Article 110 of the Company Law (**Ex. C**).

particular its books and accounts . . .[116]

129.    Due to the limited scope of the mandate of statutory auditors under Luxembourg law, Article 59 ¶ 1 claims against them are exceedingly rare.  I am not aware of any allegation in the Second Amended Complaint (and Mr. Thiebaud cites none) that the Supervisory Board failed to render supervision over any management act for which their advice or oversight was referred.  Accordingly, I believe that the Trustee's claim against its members fails at this threshold.

130.    However, even assuming *arguendo* that the exercise of "veto rights" was within the mandate of the Supervisory Board, and hence could serve as a basis of liability under Article 59 ¶ 1, Luxembourg courts afford statutory auditors (like managers) a grant of discretion in the performance of their mandate.  Under this principle, a statutory auditor will not be held liable for an error of judgment,[117] and courts will only apply substantial deference (*contrôle marginal*) when assessing the performance of the statutory auditors—*i.e.*, here, the non-exercise of their alleged "veto rights."[118]

### 2.    *Supervisory Board Liability Under Article 59 ¶ 2 Requires Demonstrating a Breach of a Mandatory Obligation*

131.    To state a claim under Article 59 ¶ 2, as explained *supra* Section III.A.2, the Trustee must first prove that the members of the Supervisory Board breached a *mandatory* prescription of the Company Law or LBI's articles of association.  Mr. Thiebaud opines that the Supervisory Board's alleged failure to exercise their "veto rights" breaches Article 15 of LBI's articles of association and, if proved, would satisfy this requirement.[119]

132.    I believe that Mr. Thiebaud's opinion is inconsistent with the Article 59 ¶ 2 jurisprudence described in Section III.A.2.  The language cited by Mr. Thiebaud in Article 15 of LBI's articles of association provides only that "the Supervisory Board members shall be solely guided by the corporate interest of the Company and shall not be bound by any instruction or order of any shareholder."[120]  This provision does not provide a basis for liability because it does not impose a mandatory obligation on the Supervisory Board to exercise their veto right under *any* circumstance, much less the one alleged.  Moreover, as explained above, substantial deference is granted to decisions of the Supervisory Board in the exercise of their mandate under Article 15 of LBI's articles of association.

---

[116]    Article 15 of LBI's articles of association (emphasis added) (annexed hereto as **Exhibit TT**).

[117]    H. ARVIS, "*Le régime général de responsabilité civile des dirigeants de sociétés commerciales au Luxembourg*", *D.A.O.R.*, 2010/96, p. 413 (annexed hereto as **Exhibit UU**).

[118]    Court of Appeal, October 1, 1997, No. 12583, 12771, 12859, 12896 and 20243, *Legicorp* ID: 17898 (**Ex. G**).

[119]    Thiebaud Report at 46-48.

[120]    *Id.* at 46-47 (quoting Article 15 of LBI's articles of association (**Ex. TT**)).

### 3. *Supervisory Board Liability Under Article 59 ¶¶ 1 or 2 Requires Demonstrating that the Supervisory Board's Failure to Exercise Their Alleged "Veto Rights" Was the Proximate Cause of Damages to LBI*

133.    Under either of Article 59 ¶¶ 1 or 2, the Trustee must independently prove that the Supervisory Board's failure to exercise their alleged veto rights proximately caused damages to LBI.  But to the extent that the Trustee's has alleged a viable theory of damages, the proximate cause of such damages cannot be found in the failure of the members of the Supervisory Board to exercise their alleged "veto rights," but rather from the management decisions taken by the GP, which, as described above, retains the exclusive power to legally bind the company.

### B.    Articles 1991 to 1997 Do Not Provide an Independent Basis of Liability

134.    The Trustee's claim against the members of the Supervisory Board is asserted, in the alternative, under Articles 1991 to 1997.  I do not dispute Mr. Thiebaud's suggestion that to the extent that Mr. Blavatnik and/or Mr. Kassin served as members of the Supervisory Board of LBI after the Merger (as alleged), they acted as agents of LBI and thus their conduct would fall within the ambit of Articles 1991 to 1997.  However, as described *supra* Section I.C, inasmuch as Articles 1991 to 1997 do not expand or modify their obligations or liabilities under Article 59, and the Trustee has failed to state an Article 59 claim (as explained above), it follows *a priori* that he cannot prevail on a claim under Articles 1991 to 1997.


[Report continues on following page.]

## SUPPLEMENTATION

135.    I have based my opinion and analysis contained in this report on documents and information available to me at the time I signed this report.  I reserve the right to supplement or amend this report if additional facts and information that affect my opinion become available.

136.    I am also prepared to testify and express my opinion on related issues or matters (i) raised on cross-examination, (ii) necessary to rebut any other matters testified to or by other experts or raised by other experts in expert witness reports or depositions, and (iii) otherwise raised at trial, by counsel, or by the Court in relation to the matters set forth therein, including any related issues or matters raised in these proceedings.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 22, 2016

_____
Alex Schmitt

# APPENDIX 1

**ALEX SCHMITT**

Nationality Luxembourgish
Born in Luxembourg, 24 March 1953

**Professional Qualifications**

- Attorney, Luxembourg Bar
- Attorney, Brussels Bar
- Senior Partner of BONN & SCHMITT, Luxembourg
- Lecturer at the Faculty of Law, Université Libre de Bruxelles
- Lecturer at the Université de Luxembourg

**Professional Experience**

| | |
|---|---|
| 2012 to present | BONN & SCHMITT, AVOCATS, LUXEMBOURG |
| | Senior Partner |
| 2000-2011 | BONN SCHMITT STEICHEN, AVOCATS, LUXEMBOURG |
| | Managing Partner |
| 1988-1999 | BONN & SCHMITT, AVOCATS, LUXEMBOURG |
| | Founding Partner |
| 1981-1982 | GRAUBARD MOSKOVITZ MC GOLDRICK DANNETT & HOROWITZ |
| | New York, USA |
| | Lawyer |
| 1979-1980 | DE BANDT VAN HECKE VAN GERVEN LAGAE & VAN BAEL |
| | Brussels, Belgium |
| | Attorney |
| 1978-1979 | EUROPEAN COMMISSION |
| | Lawyer |
| | Corporate Law Department |

**Diplomas**

- Graduate Degree in Law (*Licence en Droit*), with Distinction,     1973-1978
  University Libre de Bruxelles

- Post Graduate Degree in European Law (*Licence en Droit*),     1978-1980
  with Distinction, University Libre de Bruxelles (Institute of
  European Studies)

- *Master of Laws (LL.M)*, Harvard Law School, Cambridge, MA          1980-1981
  (United States of America)

**Languages**

- French, English, German, Luxembourgish, Italian

**Other Activities**

- Member of the OPC Committee of the Commission for the Supervision of the Financial Sector (*Commission de Surveillance du Secteur Financier*), Luxembourg
- Member of the Securitisation Committee of the Commission for the Supervision of the Financial Sector (*Commission de Surveillance du Secteur Financier*), Luxembourg
- Member of the Panel of Conciliators and Arbitrators for the International Centre for Settlement of Investment Disputes (ICSID), Washington D.C. (United State of America)

**Mandates**

- Board Member Mediobanca International (Luxembourg) S.A.
- Board Member ING Luxembourg S.A
- Board Member Eurizon Capital S.A.
- Board Member Nordea 1, SICAV
- Board Member Mandarin Capital Management S.A.
- Board Member Mandarin Capital Management II S.A.
- Board Member Eurofundlux, Euromobiliare International Fund Sicav
- Board Member Credem International (Lux) S.A.
- Board Member BG SICAV
- Board Member BG SELECTION SICAV
- Board Member BG DRAGON CHINA
- Board Member BG Fund Management Luxembourg S.A.
- Board Member Fideuram Bank (Luxembourg) S.A.
- Board Member Interfund SICAV
- Board Member Hottinger & Cie Groupe Financière Hottinguer S.A.
- Board Member UBI Management Company S.A.
- Board Member Mediaset Investment S.à r.l.
- Board Member Groupe Electa S.A.
- Board Member Italtriest International S.A.
- Board Member Samarc S.A.
- Board Member Samor S.A.

- Board Member Samorfin S.A
- Board Member International Car Business Participations S.A.
- Board Member Taufin International S.A.
- Board Member Sedge Investments SPF S.à r.l.
- Board Member Platines Holding SPF S.à r.l.
- Board Member Altera Investment Fund SICAV-SIF
- Board Member penola investo SIF management company S.A.
- Board Member DeA Communications S.A.
- Board Member Gemina Fiduciary Services
- Board Member De Agostini Invest S.A.
- Board Member B&D Finance S.A.
- Board Member Finlabo Investments Sicav
- Board Member BG Alternative Sicav-Sif

Luxembourg, 16 August 2016.

# Designation No. 888

# Robert Young, Apr. 15, 2011 Expert Report



*Robert Young, Apr. 15, 2011 Expert Report at 30*

# Designation No. 889

# Basell December 2006 Controlling Report (PP Europe)



*DX-560*

**Polyolefins Business Europe**

## PP Europe - Business & Financial Performance -

| Results in € mln | Dec 06 | Nov 06 | Variance vs. LY | Variance vs. Plan | Dec 06 CY | Variance CY |
|---|---|---|---|---|---|---|
| Total sales volumes (kton) | 212 | 234 | 24 | | 2745 | |
| Total Revenues | 246 | 283 | 34 | | 3180 | |
| Variable Costs | | | | | | |
| Contribution Margin | 21 | 34 | | | 403 | |
| Fixed costs | | | | | | |
| EBITDA | 2 | 15 | | | 191 | |
| Cash Flow | | 11 | | | 123 | |
| Contribution Margin (€/ton) | 101 | 145 | | | 147 | |
| DSO (days) | 44 | 42 | | | 44 | |
| DOH (days) | 27 | 25 | | | 27 | na | na | 33 |

Total Sales Volume (kton), Dec. 06 CY:  2,745

Total Revenues (€):  3,180

Per Unit Revenues ($/ton): 3,180/(2,745/1000) x 1.2364
(2006 avg. €/$ exchange rate) =  1,432

Basell Controlling Report:  (1,487-1,432)/1,487 x 100% =
**3.7% Discount to CMAI Marker Price**

<u>Compare</u> to Witte Report (Nov. 7, 2009) at 73:



*PX-804*

| PP | Units | 2006 |
|---|---|---|
| Polypropylene, West Europe, Contract-Market, Delivered | $/ton | 1487 |
| Actual Transaction Price | $/ton | 1353 |
| CMAI Due Diligence Model Forecast Transaction Price | $/ton | |
| *Discount to CMAI Marker Price* | % | -9.0% |
| CMAI Due Diligence Model Forecast Cash Cost | $/ton | |
| CMAI Due Diligence Model Forecast Cash Margin | $/ton | |

Witte's CIMBal Model:  **9% Discount to CMAI Marker Price**

**DX-0821**

# Designation No. 890

# Basell Polypropylene Capacity Assumptions:
## CMAI (2007) vs. CMAI (2009)

| CMAI CCA (Nov. 2007) | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Berre | 350 | 350 | 350 | 350 |
| Brindisi | 420 | 445 | 495 | 495 |
| Carrington | 210 | 210 | 210 | 210 |
| Ferrara | 185 | 185 | 185 | 185 |
| Hurth-Knapsack | 250 | 250 | 250 | 250 |
| Tarragona | 390 | 390 | 390 | 390 |
| Terni | 250 | 250 | 250 | 250 |
| Wesseling | 460 | 460 | 460 | 460 |
| **Total** | **2515** | **2540** | **2590** | **2590** |

*DX-0217*

| WITTE (2009) | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Berre | 310 | 310 | 310 | 310 |
| Brindisi | 420 | 420 | 420 | 420 |
| Carrington | 180 | 180 | 180 | 180 |
| Ferrara | 180 | 180 | 180 | 180 |
| Hurth-Knapsack | 250 | 250 | 250 | 250 |
| Tarragona | 340 | 340 | 340 | 340 |
| Terni | 250 | 250 | 250 | 250 |
| Wesseling | 460 | 460 | 460 | 460 |
| **Total** | **2390** | **2390** | **2390** | **2390** |

*Outlook Comparison.xls*

**DX-0822**

# Designation No. 891

# Basell Polypropylene Capacity (2007 CIM)

|  | |
|---|---|
| **Production Site** | **PP Capacity**<br>**(in millions of pounds)** |
| Aubette (France)......................................... | 770 |
| Brindisi (Italy) ............................................ | 930 |
| Carrington (UK) .......................................... | 460 |
| Ferrara (Italy) ............................................. | 400 |
| Fos (France) .............................................. | 0 |
| Frankfurt (Germany)..................................... | 0 |
| Knapsack (Germany) ................................... | 550 |
| Münchsmünster (Germany) ......................... | 0 |
| Tarragona (Spain) ....................................... | 795 |
| Terni (Italy)................................................. | 540 |
| Wesseling (Germany) .................................. | 1,015 |
| **Total Capacity:**........................................ | **5,460** |

**basell / LYONDELL**

Merger

$2,150,000,000 Asset Based Loan Facilities

Confidential Information Memorandum
Public Side Presentation

5,460 ÷ 2.204  = 2,477 ktonnes

*JX-0026.094*

**DX-0823**

# Designation No. 892

# 2007 LRP vs. Refreshed Projections (2007-2011)

| EBITDA | LRP | Refreshed | Change | % Change |
|---|---|---|---|---|
| Refining | $6,074 | $7,549 | $1,475 | 24.3% |
| EC&D | 4,441 | 3,922 | -519 | -11.7% |
| PO&RP | 3,410 | 3,344 | -66 | -1.9% |
| **Total** | **$13,925** | **$14,815** | **$890** | **6.4%** |

*DX-0032.003 & JX-0019.075*

**DX-0825**

# Designation No. 893

# 2007 Basell Projected and Actual EBITDA

*($ in millions)*



| 2007 PROJECTED | | 2007 ACTUAL |
|---|---|---|
| **Basell Business Plan** | **CIM (Oct. 2007)** | **2007 ACTUAL** |
| 1,269 | 1,755 | 1,977 |

*PX-057.0012*

*JX-0019.068*

*DX-0295.003*

**DX-0826**

# Designation No. 894

## Model Stress Test
### Cash EBITDA Required to Maintain Desired Minimum Liquidity of $1.4 billion ($ in millions)

| OIL PRICE SCENARIOS | 2008 | 2009 | 2010 | 2011 | CUMULATIVE |
|---|---|---|---|---|---|
| Model Oil @ $91.7 | 2,886 | 3,061 | 3,123 | 2,969 | 12,040 |
| Model Oil @ $100 | 3,046 | 3,061 | 3,123 | 2,969 | 12,200 |
| Model Oil @ $115 | 3,336 | 3,061 | 3,123 | 2,969 | 12,490 |
| Model Oil @ $130 | 3,736 | 3,061 | 3,123 | 2,969 | 12,890 |
| Model Oil @ $145 | 4,181 | 3,061 | 3,123 | 2,969 | 13,335 |
| **Projections** | **5,223** | **4,697** | **4,329** | **4,130** | **18,378** |

**Defendant Exhibit**
**DX-0851**
**Case No. 09-1375 (MG)**

*DX808, Kearns Report 11/07/2009 at 42*

2

**DX-0851.01**

# Designation No. 895

# Model Stress Test
## Cash EBITDA Required to Maintain Desired Minimum Liquidity of $1.4 billion ($ in millions)

| OIL PRICE SCENARIOS | 2008 | 2009 | 2010 | 2011 | CUMULATIVE |
|---|---|---|---|---|---|
| Model Oil @ $91.7 | 2,886 | 3,061 | 3,123 | 2,969 | 12,040 |
| Model Oil @ $100 | 3,046 | 3,061 | 3,123 | 2,969 | 12,200 |
| Model Oil @ $115 | 3,336 | | | 2,969 | 12,490 |
| Model Oil @ $130 | 3,736 | | | 2,969 | 12,890 |
| Model Oil @ $145 | 4,181 | | | 2,969 | 13,335 |
| **Projections** | **5,223** | | | 4,130 | 18,378 |

3,736/5,223 = 72%

*DX808, Kearns Report 11/07/2009 at 42*

**Defendant Exhibit**
**DX-0852**
**Case No. 09-1375 (MG)**

DX-0852.01

3

# Designation No. 896

## Cash EBITDA Required to Maintain Desired Minimum Liquidity
## (Expressed as a Percentage of the Projections)

*(% of Projections)*

| OIL PRICE SCENARIOS | 2008 | 2009 | 2010 | 2011 | CUMULATIVE |
|---|---|---|---|---|---|
| Model Oil @ $91.7 | 55% | 65% | 72% | 72% | 66% |
| Model Oil @ $100 | 58% | 65% | 72% | 72% | 66% |
| Model Oil @ $115 | 64% | 65% | 72% | 72% | 68% |
| Model Oil @ $130 | 72% | 65% | 72% | 72% | 70% |
| Model Oil @ $145 | 80% | 65% | 72% | 72% | 73% |
| **Projections** | **100%** | **100%** | **100%** | **100%** | **100%** |

*DX808, Kearns Report 11/07/2009 at 43*

**Defendant Exhibit**
**DX-0853**
**Case No. 09-1375 (MG)**

4

**DX-0853.01**

# Designation No. 897

# Cash EBITDA Required to Maintain Senior Covenant Compliance

*($ in millions)*

|  | **2008** | **2009** | **2010** | **2011** | **CUMULATIVE** |
|---|---|---|---|---|---|
| Cash EBITDA | $3,769 | $3,170 | $3,332 | $3,240 | $13,511 |
| % of Projections | 72% | 67% | 77% | 78% | 74% |
| Liquidity | 2,161 | 2,270 | 2,478 | 2,749 | |
| Excess over Minimum Liquidity | $761 | $870 | $1,078 | $1,349 | |

**Defendant Exhibit**
**DX-0855**
Case No. 09-1375 (MG)

*DX808, Kearns Report 11/07/2009 at 47*

6

**DX-0855.01**